**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC and JAMES FRANCE, <br><br> Defendants. | ORAL ARGUMENT REQUESTED <br><br> Public Redacted Version |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

    A.     NASCAR Exercises Monopoly Power in the Relevant Input Market ................... 2

    B.     The Exclusionary Conduct Engaged in By NASCAR to Maintain its
Monopsony Power. ...................................................................................... 2

    C.     Defendants Impose Anticompetitive Terms in the 2025 Charter
Agreements. ................................................................................................ 4

    D.     Plaintiffs Refused to Sign the 2025 Charter Agreements Because They
Would Not Risk Releasing Their Antitrust Rights. .................................................. 5

    E.     Plaintiffs Will Suffer Irreparable Harm without a Preliminary Injunction. ............ 6

ARGUMENT ......................................................................................................... 7

I.     Plaintiffs have a Likelihood of Success on the Merits ............................................ 7

    A.     Defendants Possess Monopoly Power in the Relevant Input Market .................... 8

    B.     Defendants Have Willfully Maintained Their Monopoly Power .......................... 9

    C.     Plaintiffs Can Show Antitrust Injury .................................................................. 11

II.     Plaintiffs Will Suffer Irreparable Harm ............................................................. 11

III.     The Balance of the Equities Favor an Injunction ................................................. 14

IV.     The Public Interest Weighs in Favor of an Injunction ......................................... 14

CONCLUSION ..................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
    910 F.2d 139 (4th Cir. 1990) .................................................8

*In re Am. Express Merchants' Litig.*,
    667 F.3d 204 (2d. Cir. 2012), *rev'd on other grounds*, 570 U.S. 228 (2013).........................11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)...........................................................8, 10

*Brady v. Nat'l Football League*,
    779 F. Supp. 2d 992 (D. Minn.), *abrogated on other grounds*, 644 F.3d 661
    (8th Cir. 2011)...................................................................13

*Carter v. Twentieth Century-Fox Film Corp.*,
    127 F. Supp. 675 (W.D. Mo. 1955) ......................................11

*Coastal Lab'ys, Inc. v. Jolly*,
    2021 WL 1599224 (D. Md. Apr. 23, 2021) ...........................7

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) ......................................8, 9, 10

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ..............................................9

*Eco Fiber Inc. v. Vance*,
    2024 WL 3092773 (W.D.N.C. June 21, 2024) (Whitney, J.) ...........................12, 13

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*,
    650 F.2d 495 (4th Cir. 1981) ..............................................13

*Ingram Corp. v. J. Ray McDermott & Co.*,
    698 F.2d 1295 (5th Cir. 1983) ............................................10

*Kentucky Speedway, LLC v. NASCAR*,
    2008 WL 113987 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908 (6th Cir. 2009) .....................8

*Marland v. Trump*,
    498 F. Supp. 3d 624 (E.D. Pa. 2020) ..................................12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)...........................................................11

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 ..................12

*Navient Sols., LLC v. United States*,
141 Fed. Cl. 181 (2018) .......................................................................................................12

*Novell, Inc. v. Microsoft Corp.*,
505 F.3d 302 (4th Cir. 2007) ..............................................................................................11

*Ohio v. NCAA*,
706 F. Supp. 3d 583 (N.D. W. Va. 2023) ...........................................................................14

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ................................................................................................7

*R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.*,
60 F. Supp. 2d 502 (M.D.N.C. 1999) ..................................................................................12

*Ramirez v. U.S. Immigr. & Customs Enf't*,
568 F. Supp. 3d 10 (D.D.C. 2021) ......................................................................................14

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020), *as amended* (Jan. 14, 2020) .................................................7

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York*,
749 F.2d 124 (2d Cir. 1984)................................................................................................14

*Sierra On-Line, Inc. v. Phx. Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984) ............................................................................................11

*Signature Flight Support Cor. v. Landow Aviation Ltd. P'ship*,
442 F. App'x 776 (4th Cir. 2011) ........................................................................................12

*Southtech Orthopedics, Inc. v. Dingus*,
428 F. Supp. 2d 410 (E.D.N.C. 2006).................................................................................13

*Starbucks Corp. v. McKinney*,
144 S. Ct. 1570 (2024) (Jackson, J. concurring in part and dissenting in part).....................14

*Tiffany v. Forbes Custom Boats, Inc.*,
1992 WL 67358 (4th Cir. Apr. 6, 1992) ..............................................................................11

*United States v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)..............................................................................................................9

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)...........................................................................................................8, 9

Case 3:24-cv-00886-FDW-SCR   Document 20-1   Filed 10/09/24   Page 4 of 23

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ................................................................................10

*Vitkus v. Blinken*,
79 F.4th 352 (4th Cir. 2023) ..................................................................................7

**Other Authorities**

*ARCA Signs 3-Year Broadcast Agreement with FOX Sports*, FOX SPORTS (Jan.
12, 2018), https://www.foxsports.com/presspass/blog/2018/01/12/arca-signs-
3-year-broadcast-agreement-fox-sports/. ...............................................................3

THE ATHLETIC (Sept. 8, 2024), https://www.nytimes.com/athletic/
5753700/2024/09/08/michael-jordan-nascar-23xi-front-row-charters/ ...................5

Fed. R. Civ. P. 3(b)(iv) .........................................................................................17

*ISC Completes Closing of Acquisition by NASCAR*, NASDAQ (Oct. 18, 2019),
https://www.nasdaq.com/press-release/isc-completes-closing-of-acquisition-
by-nascar-2019-10-18 ...........................................................................................3

Jeff Gluck and Jordan Bianchi, *Michael Jordan's 23XI, Front Row Motorsports
explain why they're NASCAR charter holdouts* .......................................................5

Matt Weaver, *NASCAR makes bold move to end charter negotiations but two
teams didn't budge*, SPORTSNAUT (Sept. 10, 2024),
https://sportsnaut.com/nascar-charter-update-michael-jordan-denny-hamlin-
no-deal/ ..................................................................................................................5

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.6(A)(2023) ......................10

YAHOO! SPORTS (Apr. 27, 2018), https://sports.yahoo.com/nascar-purchases-arca-
mean-185217538.html ...........................................................................................4

## PRELIMINARY STATEMENT

This is a case about Defendants' unlawful monopolization of premier stock car racing, and their abuse of that monopoly power to impose anticompetitive "take-it-or-leave-it" terms upon Plaintiffs and the other teams who hold charters that give them the right to compete in all NASCAR Cup Series races. Defendants presented these racing teams with a Hobson's choice: either accept a new 2025 Charter Agreement with monopsonistic terms designed to enrich Defendants at the expense of the teams and drivers—while also forcing the teams to "release" their antitrust rights—or lose their charters entirely, destroying their investments and threatening to drive them out of business. Plaintiffs are the only teams that stood up to Defendants' coercion and refused to sign the new Charter Agreement.

Plaintiffs have filed antitrust claims against Defendants to bring an end to their unlawful monopoly. However, if Plaintiffs cannot obtain charters for the 2025 season without giving up their antitrust rights, they will suffer severe and irreparable harm. They have brought this motion for a preliminary injunction so that they can continue to compete in Cup Series events under the terms of the 2025 Charter Agreements without risking forfeiture of their antitrust claims.

Plaintiffs easily meet the standards for preliminary relief. They have a likelihood of success of prevailing in their Sherman Act Section 2 claim that Defendants engaged in a series of exclusionary actions to maintain their monopoly in the relevant input market for premier stock car racing teams in the United States. They also will suffer irreparable harm if they are forced to either risk releasing their antitrust rights to break up the NASCAR monopoly or suffer the irreparable consequences of having to compete without a charter.

The balance of the equities tips decidedly in Plaintiffs' favor. Defendants will suffer no cognizable harm if Plaintiffs are permitted to compete during the pendency of this litigation under the terms of the 2025 Charter Agreements that NASCAR has offered to them. By contrast, without

the ability to compete with the assured racing slots in Cup Series events, Plaintiffs will suffer a host of irreparable harms, including the threatened loss of sponsors, drivers, goodwill, employees, and irreplaceable opportunities to compete. And the public interest favors allowing these popular teams to continue to compete in Cup Series events, while they prosecute antitrust claims that further the interests of not just racing teams, but also sponsors, broadcasters, communities, and fans.

## STATEMENT OF FACTS

### A.     NASCAR Exercises Monopoly Power in the Relevant Input Market

The France family and NASCAR have exercised monopsony power as the only premier stock car racing series in the United States. As set forth in the expert declaration of sports economist Dr. Rascher, because there are no competitive alternatives to NASCAR's Cup Series for a premier stock car racing team, NASCAR and the France family have been able to exercise their monopsony power to impose anticompetitive terms on the teams as the entry cost for competing. Rascher Decl. ¶¶ 6, 39, 66-86.

### B.     NASCAR's Exclusionary Conduct to Maintain its Monopsony Power.

Defendants have not acquired or maintained their monopoly power through superior skill or better products or prices. Instead, they have engaged in a series of exclusionary acts with the purpose and effect of maintaining their power. *Id*. ¶¶ 40-49.

First, Defendants have engaged in exclusionary acts to lock up the limited supply of top-tier racetracks capable of hosting premier stock car races. *Id*. ¶¶ 41-47. A track must be able to put on a high-quality event and have an opportunity to turn a profit, meaning, at a minimum, having a per-day capacity of ~25,000 spectators and meeting other requirements regarding safety, infrastructure, track surface, side-by-side racing capability, promotional pedigree, operational and mechanical facilities, insurance, and guest services capability, plus the experience and staffing

2

capability to successfully hold such an event. There are relatively few racetracks in the United States with these capabilities. Jenkins Decl. ¶¶ 12–17.

To block the entry of a potential competing stock car racing series, NASCAR has forced tracks it does not own to enter into exclusivity provisions as a condition of hosting a Cup Series race. Rascher Decl. ¶ 45. Defendants further cemented their control over the tracks needed to compete by spending $2 billion to acquire International Speedway Corporation ("ISC"), a company that owns about half the racetracks on the Cup Series schedule.[1] This gave Defendants the ability to directly exclude any other stock car racing series from having races at those tracks. Rascher Decl. ¶ 45.

Second, Defendants have engaged in exclusionary acts to force the chartered teams—that are independent contractors—to agree that they will ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████. Ex. 1, 2016 Charter Agreement § 6.6. This protects Defendants' monopoly by blocking the teams—who are best positioned to help form a rival premier racing series—from doing so. Rascher Decl. ¶¶ 48-49.

Third, Defendants acquired the Automobile Racing Club of America ("ARCA")—its one potential competitor with national exposure. When ARCA announced a renewed media deal that would "showcase our product to millions of viewers annually in the highest quality live television production format," reaching as many as 84.5 million homes,[2] Defendants were quick to purchase

---

[1] *ISC Completes Closing of Acquisition by NASCAR*, Nasdaq (Oct. 18, 2019), https://www.nasdaq.com/press-release/isc-completes-closing-of-acquisition-by-nascar-2019-10-18.

[2] *ARCA Signs 3-Year Broadcast Agreement with FOX Sports*, Fox Sports (Jan. 12, 2018), https://www.foxsports.com/presspass/blog/2018/01/12/arca-signs-3-year-broadcast-agreement-fox-sports/.

ARCA and relegate it to a feeder series for NASCAR, rather than allow it to continue growing into a competitor to the Cup Series.[3]  Rascher Decl. ¶¶ 13, 22.

Fourth, Defendants adopted anticompetitive terms with respect to the "Next Gen" cars that teams were required to use in Cup Series races beginning in 2022.  Under these restrictions, teams must purchase parts for the Next Gen car from NASCAR's hand-picked single-source suppliers.  *See, e.g.*, Ex. 1, 2016 Charter Agreement § 3.7; Ex. 3, NASCAR Rules § 14.1.  Further, after spending millions of dollars on these parts and cars, the teams ████████████████████████ ████████████████████████.  Rascher Decl. ¶¶ 53-59.

The combined effect of these exclusionary acts has been to maintain Defendants' monopoly power through anticompetitive means.  Rascher Decl. ¶ 37.

### C.  Defendants Impose Anticompetitive Terms in the 2025 Charter Agreements.

The 2016 Charter Agreements expire at the end of 2024, and the teams spent the last two years trying to negotiate with NASCAR to agree upon a fairer Charter Agreement.  But Defendants had a different plan.  They have used their monopsony power to force the teams to either accept onerous terms in the 2025 Charter Agreement, or face the prospect of losing their investments and having no charters at all.  Polk Decl. ¶ 29; Jenkins Decl. ¶¶ 32–36.

This culminated with NASCAR's "take-it-or-leave-it" offer on September 6, 2024.  Polk Decl. ¶ 29.  NASCAR sent the teams what it declared to be a "final" version of the 2025 Charter Agreement and gave them mere hours to either sign, without changes, or risk losing their charters entirely.  Lauletta Decl. ¶¶ 2-4.

---

[3] *NASCAR purchases ARCA: What does it mean?*, YAHOO! SPORTS (Apr. 27, 2018), https://sports.yahoo.com/nascar-purchases-arca-mean-185217538.html.

NASCAR exercised its monopsony power to impose one-sided economic terms that were far less than the teams could have obtained in a competitive market. Rascher Decl. ¶¶ 69-80; Polk Decl. ¶¶ 21–29. Among other things, the 2025 Charter Agreement: does not provide a fair split of revenues so that the teams do not have a reasonable chance to earn a return on their investment; seizes control over team intellectual property rights (to be used for NASCAR's benefit); does not provide permanent charters so that teams can maximize enterprise value; and does not give teams the ability to resist NASCAR rules that increase team costs. *See* Ex. 2, 2025 Charter Agreement §§ 2, 4, 5.14; Polk Decl. ¶ 22; Jenkins Decl. ¶ 28.

Without any competitive alternative, all teams but Plaintiffs succumbed to Defendants' monopsony power and signed the 2025 Charter Agreements. One team owner said he signed "under duress" and another said that the signing was "coerced."[4] Another was more graphic: "They put a gun to our head and we had to sign."[5]

### D. Plaintiffs Refused to Sign the 2025 Charter Agreements Because They Would Not Risk Releasing Their Antitrust Rights.

Plaintiffs each own two expiring 2016 Charter Agreements and have contractual agreements to purchase a third Charter Agreement that remain in escrow. Polk Decl. ¶ 9–14; Jenkins Decl. ¶¶ 5, 9. Plaintiffs are not willing to let Defendants continue to use their monopsony power to injure them and the rest of the industry. They have accordingly filed this lawsuit to restore competition. Polk Decl. ¶ 30–31; Jenkins Decl. ¶ 36.

---

[4] Matt Weaver, *NASCAR makes bold move to end charter negotiations but two teams didn't budge*, SPORTSNAUT (Sept. 10, 2024), https://sportsnaut.com/nascar-charter-update-michael-jordan-denny-hamlin-no-deal/.

[5] Jeff Gluck and Jordan Bianchi, *Michael Jordan's 23XI, Front Row Motorsports explain why they're NASCAR charter holdouts*, THE ATHLETIC (Sept. 8, 2024), https://www.nytimes.com/athletic/5753700/2024/09/08/michael-jordan-nascar-23xi-front-row-charters/.

The 2025 Charter Agreement includes a mandatory provision that Defendants contend would release the antitrust claims of any team that signs the Agreement.



Ex. 2, 2025 Charter Agreement § 10.3. While these release terms are not a model of clarity, Plaintiffs could not sign the 2025 Charter Agreement and risk forfeiting their antitrust rights. Polk Decl. ¶ 31; Jenkins Decl. ¶ 36.

As Dr. Rascher explains, including the mandatory release in the 2025 Charter Agreement to attempt to shield Defendants from an antitrust claim by the victims most likely to challenge Defendants' monopoly is another exclusionary action designed to maintain Defendants' monopsony power. Rascher Decl. ¶¶ 64-65.

### E. Plaintiffs Will Suffer Irreparable Harm without a Preliminary Injunction.

Without preliminary relief, Plaintiffs will be irreparably harmed. On the one hand, if Plaintiffs were to sign the 2025 Charter Agreement without an injunction against Defendants' enforcement of the release, they would run the risk of losing their antitrust rights.

On the other hand, if Plaintiffs continue to decline to enter into the 2025 Charter Agreement to preserve their antitrust claims, their only option will be to compete as "open" teams with no assurance of a spot in any Cup Series race. This will lead to the irreparable harm of possibly losing irreplaceable drivers, sponsors, goodwill, employees, and competitive opportunities. It will also cause Plaintiffs to lose ████████ of dollars in revenue each season, threatening the existence of their racing teams. Polk Decl. ¶ 34; Jenkins Decl. ¶ 46.

**ARGUMENT**

A plaintiff seeking a preliminary injunction "must demonstrate that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). "Crafting a preliminary injunction is an exercise in discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Coastal Lab'ys, Inc. v. Jolly*, 2021 WL 1599224, at *6 (D. Md. Apr. 23, 2021).

Plaintiffs ask the Court to preserve the status quo during the pendency of this litigation by issuing a preliminary injunction that would: (1) allow Plaintiffs to continue to compete as chartered teams, as they have done for years, by racing under the terms of the 2025 Charter Agreement NASCAR offered to them; and (2) enjoin Defendants from enforcing Section 10.3 of those Charter Agreements as a claimed release of the antitrust claims Plaintiffs are pursuing.[6]

## I. **Plaintiffs have a Likelihood of Success on the Merits**

"[P]laintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits," but "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). Plaintiffs can obtain the requested preliminary injunction by showing that it will likely prevail on one of its claims. *See Roe v. Dep't of Def.*, 947 F.3d 207, 234 (4th Cir. 2020), *as amended* (Jan. 14, 2020).

Plaintiffs will likely succeed on their claim for unlawful monopolization. A Section 2 violation requires: "(1) the possession of monopoly power in the relevant market and (2) the

---

[6] Plaintiffs further believe that Section 10.3 does not clearly extend to Plaintiffs antitrust claims. Accordingly, the Court could declare that the release does not apply, which would also permit Plaintiffs to sign the 2025 Charter Agreement while pursuing their antitrust rights.

willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). "[A] monopolist violates [Section] 2 when it use[s] [its] monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024) (internal quotations omitted). Courts evaluating Section 2 claims must determine if plaintiffs can prove that the defendants acquired or maintained their monopoly power through exclusionary acts rather than legitimate competition. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (conduct is predatory if it "attempt[s] to exclude rivals on some basis other than efficiency"); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990) ("key to distinguishing legal exclusion from improper, or predatory, exclusion is whether the exclusion was based on superior efficiency").

## A. Defendants Possess Monopoly Power in the Relevant Input Market

The relevant market for Plaintiffs' Section 2 claim is the input market for premier stock car racing teams in the United States. Premier stock car racing is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes.[7] Rascher Decl. ¶¶ 19-30.

NASCAR's Cup Series is the only premier stock car racing series in the United States. As a result, NASCAR is the only purchaser with a 100% market share. Rascher Decl. ¶ 31. This

---

[7] In a prior antitrust action against NASCAR, the plaintiff alleged a relevant *output* market for stock car racing to fans and did not prove that other forms of racing did not compete with stock car racing. *Kentucky Speedway, LLC v. NASCAR*, 2008 WL 113987, at *4 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908 (6th Cir. 2009). Here, by contrast, Plaintiffs are alleging an input market for stock car racing teams for which no other type of racing is a substitute. Just as football players can only compete for a professional football team—whether or not football competes with other sports for fans—a stock car racing team can only compete in stock car racing events. *See* Rascher Decl. ¶¶ 27-30.

easily meets the test for proving monopoly power (called monopsony power in an input market).
*See Grinnell Corp.*, 384 U.S. at 571; *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (monopolization found where "defendant controlled seventy to one hundred per cent of the relevant market"); *Duke Energy*, 111 F.4th at 353 (monopoly power not at issue "given [defendant's] durably high market share, which stands at or approaching 90%") (internal quotations omitted). Further, Defendants have exercised that power to exclude all competitors, which is itself evidence of monopoly power. *See, e.g.*, Rascher Decl. ¶¶ 21, 31-36, 42, 48; *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("Monopoly power is the power to control prices or exclude competition.").

### B. Defendants Have Willfully Maintained Their Monopoly Power

As Dr. Rascher shows, Defendants have not maintained their monopsony power through superior skill or business acumen. Instead, at France's direction, NASCAR has engaged in a series of exclusionary acts to block competition and maintain monopoly power. Rascher Decl. ¶¶ 37-65. These exclusionary acts include: (a) NASCAR's acquisition of, and exclusive agreements with, top-tier tracks to deny competitors access to this essential resource; (b) restrictive covenants preventing independent contractor charter teams from competing in non-NASCAR stock car racing events; (c) restrictive provisions preventing use of Next Gen cars and parts in non-NASCAR events; (d) the acquisition of ARCA to eliminate potential competition; and (e) the use of the mandatory release provision in the 2025 Charter Agreement to block charter teams, the most efficient enforcers of the antitrust laws, from challenging NASCAR's monopoly. *Id.* ¶¶ 13, 37-65. As the Fourth Circuit has explained:

> In a monopolization case conduct must always be analyzed "as a whole." A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim.

*Duke Energy*, 111 F.4th at 355 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 310c7 (4th and 5th eds. 2024)).

Here, NASCAR has engaged in a combination of exclusionary acts to maintain its monopoly power:  acquiring ISC to control almost half of the Cup Series racetracks; acquiring ARCA to eliminate a potential competitor; imposing no-competition covenants on the chartered race teams; and requiring those teams to race through Next Gen cars that are banned from being used in any non-NASCAR events.  Rascher Decl. ¶¶ 13, 37-65.

It is well-established that it violates Section 2 to acquire or maintain power through an acquisition, Areeda & Hovenkamp ¶ 701 (5th ed. 2024) ("a monopolist's acquisition of a 'likely' entrant into the market … is presumptively anticompetitive"), or through restrictive covenants that deny a competitor access to the resources—here the teams and drivers and tracks—needed to compete.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (refusal to provide competitor access to resource needed to compete constituted unlawful monopolization); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("[A] monopolist's use of exclusive contracts … may give rise to a [Section] 2 violation").  Here, there is a limited supply of top-tier tracks and NASCAR has them under its control.  Rascher Decl. ¶¶ 42-47.  The use of acquisitions to maintain a monopoly are a quintessential example of an exclusionary act.  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.6(A)(2023).

Defendants have also imposed their mandatory release to shield their monopoly position from legal attack.  Such a coerced release of antitrust claims is itself a Section 2 violation when engaged in by a monopolist to preserve its power.  *See Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1315 (5th Cir. 1983) ("another case may someday arise where the release itself was an integral part of a scheme to violate antitrust laws and therefore will not be construed to

extinguish antitrust claims") (internal quotations omitted); *Carter v. Twentieth Century-Fox Film Corp.*, 127 F. Supp. 675, 680 (W.D. Mo. 1955) (release obtained as "another of the means used by the conspirator to accomplish the monopolistic result" may not be valid). Indeed, a release purporting to waive future antitrust claims is precluded as a matter of public policy. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (a prospective waiver of antitrust claims is "condemn[ed] … as against public policy"); *In re Am. Express Merchants' Litig.*, 667 F.3d 204, 214 (2d. Cir. 2012), *rev'd on other grounds*, 570 U.S. 228 (2013) ("[A] waiver of future liability under the federal antitrust statutes is void as a matter of public policy.").

### C. Plaintiffs Can Show Antitrust Injury

Finally, plaintiffs can show that there is a likelihood that they have suffered antitrust injury from the below-market terms imposed by Defendants through the exercise of their monopsony power in the 2016 and 2025 Charter Agreements. Rascher Decl. ¶¶ 68-80. These antitrust injuries flow directly from Defendants' unlawful monopolization. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007).

## II. Plaintiffs Will Suffer Irreparable Harm

Without a preliminary injunction, Plaintiffs face irreparable harm that is "actual and imminent" and "cannot be undone through monetary remedies" if they are forced to either risk forfeiting their rights under the antitrust laws or risk losing their irreplaceable sponsors, drivers, and competitive opportunities by competing as open teams without a charter. *Tiffany v. Forbes Custom Boats, Inc.*, 1992 WL 67358, at *8 (4th Cir. Apr. 6, 1992), *corrected* (Apr. 27, 1992).

The essential purpose of a preliminary injunction is "preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). Enjoining Defendants from enforcing the release so that Plaintiffs can compete under the

2025 Charter Agreements without risking the loss of their antitrust rights falls squarely within this objective.

Alternatively, if Plaintiffs have to compete as open teams, their irreparable injuries will also be severe. Polk Decl. ¶ 33–42; Jenkins Decl. ¶¶ 37–47. An open team is not assured any spot in a Cup Series race, and there is a risk that irreplaceable sponsors and drivers could abandon Plaintiffs if they have to compete as open teams and do not qualify for all of their races. Polk Decl. ¶¶ 35–38; Jenkins Decl. ¶¶ 37–47; Rascher Decl. ¶¶ 81-86. The potential loss of their star drivers would cause irreparable harm to Plaintiffs. *See Navient Sols., LLC v. United States*, 141 Fed. Cl. 181, 184 (2018). Similarly, the loss of goodwill with sponsors and fans due to not being able to compete in important races would constitute irreparable harm. *See Eco Fiber Inc. v. Vance*, 2024 WL 3092773, at *4 (W.D.N.C. June 21, 2024) (Whitney, J.) ("[T]he loss of goodwill in the relevant industry … [is] difficult to quantify in terms of money damages and thus may justify injunctive relief."); *Marland v. Trump*, 498 F. Supp. 3d 624, 641 (E.D. Pa. 2020) (finding irreparable harm where "Plaintiffs will lose the ability to engage with their millions of followers on TikTok, and the related brand sponsorships"); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 ("permanent loss of … goodwill" is "irreparable injury"); *Signature Flight Support Cor. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 784–85 (4th Cir. 2011) (affirming injunction where irreparable injuries included loss of goodwill); *R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.*, 60 F. Supp. 2d 502, 509 (M.D.N.C. 1999) (granting preliminary injunction when "[p]laintiffs [will] suffer irreparable injury in the form of lost goodwill and lost advertising opportunities, and incalculable harm to their respective competitive positions").

Indeed, without charters, Plaintiffs may not qualify for critical competitive opportunities, like the Daytona 500, that are essential for keeping goodwill with fans and earning enough revenues to keep afloat. Polk Decl. ¶¶ 39–40; Jenkins Decl. ¶¶ 39, 42; Rascher Decl. ¶¶ 82-83. Such lost opportunities to compete in a professional sport are unique injuries that damages cannot be remedy. *See, e.g.*, *Brady v. Nat'l Football League*, 779 F. Supp. 2d 992, 1035 (D. Minn.), *abrogated on other grounds*, 644 F.3d 661 (8th Cir. 2011) ("irreparable harm has been found, and preliminary injunctive relief granted, in cases in which professional athletes' ability to play, or to play for their team of choice, was threatened") (collecting cases).

While Plaintiffs are determined to compete as open cars if necessary, the threat to the viability of their businesses in doing so is substantial. It costs at least ▮▮▮▮▮▮▮ in operational expenses alone just to outfit and get one car to the track. Jenkins Decl. ¶ 22. Plaintiffs project they will lose ▮▮▮▮▮▮ of dollars in revenues as open competitors. Polk Decl. ¶ 34; Jenkins Decl. ¶ 46. Sustaining such losses for a long period could threaten Plaintiffs' continued existence—further evidence of irreparable harm. *See Eco Fiber*, 2024 WL 3092773, at *4 (Whitney, J.) ("irreparable harm may [] exist where the moving party's business cannot survive absent a preliminary injunction"); *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) (finding irreparable harm where party "seeks to preserve its existence and its business"); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 418 (E.D.N.C. 2006) ("Generally, it is in cases where a defendant's conduct threatens to cripple or substantially alter a going concern that irreparable harm will be found….").

In addition, NASCAR has the power to exclude open competitors completely because the 2025 Charter Agreement allows it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 2, 2025 Charter Agreement § 3.2. The result is

that absent the ability to compete under the 2025 Charter Agreement, Plaintiffs will face the risk that NASCAR will eliminate open competition entirely.

## III.    The Balance of the Equities Favor an Injunction

The balance of equities strongly favors Plaintiffs because either their antitrust rights or their very existence will be threatened without a preliminary injunction, whereas the only "harm" that Defendants will incur is defending their antitrust violations. *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1585 (2024) (Jackson, J. concurring in part and dissenting in part) ("When evaluating the balance of the equities, district courts … are prohibited from crediting a party's desire to continue engaging in an alleged violation of the [law]."); *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 n.9 (D.D.C. 2021) (finding that there is "no proper interest in continuing to violate" the law).

Further, Defendants will not suffer harm if Plaintiffs are able to compete under the terms of the 2025 Charter Agreement (other than the mandatory release) that Defendants have offered to them. *See Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York*, 749 F.2d 124, 126 (2d Cir. 1984) ("equities tip decidedly in favor" of movant where it is "unlikely that [non-movant] will suffer greatly if the eleven-year relationship is continued" whereas "on the other hand, [movants] stand to lose their business forever").

## IV.    The Public Interest Weighs in Favor of an Injunction

Finally, blocking enforcement of the mandatory "release" will serve the public interest. Courts find that preliminary injunctions serve the public interest where the relief prevents a party from enforcing anticompetitive practices. *See, e.g.*, *Ohio v. NCAA*, 706 F. Supp. 3d 583, 600 (N.D. W. Va. 2023). The public will also be benefitted if Plaintiffs can continue to compete with charters, so that fans can come out to see the teams and drivers they support.

14

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Court issue the requested preliminary injunction.

Dated: October 9, 2024

Respectfully submitted,

WINSTON & STRAWN LLP

By: _/s/ Jeffrey L. Kessler_
Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

Jeanifer Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Matthew R. DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com

*Counsel for Plaintiffs 2311 Racing LLC d/b/a
23XI Racing and Front Row Motorsports Inc.*

## CERTIFICATE OF COMPLIANCE

This motion complies with the word limitation set forth in Rule 3(b)(iv) of the Standing Order Governing Civil Case Management Before the Honorable Frank D. Whitney because, excluding the parts of the document exempted by Rule 3(b)(iv), the Motion contains a total of 4,493 words.

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By:     */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

*Counsel for Plaintiffs 2311Racing LLC d/b/a*
*23XI Racing and Front Row Motorsports Inc.*

17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** was electronically filed using the Court's CM/ECF system, which will automatically send notice of this filing to counsel of record for all parties, and I caused an unredacted copy of the foregoing to be served on counsel of record for all parties, including:

> Tricia Wilson Magee
> Shumaker Loop & Kendrick, LLP
> 101 S. Tryon St., Suite 2200
> Charlotte, NC 28280
> tmagee@shumaker.com
>
> *Counsel for Defendants National Association for Stock Car Auto Racing, LLC and James France*

*Jeffrey L. Kessler*
_____
Jeffrey L. Kessler
