# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC and JAMES FRANCE <br><br> Defendants. | Civil Action No. 3:24-cv-886-FDW-SCR |

## [PUBLIC REDACTED VERSION]

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    FACTS ............................................................................................................2

     A.     NASCAR's Decades Of Investments ....................................................2

     B.     Teams Urge Creation Of The Charter System .......................................3

     C.     Two Years Of 2025 Charter Negotiations .............................................3

     D.     Plaintiffs ..............................................................................................4

III.   LEGAL STANDARD......................................................................................4

IV.    ARGUMENT .................................................................................................5

     A.     Plaintiffs' Requested Relief Is Extraordinary And Contradicts Their Complaint ...........................................................................................5

         1.     Plaintiffs' Requested Relief Disrupts The Status Quo..................5

         2.     Plaintiffs' Requested Relief Contradicts Their Complaint .........5

     B.     Plaintiffs Cannot Show Irreparable Harm............................................6

         1.     Any Claimed Injury From Enforcement Of The Release Is Not Irreparable.........................................................................6

         2.     Plaintiffs' Alleged Losses Of Goodwill Are Not Irreparable .....7

     C.     Plaintiffs Do Not Have A Likelihood Of Success .................................9

     D.     The Balance Of Equities And Public Interest Weigh Against An Injunction........15

V.     CONCLUSION................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ................................................................ 8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) .......................................................................... 11

*Auto Sunroof of Larchmont, Inc. v. Am. Sunroof Corp.*,
639 F. Supp. 1492 (S.D.N.Y. 1986) ........................................................ 9

*Bendfeldt v. Window World, Inc.*,
2017 WL 4274191 (W.D.N.C. Sept. 26, 2017) ............................................ 12

*Brady v. Nat'l Football League*,
779 F. Supp. 2d 992 (D. Minn.), *vacated*, 644 F.3d 661 (8th Cir. 2011) ................ 7

*Brantmeier v. Nat'l Collegiate Athletic Ass'n*,
2024 WL 4433307 (M.D.N.C. Oct. 7, 2024) (Eagles, C.J.) ............................ 1, 5

*Brookins v. Int'l Motor Contest Ass'n*,
219 F.3d 849 (8th Cir. 2000) ................................................................ 11

*Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*,
429 U.S. 477 (1977) .......................................................................... 15

*Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*,
605 F. Supp. 2d 870 (W.D. Ky. 2009) ...................................................... 14

*CSX Transportation, Inc. v. Norfolk S. Ry. Co.*,
114 F.4th 280 (4th Cir. 2024) .............................................................. 10

*Deal v. City of Monroe*,
2024 WL 4354718 (W.D.N.C. Sept. 30, 2024) (Whitney, J.) ............................ 8

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ............................................................ 6, 7

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991) ............................................................ 4, 6

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) .............................................................. 11

*Eco Fiber Inc. v. Vance*,
2024 WL 3092773 (W.D.N.C. June 21, 2024) (Whitney, J.) ............................ 8

*Geneva Pharmaceuticals Tech. v. Barr Labs*,
201 F. Supp. 2d 236 (S.D.N.Y. 2001) ........................................................... 12

*Hazardous Waste Treatment Council v. South Carolina*,
945 F.2d 781 (4th Cir. 1991) ...................................................................... 4

*Hughes Network Sys. v. InterDigital Commc'ns Corp.*,
17 F.3d 691 (4th Cir. 1994) ................................................................... 6, 8

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014) ...................................................................... 10

*In re Microsoft Corp. Antitrust Litig.*,
333 F.3d 517 (4th Cir. 2003) ................................................................. 6, 9

*Int'l Titanium Corp. v. Noel*,
282 F. Supp. 2d 376 (W.D.N.C. 2003) ....................................................... 7

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .................................................................... 13

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) .............................................................. 11, 14

*League of Women Voters of N.C. v. N.C.*,
769 F.3d 224 (4th Cir. 2014) ...................................................................... 5

*Loren Data Corp. v. GXS, Inc.*,
501 F. App'x 275 (4th Cir. 2012) ............................................................. 11

*M & H Tire Co. v. Hoosier Racing Tire Corp.*,
733 F.2d 973 (1st Cir. 1984) ................................................................... 11

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ......................................... 6, 9

*Maryland v. Trump*,
498 F. Supp. 3d 624 (E.D. Pa. 2020) ........................................................ 7

*MB Realty Grp., Inc. v. Gaston Cnty. Bd. of Educ.*,
2018 WL 3381427 (W.D.N.C. July 11, 2018) (Whitney, J.) .................... 15

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ...................................................................... 8

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) ..................................................................... 7

*N. Am. Soccer League, LLC v. United States Soccer Fed'n*,
   883 F.3d 32 (2d Cir. 2018) ................................................................................. 5

*Navient Sols., LLC v. United States*,
   141 Fed. Cl. 181 (2018) ...................................................................................... 7

*NHL Players' Ass'n v. Plymouth Whalers Hockey Club*,
   325 F.3d 712 (6th Cir. 2003) ........................................................................ 13, 14

*Omega World Travel, Inc. v. Trans World Airlines*,
   111 F.3d 14 (4th Cir. 1997) ............................................................................. 2, 6

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) ......................................................................................... 11

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
   636 F.3d 1150 (9th Cir. 2011) ......................................................................... 15

*PBM Prod., LLC v. Mead Johnson & Co.*,
   639 F.3d 111 (4th Cir. 2011) ........................................................................... 10

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
   872 F.2d 75 (4th Cir. 1989) ............................................................................... 7

*Ramsey v. Bimbo Foods Bakeries Distrib., Inc.*,
   2014 WL 3408585 (E.D.N.C. July 10, 2014) ................................................... 8

*Salt Lake Trib. Pub. Co. v. AT&T Corp.*,
   320 F.3d 1081 (10th Cir. 2003) ..................................................................... 5, 7

*Spacemax Int'l LLC v. Core Health & Fitness, LLC*,
   2013 WL 5817168 (D.N.J. Oct. 28, 2013) ...................................................... 8

*St. Luke's Hosp. v. ProMedica Health Sys.*,
   8 F.4th 479 (6th Cir. 2021) ............................................................................. 11

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ........................................................................................... 12

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998) ............................................................................. 14

*Turner v. Virginia Dep't of Med. Assistance Servs.*,
   301 F. Supp. 3d 637 (E.D. Va. 2018) ............................................................. 15

*United States v. Barile*,
   286 F.3d 749 (4th Cir. 2002) ............................................................................ 9

Case 3:24-cv-00886-FDW-SCR    Document 30    Filed 10/23/24    Page 5 of 25

*Verizon Commc'n Inc. v. Law Offices of Curtis v. Trinko, LLP,*
    540 U.S. 398 (2004) ................................................................................................. 10, 11

*Virginia Impression Prod. Co. v. SCM Corp.,*
    448 F.2d 262 (4th Cir. 1971) .................................................................................. 12

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Conn.,*
    108 F. Supp. 2d 549 (W.D. Va. 2000) .................................................................. 14

*VKK Corp. v. Nat'l Football League,*
    244 F.3d 114 (2d Cir. 2001) .................................................................................. 13

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................................... 4

*Z Techs. Corp. v. Lubrizol Corp.,*
    753 F.3d 594 (6th Cir. 2014) .................................................................................. 10

## STATUTES

15 U.S.C. § 15(b) ............................................................................................................ 10

## OTHER AUTHORITIES

P. Areeda & H. Hovenkamp, *Antitrust Law* (2017) ...................................................... 2

v

**BOTTOM LINE UP FRONT**

Plaintiffs' Motion—an attempt to force NASCAR into a contract on Plaintiffs' preferred terms—falls far short of meeting the demanding standard required for obtaining a mandatory injunction. The Motion seeks to change the status quo, not maintain it; is about money, not irreparable harm; and fails to show a likelihood of success on the merits. This lawsuit is not about protecting competition; it's a bid by Plaintiffs to secure more money than they could through arm's-length negotiations. The Motion should be denied.

## I. INTRODUCTION

Plaintiffs' Motion is a masterclass in contradiction. On one hand, Plaintiffs denounce the 2025 Charter as anticompetitive—despite it being the product of collective negotiations by racing teams that secured guaranteed Cup Series race spots and a far larger share of NASCAR's media revenues. On the other, Plaintiffs seek this Court's intervention to force NASCAR to offer Plaintiffs 2025 Charters so they can receive those exact same benefits—even though they rejected NASCAR's offer weeks ago. On top of that, Plaintiffs ask this Court to excise Section 10.3 (which provides NASCAR with a release from Charter teams), but ignore Section 10.4 (where NASCAR reciprocally releases claims). Plaintiffs also ignore that they *agreed to the same release* when acquiring 2016 Charters and never objected to it during two years of 2025 Charter negotiations. These contradictions expose Plaintiffs' motive: to use this Court to extract more money and better contractual terms from NASCAR.

Plaintiffs' Motion should be denied for multiple reasons. *First*, Plaintiffs seek a mandatory injunction—a disfavored form of relief "warranted only in the most extraordinary circumstances." *Brantmeier v. Nat'l Collegiate Athletic Ass'n*, 2024 WL 4433307, *1 (M.D.N.C. Oct. 7, 2024) (Eagles, C.J.). No extraordinary circumstances exist here: Plaintiffs had their chance to sign Charters but refused to take it. *Second*, Plaintiffs' demand for a 2025 Charter contradicts their

Complaint, which calls the Charter anticompetitive. This defies Fourth Circuit precedent, which firmly establishes that claiming a contract "violates the Sherman Act *cannot*, as a matter of law, support an injunction requiring [the defendant] to remain involuntarily in a contractual business relationship with [the plaintiff]." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 15 (4th Cir. 1997) (emphasis added). *Third*, Plaintiffs' alleged harm from not securing a Charter— the potential "loss of goodwill"—is far from irreparable; instead, it is self-inflicted, redressable with money damages, and neither certain nor imminent. Plaintiffs do not need Charters to race; indeed, they've already confirmed they will compete without Charters, as they have in the past. *Fourth*, Plaintiffs' antitrust claims are unlikely to succeed on the merits. Plaintiffs allege injuries from having to compete for racing positions and sponsorships, but those claimed harms are the exact opposite of *antitrust* injuries. Antitrust law protects *competition*—it does not require successful sports enterprises to admit every team that wants to participate or protect teams that do not want to compete. Areeda & Hovenkamp, *Antitrust Law* ¶2214a (2017) (Sports leagues "cannot have an antitrust duty to admit every member who has shown that it meets certain qualifications, imposing on a court the obligation to assess the latter."). *Finally*, using the Court to force NASCAR into a contract with Plaintiffs is neither equitable nor in the public interest.

## II.     FACTS

### A.     NASCAR's Decades Of Investments

NASCAR was founded in 1948. Since then, the France family has invested in racetracks, developed a racing series that attracts millions of fans, created valuable opportunities for teams, broadcasters and sponsors, and implemented rules and safety requirements to protect drivers and teams. Phelps Decl. ("Phelps") ¶¶5-43.

## B. Teams Urge Creation Of The Charter System

In 2014, teams formed the Race Team Alliance ("RTA") to collectively negotiate with NASCAR. Prime Decl. ("Prime") ¶7. In 2016, at the RTA's behest, NASCAR introduced the Charter system. NASCAR awarded 36 Charters, without charge, to teams that had shown long-term commitments to NASCAR. The 2016 Charter resulted from extensive negotiations between NASCAR and the RTA represented by outside counsel. To create a compelling product for fans, broadcasters, and sponsors, the 2016 Charter included mutual promises: NASCAR limited the number of Charters and guaranteed Charter members positions at each race and certain payments, while Charter teams agreed not to race for other stock-car racing leagues. Teams without a Charter could still race as "open teams," as all teams did before 2016. The 2016 Charter, which expires on December 31, 2024, contains reciprocal releases of claims. *Id.* ¶¶8-22.

## C. Two Years Of 2025 Charter Negotiations

Long before the time required by the 2016 Charter, NASCAR began negotiations over the 2025 Charter with teams through the Teams Negotiating Committee. NASCAR made significant concessions, including substantially increasing Charter teams' share of the media revenue attributable to the Cup Series from approximately ▉ to ▉ Prime ¶32. NASCAR also offered a longer Charter term, but declined to enter into permanent Charters for reasons described in the Prime Declaration. When NASCAR declined to issue permanent Charters, the teams collectively boycotted the Team Owner Council meeting on April 4, 2023. Nonetheless, NASCAR continued discussions with individual teams and their lawyers. *Id.* ¶¶42-52. Ultimately, the 2025 Charter's term matches NASCAR's new broadcast agreements: seven years, with a possible extension. *Id.* ¶¶28, 45. Notably, throughout these negotiations, no team voiced concerns to NASCAR about the Section 10.3 release provision. *Id.* ¶¶40, 53; Phelps ¶50.

With the 2016 Charter nearing its end, NASCAR needed to finalize the 2025 Charter to plan the upcoming racing season. NASCAR made its final offer to all Charter teams on August 30, 2024. Thirteen teams (representing 32 Charters) signed the 2025 Charter, while Plaintiffs chose not to—even after being given extra time.[1] Phelps ¶¶46-55. NASCAR then began working to fulfill its contractual obligations under the 2025 Charter. Prime ¶¶69-78.

### D. Plaintiffs

23XI Racing is a well-financed racing team that purchased its first Charter from another team in 2020 and a second in 2021. Front Row Motorsports has owned or leased one or more Charters since 2016. Both Plaintiffs also agreed to purchase one additional Charter apiece from Stewart-Haas Racing. To date, Plaintiffs have not submitted a transfer request to NASCAR for these Charters. Prime ¶¶58-68.

## III. LEGAL STANDARD

Plaintiffs must "clearly establish" each of the *Winter* factors: (1) irreparable harm; (2) likelihood of success on the merits; (3) public interest; and (4) favorable balance of the equities. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power," and may be granted "only sparingly and in limited circumstances." *Direx Israel v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991). Their sole purpose is to "preserv[e] the status quo so that a court can render a meaningful decision after a trial on the merits." *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir. 1991). Mandatory preliminary injunctions, which

---

[1] Multiple team owners' comments to the press—for example, comments labeling the 2025 Charter a "fair deal"—tell a very different story than Plaintiffs' litigation narrative. Prime ¶¶54-57.

alter the status quo, are "disfavored in any circumstance" and warranted "only in the most extraordinary circumstances." *Brantmeier,* 2024 WL 4433307, *1.

## IV.    ARGUMENT

Plaintiffs' Motion fails multiple times over:  they seek extraordinary relief that disrupts the status quo and is disconnected from the ultimate relief they seek on the merits, and they also cannot meet their *Winter* burden.

### A.    Plaintiffs' Requested Relief Is Extraordinary And Contradicts Their Complaint

#### 1.    Plaintiffs' Requested Relief Disrupts The Status Quo

Attempting to bypass the heightened bar for mandatory injunctions, Plaintiffs wrongly assert their requested relief aims to "preserve the status quo."  But the Fourth Circuit "define[s] the status quo … to be the last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 235 (4th Cir. 2014). Plaintiffs' requested injunction would upend the status quo by forcing NASCAR into a now-unwanted contractual relationship based on an expired offer, notwithstanding the fact NASCAR has (1) entered into Charters with teams on different terms than Plaintiffs demand, and (2) planned for a season with 32 Charters and eight open positions, consistent with its contractual obligations to those teams.  Prime ¶¶69-78.  Such aggressive relief is inappropriate, especially at the preliminary-injunction stage. *N. Am. Soccer League, LLC v. United States Soccer Fed'n*, 883 F.3d 32, 38 (2d Cir. 2018) (refusing to mandate league's Division II designation); *Salt Lake Trib. Pub. Co. v. AT&T*, 320 F.3d 1081, 1099 (10th Cir. 2003) (refusing to extend expiring contract).

#### 2.    Plaintiffs' Requested Relief Contradicts Their Complaint

Plaintiffs' requested relief also is fatally flawed because it directly contradicts their Complaint.  Plaintiffs seek a mandatory injunction to force NASCAR into a contractual

relationship with them, minus one term they now find objectionable. Yet, their Complaint contends this very Charter contract is anticompetitive for "numerous" reasons, Doc. 1, ¶110, and seeks to have it declared illegal and void, *e.g.*, *id.* ¶¶144, 153, Prayer for Relief B. This is improper. As the Fourth Circuit explained in *Omega*, a preliminary injunction "simply should not issue" when a plaintiff "literally seeks through its antitrust claim to dissolve the very contractual relationship which it seeks to have preserved through preliminary injunction." 111 F.3d at 15. Entering Plaintiffs' requested relief would undermine, not further, the Court's ability to provide ultimate relief "of the same kind." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003). Plaintiffs' push for a Charter ultimately dismantles their antitrust narrative, revealing their strategy to *profit from* the very system they simultaneously call anticompetitive.

### B. Plaintiffs Cannot Show Irreparable Harm

Plaintiffs have not demonstrated irreparable harm, which requires a clear showing of substantial injury that is "neither remote nor speculative, but actual and imminent." *Direx Israel*, 952 F.2d at 812. The harm must be a "present threat," *id.* at 816, leading to permanent injury absent intervention, not just temporary loss pending recovery, *Hughes Network Sys. v. InterDigital Commc'ns*, 17 F.3d 691, 694 (4th Cir. 1994). Financial and self-inflicted injuries do not qualify. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230, 235 (4th Cir. 2017). Plaintiffs also bear the burden of proving that "adequate compensatory or other corrective relief will [not] be available at a later date," as irreparable harm *never* exists when an adequate legal remedy is available. *Id.* at 230.

#### 1. Any Claimed Injury From Enforcement Of The Release Is Not Irreparable

Plaintiffs argue, without citation, that being subjected to Section 10.3 would give rise to irreparable harm. But courts routinely evaluate the enforceability of contractual provisions, even releases, during the pendency of litigation. *E.g.*, *Madison Square Garden v. Nat'l Hockey League*,

2008 WL 4547518, *6-10 (S.D.N.Y. Oct. 10, 2008). And Plaintiffs' years of operating under this provision, plus the presence of this provision in every draft of the 2025 Charter throughout years of negotiations, undermine any claimed urgency or harm. *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989).

### 2. Plaintiffs' Alleged Losses Of Goodwill Are Not Irreparable

Nor do Plaintiffs' claims of potential "goodwill losses" from competing as open teams give rise to irreparable harm. Most fundamentally, these injuries are self-inflicted. Plaintiffs had ample opportunities to sign Charters. Even Plaintiffs' cases affirm that this Court isn't a refuge from "the consequences of [Plaintiff's] own business decisions." *Navient Sols., LLC v. United States*, 141 Fed. Cl. 181, 184 (2018) (contractor had no right to renewed contract); *see Salt Lake Trib.*, 320 F.3d at 1106 (self-inflicted harm not irreparable); *Di Biase*, 872 F.3d at 235 (no irreparable harm where no attempt to avoid claimed injuries).

Plaintiffs' alleged injuries also are not irreversible. All of their claimed harm is compensable through money damages should Plaintiffs ultimately prevail; indeed, Plaintiffs implicitly acknowledge this by providing *calculations* of their potential losses. Doc. 21-2, ¶46; Doc. 21-3, ¶41; *see Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 526-27 (4th Cir. 1989) (no irreparable harm when damages available); *Int'l Titanium Corp. v. Noel*, 282 F. Supp. 2d 376, 379-80 (W.D.N.C. 2003) (similar).

Regardless, Plaintiffs can compete in 2025 without a preliminary injunction—and have confirmed they will. Doc. 21-2, ¶47; Doc. 21-3, ¶41; Doc. 27 at 2 n.2. This case is nothing like cases Plaintiffs cite where the defendants' actions barred plaintiffs from competing or earning a livelihood. *Brady v. Nat'l Football League*, 779 F. Supp. 2d 992, 1004-05, 1035 (D. Minn.), *vacated*, 644 F.3d 661 (8th Cir. 2011) (NFL players "locked out" from league); *Maryland v.*

*Trump*, 498 F. Supp. 3d 624, 632, 641 (E.D. Pa. 2020) (influencers couldn't earn living if TikTok banned).

Plaintiffs' suggestion that potential loss of goodwill is *always* irreparable defies well-settled law. "[T]he loss of customer goodwill is often calculable and compensable, and its mere pleading does not necessitate injunctive relief." *Spacemax Int'l LLC v. Core Health & Fitness*, 2013 WL 5817168, *2 (D.N.J. Oct. 28, 2013); *Ramsey v. Bimbo Foods Bakeries Distrib.*, 2014 WL 3408585, *9-10 (E.D.N.C. July 10, 2014) (distinguishing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 442 (4th Cir. 1994), and holding "goodwill can often be valued in monetary terms"). In antitrust cases, plaintiffs ordinarily must establish a threat to their very "existence" to claim irreparable harm from goodwill losses. *Am. Passage Media Corp. v. Cass Commc'ns*, 750 F.2d 1470, 1473 (9th Cir. 1985); *Eco Fiber Inc. v. Vance*, 2024 WL 3092773, *4 (W.D.N.C. June 21, 2024) (Whitney, J.) (plaintiffs credibly alleged "impending threat of Plaintiff's operations not surviving the pendency of this matter"). These circumstances are "quite narrow" due to the "substantial" "danger of a mistake" in granting a preliminary injunction. *Hughes*, 17 F.3d at 693-94.

Here, Plaintiffs merely suggest sustained losses "*for a long period*" "*could*" threaten their existence. Mot. 12 (emphasis added); *id.* 6 (arguing without citation that Plaintiffs could "possibly" lose competitive opportunities); Doc. 21-2, ¶47; Doc. 21-3, ¶11 (Jenkins and Polk stating "████████████████████████████████████████████████████████████") (emphasis added). This careful phrasing underscores that Plaintiffs' alleged harms are neither certain nor immediate. *Deal v. City of Monroe*, 2024 WL 4354718, *2 (W.D.N.C. Sept. 30, 2024) (Whitney, J.) (denying relief where plaintiff claimed "mere[] possibilities of harm"). Moreover,

self-serving assertions that a "business will collapse" are never enough to warrant injunctive relief. *Auto Sunroof of Larchmont v. Am. Sunroof Corp.*, 639 F. Supp. 1492, 1494 (S.D.N.Y. 1986).[2]

Plaintiffs' alleged "goodwill" losses ultimately rest on a speculative chain of inferences: (1) they *might* fail to qualify for crucial races; and (2) that failure *could* lead sponsors, drivers, employees, or fans to abandon them. However, as NASCAR's expert explains, Plaintiffs' teams are highly likely to qualify for all races. Hubbard Decl. ("Hubbard") ¶¶54-61. Moreover, 23XI re-signed drivers while deciding whether to sign a Charter, and publicly committed to supporting its employees throughout 2025. Prime ¶¶63-68. 23XI also has ███████████████ ████████████████████████████████████████████████████ ████████████████████████████. Phelps ¶¶44-45; Yates Decl. ¶18. Since it is "impossible to ascertain" when, if ever, Plaintiffs' hypotheticals might occur, the extraordinary relief they seek from this Court is unwarranted. *Microsoft*, 333 F.3d at 530.

### C.    Plaintiffs Do Not Have A Likelihood Of Success

Plaintiffs' unusual Section 2 claim—the only claim they raise in support of an injunction— is unlikely to succeed for multiple, independent reasons.

***First,*** this claim is barred by a contractual release *and* the statute of limitations. Plaintiffs willingly agreed to Section 10.3 when signing or acquiring 2016 Charters, a provision that "release[s] their antitrust rights." Mot. 1; *Madison Square Garden*, 2008 WL 4547518, *6-10 (enforcing similar release). The teams—undeniably sophisticated parties—were represented by counsel in both rounds of negotiations, and the teams secured the *same release* for themselves in Section 10.4.

---

[2] Plaintiffs' declarations are packed with improper legal conclusions, like assertions of a "monopoly position," that deserve no weight. *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002).

Additionally, Plaintiffs' allegations—concerning contractual terms present in the 2016 Charter (such as exclusivity), NASCAR's 2018 acquisition of ISC, its 2019 acquisition of ARCA, and the 2019 adoption of Next Gen car requirements—are all barred by the four-year statute of limitations applicable to antitrust claims, 15 U.S.C. § 15(b), and laches. The "continuing-violations doctrine" Plaintiffs reference, Doc. 1, ¶149, does not apply to completed "merger[s] or acquisition[s]," nor does it apply when the defendant simply "reaffirms a previously announced policy." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598-604 (6th Cir. 2014); *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 288-91 (4th Cir. 2024) ("mere reaffirmations of a previous pre-limitations refusal" do not accrue new claim); *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011) ("both elements of laches—unreasonable delay and prejudice—are strongly presumed" when outside limitations period).

***Second***, despite alleging a grab bag of monopolization theories, Plaintiffs cannot demonstrate exclusionary conduct by NASCAR—"conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014); *Verizon Commc'n Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004).

Mutual-exclusivity provisions—common across sports—are procompetitive because they make the product more appealing for broadcasters, fans, and sponsors that have other entertainment options. Prime ¶17; Hubbard ¶44, n.72.

Plaintiffs' suggestion that the Charters give them only a "small share of NASCAR's broadcast agreement revenues," Doc. 21-3, ¶16, is false—the 2016 Charter allowed them to receive █████ of media revenues attributable to the Cup Series, and that percentage grows to approximately ████ in the 2025 Charter. Prime ¶32. Regardless, NASCAR has every right to exercise its

"business judgment" to decide whether and how to share its revenues with teams. *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 921 (6th Cir. 2009) (NASCAR likely not required to grant speedway a race). Indeed, the Supreme Court has repeatedly confirmed businesses are generally "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions." *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

Plaintiffs' attempt to analogize this case to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985), is a non-starter; unlike in *Aspen Skiing*, NASCAR did not "refuse[] to deal with [Plaintiffs]," but "*proposed terms* for a commercial relationship." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283-86 (4th Cir. 2012) (emphasis added). Moreover, *Aspen Skiing*'s "narrow" exception applies only when a defendant terminates benefits in an *ongoing*, not proposed, relationship—and, even then, the facts of *Aspen Skiing* are teetering on the "outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409; *St. Luke's Hosp. v. ProMedica Health Sys.*, 8 F.4th 479, 491-92 (6th Cir. 2021) (*Aspen Skiing* inapplicable to conditional contract).[3]

As for the Next Gen car requirements, courts defer to motorsports sanctioning bodies' rules, including on equipment. *M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 985 (1st Cir. 1984) (tire rule); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854-55 (8th Cir. 2000) (transmissions). Besides, the teams *endorsed* the Next Gen requirements, and 23XI's co-owner publicly celebrated them as "a net positive for our sport," making "access to" competition "*easier*." Phelps ¶¶40, 43.

---

[3] Plaintiffs cite *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, but that case supports NASCAR, confirming that courts "must take care not to aggregate acts that are procompetitive to produce only a semblance of an exclusionary effect," and applying *Aspen Skiing* only after establishing a defendant's termination of an ongoing relationship. 111 F.4th 337, 354-56, 362-64 (4th Cir. 2024).

Additionally, Plaintiffs "knew from the moment they signed their agreements" that NASCAR could impose conditions regarding car parts. *Bendfeldt v. Window World, Inc.*, 2017 WL 4274191, *5 (W.D.N.C. Sept. 26, 2017) (rejecting franchisee's claim over exclusivity provision). If the Next Gen requirements were truly problematic, Plaintiffs could have explored other investments. Hubbard ¶¶14, 20-27. Instead, Plaintiffs purchased Charters *after* the requirements were adopted—demonstrating their willingness to be bound and the undeniable benefits they reaped from the Charters.

Plaintiffs' argument that NASCAR's agreements with racetracks are exclusionary fails, too. Many tracks are available, and new entrants typically do not precisely copy existing competitors. Hubbard ¶¶30-36.

Nor do Plaintiffs explain how NASCAR's acquisitions of ISC or ARCA were anticompetitive. Many acquisitions are *pro*competitive, particularly when they do not give the defendant "any 'advantage' it did not already have." *Geneva Pharm. v. Barr Labs*, 201 F. Supp. 2d 236, 279 (S.D.N.Y. 2001). Here, the France family had owned a controlling percentage of ISC's voting stock since it was founded. Phelps ¶¶28-29. The 2018 ISC acquisition also underwent government review. *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.1 (2006). And ARCA—acquired by NASCAR for only ███████—was never a potential competitor to NASCAR. Drager Decl. ¶¶2-7.

As for the reciprocal release of claims, there is "no prohibition in the [] antitrust laws that prohibits the disclaimer of [existing] antitrust claims by a general release." *Virginia Impression Prod. Co. v. SCM Corp.*, 448 F.2d 262, 266 (4th Cir. 1971). Plaintiffs' argument that "shield[ing] [a] monopoly position from legal attack" itself violates Section 2 collapses under its own weight— the *whole purpose* of a release is to prevent litigation. If Plaintiffs' theory were correct, parties

could never settle antitrust disputes, and commercial contracts couldn't include releases of prior conduct.

Citing outdated, out-of-circuit cases, Plaintiffs invoke the "[r]arely discussed and more rarely applied" "part-and-parcel" doctrine, which they say invalidates antitrust releases if they are "an integral part of a scheme to violate the antitrust laws." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 125 (2d Cir. 2001). However, "no United States Court of Appeals has ever applied [that] theory to invalidate a release" and "at least one circuit has expressed grave doubt as to [its] very existence." *Id.* at 126. Applying it here would break significant ground and depart from Fourth Circuit precedent. And even if the doctrine were valid, it would not fit Plaintiffs' alleged facts: "[i]f the release is merely an outgrowth, rather than a cause of the violation, it is not part and parcel of the antitrust conspiracy." *Id.* at 125.

***Third***, Plaintiffs also have not defined or "present[ed] evidence of an injury to" a definable market. *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 (6th Cir. 2003). After choosing to invest in NASCAR teams rather than IndyCar or another sport, Hubbard ¶¶26-27, Plaintiffs assert a market confined to the services of premier stock-car racing teams, labeling NASCAR a monopsonist in that market. But Plaintiffs and their expert, Dr. Rascher, are doing exactly what the Fourth Circuit criticized in *It's My Party, Inc. v. Live Nation, Inc.*: trying to "gerrymander [their] way to an antitrust victory without due regard for market realities" by using a market definition that "coincidentally fit[s] [Plaintiffs'] precise circumstances." 811 F.3d 676, 681 (4th Cir. 2016).[4] Indeed, in a prior antitrust action involving another "input" for NASCAR

---

[4] Dr. Rascher's economic work was recently excluded in the *NFL "Sunday Ticket" Litigation*, because of his "flawed methodolog[y]" and "*ipse dixit* opinion untethered to an economic analysis of what would have likely occurred." 2024 WL 3628118, *3-6 (C.D. Cal. Aug. 1, 2024).

races (racetracks), the Sixth Circuit rejected a market definition of "premium-stock-car hosting markets," emphasizing that NASCAR competes with various forms of entertainment, and the expert failed to analyze all potential substitutes. *Ky. Speedway*, 588 F.3d at 916-19.

Plaintiffs mistakenly assert that *Kentucky Speedway* addressed only a relevant "output" market. In reality, the *Kentucky Speedway* plaintiff—a racetrack—had claimed NASCAR's actions harmed it in the "input" market for "host[ing] premium stock-car races." *Id.* at 913-14. Regardless, because antitrust law aims to protect consumer welfare, it makes no sense to ignore the public's myriad sports-entertainment options simply because Plaintiffs chose to invest in just one. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Conn.*, 108 F. Supp. 2d 549, 583-84 (W.D. Va. 2000) (plaintiff cannot establish market "by claiming to be 'locked in'" when it knew inherent risks).

Even if Plaintiffs' gerrymandered market definition were proper, Plaintiffs have not shown "significant anticompetitive effects within [that market]," including suppressed compensation. *NHL Players' Ass'n*, 325 F.3d at 720. Nor could they. Teams can receive approximately ██ of media revenues attributable to the Cup Series under the 2025 Charter (a substantial increase from 2016), Prime ¶32, and Plaintiffs *will still race*—they just won't *personally* share in the benefits (and burdens) of having a Charter.[5] In addition, others' successful entry "refutes any inference of the existence of monopoly power." *Tops Mkts., Inc. v. Quality Mkts.*, 142 F.3d 90, 99 (2d Cir. 1998); Hubbard ¶¶34-36.

---

[5] If there is any antitrust issue in this case, it is teams—horizontal competitors according to Dr. Rascher—collectively boycotting and negotiating with NASCAR. *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.*, 605 F. Supp. 2d 870, 888-89 (W.D. Ky. 2009) (complaint alleged antitrust claim when horsemen's groups collectively pressured track operators to pay for their consent to receive simulcast signals).

**Finally**, Plaintiffs' real complaint is that, without the benefits of the contract they previously rejected, they now must compete with other teams for access to NASCAR races and sponsorships. But that is not *antitrust* injury, as "[t]he antitrust laws … were enacted for the protection of competition *not competitors*." *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 488 (1977). Courts have consistently rejected similar attempts to "use the Sherman Act to make an end-run around [a terminable] contract," as the "antitrust laws were not created to protect against this type of injury." *Turner v. Virginia Dep't of Med. Assistance Servs.*, 301 F. Supp. 3d 637, 648 (E.D. Va. 2018) (no antitrust injury where contract expiration shut plaintiff out of market); *MB Realty Grp., Inc. v. Gaston Cnty. Bd. of Educ.*, 2018 WL 3381427, *2-4 (W.D.N.C. July 11, 2018) (Whitney, J.) (contract matters did not give rise to antitrust injury).

### D. The Balance Of Equities And Public Interest Weigh Against An Injunction

Plaintiffs' requested relief would cause real harm to NASCAR and the 32 Charter holders. Teams must budget for next season, and NASCAR needs to calculate and communicate to teams the prize money available for each race. NASCAR cannot simply reissue 2025 Charters without affecting Charter teams and other stakeholders, especially since Plaintiffs' refusal to sign the 2025 Charters increased prize amounts for Charter and open teams alike. Prime ¶¶69-78. Moreover, forcing NASCAR into an unwanted contract goes against the public interest. *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1162 (9th Cir. 2011).

## V. CONCLUSION

The Court should deny Plaintiffs' Motion.

Dated: October 23, 2024          Respectfully submitted,

By:     */s/ Tricia Wilson Magee*
          Tricia Wilson Magee (N.C. Bar No. 31875)
          **SHUMAKER, LOOP, & KENDRICK, LLP**
          101 S Tryon Street, Suite 2200
          Charlotte, NC 28280
          Tel: 704-945-2911
          Fax: 704-332-1197
          tmagee@shumaker.com

          Christopher S. Yates*
          **LATHAM & WATKINS LLP**
          505 Montgomery Street, Suite 2000
          San Francisco, CA 94111
          Telephone: (415) 395-8240
          Facsimile: (415) 395-8095
          chris.yates@lw.com

          Lawrence E. Buterman*
          **LATHAM & WAKINS LLP**
          1271 Avenue of the Americas
          New York, NY 10020
          Telephone: (212) 906-1200
          Facsimile: (212) 751-4864
          lawrence.buterman@lw.com

          Anna M. Rathbun*
          Christopher J. Brown*
          **LATHAM & WATKINS LLP**
          555 Eleventh Street, NW, Suite 1000
          Washington, DC 20004
          Telephone: (202) 637-2200
          Facsimile: (202) 637-2201
          anna.rathbun@lw.com
          chris.brown@lw.com


          * Admitted *pro hac vice*

          *Counsel for Defendants NASCAR and Jim France*

## **WORD COUNT CERTIFICATION**

I hereby certify that the foregoing document contains fewer than 4,500 words according to the word count feature in Microsoft Word and is therefore in compliance with the word limitation set forth in Judge Whitney's Scheduling Order.

This the 23rd day of October, 2024.

Respectfully submitted,

*/s/ Tricia Wilson Magee*
Tricia Wilson Magee (N.C. Bar No. 31875)
SHUMAKER, LOOP, & KENDRICK, LLP
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Tel: 704-375-0057
Fax: 704-332-1197
Email: tmagee@shumaker.com

## <u>ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION</u>

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 23rd day of October, 2024.

*/s/ Tricia Wilson Magee*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction was electronically filed using the Court's CM/ECF system, which will automatically send notice of filing to all parties of record as follows:

Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
dwilliams@winston.com

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
jkessler@winston.com

Jeanifer Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
jparsigian@winston.com
mtoomey@winston.com

Matthew DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
mdalsanto@winston.com

*Counsel for Plaintiffs 23XI Racing and*
*Front Row Motorsports Inc.*

This the 23rd day of October, 2024.

*/s/ Tricia Wilson Magee*