# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING and FRONT ROW MOTORSPORTS, INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 3:24-cv-886-KDB-SCR |
| | **ORAL ARGUMENT REQUESTED** |
| NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC and JAMES FRANCE, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT NASCAR'S MOTION TO DISMISS

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

SUMMARY OF ALLEGATIONS ................................................................................... 1

I.      The Relevant Market ............................................................................................ 1

II.     Exclusionary Acts Within the Last Four Years ................................................... 2

III.    Plaintiffs Have Suffered Antitrust Injury ........................................................... 2

ARGUMENT ................................................................................................................... 3

I.      Plaintiffs' Claims Are Not Time-Barred ............................................................ 3

II.     Plaintiffs Have Alleged Antitrust Injury ............................................................ 5

III.    Plaintiffs Plead a Relevant Market ...................................................................... 8

IV.    Plaintiffs Alleged Multiple Exclusionary Acts ................................................ 10

        A.      Defendants Ignore Most of The Alleged Exclusionary Conduct ............................ 10

        B.      The Non-Compete and Release Provisions are Exclusionary Acts ...................... 12

CONCLUSION ............................................................................................................. 15

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016) ...................................................................... 5

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
    190 F.3d 1051 (9th Cir. 1999) .................................................................. 7

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019) ................................................................................ 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) .............................................................................. 11

*In re Beef Indus. Antitrust Litig.*,
    600 F.2d 1148 (5th Cir. 1979) .................................................................. 8

*Bendfeldt v. Window World, Inc.*,
    2017 WL 4274191 (W.D.N.C. Sept. 26, 2017) ...................................... 9

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) .................................................................. 6

*Carter v. Twentieth Century-Fox Film*,
    127 F. Supp. 675 (W.D. Mo. 1955) ...................................................... 15

*CBC Cos. v. Equifax*,
    561 F.3d 569 (6th Cir. 2009) .................................................................... 7

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
    120 F. Supp. 2d 556 (E.D. Va. 2000) .................................................... 14

*CSX Transportation, Inc. v. Norfolk Southern Railway Company*,
    114 F.4th 280 (4th Cir. 2024) .................................................................. 4

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) .................................................................... 7

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .................................................................... 6

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024), *rh'g denied*, 2024 WL 4891183 (2024) ............... 10, 11, 12, 15

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ........................................................................8, 13

*Eastman Kodak Co. v. Henry Bath LLC*,
   936 F.3d 86 (2d Cir. 2019).............................................................................5, 7

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ........................................................................................ 8

*Hanover Shoe v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ........................................................................................ 4

*Hecht v. Pro-Football, Inc.*,
   570 F.2d 982 (D.C. Cir. 1977)....................................................................11, 13

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
   32 F.4th 242 (3d Cir. 2022) ............................................................................ 7

*Int'l Boxing Club of N. Y., Inc. v. United States*,
   358 U.S. 242 (1959) ...................................................................................... 10

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) ...................................................................................... 13

*L.A. Mem'l Coliseum Comm'n v. NFL*,
   726 F.2d 1381 (9th Cir. 1984) ........................................................................ 9

*Laumann v. NHL*,
   907 F. Supp. 2d 465 (S.D.N.Y. 2012) ........................................................... 10

*Le v. Zuffa, LLC*,
   216 F. Supp. 3d 1154 (D. Nev. 2016) ........................................................... 10

*Living Media India v. Parekh*,
   1994 WL 68193 (S.D.N.Y. Feb. 28, 1994) ...................................................... 5

*Madison Square Garden v. NHL*,
   2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ................................................ 15

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
   334 U.S. 219 (1948) ........................................................................................ 6

*Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*,
   995 F.3d 123 (4th Cir. 2021) .......................................................................... 3

*McNeil v. NFL*,
   790 F. Supp. 871 (D. Minn. 1992) .................................................................. 9

iii

*In re Mission Health Antitrust Litig.*,
   2024 WL 759308 (W.D.N.C. Feb. 21, 2024) ...................................................................3

*N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*,
   780 F. Supp. 322 (M.D.N.C. 1991) .........................................................................4

*NCAA v. Alston*,
   594 U.S. 69 (2021) ....................................................................................6, 10

*Novell, Inc. v. Microsoft Corp.*,
   505 F.3d 302 (4th Cir. 2007) ..................................................................................7

*O'Bannon v. NCAA*,
   802 F.3d 1049 (9th Cir. 2015) ...............................................................................7

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   572 U.S. 663, 682 (2014) .......................................................................................5

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*,
   351 F. Supp. 462 (E.D. Pa. 1972) ..................................................................10, 13

*PLS.COM, Ltd. Liab. Co. v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .................................................................................14

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) .........................................................13

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ...................................................................................9

*Radovich v. NFL*,
   352 U.S. 445 (1957) .............................................................................................13

*Ray Commc'ns., Inc. v. Clear Channel Commc'ns., Inc.*,
   673 F.3d 294 (4th Cir. 2012) .................................................................................5

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
   63 F. Supp. 2d 1218 (E.D. Cal. 1999) ....................................................................3

*Robertson v. NBA*,
   389 F. Supp. 867 (S.D.N.Y. 1975) .......................................................................10

*Robertson v. Sea Pines Real Estate Cos.*,
   679 F.3d 278 (4th Cir. 2012) ...............................................................................14

*Shields v. World Aquatics*,
   2024 WL 4211477 (9th Cir. Sept. 17, 2024), *rehr'g denied*, 2024 U.S. App.
   LEXIS 29939 (Nov. 25, 2024) ..............................................................................13

*Smith v. Pro Football, Inc.*,
   593 F.2d 1173 (D.C. Cir. 1978)........................................................................11

*Solo v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014)...........................................................................4

*Spinelli v. Nat'l Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015)....................................................................8

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021)..............................................................................5

*Thompson Everett, Inc. v. National Cable Adv.*,
   850 F. Supp. 470 (E.D. Va. 1994)......................................................................8

*Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*,
   530 F.3d 204 (3d Cir. 2008)................................................................................4

*Total Vision, LLC v. Vision Serv. Plan*,
   717 F. Supp. 3d 922 (C.D. Cal. 2024)..............................................................15

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)...........................................................................................10

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)......................................................................11, 13

*USFL v. NFL*,
   644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988)..............9

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
   108 F. Supp. 2d 549 (W.D. Va. 2000)................................................................8

*VKK Corporation v. NFL*,
   244 F.3d 114 (2d Cir. 2001)..............................................................................14

*W. Penn Allegheny Health Sys. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010).................................................................................4

*White Mule v. ATC Leasing Co.*,
   540 F. Supp. 2d 869 (N.D. Ohio 2008).............................................................8

*Williams v. City of Chi.*,
   315 F. Supp. 3d 1060 (N.D. Ill. 2018)..............................................................12

**Other Authorities**

Areeda & Hovenkamp, ANTITRUST LAW, ¶320c4 (2024)...............................4, 6, 11, 13

## INTRODUCTION

Defendants' motion to dismiss is a fantasy. It is based on their contested version of the facts, instead of the Complaint's allegations. It is also based on a mischaracterization of Plaintiffs' legal claims, a mischaracterization of the relevant input market, and a mischaracterization of governing law. It is draped in rhetoric about this being a contractual dispute when Defendants know that the Complaint is alleging facts plausibly showing Defendants' unlawful maintenance of monopoly.

## SUMMARY OF ALLEGATIONS

### I.    The Relevant Market

The relevant market is the input market for premier stock car racing teams in the United States. Dkt. 1 (Compl.) ¶¶117–18. NASCAR's Cup Series is the only premier stock car racing series in this market; its market share is 100%. *Id.* ¶119. Defendants exercise monopsony power over the participants in this market, including Plaintiffs. *Id.*

Each stock car racing team operates as an independent contractor. Since 2016, the only economically viable option for racing teams to compete in Cup Series events has been through Charter Agreements, which guarantee those teams a spot in each race. *Id.* ¶¶76, 95.

Operating as a stock car racing team is not interchangeable with operating a team engaged in other types of automobile racing (*e.g.*, Formula 1, IndyCar). *Id.* ¶120. Stock cars are structurally different than Formula 1 and IndyCar cars, and stock car racing teams require approximately $18 million of annual investment per car that cannot be used for other types of automotive racing. *Id.* ¶¶120–21. Only a premier stock car series, like NASCAR, can purchase the services of top-tier stock car racing teams. *Id.* ¶¶122–24.

1

## II. Exclusionary Acts Within the Last Four Years

Defendants have engaged in a litany of exclusionary acts to maintain their monopsony power within the past four years:

- Defendants have: (i) enforced exclusivity provisions on independent racetracks that prohibit them from hosting competing stock car racing events; and (ii) refused to provide competing stock car racing events with access to the race tracks that Defendants acquired (*id.* ¶¶79–89);

- Defendants imposed non-competes in the 2016 Charter Agreements that barred teams from competing in non-NASCAR racing events and enforced these restrictions every year. Defendants imposed more restrictive non-competes in the 2025 Charter Agreements (*id.* ¶¶21, 76, 94–96, 114);

- Defendants have, since 2022, forced teams to purchase "Next Gen" parts for Cup Series cars and prohibited the use of these cars in non-NASCAR races (*id.* ¶¶97–102); and

- Defendants imposed a release in the 2025 Charter Agreement that they contend blocks antitrust claims against NASCAR's monopsony (*id.* ¶¶103–16).

## III. Plaintiffs Have Suffered Antitrust Injury

Defendants' monopsonization has caused Plaintiffs' antitrust injury through the imposition of below market terms in the input market for premier stock car racing teams. These below market terms have been imposed each year through the 2016 Charter Agreements, the 2025 Charter Agreements, and the open racing terms that NASCAR dictates. *Id.* ¶¶70–77, 103–16.

The below competitive market terms of the 2025 Charter Agreements, like the 2016 Agreements, have deprived racing teams of a fair chance to earn a profit. *Id.* ¶110. But with no viable choice, most teams acquiesced to Defendants' take-it-or-leave-it demand ("under duress").

*Id.* ¶¶104–16, 128.  Plaintiffs refused to sign the 2025 Charter Agreement because it contained a release that Defendants contend would waive Plaintiffs' antitrust rights.  *Id.* ¶¶23, 113.

While Plaintiffs can compete as "open" teams in 2025, the even more onerous, below competitive market terms imposed on open teams will cause additional antitrust injury to Plaintiffs. *Id.* ¶¶112, 127.

## ARGUMENT

### I.  Plaintiffs' Claims Are Not Time-Barred

Defendants concede that Plaintiffs have alleged two categories of conduct during the four-year limitations period — the non-competes and release in the 2025 Charter Agreements (Mot. at 5) — that Plaintiffs challenge as exclusionary acts of monopolization.  Compl. ¶¶21–22, 110–16, 142–44, 153.  That is all that is required to satisfy the statute of limitations.  *In re Mission Health Antitrust Litig.*, 2024 WL 759308, at *8 (W.D.N.C. Feb. 21, 2024) ("last anticompetitive act of [] Defendants was committed within the limitations period").

But the Complaint alleges numerous other exclusionary acts during the limitations period that Defendants ignore.  These exclusionary acts include:  the exclusivity provisions in NASCAR's sanction agreements with third-party tracks that are enforced *each year and NASCAR's continuing refusal to allow competing events at the tracks it acquired* (Compl. ¶¶78–89); the non-competes in the 2016 Charter Agreements that applied *each year* (*id.* ¶¶8, 11, 76, 94); and the Next Gen restrictions implemented in 2022 and applied *each year* (*id.* ¶¶97–100).  Such continuing overt acts create a new cause of action each year that is not time-barred.  *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1223 (E.D. Cal. 1999) ("'New and independent acts' may include active enforcement of policies first put into place outside the limitations period.").

These allegations of exclusionary acts during the limitations period must be accepted. *Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131 (4th Cir. 2021) (each

time Defendants "illegally exercised monopoly power [by] committing an overt act that caused injury and violated the antitrust laws[,] ... a new limitations period began to run"); *see also* Areeda & Hovenkamp, ANTITRUST LAW, ¶320c4 (2024) ("When the monopolist creates its monopoly by a series of repeated or reasserted acts designed to maintain its monopoly, the statute of limitation is restarted[.]"); *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (with a "continuing violation," plaintiff "could have sued in 1912 for the injury then being inflicted, [and] was equally entitled to sue in 1955").

Defendants' reliance on *CSX Transportation, Inc. v. Norfolk Southern Railway Company*, 114 F.4th 280 (4th Cir. 2024), is misplaced. That court considered the continuing effect of a *single act* by the defendants outside the limitations period. *Id.* at 284–91. But even there, the court recognized later anticompetitive conduct "would qualify as acts committed in furtherance of a continuing violation or conspiracy." *Id.* at 291.

Plaintiffs are not seeking "to recover for injuries caused by earlier predicate acts." Mot. at 5. Plaintiffs only seek damages for injuries suffered during the limitations period, but pre-limitations conduct continuing into the limitations period is actionable. *See, e.g.*, *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 109 n.15 (3d Cir. 2010); *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 217 (3d Cir. 2008); *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 780 F. Supp. 322, 328 (M.D.N.C. 1991) ("A cause of action is not barred by the statute of limitations simply because anticompetitive conduct began outside the statutory period so long as some overt act injuring a plaintiff is committed within the limitations period.").

Defendants' laches argument fails for the same reasons. *See Solo v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (laches defeated by same continuing violations satisfying statute of limitations). Laches is also inapplicable because neither of its core elements—(i) unreasonable

delay *and* (ii) prejudice to Defendants from the delay—exist. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 716 (4th Cir. 2021).

This lawsuit was not unreasonably delayed. Plaintiffs filed within weeks of rejecting Defendants' take-it-or-leave-it imposition of the 2025 Charter Agreements, which included new exclusionary acts. *See* Compl. ¶¶105–16, 127–29. As "the Supreme Court has explained, laches doesn't require a plaintiff to 'sue soon, or forever hold [their] peace.'" *Steves & Sons*, 988 F.3d at 718 (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 682 (2014)).

Defendants do not argue prejudice because any purported delay would have only allowed Defendants to violate the antitrust laws longer. *Living Media India v. Parekh*, 1994 WL 68193, at *3 (S.D.N.Y. Feb. 28, 1994) ("defendants ma[d]e no showing of prejudice" to apply laches where "[a]ll that ha[d] happened [wa]s that defendants committed the illegal acts, from which they ha[d] presumably made some profit"). And Defendants cannot use laches as a shield for continuing antitrust violations. *See Ray Commc'ns., Inc. v. Clear Channel Commc'ns., Inc.*, 673 F.3d 294, 307 (4th Cir. 2012) ("Because laches is an equitable doctrine, its application is inextricably bound up with the nature and quality of the plaintiff's claim on the merits....").

## II. Plaintiffs Have Alleged Antitrust Injury

Plaintiffs need only plausibly allege a "'causal connection' between [their] injury and an antitrust violation" and that their injury "was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Steves & Sons*, 988 F.3d at 710. Plaintiffs allege that Defendants have used their unlawfully maintained monopsony power to impose below competitive market terms on Plaintiffs for their participation in the monopsonized input market. Compl. ¶¶70–77, 103–16, 125–29, 157. That is quintessential antitrust injury to direct market participants. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (direct market participants presumptively have antitrust standing); *Eastman Kodak Co. v. Henry*

5

*Bath LLC*, 936 F.3d 86, 95 (2d Cir. 2019) (market participants entitled to standing); Areeda, ¶335(h) ("Consumers and noncommercial plaintiffs are correctly granted standing when they are the immediate victims of the defendant's violation.").

Defendants' assertion that there is no injury because "Plaintiffs are free to race in any racing league that they desire—or start their own competing league" (Mot. at 6–7) is based on disputed facts. This Court must accept as true the allegations that Plaintiffs *cannot* race in or start another premier stock car racing series because Defendants have used exclusionary acts to preclude this. Compl. ¶¶82–96.

Antitrust injury must be found based on the allegations that Plaintiffs were forced to either accept Defendants' below competitive market terms or not compete at all. *Id*. ¶¶105, 110, 115–16. When a monopolist charges supracompetitive prices (or a monopsonist pays subcompetitive prices), the purchaser (or seller) suffers antitrust injury. *See e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 214 (4th Cir. 2002) ("direct purchasers from an antitrust violator can sue for damages"); Areeda, ¶345a ("buyers have usually been preferred plaintiffs in private antitrust litigation" because they pay the monopoly prices and so "standing to recover for an overcharge paid directly to an illegal cartel or monopoly is seldom doubted"); *NCAA v. Alston*, 594 U.S. 69, 82 (2021) (college athletes had standing where "[defendant] use[d] its monopsony power to 'cap artificially the compensation offered'"); *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (sellers have standing where "the price-fixing [in the sugar beet market] was by purchasers, and the persons specially injured … are sellers"); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102, n.4 (9th Cir. 1999) ("purchasers are preferred antitrust plaintiffs"); *Apple Inc. v. Pepper*, 587 U.S. 273, 282 (2019) ("direct purchasers from monopolistic retailers are proper plaintiffs to sue those retailers"). Plaintiffs' antitrust injuries give them

standing. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 316 (4th Cir. 2007); *O'Bannon v. NCAA*, 802 F.3d 1049, 1067 (9th Cir. 2015).

Defendants' assertion that Plaintiffs "suffer no concrete injury" because they did not sign the 2025 Charter Agreement ignores the allegations that Plaintiffs suffered antitrust injuries the past four years by being subjected to the below competitive market terms of the 2016 Charter Agreement. Compl. ¶¶25, 70–77, 126, 157. Going forward, Plaintiffs will suffer antitrust injuries by being forced to compete as open teams under even worse below competitive market terms. *Id.* ¶127. Defendants' argument that the terms of the 2025 Charter Agreement are procompetitive is just another factual dispute irrelevant to a motion to dismiss.

Plaintiffs are not using "antitrust [as] a negotiating tool [to] seek[] better contract terms," *CBC Cos. v. Equifax*, 561 F.3d 569, 573 (6th Cir. 2009), or contest an "undesirable" or "objectionable term in a commercial agreement, without more," *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242 , 250 (3d Cir. 2022). *Contra* Mot. at 7. Plaintiffs have alleged facts plausibly showing that Defendants unlawfully maintained and then used monopsony power to impose below competitive market terms, causing antitrust injury to Plaintiffs. Factual disputes with these allegations are barred at the pleading stage.

Finally, as direct participants in the relevant market, Plaintiffs are an "efficient enforcer" of the antitrust laws. *Kodak*, 936 F.3d at 95; *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("courts routinely recognize the antitrust claims of market participants"). Plaintiffs' damages from receiving below competitive market terms are non-duplicative of the damages suffered by excluded competitors, and no injured party would be a more efficient enforcer. Indeed, because foreclosed potential competitors might not file claims, Plaintiffs are the most efficient enforcers. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689

(2d Cir. 2009) (antitrust standing when "[d]enying the plaintiffs a remedy in favor of a suit by [other plaintiffs] would thus be 'likely to leave a significant antitrust violation undetected or unremedied'"). Plaintiffs suffered antitrust injury when they faced the "Hobson's choice" of "sell[ing] into the rigged market ... or refus[ing] to sell at all." *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1158 (5th Cir. 1979).[1]

## III. Plaintiffs Plead a Relevant Market

Defendants' challenges to Plaintiffs' market definition are premature and meritless. Fundamentally, "courts hesitate to grant motions to dismiss for failure to plead a relevant product market" because "market definition is a question of fact." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 (4th Cir. 2011) (citation omitted). Defendants' caselaw makes that clear. *See* Mot. at 9 (citing *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 576 (W.D. Va. 2000) ("[m]arket definition typically is a question of fact for the jury")). Plaintiffs allege that the relevant market is the input market for premier stock car racing teams in the United States. Compl. ¶¶117–18. Premier stock car racing is plausibly alleged to be a distinct form of automobile racing with unique, nontransferable cars and highly specialized racing teams that render it non-interchangeable with other types of automotive racing. *Id.* ¶¶120–21. *See Eastman*

---

[1] Defendants' authority fails. In *White Mule*, the court stated an exclusivity arrangement *could* lead to supplier antitrust injuries where a monopsonist uses its power to coerce a supplier into "agreeing to [an] exclusivity deal" that "amount[s] to an 'all or nothing'" arrangement. *See* 540 F. Supp. 2d 869, 890 (N.D. Ohio 2008). That is exactly what Plaintiffs allege here. Compl. ¶¶103–16. *Thompson Everett* involved an exclusive distributorship where plaintiff conceded it had alternative avenues. *See* 850 F. Supp. 470, 476–79 & n.4 (E.D. Va. 1994). The Complaint alleges no such alternatives to NASCAR exist. In *Spinelli*, plaintiff's "alleged injury amount[ed] to personal economic loss" from the underpayment of royalties, not harm to competition. *See* 96 F. Supp. 3d 81, 109 (S.D.N.Y. 2015). Here, Plaintiffs have alleged harm to competition. *See supra* at 5–8.

*Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (interchangeability is a critical factor).

Defendants' cases about "locked-in" franchisees are inapposite. Mot. at 10. In those cases, plaintiffs proposed relevant markets that were not based on the lack of interchangeability, but rather were gerrymandered based on their franchise contracts. In *Queen's City*, Domino's franchisees tried to define an "aftermarket for sales of supplies to *Domino's franchisees*," rather than including supplies "available from other suppliers and used by other pizza companies." 124 F.3d 430, 433–38 (3d Cir. 1997). And in *Benfeldt*, the plaintiff proposed a market limited to the windows from Defendant's chosen supplier, rather than the broader market in which other suppliers with interchangeable products competed. 2017 WL 4274191, at *1, 5 (W.D.N.C. Sept. 26, 2017).

This case is different. Plaintiffs are not proposing an input market defined by NASCAR's business or the Charter Agreements. They have defined a relevant input market for premier stock car racing teams based on plausible allegations that stock car racing is not interchangeable with other forms of automotive racing and there are no other interchangeable alternatives. Just like a professional football player is not in an input labor market with soccer or basketball players, Plaintiffs are not in a market with F1 or IndyCar racing teams. And there is no case law, or pled facts, to support Defendants' contention that the relevant market consists of any sports business in which Plaintiffs might invest. Plaintiffs are asserting claims as stock car racing teams, not as financial investors.

Numerous courts have found narrow relevant markets, including input markets, based on the unique characteristics of specific sports. *See, e.g., L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1394 (9th Cir. 1984) (professional football franchises); *McNeil v. NFL*, 790 F. Supp. 871, 893 (D. Minn. 1992) (professional football players); *USFL v. NFL*, 644 F. Supp. 1040, 1057

(S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) (professional football leagues); *Robertson v. NBA*, 389 F. Supp. 867, 893 (S.D.N.Y. 1975) (professional basketball players); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462, 501–02 (E.D. Pa. 1972) (professional hockey leagues); *Laumann v. NHL*, 907 F. Supp. 2d 465, 491 (S.D.N.Y. 2012) (major league men's ice hockey); *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1159–60 (D. Nev. 2016) ("live Elite Professional MMA bouts" and input market for "live Elite Professional MMA Fighter services"). Indeed, the Supreme Court approved a relevant market limited to "championship boxing contests in contrast to all professional boxing events." *Int'l Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242, 249–52 (1959). On the input side, courts have found it proper to find narrow markets of Division I college athletes in men's basketball, female basketball and FBS football. *Alston*, 594 U.S. at 81, 86.

## IV.     Plaintiffs Alleged Multiple Exclusionary Acts

Finally, there is no basis for Defendants' contention that Plaintiffs have not adequately alleged exclusionary acts showing that Defendants' maintenance of monopsony was not the result of "superior product [or] business acumen." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Plaintiffs' allegations are more than sufficient to show that Defendants maintained their monopsony through an exclusionary "course of conduct." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024), *rh'g denied*, 2024 WL 4891183 (2024).

### A.     Defendants Ignore Most of The Alleged Exclusionary Conduct

Defendants try to narrow the alleged exclusionary acts to just two categories—the non-compete and release provisions in the 2025 Charter Agreements. Mot. at 10–15. But the Complaint's allegations of exclusionary conduct are far more extensive:

- Exclusivity Restrictions on Top-Tier Racetracks and Refusals to Deal by NASCAR-Acquired Tracks. Defendants acquired ISC (and its top-tier racetracks)

and refuse to allow any other stock car races at those tracks. Compl. ¶¶84–86. They also contractually prohibit independent racetracks from hosting competing races. *Id.* ¶¶81–89. These allegations plausibly show that Defendants have deprived potential competitors of resources they need to compete in violation of the Sherman Act. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Duke*, 111 F.4th at 363–65 (monopolist denying competitor access to needed resource violates Section 2). Indeed, it is established that, "a monopolist's use of exclusive contracts … may give rise to a [Section] 2 violation," *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001), because exclusionary conduct includes "inducing suppliers not to sell to potential competitors, [] inducing customers not to buy from them, or, in some cases, [] refusing to deal with would-be competitors themselves," *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978). *See also Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 993 (D.C. Cir. 1977) (Section 1 violation in contractually denying competitor access to stadium).

- <u>Acquisition of NASCAR's Closest Potential Competitor</u>. NASCAR acquired its closest potential competitor, the Automobile Racing Club of America, and relegated it to a Cup Series feeder series. Compl. ¶¶90–93; *see also* Areeda, ¶701d ("a monopolist's acquisition of a 'likely' entrant into the market … is presumptively anticompetitive").

- <u>NASCAR's Next Gen Restrictions</u>. Defendants require teams to buy "Next Gen" car parts from NASCAR's single-source suppliers, then prohibit any use of these cars in competing events, depriving competitors of access to this critical resource. Compl. ¶¶97–102.

Defendants' failure to address these allegations of exclusionary conduct dooms their motion. *See Williams v. City of Chi.*, 315 F. Supp. 3d 1060, 1084 (N.D. Ill. 2018) ("where defendants did not challenge certain allegations, they waived their argument and their motions to dismiss those allegations were denied").

**B.     The Non-Compete and Release Provisions are Exclusionary Acts**

All the alleged exclusionary acts must be considered together, as a whole, in determining whether Defendants have unlawfully maintained their monopsony. *Duke*, 111 F.4th at 355 ("exclusionary conduct alleged under § 2 must be considered holistically"). Viewed together with the other exclusionary acts pled, the non-compete (i.e., exclusivity) and release provisions in the 2016 and 2025 Charter Agreements state a Sherman Act claim.

**1.     The Non-Compete Provisions**

The Complaint alleges plausible facts showing that the non-compete provisions in the 2016 and 2025 Charter Agreements block the most prominent stock car racing teams from either forming a competing series themselves or providing high quality teams to a potential competing series. Compl. ¶¶21, 76, 114, 153. While Defendants have argued the 2016 restrictions are time-barred, such restrictions were in force each year to maintain Defendants' monopsony. Further, the Complaint alleges facts showing that chartered stock car racing teams would have considered forming a competing series if not for these and other NASCAR restrictions. Compl. ¶89.

Defendants' contention that "exclusivity provisions" should be deemed lawful because they purportedly are a "staple in the sports industry that courts have repeatedly recognized make the product more appealing" (Mot. at 12) is wrong. Unlike the situation in other sports leagues where the teams are joint venture partners who form a league together, in NASCAR, the league is owned by a single family and the teams are independent contractors seeking a series in which to compete. Compl. ¶¶1, 95, 104. Because NASCAR requires Cup Series teams to operate as

independent contractors, NASCAR's non-compete covenants are equivalent to a group boycott of competitors depriving them of what they need to compete. *See Shields v. World Aquatics*, 2024 WL 4211477, at *1–2 (9th Cir. Sept. 17, 2024), *rehr'g denied*, 2024 U.S. App. LEXIS 29939 (Nov. 25, 2024) (rule preventing swimmers from competing in "unaffiliated organizations" possible "per se unlawful group boycott"); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13 (1959).

There is no sports case that suggests that it would be procompetitive to restrict independent contractors from going to a competing league. To the contrary, with respect to athletes—who are similar to racing teams—courts have held that it would be an antitrust violation for a league to prevent its players from joining a rival. *See Shields*, 2024 WL 4211477, at *1–2; *World Hockey Club*, 351 F. Supp. at 508 (restraint on NHL players moving to rival league found "unreasonable, and in violation of Section 2 of the Sherman Act"); *Radovich v. NFL*, 352 U.S. 445, 448–49, 454 (1957) (football player alleging blacklist prevented him from joining another league stated Sherman Act claim).

As for Defendants' citation of non-sports cases finding procompetitive benefits for some exclusive dealing, (Mot. at 12–13) none of these cases involve allegations that a monopolist used exclusive dealing to maintain its monopoly. Indeed, the case law indicates an exclusive dealing arrangement can be a Section 2 violation and an unreasonable restraint of trade when employed by a monopolist. *See du Pont*, 637 F.3d at 453 ("we held above that Kolon adequately pled DuPont's use of anticompetitive, exclusive agreements"); *Microsoft*, 253 F.3d at 70–71 (exclusive agreements may violate Section 2); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *6–9 (C.D. Cal. Dec. 2, 2013) (de facto exclusive dealing arrangements constituted exclusionary acts); *Hecht*, 570 F.2d at 993 (exclusive stadium lease unlawful); *see also* Areeda,

¶1805a ("Exclusive dealing could also be used collusively by upstream firms as an entry-deterrence device.").

Further, even if Defendants could demonstrate that there are procompetitive justifications for exclusivity restrictions, these disputed facts cannot support a motion to dismiss. "At this early stage of the litigation, [the Court is] not in a position to weigh the alleged anticompetitive risks of the [alleged anticompetitive conduct] against their procompetitive justifications" and should not expand "beyond recognizing the sufficiency of the complaints." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 292 (4th Cir. 2012); *PLS.COM, Ltd. Liab. Co. v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022) ("whether the alleged procompetitive benefits ... outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings."); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 565 (E.D. Va. 2000) ("This factual inquiry [into anticompetitive conduct] is inappropriately performed at the pleading stage.").

## 2.    The Release Provisions

Defendants mischaracterize Plaintiffs' allegations concerning the release provisions. Plaintiffs do not contend there is a general prohibition against waivers of claims (Mot. at 13); nor do they contend there should be a "policy of nonenforcement of contracts via antitrust laws" (*id.* at 14). What the Complaint alleges is that it is another exclusionary act, as part of the overall exclusionary scheme, for Defendants to use their monopsony power to impose a release provision that Defendants contend precludes racing teams from asserting their antitrust rights against Defendants' monopsony. Compl. ¶¶113, 142, 153.

Defendants misconstrue *VKK Corporation v. NFL*, which did not rule out a release being an exclusionary act, but rather found that the plaintiff had the opportunity to sue before being bound by the release. *See* 244 F.3d 114, 123–26 (2d Cir. 2001). Here, Plaintiffs allege that

Defendants imposed the release in their 2016 Charter Agreements, and then the 2025 Charter Agreements, as a further means of maintaining monopsony power.  Compl. ¶¶22–23, 113, 142, 153.  Assuming the allegations are true, the releases are unlawful exclusionary acts.  *See Total Vision, LLC v. Vision Serv. Plan*, 717 F. Supp. 3d 922, 933 (C.D. Cal. 2024) (plaintiff "plausibly pled that the Release is invalid because it was 'part and parcel' of VSP's antitrust conspiracy"); *Madison Square Garden v. NHL*, 2008 WL 4547518, at *5–9 (S.D.N.Y. Oct. 10, 2008) (distinguishing antitrust release by members of a "legitimate joint venture" from release imposed by a monopolist, which raises "public policy concerns"); *Carter v. Twentieth Century-Fox Film*, 127 F. Supp. 675, 680 (W.D. Mo. 1955) (same).  At this stage, the Court must accept Plaintiffs' allegations that the releases have been imposed as an exclusionary cudgel to shield Defendants' monopsony.  Such allegations state a Section 2 violation when the exclusionary acts are considered together.  *Duke*, 111 F.4th at 354.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: December 16, 2024        Respectfully submitted,

WINSTON & STRAWN LLP


By:    */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

Jeanifer Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Matthew R. DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com


*Counsel for Plaintiffs 2311 Racing LLC d/b/a*
*23XI Racing and Front Row Motorsports Inc.*

16

## CERTIFICATE OF COMPLIANCE

This motion complies with the word limitation set forth in Rule 3(b)(iv) of the Standing Order Governing Civil Case Management Before the Honorable Frank D. Whitney because, excluding the parts of the document exempted by Rule 3(b)(iv), the Motion contains a total of **4,490** words.

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

*Counsel for Plaintiffs 2311Racing LLC d/b/a*
*23XI Racing and Front Row Motorsports Inc.*

17

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT NASCAR'S MOTION TO DISMISS** was electronically filed using the Court's CM/ECF system, which will automatically send notice of this filing to counsel of record for all parties, and I caused an unredacted copy of the foregoing to be served on counsel of record for all parties, including:

Tricia Wilson Magee
**SHUMAKER LOOP & KENDRICK, LLP**
101 S. Tryon St., Suite 2200
Charlotte, NC 28280
tmagee@shumaker.com

Christopher S. Yates
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
chris.yates@lw.com

Lawrence E. Buterman
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com

Anna M. Rathbun
Christopher J. Brown
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
anna.rathbun@lw.com
chris.brown@lw.com

*Counsel for Defendant National Association for Stock Car Auto Racing, LLC*

_____
*Jeffrey L. Kessler*
Jeffrey L. Kessler