IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00886-KDB-SCR

| | |
|---|---|
| 2311 RACING LLC, D/B/A 23XI RACING AND FRONT ROW MOTORSPORTS, INC.,<br><br>**Plaintiffs,**<br><br>v.<br><br>NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC AND JAMES FRANCE,<br><br>**Defendants.** | **ORDER** |

**THIS MATTER** is before the Court on Plaintiffs' renewed Motion for a Preliminary Injunction (Doc. No. 51). On November 8, 2024, this Court denied Plaintiffs' initial Motion for a Preliminary Injunction without prejudice, finding that Plaintiffs had not shown the "irreparable harm" necessary to support granting the requested injunction, but inviting Plaintiffs to file a renewed motion for a preliminary injunction "should circumstances change." Alleging that circumstances have changed based on new events, Plaintiffs renewed their motion on November 26, 2024. Briefing of the motion concluded on December 12, 2024, and the motion is ripe for the Court's decision.[1]

---

[1] On December 11, 2024, this action was reassigned to the undersigned. The Court has fully and carefully considered all the filings in support of and in opposition to the pending motion, along with the entire record of the earlier preliminary injunction motion, and honors Plaintiffs' request that the Court rule on this motion by December 18, 2024 (in an effort to maintain contractual rights as discussed in this Order).

1

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, the public interest strongly favors entry of a limited preliminary injunction in favor of the Plaintiffs during the 2025 NASCAR race season, both to give fans of stock car racing the opportunity to watch (and root for and against) the full slate of teams and to allow Plaintiffs' antitrust legal challenges to be considered. As discussed below, Plaintiffs have established that they are likely to succeed on their claims that 1) NASCAR has monopoly power in the market for premier stock car racing and 2) to the extent that NASCAR's 2025 Charter Agreement includes a release that bars teams from asserting the antitrust claims asserted by Plaintiffs, such a provision would be a violation of the antitrust laws. Further, Plaintiffs have shown that in the absence of guaranteed entry into all races as a chartered team, they will likely suffer irreparable harm through the loss of contractual control over their best drivers and the resulting inability to field their best race team. Finally, the balance of equities favors Plaintiffs because NASCAR has agreed to allow Plaintiffs to participate in all NASCAR Cup Series races (albeit only as an "open" team) without requiring the challenged release clause, and Plaintiffs will suffer harm in the absence of being considered a "charter" team.

Therefore, the Court will enter a limited preliminary injunction only for the duration of the 2025 NASCAR Cup season which allows Plaintiffs to each enter two race cars in all NASCAR Cup races under the terms applicable to all charter teams, with the exception that the "release" language in Section 10.3 of the 2025 Charter Agreement shall not be enforceable to the extent that it would release or bar Plaintiffs' claims in this action. Further, NASCAR will be preliminarily enjoined from refusing to approve Plaintiffs' purchases of two Stewart-Haas Racing, LLC

2

("SHR") charters,[2] which Plaintiffs will be entitled to use to race in all 2025 NASCAR Cup races on the same terms as other charter teams, again with the exception of the application of the release language to Plaintiffs' claims in this action. In sum, it is the Court's intent – for the 2025 race season – to maintain the status quo of Plaintiffs participating in NASCAR Cup Series races as chartered teams while being permitted to pursue their legal claims in this action.[3]

## I. LEGAL STANDARD

A preliminary injunction issued pursuant to Rule 65 of the Federal Rules of Civil Procedure is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 24, 32 (noting that even issuance of a permanent injunction after trial "is a matter of equitable discretion; it does not follow from success on the merits as a matter of right."). The Fourth Circuit has described the standard for a preliminary injunction as follows:

> Though an "extraordinary remedy," a preliminary injunction is warranted where the plaintiff has established "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

dmarcian, Inc. v. dmarcian Eur. BV, 60 F.4th 119, 138 (4th Cir. 2023) (quoting *Winter*, 555 U.S. at 20, 24).

Thus, while a plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court, *see Metro. Regul. Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591,

---

[2] The Court understands and finds that NASCAR was willing to approve this transfer on the merits but has now refused approval solely on the grounds of Plaintiffs' lawsuit and the application of the release of claims, so it rises and falls on the same grounds as Plaintiffs' existing charter agreements. *See* Doc. Nos. 31-3 at 17; 60-1 at 45, 58, 60; 66-2 at 2-3.

[3] The Court further intends to set a Case Management schedule which allows a trial on Plaintiffs' claims to be held and concluded sufficiently in advance of the beginning of the 2026 race season for the Parties to arrange their affairs accordingly.

3

595 (4th Cir. 2013), a plaintiff seeking a temporary restraining order or a preliminary injunction must demonstrate that:

> (1) it is likely to succeed on the merits,
> (2) it is likely to suffer irreparable harm absent injunctive relief,
> (3) the balance of the equities tips in its favor, and
> (4) the injunction would be in the public interest.

*Winter,* 555 U.S. at 20; *see Hebb v. City of Asheville, N. Carolina*, No. 1:22-CV-00222-MR-WCM, 2023 WL 1825081, at *1–2 (W.D.N.C. Feb. 8, 2023). Each of these four requirements must be satisfied. *Id*. However, movants "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013); *Brandt v. Caracciolo*, No. 322CV00304KDBDSC, 2022 WL 2541997, at *1 (W.D.N.C. July 7, 2022). In sum, it is an exacting test because, according to the Supreme Court, "a preliminary injunction is an extraordinary remedy never awarded as of right." *Id*.

If a preliminary injunction is found to be warranted, then "crafting a Preliminary Injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579-80 (2017). And "[i]t is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992). Indeed, a court should "mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 582 U.S. at 580 (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)). In doing so, a court must ensure a preliminary injunction is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)), and be mindful that "[t]he purpose of such interim equitable relief is not to conclusively determine the

4

rights of the parties, but to balance the equities as the litigation moves forward." *Int'l Refugee Assistance Project*, 582 U.S. at 580 (internal citation omitted); *See Microban Int'l, Ltd. v. Kennedy*, No. 322CV00620KDBDSC, 2023 WL 2533085, at *2 (W.D.N.C. Mar. 15, 2023).

## II. FACTUAL FINDINGS

In its earlier Order, the Court made findings of fact related to the Parties and background of this dispute, which are reaffirmed and incorporated by reference.[4] Further, the Court has subject matter and personal jurisdiction over the claims and defendants, venue is proper in this District and process has been served. In brief summary, Plaintiffs 23XI and Front Row are two teams that compete in NASCAR's Cup Series, the highest level stock car racing program in the United States. In 2016, NASCAR implemented a Charter Agreement system that guarantees the holder of each charter entry for one car into every Cup Series race. Front Row has held two charters from NASCAR since 2016, and 23XI acquired a 2016 charter in 2020, and another in 2021. The 2016 charters expire on December 31, 2024. In addition to "chartered cars," NASCAR races may include a few "open" cars,[5] which are required to qualify for each race separately. Because of the cost of racing in the Cup Series and the uncertainty for teams, drivers and sponsors in not having a guaranteed spot for each race, the consistent participation of "open" cars by a non-chartered team is effectively non-existent.

More than two years in advance of the expiration of the 2016 charters, NASCAR began negotiations towards a 2025 Charter Agreement with the 15 teams that collectively held

---

[4] The Court emphasizes that this Order builds on, rather than departs from, the earlier Order entered by Judge Whitney. That Order addressed a single factor in the *Winter* test (irreparable harm), and necessarily relied on the limited facts then in the record. Indeed, in that Order the Court forecast that the facts and circumstances might change based on future events, which has turned out to be prescient.
[5] In recent race seasons, there have been 36 chartered cars, which leaves at most 4 open spots in a 40-car field.

NASCAR's 36 charters (the "Teams"). NASCAR at first negotiated with the Teams together and then, beginning in the Spring of 2024, individually. Ultimately, 13 of the 15 teams signed the same standard 2025 Charter Agreement on September 6, 2024 (after NASCAR ended negotiations and required Teams to decide whether or not to sign within several hours). Significantly for this motion, the final 2025 Charter Agreement includes a release provision (the "Release"),[6] which Plaintiffs allege may bar them from bringing antitrust claims against Defendants. In relevant part, the Release reads:

> Team Owner . . . hereby releases and forever discharges [NASCAR Event Management] . . . from all [claims] . . . arising out of or relating to the criteria used by [NASCAR Event Management] to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner or any other Person . . . .

Doc. No. 21-5, pp. 44–45, § 10.3. Until November 15, 2024, the Release also appeared in NASCAR's required agreements for "open" cars in addition to the Charter Agreement.

Plaintiffs refused to sign a 2025 Charter Agreement, and on October 2, 2024, filed this action alleging that Defendants have unlawfully monopolized premier stock car racing in violation of the Sherman Act, 15 U.S.C. §§ 1, 2. Specifically, Plaintiffs allege that NASCAR, through its Cup Series, holds monopoly power over the input market for premier stock car racing teams in the United States (the only country in which such a racing series exists) and has unlawfully maintained that power "through, among other anticompetitive actions, acquisition of other racing circuits and racetracks, anticompetitive agreements that restrict the availability of racetracks that are suitable for premier stock car racing, monopoly rules regarding the exclusive use of specialized "Next Gen" cars, and non-compete restrictions that prevent premier stock car racing teams

---

[6] The same release language also appeared in the 2016 Charter Agreement, but does not affect this litigation because the Release by its terms only applies to the specific agreement in which it appears.

6

competing in the Cup Series from also participating in races outside of NASCAR's circuit." Doc. No. 1 at ¶ 1.

On October 9, 2024, Plaintiffs filed a Motion for Preliminary Injunction asking the Court to grant two NASCAR Cup Series Charter Member Agreements to 23XI Racing and Front Row with the same terms as the NASCAR Cup Series Charter Member Agreements that NASCAR offered to Plaintiffs on September 6, 2024, and enjoin Defendants from enforcing the Release with respect to any Charter Member Agreement that is granted, or transferred (pursuant to the then pending transactions with SHR) as it relates to any antitrust claim that Plaintiffs are pursuing in this action. Doc. No. 20. After full briefing and oral argument, the Court denied Plaintiffs' motion without prejudice on November 8, 2024, holding that "although Plaintiffs have alleged that they will face a risk of irreparable harm, they have not sufficiently alleged present, immediate, urgent irreparable harm, but rather only speculative, possible harm." Doc. No. 42. For example, with respect to Plaintiffs' claimed harm related to drivers and sponsors, the Court found that Plaintiffs had not alleged a "present prospect" of the loss of either drivers or sponsors. The Court did not address any of the *Winter* factors beyond "irreparable harm," but concluded that "[s]hould circumstances change, Plaintiffs may file a renewed motion for preliminary injunction." *Id*.

Plaintiffs did just that on November 26, 2024, alleging that circumstances had changed, particularly with their drivers and sponsors. Doc. No. 51. Specifically, on November 18, 2024, 23XI driver Tyler Reddick (who recently finished in fourth place in the 2024 Cup Series) notified the team that it had breached his Driver and Personal Services Agreement, which requires 23XI to "provide the Race Car prepared and entered by 23XI under a NASCAR Cup Series Charter Member Agreement … for Reddick to drive in all Cup Series Events," and had 30 days to cure the breach. Doc. No. 52-20 at § IV.C; Ex. 52-6. ("This letter serves as notice that 23XI has 30

7

days to provide me assurances that we will operate with a Chartered car, as required under Section IV of our agreement, for the 2025 and 2026 seasons."). Therefore, 23XI must cure the breach with a commitment to a chartered car by December 18, 2024, or Reddick will no longer be contractually bound to the team. 23XI's contract with driver Riley Herbst similarly requires that Herbst be provided with a chartered car, as does Front Row's contract with driver Noah Gragson. Other drivers have expressed similarly urgent concerns. Driver Bubba Wallace informed 23XI that he needs to know how it intends to compete "immediately" so that he can explore seats with other teams. Doc. No. 52-15. Corey Heim also wrote that he needs answers "right away" so that he can "speak with other Cup race teams to see if any other opportunities would exist." Doc. No. 52-16.

The lack of chartered cars has also impacted Plaintiffs' sponsor relationships. On November 15, 2024, Monster Energy informed 23XI that it decided "to delay [its] 'Ultimate Race Weekend' Consumer Promotion to a later date" because "the uncertainty around 23XI, Tyler, and the relationship with N[ASCAR] for the start of the season" makes it "just too big of a risk." Doc. No. 52-8. On November 23, 2024, 23XI received another email from Monster Energy, stating that it was reconsidering its entire relationship with 23XI. See Doc. No. 52-17 (expressing the concern that, without charter agreement rights, "both [23XI cars] could miss the Daytona 500 . . . [and] that Reddick will leave the team . . . on 12-31"). To the same effect, Front Row's largest sponsor, Love's Travel Stops, emailed the team on November 22, 2024, stating its concern about Front Row's "ability to meet contractual obligations next season" given "the numerous uncertainties raised around … not having a team Charter, as the 2025 season approaches." Doc. No. 52-9.

Further, with respect to Plaintiffs' contract to each purchase one charter from SHR, Plaintiffs are still in the process of seeking NASCAR's approval for transactions to purchase Charter Agreements from SHR. Those transactions must close within eight days of NASCAR's

8

Case 3:24-cv-00886-KDB-SCR   Document 74   Filed 12/18/24   Page 8 of 20

approval. Ex. 8 § 1(a); Ex. 9 § 1(a). While NASCAR removed the "Release" from its open agreements on November 15, 2024, it has not done this for the SHR Charter Agreements, putting Plaintiffs in the position of having to decide now whether they can go forward with those transactions, and take the same risk of releasing their antitrust rights that they face with respect to their own 2025 Charter Agreements. Again, there are currently only 36 charters (including the Plaintiffs' four charters). This makes the chance to purchase a charter from SHR a significant (and rare) opportunity.

Finally, in their renewed motion, Plaintiffs seek a different preliminary injunction. Rather than ask the Court to grant them 2025 Charter Agreements, Plaintiffs request that they simply be permitted to participate in NASCAR Cup Series events under the terms of the 2025 Charter Agreement (with the exception of the Release). Specifically, they seek the following injunction:

a. Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with Defendants, must allow 23XI Racing to run during the pendency of this litigation two NASCAR Cup Series teams under the terms of the NASCAR Cup Series Charter Member Agreements offered to 23XI Racing on September 6, 2024;

b. Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with Defendants, must allow Front Row to run during the pendency of this litigation two NASCAR Cup Series teams under the terms of the NASCAR Cup Series Charter Member Agreements offered to Front Row on September 6, 2024; and

c. Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with Defendants, shall be enjoined from enforcing Section 10.3

9

of any NASCAR Cup Series Charter Member Agreement that is granted, or transferred (pursuant to the pending transactions with SHR), to either Plaintiff as a defense to any antitrust claim that either Plaintiff is pursuing in this action.

### III. DISCUSSION AND CONCLUSIONS OF LAW

As explained above, in determining whether to grant Plaintiffs' requested injunction, the Court must address each of the *Winter* factors and find that they all support entry of the injunction. For the reasons discussed below, the Court finds that Plaintiffs have satisfied their burden of proof and are entitled to a limited preliminary injunction for the 2025 NASCAR Cup Series season on the terms previously described.

At the outset, the Parties disagree on the nature of the requested injunction and the consequent showing Plaintiffs must make to prevail. Preliminary injunctions can be characterized as either prohibitory or mandatory, the difference between them that "mandatory injunctions alter the status quo, whereas prohibitory injunctions 'aim to maintain the status quo to prevent irreparable harm while a lawsuit remains pending.'" *League of Women Voters of N.C. v. North Carolina*, 768 F.3d 224, 236 (4th Cir. 2014); *Ortiz v. N. Carolina State Bd. of Elections*, No. 5:24-CV-00420-BO, 2024 WL 3764561, at *10 (E.D.N.C. Aug. 12, 2024).[7] The status quo is "the last uncontested status between the parties which preceded the controversy." *Id.*; *see Pashby*, 709 F.3d at 319–20. Here, elevating substance over form, the "status quo" is most fairly seen as Plaintiffs being two of the NASCAR Cup Series racing teams expected to race in 2025 (and beyond) who were offered the opportunity to sign 2025 Charter Agreements. Therefore, an injunction that allows

---

[7] As the *Ortiz* court recently noted, the distinction between "prohibitory" and "mandatory" injunctions is not without its critics. *See, e.g., Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (Posner, J.) ("Whether and in what sense the grant of [injunctive] relief would change or preserve some previous state of affair is neither here nor there. To worry about these questions is merely to fuzz up the legal standard.")

10

Plaintiffs to race in 2025 with chartered cars on the same terms as other chartered cars (while addressing the impact of the Release on the litigation) puts the Plaintiffs in relatively the same position they would have been in with respect to the 2025 race season (that is, racing with chartered cars on the same terms as their fellow charter teams) while preserving their ability to pursue their legal claims. This is the essence of a prohibitory injunction "preserving the status quo." Finally on this point, whatever force the distinction between prohibitory and mandatory injunctive relief has, mandatory injunctive relief is available where the moving party's "right to relief is indisputably clear," *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019), which the Court finds that it is with respect to the limited injunction being granted by the Court.

### A. Likelihood of Success

In their Complaint, Plaintiffs broadly attack Defendants' allegedly unlawful monopolistic conduct; however, for purposes of this motion, they need only show a likelihood of success on a single instance of unlawful conduct for which a properly limited injunction might apply. *See Shibumi Shade, Inc. v. Beach Shade LLC*, No. 5:21-CV-256-FL, 2022 WL 390839, at *3 (E.D.N.C. Feb. 8, 2022); *McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995) ("Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief."). As explained below, the Court finds that, if it is interpreted as a bar to or a release of Plaintiffs' asserted antitrust claims, Plaintiffs have a likelihood of success on their allegation that the Release is unlawful. The Court emphasizes that it does not reach and expresses no opinion as to Plaintiffs' likelihood of success on their other Sherman Act claims, including, but not limited to, their allegations of anticompetitive restrictions and conduct described above.

11

Section 2 of the Sherman Act makes "every person" who, alone or in concert with others, "monopolize[s] any part of the trade or commerce among the several States, or with foreign nations" guilty of a felony. And, a plaintiff may bring a civil action when "injured in his business or property by reason of anything forbidden in [§ 2]." 15 U.S.C. §§ 2, 15(a). The Supreme Court has held that the purpose of this law is not to protect competitors, but rather to safeguard the competitive process itself, ultimately for the benefit of consumers. *See Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353–54 (4th Cir. 2024) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458–59 (1993)). To be successful on a § 2 claim, a plaintiff must satisfy two essential elements: (1) that the defendant "possess[ed] . . . monopoly power in the relevant market," and (2) that the defendant willfully acquired or maintained that power through anticompetitive conduct, as opposed to gaining its monopoly status "as a consequence of a superior product, business acumen, or historic accident." *Id.* (cleaned up).

The Court finds that NASCAR possesses monopoly/monopsony[8] power in the relevant market, which is the market for premier stock car racing teams in the United States. NASCAR's Cup Series is the only premier stock car racing series in the United States, and premier stock car racing is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes. Therefore, NASCAR fully controls which race teams can compete at the highest level of stock car racing – effectively, it has a 100% market share. *See Alston*, 594 U.S. 69, 81–82 (because there are no

---

[8] The exercise of monopoly power with respect to an "input market" where the alleged monopolist is the sole purchaser of the good or service is called "monopsony" power. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81–82 (2021) (noting that the parties did not contest that the "NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control" in the relevant market, which was defined as the market for "athletic services in men's and women's Division I basketball and FBS football.").

12

"viable substitutes," the "NCAA's Division I essentially *is* the relevant market for elite college football and basketball. . . . In short, the NCAA and its member schools have the 'power to restrain student-athlete compensation in any way and at any time they wish, without any meaningful risk of diminishing their market dominance.'"); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (monopolization found where "defendant controlled seventy to one hundred per cent of the relevant market"); *Duke Energy*, 111 F.4th at 353 (monopoly power not at issue "given [defendant's] durably high market share, which stands at or approaching 90%").

The concept of "monopoly" standing alone is distinct from "monopoly power," which has been broadly defined as the ability "to control prices or exclude competition." *Grinnell*, 384 U.S. at 571. However, rather than look at specific price controls, etc., courts typically examine market structure in search of circumstantial evidence of monopoly power. *United States v. Microsoft*, 253 F.3d 34, 51 (D.C. Cir. 2001). Under this approach, monopoly power may be found from a firm's possession of a dominant share of a relevant market that is protected by entry barriers. *Id.; see Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). NASCAR plainly exercises monopoly power under this analysis.[9] Not only does it operate the only premier stock car racing series in the United States, the barriers for others to enter the market (availability of large racing

---

[9] Defendants make only a cursory and unpersuasive argument against a finding that NASCAR enjoys monopsony power with respect to premier stock car racing, arguing that Plaintiffs and the public have numerous other sports in which to invest or to watch. The availability of multiple sports in the United States says nothing about NASCAR's control of a major one of them in the same way that the availability of professional basketball and football did not lead to a finding that the NCAA was not a monopolist with respect to the highest levels of college basketball and football in *Alston*. Also, NASCAR has elsewhere argued that its "goodwill" noncompete restrictions are necessary to protect its unique racing offering.

13

tracks, highly qualified racing car teams, etc.) are obvious. Therefore, Plaintiffs have established a likelihood of success on the first element of their § 2 Sherman Act claim.

The second element that Plaintiff must prove is that NASCAR violated § 2 by "us[ing] [its] monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Duke Energy*, 111 F.4th at 353-54 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992)). Again, for purposes of this Order, the Court has focused its attention only on the anticompetitive effect of the Release. With respect to that conduct, to the extent that the Release bars Plaintiffs' antitrust claims,[10] the Court finds that Plaintiffs are likely to succeed on their claim that it is unlawful in this context, considering the circumstances "as a whole." *Id.* at 354. In practical effect, the question before the Court is – Can a monopolist require that a party agree to release the monopolist from all claims that it is violating the antitrust laws as a condition of doing business? The answer is no.

Because "[a] no suit agreement may be one of the devices for shoring up a cartel," *see Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 250 (7th Cir.1994), the Supreme Court condemns as against public policy an agreement that "operate[s] . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 n. 19 (1985) ("[I]n the event the choice-of-forum

---

[10] To be kind, the Release is not a model of clarity (inscrutable would be a fairer description). The Release releases NASCAR from claims "arising out of or relating to the criteria used . . . to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner . . . ." Doc. No. 21-5, pp. 44–45, § 10.3. The "criteria" referenced in the Release are not otherwise defined in the agreement and do not appear to have any "plain meaning" from which a Court might conclude the Parties intended to Release Plaintiffs' asserted antitrust claims. However, Defendants clearly contend that the Release has that effect so it will be considered as such for purposes of this Order. *See* Doc. No. 31 at p. 9 ("*First*, this claim is barred by a contractual release . . . . Plaintiffs willingly agreed to Section 10.3 when signing or acquiring 2016 Charters, a provision that 'release[s] their antitrust rights.'").

and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."). *See also Redel's Inc. v. Gen. Elec. Co.,* 498 F.2d 95, 99 (5th Cir. 1974) (general release not given prospective effect where plaintiff asserted "numerous claims of unlawful price discrimination"); *In re Am. Express Merchants' Litig.*, 667 F.3d 204, 214 (2d. Cir. 2012), *rev'd on other grounds*, 570 U.S. 228 (2013) ("[A] waiver of future liability under the federal antitrust statutes is void as a matter of public policy.").

Defendants argue that accepting Plaintiffs' position will mean that parties will be unable to settle their antitrust disputes. Not so. A general release executed in the context of settling an ongoing legal dispute (for example, this lawsuit) or a specific release of past conduct may be enforceable without green-lighting the ability of a monopolist to condition entry into a market – here the NASCAR Cup Series – on the prospective entrant's agreement not to challenge the monopolist's conduct. Market aspirants should not be forced to choose between participation in a market and the later assertion of their ongoing/future antitrust rights, nor should a monopolist be permitted to include in the market only those who consent to the monopolist's alleged wrongdoing. Therefore, the Court finds that Plaintiffs have shown a likelihood of success on their Sherman Act § 2 claim as it relates to the Release.[11]

### B. Irreparable Harm

As noted above, "irreparable harm" was the only *Winter* factor discussed by the Court in ruling on Plaintiffs' initial motion for a preliminary injunction. Based on the facts then before the Court, the Court found that the harm forecast by the Plaintiffs with respect to drivers, sponsors and

---

[11] The "antitrust injury" that flows from such conduct is the party's inability to pursue antitrust claims in good faith, a potential injury which is, of course, fully avoided by the limited injunction being issued by the Court.

"open" racing was too speculative to support a preliminary injunction. However, realizing that circumstances could well change as all those affected by Plaintiffs' potential loss of chartered cars looked ahead to the 2025 racing season, the Court entered its ruling without prejudice so that Plaintiffs could renew their motion based on future events. Plaintiffs have taken the Court up on its offer.

As described above, since the Court denied the initial motion, 23XI's top 2024 driver Tyler Reddick has given notice that the team is in breach of his driver contract, which will allow him to leave the team if the breach is not cured in 30 days (by December 18, 2024). Drivers Riley Herbst, Noah Gragson, Bubba Wallace and Corey Heim have similar contracts and/or have expressed their need for immediate resolution of the uncertainty surrounding the approaching racing season. The lack of chartered cars has also impacted Plaintiffs' sponsor relationships, specifically with key sponsors Monster Energy and Love's Travel Stops. These are changed circumstances that the Court finds have moved Plaintiffs' likely harm from remote and speculative to present and immediate. *See* Doc. No. 42 at 5 (A showing of the "possibility of irreparable harm" is not sufficient. *Winter*, 555 U.S. at 22. Instead, "the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020) (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002)). The alleged harm should be "present or immediate." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

Plaintiffs' loss of their contractual rights with their drivers coupled with the uncertainty over racing as an "open" team is what moves the needle over the line.[12] The "present prospect" of

---

[12] While the Court does not minimize the economic harm reflected in Plaintiffs' likely loss of sponsorship revenue (and considers it below in balancing the respective equities), the Court agrees

16

the loss of star drivers constitutes irreparable harm that "cannot fully be rectified by the final judgment after trial." *Mt. Valley Pipeline,* 915 F.3d at 216; *see also Nassau Sports v. Hampson*, 355 F. Supp. 733, 736 (D. Minn. 1972) (services of professional athlete are "unique" and loss of "the unique services . . . represents irreparable injury"). Defendants suggest that Plaintiffs' drivers' concerns are insincere and they won't really leave Plaintiffs' teams. While the Court of course can't completely discount that possibility, the reality of the situation for both the drivers and the Plaintiffs is clear and immediate. Absent entry of a preliminary injunction by December 18, 2024, Tyler Reddick will become a "free agent" and whether or not he has a firm plan to leave 23XI, other teams will have the present ability to contract for his services (most probably for several years to protect both the team and the driver). While irreparable harm cannot be speculative, it need not be certain or have already occurred before an injunction is granted. *See Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011) ("harm need not be occurring or be certain to occur before a court may grant relief"). Otherwise, the aim and promise of a preliminary injunction to *prevent* harm would be illusory. Therefore, the fundamental change in the contractual relationship between the drivers and the teams is irreparable harm.

Also, denying Plaintiffs their best drivers effectively denies them an incalculable opportunity to achieve success on the track, even if they are allowed to race as "open" cars – which remains decidedly uncertain as it is under the control of the Defendants. Sports are played in the moment. There is no way to predict when a team will become a "Cinderella" or enjoy a "special

---

with Defendants that in the absence of a claim that Plaintiffs will be unable to continue operations without this revenue (which Plaintiffs do not assert), the loss of income, even if a "present prospect" can be compensated with money damages and is therefore not irreparable. *See Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 526-27 (4th Cir. 1989) (no irreparable harm when damages available); *Int'l Titanium Corp.v. Noel*, 282 F. Supp. 2d 376, 379-80 (W.D.N.C. 2003) (similar).

season," when the right people, plan and (in this context) machines come together just right. For that reason, beyond the commercial implications of the loss of race wins or a championship, the loss of the opportunity to succeed is itself irreparable. Put more directly, what would it be worth for each of the Plaintiffs and their drivers to be able to forever say they won the 2025 Daytona 500 or the NASCAR Cup Series Championship?

In sum, Plaintiffs have shown the likelihood of irreparable harm sufficient to support a preliminary injunction.

### C. Balancing of the Equities

The balance of equities between the Parties with respect to the limited injunction being considered tilts strongly in favor of the Plaintiffs. On the one hand, Plaintiffs will likely suffer significant harm if they are consigned to only racing as an "open" team, losing the opportunity to race their most competitive team as well as putting at risk several important sponsorships.[13] On the other hand, Defendants will not be significantly harmed (and perhaps not harmed at all) by Plaintiffs being allowed to race as chartered cars on the same terms as other chartered teams. First, NASCAR has offered Plaintiffs the opportunity to race their cars as "open" cars without the Release, Doc. No. 52-5, and represented to the Court that "Plaintiffs are 'almost certain' to qualify for the Daytona 500—and every other Cup Series race—as open teams in 2025." Doc. No. 60 at 2. Therefore, from Defendants' perspective there should be no practical difference in Plaintiffs cars running in every race in a guaranteed charter spot without the Release, as contemplated by

---

[13] Even though the loss of sponsorships is not "irreparable" harm because it may be compensated by monetary damages, such economic harm is real and may be considered in weighing the equities. *See Noodles Dev., LP v. Ninth St. Partners, LLP*, 507 F. Supp. 2d 1030 (E.D. Mo. 2007) (citing *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994)) (noting that a "Court also must consider the potential economic harm to each of the parties and to interested third parties [when balancing the harms].").

the proposed injunction. Moreover, Defendants can readily readjust the prize money schedules, etc. for the 2025 season back to the amounts the teams expected they would receive with the 36 chartered teams that raced in 2024 and were likely to race again in 2025. Therefore, the Court is well satisfied that the balance of equities favors the Plaintiffs.

### D. Public Interest

Finally, the public interest favors entry of a limited preliminary injunction for the 2025 NASCAR Cup Series season. NASCAR fans (and members of the public who may become fans) have an interest in watching all the teams compete with their best drivers and most competitive teams. Further, the public has an interest in preserving the rights of litigants to pursue legal claims in good faith, particularly antitrust claims that aim to preserve the process of commercial competition. Finally, the important public interest in supporting freedom of contract is not significantly undermined by preserving the status quo (by allowing Plaintiffs' cars to race as chartered cars) until the lawfulness of Defendants' conduct is promptly resolved. If the 2025 Charter Agreement is fully lawful then it will be upheld, and Defendants won't be required to do business with Plaintiffs. If, however, Plaintiffs are successful then a lawful agreement and/or other appropriate remedy will be the result, all to the public good.

### IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 51) is **GRANTED in part** as described above**;**

2. The Court hereby enters a limited preliminary injunction only for the duration of the 2025 NASCAR Cup season as follows: Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with

Defendants, must allow Plaintiffs to each enter two race cars in all NASCAR Cup races under the 2025 Charter Agreement terms applicable to all charter teams, with the exception that the "release" language in Section 10.3 of the 2025 Charter Agreement shall not be enforceable to the extent that it would release or bar Plaintiffs' claims in this action. Further, NASCAR is preliminarily enjoined from refusing to approve Plaintiffs' purchases of two Stewart-Haas Racing, LLC charters, which Plaintiffs will be entitled to use to race in all 2025 NASCAR Cup races on the same terms as other charter teams, again with the exception of the application of the release language to Plaintiffs' claims in this action; and

3. A Case Management schedule will be set by the Court which, in the absence of a voluntary resolution of this dispute among the Parties, provides for a trial on Plaintiffs' claims to be concluded in advance of the beginning of the 2026 NASCAR race season.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: December 18, 2024

Kenneth D. Bell
United States District Judge