# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

2311 RACING LLC d/b/a 23XI RACING and
FRONT ROW MOTORSPORTS, INC.,

      Plaintiffs,

      v.

NATIONAL ASSOCIATION FOR STOCK
CAR AUTO RACING, LLC and JAMES
FRANCE,

      Defendants.

Civil Action No. 3:24-cv-886-KDB-SCR

Public Redacted Version

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR PARTIAL STAY OF INJUNCTION PENDING APPEAL

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Argument .............................................................................................................................. 1

I.    The Court Has Already Rejected Defendants' Arguments Against
Plaintiffs' Likelihood of Success on the Merits and Defendants Have Not
Shown They Have a Likelihood of Success on Their Appeal ................................ 1

    A.    Defendants' Complaint That They Did Not Have an Opportunity to
Argue Charter Transfer Issues Is Meritless .................................................. 1

    B.    Defendants' Rejection of the Charter Transfers Unless Plaintiffs
Give Up Their Antitrust Rights Was Properly Found by This Court
to Be a New Exclusionary Act That Warrants Relief ................................... 5

    C.    Plaintiffs Do Not Challenge the Entire 2025 Charter Agreement as
Illegal ......................................................................................................... 8

    D.    Requiring Plaintiffs to Release Their Antitrust Claims in Order to
Compete With Charter Rights Is an Exclusionary Act ................................ 9

II.    Defendants Are Not Irreparably Harmed by the Preliminary Injunction ............. 10

III.    A Stay Will Cause Irreparable Harm to Plaintiffs and to SHR ........................... 12

IV.    The Court Properly Found That the Public Interest Supports the
Preliminary Injunction ...................................................................................... 14

Conclusion ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ciena Corp. v. Jarrard*,
    203 F.3d 312 (4th Cir. 2000) .................................................3

*De Simone v. VSL Pharms., Inc.*,
    36 F.4th 518 (4th Cir. 2022) .................................................4

*In re Google Play Store Antitrust Litig.*,
    2024 WL 4438249 (N.D. Cal. Oct. 7, 2024).................................................6

*Legacy Hous. Corp. v. City of Horseshoe Bay, Tex.*,
    2024 WL 2131484 (W.D. Tex. May 13, 2024) .................................................13

*Lutz v. Case Farms, LLC*,
    2020 WL 5111217 (W.D.N.C. Aug. 31, 2020) (Bell, J).................................................8

*Marshall v. James B. Nutter & Co.*,
    816 F. Supp. 2d 259 (D. Md. 2011) .................................................4

*Nat'l Soc. of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978).................................................13, 14

*New York v. Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002).................................................12

*Omega World Travel, Inc. v. Trans World Airlines*,
    111 F.3d 14 (4th Cir. 1997) .................................................8

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) .................................................14

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
    636 F.3d 1150 (9th Cir. 2011) .................................................14, 15

*U.S. ex rel. Rahman v. Oncology Assocs.*,
    198 F.3d 489 (4th Cir. 1999) .................................................3

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    568 F. Supp. 3d 10 (D.D.C. 2021).................................................11

*Richmond Tenants Org., Inc. v. Kemp*,
    956 F.2d 1300 (4th Cir. 1992) .................................................6

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) (Jackson, J., concurring in part and dissenting in part)......................11

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017)............................................................................................................5, 6

*United States v. United Shoe Mach. Corp.*,
  391 U.S. 244 (1968)...............................................................................................................14

**Other Authorities**

Kyle Dalton, *Denny Hamlin Calls Out NASCAR CEO for his Actions at Daytona*,
  HEAVY (Feb. 23, 2024), https://heavy.com/sports/nascar/denny-hamlin-
  nascar-ceo-daytona/ ................................................................................................................7

Matt Weaver, *League president Steve Phelps offers rare comments about teams
  suing NASCAR*, SPORTSNAUT (Oct. 31, 2024), https://sportsnaut.com/nascar-
  news-president-steve-phelps-rare-statement-lawsuit/ .............................................................7

## INTRODUCTION

When a litigant does not have either the law or the facts on its side, it will pound the table. But Defendants' pounding has become tired, familiar, and shrill. This Court did not make any mistake in its Preliminary Injunction decision. Defendants are simply rearguing—but louder—the same points that this Court has already heard and properly rejected. There is no basis for the Court to stay its ruling, which is necessary to protect Plaintiffs from the irreparable harm that Defendants are so desperate to inflict upon them.

## ARGUMENT

**I.      The Court Has Already Rejected Defendants' Arguments Against Plaintiffs' Likelihood of Success on the Merits and Defendants Have Not Shown They Have a Likelihood of Success on Their Appeal**

**A.      Defendants' Complaint That They Did Not Have an Opportunity to Argue Charter Transfer Issues Is Meritless**

The lead argument of Defendants' motion to stay—that they did not have a fair opportunity to address charter transfer issues—is the exact same argument Defendants made in their Motion to Strike, which this Court considered and rejected. Other than an elevated tone, Defendants offer no reasons for the Court to reconsider its ruling on this issue.

To the contrary, Defendants' claim that they were denied an opportunity to address the charter transfer issue is based on two false premises. First, Defendants wrongly contend that the Stewart-Haas Racing ("SHR") transfers were not part of Plaintiffs' Complaint, and so Plaintiffs cannot be entitled to any relief. *See* Mot. at 1, 5. Second, Defendants wrongly contend that they were never afforded the opportunity to brief issues related to the SHR transfers. *Id.*

Plaintiffs alleged in their Complaint that they were each in the process of acquiring a third charter from SHR, and that each transaction was in escrow. *See* Dkt. 1 (Compl.) ¶¶ 35, 41. Neither Plaintiff had any reason to suspect at the time of the Complaint that NASCAR would block the

transfers unless Plaintiffs agreed to forfeit their antitrust rights, and NASCAR's President had even confirmed to Front Row and others that the Front Row transfer was approved pending the ministerial task of submitting some paperwork.  *See* Dkt. 67-1 (Freeze Decl.) ¶¶ 7-8; Dkt. 66-10 (Custer Decl.) ¶ 5.

In any event, Plaintiffs specifically requested in the Complaint that "the Court grant Plaintiffs' forthcoming motion for a preliminary injunction enjoining Defendants from enforcing the release in Section 10.3 of the 2025 Charter Agreement(s)," Dkt. 1 at 41, and their initial preliminary injunction motion requested that Defendants be "enjoined from enforcing Section 10.3 of any NASCAR Cup Series Charter Member Agreement that is granted, **or transferred (*pursuant to the pending transactions with Stewart-Haas Racing, LLC*)** as a defense to any antitrust claim that either Plaintiff is pursuing in this action."  Dkt. 20 ¶ 9(c) (emphasis added).  Defendants' suggestion that "issues related to the SHR Charters … were never … even part of Plaintiffs' complaint" is thus flat wrong.  *See* Mot. at 5.

The fact that Plaintiffs did not previously know that Defendants would engage in new exclusionary conduct by refusing to approve the transfers of the charters to Plaintiffs unless they agreed to forfeit their antitrust rights did not give Defendants a free pass to inflict new irreparable harm upon Plaintiffs in violation of the Sherman Act without being subject to a request for preliminary relief.  The Complaint anticipated the possibility of Defendants engaging in new unlawful acts to maintain Defendants' monopsony power over Plaintiffs by requesting that "Defendants be permanently enjoined from further violations of the antitrust laws and that an injunction be issued to grant such relief as is necessary to restore competition in the relevant market."  Dkt. 1 at 41.  It "is always appropriate to grant intermediate relief of the same character

as that which may be granted finally." *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 497 (4th Cir. 1999).

Defendants are also incorrect that they were not afforded an opportunity to address issues related to the SHR transfers. *See* Mot. at 5. To begin with, "broad discretion is given to the district court to manage the timing and process for entry of … preliminary injunctions … so long as the opposing party is given a reasonable opportunity, commensurate with the scarcity of time under the circumstances, to prepare a defense and advance reasons why the injunction should not issue." *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000). Here, the Court properly found—and there is no reason to reconsider its previous ruling—that the charter transfer issue evidence submitted by Plaintiffs with their reply brief should be considered and that Defendants did not require another briefing opportunity on this subject, which they had already addressed.

In arguing against the renewed preliminary injunction, *Defendants* themselves introduced issues relating to their intention to disapprove the SHR charter transfers, including submitting the correspondence in which Defendants demanded that Front Row drop its antitrust claims if it wanted transfer approval. *See* Dkt. 60 at 5; Dkt. 60-1 at 44-64 (Exs. 9-14); *id.* ¶¶ 11-14. These are some of the *exact same* exhibits that Defendants cite now to argue that they did not have a fair chance to address this issue, which they introduced into the record. In arguing that the Court did not consider the "multiple conditions" that must be satisfied before charter transfer approval, Defendants cite 17 exhibits. *See* Mot. at 7 (citing Yates Decl. Exs. A-Q). Of these, 12 are dated on or before the date of Defendants' opposition, and Defendants relied on six of these *exact same exhibits* in their opposition.[1] (Two more of the exhibits are declarations Plaintiffs submitted in

---

[1] *Compare* Dkt. 77-2, Dkt. 77-3, Dkt. 77-4, Dkt. 77-6, Dkt. 77-15, and Dkt. 77-16 *with* Dkt. 60-1 (Ex. 9) Dkt. 60-1 (Ex. 10), Dkt. 60-1 (Ex. 12), Dkt. 60-1 (Ex. 14), Dkt. 60-1 (Ex. 11), and Dkt. 60-1 (Ex. 13).

support of their motion,[2] and another two were exhibits submitted earlier by Plaintiffs in connection with their motion.[3]). In any event, the record showed that the reasons Defendants stated they would not approve the transfer to Front Row were all based on Front Row's unwillingness to drop this lawsuit and release their antitrust claims. That release issue has been a part of this litigation from day one and Defendants cannot plausibly claim they have not had a fair opportunity to address it.

As this Court has observed, Defendants made a "strategic decision" to file a motion to strike Plaintiffs' evidence and request for relief against Defendants blocking the charter transfers, instead of directly providing further arguments and exhibits in response to Plaintiffs' evidence prior to the injunction order. Dkt. 83 at 2. Indeed, as the Court noted, Defendants' motion to strike[4] "included many, if not all, of the same arguments" that now appear in Defendants' motion to stay. *Id*. Choosing to sit on their arguments was Defendants' choice—"the Court did not limit their ability to present their position and evidence in any way, including with respect to the issue of the [SHR] charters." *Id*. Defendants chose to not "simply put in the record everything they now ask the Court to consider." *Id*. That choice does not support their request for a stay of the

---

[2] *Compare* Dkt. 77-10 and Dkt. 77-14 *with* Dkt. 52-1 and Dkt. 52-2.

[3] *Compare* Dkt. 77-1 and Dkt. 77-11 *with* Dkt. 52-4 and Dkt. 52-3.

[4] Defendants claimed that the motion to strike responded to supposedly "new" arguments in Plaintiffs' reply, but as Plaintiffs have already demonstrated, nothing in Plaintiffs' reply was "new" or improper. *See* Dkt. 69 at 2-3 (citing *Lismont v. Alexander Binzel Corp.*, 2014 WL 12527239, at *2 (E.D. Va. May 23, 2014) ("the purpose of a reply brief is to allow the movant to rebut the nonmovant's response, thereby persuading the Court that the movant is entitled to the requested relief"); *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) ("a district court may consider an argument raised for the first time on reply under appropriate circumstances"); *Marshall v. James B. Nutter & Co.*, 816 F. Supp. 2d 259, 264 (D. Md. 2011) (declining to strike portions of reply).

Court's Order and does not in any way support their already rejected arguments against Plaintiffs' likelihood of success on the merits.

**B.      Defendants' Rejection of the Charter Transfers Unless Plaintiffs Give Up Their Antitrust Rights Was Properly Found by This Court to Be a New Exclusionary Act That Warrants Relief**

Although Plaintiffs' request for preliminary relief to require Defendants to maintain the status quo and provide Plaintiffs with 2025 charter rights (including with respect to the SHR transfers) has been before the Court since the start of this litigation, Defendants' unlawful conduct has not remained static.  Defendants' exclusionary acts have evolved in an ongoing effort to coerce Plaintiffs into relinquishing their antitrust claims.  Their unambiguous refusal to approve the SHR transfers unless Plaintiffs agree to give up their antitrust rights is the latest iteration of their exclusionary conduct to insist upon a "release" of antitrust claims to unlawfully maintain their monopsony.  *See* Dkt. 67 at 3-4.

The timeline of Defendants' conduct bears repeating to demonstrate how their exclusionary acts have evolved.  On September 11, 2024, NASCAR President Steve Phelps informed Front Row that its SHR transfer was approved, and that Front Row just needed to submit the customary transfer documents.  Dkt. 67-1 ¶ 7.  On September 12, 2024, Phelps again confirmed that the transfer was approved.  *Id.* ¶ 8.  Front Row submitted the paperwork on November 14, 2024, and after some additional questions and submissions, NASCAR informed Front Row on December 5, 2024, that it would not approve the transfer.  *Id.* ¶ 9.  The only intervening event was Front Row filing this lawsuit.  Indeed, Defendants expressly informed Front Row that it would have to drop its lawsuit and release its antitrust rights before NASCAR would approve the transfer.  *Id.* ¶¶ 10-12.  None of these facts are disputed, or even addressed, in Defendants' motion to stay.

The Court was well within its "exercise of discretion and judgment," *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579-80 (2017) (citation omitted), to craft an injunction with

respect to the exclusionary release issue—that has been at the center of this case from the beginning—that prohibits Defendants from blocking the transfer of the SHR charters to Plaintiffs because they will not release their antitrust claims. Defendants have made it clear that they are going to withhold their approval of the charter transfers to Plaintiffs unless and until Plaintiffs give up their antitrust rights and abandon this litigation. It was perfectly appropriate for the Court to issue an injunction that prevented this irreparable harm to Plaintiffs by including "provisions to remediate the anticompetitive 'consequences' of [the defendant's] illegal conduct." *In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *5 (N.D. Cal. Oct. 7, 2024).

It was also well within the Court's discretion to extend the injunction against Defendants disapproving the SHR transfer to Plaintiff 23XI. Mot. at 4, 6. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump*, 582 U.S. at 579 (citation omitted); *see also Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) ("it is well established ... that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case"). Here, while it is correct that Defendants had not yet communicated to 23XI their intention to disapprove the transfer of the SHR charter, the Court correctly determined that Defendants would be taking the same position with respect to the 23XI transaction. And significantly, Defendants do not deny that this is the case. It was thus proper for the Court to include the 23XI transaction within the scope of the relief granted so that Defendants could not proceed to withhold their approval of that transaction, which would be for the same anticompetitive purpose of protecting their monopsony. The Court had before it evidence that, but for this antitrust litigation, NASCAR had already informed SHR that it was willing to approve the 23XI transfer. Dkt. 66-10 ¶ 5.

Defendants' claims that there are "multiple questions" about 23XI's "compliance with the Team Owner and Control Person requirements of the Charter" are wrong. *See* Mot. at 7. While such questions were raised with respect to ███████████████████████████████ ███████████████████████████████, those questions are moot as 23XI has submitted the necessary request for ███████████████████████████████ ███████████████████████████████. Lauletta Decl. ¶¶ 2-5. And there are also no legitimate questions of whether 23XI's owners are "Prohibited Persons" who cannot own a NASCAR Charter Agreement. *See* Mot. at 7. The 2025 Charter Agreement defines a "Prohibited Person" as ███████████████████████████████ ███████████████████████████████ ███████████████ Dkt. 21-5 at 59. The owners of 23XI—sports legends Michael Jordan and Denny Hamlin—have had two Charters Agreements, approved by NASCAR, for years. Moreover, NASCAR President Steve Phelps has publicly stated that 23XI owner Michael Jordan is the exact opposite of a Prohibited Person: "I love that Michael Jordan is in our sport. I personally like Michael and think he's good for the sport."[5] He had similar praise for Denny Hamlin: "Denny Hamlin's … doing a tremendous job …. I'd like to have 36 Denny Hamlins."[6] The only reason Defendants have now claimed that they may consider the owners of 23XI to be Prohibited Persons is because they have asserted their antitrust rights and filed this lawsuit. And that is the exact unlawful conduct that the Court has properly enjoined. As the Court has already found, "NASCAR was willing to approve this transfer on the merits but has now refused approval solely on the

---

[5] Matt Weaver, *League president Steve Phelps offers rare comments about teams suing NASCAR*, SPORTSNAUT (Oct. 31, 2024), https://sportsnaut.com/nascar-news-president-steve-phelps-rare-statement-lawsuit/.

[6] Kyle Dalton, *Denny Hamlin Calls Out NASCAR CEO for His Actions at Daytona*, HEAVY (Feb. 23, 2024), https://heavy.com/sports/nascar/denny-hamlin-nascar-ceo-daytona/.

grounds of Plaintiffs' lawsuit and the application of the release of claims, so it rises and falls on the same grounds as Plaintiffs' existing charter agreements." *See* Dkt. 74 at 3 n.2. Defendants have presented no basis for the Court to reconsider that determination.

### C. Plaintiffs Do Not Challenge the Entire 2025 Charter Agreement as Illegal

Defendants have repeatedly claimed, citing *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997), that Plaintiffs should not be granted a preliminary injunction that would give them the ability to race with Charter Agreement rights during the pendency of this litigation because Plaintiffs are purportedly seeking to strike down the entire 2025 Charter Agreement as illegal. This is false and the Court properly granted Plaintiffs' Charter Agreement rights for the 2025 season to preserve the status quo and prevent Plaintiffs from suffering immediate irreparable harm. *See* Dkt. 74.

Defendants' already-rejected arguments continue to fail for multiple reasons. To begin with, Plaintiffs only contend that two provisions of the 2025 Charter Agreements are exclusionary acts that are unlawful as a means for Defendants to maintain their monopsony power. *See* Dkt. 52 at 10; Dkt. 67 at 4-5. In such circumstances, it has been recognized that the concerns expressed in *Omega* do not arise because Plaintiffs are not seeking to have "the court declare a contract illegal and void"; they are rather seeking charter rights, during the pendency of the litigation, to the extent such rights do not violate the law. *Lutz v. Case Farms, LLC*, 2020 WL 5111217, at *4 (W.D.N.C. Aug. 31, 2020) (Bell, J). As this Court has found, there is "no bar precluding Plaintiffs from seeking an injunction to race under the charter terms previously offered to them *other than the anticompetitive release*." *See* Dkt. 52 at 10 (emphasis added).

Further, the relief granted by the Court with respect to the two charter renewals for each Plaintiffs was not to require Defendants to enter into new multi-year Charter Agreements with Plaintiffs. It instead ordered Defendants to permit Plaintiffs to race with charter rights solely for

8

the 2025 season.  Such relief—which does not require NASCAR to enter into new Charter Agreements with Plaintiffs—is completely inapposite to the concerns expressed in the *Omega* decision.

**D.  Requiring Plaintiffs to Release Their Antitrust Claims in Order to Compete With Charter Rights Is an Exclusionary Act**

Defendants similarly have no basis to ask the Court to reconsider its well-reasoned holding that a monopolist may not condition a company's ability to compete in the market on releasing its antitrust claims.  Defendants present arguments about releases in general, but they disregard the Court's key conclusion with respect to Defendants' efforts to coerce Plaintiffs into releasing their antirust rights:  "In practical effect, the question before the Court is – Can a monopolist require that a party agree to release the monopolist from all claims that it is violating the antitrust laws as a condition of doing business?  The answer is no."  Dkt. 74 at 14.  There is a good reason that the answer is no.  As the Court found, "NASCAR plainly exercises monopoly power" and can "condition entry into a market – here the NASCAR Cup Series – on the prospective entrant's agreement not to challenge the monopolist's conduct."  *Id.* at 13, 15.  And Defendants readily admit to doing just that, arguing that "Plaintiffs agreed to Section 10.3 on numerous prior occasions," which they were forced to do to race in the Cup Series, and so "anything historical … that is within the scope of Section 10.3 was released by Plaintiffs' acceptance of that term on multiple occasions."  Mot. at 8-9.  Put differently, Defendants argue that Plaintiffs waived their antitrust claims as the price of access to the Cup Series, which insulates Defendants from liability.  But that position is exactly why the Court correctly found that "to the extent that the Release bars Plaintiffs' antitrust claims, the Court finds that the Plaintiffs are likely to succeed on their claim that it is unlawful in this context."  Dkt. 74 at 14.  Nothing in Defendants' motion supports a different result.

Defendants' arguments about the release of prospective antitrust claims versus past antitrust claims get them nowhere. They are correct that it is against public policy to release future antitrust claims, and Plaintiffs welcome Defendants' position that their releases do not cover such future claims. But that has nothing to do with the Court's holding that a monopolist may not maintain its monopoly by requiring the release of past antitrust claims as the price for being able to compete in the monopolized market. That is the correct ruling, and there is no basis for the Court to reconsider it.

Defendants have not presented any reason for this Court to find that Defendants have a likelihood of success on the merits of their appeal. For this reason alone, Defendants have not shown that they are entitled to a stay.

## II. Defendants Are Not Irreparably Harmed by the Preliminary Injunction

Defendants also cannot show that they will suffer any irreparable harm if the injunction is not stayed. Their main argument in this regard is their claim that even if they win their appeal of the preliminary injunction, which is highly unlikely, they will be forced to remain in multi-year contractual relationships with Plaintiffs. But the Court has already rejected this argument. As the Court has noted, the injunction only grants Plaintiffs 2025 Charter rights for the 2025 season and, even with respect to the transfers of the SHR charter agreements to Plaintiffs, the Court retains the equitable power to order the unwinding of the transactions through a sale of the charter agreements if the court of appeals reverses the injunctive relief. Dkt. 83 at 1-2. The injunction thus does not mandate any long-term contractual relationship.

Further, as the Court found, the injunction only maintains the status quo with respect to the grant of 2025 charter rights to Plaintiffs, as Defendants were willing to extend such rights to Plaintiffs before this litigation was filed. *See* Dkt. 74 at 3, 19. And the same is true with respect to the transfer of the SHR Charter Agreements to Plaintiffs; Defendants made it clear that they

10

were going to approve the transfers from SHR to Plaintiffs before this litigation. *See* Dkt. 74 at 3 n.2. The evidence established that, but for Defendants' desire to coerce Plaintiffs into giving up their antitrust rights, they would be perfectly happy with—and would not suffer any harm, let alone irreparable harm from—Plaintiffs racing with charter rights or owning the SHR Charter Agreements. And the fact that Plaintiffs will be able to pursue their antitrust claims against Defendants during this period is not a cognizable harm. *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 n.9 (D.D.C. 2021) (finding that there is "no proper interest in continuing to violate" the law); *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1585 (2024) (Jackson, J., concurring in part and dissenting in part) ("When evaluating the balance of the equities, district courts … are prohibited from crediting a party's desire to continue engaging in an alleged violation of the [law].").

There is also no merit to Defendants' claim that they will suffer irreparable harm by being required to give Plaintiffs the charter rights to have a seat on the Team Owner Council that discusses unspecified "confidential information … regarding sensitive commercial and competitive issues." Mot. at 10. This is nonsense. The 2025 Charter Agreement provides █████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████. And Defendants have made no showing that they cannot impose any necessary confidentiality requirements on any information shared at Team Owner Council meetings. Defendants' claims of cognizable harm, let alone irreparable harm, from the preliminary injunction are pure fiction.

**III.    A Stay Will Cause Irreparable Harm to Plaintiffs and to SHR**

Contrary to the implication of Defendants' motion, the Court was well aware of its obligation to "ensure a preliminary injunction is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" Dkt. 74 at 4 (quoting *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 765 (1994)). Indeed, that is why the Court did not order Defendants to give charter agreement rights to Plaintiffs beyond the 2025 season and a trial. Defendants do not get to second guess the Court on this issue. To the contrary, "any doubts as to the extent of even this narrow remedy are to be resolved against the defendant." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 148 (D.D.C. 2002). For this reason, "for purposes of enjoining the conduct itself, exclusionary conduct is best defined rather broadly in the sense of resolving against the monopolist any doubts concerning the significance of the conduct's contribution to the monopoly." *Id*.

By contrast, if Defendants' stay motion were granted, Plaintiffs would be the ones to suffer significant irreparable harm. To begin with, as the Court recognized, losing the opportunity to purchase the SHR charter agreements, which are rare, would cause Plaintiffs the irreparable harm of losing this opportunity. *See* Dkt. 74 at 8-9. Defendants do not even address that irreparable harm. Second, racing without any charter rights other than having a guaranteed spot in each race would not protect Plaintiffs from the irreparable harm of ███████████████████████████ ███████████████████████████████████. *See* Dkt. 21-2 (Jenkins Decl.) ¶ 46; Dkt. 21-3 (Polk Decl.) ¶¶ 34, 41.

It was well within the Court's discretion to issue relief protecting Plaintiffs from this irreparable harm, especially since the injunction is properly preserving the status quo that existed prior to this controversy, when Defendants were more than willing to enter into 2025 Charter Agreements with Plaintiffs. Indeed, the relief granted is less protective of Plaintiffs than the status

quo, as the charter rights they have been granted are only for the 2025 season. The "standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978). The Court's preliminary injunction meets that standard. Defendants' alternative for a partial stay does not.

Defendants' partial stay would benefit Defendants at the expense of Plaintiffs. That is because Defendants could count on 23XI and Front Row fans buying tickets and tuning in to watch their teams that are now guaranteed entry into every race, while Defendants would have no obligation to share any of that increased revenue with Plaintiffs. Under the 2025 Charter Agreement, ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████. An injunction should not provide "a windfall to [Defendants], rewarding [them] for [their] nefarious actions." *Legacy Hous. Corp. v. City of Horseshoe Bay, Tex.*, 2024 WL 2131484, at *1 (W.D. Tex. May 13, 2024).

Defendants' motion for a partial stay also ignores the grievous harm such a stay would cause to SHR and its former employees. As the Court knows, SHR has already announced it is closing down most of its operations and many of its employees who supported its chartered cars have been let go and left to join Plaintiffs. *See* Dkt. 66-10 ¶¶ 6-7; Dkt. 67-1 ¶ 14. SHR no longer has the assets or infrastructure to support the Charters it has agreed to sell. Dkt. 66-10 ¶ 7. If the stay motion is granted, SHR and its former employees will be thrown into limbo and suffer their own irreparable harm. The Court's Order properly imposed "a reasonable method of eliminating

the consequences of the illegal conduct." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (citation omitted). It also properly "den[ies] the defendant the fruits of its statutory violation." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). And even if the injunction "goes beyond a simple proscription against the precise conduct previously pursued that is entirely appropriate." *Nat'l Soc. of Pro. Eng'rs*, 435 U.S. at 698.

## IV. The Court Properly Found That the Public Interest Supports the Preliminary Injunction

Finally, the Court correctly found that the preliminary injunction it granted is in the public interest because it "preserv[es] the rights of litigants to pursue legal claims in good faith, particularly antitrust claims that aim to preserve the process of commercial competition." Dkt. 74 at 19. It also ensures that NASCAR fans will be able to watch "all the teams compete with their best drivers and most competitive teams." *Id.* And finally, it does not undermine the freedom to contract because it simply preserves the status quo that existed prior to this controversy "until the lawfulness of Defendants' conduct is promptly resolved." *Id.*

Defendants argue that "forcing" them "into an unwanted contract … goes against the public interest." Mot. at 11 (citing *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1162 (9th Cir. 2011)). But the authority they cite says no such thing. In *Park Village*, the Ninth Circuit reversed the district court's grant of a preliminary injunction because the court "incorrectly inverted the burden of proof by examining whether the proposed injunction would cause irreparable harm to *Defendants*." 636 F.3d at 1160. It continued:

> By examining the legally irrelevant question of whether Defendants were likely to suffer harm if they were ordered to execute HAP contracts with the Oakland Housing Authority, the district court failed to make the essential finding that Plaintiffs are likely to suffer irreparable harm unless Defendants are ordered to enter HAP contracts with the Oakland Housing Authority.

*Id.* The Court here made no such mistake. The irreparable harm to Plaintiffs, without an injunction, was properly found to be established.

Further, as previously discussed, the Court has already explained that the injunction does not force Defendants into an extended contractual relationship with Plaintiffs because it only requires Defendants to allow Plaintiffs to race under the *terms* of the 2025 Charter Agreement for the 2025 Cup Series season and the Court retains the equitable power to require Plaintiffs to sell the SHR Charter Agreements if the preliminary injunction is reversed on appeal. Dkt. 83 at 1 n.1. And regardless, the evidence established that such transfers were not unwanted by Defendants and that they would be approved but for Defendants' unlawful efforts to force Plaintiffs to abandon their antitrust claims. The public interest here is squarely in favor of the injunction.

## **CONCLUSION**

For all the foregoing reasons, Defendants' Motion to Stay should be denied.

Dated: December 23, 2024                Respectfully submitted,

WINSTON & STRAWN LLP

By:     */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

15

Jeanifer Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Matthew R. DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com

*Counsel for Plaintiffs 2311 Racing LLC d/b/a*
*23XI Racing and Front Row Motorsports Inc.*

## CERTIFICATE OF COMPLIANCE

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By: _/s/ Jeffrey L. Kessler_

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

_Counsel for Plaintiffs 2311Racing LLC d/b/a
23XI Racing and Front Row Motorsports Inc._

17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR PARTIAL STAY OF INJUNCTION PENDING APPEAL** was electronically filed using the Court's CM/ECF system, which will automatically send notice of this filing to counsel of record for all parties, and I caused an unredacted copy of the foregoing to be served on counsel of record for all parties, including:

Tricia Wilson Magee
**SHUMAKER LOOP & KENDRICK, LLP**
101 S. Tryon St., Suite 2200
Charlotte, NC 28280
tmagee@shumaker.com

Christopher S. Yates
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
chris.yates@lw.com

Lawrence E. Buterman
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com

Anna M. Rathbun
Christopher J. Brown
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
anna.rathbun@lw.com
chris.brown@lw.com

*Counsel for Defendant National Association for Stock Car Auto Racing, LLC*

_____
*Jeffrey L. Kessler*
Jeffrey L. Kessler