IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00886-KDB-SCR

| | |
|---|---|
| 2311 RACING LLC AND<br>FRONT ROW MOTORSPORTS,<br>INC., <br><br>    Plaintiffs,<br><br>    v.<br><br>NATIONAL ASSOCIATION FOR<br>STOCK CAR AUTO RACING,<br>LLC AND JAMES FRANCE,<br><br>    Defendants. | <br><br><br><br><br><br>**ORDER** |

On December 18, 2024, the Court entered an Order granting in part Plaintiffs 2311 Racing LLC's ("23XI") and Front Row Motorsports, Inc.'s ("Front Row") renewed Motion for a Preliminary Injunction. (Doc. Nos. 51, 74). The Court did not do so lightly. Applying well-established legal standards to fast-moving and time sensitive events, the Court carefully considered Plaintiffs' likelihood of success on the merits, the irreparable harm likely to result from denial of the injunction, the equities among the Parties and the public interest. Then, the Court exercised its discretion to craft a limited injunction that sought to balance the Parties' starkly different positions and achieve, to the extent practicable, a fair, "status quo" resolution for the 2025 NASCAR Cup Series season, until trial can be held in December 2025.

Now, Defendants move the Court to stay the injunction the Court found is urgently needed for an indeterminate time while they pursue their appeal to the Court of Appeals for the Fourth Circuit. Doc. No. 76. For the reasons discussed below, including the immediate irreparable harm to Plaintiffs which will be caused by further delay and the absence of harm to Defendants if the

1

injunction is allowed to proceed, the Court declines to grant the Defendants' requested stay. However, upon reconsideration, the Court will amend the Preliminary Injunction with respect to 23XI's purchase of a Stewart Hass Racing ("SHR") charter. Plaintiffs limited their preliminary injunction request for the SHR charters to Front Row. Therefore, without prejudice to 23XI seeking a separate preliminary injunction related to its proposed SHR charter purchase, the order that NASCAR approve the transfer of that charter will be removed from the Court's injunction.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) provides in relevant part: "While an appeal is pending from an interlocutory order or final judgement that . . . grants . . . an injunction, the court may . . . suspend [or] modify . . . an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). To prevail on a motion for a stay of the Court's injunction pending appeal, Defendants must show (1) a likelihood of success on the merits of their appeal of the granting of the preliminary injunction, (2) a likelihood of irreparable harm absent relief, (3) that the stay of the injunction will not substantially harm the other party, and (4) that a stay benefits the public. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (citation omitted).

## II. DISCUSSION

### A. Likelihood of Success on the Merits

Defendants have not made a showing that they are likely to succeed on the merits. In response to Defendants' contention that the Court erred in granting its limited injunction, the Court refers to the full substance of its Order in support of its decision and disagrees that the Court's ruling is in error. Indeed, nearly all of the arguments that Defendants make in arguing their stay motion have already been made to the Court.

First, Defendants reprise their arguments that the Release is not likely to violate antitrust law based on their characterization of the Release as "retrospective." As the Court noted in its injunction Order, the Release is hardly a model of clarity, but Defendants' view that the Release bars Plaintiffs' antitrust claims *in this action* is crystal clear. *See* Doc. No. 58 (Answer) at p. 36 (Fifth Defense claiming that all of Plaintiff's claims are barred "by signing agreements with NASCAR that contained release provisions" [like the Section 10.3 release]); Doc. No. 31 at p. 9 ("First, [Plaintiffs' Sherman Act § 2] claim is barred by a contractual release . . . . Plaintiffs willingly agreed to Section 10.3 when signing or acquiring 2016 Charters, a provision that 'release[s] their antitrust rights.'"). Even accepting Defendants' inapplicable arguments related to "retrospective" claims,[1] Plaintiffs' Sherman Act claims relate to ongoing and prospective conduct. *See* Doc. No. 1 at 137 ("Defendants have engaged in a series of anticompetitive and exclusionary conduct . . . . *These exclusionary actions are of a continuing nature and constitute new overt acts in furtherance of Defendants' unlawful monopsony each year*.) (emphasis added). So, in arguing that Plaintiffs' claims are barred by the Release, Defendants admit that the Release is applicable to far more than "retrospective" claims.

In fact, the claimed effect of Defendants' arguments with respect to Plaintiffs' refusal to sign the Release as part of the 2025 Charter Agreement is even broader. In their Answer, Defendants assert as a defense that Plaintiffs can't bring their claims because they didn't sign the 2025 Charter Agreements and thus aren't "efficient enforcers" of the antitrust claims. *See* Doc. No. 58 at p. 38. So, Plaintiffs or any other team that wanted to challenge NASCAR's conduct as

---

[1] As explained in the injunction Order, the Release is not analogous to a release of specific claims in the settlement of a lawsuit. Further, NASCAR's monopsony position as the sole "owner" who decides which racing teams can participate in premier stock car racing is not the same as a true sports "joint venture" where a group of owners form a league of teams and agree on the existential point that the combination does not violate antitrust law.

3

an antitrust violation is (according to Defendants) put in a classic "Catch-22" – the team must accept the 2025 Charter Agreement, including the Release that bars Plaintiffs' antitrust claims, but if it doesn't sign the Charter Agreement then it can't bring those same antitrust claims because it doesn't hold a charter. Again, the NCAA is an apt analogy. Could the NCAA just say to all prospective "student-athletes" that they can't play unless they agree to release the NCAA from antitrust liability? Of course not. NASCAR's "release to race" requirement simply doesn't pass muster and is likely to be found to violate antitrust law.

Second, the Court's injunction is not inconsistent with Fourth Circuit precedent. To the contrary, the Court has broad discretion to create an injunction based on the unique circumstances of this case. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579-80 (2017) ("crafting a Preliminary Injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."). The Court has sought to "mold its decree to meet the exigencies of [this] case." *Id.* at 580. Also, it has sought to make the limited preliminary injunction "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The Court has limited the injunction to the 2025 NASCAR Cup racing season that begins in a few weeks and will end shortly before trial. With respect to Plaintiffs' existing charters, the injunction does not require NASCAR to enter into a long term 2025 Charter Agreement with Plaintiffs but instead requires NASCAR to allow Plaintiffs to race as chartered cars under the terms of the 2025 Charter Agreement (other than the Release), encompassing the obligations that Defendants say are most important to them, including the "Goodwill" (non-compete) restrictions. With respect to the transfer charter that Front Row will obtain from SHS, the 2025 Charter Agreement is already signed so, again, NASCAR has the same

4

benefits and obligations it has with the other race teams, with the exception of the Release. The terms of the injunction thus give Plaintiffs the status of chartered teams to keep their drivers, and NASCAR's interests are protected as well. Also, to the extent Plaintiffs' claims are unsuccessful and NASCAR seeks such relief, the Court has the equitable power to require the sale of or take other action with respect to the SHR transferred charters as part of the final relief entered after trial.

*Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) is inapplicable to this case. In that action plaintiff "literally [sought] through its antitrust claim to dissolve the very contractual relationship which it [sought] to have preserved through preliminary injunction." In contrast, not only do Plaintiffs here want to maintain a contractual relationship with NASCAR (albeit on lawful terms), the Court's injunction does not create any contractual relationship as to the existing chartered cars or a new contract for the SHR transfer. *See Lutz v. Case Farms, LLC*, No. 520CV00103KDBDCK, 2020 WL 5111217, at *4 (W.D.N.C. Aug. 31, 2020) (*Omega* inapplicable where plaintiff did not seek to avoid a contractual relationship with the defendant entirely). Indeed, Defendants' criticism of the Court's requirement that Plaintiffs abide by the terms of the 2025 Charter Agreements is puzzling because those terms, including the "Goodwill" provision, are *for NASCAR's benefit* and reflect the Court's effort to enter the least intrusive injunction. Finally, in *Omega*, the plaintiff did not urge in its preliminary injunction motion that the threatened termination of its contract would be in furtherance of a restraint of trade, and the Court of Appeals specifically stated that the preliminary injunction was not reviewed on that basis. Here, Plaintiffs did not seek a contract at all in their renewed injunction request and have claimed that the imposition of the Release in the 2025 Charter Agreement (and other provisions) are restraints of trade to which *Omega* does not speak. *Omega*, 111 F.3d at 16.

5

Therefore, the Court's limited preliminary injunction is comfortably within Fourth Circuit authority.

Third, Defendants challenge the merits of the Court's injunction with respect to the SHR charter transfers. Defendants initial argument is that they did not have a fair opportunity to oppose Plaintiffs' request. Rule 65 of the Federal Rules of Civil Procedure requires that the adverse party has notice before a preliminary injunction is issued. Defendants had notice of Plaintiffs' request that Front Row be permitted to complete the transfer of the SHR charter they previously agreed to purchase. Doc. No. 65. Further, although there is no requirement in the rule that a decision on a preliminary injunction motion be delayed until briefs can be filed, Defendants have now at least twice presented their written arguments and evidence to the Court opposing this injunctive relief.[2] *See* Doc. Nos. 68, 70 and 76. The Court has not restricted Defendants' presentation of their position on this issue and has carefully considered all of Defendants' submissions (as well as stayed the implementation of this part of the injunction while it did so).

Also, the communications and events related to the transfers of the SHR charters were happening in real time throughout the first weeks of December (one of the letters that Defendants have filed is dated as late as December 17, 2024), and the Court and the Parties did their best to brief and decide the dispute in time for the ruling to be meaningful. The Court credits Plaintiffs' evidence that at the time of the Plaintiffs' first motion for a preliminary injunction (October 9)[3]

---

[2] Defendants also included a number of communications they now cite in opposition in their response to the Plaintiffs' renewed motion for a preliminary injunction. *See* Doc. No. 60-1 at 44-64 (Exs. 9-14).

[3] Plaintiffs' initial preliminary injunction motion did in part reference the transfer issue, requesting that Defendants be "enjoined from enforcing Section 10.3 of any NASCAR Cup Series Charter Member Agreement that is granted, or transferred (pursuant to the pending transactions with Stewart-Haas Racing, LLC) as a defense to any antitrust claim that either Plaintiff is pursuing in this action." Doc. No. 20 at ¶ 9(c).

6

and the time of its renewed motion (November 26), they believed there was no need to ask the Court to order Defendants to approve the SHR charter transfer to Front Row.

On September 11, 2024, NASCAR President Steve Phelps informed Front Row that its SHR transfer was approved, and that Front Row just needed to submit the customary transfer documents. Doc. No. 67-1 at ¶ 7. On September 12, 2024, Phelps again confirmed that the transfer was approved. *Id.* at ¶ 8. Front Row submitted the paperwork on November 14, 2024, and after some additional questions and submissions, NASCAR informed Front Row on December 5, 2024, that it would not approve the transfer. *Id.* at ¶ 9. The only intervening event was Front Row filing this lawsuit. Indeed, Defendants expressly informed Front Row that it would have to drop its lawsuit and release its antitrust rights before NASCAR would approve the transfer. *Id.* at ¶¶ 10-12. Plaintiffs had no reason to suspect that NASCAR would reverse course and reject the transfer on December 5 – after Plaintiffs filed their renewed motion, but before Defendants filed their opposition. *See* Doc. No. 60-1 at 50 (Ex. 11). Therefore, the Court finds that Plaintiffs timely raised their injunction request with respect to the transfer of the SHR charter to Front Row[4] and Defendants have, given the exigencies of the circumstances, had sufficient notice under Rule 65 and an opportunity to respond. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000) ("[B]road discretion is given to the district court to manage the timing and process for entry of …

---

[4] Defendants also argue that the injunction with respect to the SHR charters should not have been entered because that requested relief is not yet presented in the Complaint. The Court disagrees. The need for NASCAR to approve the transfer of the SHR charters is raised in the Complaint, *see* Doc. No. 1 at ¶¶ 23, 35, 41, but more fundamentally, the Parties have requested and the Court has ordered that additional time be given to the Parties to amend their pleadings (until March 15, 2025) and the governing rules even allow the pleadings to be amended as late as at trial. See Doc. No. 84 at 1; Fed. R. Civ. Proc. 15(b)(1); *Boshea v. Compass Mktg., Inc*., No. CV ELH-21-309, 2024 WL 4732773, at *13 (D. Md. Nov. 8, 2024). Therefore, the absence of a request for this injunctive relief in the Complaint is not a bar to the Court's entry of the preliminary injunction in response to more recent events.

7

preliminary injunctions . . . so long as the opposing party is given a reasonable opportunity, commensurate with the scarcity of time under the circumstances, to prepare a defense and advance reasons why the injunction should not issue.").

Further, the possibility that some issues related to NASCAR's approval of Plaintiffs' purchase of SHR charters may be subject to arbitration is not a bar to the Court's preliminary injunction. An injunction issued to preserve the availability of meaningful relief in an arbitration is appropriate. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985) (An "injunction to preserve the status quo pending arbitration is appropriate where it is necessary to prevent conduct by the party enjoined from rendering the arbitral process a hollow formality."). Here, in the absence of a preliminary injunction, the object of the arbitration – Front Row's potential purchase of a SHR charter – will be lost and the arbitration rendered a "hollow formality" (if an arbitration, which has neither been sought nor convened, is even requested).

In sum, the Court reaffirms its factual finding that the record shows that the reasons Defendants stated they would not approve the transfer to Front Row were all based on Front Row's unwillingness to drop this lawsuit and release their antitrust claims. The Release is likely to be found unlawful as described above. Further, declining to enjoin NASCAR from refusing to approve Front Row's purchase of the SHR charter will cause Front Row immediate irreparable harm in the loss of a rare opportunity to acquire a charter racing spot.

Granting the stay requested by Defendants would also impose significant collateral harm on SHR and its former employees. SHR has already announced it is closing down most of its operations and many of its employees who supported its chartered cars have been let go and left to join Plaintiffs. *See* Doc. No. 66-10 at ¶¶ 6-7. Twenty-eight jobs are at risk. Doc. No. 67-1 at ¶ 14. Therefore, if the stay motion is granted, SHR and its former employees will be thrown into

limbo and suffer their own irreparable harm. For all these reasons (and the others discussed in the Court's earlier Order), after due reconsideration, the Court finds that all of the *Winter* factors are met with respect to the Court's preliminary injunction related to NASCAR's approval of Front Row's purchase of a SHR charter.

23XI's purchase of a SHR charter stands in a different posture. Plaintiffs did not request a preliminary injunction with respect to 23XI. While the circumstances and issues related to 23XI's purchase of a SHR charter substantially overlap the transfer of the SHR charter to Front Row, the situation is not entirely the same. Therefore, even though the Court has broad discretion to fashion appropriate preliminary injunctive relief, it will limit the preliminary injunction to NASCAR's approval of Front Row's SHR charter purchase until 23XI files a separate motion for a preliminary injunction with respect to its purchase of a SHR charter. If filed, the Court will promptly consider that motion on its own merits.

### B. Irreparable Harm to Defendants

In contrast to the harm that will follow an injunction, there will be no irreparable harm to Defendants if Plaintiffs are permitted to race under the agreed terms (both the benefits and obligations) of the 2025 Charter Agreements with respect to their existing chartered cars and Front Row is permitted to purchase the SHR charter. Actually, applying the charter terms to Plaintiffs' race cars will not harm NASCAR at all. NASCAR has the same terms with 30 other cars and has repeatedly represented to the Court that those terms reflect a fair and *beneficial* deal for all concerned. So, the Court's injunction requiring NASCAR to permit Plaintiffs' to race chartered cars cannot constitute "irreparable harm" to NASCAR.[5]

---

[5] To the extent Defendants contend that they will suffer any monetary loss as a result of Plaintiffs' being allowed to race with chartered cars, such harm is not irreparable (as Defendants have

9

Defendants are also incorrect that the injunction requires NASCAR to enter into a "seven to fourteen year" contractual relationship with Plaintiffs. With respect to their existing chartered cars, Plaintiffs are entitled – only for the 2025 race season – to race under the *terms* of the 2025 Charter Agreement (with the lone exception of the Release provision but including the "goodwill" and all other provisions) and NASCAR is not obligated to enter into a Charter Agreement. For the transfer of the SHR charter to Front Row, the Court is ordering NASCAR to immediately approve the transfer so that the transaction can close and Front Row will not suffer the irreparable harm of losing the opportunity to acquire the charter; however, the Court clearly retains the equitable power to in the future effectively "unwind" the transaction through an order requiring Front Row to transfer/sell the charters back to NASCAR or another team approved by NASCAR. Therefore, Defendants are not irrevocably bound to a long-term contractual relationship on the transferred charter.

Finally, the Court is unpersuaded by Defendants' argument that they will suffer "irreparable harm" as a result of the injunction because they will have to share unspecified so-called "confidential" information about the sport with Plaintiffs as a chartered team.[6] Any information that Defendants share with the chartered racing teams will by definition not be privileged information (because it will be shared with a third party) and Plaintiffs will already have

---

themselves argued with respect to Plaintiffs' allegations of monetary harm) and the issuance of a bond as security for any alleged harm to Defendants will be considered in Defendants' recently filed Motion for Bond. *See* Doc. No. 78.

[6] Plaintiffs would apparently be entitled to a seat on the Team Owner Council regardless of the injunction. The 2025 Charter Agreement provides a Team Owner Council seat not just to Chartered teams, but to "the controlling owner of each open participant that attempted to qualify for at least 75% of the Cup Series in the prior Year." Doc. No. 21-5 (2025 Charter Agreement) § 3.5(a)(ii). 23XI and Front Row both qualified for every race in the 2024 Cup Series season, so even if they were open participants for the 2025 Cup Series season, they would each have a seat on the Team Owner Council in 2025.

access to Defendants' "confidential" information through discovery in this lawsuit. *See* Doc. No. 85 (Stipulated Protective Order protecting the disclosure of highly confidential information). Therefore, Defendants will not suffer any "irreparable harm" from the potential disclosure of alleged "confidential" information (or in any other manner) as a consequence of the injunction.

### C. Injury to Plaintiffs

As discussed at length in the Court's injunction Order, Plaintiffs will be irreparably harmed by a stay because the inability to race as chartered teams (even if NASCAR guarantees that they will be allowed to race as "open" cars) will put their contracts with their best drivers at jeopardy. *See* Doc. No. 74 at 7-8, 16 (23XI driver Tyler Reddick giving notice to the team it "has 30 days to provide me assurances that we will operate with a Chartered car, as required under Section IV of our agreement . . ."). As found by the Court, 23XI was required to cure its contractual breach with Tyler Reddick with a commitment to a chartered car by December 18, 2024, or Reddick would no longer be contractually bound to the team. Other driver contracts would be similarly put at risk. *Id*. This irreparable harm would only be compounded by a stay of the Court's injunction pending appeal, throwing Plaintiffs' and their drivers' preparations for the 2025 season into chaos. Therefore, the factor of the harm to Plaintiffs in granting a stay strongly favors denial of the requested stay. Further, as discussed above, with respect to Front Row's purchase of the SHR charter, Front Row would suffer irreparable harm by losing a rare opportunity to buy a charter. *See* Doc. No. 74 at 8-9.

### D. The Public Interest

The last factor to be considered is the public interest. As explained in the Court's earlier Order, the public interest is best served by the limited injunction ordered by the Court. Allowing Plaintiffs to race with chartered cars and their best drivers gives fans the opportunity to see the

11

best and most competitive racing. Also, the public has an interest in having the merits of Plaintiffs' antitrust claims determined in this action, notwithstanding the Release. Defendants argue that the public interest in freedom of contract supports a stay of the injunction; however, that interest is, of course, only applicable to *lawful* conduct and that is the very nature of Plaintiffs' claims. Therefore, the public interest will not be served by a stay.

## III. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants Motion to Stay Pending Appeal (Doc. No. 76) is **DENIED**; however,

2. The Court's Preliminary Injunction is modified with respect to the SHR charters to enjoin NASCAR only from refusing to immediately approve Front Row's purchase of a SHR charter. NASCAR is not enjoined from declining to approve 23XI's purchase of a SHR charter, subject to 23XI's ability to seek such relief from the Court (which will independently be considered on its own merits).

**SO ORDERED ADJUDGED AND DECREED**.

Signed: December 23, 2024

Kenneth D. Bell
United States District Judge