# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC.,<br><br>       Plaintiffs,<br><br>       v.<br><br>NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE<br><br>       Defendants. | Civil Action No. 3:24-cv-886-KDB-SCR<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

PARTIES .................................................................................................................... 11

    I.      Plaintiff 23XI Racing ............................................................................ 11

    II.     Plaintiff Front Row Motorsports, Inc. ................................................. 12

    III.    Defendant NASCAR ............................................................................. 13

    IV.    Defendant NASCAR Holdings, LLC ................................................... 14

    V.     Defendant NASCAR Event Management, LLC .................................. 14

    VI.    Defendant Jim France ........................................................................... 14

FACTUAL ALLEGATIONS ...................................................................................... 16

    I.      The France Family Monopoly Enterprise ............................................ 16

    II.     The 2016 Charter Agreements with Stock Car Racing Teams ........... 19

    III.    NASCAR and Jim France's Monopsonistic Scheme .......................... 21

            A.     NASCAR Maintains its Monopsony Power by Purchasing a
                 Large Cache of Racetracks That it Uses to Protect its
                 Market Position and by Forcing Anticompetitive
                 Exclusivity Provisions on the Tracks it Does Not Own ........................ 22

                     1.     NASCAR Acquires Premier Racetracks and
                          Prohibits Any Other Premier Stock Car Races on
                          Those Tracks ............................................................ 23

                     2.     NASCAR Forces Exclusive Terms on Racetracks as
                          a Condition of Hosting a Cup Series Race, Further
                          Strengthening the Barrier to Entry for Any New
                          Top-Tier Stock Car Racing Series ................................ 24

            B.     NASCAR Acquires ARCA and the ARCA Menards Series
                 to Prevent Potential Competition with the Cup Series ............................ 25

            C.     NASCAR Uses Covenants Not to Compete to Maintain Its
                 Monopoly Position .................................................................................. 26

            D.     The Anticompetitive Next Gen Requirements ........................................ 26

E.      The Exercise of Monopsony Power by NASCAR and France to Impose Anticompetitive Terms in the 2025 Charter Agreements ...................................................................... 28

RELEVANT MARKET AND MARKET POWER ....................................................... 32

ANTITRUST INJURY ...................................................................................................... 34

INTERSTATE TRADE, COMMERCE, AND CONDUCT ........................................... 35

CLAIMS FOR RELIEF ..................................................................................................... 36

PRAYER FOR RELIEF ..................................................................................................... 41

DEMAND FOR JURY TRIAL ......................................................................................... 42

Plaintiffs 2311 Racing LLC d/b/a 23XI Racing ("23XI") and Front Row Motorsports, Inc. ("Front Row" and together with 23XI, "Plaintiffs"), by their undersigned attorneys, for their Complaint (the "Complaint") herein allege as follows:

## INTRODUCTION

1.　　　This is a case about the unlawful monopolization of premier stock car racing by the France family in order to enrich themselves at the expense of the premier stock car racing teams that the fans come out to see and that sponsors and broadcasters value.  The France family has realized monopoly profits through its ownership and control over the National Association for Stock Car Auto Racing ("NASCAR")[1], which has exploited its economic power as the sole premier stock car racing organization in the United States.  NASCAR races are the number one motorsport events in the United States, with no other motorsport series coming close in broadcast ratings, live gate attendance, rights fees, or corporate sponsorship revenue.  This dominant position has not been created by the superior product or skill of NASCAR's owners—it is the product of the anticompetitive and exclusionary practices that NASCAR has employed to protect its premier racing series, known as the "Cup Series," from having to compete with any other premier stock car racing series.  The France family has used NASCAR to acquire and maintain a monopsony position over premier stock car racing teams through, among other anticompetitive actions, acquisition of other racing circuits and racetracks, anticompetitive agreements that restrict the availability of racetracks that are suitable for premier stock car racing, monopoly rules regarding the exclusive use of specialized "Next Gen" cars, and non-compete restrictions that prevent

---

[1] "NASCAR" collectively refers to Defendants National Association for Stock Car Auto Racing, LLC, NASCAR Holdings, LLC, and NASCAR Event Management, LLC.

premier stock car racing teams competing in the Cup Series from also participating in races outside of NASCAR's circuit.

2. Founded in 1948, NASCAR's business model has been based on the principle of independent stock car racing teams investing their own money and time for the opportunity to compete in premier stock car events at tracks largely owned by NASCAR's ruling family, the Frances. Whatever teams put in, NASCAR argued, would be rewarded with the glory of race wins and championships. However, even some of the most successful racing teams in NASCAR history have left the sport with little to show for it, at least not in their wallets, while the France family profited handsomely.

3. Unlike many major professional sports leagues like the NFL or the NBA, which are owned and operated by their teams, NASCAR has always been privately owned by the France family, including current CEO and Chairman, James ("Jim") France. By exploiting its monopsony power over the racing teams, NASCAR has been able to impose anticompetitive terms as a condition of a team's access to competitions. By blocking the formation or growth of any competing premier stock car racing series, NASCAR has been able to force the teams to accept take-it-or-leave-it economic conditions in order to compete at the highest level of stock car racing in the United States.

4. For most of NASCAR's history, teams competed under year-to-year contracts that provided no assurance of the long-term viability of a racing team. Because teams had no guaranteed entry into any Cup Series event, prize money (the only payment they received from NASCAR) was not a reliable revenue source, and teams had to depend primarily on individual team sponsorships. But near-total dependence on sponsors left teams with few funds to invest in their operations. Further, only the most successful, high-performing teams were able to

consistently obtain substantial sponsorships, while "[o]thers scrambled for scraps."[2] The system left teams in a constant state of financial vulnerability, and NASCAR's history is littered with once successful racing teams that are now defunct. Even some of NASCAR's most valuable teams took hits when they could not consistently perform at a high level in races.[3] In the words of NASCAR Hall of Famer Jimmie Johnson, "The best thing to be is NASCAR, the second best a driver and the last thing a team owner."[4]

5. The economic exploitation of the racing teams by NASCAR led to a phenomenon known as "start-and-park," which occurs when a car qualifies for a NASCAR race, starts the race, and then after a few laps, heads to the pit lane and retires in order to conserve costs. Teams were desperate for revenue, and avoiding a full race minimized the team's costs—including the potential for a financially catastrophic crash. The owner of one team (that no longer races in the Cup Series) said in 2009 that he "always wants to run the whole distance but sometimes can't afford it." The only other option, he said, "is to not race at all. Do I like it? No."[5]

6. Meanwhile, NASCAR and the France family were paid handsomely with increasingly rich television broadcast deals. In 2001, NASCAR struck deals with NBC, TBS, and Fox worth $400 million per year, quadrupling the value of its then-existing broadcast rights. NASCAR then inked new deals with ABC/ESPN, Fox, and TNT worth $600 million per year for

---

[2] *Roy S. Johnson, Cora Daniels, Speed Sells*, CNN MONEY (originally published in FORTUNE MAGAZINE, April 12, 1999), https://money.cnn.com/magazines/fortune/fortune_archive/1999/04/12/258135/index.htm (last visited Oct. 1, 2024).

[3] *The Most Valuable Teams In NASCAR*, FORBES, (June 11, 2008, last updated July 12, 2012), https://www.forbes.com/2008/06/11/nascar-car-values-biz-cx_jg_0611nascar_land.html (last visited Sept. 27, 2024).

[4] *Nascar's Business Wreck*, FORBES (Feb. 20, 2009, last updated Jul. 16, 2012), https://www.forbes.com/global/2009/0302/050_pileup.html (last visited Sept. 24, 2024).

[5] Steven Cole Smith, *Stopping for cash: NASCAR racing is a business, but when is it no longer sport?*, AUTOWEEK (Aug. 5, 2009), https://www.autoweek.com/racing/nascar/a2028311/stopping-cash-nascar-racing-business-when-it-no-longer-sport/.

3

2007 through 2014. NASCAR's deals with Fox and NBC for 2015 through 2024 upped the annual value again, this time paying $820 million per year. And NASCAR's latest deals with Fox, NBC, Amazon, and Warner Bros. added another comma to the annual value, this time paying $1.1 billion per year from 2025 through 2031. In total, NASCAR's broadcast deals have been worth $23.1 billion since 2001.

7.      In 2015, with NASCAR and the France family growing richer off increasingly lucrative broadcast deals and teams struggling financially, the teams formed the Race Team Alliance ("RTA") to try to negotiate a fairer deal between the teams and NASCAR. Brian France, who was NASCAR's chairman at the time, immediately blasted the idea of negotiating with RTA instead of individual teams, saying that "listen[ing] to one voice, even if it were a consensus voice," "would probably be the worst thing we could ever do."[6] NASCAR preferred negotiating with teams individually so that it could ensure its counterparties would have little bargaining power and could continue to be forced into one-sided contracts that would provide most of the economic benefits of stock car racing to the France family.

8.      RTA nonetheless pushed forward, negotiating on behalf of all but one Cup Series team, and RTA and NASCAR eventually agreed on implementing a system in 2016 under which NASCAR entered into Charter Agreements with Cup Series teams that would guarantee each chartered car entry into every Cup Series race for the term of the Charter Agreement. The original charters lasted from 2016 through December 31, 2020, and were automatically renewed to continue through December 31, 2024, if the team provided NASCAR with written notice of its desire to extend the term for four more years between January 1, 2020 and March 1, 2020.

---

[6] Jeff Gluck, *NASCAR's Brian France says Race Team Alliance unnecessary*, USA TODAY (July 21, 2014), https://www.usatoday.com/story/sports/nascar/2014/07/21/race-team-alliance-brian-france/12967329/ (last visited Oct. 2, 2024).

9.     Although the 2016 Charter Agreement was an improvement over the prior economic conditions of the teams, it still was the anticompetitive product of NASCAR's unlawful monopoly over premier stock car racing in the United States.  The economic terms were far below what the teams would be able to obtain if there were a competitive market for premier stock car racing.  And the teams continued to struggle to make a reasonable profit while investing the tens of millions of dollars that were required to support the operations of a premier stock car racing team.  Even with four charters and fourteen Cup Series championships, Hendrick Motorsports Vice Chairman (and NASCAR legend) Jeff Gordon said his race team has not had a profitable season in years, and he has "a lot of fears that sustainability is going to be a real challenge." [7]

10.     Of the 19 team owners that were originally granted charters in 2016, only eight remain in the sport.  One of the teams that left the sport was Furniture Row Motorsports, which left after the conclusion of the 2018 Cup Series season, just one season after winning the coveted Cup Series Championship as the Series' best team.

11.     The 2016 Charter Agreement included an anticompetitive provision which required the teams to agree to not compete in any other professional stock car racing series.

12.     In 2018, NASCAR acquired the only other recognizable stock car racing series competitor in the United States, the Automobile Racing Club of America ("ARCA").  The Menards Series, ARCA's highest level of competition, had gained access to some of the premier racetracks in the United States, and held races at famous tracks like Daytona International Speedway and Michigan International Speedway.  By 2018, nine of the 20 Menards Series races

---

[7] Nick Bromberg, *NASCAR teams: Current Cup Series economic model is 'broken' and future sustainability 'could be a real challenge'*, YAHOO! SPORTS (Oct. 7, 2022), https://sports.yahoo.com/nascar-teams-current-cup-series-economic-model-is-broken-and-future-sustainability-could-be-a-real-challenge-194559687.html (last visited Oct. 2, 2024).

were held on tracks that also hosted NASCAR events. Instead of standing by while the ARCA Menards Series tried to grow into a more substantial competitor, NASCAR acquired ARCA and relegated it into a "feeder" series that it could keep under NASCAR's thumb.

13. Following the 2018 season, NASCAR developed its "Next Gen" car program to exercise additional control over the teams. NASCAR has unfettered power to require Cup Series teams to race cars that comply with whatever technical regulations and parameters NASCAR sets. This gives NASCAR the unilateral authority to increase teams' costs and to force them to buy from NASCAR's hand-picked single-source suppliers. But with the Next Gen car, NASCAR made not only technical changes to the car's parameters, it also changed the rules so that each Next Gen car's parts remain the property of NASCAR. Teams are now required to shell out millions of dollars to purchase the car parts dictated by NASCAR, but they do not retain ownership of these parts and are forbidden from using the cars containing these parts in any other racing event. It costs approximately $3 million in car parts for one chartered team for a full season of Cup Series races. Overall, it costs approximately $18 million per year to run one chartered team (including car costs, travel expenses, etc., but excluding driver salary) for a full season of Cup Series races.

14. In 2019, NASCAR acquired International Speedway Corporation ("ISC") for $2 billion. This acquisition gave NASCAR full control over 13 of the country's premier racetracks, including Daytona International Speedway and Talladega Superspeedway. When paired with NASCAR's practice of entering into anticompetitive agreements requiring independently owned racetracks to agree to not host any other premier stock car racing events as a condition of those tracks being awarded a Cup Series event, this acquisition substantially foreclosed any potential new competitor from being formed, as it would not be able to access enough high-quality racetracks to operate a stock car racing series that could compete with NASCAR's Cup Series.

NASCAR has continued to employ these anticompetitive restrictions on top-tier racetrack access through today to prevent any competitor from entering the market for a premier stock car racing series in the United States.

15. By continuously employing anticompetitive restrictions on racetrack access, restrictions on teams competing in other events, and other anticompetitive acts, NASCAR has unlawfully maintained its monopoly position for offering a top-tier stock car racing series in the United States in violation of the Sherman Antitrust Act. No stock car racing team can compete at the top-tier level in the United States without accepting the anticompetitive terms that NASCAR imposes as a condition for the teams to compete in the input market for racing teams that NASCAR controls.

16. Beginning in 2022, with the 2016 Charters set to expire at the end of December 2024, the racing teams tried to negotiate through a joint negotiating committee to obtain a fairer Charter Agreement from NASCAR for 2025 and beyond. While Plaintiffs and the other teams came to the table in search of a fair deal that would allow all well-managed teams to have a chance to compete for a championship and make a reasonable profit to justify their investments, NASCAR's objective, directed by Jim France, was to use its monopsony power to impose a new set of anticompetitive terms on the racing teams and generate further monopsony profits for the France family.

17. After the joint negotiating committee presented a number of proposals for improving the economics of the racing teams that NASCAR did not wish to accept, including a request for permanent charters, NASCAR decided that it would cease negotiating with the teams on a joint basis. Instead, in March 2024, NASCAR informed the racing teams that it would not engage in any further joint negotiations, and it insisted that each team separately negotiate for the

renewal of its Charter Agreement. NASCAR's objective was once again to impose a host of anticompetitive terms on the racing teams that would enrich NASCAR and the France family, while forcing the teams to accept a much more onerous agreement than that which would be available if not for the continuing exclusionary restrictions and other anticompetitive actions used by NASCAR to prevent the entry of any competitor and thereby protect and preserve NASCAR's monopsony power.

18.     The individual negotiations with the racing teams were completely one-sided, as NASCAR refused to budge from any of its core negotiating demands. Then, with little warning, NASCAR sent a final, take-it-or-leave-it version of the 2025 Charter Agreement to the teams at approximately 5:00 p.m. on September 6, 2024, and told the teams they had a 6:00 p.m. deadline to sign the more than 100-page agreement or risk not having a charter for 2025.

19.     After initial outrage from the teams, Jim France and other members of NASCAR's senior leadership started calling the teams to tell them NASCAR would extend the signing deadline to midnight, but it would eliminate the charter system altogether for 2025 and beyond if a substantial number of teams did not sign by that deadline. The teams knew that fielding a NASCAR car had become so expensive that it would be economically devastating for most of them to compete without the stability provided by the charter system and that they would suffer a complete loss of their enterprise values if the charter system was discontinued.

20.     Faced with a take-it-or-leave-it offer, and no competing opportunity for premier stock car racing in the United States, most of the teams concluded that they had to sign. One team described its signing as "coerced," and another said it was "under duress." A third team said, NASCAR "put a gun to our head[s]" and we "had to sign." A fourth described NASCAR's tactics

as that of a "communist regime." None of these teams would permit their identities to be publicly revealed for fear of retribution from NASCAR.

21.     To further protect NASCAR's monopsony power, the 2025 Charter Agreement expanded the scope of the non-compete provision in the 2016 Charter Agreement. While teams used to be prohibited from participating in any professional "stock car racing" other than NASCAR, teams with 2025 Charter Agreements are now prohibited from participating in any "automobile or truck racing" series not sanctioned by NASCAR. So even if a team could figure out how to transfer its stock car racing expertise to another kind of automobile racing, it is now contractually prohibited from doing so by the terms of the 2025 Charter Agreement.

22.     The 2025 Charter Agreement also includes an anticompetitive release provision that purports to require the signing team to release any legal claims it may have against NASCAR that are connected to NASCAR's determination of whether and on what criteria to enter into a Charter Agreement. On information and belief, NASCAR intends to argue that any team that has signed the 2025 Charter Agreement, and agreed to this release, has released its right to assert future antitrust claims against NASCAR with respect to the anticompetitive terms that NASCAR has imposed upon the teams in the 2025 Charter Agreement. Because the teams are the most likely antitrust plaintiffs to challenge NASCAR, the mandatory release is being used to further protect NASCAR's monopsony position and is, itself, an anticompetitive act in violation of the Sherman Act.

23.     Plaintiffs are the only two racing teams who did not bow down to NASCAR's pressure by signing the 2025 Charter Agreement with the possible release of their antitrust claims. They both currently each own two 2016 Charters that are due to expire at the end of 2024, and both also have entered into purchase agreements for a third charter from another racing team whose

owner has signed the 2025 Charter Agreements. Believing that NASCAR would contend that they had released their antitrust claims if they signed the 2025 Charter Agreement, they refused to give in to NASCAR's pressure. The risk was not acceptable to Plaintiffs, as they have determined that there is a pressing need for them to stand up to the France family and NASCAR and hold them accountable for the antitrust violations they are committing.

24. It has become evident that this antitrust litigation is the only way to free up the market for competition and enable Plaintiffs, and other stock car racing teams, to obtain the fair charter terms that will be realized in a competitive market for their services as top-tier stock car racing teams. A competitive market will enable the teams to earn the reasonable profits that are necessary for them to reinvest in their businesses and create an even more exciting product for stock car racing fans, sponsors, and broadcasters. The France family and NASCAR are monopolistic bullies. And bullies will continue to impose their will to hurt others until their targets stand up and refuse to be victims. That moment has now arrived.

25. Plaintiffs have been, and are continuing to be, harmed by and suffered antitrust injury from Defendants' Sherman Act violations, and are entitled to, among other relief: (i) a preliminary injunction that will allow Plaintiffs to accept and operate under the 2025 Charter Agreement until the completion of this litigation without being subject to any claim by Defendants that Plaintiffs have relinquished their antitrust claims against Defendants because of the release terms of the 2025 Charter Agreement; (ii) permanent injunctive relief to end NASCAR's exclusionary practices and restore competition in the relevant market; and (iii) trebled monetary damages for the harm suffered by Plaintiffs during the past four years as a result of having to compete under the anticompetitive, below market terms of the 2016 Charter Agreement and for

the harm that Plaintiffs will suffer going forward for having to compete under the anticompetitive terms of the 2025 Charter Agreement while they litigate this case through trial.

**PARTIES**

**I.      Plaintiff 23XI Racing**

26.      Plaintiff 2311 Racing LLC d/b/a 23XI Racing ("23XI") is a limited liability company organized under the laws of North Carolina, with its principal place of business in North Carolina.  23XI is owned by entities under the control of NBA legend Michael Jordan, NASCAR legend Denny Hamlin, and their business partner Curtis Polk.

27.      23XI is primarily owned by two limited liability companies:  Airspeed 23 LLC, a Delaware limited liability company registered to transact business in North Carolina; and Won One Racing, LLC, a limited liability company organized under the laws of North Carolina.

28.      23XI was founded with the sole purpose of funding a race team to compete in the NASCAR Cup Series.

29.      In or around October 2020, 23XI acquired a 2016 Charter to compete in the Cup Series from a previous racing team exiting Cup Series racing.

30.      NASCAR approved the purchase of the 2016 Charter by 23XI prior to closing.

31.      23XI began racing under its first charter in the 2021 Cup Series with the "23" car driven by Bubba Wallace.

32.      In October 2021, Wallace became only the second-ever Black driver to win a NASCAR Cup Series race when he won at Talladega.  And after his victory at Kansas Speedway in 2022, Wallace became the first Black driver to win multiple Cup Series races.  Under the banner of 23XI, Wallace made it to the NASCAR Playoffs for the first time in his career in 2023.

33.      In the Fall of 2021, 23XI purchased a second 2016 Charter for $13.5 million from another race team that was exiting the Cup Series.  The owners of 23XI funded 23XI with

additional funds to have the second car ready to compete in the Cup Series in 2022. By the end of 2021, its owners had invested approximately $30 million into 23XI.

34. This second car joined the "23" car and raced in the 2022 Cup Series as the "45" car. The car is currently driven by Tyler Reddick. Reddick won the 2024 NASCAR Cup Series Regular Season Championship and is currently in the 2024 NASCAR Playoffs.

35. 23XI is currently in the process of acquiring a third charter. 23XI and Stewart-Haas Racing, LLC entered into a purchase agreement on August 7, 2024, but the transaction is still in escrow and requires approval from NASCAR. In the interim, Stewart-Haas Racing, LLC signed NASCAR's 2025 Charter Agreement.

## II. Plaintiff Front Row Motorsports, Inc.

36. Plaintiff Front Row Motorsports, Inc. ("Front Row") is a corporation organized under the laws of Tennessee, with its principal place of business in Tennessee. Front Row is registered to transact business in the state of North Carolina.

37. Front Row was founded in 2004 and currently runs cars in the NASCAR Cup Series and NASCAR Craftsman Truck Series. The team began running part-time in 2004 as Means-Jenkins Motorsports, Inc. under a partnership with Jimmy Means and restaurant entrepreneur Bob Jenkins. Jenkins became the sole team owner in 2005.

38. In or around 2016, Front Row received two of the 2016 charters from NASCAR and signed two corresponding Charter Agreements, which run through December 31, 2024.

39. Front Row currently runs two full-time cars in the Cup Series: the "34" for Michael McDowell and the "38" for Todd Gilliland.

40. Under Front Row, McDowell won the 2021 Daytona 500. McDowell won the NASCAR Cup Series race at Indianapolis Motor Speedway in 2023 and made the NASCAR

Playoffs that year as well. Despite Front Row's emergence as a NASCAR Cup Series playoff contender, the organization has never generated a profit.

41. In May 2024, Front Row purchased a third charter from Stewart-Haas Racing, but the transaction is in escrow and requires approval from NASCAR. In the interim, Stewart-Haas Racing, LLC signed NASCAR's 2025 Charter Agreement.

## III. Defendant NASCAR

42. Defendant National Association for Stock Car Auto Racing, LLC ("NASCAR" or "Defendant") is a limited liability company organized under the laws of the state of Florida, having its principal place of business in Daytona Beach, Florida.

43. NASCAR is privately owned and was founded by William H.G. "Big Bill" France Sr. in 1948. His son, Jim France, has been the Chief Executive Officer since August 2018.

44. The company is privately owned and controlled by the France family, including Jim France and his niece, Lesa France Kennedy.

45. NASCAR is the self-appointed sanctioning body for three national series for stock car racing in the United States: (1) the top-tier NASCAR Cup Series (the "Cup Series"), (2) the second tier NASCAR Xfinity Series, and (3) the lowest tier NASCAR Craftsman Truck Series. "Sanctioning" refers to NASCAR's staging of stock car races in the United States, including selecting venues, drivers and teams, and setting race rules.

46. Of the three national series, the Cup Series is stock car racing's highest level of professional competition, and as a result, the most popular and profitable for NASCAR. The Cup Series season consists of thirty-six point races and four exhibition races over ten months. The Cup Series holds its thirty-six races on different top-tier quality tracks across the United States, including short tracks, intermediate tracks, superspeedways, and road courses.

47.     NASCAR operates the only top-tier stock car racing series in the United States.  It has acquired and maintained this monopoly position through the anticompetitive actions described in this Complaint.  Stock car racing teams can only compete at the top-tier level in the United States if they agree to NASCAR's anticompetitive terms.

## IV.    **Defendant NASCAR Holdings, LLC**

48.     Defendant NASCAR Holdings, LLC is a limited liability company organized under the laws of the state of Delaware, having its principal place of business in Daytona Beach, Florida.

## V.     **Defendant NASCAR Event Management, LLC**

49.     Defendant NASCAR Event Management, LLC is a limited liability company organized under the laws of the state of Florida, having its principal place of business in Daytona Beach, Florida.

## VI.    **Defendant Jim France**

50.     Jim France is CEO, chairman, and executive vice president of NASCAR.  France is the son of NASCAR founder, "Big Bill" France Sr.  Jim France also served as chairman of International Speedway Corporation ("ISC"), and served as its secretary, assistant treasurer, vice president, executive vice president, president, and CEO.

51.     Jim France has been NASCAR's CEO and chairman since August 6, 2018, after originally being appointed on an interim basis.  During this time period, he has directed, controlled and/or ratified each of NASCAR's anticompetitive and exclusionary acts to maintain its unlawful monopoly power and unreasonably restrain competition.

52.     In 2015, Forbes estimated that the France family had a net worth of $5.7 billion.

53.     Jim France and the France family currently own and control not only NASCAR, but also ISC, ARCA, International Motor Sports Association (a sports car racing sanctioning body), Action Express Racing (Jim France's IMSA racing team), and Motor Racing Network (a

radio network for auto racing broadcasts). Through ISC, Jim France and the France family own and control some of the most prominent racetracks in the United States, including Daytona International Speedway, Talladega Superspeedway and Michigan International Speedway.

<u>**JURISDICTION AND VENUE**</u>

54.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 2 of the Sherman Act (15 U.S.C. § 2).

55.     This Court has personal jurisdiction over Defendants in this District because Defendants, *inter alia*, have: (a) transacted substantial business throughout the United States, including in this District; (b) engaged in the antitrust violations alleged in substantial part in this District; (c) engaged in an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect on commerce in this District; and (d) have had substantial aggregate contacts with the United States as a whole, including in this District.

56.     Since 2018, NASCAR has hosted and organized at least two Cup Series stock car competitions each year at Charlotte Motor Speedway in Charlotte, North Carolina in this District: The Coca Cola 600 every Memorial Day Weekend in May (since 1960), and the Bank of America Roval 400 (since 2018). NASCAR also hosted its All-Star race in this District in both 2023 and 2024. Since 2009, NASCAR has maintained corporate offices in this District in Charlotte, North Carolina.[8]

---

[8] According to NASCAR's official website, its Charlotte offices were "[b]uilt in 2009 . . . in uptown Charlotte" and "boasts a connection to the NASCAR Hall of Fame and the Charlotte Convention Center. NASCAR Media Group, including productions, digital, and NASCAR.com is housed here, along with several marketing, communications and strategy functions. The office is also the hub for the NASCAR social media team. Supporting these teams, several business functions are co-located here including Legal, Human Resources, and IT." *Charlotte*, NASCAR.com, https://careers.nascar.com/charlotte/ (last visited 9/20/2024).

57.     Defendant Jim France regularly transacts business in the State of North Carolina and in this District.  He has directed, controlled or ratified each of the anticompetitive actions taken by Defendant NASCAR in this District.

58.     Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391 and 15 U.S.C. § 22.

59.     The 2016 Charter Agreements between the Parties contain a limited arbitration provision for claims "aris[ing] under or in connection with" the 2016 Charter Agreement.  This provision is inapplicable in this action, as Plaintiffs' claims arise out of Defendants' unlawful anticompetitive scheme to acquire and maintain monopoly power through exclusionary actions and unreasonable restraints of trade that extend far beyond the 2016 Charter Agreement and that will continue after its expiration.

60.     Even if the arbitration provision in the 2016 Charter Agreement applied to any part of the claims asserted in this action, this action for a preliminary injunction would still be proper in this court, pursuant to the 2016 Charter Agreement, which expressly provides for the filing of such a preliminary injunction action and selects the federal or state courts in North Carolina as the venue for any such action.

## FACTUAL ALLEGATIONS

### I.     The France Family Monopoly Enterprise

61.     Ever since its founding in 1948 by "Big Bill" France Sr., NASCAR has been a private company controlled by the France family racing dynasty, which ESPN called "the most powerful lineage in American sports."[9]   While other professional sports organizations have

---

[9] Ed Hinton, *Daytona Dynasty*, ESPN (July 22, 2013), https://www.espn.com/espn/feature/story/_/id/9488280/daytona-dynasty (last visited Oct. 2, 2024).

evolved, the France family operates NASCAR like a closed-door shop, wheeling and dealing its monopoly power in smoke-filled backrooms.

62.     The France family has long been determined to protect its monopoly from having to compete with any other racing organization.  When Lee Petty, Richard Petty's father, competed in a non-NASCAR race in 1950, "Big Bill" France Sr. responded by stripping him of all his earned points in the NASCAR standings.[10]

63.     The France family has equally been determined to prevent its drivers or teams from asserting their economic rights.  In 1961, the Teamsters attempted to unionize NASCAR drivers. Bill France Sr. responded by decreeing: "No known Teamster can compete in a NASCAR race, and I'll use a pistol to enforce it."[11]  When NASCAR's veteran drivers saw that track conditions for the first running of the Talladega 500 in 1969 were unsafe with the track tearing up tires and cars crashing at top speeds, Bill France Sr. tried to shame the veteran drivers into driving by first pretending to drive a demonstration lap to show the track was safe (which he accomplished only by driving well below actual race speeds), and then by telling the drivers, "If you're scared, go home."[12]  That dismissive treatment earned him a punch in the face from Lee Yarbrough—NASCAR's top driver that year—and an exodus of drivers.  Undeterred, Bill France Sr. held the race anyway, mostly with replacement drivers who would never be heard from in NASCAR again.[13]

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

64.     When Bill France Jr. became the CEO of NASCAR in 1972, he told reporters they could describe NASCAR as a "dictatorship," as long as they qualified that dictatorship as "benign."[14]

65.     Brian France (son of Bill France Jr.) served as CEO and Chairman of NASCAR from 2003 through 2019.  Brian resigned from NASCAR in 2019 after his arrest for DUI and possession of oxycodone.

66.     Jim France succeeded Brian France as the NASCAR CEO in 2018.  He has directed and controlled all of NASCAR's anticompetitive actions since that time through today.

67.     Even before NASCAR's 2019 purchase of ISC, giving it complete control over the ISC-owned racetracks, the France family owned a controlling interest in ISC.  Under Bill Jr.'s stewardship, ISC significantly expanded its number of tracks, and a France family member has always been in a leadership role at ISC, helping to ensure that the family could prevent any competing racing series from gaining access to the top-tier tracks that it would need to compete.

68.     NASCAR has never had someone from outside the France family serve as CEO. Jim France has continued to run NASCAR to serve the economic interests of the France family, above all else, and has continued to wield the monopoly power of NASCAR to inflict anticompetitive harm on the race teams so that the France family could be further enriched.

69.     The France family's control of NASCAR and its racetracks has generated monopoly profits for the France family.  In 2001, NASCAR secured its first national broadcast contract, coinciding with the death of its biggest star, Dale Earnhardt, during the season's first race.  This event led to massive exposure and an influx of sponsorship, such as Sprint's ten-year title sponsorship, for a reported $50 to $75 million annually, beginning in 2004.  During Sprint's

---

[14] *Id.*

years as a sponsor, NASCAR averaged approximately six million broadcast viewers per race, with seventeen of the top twenty largest-attended United States sporting events being NASCAR races.

70.     NASCAR's ten-year media rights agreement with Fox Sports and NBC Sports that expires at the end of this year was worth $8.2 billion.[15]  The next deal is worth even more per year, with NASCAR agreeing to a seven-year, $7.7 billion deal with Fox, NBC, Amazon, and Warner Bros.[16]

71.     NASCAR has used its monopoly power and exclusionary conduct to impose terms upon the racing teams that ensure that a majority of the revenues generated by stock car racing in the United States will go to NASCAR and the France family, at the expense of the teams and their drivers, who are most responsible for generating those revenues.

## II.     The 2016 Charter Agreements with Stock Car Racing Teams

72.      Prior to 2016, stock car racing teams operated under year-to-year agreements with NASCAR.  The teams struggled to survive economically under this system, in which almost all of the revenues generated by stock car racing went to NASCAR and teams were required to make substantial economic investments in their cars and drivers without any assurance that they would have a spot to compete in a top-tier NASCAR event.

73.     In July 2014, the Race Team Alliance ("RTA") was formed to try to jointly negotiate a fairer deal with NASCAR on behalf of nine stock car racing teams.  NASCAR's then

---

[15] Adam Stern, *Is there a win-win? NASCAR nears a new media rights deal but a simmering dispute with teams over revenue has complicated matters*, SPORTS BUS. J. (Jan. 30, 2023), https://www.sportsbusinessjournal.com/Journal/Issues/2023/01/30/Portfolio/nascar.aspx (last visited Oct. 2, 2024).

[16] Jordan Bianchi, *NASCAR strikes $7.7 billion media rights deals with Fox, NBC, Amazon and Warner Bros.: Sources*, THE ATHLETIC (Nov. 29, 2023), https://www.nytimes.com/athletic/5100234/2023/11/29/nascar-tv-deal-fox-nbc-amazon-warner-bros/ (last visited Oct. 2, 2024).

chairman Brian France declared that he "didn't think [the RTA] was necessary" and listening to RTA negotiate on behalf of the racing teams would be a "bad idea."[17]

74.     Despite NASCAR's vocal opposition to negotiating with the RTA, by August 2014, all but one stock car racing team had joined the RTA.[18] The RTA pushed for teams to have a more permanent right to compete each week in the NASCAR Cup Series (then called the Sprint Cup), and in February 2016, NASCAR and the RTA announced that they had agreed upon a new Charter system.[19] The 2016 Charter Agreements were an improvement for the teams over the prior system, because they, at least, assured each chartered team a place in every Cup Series event. But the 2016 Charter Agreements were still the product of NASCAR's unlawfully acquired and maintained monopoly power, which was exercised to inflict economic terms upon the teams that were significantly worse than those which teams would have been able to negotiate had NASCAR faced competition for top-tier stock car racing in the United States.

75.     In 2016, NASCAR entered into thirty-six charters with team owners. Because of the barriers to earn a fair rate of return under these Charter Agreements, which were the product of NASCAR's monopsony power over the teams, 11 of the 19 original charter teams have left the sport.

76.     One example of the below competitive market terms of the 2016 Charter Agreements is the small amount of broadcast revenues that get shared with the teams. The 2016

[17] Jeff Gluck, *NASCAR's Brian France says Race Team Alliance unnecessary*, USA TODAY (July 21, 2014), https://www.usatoday.com/story/sports/nascar/2014/07/21/race-team-alliance-brian-france/12967329/.

[18] Nate Ryan, *RTA expands to include 18 full-time Sprint Cup teams*, USA TODAY (Aug. 13, 2014), https://www.usatoday.com/story/sports/nascar/2014/08/13/race-team-alliance-expands-to-include-18-nascar-sprint-cup-teams/14003447/ (last visited Oct. 2, 2024).

[19] Dustin Long, *NASCAR announces charter system for Sprint Cup team owners*, NBC SPORTS (Feb 9, 2016), https://www.nbcsports.com/nascar/news/nascar-announces-charter-system-for-sprint-cup-team-owners (last visited Oct. 2, 2024).

Charter Agreements do not share any NASCAR sponsorship revenues with the teams: they all remain with NASCAR.

77.     Further, while teams in other major professional sports in the United States, like the NFL and the NBA, share all their national television revenues at the league level equally, the 2016 Charter Agreements shared a very modest percentage of these revenues with the chartered teams. The 2016 Charter Agreements paid "pooled" money to the chartered teams of approximately 37% of broadcast revenues.

78.     The 2016 Charter Agreements also contained anticompetitive restrictions designed to help NASCAR maintain its monopoly position. One such provision prohibited chartered teams and their owners from competing or participating in any other stock car racing event not authorized by NASCAR, denying a competitive circuit access to the limited supply of top stock car racing teams and ownership capital that would be available. Because the teams were independent contractors who raced in NASCAR events—and not joint venture members of a league—there was no procompetitive justification for imposing such a non-compete restraint.

79.     The 2016 Charter Agreements were all extended through 2024 and expire at the end of this year.

III.     **NASCAR and Jim France's Monopsonistic Scheme**

80.     After imposing the anticompetitive terms of the Charter Agreements in 2016, NASCAR and the France family continued to engage in exclusionary and anticompetitive acts to preserve and maintain NASCAR's monopoly power over premier stock car racing in the United States.

A. **NASCAR Maintains its Monopsony Power by Purchasing a Large Cache of Racetracks That it Uses to Protect its Market Position and by Forcing Anticompetitive Exclusivity Provisions on the Tracks it Does Not Own**

81.    A premier stock car racing series must be just that—a series of races across the United States featuring top-tier stock car racing teams.  Any new competitor to NASCAR in this market would likely need to host a *minimum* of 18 to 20 races each year.  For a strong competitor to emerge, 24 to 28 races would likely be needed each year.  To be successful, a 28-race season would also likely require races on at least two superspeedway tracks, six intermediate tracks, 12 short tracks, and a handful of road course tracks.  The series would also need a national presence, hosting races across the country at premier racetracks capable of hosting high-end competitions.

82.    Not just any racetrack is capable of hosting stock car racing events that are good enough to compete with the NASCAR Cup Series.  A track must be able to put on a high-quality event (for both television and in-person fans) and have an opportunity to turn a profit.  This means having a per-day capacity of at least 25,000 spectators and meeting top-level requirements regarding safety, infrastructure, track surface, side-by-side racing capability, promotional pedigree (which impacts a track's ability to pack the stands and entertain the fans), operational and mechanical facilities, insurance, and guest services capability (for fans, sponsors, and other strategic partners), plus the experience and staffing capability to successfully hold such an event.  There are a limited number of such racetracks in the United States, and so whoever controls those racetracks controls the ability of any other racing series to compete with NASCAR.

83.    As one aspect of its scheme to exclude competition and maintain its monopoly position with respect to premier stock car racing, NASCAR has actively engaged in affirmative overt acts on a continuing basis to substantially foreclose any potential new entrants from forming and gaining access to a sufficient number of suitable racetracks to compete successfully in the United States.  It has accomplished this monopolistic objective in two ways:  through the

acquisition of premier racetracks which it then refuses to make available to any competitor, and through entering into restrictive exclusivity provisions with premier race tracks it does not own.

1.    **NASCAR Acquires Premier Racetracks and Prohibits Any Other Premier Stock Car Races on Those Tracks**

84.    Each NASCAR Cup Series season consists of a series of races on a variety of racetracks sanctioned by NASCAR for the purpose of conducting stock car racing events. For example, the 2024 Cup Series includes thirty-six races and four exhibitions taking place on twenty-eight different tracks.

85.    By 2018, ISC owned a total of 12 racetracks including some of the most prominent racetracks in the sport.[20]

86.    In 2019, NASCAR made a move to further maintain its monopoly control of the elite stock car racing market when it acquired ISC—and its 12 racetracks—for $2 billion. ISC's portfolio was a major acquisition for NASCAR, as six of the twelve tracks acquired by NASCAR hosted two Cup Series races annually—an honor bestowed on only the very best racetracks that NASCAR visits each year. Two current NASCAR executives serve as the highest executives at ISC: Jim France (Chairman of ISC and CEO of NASCAR) and Lesa France Kennedy (CEO of ISC and Executive Vice Chair of NASCAR).

87.    In 2024, more than half of the Cup Series' races were held on one of the 12 NASCAR-owned tracks.[21]

88.    As the owner of these premier racetracks, NASCAR can and will refuse to hold any other top-tier stock car races at the tracks so that it can maintain its monopoly position. This refusal

---

[20] *ISC Completes Closing of Acquisition by NASCAR*, NASDAQ (Oct. 18, 2019), https://www.nasdaq.com/press-release/isc-completes-closing-of-acquisition-by-nascar-2019-10-18 (last visited Oct. 2, 2024).

[21] *See List of NASCAR Tracks*, NASCAR, https://www.nascar.com/tracks/ (last visited Sept. 22, 2024).

to deal is a continuing exclusionary act that has anticompetitive effects each year by serving as a barrier to entry for any new competitor. For example, the owners of 2016 NASCAR charters recognized this as a barrier to competition that would present a barrier for them to form a competitor rather than accept the anticompetitive terms of the new charters that NASCAR is offering for 2025 going forward.

> **2.** **NASCAR Forces Exclusive Terms on Racetracks as a Condition of Hosting a Cup Series Race, Further Strengthening the Barrier to Entry for Any New Top-Tier Stock Car Racing Series**

89. A Cup Series race is a tremendous revenue opportunity for racetracks. Considering NASCAR's high-attendance figures, in addition to a track's share of NASCAR's media rights distribution, hosting a Cup Series race allows a track to make a significant amount of money in a single event.

90. Any track owner wishing to host a Cup Series race must sign a NASCAR sanction agreement. These agreements contain an exclusivity provision that prohibits the racetrack from hosting any other stock car racing event that may resemble NASCAR's racing product:

> In recognition of the importance and stature of the Event and the Series, the financial significance of agreements with NASCAR Rights Affiliates, and the sanction granted under this Agreement, during the Term of this Agreement PROMOTER covenants ***not to promote, host, conduct or stage, nor allow any third party(s) to promote, host, conduct or stage, a stock car racing event at the Facility that attempts to duplicate, emulate, imitate, copy, simulate and/or mimic the NASCAR National Series;*** or uses the same or similar race vehicles, rules, competitors, trademarks, trade dress, and/or 'look and feel' of the NASCAR National Series; or would create confusion in the public; or would in any way dilute the stature, impact and value of the NASCAR National Series, NASCAR, NEM, NASCAR Rights Affiliates and others.[22]

91. Most tracks sit vacant throughout the year due to NASCAR's sanction agreement's exclusivity provision. The combined effect of the sanction agreement's exclusivity provisions

---

[22] *See* Secs. and Exch. Comm'n Form 8-K, Dover Motorsports, Inc., June 2, 2020 (emphasis added).

with NASCAR's ownership of various tracks is that each year, NASCAR prevents any potential new stock car racing series entrant from being formed because of the exclusionary barrier to gaining access to the top-tier tracks that would be necessary for the new entrant to compete successfully with the NASCAR Cup Series. The owners of the 2016 Charters were deterred from trying to form a competing stock car racing circuit because of this barrier to entry, and instead accepted NASCAR's anticompetitive terms in the 2025 Charter Agreements.

## B. NASCAR Acquires ARCA and the ARCA Menards Series to Prevent Potential Competition with the Cup Series

92.     The only other notable stock car racing series in the United States was the Automobile Racing Club of America ("ARCA") Menards Series—which was known as the ARCA Menards Series. ARCA was founded in 1953 as a regional stock car racing series in Ohio.

93.     Given NASCAR's economic power, ARCA chose to not compete with top-tier NASCAR events in the Cup Series, operating at a lower regional level of competition. However, in 2018, nine of the 20 races in the ARCA Menards Series were held at NASCAR event venues and NASCAR decided it needed to do something to prevent ARCA from growing its lower-level regional events into a higher level of competition in a national circuit, which could grow into a competitive threat to NASCAR.

94.     NASCAR decided to acquire ARCA. A commentator on stock car racing noted the following in reporting on the transaction: "[i]t's plausible to wonder if NASCAR is making the purchase for self-preservation purposes. ARCA isn't a true competitor to NASCAR [], but having ARCA under the NASCAR umbrella removes the last remaining possible competition to NASCAR's stock car monopoly."[23]

---

[23] *NASCAR purchases ARCA: What does it mean?*, YAHOO! SPORTS (Apr. 27, 2018), https://sports.yahoo.com/nascar-purchases-arca-mean-185217538.html (last visited Oct. 2, 2024).

95.     NASCAR officially took control over ARCA in 2020 and installed it as NASCAR's "feeder series."  By relegating ARCA to a lower-level feeder series role, NASCAR is preventing ARCA from becoming a competitor to NASCAR's monopoly position in the top-tier level of stock car racing competition.

C.     **NASCAR Uses Covenants Not to Compete to Maintain Its Monopoly Position**

96.     As previously discussed in Paragraph 78 above, NASCAR has also maintained its monopoly position by including covenants not to compete in its 2016 Charter Agreements, which have been applied on a continuing basis through the end of this calendar year.

97.     Because the owners of the 2016 NASCAR Charter Agreements were independent contractors—not the members of a joint venture operating a sports league—they were the most likely racing team owners to form a competing circuit to NASCAR.  By prohibiting them from competition in any other stock car races during the existence of the 2016 Charter Agreement, NASCAR further created a barrier to competitive entry which preserved its monopoly position and helps to do so through this day.

98.     There are a limited supply of top-tier stock car racing teams and top-tier stock car racing drivers.  By precluding its chartered racing teams from competing in any other events, NASCAR is substantially restraining competition and helping to protect its monopoly position.

D.     **The Anticompetitive Next Gen Requirements**

99.     Under the guise of a business model that NASCAR presented as a move to make stock car racing more affordable, NASCAR introduced the "Next Gen" car in 2022.  In reality, this change is an exclusionary requirement which locks premier stock car racing teams even further into NASCAR, makes switching to any competitive racing series even more difficult, and ultimately increases costs on racing teams.  It now costs teams approximately $3 million per year in car parts to field just one charter team in a full Cup Series schedule.

100.    When NASCAR began racing what is now known as the Cup Series in 1949, the series was called the "Strictly Stock" series and was intended to race cars right out of the showroom.  Over time, teams gained greater autonomy to build their own cars, develop custom parts, and otherwise optimize their car designs within the boundaries set by NASCAR.

101.    With the Next Gen car restrictions, NASCAR essentially casts all of that development work aside and imposes a new set of restrictions that gives NASCAR even greater control over the racing teams and their ability to ever go to a competing circuit. Rather than developing and manufacturing parts themselves, teams are required to purchase standardized parts from NASCAR's hand-picked single source suppliers.  Teams are also now limited to seven cars (per car number) at a time, and NASCAR and the chassis supplier—not the team—get to decide if a chassis can be repaired or must be replaced in the event of a crash.

102.    Most significantly, to lock the racing teams into NASCAR, each Next Gen car remains property of NASCAR.  This means that Plaintiffs and other teams pour money into purchasing parts and pieces from NASCAR's authorized suppliers while developing expertise in driving and maintaining the Next Gen car, but ultimately are left with a very expensive racing car that can only be used for NASCAR Cup Series races.  Since the Next Gen car is property of NASCAR, NASCAR can and does prohibit teams from using the car in any race other than Cup Series races.  If a team wanted to participate in another stock car racing event not authorized by NASCAR—even after the Charter Agreement and the covenant not to compete expired—it would have to build an entirely new car from the ground up.

103.    That challenge would be exacerbated by the fact that many teams have had to lay off technical staff that had previously handled in-house part development and manufacturing. With the new requirements that teams purchase parts from NASCAR's single source suppliers,

rather than make the parts themselves, these portions of teams were left with no work to do. If a team decided to leave NASCAR to develop a car to compete in other races, it would have to hire an entirely new department of technicians to develop such a car.

104.    With no cars of their own and reduced teams no longer capable of designing and producing their own parts, most of the teams have had little choice but to yield to whatever terms NASCAR seeks to impose in its Charter Agreements with Cup Series teams.

E.    **The Exercise of Monopsony Power by NASCAR and France to Impose Anticompetitive Terms in the 2025 Charter Agreements**

105.    In February 2022, recognizing that the media rights were likely to be negotiated in 2023 (FOX and NBC had exclusive negotiating periods in early 2023) and that the Charter and media rights agreements were expiring following the 2024 Cup Series season, a group of racing team executives, in consultation with the RTA, approached NASCAR senior leadership about participating in discussions about the next generation of Charter Agreements and in assisting NASCAR with the media rights negotiation.

106.    From the outset, NASCAR sought to resist this effort by the racing teams to jointly negotiate terms for the 2025 Charter Agreement renewals that would provide the teams with a fairer economic deal and the opportunity to earn a reasonable return on the substantial investments they were required to make. Under the direction of Jim France, NASCAR's plan was to use its monopsony power over the teams to impose a new set of anticompetitive terms that would be far less favorable than the teams could obtain if there were a competitive market for their independent contractor services as top-tier stock car racing teams.

107.    NASCAR exercised its monopsony power over the racing teams by putting them in an economic squeeze: the teams could either choose not to sign the renewed charters, which would make it economically devastating for them to try to continue to compete as so-called "open"

teams and destroy the existing value of their charters (which, even at their artificially decreased value are still worth millions of dollars) or, conversely, agree to NASCAR's monopsony terms and run the risk of giving up their antitrust rights under the agreements' release terms.

108.    Until March 2024, NASCAR went through the motions of meeting with a negotiating committee of the racing teams to discuss the terms of a charter renewal.  However, after the joint negotiating team presented core proposals to NASCAR–including a fairer economic split of revenues for teams, permanent charters, shared governance over matters that impacted team investment requirements, team control over its intellectual property, and the changing of covenants not to compete—NASCAR decided to end its charade and announced that it would no longer engage in any joint negotiations.

109.    Instead, NASCAR declared that it would negotiate with each team individually.  It did so because it knew that this would increase its ability to exercise its monopsony power to force the individual teams to accept one-sided economic terms favoring NASCAR and the France family rather than risk losing the ability to renew their charters at all.

110.    Plaintiffs each tried to engage in good faith negotiations with NASCAR on the renewal of their individual charters.  But NASCAR would not reciprocate.  It barely moved from any of its onerous proposals, with the objective of presenting Plaintiffs and the other racing teams with a one-sided, onerous charter renewal proposal on a take-it-or-leave-it basis.  While minor changes may have been made in the negotiations with individual teams, no good faith proposals were made by NASCAR to address the core economic imbalance between the teams and NASCAR that were imposed by NASCAR in the Charter Agreements.

111.    On September 6, 2024, NASCAR executed its monopsony power to full effect.  It sent what it declared to be the final version of the 2025 Charter Agreement to all of the racing

teams at approximately 5:00 p.m. and told the teams they had a 6:00 p.m. deadline to sign the more than 100-page agreement or risk losing their charters. After initial outrage from the teams, Jim France and other members of NASCAR's senior leadership started calling teams to tell them NASCAR would extend the signing deadline to midnight, but it would eliminate the charter system altogether for 2025 and beyond if a substantial number of teams did not sign by that deadline.

112.     The take-it-or-leave-it offer from NASCAR included numerous one-sided, monopolistic economic terms that were far less than the teams would receive in a competitive market. It did not provide a fair split of revenues so that the teams would have a chance to earn a reasonable return on their investment. It seized control over team intellectual property rights, to be used for NASCAR's benefit. It did not provide permanent charters so that the teams could realize value through permanent charter appreciation. It did not give teams the ability to resist unilateral NASCAR rules that increased team costs. And it did not give the teams any meaningful role in governance of the sport. It also imposed terms that would undermine the relationship between teams and drivers.

113.     The threat to eliminate charters was frightening to most of the racing teams, as the investment requirements to operate a top-tier stock racing team are so large that it is not economically viable to go back to the pre-charter system on an extended basis.

114.     And it would be economically devastating for Plaintiffs to try to compete as an "open" team under the current charter system. "Open" teams generate revenue *only* from prize money and whatever sponsorships they can scrape together. They do not receive any portion of the "pooled" money or other benefits from NASCAR, however modest, provided to the charter teams. Considering the charter teams are barely profitable, trying to compete without these assured revenue sources is not an economically viable long-term solution.

30

115.    The 2025 Charter Agreement also contained a release which, although ambiguously worded, the teams believe NASCAR would contend required them to release any antitrust claims they would have as a result of being forced to agree to the anticompetitive Charter terms. Through this provision, Defendants have sought to provide themselves with self-awarded immunity from the antitrust laws as a condition of the racing teams being able to compete in NASCAR. This is a blatant exercise of Defendants' unlawfully obtained and maintained monopsony power to try to force teams to sign a Charter Agreement with anticompetitive terms, and then insulate themselves from liability for their antitrust violations through a coerced release of claims.

116.    As previously mentioned, the take-it-or-leave-it 2025 Charter Agreement also has a new, even broader, covenant not to compete that prevents the teams with a charter from participating in any "automobile or truck racing" events other than NASCAR events—not just stock car racing events. It thus further entrenches Defendants' monopoly.

117.    With no competitive alternative, every racing team with a 2016 Charter, except for Plaintiffs, relented and signed the 2025 Charter Agreements. One team described its signing as "coerced," and another as "under duress." Another described NASCAR as "put[ting] a gun to our head" so it "had to sign." And still another described NASCAR's tactics as that of a "communist regime." Out of fear of retribution, none of the teams who made these statements would permit their identity to be revealed in the press.

118.    Plaintiffs would not sign the 2025 Charter Agreement, with its onerous and anticompetitive terms, because they concluded it was time that someone had to stand up to the France and NASCAR monopoly. In particular, they concluded that they could not risk having NASCAR succeed in claiming that they waived their antitrust rights by agreeing to the 2025

Charter Agreement, as exercising their antitrust rights was the only way to hold Defendants' illegal monopoly accountable and bring competition to stock car racing in the United States.

## RELEVANT MARKET AND MARKET POWER

119.    The relevant product market is the input market for premier stock car racing teams, which a premier stock car racing circuit requires to produce its premier racing series product.

120.    The relevant geographic market is the United States.  Indeed, there is no premier stock racing series in any other country, so there are no competitive options for premier stock car racing teams to compete in outside of the United States.

121.    NASCAR's Cup Series is currently the only premier stock car racing series in the United States, and it thus also has monopsony power over the input market for premier stock car racing teams.  A successful premier stock car racing series requires, among other things, access to top-tier racing teams.

122.    Premier stock car racing teams are highly specialized entities that are capable of racing only in stock car races.  Stock car racing itself is a distinct form of automobile racing that differs markedly from other premier racing such as single-seat Formula 1 and Indy Car.  The sports differ significantly, most notably in the types of cars that compete.  Aside from the obvious visual difference—Indy Car and Formula 1 race open-wheeled cars, while NASCAR Cup Series stock cars are closed-wheel cars—the cars involved are built by different manufacturers and require different engineering to meet different specifications and regulations.  In fact, NASCAR's introduction of the Next Gen car locked its premier stock car racing teams in even further, since premier stock car racing teams develop expertise not in designing and building their own car from scratch, but rather maximizing the output from a standardized car built by NASCAR's hand-picked manufacturers.

123.    A premier stock car racing team's specialization comes at a high cost.  Annual costs of running a Cup Series team are estimated to be $18 million, with driver salary expenses on top of that cost.[24]  All of these expenditures are intended to optimize the stock car and win Cup Series races, and they do not lend themselves to any other kind of motorsport.  These engines, and the stock car more generally, cannot be transferred to any other type of racing.  Accordingly, a premier stock car racing team is thus equipped only to compete in premier stock car races, and so no other motorsport is interchangeable with the Cup Series for those teams to compete.

124.    NASCAR is the gatekeeper to the Cup Series and has monopsony power over the input market for premier stock car racing teams, as it is the only purchaser of premier stock car racing team services in the United States.  Just as the NFL has monopsony power over the input market for top-tier professional football players in the United States, and the NBA has monopsony power over the input market for professional basketball players in the United States, NASCAR has monopsony power over the input market for premier stock car racing teams.  There is simply no other place for such teams to offer their unique services.

125.    NASCAR has the monopsony power to exclude other competitors from this market.  As set forth in Paragraphs 80–118 above, NASCAR has exercised that power to prevent any other stock car racing series from entering the market and thus has excluded any such competitor from offering a competitive alternative to premier stock car racing teams.

126.    NASCAR has foreclosed any potential competitor from accessing the high-quality tracks or teams needed to develop a competing circuit.  With no competing premier stock car racing series, NASCAR has a complete monopsony on premier stock car racing team services—it

---

[24] *See* Tyler McCarthy, *How Do You Start A New NASCAR Team? What To Know*, USA NETWORK (Oct. 19, 2022), https://www.usanetwork.com/usa-insider/how-to-start-new-nascar-team (last visited Oct. 2, 2024).

has a 100% market share in the acquisition of premier stock car racing team services in the United States.

**ANTITRUST INJURY**

127.    Defendants' monopolization and restraints of trade that have prevented the formation of any competing premier stock car racing circuit have caused severe antitrust injury and competitive harm to Plaintiffs.

128.    Without the competitive constraint of any alternative premier stock car racing series, Defendants have used their monopsony power to impose manifestly anticompetitive terms on Plaintiffs in the 2016 Charter Agreement. Absent Defendants' violations, a competitive market would have yielded significantly better terms for Plaintiffs to compete in the but-for world, either in NASCAR or in a competitive series. Plaintiffs thus suffered a significant antitrust injury as a result of having to compete under these monopolistic terms.

129.    Going forward, Plaintiffs will continue to suffer antitrust injury. Either they will be competing under the anticompetitive and monopolistic terms of the 2025 Charter Agreement— if a preliminary injunction is granted to prevent Defendants from applying the release in that agreement against Plaintiffs' antitrust claims—or Plaintiffs will be required to race as "open" teams, suffering even greater antitrust injuries, with the substantial threat of eventually being driven out of business entirely.

130.    As previously discussed at Paragraphs 105–118, the terms of the 2025 Charter Agreement are much more economically adverse to Plaintiffs than would be available in a competitive market without Defendants' antitrust violations. Taken as a whole, the terms are even worse for Plaintiffs than those imposed by the 2016 Charter Agreement. And the alternative of competing without a charter would cause even greater economic injury to Plaintiffs and would likely eventually cause them to cease competing at all, as competing without a charter is not

economically viable in the long run given the NASCAR requirements, which require tens of millions of dollars in investment.

131.    Until injunctive relief restores a competitive market, Plaintiffs will continue to suffer antitrust injury imposed as a result of the absence of any competition for their services as premier stock car racing teams.  And that injury will be irreparable if Plaintiffs are unable to compete with a charter in 2025 without sacrificing their antitrust claims.

## INTERSTATE TRADE, COMMERCE, AND CONDUCT

132.    Defendants' anticompetitive conduct, including their monopsony and contracts, combinations, and conspiracies that are the subject of this Complaint, is within the flow of, and substantially affects, interstate trade and commerce.

133.    Defendants' Cup Series travels across the country putting on premier stock car racing competitions in 20 states.  These races and their associated ticket sales, merchandise sales, and sponsorship deals generate tens of millions of dollars in interstate commerce each year.

134.    Defendants have also entered into commercial agreements and arrangements with racetracks located throughout the country that govern the terms on which NASCAR will grant these racetracks a Cup Series race.  These agreements generate tens of millions of dollars in interstate commerce.

135.    Defendants' aforementioned activities make use of the instrumentalities of interstate commerce, and payments for those activities of Defendants are made by instrumentalities of interstate commerce.

136.    The contracts, combinations and conspiracies at issue entered into by Defendants to restrain competition in the market for premier stock car racing teams and to create and protect the Defendants' monopoly positions substantially affect interstate trade and commerce.

## CLAIMS FOR RELIEF

## COUNT ONE

### Against all Defendants
### Violation of Section 2 of The Sherman Act: Monopolization

137.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138.    Defendants have obtained a monopsony as a buyer of the services of premier stock car racing teams in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

139.    Defendants have engaged in a series of anticompetitive and exclusionary conduct in furtherance of its monopsonization of the relevant market, as alleged further throughout this Complaint.  These exclusionary actions are of a continuing nature and constitute new overt acts in furtherance of Defendants' unlawful monopsony each year.

140.    Defendants acquired ISC to gain control of many of the most prominent racetracks in motorsports, including Daytona International Speedway, Talladega Superspeedway, and Michigan International Speedway, allowing NASCAR to ensure that no market competitor could ever gain access to these elite racetracks.  As for the racetracks that NASCAR does not own, Defendants impose unlawful exclusive dealing provision terms on owners of these independent racetracks as a requirement for hosting Defendants' Cup Series events.  The exclusive dealing provisions prevent the racetrack owners from entering into any agreements to host any other stock car racing event not sanctioned by Defendants at their racetrack venues.

141.    Defendants also eliminated a potential competitor by purchasing ARCA and its ARCA Menards Series to prevent any potential competition with the Cup Series.

142. Defendants have also unlawfully maintained their monopoly through the imposition of covenants not to compete, which restrict chartered teams from competing in any other stock car series or forming such a series. These covenants restrict the availability of the limited supply of premier stock car racing teams, which serves as a barrier to entry to other competitors.

143. Defendants have further engaged in exclusionary conduct through their anticompetitive Next Gen requirements. These requirements further lock in the racing teams to NASCAR and further serve as a barrier to entry to preclude the formation of a competitive stock car racing series. They serve no procompetitive purpose to have NASCAR own these cars and prevent them from being raced in other events, even after the Charters expire.

144. The mandatory release provision of the 2025 Charter Agreement is a further anticompetitive term which protects Defendants' monopsony. The premier stock car racing teams that compete in NASCAR are the direct victims of Defendants' monopsony and the most likely plaintiffs to assert their antitrust rights to free up the market to competition. By forcing these teams to sign a release which might cover their antitrust claims as a condition of renewing their Charter Agreements, Defendants are engaging in further anticompetitive conduct to maintain their unlawful monopoly.

145. Defendants' conduct in furtherance of their monopsony of the relevant market is exclusionary in nature, does not consist of legitimate business activities, and is an abuse of its market position. There is no procompetitive justification for this exclusionary and anticompetitive conduct.

146. Defendants have exercised their monopsony power by imposing anticompetitive terms through Defendants' Charter Agreements on Plaintiffs and other premier stock car racing

teams as a condition for being able to compete in the relevant market. Agreeing to Defendants'

Charter Agreement is necessary for any racing team to viably compete in the relevant market on a

long-term basis. The 2016 and 2025 Charter Agreements contain anticompetitive and abusive

contract terms that are substantially inferior to the terms that racing teams, like Plaintiffs, would

be able to negotiate in a competitive market.

147.    Defendants' monopsonization of the relevant market occurred in and unreasonably

restrained interstate commerce.

148.    Defendants' monopsonization of the relevant market has directly and proximately

caused antitrust injury and damages to the business and property of Plaintiffs. Plaintiffs will

continue to suffer antitrust injury and damages unless Defendants are enjoined from continuing to

engage in the foregoing violations of law and competition is restored in the market.

149.    Further, Defendants' efforts to obtain and maintain their monopsony power has

harmed Plaintiffs and competition in the relevant market as set forth above and will continue to do

so until Defendants are enjoined from further engaging in conduct to preserve and protect their

monopsony power.

150.    The amount of damages suffered by Plaintiffs has not yet been ascertained.

Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from Defendants treble

the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

151.    Defendants' violation of Section 2 of the Sherman Act is a continuing violation

causing new injury to Plaintiffs, as Defendants continue to engage in new overt acts to maintain

their monopsony power and then exercise that power to impose anticompetitive terms of doing

business on Plaintiffs. Plaintiffs seek damages for their past four years of antitrust injury from

Defendants' Section 2 violations, plus all damages that they will continue to suffer in the future until Defendants' Section 2 violations are enjoined.

## COUNT TWO

**Against all Defendants**
**Violation of Section 1 of the Sherman Act:  Contract, Combination, or Conspiracy By Defendant in Unreasonable Restraint of Competition**

152.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153.    Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a series of continuing contracts, combinations, and conspiracies in restraint of trade, which have the combined effect of foreclosing competition in the relevant market in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

154.    Defendants entered into contracts, combinations, and conspiracies with owners of premier racetracks for the sanctioning rights to host Cup Series races.  These agreements imposed unlawful exclusive dealing provision terms on the owners of these independent racetracks as a requirement for hosting Defendants' Cup Series events.  The exclusive dealing provisions prevent the racetrack owners from entering into any agreements to host any other stock car racing event at their racetrack venues. As a direct result of these unlawful exclusive dealing provisions, Defendants severely limit or destroy access to nearly all top-tier racetracks in the market, foreclosing any competitor entering or competing in the relevant market.  These exclusionary actions are of a continuing nature and constitute new overt acts in furtherance of Defendants' unlawful contract, combination, and conspiracy each year.

155.    Defendants entered into contracts, combinations, and conspiracies with racing teams through anticompetitive terms in their 2016 and 2025 Charter Agreements, which the racing

teams were forced to accept. These anticompetitive terms include non-compete restrictions and Next Gen car requirements, which have the combined effect of preventing the limited supply of premier stock car racing teams and drivers from participating in any other racing competition. Because these restrictions foreclose access to the racing teams and drivers needed to compete, they serve as a means of preserving Defendants' monopsony power in the relevant market. Another anticompetitive term of the Charter Agreements is a mandatory release which, according to Defendants, would shield them from any antitrust claims from the racing teams that are victimized by Defendants' anticompetitive conduct. These unreasonable agreements in restraint of trade are of a continuing nature and constitute new overt acts in furtherance of Defendants' unlawful contract, combination, and conspiracy each year.

156.     The agreements, combinations, or conspiracies are driven by Defendants' intent to unreasonably restrain and monopolize trade in the relevant market and have the significant anticompetitive effect of foreclosing competition in the relevant market and maintaining Defendants' monopoly power therein.

157.     No legitimate procompetitive justifications exist to justify Defendants' unreasonable restraints of trade.

158.     Moreover, even if Defendants offered any alleged potential procompetitive justifications for their anticompetitive agreements, there are significantly less-restrictive means to promote any such conceivable alleged procompetitive purpose for Defendants' conduct. Accordingly, even under a rule-of-reason analysis, the Defendants' agreements, combinations, or conspiracies in restraint of trade violate Section 1 of the Sherman Act under either a quick look or full-blown rule of reason analysis. And their anticompetitive effects may be proven either by

defining the relevant market and demonstrating the existence of Defendants' market power or by providing direct evidence of the anticompetitive effects of Defendants' unreasonable restraints.

159.    Plaintiffs have suffered and will continue to suffer antitrust injury to their business and property as a direct and proximate result of Defendants' unlawful agreements, combinations, or conspiracies in restraint of trade. Without the possibility of being able to compete in any alternative premier stock car racing series except for NASCAR, Plaintiffs are forced to either accept NASCAR's monopsonistic terms or cease participating in premier stock car racing at all. Plaintiffs' injuries will continue to be suffered until Defendants are prohibited from further engaging in such activity.  By foreclosing any competitive alternative, these anticompetitive agreements have enabled Defendants to impose below market terms on Plaintiffs in their 2016 Charter Agreements and will continue to do so either through their 2025 Charter Agreements or the even more unfavorable terms that will be imposed on Plaintiffs if they are required to compete without a charter in 2025.

160.    Defendants' contracts, combinations, and conspiracies in unreasonable restraint of trade are continuing as new, overt acts causing Plaintiffs antitrust injury and damages on a continuing basis.  Plaintiffs seek damages for their past four years of antitrust injury from Defendants' Section 1 violations, plus damages for the antitrust injury they will continue to suffer going forward until Defendants' Section 1 violations are enjoined.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief:

A.    That Defendants' monopsony over the relevant market for premier stock car racing teams, which Defendants have willfully maintained by anticompetitive conduct, be adjudged to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.     That the above-identified contracts, combinations, or conspiracies entered into by Defendants be adjudged to be unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     That the Court grant Plaintiffs' forthcoming motion for a preliminary injunction enjoining Defendants from enforcing the release in Section 10.3 of the 2025 Charter Agreement(s) for the duration of this action and ordering Defendants to permit Plaintiffs to sign such a renewed 2025 Charter Agreement without being subject to any claimed release of antitrust claims so that Plaintiffs may proceed with this action and obtain relief to which they are entitled under the antitrust laws while continuing to compete as chartered teams in the relevant market;

D.     That the Court declare that the release set forth in Section 10.3 of the 2016 Charter Agreement is invalid as a matter of law to the extent it might apply to Plaintiffs' antitrust claims in this action;

E.     That Defendants be permanently enjoined from further violations of the antitrust laws and that an injunction be issued to grant such relief as is necessary to restore competition in the relevant market;

F.     That judgment be entered for Plaintiffs against Defendants for three times the amount of damages, as allowed by law, sustained by Plaintiffs as a result of Defendants' Sherman Act violations, in an amount to be determined at trial, together with the costs of this action and reasonable attorneys' fees; and

G.     That Plaintiffs be accorded such other, further, or different relief as the case may require and the Court may deem just and proper under the circumstances to restore competition.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: February 3, 2025    Respectfully submitted,

WINSTON & STRAWN LLP


By: */s/ Jeffrey L. Kessler*
   Jeffrey L. Kessler
   **WINSTON & STRAWN LLP**
   200 Park Avenue
   New York, NY 10166
   Tel: (212) 294-6700
   Fax: (212) 294-4700
   jkessler@winston.com

   Danielle T. Williams
   **WINSTON & STRAWN LLP**
   300 South Tryon Street
   16th Floor
   Charlotte, NC 28202
   Tel: (704) 350-7700
   Fax: (704) 350-7800
   dwilliams@winston.com

   Jeanifer Parsigian
   Michael Toomey
   **WINSTON & STRAWN LLP**
   101 California Street
   San Francisco, CA 94111
   Tel: (415) 591-1000
   Fax: (415) 591-1400
   jparsigian@winston.com
   mtoomey@winston.com

   Matthew R. DalSanto
   **WINSTON & STRAWN LLP**
   35 W. Wacker Drive
   Chicago, IL 60601
   Tel: (312) 558-5600
   Fax: (312) 558-5700
   mdalsanto@winston.com

   *Counsel for Plaintiffs 2311 Racing LLC d/b/a*
   *23XI Racing and Front Row Motorsports, Inc.*