# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. <br><br> ───────────────────── <br><br> NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. | No. 3:24-cv-886-KDB-SCR |

## NASCAR'S COUNTERCLAIMS AGAINST 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., AND CURTIS POLK, & DEFENDANTS' ANSWER TO AMENDED COMPLAINT AND DEFENSES

Counterclaimant NASCAR Event Management, LLC ("NASCAR") alleges as follows:

### INTRODUCTION

1.       2311 Racing LLC d/b/a 23XI Racing ("23XI") and Front Row Motorsports, Inc. ("FRM") brought suit against NASCAR and James France because they are unhappy with the commercial terms of the most-recent Charter Agreements that 13 other team owners entered into with NASCAR in 2024.  NASCAR's first Charter Agreements were signed in 2016 after team owners

approached NASCAR about creating a new system that would provide guaranteed entry into NASCAR events and guaranteed revenue. Following over a year of arm's length negotiations, NASCAR agreed to provide racing teams that had demonstrated a history of partnering with NASCAR with guaranteed starting positions in all NASCAR Cup Series races and other benefits, including fixed and guaranteed payments, in exchange for certain commitments from the racing teams that would help further grow the Cup Series. NASCAR was under no obligation to agree to a Charter system, but did so because the teams requested it. NASCAR provided the 2016 Charters to the racing teams for free (*i.e.*, team owners paid no consideration to NASCAR), but agreed those Charters would be transferrable, providing Charter owners with a valuable asset and revenue source. Since inception, team owners with Charters have, from time-to-time, sold their Charters to other investors seeking to obtain guaranteed entry into Cup Series races and the other benefits of Charters. The sales price of these Charters has increased over time, only highlighting the value that the Charter system provides to team owners.

2. Although NASCAR recognizes the value the Charter model has brought to Charter teams and is certainly willing to continue with the model on the terms mutually agreed to, NASCAR now finds itself in the ironic position of having to defend a model that NASCAR never asked for in the first place and which it would be content not to have.

3. The Charter Agreements made the racing teams stronger financially, and most importantly, partners with NASCAR in trying to grow the Cup Series as a sports and entertainment property to attract new fans, sponsors, broadcast partners, and other participants. As part of that partnership, team owners with Charter Agreements agreed they would not participate in certain other racing series that could confuse fans and undermine the value associated with the Cup Series. And more generally, team owners agreed to work with NASCAR for the betterment of the Cup Series,

agreeing in the Charters to standard provisions that appear regularly in such agreements, including provisions on non-disparagement and releases of past legal claims. Since team owners asked for the Charter system, it is not surprising that team owners signed the 2016 Charters; but, none were forced to sign the 2016 Charters if they did not approve of the ultimate terms. Racing teams remained free to compete in the Cup Series the same way they did prior to the 2016 Charters. Since 2016 numerous racing teams have competed in the Cup Series without the benefits and requirements of the Charters as "open teams," as well as in NASCAR's Xfinity Series and Craftsman Truck series, each of which has no exclusivity requirements—but also no guaranteed starting positions or guaranteed revenue distributions.

4.      By their terms, the 2016 Charter Agreements expired on December 31, 2024. In anticipation of that expiration, team owners approached NASCAR in 2022 and asked NASCAR to enter into early negotiations regarding new commercial terms to include in the 2025 Charters. The 2025 Charter was intended to govern the relationship between NASCAR and Cup Series Charter owners for the next seven to fourteen years. As part of those negotiations, NASCAR agreed that 2025 Charter holders would receive increased portions of revenue and other concessions team owners requested. The negotiations carried on well into 2024, but with the 2025 NASCAR Cup Series season quickly approaching, the negotiations needed to be concluded. It has been suggested that the negotiations were rushed and teams were not given sufficient time to evaluate the Charter terms. However, the negotiations for the 2025 Charter Agreements took place over years, and indeed were longer in duration and more inclusive than those negotiations which originally created the Charter system from scratch. While neither NASCAR nor the teams got everything they wanted, 13 of the 15 racing team owners, who owned 32 out of the 36 existing Charters, agreed with NASCAR on terms for the 2025 Charters. 23XI and FRM felt differently.

They decided to not sign the 2025 Charters—as was their prerogative if they did not want to enter into a long-term contractual relationship with NASCAR.

5.      However, 23XI and FRM did not merely reject the terms of the 2025 Charters. Rather, those teams embarked on a strategy to threaten, coerce, and extort NASCAR into meeting their demands for better contract and financial terms. Aided by counsel who has a history of suing various sports leagues and claiming that they engage in anticompetitive conduct, 23XI and FRM brought suit, alleging that the 2016 and 2025 Charters are illegal agreements, and that NASCAR is an illegal monopsonist. For themselves, 23XI and FRM are seeking treble damages and attorneys' fees. But they are also seeking a declaration that the 2025 Charter Agreement is illegal and violates the antitrust laws. By claiming the Charters are illegal agreements, Plaintiffs have opened pandora's box. Charters, as previously mentioned, contain a goodwill provision prohibiting a Charter holder from competing in a stock car racing product that would be dilutive to the NASCAR Cup Series. In exchange, the Charters grant the Charter holder a guaranteed starting position in all NASCAR Cup Series events. Both of these exclusivity provisions have existed for over nine years and have benefited both parties respectively. If the Charters are deemed to be anticompetitive, then either Charters will go away entirely or the cross exclusivities that benefitted both parties will be eliminated. That is not an outcome that NASCAR is seeking, nor is it one that NASCAR believes benefits the racing teams which have partnered with NASCAR and signed Charters. But this is an outcome that 23XI and FRM, through this lawsuit, could impose on all race teams and their owners.

6.      This is not the first time that 23XI and FRM have sought to impose their viewpoints, and those of their counsel, on the racing teams writ large. And it is truly ironic that in trying to blow-up the Charter system, 23XI and FRM have sought to weaponize the antitrust laws to achieve their

4

goals. That is because the undisputed reality is that it is 23XI and FRM, led by 23XI's owner and sports agent Curtis Polk (23XI, FRM, and Curtis Polk collectively, "Counterclaim Defendants"), who willfully violated the antitrust laws by orchestrating anticompetitive collective conduct in connection with the terms of the 2025 Charter Agreements.

7. 23XI joined NASCAR in 2021 through the purchase of one Charter from a 2016 Charter holder, and quickly purchased another. Polk and 23XI's other owners openly professed that they wanted to change NASCAR's economic model by demanding more money for the teams from NASCAR media revenues, instead of teams competing against each other (their horizontal competitors) for sponsorship dollars.[1]

8. Polk put this plan into action during 23XI-led negotiations on behalf of the members of the Race Team Alliance ("RTA"), seeking to extract more favorable financial and non-financial terms than in the 2016 Charter. Polk played an active role in coordinating the Counterclaim Defendants' concerted actions, negotiating on behalf of all RTA members when engaging with NASCAR on terms such as the payments the teams would receive as part of the 2025 Charter. Polk sent multiple requests to NASCAR on behalf of all RTA members demanding changes to the 2025 Charter, and otherwise threatening that the RTA members would take adverse group actions if such demands were not met. Polk's individual role was at the very center of the plot to use collusive behavior to extract more favorable commercial terms from NASCAR in the Charter negotiations. These strategies and threats included, but were and are not limited to, a group boycott and threatened group boycotts of NASCAR events, including televised qualifying races, negative media campaigns, meetings with at least one NASCAR media partner to affect ongoing NASCAR negotiations for a new media rights agreement, and threats/coercion to other team owners to "not

---

[1] http://www.sportsbusinessjournal.com/Journal/Issues/2022/02/28/Upfront/NASCAR.aspx.

break ranks." The Counterclaim Defendants' anticompetitive negotiating strategy had an adverse effect on both the 2025 Charter and NASCAR's renewal of its media rights agreements. And, Counterclaim Defendants continue to ensure that teams are "aligned" in their positions vis-à-vis NASCAR even though the teams are horizontal competitors.

9.     The Supreme Court of the United States has emphasized that in drafting Section 1, "Congress treated concerted behavior more strictly than unilateral behavior," because unlike independent action, "[c]oncerted activity inherently is fraught with anticompetitive risk" insofar as it "deprives the marketplace of independent centers of decision making that competition assumes and demands."[2] NASCAR asserts these counterclaims against Counterclaim Defendants because their concerted, collusive activity, which includes organizing and participating in *per se* unlawful horizontal agreements to collectively negotiate the terms of the 2025 Charter Agreements, violates Section 1 of the Sherman Act. NASCAR is bringing suit against the Counterclaim Defendants because they not only participated in the collusive conduct, but on information and belief, orchestrated it.

## THE PARTIES

10.     Counterclaim Defendant 2311 Racing LLC d/b/a 23XI Racing ("23XI") is a limited liability company organized under the laws of North Carolina, with its principal place of business in North Carolina. On information and belief, 23XI is owned by entities under the control of Michael Jordan, Denny Hamlin, and their business partner Curtis Polk.

11.     Counterclaim Defendant Front Row Motorsports, Inc. ("Front Row") is a corporation organized under the laws of Tennessee. On information and belief, Front Row Motorsports is

---

[2]     *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)) (quotation marks omitted).

owned by entities under the control of Robert "Bob" Jenkins. On information and belief, Front Row Motorsports has places of business in at least Tennessee and North Carolina. Front Row is registered to transact business in the state of North Carolina.

12. Defendant Curtis Polk ("Polk") is a co-owner of 23XI. On information and belief, Polk regularly transacts business in North Carolina, including on behalf of 23XI. Joinder of Polk is appropriate as the claims against him arise out of the same series of occurrences as the claims against 23XI and Front Row and because questions of law and fact are common to Polk, 23XI, and Front Row.

13. Counterclaimant NASCAR Event Management, LLC ("NASCAR") is a privately-owned company responsible for sanctioning and producing NASCAR's motorsport races.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

15. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and (c).

16. 23XI is subject to general and specific personal jurisdiction in this judicial district based upon its purposeful, systematic, and continuous contacts with the state of North Carolina, including that it is headquartered in Huntersville, North Carolina,[3] its decision to maintain an office, and its previous registration to do business in the state.

17. Front Row is subject to general and specific personal jurisdiction in this judicial district based on upon its purposeful, systematic, and continuous contacts with the state of North Carolina,

---

[3] https://www.nascar.com/news-media/2024/05/30/cup-series-2024-inside-airspeed-23xi-racing-headquarters/.

including that it maintains offices and garages in Mooresville, North Carolina[4] and its previous registration to do business in the state.

18.     Curtis Polk is subject to personal jurisdiction in this judicial district based on upon his purposeful, systematic, and continuous contacts with the state of North Carolina.

19.     Venue for these counterclaims is proper within this judicial district pursuant to 28 U.S.C. §§ 1391.

## THE FACTS

## I.     THE HISTORY OF NASCAR

20.     William ("Bill") France, Sr. formed NASCAR in 1948.  Bill France's story is the quintessential American success story.  Bill France moved to Daytona Beach during the Great Depression with $100 to his name.  When he arrived, he worked as a house painter, at a car dealership, and then a car repair shop.  Eventually, he began promoting stock car races in Daytona, and ultimately created NASCAR in response to the then frequent practice of unscrupulous promoters leaving events without paying drivers.

21.     Bill France also founded the International Speedway Corporation ("ISC") in 1953.  In 1957, ISC built the Daytona International Speedway.  In 1967, ISC bought the site of the Talladega Superspeedway.  Over the next few decades, ISC invested in building and acquiring additional tracks.  By 2019, ISC owned and operated 13 motorsports facilities.  At that time, ISC was a public company, although over seventy percent of the voting stock was held by the France family.  On May 20, 2019, NASCAR announced that it would fully acquire ISC and take it private.  This transaction meant that NASCAR could better compete with other sports for fans and fan

---

[4]     https://www.facebook.com/FrontRowMotorsports.

engagement by standardizing track facilities and the fan experience, optimizing race schedules, standardizing event pricing, and centralizing the inventory of media and sponsorship assets.

22.     Stock car racing is a form of motorsports that gets its name from a time when racers originally used unmodified production-model cars (*i.e.*, right off the assembly line) to compete. Today, cars used in NASCAR races still outwardly resemble standard commercial sedan vehicles, though they have been developed and engineered over years of experience for safety, competition, and cost efficiency.

23.     For over 75 years, NASCAR—and the France family in particular—have continued to invest in and grow the sport of stock car racing. They secured title sponsors and expanded the reach of the sport through media-rights deals to bring stock car racing into living rooms across the country. The France family expanded the sport globally through the creation of international racing series and provided opportunities for hundreds of teams and tens of thousands of drivers, pit crew workers, and other personnel. NASCAR is now considered one of the top motorsport series in the world and is one of the largest sports leagues in America.

24.     Each generation of the France family has been devoted to improving the sport before turning it over to the next generation, but the France family is not the only family dedicated to the business of stock car racing. NASCAR's success has translated into success for countless participants in the sport (e.g., drivers, crew chiefs, engineers, mechanics, etc.), many of whom have gone on to own their own stock car racing teams (as well as teams competing in other motorsports) and racetracks and share the success of their NASCAR businesses with their families.

25.     NASCAR sanctions three national racing series: the Cup Series, the Xfinity Series, and the Craftsman Truck Series.

26.     The NASCAR Cup Series currently races on 28 different tracks in 2025, of which NASCAR owns, operates, or is licensed to promote 13.  After the ISC acquisition, NASCAR owns 16 racetracks.  That leaves 15 racetracks that are used in the NASCAR Cup Series that NASCAR does *not* own—including the Indianapolis Motor Speedway, Charlotte Motor Speedway, and Pocono Raceway.

27.     The NASCAR Xfinity Series generally holds races on the same tracks as the Cup Series, but Xfinity Series races have fewer laps.

28.     The Craftsman Truck Series is comprised of modified pickup truck races.

29.     NASCAR racing series team ownership is open to any individuals with a license to compete.  To obtain a license to compete, individuals simply fill out an application, submit payment, and sign liability waivers that are all publicly available on NASCAR's website. Currently, NASCAR has over 156 full-season licensed owners.

30.     There are at least 150 tracks and road courses in the United States that NASCAR believes can support motorsports (including stock car) races.

31.     There are also endless opportunities for races outside of existing tracks, including recent utilization by NASCAR and other racing promoters of specialty-built facilities (e.g., in the Los Angeles Memorial Coliseum) or street course races (e.g., Las Vegas, Chicago, Miami, etc.).

32.     There are many traditional oval-shaped tracks that NASCAR neither owns nor with which NASCAR contracts.  And, NASCAR has increasingly sanctioned and promoted races on street tracks, like NASCAR's Grant Park 165 street race in Chicago.  In addition, NASCAR has sanctioned and promoted races in the Los Angeles Memorial Coliseum, a stadium used for football and the Olympic Games.

33.     Teams do not contribute to the cost of developing or maintaining racetracks or other facilities for NASCAR races.  Teams also do not contribute to the other costs of hosting events, including track personnel, supplies, marketing, ticketing, and all of the other costs necessary to host a race.

34.     In addition to its investment in racetracks and other venues for NASCAR events, NASCAR invests heavily in production infrastructure to deliver first-class live event content to fans and industry partners.  For example, in 2022 NASCAR announced construction of a 58,000-square-foot production facility in Charlotte, North Carolina.  That production facility, now operational, was built at a large cost to NASCAR and is or will be used by NASCAR media partners and has also been used by racing teams.

35.     Teams do not contribute to the costs of producing and delivering world-class live broadcasts for NASCAR races even though Cup Series teams are the largest beneficiary of the increased revenues attributable to broadcasts of Cup Series races under the 2025 Charter.

36.     From 1949 through 2015, teams that raced in NASCAR-sanctioned events competed to qualify for their entry into each race.  This included NASCAR's Cup Series, which is NASCAR's most prestigious stock-car racing series.  In the years immediately preceding 2016, each race in the Cup Series typically had 43 positions available for competitors.  Teams competed to earn their position and competed to win race purses.  NASCAR awarded the highest race purses to the best racing teams based on how they finished in each race individually and overall throughout the season.  The highest performers also earned lucrative sponsorships, as sponsors wanted to be associated with the best competitors.

37.     Before 2016, teams earned money from NASCAR and tracks based on performance at each race.  Historically, money from NASCAR's television deals was split 65% to tracks (via the

sanctions awarded to host races), 25% to teams (via the purses for each race), and 10% to NASCAR.

38.     Teams also earned, and today still earn, significant revenues from sponsorship deals, which they do not share with NASCAR. Steve Lauletta, President of 23XI, has described 23XI as a "brand that happens to be a race team, not a race team brand."[5]

39.     Teams benefit from NASCAR's investment in racetracks, venues, and production facilities, because these investments make NASCAR races more attractive to broadcast partners, patrons, and viewers, which in turn helps teams sell sponsorships and otherwise monetize their team's intellectual property.

40.     NASCAR has also made additional changes that have helped teams sell more sponsorships. For example, NASCAR's change to the Next Gen car has "opened a floodgate of new sponsors" for NASCAR teams.[6] Next Gen cars reflect NASCAR's most recent generation of rules for the types of cars that can be raced in the Cup Series. The previous generation of cars ("Generation 6") resulted in cars featuring more custom parts and features. On the other hand, Next Gen cars are made from standardized parts and require significantly fewer custom-made parts. Not only does this lower costs for Cup Series teams, but it has increased sponsorship opportunities for teams, and made races more competitive.

---

[5]     https://racer.com/2022/07/07/interview-23xis-steve-lauletta/.

[6]     https://www.forbes.com/sites/gregengle/2024/04/21/how-nascars-sponsorship-ecosystem-is-evolving-with-the-times/.

## II.    THE ORIGINS OF THE CHARTER SYSTEM

41.    In the summer of 2014, nine NASCAR Cup Series racing teams[7] jointly formed the RTA, and by August 2014, nine more teams had joined, including Front Row Motorsports.[8]  The RTA was an association of team owners who compete with each other for NASCAR entry slots, NASCAR race purses, sponsors, drivers, employees, and other investments.  Team owners are thus horizontal competitors.  The RTA limited its membership to only team owners whose teams attempted to qualify for at least 95% of NASCAR's Cup Series races in the prior two seasons.[9] New or prospective team owners seeking to enter the NASCAR Cup Series at the time were not a part of the RTA.  As reported by the Associated Press: "The Race Team Alliance was formed in 2014 to give teams a unified voice in negotiations with the sanctioning body [NASCAR]."[10]  The RTA and its race team members sought, among other things, guaranteed entry into Cup Series races and guaranteed revenue from NASCAR.

42.    The negotiations between the RTA and NASCAR regarding the terms of the Charter Agreement included fixed and performance amounts, guaranteed starting positions, goodwill, and the preservation of Open positions.  The RTA-member teams shared information amongst themselves regarding which terms to propose, agreed with each other on their preferred outcomes

---

[7]    The original founding members of the RTA were: Chip Ganassi Racing with Felix Sabates, Hendrick Motorsports, Joe Gibbs Racing, Michael Waltrip Racing, Richard Childress Racing, Richard Petty Motor Sports, Roush Fenway Racing, Stewart-Haas Racing, and Team Penske.

[8]    https://www.usatoday.com/story/sports/nascar/2014/08/13/race-team-alliance-expands-to-include-18-nascar-sprint-cup-teams/14003447/.

[9]    https://www.usatoday.com/story/sports/nascar/2014/08/13/race-team-alliance-expands-to-include-18-nascar-sprint-cup-teams/14003447/.

[10]    https://apnews.com/article/sports-auto-racing-charlotte-michael-jordan-formula-one-00c6f2f2d4f9727ae21bb3dfbb742aec.

and negotiating positions, and even shared the same outside counsel to negotiate on their collective behalf.

43. After significant negotiations between the RTA and NASCAR, the parties reached agreement on the terms of the 2016 Charter Agreements. Under the 2016 Charter Agreements, there are 36 Charters, each issued by NASCAR for $0 paid by team owners. Each Charter (1) entitles a Charter holder to one guaranteed entry in every Cup Series race and (2) guarantees millions of dollars in payments to a Charter holder, just for having a Charter. In other words, merely by being awarded a Charter, a Charter team will receive millions of dollars from NASCAR, even if they never win or achieve any success in a race. The Charter Agreements also decreased the number of available positions in each Cup Series race from 43 to 40. Of those 40 positions, 36 are reserved for Charter teams (assuming each team receiving a Charter Agreement signed such agreement).

44. Under the 2016 Charter Agreements, media rights were split 65% to racetracks, 25% to teams and 10% to NASCAR. Promoters and NASCAR also contributed toward the teams' Pool Money, increasing the teams' net payout to approximately 38% of the NASCAR Cup Series media revenue (increasing over time to approximately 40% in 2024). The RTA teams also limited competition between themselves by negotiating for a distribution of funds from NASCAR that was not solely linked to a team's performance in a particular race. Under the Charter system, funds are awarded to Charter teams for (i) performance in a particular race (Race Purse); (ii) overall performance in a particular year (Year-End Point Fund); (iii) overall performance over a number of seasons (Historical Owner's Plan) and (iv) payments merely for being a Charter member and committing to race in each Cup race (Fixed Owner's Plan).

14

45.     While Charter holders are able to sell their Charters for tens of millions of dollars (it has been publicly reported that Spire purchased a Charter from another team for $40 million),[11] as noted above, NASCAR issued the original Charters to team owners for free.

## III.   THE 2025 CHARTER AGREEMENT NEGOTIATIONS

46.     23XI joined the RTA in 2021, and Front Row Motorsports rejoined in 2022 in anticipation of 2025 Charter negotiations.[12]  In 2022, the RTA consisted of every team then holding a 2016 Charter.

47.     Although 23XI and Front Row claim that they have never generated a profit competing in NASCAR, and that NASCAR's business model has "failed," both have expanded their racing teams by purchasing additional Charters from SHR for tens of millions of dollars.  Front Row also recently announced that it would expand with an additional driver in NASCAR's Truck series.  Upon information and belief, 23XI also intends to race an additional car as an "open" team in 2025.  Moreover, 23XI has continued to increase its investments in its race shop, Airspeed, which confirms that NASCAR and the Charter system drives value for teams.

48.     On information and belief, Front Row and 23XI each earned tens of millions of dollars of sponsorship revenue in 2023 as result of their participation in NASCAR races, as shown by the chart below.  None of this sponsorship revenue is shared with NASCAR or contributed by teams towards the cost of tracks, hosting races, or the broadcasts that teams benefit from in many ways, including by receiving both a share of broadcast revenues and also the ability to sell sponsorships.

---

[11]     https://www.nbcsports.com/nascar/news/spire-buys-charter-trackhouse-signs-zane-smith-for-2024-cup-ride.

[12]     Front Row had been a member of the RTA during the 2016 Charter negotiations, but subsequently left after the 2016 Charters were signed.



49.     In addition to the tens of millions of sponsorship revenue teams receive and do not share with NASCAR, Polk orchestrated a scheme to extract even more money from NASCAR and the industry for the benefit of himself, his team 23XI, and Front Row, among others.  On information and belief, he did so by organizing together 23XI, Front Row, and certain members of the RTA to jointly negotiate against NASCAR, with Polk himself leading the charge to demand Counterclaim Defendants' preferred terms for the 2025 Charter from NASCAR.  If NASCAR did not cede to his demands, Polk threatened to (and did) interfere with NASCAR's broadcast negotiations and also threatened a group boycott of NASCAR events.  This wasn't merely hypothetical.  In April 2023, Charter teams collectively boycotted a meeting with NASCAR that was contractually-obligated pursuant to the terms of the 2016 Charter.[13]

50.     At least as early as February 2022, with Polk leading the charge, 23XI, Front Row, and others sent a joint letter to NASCAR notifying NASCAR that they had established the Teams

---

[13]     https://apnews.com/article/nascar-owners-boycott-40d028af65c240c835176476344391a3.

Negotiating Committee ("TNC").[14] The TNC consisted of Polk of 23XI and representatives of three other members of the RTA.

51.   Unsurprisingly, the TNC was led by Polk. The TNC presented demands to NASCAR on behalf of all existing Charter teams. In order to make these unified proposals, Polk, 23XI, Front Row, and others agreed upon desired contract terms.

52.   Polk played an active role in 23XI's decision to enter into a conspiracy with Front Row and others to negotiate collectively with NASCAR. Polk provided the united position of the teams with respect to how much money teams would receive as part of the 2025 Charter Agreement, among other terms.

53.   In June 2022, the TNC, led by Polk, presented NASCAR its initial proposal and represented that the proposal had been agreed upon by all 16 teams holding 36 Charters at the time.[15] The TNC proposed a multi-point plan intended to increase payments to the teams and further limit competition between them.[16] In exchange for the above list of demands, the teams told NASCAR that they were "all in."

54.   Throughout 2022, the TNC, including Polk, had private meetings with NASCAR about the 2025 Charter Agreements and the teams' demands for additional broadcast revenue from

---

[14]   Pursuant to Section 2.3 of the 2016 Charter Agreement, negotiations were scheduled to start on January 1, 2023.

[15]   https://apnews.com/article/sports-auto-racing-charlotte-michael-jordan-formula-one-00c6f2f2d4f9727ae21bb3dfbb742aec.

[16]   These demands included: (1) $720 million annual payment to teams; (2) 33% of all new revenue sources that include Team rights; (3) 33% of media increases: (4) permanent charters; (5) a change of control provision; (6) additional approval rights on material issues such as the race schedule, moves toward electrification, and new industry initiatives.

Case 3:24-cv-00886-KDB-SCR     Document 111     Filed 03/05/25     Page 17 of 31

NASCAR, while NASCAR's broadcast agreement was under negotiation.[17] These meetings included Polk and representatives of NASCAR, and others on multiple dates.

55. Upon information and belief, in furtherance of their conspiracy, Counterclaim Defendants and others agreed to engage in a misinformation campaign designed to increase their collective leverage against NASCAR.

56. In early October 2022, the TNC held a joint press conference to publicize their dissatisfaction with the fact that NASCAR had not given in to their demands.

57. The RTA further announced in November of 2022 that it had engaged Wasserman Media Group, a sports marketing agency, to explore the possibility of holding exhibition events outside of NASCAR. It was widely reported at the time that this was "just a leverage tool" used by the teams to extract concessions from NASCAR in Charter negotiations.[18]

58. RTA members also engaged in a scheme to deter new team owners from seeking to enter the Cup Series by purchasing a Charter, preferring instead to consolidate their own positions by purchasing additional Charters themselves. Former racing star Dale Earnhardt Jr., who owns a NASCAR Xfinity Series team, explained that although he sought to purchase a charter, the RTA told him that "this charter that I want to buy is a losing proposition. It's broken. That I don't want to buy this charter now, because it's not a successful business."[19] These representations were false,

---

[17]    https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2022/10/07/NASCAR-Race-Team-Alliance-Tensions.aspx.

[18]    https://racingnews.co/2022/11/30/nascar-teams-could-soon-host-exhibition-races-without-nascar/; https://www.news-journalonline.com/story/sports/outdoors/fishing/2022/12/04/nascar-shots-fired-owners-consider-going-rogue-exhibitions-tony-stewart-jeff-gordon-roger-penske/10811534002/.

[19]    https://racingnews.co/2022/10/14/dale-earnhardt-jr-perplexed-as-nascar-charters-valued-at-30m/.

as shown by Counterclaim Defendants' purchases of two Charters only a few months later for tens of millions of dollars.

59.     Pursuant to the 2016 Charter Agreement, NASCAR and Charter teams are required to attend a minimum of four annual meetings each year ("Team Owner Council Meetings"). NASCAR, pursuant to the Charter Agreement, sent out notice of a meeting to be held on April 5, 2023.  All teams accepted the meeting invitation.

60.     Upon information and belief, Polk and the TNC agreed with each other and one or more other RTA members to boycott the meeting to pressure NASCAR to give in to the TNC's collective demands.

61.     On the day of the scheduled meeting, in an effort to pressure NASCAR to agree to the RTA's terms, all teams boycotted a Team Owner Council Meeting.

62.     Following this boycotted meeting, NASCAR decided it had to continue to negotiate the terms of the 2025 Charter Agreements with all of the RTA members through the TNC.  NASCAR also sought to simultaneously negotiate with the teams individually because it appeared that the TNC and Polk were not providing all of NASCAR's offers to all teams/team owners.

63.     The TNC and Polk were successful in obtaining concessions from NASCAR during these negotiations.  One of these concessions is that NASCAR agreed to increase the percentage of revenue to the teams by approximately 25%.  All told, the team owners collectively negotiated an increase of guaranteed payments to almost half of media revenue attributable to the Cup Series based on 36 Charters.

64.     But the Counterclaim Defendants were not satisfied.  They wanted to achieve permanent Charters (essentially granting them equity in NASCAR for no consideration), which would include permanent guaranteed entry into NASCAR races, even further increased revenues from NASCAR,

and they wanted to take the greatest share of money for themselves by limiting the amount of money that open teams could receive even if they performed well in Cup Series races.

65.    In February 2023, 23XI co-owner Denny Hamlin admitted publicly that the RTA purposefully engaged in a media campaign regarding the 2025 Charter negotiations at the same time that NASCAR was negotiating with broadcasters in order to put pressure on NASCAR "to make a deal with us."  Hamlin explained the RTA's reasoning and threatened that the teams would boycott NASCAR if they did not achieve their demands: "I don't see how you can go out and get the most money from a TV partner if you don't have your house in order.  No TV partner wants any interruptions in service.  And with the teams publicly saying they weren't happy with the deal, that could throw up red flags for TV."[20]  Hamlin also argued on his podcast that NASCAR did not need to spend money on racetracks because races can be held at tracks like the LA Coliseum and the COTA road course in Austin, Texas, and that that money should instead be given to Charter teams.[21]  That, of course, ignores the substantial costs incurred by NASCAR to create a track for the LA Coliseum and the amounts payable to race at COTA.

66.    On information and belief, in furtherance of the conspiracy, Polk spoke with broadcasters in an attempt to interfere with NASCAR's media rights negotiations.

67.    Polk, 23XI, Front Row and their co-conspirators agreed to attempt to interfere with NASCAR's media rights negotiations in order to extract even better terms under the 2025 Charter. 23XI, Front Row, and others threatened to boycott qualifying races for at least one NASCAR Cup Series race.  On information and belief, Polk organized this threatened boycott in order to harm NASCAR, including NASCAR's relationships with its broadcast partners.

---

[20]    https://www.essentiallysports.com/nascar-news-denny-hamlin-admits-rta-deliberately-made-their-feud-with-nascar-public-to-sabotage-leverage-new-tv-deal-amid-75-vs-25-row/.

[21]    *Id*.

68.     On April 25, 2024, the TNC presented another proposed allocation of pool money (the money NASCAR awards to teams) under the terms of the 2025 Charter Agreement. The presentation acknowledged NASCAR's proposal for allocating pool money, but threatened that RTA members would not accept that allocation unless NASCAR added more dollars to the overall pool. NASCAR proposed that 50% of pool money be awarded to teams based on performance in races through the race purse. The TNC's proposal again sought to limit competition between the teams by requiring NASCAR to allocate the majority of payments from the pool to Charter teams based on historical and fixed Charter owner's payments (and not on the finishing position of any particular race).

69.     On July 9, 2024, the TNC sent NASCAR proposed revisions to the 2025 Charter Agreement, which had "the support of all of the Teams." The TNC representative sending the correspondence made clear: "I can say with assurance that . . . each [team] would sign onto the terms as reflected herein." These revisions involved numerous provisions in the 2025 Charter Agreement, including the Charter teams' demand that NASCAR pay at least 42.7% of all media revenues to teams during the term of the agreement, most favored nations clauses to prevent NASCAR from negotiating for different Charter Agreement terms with new teams, and other revisions meant to insulate Charter teams from competition.

70.     On August 14, 2024, Steve Phelps, the President of NASCAR, sent 23XI an updated version of the proposed Charter Agreement, which included revisions based on input from the TNC and various teams.

71.     During the negotiations, NASCAR learned that the Counterclaim Defendants were not accurately conveying the substance of the negotiations, or NASCAR's positions, to other teams.

72.     On August 26, 2024, after NASCAR attempted to engage in one-on-one discussions with teams, 23XI, Front Row, and Polk recommitted to their unlawful scheme to jointly negotiate against NASCAR.  A member of the TNC sent an email to NASCAR on behalf of all teams identifying remaining "key issues."  The TNC representative explained, "[a]s a group, the Teams are eager to sign a new Charter Agreement . . . ."  The teams demanded that NASCAR remove a one-year non-compete at the end of the term of the proposed 2025 Charter Agreement and demanded a most favored nations clause to eliminate competition between the teams.  The teams also objected to NASCAR's proposal to make direct payments of millions of dollars to drivers under the Driver Ambassador program, again in an effort to stifle competition between the teams.

73.     NASCAR was told that several teams were ready and willing to sign the 2025 Charter Agreement, but were threatened by 23XI, Polk, and Front Row and others to "not break ranks."

74.     NASCAR further understood that the Counterclaim Defendants instructed teams to drag out the negotiations for the 2025 Charter Agreements, believing that NASCAR would cave to their demands as the 2025 season drew closer and also discussed potential threatened boycotts of NASCAR races and events.

75.     23XI, Front Row, Polk and others joined together to collectively demand "a larger share of the NASCAR pie than they've been getting."[22]  By agreeing to eliminate competition among the teams, Counterclaim Defendants were able to achieve this outcome.

76.     NASCAR was harmed as a result of the collusive, threatening and damaging behavior of Counterclaim Defendants.  These activities resulted in reputational and brand damage at a time when NASCAR was attempting to renew its most important revenue stream, its media rights.  The

---

[22]     https://www.forbes.com/sites/gregengle/2023/04/05/nascar-owners-need-to-tread-carefully-or-they-could-lose-everything/.

Counterclaim Defendants also obtained Charter Agreements that contained more beneficial terms for race teams than would have been obtained in the absence of collusion, including terms relating to duration of the Charters and financial floors.

77.     The anticompetitive scheme of Counterclaim Defendants has and will continue to artificially eliminate competition between teams that should be direct competitors, stifle incentives to innovate, stymie investment and growth of the sport, and threaten to reduce the competitive quality of the Cup Series.

78.     Since Counterclaim Defendants' collusion is *per se* unlawful, no market definition is necessary.

79.     In the alternative, if market definition is necessary, then the teams' horizontal agreements constitute an unreasonable restraint of trade in the market for entry of cars into NASCAR Cup Series races in the United States and any other location where a Cup Series race is held.

80.     Many teams that participate in NASCAR are parts of larger organizations that establish teams to purchase entry in multiple NASCAR Series and other motorsports for the opportunity to compete for prize money and to obtain sponsorship dollars.  For example, Penske Corporation includes the NASCAR Team Penske, as well as an IndyCar and IMSA team.  Counterclaim Defendant Front Row fields two Cup Series cars and two trucks in NASCAR's Truck Series.  In addition, financial investors including private equity firms and others are increasingly taking ownership stakes in teams.  Other organizations have been created to manage a portfolio of motorsports investments.  For example, TWG Motorsports hold interests in a Formula 1 team, IndyCar teams, Spire Motorsports in NASCAR, teams that compete in IMSA and other endurance races, and a SuperCars team.

81.     These organizations, through and on behalf of their NASCAR teams, compete against each other (and many other organizations) for hundreds of millions of sponsorship dollars, or more. Obtaining guaranteed entry into Cup Series races—and excluding other teams from entry—is thus incredibly valuable to motorsports organizations.

82.     Counterclaim Defendants' conspiracy has harmed competition.  The conspiracy has eliminated competition between teams that should be direct competitors, harmed incentives to innovate, invest, and grow the sport, and anticompetitively misallocated resources.  The conspiracy has also reduced performance-based competition due to the guaranteed starting positions occupying 90% of the total number of racing opportunities in any given event.  These harms to competition have also harmed NASCAR.  Unlike the Cup Series, the Xfinity and Truck Series, which do not operate under a Charter system, have remained vibrant and expansive.

### COUNT I – CONSPIRACY IN RESTRAINT OF TRADE – SHERMAN ACT SECTION 1

83.     NASCAR incorporates its allegations in Paragraphs 1-82 as if fully stated herein.

84.     Horizontal competitors violate Section 1 of the Sherman Act when they agree to engage in joint negotiations regarding prices and other terms of dealing with counterparties who are either buyers or sellers.

85.     Beginning no later than June 2022, Counterclaim Defendants engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Curtis Polk knowingly and actively orchestrated and participated in this illegal conspiracy, while working as a member of the TNC on behalf of the RTA and aiding 23XI's and Front Row's participation in the scheme, also constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

86.     The conspiracy and agreement consists of an agreement to engage in concerted action among Counterclaim Defendants and others to limit competition, increase payments, and otherwise demand their preferred terms for Charter teams by agreeing on the terms they would offer and agree to when collectively negotiating the 2025 Charter Agreements with NASCAR.

87.     23XI, Front Row, and their co-conspirators are horizontal competitors and separate economic actors who agreed to join together to collectively negotiate with NASCAR. 23XI, Front Row, Polk, and others agreed to a scheme to pressure NASCAR to accept their collusive terms, including by engaging in media campaigns, interfering with NASCAR's broadcast agreement negotiations, threatening boycotts of NASCAR events, and engaging in a group boycott of a NASCAR Team Owner Council Meeting.

88.     In addition, Counterclaim Defendants engaged in active threats and coercive behavior in order to maintain their *per se* illegal cartel. Counterclaim Defendants' collusive conduct achieved its goals. Such an agreement to eliminate horizontal competition and jointly negotiate constitutes a *per se* violation of Section 1 of the Sherman Act.

89.     Polk played an active role in this illegal conspiracy by, *inter alia*, representing all teams in negotiations, coordinating their conduct, and threatening teams that considered leaving the conspiracy and interfering and negatively affecting NASCAR's attempts to renew its media rights agreements.

90.     The law does not allow horizontal competitors to agree to eliminate competition by joining together to jointly negotiate terms of a contract. Such agreements are considered *per se* violations of the antitrust laws.

91.     Counterclaim Defendants' agreements, combinations, and conspiracies unreasonably restrain trade and foreclose competition.

92.     No legitimate procompetitive justifications exist to justify Counterclaim Defendants' unreasonable restraints of trade.

93.     NASCAR has suffered and will continue to suffer antitrust injury to its business and property as a direct and proximate result of Counterclaim Defendants' unlawful agreements, combinations, and conspiracies in restraint of trade.  Counterclaim Defendants' participation in the unlawful cartel has resulted in harm to NASCAR's Cup Series through decreased competition, participation and growth of the sport.

94.     NASCAR is entitled to judgment from this Court for all damages incurred by NASCAR because of Counterclaim Defendants' antitrust violations, including treble damages and attorneys' fees.  NASCAR is also entitled to injunctive relief requiring Counterclaim Defendants to refrain from their anticompetitive conduct, which includes collective negotiations with NASCAR on behalf of multiple, separate NASCAR teams.

## PRAYER FOR RELIEF

WHEREFORE, NASCAR prays for judgment and relief as follows:

a) Judgment that 23XI, Front Row, and Curtis Polk violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and an award of treble the actual damages suffered by NASCAR under Section 4 of the Clayton Act, 15 U.S.C. § 15;

b) An order permanently enjoining 23XI, Front Row, and Curtis Polk and those in active concert with them from violating Section 1 of the Sherman Act, including by prohibiting them from jointly negotiating with NASCAR;

c) That an injunction be issued to grant such relief as is necessary to restore competition including, the elimination of Section 3.1(a) of the 2025 Charter Agreement which provides for guaranteed entry into Cup Series races if Counterclaim Defendants persist in seeking to have the Charter Agreements declared as unlawful under the antitrust laws or seek the

elimination of Section 6.6 or other provisions of the 2025 Charters mutually agreed upon by NASCAR and approximately ninety-percent of Charter holders.

d) Award NASCAR its costs and attorneys' fees in connection with this action; and

e) Such further and additional relief as the Court deems just and proper.

## JURY DEMAND

NASCAR demands a trial by jury on all issues on which trial by which trial by jury is available under applicable law.

\*     \*     \*

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT AND DEFENSES

Defendants National Association for Stock Car Auto Racing, LLC ("NASCAR, LLC"), NASCAR Event Management, LLC ("NASCAR"), NASCAR Holdings, LLC ("NASCAR Holdings"), and James France (collectively, "Defendants") hereby respond to the Amended Complaint dated February 3, 2025, ECF No. 107, filed by Plaintiffs 2311 Racing LLC d/b/a 23XI Racing, and Front Row Motorsports, Inc. (collectively, "Plaintiffs").

On October 2, 2024, Plaintiffs filed their complaint against NASCAR, LLC and James France (together, the "Initial Defendants"). *See* ECF No. 1 ("Initial Complaint"). On December 2, 2024, the Initial Defendants filed their Answers to Complaint and Defenses. *See* ECF No. 58 ("Initial Answer"). On January 31, 2025, the parties filed a Joint Stipulation as to Plaintiffs' Amended Complaint. *See* ECF No. 106 ("Joint Stipulation"). In relevant part, the parties agreed in the Joint Stipulation that Plaintiffs would file an amended complaint by February 4, 2025, naming NASCAR and NASCAR Holdings as defendants. *See id.* at 2. Furthermore, the parties agreed that Defendants would answer the Amended Complaint, not file a motion to dismiss, that NASCAR and NASCAR Holdings would adopt the Initial Answer filed by the Initial Defendants, and that Defendants need to further answer only the paragraphs in the Amended Complaint

specifically identifying NASCAR and NASCAR Holdings. *See id.* The Court so-ordered the Joint Stipulation on January 10, 2025. Plaintiffs filed their Amended Complaint on February 3, 2025, which names NASCAR in Paragraph 47 and names NASCAR Holdings in Paragraph 48, and otherwise repeats the allegations in the Initial Complaint.

Pursuant to the Joint Stipulation, Defendants hereby adopt and incorporate by reference the Answer and Defenses previously submitted by the Initial Defendants in their Initial Answer, as if fully set forth herein. As previously stated, Defendants reserve the right to change, supplement, and amend this Amended Answer, Defenses, and Counterclaims if and when new information is revealed. Defendants deny that Plaintiffs are entitled to any relief.

**SPECIFIC RESPONSES TO PLAINTIFFS' AMENDED COMPLAINT ALLEGATIONS**

1.    Paragraphs 1 through 47 repeat verbatim the language contained in Initial Complaint Paragraphs 1 through 47. Accordingly, pursuant to the Joint Stipulation, Defendants repeat, adopt, and incorporate by reference the Initial Answers to those Paragraphs.

2.    As to Paragraph 48, which names NASCAR Holdings, Defendants admit that NASCAR Holdings is a limited liability company organized under the laws of the state of Delaware, having its principal place of business in Daytona Beach, Florida.

3.    As to Paragraph 49, which names NASCAR, Defendants admit that NASCAR is a limited liability company organized under the laws of the state of Florida, having its principal place of business in Daytona Beach, Florida.

4.    Paragraphs 50 through the Demand for Jury Trial repeat verbatim the language contained in the Initial Complaint Paragraphs 48 through Demand for Jury Trial. Accordingly, pursuant to the Joint Stipulation, Defendants repeat, adopt, and incorporate by reference the Initial Answers to those Paragraphs.

## AFFIRMATIVE AND OTHER DEFENSES

5.    Pursuant to the Joint Stipulation, Defendants repeat, adopt, and incorporate by reference their affirmative and other defenses included within their Initial Answer, including expressly and without limitation Defendants' First Defense through their Thirteenth Defense. *See* Initial Answer at 33-38.


Dated:  March 5, 2025                    Respectfully submitted,


                                         By:    */s/ Tricia Wilson Magee*
                                                Tricia Wilson Magee (N.C. Bar No. 31875)
                                                **SHUMAKER, LOOP, & KENDRICK, LLP**
                                                101 S Tryon Street, Suite 2200
                                                Charlotte, NC 28280
                                                Telephone: 704-945-2911
                                                tmagee@shumaker.com

                                                Christopher S. Yates*
                                                **LATHAM & WATKINS LLP**
                                                505 Montgomery Street, Suite 2000
                                                San Francisco, CA 94111
                                                Telephone: (415) 395-8240
                                                chris.yates@lw.com

                                                Lawrence E. Buterman*
                                                **LATHAM & WATKINS LLP**
                                                1271 Avenue of the Americas
                                                New York, NY 10020
                                                Telephone: (212) 906-1200
                                                lawrence.buterman@lw.com

                                                Anna M. Rathbun*
                                                David L. Johnson*
                                                Christopher J. Brown*
                                                **LATHAM & WATKINS LLP**
                                                555 Eleventh Street, NW, Suite 1000
                                                Washington, DC 20004
                                                Telephone: (202) 637-2200

anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com

*Admitted *pro hac vice*

*Counsel for Defendants and Counter-Plaintiff*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of artificial intelligence embedded in the standard on-line legal research sources, such as Westlaw, Lexis, FastCase, and Bloomberg.

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 5th day of March, 2025.

*/s/ Tricia Wilson Magee*