# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| NASCAR Event Management, LLC, | |
| Counter-Plaintiff, | |
| v. | Civil Action No. 3:24-cv-886-KDB-SCR |
|  | **ORAL ARGUMENT REQUESTED** |
| 2311 Racing LLC d/b/a 23XI Racing, Front Row Motorsports, Inc., and Curtis Polk, | |
| Counter-Defendants. | |

## COUNTER-DEFENDANTS 2311 RACING LLC D/B/A 23XI RACING AND CURTIS POLK'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION TO STRIKE

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

NASCAR'S FACTUAL ALLEGATIONS ............................................................................5

ARGUMENT ......................................................................................................................10

I.    The Counterclaim Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim ..................................................................................................................... 10

    A.    NASCAR Fails to Plausibly Allege Concerted Action in Restraint of Trade Cognizable Under Section 1 ...................................................................... 10

    B.    NASCAR Fails to Allege a Per Se Section 1 Violation ......................................... 12

        1.    The threatened group boycott is not subject to per se illegality................ 13
        2.    The joint negotiations are not subject to per se illegality .......................... 15

    C.    NASCAR Fails to Allege Facts Plausibly Showing a Section 1 Violation Under the Rule of Reason ......................................................................... 17

        1.    NASCAR has failed to define a relevant market ....................................... 17
        2.    NASCAR has failed to allege any facts plausibly showing anticompetitive effects or harm to competition ........................................... 18

    D.    NASCAR Has Not Alleged Facts Plausibly Showing Antitrust Injury ................ 20

II.    The Court Should Strike NASCAR's Relief Request to Eliminate Section 3(a) of the Charter Agreement ........................................................................................... 23

CONCLUSION ................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC,*
  1 F.4th 102 (2d Cir. 2021) ...........................................................................................18

*Agbara v. Prince George's Cnty. Pub. Sch.,*
  2020 WL 7425298 (D. Md. Dec. 18, 2020), *aff'd*, 2022 WL 683362 (4th Cir.
  Mar. 8, 2022) ................................................................................................................25

*Am. Needle, Inc. v. NFL,*
  560 U.S. 183 (2010) ................................................................................................ 16, 17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................................................. 9, 11

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
  182 F.3d 1096 (9th Cir. 1999) ......................................................................................13

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.,*
  563 F. Supp. 3d 578 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022).............................12

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979) .................................................................................................... 11, 16

*Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers,*
  744 F.2d 917 (2d Cir. 1984) .........................................................................................17

*Chapman v. Duke Energy Carolinas, LLC,*
  2009 WL 1652463 (W.D.N.C. June 11, 2009) ....................................................... 23, 25

*Columbia Broad. Sys., Inc. v. Am. Soc. of Composers, Authors & Publishers,*
  620 F.2d 930 (2d Cir. 1980) .........................................................................................11

*Dickson v. Microsoft Corp.,*
  309 F.3d 193 (4th Cir. 2002) ...........................................................................17, 19, 20

*Doe v. Va. Dep't of State Police,*
  713 F.3d 745 (4th Cir. 2013) ........................................................................................22

*Dr. Mark G. Turner, DDS, PC v. Dentaquest, LLC,*
  2018 WL 3795237 (E.D. Va. Aug. 9, 2018)..................................................................23

*E. I. du Pont de Nemours & Co. v. Kolon Indus.,*
  637 F.3d 435 (4th Cir. 2011) ........................................................................................18

*E.I. Dupont De Nemours & Co. v. Kolon Indus.*,
  688 F. Supp. 2d 443 (E.D. Va. 2009) ........................................................................18

*Expert Masonry, Inc. v. Boone Cnty., Ky.*,
  440 F.3d 336 (6th Cir. 2006) ...................................................................................13

*Five Smiths, Inc. v. NFLPA*,
  788 F. Supp. 1042 (D. Minn. 1992) .........................................................................11

*Flaa v. Hollywood Foreign Press Ass'n*,
  2021 WL 1399297 (C.D. Cal. Mar. 23, 2021), *aff'd*, 55 F.4th 680 (9th Cir.
  2022).........................................................................................................................15

*Grant v. Adventist Health Sys. Sunbelt Health Care Corp.*,
  2009 WL 6315308 (W.D.N.C. July 28, 2009), *report and recommendation
  adopted*, 2010 WL 1257624 (W.D.N.C. Mar. 25, 2010). ........................................10

*Hanger v. Berkley Grp., Inc.*,
  2015 WL 3439255 (W.D. Va. May 28, 2015)....................................................13, 20

*Honey Bum, LLC v. Fashion Nova, Inc.*,
  63 F.4th 813 (9th Cir. 2023) ...................................................................................14

*Lala v. Frampton*,
  2008 WL 4059874 (D. Colo. Aug. 28, 2008) ..........................................................18

*Larry Muko, Inc. v. Sw. Pa. Bldg. & Const. Trades Council*,
  670 F.2d 421 (3d Cir. 1982) ...................................................................................14

*Liu v. Amerco*,
  677 F.3d 489 (1st Cir. 2012) ...................................................................................12

*Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.*,
  299 F. Supp. 2d 370 (D. Del. 2004) .........................................................................17

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
  922 F.3d 713 (6th Cir. 2019) ...................................................................................13

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015)..................................................................................25

*Microsoft Corp. v. Comput. Support Servs. of Carolina, Inc.*,
  123 F. Supp. 2d 945 (W.D.N.C. 2000).....................................................................22

*N. Carolina State Bd. of Dental Examiners v. FTC*,
  717 F.3d 359 (4th Cir. 2013)....................................................................................10

iii

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ................................................................................10

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) .......................................................... 13, 14, 15, 16

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ................................................................... 18, 19

*Oksanen v. Page Mem'l Hosp.*,
    945 F.2d 696 (4th Cir. 1991) ..............................................................20

*PBM Prods., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ..............................................................25

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ...............................................................18

*Pressley v. United States*,
    2009 WL 10713258 (E.D.N.C. Dec. 23, 2009) .......................................8

*Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*,
    714 F.2d 351 (4th Cir. 1983) ......................................................... 17, 18

*Simaan, Inc. v. BP Prods. N, Am., Inc.*,
    395 F. Supp. 2d 271 (M.D.N.C. 2005) ...............................................23

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ..............................................................21

*Syncsort Inc. v. Sequential Software, Inc.*,
    50 F. Supp. 2d 318 (D.N.J. 1999) .......................................................18

*Synthes, Inc. v. Emerge Med., Inc.*,
    2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) .......................................18

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ..............................................................................16

*Traore v. Balt. Police Dep't*,
    2024 WL 4361860 (D. Md. Sept. 30, 2024) .........................................7

*United States v. Am. Airlines, Inc.*,
    570 F. Supp. 654 (N.D. Tex. 1983), *rev'd on other grounds*, 743 F.2d 1114
    (5th Cir. 1984) .................................................................................12

*United States v. Brewbaker*,
    87 F.4th 563 (4th Cir. 2023) ...................................................*passim*

*United States v. Topco Assocs., Inc.*,
 405 U.S. 596 (1972) ............................................................................................17

*Wahi v. Charleston Area Med. Ctr., Inc.*,
 562 F.3d 599 (4th Cir. 2009) ..............................................................................10

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
 252 F.3d 316 (4th Cir. 2001) ..............................................................................24

**Statutes**

Sherman Act Section 1 .............................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 9, 10

Fed. R. Civ. P. 12(f) ................................................................................................ 4, 23

John Ourand and Adam Stern, *NASCAR's Phelps calls media deal most
 important, difficult of his career*, SPORTS BUS. J. (Nov. 30, 2023),
 https://www.sportsbusinessjournal.com/Articles/2023/11/30/nascar-media-
 rights-deal-steve-phelps/ ......................................................................................4

Jordan Bianchi, *NASCAR's new TV deal, explained: Why Amazon, who gets what
 races and more*, THE ATHLETIC (Nov. 30, 2023),
 https://www.nytimes.com/athletic/5100901/2023/11/30/nascar-tv-deal-fox-
 nbc-amazon-warner-bros-explained/ ..................................................................7

Kyle Dalton, *Denny Hamlin Calls Out NASCAR CEO for His Actions at Daytona*,
 HEAVY (Feb. 23, 2024), https://heavy.com/sports/nascar/denny-hamlin-
 nascar-ceo-daytona/ ............................................................................................22

Matt Weaver, *League President Steve Phelps Offers Rare Comments About
 Teams Suing NASCAR*, SPORTSNAUT (Oct. 31, 2024),
 https://sportsnaut.com/nascar-news-president-steve-phelps-rare-statement-
 lawsuit/ ...............................................................................................................22

*NASCAR announces historic media rights agreements with FOX, NBC, Amazon
 and Warner Bros. Discovery* (Nov. 29, 2023), https://www.nascar.com/news-
 media/2023/11/29/nascar-announces-historic-media-rights-agreements-with-
 fox-nbc-amazon-and-warner-bros-discovery/ .....................................................7

*NASCAR President Reveals Charter Agreement Negotiation Details Amid Intense
 Legal Battle*, NEWSWEEK (Dec. 11, 2024),
 https://www.newsweek.com/sports/racing/nascar-president-reveals-charter-
 agreement-negotiation-details-amid-intense-legal-battle-1999524 .....................1

*NASCAR sues Michael Jordan's team, Front Row Motorsports, calls them 'an illegal cartel,'* THE ATHLETIC (Mar. 5, 2025), https://www.nytimes.com/athletic/6177331/2025/03/05/nascar-michael-jordan-lawsuit-illegal-scheme/ ................................................................................................1

U.S. DEP'T OF JUST. & FED. TRADE COMM'N, *Antitrust Guidelines for Collaborations Among Competitors* ..........................................................................................16

## INTRODUCTION

NASCAR's retaliatory counterclaim is an act of desperation that cannot withstand a motion to dismiss. It does not allege the facts necessary to state a claim. Instead, NASCAR is using the counterclaim to engage in litigation gamesmanship, with the transparent objective of intimidating the other racing teams by threatening them with severe consequences if they support Plaintiffs' challenge to the unlawful NASCAR monopoly. NASCAR's lead counsel used the filing of the counterclaim as an occasion to conduct a press conference in which he delivered a warning that NASCAR will end the charter system that the racing teams depend on if Plaintiffs prevail in their antitrust claims.[1]

The conduct that NASCAR characterizes in the counterclaim as a new conspiracy in restraint of trade led by Curtis Polk—the joint negotiations by the teams organized by the Race Team Alliance ("RTA")—was first voluntarily agreed to by NASCAR, more than a decade ago, long before Mr. Polk and 23XI Racing entered the stock car racing business. Those negotiations led to the creation of the charter system, in 2016, a development that NASCAR has repeatedly praised. Then, a new round of joint negotiations led by the Teams Negotiating Committee ("TNC") starting in 2022—once again voluntarily agreed to by NASCAR—ultimately gave way to individual negotiations that led to NASCAR's imposition of the 2025 Charter Agreement terms.

After completing those negotiations, NASCAR President Steve Phelps declared: "I think the charter system is a good thing for NASCAR and the growth of this sport."[2] In this litigation

---

[1] *NASCAR sues Michael Jordan's team, Front Row Motorsports, calls them 'an illegal cartel,'* THE ATHLETIC (Mar. 5, 2025), https://www.nytimes.com/athletic/6177331/2025/03/05/nascar-michael-jordan-lawsuit-illegal-scheme/ (Chris Yates: "If they [23XI Racing and Front Row Motorsports] prevail, the charter system likely goes away.").

[2] *NASCAR President Reveals Charter Agreement Negotiation Details Amid Intense Legal Battle*, NEWSWEEK (Dec. 11, 2024), https://www.newsweek.com/sports/racing/nascar-president-reveals-charter-agreement-negotiation-details-amid-intense-legal-battle-1999524.

too—as this Court has recognized—NASCAR has argued repeatedly that the charters are a "fair and *beneficial* deal for all concerned." *See* Order Denying NASCAR Mot. to Stay, Dkt. 89 at 9. It is only now—after a preliminary injunction was granted against it and its motion to dismiss Plaintiffs' monopolization claims was denied—that NASCAR has had the epiphany that it should claim that it, not the racing teams who have no choice but to accept the charter terms imposed by NASCAR through its monopsony power, is the real victim of a Sherman Act violation. That implausible claim fails on multiple grounds which require the dismissal of NASCAR's counterclaim.

*First*, NASCAR's Section 1 claim fails at the threshold because it does not allege facts plausibly showing a contract, combination or conspiracy in restraint of trade. The fact that NASCAR voluntarily agreed to participate in joint negotiations with the teams does not state a conspiracy in restraint of trade, as NASCAR does not allege that the teams entered into an agreement that prevented them from engaging in individual negotiations. To the contrary, NASCAR *admits* that it ultimately opted to have individual negotiations with the teams when it was unhappy with the joint negotiations. It was these individual negotiations that resulted in all of the teams, other than Plaintiffs, agreeing to the 2025 Charter Agreement on the terms demanded by NASCAR. There is thus not even parallel conduct alleged among the Counterclaim-Defendants and the other racing teams to support any claim of a conspiracy blocking individual negotiations. The counterclaim allegations instead show each racing team individually determining whether or not to agree to NASCAR's demands through individual negotiations—the opposite of a Section 1 conspiracy.

While NASCAR adds the allegation that Mr. Polk purportedly *threatened* and tried to organize a racing team boycott of qualifying races for at least one NASCAR event during the

renewal negotiations for the 2025 Charter Agreement, there is no allegation that such a threatened boycott of qualifying races ever took place. This too defeats NASCAR's Section 1 claim, as there is no "attempt" liability under Section 1. NASCAR's claim of a threatened boycott of qualifying races that never happened does not satisfy the Section 1 test.

*Second*, even if the joint negotiations agreed to by NASCAR could satisfy the concerted action requirement of Section 1, NASCAR would still be wrong in claiming that it has plausibly alleged a *per se* violation. None of NASCAR's factual claims fit into the very narrow categories of blatantly anticompetitive agreements that courts summarily condemn as *per se* unlawful. The *per se* label is especially inapposite here, because the conduct that NASCAR challenges—joint negotiations by NASCAR Cup Series race teams—has plainly procompetitive benefits in a sports context, in which each of the teams must compete on equal footing in the same racing events. Because the teams, by necessity, have to agree to compete under some of the same terms, jointly negotiating those terms with NASCAR creates obvious efficiencies.

*Third*, NASCAR has failed to allege facts plausibly showing the elements of a rule of reason violation. NASCAR's one-sentence market definition allegation is entirely conclusory and devoid of any of the specifics required to survive a motion to dismiss. Likewise, NASCAR has failed to allege facts plausibly showing any anticompetitive effects in the market that it has identified. To the contrary, there are no facts alleged showing that the joint negotiations or alleged threatened boycott of qualifying races had any anticompetitive effect. This includes NASCAR's allegation that the racing teams refused to attend a quarterly business meeting with NASCAR in April 2023. No facts show that this alleged refusal to attend a single quarterly business meeting had any impact on competition or the terms of the 2025 Charter Agreement.

*Fourth*, NASCAR has failed to allege facts plausibly showing antitrust injury. NASCAR does not identify any concrete harm it suffered from any claimed reduction of competition caused by the teams participating in the joint negotiations to which NASCAR agreed. Further, the pleadings show that there never was any boycott by the teams of any NASCAR qualifying races, and that the teams did in fact engage in individual negotiations for the 2025 Charter Agreement. In addition, there are no counterclaim allegations plausibly showing that the alleged concerted action by the Counterclaim-Defendants reduced competition in a manner that lowered the value of the record-breaking media rights deal ($1.1 billion per year) that NASCAR entered into in November 2023—eleven months before the negotiations for the 2025 Charter Agreement were completed. Mr. Phelps publicly heralded NASCAR's new media rights deal as a remarkable achievement in the face of declining NASCAR TV viewership; that is the opposite of an antitrust injury.[3]

*Finally*, NASCAR improperly seeks injunctive relief to eliminate the right of guaranteed race entry that has been the economic lifeblood of the chartered racing teams. If the counterclaim is not dismissed in its entirety, this requested relief should be stricken, under Rule 12(f), because the guaranteed entry right for chartered teams—which has existed since 2016—has no connection to remedying the alleged Section 1 violation by the Counterclaim-Defendants, starting in 2022, to engage in joint negotiations for the 2025 Charter Agreement. NASCAR's requested relief to eliminate guaranteed racing entry for chartered teams has no place in this litigation, as it is nothing

---

[3] John Ourand and Adam Stern, *NASCAR's Phelps calls media deal most important, difficult of his career*, SPORTS BUS. J. (Nov. 30, 2023), https://www.sportsbusinessjournal.com/Articles/2023/11/30/nascar-media-rights-deal-steve-phelps/.

more than an attempt to threaten the lifeline of the non-party racing teams so that they do not join in or support Plaintiffs' challenge to NASCAR's unlawful monopoly.

## NASCAR'S FACTUAL ALLEGATIONS

1. NASCAR is the premier stock car racing league in the United States and "one of the largest sports leagues in America." Dkt. 111 ("Counterclaim Compl.") ¶ 23. Since its founding in 1948, NASCAR has been owned not by the teams that compete in NASCAR (as with most professional sports leagues), but rather by the France family. *Id.* ¶¶ 20-21. From 1949 through 2015, teams that raced in NASCAR events did not have guaranteed entry into any race. *Id.* ¶ 36. Instead, the teams were required to compete for entry on a race-by-race basis. *Id.* Teams had no guaranteed revenues; they earned money through race purses and team-specific sponsorship deals. *Id.* ¶¶ 37-38.

2. In 2014, nine NASCAR teams formed the RTA, an association of racing teams whose objective was to give teams a "unified voice in negotiations with … [NASCAR]." *Id.* ¶ 41. "The RTA … sought, among other things, guaranteed entry into Cup Series races and guaranteed revenue from NASCAR." *Id.* NASCAR voluntarily agreed to participate in the joint negotiations proposed by the RTA, and those negotiations resulted in the creation of the charter system, which was formalized in 2016. *Id.* ¶¶ 42-43. Each charter granted a team one guaranteed entry in every Cup Series race and a small share of certain media rights revenue, among other provisions. *Id.* ¶¶ 43-44.

3. NASCAR has touted the 2016 Charter Agreement that it jointly negotiated with the teams through the RTA. *Id.* ¶ 2 ("NASCAR recognizes the value the Charter model has brought to Charter teams"); *id.* ¶ 3 ("The Charter Agreements made the racing teams stronger financially, and most importantly, partners with NASCAR in trying to grow the Cup Series as a sports and entertainment property to attract new fans, sponsors, broadcast partners, and other participants.").

4.     2311 Racing LLC d/b/a 23XI Racing entered NASCAR and joined the RTA in 2021. *Id.* ¶¶ 7, 46. 23XI Racing is co-owned by Curtis Polk, Michael Jordan, and Denny Hamlin. *Id.* ¶¶ 10, 12. Front Row Motorsports, Inc. rejoined the RTA in 2022, in advance of negotiations for the 2025 Charter Agreement. *Id.* ¶ 46. "[By] 2022, the RTA included every team then holding a 2016 Charter Agreement." *Id.* Besides Mr. Polk, there are no allegations in the counterclaim about the specific actions of any of the racing teams or their owners during the joint negotiations with NASCAR regarding the 2025 Charter Agreement.

5.     The 2016 Charter Agreement was set to expire on December 31, 2024. *Id.* ¶ 4. Just as it had in 2014, NASCAR voluntarily agreed to participate in a joint negotiation process for the new Charter Agreement. In February 2022, the TNC, a subgroup of race team executives chosen by the teams, began discussing terms for the 2025 Charter Agreement with NASCAR. Mr. Polk was one of the members of the TNC. *Id.* ¶¶ 49-51. In June 2022, the TNC provided NASCAR with a proposal that it believed all of the racing teams would sign. *Id.* ¶ 53. The proposal sought, among other things, permanent charters so that the teams could build a transferable asset that would grow in value over time, an increased share of media rights to reflect the economic value of the teams to NASCAR, sharing of additional revenue beyond media rights, and approval rights with respect to major decisions regarding the Cup Series races in which the teams competed. *Id.* ¶ 53 n. 16. It is undisputed that NASCAR rejected this joint negotiating proposal and never agreed to its principal terms, like the one providing for permanent charters. *See* NASCAR's First Answer, Dkt. 58 ¶ 17 ("Defendants admit that the 2016 Charter Agreement teams collectively sought to make the 2025 Charter Agreement permanent.").

6.     When NASCAR's joint negotiations with the TNC over the terms of the 2025 Charter Agreement did not lead to an agreement, *see* Counterclaim Compl. ¶¶ 68-69, NASCAR

proceeded with individual negotiations with each of the teams. *See* NASCAR's First Answer, Dkt. 58 ¶ 107 ("Defendants … admit that NASCAR engaged in individual negotiations with certain teams to address their individual requests regarding the 2025 Charter Agreements while still negotiating with the teams negotiating collectively."); Prime Decl., Dkt. 31-3 ¶ 37 (acknowledging NASCAR met individually to negotiate with teams); *id.* ¶ 40 ("NASCAR senior leadership met with 23XI on May 10, 202[4] as part of its discussions with individual teams."). There is no allegation that the teams refused to engage in individual negotiations with NASCAR. To the contrary, it is undisputed that individual negotiations led to every one of the chartered teams, except 23XI Racing and Front Row Motorsports, individually agreeing to NASCAR's final terms for the 2025 Charter Agreement. Phelps Decl., Dkt. 31-4 ¶ 51; PI Order, Dkt. 74 at 6. In a public statement, Mr. Phelps said of the 2025 Charter Agreement: "[W]e negotiated in good faith with our race teams to find a balance that was going to help the sport move forward positively. And I think that's what the charters do. I think the charter system is a good thing for NASCAR and the growth of this sport."[4]

7.     In November 2023, NASCAR entered into a seven-year media rights deal (running from 2025 through 2031) for a record $1.1 billion per year ($7.7 billion total).[5] Phelps proclaimed that "This landmark deal underscores our collective growth opportunity to drive engagement across this diverse collection of platforms — whether on broadcast, cable or direct-to-consumer."[6]

---

[4] *Supra* note 2, at 1. The Court may "'take judicial notice of matters of public record' when considering a motion to dismiss." *Traore v. Balt. Police Dep't*, 2024 WL 4361860, at *1 n. 1 (D. Md. Sept. 30, 2024) (quotation omitted).

[5] Jordan Bianchi, *NASCAR's new TV deal, explained: Why Amazon, who gets what races and more*, THE ATHLETIC (Nov. 30, 2023), https://www.nytimes.com/athletic/5100901/2023/11/30/nascar-tv-deal-fox-nbc-amazon-warner-bros-explained/.

[6] *NASCAR announces historic media rights agreements with FOX, NBC, Amazon and Warner Bros. Discovery*, NASCAR.COM (Nov. 29, 2023), https://www.nascar.com/news-

In a declaration Mr. Phelps submitted during the preliminary injunction proceedings, he noted "NASCAR's ability to obtain a higher media rights deal in 2023 than we had obtained a decade earlier," Phelps Decl., Dkt. 31-4 ¶ 31, which NASCAR secured despite declining TV viewership. *Id.* ¶ 19.[7]

8.    While the counterclaim only names 23XI Racing, Mr. Polk, and Front Row Motorsports as defendants (collectively, the "Counterclaim-Defendants"),[8] it accuses them of engaging in a conspiracy with the RTA and the TNC by, *inter alia*, participating in joint negotiations with NASCAR through the TNC. Counterclaim Compl. ¶ 52 (alleging that all of the charter-holding NASCAR teams entered into a conspiracy—purportedly led by Mr. Polk—to "negotiate collectively with NASCAR"); *see also id.* ¶¶ 51-54, 57-58, 60, 72, 87.

9.    The counterclaim further alleges that Mr. Polk tried to organize an agreement pursuant to which the chartered racing teams "threatened to boycott qualifying races for at least one NASCAR Cup Series race." *Id.* ¶ 67; *see also id.* ¶ 49. But the counterclaim contains no details about the purported threats—including no details about the date of the threats; the wording of the threats; or to whom the threats were made. NASCAR likewise does not allege that any boycott of qualifying races ever happened.

10.   The counterclaim alleges that Mr. Polk, the RTA, and the other racing teams engaged in concerted action which attempted to interfere with NASCAR's negotiation over its new

---

media/2023/11/29/nascar-announces-historic-media-rights-agreements-with-fox-nbc-amazon-and-warner-bros-discovery/.

[7] The Court can take judicial notice of the declaration that Mr. Phelps submitted to this Court. *Pressley v. United States*, 2009 WL 10713258, at *1 (E.D.N.C. Dec. 23, 2009) ("[A] court may take judicial notice of its own records and proceedings without converting a motion to dismiss to a motion for summary judgment.").

[8] The lack of any specific allegations of conspiratorial conduct against Front Row Motorsports is addressed in Front Row Motorsports' concurrently filed motion to dismiss.

media rights deal. *Id.* ¶ 65 ("RTA purposefully engaged in a media campaign" that purportedly interfered with NASCAR's relationships with broadcasters). It further alleges that Mr. Polk "spoke with broadcasters in an attempt to interfere with NASCAR's media rights negotiations." *Id.* ¶ 66. But, once again, no details are provided to back up these conclusory allegations or show any harm to the ultimate media rights deal that NASCAR has publicly touted as a landmark achievement. *See id*; *see also supra* at 7-8.

11. The counterclaim additionally alleges that the Counterclaim-Defendants and the other racing teams agreed to not attend a scheduled quarterly business meeting with NASCAR in April 2023. *Id.* ¶¶ 49, 59-60. But there are no allegations about any competitive harm that purportedly resulted from the claimed failure of the racing teams to attend this quarterly meeting or what impact, if any, the meeting had on the negotiations for the 2025 Charter Agreement.

12. In its prayer for relief, the counterclaim seeks, among other things, the "elimination of Section 3.1(a) of the 2025 Charter Agreement which provides for guaranteed entry into Cup Series races if Counterclaim[-]Defendants persist in seeking to have the Charter Agreement declared as unlawful under the antitrust laws or seek the elimination of Section 6.6 or other provisions of the 2025 Charters mutually agreed upon by NASCAR and approximately ninety-percent of Charter holders." *Id.* at pp. 26-27. There are no allegations to explain how this relief request has any remedial connection to the counterclaim allegations of an agreement in restraint of trade with respect to the negotiations of the 2025 Charter Agreement.

## STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the sufficiency of a complaint by assessing whether the allegations plausibly support a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A complaint must contain more than mere labels

or conclusory statements; "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555.

"[B]are assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Likewise, courts "decline to consider 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Id.* (quoting *Wahi v. Charleston Area Med. Ctr., Inc.,* 562 F.3d 599, 615 n. 26 (4th Cir. 2009); *Grant v. Adventist Health Sys. Sunbelt Health Care Corp.*, 2009 WL 6315308, at *6 (W.D.N.C. July 28, 2009) ("naked assertions devoid of further factual enhancement" should be disregarded) (cleaned up), *report and recommendation adopted*, 2010 WL 1257624 (W.D.N.C. Mar. 25, 2010).

## ARGUMENT

### I. The Counterclaim Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim

#### A. NASCAR Fails to Plausibly Allege Concerted Action in Restraint of Trade Cognizable Under Section 1

Under Section 1 of the Sherman Act, "a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *N. Carolina State Bd. of Dental Examiners v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013).

Here, NASCAR bases its Section 1 claim on the alleged agreement by the Counterclaim-Defendants with the RTA and the other chartered racing teams to engage in joint negotiations for the 2025 Charter Agreement. But the counterclaim does not dispute that NASCAR voluntarily agreed to participate in such joint negotiations. *See* NASCAR's First Answer, Dkt. 58 ¶ 17 ("Defendants further admit that NASCAR negotiated with the teams collectively"). NASCAR makes no plausible allegation to show that the Counterclaim-Defendants agreed among themselves or with the other racing teams not to engage in individual negotiations with NASCAR if NASCAR

wanted to do so. Indeed, NASCAR has conceded that it eventually chose to engage in such individual negotiations. *Id.* ¶ 107. And it was those individual negotiations that led to the racing teams (other than 23XI Racing and Front Row Motorsports) agreeing to the 2025 Charter Agreement terms demanded by NASCAR. Counterclaim Compl. ¶¶ 4, 72. There is thus no allegation plausibly showing any agreement by the racing teams that precluded individual negotiations, and not even a claim of parallel conduct from which to infer such an agreement. *See Twombly*, 550 U.S. at 557 ("[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").

The allegations that the Counterclaim-Defendants, the RTA, and the other racing teams participated in joint negotiations with NASCAR are not sufficient to show any concerted action in restraint of trade actionable under Section 1. Rather, the allegations are consistent with unilateral conduct by each of the racing teams, choosing individually and in their own self-interest to participate in joint discussions led by the TNC that NASCAR also agreed to participate in. *See Five Smiths, Inc. v. NFLPA*, 788 F. Supp. 1042, 1049 (D. Minn. 1992) (holding allegations of joint "negotiating tactics" by NFL Players Association and player-agents to be insufficient to state a Section 1 claim where those tactics are "wholly consistent with the agents' independent business interests in obtaining the best possible deal for their players.").

Indeed, the courts have held that there is no actionable restraint under Section 1 when competitors offer joint negotiations as an option, while individual negotiations remain available if the counterparty so chooses. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23-24 (1979) ("The individual composers and authors have **neither agreed not to sell individually** in any other market nor use the blanket license to mask price fixing in such other markets.")

(emphasis added); *Columbia Broad. Sys., Inc. v. Am. Soc. of Composers, Authors & Publishers*, 620 F.2d 930, 936 (2d Cir. 1980) ("We agree with the defendants that if that opportunity is fully available, and if copyright owners retain unimpaired independence to set competitive prices for individual licenses to a licensee willing to deal with them, the blanket license is not a restraint of trade."). That is the case here: NASCAR's pleadings and admissions concede that individual negotiations with the racing teams were not only an option—they were an option that NASCAR exercised. Counterclaim Compl. ¶ 72; NASCAR's First Answer, Dkt. 58 ¶¶ 17, 108.

Nor can NASCAR overcome its failure to plead concerted action in restraint of trade by alleging that there was an attempt by Mr. Polk to organize a group boycott by the race teams of qualifying races for at least one NASCAR event. Counterclaim Compl. ¶¶ 8, 49, 67. Because Section 1 liability turns on the existence of an agreement, NASCAR cannot assert a claim based on an *attempted* agreement. *See, e.g., BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 596 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022) ("Absent any agreement, there is no Section 1 claim, because an anticompetitive agreement is the *sine qua non* of a Section 1 violation."); *Liu v. Amerco*, 677 F.3d 489, 493-94 (1st Cir. 2012) ("Section 1 of the Sherman Act … does not condemn an attempt to conspire, nor a solicitation to conspire."); *United States v. Am. Airlines, Inc.*, 570 F. Supp. 654, 657 (N.D. Tex. 1983) ("Section 1 proscribes only actual combinations, contracts and conspiracies; it does not reach attempts."), *rev'd on other grounds*, 743 F.2d 1114 (5th Cir. 1984). The counterclaim does not allege that any actual boycott of any qualifying races ever took place. It thus does not state a claim of concerted action with respect to such a boycott threat under Section 1.

### B.  NASCAR Fails to Allege a *Per Se* Section 1 Violation

NASCAR's allegation that the Counterclaim-Defendants have committed a *per se* violation of Section 1 of the Sherman Act, *see* Counterclaim Compl. ¶¶ 78, 90, fails as a matter of law.

Under Section 1, "[t]here are two dominant ways to determine whether a restraint is unreasonable: the rule of reason and the *per se* rule." *United States v. Brewbaker*, 87 F.4th 563, 573 (4th Cir. 2023). "The rule of reason is the default," *id.*, and presumptively applies except in a few narrow, defined categories of cases.

Restraints are subject to *per se* condemnation only when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-90 (1985). "The Supreme Court has been cautious in extending the *per se* approach to claims that fall outside certain previously enumerated categories of liability." *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, at *4 (W.D. Va. May 28, 2015); *Brewbaker*, 87 F.4th at 574 ("[T]he *per se* rule only applies automatically to restraints that already have been held to be devoid of procompetitive effects."). In particular, "[h]orizontal price-fixing, market division, and certain types of group boycotts are unlawful *per se*," *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir. 1999), as are certain tying arrangements, while the rule of reason standard applies to all other alleged Section 1 violations. *Id.*; *accord Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 724 (6th Cir. 2019) ("There is a presumption against applying the *per se* rule unless the restraint falls squarely into a *per se* category.") (cleaned up). The counterclaim fails to allege any concerted behavior fitting within one of the narrowly defined *per se* categories.

### 1. The threatened group boycott is not subject to *per se* illegality

The counterclaim does not allege horizontal price fixing, market division, or tying. At most, it alleges an *attempted* group boycott—which, as discussed *supra* at 12, is not cognizable as concerted action subject to Section 1, let alone as a *per se* violation. Because NASCAR has not alleged an agreement that falls into any of these narrow categories, its *per se* claim must be dismissed. *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 343-44 (6th Cir. 2006).

Even if NASCAR could plead facts that a group boycott was effectuated (and it cannot because it is undisputed that no boycott occurred), NASCAR's *per se* claim would still fail. The "mere allegation of a concerted refusal to deal does not suffice [for stating a *per se* claim] because not all concerted refusals to deal are predominantly anticompetitive." *Nw. Wholesale*, 472 U.S. at 298. Rather, group boycotts are only cognizable as *per se* violations when they involve "joint efforts by a firm or firms ***to disadvantage competitors*** by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Id.* at 294 (cleaned up) (emphasis added); *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 820 (9th Cir. 2023) ("*per se* prohibition applies to group boycotts '*designed to stifle competition*'") (emphasis in original) (quoting *Assoc. Press v. United States*, 326 U.S. 1, 19 (1945)).

NASCAR does not allege that the Counterclaim-Defendants participated in a group boycott to disadvantage any of their competitors by depriving them of a resource they need to compete. Rather, the counterclaim only alleges that there was an attempted group boycott of qualifying races in a single event intended to protest NASCAR. Counterclaim Compl. ¶¶ 8, 49, 67. Where, as here, the alleged group boycott does not involve a horizontal agreement between competitors ***to exclude a rival firm from their market***, *per se* treatment does not apply. *E.g.*, *Larry Muko, Inc. v. Sw. Pa. Bldg. & Const. Trades Council*, 670 F.2d 421, 429 (3d Cir. 1982) ("Generally, the application of the *per se* rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace.").[9] There is similarly no basis for NASCAR to argue for the application of the *per*

---

[9] Indeed, in a recent case, NASCAR's counsel at Latham & Watkins successfully persuaded the Central District of California to dismiss a group boycott claim on precisely these grounds—that *per se* treatment only applies to group boycotts engineered "by one or more firms with market

*se* rule to the alleged boycott by the racing teams of a quarterly business meeting with NASCAR, *see* Counterclaim Compl. ¶¶ 49, 59-60, as a boycott of a single meeting would have had no material competitive impact, let alone the type of impact stifling competition that would support *per se* condemnation.

Further, even the narrow category of group boycotts cognizable as *per se* violations has generally been subject to such treatment only when the participants have market power. *Nw. Wholesale*, 472 U.S. at 296 ("Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted."). Here, NASCAR makes no allegations that the Counterclaim-Defendants and their alleged co-conspirators have the market power to exclude any competitors. For this additional reason, NASCAR fails to allege a *per se* unlawful group boycott. *Hollywood Foreign Press*, 2021 WL 1399297, at *3-4 (dismissing *per se* group boycott claim where the plaintiffs failed to allege the defendants had market power).

### 2. The joint negotiations are not subject to *per se* illegality

NASCAR's claim that the Counterclaim-Defendants, the RTA, and the other racing teams agreed to "jointly negotiate" the terms of the 2025 Charter Agreement through the TNC, *see* Counterclaim Compl. ¶¶ 51-52, 87, also does not state a *per se* violation.

An agreement to engage in joint negotiations with a willing counterparty like NASCAR does not fall into any of the established *per se unlawful* categories. *See supra* at 12-13; *Brewbaker*, 87 F.4th at 573-74. The Supreme Court in *BMI* explained that the fact that a joint negotiation arrangement necessarily requires the jointly negotiating parties to agree upon a price does not

---

power to disadvantage competitors." *Flaa v. Hollywood Foreign Press Ass'n*, 2021 WL 1399297, at *3 (C.D. Cal. Mar. 23, 2021), *aff'd*, 55 F.4th 680 (9th Cir. 2022).

constitute horizontal price fixing triggering *per se* condemnation; the rule of reason applies. *See BMI*, 441 U.S. at 23-24; *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 6-8 (2006) (holding *per se* treatment not applicable to "price setting" by the members of the joint venture).

Joint negotiations agreed to by a counterparty can have procompetitive efficiencies and thus are not "virtually always likely to have an anticompetitive effect." *Nw. Wholesale*, 472 U.S. at 296; *Brewbaker*, 87 F.4th at 574 (the *per se* rule "cannot be extended to new categories of restraints except through economic analysis that shows the new type of restraint is always anticompetitive."). This is particularly true in the context of sports, where some common rules for the competitors are needed to have the competition at all. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 204 (2010) (applying rule of reason). A number of the provisions of the 2025 Charter Agreement cover such common terms—like the manner in which prize money is awarded, the length of the season, and the maximum number of cars that may compete in a race—that are more efficiently arrived at through a joint negotiation with the teams, as such terms have to be the same for all competitors in a particular race.

Indeed, even joint purchasing and selling arrangements outside of the sports business— where there is not the same need for common terms of competition—have been recognized by the courts and antitrust regulators as having potential procompetitive benefits and efficiencies that render the *per se* rule inapplicable. *Nw. Wholesale*, 472 U.S. at 295 ("Wholesale purchasing cooperatives … are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects."); U.S. DEP'T OF JUST. & FED. TRADE COMM'N, *Antitrust Guidelines for Collaborations Among Competitors* at 1 ("Such collaborations are often not only benign but procompetitive."), *id*. at 8. The rule of reason is the prevailing standard for such joint selling or buying arrangements where participation is voluntary and individual negotiations are

also permitted. *See Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers*, 744 F.2d 917, 925-26 (2d Cir. 1984); *Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 378-79 (D. Del. 2004).

Courts have no experience condemning as anticompetitive an agreement by sports teams to offer joint negotiations as an efficient option for reaching an agreement on the terms for competing in a sports league. *Am. Needle*, 560 U.S. at 204 ("*per se* rules of illegality are inapplicable" in sports context where cooperation in production of competition is necessary). "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972); *Brewbaker*, 87 F.4th at 574 (similar). Here, where NASCAR has monopsony power and all the racing teams have no choice but to sell their services to it, there is even less experience by the courts in assessing whether joint negotiations by the teams have the potential for procompetitive effects, rendering *per se* treatment inapplicable.

### C. NASCAR Fails to Allege Facts Plausibly Showing a Section 1 Violation Under the Rule of Reason

Because NASCAR has not pled a *per se* violation, it must satisfy the rule of reason. A rule of reason claim under Section 1 has two core elements: (1) proof of a relevant market and market power (or direct evidence of anticompetitive effects) and (2) anticompetitive effects within that relevant market. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002). NASCAR has failed to allege facts satisfying either of these elements.

#### 1. NASCAR has failed to define a relevant market

To state a rule of reason claim under Section 1, a plaintiff generally must allege facts plausibly showing at least one relevant antitrust market. *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983). "[T]he relevant product

market [includes] 'those products or services which are reasonably interchangeable by consumers for the same purposes.'" *Id.* (quoting *United States v. E.I. Dupont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).[10]

The absence of a properly defined relevant market in this case is a "glaring deficienc[y]" that warrants dismissal. *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002) ("[b]ecause PepsiCo … failed properly to define the relevant market here, there can be no Section 1 violation under a rule of reason analysis.") (internal quotations omitted).

NASCAR's product market allegation is confined to a single sentence, which contains the wholly conclusory assertion defining the relevant market as being the "market for entry of cars into NASCAR Cup Series races in the United States or any other location where a Cup Series race is held." Counterclaim Compl. ¶ 79. No specific facts supporting this market definition are pled. Such conclusory assertions are not sufficient to define a relevant market under *Twombly*. *E.I. Dupont De Nemours & Co. v. Kolon Indus.*, 688 F. Supp. 2d 443, 457 (E.D. Va. 2009); *Lala v. Frampton*, 2008 WL 4059874, at *4 (D. Colo. Aug. 28, 2008) (similar); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 333 (D.N.J. 1999) (similar); *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *16 (E.D. Pa. Sept. 28, 2012) (similar).

### 2. NASCAR has failed to allege any facts plausibly showing anticompetitive effects or harm to competition

A rule of reason claim requires "a showing of 'anticompetitive effect' resulting from the agreement in restraint of trade." *Dickson*, 309 F.3d at 206 (quotation omitted).

---

[10] While it is possible for a Section 1 plaintiff to alternatively prove a rule of reason violation with direct evidence of anticompetitive effects, *see Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018); *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 117 (2d Cir. 2021), the counterclaim does not allege any such direct evidence of anticompetitive effects.

NASCAR nowhere alleges facts plausibly showing that any of the Counterclaim-Defendants' conduct resulted in reduced output, increased prices, decreased quality, or any other anticompetitive effects in the alleged market for the entry of cars into NASCAR races. *Am. Express*, 585 U.S. at 542 (anticompetitive effects are shown by either "reduced output, increased prices, or decreased quality in the relevant market.") (cleaned up). NASCAR's allegations about harm to competition are confined to a single paragraph, *see* Counterclaim Compl. ¶ 82, which asserts—in wholly conclusory fashion—that the Counterclaim-Defendants' "conspiracy" has (1) harmed incentives to invest in NASCAR; and (2) reduced "performance-based competition" because of the "guaranteed starting positions" that the charter system provides. Neither of these conclusory assertions have any connection to the alleged concerted actions by the Counterclaim-Defendants that NASCAR claims to be unlawful.

The counterclaim contains no factual allegations to support the conclusory assertion that either the joint negotiations or the allegedly threatened boycott of qualifying races harmed any person's incentives to invest in NASCAR. There is no allegation that any threatened boycott ever took place and it is undisputed that NASCAR pursued the alternative of individual negotiations with the racing teams to obtain the terms in the 2025 Charter Agreement that it demanded. *See* NASCAR's First Answer, Dkt. 58 ¶ 107; Prime Decl., Dkt. 31-3 ¶¶ 31, 37, 40. Rather than decreasing the incentive to invest in NASCAR, the charter system that was agreed upon has, as has previously been discussed, been lauded by NASCAR as being beneficial.[11] The wholly conclusory assertion of competitive harm is insufficient to state a claim. *See Hanger*, 2015 WL 3439255, at *3.

---

[11] *See supra* at 1-2.

Nor are there any facts alleged to plausibly support the claim of a causal connection between the challenged joint negotiations or threatened boycott of qualifying races and the claim that guaranteed starting positions in races reduced the quality of performance-based competition. As NASCAR acknowledges, the charter system with guaranteed starting positions predates the negotiations for the 2025 Charter Agreement by many years (it goes back to 2016) and has been beneficial for both NASCAR and its racing teams. Counterclaim Compl. ¶¶ 2-3. As NASCAR President Mr. Phelps put it, "I think the charter system is a ***good thing for NASCAR and the growth of this sport***."

Further, the counterclaim contains no allegation that guaranteed starting positions would have been eliminated in the 2025 Charter Agreement if not for the joint negotiations that NASCAR agreed to or the alleged boycott threat made for unidentified qualifying races. There are no allegations that NASCAR ever asked for this provision to be eliminated. Nor are there any specific facts alleged to support the conclusory assertion that guaranteed starting positions reduced the quality of NASCAR races. These pleading deficiencies with respect to harm to competition are fatal to NASCAR's rule of reason claim. *Dickson*, 309 F.3d at 206; *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) ("Under the rule of reason, [claimant] bears the burden of proving that the actions of the defendants have unreasonably restrained trade.").

Finally, while the counterclaim also alleges that the racing teams agreed that they would not attend a scheduled quarterly business meeting with NASCAR in April 2023, there are no allegations that the failure of the teams to attend this one business meeting caused any competitive harm in the relevant market.

### D. NASCAR Has Not Alleged Facts Plausibly Showing Antitrust Injury

"To bring a private antitrust suit, a plaintiff must have antitrust standing," which requires a showing of "antitrust injury." *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 710 (4th Cir.

2021).  "Antitrust injury encompasses two concepts: (1) the causal connection between the plaintiff's injury and an antitrust violation, and (2) whether the plaintiff's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Id.* (cleaned up).

NASCAR alleges (in conclusory fashion) that it suffered a variety of alleged injuries from the concerted conduct of the Counterclaim-Defendants, but none of those purported injuries are *antitrust* injuries because they lack the required nexus to the alleged Section 1 violation and do not show harm to competition.

*First*, NASCAR fails to allege any facts plausibly showing antitrust injury from an agreement by the chartered racing teams to jointly negotiate the 2025 charter renewal.  Any claim that NASCAR was harmed by such joint negotiations is negated by NASCAR's own statements that the charter renewal was *good* for NASCAR—a fact noted by this Court both in denying NASCAR's motion to dismiss and in denying NASCAR's motion to stay the preliminary injunction.  *See, e.g.,* Order Denying NASCAR Mot. to Dismiss, Dkt. 104 at 6 ("NASCAR has previously argued at length that the balance of payments and obligations for chartered teams is beneficial rather than harmful to NASCAR"); Order Denying NASCAR Mot. to Stay, Dkt. 89 at 9 ("NASCAR … has repeatedly represented to the Court that those [charter] terms reflect a fair and *beneficial* deal for all concerned.").  Equally significant, any claim of harm to NASCAR from the joint negotiations is negated by the undisputed fact that NASCAR was able to choose the alternative of individual negotiations to obtain the terms that it demanded in the 2025 Charter Agreement.[12]

---

[12] *See supra* at 10-12.

*Second*, NASCAR fails to allege facts showing any antitrust injury resulting from the purported harm to its reputation and brand in connection with NASCAR's negotiations for a new media rights deal. NASCAR alleges that the RTA engaged in a "media campaign," *see* Counterclaim Compl. ¶ 65, and that Mr. Polk "spoke with broadcasters," *id*. ¶ 66, in an attempt to interfere with NASCAR's new media rights deal. But it is undisputed that NASCAR signed a record $1.1 billion-per-year TV contract in November 2023, *see supra* at 7, eleven months *before the negotiations of the 2025 Charter Agreement were completed.* Counterclaim Compl. ¶¶ 65-75. The counterclaim does not offer any factual allegations plausibly supporting the contention that the joint negotiations or other allegedly conspiratorial conduct caused any antitrust injury to NASCAR in its successful negotiations for a record breaking media rights deal.[13] Nor are there any plausible allegations to show that there was an adverse impact on NASCAR's new media rights deal or brand reputation that would constitute an injury to competition and not just an injury to NASCAR.[14] *See, e.g., Microsoft Corp. v. Comput. Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 951 (W.D.N.C. 2000) ("Antitrust injury is injury to competition beyond the impact on the claimant in the market within which the defendants compete.") (cleaned up); *Dr. Mark G. Turner, DDS, PC v. Dentaquest, LLC*, 2018 WL 3795237, at *5 (E.D. Va. Aug. 9, 2018) (holding there is

---

[13] The allegation concerning Mr. Polk's conversation with a broadcaster is bereft of specifics and should thus be disregarded. Counterclaim Compl. ¶ 66. *See Doe v. Va. Dep't of State Police*, 713 F.3d 745, 754 (4th Cir. 2013) ("[W]holly vague and conclusory allegations are not sufficient to withstand a motion to dismiss.") (internal quotations omitted).

[14] In fact, Phelps's public statements show just the opposite. *See* Matt Weaver, *League President Steve Phelps Offers Rare Comments About Teams Suing NASCAR*, Sᴘᴏʀᴛsɴᴀᴜᴛ (Oct. 31, 2024), https://sportsnaut.com/nascar-news-president-steve-phelps-rare-statement-lawsuit/ (Phelps: "I love that Michael Jordan is in our sport."); Kyle Dalton, *Denny Hamlin Calls Out NASCAR CEO for His Actions at Daytona*, Hᴇᴀᴠʏ (Feb. 23, 2024), https://heavy.com/sports/nascar/denny-hamlin-nascar-ceo-daytona/ (Phelps: "I'd like to have 36 Denny Hamlins.").

no antitrust injury when "the complaint contains no plausible allegations that … action[s] will produce anticompetitive results in the relevant market.") (cleaned up).

*Third*, NASCAR's allegations that the Counterclaim-Defendants (1) threatened to (but in fact did not) boycott qualifying races for a NASCAR race and (2) boycotted a quarterly business meeting in April 2023 do not establish antitrust injury. The counterclaim fails to allege any facts to plausibly show that either the threatened qualifying race boycott that did not come to fruition or a lone missed quarterly business meeting could have caused any reduction in competition that inflicted any antitrust injury on NASCAR.

## II. The Court Should Strike NASCAR's Relief Request to Eliminate Section 3(a) of the Charter Agreement

For all the reasons described above, NASCAR's counterclaim should be dismissed in its entirety. In the alternative, if the Court permits any part of NASCAR's counterclaim to proceed, the Court should strike NASCAR's request to eliminate Section 3(a) from the 2025 Charter Agreement, which is the provision that provides for the guaranteed entry of chartered teams in all Cup Series races.

Under Rule 12(f), the Court may strike from pleadings any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A matter may be struck from a pleading when it is irrelevant to the issue at hand or could unfairly prejudice the objecting party. *Simaan, Inc. v. BP Prods. N, Am., Inc.*, 395 F. Supp. 2d 271, 278 (M.D.N.C. 2005). When "it is clear that [a matter] ha[s] no possible bearing upon the subject matter of the litigation," the matter should be struck. *Chapman v. Duke Energy Carolinas, LLC*, 2009 WL 1652463, at *1 (W.D.N.C. June 11, 2009). Courts have broad discretion in deciding motions to strike. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001).

The Court should strike NASCAR's requested injunctive relief to eliminate Section 3.1(a) because that request has no plausible remedial relationship to the alleged conspiracy to engage in joint negotiations and threaten a boycott of qualifying races for a NASCAR event that is the subject of the counterclaim. This provision providing for guaranteed entry into Cup Series races dates back to the 2016 Charter Agreement and there are no allegations in the counterclaim that it would have been eliminated as the core element of the charter system but for the alleged conspiracy, purportedly led by Mr. Polk starting in 2022, with respect to the negotiation of the 2025 Charter Agreement. Indeed, there are no counterclaim allegations that NASCAR even sought to eliminate this aspect of the charter system in the negotiations for the 2025 Charter Agreement.

Further, the language of the relief request to invalidate Section 3.1(a) demonstrates that it is not connected to the counterclaim. That relief is instead linked to Plaintiffs seeking to hold certain provisions of the 2025 Charter Agreement to be unlawful exclusionary acts used by NASCAR to maintain its monopoly:

> NASCAR prays for judgment and relief as follows … [t]hat an injunction be issued to grant such relief as is necessary to restore competition including, the elimination of Section 3.1(a) of the 2025 Charter Agreement which provides for guaranteed entry into Cup Series races *if Counterclaim Defendants persist in seeking to have the Charter Agreements declared as unlawful under the antitrust laws or seek the elimination of Section 6.6 or other provisions of the 2025 Charters mutually agreed upon by NASCAR and approximately ninety-percent of Charter holders.*

Counterclaim Compl. at pp. 26-27 (emphasis added). This language reveals NASCAR's true objective for seeking to invalidate Section 3.1(a)—which is not to remedy the Section 1 violation alleged in the counterclaim, but to intimidate the non-party racing teams from joining in the challenge to NASCAR's unlawful monopoly. This is the transparent explanation for why NASCAR counsel conducted a press conference with the filing of the counterclaim in which he

delivered the warning that NASCAR will seek to eliminate the right of charter holders to have guaranteed racing spots if Plaintiffs prevail in their monopolization case.[15]

"[I]njunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quotation omitted). An injunction should be "carefully addressed to the circumstances of the case" and should not be "broader in scope than that necessary to provide complete relief to the plaintiff." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011). Because NASCAR's request to invalidate Section 3(a) has no nexus to the alleged anticompetitive conduct challenged in the counterclaim and is being sought for improper purposes, it should be stricken. *See, e.g.*, *Chapman*, 2009 WL 1652463, at *2 (striking paragraphs and exhibits that are "immaterial to Plaintiff's causes of action."); *Agbara v. Prince George's Cnty. Pub. Sch.*, 2020 WL 7425298, at *10 (D. Md. Dec. 18, 2020), *aff'd*, 2022 WL 683362 (4th Cir. Mar. 8, 2022) (similar).

## <u>CONCLUSION</u>

For all the reasons stated above, the Court should dismiss NASCAR's counterclaim in its entirety or, as necessary, grant the motion to strike.

---

[15] *See supra* note 1, at 1.

Dated: March 26, 2025

Respectfully submitted,

WINSTON & STRAWN LLP

By:   */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

E. Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

Jeanifer E. Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Matthew R. DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com

*Counsel for 2311 Racing LLC d/b/a 23XI*
*Racing and Curtis Polk*

## CERTIFICATE OF COMPLIANCE

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By:  */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

*Counsel for 2311 Racing LLC d/b/a 23XI Racing and Curtis Polk*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing **COUNTER-DEFENDANTS 2311 RACING LLC D/B/A 23XI RACING AND CURTIS POLK'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS AND MOTION TO STRIKE** was electronically filed using the Court's CM/ECF system, which will automatically send notice of this filing to counsel of record for all parties, and I caused an unredacted copy of the foregoing to be served on counsel of record for all parties, including:

Tricia Wilson Magee
**SHUMAKER LOOP & KENDRICK, LLP**
101 S. Tryon St., Suite 2200
Charlotte, NC 28280
tmagee@shumaker.com

Christopher S. Yates
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
chris.yates@lw.com

Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com

Anna M. Rathbun
Christina R. Gay
David L. Johnson
Christopher J. Brown
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
anna.rathbun@lw.com
christina.gay@lw.com
david.johnson@lw.com
chris.brown@lw.com

*Counsel for NASCAR Event Management, LLC*

_____
*Jeffrey L. Kessler*
Jeffrey L. Kessler