**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

2311 RACING LLC d/b/a 23XI RACING, and
FRONT ROW MOTORSPORTS, INC.,

              Plaintiffs,

              v.

NATIONAL ASSOCIATION FOR STOCK
CAR AUTO RACING, LLC, NASCAR
HOLDINGS, LLC, NASCAR EVENT
MANAGEMENT, LLC, and JAMES FRANCE,

              Defendants.

NASCAR EVENT MANAGEMENT, LLC,

              Counter-Plaintiff,

              v.

2311 RACING LLC d/b/a 23XI RACING,
FRONT ROW MOTORSPORTS, INC., and
CURTIS POLK,

              Counter-Defendants.

No. 3:24-cv-886-KDB-SCR

**COUNTERCLAIM PLAINTIFF NASCAR'S OPPOSITION TO 2311
RACING LLC AND CURTIS POLK'S MOTION TO DISMISS AND
MOTION TO STRIKE**

**TABLE OF CONTENTS**

Page

FACTUAL BACKGROUND .................................................................................................2

LEGAL STANDARD ........................................................................................................7

ARGUMENT ....................................................................................................................7

I.     MR. POLK, 23XI, AND OTHERS ENGAGED IN CONCERTED ACTION ..................8

       A.     NASCAR Alleges Direct Evidence Of Polk And 23XI's Agreements ..................8

       B.     Circumstantial Evidence Confirms The Existence Of A Conspiracy .....................9

       C.     Mr. Polk And 23XI's Arguments Have No Merit .................................................11

II.    COUNTERCLAIM DEFENDANTS' CONSPIRACY WAS
       ANTICOMPETITIVE ......................................................................................................14

       A.     Mr. Polk, 23XI, And Front Row Engaged In *Per Se* Illegal Conduct ..................14

       B.     The Conspiracy Is Also Illegal Under A Rule-Of-Reason Analysis .....................19

              1.     NASCAR Alleges Direct Evidence Of Anticompetitive Effect ...............19

              2.     The Conspirators Had Market Power In A Relevant Market ...................20

III.   THE ILLEGAL CONSPIRACY CAUSED NASCAR ANTITRUST INJURY ..............21

IV.    THE MOTION TO STRIKE IS PROCEDURALLY IMPROPER AND
       BASELESS ......................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agbara v. Prince George's Cnty, Pub. Sch.*,
  2020 WL 7425298 (D. Md. Dec. 18, 2020).............................................................................25

*Am. Needle v. NFL*,
  560 U.S. 183 (2010).......................................................................................................17, 18

*Andrew v. Clark*,
  561 F.3d 261 (4th Cir. 2009) ...............................................................................................12

*Arizona v. Maricopa Cnty. Med.*,
  457 U.S. 332 (1982)...............................................................................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................................7, 8

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979)............................................................................................................13, 17

*Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers*,
  744 F.2d 917 (2d Cir. 1984)...................................................................................................17

*Catalano, Inc. v. Target Sales*,
  446 U.S. 643 (1980)...............................................................................................................15

*Churchill Downs Inc. v Thoroughbred Horsemen's Grp.*,
  605 F. Supp. 2d 870 (W.D. Ky. 2009)........................................................................16, 17, 22

*Cloverleaf Enters. v. Md. Thoroughbred, Horsemen's Ass'n*,
  730 F. Supp. 2d 451 (D. Md. 2010).......................................................................................17

*Compact v. Metropolitan Gov't of Nashville & Davidson Cnty.*,
  594 F. Supp. 1567 (M.D. Tenn. Oct. 18, 1984).................................................................15, 16

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)........................................................................................................13, 17

*E. I. du Pont de Nemours & Co. v. Kolon Indus.*,
  637 F.3d 435 (4th Cir. 2011) ................................................................................................21

*Evergreen Partnering Grp. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013)....................................................................................................11

*F.T.C. v. Cmty. Health Sys.*,
   2024 WL 2034572 (W.D.N.C. Apr. 4, 2024) ........................................................................24

*F.T.C. v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986) ...............................................................................................................20

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ...................................................................................................23

*Horn v. Jones*,
   2015 WL 3607012 (S.D. Fla. May 8, 2015) ..........................................................................25

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ...................................................................................................22

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ...........................................................................................13, 15

*In re Mission Health Antitrust Litig.*,
   2024 WL 759308 (W.D.N.C. Feb. 21, 2024) .........................................................................19

*In re Processed Egg Prods. Antitrust Litig.*,
   902 F. Supp. 2d 704 (E.D. Pa. 2012) ...............................................................................14, 17

*Jien v. Perdue Farms*,
   2020 WL 5544183 (D. Md. Sept. 16, 2020) .............................................................................9

*Kaiser Steel Corp. v. Mullins*,
   455 U.S. 72 (1982) .................................................................................................................25

*King v. Rubenstein*,
   825 F.3d 206 (4th Cir. 2016) .................................................................................................12

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) .................................................................................................23

*Lane v. Endurance Am. Specialty Ins.*,
   2011 WL 1343201 (W.D.N.C. Apr. 8, 2011) .........................................................................24

*Matsushita Elec. Indust. Co., Ltd. v. Cinram Intern., Inc.*,
   299 F. Supp. 2d 370 (D. Del. 2004) .......................................................................................17

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ...............................................................................................25

*Meredith Corp. v. SESAC LLC*,
   1 F. Supp. 3d 180 (S.D.N.Y. 2014) .......................................................................................13

*Meredith Corp. v. SESAC, LLC*,
  2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ...........................................................................13

*Murray Energy Corp. v. McCarty*,
  2014 WL 4656221 (N.D.W. Va. Sept. 16, 2024) ...................................................................24

*New York ex rel. Spitzer v. Saint Francis Hospital*,
  94 F. Supp. 2d 399 (S.D.N.Y. 2000).....................................................................................16

*Novell, Inc. v. Microsoft Corp.*,
  505 F.3d 302 (4th Cir. 2007) ...........................................................................................21, 22

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)...............................................................................................................19

*PBM Prods. v. Mead Johnson & Co.*,
  639 F.3d 111 (4th Cir. 2011) .................................................................................................25

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
  279 F.2d 128 (9th Cir. 1960) .................................................................................13, 14, 15, 23

*Robertson v. Sea Pines Real Est.*,
  679 F.3d 278 (4th Cir. 2012) ....................................................................................7, 8, 9, 10

*SD3, LLC v. Black & Decker*,
  801 F.3d 412 (4th Cir. 2015) ........................................................................................ *passim*

*Sharon Steel Corp. v. Chase Manhattan Bank*,
  88 F.R.D. 38 (S.D.N.Y. 1980) ..............................................................................................16

*Simba v. Fenty*,
  754 F. Supp. 2d 19 (D.D.C. 2010) .........................................................................................24

*Team Cam, LLC v. Reliable Contracting*,
  2025 WL 1019262 (D. Md. Apr. 4, 2025) ...................................................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................................14

*Texaco v. Dagher*,
  547 U.S. 1 (2006)..............................................................................................................17, 18

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)..................................................................................................21

*Toys 'R' Us, Inc. v. F.T.C.*,
  221 F.3d 928 (7th Cir. 2000) ................................................................................................20

*United States v. Apple*,
    791 F.3d 290 (2d Cir. 2015)..................................................................................................10

*United States v. Charlotte-Mecklenburg Hosp.*,
    248 F. Supp. 3d 720 (W.D.N.C. 2017) ...................................................................................19

*United States v. Foley*,
    598 F.2d 1323 (4th Cir. 1979) ...............................................................................................12

*United States v. Socony-Vacuum*,
    310 U.S. 150 (1940)................................................................................................................15

*United States v. Trenton Potteries*,
    273 U.S. 392 (1927)................................................................................................................23

*W. Penn Allegheny Health Sys. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)...................................................................................................8, 9

## STATUTES

15 U.S.C. § 26.....................................................................................................................................24

## RULES

Fed. R. Civ. P. 8(a)(2)..........................................................................................................................7

Fed. R. Civ. P. 12(b)(6).........................................................................................................................7

Fed. R. Evid. 201(b)..............................................................................................................................4

## OTHER AUTHORITIES

U.S. Dep't of Justice & FTC Withdraw Guidelines for Collaboration Among
    Competitors (Dec. 11, 2024),
    https://www.ftc.gov/system/files/ftc_gov/pdf/v250000collaborationguidelines
    withdrawalstatement.pdf ........................................................................................................19

Stock car racing should be a competition in its purest sense. The sanctioning body identifies the course and sets the rules for running the race. Drivers then test their skill, preparation, and nerves in a head-to-head contest for prizes and fame. That's the vision Bill France, Sr. had when he founded NASCAR over seventy-five years ago. It's the vision every generation of the France family after him has pursued in a tireless effort to grow NASCAR from nothing into one of the most competitive entertainment options around.

When Counterclaim Defendants Curtis Polk and 23XI Racing arrived to the sport in late 2020, they brought a vision of a less competitive NASCAR. Motivated to turn their initial purchase of a NASCAR Charter into a windfall, Polk and 23XI set out to eliminate competition between rivals for the terms on which they would race in NASCAR. Polk, 23XI, and other teams knew that if they negotiated the 2025 Charter as a group, they could use collective leverage to obtain more favorable terms than any team would have been able to obtain individually. Their ultimate goal was to convert the seven-year Charter into a permanent right of entry into all future races, without contributing any equity to NASCAR. They also jointly agreed to demand more money from NASCAR, jointly agreed on the amount of money to accept, and jointly agreed to allocate more money for themselves through fixed payments (instead of prize money that might be shared with drivers or paid to teams without Charters). They funneled their demands through a group representing all Charter-holding teams, which Polk led as 23XI's owner. They coerced NASCAR to negotiate only with the collective group by boycotting a meeting where all teams would have been present, threatening boycotts of races, spreading misinformation, interfering with NASCAR's media negotiations, and coercing teams to "not break ranks." That is a cartel. It is illegal. And it artificially inflated the monetary and other terms granted to 2025 Charter holders.

Remarkably, Polk and 23XI knew what they were doing violated antitrust law—it just did not matter to them.

Though the parties have competing views of the events that led to the 2025 Charter, discovery has already confirmed NASCAR's allegations in shocking detail.[1] Polk and 23XI's motion ignores the Counterclaim's allegations, contradicts the pleaded facts, and argues contrary to established motion-to-dismiss and antitrust standards. In short, there is no basis to prevent NASCAR's claims and the evidence coming to light.

## FACTUAL BACKGROUND

The France family has invested in, promoted, and grown stock car racing for over seventy-five years. CC ¶¶ 20, 23. Multiple generations of the France family built speedways from the ground up and have grown NASCAR into what it is today. CC ¶¶ 21, 24. NASCAR's work and growth has translated into success for countless participants in the sport, including drivers, crew chiefs, engineers, mechanics, racetracks, and also team owners. CC ¶ 24, 34. The investments that NASCAR makes in those and other elements of the sport greatly benefit the teams financially and make races more attractive to broadcast partners, patrons, and viewers. CC ¶¶ 33-35, 39, 48.

Team owners do not contribute to the cost of developing or maintaining racetracks or production infrastructure to broadcast the sport to television viewers. CC ¶¶ 33-35. Nor have they paid NASCAR for equity ownership. CC ¶ 64. In the teams' own words, they are "not the members of a joint venture operating a sports league." Doc. 107 ¶ 97. Instead, as they describe it, they are—and are supposed to be—"independent contractors." *Id.*

---

[1] It is not necessary for the Court to rely on newfound evidence to deny dismissal because NASCAR's initial Counterclaim is sufficient. But NASCAR's motion for leave to amend and proposed Amended Counterclaim lay out additional, recently produced evidence confirming Polk, 23XI, and Front Row's illegal conduct.

2

For the vast majority of NASCAR's existence, teams made money by racing cars against each other—the teams were (as they still should be) horizontal competitors. CC ¶ 36, 41. Their cars competed to earn their positions in a race and competed to win race purses from NASCAR and tracks, all within the confines of rules that NASCAR set. CC ¶¶ 36-37. The racing teams with the best cars received the highest race purses and the most lucrative sponsorships. CC ¶ 36. Those sponsorship revenues were (and still are) significant, and the teams have never shared that income with NASCAR. CC ¶¶ 38, 48. Historically, NASCAR also provided 25% of all television revenue directly to the teams, with the remaining 65% going to the tracks (part of which tracks then used for race purses for winning cars), and 10% staying with NASCAR. CC ¶ 37.

Beginning in 2014, some NASCAR Cup Series teams collectively agreed to form the Race Team Alliance with the express purpose of giving the teams "a unified voice in negotiations" with NASCAR. CC ¶ 41. The teams sought, among other things, a route to guaranteed entry for their cars into Cup Series races and guaranteed revenue from NASCAR. *Id.* After significant negotiations, the parties reached an agreement embodied in the 2016 Charter, the first of its kind for NASCAR. CC ¶ 43. That Charter granted substantial benefits to the teams that received one, including guaranteed starting positions for their Charter cars, an increased payout of media revenue, and even payments merely for holding a Charter and committing to race. CC ¶ 43, 44. A Charter is transferrable, creating an appreciating asset for teams worth millions and later tens of millions of dollars (or more). CC ¶¶ 1, 45. The team owners that received the 36 initial Charters paid $0 to NASCAR for that asset. CC ¶ 43.

Counterclaim Defendants 23XI and Curtis Polk had no role in growing NASCAR from its infancy. They joined NASCAR in 2020 by purchasing a Charter from a 2016 Charter holder. Doc.

21-3 ¶¶ 1, 9.[2]  They knew full well the benefits of holding a 2016 Charter, as they did "due diligence on team ownership in the Cup Series" before becoming involved.  *Id.* ¶ 7.  Despite Polk claiming that he believed the 2016 Charters were "very one-sided" in NASCAR's favor, *id.*, 23XI quickly bought another 2016 Charter because (in his words) Polk believed the next Charter issued for 2025 would be more favorable to teams.  *Id.* ¶ 8, 10.  Polk and 23XI's other owners openly professed that they had a plan to ensure that happened.  CC ¶ 7.

Beginning in the first quarter of 2022, Polk, 23XI, and others coordinated a years-long-conspiracy among racing teams to extract more money from NASCAR and eliminate competition amongst themselves.  CC ¶ 49-50.  They made their collective agreement and agenda clear.  In early 2022, with Polk leading the charge, a group of four racing team owners calling themselves the Teams Negotiating Committee ("TNC") notified NASCAR that they represented "all existing Charter teams."  CC ¶¶ 49-51.  With that collective authority, the Teams Negotiating Committee then made "unified" demands for the future terms of the 2025 Charters that had been agreed upon in advance with all other Charter-holding teams, including how much money teams would receive for holding a 2025 Charter.  CC ¶¶ 51-52.  The teams initiated that negotiation process almost a year before any Charter-renewal discussions were contractually scheduled to start, because the teams knew a longer negotiation period would give them more opportunity to exert collusive leverage over NASCAR.  CC ¶¶ 50 & n.14, 74.

For the next two-and-a-half years, the Teams Negotiating Committee explicitly made repeated demands representing agreements amongst race teams on key financial and other Charter terms.  In June 2022, for example, Polk's Teams Negotiating Committee presented to NASCAR a

---

[2]     A court may take judicial notice of counter-party litigation statements, but Counterclaim Defendants may not use them to create disputes of alleged facts.  *See* Fed. R. Evid. 201(b).

set of demands that "had been agreed upon by all 16 teams holding 36 Charters at the time." CC ¶ 53. The collective demands included increasing payments to the teams and further limiting competition among them for prize money. *Id.* In this communication, the teams represented that, if their demands were met, they were "all in." *Id.* In April 2024, the TNC collectively rejected an offer from NASCAR and demanded that it add more dollars to the revenue allocation pool to increase payouts to Charter teams. CC ¶ 68. In July 2024, the TNC sent a proposal that had "the support of all the Teams," and stated that all teams had agreed on terms, including demanding that NASCAR pay at least 42.7% of media revenue to the teams, that NASCAR be precluded from negotiating for different Charter terms with new teams, and other clauses to insulate the teams from competition. CC ¶ 69. On August 26, 2024, the TNC sent another communication where the teams "[a]s a group" demanded a most favored nations clause to eliminate competition amongst themselves and refused financial components of NASCAR's latest proposal. CC ¶ 72.

The teams' collectively agreed upon terms communicated through Polk and the TNC were more beneficial to the teams than what each team would have been able to obtain—and would have been willing to accept—in the absence of collusion. CC ¶¶ 73, 76. They included demands that NASCAR grant them "permanent charters," essentially granting them equity in NASCAR for no consideration, and other unreasonable terms. CC ¶¶ 53 n.16, 64. Frustrated with the intransigence of the collusive action of the TNC, and believing it was not accurately representing NASCAR's proposals, NASCAR intermittently "sought to simultaneously negotiate with the teams individually." CC ¶¶ 62, 72 (describing that "NASCAR *attempted* to engage in one-on-one discussions" (emphasis added)). In response, Polk, 23XI, and Front Row threatened individual teams to "not break ranks," and sought to deter them from reaching any individual agreements with NASCAR, else the TNC might lose its collective leverage. CC ¶¶ 73-74, 76, 89. Their

intimidation successfully deterred teams that were ready and willing to sign a 2025 Charter from doing so, and Polk, 23XI, and others instructed teams to drag out negotiations to increase the TNC's leverage as the 2025 season drew closer. CC ¶¶ 73-74, 89.

Polk, 23XI, and others agreed to many other tactics to coerce NASCAR to deal only with the teams as a unified group and accept the terms they jointly fixed. Their campaign included a long list of threatened and collective boycotts, dissemination of misinformation, and interference with NASCAR's contractual relations with media partners. *See* CC ¶¶ 8, 55, 56, 59-62, 65-67, 76, 87, 89. Each of these acts was in furtherance of their ultimate conspiracy of compelling Charter terms they had fixed amongst themselves. *Id.* For example, 23XI co-owner Denny Hamlin publicly admitted that the Race Team Alliance—consisting of all 2016 Charter-holding race teams—purposely engaged in a media campaign to influence the 2025 Charter negotiations and threatened that teams would boycott NASCAR events if it did not give in to the teams' collective demands. CC ¶ 46, 65. The teams also admitted to intentionally timing their media campaign to interfere with NASCAR's negotiations with broadcasters, which generate revenues that the teams receive. CC ¶¶ 37, 65-66. This was part of a strategy by the Teams Negotiating Committee to flex the teams' collective solidarity in the press as "a leverage tool" to force NASCAR to deal with them only as a group. CC ¶¶ 37, 56-57. To prove to NASCAR that the teams were operating as a unified group and would not deal with NASCAR individually, the teams agreed to, and did, boycott a Team Owner Council meeting that was contractually required under the 2016 Charter and would have included representation from each team, as each team had accepted an invitation to attend. CC ¶¶ 49, 59-61. To escalate things further, Polk, Front Row, and others agreed to threaten to boycott qualifying races for at least one NASCAR Cup Series race. CC ¶ 67.

The conspiracy among teams to only accept key terms that they all agreed upon accomplished much of what Polk, 23XI, and Front Row intended. Polk's Teams Negotiating Committee, through unwavering collective action, obtained financial concessions from NASCAR that they would not have obtained in the absence of their collusion. CC ¶¶ 63, 75. One of those concessions was that NASCAR agreed to increase the percentage of revenue to the teams by approximately 25%. CC ¶ 63. All told, the team owners collectively negotiated an increase of guaranteed payments to almost half of media revenue attributable to the Cup Series. CC ¶ 63. The Counterclaim Defendants achieved that outcome only by agreeing to eliminate competition among themselves and others, and not "break ranks." CC ¶¶ 73, 75-76. Polk, 23XI, and Front Row held the conspiracy together for over two-and-a-half years, and the effects of that conspiracy are embodied in the financial and other terms of the 2025 Charters that 13 of the 15 racing teams holding a 2016 Charter signed nearly in unison in late 2025. CC ¶¶ 63, 75-76.

## LEGAL STANDARD

"[T]he Federal Rules of Civil Procedure set a high threshold for a court to dismiss claims at the outset of a lawsuit." Order on Defs.' Mot. to Dismiss at 1, Doc. 104 ("Or."). Under Rule 8(a)(2), "a complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 2 (quoting Fed. R. Civ. P. 8(a)(2)). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) assesses "only whether a claim is stated; 'it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Id.* at 2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

To assert a claim under Section 1 of the Sherman Act, a claimant must plead "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Robertson v. Sea*

*Pines Real Est.*, 679 F.3d 278, 284 (4th Cir. 2012). A court's "task is limited" when evaluating those allegations on a motion to dismiss. *Id.* The court need not consider or decide "whether defendants actually violated § 1," only if "the complaint states 'a plausible claim for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). NASCAR's Counterclaim easily satisfies both elements.

## I. MR. POLK, 23XI, AND OTHERS ENGAGED IN CONCERTED ACTION

The existence of any "contract, combination, or conspiracy," satisfies the first element of a Section 1 claim. *Robertson*, 679 F.3d at 284. A claimant can show such an agreement with allegations that there was "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010). Either direct or circumstantial evidence of such an understanding suffices, provided the allegations contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *SD3, LLC v. Black & Decker*, 801 F.3d 412, 424 (4th Cir. 2015); *Robertson*, 679 F.3d at 289-90. The Counterclaim alleges both direct evidence of an agreement and circumstantial evidence in abundance.

### A. NASCAR Alleges Direct Evidence Of Polk And 23XI's Agreements

The direct evidence of agreement between Mr. Polk, 23XI, and others is "both plainly documented and readily available." *Robertson*, 679 F.3d at 290. The Counterclaim presents numerous examples of Polk, 23XI, and others admitting through the TNC or the Race Team Alliance—both of which are composed of NASCAR teams—that they agreed to negotiate the terms of the 2025 Charter agreement collectively and agreed on the terms they would demand. *See* CC ¶¶ 50-54, 65, 68-69, 72. Examples of those admissions of express agreement include a joint communication representing all teams in February 2022, CC ¶ 50, a June 2022 proposal "agreed upon by all 16 teams," CC ¶ 53, an April 2024 proposal, CC ¶ 68, a July 2024 proposal submitted with "the support of all of the Teams," CC ¶ 69, an August 2024 email sent on behalf of all teams

identifying "key issues" and explaining those were terms the teams "[a]s a group" were "eager to sign," CC ¶ 72, and others. CC ¶¶ 50-75. Prior to those "unified proposals, Polk, 23XI, Front Row, and others agreed upon desired contract terms" to collectively demand. CC ¶ 51.

Those "document[s] or conversation[s] explicitly manifesting the existence of the agreement in question" are more than adequate direct evidence to satisfy the agreement element. *Jien v. Perdue Farms*, 2020 WL 5544183, at *5 (D. Md. Sept. 16, 2020); *Robertson*, 679 F.3d at 289; *W. Penn*, 627 F.3d at 100. NASCAR has plainly alleged that "multiple parties join[ed] their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests." *Team Cam, LLC v. Reliable Contracting*, 2025 WL 1019262, at *7 (D. Md. Apr. 4, 2025). *See* CC ¶¶ 8, 55-60, 75.

## B. Circumstantial Evidence Confirms The Existence Of A Conspiracy

In light of the direct evidence of an agreement, "[c]ircumstantial evidence sufficient to suggest a preceding agreement is [] superfluous." *Robertson*, 679 F.3d at 289. Nonetheless, the Court may consider "direct evidence alongside circumstantial evidence" in support of finding an agreement. *Team Cam*, 2025 WL 1019262, at *9. Typical examples of circumstantial evidence include evidence that the conspirators acted "similarly," plus "further circumstance[s] pointing towards a meeting of the minds." *SD3*, 801 F.3d at 424, 427.

The Counterclaim identifies similarity of action among the conspirators—or parallel conduct—for over two-and-a-half years during the negotiation of the 2025 Charter. During that time, the conspirators acted in lockstep. They simultaneously and collectively approached NASCAR with their agreed-upon demands repeatedly. *See, e.g.*, CC ¶¶ 7-8, 49-54, 63, 68-69, 72. They collectively appeared in press conferences touting their joint efforts, and admitted they were using the press as an intentional strategy to achieve their commonly agreed-upon objectives. CC ¶¶ 56, 65. They simultaneously, with all other 2016 Charter holders, boycotted a meeting that they

had each previously indicated they would attend where teams would have been individually represented. CC ¶¶ 59-61. And despite some teams indicating that they were prepared to sign-on to Charter terms, no teams entered into any Charter agreement with NASCAR during over two-and-a-half years of negotiation—which is longer than it took to create the entire 2016 Charter system from scratch. CC ¶¶ 4, 73. This provides far more than the required "facts indicating that the [counter] defendants acted 'similarly.'" *SD3*, 801 F.3d at 427.

The Counterclaim also provides substantial allegations of the "further circumstance[s]" or "plus factors" that courts routinely accept as showing concerted action. *Id.* at 424. To begin with, it is compelling that the parallel acts alleged "would probably not result from chance coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* It is implausible, for example, that representatives of fifteen separate teams would independently, but simultaneously, boycott a meeting that they were required by contract to attend and had accepted invitations to attend. The facts alleged are that the teams did this pursuant to an advance agreement. CC ¶¶ 59-61. Nor would it be in any team's individual self-interest, absent the existence of a conspiracy, to threaten to boycott NASCAR events, to decline to enter a Charter that they were independently willing to sign, or to wage a campaign to interfere with NASCAR's media-contract negotiations, the revenues of which are paid in part to Charter teams. *See* CC ¶¶ 8, 49, 55, 59-61, 65-67, 73. Each of these actions "would be attractive only if the [teams] acted collectively," which is further support that a conspiracy existed. *United States v. Apple*, 791 F.3d 290, 316 (2d Cir. 2015).[3]

---

[3]     Counterclaim Defendants' argument that each team had an independent desire to obtain better 2025 Charter terms, Mot. at 11, does nothing to undermine the existence of an agreement. *See Robertson*, 679 F.3d at 286 ("commonality of interest exists in every cartel").

The substantial "communications and meetings among conspirators" also support an inference of agreement because "they provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432. The very purpose of the Race Team Alliance and then the TNC was to present the "unified voice" of all race teams holding a 2016 Charter. CC ¶¶ 41, 50. And their written demands reflect that there had been discussion amongst teams regarding proposed 2025 Charter terms. *See, e.g.*, CC ¶¶ 50-54, 68-69, 72. Through the TNC and Race Team Alliance, Polk and others had multiple opportunities to collude through communications and meetings with co-conspirators. CC ¶¶ 49, 54, 55, 58. The reporting channels through those groups created readily accessible routes to facilitate collusion, as they provided "a basis for notifying alleged members of the conspiracy" and a way "to keep tabs on members." *Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33, 49 (1st Cir. 2013). And that is exactly what happened, as NASCAR has alleged. CC ¶¶ 8, 73.

The fact that Polk, 23XI, and others publicly professed that they wanted, and even required, collective action to achieve their desired contractual terms is also a compelling circumstance suggesting that the teams' similar actions were not mere happenstance. As alleged, "Polk and 23XI's other owners openly professed that they wanted to change NASCAR's economic model by demanding more money for the teams," rather than having "teams competing against each other (their horizontal competitors) for sponsorship dollars." CC ¶ 7. They also took to the media as a strategy to communicate their goals of collective action. *See, e.g.*, CC ¶¶ 56, 65. These factors "evaluated holistically" with the evidence alleged, are "sufficient to provide the 'more'" needed to adequately plead concerted action circumstantially. *Team Cam*, 2025 WL 1019262, at *7.

## C. Mr. Polk And 23XI's Arguments Have No Merit

Faced with insurmountable allegations of concerted activity, Counterclaim Defendants resort to arguments that ignore the actual allegations, contradict the pleaded facts, or argue contrary to established motion-to-dismiss and antitrust standards. Their arguments are meritless.

11

First, Polk and 23XI argue that there could be no conspiracy because NASCAR could have negotiated with teams directly "if NASCAR wanted to." Mot. at 10-12. The allegations are the exact opposite: NASCAR "sought to" and "attempted to" negotiate with teams one-on-one, CC ¶¶ 62, 72, but Polk, 23XI, and Front Row thwarted those efforts, in many ways, including coercing teams to "not break ranks." CC ¶¶ 72, 74, 89. There is no allegation that any of the financial terms that Polk, 23XI, and the Teams Negotiating Committee were demanding on behalf of all teams were altered in any way through individual negotiations. Instead, teams allegedly ready to accept an offer from NASCAR delayed and stuck to the conspiracy to only accept terms jointly advanced by the Teams Negotiating Committee. CC ¶¶ 73-74.[4] Counterclaim Defendants cannot obtain dismissal by presenting "contests surrounding the facts." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016); *see also Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009).

Counterclaim Defendants' counterfactual argument is legally wrong in any event. In *SD3 v. Black & Decker*, the Fourth Circuit rejected Counterclaim Defendants' exact argument, declaring that it is impermissibly "confusing 'plausibility' with 'probability'" to contend that defendants' "conduct must be deemed dissimilar at this stage because some licensing negotiations continued after the conspiracy formed." 801 F.3d at 427-28. It is "the agreement itself, not its performance," that is illegal; thus even "partial non-performance" does not preclude a finding of conspiracy. *United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979). Agreeing to commonly fixed terms even as a starting point for future discussions is sufficient to allege an illegal agreement under Section 1. *See Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132-33

---

[4]     Counterclaim Defendants' citation to NASCAR's answer statement that it "engaged in individual negotiations with certain teams to address their individual requests . . . while still negotiating with the teams negotiating collectively," does not show that any team agreed to deviate in any way from the teams' collective demands. Mot. at 7 (citing Doc. 58 ¶ 107).

(9th Cir. 1960); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (agreement on list price is a *per se* violation "even if most or for that matter all transactions occur at lower prices").

Counterclaim Defendants' citations to *Broadcast Music, Inc.* and *Columbia Broadcast Systems* do nothing to refute the above pleading standards. Mot. at 11-12. Those cases actually support NASCAR's arguments about the existence of an agreement, because the Supreme Court ruled that the challenged group licensing at issue in those cases "plainly involve concerted action in a large and active line of commerce." 441 U.S. 1, 10 (1979); *see also Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 207 (S.D.N.Y. 2014) (reviewing the same cases and concluding that they "were not decided on the basis of a lack of evidence of concerted action"); *Meredith Corp. v. SESAC, LLC*, 2011 WL 856266, at *13 (S.D.N.Y. Mar. 9, 2011) (finding allegations against group licensing practices "sufficient to state a claim for a § 1 violation" at motion-to-dismiss stage).[5]

Lastly, Counterclaim Defendants attempt to argue that no agreement is alleged, because the race boycott the teams threatened never materialized. Mot. at 12. That argument takes an impermissibly narrow view of the conspiracy alleged. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts," as Polk and 23XI seek to do here, "but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citation omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

---

[5]    To the extent Counterclaim Defendants rely on the "unreasonableness" analysis in those copyright licenses cases, that reliance invites error because those findings "were shaped by the evidence presented at trial," "none were decided at the pleading stage," and the cases involved defendants "operating under the terms of [antitrust] consent decrees." *Meredith Corp.*, 2011 WL 856266, at *12; *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 13, 24 (1979) (appellate court wrongly "ignored" the consent decrees). The Fourth Circuit has found reversible error from "look[ing] to summary judgment cases to define the relevant standards" for a motion to dismiss. *SD3*, 801 F.3d at 426.

308, 326 (2007) ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). The threat to boycott a NASCAR race was intended to intimidate NASCAR to negotiate only with the teams collectively, and to demonstrate leverage the teams have over NASCAR, all in furtherance of their ultimate goal of obtaining Charter terms that the teams collectively fixed. CC ¶ 87 (alleging Polk and others agreed to "pressure NASCAR to accept their collusive terms, including by . . . threatening boycotts of NASCAR events"); *see also id.* ¶¶ 8, 49, 65, 67. Counterclaim Defendants' argument seeks to improperly "'compartmentalize' the conspiracy," which is impermissible. *In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012).[6] In short, Counterclaim Defendants' arguments cannot overcome the abundant, well-pleaded allegations of agreements satisfying the first element of NASCAR's claim.

## II. COUNTERCLAIM DEFENDANTS' CONSPIRACY WAS ANTICOMPETITIVE

NASCAR satisfies the second element of its Section 1 claim—that the concerted action "imposed an unreasonable restraint of trade"—because the conspiracy that Polk, 23XI, and others implemented is the type of restraint that has "such a pernicious effect on competition" that it is *per se* unreasonable. *SD3*, 801 F.3d at 433. Thus, a full inquiry into the "net impact on competition" through a "rule of reason" analysis is not required at this stage, *Team Cam*, 2025 WL 1019262, at *10, but NASCAR's allegations would satisfy that standard as well.

### A. Mr. Polk, 23XI, And Front Row Engaged In *Per Se* Illegal Conduct

Polk and 23XI concede that "horizontal price-fixing" is "unlawful *per se*," Mot. at 13, and that is exactly what NASCAR alleges. As the Supreme Court has made clear, "price-fixing includes more than the mere establishment of uniform prices," and "the machinery employed by a

---

[6] If the teams agreed to boycott a NASCAR event, but that agreement ultimately fell apart, that is still an actionable agreement because "it is 'immaterial whether the agreements were ever actually carried out . . . or whether an effort was made to carry the object of the conspiracy into effect.'" *Plymouth Dealers*, 279 F.2d at 132 (quotation omitted).

combination for price-fixing is immaterial." *U.S. v. Socony-Vacuum*, 310 U.S. 150, 222-23 (1940). In other words, "[w]hen the term 'fix prices' is used, that term is used in its larger sense" to capture any "combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price." *Plymouth Dealers*, 279 F.2d at 132. Merely "tampering with price structures" is "price fixing" under the Sherman Act, *Socony-Vacuum*, 310 U.S. at 221-22, as is competitors agreeing on a "starting point" for price in their negotiations, *High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 656. And even agreeing on non-price factors that are "an inseparable part of the price," such as "credit terms," falls "squarely within the traditional per se rule against price fixing." *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 (1980).

The Counterclaim alleges at length how Polk, 23XI, Front Row, and others eliminated competition amongst themselves on the financial terms they would be willing to accept in the 2025 Charter, and instead jointly agreed upon those terms in order to drive them higher. *See* CC ¶¶ 50-82. The Counterclaim alleges, and the Counterclaim Defendants do not dispute, that they are "horizontal competitors." *See* CC ¶¶ 8, 41, 87. And they do not dispute (nor could they) that NASCAR alleges competitors joined together to demand collectively agreed-upon financial terms in the 2025 Charters, including the percentage of media revenues paid to Charter holders, the fixed payments to Charter holders (as compared to prize money available to other competitors), payments NASCAR sought to make to drivers (which teams viewed as competing with their own driver payments), and other terms. *See, e.g.*, CC ¶¶ 8, 52-54, 63, 64, 68, 69, 72, 75, 77, 82, 86.

NASCAR's allegations fall squarely within the cases finding price-fixing arrangements among competitors to be *per se* unreasonable. Counterclaim Defendants' conduct is akin to the *per se* illegal agreement in *Compact v. Metropolitan Government of Nashville & Davidson County*, where three suppliers of engineering services "agreed to band together" to "present a unified front

for negotiating contracts on projects" so as to "increase their bargaining power by eliminating competition between themselves." 594 F. Supp. 1567, 1569, 1577 (M.D. Tenn. Oct. 18, 1984). It is similar to allegations found to be *per se* illegal in *Team Cam v. Reliable Contracting*, where a trade association of asphalt suppliers "informed" its members they "should be demanding [] pass-through payments" in their contracts, and the suppliers subsequently did impose those pass-throughs on the plaintiff, which "necessarily raised" its costs to operate. 2025 WL 1019262, at *8, 13 (D. Md. Apr. 4, 2025). And it resembles the *per se* illegal agreement in *New York ex rel. Spitzer v. Saint Francis Hospital*, which granted summary judgment *for plaintiffs* against defendants' collusive "joint negotiation" tactics. 94 F. Supp. 2d 399 (S.D.N.Y. 2000). It is the archetypal price-fixing scenario where horizontal competitors conclude that their rivalry is causing their returns to be "too low and they consequently agreed and did take steps to improve the terms and conditions" upon which they would deal by presenting a fixed and unified front. *Sharon Steel Corp. v. Chase Manhattan Bank*, 88 F.R.D. 38, 43 (S.D.N.Y. 1980). This class of conspiracy "establishes an unreasonable restraint of trade without the need for further analysis," *Team Cam*, 2025 WL 1019262, at *11, and Counterclaim Defendants' arguments that their agreement "lacked anticompetitive effects . . . are simply irrelevant," and wrong. *SD3*, 801 F.3d at 433.

Counterclaim Defendants seek to avoid this conclusion by attacking the strawman argument that an attempted race boycott is not *per se* illegal. Mot. at 13-15. But that argument is just ignoring the actual price-fixing conspiracy NASCAR alleged—the threatened boycott was to gain leverage in furtherance of the overarching conspiracy. CC ¶¶ 8, 49, 65, 67, 74. It is no different from the *per se* illegal conspiracy that horsemen groups perpetrated in *Churchill Downs Inc. v Thoroughbred Horsemen's Group*, when they collectively "withheld their permission for the racetracks" to sell off-track betting rights on their races in order to "apply some financial

leverage against the racetracks" to obtain their preferred "allocation of the revenues" from the sale of those rights. 605 F. Supp. 870, 873, 890 (W.D. Ky. 2009). The court held that "[e]vidence of a group boycott used to effectuate a price-fixing arrangement is sufficient to support a *per se* violation." *Id.* at 890; *see also Cloverleaf Enters. v. Md. Thoroughbred, Horsemen's Ass'n*, 730 F. Supp. 2d 451, 464 (D. Md. 2010) (finding similar horsemen group conspiracy was "synonymous with anticompetitive restraints that courts have identified as *per se* violations"). That is precisely what NASCAR alleged, including the teams' actual boycott of a meeting that would have facilitated direct negotiations with representatives of each team. *See* CC ¶¶ 8, 49, 59-62, 65, 67, 74. Counterclaim Defendants cannot avoid the allegations by improperly attempting to "'compartmentalize' the conspiracy," *Processed Egg Prods.*, 902 F. Supp. 2d at 710, or to "dismember[] it and view[] its separate parts," *Cont'l Ore*, 370 U.S. at 699.

Counterclaim Defendants' argument that courts lack sufficient "experience condemning as anticompetitive an agreement by sports teams to offer joint negotiations" regarding "terms for competing in a sports league" is also flawed in multiple ways. Mot. at 17. First, it is premised on a baffling mischaracterization that the allegations contend the teams merely "offer[ed] joint negotiations," *id.*, rather than confronting the actual allegations that Polk, 23XI, and Front Row coerced joint negotiations and threatened potential defectors to "not break ranks." CC ¶ 73. Second, the argument is built on opinions entered after considering actual evidence at summary judgment or even after trial,[7] which were evaluating either an "economically integrated joint venture," *Texaco*, 547 U.S. at 3, or a product where the challenged constraints were "essential if

---

[7]    *See Broad. Music*, 441 U.S. at 6 (reviewing case "[a]fter an 8-week trial"); *Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers*, 744 F.2d 917, 919 (2d Cir. 1984) (ruling "[a]fter a bench trial"); *Matsushita Elec. Indust. Co., Ltd. v. Cinram Intern., Inc.*, 299 F. Supp. 2d 370, 375, 378-79 (D. Del. 2004) (ruling on summary judgment after "[v]iewing the evidence"); *Am. Needle v. NFL*, 560 U.S. 183, 188 (2010) (same); *Texaco v. Dagher*, 547 U.S. 1, 4 (2006) (same).

the product is to be available at all," *Am. Needle*, 560 U.S. at 203. Those are both factual arguments (inappropriate for a motion to dismiss), and none of those factual scenarios is alleged here. The allegations are the opposite. Each co-conspirator is alleged to have been a "horizontal competitor" with the others—there is no economic integration alleged. CC ¶¶ 7, 9, 87. Even 23XI and Front Row admit they are "not the members of a joint venture operating a sports league." Doc. 107 ¶ 97. Furthermore, unlike all of the cases Counterclaim Defendants cite from joint venture sports leagues, none of the agreements among teams here were "necessary" for the NASCAR Cup Series "to be available at all." As NASCAR alleged, it operated for over 65 years without any Charter agreement at all, it still operates two successful racing circuits without any Charter agreements, and teams can participate in the Cup Series today without holding a Charter. *See* CC ¶¶ 3, 36. Counterclaim Defendants push the cited post-discovery sports-league cases far beyond their limits: the Supreme Court held in that line of cases that "not all aspects of elaborate interleague cooperation are necessary to produce a game," participating in a sports league "does not mean that cooperation amongst [] teams is immune from §1 scrutiny," and "[m]embers of *any cartel* could insist that their cooperation is necessary to produce the 'cartel product.'" *Am. Needle*, 560 U.S. at 199 n.7 (2010) (emphasis added). As the authority NASCAR has cited shows, joint negotiations are far from immune from *per se* liability, *see supra* pp.15-17, and "the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Arizona v. Maricopa Cnty. Med.*, 457 U.S. 332, 349 (1982).

In advancing its flawed arguments, Polk and 23XI even invite the Court to rely upon an authority that has been expressly denounced by its own authors as unreliable. Polk and 23XI argue that the Department of Justice and Federal Trade Commission "Antitrust Guidelines for Collaborations Among Competitors," in an inapplicable discussion about joint ventures, somehow

supported that their non-joint venture price-fixing may be "not only benign but procompetitive." Mot. at 16. They fail to disclose that the agencies that authored those Guidelines withdrew them in 2024 after concluding that they "do not reflect" prevailing law, are based on "outdated" conceptions of the "competitive implications of corporate collaborations," and "no longer provide reliable guidance."[8] Even those withdrawn Guidelines noted that "labeling an arrangement a 'joint venture' will not protect what is merely a device to raise price or restrict output."

### B. The Conspiracy Is Also Illegal Under A Rule-Of-Reason Analysis

Because the alleged conspiracy is *per se* illegal, the Court need not apply the "rule of reason" analysis in search of anticompetitive effect. *Team Cam*, 2025 WL 1019262, at *10; *SD3*, 801 F.3d at 433. Nonetheless, the allegations are sufficient to show such effects through evidence of "an actual adverse effect on competition" or through "sufficient market power to cause an adverse effect on competition." *United States v. Charlotte-Mecklenburg Hosp.*, 248 F. Supp. 3d 720, 728 (W.D.N.C. 2017).

### 1. NASCAR Alleges Direct Evidence Of Anticompetitive Effect

"To prove an unreasonable restraint through evidence of direct harm, a plaintiff must offer 'proof of actual detrimental effects,'" *id.*, such as "increased prices, reduced output, and reduced quality." *In re Mission Health Antitrust Litig.*, 2024 WL 759308, at *9 (W.D.N.C. Feb. 21, 2024).[9] Repeatedly, the Counterclaim alleges facts showing that, as a result of Polk, 23XI, and others' collective agreement to adhere to a fixed set of terms, the Counterclaim Defendants "were successful in obtaining concessions from NASCAR" within the 2025 Charter, including to

---

[8]    U.S. Dep't of Justice & FTC Withdraw Guidelines for Collaboration Among Competitors (Dec. 11, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/v250000collaborationguidelines withdrawalstatement.pdf.

[9]    The Counterclaim Defendants acknowledge that "it is possible for a Section 1 plaintiff to alternatively prove a rule of reason violation with direct evidence of anticompetitive effects." Mot. at 18 (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)).

"increase the percentage of revenue to the teams by approximately 25%." CC ¶ 63; *see also* CC ¶ 75. Their collusive conduct "obtained Charter Agreements that contained more beneficial terms for race teams than would have been obtained in the absence of collusion," including "financial floors" that provided guaranteed payments for merely holding a Charter, at the expense of compensation that incentivizes a higher-quality racing event. CC ¶¶ 76-77. A twenty-five percent increase in payout alone is far beyond what is required to show anticompetitive effects directly at the pleading stage. *Toys 'R' Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (finding "steps to prevent" price decline "through coordination of action among competitors" was "sufficient proof of actual anticompetitive effects that no more elaborate market analysis was necessary").

### 2. The Conspirators Had Market Power In A Relevant Market

It is not necessary for NASCAR to allege a relevant market to support the likelihood of anticompetitive effects because NASCAR has shown that the Counterclaim Defendants' conduct was *per se* illegal, and has also shown direct evidence of anticompetitive effects, each of which obviates the market-drawing exercise. *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). Nonetheless, the co-conspirators plainly had market power in a relevant market.

The Counterclaim Defendants' illegal conduct constitutes an unreasonable restraint of trade in the market for entry of cars into NASCAR Cup Series races in the United States, and any other location where a Cup Series race is held. CC ¶ 79. As an event promoter, NASCAR Cup Series races must feature NASCAR Cup Series cars. CC ¶ 40. Even Plaintiffs recognize this. Doc. 107 ¶ 13. And the conspiracy that Polk, 23XI, and Front Row orchestrated included agreements on behalf of the teams that then possessed the vast majority of those cars, representing all 16 teams holding Charters covering 36 of the 40 race starting positions that existed prior to 2025. CC ¶ 53.

Counterclaim Defendants' criticisms of the relevant market alleged provide no basis to dismiss the Counterclaim.[10]  Where market definition is necessary, courts rarely grant motions to dismiss for failure to plead a relevant product market because it is a "deeply fact-intensive inquiry." *See Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).  Pre-discovery dismissals "remain relatively rare" and are limited to "glaring deficiencies," such as an "unreasonably and implausibly narrow" definition, or a "contradictory and vague delineation."  *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011) (citation omitted).  Counterclaim Defendants advance no such arguments and instead simply state that the definition is "conclusory."  *See* Mot. at 18.  Counterclaim Defendants do not identify any product that has been artificially excluded from the market alleged, or any contradiction in the delineation, which are issues that were present in all of the authority they rely on.  They just complain that it is simple.  That is not enough.

It is also inexplicable how Counterclaim Defendants contend the alleged market is inadequate, while they are simultaneously pursuing claims based on a relevant market of "premier stock car racing teams," with "premier stock car racing" being limited to only "NASCAR's Cup Series."  *See* Doc. 107 ¶¶ 119, 121.  Although NASCAR maintains that Plaintiffs' relevant market is legally flawed, and the options available to buyers and sellers are not necessarily symmetrical, Counterclaim Defendants cannot explain how NASCAR's alleged market can be dismissed, if Plaintiffs' market is allowed to go forward.

## III.  THE ILLEGAL CONSPIRACY CAUSED NASCAR ANTITRUST INJURY

Lastly, Counterclaim Defendants contend that NASCAR inadequately alleges "antitrust injury," Mot. at 20-23, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the counter] defendants' acts unlawful," *Novell, Inc. v.*

---

[10]     Counterclaim Defendants challenge the specificity of the market allegations, but do not argue that the co-conspirators lacked power in the market alleged.  *See* Mot. at 17-18.

*Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007).[11] But the Counterclaim easily satisfies this standard where NASCAR alleges that, but for the conspiracy, NASCAR would have paid less to the co-conspirators through the terms of the 2025 Charters. *See* CC ¶ 76 ("The Counterclaim Defendants also obtained Charter Agreements that contained more beneficial terms for race teams than would have been obtained in the absence of collusion, including terms relating to duration of the Charters and financial floors"); CC ¶ 63 (alleging Polk and the Teams Negotiating Committee "were successful in obtaining concessions from NASCAR" during their collusive negotiations, including "that NASCAR agreed to increase the percentage of revenue to the teams by approximately 25%"); *see also id.* ¶ 75. "[B]eing forced to pay supra-competitive prices as a result of the defendants' anti-competitive conduct is an injury plainly of the type the antitrust laws were intended to prevent." *Team Cam*, 2025 WL 1019262, at *12 (cleaned up) (quotation omitted); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (same); *Churchill Downs*, 605 F. Supp. 2d at 890 (same).

Counterclaim Defendants attempt to argue that the Court's preliminary injunction findings resolved, for all purposes, that NASCAR experienced no harm. Mot. at 21. That argument misinterprets the antitrust injury standard, the motion-to-dismiss standard, and the Counterclaim allegations. The Court's prior findings were entered under different legal standards, namely whether, for purposes of deciding a preliminary injunction, the asserted harm from an injunction would be "irreparable," not merely a "monetary loss." Doc. 89 at 9 n.5. A very different standard applies here. Moreover, the Court did not have the benefit of NASCAR's Counterclaim allegations, accepted as true, at the preliminary injunction phase. Counterclaim Defendants'

---

[11] Antitrust injury is a component of the "antitrust standing" requirement, but Counterclaim Defendants do not challenge the remaining elements of the standing doctrine, which relate to "the directness or remoteness of the plaintiff's alleged anti-trust injury." *Novell*, 505 F.3d at 311.

position that the Charter terms "on balance" are "beneficial" is akin to arguing that the financial terms are "reasonable," which the Supreme Court has long rejected as incapable of overcoming antitrust injury when the claims allege a conspiracy to interfere with competitive pricing mechanisms. *See, e.g.*, *United States v. Trenton Potteries*, 273 U.S. 392, 396 (1927) ("[I]t does not follow that agreements to fix or maintain prices are reasonable and therefore permitted by the statute, merely because the prices themselves are reasonable."). The fact of paying prices that "no longer reflect ordinary market conditions" due to "a conspiracy" alone is sufficient to assert "injury of the type the antitrust laws were intended to prevent and that flows from which makes defendants' acts unlawful." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).

Counterclaim Defendants' arguments regarding the harm of their targeted campaign at NASCAR's media-contract negotiations are also misdirected. Mot. at 22. They rely principally on their characterization that, despite their conspiratorial efforts, NASCAR entered into a "record" high media contract. *Id.* However, "[t]he question is not what the profit was, but how it got where it was, and what it would have been" in the absence of Counterclaim Defendants' collusive conduct. *Plymouth Dealers*, 279 F.2d at 133. NASCAR alleges that media deal was harmed through Counterclaim Defendants' conspiracy to eliminate competition amongst themselves, CC ¶¶ 67, 76, and whether "experts will be able to measure the difference" between the achieved value of that deal and the value that "would have prevailed but for the antitrust violations remains to be seen," but should not be decided on a motion to dismiss. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992 (9th Cir. 2000).[12]

---

[12] Counterclaim Defendants' attempt to evaluate only one effect of their broader conspiracy in isolation overlooks the Court's obligation to view the allegations holistically. *See supra* p.13.

## IV. THE MOTION TO STRIKE IS PROCEDURALLY IMPROPER AND BASELESS

In a motion that was improperly appended as an add-on to the end of their motion to dismiss, Counterclaim Defendants seek to apply Federal Rule of Civil Procedure 12(f) to obtain the equivalent of summary judgment on NASCAR's prayer for injunctive relief. *See* Mot. at 23-25. Mr. Polk and 23XI cite no instance when a court has utilized Rule 12(f) to strike a request for injunctive relief at the pleading stage, and there is no basis to do so here.

As this Court has correctly recognized, "[m]otions to strike are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy," and thus "are to be granted infrequently." *F.T.C. v. Cmty. Health Sys.*, 2024 WL 2034572, at *1 (W.D.N.C. Apr. 4, 2024) (Bell, J.). These "motions are denied 'unless the allegations attacked have no possible relation to the controversy and may prejudice the other party.'" *Murray Energy Corp. v. McCarty*, 2014 WL 4656221, at *7 (N.D.W. Va. Sept. 16, 2024) (quotation omitted). "Any doubt" regarding the application of Rule 12(f) "must be decided in favor of the non-movant." *Lane v. Endurance Am. Specialty Ins.*, 2011 WL 1343201 at *4 (W.D.N.C. Apr. 8, 2011).

Counterclaim Defendants' attempted use of a Rule 12(f) motion to strike a prayer for injunctive relief is entirely improper. Where the "Court has the authority to grant injunctive relief," the "argument as to the scope of the relief is simply premature at this point in the proceedings." *Murray Energy*, 2014 WL 4656221, at *7; *Simba v. Fenty*, 754 F. Supp. 2d 19, 23 (D.D.C. 2010) ("[A] defendant's motion to strike a prayer for relief is premature if such relief is provided by law."). There can be no dispute that injunctive relief is available to a prevailing private antitrust plaintiff. *See* 15 U.S.C. § 26. And as the Court has ruled in this very case, "the Court has broad discretion to create an injunction based on the unique circumstances of this case." Doc. 89 at 4. It is thus "premature" and unfounded to seek to entirely foreclose a prayer for injunctive relief, before the party seeking that relief has had any opportunity to present evidence in its support,

24

because "[w]hether it might be appropriate will depend on the proof presented." *Horn v. Jones*, 2015 WL 3607012, at \*12 (S.D. Fla. May 8, 2015) (denying motion to strike injunctive relief).[13]

When, after trial, the jury finds in NASCAR's favor on its Counterclaim, it would be well within the Court's broad discretion to seek to mitigate the harm caused by the Counterclaim Defendants by issuing an injunction "to grant such relief as is necessary to restore competition," as included in NASCAR's Prayer for Relief. CC at Prayer for Relief (c). That includes the option of eliminating the guaranteed entry that is tied to payouts corrupted by Counterclaim Defendants' price-fixing. This form of injunctive relief follows directly from both the Counterclaim that NASCAR is raising, as well as the claims that 23XI and Front Row bring in their affirmative case—both of which allege that certain terms in the 2025 Charters arise from antitrust violations. As there can be "no doubt that illegal promises will not be enforced in cases controlled by federal law," *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982), elimination of guaranteed entry may be appropriate relief, if either side prevails in proving the 2025 Charters were the product of an antitrust violation. That is a question for a later day, not to be decided on the pleadings.

\*     \*     \*

For the foregoing reasons, NASCAR respectfully requests that Counterclaim Defendants Polk and 23XI's motions be denied, or in the alternative that the Court permit NASCAR leave to amend the concurrently filed proposed Amended Counterclaim.

---

[13] None of the authorities Counterclaim Defendants cite even hint that such a remedy is appropriate. The only two authorities they muster that involved injunctions were both issued after merits trials, and did not involve Rule 12(f). *See* Mot. at 25 (citing *Melendres v. Arpaio*, 784 F.3d 1254, 1258 (9th Cir. 2015) (permanent injunction issued after bench trial), and *PBM Prods. v. Mead Johnson & Co.*, 639 F.3d 111, 116 (4th Cir. 2011) (injunction issued after jury trial)). The cases that Counterclaim Defendants invoke that do apply Rule 12(f) had nothing to do with injunctions, and instead dealt primarily with factual allegations that were "inflammatory and scandalous," *Agbara v. Prince George's Cnty., Pub. Sch.*, 2020 WL 7425298, at \*10 (D. Md. Dec. 18, 2020), which is the typical purview of Rule 12(f), but has no application here.

Dated: April 16, 2025

Respectfully submitted,

By:   */s/ Christopher Yates*
      Christopher S. Yates*
      **LATHAM & WATKINS LLP**
      505 Montgomery Street, Suite 2000
      San Francisco, CA 94111
      Telephone: (415) 395-8240
      Facsimile: (415) 395-8095
      chris.yates@lw.com

      Lawrence E. Buterman*
      **LATHAM & WAKINS LLP**
      1271 Avenue of the Americas
      New York, NY 10020
      Telephone: (212) 906-1200
      Facsimile: (212) 751-4864
      lawrence.buterman@lw.com

      Anna M. Rathbun*
      David L. Johnson*
      Christopher J. Brown*
      **LATHAM & WATKINS LLP**
      555 Eleventh Street, NW, Suite 1000
      Washington, DC 20004
      Telephone: (202) 637-2200
      Facsimile: (202) 637-2201
      anna.rathbun@lw.com
      david.johnson@lw.com
      chris.brown@lw.com

      Tricia Wilson Magee (N.C. Bar No. 31875)
      **SHUMAKER, LOOP, & KENDRICK, LLP**
      101 S Tryon Street, Suite 2200
      Charlotte, NC 28280
      Tel: 704-945-2911
      Fax: 704-332-1197
      tmagee@shumaker.com

      * Admitted *pro hac vice*

      *Counsel for Defendants and Counterclaim Plaintiff*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of artificial intelligence embedded in the standard on-line legal research sources, such as Westlaw, Lexis, FastCase, and Bloomberg.

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 16th day of April, 2025.

*/s/ Christopher Yates*

2