| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. <br><br> NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. | No. 3:24-cv-886-KDB-SCR |

**COUNTERCLAIM PLAINTIFF'S OPPOSITION
TO COUNTERCLAIM DEFENDANT
FRONT ROW MOTOTORSPORT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...............................................................................................................1

II. BACKGROUND .................................................................................................................1

III. LEGAL STANDARD ..........................................................................................................4

IV. ARGUMENT .......................................................................................................................4

    A. The Counterclaim Plausibly Alleges That Front Row Joined The Conspiracy ...............................................................................................................4

    B. NASCAR's Counterclaim Does Not Include Impermissible Group Pleading......................................................................................................................9

    C. Front Row's Alternative Arguments For Dismissal And Striking NASCAR's Requested Relief Fail For The Same Reasons That 23XI And Curtis Polk's Motion Fails ...................................................................................10

V. CONCLUSION..................................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................... 4

*Austin Legal Video, LLC v. Deposition Sols., LLC*,
  2024 WL 5184485 (W.D. Tex. July 19, 2024) ........................................................ 10

*Carrado v. Daimler AG*,
  2018 WL 4565562 (D. Colo. Sept. 24, 2018) .......................................................... 10

*Evergreen Partnering Grp. Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013) ......................................................................................... 8

*Haley Paint Co. v. E.I. Dupont De Nemours and Co.*,
  804 F.Supp.2d 419 (D. Md. 2011) ............................................................................. 7

*In re Int. Molded Doors Antitrust Litig.*,
  2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ........................................................... 6

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019) ..................................................................... 10

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  2019 WL 6977405 (E.D. Va., Dec. 20, 2019) .......................................................... 9

*Meredith Corp. v. SESAC LLC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) ........................................................................... 9

*Mr. Dee's Inc. v. Inmar, Inc.*,
  2022 WL 825995 (M.D.N.C. Mar. 18, 2022) ........................................................... 5

*Power Conversion, Inc. v. Saft Am., Inc.*,
  672 F. Supp. 224 (D. Md. 1987) ................................................................................ 5

*Robertson v. Sea Pines Real Est. Companies, Inc.*
  679 F.3d 278 (4th Cir. 2012) ...................................................................................... 5

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) .......................................................................... 5, 6, 7, 8

*Team Cam, LLC v. Reliable Contracting Co., Inc.*,
  2025 WL 1019262 (D. Md. Apr. 4, 2025) ................................................................. 7

*U.S. v. Gen. Motors Corp.*,
   384 U.S. 127 (1966) ...........................................................................................................7

*Wordlaw v. Enter. Leasing Co. of Chicago, LLC*,
   2020 WL 7490414 (N.D. Ill. Dec. 21, 2020) ..........................................................................10

## RULES

Fed. R. Civ. P. 8(a)(2) ....................................................................................................................4

Fed. R. Civ. P. 12(b)(6) ..................................................................................................................4
*U.S. v. Gen. Motors Corp.*,
   384 U.S. 127 (1966) ...........................................................................................................7

*Wordlaw v. Enter. Leasing Co. of Chicago, LLC*,
   2020 WL 7490414 (N.D. Ill. Dec. 21, 2020) ..........................................................................10

**RULES**

Fed. R. Civ. P. 8(a)(2) ....................................................................................................................4

Fed. R. Civ. P. 12(b)(6) ..................................................................................................................4

## I. INTRODUCTION

Front Row's motion to dismiss attacks a strawman by mischaracterizing NASCAR's counterclaim as merely alleging that Front Row was a member of the Race Team Alliance ("RTA"). But that is not what NASCAR alleged. Rather, NASCAR's counterclaim alleges Front Row agreed to enter a conspiracy among horizontal competitors to use their collective leverage to obtain more favorable terms than any team would have been able to obtain individually. That 23XI and Front Row's co-conspirators were also members of the RTA does not insulate Front Row from liability.

Front Row joined the unlawful conspiracy with 23XI and other co-conspirators at least as early as February 2022 when it agreed with other race teams to jointly negotiate with NASCAR through the Teams Negotiating Committee ("TNC"). Front Row agreed with its co-conspirators about the prices and terms to seek from NASCAR and signed onto letters making collective demands. And Front Row sought to prevent other teams from defecting from that conspiracy and signing a Charter Agreement. Front Row further agreed to and participated in both threatened and actual boycotts of NASCAR events. NASCAR has more than sufficiently alleged Front Row's agreement to join this illegal conspiracy, and discovery to date confirms as much. Accordingly, Front Row's motion should be denied.[1]

## II. BACKGROUND

Front Row is a motorsports team that competes in NASCAR's Cup Series and Truck Series. Doc. No. 111 ¶ 47. Front Row, like every team that races in the Truck Series, competes in the

---

[1] NASCAR's counterclaim plainly states a claim, but discovery has only confirmed that NASCAR's counterclaim understates the involvement of Front Row in the conspiracy and the extent of the unlawful agreements reached. NASCAR's motion for leave to amend (and proposed amended counterclaims) lays out the evidence found in Front Row and 23XI's document productions *after* NASCAR filed its counterclaim confirming the *per se* unlawful conspiracy.

Truck Series without having a Charter Agreement. But in the Cup Series, Front Row has multiple Chartered cars that compete to win against an array of Charter and Open Teams in each race. *Id.* Front Row's competition with 23XI and other members of the RTA extends beyond each Cup Series race and includes competition for drivers, pit crews, engineers, technology, sponsors, and a number of other fronts. *Id.* ¶ 41. It also includes competition for Charters themselves, with Front Row having agreed to spend tens of millions of dollars to buy a third Charter in 2024, prior to the final 2025 Charter being negotiated. *Id.* ¶ 47. This is because Charters are valuable; they guarantee money from NASCAR and also guarantee entry into every Cup Series race, among other terms. *Id.* ¶¶ 44-45. Front Row's appearance in each race and its success on the track against other teams helps Front Row compete for sponsorship dollars. *Id.* ¶ 48. All of this competition is beneficial.

But when it came to competition with other teams for NASCAR proceeds and other terms under the Charter Agreements, Front Row decided to stop competing and instead agreed with its competitors to seek their goals collectively. *Id.* ¶ 51. Specifically, Front Row agreed with 23XI and their co-conspirators on the price demanded from NASCAR and the way those proceeds would be allocated amongst the teams.[2] That constitutes a *per se* violation of the antitrust laws.

Front Row's decision to delegate its decision-making to the conspiracy became obvious in February 2022, when Front Row communicated to NASCAR that it had agreed to join together with other NASCAR Cup Series teams to negotiate for what became the 2025 Charter Agreement. *Id.* ¶ 50. Front Row and its co-conspirators elected to delegate their negotiating authority to the

---

[2] The proceeds that a team receives from NASCAR pursuant to a Charter Agreement depend on the total award pool and the allocation of that total award pool. Specifically, those funds are awarded to NASCAR Charter teams for (i) performance in a particular race (Race Purse); (ii) overall performance in a particular year (Year-End Point Fund); (iii) overall performance over a number of seasons (Historical Owner's Plan) and (iv) payments merely for being a Charter member and committing to race in each Cup race (Fixed Owner's Plan). *Id.* at ¶ 44.

TNC, which included Curtis Polk as one of the primary negotiators. *Id.* ¶¶ 50-51. As part of this agreement, Front Row agreed with its other co-conspirators about what they would collectively demand from NASCAR. *Id.*

Front Row reaffirmed this decision in June 2022, when it agreed as one of "16 teams holding 36 Charters at the time" to the terms that the TNC would present to NASCAR. *Id.* ¶ 53. If NASCAR accepted the terms that Front Row and its co-conspirators had agreed on, the TNC represented that all teams (i.e., including Front Row) would be "all in." *Id.* After proposing these initially agreed terms, the teams further agreed to other terms to propose and to engage in collective conduct to leverage their power against NASCAR. For example, Front Row, 23XI and others threatened to boycott qualifying races for at least one NASCAR Cup Series race. *Id.* ¶ 67. They also interfered with NASCAR's media rights negotiations. *Id.* ¶ 66-67.

Front Row's decision to agree on terms with its competitors and demand those from NASCAR was successful. *Id.* ¶ 75. Front Row and its co-conspirators increased the total payout that they received from NASCAR by about 25% as compared to the 2016 Charter Agreement. *Id.* ¶ 63. Having achieved NASCAR's concession to increase the total payout to the teams, Front Row and its co-conspirators set out deciding how to allocate that money among the teams. On April 25, 2024, the TNC presented to NASCAR what Front Row and its co-conspirators had agreed to regarding the allocation of pool money. *Id.* ¶ 68.

Front Row's decision to continue to agree to proposed terms with its co-conspirators and leverage their joint power to demand them from NASCAR continued. On July 9, 2024, the TNC sent NASCAR proposed revisions to the 2025 Charter Agreement, which had "the support of all of the Teams." *Id.* ¶ 69. Again, the TNC identified that if NASCAR accepted the Teams' collectively-agreed terms, then "each [team] would sign onto the terms as reflected herein." *Id.*

3

When some co-conspirators considered signing the 2025 Charter Agreement before all teams agreed to do so, Front Row (alongside 23XI and Curtis Polk) threatened those teams "not to break ranks." *Id.* ¶ 73.

The goal of Front Row's collusion was simple: Front Row sought to achieve "a larger share of the NASCAR pie" than it could have otherwise achieved but for the collusion. *Id.* ¶¶ 75, 87.

## III. LEGAL STANDARD

"[T]he Federal Rules of Civil Procedure set a high threshold for a court to dismiss claims at the outset of a lawsuit." Doc. No. 104 at 1-2. Under Rule 8(a)(2), "a complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 2 (quoting Fed. R. Civ. P. 8(a)(2)). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) assesses "only whether a claim is stated; 'it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Id.* at 2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## IV. ARGUMENT

### A. The Counterclaim Plausibly Alleges That Front Row Joined The Conspiracy

Front Row argues that the counterclaim against it must be dismissed because membership in the RTA alone is insufficient to show that it joined a conspiracy with Curtis Polk, 23XI, and other co-conspirators to fix prices and other terms favorable to the teams. Doc. No. 116-1 at 3. But NASCAR alleged far more than mere membership in the RTA. NASCAR alleged that Front Row entered into a conspiracy with other members of the RTA to fix prices and demand more favorable Charter terms in violation of Section 1 of the Sherman Act. Doc. No. 111 ¶¶ 50-51, 53, 63, 67-69, 73, 75, 87 ("In order to make [the TNC's] unified proposals, Polk, 23XI, Front Row, and others agreed upon desired contract terms."). In so doing, Front Row participated in a scheme to eliminate competition among the teams and fix prices and other contractual terms. *Id.* ¶ 75.

4

"The essence of a § 1 claim is concerted action." *Mr. Dee's Inc. v. Inmar, Inc.*, 2022 WL 825995, at *5 (M.D.N.C. Mar. 18, 2022) (citation and quotation marks omitted). A plaintiff adequately alleges a "contract, combination, or conspiracy" by plausibly alleging either direct or circumstantial evidence. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015). NASCAR has done both here.

Courts find direct evidence of a Section 1 violation where "concerted conduct is both plainly documented and readily available." *Robertson v. Sea Pines Real Est. Companies, Inc.* 679 F.3d 278, 290 (4th Cir. 2012). NASCAR alleged that Front Row communicated and signed letters identifying terms that it demanded from NASCAR in concert with other teams. Doc. No. 111 ¶¶ 50-52, 59. Examples of those admissions of express agreement include a joint communication representing all teams in February 2022, *id.* ¶ 50, a June 2022 proposal "agreed upon by all 16 teams," *id.* ¶ 53, an April 2024 proposal, *id.* ¶ 68, a July 2024 proposal submitted with "the support of all of the Teams," *id.* ¶ 69, an August 2024 email sent on behalf of all teams identifying "key issues" and explaining those were terms the teams "[a]s a group" were "eager to sign," *id.* ¶ 72, and others. *id.* ¶¶ 50-82. Prior to making those "unified proposals, Polk, 23XI, Front Row, and others agreed upon desired contract terms" to collectively demand. *Id.* ¶ 51. NASCAR also alleged that the TNC presented offers to NASCAR on behalf of Front Row (and all the co-conspirator teams). *Id.* ¶ 53. None of these allegations requires any inference to determine that a conspiracy existed and that Front Row was a member of that conspiracy. *See Robertson*, 679 F.3d at 290; *Power Conversion, Inc. v. Saft Am., Inc.*, 672 F. Supp. 224, 225 (D. Md. 1987) (denying motion to dismiss when plaintiff offered direct evidence that conspirators agreed on prices that multiple bidders would submit to a buyer).

With respect to circumstantial evidence, NASCAR has more than plausibly alleged both parallel conduct and plus factors. To plausibly allege parallel conduct, NASCAR must plead facts indicating that Front Row and its co-conspirators acted "similarly." *SD3*, 801 F.3d at 427. Here, that is easily met because NASCAR's counterclaim makes clear that Front Row and its co-conspirators made the same demands of NASCAR not just at the same time, but in the very same correspondence. Doc. No. 111 ¶¶ 69, 72, 75. Front Row simultaneously with all other Charter holders boycotted a meeting that they were contractually obligated to attend under the terms of the 2016 Charter and which each had previously indicated they would attend. *Id.* ¶¶ 59-61. Further, not a single team signed a Charter Agreement over two years of negotiations despite NASCAR making multiple Charter offers. *Id.* ¶¶ 63, 70, 72. This was because (1) Front Row and others threatened teams not to sign, *id.* ¶ 73, and (2) the teams had agreed that this would put increased leverage on NASCAR, *id.* ¶ 74-75. The fact that all but two members of the conspiracy did ultimately sign the Charter Agreement in September 2024 does not somehow negate the years of parallel conduct by Front Row and its co-conspirators (and the harm that parallel conduct caused). Front Row and its co-conspirators acted "similarly."

The plus factors NASCAR alleges further support the claimed conspiracy. In this Circuit, plus factors must be "considered in conjunction with other surrounding circumstances." *SD3*, 801 F.3d at 425. "The circumstantial evidence need not compel an inference of conspiracy, but need only render the allegations plausible." *In re Int. Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *4 (E.D. Va. Sept. 18, 2019) (cleaned up); *U.S. v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966) ("[I]t has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy—certainly not where, as here, joint and collaborative action was pervasive in the initiation, execution, and fulfillment of the plan."). NASCAR alleges the following plus factors:

6

(1) "the 'who, what, when, and where' of the claimed antitrust misconduct" (i.e., traditional circumstantial evidence of a conspiracy); (2) the "why" or "motivation for common action"; and (3) "allegations of communications and meetings among conspirators," which can provide "the means and opportunity to conspire." *See SD3*, 801 F.3d at 430-32; *see also Team Cam, LLC v. Reliable Contracting Co., Inc.*, 2025 WL 1019262, at *9 (D. Md. Apr. 4, 2025).

**The who, what, when, and where**. Antitrust claims, like NASCAR's, "that include detailed fact allegations as to the 'who, what, when and where' of the claimed antitrust misconduct not surprisingly survive dismissal." *SD3*, 801 F.3d at 430. Starting at least as early as 2022 (the 'when') Front Row joined forces with the other Counterclaim Defendants and unnamed co-conspirators—together, the 'who'—and agreed to make (and did make) unified proposals to NASCAR regarding desired contract and price terms (the 'what' and 'where'). Doc. No. 111 ¶ 51. And, in April 2023, Front Row helped organize a collective boycott of a contractually obligated meeting with NASCAR. *Id.* ¶ 49. These actions taken by Front Row present more than enough to state a claim alleging Front Row's conscious effort to participate in an unlawful conspiracy.

**The why**. "Motivation for common action is a key circumstantial plus factor." *SD3*, 801 F.3d at 431 (cleaned up). NASCAR has explained "why" Front Row joined the conspiracy—to achieve "a larger share of the NASCAR pie" than it would have absent collusion. *Id.* ¶ 75. Front Row and its co-conspirators believed that by leveraging their collective market power, they could achieve higher prices and better Charter terms. *Id.* ¶¶ 55, 67, 75.

**Communications and meetings among conspirators**. "Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432; *see also Haley Paint Co. v. E.I. Dupont*

7

*De Nemours and Co.*, 804 F.Supp.2d 419, 426 (D. Md. 2011) (denying motion to dismiss because alleged conspirators had "opportunities to agree and collude in the form of trade association meetings"). That is exactly what NASCAR alleges. Front Row had multiple opportunities to collude through communications and meetings with its co-conspirators, including RTA meetings and other events. Doc. No. 111 ¶¶ 49, 54, 55, 58. Further, these meetings were private, consisting of *only* NASCAR Cup Series Chartered race teams and their trade organization, providing a particularly strong opportunity to collude.

Additionally, Front Row's membership in the RTA provides further circumstantial support as a plus factor that Front Row did join the conspiracy. *See Evergreen Partnering Grp. Inc. v. Pactiv Corp.*, 720 F.3d 33, 49 (1st Cir. 2013) (at the motion to dismiss stage, participation in an industry or trade association—such as the RTA— "may serve as practices facilitating collusion as they provide a basis for notifying alleged members of the conspiracy of the agreed-upon refusal to deal as well as to keep tabs on members."). The cases cited by Front Row are inapposite. They merely stand for the proposition that membership alone in a trade organization—without more—is insufficient to allege a conspiracy.[3] NASCAR alleges far for than mere membership. The Counterclaim makes clear, through both direct and circumstantial evidence, the extent of Front Row's conscious commitment to a common scheme. Doc. No. 111 ¶¶ 49-51, 53, 63, 67-69, 73, 75, 87.

*   *   *

---

[3] Each of Counterclaim Defendant's cited cases are further inapposite because they apply the probability standard at the summary judgment stage, while courts apply a plausibility standard at the motion to dismiss stage. *SD3*, 801 F.3d at 425 (cautioning that "courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage" because when "a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint").

Counterclaim Defendant's argument seems to boil down to the fact that because Front Row was not one of the four teams negotiating on behalf of the TNC, it is somehow immunized from the fact that it agreed with its co-conspirators about what terms the TNC would demand. But that is not the law. It is black letter law that a conspirator need not be part of every piece of a conspiracy to be liable for the conspiracy. *In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 6977405, at *4 (E.D. Va., Dec. 20, 2019) (denying motion to dismiss because "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability"); *see also Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 213 (S.D.N.Y. 2014) ("[To be held a part of a conspiracy, a conspirator need not know all dimensions of the wrongful conduct taken in its furtherance."). The Counterclaim contains ample allegations that Front Row engaged on numerous occasions with the other Counterclaim Defendants and co-conspirators to agree on terms the collective group would seek from NASCAR. This is shown by the fact that Front Row and the other co-conspirators demanded *the same* terms throughout the Charter negotiation process. Doc. No. 111, ¶¶ 7-8, 49, 51-54, 63, 68-69, 72.

**B.     NASCAR's Counterclaim Does Not Include Impermissible Group Pleading**

Front Row next argues, Doc. No. 116-1 at 5, that NASCAR's allegations against Front Row are impermissible group pleadings. Not so. NASCAR alleges that Front Row joined a conspiracy, and the actions that NASCAR alleges regarding the members of that conspiracy apply with full force to Front Row. NASCAR need not individually name Front Row and the other co-conspirators each time for Front Row to be on notice of the allegations against it because it was a member of the conspiracy and took the alleged actions alongside its other co-conspirators. Front Row "has clear notice of the claims against [it] (as reflected in the substantial and detailed defense already mounted by [its] counsel) and will have ample opportunity to challenge the allegations of [its participation] as the case proceeds." Doc. No. 104 at 3, n.1; *see also Wordlaw v. Enter. Leasing*

*Co. of Chicago, LLC*, 2020 WL 7490414, at *3 (N.D. Ill. Dec. 21, 2020) (rejecting argument that allegations constituted group pleading when "[all] defendants [have] sufficient notice of wrongdoing"); *Carrado v. Daimler AG*, 2018 WL 4565562, at *4 (D. Colo. Sept. 24, 2018) (holding that no group pleading issue exists with "no risk of mistakenly grouping allegations against unrelated entities").

The cases Front Row relies upon do not change this analysis. In both cases, the plaintiff failed to allege any direct or circumstantial evidence of how the particular defendants had participated in the conspiracy. *Austin Legal Video, LLC v. Deposition Sols., LLC*, 2024 WL 5184485, at *5 (W.D. Tex. July 19, 2024); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019). That is not true here. As discussed *supra*, NASCAR's allegations make clear that Front Row agreed with its other co-conspirators to make bids to NASCAR to demand certain payouts and other terms preferential to Front Row and its co-conspirators.

### C. Front Row's Alternative Arguments For Dismissal And Striking NASCAR's Requested Relief Fail For The Same Reasons That 23XI And Curtis Polk's Motion Fails

Front Row's incorporation by reference of 23XI and Curtis Polk's motion to dismiss fails for the same reasons as those arguments must fail against 23XI and Curtis Polk. Front Row has made no independent arguments in support of its co-conspirators' motion, and the Court should reject these arguments for the same reasons it should reject 23XI and Curtis Polk's arguments. Further, Front Row's motion includes a request to strike NASCAR's requested relief. Because Front Row's memorandum in support of its motion includes no arguments in support of that motion to strike, the Cout should reject Front Row's request. NASCAR incorporates its Opposition to 23XI and Curtis Polk's Motion to Dismiss by reference.

## V. CONCLUSION

For the foregoing reasons, NASCAR respectfully requests that the Court deny Front Row's motion to dismiss.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE FOLLOWS]**

Dated: April 16, 2025          Respectfully submitted,

By:   */s/ Christopher Yates*
      Christopher S. Yates*
      **LATHAM & WATKINS LLP**
      505 Montgomery Street, Suite 2000
      San Francisco, CA 94111
      Telephone: (415) 395-8240
      Facsimile: (415) 395-8095
      chris.yates@lw.com

      Lawrence E. Buterman*
      **LATHAM & WAKINS LLP**
      1271 Avenue of the Americas
      New York, NY 10020
      Telephone: (212) 906-1200
      Facsimile: (212) 751-4864
      lawrence.buterman@lw.com

      Anna M. Rathbun*
      David L. Johnson*
      Christopher J. Brown*
      **LATHAM & WATKINS LLP**
      555 Eleventh Street, NW, Suite 1000
      Washington, DC 20004
      Telephone: (202) 637-2200
      Facsimile: (202) 637-2201
      anna.rathbun@lw.com
      david.johnson@lw.com
      chris.brown@lw.com
      * Admitted *pro hac vice*

      Tricia Wilson Magee (N.C. Bar No. 31875)
      **SHUMAKER, LOOP, & KENDRICK, LLP**
      101 S Tryon Street, Suite 2200
      Charlotte, NC 28280
      Tel: 704-945-2911
      Fax: 704-332-1197
      tmagee@shumaker.com


      *Counsel for Defendants and Counterclaim Plaintiff*

## **ARTIFICIAL INTELLIGENCE CERTIFICATION**

I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of artificial intelligence embedded in the standard on-line legal research sources, such as Westlaw, Lexis, FastCase, and Bloomberg.

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 16th day of April, 2025.

*/s/ Christopher Yates*

13
Case 3:24-cv-00886-KDB-SCR    Document 121    Filed 04/16/25    Page 17 of 17