UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE,<br><br>Defendants.<br><br>NASCAR EVENT MANAGEMENT, LLC,<br><br>Counter-Plaintiff,<br><br>v.<br><br>2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK,<br><br>Counter-Defendants. | No. 3:24-cv-886-KDB-SCR |

**COUNTERCLAIM PLAINTIFF NASCAR'S REPLY IN SUPPORT OF
MOTION FOR LEAVE TO AMEND COUNTERCLAIM**

**[PUBLIC REDACTED VERSION]**

**TABLE OF CONTENTS**

|   |   |   | Page |
|---|---|---|------|
| I. | THERE IS GOOD CAUSE TO AMEND UNDER RULE 16(B) | | 2 |
| II. | AMENDMENT DOES NOT PREJUDICE COUNTERCLAIM DEFENDANTS | | 3 |
| III. | THE AMENDED COUNTERCLAIM IS NOT "FUTILE" | | 5 |
| | A. | Counterclaim Defendants Improperly Rely On Extraneous Documents | 5 |
| | B. | The Amended Counterclaim States A Section 1 Violation | 6 |
| | | 1. Counterclaim Defendants Engaged In Concerted Action | 6 |
| | | 2. The Conspiracy Was An Illegal Unreasonable Restraint | 8 |
| | | 3. Relevant Market Allegations Are Unnecessary, But Plainly Alleged | 11 |
| | | 4. The Conspiracy Caused Textbook Antitrust Injury | 12 |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alden Rochelle v. ASCAP*,
   80 F. Supp. 888 (S.D.N.Y. 1948) ...................................................................................9

*American Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ......................................................................................................10

*Atlantic Bulk Carrier v. Milan Exp. Co.*,
   2010 WL 2929612 (E.D. Va. July 23, 2010) ...............................................................3, 4

*Broadcast Music Inc. v. Columbia Broadcast Sys., Inc.*,
   441 U.S. 1 (1979).......................................................................................................9, 10

*Celebrate Va. S. Holding Co. v. CVAS Prop.*,
   2022 WL 20581965 (E.D. Va. Jan. 27, 2022) ...............................................................4

*Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.*,
   605 F. Supp. 2d 870 (W.D. Ky. 2009)...............................................................8, 11, 12

*Clayton v. Gaidarik*,
   2021 WL 1328920 (S.D. Miss. Apr. 9, 2021)................................................................5

*Cloverleaf Enters. v. Md. Thoroughbred, Horsemen's Ass'n*,
   730 F. Supp. 2d 451 (D. Md. 2010) ..........................................................................8, 11

*Columbia Broadcast Sys., Inc. v. Am. Soc. of Composers, Authors & Publishers*,
   620 F.2d 930 (2d Cir. 1980)........................................................................................9, 10

*Compact v. Metropolitan Gov't of Nashville & Davidson Cty.*,
   594 F. Supp. 1567 (M.D. Tenn. 1984)............................................................................8

*Crete Carrier Corp. v. Sullivan & Sons*,
   2022 WL 313865 (D. Md. Feb. 1, 2022) .......................................................................3

*Earthkind, LLC v. Lebermuth Co.*,
   2020 WL 8771419 (W.D.N.C. Dec. 1, 2020) ......................................................3, 4, 6, 12

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) .........................................................................................3

*F.T.C. v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986)......................................................................................................11

*Fisher v. Md. Dep't of Public Safety & Correctional Servs.*,
 2010 WL 2732334 (D. Md. July 8, 2010)..................................................................................6

*Five Smiths, Inc. v. NFLPA*,
 788 F. Supp. 1042 (D. Minn. 1992).......................................................................................11

*Frank M. McDermott v. Moretz*,
 898 F.2d 418 (4th Cir. 1990) ...................................................................................................4

*Gelboim v. Bank of America Corp.*,
 823 F.3d 759 (2d Cir. 2016)...................................................................................................12

*In re DDAVP Direct Purchaser Antitrust Litig.*,
 585 F.3d 677 (2d Cir. 2009)...................................................................................................12

*In re High Fructose Corn Syrup Antitrust Litig.*,
 295 F.3d 651 (7th Cir. 2002) ...................................................................................................7

*In re Mission Health Antitrust Litig.*,
 2024 WL 759308 (W.D.N.C. Feb. 21, 2024) ........................................................................11

*McDaniel v. Loyola Univ. Med. Ctr.*,
 317 F.R.D. 72 (N.D. Ill. 2016)..................................................................................................6

*Meredith Corp. v. SESAC*,
 1 F. Supp. 3d 180 (S.D.N.Y. 2014) .......................................................................................10

*Meredith Corp. v. SESAC*,
 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ...........................................................................10

*Miller v. Md. Dep't of Nat'l Resources*,
 813 F. App'x 869 (4th Cir. 2020) ............................................................................................5

*New York ex rel. Spitzer v. Saint Francis Hospital*,
 94 F. Supp. 2d 399 (S.D.N.Y. 2000).......................................................................................8

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
 279 F.2d 128 (9th Cir. 1960) ...................................................................................................7

*Radio Music License Comm. v. Global Music Rights*,
 No. 19-cv-3957 (C.D. Cal. June 20, 2016) ............................................................................10

*Robertson v. Sea Pines Real Estate*,
 679 F.3d 278 (4th Cir. 2012) ................................................................................................6, 8

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
 801 F.3d 412 (4th Cir. 2015) ................................................................................................7, 8

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
 988 F.3d 690 (4th Cir. 2021) ...............................................................................................12

*Team Cam, LLC v. Reliable Contracting Co., Inc.*,
 2025 WL 1019262 (D. Md. Apr. 4, 2025) ........................................................................8, 12

*United States v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940)...............................................................................................................8

*United States v. Trenton Potteries Co.*,
 273 U.S. 392 (1927).............................................................................................................12

*W. Penn Allegheny Health Sys. v. UPMC*,
 627 F.3d 85 (3d Cir. 2010).....................................................................................................7

*Wilkins v. Wells Fargo Bank*,
 320 F.R.D. 125 (E.D. Va. 2017) ........................................................................................3, 5

*Williams v. Basic Cont. Servs.*,
 2010 WL 11492374 (S.D.W. Va. Apr. 30, 2010)..................................................................3

## **RULES**

Fed. R. Civ. P. 12(b)(6)....................................................................................................................5

Fed. R. Civ. P. 15 ............................................................................................................................3

Fed. R. Civ. P. 16(b) ...................................................................................................................2, 3

Fed. R. Civ. P. 56............................................................................................................................4

The evidence that racing teams 23XI and Front Row Motorsports, and owner Curtis Polk, violated the antitrust laws is overwhelming, even at this early stage of discovery. Counterclaim Defendants touted publicly and in private that they would succeed in their plan to extract more guaranteed money from NASCAR by banding together, advancing the same fixed terms in negotiations for the 2025 Charter Agreement, and not breaking ranks or going rogue by striking individual deals with NASCAR. Polk led these efforts. Polk enticed the teams to act only as a group, writing: "█████████████████████████████████████████ █████████████████████████████." Doc. 123-2, ACC ¶ 58. Polk assured the group that its bonds were strong: "███████████████████████████████████." ACC ¶ 62. And when NASCAR attempted to deal with teams directly, Polk, his Teams Negotiating Committee ("TNC"), and other conspirators directly "████████████████████████████████," emphasized the need "██████████████████████████" in one-on-one meetings, and threatened teams to "not break ranks." ACC ¶¶ 8, 52, 91, 116. The TNC drafted language for teams to parrot in their meetings to ensure their positions remained "████████████," monitored teams' meetings to confirm everyone "████████████████" and did "████████████," and reassured members that no one was "████████████" and "███████████████████████████████." ACC ¶¶ 66, 89, 96-98.

At the same time, Polk coordinated efforts to coerce NASCAR not to deal with teams outside of his cartel. He and others arranged all 2016 Charter holders to boycott a contractually required meeting with NASCAR, threatened other boycotts, weaponized the media, interfered with NASCAR's broadcast-agreement negotiations, and urged teams not to participate in other opportunities that would benefit them, NASCAR, and the sport. ACC ¶¶ 8, 50, 61-64, 69-76, 84, 107, 111, 116, 134. They intended for these acts to demonstrate the teams' unity and to discourage any individual deal-making on terms different from those the cartel had agreed on. As Polk wrote

in private messages: "████████████████████████████████████████████████," ACC ¶ 70, in order to "████████████" and impose "████████████████" on NASCAR that will "████████████████████," ACC ¶ 62. Through this scheme, the conspiracy held together for over two and a half years, as every Charter-holding team collectively refused NASCAR's repeated offers, despite clear evidence that ████████████████████████████ found the offered terms agreeable. ACC ¶ 88; *see also id.* ¶¶ 77, 78, 81, 101, 115, 116. When teams ultimately signed Charter agreements after two-and-a-half years of not breaking ranks, those agreements contained financial terms more beneficial to the teams because of their conspiracy. ACC ¶¶ 4, 82, 98, 103, 121-23, 129. Counterclaim Defendants privately touted that financial success. *See* ACC ¶¶ 103, 121.

NASCAR's initial Counterclaim more than sufficiently described the conspiracy. Docs. 111, 120. But Counterclaim Defendants' document productions, which were timed just after the deadline for amendments, illuminated the scheme further. NASCAR quickly moved to amend without waiting on rulings on the pending motions to dismiss. Counterclaim Defendants' argument that NASCAR's request for leave to amend is untimely is ultimately a problem of their own making, as they alone were responsible for the timing of their document productions.

Unable to challenge NASCAR's actual allegations, Counterclaim Defendants attack strawman arguments that have no relation to the conspiracy alleged and resort to page-after-page of factual disputes relying on extraneous sources, including attaching 27 exhibits without any authority or argument that they are proper for judicial notice or may be considered in connection with their motions or opposition. That was improper and should be promptly rejected.

## I. THERE IS GOOD CAUSE TO AMEND UNDER RULE 16(B)

NASCAR filed this first motion for leave to amend only 21 days after the Counterclaim Defendants moved to dismiss. That prompt action would have satisfied the default deadline for amending as a matter of right. *See* Fed. R. Civ. P. 15(a)(1)(B). Although the schedule here set an

2

earlier deadline, NASCAR has demonstrated "'good cause' for seeking modification of the scheduling deadline under Rule 16(b)." *Earthkind, LLC v. Lebermuth Co.*, 2020 WL 8771419, at *1 (W.D.N.C. Dec. 1, 2020). NASCAR's amendment seeks to add "additional facts and information" derived from large "supplemental document production[s]" by 23XI and Front Row shortly after the amendment deadline. *Id.* at *2; Doc. 123-1, Mot. for Leave at 7-8. Counterclaim Defendants fail to mention Rule 16(b) or the "good cause" standard, and thus concede this point.

## II.  AMENDMENT DOES NOT PREJUDICE COUNTERCLAIM DEFENDANTS

NASCAR also meets the Rule 15 amendment standard. The "Fourth Circuit's policy is 'to liberally allow amendment'" because Rule 15 requires leave to amend "be freely given when justice so requires." *Earthkind*, 2020 WL 8771419, at *1; *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) ("The Supreme Court has declared that 'this mandate is to be heeded.'").

Counterclaim Defendants cannot evade that mandate with conclusory claims that they would be "prejudiced" from (1) discovery; and (2) another round of dismissal motions. They bear "the burden of showing prejudice," but neither argument has merit. *Atl. Bulk Carrier v. Milan Exp.*, 2010 WL 2929612, at *4 (E.D. Va. July 23, 2010). First, any discovery into the conspiracy arose from the initial Counterclaim, not the amendment. The parties have already submitted, and the Court has approved, a joint plan for counterclaim discovery. Doc. 114. Counterclaim Defendants attested that "no party will be prejudiced" by that schedule. *Id.* at 4. They cannot reverse course now. The Opposition "has not identified with particularity any additional discovery that would be necessary to defend against" the Amended Counterclaim. *Williams v. Basic Cont. Servs.*, 2010 WL 11492374, at *3 (S.D.W. Va. Apr. 30, 2010). An amendment, like this one, that "add[s] additional facts supporting the same basic legal argument" causes no prejudice. *Wilkins v. Wells Fargo Bank*, 320 F.R.D. 125, 128 (E.D. Va. 2017); *Crete Carrier Corp. v. Sullivan &*

*Sons*, 2022 WL 313865, at *8 (D. Md. Feb. 1, 2022); *Atl. Bulk*, 2010 WL 2929612, at *5 (no prejudice from amendment "nearly one month" before discovery cutoff date).

Second, the professed need to file a new motion to dismiss is not grounds to preclude amendment, and there is no basis for such a motion here anyway. Counterclaim Defendants cite no support for their argument that responding to amended allegations is prejudicial, and that suggestion conflicts with the mandate "to liberally allow amendment."[1] *Earthkind*, 2020 WL 8771419, at *1. Denial of the briefed pending motions to dismiss should preclude any further dismissal attempt in any event. *See Celebrate Va. S. Holding v. CVAS Prop.*, 2022 WL 20581965, at *2 (E.D. Va. Jan. 27, 2022) (precluding challenge to amended claims that survived dismissal). Counterclaim Defendants' futility argument is based on the exact same legal arguments and authorities presented in 23XI's motion to dismiss. Doc. 115-1. They should not get a third attempt to avoid confronting the merits. That is especially true when Counterclaim Defendants made the improper choice to go *far* beyond the pleadings when arguing futility, referencing and attaching dozens of extraneous exhibits that just further demonstrate that the "parties to this action cast their existential dispute in starkly different terms." Doc. 104 at 2. Arguing facts outside of the Amended Counterclaim is improper at the futility (or dismissal) stage. Counterclaim Defendants can make these fact-based arguments after "the parties have a full opportunity to pursue discovery of the relevant facts and then at trial, where the jury will be able to weigh the evidence." *Id.* at 3. The parties should follow this Court's instruction in *Earthkind* and "focus their efforts on completing discovery on the merits and only thereafter presenting any arguments as to the legal sufficiency of the claims in a dispositive motion under Rule 56 . . . or at trial." 2020 WL 8771419, at *3.

---

[1] Creating risk of a "remand[] for retrial" by denying leave would cause more inefficiency than granting leave. *Frank M. McDermott v. Moretz*, 898 F.2d 418, 422 (4th Cir. 1990).

### III. THE AMENDED COUNTERCLAIM IS NOT "FUTILE"

Counterclaim Defendants' argument that the amendment would be "futile" is also meritless. Their argument is based on factual disputes, extraneous documents, and claims of what "discovery documents confirm." Opp'n at 4-11. None of these addresses NASCAR's actual allegations. Counterclaim Defendants make no attempt to adhere to the requirement that "[j]ust as when ruling on a Rule 12(b)(6) motion to dismiss, to determine the futility of amending a [counterclaim], the Court must consider the motion without resolving factual disputes," *Wilkins*, 320 F.R.D. at 129, and "must accept [NASCAR's] factual allegations as true and resolve any inferences in [NASCAR's] favor," *Clayton v. Gaidarik*, 2021 WL 1328920, at *2 (S.D. Miss. Apr. 9, 2021). They ignore this standard, because they cannot satisfy it.

#### A. Counterclaim Defendants Improperly Rely On Extraneous Documents

Counterclaim Defendants' choice to attach dozens of extraneous documents to their opposition—without any legal support—justifies rejecting their futility argument outright. Counterclaim Defendants could never have attached those exhibits to a motion to dismiss because the "Federal Rules of Civil Procedure make clear that a district court cannot consider materials outside the pleadings on a 12(b)(6) motion." *Miller v. Md. Dep't of Nat'l Res.*, 813 F. App'x 869, 873 (4th Cir. 2020). So too here. The same applies to a futility argument where the Court cannot resolve fact disputes and "conjecture about the merits of the litigation should not enter into the decision." *Earthkind*, 2020 WL 8771419, at *2.[2] "[I]t is inappropriate for the Court to go beyond the pleadings and any critical documents referred to therein when considering [a] futility objection

---

[2] 23XI, Polk, and Front Row apparently found no support for their approach, and so they resort to mischaracterizing this Court's ruling in *Earthkind*. Opp'n at 2. They claim the Court "consider[ed] discovery documents submitted by the party opposing amendment in assessing futility of amendment" in *Earthkind*. *Id.* But the Court did no such thing, as the opposition did not attach even a single exhibit. *See* No. 19-cv-0051 (W.D.N.C. Sept. 29, 2020), Doc. 48. Only the *amending party* attached exhibits. *See* No. 19-cv-0051 (W.D.N.C. Sept. 15, 2020), Doc. 46.

5

to [a] motion to amend." *McDaniel v. Loyola Univ. Med. Ctr.*, 317 F.R.D. 72, 79 (N.D. Ill. 2016). The Court should "disregard" the conspirators' extraneous materials. *Fisher v. Md. Dep't of Public Safety & Correctional Servs.*, 2010 WL 2732334, at *3-4 (D. Md. July 8, 2010).

Even worse, Counterclaim Defendants attached incomplete documents and mischaracterized them, such that none of their representations can be accepted as anything but disputed facts. For example, for numerous exhibits, Counterclaim Defendants excluded the document's attachment or parent email. As one example of how this facilitated Counterclaim Defendants' misdirection, they attached an April 2024 email summarizing the responses NASCAR received from a request for individual team meetings. Doc. 129-5. The opposition argues the summaries show that teams meaningfully negotiated with NASCAR individually. Opp'n at 6. But Counterclaim Defendants excluded attachments (referenced on the face of the exhibit) showing that teams responded to NASCAR by sending the nearly verbatim response that Polk and the TNC drafted, exactly as NASCAR alleged. ACC ¶¶ 97-98. Thus, far from showing futility, these documents only further support that "Polk and others repeatedly sought to interfere with or deter" NASCAR's attempts at individual negotiations so as to keep the conspiracy together. ACC ¶ 76.

### B. The Amended Counterclaim States A Section 1 Violation

If the Court were to reach the substance of Counterclaim Defendants' futility argument, their contentions fall far short of the required showing that the amendment is "clearly insufficient or frivolous on its face." *EarthKind*, 2020 WL 8771419, at *2.

#### 1. Counterclaim Defendants Engaged In Concerted Action

NASCAR satisfied the first Section 1 element of "a contract, combination, or conspiracy," *Robertson v. Sea Pines Real Estate*, 679 F.3d 278, 284 (4th Cir. 2012), by alleging direct and circumstantial evidence of a conspiracy among Counterclaim Defendants and others to agree to fix Charter terms through the TNC and to not deviate from those terms in individual discussions

6

with NASCAR. *See* Doc. 120, at 8-11. The Amended Counterclaim bolsters the prior allegations with support pulled from the conspirators' own documents. *See, e.g.*, ACC ¶¶ 51-54, 57-58, 60-70, 74-81, 87-113, 115, 118-21, 126, 132. These allegations more than demonstrate "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010). The co-conspirators' writings make this common design and understanding explicit, touting that



"██████████████████████████████," "██████████████████," "████████████████████████████," "██████████████████████," "██████████████████████," "████████████████████████████," "██████████████████," and we "████████████████████████" in any separate meetings to ensure teams do "not break ranks." ACC ¶¶ 62, 66, 90, 107, 116, 119.

Counterclaim Defendants' contentions that there are no allegations conspirators agreed not to deviate from the TNC's fixed terms is baseless. There are dozens of allegations showing that occurred, including direct quotes from the conspirators demonstrating they provided a script for teams to use in meetings with NASCAR, monitored teams to ensure the teams adhered to the script, touted the fact that teams did not deviate, and engaged in numerous improper tactics to coerce NASCAR not to pursue individual negotiations. ACC ¶¶ 8, 62, 64, 66-67, 76, 79, 80, 84, 86, 88-92, 96-98, 102, 106-07, 112-14, 116, 119, 136. Counterclaim Defendants' argument that some teams met individually with NASCAR (without deviating from the fixed terms) is legally meaningless. *See SD3, LLC v. Black & Decker*, 801 F.3d 412, 427-28 (4th Cir. 2015) (rejecting premise that presence of "some licensing negotiations" defeated conspiracy allegations); *see also Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002).

### 2. The Conspiracy Was An Illegal Unreasonable Restraint

The Amended Counterclaim also sufficiently alleges that the conspiracy "imposed an unreasonable restraint of trade," satisfying the second element of NASCAR's Section 1 claim. *Robertson*, 679 F.3d at 284. The agreements these horizontal competitors entered into to eliminate competition amongst themselves on important financial (and other) terms is exactly the type of practice that has "such a pernicious effect on competition" that it is deemed *per se* unreasonable. *SD3*, 801 F.3d at 433; *Team Cam v. Reliable Contracting*, 2025 WL 1019262, at *8, 13 (D. Md. Apr. 4, 2025). Merely agreeing to "tamper[] with price structures" is "price fixing" under the Sherman Act. *United States v. Socony-Vacuum*, 310 U.S. 150, 221-22 (1940). But the conspiracy alleged here destroyed any competition between the teams for the financial components of the 2025 Charter—they acted exclusively as one conspiring bloc. ACC ¶¶ 67, 76, 88, 97-98, 116. Courts have robust experience finding this class of conduct to be *per se* unreasonable. *See, e.g.*, *Compact v. Metropolitan Gov't of Nashville & Davidson Cty.*, 594 F. Supp. 1567, 1569, 1577 (M.D. Tenn. 1984) (*per se* illegal when engineering services suppliers "agreed to band together" to "increase their bargaining power by eliminating competition between themselves"); *Team Cam*, 2025 WL 1019262, at *8, 13 (*per se* illegal agreement through trade association of asphalt suppliers that "informed" members they "should be demanding" certain payments); *New York ex rel. Spitzer v. Saint Francis Hospital*, 94 F. Supp. 2d 399, 412-15 (S.D.N.Y. 2000) (*per se* illegal "joint negotiation" tactics); *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.*, 605 F. Supp. 2d 870, 873, 890 (W.D. Ky. 2009) (*per se* collective action by horsemen groups to "apply some financial leverage against the racetracks" to obtain their preferred "allocation of revenues"); *Cloverleaf Enters. v. Md. Thoroughbred*, 730 F. Supp. 2d 451, 464 (D. Md. 2010) (same).

Instead of addressing these dispositive authorities, the Counterclaim Defendants analogize to inapposite cases involving performing rights organizations—like ASCAP and BMI—that

8

aggregate millions of artists' copyrights and sell them as a single bundled "blanket license" to music users. *See* Opp'n at 1, 4-5, 8 (citing *Broad. Music Inc. v. Columbia Broad.*, 441 U.S. 1 (1979) ("*BMI*"); *Columbia Broad. Sys. v. Am. Soc. of Composers, Authors & Publishers*, 620 F.2d 930 (2d Cir. 1980) ("*CBS*")). Counterclaim Defendants' reliance on these cases is baffling because courts have long recognized that "[a]lmost every part of the ASCAP structure, almost all of ASCAP's activities in licensing motion picture theaters, involve a violation of the antitrust laws." *Alden Rochelle v. ASCAP*, 80 F. Supp. 888, 903 (S.D.N.Y. 1948). That is why the Department of Justice sued those organizations for antitrust violations decades ago, resulting in court-ordered consent decrees "that imposed tight restrictions" on their operations and remain in effect, including mandating "the legal availability of direct licensing" with individual artists. *BMI*, 441 U.S. at 11. The ASCAP consent decree "enjoins ASCAP from limiting, restricting, or interfering with the rights of any member" to deal directly with a music user, and establishes a federal rate court "to determine a reasonable fee" in the event of fee "disputes." *CBS*, 620 F.2d at 933-34. The protections of the consent decree, the associated monitoring by the Department of Justice, and the fact that the "blanket license" was "quite different from anything any individual" artist could offer is what led the Supreme Court to apply the rule of reason to the blanket license. *BMI*, 441 U.S. at 13, 22-24. But none of those facts apply to Charter holders.

Although the Supreme Court instructed that "the substantial restraints placed on ASCAP and its members by the consent decree must not be ignored," *BMI*, 441 U.S. at 24, Counterclaim Defendants ignore the consent decree in their repeated reliance on *BMI* and its progeny. *See* Opp'n at 1, 4-5, 8; Doc. 115-1, at 11-12, 15; Doc. 126, at 3-5. Counterclaim Defendants suggest that on remand the Second Circuit imposed a categorical pleading rule that all group licensing activity is immune from antitrust challenge if any allegation can be read to suggest that individual

9

negotiations were "fully available." Opp'n at 4-5 (quoting *CBS*, 620 F.2d at 936). That is wrong. The *CBS* court conducted a fact-intensive assessment "under the rule of reason" only after "an eight-week bench trial" that "concerned primarily the issue of whether direct licensing was feasible." *CBS*, 620 F.2d at 932-34, 937. And even after *CBS*, courts have allowed claims to proceed alleging that performing rights organizations' group licensing violated the rule of reason, *see Meredith Corp. v. SESAC*, 2011 WL 856266, at *12-14 (S.D.N.Y. Mar. 9, 2011), and were *per se* unreasonable, *see* Sec. Am. Compl. ¶¶ 98-138, *Radio Music License Comm. v. Global Music Rights*, No. 19-cv-3957 (C.D. Cal. June 20, 2019), Doc. 163; Or. at 2, No. 19-cv-3957 (C.D. Cal. Feb. 13, 2020), Doc. 201. The outcome depends on the facts alleged. The allegations here show the conspirators repeatedly and substantially interfered with direct negotiations, the conspiracy continued into any individual meetings, and no direct deal on materially different terms was made.[3]

Counterclaim Defendants then attempt to shoehorn NASCAR's allegations into cases that applied the rule of reason to agreements between teams that operate sports leagues; another argument that directly conflicts with the allegations. *See* Opp'n at 8. Unlike those sports-league cases, NASCAR does not require its teams to agree with each other on how NASCAR will allocate the money it offers, as NASCAR has long operated without any such agreements. ACC ¶¶ 3, 37, 139. Even the teams admit they are "not the members of a joint venture operating a sports league." Doc. 107 ¶ 97. The authority the Counterclaim Defendants cite warns courts to be cautious that "[m]embers of any cartel could insist that their cooperation is necessary to produce the 'cartel product,'" *Am. Needle v. NFL*, 560 U.S. 183, 199 n.7 (2010), but that claim is not a cure all. The racing cases NASCAR cites show the *per se* rule can—and does—still apply in sports settings

---

[3] To the extent Counterclaim Defendants rely on *BMI* to argue that group licensing is not an "agreement," the Supreme Court held the opposite. *See BMI*, 441 U.S. at 10 ("plainly involve concerted action"); *Meredith Corp. v. SESAC*, 1 F. Supp. 3d 180, 207 (S.D.N.Y. 2014).

where horizontal competitors reach agreements regarding price terms. *See Churchill Downs*, 605 F. Supp. 2d at 873, 890; *Cloverleaf Enters.*, 730 F. Supp. 2d at 464.[4]

If the Court were to look for the likelihood of harm under the rule of reason, NASCAR's allegations clearly demonstrate the conspiracy caused the payments teams receive to increase by approximately 25%, eliminated competition between teams by making more of those payments fixed (rather than awarded through prize money), and harmed NASCAR's media negotiations. ACC ¶¶ 4, 61-62, 82, 84-86, 98, 103, 121-23, 129, 136. The increased payments alone are evidence of direct harm sufficient to survive a rule-of-reason pleading challenge. Doc. 120, at 19-20; *In re Mission Health Antitrust Litig.*, 2024 WL 759308, at *9 (W.D.N.C. Feb. 21, 2024).

### 3. Relevant Market Allegations Are Unnecessary, But Plainly Alleged

Defining a relevant market is unnecessary here for two independent reasons: NASCAR has alleged (1) a *per se* anticompetitive agreement; and (2) direct evidence of anticompetitive effects. Doc. 120, at 20 (citing *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).

Nonetheless, the Amended Counterclaim shows the co-conspirators had market power in a relevant market for the entry of cars into NASCAR Cup Series races. ACC ¶ 126. The conspiracy included agreements on behalf of teams possessing all Charters, guaranteeing them 36 of the 40 NASCAR Cup Series race starting positions prior to 2025. ACC ¶ 54. This gave those teams immense power when conspiring together, as they admitted. *See, e.g.*, ACC ¶¶ 58, 62, 66, 95; *see also* Doc. 120, at 20-21. Counterclaim Defendants quibble with the specificity of the market definition but fail to identify any product that was wrongfully excluded.

---

[4] Counterclaim Defendants' reliance on *Five Smiths, Inc. v. NFLPA* is also inapposite because that case was about "exchang[ing] compensation information" and contained only "one specific factual allegation of concerted action." 788 F. Supp. 1042, 1046, 1048 (D. Minn. 1992).

#### 4. The Conspiracy Caused Textbook Antitrust Injury

NASCAR's initial allegations adequately pled "injury of the type the antitrust laws were intended to prevent" by alleging facts showing that "but for the conspiracy, NASCAR would have paid less to the co-conspirators through the terms of the 2025 Charters." Doc. 120, at 21-23 (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016)); ACC ¶¶ 4, 68, 82, 98, 103, 121-23, 129. NASCAR also alleged harm from the co-conspirators' intentional interference with NASCAR's media-partner negotiations. ACC ¶¶ 61, 86, 123, 136. "[B]eing forced to pay supra-competitive prices as a result of defendants' anticompetitive conduct is an injury plainly of the type the antitrust laws were intended to prevent." *Team Cam*, 2025 WL 1019262, at *12; *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (same); *Churchill*, 605 F. Supp. 2d at 890 (same). Counterclaim Defendants ignore the above authority and instead wrongly claim that the post-jury-verdict decision in *Steves & Sons* requires "allegations of concrete anticompetitive harm to plausibly plead antitrust injury." Doc. 126, at 10. But *Steves & Sons* said no such thing, and instead declared that "[w]hether antitrust injury occurred is a question for the jury to decide." 988 F.3d 690, 710 (4th Cir. 2021). If anything is applicable from *Steves & Sons*, it is that "intent is relevant to our antitrust-injury analysis." *Id.* at 711. These conspirators intended anticompetitive harm.[5] *See* ACC ¶¶ 61-62, 70, 82, 84, 100.

For the reasons above and in NASCAR's Oppositions to Counterclaim Defendants' Motions to Dismiss, the Court should grant the requested leave to amend without the ability for a renewed motion to dismiss. *See Earthkind*, 2020 WL 8771419, at *3.

---

[5] Counterclaim Defendants' remaining injury argument again devolves into impermissible factual disputes about whether NASCAR was happy with the Charter terms. That argument is a dead-end in any event, because "it does not follow that agreements to fix or maintain prices are reasonable and therefore permitted by the [Sherman Act], merely because the prices themselves are reasonable." *United States v. Trenton Potteries*, 273 U.S. 392, 396 (1927); Doc. 120, at 23.

Dated: May 7, 2025                    Respectfully submitted,

By:  */s/ Christopher S. Yates*
Christopher S. Yates*
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
chris.yates@lw.com

Lawrence E. Buterman*
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Anna M. Rathbun*
David L. Johnson*
Christopher J. Brown*
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com

Tricia Wilson Magee (N.C. Bar No. 31875)
**SHUMAKER, LOOP, & KENDRICK, LLP**
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Tel: 704-945-2911
Fax: 704-332-1197
tmagee@shumaker.com

* Admitted *pro hac vice*

*Counsel for Defendants and Counterclaim Plaintiff*

## ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION

I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 7th day of May, 2025.

*/s/ Christopher S. Yates*