# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. | No. 3:24-cv-886-KDB-SCR |
| NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. | [PUBLIC REDACTED VERSION] |

## NASCAR'S COUNTERCLAIM
## AGAINST 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW
## MOTORSPORTS, INC., AND CURTIS POLK

Counterclaimant NASCAR Event Management, LLC ("NASCAR") alleges as follows:

## INTRODUCTION

1.     2311 Racing LLC d/b/a 23XI Racing ("23XI") and Front Row Motorsports, Inc. ("Front Row" or "FRM") brought suit against NASCAR and James France because they are unhappy with the commercial terms of the most-recent Charter Agreements that 13 other team owners entered into with NASCAR in 2024.  NASCAR's first Charter Agreements were signed in 2016 to meet

the requests of team owners for guaranteed entry into NASCAR events and guaranteed revenue. Following over a year of arm's length negotiations, NASCAR agreed to provide racing teams that had demonstrated a history of partnering with NASCAR with guaranteed starting positions in all NASCAR Cup Series races and other benefits, including fixed and guaranteed payments, in exchange for certain commitments from the racing teams that would help further grow the Cup Series. NASCAR was under no obligation to agree to a Charter system, but did so at the request of teams. NASCAR provided the 2016 Charters to the racing teams for **free** (*i.e.*, team owners paid no consideration to NASCAR), but NASCAR agreed those Charters would be transferrable, providing Charter owners with a valuable asset and revenue source. Since inception, team owners with Charters have, from time-to-time, sold their Charters to other investors seeking to obtain guaranteed entry into Cup Series races and the other benefits of Charters. The sales price of these Charters has increased significantly over time with recent public reports that the most recent sale was for over $45 million, only highlighting the value that the Charter system provides to team owners.

2.      Although NASCAR recognizes the value the Charter model has brought to Charter teams and is certainly willing to continue with the model, NASCAR now finds itself in the ironic position of having to defend a model created at the request of teams, which is not necessary and that NASCAR would be content not to have.

3.      The initial Charter Agreements made the racing teams stronger financially, and most importantly, attempted to incentivize them to grow the Cup Series as a sports and entertainment property to attract new fans, sponsors, broadcast partners, and other participants. To that end, team owners with Charter Agreements agreed they would not participate in certain other racing series that could confuse fans and undermine NASCAR's brand and goodwill, including the value

2

associated with the Cup Series. And more generally, team owners agreed to work with NASCAR for the betterment of the Cup Series, agreeing in the Charters to standard provisions that appear regularly in such agreements, including provisions on non-disparagement and releases of past legal claims. Since team owners wanted the Charter system, it is not surprising that team owners signed the 2016 Charters; but none were forced to sign the 2016 Charters if they did not approve of the ultimate terms. Racing teams remained free to compete in the Cup Series the same way they did prior to the 2016 Charters. Since 2016 numerous racing teams have competed in the Cup Series without the benefits and requirements of the Charters as "open teams," as well as in NASCAR's Xfinity Series and Craftsman Truck series, each of which has no exclusivity requirements—but also no guaranteed starting positions or guaranteed revenue distributions.

4.      By their terms, the 2016 Charter Agreements expired on December 31, 2024. In anticipation of that expiration, team owners approached NASCAR in 2022 and asked NASCAR to enter into early negotiations regarding new commercial terms to include in proposed 2025 Charters. The 2025 Charter was intended to govern the relationship between NASCAR and Cup Series Charter owners for the next seven to fourteen years. As part of those negotiations, the teams collectively demanded, and NASCAR ultimately acceded to the demand, that 2025 Charter holders would receive increased portions of revenue and other concessions. The negotiations carried on well into 2024, but with the 2025 NASCAR Cup Series season quickly approaching, the negotiations needed to be concluded. It has been suggested that the negotiations were rushed and teams were not given sufficient time to evaluate the Charter terms. However, the negotiations for the 2025 Charter Agreements took place over years, and indeed were longer in duration and more inclusive than those negotiations which originally created the Charter system from scratch. While neither NASCAR nor the teams got everything they wanted, 13 of the 15 racing team owners, who

owned 32 out of the 36 existing Charters, signed the 2025 Charter. 23XI and FRM felt differently. They decided to not sign the 2025 Charters—as was their prerogative if they did not want to enter into a long-term contractual relationship with NASCAR.

5.     However, 23XI and FRM did not merely reject the terms of the 2025 Charters. Rather, those teams redoubled the strategy they had been spearheading since 2022 to threaten, coerce, and extort NASCAR into meeting their demands for better contract and financial terms. Aided by counsel who has a history of suing various sports organizations and claiming that they engage in anticompetitive conduct, 23XI and FRM brought suit, alleging that the 2016 and 2025 Charters are illegal agreements, and that NASCAR is an illegal monopsonist. For themselves, 23XI and FRM are seeking treble damages and attorneys' fees. But they are also seeking a declaration that the 2025 Charter Agreement is illegal and violates the antitrust laws. By claiming the Charters are illegal agreements, Plaintiffs have opened Pandora's box. Charters, as previously mentioned, contain a goodwill provision prohibiting a Charter holder from competing in a stock car racing product that would be dilutive to the NASCAR Cup Series and NASCAR's brand. In exchange, the Charters grant the Charter holder a guaranteed starting position in all NASCAR Cup Series events. Both of these exclusivity provisions have existed for over nine years and have benefited both parties respectively. If the Charters are deemed to be anticompetitive, then either Charters will go away entirely or the cross exclusivities that benefitted both parties will be eliminated. That is not an outcome that NASCAR is seeking, nor is it one that NASCAR believes benefits the racing teams which have partnered with NASCAR and signed Charters. But this is an outcome that 23XI and FRM, through this lawsuit, could impose on all race teams and their owners.

6.     This is not the first time that 23XI and FRM have sought to impose their viewpoints, and those of their counsel, on the racing teams writ large. And it is truly ironic that in trying to blow-

up the Charter system, 23XI and FRM have sought to weaponize the antitrust laws to achieve their goals. That is because the undisputed reality is that it is 23XI and FRM, led by 23XI's owner and sports agent Curtis Polk (23XI, FRM, and Curtis Polk collectively, "Counterclaim Defendants"), who willfully violated the antitrust laws by orchestrating anticompetitive collective conduct in connection with the terms of the 2025 Charter Agreements.

7. 23XI joined NASCAR in late 2020 through the purchase of one Charter from a 2016 Charter holder, and quickly purchased another. Polk and 23XI's other owners openly professed that they wanted to change NASCAR's economic model by demanding more money for the teams from NASCAR media revenues, instead of teams competing against each other (their horizontal competitors) for sponsorship dollars.[1]

8. Polk put this plan into action during 23XI-led negotiations on behalf of the race-team members of the Race Team Alliance ("RTA"), seeking to extract more favorable financial and non-financial terms than in the 2016 Charter. Polk played an active role in coordinating the Counterclaim Defendants' concerted actions, negotiating on behalf of all RTA members (consisting of teams owning all 2016 Charters) when engaging with NASCAR on terms such as the payments the teams would receive as part of the 2025 Charter. Polk sent multiple requests to NASCAR on behalf of all RTA members demanding changes to the 2025 Charter, and otherwise threatening that the RTA members would take adverse group actions if such demands were not met. Polk's individual role was at the very center of the plot to use collusive behavior to extract more favorable commercial terms from NASCAR in the Charter negotiations. These strategies and threats included, but were and are not limited to, a group boycott and threatened group boycotts of NASCAR events including televised qualifying races, negative media campaigns, meetings with

---

[1] http://www.sportsbusinessjournal.com/Journal/Issues/2022/02/28/Upfront/NASCAR.aspx.

at least one NASCAR media partner to affect ongoing NASCAR negotiations for a new media rights agreement, and threats/coercion to other team owners to "not break ranks" by negotiating with NASCAR individually. The Counterclaim Defendants' anticompetitive negotiating strategy had an adverse effect on both the 2025 Charter and NASCAR's renewal of its media rights agreements. And, Counterclaim Defendants continue to ensure that teams are "aligned" in their positions vis-à-vis NASCAR even though the teams are horizontal competitors.

9.     The Supreme Court of the United States has emphasized that in drafting Section 1, "Congress treated concerted behavior more strictly than unilateral behavior," because unlike independent action, "[c]oncerted activity inherently is fraught with anticompetitive risk" insofar as it "deprives the marketplace of independent centers of decision making that competition assumes and demands."[2] NASCAR asserts this counterclaim against Counterclaim Defendants because their concerted, collusive activity, which includes organizing and participating in *per se* unlawful horizontal agreements to collectively negotiate the terms of the 2025 Charter Agreements, violates Section 1 of the Sherman Act. NASCAR is bringing suit against the Counterclaim Defendants because they not only participated in the collusive conduct, but on information and belief and as shown by documents provided in discovery *after* NASCAR filed its original counterclaim, orchestrated it.

**THE PARTIES**

10.     Counterclaim Defendant 2311 Racing LLC d/b/a 23XI Racing ("23XI") is a limited liability company organized under the laws of North Carolina, with its principal place of business

---

[2]     *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)) (quotation marks omitted).

in North Carolina. On information and belief, 23XI is owned by entities under the control of Michael Jordan, Denny Hamlin, and their business partner Curtis Polk.

11. Counterclaim Defendant Front Row Motorsports, Inc. ("Front Row") is a corporation organized under the laws of Tennessee. On information and belief, Front Row Motorsports is owned by entities under the control of Robert "Bob" Jenkins. On information and belief, Front Row Motorsports has places of business in at least Tennessee and North Carolina. Front Row is registered to transact business in the state of North Carolina.

12. Defendant Curtis Polk ("Polk") is a co-owner of 23XI. On information and belief, Polk regularly transacts business in North Carolina, including on behalf of 23XI. Polk was joined to this case through NASCAR's original counterclaim because the claim against him arises out of the same series of occurrences as the claim against 23XI and Front Row and because questions of law and fact are common to Polk, 23XI, and Front Row. Counterclaim Defendants have not objected to that joinder.

13. Counterclaim Defendants, race teams or race team owners, are distinct from the racing drivers that they employ. Counterclaim Defendants compete with other race teams to employ the best drivers, and, absent collusion, would compete for those drivers by offering higher compensation. Counsel for Counterclaim Defendants do not represent those drivers, whose interests and incentives are not aligned with those of the Counterclaim Defendants.

14. Counterclaimant NASCAR Event Management, LLC ("NASCAR") is a privately-owned company responsible for sanctioning and producing NASCAR's motorsport races.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

7

16. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and (c).

17. 23XI is subject to general and specific personal jurisdiction in this judicial district based upon its purposeful, systematic, and continuous contacts with the state of North Carolina, including that it is headquartered in Huntersville, North Carolina,[3] its decision to maintain an office, and its previous registration to do business in the state.

18. Front Row is subject to general and specific personal jurisdiction in this judicial district based on upon its purposeful, systematic, and continuous contacts with the state of North Carolina, including that it maintains offices and garages in Mooresville, North Carolina[4] and its previous registration to do business in the state.

19. Curtis Polk is subject to personal jurisdiction in this judicial district based on upon his purposeful, systematic, and continuous contacts with the state of North Carolina.

20. Venue for this counterclaim is proper within this judicial district pursuant to 28 U.S.C. §§ 1391.

## THE FACTS

## I. THE HISTORY OF NASCAR

21. William ("Bill") France, Sr. formed NASCAR in 1948. Bill France's story is the quintessential American success story. Bill France moved to Daytona Beach during the Great Depression with $100 to his name. When he arrived, he worked as a house painter, at a car dealership, and then a car repair shop. Eventually, he began promoting stock car races in Daytona, and ultimately created NASCAR in response to the then frequent practice of unscrupulous promoters leaving events without paying drivers.

---

[3] https://www.nascar.com/news-media/2024/05/30/cup-series-2024-inside-airspeed-23xi-racing-headquarters/.

[4] https://www.facebook.com/FrontRowMotorsports.

22.     Bill France also founded the International Speedway Corporation ("ISC") in 1953. In 1957, ISC built the Daytona International Speedway. In 1967, ISC bought the site of the Talladega Superspeedway. Over the next few decades, ISC invested in building and acquiring additional tracks. By 2019, ISC owned and operated 13 motorsports facilities. At that time, ISC was a public company, although over seventy percent of the voting stock was held by the France family. On May 20, 2019, NASCAR announced that it would fully acquire ISC and take it private. This transaction meant that NASCAR could better compete with other sports for fans and fan engagement by standardizing track facilities and the fan experience, optimizing race schedules, standardizing event pricing, and centralizing the inventory of media and sponsorship assets.

23.     Stock car racing is a form of motorsports that gets its name from a time when racers originally used unmodified production-model cars (*i.e.*, right off the assembly line) to compete. Today, cars used in NASCAR races still outwardly resemble standard commercial sedan vehicles, though they have been developed and engineered over years of experience for safety, competition, and cost efficiency.

24.     For over 75 years, NASCAR—and the France family in particular—have continued to invest in and grow the sport of stock car racing. They secured title sponsors and expanded the reach of the sport through media-rights deals to bring stock car racing into living rooms across the country. The France family expanded the sport globally through the creation of international racing series and provided opportunities for hundreds of teams and tens of thousands of drivers, pit crew workers, and other personnel. NASCAR is now considered one of the top motorsport series in the world.

25.     Each generation of the France family has been devoted to improving the sport before turning it over to the next generation, but the France family is not the only family dedicated to the

business of stock car racing. NASCAR's success has translated into success for countless participants in the sport (e.g., drivers, crew chiefs, engineers, mechanics, etc.), many of whom have gone on to own their own stock car racing teams (as well as teams competing in other motorsports) and racetracks and share the success of their NASCAR businesses with their families.

26.     NASCAR sanctions three national racing series:  the Cup Series, the Xfinity Series, and the Craftsman Truck Series.

27.     The NASCAR Cup Series currently races on 28 different tracks in 2025, of which NASCAR owns, operates, or is licensed to promote 13.  After the ISC acquisition, NASCAR owns 16 racetracks.  That leaves 15 racetracks that are used in the NASCAR Cup Series that NASCAR does *not* own—including the Indianapolis Motor Speedway, Charlotte Motor Speedway, and Pocono Raceway.

28.     The NASCAR Xfinity Series generally holds races on the same tracks as the Cup Series, but Xfinity Series races have fewer laps.

29.     The Craftsman Truck Series is comprised of modified pickup truck races.

30.     NASCAR racing series team ownership is open to any individuals with a license to compete.  To obtain a license to compete, individuals simply fill out an application, submit payment, and sign liability waivers that are all publicly available on NASCAR's website. Currently, NASCAR has over 156 full-season licensed owners.

31.     There are at least 150 tracks and road courses in the United States that NASCAR believes can support motorsports (including stock car) races.

32.     There are also endless opportunities for races outside of existing tracks, including recent utilization by NASCAR and other racing promoters of specialty-built facilities (e.g., in the Los Angeles Memorial Coliseum) or street course races (e.g., Las Vegas, Chicago, Miami, etc.).

33.     There are many traditional oval-shaped tracks that NASCAR neither owns nor with which NASCAR contracts.  And, NASCAR has increasingly sanctioned and promoted races on street tracks, like NASCAR's Grant Park 165 street race in Chicago.  In addition, NASCAR has sanctioned and promoted races in the Los Angeles Memorial Coliseum, a stadium used for football and the Olympic Games.

34.     Teams do not contribute to the cost of developing or maintaining racetracks or other facilities for NASCAR races.  Teams also do not contribute to the other costs of hosting events, including track personnel, supplies, marketing, ticketing, and all of the other costs necessary to host a race.

35.     In addition to its investment in racetracks and other venues for NASCAR events, NASCAR invests heavily in production infrastructure to deliver first-class live event content to fans and industry partners.  For example, in 2022 NASCAR announced construction of a 58,000-square-foot production facility in Charlotte, North Carolina.  That production facility, now operational, was built at a large cost to NASCAR and is or will be used by NASCAR media partners and has also been used by racing teams.

36.     Teams do not contribute to the costs of producing and delivering world-class live broadcasts for NASCAR races even though Cup Series teams are the largest beneficiary of the increased revenues attributable to broadcasts of Cup Series races under the 2025 Charter.

37.     From 1949 through 2015, teams that raced in NASCAR-sanctioned events competed to qualify for their entry into each race.  This included NASCAR's Cup Series, which is NASCAR's most prestigious stock-car racing series.  In the years immediately preceding 2016, each race in the Cup Series typically had 43 positions available for competitors.  Teams competed to earn their position and competed to win race purses.  NASCAR awarded the highest race purses to the best

racing teams based on how they finished in each race individually and overall throughout the season. The highest performers also earned lucrative sponsorships, as sponsors wanted to be associated with the best competitors.

38. Before 2016, teams earned money from NASCAR and tracks based on performance at each race. Historically, money from NASCAR's television deals was split 65% to tracks (via the sanctions awarded to host races), 25% to teams (via the purses for each race), and 10% to NASCAR.

39. Teams also earned, and today still earn, significant revenues from sponsorship deals, which they do not share with NASCAR. Steve Lauletta, President of 23XI, has described 23XI as a "brand that happens to be a race team, not a race team brand."[5]

40. Teams benefit from NASCAR's investment in racetracks, venues, and production facilities, because these investments make NASCAR races more attractive to broadcast partners, patrons, and viewers, which in turn helps teams sell sponsorships and otherwise monetize their team's intellectual property.

41. NASCAR has also made additional changes that have helped teams sell more sponsorships. For example, NASCAR's change to the Next Gen car has "opened a floodgate of new sponsors" for NASCAR teams.[6] Next Gen cars reflect NASCAR's most recent generation of rules for the types of cars that can be raced in the Cup Series. The previous generation of cars ("Generation 6") resulted in cars featuring more custom parts and features. On the other hand, Next Gen cars are made from standardized parts and require significantly fewer custom-made parts. Not only

---

[5]     https://racer.com/2022/07/07/interview-23xis-steve-lauletta/.

[6]     https://www.forbes.com/sites/gregengle/2024/04/21/how-nascars-sponsorship-ecosystem-is-evolving-with-the-times/.

does this lower costs for Cup Series teams, but it has increased sponsorship opportunities for teams, and made races more competitive.

## II.  THE ORIGINS OF THE CHARTER SYSTEM

42.    In the summer of 2014, nine NASCAR Cup Series racing teams[7] jointly formed the RTA, and by August 2014, nine more teams had joined, including Front Row Motorsports.[8]  The RTA was, and remains, an association of team owners who compete with each other for NASCAR entry slots, NASCAR race purses, sponsors, drivers, employees, and other investments.  Team owners are thus horizontal competitors.  The RTA limited its membership to only team owners whose teams attempted to qualify for at least 95% of NASCAR's Cup Series races in the prior two seasons.[9]  New or prospective team owners seeking to enter the NASCAR Cup Series at the time were not a part of the RTA.  As reported by the Associated Press: "The Race Team Alliance was formed in 2014 to give teams a unified voice in negotiations with the sanctioning body [NASCAR]."[10]  The RTA and its race team members sought, among other things, guaranteed entry into Cup Series races and guaranteed revenue from NASCAR.

43.    The negotiations regarding the terms of the 2016 Charter Agreement included fixed and performance amounts, guaranteed starting positions, goodwill, and the preservation of Open positions.  The RTA-member teams shared information amongst themselves regarding which

---

[7]    The original founding members of the RTA were: Chip Ganassi Racing with Felix Sabates, Hendrick Motorsports, Joe Gibbs Racing, Michael Waltrip Racing, Richard Childress Racing, Richard Petty Motor Sports, Roush Fenway Racing, Stewart-Haas Racing, and Team Penske.

[8]    https://www.usatoday.com/story/sports/nascar/2014/08/13/race-team-alliance-expands-to-include-18-nascar-sprint-cup-teams/14003447/.

[9]    https://www.usatoday.com/story/sports/nascar/2014/08/13/race-team-alliance-expands-to-include-18-nascar-sprint-cup-teams/14003447/.

[10]    https://apnews.com/article/sports-auto-racing-charlotte-michael-jordan-formula-one-00c6f2f2d4f9727ae21bb3dfbb742aec.

terms to propose, agreed with each other on their preferred outcomes and negotiating positions, and even shared the same outside counsel to negotiate on their collective behalf.

44.     After significant negotiations between the RTA and NASCAR, the parties reached agreement on the terms of the 2016 Charter Agreements. Under the 2016 Charter Agreements, there are 36 Charters, each issued by NASCAR for $0 paid by team owners. Each Charter (1) entitles a Charter holder to one guaranteed entry in every Cup Series race and (2) guarantees millions of dollars in payments to a Charter holder, just for having a Charter. In other words, merely by being awarded a Charter, a Charter team will receive millions of dollars from NASCAR, even if they never win or achieve any success in a race. The Charter Agreements also decreased the number of available positions in each Cup Series race from 43 to 40. Of those 40 positions, 36 are reserved for Charter teams (assuming each team receiving a Charter Agreement signed such agreement).

45.     Under the 2016 Charter Agreements, media rights were split 65% to racetracks, 25% to teams, and 10% to NASCAR. Promoters and NASCAR also contributed toward the teams' Pool Money, increasing the teams' net payout to approximately 37% of the NASCAR Cup Series media revenue (increasing over time to approximately 39% in 2024). The RTA teams also limited competition between themselves by negotiating for a distribution of funds from NASCAR that was not solely linked to a team's performance in a particular race. Under the 2016 Charter, funds are awarded to Charter teams for (i) performance in a particular race (Race Purse); (ii) overall performance in a particular year (Year-End Point Fund); (iii) overall performance over a number of seasons (Historical Owner's Plan) and (iv) payments merely for being a Charter member and committing to race in each Cup race (Fixed Owner's Plan).

46.     While Charter holders are able to sell their Charters for tens of millions of dollars (it has been publicly reported that the most recent Charter sale was for $45 million),[11] as noted above, NASCAR issued the original Charters to team owners for free.

## III.     THE 2025 CHARTER AGREEMENT NEGOTIATIONS

47.     23XI joined the RTA in 2021, and Front Row Motorsports rejoined in 2022 in anticipation of 2025 Charter negotiations.[12]  In 2022, the RTA consisted of every team then holding a 2016 Charter.

48.     Although 23XI and Front Row claim that they have never generated a profit competing in NASCAR, and that NASCAR's business model has "failed," both have expanded their racing teams by purchasing additional Charters from SHR for tens of millions of dollars.  In addition,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  Front Row also recently announced that it would expand with an additional driver in NASCAR's Truck series.  23XI also intends to race an additional car as an "open" team in 2025 with Corey Heim behind the wheel.[13]  Moreover, 23XI has continued to increase its tens of millions of dollars in investments in its race shop, Airspeed, which confirms that NASCAR and the Charter system drives value for teams.

---

[11]     Jordan Bianchi, The Athletic, Legacy Motor Club Obtains Restraining Order Against RWR In Suit Of NASCAR Charter (Apr. 5, 2025), https://www.nytimes.com/athletic/6268008/2025/04/09/legacy-motor-club-obtains-restraining-order-against-rwr-in-suit-of-nascar-charter/.

[12]     Front Row had been a member of the RTA during the 2016 Charter negotiations, but subsequently left after the 2016 Charters were signed.

[13]     https://www.jayski.com/2025/02/23/corey-heim-signs-developmental-deal-with-23xi-racing/.

49.     On information and belief, Front Row and 23XI each earned tens of millions of dollars of sponsorship revenue in 2023 as result of their participation in NASCAR races, as shown by the chart below.  None of this sponsorship revenue is shared with NASCAR or contributed by teams towards the cost of tracks, hosting races, or the broadcasts that teams benefit from in many ways, including by receiving both a share of broadcast revenues and also the ability to sell sponsorships.



50.     In addition to the tens of millions of sponsorship revenue teams receive and do not share with NASCAR, Polk orchestrated a scheme to extract even more money from NASCAR and the industry for the benefit of himself, his team 23XI, and Front Row, among others.  He did so by organizing together 23XI, Front Row, and certain race-team members of the RTA to jointly negotiate against NASCAR, with Polk himself leading the charge to demand Counterclaim Defendants' preferred terms for the 2025 Charter from NASCAR.  If NASCAR did not cede to his demands, Polk threatened to (and did) interfere with NASCAR's broadcast negotiations and also threatened a group boycott of NASCAR events.  This wasn't merely hypothetical.  In April 2023,

Charter teams collectively boycotted a meeting with NASCAR that was contractually-obligated pursuant to the terms of the 2016 Charter.[14]  But the conspiracy began before then.

51.  During the first quarter of 2021, 23XI was already discussing ███████████████████ ██████████████████████████████████ that 23XI just acquired from another team. On February 10, 2021, Denny Hamlin (23XI, Co-owner) emailed Polk and 23XI's President that ████████████████████████████████████████████████████████████████████ ████████████████████  Polk knew that to be successful in changing NASCAR's model, he would need to make sure all of the Charter teams were aligned.  To begin that process, in July 2021, Polk hosted a meeting regarding ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████

52.  On February 17, 2022, all of the teams in the RTA met to discuss next steps in negotiating the 2025 Charter negotiations.  In anticipation of that meeting, Polk put together ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████

53.  During this meeting on February 17, 2022, ████████████████████████████████ ████████████████████ regarding the Charter renewal.

54.  During or before February 2022, Polk succeeded in getting the teams owning all the 36 Charters to agree to delegate their negotiating authority to a common body that became known as

_____

[14]  https://apnews.com/article/nascar-owners-boycott-40d028af65c240c835176476344391a3.

the Teams Negotiating Committee ("TNC"). The next step was to let NASCAR know that the teams were unified. In February 2022, with Polk leading the charge, 23XI, Front Row, and others communicated to NASCAR making clear that the TNC would represent all teams throughout Charter negotiations and would provide proposals agreed amongst the teams to NASCAR.[15] The TNC consisted of Polk from 23XI and representatives of three other members of the RTA.

55.    Unsurprisingly, Polk led the TNC. The TNC presented demands to NASCAR on behalf of all existing Charter teams. In order to make these unified proposals, Polk, 23XI, Front Row, and others discussed and agreed upon desired contract terms in advance.

56.    Polk played an active role in 23XI's decision to enter into a conspiracy with Front Row and others to negotiate collectively with NASCAR. Polk provided the united position of the teams with respect to how much money teams would receive as part of the 2025 Charter Agreement, among other terms.

57.    Minutes of an April 5, 2022 RTA Meeting emphasized 

---

[15]    Pursuant to Section 2.3 of the 2016 Charter Agreement, negotiations were scheduled to start on January 1, 2023.

the Teams Negotiating Committee ("TNC"). The next step was to let NASCAR know that the teams were unified. In February 2022, with Polk leading the charge, 23XI, Front Row, and others communicated to NASCAR making clear that the TNC would represent all teams throughout Charter negotiations and would provide proposals agreed amongst the teams to NASCAR.[15] The TNC consisted of Polk from 23XI and representatives of three other members of the RTA.

55.    Unsurprisingly, Polk led the TNC. The TNC presented demands to NASCAR on behalf of all existing Charter teams. In order to make these unified proposals, Polk, 23XI, Front Row, and others discussed and agreed upon desired contract terms in advance.

56.    Polk played an active role in 23XI's decision to enter into a conspiracy with Front Row and others to negotiate collectively with NASCAR. Polk provided the united position of the teams with respect to how much money teams would receive as part of the 2025 Charter Agreement, among other terms.

57.    Minutes of an April 5, 2022 RTA Meeting emphasized ███████████████  ██████████  The RTA also set out ███████████████████████████████  in ██████████████████████████████████████

58.    Mr. Polk explained his ██████████  He said that ████████████████████  ████████████████████████████████████████████  Mr. Polk  ████████████████████████████████  to his ██████  and multiple teams ██████  One team responded, ████████████████████████████████████  ████████████████████████████████████  Another team said that █████████████████████████████████



[15]    Pursuant to Section 2.3 of the 2016 Charter Agreement, negotiations were scheduled to start on January 1, 2023.

███████████████████████████████████████ and █████████████████ A third team replied,

we ███████████████ And a fourth team said, ██████████████████████████████

██████████████████████

59.     Shortly thereafter, in June 2022, the TNC, led by Polk, presented NASCAR its initial proposal and represented that the proposal had been agreed upon by all 16 teams holding 36 Charters at the time.[16] The TNC proposed a multi-point plan intended to increase payments to the teams and further limit competition between them.[17] In exchange for the above list of demands, the teams told NASCAR that they were "all in."

60.     On September 1, 2022, the TNC sent a letter to NASCAR that ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

61.     Nine days later, Polk considered ████████████████████████████ Polk identified

██████████████████████████████████ On September 10, 2022, in a text chain between Polk, the RTA's Executive Director, and others, the RTA's Executive Director described █

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[16]     https://apnews.com/article/sports-auto-racing-charlotte-michael-jordan-formula-one-00c6f2f2d4f9727ae21bb3dfbb742aec.

[17]     These demands included: █████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



62.     Less than two weeks later, on September 22, 2022, the TNC had a meeting with NASCAR regarding ███████████████ After the meeting, Polk and other members of the TNC and RTA discussed ███████████████ Polk made clear ███████████████ He reiterated ███████████████ ███████████████ ███████████████ ██████ as he stated, ███████████████ Polk said, ██████ ███████████████ And to do so, Polk declared, ███████████████ ███████████████

63.     Throughout 2022, the TNC, including Polk, continued to have private meetings with NASCAR about the 2025 Charter Agreements and the teams' demands for additional broadcast revenue from NASCAR, while NASCAR's broadcast agreement was under negotiation.[18]  These meetings included Polk and representatives of NASCAR, and others on multiple dates.

---

[18]     https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2022/10/07/NASCAR-Race-Team-Alliance-Tensions.aspx.

64.     In furtherance of their conspiracy, Counterclaim Defendants and others agreed to engage in a misinformation campaign designed to increase their collective leverage against NASCAR, and discourage NASCAR from seeking to negotiate with teams individually.

65.     On or about October 2, 2022, NASCAR offered the Charter teams proposed terms of a Charter agreement.  The teams collectively rejected those terms.

66.     Just three days later, on October 5, 2022, Denny Hamlin (23XI, Co-owner) messaged the owner of a competitor Charter team.  Hamlin wrote, ███████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████ The competitor team's owner asked about ██████████████████████████████████████████████████████████████ ██████████████████████████

67.     These communications demonstrate that, even if teams had individual discussions with NASCAR, those teams were adhering to their collectively agreed-upon prior plan, they were reaffirming to each other their commitment to that plan, and they were monitoring each other to ensure teams did not deviate from the collective objectives.

68.     The next day, on October 6, 2022, the RTA's Executive Director emailed TNC members, including Polk, ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████ As will become clear (see below), Charter teams were unified in seeking more fixed revenue as opposed to revenue through race purses because ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Further, the

TNC explained, ████████████████████████████████████████████████

████████████████████████████████████████ And the message that ████████████

███████████████████████████████████████████████████████████

██████████

69.     In early October 2022, the TNC held a joint press conference to publicize their dissatisfaction with the fact that NASCAR had not given in to their collective demands.

70.     Polk continued to ████████████████████████████████████████████████

On October 19, 2022, Polk texted Michael Jordan that ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████

71.     The RTA further announced in November of 2022 that it had engaged Wasserman Media Group, a sports marketing agency, to explore the possibility of holding exhibition events outside of NASCAR.  It was widely reported at the time that this was "just a leverage tool" used by the teams to extract concessions from NASCAR in Charter negotiations.[19]

72.     RTA members also engaged in a scheme to deter new team owners from seeking to enter the Cup Series by purchasing a Charter, preferring instead to consolidate their own positions by purchasing additional Charters themselves.  Former racing star Dale Earnhardt Jr., who owns a NASCAR Xfinity Series team, explained that although he sought to purchase a charter, the RTA told him that "this charter that I want to buy is a losing proposition. It's broken. That I don't want

---

[19]     https://racingnews.co/2022/11/30/nascar-teams-could-soon-host-exhibition-races-without-nascar/;   https://www.news-journalonline.com/story/sports/outdoors/fishing/2022/12/04/nascar-shots-fired-owners-consider-going-rogue-exhibitions-tony-stewart-jeff-gordon-roger-penske/10811534002/.

to buy this charter now, because it's not a successful business."[20]  These representations were false, as shown by Counterclaim Defendants' purchases of two Charters only a few months later for tens of millions of dollars.

73.     Pursuant to the 2016 Charter Agreement, NASCAR and Charter teams are required to attend a minimum of four annual meetings each year ("Team Owner Council Meetings"). NASCAR, pursuant to the Charter Agreement, sent out notice of a meeting to be held on April 5, 2023.  All teams accepted the meeting invitation.

74.     Upon information and belief, Polk and the TNC agreed with each other and one or more other RTA members to boycott the meeting to pressure NASCAR to give in to the TNC's collective demands and not to seek to deal with teams individually or directly.

75.     On the day of the scheduled meeting, in an effort to pressure NASCAR to agree to the RTA's terms, all teams boycotted a Team Owner Council Meeting.

76.     Following this boycotted meeting, NASCAR decided it had to continue to negotiate the terms of the 2025 Charter Agreements with all of the RTA members through the TNC.  NASCAR also sought to simultaneously negotiate with the teams individually because it appeared that the TNC and Polk were not providing all of NASCAR's offers to all teams/team owners, but Polk and others repeatedly sought to interfere with or deter those efforts.

77.     On or about February 4, 2023, NASCAR offered the teams a Charter agreement.  The teams collectively refused.

78.     The following month, on or about March 24, 2023, NASCAR again offered the teams a Charter agreement.  The teams collectively refused.

---

[20]     https://racingnews.co/2022/10/14/dale-earnhardt-jr-perplexed-as-nascar-charters-valued-at-30m/.

79.     At least as early as April 2023, Counterclaim Defendants had been attempting to  ███████ perhaps in anticipation of litigation, even before knowing the final Charter terms.   On April 25, 2023, in a text chain between Polk other 23XI personnel, Polk wrote: ███████████ ████████████████████████████████████████

80.     On December 22, 2023, a TNC member reported to the rest of the TNC and the RTA's executive director regarding ███████████████████████████████ ████████████████   One TNC member wrote that a TNC representative ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████   Ultimately, the TNC was satisfied that ███████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████

81.     That same day, NASCAR offered the teams a Charter agreement.   The teams collectively refused.

82.     The TNC and Polk were successful in obtaining concessions from NASCAR during these negotiations.   One of these concessions is that NASCAR agreed to increase the percentage of revenue to the teams by approximately 25%.   All told, the team owners collectively negotiated an increase of guaranteed payments to almost half of media revenue attributable to the Cup Series based on 36 Charters.

83.     But the Counterclaim Defendants were not satisfied.   They wanted to achieve permanent Charters (essentially granting them equity in NASCAR for no consideration), which would include

permanent guaranteed entry into NASCAR races, even further increased revenues from NASCAR, and they wanted to take the greatest share of money for themselves by limiting the amount of money that open teams could receive even if they performed well in Cup Series races.

84.     In February 2023, 23XI co-owner Denny Hamlin admitted publicly that the RTA purposefully engaged in a media campaign regarding the 2025 Charter negotiations at the same time that NASCAR was negotiating with broadcasters in order to put pressure on NASCAR "to make a deal with us." Hamlin explained the RTA's reasoning and threatened that the teams would boycott NASCAR if they did not achieve their demands: "I don't see how you can go out and get the most money from a TV partner if you don't have your house in order. . . . No TV partner wants any interruptions in service. . . . And with the teams publicly saying they weren't happy with the deal, that could throw up red flags for TV."[21] Hamlin also argued on his podcast that NASCAR did not need to spend money on racetracks because races can be held at tracks like the LA Coliseum and the COTA road course in Austin, Texas, and that that money should instead be given to Charter teams.[22] That, of course, ignores the substantial costs incurred by NASCAR to create a track for the LA Coliseum and the amounts payable to race at COTA.

85.     On information and belief, in furtherance of the conspiracy, Polk spoke with broadcasters in an attempt to interfere with NASCAR's media rights negotiations.

86.     Polk, 23XI, Front Row and their co-conspirators agreed to interfere with NASCAR's media rights negotiations in order to extract even better terms under the 2025 Charter through their collective action, and to deter NASCAR from dealing with teams individually. 23XI, Front Row,

---

[21]     https://www.essentiallysports.com/nascar-news-denny-hamlin-admits-rta-deliberately-made-their-feud-with-nascar-public-to-sabotage-leverage-new-tv-deal-amid-75-vs-25-row/; https://open.spotify.com/episode/474wYcbIdAxfbIULxCREjv?si=tIzu1ez8RmyYpjlHr96OTg&nd=1&dlsi=37c44e427d404597 at 1:04:30 – 1:04:59.

[22]     *Id.*

and others threatened to boycott qualifying races for at least one NASCAR Cup Series race. On information and belief, Polk organized this threatened boycott in order to harm NASCAR, including NASCAR's relationships with its broadcast partners, and demonstrate their resolve to presenting a unified front against NASCAR.

87.     On August 10, 2023, Polk emailed members of the TNC regarding ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

88.     On October 26, 2023, the day following a Team Owner Council meeting with NASCAR, the RTA's Executive Director sent an email to the TNC detailing ███████████████

██████ writing: █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

89.     Throughout Charter negotiations, the TNC regularly shared ████████████████

████████████████████████████████████████████████████████

████████████     On October 28, 2023, the RTA's Executive Director expressed ████████████

█████████████████████████████████████     The RTA's Chairman asked

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

90.     On January, 26, 2024 in a text chain between Polk, RTA's Executive Director, and another TNC member, the RTA's Executive Director circulated ███████████████████████ ████████████████████████████████████ Polk replied, █████████████████ ██████████████████████████████████████████

91.     In early 2024, Polk and the TNC continued to █████████████████████████ ████████████████. On February 13, 2024, following NASCAR's outreach to teams to expect one-on-one meeting requests, Polk wrote, ██████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████

92.     On February 14, 2024, the RTA's Executive Director circulated a ██████████████ ████████████ which 23XI claims is partially privileged.  This document was sent by the RTA's Executive Director to Curtis Polk, the RTA's Chairman, and principals from four other teams. Because there are multiple parties on this email, 23XI must be claiming an exception to waiver based on the joint defense privilege.  To qualify for a claim of the joint defense privilege, 23XI is asserting that all persons on this email were members to an agreement to share information as a result of a common legal interest relating to ongoing or contemplated litigation.  There was no litigation between 23XI and NASCAR at that time.  This means that 23XI must have been contemplating litigation at that time and that all other parties on the email must also have an identical *legal* interest.  NASCAR disagrees with the basis of this privilege claim, but 23XI's assertion further evidences the existence of an agreement.  In response to the redacted proposed communication,  the RTA's Chairman replied, ██████████████████████████████ ███████████████████████████████████████ Another TNC member

agreed and wrote, ██████████████████████████████████████████████████

███████████████████████████████████████████████

93.    As early as February 2024, Polk attempted to ████████████████████████

████████████████████████████████████    On February 21, 2024, in a text chain with other

TNC members, Polk wrote: ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████

94.    During that same month, on February 27, 2024, the RTA's Executive Director circulated a

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████    ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

95.    Two days later, on February 29, 2024, the RTA's Executive Director emailed members of

the TNC regarding ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

96.     Polk, 23XI, and other members of the TNC sought to █████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ On April 8, 2024, the RTA's Executive

Director emailed the TNC including Polk that ██████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████

97.     On April 10, 2024, in response to NASACAR sending letters requesting individual

meetings with teams, the RTA's Executive Director emailed the teams ████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████  The RTA's Executive Director wrote that ████████████████████████████████

████████████████████████████████████████████ He also noted

that █████████████████████████████████████████████████

███████████████████████

98.     While certain Charter teams did have individual meetings with NASCAR regarding negotiating the Charter agreement, those teams still abided by their agreement with their co-conspirators to use the terms negotiated by the TNC. ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ In the course of any individual discussions with Charter teams, the Charter terms regarding how much money teams would receive never decreased, and remained artificially inflated through the conspiracy that Polk, 23XI, and Front Row orchestrated.

99.     On April 25, 2024, the TNC presented ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████ As shown in paragraph 68, above, 23XI, Front Row and their co-conspirators had reached an agreement to focus on fixed payments because ██████████████████████████ ████████████████████████████████████

100.    On May 1, 2024, Denny Hamlin (23XI, Co-owner) emailed Polk regarding ████████ ████████████████████████████████████████████████████████████ ████████████████████ He explained that ████████████████████████████ ████████████████████████████████████ Notwithstanding 23XI

████████████████████████████████████████████████████████

████████████████████████████████

101.    On or about May 28, 2024, NASCAR offered the teams a Charter agreement.  Again, the

teams collectively refused.

102.    On May 30, 2024, following receipt of NASCAR's May 28, 2024 Charter draft, the RTA's

Executive Director emailed Front Row that ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

103.    On June 3, 2024, 23XI's President messaged Polk that ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

104.    On June 26, 2024, in a text chain between the RTA's Executive Director and Front Row's

General Manager regarding ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Front Row's General Manager responded,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██

105.    On June 26, 2024, Front Row, 23XI, and their co-conspirators met ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

106.    On July 9, 2024, the TNC sent NASCAR proposed revisions to the 2025 Charter Agreement, which had "the support of all of the Teams."  The TNC representative sending the correspondence made clear: "I can say with assurance that . . . each [team] would sign onto the terms as reflected herein."  These revisions involved numerous provisions in the 2025 Charter

Agreement, including the Charter teams' demand that NASCAR pay at least 42.7% of all media revenues to teams during the term of the agreement, most favored nations clauses to prevent NASCAR from negotiating for different Charter Agreement terms with new teams, and other revisions meant to insulate Charter teams from competition.

107.    On July 31, 2024 and August 1, 2024, 23XI executives and the RTA's Executive Director communicated regarding ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

108.    On August 14, 2024, Steve Phelps, the President of NASCAR, sent 23XI an updated version of the proposed Charter Agreement, which included revisions based on input from the TNC and non-compensation issues from various teams.

109.    During the negotiations, NASCAR learned that the Counterclaim Defendants were not accurately conveying the substance of the negotiations, or NASCAR's positions, to other teams.

110.    On or about August 14, 2024, NASCAR provided another proposed revised Charter Agreement.

111.    After discussing ████████████████████████████████████ 23XI's President wrote to the RTA's Executive Director: ████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████

112.    On August 16, 2024, the RTA's Executive Director texted Front Row's President that he would ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████

113.    On August 25, 2024, Denny Hamlin (23XI, Co-Owner) and Bob Jenkins (FRM, Owner) exchanged text messages regarding ████████████████████████████████

████████████████████████████

114.    On August 26, 2024, after NASCAR attempted to engage in one-on-one discussions with teams, 23XI, Front Row, and Polk recommitted to their unlawful scheme to jointly negotiate against NASCAR.  A member of the TNC sent an email to NASCAR on behalf of all teams identifying remaining "key issues."  The TNC representative explained, "[a]s a group, the Teams are eager to sign a new Charter Agreement . . . ."  The teams demanded that NASCAR remove a one-year non-compete at the end of the term of the proposed 2025 Charter Agreement and demanded a most favored nations clause to eliminate competition between the teams.  The teams

also objected to NASCAR's proposal to make direct payments of millions of dollars to drivers under the Driver Ambassador program, again in an effort to stifle competition between the teams.

115.  On August 30, 2024, NASCAR offered the teams a Charter agreement.  The teams collectively refused.

116.  NASCAR was told that several teams were ready and willing to sign the 2025 Charter Agreement, but were threatened by 23XI, Polk, and Front Row and others to "not break ranks."

117.  NASCAR further understood that the Counterclaim Defendants instructed teams to drag out the negotiations for the 2025 Charter Agreements, believing that NASCAR would cave to their demands as the 2025 season drew closer and also discussed potential threatened boycotts of NASCAR races and events.

118.  On September 6, 2024, NASCAR offered the teams a Charter agreement.

119.  After receiving that offer, Polk messaged other 23XI personnel that ███████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████

120.  On September 6, 2024, the RTA's Executive Director emailed all of the Charter teams ██ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

121.  Later that same day, Polk emailed Denny Hamlin (23XI, Co-Owner) regarding ██████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████

122.   Throughout the negotiation process 23XI, Front Row, Polk and others joined together to collectively demand "a larger share of the NASCAR pie than they've been getting."[23]  By agreeing to eliminate competition among the teams, Counterclaim Defendants were able to achieve this outcome.

123.   NASCAR was harmed as a result of the collusive, threatening and damaging behavior of Counterclaim Defendants.  These activities resulted in reputational and brand damage at a time when NASCAR was attempting to renew its most important revenue stream, its media rights.  The collusion also led to Charter Agreements that contained more beneficial terms for race teams than would have been obtained in the absence of collusion, including terms relating to duration of the Charters and financial floors.

124.   The anticompetitive scheme of Counterclaim Defendants has and will continue to artificially eliminate competition between teams that should be direct competitors, stifle incentives to innovate, stymie investment and growth of the sport, and threaten to reduce the competitive quality of the Cup Series.

125.   Since Counterclaim Defendants' collusion is *per se* unlawful, no market definition is necessary.

126.   In the alternative, if market definition is necessary, then the teams' horizontal agreements constitute an unreasonable restraint of trade in the market for entry of cars into NASCAR Cup Series races in the United States and any other location where a Cup Series race is held.  NASCAR Cup Series races must feature cars qualified to race in NASCAR Cup Series races.  The conspiracy that Polk, 23XI, and Front Row orchestrated included agreements on behalf of the teams that then

---

[23]    https://www.forbes.com/sites/gregengle/2023/04/05/nascar-owners-need-to-tread-carefully-or-they-could-lose-everything/.

possessed the vast majority of those cars, representing all 16 teams holding Charters covering 36 of the 40 race starting positions for most races.

127.    Many teams that participate in NASCAR are parts of larger organizations that establish teams to purchase entry in multiple NASCAR Series and other motorsports for the opportunity to compete for prize money and to obtain sponsorship dollars.  For example, Penske Corporation includes the NASCAR Team Penske, as well as an IndyCar and IMSA team.  Counterclaim Defendant Front Row fields two Cup Series cars and two trucks in NASCAR's Truck Series.  In addition, financial investors including private equity firms and others are increasingly taking ownership stakes in teams.  Other organizations have been created to manage a portfolio of motorsports investments.  For example, TWG Motorsports hold interests in a Formula 1 team, IndyCar teams, Spire Motorsports in NASCAR, teams that compete in IMSA and other endurance races, and a SuperCars team.

128.    These organizations, through and on behalf of their NASCAR teams, compete against each other (and many other organizations) for entry into NASCAR Cup Series races and also hundreds of millions of sponsorship dollars, or more.  Obtaining guaranteed entry into Cup Series races—and excluding other teams from entry—is thus incredibly valuable to motorsports organizations.

129.    Counterclaim Defendants' conspiracy has harmed competition.  The conspiracy has eliminated competition between teams that should be direct competitors, harmed incentives to innovate, invest, and grow the sport, and anticompetitively misallocated resources.  The conspiracy has also reduced performance-based competition due to the guaranteed starting positions occupying 90% of the total number of racing opportunities in any given event.  In addition, Counterclaim Defendants reached an agreement to increase the amount of fixed revenue each would receive as opposed to the amount of compensation provided for performance on the track

(or "purse" money). This hurts NASCAR and competition because it reduces the incentives for new teams to enter and race open—and depresses competition on the track. The fact that the Charter teams reached this agreement further harms competition and NASCAR. All of these harms to competition have also harmed NASCAR. Unlike the Cup Series, the Xfinity and Truck Series, which do not operate under a Charter system, have remained vibrant and expansive.

## COUNT I – CONSPIRACY IN RESTRAINT OF TRADE – SHERMAN ACT SECTION 1

130. NASCAR incorporates its allegations in Paragraphs 1-82 as if fully stated herein.

131. Horizontal competitors violate Section 1 of the Sherman Act when they agree to engage in joint negotiations regarding prices and other terms of dealing with counterparties who are either buyers or sellers.

132. Beginning no later than June 2022, Counterclaim Defendants engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Curtis Polk knowingly and actively orchestrated and participated in this illegal conspiracy, while working as a member of the TNC on behalf of the RTA and aiding 23XI's and Front Row's participation in the scheme, also constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. 23XI, Curtis Polk, Front Row, and their co-conspirators agreed to a fixed price to seek for the total award pool and further agreed how to allocate that fixed price by deciding how the total award pool would be allocated.

133. The conspiracy and agreement consists of an agreement to engage in concerted action among Counterclaim Defendants and others to limit competition, increase payments, and otherwise demand their preferred terms for Charter teams by agreeing on the terms they would offer and agree to when collectively negotiating the 2025 Charter Agreements with NASCAR.

134.   23XI, Front Row, and their co-conspirators are horizontal competitors and separate economic actors who agreed to join together to collectively negotiate with NASCAR. 23XI, Front Row, Polk, and others agreed to a scheme to pressure NASCAR to accept their collusive terms, including by engaging in media campaigns, interfering with NASCAR's broadcast agreement negotiations, threatening boycotts of NASCAR events, and engaging in a group boycott of a NASCAR Team Owner Council Meeting.

135.   In addition, Counterclaim Defendants engaged in active threats and coercive behavior in order to maintain their *per se* illegal cartel. Counterclaim Defendants' collusive conduct achieved its goals. Such an agreement to eliminate horizontal competition and jointly negotiate constitutes a *per se* violation of Section 1 of the Sherman Act.

136.   Polk played an active role in this illegal conspiracy by, *inter alia*, representing all teams in negotiations, coordinating their conduct, and threatening teams that considered leaving the conspiracy and interfering and negatively affecting NASCAR's attempts to renew its media rights agreements.

137.   The law does not allow horizontal competitors to agree to eliminate competition by joining together to jointly negotiate terms of a contract. Such agreements are considered *per se* violations of the antitrust laws.

138.   Counterclaim Defendants' agreements, combinations, and conspiracies unreasonably restrain trade and foreclose competition.

139.   No legitimate procompetitive justifications exist to justify Counterclaim Defendants' unreasonable restraints of trade. Collusion among racing teams in the manner described above is not necessary for the performance of the NASCAR Cup Series. NASCAR operated for over 68 years without the existence of Charters by hosting races governed by rules and for financial

incentives that did not require agreement or collusion among NASCAR teams. Indeed, teams have competed in the NASCAR Cup Series without a Charter and without participating in the Race Team Alliance, and NASCAR continues to operate two successful racing series that also do not employ Charters.

140.    NASCAR has suffered and will continue to suffer antitrust injury to its business and property as a direct and proximate result of Counterclaim Defendants' unlawful agreements, combinations, and conspiracies in restraint of trade. Counterclaim Defendants' participation in the unlawful cartel has resulted in harm to NASCAR's Cup Series through decreased competition, participation and growth of the sport.

141.    NASCAR is entitled to judgment from this Court for all damages incurred by NASCAR because of Counterclaim Defendants' antitrust violations, including treble damages and attorneys' fees. NASCAR is also entitled to injunctive relief requiring Counterclaim Defendants to refrain from their anticompetitive conduct, which includes collective negotiations with NASCAR on behalf of multiple, separate NASCAR teams.

## PRAYER FOR RELIEF

WHEREFORE, NASCAR prays for judgment and relief as follows:

a)  Judgment that 23XI, Front Row, and Curtis Polk violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and an award of treble the actual damages suffered by NASCAR under Section 4 of the Clayton Act, 15 U.S.C. § 15;

b)  An order permanently enjoining 23XI, Front Row, and Curtis Polk and those in active concert with them from violating Section 1 of the Sherman Act, including by prohibiting them from jointly negotiating with NASCAR;

c)  That an injunction be issued to grant such relief as is necessary to restore competition including, the elimination of Section 3.1(a) of the 2025 Charter Agreement which provides

for guaranteed entry into Cup Series races if Counterclaim Defendants persist in seeking to have the Charter Agreements declared as unlawful under the antitrust laws or seek the elimination of Section 6.6 or other provisions of the 2025 Charters mutually agreed upon by NASCAR and approximately ninety-percent of Charter holders.

d) Award NASCAR its costs and attorneys' fees in connection with this action; and

e) Such further and additional relief as the Court deems just and proper.

## JURY DEMAND

NASCAR demands a trial by jury on all issues on which trial by which trial by jury is available under applicable law.

Dated:  May 8, 2025                                    Respectfully submitted,


By:      */s/ Christopher Yates*
         Christopher S. Yates*
         **LATHAM & WATKINS LLP**
         505 Montgomery Street, Suite 2000
         San Francisco, CA 94111
         Telephone: (415) 395-8240
         chris.yates@lw.com

         Lawrence E. Buterman*
         **LATHAM & WATKINS LLP**
         1271 Avenue of the Americas
         New York, NY 10020
         Telephone: (212) 906-1200
         lawrence.buterman@lw.com

         Anna M. Rathbun*
         David L. Johnson*
         Christopher J. Brown*
         Christina R. Gay*
         **LATHAM & WATKINS LLP**
         555 Eleventh Street, NW, Suite 1000
         Washington, DC 20004
         Telephone: (202) 637-2200

41

anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com
christina.gay@lw.com

Tricia Wilson Magee (N.C. Bar No. 31875)
**SHUMAKER, LOOP, & KENDRICK, LLP**
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Telephone: 704-945-2911
tmagee@shumaker.com


*Admitted *pro hac vice*

*Counsel for Defendants and Counter-Plaintiff*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

I hereby certify the following:

1.       No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of artificial intelligence embedded in the standard on-line legal research sources, such as Westlaw, Lexis, FastCase, and Bloomberg.

2.       Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 8th day of May, 2025.

*/s/ Christopher Yates*