# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. <br><br> NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. | No. 3:24-cv-886-KDB-SCR |

**NON-PARTY TEAMS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO NASCAR'S REQUEST FOR DISCOVERY-DISPUTE INTERVENTION REGARDING SUBPOENAS TO NON-PARTY RACING TEAMS**

The Non-Party Teams[1] oppose Defendant/Counter-Plaintiff NASCAR Event Management, LLC's ("NASCAR") eleventh-hour request for production of their "ordinary course" financial documents.

**INTRODUCTION**

"If you ain't first, you're last." The competitiveness of NASCAR is evident in every aspect of the sport. NASCAR teams, including the Non-Party Teams, use absolutely everything at their disposal to cross the finish line first, whether it is on-track talent and strategy or sponsorship, manufacturer support, and other revenue streams that feed the business. The teams' financial information is, therefore, a closely-guarded secret. Nevertheless, NASCAR asks this Court to compel the production of "ordinary course team financial documents related to the costs, revenues, and profits of the [Non-Party] Teams"[2] from 2020 through 2024.[3]

For *weeks*, counsel for the Non-Party Teams have asked NASCAR what *specific* financial information from these "ordinary course" financials it believes is relevant. Counsel for NASCAR refused to provide any response, instead saying that they "can't know how the data will be used until it is produced, our experts analyze it, etc." In other words—a classic fishing expedition. Such an exercise does not warrant the disclosure of the Non-Party Teams' highly confidential financial information.

The reason NASCAR cannot articulate how it intends to use the Non-Party Teams' admittedly confidential and proprietary financial information is now clear—NASCAR has no real

---

[1] Hendrick Motorsports, LLC, Joe Gibbs Racing, LLC, Penske Racing South, Inc., Richard Childress Racing Enterprises, Inc., Rick Ware Racing, LLC, RPAC Racing LLC d/b/a Legacy Motor Club, Roush Fenway Keselowski Racing, LLC, Smith Racing LLC d/b/a Hyak Motorsports, Spire Motorsports, Haas Factory Team, LLC, Trackhouse Entertainment Group, LLC, and Wood Brothers Racing, LLC.
[2] NASCAR has not made clear what it means by the term "ordinary course," but based on discussions in the meet-and-confer process and in NASCAR's brief, the Non-Party Teams understand this to mean "financial statements (audited, if available)" necessary to defend against Plaintiffs' claim that "NASCAR does not 'fairly' share 'industry revenues,'" which should be limited to no more than any available redacted annual income statements.
[3] Although the time period in NASCAR's subpoenas dates back to 2014, NASCAR's proposal during the meet-and-confer process limited its request to 2020-2024.

purpose. Indeed, although NASCAR claims the Non-Party Teams' financial information is "highly relevant," in the same breath it invites this Court to issue an order finding that the information is "***irrelevant***." ECF No. 156, at 5. NASCAR cannot speak out of both sides of its mouth. If the information is irrelevant, it is not discoverable, and the Court should take NASCAR up on its invitation to summarily resolve this issue on those grounds.

But even if some subset of the financial information contained in the Non-Party Teams' ordinary course financial statements has *some* marginal relevance, NASCAR has an obligation under Rule 45 to work with the Non-Party Teams to address their confidentiality concerns. NASCAR concedes these confidentiality concerns are "understandable." The Non-Party Teams listened to what NASCAR said it needed during the meet-and-confer process (i.e., top-level revenue, cost, and profit information) and proposed a workable way to provide that information so long as steps were taken to anonymize it and remove sensitive financial information that NASCAR did not need. But NASCAR made no attempt to work with the Non-Party Teams. It instead elected to violate the Charter Agreements it seeks to defend by asking this Court to compel the Non-Party Teams—the same teams NASCAR calls its "partners"—to produce detailed, unredacted financial statements that include highly confidential detailed line items far beyond what even NASCAR has suggested it could possibly need.

As discussed below, this turns third-party discovery upside down. Under Rule 45, to establish its right to any disclosure, NASCAR must first (i) articulate how the information sought is relevant and proportional to the needs of the case and (ii) take reasonable steps to avoid imposing undue burden or expense on the Non-Party Teams. NASCAR has not done this. Therefore, its informal motion to compel should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This discovery dispute traces back to NASCAR's last-minute decision to serve wildly overbroad, intrusive document subpoenas on all of the Non-Party Teams—its "partners," as

2

NASCAR's counsel fondly referred to them at last Tuesday's hearing. Following an unnecessarily urgent, difficult, and costly process of identifying the scope of responsive information, the Non-Party Teams responded individually, each lodging its own objections and engaging in one-off meet-and-confer discussions with NASCAR's trial counsel. Bound together by a common interest[4] to safeguard their highly confidential competitive information, the Non-Party Teams and their various counsel began having group discussions about a collective proposal that would get NASCAR the information it claimed to need most—basic top level, Cup Series-related financial data—while at the same time protecting the teams' overwhelming need for confidentiality.

The Non-Party Teams eventually reached consensus on a joint proposal which touched the outer limits of what could possibly be required or even appropriate under the circumstances:

- Each team would separately provide its annual top-line financial data (total revenue, total costs, and net profits/losses) on an anonymized, average per-car basis for each year dating to 2014.

- The financial information would be limited to operations associated with fielding full-time cars in the Cup Series (i.e., not revenue or expenses tied to ancillary business lines like engine programs or non-Cup Series racing activities).

- The average per-car information from each team would be provided by the teams to an acceptable neutral accountant, who would produce to NASCAR's trial counsel one spreadsheet displaying the per-car annual averages for each team but without identifying the team associated with each set of numbers.

Anonymity is a key feature for the teams. As the Court knows, protective orders can only provide so much protection, as demonstrated at last week's hearing when NASCAR's counsel recited in

---

[4] The Non-Party Teams are a disparate group, varying widely in their size, scale, resources, and affiliations with the broader corporate world. They compete fiercely on the track and also for talent and sponsorship support. But the teams also are aligned—just as fiercely—in one critical respect: their vigilant commitment to safeguarding their highly sensitive and competitive business secrets from their competitors. Moreover, unlike the dynamic in other professional sports between teams and their sanctioning body, here, that competitor relationship includes NASCAR, which directly competes with the race teams for sponsors, for employees, and potentially on the race track itself.

3

open court, with the press in attendance, the contents of a communication designated as Attorneys' Eyes Only. This confidential information was then quoted in at least one national news article.[5]

The Non-Party Teams made their proposal to NASCAR on June 4, 2025. Ex. B. NASCAR's counsel rejected the proposal but agreed to limit the scope of the subpoenas to just the Non-Party Teams' "ordinary course financials." Ex. C. NASCAR cited admissibility concerns and a purported need for more robust financial data as the reasons for rejecting the teams' proposal. The Non-Party Teams then suggested various potential ways to assuage NASCAR's concerns, including that the parties to the lawsuit and the Non-Party Teams could work on a stipulation addressing any admissibility/authenticity concerns.

NASCAR refused to have *any* of those discussions, refusing even to identify the specific financial data it needed.[6] "[T]he issue," NASCAR's counsel stated, "is that we can't know how the data will be used until it is produced, our experts analyze it, etc." Ex. D. NASCAR broke off discussions and immediately sought Court intervention.

## ARGUMENT

NASCAR comes nowhere close to meeting the high burden required to obtain the Non-Party Teams' highly confidential financial information.[7] The Federal Rules provide special protections when the information sought through a non-party subpoena is "a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45. Specifically, Rule 45(d)(3)(B) requires that the serving party show a "substantial need" for the information, and

---

[5] *See* Ex. A, Fryer, Jenna, "Federal judge calls on NASCAR, teams to settle bitter antitrust battle," APNews.com (June 17, 2025) (https://apnews.com/article/nascar-antitrust-lawsuit-michael-jordan-68a39df51b963a1e1be6ba37d6cf02c3) (accessed on June 22, 2025).

[6] NASCAR also refused to accept attestations from Non-Party Team CFOs vouching for the accuracy of the anonymized financial data the teams—NASCAR's "partners"—proposed to provide.

[7] At the outset, this is not the proper forum for this dispute. NASCAR insisted that the Charter Agreements require arbitration rather than judicial intervention. *See* ECF No. 142-1, Exhibit A, § 12 (requiring arbitration for "any dispute, disagreement, controversy or claim between the parties hereunder . . . that arises under or in connection with this Agreement . . . ."). Now, due to NASCAR's haste, the Non-Party Teams find themselves before the Court with NASCAR ignoring its own Charter Agreement.

4

even then, the Court will order compliance only if it can "devise an appropriate accommodation to protect the interests of the" party opposing such potentially harmful disclosure. Fed. R. Civ. P. 45 advisory committee's note to 1991 amendment. "Even if the information sought is relevant, discovery is not allowed . . . where the potential harm caused by production outweighs the benefit." *Insulate Am. v. Masco Corp.*, 227 F.R.D. 427, 432 (W.D.N.C. 2005). This rule applies with considerable force to a non-party's most sensitive financial information. *See, e.g., In re Subpoena Duces Tecum Served on Duke Energy Corp.*, No. 3:05-MC-201, 2005 WL 2674938 (W.D.N.C. Oct. 18, 2005) (declining to compel production of "general operating and financial information," finding that the plaintiff had not demonstrated a "substantial need" for "information on cost, pricing, bidding and transactional data" that it wanted "to support expert testimony").

In *Insulate America v. Masco Corp.*, the Western District of North Carolina dealt with the enforceability of a non-party subpoena stemming from antitrust litigation much like the present case. 227 F.R.D. at 428. Through a subpoena, the defendants sought, among other things, all financial statements during the relevant period, which the non-party identified as its "highly confidential commercial information." *Id*. at 430. The Court determined that the antitrust defendants had not met their need under "the balancing test of relevance, need, confidentiality and harm," and, accordingly, quashed the subpoena. *Id*. at 434. In doing so, the Court recognized that other "[c]ourts have concluded that disclosure to a competitor is more harmful than disclosure to a non-competitor." *Id*. at 433; *accord Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985). Because both the defendants and the plaintiff in the antitrust action were competitors of the non-party, they "could easily gain financial advantage over [the non-party] by use of the information requested in the subpoenas of the defendants." *Insulate Am.*, 227 F.R.D. at 433. As such, "the party requesting disclosure must make a strong showing of need, especially when confidential information from a non-party is sought." *Id*. at 434 (quoting *Litton*

5

*Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 531 (E.D. Wis. 1990)). Simply put, NASCAR has completely failed to meet this burden.

> **A.      The burden on the Non-Party Teams to produce their highly confidential financial information is substantial.**

Contrary to NASCAR's assertions, producing "ordinary course" financial information would be incredibly burdensome and potentially harmful for the Non-Party Teams. The fact that NASCAR and Plaintiffs are direct competitors of the Non-Party Teams—both for sponsors and employees, as well as on the track—poses a burden long recognized by federal courts.[8] *See Insulate Am.*, 227 F.R.D. at 433 ("[D]isclosure to a competitor is more harmful than disclosure to a non-competitor."). Indeed, this Court previously quashed a similar subpoena questioning "whether produced documents would be protected" and whether it was "convinced that if there was a disclosure of the requested information to the defendants that there would be a substantial harm caused to" the non-party. *Id.* at 434. NASCAR Cup Series racing is a very small and insular industry—the same personnel from the same organizations live in the same town and travel together week after week, interacting with each other constantly. The Non-Party Teams have justifiable concerns about permitting any of the parties' employees or representatives, or even counsel in the present lawsuit, to see their highly confidential competitive information.[9]

And the Non-Party Teams have little confidence in the ability of a protective order or the assurances of NASCAR to actually maintain the confidentiality of their most sensitive financial information. Once the information is out of their hands, it is gone. Essentially, disclosure of the

---

[8] These are not theoretical risks. During the course of the meet-and-confer process, NASCAR directly contacted an important sponsor of one of the Non-Party Teams to try to sell sponsorship for NASCAR's direct benefit. And, as recently as a few weeks ago, NASCAR was pursuing plans to race in at least one Cup Series event with its own car, something NASCAR reserved the right to do in the current Charter Agreement.

[9] The highly confidential financial information sought by NASCAR is also subject to numerous separate confidentiality agreements embedded within the Non-Party Teams' contracts, such as those with their primary and associate sponsors, drivers, manufacturers, crew chiefs, private equity, and other investors. The confidentiality interests here, therefore, go far beyond those of just the Non-Party Teams, extending to the entire business community supporting the sport. Any required production of this information would be arduous and likely result in numerous ancillary proceedings to allow the contractual parties to seek protection for their confidential information.

information would be the classic toothpaste/tube situation and is unfixable. "A protective order presumably would . . . reduc[e] the likelihood of public disclosure . . . , but it [will] not . . . eliminat[e] that risk." *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1278 (7th Cir. 1982). As such, "[t]here is a constant danger inherent in disclosure of confidential information pursuant to a Protective Order." *Insulate Am.*, 227 F.R.D. at 434 (quoting *Litton Indus., Inc.*, 129 F.R.D. at 531). The gravity of this risk came into full relief in last week's hearing when NASCAR's counsel publicly quoted from a highly confidential email in apparent violation of the Protective Order. The burden to the Non-Party Teams in producing their confidential financial information in a traceable format to their direct competitors—at least one of whom (NASCAR) has already demonstrated an inability or unwillingness to maintain the confidentiality of documents produced in this litigation—outweighs any limited need NASCAR may have for that information.

        **B.**     **NASCAR has failed to show a "substantial need" for the documents that it seeks.**

NASCAR fails to explain the relevance of the financial information it seeks and, more particularly, exactly what financial data would be utilized by NASCAR's experts. Throughout this process, the Non-Party Teams' goal has been to find a solution that would provide NASCAR the financial data that it supposedly needed (i.e., was relevant), but to do so in a way that mitigated the Non-Party Teams' substantial concerns about safeguarding their most sensitive financial data. To this end, the Non-Party Teams offered to provide NASCAR with top-line financials—total revenues, total costs/expenses, and ultimate profit or loss—on an anonymized, average-per-car basis for each year dating back to 2014. Ex. B. NASCAR rebuffed this proposal, wanting more.

In its brief, ***for the first time***, NASCAR explains that the Non-Party Teams' financial data is necessary to rebut Plaintiffs' claims that "NASCAR does not 'fairly' share 'industry revenues.'" ECF No. 156, at 1. NASCAR thus acknowledges that at most it believes it needs the Non-Party

7

Teams' top line revenues to rebut Plaintiffs' claims.[10] *Id.* at 2 ("Plaintiffs 23XI and Front Row have alleged that the NASCAR Charter Agreements are anticompetitive, including because their terms allegedly do not fairly share industry *revenue* with racing teams.") (emphasis added). Beyond that, NASCAR's brief contains only vague generalities that fail to demonstrate a substantial need for detailed cost and revenue line items showing the teams' most sensitive information such as driver salaries, sponsorship revenues, and manufacturer's support.[11] For example, NASCAR states, "financial data related to team costs, revenues, and profits must be evaluated," but then fails to explain why. *See id*. at 2-3. Similarly, NASCAR represents that the financial documents are "critical to NASCAR's defense" because it does not know "several major components of 'industry revenue,' such as team sponsorship revenues." *Id*. at 1. But then NASCAR does not explain *why* it needs to see each individual revenue component such as sponsorship revenues rather than total revenues, much less why it cannot perform its analysis using revenue and other financial information it has obtained from Plaintiffs. Finally, NASCAR claims that it needs "cost information to rebut Plaintiffs efforts to argue that the NextGen car has

---

[10] Moreover, NASCAR has failed to identify how any analysis of "industry revenues" or a damage model by its experts would account for variations between the teams' accounting practices or the referenced revenue streams and costs that are wholly unrelated to the Charter Agreements or even the Cup Series. *See, e.g.*, *Insulate Am. v. Knauf Insulation GmbH*, No. 1:06-MC-29, 2006 U.S. Dist. LEXIS 58057, at *16–17 (W.D.N.C. Aug. 17, 2006) (quashing third-party subpoena where, among other things, the requesting party "failed to explain to the court how it would or could forensically reconstruct the actual price of [the good at issue] from the information sought, and has not, therefore, shown that it is 'relevant information'"); *In re Subpoenas Issued to Labatt Food Serv., LLC*, No. 5:21-CV-01242, 2022 WL 1000318, at *3 (W.D. Tex. Apr. 1, 2022) (holding third-party financial data was not relevant to the case because the plaintiffs were "unable to describe at the hearing how their damages model would account for deviations in the [distributor's] turkey pricing that were unrelated to changes in the producer's price").

Consider the case of Penske Racing South, Inc. Penske's NASCAR Cup Series teams are housed in the same facility in Mooresville as Team Penske's IndyCar Series, IMSA sports car series, and World Endurance Championship sports car series teams, sharing personnel, services, utilities, transportation, insurance, information technology, engineering, and components. The Cup Series teams share sponsors with other Team Penske racing teams, including the IndyCar Series teams. Penske's financial statements encompass financial information associated with all of Team Penske's racing activities and therefore present a serious challenge for any outsider attempting to allocate revenue and expenses (or taxes) by car, team, or racing series. Other teams' financials will present similar allocation issues.

[11] Indeed, during meet and confers NASCAR's counsel represented that its expert would aggregate the financial information for his or her report/opinion.

8

increased, rather than reduced, parts costs." [12] *Id.* But this argument likewise overlooks NASCAR's ability to inspect Plaintiffs' NextGen cost data for that purpose.[13]

NASCAR argues only that this information is insufficient due to its concern that, in creating the documentation of the anonymous, average-per-car numbers, the Non-Party Teams would inappropriately reallocate costs and revenues and prevent NASCAR from determining accurate sponsorship revenue and costs.[14] NASCAR, however, provides no support or other justification to question the "integrity" of the teams to provide accurate, yet anonymized and aggregated, information, especially if the Non-Party Teams are truly "partners." In essence, NASCAR has provided no rationale for why it needs to know which financial information goes with which of the Non-Party Teams—i.e., why the data cannot be anonymized. Being able to trace financial data back to a specific team is not necessary to show the type of "industry wide" financial information NASCAR supposedly seeks.

## **CONCLUSION**

The Non-Party Teams whole-heartedly agree with NASCAR's alternative position: the Court should rule that their "ordinary course financial information" is irrelevant to this case. When viewed closely, NASCAR's brief highlights that it really is just fishing. The Court should not allow NASCAR to cast its line into every Non-Party Team's pond, considering the sensitive nature of the fish it seeks. "[O]f course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes. But Fed. R. Civ. P. 45(c) allows the fish to object, and when

---

[12] Relatedly, NASCAR makes no showing of why it should be allowed to see other cost line items such as driver salaries, which are extremely sensitive for obvious reasons.
[13] In addition, NASCAR has previously received anonymized team financial information produced, on multiple occasions, by the Race Team Alliance, data on every sale of a NASCAR Charter, and data on all payments it makes to the Non-Party Teams in connection with the Charters. NASCAR has not given any cogent rationale for why that information is collectively insufficient to meet its needs.
[14] This is a notable departure from NASCAR's position, earlier in the meet-and-confer process, that at least one of its subpoena requests could be satisfied by the Non-Party Teams creating "summaries" of financial data. *See, e.g.*, Ex. E ("I proposed that this request can be satisfied with [the Teams'] summar[ies] of financial investments in other motorsports, via a list or declaration.").

they do so the fisherman has to come up with more than [NASCAR] has been able to do in this case despite the excellence of its lawyers." *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir. 2004). Because NASCAR has fallen woefully short of showing any need—much less a substantial need—for this highly sensitive and commercially valuable information, the Court should deny NASCAR's informal motion to compel the production of the Non-Party Teams' "ordinary course" financial documents.

****

Notwithstanding the foregoing, in the event the Court is inclined to order the production of certain financial information to NASCAR, the Non-Party Teams remain willing to provide the anonymized, average per-car top line revenue, cost, and profit/loss information that was previously offered, as soon as practicable. *See, e.g., In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 4:11-MC-80300, 2012 WL 629225, at *5 (N.D. Cal. Feb. 27, 2012) (finding that the antitrust plaintiff's requests should be limited to the information in non-parties' compromise proposal because requests were "not tailored to minimize the potential prejudice that the nonparties could suffer by releasing such information" and the antitrust plaintiffs had "not established a substantial need for any material that falls outside the proposed compromise"). The Non-Party Teams will also work with NASCAR to provide this information in a manner that can be utilized at trial with appropriate protections.

Dated: June 23, 2025.

| **JAMES, MCELROY & DIEHL, P.A.** | **WOMBLE BOND DICKINSON (US) LLP** |
|---|---|
| */s/ Adam L. Ross & Jennifer M. Houti* | */s/ Aaron J. Horner & John F. Morrow, Jr.* |
| Adam L. Ross (NC Bar No. 31766) | John F. Morrow, Jr. (NC Bar No. 23382) |
| Jennifer M. Houti (NC Bar No. 45442) | Aaron J. Horner (NC Bar No. 56335) |
| 525 North Tryon Street, Suite 700 | One West Fourth Street |
| Charlotte, NC 28202 | Winston-Salem, NC 27101 |
| Telephone: (704) 372-9870 | Telephone: (336) 721-2584 |
| Facsimile: (704) 333-5508 | Email: John.Morrow@wbd-us.com |
| | AJ.Horner@wbd-us.com |

Email: aross@jmdlaw.com
jhouti@jmdlaw.com

*Counsel for Non-Parties Joe Gibbs Racing, LLC; Hendrick Motorsports LLC; Smith Racing, LLC d/b/a Hyak Motorsports; RPAC Racing LLC d/b/a Legacy Motor Club; and Spire Motorsports*

**BRADLEY ARANT BOULT CUMMINGS LLP**

*/s/ C. Bailey King, Jr.*
C. Bailey King, Jr. (NC Bar No. 34043)
Samuel M. Dearstyne (NC Bar No. 54803)
214 North Tryon Street, Suite 3700
Charlotte, NC 28202
Telephone: (704) 338-6000
Facsimile: (704) 332-8858
Email: bking@bradley.com
sdearstyne@bradley.com

*Counsel for Non-Parties Haas Factory Team, LLC and Rick Ware Racing, LLC*

**MAYNARD NEXSEN PC**

*/s/ Joseph W. Moss, Jr.*
Joseph W. Moss, Jr. (NC Bar No. 20236)
227 West Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 338-5340
Email: jmoss@maynardnexsen.com

*Counsel for Non-Party Trackhouse Racing, LLC*

*Counsel for Non-Party Richard Childress Racing Enterprises, Inc.*

**ROBINSON, BRADSHAW & HINSON, P.A.**

*/s/ Cary B. Davis & John R. Wester*
Cary B. Davis (NC Bar No. 36172)
John R. Wester (NC Bar No. 4660)
600 South Tryon Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 377-2536
Email: cdavis@robinsonbradshaw.com
jwester@robinsonbradshaw.com

*Counsel for Non-Parties Wood Brothers Racing, LLC; Roush Fenway Keselowski Racing, LLC; Penske Racing South, Inc.; and Penske Motorsports, LLC*

## ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION

I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Fast Case, and Bloomberg.

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 23, 2025.

*/s/ Aaron J. Horner*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 23, 2025, the foregoing **NON-PARTY TEAMS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO NASCAR'S REQUEST FOR DISCOVERY-DISPUTE INTERVENTION REGARDING SUBPOENAS TO NON-PARTY RACING TEAMS** was electronically filed using the Court's CM/ECF system, which will automatically send notice of filing to all parties of record.

*/s/ Aaron J. Horner*

13
Case 3:24-cv-00886-KDB-SCR   Document 161   Filed 06/23/25   Page 14 of 14