IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00886-KDB-SCR

| | |
|---|---|
| 2311 RACING LLC AND FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, ET AL., <br><br> Defendants. | ORDER |

**THIS MATTER** is before the Court on Plaintiffs' and Curtis Polk's Motions to Dismiss Defendant NASCAR Event Management, LLC's Counterclaim (Doc. Nos. 115, 116). The Court has carefully considered these motions, the parties' briefs and exhibits and oral argument on the motions from the parties' counsel on June 17, 2025. Based on the lenient standard of review under Rule 12(b)(6), the Court will **DENY** the motions, finding that the challenges to the Counterclaim are best addressed at Summary Judgment, with a more developed factual record.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually

1

sufficient. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp.*, 550 U.S. at 570; *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom*. *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Construing the facts in this manner, a complaint must only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted). Thus, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## II. FACTS AND PROCEDURAL HISTORY

In its earlier orders in this action, the Court has broadly described the background of this antitrust dispute, in which two of the racing teams that compete in NASCAR's Cup Series have sued NASCAR, James France and other entities alleging that Defendants (collectively, "NASCAR") have unlawfully monopolized premier stock car racing in violation of the Sherman Act, 15 U.S.C. §§ 1, 2. *See* Doc. No. 74 at 5-8. Most relevant here, in 2016, NASCAR implemented a Charter Agreement system that guarantees the holder of each Charter entry for one car into every Cup Series race. Plaintiffs acquired their 2016 Charters in 2016 (Front Row Motorsports) and

2020-21 (2311 Racing). In addition to "chartered cars," NASCAR races may include a few "open" cars, which are required to qualify for each race separately.[1]

More than two years in advance of the expiration of the 2016 Charters on December 31, 2024, NASCAR began negotiations towards a 2025 Charter Agreement with the 15 teams that collectively held NASCAR's 36 charters (the "Teams"). NASCAR negotiated with the Teams together and individually. See Doc. No. 58 (Answer) at ¶¶ 17 ("Defendants further admit that NASCAR negotiated with the teams collectively and with individual teams, but denies that it ceased negotiating with the teams collectively."), 107 (Defendants … admit that NASCAR engaged in individual negotiations with certain teams to address their individual requests regarding the 2025 Charter Agreements while still negotiating with the teams negotiating collectively."). Ultimately, 13 of the 15 teams signed the same standard 2025 Charter Agreement on September 6, 2024.

The two racing teams that did not sign a 2025 Charter Agreement filed this action on October 2, 2024, seeking damages, injunctive relief (such as requiring NASCAR to divest some of the racing tracks that it owns) and a Preliminary Injunction to be allowed to race under the terms of the 2025 Charters. NASCAR opposed the Preliminary Injunction, arguing in part that the terms of the 2025 Charters reflected a fair and beneficial deal for all concerned. See Doc. No. 89 at 9. NASCAR also filed an Answer and Motions to Dismiss the Complaint on December 2, 2024. Doc. Nos. 56-58. No Counterclaim was asserted. On December 18, 2024, the Court entered a

---

[1] Because of the cost of racing in the Cup Series and the uncertainty for teams, drivers and sponsors in not having a guaranteed spot for each race, no non-chartered team has consistently participated as a "open" team since the Charter system was put in place in 2016.

Preliminary Injunction, allowing the Plaintiffs to race under the terms of the 2025 Charters.[2] Doc. No. 74. NASCAR's Motions to Dismiss were denied by the Court on January 10, 2025. Doc. No. 104. By consent, Plaintiffs filed an Amended Complaint on February 3, 2025, to name the proper NASCAR affiliated entities as Defendants. Doc. No. 106.

In response, on March 5, 2025, NASCAR filed an Answer to the Amended Complaint, adopting its earlier Answer as stipulated among the Parties, but also adding a Counterclaim against Plaintiffs and Curtis Polk (a co-owner of 2311 Racing), alleging that they violated Section 1 of the Sherman Act by jointly negotiating with other racing teams to "pressure NASCAR to accept their collusive terms" during the negotiation of the 2025 Charter agreements. Doc. No. 111. Plaintiffs and Mr. Polk have moved to dismiss the Counterclaim, arguing that it is intended only as a "retaliatory" filing to intimidate Plaintiffs and other race teams,[3] particularly NASCAR's requests for injunctive relief, which include "the elimination of Section 3.1(a) of the 2025 Charter Agreement which provides for guaranteed entry into Cup Series races." *See* Doc. Nos. 115, 116. Indeed, Plaintiffs have separately moved to strike that request pursuant to Rule 12(f). *Id*.

These motions to dismiss and strike have now been fully briefed, and the Court has heard extensive oral argument from the Parties. All are ripe for the Court's ruling.

---

[2] On June 5, 2025, the Fourth Circuit Court of Appeals issued a ruling vacating the Preliminary Injunction, thereby returning the Plaintiffs to the status of other non-chartered teams (i.e. having to qualify as "open" cars to participate in races). Doc. No. 151. The Mandate related to this ruling has been temporarily stayed pending the court's ruling on Plaintiffs' petition for rehearing en banc. Doc. No. 159.

[3] NASCAR's motivations in filing its Counterclaim, whatever they may be, need not be determined in resolving the legal issues before the Court; however, the Court recognized at oral argument the possibility of "negotiation by litigation" at work in NASCAR's Counterclaim. (But the Court did not discourage negotiation. To the contrary, it also urged the Parties to consider resolving their disputes outside of court based on the existential risks to both sides)

4

### III.  DISCUSSION

Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade [in interstate or foreign commerce]." 15 U.S.C. § 1. Although the Act, by its terms, prohibits every agreement "in restraint of trade," the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints. *See, e.g., Arizona v. Maricopa County Medical Soc.,* 457 U.S. 332, 342–343 (1982) (citing *United States v. Joint Traffic Assn.,* 171 U.S. 505 (1898)). Thus, a plaintiff asserting a claim for violation of Section 1 must plead: (1) an agreement or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce. *See Estate Constr. Co, v. Miller & Smith Holding Co.,* 14 F.3d 213, 220–21 (4th Cir.1994).

### A.  Allegations of a Per Se Violation

NASCAR argues two grounds to support a Section 1 violation. First, it alleges that the Cup Series racing teams (in a conspiracy led by the Counterclaim Defendants) committed a "*per se*" antitrust violation because "horizontal competitors" cannot ever agree "to engage in joint negotiations regarding prices and other terms of dealing." The Court disagrees. NASCAR's argument is too rigid and overly broad. Context matters. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8–9 (1979) ("[T]his is not a question simply of determining whether two or more potential competitors have literally 'fixed' a 'price.' … Literalness is overly simplistic and often overbroad.").

Beginning at first principles, the primary goal of the antitrust laws is to promote fair economic competition, which of course is often reflected in countervailing market power between buyers and sellers (i.e., neither sellers nor buyers can fully dictate the terms of their transactions). *Id*. at 14. ("The Sherman Act has always been discriminatingly applied in the light of economic

realities."); *Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 809 (1945) ("The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly."). Thus, it has long and often been said that the Sherman Act was "enacted for 'the protection of competition, not competitors.'" *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338, (1990) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *United States v. Google LLC*, No. 1:23-CV-108, 2025 WL 1132012, at *18 (E.D. Va. Apr. 17, 2025).

A *per se* violation of Section 1 is a judicially created category of conduct that is, by law, an unreasonable restraint of trade without further analysis into specific circumstances that might render the conduct reasonable and therefore lawful. Such agreements have such a "pernicious effect on competition and lack of any redeeming virtue" that they "are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, (1958); *see, e.g., Broadcast Music, Inc. v. Columbia Broad. Sys.,* 441 U.S. 1, 19–20 (1979) (stating that *per se* analysis applies to an agreement that "facially appears to be one that would always or almost always tend to restrict competition and restrict output"). Indeed, a court confronted with a *per se* unreasonable restraint on competition need not study the market involved, the effects of such an agreement on competition, or the purpose for its adoption before concluding that the plaintiff has satisfied the second element of a Section 1 violation. *See Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 562–64 (E.D. Va. 2000).

As a consequence, "most antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information

6

about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 459 (1986). That is, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49 (1977). "The true test of legality" under the Rule of Reason "is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Id*. at 49 n.15.

The circumstances here make clear that joint negotiation by all or some of the chartered Teams with NASCAR, the sole owner of the Cup Series (as well as most of the racing tracks), is not inherently "pernicious," lacking "any redeeming virtue," or "always or almost always tend[ing] to restrict competition." First, in terms of legal precedent, it is recognized in *BMI* and other authorities that joint selling (or buying) ventures are not always or almost always pernicious. Indeed, they are not pernicious at all in the absence of market power. *See BMI*, 441 U.S. at 23 (holding that "not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints"); Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶1510. (Fourth and Fifth Editions, 2025 Cum. Supp. 2018-2023) ("Areeda").[4] Second, the inherent "joint" nature of Cup Series racing and NASCAR's sole control over its operations establish that *per se* treatment is not appropriate.

---

[4] Even in the presence of market power, a concerted refusal to deal should be addressed under the rule of reason if the challenged restraint falls within the scope of joint venture decision making where joint action is necessary to create the product. Areeda at ¶1510, citing *American Needle, Inc. v. National Football League*, 560 U.S. 183, 187, 203 (2010); *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla*., 468 U.S. 85, 101 (1984).

7

The NASCAR Cup Series is in all respects a collective, not an individual sport. The Teams race against each other in a single event, not simply on a common course (such as in skiing or golf). And, to have a fair race, the rules need to be the same for all participants. Therefore, much of the content of the 2025 Charter agreements relates to all race participants and must necessarily be the same for all charter holders. For example, in addition to agreeing to the same racing rules, (2025 Charter Agreement, § 6.5, Doc. No. 52-19), the size of the race field could not be different for individual teams. *Id*. at § 3.2. Nor could the grant to NASCAR of the IP rights to race events be accomplished individually because broadcasting each race involves all the participants. *See* Doc. No. 52-19 at §§ 5.1 (grant of IP rights to NASCAR), 5.3 (providing Teams with collective IP rights to pictures or video of more than five race vehicles or drivers).[5] Further, the nature of NASCAR's business practices, such as designating a single Series Tire or Fuel Sponsor, *id*. at §§ 6.10, 6.11, often as a practical matter require the same charter terms for all Teams.

In sum, NASCAR and each Charter holder needed to reach the same agreement in all the Charters on many issues, whether or not NASCAR negotiated the Charters individually or collectively. Therefore, it would (or at least could) be more efficient and procompetitive for the Teams and NASCAR to engage in joint negotiations when they all would be affected by the resulting single "standard" agreement. *See American Needle*, 560 U.S. at 203 (nature of NFL

---

[5] One would think that the amount of race purses and the percentage allocation of the pool of money allocated to each finishing position would also need to be the same in all the Charter agreements. *See, e.g.,* Doc. No. 52-19 at Ex. B. However, NASCAR surprisingly claimed at oral argument that it wanted to negotiate with the Teams individually over those amounts; for example, paying the Hendrick team more if it won a race than if another team won the same race. Whether or not that assertion is credible, the remaining teams could still have a legitimate procompetitive interest (sufficient to defeat a per se violation) in jointly negotiating a provision that allows all teams to be racing for the same prize.

8

"joint venture" required rule of reason analysis). Therefore, the Counterclaim does not state a *per se* Sherman 1 claim and must be analyzed under the Rule of Reason test.

B.    **Rule of Reason Analysis**

NASCAR's alternative argument is that even if the race teams' collective conduct is not a *per se* violation, it is unlawful under the "rule of reason" standard. A rule of reason claim under Section 1 has two core elements: (1) proof of a relevant market and market power (or direct evidence of anticompetitive effects) and (2) anticompetitive effects within that relevant market. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002). Based on the lenient standard of review on a 12(b)(6) motion, NASCAR has alleged enough facts to allow its rule of reason claim to proceed.

With respect to the first element, NASCAR's allegation is that the relevant market is the "market for entry of cars into NASCAR Cup Series races in the United States or any other location where a Cup Series race is held." This proposed market appears to mirror Plaintiff's allegation that NASCAR controls the "input market for premier stock car racing teams… ." Doc. No. 107 at 32. Also, NASCAR has alleged that the teams currently racing in the Cup Series collectively have power in that market. Therefore, for the limited purpose of these 12(b)(6) motions, NASCAR has sufficiently alleged a relevant market and market power.

Also, again accepting its allegations as true, NASCAR has alleged unlawful "anticompetitive effects." NASCAR contends that through actual and threatened "boycotts" and the insistence on relatively more guaranteed money, the Counterclaim Defendants harmed "performance-based competition" and the incentive for "open" cars to race. Of course, Plaintiffs have several responses to these allegations that will be considered at Summary Judgment (for example, that the alleged harm to "performance-based competition" flows, if at all, from the

9

guaranteed entry provision which NASCAR touts as a beneficial aspect of the 2016 Charter that was never at issue in the 2025 Charter negotiations, the absence of "antitrust injury," etc.), but the Court's task at this stage of the proceedings is simply to determine if there is a "plausible" claim. And, NASCAR has satisfied that (relatively) low bar. Therefore, the Court will allow NASCAR's Counterclaim to proceed towards a merits decision on its Rule of Reason Sherman 1 claim.

The final issue is whether the Court should strike NASCAR's request to eliminate Section 3(a) from the 2025 Charter Agreement, which is the provision that provides for the guaranteed entry of chartered teams in all Cup Series races. Under Rule 12(f), the Court may strike from pleadings any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Courts have broad discretion in deciding motions to strike. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001). While the Court agrees with Plaintiffs that this request for injunctive relief is not a proper responsive remedy to NASCAR's claims,[6] and it raises difficult issues related to the necessity of adding the other racing teams as parties under Federal Rule of Civil Procedure 19, NASCAR represented at oral argument that it did not intend to pursue this relief in light of the Fourth Circuit's ruling denying Plaintiffs a Preliminary Injunction.[7] Therefore, the Court will deny the Motion to Strike as moot.

---

[6] In arguing the relevance of its request to rewrite the 2025 Charter Agreements (which Plaintiffs did not sign), NASCAR argued that its requested injunctive relief compared favorably to Plaintiffs' requests. The Court disagrees. Putting aside the fact that Plaintiffs do not have 2025 Charters, NASCAR's request to modify the Charters to remove the "guaranteed entry" provision (which was not at issue in the alleged wrongful negotiations) is not causally related to NASCAR's Counterclaim. In contrast, Plaintiffs' proposed track divestitures and non-enforcement of non-competition restrictions (if they prevail on the merits at trial) is directly related to their claims of unlawful monopolistic conduct.

[7] In addition, NASCAR represented that in seeking an injunction against Plaintiffs, it would not seek any remedy that affected the ability of other racing teams to jointly negotiate.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

Plaintiffs and Curtis Polk's Motions to Dismiss (Doc. Nos. 115, 116) are **DENIED.**

**SO ORDERED ADJUDGED AND DECREED**.

Signed: June 23, 2025

Kenneth D. Bell
United States District Judge