# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. <br><hr> NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. | No. 3:24-cv-886-KDB-SCR |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

# **CONTENTS**

**Page**

BACKGROUND .................................................................................................................3

A.     Plaintiffs Declined To Sign The Favorable 2025 Charter ...................................3

B.     Plaintiffs Manufactured Evidence Of Irreparable Harm And False Declarations .............4

C.     The Fourth Circuit Vacates The Injunction ......................................................7

D.     Plaintiffs Will Participate In The Cup Series For The Remainder Of The 2025 Season ..................................................................................................9

LEGAL STANDARD.........................................................................................................9

ARGUMENT.....................................................................................................................10

I.   Plaintiffs' Requested Relief Conflicts With The Fourth Circuit's Opinion .........................10

II.  Plaintiffs Fail To Show Any Imminent, Irreparable Injury Without A TRO ........................12

A.     The Status Quo Is No Charters ......................................................................12

B.     Plaintiffs Will Qualify For At Least The Next Two Weeks' Races ..................................13

C.     Plaintiffs' Self-Inflicted Harms Are Not Irreparable .......................................13

D.     Plaintiffs' Claimed Harms Are Speculative—And Their Evidence Should Be Viewed Skeptically Given Their Prior Creation Of Evidence...........................................14

III. The Relief Plaintiffs Claim To Seek Post-Trial Is Improper ...................................16

IV. Plaintiffs Cannot Establish A Likelihood Of Success At Trial................................18

A.     Plaintiffs Have Not Shown That NASCAR Holds Monopsony Power In A Relevant Market........................................................................................19

B.     Plaintiffs' Theories Of Anticompetitive Conduct Will Not Prevail .................................21

V.  Forcing NASCAR To Treat Plaintiffs As Chartered Teams Harms NASCAR......................23

VI. The Balance Of Equities And Public Interest Weigh Against Plaintiffs' Requested Relief ...25

CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

*2311 Racing v. NASCAR*,
    139 F.4th 404 (4th Cir. 2025) ........................................................................ *passim*

*Advanced Healthcare Servs., Inc. v. Radford Cmty. Hosp.*,
    910 F.2d 139 (4th Cir. 1990) ...................................................................18

*Am. President Lines v. Matson, Inc.*,
    775 F. Supp. 3d 379 (D.D.C. 2025) .........................................................17

*Brookings v. Int'l Motor Contest*,
    219 F.3d 849 (8th Cir. 2000) ...................................................................23

*Castro v. SC Elections Comm'n*,
    2024 WL 340779 (D.S.C. Jan. 30, 2024) .............................................9, 13

*CBC Cos. v. Equifax*,
    561 F.3d 569 (6th Cir. 2009) ................................................................2, 18

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ...................................................................14

*Drivers, Chauffeurs, Warehousemen & Helpers Teamsters Loc. Union No. 71 v.*
    *Akers Motor Lines, Inc.*,
    582 F.2d 1336 (4th Cir. 1978) .................................................................11

*Glacier Sales & Eng'g, LLC v. Eagle Plastics*,
    2007 WL 2694402 (E.D. Mich. Sept. 11, 2007) .....................................24

*Hoechst Diafoil v. Nan Ya Plastics*,
    174 F.3d 411 (4th Cir. 1999) ...................................................................13

*Host Int'l, Inc. v MarketPlace*,
    32 F.4th 242 (3d Cir. 2022) .........................................................2, 18, 22

*In re Beef Indus. Antitrust Litig*,
    907 F.2d 510 (5th Cir. 1990) ...................................................................19

*In re Microsoft Corp. Antitrust Litig.*,
    333 F.3d 517 (4th Cir. 2003) ..............................................................16, 17

*Mozart Co. v. Mercedes-Benz*,
    833 F.2d 1342 (9th Cir. 1987) .................................................................20

*NCAA v. Alston*,
    594 U.S. 69 (2021) ...................................................................................20

*Omega World Travel, Inc. v. Trans World Airlines*,
    111 F.3d 14 (4th Cir. 1997) ........................................................................10

*Pac. Bell Tel. Co. v linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...........................................................................17, 21

*Queen City Pizza v. Domino's Pizza, Inc.*,
    124 F. 3d 430 (3d Cir. 1997)........................................................................20

*Quickie Mfg. v. Libman Co.*,
    180 F. Supp. 2d 636 (D.N.J. 2002) ..........................................................24

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)........................................................................23

*Ramsey v. Bimbo Foods Bakeries Distrib.*,
    2014 WL 3408585 (E.D.N.C. July 10, 2014) ..........................................25

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ....................................................................23

*Salt Lake Trib. Pub. v. AT&T*,
    320 F.3d 1081 (10th Cir. 2003) ................................................................14

*Spacemax Int'l LLC v. Core Health & Fitness*,
    2013 WL 5817168 (D.N.J. Oct. 28, 2013)...............................................25

*Spinelli v. National Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015)..........................................................23

*Taylor v. Freeman*,
    34 F.3d 266 (4th Cir. 1994) ......................................................................11

*Thompson Everett v. Nat'l Cable Advert.*,
    57 F.3d 1317 (4th Cir. 1995) ....................................................................22

*United States v. Turner Constr. Co.*,
    946 F.3d 201 (4th Cir. 2019) ....................................................................24

*Virginia Vermiculite v. W.R. Grace & Co.*,
    108 F. Supp. 2d. 549 (W.D. Va. 2000), 23XI.........................................22

*Yukon Packaging, LLC v. Jones Sustainable Packaging, LLC*,
    2025 WL 209171 (W.D.N.C. Jan. 15, 2025) (J., Bell) ............................9

Four issues foreclose the extraordinary relief 23XI and Front Row seek in their temporary restraining order. **First**, the Fourth Circuit held that it was improper for an injunction to issue that "required two parties to engage in a business that one party claims to be illegal." *2311 Racing v. NASCAR*, 139 F.4th 404, 411 (4th Cir. 2025). The Fourth Circuit relied on its earlier opinion in *Omega* and also noted that Plaintiffs were requesting "to participate in the very business that they sought to dismantle." *Id.* at 409. As Judge Niemeyer said at oral argument, Plaintiffs asked to have their cake and eat it too. That is exactly what Plaintiffs ask for again in this TRO: an injunction that gives them Charter rights on their preferred terms. Regardless of the outcome of this litigation, NASCAR cannot be forced into a contractual relationship with Plaintiffs. As such, that is not relief they rightly can seek at this preliminary stage.

**Second**, even if the Court could, consistent with the Fourth Circuit's opinion, issue mandatory relief forcing NASCAR into contracts with Plaintiffs, it respectfully cannot grant Plaintiffs the contract they are demanding. Plaintiffs seek the exact same injunctive relief (a TRO and then an injunction ordering NASCAR to "allow Plaintiffs to each enter three race cars in all NASCAR Cup Series races under the 2025 Charter Agreement" except for "the release provision") that they previously sought in their second PI motion. Doc. 176 at 2. However, the Fourth Circuit's opinion forecloses ***this relief***. *2311 Racing*, 139 F.4th at 408-09. The Fourth Circuit was clear (relying on the Supreme Court's *linkLine* decision) that NASCAR was well within its rights to propose what it called a "standard release provision" that does not "eliminate or injure *competition.*" *Id.* at 410. Because Plaintiffs cannot now establish a likelihood of success on the issue of whether the releases in the Charter and Joinder Agreements are anticompetitive, there is no logical basis for their request that the Court issue injunctive relief excising any such release terms.

**Third,** Plaintiffs' entire application is based on a false premise: that the status quo is they *do* have Charters and thus may be "forced to relinquish their charters" absent a TRO. Doc. 176 at 24. That is wrong as both the Fourth Circuit and this Court have recognized. 139 F.4th at 409 ("[P]laintiffs' participation in the Cup Series races would not have been guaranteed because they refused to sign the 2025 Charter Agreement."); Doc. 162 at 10 n.6 ("Plaintiffs do not have 2025 Charters"). As a result, a TRO will not maintain the status quo, it will upend it. Moreover, Plaintiffs cannot establish any irreparable injury. In fact, Plaintiffs' owners have made clear that "[w]e've always said we're racing no matter what. If we have to race open, we have to race open." Ex. 3. It is impossible to reconcile the story Plaintiffs are telling the Court, with what they are saying outside the Court. Regardless, Plaintiffs' speculative claims of injury do not concern the 14 days that a TRO can be in effect—and are based on the same sort of evidence that was improperly manufactured and submitted to the Court in connection with the second PI.

**Fourth**, Plaintiffs cannot establish a likelihood of success on the merits, let alone an indisputable right to this mandatory relief. Even if their market definition was correct—and it is not—case after case makes clear that "antitrust law is not a negotiating tool for a plaintiff seeking better contract terms." *CBC Cos. v. Equifax*, 561 F.3d 569, 573 (6th Cir. 2009); s*ee also Host Int'l, Inc. v MarketPlace*, 32 F.4th 242, 250 (3d Cir. 2022) ("[A] breakdown in contract negotiations is outside the Sherman Act's scope."). That is all this case is at the end of the day. Plaintiffs' motion is nothing more than an attempt to retain some sort of "quasi-contract" status and thereby receive the substantial benefits of the Charters to the detriment of the 30 actual Charter holders, all while trying to use this Court to improperly obtain even more. Plaintiffs' TRO should be denied.

## BACKGROUND

### A.     Plaintiffs Declined To Sign The Favorable 2025 Charter

The 2025 Charters delivered what teams said they wanted most: more money. The 2025 Charters gave the teams substantially increased revenues, more guaranteed payments, increased term length, and good-faith-renewal protections, all of which teams asked for in negotiations. Decl. of Scott Prime Decl. ¶ 10 ("Prime Decl."). Compared to the 2016 Charter, the 2025 Charter provided teams collectively an increase of $███ million *per year* on average. Prime Decl. ¶ 12.

Plaintiffs' entire case is thus built on two false claims: that the Charter terms are "unfair" and that NASCAR sent the Charter to teams on September 6, 2024, and demanded a signature the same day. The reality is that negotiations lasted for 2.5 years, many drafts were exchanged, NASCAR circulated a proposed final version of the Charter on August 30, and provided advanced notice of the September 6 final deadline. Doc. 31-4 ¶¶ 46-49. And even after the September 6 deadline, NASCAR gave Plaintiffs two more weeks to decide whether to sign the Charters. Doc. 20-13; Ex. 27, Lauletta (23XI 30(b)(6)) Tr. 11:1-8.

Also, the terms of the Charters were so favorable to teams that at least ███ teams reported that they were ██████████████████ as early as October 26, 2023. Ex. 5, 23XI_0013978 at -979. As a team wrote to NASCAR in May 2024, the draft Charter was "seriously fair." Ex. 13, NASCAR-00469409, at -410. It was sufficiently fair that in April 2024, FRM decided to increase its presence in NASCAR by agreeing to buy a third Charter from Stewart-Haas Racing ("SHR"), and 23XI did the same in August 2024. Despite arguing in its Motion that the May 2024 Charter draft had ██████████," Doc. 176 at 11, 23XI's President wrote to

████████████████████████████████

████████████████████████████████

████████████      Ex. 8, 23XI_0128885, at -885 (emphasis added). Numerous other teams

reported they ███████████████ the 2025 Charter agreement on August 26, 2024, "██████

██████████████████████████████████████████████████████████████████

██████████████████████. Ex. 14, RTA00052162, at -163.

By September 4, 2024, the Race Team Alliance's Executive Director, Jonathan Marshall, who was collecting and distributing communications among all teams, reiterated that ███████

████████████████████████████████████████████████████████ Ex. 16, RTA00049199, at -200. The RTA's law firm then had a █████████████ meeting with NASCAR to do just that. Ex. 17, RTA00051900, at -901. So, when NASCAR sent finalized Charters to teams for signature, they knew they were coming and the majority were prepared to sign; almost 90% did.

Even though 23XI and FRM declined to sign the 2025 Charters on September 6, 2024, NASCAR continued to offer them the opportunity to sign until as late as September 20. Doc. 20-13; Ex. 27, Lauletta (23XI 30(b)(6)) Tr. 11:1-8. When neither 23XI nor Front Row signed by their extended deadlines, NASCAR deemed its offers rejected. Doc. 31-3 ¶ 52. Plaintiffs understood that by not signing the 2025 Charter agreements, they were relinquishing their rights to the benefits of those Charters. Ex. 25, Jenkins Tr. 68:18-24; Ex. 22, Polk Tr. 126:01-09.

**B. Plaintiffs Manufactured Evidence Of Irreparable Harm And False Declarations**

Discovery has revealed that evidence Plaintiffs submitted to the Court in connection with their second PI motion was manufactured. It has also shown that declarations submitted under penalty of perjury suggesting that Plaintiffs had no involvement in the creation of that evidence were false.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

4

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ Ex. 23, Hamlin Tr. 75:23-25, 77:6-14.

On October 2, 2024, Plaintiffs filed this lawsuit, and moved for a preliminary injunction one week later ("first PI motion"). In their first PI motion, Plaintiffs asked the Court to require NASCAR to offer them two Cup Series Charter Agreements each, despite the fact that both Plaintiffs rejected NASCAR's offer for the very same contracts just weeks earlier. Doc. 20. Plaintiffs also asked the Court to enjoin NASCAR from enforcing the release provision in those Agreements during the pendency of the litigation, *id.*, even though Plaintiffs have now admitted in discovery that they never asked NASCAR to remove that language before they filed this lawsuit. Ex. 31, FRM May 7, 2025 R&O to Interrog. No. 7, Ex. 29, 23XI May 7, 2025 R&O to Interrog. No. 7.

Judge Whitney denied Plaintiffs' first motion on November 8, 2024. Doc. 43. The Court noted that Plaintiffs' alleged "sponsors could abandon them" and that Mr. Reddick would be permitted to terminate his contract with 23XI if there was no Charter in place. *Id.* But the Court found Plaintiffs' claimed harms to be speculative. *Id.* at 5-6.

Plaintiffs saw an opening in the Court's decision and decided to take another shot at obtaining the Charter benefits they rejected in September. But Plaintiffs had a problem. Before their counsel proclaimed in open court at the PI hearing that both teams would fail without Charters, their drivers and sponsors had not indicated *any* intent to abandon Plaintiffs. In fact, drivers and sponsors had either expressed publicly that they had no concerns about 23XI and FRM racing as Open teams for 2025, or had said nothing at all. Mr. Reddick told the press in October 2024 he had no concerns about the lawsuit. Doc. 60-1 ¶ 5. On the sponsorship side, ████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████

After denial of the first PI, 23XI purportedly just by happenstance, received emails from their drivers ████████████████████████. Docs. 52-6, 52-15, 52-16. These letters, sent just days apart from one another, raised concerns about 23XI operating without Charters and, contrary to their prior public statements, suggested that ████████████████████████████████████ ██████████████████ Around the same time, ███████████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████████████████████████." Doc. 52-9 at 2.

Plaintiffs thereafter filed a second PI motion on November 26, attaching the █████████ ███████████████████████ Docs. 52-15, 52-16, 52-9. NASCAR opposed the motion on December 9, and pointed out similarities between the ██████████████████████, "suggesting a coordinated effort behind the scenes." Doc. 60 at 4. In declarations on December 12, ███████ █████████████████████████████████████████████████████████ ██████████████████████████████████ Docs. 67-1, 67-2.

For his part, ██████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████ Doc. 67-2 ¶ 4. What Mr. Lauletta did not disclose to the Court, but discovery later revealed, is that ██████████████████████████████████████████████████████ ██████████████████████████████. Ex. 22, Polk Tr. 48:10-21. Thus Mr. Lauletta's sworn statement to

the Court, submitted by Plaintiffs in connection with their preliminary injunction request, that 23XI ███████████████████████████████████████, was false. ███████████████████████

Mr. Freeze similarly told this Court under penalty of perjury in support of Plaintiffs' renewed motion for a preliminary injunction that ████████████████████████████████ ██████████████████████████ Doc. 67-1 at 20. Discovery has revealed otherwise. On November 21, 2024, ████████████████████████████████████████████ ████████████████████████████████ Ex. 28, Priv001575, Priv001576. That same day, Mr. Freeze disclosed privately to a colleague that ████████████████████████████ ████████████████████████████████████ Ex. 11, FRM_0075792. At his deposition on May 20, 2025, when confronted with ████████████████████████████████████ ████████████████████████████████████████████████████████████████████. Ex. 19, Freeze Tr. 83:18-25. Additionally troubling, while the second PI motion was pending, Mr. Freeze ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████." Ex. 12, FRM_0013996.[1]

## C. The Fourth Circuit Vacates The Injunction

In connection with the appeal from this Court's injunction, Plaintiffs raised as alternate grounds for affirmance the same arguments that they advance in their TRO and third motion for preliminary injunction. No. 24-2245 (4th Cir. Mar. 14, 2025), Doc. 38 at 53-58. The Fourth Circuit vacated this Court's injunction in a published opinion, holding that there was "no support for the proposition that a business entity or person violates the antitrust laws by requiring a

---

[1]     Plaintiffs also attempted to paint a misleading image of their operations in the media. For example, ████████████████████████████████████████████████████████ ████████████████████████ Ex. 7, 23XI_0169954.

prospective participant to give a release for past conduct as a condition for doing business." No. 24-2245 (4th Cir. June 5, 2025), Doc. 45 at 9. Plaintiffs moved for rehearing *en banc*, which the Fourth Circuit rejected (without any Judge even requesting a response from NASCAR). No. 24-2245 (4th Cir. July 9, 2025), Doc. 49. Both before and after the denial of rehearing, ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Exs. 36-39. NASCAR also repeatedly asked Plaintiffs to make a settlement proposal as the courts suggested.

Instead of proposing a settlement, Plaintiffs moved, for a third time, for a pre-trial injunction two days before the mandate issued. This motion seeks the same relief—Charters but without any applicable release—as the first two motions. Doc. 175. Plaintiffs assert that, if "forced to relinquish their charter rights during the middle of the Cup Series" they face the "possible" loss of drivers and sponsors, it "could deny" them of potential for success "on the track" in 2025 without a "guarantee their cars will qualify," and they face the threat of "losing their charter rights for good" post-trial if NASCAR sells the Charters. Doc. 176 at 12, 22-24.

In support of their motion, Plaintiffs attached declarations from Mr. Lauletta and Mr. Jenkins. Mr. Jenkins asserts ████████████████████████████████████

████████████████████████████████████████████████████████████████

Doc. 176-2 ¶7. He points to no actual evidence that any sponsor has raised any concerns about FRM's future. Mr. Lauletta asserts ████████████████████████████████████

████████████████████████████████████████. Doc. 176-1 ¶2. He attaches letters from

████████████████████████████████████████████████████████ and once again all seemingly written by the same person. Docs. 176-54, 176-55, 176-56.

**D.      Plaintiffs Will Participate In The Cup Series For The Remainder Of The 2025 Season**

Plaintiffs have repeatedly stated publicly and in discovery that they will continue to compete in the NASCAR 2025 Cup Series as Open teams, if needed.  *See* Exs. 1-3.  For instance, just three days ago (i.e., the day before filing for a TRO), one 23XI owner said publicly:  "We're not worried because our cars have the speed.  We've always said we're racing no matter what.  If we have to race open, we have to race open."  Ex. 3.  Even on the day Plaintiffs filed their motion claiming an "imminent threat of irreparable harm" to their ability to compete in 2025, 23XI co-owner Denny Hamlin publicly stated (when asked about the effect of the litigation on 23XI):  "We're going to race.  One thing is for sure is that we've always said that we're committed to racing this season, whether it be chartered or unchartered."  Ex. 2.  And when asked about the potential impact on drivers Reddick and Wallace of racing Open, 23XI co-owner Mr. Hamlin said:  "Everything would be the same there as far as trying to race for the playoffs."  *Id.*  Both Plaintiffs have completed the paperwork to race as Open teams at the Dover Race on July 20 and will have a spot in that race.  The same is true of the July 27 Indianapolis race.  Prime Decl. ¶¶ 5-7.

## LEGAL STANDARD

A TRO is "'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'"  *Yukon Packaging, LLC v. Jones Sustainable Packaging, LLC*, 2025 WL 209171, at *1 (W.D.N.C. Jan. 15, 2025) (J., Bell).  To receive the "extraordinary and drastic remedy," *2311 Racing*, 139 F.4th at 408, of a TRO, the movant must establish it "will suffer irreparable harm in the relatively brief amount of time it ordinarily would take the Court to resolve a preliminary injunction motion."  *Castro v. SC Elections Comm'n*, 2024 WL 340779, at *2 (D.S.C. Jan. 30, 2024).  The movant must also make "a clear showing that it is likely to succeed on the merits—along with the risk of irreparable harm,

the balance of the equities, and the public interest." *2311 Racing*, 139 F.4th at 408. Because the relief Plaintiffs seek here is "mandatory rather than prohibitory," *id.*, their required showing is even higher. Plaintiffs' showing as to all elements must "be indisputably clear." *Id.* at 409. The mandatory relief Plaintiffs seek is particularly "disfavored, and warranted only in the most extraordinary circumstances." *Id*. at 408 (quotation omitted).

## ARGUMENT

## I.  PLAINTIFFS' REQUESTED RELIEF CONFLICTS WITH THE FOURTH CIRCUIT'S OPINION

The relief Plaintiffs seek in their TRO—identical to the relief the Fourth Circuit already rejected because it asks for Charters but without releases—is foreclosed.

*First*, the Fourth Circuit has held that it is an abuse of discretion to require NASCAR to permit Plaintiffs "to participate in NASCAR Cup Series events under the terms of the 2025 Charter Agreement" because, among other reasons, that form of relief "require[s] two parties to engage in a business that one party claims to be illegal." *2311 Racing*, 139 F.4th at 411 (citing *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997)). The Fourth Circuit's decision in *Omega* bars such paradoxical relief—a point the Fourth Circuit acknowledged in this case. *See id.* (noting that *Omega* held that "when the injury that the movant seeks to prevent through a preliminary injunction is . . . directly contradictory to the injury for which it seeks redress in the underlying complaint, then a preliminary injunction simply should not issue"). Plaintiffs all but ignore this glaring defect in their requested relief, relegating their discussion of *Omega* to the very last paragraph of their motion where they copy-and-pasted the exact same argument that failed to move the Fourth Circuit. *Compare* Doc. 176 at 25, *with* Appellees' Br., No. 24-2245 (4th Cir. Mar. 14, 2025), Doc. 38 at 61-62.

In addition, the Fourth Circuit already determined that any request by Plaintiffs for Charters amounts to a request for a "mandatory" injunction—a "disfavored" form of relief "warranted only in the most extraordinary circumstances." *2311 Racing*, 139 F.4th at 408 (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)). Plaintiffs ignore that holding by repeatedly arguing in conclusory fashion that the relief they seek "will preserve the status quo for trial." Doc. 176 at 20; *see also id.* at 1 (requesting injunction to "protect the status quo"); *id.* at 2 ("if this status quo is maintained"); Doc. 175 at 4 (same). But the status quo is obviously determined by the "status quo ante" positions *before* the vacated injunctions, not after. *See Drivers, Chauffeurs, Warehousemen & Helpers Teamsters Loc. Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336, 1343 (4th Cir. 1978).

*Second*, even if the Fourth Circuit's decision did not explicitly preclude Plaintiffs from obtaining mandatory relief permitting them to operate as a Charter team, it indisputably precludes them from doing so without being subject to the release provisions in the Charter and Joinder Agreements. Plaintiffs again seek to receive Charter benefits without being bound by releases that the Fourth Circuit unequivocally determined do not violate the antitrust laws. *2311 Racing*, 139 F.4th at 409-10. The Fourth Circuit was explicit: "eliminat[ing] antitrust suits and others between parties doing business with each other" does not "eliminate or injure competition," so NASCAR requiring such a release does not violate the antitrust laws. *Id*. at 410. Yet, Plaintiffs again ask this Court to grant them all the benefits of the Charters but without the release, on the premise that being subject to it would violate the antitrust laws. *Compare* Doc. 176 at 20 ("The Court should still consider the exclusionary effect of the release . . . ."), *with 2311 Racing*, 139 F.4th at 410 (specifically rejecting this reasoning and holding that "[t]he offer of a contract for joint participation in business that includes mutual releases constitutes just what *linkLine* authorizes").

The bottom line is that, as the Supreme Court held in *linkLine* and the Fourth Circuit relied on, NASCAR was well within its rights to set the terms of conditions of dealing to include a release and to decide who it wants to contract with. As such, there is no basis for Plaintiffs' request that the Court provide preliminary relief that permits Plaintiffs to race under the terms of the Charter minus the release provision.

Plaintiffs' argument (at 2, 19-20) that the release violates *public policy* does not improve their lot. The Fourth Circuit foreclosed that argument as well, by holding that "unlike the releases in the cases cited by the district court, the release in the 2025 Charter Agreement is *not prospective*"—meaning it does not violate public policy. *2311 Racing*, 139 F.4th at 409. Plaintiffs' argument that this Court should find the retrospective release void against public policy as it relates to even "past" conduct, Doc. 176 at 20, cannot be reconciled with the Fourth Circuit's singular identification of releases that "may violate *public policy* by being prospective," *2311 Racing*, 139 F.4th at 409.[2]

## II. PLAINTIFFS FAIL TO SHOW ANY IMMINENT, IRREPARABLE INJURY WITHOUT A TRO

### A. The Status Quo Is No Charters

The Fourth Circuit was clear that absent the vacated injunction, "plaintiffs' participation in the Cup Series races would not have been guaranteed because they refused to sign the 2025 Charter Agreement." *Id*. at 408-09. This means that the status quo is Plaintiffs have no Charters and no Charter rights, as this Court recognized. *See* Doc. 162 at 6 n.10 ("Plaintiffs do not have 2025 Charters"). Thus, Plaintiffs' application is entirely based on a false premise: that they *do* have

---

[2] Plaintiffs' new assertion that the release does not encompass their claims is untenable. If Section 10.3 truly did not apply, that would eliminate any conceivable need for the relief they request, including their previous two requests for preliminary injunctions. Plaintiffs' argument also ignores the General Release of Claims provision in the Joinder Agreement that they refused to sign to obtain the SHR Charters.

Charters and may be "forced to relinquish their charters" absent a TRO. Doc. 176 at 24. Plaintiffs chose to reject NASCAR's contractual offers (both for Charters and for transfer of the SHR Charter with a Joinder with a General Release). That was their choice, but it confirms that a TRO will not maintain the status quo; instead, it will improperly upend it. *See Hoechst Diafoil v. Nan Ya Plastics*, 174 F.3d 411, 422 (4th Cir. 1999) ("[A] temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held.").

### B.    Plaintiffs Will Qualify For At Least The Next Two Weeks' Races

Rule 65 limits the duration of a TRO to 14 days absent agreement to extend. NASCAR is holding two Cup Series races (in Dover and Indianapolis) in the next 14 days. Not including Plaintiffs, neither race has more than 34 entrants (40 entrants are allowed). So, all six of Plaintiffs' cars will qualify if they choose to race. Prime Decl. ¶¶ 6-7. This means no TRO is necessary to address the parade of horribles Plaintiffs hypothesize.[3] Plaintiffs cannot meet their burden to "show [they] will suffer irreparable harm in the relatively brief amount of time it ordinarily would take the Court to resolve a preliminary injunction motion." *Castro*, 2024 WL 340779, at \*2. Plaintiffs' brief confirms this fact, by only arguing about harm absent "the requested *preliminary injunction*," Doc. 176 at 22 (emphasis added), and discussing the consequences of running Open cars "for the rest of the 2025 Cup Season and beyond," Doc. 176-1 ¶2. Supposed harm in that time period cannot sustain a TRO.

### C.    Plaintiffs' Self-Inflicted Harms Are Not Irreparable

Plaintiffs made the choice to not sign NASCAR's offer of a 2025 Charter. They did so in September 2024 ***after*** entering into agreements with drivers and sponsors that extended into the

---

[3]     The reality is that none of Plaintiffs' claimed harms flow from not operating as Chartered cars, but rather are merely byproducts of potentially failing to qualify for a race—something that is a non-issue for the next two weeks and in all likelihood the remaining 2025 season.

2025 season and beyond.[4]  In other words, to the extent Plaintiffs' contracts with drivers and

sponsors may be in jeopardy in the future by virtue of them having to operate as Open teams, that

is the consequence of a strategic decision they made to not sign Charters, unlike the holders of

32 other Charters.  The Court should "not consider a self-inflicted harm to be irreparable." *Salt*

*Lake Trib. Pub. v. AT&T*, 320 F.3d 1081, 1106 (10th Cir. 2003); *Di Biase v. SPX Corp.*, 872 F.3d

224, 235 (4th Cir. 2017) (no irreparable harm where movants "had the option to avoid the loss").

### D.    Plaintiffs' Claimed Harms Are Speculative—And Their Evidence Should Be Viewed Skeptically Given Their Prior Creation Of Evidence

All four of Plaintiffs' claimed harms are speculative.  Plaintiffs' submissions to this Court

also contradict their out-of-court statements.  And Plaintiffs manufactured evidence of harm to

support their second PI motion, and misled the Court in declarations.  This means that Plaintiffs'

latest submissions should, at the very least, be viewed skeptically.

Each of the four types of harm Plaintiffs claim is inadequately speculative (or wrong in the

case of qualifying for races in Dover and Indianapolis, as described above at page 13):

**Drivers**.  There is no credible risk (or even threat) that any of Plaintiffs' drivers will leave

mid-season, let alone over the next two weeks.  None of their evidence even makes that claim.

Instead, in suspiciously identical language, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████ Doc. 176-54; Doc. 176-55. ███████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Doc. 176-56.

And Front Row notes only ████████████████████████████████████████████████████████

---

[4]       *See e.g.*, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████. Doc. 176-2.

What Plaintiffs describe is, in their own words, a "possible loss of their drivers" at some indefinite, future time. Doc. 176 at 12. That cannot support a PI, as Judge Whitney held, and certainly cannot support a TRO. *See* Doc. 43 at 5 ("[Plaintiffs] have not sufficiently alleged present, immediate, urgent irreparable harm, but rather only speculative, possible harm.").

**Sponsors.** Nor is there evidence that any sponsor will terminate its sponsorship of upcoming *2025* races with 23XI and FRM. That vague concern for "loss of sponsorships is not 'irreparable' harm" in any event, "because it may be compensated." Doc. 74 at 18 n.13.

**Sale of Charters**. Although based on the false premise that Plaintiffs have Charters, and notwithstanding the substantial interest in Charters from motorsports companies racing in INDYCAR, Xfinity, and other series, NASCAR has represented it will not sell any Charters before the Court can rule on Plaintiffs' motion for preliminary injunction.

Plaintiffs' submissions portray running Open as a nightmare but their out-of-court representations are the opposite. In addition to the out-of-court confirmation that Plaintiffs will race Open (*see* page 9, above), Plaintiffs confirmed in deposition that they will race Open. For instance, Michael Jordan confirmed in deposition that 23XI would complete 2025 as an Open team: "Q. Does 23XI have plans to race as an open team if that injunction is overturned? A. For the remainder of the year? Yes, we would race." Ex. 18, M. Jordan Tr. 137:3-7. ████████████

██████████████████████████[5] These statements are irreconcilable with Plaintiffs' current TRO claims. And, of course, to the extent Plaintiffs claim harm from the decreased money they receive as Open

---

[5]      *See* Ex. 27, Lauletta (23XI 30(b)(6)) Tr. 242:2-10 ████████████████████████
████████████████████████████ █ ███████
████████████████████████████████████████

teams, that legally should not be part of any injunction or TRO, as it is by definition redressable through monetary damages.

As noted above, discovery also revealed that Plaintiffs manufactured evidence that they submitted to the Court in connection with the Second PI, and remarkably represented to the Court that they had no involvement in the creation of that evidence. *See supra* pp.4-7. Plaintiffs' latest submission is similarly suspect. For instance, the letters from ███████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. *See* Docs. 176-54, 176-55, 176-56; Ex. 23, Hamlin Tr. 88:7-90:17.

## III. THE RELIEF PLAINTIFFS CLAIM TO SEEK POST-TRIAL IS IMPROPER

Plaintiffs' requested relief also suffers from the "fatal" defect that it is not "necessary to the prosecution of [their] claim" at trial. *In re Microsoft Corp. Antitrust Litig*., 333 F.3d 517, 531 (4th Cir. 2003). Plaintiffs forget that the "limited function" of preliminary injunction is "to preserve the court's ability to render meaningful judgement on the merits." *Id*. So, any relief "must be necessary . . . to preserve the court's ability to enter ultimate relief on the merits." *Id*. at 526. The Fourth Circuit has unequivocally held that "[i]f that need is not presented, then a preliminary injunction should not be considered." *Id*. at 526. This is a "fundamental" requirement, *id*. at 531, but Plaintiffs fail to satisfy it in two independent ways.

*First*, Plaintiffs have no prospect of obtaining their requested relief, irrespective of the trial outcome. The relief of being awarded six Charters—a benefit worth hundreds of millions of dollars—is completely disconnected from the liability theories Plaintiffs are now pushing—such as challenging NASCAR's acquisition of tracks and a minor racing series or its restrictions on its intellectual property. Plaintiffs fail to demonstrate how forcing NASCAR to grant them six Charters—thus taking Charters away from the many other potential owners who are excited about

racing in NASCAR under the current Charter system—could possibly preserve or restore competition in Plaintiffs' alleged relevant market. This glaring disconnect again demonstrates the true motive behind this case: to negotiate better contractual terms and obtain the valuable assets Plaintiffs gave up when they did not sign Charters, not to remedy any supposed antitrust issue. Nor have Plaintiffs provided any authority whatsoever demonstrating how forcing NASCAR to enter into long-term contractual relationships with these Plaintiffs is reconcilable with the black-letter antitrust principles that even alleged "[m]onopolists have a broad right not to deal," including the "unquestioned right to stop dealing with a [supplier] for reasons sufficient to himself." *Am. President Lines v. Matson, Inc.*, 775 F. Supp. 3d 379, 408 (D.D.C. 2025); *see also Pac. Bell Tel. Co. v linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Because Plaintiffs fail to link their requested mandatory injunction to the "final relief" that they seek in this case using "any established legal theory," the requested mandatory injunction may not issue. *Microsoft*, 333 F.3d at 534 (vacating mandatory preliminary injunction that "has not been linked in fact or by any established legal theory the final relief that [plaintiff] seeks").[6]

*Second*, compelling NASCAR to grant Charter rights for the remainder of 2025 is in no sense "necessary" to preserving this Court's ability to enter ultimate relief on the merits—as Plaintiffs cannot even say with certainty that they will remain operating in NASCAR if they prevail at trial. During the June 17, 2025 hearing, the Court asked Plaintiffs "[w]hat exactly are you hoping for relief at the end of a successful trial in your view?" June 17, 2025 Hrg. Tr. 3:16-18.

---

[6] Plaintiffs' suggestion that the Court can order NASCAR to provide them with Charters also is unworkable for another reason. To do so would require the Court to conclude that Charters are required for anyone to be able to participate in NASCAR. But that would mean NASCAR would have to provide Charters to anyone who sought them—meaning that there would be no limit to the number of cars that could enter any race, and claim entitlement to the other benefits that come from being a Charter team. Even Plaintiffs have acknowledged that Charters should not be available to anyone who wants them.

Plaintiffs' vacillating response was revealing. *Id*. at 4:8-25. When asked in deposition, 23XI's principal owner Michael Jordan was similarly non-committal. He conditioned 23XI's long-term participation in NASCAR on the implementation of a permanent Charter system. And when asked what he was "hoping not get out of this lawsuit," his response was: "Permanent charters, an opportunity to race Cup, race stock cars." Jordan Tr. 133:16-19. That permanent Charters was at the top of his list confirms that Plaintiffs are using this litigation improperly to attempt to extract their preferred contract terms. But case after case makes clear that "antitrust law is not a negotiating tool for a plaintiff seeking better contract terms." *Equifax*, 561 F.3d at 573; *Host*, 32 F.4th at 250 ("[A] breakdown in contract negotiations is outside the Sherman Act's scope.").

## IV. PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS AT TRIAL

To ultimately prevail on their Section 2 claim—the only claim they rely on in connection with this motion—Plaintiffs must show "possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Healthcare Servs., Inc. v. Radford Cmty. Hosp*., 910 F.2d 139, 147 (4th Cir. 1990); *23XI Racing*, 139 F.4th at 409. Plaintiffs cannot establish any of these elements.

Throughout their arguments about what evidence discovery has "revealed," Plaintiffs repeatedly cite to evidence they manufactured, or evidence they are badly misrepresenting. Plaintiffs also repeatedly rely on self-serving testimony from representatives of the Race Team Alliance who have ██████████████████████████ with the Plaintiffs in this litigation,[7] and view their role to be ██████████████████████ Ex. 26, Marshall Tr. 20:19-23, 21:25-22:3, 38:8-14; Ex. 15, RTA00051917, at -919. ████████████ ████████████████████████████████████████████████

---

[7]     Neither the RTA nor Plaintiffs disclosed ██████████████████████ to the Court at the time the RTA filed an *amicus* brief in this proceeding. Doc. Nos. 142-1, 143.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ Ex. 26, Marshall Tr. 84:9-85:11. And Plaintiffs' primary evidence that the Charter terms were "unreasonable" is a text from a witness who did not have "any involvement in negotiating the 2025 charter agreement between NASCAR and its teams," Ex. 20, Herbst Tr. 198:14-24, and was actually texting about the unreasonableness of Curtis Polk and his positions, as Polk walked around a racetrack with a sign taped to his shirt about the Charter negotiations. And those are just the tip of the iceberg.[8] Whether a jury will ultimately credit Plaintiffs' biased and misrepresented evidentiary shenanigans at trial is to be determined. But at this stage nothing about the evidence presents an "indisputably clear" likelihood of Plaintiffs prevailing at trial.

### A. Plaintiffs Have Not Shown That NASCAR Holds Monopsony Power In A Relevant Market

It also remains far from "indisputably clear" that Plaintiffs will substantiate NASCAR's monopsony power or adequately define a relevant market at trial. On monopsony power, the evidence shows that NASCAR agreed in the 2025 Charter to *increase* its total payments to teams by $███ million *per year* (on average) during the Charter's initial term, giving the teams *all* of NASCAR's increased revenue from new media deals plus an additional $██████ million a year. Prime Decl. ¶ 12; Ex. 24, Phelps Tr. 137:20-138:8. This behavior is the exact opposite of what one would expect from a monopsonist. If NASCAR truly had market power, it would be decreasing the amount by which it compensates them—not significantly *raising* it. *See, e.g.*, *In re Beef Indus. Antitrust Litig*, 907 F.2d 510, 515-16 (5th Cir. 1990) ("[I]n order to demonstrate that

---

[8]     NASCAR's preliminary injunction opposition will reveal more, if required.

IBP had obtained monopsony power . . . the cattlemen would have had to show that IBP reduced its purchases of and its prices for feed cattle . . . ."). [9]

Plaintiffs' proposed market definition—based on an unrealistic view that NASCAR is a relevant market unto itself—is also flawed. Plaintiffs incorrectly fixate on the notion that certain assets, like cars, which motorsports organizations invest in *after* choosing to partner with NASCAR, cannot be used to race in other leagues. Doc. 176 at 9. The relevant market analysis, however, must focus on the existence of competition at the *pre*-investment stage, not the present circumstances of any "particular plaintiff." *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F. 3d 430, 438 (3d Cir. 1997); *Mozart Co. v. Mercedes-Benz*, 833 F.2d 1342, 1346-47 (9th Cir. 1987). [10]

Fact-discovery also has confirmed that even after making an initial investment, NASCAR teams and owners continue to compete in other motorsports—making it even easier for them to substitute away from NASCAR if NASCAR's terms are not competitive. [11]

In light of all this, Plaintiffs have not shown that it is "indisputably clear" that their gerrymandered, single-firm market will carry the day.

---

[9] ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████ NASCAR, by contrast, is paying itself *less* as its media revenues have increased. This is quite simply not the behavior of a monopsonist.

[10] This situation of team owners *choosing* to invest in a NASCAR team sets this case apart from *NCAA v. Alston*, 594 U.S. 69 (2021) and other antitrust cases involving *athletes*.

[11] *See, e.g.*, Doc. 161 at 8 n.10 ████████████████████████████
███████████████████████████████████████████████

**B.      Plaintiffs' Theories Of Anticompetitive Conduct Will Not Prevail**

Plaintiffs' theories of anticompetitive conduct likewise have many deficiencies that demonstrate they will not prevail at trial. "Simply possessing monopoly power" or even "charging monopoly prices does not violate § 2." *linkLine*, 555 U.S. at 447-48. "Section 2 requires that the defendant have engaged in anticompetitive conduct," *2311 Racing*, 139 F.4th at 410.

**1.      Plaintiffs Complain About Old Acts That Are Time-Barred**

Nearly all of the conduct that Plaintiffs challenge as anticompetitive is time barred by the Sherman Act's statute of limitations as it relates to policies or actions NASCAR initiated more than four years before Plaintiffs filed this suit in October 2024. *See* 15 U.S.C. § 15b. This includes NASCAR's acquisition of ARCA in 2018 (Doc. 107 ¶ 12), NASCAR's acquisition of International Speedway Corp. in 2019 (Doc. 107 ¶ 14), and its 2019 development of the Gen 7 or "Next Gen" car program (Doc. 107 ¶ 13). The 2016 Charter contained a similar Protection of Goodwill clauses in § 6.6 of that agreement—which both FRM and 23XI voluntarily agreed to. *See* Doc. 21-4, at § 6.6 ("Protection of Goodwill"). And Plaintiffs have conceded in discovery that NASCAR's use of Sanction Agreements containing exclusivity with tracks began ███████████████████ ████████████[12] Plaintiffs do not address the statute of limitations issues their claims face.

23XI elected to invest in a NASCAR team after all of these acts occurred, and with full knowledge of them and their supposed import. 23XI owner Curtis Polk ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[12]  Ex. 33, 23XI R&O to Interrog. No. 21.

██████████████████████████████████████████████████████████████

████████████████████ Doc. 21-3 ¶ 7.  23XI has conceded in discovery that ████████████████████

██████████████████████████████████ Ex. 30, 23XI R&O to Request for

Admission No. 16.  These facts render Plaintiffs' claims not only untimely, but also illogical.  Just

as a plaintiff cannot enter into a transaction with "eyes wide open, fully able to 'assess the potential

costs and economic risks at the time,'" and then claim of being "locked in," *Virgina Vermiculite

v. W.R. Grace & Co.*, 108 F. Supp. 2d. 549, 584 (W.D. Va. 2000), 23XI cannot complain about

acts they were fully aware of before electing to invest in a NASCAR team.

### 2. Plaintiffs Lack Standing To Challenge The 2025 Charter Terms

Plaintiffs also lack antitrust standing because they did not sign the 2025 Charters.  A

supplier's refusal to sign a noncompete provision—like Plaintiffs did here—negates any possible

antitrust standing to challenge it.  *See Host*, 32 F.4th at 250 (no antitrust standing where plaintiff

"choose to walk away from the table because it did not like the lease terms [] offered").  Moreover,

their "[f]ailure to secure preferred contractual terms is not an antitrust injury."  *Id.*

### 3. NASCAR's Vertical Exclusive Dealing Arrangements Are Procompetitive

Plaintiffs also reference two clauses in NASCAR's contracts that they claim are

exclusionary: ██████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████.  Doc. 176 at 17.  Setting aside the fact that Plaintiffs disclaimed being

competitors to NASCAR and thus have no standing to challenge these provisions,[13] non-price

---

[13]     *See, e.g., Thompson Everett v. Nat'l Cable Advert.*, 57 F.3d 1317, 1325 (4th Cir. 1995)
(plaintiff did not have antitrust standing to challenge exclusivity contract because it was "not a
would-be competitor").  Both 23XI and FRM admitted in discovery ████████████████████
████████████████ Ex. 30, 23XI R&O to Request for Admission No. 14; Ex. 32, FRM R&O to Request
for Admission No. 12.

exclusive dealing arrangements like these are well-known to have procompetitive justifications. For example, exclusive contracts of this type encourage investment by preventing others from "free rid[ing] on [its] efforts" or on its brand. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984); *Spinelli v. National Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) (upholding NFL's exclusivity contract NASCAR will explain this, in detail, in PI opposition). Similarly, Plaintiffs' challenge to NASCAR's vertical acquisitions of ISC and ARCA is not likely to prevail, even setting aside the limitations problem.[14]

## V. FORCING NASCAR TO TREAT PLAINTIFFS AS CHARTERED TEAMS HARMS NASCAR

NASCAR will be harmed if the Court grants Plaintiffs' requested relief, which offends the contractual agreement that NASCAR and *every other racing team* have been operating under.

All agree that Plaintiffs did not sign the Charter Agreements for their 23, 34, 38, and 45 cars. By operation of the 2025 Charter Agreements between NASCAR and the 13 other racing teams, these forfeited Charters reverted to NASCAR long ago. Front Row and 23XI's continued collection of financial benefits reserved for Charter-holding teams is directly decreasing the size of the Pool Money available to be paid to teams that signed 2025 Charters. Prime Decl. ¶ 15. It is no answer to merely "grant Plaintiffs the rights" under the 2025 Charters without requiring an actual agreement to be signed. This is because Section 3.1 of the 2025 Charter Agreement, which was negotiated at the teams' request, *2311 Racing*, 139 F.4th at 407, ███████████████ ██████████████████████████████████████████. Nor could NASCAR grant Plaintiffs'

---

[14] Plaintiffs are also *unlikely* to prevail on their claim that NASCAR's "Next Gen" car requirements are anticompetitive. Motorsports sanctioning bodies have broad leeway in rule-setting. *See Brookings v. Int'l Motor Contest*, 219 F.3d 849, 854-55 (8th Cir. 2000) (upholding transmissions rules); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80-82 (3d Cir. 2010) (upholding tires rules). Even the RTA Chairman admitted that ████████████ ████████ ████████████████ Ex. 21, Kauffman Tr. at 15:1-15.

teams the "benefits" of the Charters while also allowing new teams to join pursuant to the rejected agreements ████████████████████████████████████████████████ ██████████████████████████████████████.

NASCAR was compelled to sign a special joinder allowing Plaintiffs to assume the responsibilities and obligations of the SHR Charters as a result of the now-vacated injunction. The Fourth Circuit has made clear that it would be error to grant a TRO based on the release in the SHR Charters. NASCAR has offered Plaintiffs the option to sign the customary joinder to the SHR Charters, which contains a mutual release, but Plaintiffs have refused to do so, instead preferring to continue litigating. Prime Decl. ¶ 18. While regrettable, the Fourth Circuit's ruling is clear that it is their choice to make. 139 F.4th at 409. But "[i]t is not the province of the court . . . to make a new contract for them." *United States v. Turner Constr. Co.*, 946 F.3d 201, 207 (4th Cir. 2019).

*Second*, Plaintiffs' proposed TRO would harm NASCAR's own ability to seek a relationship with new team owners that seek to enter the 2026 Cup Series. Prime Decl. ¶ 17. As Plaintiffs themselves acknowledge, now is the time when teams begin to plan and obtain sponsorship and other funding for the next season. Doc. 176 at 24. But ***Plaintiffs*** are the ones who decided not to sign the 2025 Charter Agreements; every day of uncertainty around the rejected Charters for the benefit of Plaintiffs is a day preventing a new team that wants to partner with NASCAR and the other 30 Charter holders from entering and growing the sport. Denying Plaintiffs' proposed injunction is crucial to avoid this irreparable harm—both to NASCAR and the 30 other Charter holders. *Glacier Sales & Eng'g, LLC v. Eagle Plastics*, 2007 WL 2694402, at *3 (E.D. Mich. Sept. 11, 2007); *Quickie Mfg. v. Libman Co*., 180 F. Supp. 2d 636, 651 (D.N.J. 2002).

## VI. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST PLAINTIFFS' REQUESTED RELIEF

The balance of equities further weighs against the issuance of Plaintiffs' requested relief. It is uncontested that Plaintiffs decided not to sign the 2025 Charter agreements fully aware of the potential risks. *Supra* p.4. Instead, they decided to use litigation to try to cow NASCAR into providing them better terms. Ex. 6, 23XI_0252203 ████████████████████████████████ When that did not work, they moved for an injunction, spun up a complaint about a release that was never an issue in negotiations, purposefully downplayed their own success to hide it from the Court, and manufactured evidence to convince the Court to save them from their bad business decision. It has dragged NASCAR into a baseless litigation that has harmed NASCAR's goodwill, prevented NASCAR from seeking partners that want to help grow the sport, and has taken money that rightfully belongs to teams that did sign 2025 Charter Agreements. Prime Decl. ¶ 15.

On the other hand, Plaintiffs' purported harms remain speculative, are likely manufactured once again, and are entirely self-inflicted. Losses to sponsorship and goodwill are the exact type of harm that courts routinely find compensable through monetary damages because "the loss of [] goodwill is often calculable and compensable, and its mere pleading does not necessitate injunctive relief." *Spacemax Int'l LLC v. Core Health & Fitness*, 2013 WL 5817168, *2 (D.N.J. Oct. 28, 2013); *see Ramsey v. Bimbo Foods Bakeries Distrib.*, 2014 WL 3408585, *9-10 (E.D.N.C. July 10, 2014). Plaintiffs do not need Charters to race: they have confirmed multiple times they will compete without Charters, as they have in the past. The Open entries for Dover and Indianapolis are locked; Plaintiffs will qualify for those races and can continue to compete to earn playoff points while the Court considers Plaintiffs' motion for preliminary injunction.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' application for a TRO.

Dated: July 16, 2025

Respectfully submitted,

By: _/s/ Christopher S. Yates_
Christopher S. Yates*
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
chris.yates@lw.com

Lawrence E. Buterman*
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
lawrence.buterman@lw.com

Anna M. Rathbun*
David L. Johnson*
Christopher J. Brown*
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com

Tricia Wilson Magee (N.C. Bar No. 31875)
**SHUMAKER, LOOP, & KENDRICK, LLP**
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Tel: 704-945-2911
Fax: 704-332-1197
tmagee@shumaker.com

* Admitted _pro hac vice_

_Counsel for Defendants and Counter-Plaintiffs_

## ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 16th day of July, 2025.

*/s/ Christopher S. Yates*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** was electronically filed using the Court's CM/ECF system, which will automatically send notice of filing to all parties of record as follows:

Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
dwilliams@winston.com

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
jkessler@winston.com

Jeanifer Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
jparsigian@winston.com
mtoomey@winston.com

Matthew DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
mdalsanto@winston.com

*Counsel for Counterclaim Defendants 23XI
Racing, Front Row Motorsports Inc., and
Curtis Polk*

This the 16th day of July, 2025.

*/s/ Christopher S. Yates*
