**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC.,

Plaintiffs,

v.

NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE,

Defendants.

NASCAR EVENT MANAGEMENT, LLC,

Counter-Plaintiff,

v.

2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK,

Counter-Defendants.

No. 3:24-cv-886-KDB-SCR

[**PUBLIC VERSION**]

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**CONTENTS**


Page

BACKGROUND ....................................................................................................3

A. The 2016 NASCAR Cup Series Charters ....................................................3

B. The Negotiation Of The 2025 NASCAR Cup Series Charters .....................3

C. The Preliminary Injunction Rulings ..............................................................7

D. The Fourth Circuit Vacates The Injunctions ................................................8

E. Plaintiffs' Third Motion For A Preliminary Injunction ..................................8

LEGAL STANDARD ...........................................................................................9

ARGUMENT .........................................................................................................9

I. Plaintiffs Fail To Show Any Imminent, Irreparable Injury ...........................9

A. Plaintiffs Can Race As Open Teams For 2025 Without Any Irreparable Harm .................9

B. There Is No Cognizable Harm From Plaintiffs Not Having Charters In 2026 ..................10

II. Plaintiffs' Request To Freeze Six Charter Sales Is Improper ........................11

III. Plaintiffs Cannot Establish A Likelihood Of Success At Trial .....................13

IV. Preventing NASCAR's Sale Of Charters Pre-Trial Would Substantially Harm NASCAR And The Cup Series ...........................................................................23

V. The Balance Of Equities And Public Interest Weigh Against Plaintiffs' Requested Relief ...25

CONCLUSION ....................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*2311 Racing v. NASCAR*,
139 F.4th 404 (4th Cir. 2025) ........................................................................ *passim*

*3Shape Trios v. Align Tech.*,
2019 WL 3824209 (D. Del. Aug. 15, 2019) ..............................................................10

*Adv. Healthcare Servs., Inc. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ..................................................................................13

*Am. Cricket Premier League v. USA Cricket*,
445 F. Supp. 3d 1167 (D. Colo. Mar. 12, 2020) .............................................12, 13

*Am. President Lines v. Matson, Inc.*,
775 F. Supp. 3d 379 (D.D.C. 2025)..........................................................................23

*Arcesium LLC v. Advent Software, Inc.*,
2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ............................................................10

*Brookins v. Int'l Motor Contest Ass'n*,
219 F.3d 849 (8th Cir. 2000) ..............................................................................14, 21

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..................................................................................................12

*Campfield v. State Farm Mut. Auto. Ins.*,
532 F.3d 1111 (10th Cir. 2008) ...............................................................................15

*CBC Cos. v. Equifax*,
561 F.3d 569 (6th Cir. 2009) ...................................................................................13

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ...................................................................................10

*Expert Masonry v. Boone Cty, Ky.*,
440 F.3d 336 (6th Cir. 2006) ...................................................................................12

*Fed. Trade Comm'n v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025) ........................18

*Freeland v. Nippon Steel Corp.*,
2025 WL 1724997 (N.D. Cal. June 20, 2025) .........................................................22

*HCI Techs., Inc. v. Avaya, Inc.*,
241 F. App'x 115 (4th Cir. 2007) ....................................................................11

*Host Int'l v MarketPlace*,
32 F.4th 242 (3d Cir. 2022) ....................................................................13, 19

*Imaging Center, Inc. v. W. Md. Health Sys.*,
158 F. App'x 413 (4th Cir. 2005) ....................................................................18

*In re Beef Indus. Antitrust Litig*,
907 F.2d 510 (5th Cir. 1990) ....................................................................15

*In re Microsoft Corp. Antitrust Litig*.,
333 F.3d 517 (4th Cir. 2003) ....................................................................11, 12

*Intergraph Corp. v. Intel Corp.*,
195 F.3d 1346 (Fed. Cir. 1999)....................................................................18

*It's My Party v. Live Nation*,
811 F.3d 676 (4th Cir. 2016) ....................................................................15

*JES Props. v. USA Equestrian Inc.*,
2005 WL 1126665 (M.D. Fla. May 9, 2005)....................................................................13

*Ky. Speedway v. NASCAR*,
588 F.3d 908 (6th Cir. 2009) ....................................................................13, 14

*Langston Corp. v. Standard Registry Co.*,
553 F. Supp. 632 (N.D. Ga. 1982)....................................................................13

*Loren Data Corp. v. GXS, Inc.*,
501 F. App'x 275 (4th Cir. 2012) ....................................................................2, 13

*Martin v. Am. Kennel Club*,
697 F. Supp. 997 (N.D. Ill. 1988) ....................................................................13

*Methodist Health Services Corp. v. OSF Healthcare System*,
859 F.3d 408 (7th Cir. 2017) (Posner, J.) ....................................................................20

*Mid-South Grizzlies v. Nat'l Football League*,
720 F.2d 772 (3d Cir. 1983)....................................................................12

*NCAA v. Alston*,
594 U.S. 69 (2021)....................................................................15

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021)....................................................................20, 21

*New York v. Meta*,
66 F.4th 288 (D.C. Cir. 2023) .......... 25

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) .......... 10

*Novell v. Microsoft*,
731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.) .......... 19, 21

*Oksanen v. Page*,
945 F.2d 696 (4th Cir. 1991) (en banc) .......... 14

*Omega World Travel v. Trans World Airlines*,
111 F.3d 14 (4th Cir. 1997) .......... 11

*Pac. Bell Tel. v. linkLine Commc'ns*,
555 U.S. 438 (2009) .......... 8, 23, 25

*Queen City Pizza v. Domino's Pizza*,
124 F. 3d 430 (3d Cir. 1997) .......... 14

*R.J. Reynolds Tobacco Co. v. Philip Morris*,
199 F. Supp. 2d 362 (M.D.N.C. 2002) .......... 19, 20

*Racing Tires Am. v. Hoosier Racing Tire*,
614 F.3d 57 (3d Cir. 2010) .......... 14, 18, 21

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) .......... 20

*Salt Lake Trib. Pub. v. AT&T*,
320 F.3d 1081 (10th Cir. 2003) .......... 10

*SMS Sys. Maintenance Servs. v. Digital Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999) .......... 18

*Spectrofuge Corp. v. Beckman Instruments*,
575 F.2d 256 (5th Cir. 1978) .......... 14

*Spinelli v. Nat'l Football League*,
96 F. Supp. 3d 81 (S.D.N.Y. 2015) .......... 20

*Thompson Everett v. Nat'l Cable Adver.*,
57 F.3d 1317 (4th Cir. 1995) .......... 19, 20

*U.S. v. Marine Bancorp., Inc*,
418 U.S. 602 (1974) .......... 22

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................14

*Va. Vermiculite v. W.R. Grace & Co.-Conn.*,
108 F. Supp. 2d 549 (W.D. Va. 2000) ....................15, 22

*Verizon Commc'nc Inc. v. Law Offices of Curtis V. Trinko*,
540 U.S. 398 (2004) ....................17, 19

**STATUTES**

15 U.S.C. § 15b ....................22

NASCAR built the world's best racing series from the ground up through 75-plus years of hard work, billions in investment, and innovation. The antitrust laws celebrate, rather than punish, such success. They do not require a business to contract with all comers or to agree to the specific terms every counterparty demands, just because a business has reached a high level of success. Plaintiffs' third preliminary injunction motion seeks relief that is irreconcilable with these bedrock principles. No further preliminary relief should issue for multiple reasons.

**First**, Plaintiffs are assured entry for six "Open" cars in all remaining 2025 Cup Series races, and running those races Open causes them no irreparable harm. Moreover, there cannot be any irreparable harm from NASCAR choosing who it wants to do business with. Plaintiffs knowingly accepted the risk and made the informed choice of rejecting NASCAR's offer. NASCAR now wishes to partner with others. Equity does not reward self-inflicted injuries.

**Second**, Plaintiffs improperly ask the Court to force NASCAR to permit them "to participate in the very business that they s[eek] to dismantle," and on preferential terms. *2311 Racing v. NASCAR*, 139 F.4th 404, 409 (4th Cir. 2025). The Fourth Circuit rejected such relief when it vacated the prior injunctions as wrongly "requir[ing] two parties to engage in a business that one party claims to be illegal." *Id.* at 411. In addition, Plaintiffs' expert identified the changes he believes are needed to restore competition in the alleged market for "premier stock car racing" services, and ***none*** included giving Charters to Plaintiffs. Ex. 5, Snyder R. ¶ 171. That is because a forced Charter relationship would not enhance competition in the alleged market; it would only help Plaintiffs. But it is black letter law that addressing harm to competition (not helping individual competitors) is the purpose of the Sherman Act.

**Third**, Plaintiffs cannot show a likelihood of success on their monopsony claim. Plaintiffs' claimed market conflicts with ***every*** court of appeals decision addressing market definition in

motorsports. Neither Plaintiffs nor their experts identify any motorsport competitor ever excluded by NASCAR, and there are well-recognized procompetitive benefits for all of the challenged conduct. The law requires a monopsony plaintiff to show actual exclusionary conduct that allows a buyer to reduce the amount it buys in order to depress the price it pays. The opposite is true here. NASCAR has not reduced the number of Charters. And NASCAR has repeatedly agreed to pay Charter holders more or create additional value for them, as the following facts demonstrate:

- At the Teams' request, NASCAR agreed to the Charter system in 2016, gave Charters away for free, and thereby created about $1.5 billion (and growing) in equity value for the Teams.
- In the 2016 Charters, NASCAR increased annual payments to Teams by 28% to [REDACTED] on average over the pre-Charter period. In the 2025 Charters, NASCAR increased those payments by another 62% to an annual average of [REDACTED] million for the 2025-2031 period.
- In 2025, Teams will collectively receive about [REDACTED] billion from their participation in the Cup Series (including NASCAR payments and Teams' more than [REDACTED] million in sponsorships).
- NASCAR pays *a higher percentage* of its operating income to Charter Teams than Formula 1 pays to its teams (Formula One is Plaintiffs' benchmark). This is fatal.

Over 2.5 years of negotiations, NASCAR made many compromises, including offering Charter holders a substantial pay raise and other benefits such as an extended term. During those negotiations, Plaintiffs each purchased a Charter ([REDACTED]) fully aware of the terms being negotiated. NASCAR was not required to contract with any Team, nor to offer "the terms and conditions" that Teams "desire[d]." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012); *see also infra* pp. 11, 14. And no Team was required to accept NASCAR's offer. But nearly 90% of then-existing Charter holders did because it was "seriously fair," as one Team wrote in May 2024. Doc. 178-11, at -410. Not only did the majority of Teams

accept NASCAR's offer, but many organizations racing in other motorsports and private equity companies are eager to sign up for those very same terms today. Phelps Decl. ¶¶ 31-39.

**Fourth,** it would harm NASCAR, current Charter holders, and other stakeholders, such as media partners, to prevent NASCAR from letting existing Charter holders bid to acquire the Stewart-Haas ("SHR") Charters, or from working with organizations eager to enter the Cup Series. There are many eager potential entrants who want to obtain Charters, including organizations from other motorsports who recognize the value that NASCAR offers and want to help grow the sport for the betterment of fans, media partners, tracks, NASCAR, and Charter Teams. *Id.* ¶¶ 31-39. To be ready for the first race of the 2026 Season—those potential entrants need to arrange their businesses now, and cannot delay until 2026. *Id.* ¶¶ 40-42. Accordingly, the Court should deny Plaintiffs' Motion, so that the 2026 Cup Series is not irreparably harmed.

## BACKGROUND

### A. The 2016 NASCAR Cup Series Charters

The 2016 Charters that Plaintiffs received for free (in the case of Front Row ("FRM")) or purchased (in the case of 23XI) had a set term, ending on December 31, 2024. Doc. 21-2 at ¶ 5. The contract reflected that the parties had a "desire to renew" the arrangement, but reserved that "the final decision regarding whether or not to renew, and the term of any renewal period, shall be subject to mutual agreement of the parties and, for clarity, either party may propose any changes to this Agreement." Doc. 21-4 at § 2.3. For the Teams' benefit, the 2016 Charters allowed each Team to trigger a "Good Faith Renewal Negotiation" from July 2023 through December 2023, during which time the Team would have the "exclusive" right to negotiate with NASCAR. *Id.*

### B. The Negotiation Of The 2025 NASCAR Cup Series Charters

Despite the agreed 6-month exclusive negotiation period, NASCAR negotiated the 2025 Charter exclusively with existing Charter holders for over two years. The Teams' initial June 2022



proposal would have rendered NASCAR bankrupt, and they knew NASCAR would not accept it. Ex. 15, Phelps Tr. 130:12-133:2. During the Teams' presentation, "[redacted]," the Teams' notes show, but "[redacted]" Ex. 21 at -737.

Curtis Polk was the architect of the Teams' plan. Polk entered NASCAR Team ownership only the prior season with no experience or interest in motorsports. His first impression was that the sport was "[redacted]" and "[redacted]." Ex. 18 at -839. He and Jordan viewed the sport as a "[redacted]," Ex. 30 at -379, and compared the money they spent on their team to amounts Jordan [redacted]," Ex. 53 at -376. But, as he told the Teams, [redacted]." Ex. 47 at -972-73. He proposed that the Teams "[redacted]," [redacted]" and if the Teams "[redacted]." *Id.* at -986-87.

NASCAR met with the Teams' appointed committee (the "TNC") through June, July, and August 2022. The TNC thought that dialogue was "[redacted]." Ex. 22 at -512. When the TNC requested NASCAR's position in writing, NASCAR provided it, including describing that, with respect to revenue, "[redacted]" to ensure all stakeholders were "[redacted]," but that it was challenging to discuss "[redacted]" until NASCAR's 2025 broadcast contract negotiations were further along. Ex. 23 at -362. NASCAR Directors Jim France and Lesa France Kennedy met with Teams that month to personally communicate that NASCAR "[redacted]

[redacted].” Ex. 29 at -217. France also encouraged Teams to deal with him directly, rather than through a committee. *Id.*

France’s request to deal directly with Teams enraged Polk because it upset his plan to leverage the Teams’ collective force. When Polk learned of it, he wrote to multiple Teams that “[redacted].” Ex. 24 at -960. To put pressure on NASCAR and deter individual meetings, he and the TNC arbitrarily demanded that NASCAR submit a more specific counterproposal by August 29, 2022, or else the TNC would begin [redacted]. *Id.*; Ex. 29 at -217-18. Polk told the Teams [redacted].” Ex. 25 at -899. Polk then threatened NASCAR’s negotiators, telling them (in his words): “[redacted]” Ex. 26 at -121. Polk told NASCAR “[redacted].” *Id.*

In communications with the TNC, however, Polk made clear he intended to move “[redacted]” Ex. 28 at -151. NASCAR had asked Polk to [redacted] but Polk called the request “[redacted],” and wrote: “[redacted].”

Ex. 27 at -970. Polk's series of "[redacted]" included media outreach, [redacted] [redacted] and more. *See* Ex. 48 at -627.

From that point on, tensions during negotiations were high (just as Polk intended), with distrust on both sides, and Polk leading an illegal conspiracy. *See* Ex. 1, Hubbard R. ¶¶ 59-75; Ex. 2, Desser R. ¶¶ 11.8-12.13. Still, after NASCAR concluded its media-rights negotiations in November 2023, NASCAR made good on France's commitment to increase Teams' share of revenues; NASCAR's draft December 2023 Charter agreement gave the teams *all* of NASCAR's increased media revenue plus tens of millions more. Ex. 15, Phelps Tr. 137:20-138:8; Ex. 31 at -947. Teams "[redacted]," Ex. 35 at -962, and were "[redacted] [redacted] Ex. 32 at -861.

After seeing the substantial pay increase that NASCAR was offering in the December 2023 draft, 23XI and FRM sought to buy *more* Charters. 23XI signed [redacted] [redacted]. Ex. 33 at -456. FRM signed [redacted] [redacted]." Ex. 34 at -655, -657. FRM then quickly signed a purchase agreement. Doc. 52-10. 23XI delayed moving forward with SHR until it received NASCAR's May 2024 draft Charter Agreement. 23XI's owners then "[redacted] [redacted]" with purchasing a Charter from SHR. Doc. 178-6 at -885.[1] [redacted]" if 23XI and FRM did not buy the two SHR Charters. Ex. 11, Hamlin Tr. 215:16-217:8.

In addition to the May 2024 draft, NASCAR provided drafts with additional benefits for Teams on August 30, September 5, and September 6, 2024. Ex. 42 at -763-64. When NASCAR

---

[1] Plaintiffs argue NASCAR executives admitted this May draft had "zero wins" for Teams. Doc. 176 at 11. But this was the draft another Team called "seriously fair," Doc. 178-11 at -410, and was good enough for 23XI to agree to move forward with the purchase of an additional Charter.

sent finalized Charters for signature on September 6, the Teams knew the final Charters were coming and the majority were prepared to sign; almost 90% did. Doc. 31-4 at ¶¶ 46-51; Doc. 178-12 at -163 (Aug. 26, 2024: "[redacted]"); Doc. 178-14 at -200 (Sept. 4, 2024: "[redacted]").

Even after September 6, NASCAR gave Plaintiffs two more weeks to decide whether to sign the Charters, but again they declined. Doc. 31-4 at ¶¶ 52-55; Ex. 45 at -903. 23XI sent a letter identifying eight issues it wanted changed, none of which were permanent Charters, the legal release, or the contract clauses Plaintiffs now call exclusionary. Ex. 40 at -316; Ex. 42 at -760. When neither 23XI nor FRM signed by their extended deadlines, NASCAR deemed its offers rejected. Doc. 31-3 at ¶ 52. Plaintiffs understood that by not signing the 2025 Charter agreements, they were knowingly relinquishing their rights to the potential benefits of those Charters. Ex. 9, Polk Tr. Vol 2 126:1-9 (Polk: "[redacted]"); Doc. 178-23, Jenkins Tr. 68:18-24. Plaintiffs believed they would negotiate more favorable Charters for themselves by initiating a lawsuit. *See* Ex. 6, Jordan Tr. 133:16-19 (Jordan wants to get "permanent Charters" from lawsuit); Ex. 41 at -394.

**C. The Preliminary Injunction Rulings**

Judge Whitney denied Plaintiffs' first preliminary injunction motion on November 8, 2024. Doc. 43. Plaintiffs then filed a renewed motion. Doc. 51. After reassignment, the Court ordered NASCAR to allow each Plaintiff to enter two cars in 2025 Cup Series races "under the 2025 Charter Agreement terms," with the exception of the release in § 10.3. Doc. 74 at 20. The Court also ordered NASCAR to approve the assignment of two Charters held by SHR for Plaintiffs "to use to race in all 2025 NASCAR Cup races," Doc. 74 at 2-3; Doc. 83 at 1 n.1, but the Court explained that it "clearly retains the equitable power to in the future effectively 'unwind'

those transactions through an order requiring Plaintiffs to transfer/sell the charters back to NASCAR or another team approved by NASCAR." Doc. 83 at 1 n.1. The Court intended to issue "a limited preliminary injunction only for the duration of the 2025 NASCAR Cup season," Doc. 74 at 2, 19, which concludes on November 2, 2025.

NASCAR paid 23XI and FRM [redacted] under the preliminary injunction (plus over [redacted] million in race purses). Phelps Decl. ¶ 44. NASCAR would have paid that [redacted] million to the Teams that signed a 2025 Charter—[redacted] per Charter—and still will if that money is returned—as it should be. *Id.* ¶ 47.

**D. The Fourth Circuit Vacates The Injunctions**

The Fourth Circuit vacated the injunctions on March 14, 2025. Citing the holding in *linkLine* that "parties are 'free to choose the parties with whom they deal, as well as the prices, terms, and conditions of that dealing,'" the Fourth Circuit found NASCAR's "offer of a contract for joint participation in business that includes mutual releases constitutes just what *linkLine* authorizes." *2311 Racing*, 139 F.4th at 410 (quoting *Pac. Bell Tel. v. linkLine Commc'ns*, 555 U.S. 438, 448 (2009)). The Fourth Circuit held that "the release in the 2025 Charter Agreement is *not prospective*," so declined to apply cases addressing policy considerations with prospective waivers. *Id.* at 409. The Court also wrote that the injunctions were improper because they "required two parties to engage in a business that one party claims to be illegal." *Id.* at 411. Plaintiffs unsuccessfully moved for rehearing *en banc*.

**E. Plaintiffs' Third Motion For A Preliminary Injunction**

Two days before the Fourth Circuit's mandate issued, Plaintiffs moved for a TRO and injunction "through trial" that would require NASCAR to "allow Plaintiffs to each enter three cars in all NASCAR Cup Series races under the 2025 Charter Agreement," with the exception of § 10.3. Doc. 175 at 2, 6. In response, NASCAR represented that Plaintiffs were assured entry in upcoming

races as Open cars, and that NASCAR would not "sell any Charters before the Court can rule on Plaintiffs' motion for preliminary injunction." Doc. 178 at 9, 15, 25. The Court relied on that representation to find that Plaintiffs failed to state any irreparable harm. Doc. 181 at 3-4.

Plaintiffs' six cars have raced Open in the month since the mandate issued. Plaintiffs' opportunity to race as Open teams for the remainder of the 2025 Cup Series season is assured.

## LEGAL STANDARD

To receive the "extraordinary and drastic remedy" of a preliminary injunction, Plaintiffs must make "a clear showing that [they are] 'likely to succeed on the merits—along with the risk of irreparable harm, the balance of the equities, and the public interest.'" *2311 Racing*, 139 F.4th at 408. The relief Plaintiffs seek is "mandatory rather than prohibitory," *id.*, because the status quo is Plaintiffs have no Charters or even what they call "charter rights," Doc. 162 at 10 n.6. Therefore, Plaintiffs' showing must "be indisputably clear." *2311 Racing*, 139 F.4th at 409.

## ARGUMENT

### I. PLAINTIFFS FAIL TO SHOW ANY IMMINENT, IRREPARABLE INJURY

#### A. Plaintiffs Can Race As Open Teams For 2025 Without Any Irreparable Harm

Plaintiffs will qualify for all remaining races they choose to race in for the duration of the 2025 Cup Series. Phelps Decl. ¶ 24. Thus, Plaintiffs cannot claim irreparable harm from remaining without what they call "charter rights" this season. Doc. 181 at 5. No driver has left and, as the Court previously found, there is no clear evidence that any 23XI or FRM driver will leave the team mid-season instead of race Open in 2025. *Id.* And these drivers and Plaintiffs' owners have repeatedly said they fully expect to race Open this season. *See* Docs. 179-3, 179-4, 179-5; Ex. 6, Jordan Tr. 137:3-7. The vague concern for "loss of sponsorships is not 'irreparable' harm" either "because it may be compensated" and has not been shown in any event. Doc. 74 at 16 n.12; Doc. 181 at 5. Plaintiffs have not shown they will suffer any irreparable harm if the Court

does not issue a mandatory preliminary injunction for 2025 "charter rights."

**B. There Is No Cognizable Harm From Plaintiffs Not Having Charters In 2026**

Plaintiffs' theoretical inability to obtain Charters post-trial also does not justify precluding NASCAR from selling or transferring Charters, because Plaintiffs do not have Charters now because of their own strategic choices. Courts do "not consider a self-inflicted harm to be irreparable," yet that is exactly what Plaintiffs complain of here. *Salt Lake Trib. Pub. v. AT&T*, 320 F.3d 1081, 1106 (10th Cir. 2003); *see also Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (no irreparable harm where movants "had the option to avoid the loss").

Plaintiffs had multiple opportunities to acquire 2025 Charters, and they squandered them. Throughout the Charter negotiations, Plaintiffs were aware of the offered terms and knew their 2016 Charters expired in December 2024. When Plaintiffs again rebuffed the opportunity to sign 2025 Charters in September 2024, their stated reasons had nothing to do with the legal release, the existence of the Goodwill clause, or the Next Gen IP that they attack in this lawsuit. *See* Ex. 40 at -316.[2] Plaintiffs declined to sign because they wanted to negotiate for themselves [REDACTED] [REDACTED] than other Teams. Ex. 46 at -981; Ex. 41 at -394. And that is still their goal. *See* Ex. 6, Jordan Tr. 133:16-19.

It is not irreparable harm, or harm under the antitrust laws at all, for Plaintiffs to "demand one thing" in a negotiation, and for NASCAR to offer "different terms" that they decline. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 453 (6th Cir. 2007); *Arcesium LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *6 (S.D.N.Y. Mar. 31, 2021) (finding "no authority" that "an unconsummated offer . . . to contract with Plaintiff on terms Plaintiff found unfavorable" is an antitrust violation); *3Shape Trios v. Align Tech.*, 2019 WL 3824209, at *6 (D. Del. Aug. 15, 2019) ("allegations about

---

[2] FRM reported "[o]ur issues with the current Agreement are similar in nature to the most part with those brought up by 23XI Racing." Ex. 43 at -006.

Align's unaccepted proposals do not suggest plausible harm to competition"). Plaintiffs' decision to reject 2025 Charters was their own strategic choice—and did not impact competition at all.

## II. PLAINTIFFS' REQUEST TO FREEZE SIX CHARTER SALES IS IMPROPER

Plaintiffs' motion is based entirely on a false premise: that they have some sort of Charter "rights" that the Court should preserve. To the extent Plaintiffs seek an order requiring NASCAR to grant them six 2025 Charters through trial or preventing NASCAR from transferring Charters,[3] the Court respectfully should deny that relief because Plaintiffs cannot show it is "necessary to the prosecution of [their] claim" at trial. *In re Microsoft Corp. Antitrust Litig*., 333 F.3d 517, 531 (4th Cir. 2003). Plaintiffs' request suffers from this "fatal" defect in at least three independent ways, and thus "a preliminary injunction should not be considered." *Id*. at 526.

**First,** the Fourth Circuit—in this case and in *Omega*—has barred this form of preliminary relief. The Fourth Circuit held it was improper to "require[] two parties to engage in a business that one party claims to be illegal."[4] *2311 Racing*, 139 F.4th at 411 (citing *Omega World Travel v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997); *id.* (quoting *Omega* holding that "when the injury that the movant seeks to prevent through a preliminary injunction is . . . directly contradictory to the injury for which it seeks redress . . . then a preliminary injunction simply should not issue"); *see also, e.g.*, *HCI Techs., Inc. v. Avaya, Inc.*, 241 F. App'x 115, 124-25 (4th Cir. 2007) (refusing to enter relief that would "effectively force [the defendant] to continue to deal with [a plaintiff] that refuses to comply with [the defendant's] business model").

---

[3] Plaintiffs' Motion does not request an order preventing NASCAR from selling or transferring Charters. *See* Doc. 175. NASCAR addresses it here because the Court's TRO ruling referenced it. Doc. 181 at 5 n.4. Plaintiffs instead ask to "preserve[] Plaintiffs' current right to continue racing three chartered cars for the remainder of the 2025 Cup Series season through trial." Doc. 176 at 2. In other words, Plaintiffs again seek what the Fourth Circuit ruled was improper.

[4] As the Fourth Circuit recognized, Plaintiffs are seeking to "dismantle" NASCAR's business. 139 F.4th at 409. Plaintiffs confirmed that in discovery, saying that they might seek "divestiture of . . . the Cup Series." Doc. 178-28 at 23XI Resp. No. 3.

**Second**, preventing the 2025 Charters at issue from going to new teams until the completion of trial is not "necessary . . . to preserve the court's ability to enter ultimate relief," *Microsoft*, 333 F.3d at 525, because Plaintiffs have made no clear showing that an award of six Charters will issue post-trial, even if Plaintiffs somehow prevail on the merits. Such relief cannot issue because it would do nothing to increase competition in Plaintiffs' proposed market.

Plaintiffs' own expert, Dr. Snyder, identified three reforms that, in his view, would remedy the supposed harm to competition Plaintiffs have put forward. Specifically, Dr. Snyder identified three "changes [that] would prevent NASCAR from exercising its monopsony power": (1) preventing NASCAR from "exclud[ing] potential rivals from using tracks;" (2) preventing NASCAR from using its IP rights "to block the use of the teams' stock cars in competing racing events;" and (3) eliminating "non-compete clauses" in the Charters. Ex. 5, Snyder R. ¶ 171-72. Missing is any requirement that NASCAR be forced into a contractual relationship with Plaintiffs. That omission is not surprising, as mandating that 23XI and FRM should receive Charters (and depriving them from other organizations) would merely be a windfall to Plaintiffs, not a cure for alleged competitive harm. *See, e.g.*, *Mid-South Grizzlies v. Nat'l Football League*, 720 F.2d 772, 787 (3d Cir. 1983) (rejecting claim that, "because the NFL is a practical monopoly it had an obligation to admit members on fair, reasonable, and equal terms," because that "fail[s] to show how competition in any arguably relevant market would be improved" by plaintiff's entry).

This remedy would be contrary to the "purpose of federal antitrust laws," which "is to remedy harm to 'competition, not competitors.'" *Am. Cricket Premier League v. USA Cricket*, 445 F. Supp. 3d 1167, 1177 (D. Colo. Mar. 12, 2020) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). This principle "lies at the very heart of the antitrust law," distinguishing it from "the ordinary meaning of tortious injury in the commercial context." *Expert Masonry v.*

*Boone Cty, Ky.*, 440 F.3d 336, 346 (6th Cir. 2006). Plaintiffs' failure to show harm to competition contributed to the Fourth Circuit vacating the prior injunctions. *See 2311 Racing*, 139 F.4th at 410. The Court should "reject[] out of hand Plaintiff[s'] request for injunctive relief which would require" NASCAR to utilize Plaintiffs as Chartered Teams in 2026 or beyond, because "this relief would not serve any interest protected by [the antitrust] laws." *Langston Corp. v. Standard Registry Co.*, 553 F. Supp. 632, 637 (N.D. Ga. 1982).

A company's decision to negotiate for the terms it desires or even its choice to work with some suppliers and not others is what the antitrust laws allow and does not harm competition. *See Loren Data*, 501 F. App'x at 283; *CBC Cos. v. Equifax*, 561 F.3d 569, 573 (6th Cir. 2009) ("[A]ntitrust law is not a negotiating tool for a plaintiff seeking better contract terms."); *Host Int'l v MarketPlace*, 32 F.4th 242, 250 (3d Cir. 2022) ("[A] breakdown in contract negotiations is outside the Sherman Act's scope."); *JES Props. v. USA Equestrian Inc.*, 2005 WL 1126665, at *11 (M.D. Fla. May 9, 2005) (dismissing claim by excluded horse-show promoter for lack of harm to competition); *Martin v. Am. Kennel Club*, 697 F. Supp. 997, 1002 (N.D. Ill. 1988) (similar); *Am. Cricket*, 445 F. Supp. 3d at 1178 (one cricket league selected over another "is not something the antitrust laws were designed to remedy"); *Ky. Speedway v. NASCAR*, 588 F.3d 908, 920-21 (6th Cir. 2009) (one racetrack excluded from series is "simply a 'jilted distributor,'" and not "an injury of the type the antitrust laws were intended to prevent").

## III. PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS AT TRIAL

To ultimately prevail on their Section 2 claim—the only claim they rely on in connection with this motion—Plaintiffs must show "possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Adv. Healthcare Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990). Plaintiffs cannot establish any of these elements, or negate, as is their burden, the well-established

procompetitive benefits of the challenged conduct. *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001); *Racing Tires Am. v. Hoosier Racing Tire*, 614 F.3d 57, 75 (3d Cir. 2010).

**A. Plaintiffs Have Not Shown That NASCAR Holds Monopsony Power**

Plaintiffs' claim fails because they cannot show that NASCAR has monopsony power in a properly defined market. The core principle of Plaintiffs' market definition, as explained by their expert Dr. Rascher, is that NASCAR Teams invest in specialized equipment—namely the car—that cannot be raced outside of the Cup Series. Doc. 176 at 9; Doc. 176-4 at ¶¶ 54, 58-59. That is inherently wrong: product differentiation is a method of competing in motorsports, not a barrier to it. Ex. 4, Murphy R. ¶¶ 171-84. Motorsports typically use "different types of vehicles," as Plaintiffs' experts admit, Doc. 176-4 at ¶ 42; Ex. 5, Snyder R. ¶ 212 & Ex. 4, Murphy R. ¶¶ 22, 177, yet every court of appeals to consider the issue has rejected that each motorsport series is its own market. *See, e.g.*, *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854-55 (8th Cir. 2000) ("[N]o reasonable jury could find that races governed by the IMCA modified car rules are a separate relevant market for antitrust purposes."); *Ky. Speedway*, 588 F.3d at 916-19 (rejecting that "NASCAR owns a 100% share of the premium-stock-car racing-sanctioning market"); *see also Racing Tires*, 614 F.3d at 81 ("It is well established that the sanctioning bodies compete for [teams] and drivers. . .").

Plaintiffs' framing would convert every franchised, trademarked, or differentiated product into its own market. But that is not the law. *See Spectrofuge Corp. v. Beckman Instruments*, 575 F.2d 256, 282 (5th Cir. 1978) (supposed "monopolies" of products "sold under a trademark" "have been held not to violate the antitrust laws"). The fact that Teams chose (and are paid) to race in a series with specialized vehicles does not make the racing of those vehicles a market unto itself. *See Queen City Pizza v. Domino's Pizza*, 124 F. 3d 430, 438 (3d Cir. 1997); *see also Oksanen v. Page*, 945 F.2d 696, 709 (4th Cir. 1991) (en banc) (plaintiff "preference" [such as for the Cup

Series] does not justify excluding products from "the relevant market definition"); *Va. Vermiculite v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 583 (W.D. Va. 2000) (plaintiff cannot establish a relevant market "by claiming to be 'locked in' a market that it entered knowing in advance that doing so would entail lock-in costs and other economic risks").[5]

Plaintiffs improperly seek to "gerrymander [their] way to an antitrust victory without due regard for market realities." *It's My Party v. Live Nation*, 811 F.3d 676, 683 (4th Cir. 2016). The "team services" Plaintiffs cite are actually a bundle of components—drivers, owner capital, pit crew, and others—that freely flow into and out of NASCAR and other motorsports. Ex. 4, Murphy R. ¶¶ 68, App'x Ex. C-4; Doc. 161 at 8 n.10; Ex. 20 at -527; Doc. 178-17 at 56:24-60:3; Ex. 15, Phelps Tr. 275:11-276:13. Entire racing teams switch from one motorsport series to another, with their owners making competing sport-team investments even more broadly. Ex. 4, Murphy R. ¶¶ 19, 159, 184; Phelps Decl. ¶ 33. Those are market realities that Plaintiffs and their experts improperly ignore.

The ever-increasing payments NASCAR has made to Teams also destroy Plaintiffs' claim that NASCAR holds monopsony power. "In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices." *Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111, 1118 (10th Cir. 2008); *In re Beef Indus. Antitrust Litig*, 907 F.2d 510, 515 (5th Cir. 1990). NASCAR has done the opposite. NASCAR has not reduced the amount of Charters Teams, and it *increased* payments to Teams by 28% through the 2016 Charters, and *increased* payments by 62% through the 2025 Charters. Ex. 3, Meyer R. ¶ 37; Doc. 178-1 at ¶¶ 10-13. NASCAR pays Teams more than even Formula 1 as a percentage of profit (the metric

---

5 The fact that Team owners *choose* to invest in a NASCAR Team is one of many reasons this case is different from *NCAA v. Alston*, 594 U.S. 69 (2021) and other antitrust cases involving *athletes*.

Formula 1 uses). Ex. 3, Meyer R. ¶¶ 15, 116; Ex. 51, Zmijewski R. ¶¶ 50-51. This is irreconcilable with monopsony power.[6]

Plaintiffs ignore the pay raises the Teams received. Instead, they focus on a text during negotiations for the 2025 Charter that said an internal version of the May 2024 draft contained "zero wins" for Teams. Doc. 176-47 at -213. Plaintiffs ignore that the actual May 2024 draft proposed to Teams carried forward the biggest win for the Teams—a massive pay increase—that was set out in the December 2023 draft. Doc. 178-1 at ¶ 12. It also gave Charter holders an opportunity to obtain any improved extension terms NASCAR offered to third parties and increased Teams' ability to receive investor funding, among other benefits. Doc. 178-11 at -411.[7] One Team remarked to NASCAR that the May 2024 draft was "seriously fair." *Id.* at -410. And after receiving and reviewing this draft, which contained a Goodwill clause, a legal release, and a 7-year term with 7-year extension option, 23XI's owners "[REDACTED]" with purchasing another Charter.[8] Doc. 178-6 at -885. Neither 23XI nor FRM conditioned their desire to move forward on those terms being changed. *See* Docs. 52-10; 52-11.

Plaintiffs also mischaracterize some stray communications to suggest that NASCAR believed it had "all the leverage and the Teams will almost have to sign whatever Charter terms

---

6 Plaintiffs' emphasis on Team profitability does not change this. [REDACTED] 23XI has made "reasonable" profits year after year. Ex. 6, Jordan Tr. 31:15-18, 106:4-13; Ex. 9, Polk Tr. 240:19-241:5. [REDACTED] Ex. 54, Avrit Tr. 41:12-19, 58:9-11. In any event, NASCAR's increased payments under the 2025 Charters [REDACTED]. NASCAR, however, does not control team spending which varies [REDACTED]. *See* Doc. 176-49. In any event, Plaintiffs' own experts admit that sports teams are often not profitable. Ex. 5, Snyder R. ¶ 203.

7 *Compare* Ex. 31 at -895-896, -957 *with* Ex. 52 at -065-067, -129.

8 The May 2024 draft continued to improve for Teams in multiple subsequent drafts. For example, the August 30, 2024 draft removed any non-compete restrictions on teams that elected not to renew their Charters in 2031. *See* Ex. 39 at -326-28.

we put in front of them." Doc. 176 at 10. As witness after witness testified, and the document itself shows, that was not NASCAR's position. It was just one hypothetical "Path" that NASCAR did not believe and did not pursue.[9] Instead, NASCAR pursued "Path 2" of "attempt[ing] to find some common ground which addresses the teams [sic] needs and concerns." Doc. 176-45. Meanwhile, Polk was touting that [REDACTED] and it was a "[REDACTED] that Teams had no "[REDACTED] Ex. 49 at -302-03. The documents Plaintiffs cite show that Polk and the TNC "haven't moved off their position in 18 months—no negotiation at all," Doc. 176-46, and that Polk's positions were "unreasonable," Doc. 176-48.

But negotiations must conclude at some point, especially with the 2025 season approaching. Numerous teams reported they were "[REDACTED] [REDACTED]" Doc. 178-12. By September 4, 2024, "[REDACTED] [REDACTED]." Doc. 178-14. Just as Plaintiffs contend that "summer and fall are the crucial windows" for a Team to plan for the next season, Doc. 176 at 24, NASCAR needed to plan the upcoming 2025 season. Just because 23XI and FRM did not get everything they wanted, does not mean there was an antitrust violation.

### B. Plaintiffs' Theories Of Anticompetitive Conduct Should Not Prevail

Plaintiffs also are unable to show that NASCAR's success has been the result of "the willful acquisition or maintenance of [monopsony] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Commc'nc*

---

9 *See* Ex. 14, Prime Tr. 210:20-23 ("Q. Did you believe when you wrote this, that the teams would have to sign almost whatever charter you put in front of them? A. I did not, no."); Ex. 10, France Tr. 175:23-176:1 ("Q. Do you agree that at this time, September 15 of 2023, NASCAR had all the leverage? A. I do not agree with that."); Ex. 7, Kennedy Tr. 203:15-204:13 ("Q. Which of those two paths did you prefer? A. I'd say if I had to pick between the two paths, I would choose path two. I felt like it was a greater opportunity for us to collaborate together with the teams going forward on helping to grow the sport.").

*Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004); *SMS Sys. Maintenance Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("When a party brings a Section 2 claim, it is not enough simply to show that there is monopoly power. Monopoly power may be obtained through legitimate means."). Section 2 cases are thus about exclusion of potential rivals. But Plaintiffs do not cite a single instance of a stock car racing series that was actually excluded by supposedly anticompetitive acts of NASCAR. Ex. 4, Murphy R. ¶ 97. That is dispositive, especially where there are other stock car series such as The Cars Tour.[10] *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) ("The prohibited conduct must be directed toward competitors and must be intended to injure competition.").

### 1. The Charters' Exclusive Supply Clauses Are Procompetitive

The "Goodwill" clause in Section 6.6 of the Charters serves the procompetitive purposes of ensuring that Teams devote appropriate resources to compete at the highest possible level, preventing marketplace confusion, preventing dilution of rights that broadcasters pay for, and maintaining consistent race quality, among others. *See* Doc. 21-5 at § 6.6; Ex. 13, O'Donnell 30(b)(6) Tr. 167:15-168:1; *see also* Ex. 4, Murphy R. ¶¶ 77-80; Ex. 50, Desser Rebuttal R. ¶ 8.4. These are "widely recognized" justifications for exclusive supply arrangements and "pose no competitive threat at all." *Racing Tires*, 614 F.3d at 76. These procompetitive justifications outweigh any "substantial foreclosure" Plaintiffs might attribute to these clauses, *Imaging Center,*

---

[10] Plaintiffs' reference to the RTA's purported consideration of an exhibition race or series is no exception. The RTA's Executive Director admitted [REDACTED] ." *Id.* at 83:2-15, 90:25-91:4. In any event, entry needs to be "likely," not theoretical, in order to be considered. *Fed. Trade Comm'n v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1099 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025).

*Inc. v. W. Md. Health Sys.*, 158 F. App'x 413, 420 (4th Cir. 2005), but Plaintiffs identify none whatsoever. The Goodwill clause terminates immediately upon a Team selling its Charter or the Charter term ending, Phelps Decl. ¶ 8, meaning any Chartered Team seeking to switch series could do so swiftly. That is dispositive because the "Fourth Circuit has held that exclusive contracts terminable after thirty days to one year do not have substantial anticompetitive effects." *R.J. Reynolds Tobacco Co. v. Philip Morris*, 199 F. Supp. 2d 362, 391 (M.D.N.C. 2002) (citing *Thompson Everett v. Nat'l Cable Adver.*, 57 F.3d 1317, 1326 (4th Cir. 1995)). Even when in effect, the Goodwill clause permits Teams to participate in every sanctioned motorsport series (e.g., INDYCAR), even stock car series The CARS Tour, and any new racing series with NASCAR's approval. Doc. 21-5 at § 6.6. NASCAR has never denied that approval; and Plaintiffs never asked to race elsewhere. Phelps Decl. ¶ 12-13.

Lastly, Plaintiffs did not sign the 2025 Charters, do not have them, and so are not restricted by the Goodwill clause. Nor are they a purchaser of team services, and they have repeatedly disclaimed being a potential competitor to NASCAR. *See, e.g.*, No. 22-2245 (4th Cir. March 14, 2024), Doc. 38 at 45-46; Doc. 178-28 at 23XI Resp. No. 14; Doc. 178-30 at FRM Resp. No. 12. Thus, unlike a hypothetically foreclosed rival, they lack standing to challenge any purported exclusionary effect of the Charter. *Thompson Everett*, 57 F.3d at 1325 (no antitrust standing to challenge exclusivity for plaintiff that was "not a could-be competitor"); *Host*, 32 F.4th at 250.

**2. NASCAR's Exclusive Agreements With Tracks Are Procompetitive**

Plaintiffs do no better with their challenge to NASCAR's racetrack agreements. With respect to the tracks that NASCAR owns, the Supreme Court has "long and emphatically rejected" the argument (which Plaintiffs advance) that a business must allow a rival to "piggyback" on its investments. *Novell v. Microsoft*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.); *Verizon*, 540 U.S. at 407-08. NASCAR's unilateral decision to use its own tracks exclusively, even if true,

is "essentially 'per se lawful' or 'presumptively legal,'" *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 25 (D.D.C. 2021), and is supported by substantial procompetitive benefits. *See* Ex. 4, Murphy R. ¶ 84.[11] The majority of NASCAR's contracts with SMI are for one or two years, *id.* ¶ 111, which thus do not have a significant exclusionary effect. *Methodist Health Services Corp. v. OSF Healthcare System*, 859 F.3d 408, 410 (7th Cir. 2017) (Posner, J.) (finding no evidence of significant exclusionary effect "since most of the contracts expire every year or two"); *R.J. Reynolds*, 199 F. Supp. 2d at 392. They also have procompetitive benefits. Ex. 4, Murphy R. ¶ 114; Ex. 50, Desser Rebuttal R. ¶ 12.5; *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 116-17 (S.D.N.Y. 2015). The CARS Tour, another stock car series, along with INDYCAR and many other motorsports are carved out of this exclusivity. Ex. 4, Murphy R. ¶ 122. This confirms that the exclusivity with tracks is valid because it does "not go beyond the legitimate business purposes for which they are used," which is expressly to protect NASCAR's investments in tracks and the NASCAR brand (NASCAR's IP) and goodwill. *Everett*, 57 F.3d at 1325; *see also Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 395 (7th Cir. 1984). In addition, a rival could compete to use those tracks by offering SMI a better deal. There are plenty of other racing venues available; and, a new entrant would not choose to exactly copy the Cup Series (just like LIV Golf did not copy the PGA Tour) and could race on tracks/circuits used by INDYCAR, other tracks, or off-track venues. Ex. 4, Murphy R. ¶ 116; Doc. 31-2, Hubbard Decl. ¶¶ 15, 30-31, 34-36.

**3. Protecting NASCAR Intellectual Property Is Not Anticompetitive**

NASCAR spent years and millions to design, develop, and test the Gen 7 ("Next Gen") race car. Ex. 8, Probst Tr. 351:18-353:12. That effort was at the Teams' request to help with cost control, and it has dramatically decreased parts costs, created better racing that broadcast partners

[11] NASCAR's purchase of ISC was procompetitive. *See* Ex. 4, Murphy R. ¶ 108. Plaintiffs cannot show any foreclosure from NASCAR becoming the sole, rather than controlling, owner.

praise, and made it easier for teams to enter the Cup Series. Ex. 38 at -532; Ex. 44 at Slide 3. NASCAR is allowed to protect that investment and intellectual property, and protect against consumer confusion and free-riding by preventing the car from being raced elsewhere. This practice is at the very heart of the doctrine that "[e]ven a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival." *Novell*, 731 F.3d at 1074; *2311 Racing*, 139 F.4th at 410; *Facebook*, 549 F. Supp. 3d at 24-25. That law applies "even where a monopolist refuses to deal with its competitor merely 'in order to limit entry,'" *Facebook*, 549 F. Supp. 3d at 24-25, which the facts here do not show anyway. It is a hallmark of major racing series to have different (and specialized) cars, as Plaintiffs' expert and other witnesses have admitted,[12] and a point of competition between them, not an anticompetitive act. *See Brookins*, 219 F.3d at 854-55; *Racing Tires*, 614 F.3d at 80-83.

Moreover, there is no harm to competition from NASCAR's Next Gen IP because Plaintiffs' cars' engines, body parts, and other features are subject to IP restrictions of the OEMs and other part manufacturers prevent them from using those parts in other series. *See, e.g.*, Ex. 19 at -325 (Toyota restrictions on vehicle part usage outside of Cup Series).

**4. NASCAR's ARCA Acquisition Did Not Harm Competition**

NASCAR's acquisition of tiny ARCA in 2018 for less than [REDACTED] had no anticompetitive effect at all—and only demonstrates how far Plaintiffs are stretching. Far from seeking to deter ARCA, NASCAR invited ARCA to race at Daytona beginning in 1964 and provided loans to keep ARCA afloat. Doc. 31-5, R. Draper Decl. ¶¶ 4-5. As ARCA's owner described, *he approached NASCAR* because he feared ARCA would soon fail. *Id.* ¶ 7. Plaintiffs present no "intent, plans, or capabilities to enter the market" by ARCA as a competitor to the Cup

12 *See* Even the RTA Chairman admitted "[REDACTED] Doc. 178-19, Kauffman Tr. at 15:1-15.

Series, and all the evidence is to the opposite. *Freeland v. Nippon Steel Corp.*, 2025 WL 1724997, at *7 (N.D. Cal. June 20, 2025); *U.S. v. Marine Bancorp., Inc*, 418 U.S. 602, 639-40 (1974) .[13]

**5. Plaintiffs' Alleged Anticompetitive Acts Are Largely Time-Barred**

Nearly all of the conduct that Plaintiffs challenge as anticompetitive predates October 2020 and is barred by the four-year statute of limitations. 15 U.S.C. § 15b.[14] 23XI claims it formed the opinion that NASCAR held a "monopoly position" before it decided to join the sport, but it joined nonetheless after reviewing the 2016 Charter in September 2020. *See* Doc. 178-20; Ex. 9, Polk Tr. Vol 1 227:22-228:11; Doc. 21-3 at ¶ 7; Doc. 178-28 at 23XI Resp. No. 16. A plaintiff cannot enter into a transaction with "eyes wide open, fully able to 'assess the potential costs and economic risks at the time,'" and then claim of being "locked in." *Va. Vermiculite*, 108 F. Supp. at 584.

**6. Aggregating NASCAR's Legitimate Conduct Changes Nothing**

Lacking any actual cognizable theory of evidence of anticompetitive acts, Plaintiffs argue that the sum of the allegations together gets them over the line. *See* Doc. 176 at 15-16. The *Duke Energy* case Plaintiffs rely on related to "uncommon" cases involving "a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories." 111 F.4th 337, 354 (4th Cir. 2024). *Duke Energy* confined this approach

---

13 Plaintiffs go to desperate lengths to bolster ARCA's significance, but still fail. First, they claim Jim France conceded that ARCA was a "close competitor," Doc. 176 at 9 n.5, but he actually said he would not "look at it that way." Doc. 176-43, France Tr. 440:12-441:22; *see also* Ex. 50, Desser Rebuttal R. ¶ 6.4 ("ARCA is and has never been a realistic competitor to NASCAR Cup Series Racing."). Next, Plaintiffs claim ARCA signed a "national" television deal with FOX pre-acquisition. Doc. 176 at 10. Wrong again. ARCA signed a deal with FS1 for [REDACTED] annually. Ex. 17 at -529. ARCA was not "aired on network television" until 2025, after NASCAR kept it afloat during the pandemic. Doc. 31-5, Draper Decl. ¶¶ 8-9.

14 This includes NASCAR's acquisition of ARCA in 2018 (Doc. 107 at ¶ 12), NASCAR's acquisition of ISC in 2019 (Doc. 107 at ¶ 14), and its 2019 development of the Next Gen car program (Doc. 107 at ¶ 13). The 2016 Charter contained a similar Protection of Goodwill clauses in § 6.6 of that agreement. *See* Doc. 21-4 at § 6.6. And Sanction Agreements are not new either. Doc. 178-31, 23XI Resp. at No. 21.

to the "context of the allegations in th[at] case," which involved interrelated actions taken "simultaneously, and to the same effect" to drive out a competitor. *Id.* at 354, 366. But in this case, Plaintiffs challenge common business practices—acquisitions, exclusive supply arrangements, and legal releases—that were undertaken years apart, for which "the caselaw has developed tests for analyzing." *Id.* at 354-55; *see also 23XI Racing*, 139 F.4th at 410 (addressing NASCAR's "standard release provision"). Under those tests, none of the acts Plaintiffs complain of are anticompetitive. "Two wrong claims do not make one that is right." *linkLine*, 555 U.S. at 457; *Am. President Lines v. Matson, Inc.*, 775 F. Supp. 3d 379, 402 (D.D.C. 2025).

## IV. PREVENTING NASCAR'S SALE OF CHARTERS PRE-TRIAL WOULD SUBSTANTIALLY HARM NASCAR AND THE CUP SERIES

Long-term Charters are collaborative agreements in which NASCAR and Charter holders work together to build the sport to better compete (against other forms of entertainment).[15] *See* Ex. 12, O'Donnell Tr. 168:21-169:4; 241:6-18; Ex. 14, Prime Tr. 132:3-25. Currently, 6 of 36 Charters are inactive. An order preventing NASCAR from selling or conveying Charters would not only harm NASCAR and other Teams now, but also damage the 2026 Cup Series and beyond.

Preventing the sale of Charters until after trial will prevent existing Teams from growing and new teams from joining for 2026. Multiple parties have expressed interest in acquiring Charters from NASCAR for use in the 2026 season and beyond. Phelps Decl. ¶ 31. Those parties include existing Charter holders, teams racing in other motorsports [redacted] [redacted], and others. *Id.* ¶ 31. [redacted] [redacted]. *Id.* ¶ 35.

[15] The 2025 Charters are long-term Agreements. The Charters last through 2038 (there are two 7-year terms designed to line-up with NASCAR's current media rights agreements and expected future agreements) and NASCAR has an obligation to negotiate in good faith with 2025 Charter holders for the period beyond 2038. Ex. 15, Phelps Tr. 143:22-144:12.

If the fate of these six Charters is not resolved until after the trial concludes in mid-December 2025, it will be impossible for a new team to gear up for the 2026 season. New owners would require more time than that to adequately prepare for the first and most significant points race of the season—the Daytona 500—scheduled for February 15, 2026. From prior experience, NASCAR estimates that a new entrant would need to begin its preparation process by no later than October 1 to ramp up for a competitive entry in the 2026 Cup Series. Phelps Decl. ¶ 28. And to reissue the two former SHR Charters pursuant to the Charters requires a 30-day bidding process open to qualified existing Charter holders. Doc. 21-5 at § 3.4(ii). Beginning that 30-day process after a December trial, would not permit a team to put that Charter to effective use by the February 2026 start of the 2026 Cup Series season. Phelps Decl. ¶ 30; Doc. 66-10, J. Custer (SHR) Decl. ¶ 7. The Court's prior injunction was intended to be a "limited preliminary injunction only for the duration of the 2025 NASCAR Cup season." Doc. 74 at 2-3. But the harm from the relief Plaintiffs seek now would stretch beyond 2025 and would lead to irreparable losses for the Cup Series.

An Order requiring NASCAR to treat Plaintiffs as Chartered teams for the remainder of this season carries harm as well. As the Court previously recognized, the "Plaintiffs have not and will not be pulling their oars in the same direction as NASCAR and the other chartered teams." Doc. 104 at 6-7. The Fourth Circuit took this a step further. *2311 Racing*, 139 F.3d at 411. Plaintiffs' conduct demonstrates why. Mr. Jordan has said he wants to use the litigation to grant him a permanent Charter that no other Team has. Ex. 6, Jordan Tr. 133:16-19. Jordan referred to teams that signed the Charters in [REDACTED] [REDACTED]" for working with NASCAR. Ex. 41 at -392-94. Mr. Jordan and Mr. Polk view NASCAR team ownership as a "[REDACTED] Ex. 30 at -379, and Mr. Hamlin has admitted that his "[REDACTED]," Ex. 36 at

-868. Mr. Lauletta has stated that "[REDACTED]" to the question of whether to continue to invest in NASCAR. Ex. 37 at -956. The law does not require NASCAR to provide Plaintiffs special treatment, especially in these circumstances. NASCAR can "choose the parties with whom [it] will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448; *New York v. Meta*, 66 F.4th 288, 306 (D.C. Cir. 2023).

## V. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST PLAINTIFFS' REQUESTED RELIEF

The balance of equities further weighs against the issuance of Plaintiffs' requested relief. Because Plaintiffs rejected NASCAR's 2025 Charter offers and did not agree to the terms of assignment of the SHR Charters, NASCAR has a unique opportunity to bring in new teams that would delight fans and inject valuable innovation and investment into the sport. Phelps Decl. ¶ 31-36. These are aspiring entrants that have a passion for motorsports, have infrastructural support behind them, and have histories of on-the-track success. *Id.* ¶ 33-36. It would benefit fans, other teams, broadcast partners, and the Cup Series generally to bring in these new teams.

On the other hand, Plaintiffs purchased or received for free 2016 Charters that were, on their face, limited in duration. Both Teams received absolutely everything they were entitled to under those contracts. NASCAR was not required to offer them more—the 2016 Charters stated that plainly. Doc. 21-4 at § 2.3 Nonetheless, NASCAR offered them each many millions *more* per year. Doc 178-1 at ¶ 13. They received the benefit of their bargain, plus the opportunity for more. It is not equitable, it does not promote competition, and it is contrary to established law to prevent NASCAR from moving on and working with organizations that actually want to focus on the real competition with other motorsports and to grow the Cup Series for the benefit of fans.

## CONCLUSION

Plaintiffs cannot meet their *Winter* burden and the Court should deny Plaintiffs' motion.

Dated: August 18, 2025

Respectfully submitted,

By: */s/ Christopher S. Yates*
Christopher S. Yates*
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
chris.yates@lw.com

Lawrence E. Buterman*
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
lawrence.buterman@lw.com

Anna M. Rathbun*
David L. Johnson*
Christopher J. Brown*
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com

Tricia Wilson Magee (N.C. Bar No. 31875)
**SHUMAKER, LOOP, & KENDRICK, LLP**
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Telephone: (704) -945--2911
Facsimile: (704) -332--1197
tmagee@shumaker.com

* Admitted *pro hac vice*

*Counsel for Defendants and Counter-Plaintiffs*

**ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION**

I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 18th day of August, 2025.

*/s/ Christopher S. Yates*
Christopher S. Yates
Of Latham & Watkins LLP

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** was electronically filed using the Court's CM/ECF system, which will automatically send notice of filing to all parties of record as follows:


Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
dwilliams@winston.com

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
jkessler@winston.com

Jeanifer Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
jparsigian@winston.com
mtoomey@winston.com

Matthew DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
mdalsanto@winston.com

*Counsel for Counterclaim Defendants 23XI Racing, Front Row Motorsports Inc., and Curtis Polk*


This the 18th day of August, 2025.

*/s/ Christopher S. Yates*
Christopher S. Yates
Of Latham & Watkins LLP