IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____ )
2311 RACING LLC d/b/a             )
23XI RACING and FRONT ROW         )
MOTORSPORTS, INC.,                )
                                  )   DOCKET NO. 3:24-CV-886
          Plaintiffs,             )
                                  )
     vs.                          )
                                  )
NATIONAL ASSOCIATION FOR STOCK    )
CAR AUTO RACING, LLC ET AL,,      )
                                  )
          Defendants.             )
_____ )


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
THURSDAY, AUGUST 28, 2025 AT 1:30 P.M.


<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

          E. DANIELLE T. WILLIAMS, ESQ. (North Carolina)
          JEFFREY L. KESSLER, ESQ. (New York)
          Winston & Strawn LLP
          300 South Tryon Street, 16th Floor
          Charlotte, North Carolina 28202


JILLIAN M. TURNER, RMR, CRR, CRC
Official U.S. District Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES (Cont'd):

On Behalf of the Defendants:


    PATRICIA W. MAGEE, ESQ.
    Shumaker, Loop & Kendrick, LLP
    128 South Tryon Street, Suite 1800
    Charlotte, North Carolina  28202


    CHRISTOPHER S. YATES, ESQ.
    DAVID L. JOHNSON, ESQ.
    Latham & Watkins LLP
    505 Montgomery Street, Suite 2000
    San Francisco, California  94111

1  (Court called to order on Thursday, August 28, 2025,
2  commencing at 1:30 p.m.)
3              P R O C E E D I N G S
4         THE COURT:  Welcome back, all.
5         And so we're here on a motion for a preliminary
6  injunction, Docket Number 3:24-CV-886.
7         Excuse me if I sound like I have a cold.  It's
8  because I have a cold.  So excuse my intermittent coughing if
9  you would.
10        All right.  So, Mr. Kessler, referring to
11 Document 200 where you set forth specifically the injunction
12 you're seeking, skipping to subparagraph B, it says, "to
13 enter" -- "each enter three race cars in all of NASCAR Cup
14 Series races."
15        Is there any question that that's going to happen
16 for the rest of the year?
17        MR. KESSLER:  There is no question that if they
18 don't change the rule that they implemented in the last
19 month, that we will qualify for races.
20        Your Honor will recall --
21        THE COURT:  And that's all I need.  I've read all
22 about this.
23        MR. KESSLER:  Right, right.  So --
24        THE COURT:  So --
25        MR. KESSLER:  So as long as they don't --

1          THE COURT:  Hold on just a second.

2          MR. KESSLER:  Sorry.

3          THE COURT:  This will work a lot better if you let

4    me talk every once in a while.

5          MR. KESSLER:  Of course.

6          THE COURT:  Is there any question from NASCAR that

7    the rules will not change again unilaterally in the

8    mid-season that would in any way disqualify from any of those

9    six teams from racing?

10         MR. YATES:  The six cars, Your Honor?

11         THE COURT:  Six cars, yes.

12         MR. YATES:  No, Your Honor, there is no chance of

13   that happening.  Mr. Phelps's declaration is in the record.

14   They will qualify for every race this year.

15         THE COURT:  Now, let me ask you, Mr. Kessler.  The

16   two charters that were obtained from Stewart-Haas, one to --

17   each team owns one of them.  How are the parties treating

18   those charters?  Are they being honored as all the other

19   charters are, or is there some distinction being made?

20         MR. KESSLER:  NASCAR is refusing to honor them in

21   that way.  We have a disagreement.  Our belief is that we've

22   purchased those teams.  They should be treated as all other

23   charters unless and until Your Honor were to order some

24   relief for equitable unwinding, which you said you retain the

25   power to do.  That obviously hasn't happened or even been

1   requested.

2          So we believe we have full charter rights, but

3   NASCAR's position that they've sent to us is those charters

4   are no longer valid and are not in effect.  That's what they

5   -- and they said that they want to have them sold by them and

6   that they would then give us back what we paid for them after

7   they sell them, but they will not honor them now.  That's my

8   understanding.

9          THE COURT:  So you haven't brought up breach of

10  contract claim with respect to those two charters.

11         Would that just be a measure of your damages if you

12  prevail at trial?

13         MR. KESSLER:  We would like our injunction to cover

14  it under the antitrust theory that, in other words, we should

15  be able to get that relief for all six there.  You're right,

16  we have not filed a breach of contract claim there.  And I

17  think it really depends how Your Honor comes out on that

18  issue.

19         But, yes, we would certainly add damages to our

20  claim at trial as part of our antitrust claim without even

21  adding a breach of contract claim for them not honoring that.

22         THE COURT:  So that paragraph I was referencing in

23  addition to making sure that the cars are entered into the

24  races also asks that the teams and the cars be allowed to

25  race essentially as if they had 2025 charters except for the

1  dispute provision, of course.

2        What else in the charters are you looking for an

3  injunction to enforce?

4        MR. KESSLER:  So our position was that if we don't

5  have the type of charter rights we had under your prior

6  injunction, that our drivers can give notice that we're in

7  breach.  As you saw, we had the dispute already with

8  Mr. Reddick about that.  We put in declarations from both

9  Mr. Jenkins and Mr. Laletter (phonetic) describing the

10  different state of the drivers.  And this is a time when

11  other teams are seeking to employ drivers for next season.

12  And if they're free now, that creates significant irreparable

13  harm.

14        We also made the arguments about the damages doing

15  with sponsors again because we're back without charter

16  rights.  So it's really not just the money; it's the charter

17  status that protects us.

18        Having said that, Your Honor, the most critical

19  part of the injunction we are seeking to prevent the sale of

20  the charter rights.

21        THE COURT:  Well, that's what I've been trying to

22  boil down to here, what are we really fighting about?  We

23  don't need an injunction to require the sun to rise tomorrow.

24  Some of these things really don't need to be addressed.

25        So I do want to talk about the first part of your

1  requested injunction which talks about prohibiting NASCAR

2  from selling or transferring the numbered charters, which are

3  inartfully characterized as belonging to the plaintiffs

4  because they don't belong to the plaintiffs.  They didn't

5  sign them, so they're not theirs.

6          But I do want to hear about the irreparable harm of

7  permitting NASCAR to distribute, sell, give, whatever those

8  charters.

9          MR. KESSLER:  That is clearly the most important

10  part of the injunction from our standpoint.

11          And Your Honor previously found in the prior

12  preliminary injunction decision -- and this was a part that

13  was not challenged on appeal before the Fourth Circuit --

14  that it is not economically viable to race on a long-term

15  basis without charter rights.

16          So while we can make it through this season as open

17  terms with assurances that we will qualify every week under

18  the rule this week, we could not make it going forward into

19  next season if we don't have any charter rights because we

20  will not get the sponsors, we will not have the drivers, we

21  will not have the ability to make it economically viable to

22  continue, and NASCAR knows that.

23          And it is -- it is interesting to me, Your Honor,

24  how they have suddenly come up with an immediate sale they

25  want to make, because what the declaration of Mr. Phelps says

1  is this buyer has been asking for a charter for the past

2  several years.  That's what it says.

3           NASCAR has the power to increase above 36, up to

4  40.  So it could have granted this person a charter last year

5  before this.

6           But suddenly now in the midst of this preliminary

7  injunction they suddenly meet a few weeks ago with this buyer

8  and say, Oh, would you like a charter now, so that we could

9  come in and say there's some urgency here to this situation.

10          But this is a cajole because they have made it

11  clear that they don't want us to be able to compete on a

12  long-term basis, and they know it's not economically viable

13  to compete without charter rights.  And we had a full record

14  on that issue in the prior preliminary injunction.  NASCAR

15  has not put in any new evidence in this injunctive proceeding

16  to show that it is economically viable to compete on a

17  long-term basis with our charters.

18          So we believe preserving this through trial so that

19  after trial if we win, part of the relief we could ask for is

20  a continuation of those rights so we can compete on an

21  economically viable basis will be preserved.

22          It's a status quo injunction, this part, as Your

23  Honor pointed out in your TRO ruling.  That is the status

24  quo.  It's at the lower standard.  There is no *Omega* issue

25  with that injunction, not that I think *Omega* applies.

 1          But we would not be seeking now to do anything
 2    other than to stop them from doing this.
 3          Now, their main argument against this is not that
 4    we can compete without irreparable harm; it's that they don't
 5    -- they should be not be required to do business with us if
 6    they do not want to and that somehow there's no legal power
 7    to grant such an injunction.
 8          THE COURT:  Well, let me -- let me back you up just
 9    a bit.
10          So the charter agreements provide that it is
11    contemplated that through the term of the charters there
12    won't be more than 36 charters, but that NASCAR essentially
13    has the unfettered discretion to issue up to 40 charters,
14    right?
15          MR. KESSLER:  Yes, subject to certain rights of the
16    teams they have notice.
17          THE COURT:  Right.  I know there are adjustments
18    that result from increasing the number of charters and all
19    that.
20          MR. KESSLER:  Yes.
21          THE COURT:  So if -- if there's not an injunction
22    and they alienate, trade, whatever some of these charters, as
23    long as there are six left, that is 36 from 30 -- from 40,
24    excuse me, that would possibly be available if you prevailed
25    at trial, what is the harm to plaintiffs?

1              MR. KESSLER:  Here's the problem.  NASCAR's pointed

2    this out.

3              To go from 36 to 40, they have to give a right of

4    first refusal, a notice period, other things contractually to

5    their other existing charter holders.

6              So there is -- so even if you -- it would be a

7    breach of that contract.  In other words, from 36 to 40 in

8    addition to -- in addition to the ability to do -- it's a

9    dilutive effect.  They have to put more prize money out.

10   That they could do because they have to pay the money.  They

11   have to get a notice period, a matching period, all of that

12   going forward to do that.  The teams bargain for that as part

13   of the agreement.

14             With our up to 36, that's how they say they're

15   selling it now, right?  They say it doesn't apply to that

16   because it's unissued.  So in order to preserve those rights,

17   we need that.

18             The other problem is that if we lose our charter

19   rights in the interim.  For example, our Stewart-Haas

20   charters, the ability to recapture those is completely

21   uncertain.

22             And there's -- the burden here should be if NASCAR

23   wants to increase the number now, it should do so under its

24   provisions of its contract, which it could have done that for

25   months.  So there's no equity for them saying I need to do it

1   now.

2         But to put us at risk that some other team will

3   exercise a right of first refusal, they otherwise won't be

4   able to exceed the 36, we believe puts us in a position of

5   severe irreparable harm.

6         THE COURT:  Well, if the plaintiffs prevail at

7   trial, there are a whole host of equitable remedies available

8   to the Court.  And, you know, a lot of them have been

9   discussed in your papers.  There's likely to be sales of

10   tracks.  There will be nonexclusivity provisions that will be

11   erased.  There will be noncompete provisions that will be

12   erased.  There will be changes to what use can be made of the

13   cars.  The whole charter system itself may be looked at.

14   Even though nobody's asked the Court to look at it, but the

15   Court's not limited to remedies suggested by the parties.

16   And the charters are going to look different even if the

17   charter system survives.  There will be changes to the

18   charter.

19         So among those, don't you think the Court could

20   order that if plaintiffs prevail, that fewer than 34 charters

21   be awarded prior to trial, 34 or fewer, and require good

22   faith negotiations for the six charters that are at issue

23   here?  And if I can do that, there's no harm that can't be

24   remedied.

25         MR. KESSLER:  So I do not -- I believe the Court

 1  has very broad direction on relief you can order.  I agree

 2  with that.

 3          But I do foresee, for example, that the other

 4  teams, right, who are not parties to this case -- and Your

 5  Honor asked -- asked about that previously whether they were

 6  indispensable in some way -- would come in and say if it's

 7  going to exceed 36, we have contractual rights as third

 8  parties that we have a right of first refusal, and that the

 9  Court should not be able to interfere with our contractual

10  rights to do that unless we're before the Court in some way,

11  which they're not.  You know, we weren't seeking that relief,

12  so we had no reason to bring them in there.

13          So I just believe that the cleanest, simplest way

14  is to preserve the status quo.  And it's sort of a classic

15  status quo injunction.  So the cases we cited, for example,

16  where courts have granted preliminary injunctions do require

17  someone to keep dealing with someone in the interim, you

18  know, pending that, the distributors.  The courts didn't say,

19  well, I could always order new distributor agreements later.

20  In other words, they have preserved the status quo to allow

21  the relationships to go forward and then after trial sort out

22  of very complicated issues on this.

23          So, again, while I wouldn't say you don't have the

24  power to do that, because I think your powers to grant relief

25  if we find monopolization are extraordinarily broad.  That's

1    what all the cases we cited make clear -- I do think that

2    there will be a combination of irreparable harm to us,

3    including the increased risk to our drivers, the increased

4    risk to our sponsors now.  If they are given the uncertainty

5    that, you know, we don't currently even know if those

6    charters will be there and what will happen and what will --

7    will there be first refusal rights, how would that play

8    itself out in terms of that.

9            THE COURT:  So if plaintiffs prevail and if the

10   Court ordered that the six charters at issue here not be

11   alienated, what would be the terms of that negotiation?  Even

12   if the Court ordered, NASCAR, you must engage in good faith

13   negotiations with these teams, there's no guarantee that

14   you'll come to a deal.

15           MR. KESSLER:  No, Your Honor.  This is what the

16   injunction would state.  This goes back to a whole host of

17   cases we cited starting with *Glaxo* in the Supreme Court.

18           You could honor -- you can issue an order saying

19   they have to do business with us on nondiscriminatory terms

20   that they do with the other charter teams.  That is all you

21   have to say.  That means they extend the existing charter

22   agreements to us because that will make it nondiscriminatory.

23   We will take those charter agreements and then add all the

24   other injunctive relief and then the exclusivity in the

25   tracks ending the restrictions.  That will be relief, in

1    addition to free up the market to competition, maybe a

2    divestiture.  Whatever we would be asking for, that Your

3    Honor would look at how to free competitive market.  But the

4    narrow point would be an order to deal with us and allow to

5    us compete on nondiscriminatory terms.

6           And, Your Honor, I think we've cited at least seven

7    or eight decisions where that has been exactly the relief

8    that the courts have granted, these nondiscriminatory dealing

9    injunctions regarding that.

10          So there doesn't have to be a negotiation.  It

11   doesn't -- we -- we would not be seeking better terms than

12   the other teams.  The relief we would seek would be

13   structural to help the market, you know, so that new

14   competitors could come in, so that the barriers to entry are

15   brought down, possibly a divestiture.

16          But in terms of the terms for doing business, it

17   would just have to be nondiscriminatory.  That's all.  And,

18   again, classic form of injunctive relief in all of the cases

19   that we've cited about that.

20          THE COURT:  Well, wouldn't the charters themselves

21   potentially be voidable either by these plaintiffs or by any

22   of the rest of the team owners if the jury found antitrust

23   conduct led to and allowed for those charters because of

24   uncompetitive terms?  It wouldn't -- the rest of the teams

25   come in and say, Well, these were bad economic terms that we

1 had to accept because of their anticompetitive conduct. But

2 now that has been so found and the Court's in the business of

3 remediating that, we want to blow these charters up and start

4 over.

5 MR. KESSLER: So I think there are different

6 possibilities. It is possible that someone could seek

7 equitable relief to give them the right to void the charters,

8 especially if a new competitor comes in and offers better

9 terms or if the threat of doing that leads to better terms.

10 That's possible.

11 But the other teams, as long as they're not within

12 the statute of limitations, could also sue for triple damages

13 and decide to keep the 2025 agreements and say, NASCAR, if

14 you continue to impose those below market terms on us, those

15 are damages going forward. Or they could seek -- so either

16 one would be possible.

17 But, again, that's the reason why preserving the

18 status quo makes sense, because it's only when Your Honor

19 sees the trial verdict, all the evidence comes in, you hear

20 from all the economists that you'll have an idea of what the

21 scope of the possible post-trial relief might be or should

22 be. And as Your Honor said, it could be even what Your Honor

23 decides is appropriate. It doesn't even have to be what the

24 parties asked for.

25 But right now we're speculating without that

1  record, without that evidence, which is why a status quo

2  injunction makes so much sense in terms of that.

3         And, again, in the end an injunction going forward

4  permanently we believe on the one narrow thing would just be

5  you're required to do business with plaintiffs on the

6  nondiscriminatory terms with the others.

7         Now, whatever relief there is, if there's a relief

8  that all the charters are voidable that apply to everybody,

9  then obviously that would apply to us too, right?  That would

10  be determined in the overall relief that Your Honor felt was

11  necessary in order to free up competition.

12         THE COURT:  So as I understood the whole -- one of

13  the main complaints when this case was brought was that the

14  financial terms that we were forced that were offered and

15  refused are so unfair because of the anticompetitive conduct

16  of the defendants.

17         And so now you're saying that if you prevail, you

18  want to sign the same charter with the same financial

19  arrangements and you're not going to try to renegotiate that

20  or?

21         MR. KESSLER:  So our belief, Your Honor, is that

22  competition would be free, potential competitors would emerge

23  and come in, and that would give people options, right?

24  Including, for example, someone can forfeit their charter --

25  right?_-- and go to another league.  You could forfeit it.

1  They have a restrictive provision that says if you do that,
2  you can't compete for a year.

3          But let's assume that's enjoined as part of the
4  relief so that you could go negotiate with a new competitor
5  and get better terms, or maybe NASCAR will renegotiate to
6  keep you, like the way that the PGA Golf Tour did against
7  Live Golf competition.  So that could work out.

8          But what I was saying is that at least at this
9  moment, my thought was if we got an injunction going forward
10 to do business with us, the simplest way would be to be
11 nondiscriminatory.

12         But, frankly, Your Honor, I wouldn't rule out,
13 depending on what the verdict is, that maybe we would say
14 they have to negotiate in good faith on new terms.  Maybe
15 it's for everybody.  Maybe people have a right to void their
16 charters if they want to at their choice.  That's a
17 possibility.

18         Again, it's very hard to know exactly what would be
19 the best relief without seeing how the evidence comes in and
20 what the verdict is, where this is going to lead.

21         I was just trying to say to Your Honor there is a
22 very narrow injunction that could keep us at least
23 economically viable while competition is being created.
24 Because if the charter system stays as it is, and we can't
25 just race open all next year, right?  That's not going to be

1   an economically viable way to compete.  And they've created
2   that system through their monopsony power by imposing these
3   terms in terms of that.
4        So I do think it would have to be an ability
5   created through equitable relief that we could compete on
6   terms that are fair, but I'm also understand that competition
7   has to come in as well.  So, again, it's a complicated
8   picture in terms of that relief.
9        THE COURT:  Well, and you've talked several times
10  and I've always had an eye on it that trying to give people
11  as much certainty about 2026, that's possible.  That's kind
12  of why we rushed this thing to get ready for trial before the
13  2026 season.
14       But until the jury comes back and we start talking
15  -- and only if they find for the plaintiffs, and we start
16  talking about equitable remedies, nobody knows what '26 is
17  going to look like.  Sponsors don't know, drivers don't know,
18  broadcasters don't know.  Because if plaintiffs prevail,
19  NASCAR is going to look very different.  And that's a lot of
20  uncertainty for everybody.  If plaintiffs don't prevail,
21  everybody's got certainty.  You ain't racing with a charter.
22  Nothing about their business is going to change.  But nobody
23  knows that until sometime mid-December.
24       So I'm not sure -- I keep trying to think what
25  injunctive relief could be fashioned to give the most

1    certainty to everybody concerned, including some people that
2    aren't before the Court, the other teams, the prospective
3    buyers, drivers, advertisers.  So that's what the Court's
4    wrestling with.  How can we not unsettle things until the
5    jury decides whether to unsettle it or not?

6           MR. KESSLER:  I think -- I think, Your Honor, there
7    is uncertainty no matter what.  I think if you grant a status
8    quo injunction, you don't improve the current uncertainty in
9    terms of what the trial will bring, but you preserve whatever
10   is the current situation.  And in the current situation, we
11   know we can continue to compete.  And in the current
12   situation, we know there will be charters available without
13   any contractual complexity or other things if we prevail at
14   trial.

15           And my clients have always been clear they're doing
16   this case because they want to see fundamental structural
17   changes in NASCAR.  That's why they're doing this case to
18   benefit not just themselves, but everyone.  So they're
19   willing to take the risk.  As Your Honor said, that if they
20   lose at trial, that they could be out if they lose.  They're
21   taking that risk of their business because they think it's
22   the right thing to do, that someone has to stand up and do
23   that.

24           But we'd ask is that you simply preserve the status
25   quo now.  We think we certainly have a likelihood of success

1  that meets that status quo standard.  And if we just preserve

2  that, we feel we then can all go into the trial -- okay? --

3  and then find out where we are, unless, of course, the

4  parties settle, which Your Honor has also urged us to do.

5  You know we've been unsuccessful so far in that, but, you

6  know, that's not something we couldn't keep trying to do as

7  we went towards trial.

8              THE COURT:  So I want to come back to likelihood of

9  success.  Let me hear from defendants about the irreparable

10 harm.

11             MR. YATES:  Certainly, Your Honor.

12             Let me start, though, by correcting Mr. Kessler in

13 a fundamental misimpression that he keeps repeating, which is

14 that plaintiffs have some kind of charter rights or that

15 charters actually belong to them.

16             There's a Supreme Court of the United States case.

17 It's called *Campbell* v. Gomez, 577 U.S. 153.  In it the

18 Supreme Court says "unaccepted contract offer is illegal

19 nullity, has no effect," as every first year student learns.

20 And critically, what does it say?  It also says "that

21 unaccepted contract offers create no lasting right or

22 obligation."

23             So the whole premise for this motion is that

24 there's some kind of rights that need to be preserved.  That

25 is wrong.

 1          In terms of irreparable harm, NASCAR needs to go

 2    forward and operate its business.  There is no irreparable

 3    harm.  There are open teams out there.

 4          We need to wind back here because Mr. Kessler, 23XI

 5    bought into NASCAR in 2020.  The charter system was created

 6    in 2016 at the request of teams.  NASCAR didn't need to agree

 7    to it, but it agreed to it and has created $1.5 billion in

 8    equity value for teams.  That is undisputed.

 9          If we have to go back to pre-charter, we will.

10    What happened there?  Everyone ran open.  There were no --

11    there's no exclusivity.  Everyone competed for prize money.

12    That was the system as it existed in 2015 for the 2015

13    season.  And the teams, the teams that Mr. Kessler doesn't

14    represent are the ones that wanted it changed.  They wanted

15    certainty.  They wanted guaranteed entry into every race,

16    which they got, so they can sell more sponsorships.  They

17    wanted -- they wanted guaranteed money.  NASCAR agreed to

18    give them all of that.

19          THE COURT:  Well, the question for the moment,

20    rather than, you know, an opening or closing statement.  The

21    question for the moment is why NASCAR can't transfer this

22    prospective owner a charter out of the ones that remain

23    available to it?

24          I understand it's going to trigger a whole bunch of

25    process, and I understand there's a right of first refusal to

1   the other signed teams.  But my guess is they could be
2   encouraged and cajoled to decline that right and let this new
3   person in.  It just doesn't seem that insurmountable to me.

4          MR. YATES:  So I think just on the right of first
5   refusal, that applies to two, the Stewart-Haas charters.

6          And the status quo here, Your Honor, is there are
7   no charters.  The Fourth Circuit said that because they
8   didn't -- they didn't --

9          THE COURT:  You're not answering my question.

10         MR. YATES:  Understood.

11         THE COURT:  I'm trying to be a little more
12  practical about it.

13         NASCAR has the ability to issue this prospective
14  buyer a charter without touching the ones that formerly, and
15  I agree with you, formerly belonged to these plaintiffs.
16  They could do that?

17         MR. YATES:  We could, Your Honor, but it would hurt
18  the other teams.  It hurts the other teams because when you
19  -- the teams -- the teams wanted 36 or fewer charters.  Why?
20  Because they want scarcity.  Scarcity drives value.  So if we
21  start changing the system, the team -- the other teams that
22  are not before the Court bargain for, then we upset the
23  system.  The other teams will be hurt and they do not want
24  that.  They want their charters to continue increasing in
25  value.

1          THE COURT:  But as of the moment, there are only

2     what is it, 30 charters in NASCAR's position that have been

3     issued.  30 existing charters.

4          MR. YATES:  There are 30 -- there are -- there are

5     -- I would say -- I would say slightly.  I think there are 32

6     issued.  We've got a deal with the Stewart-Haas ones.  There

7     are four unissued charters, the ones that the plaintiffs

8     rejected last year and which are no legal significance or

9     rights.

10          THE COURT:  So here's what my thinking is that so

11     let's call it 32 charters at the moment.  The other teams

12     bargained for 36 knowing that it could go to 40, but they

13     bargained for 36.

14          If you issue a charter -- and I don't care what you

15     call it, one of their four or one of the remaining four,

16     whatever.  If you issue this charter, going into '26 you have

17     33 charters.

18          If the plaintiffs don't prevail, you take your

19     charters and put in your pocket and wait for the next

20     interested party.

21          If you don't prevail at trial, this thing is going

22     sideways for NASCAR anyway, and so you're not really hurt by

23     all that.  Everybody's -- everybody's going to get hurt with

24     this thing if it goes a certain way.  But I don't see how the

25     current owners who bargained for 36, because it's either

1  going to be a completely different system or it's going to be

2  fewer than 36.

3      MR. YATES:  It will be a completely different

4  system or no system, which is why the plaintiffs, to quote

5  the Fourth Circuit, are "attacking the entire model."  That's

6  why their injunction can't issue.  Their injunction can't

7  also issue because it's not the status quo.  They're not

8  seeking to preserve the status quo.

9      I agree with Your Honor that assuming that no

10  injunction issues, we can go forward and issue that charter.

11  I agree with that.  And you're right, NASCAR takes the risk

12  about what happens at trial.  I'm more than willing to take

13  that risk.

14      I've heard Mr. Kessler talk in bold terms about how

15  successful he's going to be in trial.  We tried a case in

16  January of this year.  The jury came back after a month in

17  less than 90 minutes, including the lunch break, against his

18  client because he had a gerrymandered relevant market.  The

19  exact same thing is true here.  So we're willing to take that

20  risk.

21      But what cannot happen --

22      THE COURT:  Let me say this while you bring that

23  up.

24      If either party feels certain that they're going to

25  win, you're wrong, okay?  I hope everybody appreciates the

risks. I mean, it's existential risk, obviously, for the
plaintiffs. If they lose, they're not participating in
Premium Stock Car Racing anymore. Unless, of course, they're
welcomed back in the loving arms of NASCAR like a couple of
friends after a drunken bar fight, but it's not looking like
that.

So there's risk everywhere.

MR. YATES: I agree. But look, juries -- juries
are risk, which is why they can't meet their standard here.

But the reality is, Your Honor, what should not
happen -- first of all, I think we've already dealt with, but
I'll confirm, they cannot have charter rights for the rest of
the year. That's what the Fourth Circuit has already dealt
with.

And then for basically preventing any issuance of
charters, they should not get that neither because NASCAR
should be, as it's allowed under the antitrust laws, as it's
allowed under contract law, should be able to chose who it
wants to deal with. NASCAR does not want to deal with 23XI
and Front Row anymore. You've seen the evidence and you've
seen why. So we want to move forward. We want to move
forward with all of the people that want charters.

What's remarkable, I heard Mr. Kessler say give us
nondiscriminatory terms, the same ones that everyone else
had. They could have gotten that last year if they just

1    signed.

2         The reality here is charters have increased in

3    value.  There are more and more people that want charters.

4    The second the Fourth Circuit's mandate came down, people

5    started calling, private equity firms, who, by the way,

6    private equity firms never invest if it's a bad deal.  They

7    see tremendous value in the system.  They see tremendous

8    value.  That's why we're willing to take the risk.  I

9    understand juries can be a risk.  But the reality here is the

10   system is good.  These plaintiffs are attacking the system.

11        THE COURT:  Well, that's just far afield what's

12   before me today.  That's for December.  All of those

13   arguments are for December.

14        I'm trying to focus in on whether NASCAR is harmed

15   if they issue another charter, and plaintiffs prevail, and as

16   part of the equitable relief the Court orders that NASCAR

17   engage with them on participating in the charter system,

18   which you say I can't do, but you're wrong about that.  I'm

19   trying to see where NASCAR's harmed by that.

20        MR. YATES:  Perhaps I didn't quite follow your

21   question, Your Honor.  I apologize.  I was actually in

22   deposition yesterday with Mr. Kessler.  So if Your Honor

23   could just repeat that question.

24        THE COURT:  This whole question about, look, you've

25   got, you know, theoretically charters in your pocket right

1    now.  Just issue one if you want to and -- but recognize that

2    if plaintiffs prevail, they're going to be back at your table

3    with a good faith negotiation on economic terms as part of

4    it.

5              MR. YATES:  As long as an injunction doesn't issue,

6    we'll move forward.

7              Part of the issue here is the uncertainty, Your

8    Honor.  The uncertainty after, you know, the Fourth Circuit

9    mandate issues, two days before they filed the third motion

10   for preliminary injunction.  So there is a tremendous amount

11   of uncertainty.

12             We would have loved to have resolved this case and

13   move on.  We think the charter system is good.  We think it's

14   good for all teams.  We think what's happening here hurts the

15   sport.  Really think it hurts the sport and hurts other

16   teams.

17             If Your Honor just denies the preliminary

18   injunction, we'll issue the charter.  We'll move forward with

19   that person who we've identified who will deliver great

20   things for the Cup Series for other teams in the 2026 season.

21   And then we can all see what happens at jury trial and then

22   we can move forward.

23             And if -- if -- if we prevail, as Your Honor said,

24   they will either decide to race as open teams or perhaps come

25   back and try to do something else.  If they prevail, we'll be

1  talking to Your Honor about -- about structural changes, what
2  needs to be done.

3        Now, I would say, Your Honor, the one thing that I
4  would just want to emphasize is that any structural change
5  like getting rid of an exclusivity provision, that would
6  benefit competition in their alleged relevant market.  What
7  would not benefit competition is locking them in.  Giving
8  them charters does not benefit competition; it actually, in
9  their theory of the case, it harms it.  So that's why I say I
10 don't believe giving them charters is available.  I agree
11 Your Honor has equitable powers.  You could say get rid of
12 the exclusivity clause in 6.6 or whatever it may be.

13       But I don't think, Your Honor, because it will not
14 help competition.  In fact, it would harm competition, which
15 is anathema to the antitrust laws.  I don't think Your Honor
16 can give them charter rights.

17       THE COURT:  It strikes me as sort of an attack on
18 the charter system itself for you to even say that.  A
19 charter system harms competition.  Them participating in the
20 charter system harms competition.

21       MR. YATES:  I don't believe the charter system
22 harms competition.  There's never been a competitor.  They
23 don't identify any competitors, because the way motorsports
24 competition works is across motorsports.  They're not
25 restricted right now.  They've got owners with lots of money.

1  They could go create something new right now if they wanted

2  to.  Go create a new racing series.  That's fine.

3          THE COURT:  Yeah, they made lots of arguments as to

4  why your clients have made that impossible, which we'll

5  resolve in December.

6          But if you don't mind, let's move on from both

7  sides to likelihood of success.

8          And I want to start by saying this:  That the Court

9  would prefer not to make a public announcement three months

10  before trial as to its opinion as to whether or not

11  plaintiffs are likely to succeed.  It's going to make jury

12  selection more difficult.  It's going to create a lot of

13  issues.

14          Now, of course, I'm going to do that if the parties

15  persist in requiring the Court to rule on this motion.  I

16  really wish you all could work something out that would not

17  necessitate an order on a preliminary injunction motion where

18  the Court will opine on whether plaintiffs are likely to

19  succeed.  I'd really rather not three months before trial.

20          Anyway, with that in mind, let me hear from you.

21          MR. KESSLER:  Thank you, Your Honor.

22          On likelihood of success, unlike the typical

23  antitrust case where defendants' anticompetitive conduct has

24  to be inferred from circumstantial evidence.

25          This is the rare case where the documents and the

1  testimony provide direct virtually irrefutable evidence of

2  anticompetitive exclusionary conduct.  And I'll just briefly

3  cover each one of the elements because I know Your Honor has

4  thoroughly read the papers, but I just want to highlight a

5  few.

6         First, on the issue of monopsony power.  We heard

7  the CH just say, well, there is no monopsony here because the

8  market is really all racing teams or there are other

9  opportunities.

10         What did the documentation show?  What does the

11  internal evidence show?  What that shows is the following:

12         NASCAR executives knew that the teams had no

13  alternative because there was no place to go other than to

14  ultimately accept the terms they imposed.

15         And I'm quoting now Exhibit 43 from Scott Prime,

16  NASCAR's senior executive as follows:  "We have all the

17  leverage and the teams will almost have to sign whatever

18  charter terms we put in front of them."  That was NASCAR's

19  internal view.

20         But not just Mr. Prime, NASCAR Commissioner Steve

21  Phelps, current Commissioner, he was then the president, put

22  it this way:  "Give them the charters."  This is Exhibit 44.

23  "Pick a date and they can sign or they can lose their

24  charters.  It is that simple." That was Exhibit 44.  That is

25  the ultimate recognition of monopsony power.

1          But I'm going to put up one, Your Honor, on the

2     ELMO, which I apologize for this because it's graphic and

3     explicit, but it is NASCAR's own words of how they viewed --

4     how NASCAR viewed the deal that they were presenting to them.

5          What happened, Your Honor, here is that there was a

6     disagreement inside of NASCAR.  That's what the evidence

7     shows.  Mr. France and his family wanted to impose one-sided

8     terms that would be a complete win for NASCAR using their

9     monopsony power.  The other executives -- Mr. Prime,

10    Mr. Phelps, Mr. O'Donnell -- worried that, yes, NASCAR could

11    do that because of its power, but that the ramification as

12    for the fans and the sport would be bad.  Even though it

13    would enrich NASCAR, Mr. France and his family, it would hurt

14    the sport.  So they were troubled by it.  And this is what

15    they said.  And I'm reading now from this document that is up

16    there.

17         And maybe you can help, Danielle, you know, with

18    this.

19         So this is from -- this is a private chat between

20    Mr. Phelps, Mr. O'Donnell, and also Scott Prime.

21         Mr. O'Donnell.  "Lesa called."  Lesa, of course, is

22    Lesa Kennedy, who is the co-owner with Jim France of NASCAR,

23    her family.  "Spoke to Gary, Mike and Jim.  They all thought

24    meeting was productive and that we just need to keep trying

25    for to move the needle.  Teams won't get everything they want

1  and hopefully we can just meet in the middle."

2          That's what he's reporting was said to him by Lesa
3  Kennedy.

4          "I just listened as she didn't want to hear any
5  opinions.  I, of course, didn't hold back.  I just asked for
6  someone in the meeting to point out how any of our positions
7  are going to grow the sport and position us for a big rights
8  renewal in the future."

9          And this is now the reaction of the top executives
10 of NASCAR who are not family members.

11         Mr. Phelps, "Productive?  Insanity.  Look at the
12 Amanda chart."

13         The Amanda chart was a chart they prepared as to
14 who would win on each provision of the new 2025 charter
15 agreements.  "Zero wins for the team."

16         Now, Mr. Yates will get up and say how much they
17 care about the teams, what a great deal for the teams, how
18 well the teams are going to do.  What they internally said is
19 "Zero wins for the teams."

20         Then Mr. Phelps says, "The draft must reflect a
21 middle position of we are dead in the water - they will sign
22 them.  They knew we would sign them.  They would all sign
23 because of the power, but we are" -- and I apologize for the
24 language "fucked moving forward."  Then he said, "I feel
25 better now.  Thanks for that," he got to say that.

1          Then here's what Mr. Prime said, "The approach of

2     here's a bit more money, fuck off everywhere else is a bold

3     strategy."  He's obviously being sarcastic.

4          Then Mr.  O'Donnell says, "And one that Lesa said

5     both Mike and Gary" -- who were the other board members of

6     Mr. France -- "that both Mike and Gary thought is getting us

7     close."

8          Here's what Mr. O'Donnell said, "Close to a

9     comfortable 1996, fuck the teams, dictatorship, motorsport,

10     redneck, southern, tiny sport."

11          That was the great deal they were giving to the

12     teams of no wins.  That's what the NASCAR executives said.

13     And then this goes on and on and on.  And I'm not going to

14     read anymore, Your Honor but it goes on and on.

15          To indicate that they knew in this deal, this deal

16     which they know had no wins, is economically identical to the

17     deal that they imposed on September 6.  It's identical to

18     that deal which the teams were given five hours to accept,

19     take it or leave it.  And every one of my clients accepted

20     it.

21          So there is unquestionably monopsony power.  There

22     is unquestionably a market for an input market for the teams.

23          And, in fact, Your Honor, I would point out NASCAR

24     hasn't mentioned this, but their expert Mr. Hubbard in the

25     counterclaim advocated for basically the same input market

1  that we are advocating for, right?

2          Then they come in here -- of course, they don't use

3  Mr. Hubbard now in opposition anymore.  Remember, they used

4  him first to oppose the original PR.  You don't see him now

5  because in the counterclaim he's saying that was the market,

6  the market of the teams to go into NASCAR.  Virtually

7  identical to the market that we're talking about.

8          So, Your Honor, we believe the monopsony power has

9  been established, the market has been established.  There's

10  nothing to change your conclusion on that from your prior

11  preliminary injunction, which they did not appeal to the

12  Fourth Circuit.

13          So now I go to the exclusionary conduct, Your

14  Honor.  And on the exclusionary conduct, there are two things

15  again.  Looking at their own internal documents.

16          First, we know that NASCAR feared competitive

17  entry.  How do we know that?  It's in their own documents.

18  Again, you don't have to infer this.  It comes via documents.

19          So we start -- this is Exhibit 33.  Exhibit 33 is a

20  document written from Scott Prime to Steve O'Donnell on

21  March 15, 2022.  And what he says he's worried about the new

22  golf model is what he starts in the last one.

23          He says, "Here's the latest sorry proposal to

24  disrupt the PGA tour.  Easy to see how our teams or outside

25  investors back the teams could propose something similar."

1           And then he goes on to say the following.  And this
2   is on the top now of the page.  Here's the proposal I'd come
3   up with if I were them:  20 cars (10 teams of 2) super series
4   that sits on top of the Cup schedule (basically F1).  12 to
5   14 week schedule.  Compete as teams and individuals.
6   Financial backing from Liberty, Bruin, Fenway, et cetera.
7   Those are private equity firms and big pockets of money.  In
8   for 2 billion.  $20 million purse weekly.  10 teams get
9   50 percent of the equity value.  This would give $100 million
10  team valuations, he says.  Non-member teams, other ones, can
11  get 10 percent value.  NASCAR would get 10 percent.  So he
12  even think it would be a deal where NASCAR would do this.
13  And he basically says basically bring in outside money, layer
14  it on top of the Cup Series.  The better award the top teams.
15  Then he ends up by saying, War game time.
16          Now, they did not want this.  They were desperate
17  to prevent this.  So what did they do?  And that brings us to
18  Exhibit 23.  And there are many exhibits like this.
19          This now goes through how they're going to respond
20  to the competitive threat.  And this is a chart prepared
21  called "Owner Follow-up of June of 2022."  And this is what
22  their own documents say.  We'll look at page, if we can,
23  page 3 of that, please.
24          Page 3 says "What Could the Owners Do?"  Those are
25  the team owners.  And number 3 says start their own

competitive product?  Existing NextGen inventory or
non-NASCAR tracks?  Build their own inventory (SRX-style)?
Full season versus mid-week?

That's what they could do.  They were worried about
this.

Now, they then say "What are the considerations?"
One of them is it would likely require a partnership with
SM -- that's Speedway Motorsport -- to secure track inventory
for a full season.

Why is that significant?  Because Your Honor knows
the documents then show that they say to head off this threat
they would enter into new sanction agreements with Speedway
Motorsports, which they did, which precluded Speedway
Motorsport from having any competitive events like this.

So they took all those tracks off the table along
with all the other tracks that they took off the table with
these exclusivity agreements.  And the documents show they
did this specifically to prevent this competitive entry.

And, you know, Mr. Yates is going to say, and he
said in his papers, well, they had a procompetitor purpose
for the track exclusivity because it protected NASCAR's
investment.  No, it didn't.  NASCAR didn't invest in Speedway
Motorsports' tracks.  Speedway Motorsports invested in their
tracks.  All NASCAR did was put in a sanction of exclusivity
that's saying if you want our events, you can't have the

1    competing events come in.  That hurt Speedway Motorsports who
2    made the investment because the tracks sit idle.

3              And we put in, as you know, an expert report from
4    Mr. Frost -- which they chose not to rebut; so it's
5    unrebutted evidence.  They put in no expert response -- that
6    they have tied up so many tracks for the whole period, that
7    it is not possible for a series competitive to the Cup Series
8    to be formed.

9              And we cite testimony from Mr. Phelps where he
10   says -- there's testimony that I'm not sure if it's Phelps or
11   O'Donnell now.  So it's one of them who says, yeah, you can
12   compete against us; but if you want to be at our level --
13   it's cited in our brief -- you couldn't do it.  There aren't
14   enough tracks available to do that.  So that's what they tied
15   up.

16             And if you go further down, you'll see on page --
17   the same document of actions.

18             Is it we go to this one?

19             These are the actions.  They said, What are our
20   options?  Lock up SM, Speedway Motorsport.  That's to head
21   off the competitor.

22             Well, did that happen?  Yes, it's undisputed they
23   locked up the SM tracks.  No disputes about that.

24             Letter of intent.  This was a letter of intent on a
25   long-term relationship with SM.

1          Did they do that?  Yes, that's in evidence in the

2   record.

3          Multi-sanctions through 2005 plus.

4          Did they do that?  Yes, they did that.  All of that

5   was done specifically for the purpose that they wrote in

6   these documents to tie up.

7          And, in fact, while the history was that they used

8   to do one-year sanction agreements for the tracks, they went

9   to agreements with SM that went past 2025.

10          Why would they do that?  So that it was not

11   possible to form a competitive series and be able to compete

12   with that.  They locked it down.  That's what the evidence

13   shows.

14          But I also note here you'll see the reference to

15   vertical integration, okay?  What this refers to is that this

16   is unsimilar to what Mr. Yates actually said in open court.

17          Well, if we can't get the teams to accept our will

18   in this monopsonized market, we'll just get rid of all of the

19   teams.

20          They had a document pulled, the gold codes, and

21   that document said we will have a league we'll form that

22   NASCAR will own all the teams and there will be no

23   independent teams.  They'll just be the France family owning

24   and racing all the teams.  And that would be awful for fans

25   and competitive integrity.  But they'd rather do that than

1   see a fair competitive system or compensation given.  That's

2   what the evidence shows in terms of this.

3          So we have the track exclusivity.  We have the

4   NextGen restrictions.  The NextGen restrictions in Exhibit 40

5   just briefly show again six cars had no IP production.  And

6   what they recognized in Exhibit 40 is that left them

7   vulnerable to a copycat series, and that's right on

8   Exhibit 40 and that's on right there.  That's on page 6 of

9   10.  You'll see that it says, NASCAR doesn't own the IP of

10  the current platform.  Easily copycatted.  That was Gen-6.

11  So what they then did is on page 8 is they go in Gen-7, we

12  would own this IP.  We would own this IP for eventual use.

13  Of course, all series of desired with less risk of copycat

14  series.  And that's what they imposed in 2022.

15         They can't say they did this to protect their

16  investment; because if it was to protect their investment,

17  they would do it in Gen-6.  They only decided to do it in

18  Gen-7 so that they could restrict you from having a copycat

19  series, which is exactly what we also looked at in Exhibit 23

20  when they said you could use the existing inventory to

21  compete against you.

22         And here's why this is important.  The charter

23  agreements are going to expire.  And they are correct, they

24  now changed it going forward.  So if they expire at the end,

25  there's no one-year additional restriction.  That only

1    applies if you leave early.  So you can't leave early and do
2    it.  So that's restrictive.  But at least if you go out, you
3    don't have that.

4         But they don't need that restriction anymore
5    because you have 20, 40, $60 million of cars, depending on
6    how many charters you have.  $80 million if you have four
7    charters, of cars sitting around that they can't use.  You
8    have to scrap it if you go to another series.  And then you'd
9    have to build a whole new series of cars to go there.

10        And the only reason that restriction was imposed
11   was to prevent the copycat copyrighted series in terms of
12   this.

13        I also want to say just a couple of words about the
14   acquisition.

15        So on the acquisition, which is a classic form of
16   an exclusionary conduct, they say it makes no difference
17   because after all, the France family already owned all of it.
18   Not true.

19        When the team -- when ISC was public, they had a
20   duty to their public stockholders that if someone came to
21   them and said we want to race on your tracks, they're idle,
22   use them, they'd have to consider it.  When they acquired it
23   all, they took that off the table.  So that they knew all of
24   those tracks they wouldn't have to worry about it.  They
25   worried about SM.

1          We also point out they acquired another racetrack
2     during this period of time besides ISC.  So we have
3     acquisitions.
4          So all of this together under *Duke Energy* which is,
5     of course, is the controlling standard in this circuit and
6     accurately states I believe the Supreme Court law as well, is
7     that you look at all of this conduct together with this
8     direct evidence of intent, with direct evidence of intent,
9     and you only can draw the conclusion this is part of a common
10    scheme that is not competition on the merits.  It is
11    restrictive.
12         You know, they will cite cases, and they do cite
13    cases, that generally someone could refuse to do with another
14    company.  That's true.  Generally someone can enter into a
15    single vertical exclusive dealing arrangement.  That's true.
16    Generally you can protect your IP for how it's used.  That's
17    true.
18         But what all the monopolization cases say,
19    especially Your Honor looks at *Aspen Skiing*, because *Aspen*
20    *Skiing* it's very helpful on the type of injunctive relief
21    granted there, which required them to keep do business with
22    someone on the specific terms that the Court set forth by the
23    Supreme Court.
24         What the case law says is when you use these normal
25    business practices for the purposes of excluding entry,

1   deterring entry, preventing competition, then it becomes

2   unlawful monopolization.  That's what the case law says.

3          All the cases they cite are cases where it wasn't

4   monopoly power or it was a regulated industry, like the

5   *Trinco* case that had special considerations.  But none of

6   them is a case like this.

7          This falls squarely under the case law we cited

8   where courts have said exclusive dealing arrangements,

9   covenants and restrictions of this type, acquisitions are all

10  acts of monopolization.  That is not competition on the

11  merits.

12         So, Your Honor, I would close by just saying I

13  don't think this is a close question on likelihood of success

14  on the merits.  I understand Your Honor's reluctance to rule

15  on this.  But I feel very strongly that if Your Honor does

16  rule, the only conclusion you can come to -- it doesn't

17  mean -- by the way, Your Honor, I know it doesn't mean before

18  a jury.  I understand jury trial risks very well.  But what

19  it means is that we are entitled to a status quo injunction

20  in this case.

21         And in that regard, Mr. Yates is not correct that

22  if we win this case, they can just go back to the open system

23  because they're saying, as Your Honor said, that, oh, the

24  charter system is anticompetitive if you grant charter

25  rights, which is really peculiar, as Your Honor would say,

1  given their position in the case.

2          You'd be shocked to know their expert, Mr. Hubbard,

3  has actually said, put in a declaration in the counterclaim

4  that the charter system is anticompetitive, that open

5  competition is preferable.  That's what their expert said.

6          So their position is so distorted to try to get to

7  an end result as opposed to following what the basic legal

8  standards here, Your Honor.

9          So unless you have any questions, I think we're

10  clearly entitled to a finding that there's a likelihood of

11  success on the merits under the prevailing standard, which is

12  you're not finding we have proved it beyond, you know, a

13  doubt, or, you know, prevail at trial, but we've raised it

14  sufficiently likely that we satisfied, especially if you only

15  grant the status quo injunction, which is at a lower standard

16  of proof.

17          Thank you, Your Honor.

18          THE COURT:  Mr. Yates, it is true that you're

19  perhaps now former expert defined the relevant market pretty

20  much the same way plaintiffs had?

21          MR. YATES:  He did not.

22          THE COURT:  Well, I've read it.

23          MR. YATES:  I understand.

24          THE COURT:  My opinion is he did.  So you can tell

25  me why I'm wrong but --

1          MR. YATES:  He's still our expert on the

2   counterclaims.

3          THE COURT:  All right.

4          MR. YATES:  And he'll come in and explain, as well

5   as Professor Murphy, there's a difference between input and

6   output markets and there's a distinction there.  And the

7   reality here again is he defines the market in a way that it

8   includes all kinds of other competitors, and that's exactly

9   the way we're saying it needs to be defined.  I don't believe

10  there's any kind of contradiction at all.

11         THE COURT:  So what is your relevant market?

12         MR. YATES:  The relevant market there is -- I don't

13  have it committed to memory, Your Honor.  If I could.

14         THE COURT:  No.  Just paraphrase.  Take your best

15  shot.

16         MR. YATES:  So what I would say is what he says is

17  the relevant market is the market for teams -- I'm sorry, for

18  cars to race in the Cup Series.  That includes open cars, it

19  includes cars -- teams from other motorsports, because teams

20  from other motorsports come into the Cup Series.

21         THE COURT:  As charter members or open?

22         MR. YATES:  Charter -- charter members would be

23  included too.

24         The problem with Mr. Kessler's market -- and, by

25  the way, the expert he's advanced here his testimony has been

excluded, including recently in the *Sunday Ticket* case,
because it's untethered economics; whereas our expert,
Professor Murphy, renowned economist at the University of
Chicago, winner of Bates Medal.

But the reality here is their market is just the
Cup Series teams.

23XI wouldn't have been in their market at the time
it was formed because it didn't have a charter.  Their market
is just tightly defined to just be their -- just be the
charter teams.

That's not the right way to think about it because
teams have come in.  23XI entered.  Trackhouse when Chip
Ganassi Racing decided, hey, we want to focus on IndyCar, not
NASCAR, and that's okay.

Part of the benefit of a charter system is a team
like Chip Ganassi say, we want to sell, we've got an asset, a
charter that we can sell.

We also have parts.  We have NextGen cars.  They
sold their NextGen cars and NextGen parts.  That's part of
what happens.

I mean, Mr. Kessler's argument that everything just
gets locked up is just wrong.  People come and go into the
Cup Series, open teams, charter teams.  People sell their
charters.  New people come in from other motorsports.
Private equity firms come in.  What do they do?  They buy an

1  asset, a charter that gives them guaranteed entry which lets

2  them sell sponsorships.  They get guaranteed money, but they

3  -- they enter by buying the charter and buying assets.  They

4  get -- they hire people who previously worked for the other

5  people.

6          But I'd like to go back, Your Honor, because

7  Mr. Kessler started, he started his entire presentation in

8  his claim that he has a likelihood of success by trying to go

9  to a lower standard.  He says that he's seeking a status quo

10 injunction.  He is not.  He's trying to upend the status quo,

11 which means he needs to establish, and Your Honor would need

12 to find, that his likelihood of success is indisputably

13 clear.

14         Let me talk to you about the real facts --

15         THE COURT:  Well, the injunction he seeks is pro --

16 prohibitory rather than mandatory, right?

17         MR. YATES:  I don't think so, Your Honor.  I think

18 it changes the status quo because the status quo is no

19 charters and that makes it -- that makes it a mandatory

20 injunction according to the Fourth Circuit, including in this

21 case.  That's my view of it.  Because I think if you change

22 the status quo, if you do something that alters the status

23 quo, that becomes mandatory.  That's what we're talking about

24 here.  But that's the standard.

25         I'd like to if I can get to the merits and respond

1 to Mr. Kessler's argument on that, sir.

2          THE COURT:  Sure.

3          MR. YATES:  Okay.  So Mr. Kessler began his

4 presentation about his supposed likelihood of success by

5 focusing on an internal draft from May of 2024 and a series

6 of texts about that draft which used unfortunate language,

7 but we're going to see some unfortunate language from the

8 plaintiffs as well.

9          So put up the timeline.  So -- can we publish it?

10 Thank you.

11          So this timeline depicts part of the two and a half

12 years of negotiations over the charter.  And I'll explain to

13 Your Honor in a moment why the negotiations took two and a

14 half years and why tempers and feelings became frayed.

15          So the teams in February of 2024 said they were

16 okay with the financial terms.  All the teams agreed we were

17 okay with the financial terms.

18          Mr. Kessler spent all of his time focused on a

19 May 2024, May 21.  The dates become important here.  And he

20 says in his reply brief those are smoking gun texts.  That's

21 an internal draft where people are debating what are we going

22 to back to the teams with, what are we going to go back.

23          They could -- when he read -- when he read things,

24 what did it say?  Mr. France, Ms. France Kennedy wanted to

25 meet in the middle.  What did Mr. Phelps say?  We want to

1    meet in the middle.

2            Ultimately, what happened?  A new draft went out on

3    May 28 which adds additional benefits for the teams.  So what

4    he's talking about, what he spent most of his time talking

5    about is an internal draft that never goes to the teams.

6            The May 28, 2024, draft it goes out and it adds

7    benefits.  What do teams say?  Teams say the draft is

8    seriously fair and pretty reasonable.  It's in the record.

9    Seriously fair and pretty reasonable.

10           What else do we see, Your Honor?  What else do we

11   see?  How do the plaintiffs react?  How do the plaintiffs in

12   this case react about the charter that they now say was so

13   unfair, so one-sided?  That's their position in this case.

14   What do they do?

15           Each of them, each of them commits to buy another

16   charter.  They say we want more of this.  We want more of

17   this system, which is supposedly unfair.  That's what they

18   do.

19           So in June of 2024, 23XI goes forward and says the

20   owners have already committed.  Said reaffirmed we want to

21   buy that Stewart-Haas charter, and they then sign a contract.

22           The contract -- the only out -- the only basically

23   out for 23XI was if a simple majority of existing NASCAR Cup

24   Series charter holders didn't sign.  That was the only out.

25           There's nothing about permanent charter.  There's

nothing about more fair terms.  There's nothing about more
money.  There's nothing about getting rid of their release.
There's nothing of that.  There is nothing about getting rid
of the goodwill provision or anything else they now claim is
anticompetitive.

What else?  Front Row did the exact same thing.
Front Row did the exact same thing.  And all they conditioned
it on was the charter going through at least 2027.  The
charter is a long-term agreement.  It goes through 2031 and
then through 2038 with good faith negotiations thereafter.
It's a very long-term agreement

Now, 23XI and Front Row are not the only ones who
fought the charter proposal.  And there are better terms that
come.  More revisions were made by NASCAR after 23XI and
Front Row agreed to buy more.

What happens is Mr. Hamlin admitted in deposition
there were other buyers waiting in the wings.  Again, common
sense; people would not be trying to buy these charters if
the deal is bad, if it's so unfair as Mr. Kessler keeps
arguing.

So August -- there are August drafts, there are
September drafts.  I heard Mr. Kessler repeat his false claim
once again that the teams were only given hours to sign.
Their drafts went out in August, drafts went out earlier in
September.  They all added additional benefits for the teams.

1  So what happened?  This was a long drawn out negotiation.

2  Things -- feelings became frayed.

3        From NASCAR's perspective, Your Honor, 23XI led by

4  Curtis Polk was engaged in dishonest and confrontational

5  negotiating tactics.  That's what dragged the negotiation

6  out.

7        Now, this was Mr. Polk's plan from very, very

8  beginning.  Here's what they said:  "Agree on the outline of

9  a plan with other teams.  Form a negotiating committee.

10  Create a shadow committee that creates leverage.  The need

11  for leverage to stick.  I believe if we all band together, we

12  can get positive results."  That's how he approached the

13  beginning of the negotiations in 2022.

14        Mr. Polk, what else was he saying?  He was saying

15  it's a myth that the teams have no leverage.  There's that

16  word "leverage" again.  The teams believed they had leverage.

17  He says it's a myth, and 16 teams together are stronger than

18  NASCAR.  That what -- Mr. Polk's own handwritten words from

19  2022.

20        Mr. Polk also organizes a boycott in Daytona.  The

21  plaintiffs tried to deny, but Mr. Hamlin sent a text using

22  the word "boycott."  Mr. Jenkins from Front Row sends a text

23  using the word "boycott."

24        And it was an effective boycott.  What did it lead

25  to?  It led NASCAR to have to consider all of these

1  alternative options.

2          Mr. Kessler talked about gold codes.  NASCAR has

3  got to continue to run the business.  They weren't talking

4  about vertical integration in that document.  They were

5  talking about bringing a XFinity teams, Truck teams, teams

6  from other motorsports.  Because if the teams boycott and

7  don't run races, you need to put on events in order to

8  satisfy your obligations to media partners.

9          So Mr. Polk also he bragged.  He bragged, but he

10  told NASCAR which said, hey, let's negotiate this thing

11  privately.  At the same time NASCAR was trying to negotiate

12  contracts with its media partners.  Mr. Polk, he went to the

13  media partners.  He interfered with those discussions.  He

14  hurt the other teams because the amount that NASCAR got was

15  lower.

16          But what did he say?  He basically he threatens

17  Mr. Phelps.  You've got days, not weeks.  He says, I'm not

18  going to go quiet on this.  I'm going to use my stick.  I'm

19  going to use my leverage.

20          Mr. Polk was the one giving ultimatums.  He was the

21  one confrontational.  That is what caused the frustration.

22          Now, Mr. Polk, he doesn't even like -- he doesn't

23  even like Cup Series.  He calls it boring as shit, painful to

24  watch.  That's why throughout the process he wasn't

25  interested in negotiating the deal that would grow the sport

 1    or which was reasonable.  It was his way or the highway, Your
 2    Honor.
 3            Instead, what does he say?  He says, I'm a
 4    businessman.  I only like to invest money if it makes
 5    economic sense and it looks like it has a large potential
 6    upside.
 7            What else does he say?  I came to the conclusion
 8    that the economics of NASCAR team ownership are a sleeping
 9    giant.
10            He recognizes what all the private equity companies
11    are recognizing now.  This charter system is a great deal for
12    teams.  That's why his initial financial demand would have
13    bankrupted NASCAR.  That's what he demanded.
14            So this case is really about greed.  Greed about a
15    sport that matters not much to Mr. Polk.  Mr. Polk and
16    Mr. Jordan consider their ownership of 23XI a hobby.  Why?
17    Because one can only play so much golf.
18            You know, Mr. Polk, he was against bringing in a --
19    he was against the acquisition of the Stewart-Haas charters.
20    Didn't want to bring in a new driver.  Didn't want to pay for
21    a new driver.  Why?  We're going to be burning.  Mr. Jordan
22    says, I lost that much in a casino; let's go forward.
23            Also, at the same time the negotiating tactic for
24    Mr. Polk in 23XI was, okay, we've got to go out there and
25    tell everyone that the economics in NASCAR are so bad.

1    That's what we got to tell them.

2         What was he saying at the time?  He was saying at

3    the time, he was saying at the time we can't be crying

4    poverty.  23XI had just built a brand-new building.  People

5    wanted to bring *The New York Times* over to see the building

6    to learn about 23XI.

7         Mr. Polk says we're in the midst of crying poverty.

8    We don't want to highlight this building that costs a lot of

9    money to build, so better be careful.  Better be careful

10   here.

11        Mr. Polk and Mr. Jordan also admitted that they

12   made more money than they projected when they bought 23XI,

13   bought a charter in 2020 and made a reasonable profit.

14        So 23XI didn't come to this negotiation that lasted

15   for two and a half years to be reasonable.  Part of the

16   reason why -- and this is really unfortunate, but it's part

17   of the reason why NASCAR doesn't want to work with 23XI or

18   Front Row any longer, Mr. Hamlin.  "My despise of the France

19   family runs deep."  That's what's animating 23XI.

20        Now, the France family has spent the last 77 years

21   building the sport which lets Mr. Hamlin fly a private jet,

22   fly in helicopters.  It has created -- France family created

23   his life, but he despise them so much he says his despise

24   runs deep.

25        What else?  23XI's president, what does he say?

1 | Jim dying.  Mr. France dying is probably the answer.  These
2 | are not good partners.  These are not people that NASCAR
3 | wants to work with.  Now, 23XI just didn't harbor hatred for
4 | NASCAR's owner.  When Mr. Polk and Mr. Jordan didn't get
5 | their way, they disparaged the other teams.

6 | When Mr. Jordan learned that Joe Gibbs Racing,
7 | their technical partner, the entity that helped Bubba Wallace
8 | last week in Daytona Beach, when they learned that Joe Gibbs
9 | Racing had chosen to sign the charter, what's the response?
10 | Fuckers.  When Mr. Jordan learns that other teams had signed,
11 | what's his response?  Pussies.  They're disparaging the
12 | supposed partners and other teams as well.

13 | So the actual 2025 charter, the one signed in
14 | September, not the internal draft from May that Mr. Kessler
15 | focused on, what does it do?

16 | Again, NASCAR created the charter system at the
17 | teams' request.  $1.5 billion in equity value created by
18 | NASCAR for free.  For free.  NASCAR took nothing from that.
19 | $1.5 billion in equity value.  The teams got a 62 percent
20 | increase in payments in the 2025 charters.  I'll talk to you
21 | in a moment about that.  That's the opposite what happens in
22 | monopsony.

23 | The teams collectively received -- this is under
24 | seal -- a very substantial money from participating in the
25 | charter series, not just from NASCAR but also from their

1   sponsorships, which again, are enabled by guaranteed entry.

2          NASCAR pays a higher percentage of operating income

3   than F1 pays to its teams.  That's remarkable.  NASCAR pays

4   more of its operating income than Formula 1.

5          And there's all this demand for charters right now.

6   As I mentioned to Your Honor earlier, the second mandate

7   issued, people started calling.  There will be substantial

8   bidding for the Stewart-Haas charters.  Existing charter

9   teams want more.  New people want to come into the sport.

10  That also destroys their market definition.

11         So just on the pay increase, there it is over time.

12  Pre-charter, first charter, 28 percent.  And it goes up again

13  62 percent.  And there's the F1, 70 percent to 63.  69 to 62.

14  NASCAR pays more on an operating income basis than Formula 1.

15         Mr. Kessler doesn't touch any of these facts.  He

16  doesn't touch any of them.  But they're critical here because

17  this is a monopsony case.

18         What is monopsony all about?  Under the law,

19  monopsony is all about lower prices.  Monopsony is all about

20  lower prices.  No monopsony case in history ever involves

21  with a company agreeing with a system that creates a billion

22  and a half dollars in equity value for free.  No monopsony

23  case in history involves sort of the pay increases we're

24  talking about here.

25         Now, plaintiff's reply brief says, well, big pay

1 increases, but they're below the competitive level.  They

2 didn't say that when they bought new charters, but let's set

3 that aside.

4        The important thing, Your Honor, not one of

5 plaintiffs' experts offers an opinion that the 2025 charter

6 payments would have been higher without NASCAR's supposed

7 monopsony and supposed exclusionary conduct.  Not one.

8 There's no evidence.  They say the words, but it's

9 unsupported.

10        They couldn't that because what NASCAR did is it

11 gave every penny of the media increase to the teams.  The

12 media increase would have been higher but for Mr. Polk's

13 conduct.  But the NASCAR gave them every penny of that and

14 then tens of millions of dollars more.  That's not what a

15 monopsonist does.  It doesn't make sense.

16        In fact, the only evidence in the report on whether

17 the 2025 charter terms are above or below the competitive

18 level is from Dr. Hubbard.  He confirms that NASCAR is paying

19 more because of the conspiracy that Mr. Polk organized.

20        Now, Mr. Kessler's entire case here it really is it

21 comes down to a failed contract negotiation.  But the law,

22 the law is undisputed, including in the Fourth Circuit, that

23 a failed contract negotiation does not -- does not indicate

24 an antitrust case.

25        Mr. Kessler tried to rely on *Aspen Skiing*.  *Loren*

1  *Daner* address that directly.  It says there's no -- *Aspen*
2  *Skiing*.  There's no refusal to deal if you don't accept a
3  contract.  *Aspen Skiiing* was only if there's an existing
4  long-standing, mutually beneficial, profitable relationship
5  that gets terminated.  That was the *Duke Energy* case.  That's
6  not the case here at all.

7          But critically, basically a breakdown in contract
8  negotiations or these plaintiffs, unlike the 13 or 15 teams
9  that signed the charters refusing to sign, does not indicate
10 there is an antitrust problem.

11         Also critical, Mr. Kessler went on and on about
12 hypotheticals we've excluded competitors.  Plaintiffs and
13 their experts have not identified one competitor in history
14 that has ever been excluded.  Proffer Murphy offers, points
15 that out.  No evidence there ever been any competitors for
16 NASCAR to exclude.

17         And this case we cite, the *Credit Bureau*
18 *Services* case and many others, say if there's no competitor
19 to exclude, there is no exclusionary conduct.  Exclusionary
20 conduct has to involve identified actual competitors.

21         If Your Honor looks at the way they cite a Facebook
22 case, they ellipses out the key language.  They ellipses out
23 of the holding of the court.  There has to be an identifiable
24 likely entrance, and they can't identify one.

25         You know, so they try to imagine in NASCAR when it

1  was war games, well, maybe some sovereign wealth fund will

2  come in.  Of course, you're going to consider that if you're

3  NASCAR, but no one came in.

4          The RTA -- the RTA never wanted a former competing

5  series.  We pointed that out in our opposition brief.  So the

6  law requires actual capable entrance.

7          As for the acquisitions --

8          THE COURT:  Well, I think their argument, though,

9  is the conduct of NASCAR has prevented anyone to become a

10 competitor.

11         MR. YATES:  You got to identify who that would be.

12 You can't hypothesize someone would come in.  The law doesn't

13 allow that.  Every monopsony or monopoly involves some

14 identifiable competitor that is excluded.  There is no case

15 out there that says you can hypothesize a competitor and say,

16 oh, you took acts to exclude the competitor.  It just doesn't

17 happen.  It's not permitted as a matter of law.

18         So Mr. Kessler also talks about acquisitions.

19 First of all, ARCA, Mr. Kessler didn't mention it.  They

20 spent a lot of time in their brief on it.  They call it

21 NASCAR's closest competitor.  It's entirely made up.  It's

22 undisputed evidence, including the declaration of Mr. Drager

23 of ARCA, says ARCA was never a competitor of the Cup Series,

24 had no plans to compete, and would never had survived if

25 NASCAR had not acquired it.  They wouldn't have survived

1  COVID even.

2          Mr. Kessler is relying on dated things.  Your Honor

3  said you can use things that happened in a long time in the

4  past, like the acquisitions.  You can use that basically for

5  informational, color, background, but it cannot be the part

6  of this case.  They are time barred.  They are beyond the

7  statute of limitations.

8          Very quickly, Your Honor, on market definition.

9          Mr. Kessler is trying to jerrymand a marked the way

10  he did in my NASL case and his NASL case, the way the Fourth

11  Circuit rejected in its biparty.  You cannot just tightly

12  define it just to be exactly what is necessary in order to

13  claim that NASCAR has 100 percent share of the market.

14          All of the cases involving motorsports and

15  involving motorsports market definition say that there's

16  competition across motorsports, there's competition across

17  sanctioning bodies.  All of the cases in our brief that is

18  what they all talk about, including the *Brooklyn* case which

19  talks about NASCAR.  It says there's competition involving

20  NASCAR, CART, and USAC.

21          THE COURT:  Those are very different sports, right?

22          MR. YATES:  That's -- that's motorsports's

23  competition, Your Honor.  Professor Murphy explains it well,

24  and NASCAR witnesses will explain it well at trial.

25          In motorsports, everything is different.  In other

1    words, like, if you look at IndyCar and Formula 1, they're

2    both open wheel racing, but you can't take a Formula 1 car

3    and race an IndyCar.

4         And NASCAR also owns another series called IMSA.

5    It's a sports car series. You cannot take any NASCAR car

6    whether it's XFinity, Truck, or Cup Series car and race in

7    Imsa because the rules are different. That is how

8    motorsports compete. And that's what these courts of appeals

9    are all recognizing, which is competition in motorsports

10    space actually involves differentiation. It involves being

11    different, racing in a different way, whatever it may be,

12    open wheel versus closed versus drag races versus something

13    else. Different things appeal to different people and that's

14    the way you compete.

15         And the reality here -- and I'm glad Your Honor

16    asked this question -- is that there are teams that race

17    across motorsports. Penske, for example, NASCAR, IndyCar,

18    IMSA, other kinds of sports car series. And Chip Ganassi, I

19    mentioned him earlier. He sold his NASCAR team in order to

20    focus on IndyCar.

21         Also going back to Penske for a second. Penske's

22    lawyers came into this courtroom.

23         Go back one. Thank you, David.

24         And said all our car -- all our racing teams, all

25    the different series are housed in the same complex. They

1   didn't want to produce documents, as Your Honor remembered,

2   and we didn't want to ask them to, but we got sued.

3           What's the important thing there?  They're sharing

4   information across all of these different motorsports.

5           Same thing -- there are many examples of this.

6           Go to the next one, David, please.

7           TW Global owns Aspire and NASCAR owns an F1 team

8   Formula E.  IndyCar.  People race all kinds of motorsports.

9           At worse, what you've got here, Your Honor, at

10  worse what you've got is a dispute between two experts on

11  what the market should be.

12          THE COURT:  Are there any owners of NASCAR teams

13  that own teams in any other stock car series?

14          MR. YATES:  The answer I believe is yes, because

15  there's the Car Series.  It's been formed by some very

16  prominent former drivers.  And so I believe the answer is

17  yes.  I believe that they may not race in the Cup Series.

18  They may race in the XFinity and Truck but also Cars.

19          But that's another point here which I'll get to in

20  a second, which is the alleged exclusionary conduct.  I know

21  Your Honor has looked at them, and I know Your Honor's clerks

22  will look at them.

23          I've never seen any kind of -- any kind of

24  exclusivity provision that's got more exceptions.  The

25  exclusivity provisions exclude basically every other

1   motorsport.  If you look at 6.6, it allows people to race in
2   cars.  That's another stock car series.  It allows people to
3   race in IndyCar.  It allows people to race in F1.  What
4   doesn't NASCAR want?  NASCAR doesn't want someone copying its
5   IP.  It doesn't want someone basically free riding, as
6   Professor Murphy explained, on its brand.  That's what NASCAR
7   doesn't want.  It doesn't want we're going to copy what's
8   taken you 77 years to build.
9           As best for plaintiffs, Your Honor, there's a
10  disputed issue of fact here on market definition.
11  Mr. Kessler tried to slide by this.  But the reality, Your
12  Honor, is under the antitrust laws, they have a burden to
13  negate the procompetitive benefits of what they claim to be
14  exclusionary conduct.  Professor Murphy goes through this in
15  detail and he explains the procompetitive benefits for each
16  of the challenged provisions.
17          And the reality is if there's a valid -- and this
18  comes in *Aspen Skiing* too, which Mr. Kessler mentioned.  If
19  there is a valid business purpose for a contract clause or
20  whatever it may be, the defendant wins.  The jury gets to say
21  that's a valid business purpose.  And so what -- they don't
22  -- Mr. Kessler didn't really address that at all.
23          Let's start with the goodwill provision.  First of
24  all, these plaintiffs aren't bound by it today.  They're not
25  bound by the goodwill provision because they didn't sign the

1    contract.

2           The goodwill provision terminates at the expiration
3    of the charter.  It's got no tail.  That was one of the
4    additional benefits the teams negotiated for.  They wanted
5    the ability in 2031 to say we can stop racing in NASCAR and
6    do something else right away.  NASCAR said okay.  The old
7    charters had one tail.  Basically, exclusivity went one year
8    past the charter period.  NASCAR removed that.  Said if
9    that's what you want, we'll do that, that's fine.  So it's a
10   limited duration.

11          And, again, I mentioned it's got more -- it's got
12   more exceptions than any exclusivity provisions I've seen in
13   my entire, including for other stock car series, for example.
14   It only applies while the person owns the charter.

15          And why is that?  Professor Murphy explains in this
16   case all about trying to create incentives to act together to
17   build the Cup Series.  That's what everyone should be doing.

18          NASCAR views the charter system as a former
19   partnership.  It wants everyone rowing in the same direction
20   to basically build the Cup Series.  Why?  Because NASCAR's
21   got to compete for entertainment dollars.  It's got to
22   compete against all of these other motorsports.

23          If NASCAR and the charter teams don't do this
24   right, Your Honor, if what Mr. Kessler and his clients are
25   doing right now, if they continue like this, what's going to

1   happen is what happened to IndyCar.

2           IRL and CART got into a fight.  They got into a

3   fight that's kind of like this one.  And you know what?  You

4   know what the reality is now?  IndyCar doesn't generate any

5   positive media revenues, none.  It basically gets a time buy

6   from FOX.  They pay FOX for the production costs -- or FOX

7   pays IndyCar for the production costs.  That's what happens

8   when there's disharmony.  The kind of disharmony Mr. Polk

9   tried to create in the sport.  Everyone needs to be rowing in

10  the same direction.  That's why there is a goodwill

11  provision.

12          Turning to tracks.  Let me start here.  It's

13  crystal clear under the antitrust laws NASCAR is in no

14  obligation to let anyone else race on, for example, the

15  Daytona Motor Speedway.  That's crystal clear under the

16  antitrust laws.  We cited cases that say it's per se lawful

17  to say, No, we built this; we've invested hundreds of

18  millions of dollars in building this; we're going to be the

19  only ones to race on them.  But NASCAR let's all kinds of

20  other motorsports race on it.  Again, there are exceptions to

21  all of the exclusivity.

22          What else?  Professor Murphy explains the

23  procompetitive reasons for track exclusivity, which including

24  is Speedway Motorsports tracks.

25          You know, what is the reality here?  They're

short-term contracts, typically a year or two.  IndyCar is
carved out.  Many, many motorsports are carved out.  NASCAR's
focus again is on protecting its brand and goodwill, it's
intellectual property.  That's something allowed by the
antitrust laws.

In fact, we're here in Charlotte.  The Charlotte
Motor Speedway is owned by Speedway Motorsports.  NASCAR's
ability to deliver the Coke 600 at speedway -- at Charlotte
Motor Speedway is so important to NASCAR's broadcast partner
that the broadcast partner who has that race writes in the
contract that the race has to be there over Memorial Day
weekend.  That is why there is exclusivity.

So Mr. Dexter is a noted media expert.  He explains
why you need track exclusivity.  The reality is that in order
to deliver the media dollars, which the teams are the biggest
beneficiary of them of 49 percent of the media dollars go to
the teams, you need to be able to do what the media partners
want, which is to have races at places like the Charlotte
Motor Speedway or Sonoma or other tracks owned by Speedway
Motorsports.

Again, these contracts are short, typically a year,
sometimes two.  What does the Fourth Circuit say?  One year
do not -- one-year contracts do not have -- do not have
anticompetitive effects.  Exclusive dealing arrangements
typically pose no issue.

1            What does Judge Posner say about this?  Since most

2     of the contracts expire every year or two, there is no --

3     there is no significant exclusionary conduct.  That is the

4     law.

5            And the reason is, as Professor Murphy explains, if

6     you allow people, potential competitors, whoever they may be

7     to compete for the contract, that's totally fine.  That,

8     frankly, that's what Speedway Motorsports want is that every

9     two years someone is coming in; and if they're someone who

10    wants to pay more, that's great, they'll pay more, and NASCAR

11    will have to deal with its media partners.  So there is no

12    significant exclusionary conduct here.

13           NextGen IP.  NASCAR invested tens of billions of

14    dollars to build, to develop, and then design the NextGen

15    cars.  Why did it do that?  The teams wanted it.  That's the

16    other irony here.  The teams wanted the NextGen car.

17           Why?  Because it drives the team costs down.  It

18    has been unbelievably successful in driving team costs down.

19    The evidence at trial will show that for some teams up to

20    40 percent cost reduction because of the NextGen car.  The

21    NextGen has also made racing more competitive and media

22    partners love it they love competitive races.  They love the

23    fact that on any given -- on any given race weekend anyone

24    can win, whether it's Bubba Wallace at Brickyards 400 or

25    anyone.  They want -- media partners want people to have a

1  chance of winning.  That's what makes compelling TV.

2  Presumptively legal again for NASCAR to protect its IP, to

3  protect its investments.

4        Plaintiffs also don't disclose the fact that

5  there's tons of other intellectual property in those -- in

6  those cars that is not -- that has got nothing to do with

7  NASCAR.  All of those cars include engines designed by OEMs.

8  And they include other parts designed by OEMs.

9        23XI works with Toyota.  They can't take -- they

10  can't take their NextGen car with a Toyota engine and race it

11  anywhere else.  Why?  Because Toyota's IP and Toyota has a

12  contract that has told them that.

13        At the end of the day, Your Honor, I trust juries.

14  I trust juries because juries typically apply common sense.

15  When you look at the common sense facts in this case, what do

16  they show?

17        The common sense facts show that if the deal was so

18  bad, these plaintiffs wouldn't be asking for permanent

19  charters.  That's the number one thing Michael Jordan wants,

20  permanent charters.  If the deal is so bad, no one would be

21  asking for permanent charters.  Everyone would be running

22  away.

23        If the deal is so bad, plaintiffs would not have

24  bought more charters after knowing all of the terms.  If the

25  deal is so bad, plaintiffs would not be asking the Court to

1  give them 2025 charters.

2          If the deal is so bad, plaintiffs' experts would

3  have identified an underpayment under the 2025 charters, but

4  they don't identify any underpayment.

5          If the deal was so bad, private equity firms would

6  not be, you know, sending emails and calling up

7  Mr. Commissioner Phelps all the time.  Private equity firms

8  only invest if they think that the contract is a good deal,

9  the investment is a good deal.  They're beating down NASCAR's

10  door trying to get into the Cup Series.  And there are all

11  kinds of organizations from other motorsports that are trying

12  to come in.

13          That's the evidence that is going to be there at

14  trial.  The evidence at trial is not going to be

15  Mr. Kessler's market, which is just Cup Series teams,

16  IndyCar, F1 teams, all these other teams from motorsports

17  wants to join the Cup Series.

18          So with that, Your Honor, I've covered -- I've

19  covered likelihood of success.  Would you like me to pause

20  there?

21          THE COURT:  Yes.  Just in general.  No, kidding.

22          Mr. Kessler.

23          MR. KESSLER:  May I, Your Honor?

24          THE COURT:  Yes.  Briefly, please.

25          MR. KESSLER:  I'll try to be targeted.

1          So I don't have to respond to most of what

2    Mr. Yates spoke about because it has nothing to do with this

3    motion.

4          You know, again, there is a great philosophy when

5    you don't want to talk about the evidence against you, let's

6    talk about something else.  So we spent half of his

7    presentation attacking Mr. Polk, attacking Michael Jordan,

8    attacking others for issues that Your Honor knows he raises

9    in the counterclaim having nothing to do with this motion.

10          What he doesn't want to talk about, and he doesn't

11    talk about much, is the evidence here of his monopsony power

12    and exclusionary conduct.  So that's what I'm going to focus

13    on in terms of this.

14          But I want to also do a little case law because

15    that will help here, because Mr. Yates's view of the case law

16    is wrong.  He cites nonmonopolization cases to talk about how

17    short-term exclusive agreements are okay.  Not in the

18    monopolization cases they used to exclude a competitor and,

19    as here, they used every single year because NASCAR uses its

20    power over the Cup Series to say if you want the Cup Series,

21    you can't have any other stock car racing competing against

22    that premier level.  They did it in 2016 every year going

23    forward through 2025.  That is undisputed.

24          He won't talk about it.  He won't talk about the

25    evidence that says the intent of those provisions is to deter

1  us from forming a competitor.  And this is why I want to get

2  to the case law.  Your Honor is quite right.  The issue is

3  not whether a competitor actually came in and was excluded.

4  The tests could be they're taking action to prevent the

5  competitor from forming in the first place.

6        The case I direct Your Honor to is *Great Western*

7  *Directories v. Southwest Bell Telephone*, a Fifth Circuit

8  case.  And they make two important points.  One, that case

9  was they made a Yates argument.  A Yates argument is, well,

10  where's the competitor who's excluded?  You can't find

11  monopolization.  And the Fifth Circuit said, no, you took

12  steps to prevent the competitor from forming.  You don't have

13  to show the exclusion of an actual competitor after coming in

14  to do it.  It's enough if you're there.  And their own

15  documents show that.

16        The other thing you get in *Great Western* is he

17  makes the argument, well, you know 23XI actually made money.

18  We did, Your Honor.  Your Honor, we're doing this case for

19  more than the other teams, the 75 percent who put in

20  documents in this case saying they made zero profits in 2024,

21  and on average, the average team made no profits under the

22  last agreement.  That's why 23XI is doing this.

23        And what the *Great Western* case says just because

24  you made some money is not the test.  The test is would you

25  have had a more robust return in the competitive market.

1  That's right on point regarding this.

2      And he said we didn't put in evidence of that?  We

3  put in evidence of our experts in our damages report that is

4  so large that their experts said if they had to pay that,

5  NASCAR would go bankrupt.  So he knows our expert put in

6  evidence about how underpayment it was.  That's why it was a

7  fuck the teams offer.  It wasn't that because it was a great

8  deal for the team.  No one uses that.

9      An agreement that says no wins is not a win.  And

10 then he has the gall to come up here and show you a timeline

11 and say, oh, that was in May of 2024.  The deal we did was in

12 September 5th.

13      Well, did he tell the Court that we did a

14 comparison one by one of all the key economic terms, and it

15 was the fuck the teams, go back to the old south 1996 deal

16 that were the same economic terms imposed upon them in

17 September 6 when they were given that take-it-or-leave-it

18 offer.  He knows that and he doesn't care.

19      Dr. Rauscher did that analysis, and he impudes

20 Dr. Rauscher because in one case his testimony was excluded.

21 And I'll have to talk about Mr. Yates' track record in the

22 case.  I won't go there because that's what he wants to go.

23 I want to talk about the evidence here.

24      But Dr. Rauscher who did the analysis here led his

25 analysis led to a $2.75 billion settlement with the NCAA

1  against Mr. Yates' client, just if anybody is asking.

2         So what does the evidence show?  We should talk

3  about the evidence.  I want to go down into the mud here

4  where we're being dragged.

5         The evidence shows no dispute Mr. Frost

6  demonstrated the number of tracks tied up leaves it

7  impossible for competitive to compete.  The testimony was the

8  RTA sought to explore forming a competitor.  They couldn't do

9  it because of the lack of tracks.  That testimony is all in

10  the record before Your Honor.  They themselves perceive the

11  real possibility that a competitor could form, so they had to

12  tie up SM in the tracks.

13         He also says, well, we make the investments.  He

14  says the experts make the investments.  There is no evidence

15  NASCAR invested in SM's tracks or any independent track.  All

16  they do is use their sanction.  That can't Be procompetitive.

17  You can't just make it up.  He makes it up in terms of that.

18         Your Honor, I also want to call your attention to

19  the *Atrona* (phonetic) case in the Ninth Circuit because the

20  *Atrona* case is very much like this.  There was evidence that

21  the monopsony power was used to reduce what you would receive

22  in the input market in the market there.  And the Court said

23  that is a basis for granting the type of injunctive relief

24  given here.  Specifically, because it was the only way was to

25  set an injunction requiring to do business on a fair

nondiscriminatory terms was the only way to assure that the
plaintiffs could recover there after being forced to pay
inflated prices.

Your Honor, I'd like to also talk about the market.

So Your Honor's right. Mr. Hubbard has that same
market. And what Mr. Yates said in response was, frankly,
gobbledygook. He said, oh, it's the same market, but all
these other track teams can come in to compete in that
market. You know, you can come in from other sports.

That's the wrong side of the market. There's only
one purchaser of services in that market. The only purchaser
of services is NASCAR. That's where his problem is. It's
not the fact that a lot of other teams can come into racing.
Yeah, they could. They could, but that doesn't change the
market power of the single purchaser in that market. And
Mr. Hubbard stood by that market, and that's the market Your
Honor found, the input market.

The cases he cite about dirt racing and other types
are all output markets. This is a case, as Your Honor knows,
is it a case about the NCAA input market, and his experts
can't responds to that. They can't. They can't deny that
input market. They get there by saying, well, the output
market has other races. That's not the point in terms of all
of that.

And, Your Honor, we also got arguments from him

1    about, well, we gave this increase.  We gave this increase in

2    the media rights or how could that be bad?  Why would a

3    monopsony would do that?

4           Well, first of all, look what they gave.  The

5    evidence shows that unequivocally -- and let's put up

6    Exhibit 23, because I think it's important.

7           Exhibit 23.  If you go to the offer page.  What the

8    teams were asking for was $720 million annual payment, which

9    was one-third of the industry revenues, okay?  Why is that

10    significant?  Because we know their own document show that

11    50 percent of the revenues go in a sport like F1.  That's why

12    I'm so shocked to hear this slight of hand.

13           He says, well, on an operating profit basis, F1

14    gives more than teams.  F1 won't tell anyone how they define

15    operating profit.  Nobody knows.  So he just made it up and

16    said, oh, well, our operating profit is not as good.  He's

17    making it up.  He doesn't know how F1 defines operating

18    profit.  What we know is revenues because it's public

19    information through the Liberty SEC filings, and you can

20    calculate how much that is.  And there they get 50 percent of

21    the revenues.  We were asking for a third, which we didn't

22    get.

23           And he says, oh, but they're very generous to us.

24    How are they generous?  He comes in and tells you, well, we

25    gave them all of the television increase.  That's not true.

It's a lie. The first year they front-loaded the money. He knows that. And then it's a less percentage over time. So the total amount is not the entire increase. It's just wrong. Just wrong. But he doesn't hesitate to say things that he knows are wrong.

Now, where do we get this $720 million number. This was total for the teams. Did we pull it out of thin air? No.

The evidence shows, Your Honor has this, that we did a joint study with NASCAR of how much it costs per charter to run a team to break even before you pay your drivers -- and you pay your drivers a lot -- before you pay them. And that was about $20 million per charter. He knows that. And when you multiply that to the charters, that's where the 720 comes from

And when he came back is a finally said, well, we got to offer some increase because everyone knows how much our TV rights are going up. So they made an offer initially of $450 million. That was their first offer. Not only did they never move from that, they ended imposing $430 million, which is less the entire negotiation.

And if you look at these things of what our proposal was, we didn't get any of them. We didn't get $720 million. They got 430 million. We didn't get any percentage of new revenues that include team rights. Zero.

1  We didn't get any percentage of media increases that
2  corresponded to that.  We didn't get permanent charters.  We
3  didn't get a change in control provision.  We didn't get the
4  additional approvals/seat at table in terms of that.  We
5  didn't get any of that.  That's why it was that offer that
6  was said to be no wins.
7          And, again, as verification for this.  When they
8  did their gold codes documents -- and I can't show the number
9  because they wanted it to be confidential.
10         THE COURT:  Yeah, that's another thing.  There's
11  way to much stuff sealed in this case.
12         MR. KESSLER:  Your Honor --
13         THE COURT:  It's all going to get unsealed.
14         MR. KESSLER:  Your Honor, we support, you know,
15  doing all of that.
16         THE COURT:  That's another thing.
17         MR. KESSLER:  Want to be transparent.
18         THE COURT:  That's another thing people ought to
19  think about when they go to trial.  This is an open and
20  public trial.
21         MR. KESSLER:  We want transparency, Your Honor.
22  We're good with that.  We're good with that.
23         And, Your Honor, the document I can't show the
24  number unfortunately this morning.  They estimate how much it
25  costs to run a team, because they were talking about going

1  vertical and owing the teams themselves.

2          And while I can't use the number, I can say this:

3  It is a hell of lot more than the $450 million that they put

4  out as their final offer.  I'm sorry.  430 million.  450 is

5  what they cut back on.  Sorry.  430 million that they put

6  out.  That's in their own documents.  It's before Your Honor.

7          So there's no doubt this was not evidence of a good

8  deal for this.

9          Now, they also make this point and say, Why did

10 Michael Jordan and others buy more charters?  Why do they

11 want to be in this sport?  Why do others want to come in this

12 sport?  Because they love premier stock car racing.  And it's

13 monopolized by NASCAR and the France family.  And if you want

14 to do that, that's the only place you could do it whether you

15 pay more or you pay less.

16         If you have a deep loving craving for, take your

17 pick, you know, apple pie and somebody is monopolizing the

18 apple pie market and they're overcharging you for the pie, if

19 you can afford it -- and, yes, Michael can afford it -- then

20 you'll pay more for the pie because you love it.

21         But that's not why he brought this case.  He

22 brought this case to make it better so everybody can afford

23 the pie.  That's what this case is about and that's what the

24 evidence shows.

25         I also find it ironic that he gets up and says,

well, Mr. Hamlin, we don't want to do business with him; he
says bad things about us.

They feature Denny Hamlin on their programming
every day five times a day.  Every day five times a day, but
they don't want to do business with him.  Okay?  That's made
up for this case.  They love promoting Denny Hamlin.  They
should because he's one of the greatest drivers in history.

And, by the way, even though we have no charter
rights, these teams right now do all the promotion they've
asked for.  So Denny is out there every day because they ask
him.  Last week Bubba was out there, our driver.  But they
hate 23XI, but they asked him to go on Good Morning America
to promote the playoffs.  That's how much they hate us.
That's how much they don't want to do business with us when
they go to Front Row's drivers and ask them every week to be
out there.  That's how much they don't like us.

This is a side that makes up arguments to get to an
end point.  It's not the law.  It's not the facts.

In conclusion, Your Honor, I know I've overstayed
my welcome and I apologize for that.

THE COURT:  You didn't hear me say that.

MR. KESSLER:  I read minds.

The evidence -- the evidence which is what you,
Your Honor, has to look at unequivocally shows that NASCAR is
the only purchaser in an input market for premier stock car

racing which unquestionably has the power to put any deal in
front of them, and teams will accept that because that's what
NASCAR's own executives said, that it enabled them to impose
a deal that they knew was a no wins and set back for the
sport that Mr. France family wanted.  That's monopsony power.

The evidence shows that there was unequivocal
exclusionary conduct in a scheme under *Duke Energy*, which
included the exclusive arrangements with the tracks for which
there is no plausible procompetitive justification at all.
That's not competition on the merits of the monopoly.

By the way, with respect to what they call goodwill
clause, the evidence shows that clause has been used to
restrict premier stock car racing teams.  That's the market.
They brand, well, we'll allow it for Indy cars, we'll allow
it for nonpremier like the Car Series, which they don't even
claim is competitive.  I asked their witnesses:  Is that
competitive with Premier Cup Series?  No.  No one says it is.
Maybe Mr. Yates says it is.  No one thinks it is.  They don't
allow exactly what they're trying to monopolize or trying to
protect.

And that was imposed, by the way, every year 2016
forward.  We purchased our team in 2022.  We had agreed to
that again.  He says, oh, you didn't agree to it in 2025.
Well, we agreed to it in 2022 twice.  We agreed to it when we
got the Stewart-Haas charters.

1        So, again, he takes like a snippet of facts and

2   ignores the evidence.

3        There's no question that restriction applies.  And

4   the one year tail applies if you quit and try to go to

5   another team, even in the 2025 agreement.  You have to let it

6   play all out for the one-year tail.  And there's no

7   justification for that.  Zero.

8        And with respect to the NextGen car restrictions,

9   he knows that it wasn't to protect property because it wasn't

10  in 6.  It's only when they started to worry about the Copycat

11  Series in '22 and forward.  That's when they imposed that and

12  it comes down.

13       So, Your Honor, we think the exclusionary conduct

14  is established.  We think the irreparable harm is established

15  and this is a status quo injunction.  As Your Honor pointed

16  out, at least the portion to stop it from selling their

17  teams, and I will be consent, Your Honor.  I don't know if my

18  clients will be content.

19       I would be content if we get that injunction

20  because that is the critical piece of it.  That is just

21  saying you can't sell teams or rights or whatever they are of

22  those six numbered charters, that is unquestionably the

23  status quo; and, therefore, we're at the lowest standard in

24  terms of that.  It is prohibitory, not mandatory, which is

25  unquestionably the lowest standard.  And it has no *Omega*

issues. It's not even requiring them to do business with us. All it's doing is preserving the status quo so when we get to that jury trial.

And, boy, I know, Your Honor, no one knows how a jury will decide. But we are strong in our belief that if we can't free up competition by agreement with them, we are going down fighting if we have to try to free it up in this legal system because that's why they didn't sign. Otherwise, they'd be playing right now under the charter agreements. These plaintiffs are here because they're fighting for all of the charter teams, and we believe we will be able to persuade the jury whether prove right or not that this has been unlawful monopolization.

But, Your Honor, the only issue for us today is please protect our charters until we get to trial so that there's no irreparable harm between now and then.

Thank you so much.

THE COURT: All right. I'll get an order out next week, unless counsel get together and work out something so that I don't have to render such an opinion.

We're going to schedule -- obviously, we'll work with counsel -- some pretrial conference issues really early in this case, because although it's clear you all get along famously, I'm anticipating that there may be some motions and disputes over admissibility of evidence, and I'm going to be

1  doing that over the week before trial.  So we're going to
2  look for some time in October to get this trial really ready.

3          Frankly, I'm not going to let your animosity for
4  one another inconvenience me.  Get right down to it.  I do
5  notice looking at the case management filing of dispositive
6  motions due October 1st.  You do what you want, but I think I
7  know enough about the evidence and law in this case to tell
8  you now there appear to be disputed material facts.  And if
9  you want to kill another few thousand pages on your motion
10 for summary judgment, of course, you have the right to do
11 that, but this case is going to trial.  So let's look for
12 time for some of these motions.

13         Anything else that we can discuss while we're here?

14         Let me say this too.  I have a little bit more of a
15 lackadaisical, just because I enjoy it, position with counsel
16 when there's no jury here.  I don't really like when you have
17 at each other.  As entertaining as it is, I don't really like
18 it.  When that jury is in the box, there's not going to be a
19 lot of this that I've seen today and all the other hearings.

20         Plus, just for your own sense and your own client's
21 sake, you better know what a Charlotte jury is because a lot
22 of things that might work somewhere, they're not going to
23 work here.

24         I would do not mean to lecture such esteemed trial
25 lawyers as yourselves.  I bet I've tried more cases in

1  Charlotte than you.  So lean on your local counsel maybe and
2  they can give you some help on that.
3          All right.  We'll get an order out next week.
4          MR. KESSLER:  Thank you, Your Honor.
5          MR. YATES:  Thank you, Your Honor.
6          (The proceedings concluded at 3:30 p.m.)
7                          *   *   *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 29th day of August 2025.


/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CRC
U.S. Official Court Reporter