IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00886-KDB-SCR

2311 RACING LLC AND FRONT
ROW MOTORSPORTS, INC.,

    Plaintiffs,

v.

NATIONAL ASSOCIATION FOR
STOCK CAR AUTO RACING,
LLC, ET AL.,

    Defendants.

## MEMORANDUM AND ORDER

**THIS MATTER** is before the Court on Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 175). On July 17, 2025, the Court denied Plaintiffs' request, as part of the same motion, for a Temporary Restraining Order ("TRO"), based, in significant part, on NASCAR's representations that Plaintiffs would have the opportunity to race as "Open" cars in the upcoming Cup Series races and that NASCAR would not sell or otherwise transfer the disputed 2025 Charters pending the Court's decision on a Preliminary Injunction.[1] *See* Doc. No. 181. With trial in this matter now less than three months away and the season on its proverbial last laps, NASCAR has agreed to extend those representations, in material effect. Therefore, as explained below and

---

[1] The history of Plaintiffs' injunction requests is well known. After denial of their initial request, this Court granted Plaintiffs a Preliminary Injunction in December 2024, which permitted Plaintiffs to "participat[e] in NASCAR Cup Series races as chartered teams while being permitted to pursue their [antitrust] claims in this action." Doc. No. 74 at 3. The Fourth Circuit vacated that injunction on June 5, 2025, *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404 (4th Cir. 2025), which prompted Plaintiffs' pending motion filed July 14, 2025.

1

consistent with its earlier Order, the Court will deny Plaintiffs' Motion for Preliminary Injunction based on the absence of irreparable harm. This will effectively maintain the status quo pending a final decision on the merits and any permanent injunctive relief following trial (that is, Plaintiffs will be able to race and the disputed Charters will not be sold or otherwise transferred).

Plaintiffs assert that an immediate Preliminary Injunction is needed to ameliorate the consequences of no longer operating as a "chartered" team. Also (and more importantly they say), they seek to prevent NASCAR from moving forward with its plan to sell their former Charters to other racing teams, which Plaintiffs claim will for all practical purposes end their existence as a realistic competitor in NASCAR's Cup Series. In response, NASCAR says, first, that Plaintiffs will indisputably be able to participate in all the remaining Cup Series races and any monetary harm and risk of driver or sponsor defections is either not irreparable harm or is unrealistic this late in the season. As to the second issue, NASCAR contends that it has an unencumbered right to sell or transfer the Charters that Plaintiffs declined to sign or purchased. However, it confirms that it is willing not to sell or convey the 2025 Charters previously owned by Stewart-Haas Racing and will not sell, convey or lease more than four "additional" Charters beyond the 30 active and 6 disputed but previously issued Charters[2] (that is, in the Court's view, any new Charters would be Nos. 37 - 40 until the dispute is resolved).

The Court has previously ruled that in the absence of an inability to participate in upcoming races, Plaintiffs cannot establish irreparable harm as to drivers, sponsors or lost Charter revenue at this point in the season, and that ruling still holds. *See* Doc. No. 181. Therefore, the only issue left to be decided is whether NASCAR should be required to maintain the status quo pending trial and

---

[2] Specifically, the disputed Charters are those that previously belonged to the #23, #35, #45, #4, #34, and #38 cars.

2

not sell or transfer ownership of the Charters formerly held by Plaintiffs, all of which remain unallocated or have not been resold.

The Court concludes that in light of NASCAR's renewed commitments to the Court, a Preliminary Injunction limited to preventing the reissuance / sale of the disputed Charters is not necessary or appropriate, even for the very short time until a jury decides the merits of Plaintiffs' claims. While a Preliminary Injunction enjoining the sale or transfer of the disputed Charters would be merely "prohibitory," only preserving the status quo pending trial, Plaintiffs must still establish each of the *Winter* factors is met, including that they will suffer irreparable harm if an injunction does not issue. Based on NASCAR's representations with respect to issuing new Charters, which it says will leave the Court "free to exercise such equitable remedies as it deems appropriate"[3] in the event that Plaintiffs prevail at trial, there will be no irreparable harm to Plaintiffs if an injunction is denied. Therefore, the Motion for a Preliminary Injunction will be **DENIED**.

---

[3] Where a defendant has been found to violate federal antitrust laws, "the available injunctive relief is broad, including to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *In re Google Play Store Antitrust Litig.*, No. 24-6256, 2025 WL 2167402, at *15–16 (9th Cir. July 31, 2025). As noted in *Google Play Store*, the Supreme Court has repeatedly endorsed the principle that district courts are "clothed with 'large discretion' to fit the decree to the special needs of the individual case"—not just to "unfetter a market from anticompetitive conduct," but also to "pry open to competition a market that has been closed by defendants' illegal restraints." (citing *Ford Motor Co. v. United States*, 405 U.S. 562, 573, 577–78 (1972)). More specifically, "[m]andatory selling on specified terms and compulsory … licensing at reasonable charges are recognized antitrust remedies. *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601–02 (1985) (requiring the Aspen ski resorts to sell a multi-mountain ticket with competitors and directly rejecting the absolute "right" of a business to select its customers and those with which it does business, which it found to be "qualified" by the antitrust laws). The Court is confident that even without an injunction, sufficient equitable remedies and tools will be available to the Court if Plaintiffs prevail at trial.

## I. LEGAL STANDARD

As noted in declining to issue a TRO, the Court has carefully reviewed the ruling of the Court of Appeals vacating the earlier injunction in considering a new Preliminary Injunction. When the Court entered that first injunction in late December 2024 (just seven days after the case was reassigned to the undersigned judge), it sought to decide the motion on the narrowest grounds possible, both because of the lack of a developed evidentiary record on the parties' broader antitrust contentions and the exigency of the circumstances. In its relatively brief 10-page decision, the Court of Appeals appeared to recognize the narrowness of this Court's ruling, quoting the Court's injunction order "emphasiz[ing] that it does not reach and expresses no opinion as to Plaintiffs' likelihood of success on their other Sherman Act claims…" and then making clear that it understood the District Court ruled only "[a]s to the single ground that the release violated the antitrust laws." *2311 Racing*, 139 F.4th at 409. Significantly, the Court of Appeals (after finding that ground standing alone insufficient) concluded, "[w]e express no view, however, on any aspect of the pending case beyond those stated herein with respect to the preliminary injunction." *Id*. at 10.

The test for entering the extraordinary remedy of an injunction prior to trial is well-established. As recently described in *2311 Racing*, to grant a temporary or preliminary injunction, a court must conclude that the plaintiff made a clear showing that it "is *likely* to succeed on the merits — along with the risk of irreparable harm, the balance of equities, and the public interest." *2311 Racing*, 139 F.4th at 408 (emphasis in original) (quoting *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025)); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008) (requiring that a preliminary injunction be awarded only "upon a clear showing" of entitlement to relief). The standard is "heightened" where a plaintiff is seeking a "mandatory" injunction; that is, one in which

the Court orders that a party do some act rather than only refrain from taking action that alters the status quo. *Id*. at 408-09, 411.

## II. FACTS

The relationship of the Parties and many of the underlying facts have been previously explained in detail and need not be repeated here. S*ee* Doc. No. 74 at 5-9. With respect to the Charter Agreements that are now most directly at issue, NASCAR and a number of stock car racing teams that had regularly participated in NASCAR's Cup Series (the "Teams") first agreed (through collective negotiations) to create Charters in 2016. Each Charter guarantees entry for one car into every Cup Series race[4] and describes various other rights, obligations and benefits between NASCAR and the "Team Owner" / "Control Person."[5] There were 36 2016 Charters executed among 15 Teams.[6] Front Row held two 2016 Charters and 23XI acquired a 2016 charter in 2020, and another in 2021. The term of the 2016 Charters expired on December 31, 2024. Doc. No. 21-4 at § 2.3. However, consistent with NASCAR and the Teams' then "current[] desire to renew [the] Agreement upon expiration of the Term," the Charters required NASCAR to "enter into confidential and good faith negotiations" regarding a potential renewal of the Agreement,

---

[4] In the 2016 Charters, the size of the race field was set at 40 cars, leaving at most 4 spots available for "Open" cars in the 40-car field. *See* Doc. No. 21-4 at § 3.2. "Open" cars are required to qualify for each race separately. (Because of the cost of racing in the Cup Series without any share of the "fixed" payments made to Charter Members and the uncertainty for teams, drivers and sponsors in not having a guaranteed spot for each race, the consistent participation of "Open" cars by a non-chartered team has effectively been non-existent since the Charter system was put in place).

[5] NASCAR repeatedly states that the Charters were issued for "free," but this is, at a minimum, misleading. While the Charter Agreements do not require any direct monetary payments from the Teams to NASCAR, the Agreements reflect the Parties' mutual bargain on a bundle of rights and obligations, including the Teams' numerous commitments to "operating obligations," "sponsor exclusivity," allowing the use of their intellectual property, etc. that both impose significant costs on the Teams as well as provide substantial benefits to NASCAR. *See* Doc. No. 21-4 at §§ 5-6.

[6] The 2016 Charters set the "maximum" number of Charter Members at 36. *See* Doc. No. 21-4 at § 3.2. However, the 2016 Charters gave NASCAR the right to increase the number of Charter Members to 40 (and the field size to 43) "if it determines it is in the best interest of the sport." *Id*.

5

including a six-month "Negotiation Period" in advance of the expiration that was "exclusive to the Team Owner." *Id*. at § 2.3.

More than two years in advance of the expiration of the 2016 charters, NASCAR and the 15 Teams began negotiations towards a 2025 Charter Agreement. NASCAR at first negotiated with the Teams together and then, beginning in the Spring of 2024, individually. As in the 2016 Charters, the 2025 Charters set an initial "maximum" number of 36 Charters, but allow NASCAR to increase the number of Charter Members to 40 (and the field size to 43) "if it determines it is in the best interest of the sport." *See* Doc. No. 21-4 at § 3.2. Ultimately, 13 of the 15 teams signed the same standard 2025 Charter Agreement on September 6, 2024 (after NASCAR ended negotiations and required Teams to finally decide whether or not to sign within several hours).

Plaintiffs declined to sign their 2025 Charter, instead filing this lawsuit. Plaintiffs contend that NASCAR has violated the Sherman Act, which makes "every person" who, alone or in concert with others, "monopolize[s] any part of the trade or commerce among the several States, or with foreign nations" guilty of a felony, and allows a civil plaintiff to bring a civil action when "injured in his business or property by reason of anything forbidden in [§ 2]." 15 U.S.C. §§ 2, 15(a). Most simply put, Plaintiffs' claim is that NASCAR's Cup Series is the only premier stock car racing series and NASCAR engaged in numerous instances of unlawful anticompetitive behavior to keep it that way.

### III.  DISCUSSION

The absence of any of the four requirements for a TRO requires that the requested injunction be denied. *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 497 (4th Cir. 2025) ("Denying a preliminary injunction only takes the rejection of a single factor."). After careful

review, and without deciding the remaining factors,[7] the Court finds that based on the two critical representations by NASCAR, Plaintiffs cannot show the likelihood of imminent irreparable harm sufficient to support a Preliminary Injunction.

First, NASCAR has changed its "Open" racing rules in a way that guarantees that Plaintiffs will be able to fully participate in each of the remaining Cup Series races. While noting that NASCAR's ability and willingness to make this "rule change" during the season reflects its full, private control over which teams can race in the Cup Series, the result is that Plaintiffs will be able to race until the end of the season so they will suffer no harm in that regard. And, again, the loss of the "fixed" Charter payouts and the uncertainty of ongoing relationships with drivers and sponsors can either be compensated with money damages at trial or is simply inherent in the risks associated with the lawsuit. What will happen for the 2026 racing season will remain unsettled for everyone involved in the NASCAR Cup Series until after trial[8] (or an earlier resolution among the Parties). Therefore, there is no irreparable harm with respect to the loss of "Charter rights" for the remainder of the 2025 Cup Series.

With respect to the sale / transfer / etc. of additional Charters pending a ruling on the merits, Plaintiffs claim that the transfer of the Charter spots Plaintiffs had been using prior to this dispute would "destroy their businesses" under the current Charter Agreement regime.[9] This is a fair and

---

[7] As the Court noted at the hearing on this motion, the Court believes that it is best not to provide its forecast of the Plaintiffs' likelihood of success on the merits, and thereby potentially bias the jury pool, unless it is necessary to do so, which it is not here.

[8] The uncertainty about what the 2026 season will look like unfortunately exists not just for the Parties, but for the other teams, drivers, crews, sponsors, broadcasters and, most regrettably, the fans.

[9] Plaintiffs also complain about NASCAR's refusal to acknowledge their ownership of the Charters purchased from the Stewart-Haas team. However, the Court need not resolve that ownership claim in this Order. The Parties' rights and obligations with respect to those Charters will be determined after trial.

7

significant fear; however, NASCAR has agreed that it will in effect maintain the status quo with respect to those earlier Charter spots (the ones that previously belonged to the #23, #35, #45, #4, #34, and #38 cars) by limiting the number of new Charters issued to four. The 2025 Charter Agreements give NASCAR the authority to create up to 40 Charter Members so temporarily adding Charters 37-40[10,11] will not irreparably harm Plaintiffs. In other words, so long as the disputed Charters are available for the Court to potentially use as part of the final relief granted to Plaintiffs if they are successful at trial,[12] then Plaintiffs are not irreparably harmed and no preliminary injunction is necessary or, indeed, permitted.

---

[10] Of course, if NASCAR prevails at trial, the disputed Charters formerly assigned to the #23, #35, #45, #4, #34, and #38 cars can be resold or abandoned so that NASCAR is left with only 36 active Charters, if that is its preference. The Court's concern (for now) is only that Plaintiffs' previously owned Charters are available for possible reallocation to Plaintiffs if they prevail at trial.

[11] Plaintiffs express concern over the process, terms and conditions related to these additional Charters. The Court need not and does not rule on how NASCAR can create these Charters and what caveats it may want to include based on the risks related to the lawsuit (which presumably will be well-known to any new Charter holders). However, the Court notes that it is unlikely to view the presence of any newly issued Charters as an impediment to granting Plaintiffs full relief if they prevail at trial.

[12] As discussed above, the Court has broad authority to fashion appropriate permanent injunctive relief to rectify any conduct found to be unlawful, including with respect to the relationship between NASCAR and the Plaintiffs (as well as Charters more generally).

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

Plaintiff's Motion for a Preliminary Injunction (Doc. No. 175) is **DENIED.**

Signed: September 3, 2025

Kenneth D. Bell
United States District Judge