## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. | No. 3:24-cv-886-KDB-SCR <br><br> **ORAL ARGUMENT REQUESTED** <br><br> [**PUBLIC VERSION**] |
| NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. | |

## NASCAR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................4

LEGAL STANDARD ............................................................................................................6

ARGUMENT .........................................................................................................................6

I.  ELEMENTS OF PLAINTIFFS' CLAIMS ARE TIME-BARRED AND HAVE BEEN RELEASED..........................................................................................................7

    A.  Challenges To The ARCA And ISC Acquisitions Are Time-Barred.....................8

    B.  Plaintiffs Are Too Late To Challenge The Charter And Sanction Agreement Exclusivity Clauses................................................................................................10

    C.  Plaintiffs' "Course of Conduct" Theory Does Not Save Their Claims .................12

    D.  Plaintiffs Have Released Their Claims .................................................................13

II.  PLAINTIFFS' FLAWED AGGREGATE DAMAGES ANALYSIS RENDERS THEM INCAPABLE OF PROVING ANY DAMAGES AT TRIAL .............................13

III.  PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS................................17

IV.  PLAINTIFFS HAVE NOT PROVEN MARKET POWER ............................................18

V.  PLAINTIFFS HAVE FAILED TO PROVE THEIR SECTION 1 CLAIMS...................20

    A.  No Genuine Dispute Of Material Fact Regarding Unreasonable Restraint..........21

        1.  Racetrack Sanction Agreements .................................................................22

        2.  Charter Agreement Non-Competes............................................................23

    B.  Procompetitive Justifications Are Unrebutted And Dispositive............................24

CONCLUSION.....................................................................................................................25

**Page(s)**

**CASES**

*2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*,
   139 F.4th 404 (4th Cir. 2025) ...................................................................13

*Allen v. Dairy Farmers of Am., Inc.*,
   748 F. Supp. 2d 323 (D. Vt. 2010)............................................................10

*Am. President Lines, LLC v. Matson, Inc.*,
   775 F. Supp. 3d 379 (D.D.C. 2025) ..........................................................13

*Bd. of Regents of Univ. of State of N.Y. v. Tomanio*,
   446 U.S. 478 (1980).....................................................................................7

*Blake v. JP Morgan Chase Bank NA*,
   927 F.3d 701 (3d Cir. 2019).......................................................................13

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
   152 F.3d 588 (7th Cir. 1998) .....................................................................16

*Brookins v. IMCA*,
   219 F.3d 849 (8th Cir. 2000) .....................................................................20

*Campfield v. State Farm Mut. Auto. Ins.*,
   532 F.3d 1111 (10th Cir. 2008) .............................................................3, 20

*Complete Ent. Res. LLC v. Live Nation Ent., Inc.*,
   2016 WL 3457177 (C.D. Cal. May 11, 2016) ..........................................10

*Continental Airlines, Inc. v. United Airlines, Inc.*,
   277 F.3d 499 (4th Cir. 2002) .....................................................................18

*Craven v. Novelli*,
   661 F. Supp. 3d 430 (W.D.N.C. 2023), *aff'd*, 2024 WL 1952590 (4th Cir. May
   3, 2024) ....................................................................................................3, 6

*CSX Transportation, Inc. v. Norfolk S. Ry. Co.*,
   114 F.4th 280 (4th Cir. 2024) ........................................................ *passim*

*Delaware State College v. Ricks*,
   449 U.S. 250 (1980).....................................................................................9

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ........................................................21, 22, 23

ii

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,*
    111 F.4th 337 (4th Cir. 2024) ........................................................12, 13

*E.E.O.C. v. Freeman,*
    778 F.3d 463 (4th Cir. 2015) ........................................................23

*Felty v. Graves-Humphreys Co.,*
    818 F.2d 1126 (4th Cir. 1987) ......................................................23

*Giordano v. Saks Inc.,*
    654 F. Supp. 3d 174 (E.D.N.Y. 2023), *aff'd sub nom. Giordano v. Saks & Co.,*
    2025 WL 799270 (2d Cir. Mar. 13, 2025) ....................................10

*GO Computer, Inc. v. Microsoft Corp.,*
    508 F.3d 170 (4th Cir. 2007) ..........................................................7

*Grand Rapids Plastics, Inc. v. Lakian,*
    188 F.3d 401 (6th Cir. 1999) ........................................................11

*In re Mission Health Antitrust Litig.,*
    2024 WL 759308 (W.D.N.C. Feb. 21, 2024) ...............................11

*Indep. Ent. Grp., Inc. v. Nat'l Basketball Ass'n,*
    853 F. Supp. 333 (C.D. Cal. 1994) ..............................................25

*It's My Party, Inc. v. Live Nation, Inc.,*
    811 F.3d 676 (4th Cir. 2016) ........................................................20

*Jefferson Parish Hospital Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) ..........................................................................22

*Johnson v. Italian Shoemakers, Inc.,*
    2024 WL 2949027 (W.D.N.C. June 11, 2024) ............................13

*Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.,*
    588 F.3d 908 (6th Cir. 2009) ........................................................20

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997)...........................................................2, 10, 12, 16

*Limestone Dev. Corp. v. Vill. Of Lemont, Ill.,*
    520 F.3d 797 (7th Cir. 2008) ........................................................13

*Magnetar Techs. Corp. v. Intamin, Ltd.,*
    801 F.3d 1150 (9th Cir. 2015) ................................................14, 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)........................................................................23

*Midwestern Mach. Co., Inc. v. N.W. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ......................................................................9, 10

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ..............................................................................24

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002)..............................................................................................12

*NCAA v. Alston*,
    594 U.S 69 (2021)..........................................................................................21, 24

*Nease v. Ford Motor Co.*,
    848 F.3d 219 (4th Cir. 2017) ..............................................................................23

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) .............................................................................10

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................22, 24, 25

*Oksanen v. Page Memorial Hosp.*,
    945 F.2d 696 (4th Cir. 1991) ..............................................................................21

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)..............................................................................................13

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) .....................................................................8, 10, 16

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)...........................................................................18, 19

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)...................................................................................20

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................................10

*Ricci v. DeStefano*,
    557 U.S. 557 (2009)................................................................................................6

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
    720 F. Supp. 1196 (W.D.N.C. 1989) ...................................................................21

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015)......................................................................18

*Thompson Everett, Inc. v. Nat'l Cable Advert.*,
  57 F.3d 1317 (4th Cir. 1995) ...................................................................17, 22

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
  850 F. Supp. 470 (E.D. Va. 1994) .....................................................................18

*U.S. Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988) ............................................................................16

*United Air Lines, Inc. v. Evans*,
  431 U.S. 553 (1977) .............................................................................................9

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
  89 F.3d 233 (5th Cir. 1996) ...............................................................................18

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) .................................................................................11

*Varner v. Peterson Farms*,
  371 F.3d 1011 (8th Cir. 2004) ...........................................................................11

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Conn.*,
  108 F. Supp. 2d 549 (W.D. Va. 2000) ..........................................................18, 19

*White Mule Co. v. ATC Leasing Co. LLC*,
  540 F. Supp. 2d 869 (N.D. Ohio 2008) ..............................................................18

*Z Techs. Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) .....................................................................7, 8, 9, 10

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971) ...................................................................................7, 8, 16

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ...............................................................................12

## STATUTES

15 U.S.C.
  § 1 ............................................................................................................. *passim*
  § 2 ............................................................................................................. *passim*
  § 14 .....................................................................................................................12
  § 15(a) .................................................................................................................18
  § 15b ....................................................................................................................7
  § 18 .....................................................................................................................10

## RULES

Fed. R. Evid. 702 ................................................................................................................3

## OTHER AUTHORITIES

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023 Supplement) .............................................................7

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2025) ...............................................................................25

# INTRODUCTION

Plaintiffs' frontal assault on the NASCAR Charter system should not be permitted to proceed to trial. Plaintiffs cannot succeed on either of their Sherman Act claims, including their claim that the Charter Agreement itself is an unlawful agreement in restraint of trade. The Charter system has created more than $1.5 billion in equity value for racing teams since it started in 2016. The value of a Charter has increased by approximately $20 million dollars since Plaintiffs 23XI and Front Row reached agreements to purchase Charters from Stewart-Haas Racing last year, and interest in acquiring them remains high. As Plaintiffs' expert economist was forced to admit, a Charter sold in 2025 was priced at a 60% premium to 2024 prices and reflects the value willing buyers believe a 2025 Charter delivers. Ex. 10, Rascher Tr. 248:18-249:21.

Plaintiffs assert that they are fighting for a "fair" Charter system for all Teams, but they are the only ones that want this lawsuit. Consistent with that, they are seeking over ███████ in made-up treble damages to put in their own pockets, irrespective of the impact it has on the sport and the other Teams going forward. Neither greed, nor an individual's bruised ego over his inability to deliver on some promises he made to other Teams, justifies trying to destroy an institution that countless people, including the France family, tracks, Team owners, and drivers have spent decades developing and growing.

Plaintiffs' case should come to an end (as the garage wants)[1] so that the focus can return to exciting racing on the track for the remainder of 2025 and planning can begin for a pivotal 2026 season. Plaintiffs' claims should be dismissed for the following reasons:

---

[1] Sworn declarations from non-party Team owners describe the value they see in the Charter system, the substantial increase in Charter prices, that what Plaintiffs call anticompetitive conduct (*e.g.*, the Next Gen car) was procompetitive and has driven down parts costs by 40% or more, and that Plaintiffs' lawsuit is risking Charter values. Declarations of Richard Childress, Joe Gibbs, Rick Hendrick, Brad Keselowski, Carl Long, B.J. McLeod, Roger Penske, Gordon Smith, Rick Ware, Cal Wells, and Jon Wood are attached as Exhibits 1-9 and 29-30 to the Bauer Declaration.

1

*First*, both claims are largely time-barred and have been released. The statute of limitations for Sherman Act claims is four years. There is no dispute that the key conduct that underlies Plaintiffs' claims occurred between 2016 and 2019. Those claims are time-barred. Plaintiffs try to skirt the statute of limitations by calling NASCAR's conduct a "series" of acts or "course of conduct" that must be viewed collectively under the continuing violation doctrine. But courts consistently hold that the continuing violation doctrine does *not* apply in these circumstances. Plaintiffs "cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 292 (4th Cir. 2024) (same). Plaintiffs also voluntarily and repeatedly released their time-barred claims each instance they purchased Charters and agreed to be bound to the Charters' terms.

*Second*, Plaintiffs cannot prove any damages at trial. Plaintiffs concede that they cannot recover for damages pre-dating October 2, 2020 and represented to the Court that they would not seek damages for time-barred conduct. Doc. 103 (Jan. 8, 2025 Hr'g Tr.) at 40:17-18 ("The damages we are claiming are only within the four years of when we filed this action. Four years back."). But that is exactly what Plaintiffs plan to do, casting stale conduct as part of a larger "course" of action for which they seek to recover. What's worse, Plaintiffs chose to present only aggregated alleged damages numbers supposedly accounting for their harm from *all* challenged conduct—time-barred or otherwise. Plaintiffs cannot distinguish damages numbers for different conduct, which means that a jury would not have a non-speculative way to determine damages.

*Third*, Plaintiffs lack standing to assert their claims. Plaintiffs' alleged injuries do not (and could not) stem from the exclusivity provisions in NASCAR's racetrack sanctions or the Charter Agreements. Plaintiffs concede they are not trying to start their own series, so any alleged harm

from these exclusionary provisions is not anticompetitive to Plaintiffs.  Moreover, Plaintiffs did not agree to the 2025 Charter Agreement and thus are not bound by its provisions.

*Fourth,* Plaintiffs' gerrymandered, fail-safe, alleged market should be rejected, even if the testimony of their expert satisfies Rule 702, which it does not.

*Finally*, Plaintiffs' Section 1 claim also fails for lack of proof.  Plaintiffs did not meet their initial burden to show that the challenged exclusivity provisions caused actual harm to the competitive process or to consumers in a properly defined market.  Even if they had, Plaintiffs failed to rebut Defendants' evidence of procompetitive justifications, which is dispositive under the third step of the rule of reason.  The absence of proof on these elements is fatal.[2]

At the end of the day, this is not a real monopsony lawsuit.  Real monopsony cases involve a buyer using "market power to decrease market demand for a product and thereby lower prices." *Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111, 1118 (10th Cir. 2008).  Here, NASCAR agreed to a substantial *increase* in compensation to Charter holders in the 2016 Charter and then an even bigger *increase* as part of the 2025 Charter.  *See* Ex. 10, Rascher Tr. 202:7-20, 345:5-12; *see also id.* at 222:15-223:13; Ex. 11, Snyder Tr. 297:10-16.  NASCAR did the opposite of what a monopsonist would do, as the ever-increasing market prices for Charters confirms.  Neither Dr. Rascher nor Dr. Snyder offered an opinion that the 2025 Charter pool payments are below the competitive level.  *See* Ex. 10, Rascher Tr. 334:15-335:25; Ex. 11, Snyder Tr. 363:6-15.  And even

---

[2]     Defendants simultaneously move to exclude testimony of Plaintiffs' experts Daniel Rascher, Edward Snyder, and Timothy Frost under Federal Rule of Evidence 702.  If those motions are granted, summary judgment must follow.  *See Craven v. Novelli*, 661 F. Supp. 3d 430, 438 (W.D.N.C. 2023), *aff'd,* 2024 WL 1952590 (4th Cir. May 3, 2024).  Without Dr. Rascher's testimony, Plaintiffs have no proof of a relevant market, harm to competition on their Section 1 claim, or antitrust injury on their Section 2 claim.  Similarly, without Professor Snyder and Frost's opinions, Plaintiffs cannot establish the relevant market, exclusionary conduct, causation, injury, or damages caused solely by acts within the limitations period as required for their Section 2 claim.

Dr. Rascher admits that NASCAR did not need to agree to every contract demand. Ex. 10, Rascher Tr. 210:23-211:10. It is time for this misguided case to come to an end.

## BACKGROUND

Plaintiff Front Row Motorsports, Inc. ("Front Row") has owned or leased Charters since 2016. Doc. 21-4 (Front Row 2016 Charter Agreement); Doc. 52-24 (Jenkins Decl.) ¶ 5; Ex. 12, FRM_0000130 at -132; Ex. 13, Front Row Resp. to Interrog. 24. Front Row was granted two Charters in 2016, and later that year, purchased a third Charter from another team. Ex. 13, Front Row Resp. to Interrog. 24. Front Row leased two of those Charters to other teams in 2017 and 2018. *Id.* In 2018, Front Row purchased a fourth Charter. *Id.* Front Row then sold two of its Charters in 2019 and 2020. *Id.* With each purchase, Front Row agreed to the 2016 Charter Terms.

NASCAR acquired the Automobile Racing Club of America ("ARCA") in 2018, after ARCA's owner expressed concerns about the lower-level series failing. Doc. 31-5 (Drager Decl.) ¶¶ 4-5, 7; Doc. 178-28 at 10-11. A year later, NASCAR acquired the International Speedway Corporation ("ISC") to standardize track facilities, the fan experience, and event pricing, optimize race schedules, and centralize media inventory and sponsorship assets. Doc. 178-28 at 10-11. Prior to that acquisition, the France family held over seventy percent of ISC voting stock. Doc. 31-4 ¶ 29; Doc. 231-13 (Snyder Rep.), Ex. 8. NASCAR's 2019 acquisition, which merely privatized ISC, was not challenged by antitrust enforcers. *See* Schedule 14A—Proxy Statement Pursuant to § 240.14a-191, *International Speedway Corporation*, SEC Filing, 2019, at 57.

The 2016 Charter Agreements' initial term was set to expire at the end of 2020 and required NASCAR to provide teams with an updated value of payments based on a previously negotiated formula. NASCAR provided those updated values at the end of 2019. By March 1, 2020, all teams opted to extend the 2016 Charter Agreement through December 31, 2024. Doc. 216-18 (Ex. 19 at 6). Front Row submitted its notice of extension on February 13, 2020, agreeing again

to the Charter terms.  *See, e.g.*, Ex. 25, FRM_0091183 at -188.

In 2020, Plaintiff 2311 Racing ("23XI") purchased a 2016 Charter for the 2021 season, with a term through December 2024.  Doc. 178-27 at 30-31.  Michael Jordan, Denny Hamlin, and Curtis Polk created 23XI solely to "fund[] a race team to compete in the NASCAR Cup Series." Doc. 107 ¶ 28.  Hamlin proposed the idea to Jordan on August 28, 2020, and sent him a written proposal with financial projections on August 30, 2020.  Ex. 14, 23XI_0251833 at -833; Ex. 15, 23XI_0222072 at -072.  Polk also received the written proposal on August 30, 2020 from Hamlin's manager.  Ex. 16, 23XI_0076215 at -215.  Polk reviewed the 2016 Charter Agreement by mid-September.  Ex. 17, Polk Tr. 214:14-21, 227:6-228:1; Ex. 18,  23XI_0300683 at -683; *see also* Ex. 19, Jordan Tr. 76:9-17 (Jordan explaining that he ██████████████████████ for 23XI).  Jordan and Polk expected they would make about ████████ in their first year operating a chartered car in the Cup Series.  Ex. 19, Jordan Tr. 50:20-25; Ex. 17, Polk Tr. 168:8-16.  From their diligence conducted prior to October 2020, Jordan and Polk concluded that NASCAR had monopsony power and that its "monopoly position gave it the power to dictate the economic terms under which stock car racing teams could compete."  Doc. 21-3 (Polk Decl.) ¶¶ 7-9; Ex. 17, Polk Tr. 180:1-183:8; *see* Ex. 19, Jordan Tr. 76:9-17.  Nonetheless, 23XI bought a 2016 Charter, agreeing to its terms, and formed a Cup Series team from scratch.  Doc. 21-3 (Polk Decl.) ¶ 8; Ex. 19, Jordan Tr. 78:15-20; Ex. 17, Polk Tr. 182:16-21.  On September 12, 2020, with approval from Jordan, 23XI purchased its first Charter for ████████.  Ex. 17, Polk Tr. 180:24-181:12; Ex. 20, 23XI_0304433 at -433.  23XI then purchased a second Charter in December 2021 for ████████, agreeing again to the 2016 Charter terms.  Doc. 178-27 at 30-31.

In April 2024, Front Row agreed with Stewart-Haas Racing to purchase a third Charter. *See* Doc. 21-2 (Jenkins Decl.) ¶ 9; Doc. 52-10 (Agreement); Doc. 67-1 (Freeze Decl.) ¶ 2; Ex. 13,

Front Row Resp. to Interrog. 24. In August 2024, 23XI purchased a third Charter from Stewart-Haas Racing. Doc. 52-11; Doc. 178-27 at 30-31. Neither agreement was conditioned on permanence or any other extraneous conditions. Instead, renewal was conditioned on 23XI receiving the same terms as other Charter holders. Doc. 178-6, 23XI_012885 at -890, § 5(d).

On September 6 and 20, 2024, Plaintiffs rejected NASCAR's offer of 2025 Charters. Doc. 21-3 (Polk PI Decl.) ¶ 30. On October 2, 2024, more than four years after concluding that NASCAR had monopoly power, Plaintiffs filed this lawsuit, asserting claims under Sections 1 and 2 of the Sherman Act. Doc. 1. On December 31, 2024, Plaintiffs' 2016 Charters expired. *Id.* ¶ 16; Doc. 21-2 (Jenkins PI Decl.) ¶ 10.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Craven v. Novelli*, 661 F. Supp. 3d 430, 438 (W.D.N.C. 2023), *aff'd,* 2024 WL 1952590 (4th Cir. May 3, 2024) (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted).

## ARGUMENT

Plaintiffs cannot succeed on either of their Sherman Act claims. Both of Plaintiffs' claims fail. *First*, Plaintiffs indisputably rely on multiple time-barred acts and attempt to evade the statute of limitations by presenting them collectively as a "course of conduct" to invoke the continuing violation doctrine. But the supposed harms Plaintiffs complain of are, at most, the inertial consequences of time-barred conduct. *Second*, Plaintiffs improperly aggregate damages for their purported harm from all of NASCAR's alleged anticompetitive conduct, leaving the jury to speculate on any damages number that properly excludes time-barred conduct. *Third*, Plaintiffs

lack standing to assert either claim. *Fourth*, Plaintiffs' alleged market is contrary to law. In addition to these failures, Plaintiffs' Section 1 claim also suffers from lack of proof.

## I.   ELEMENTS OF PLAINTIFFS' CLAIMS ARE TIME-BARRED AND HAVE BEEN RELEASED

The statute of limitations for Sherman Act claims is four years. 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). "Statutes of limitations are not simply technicalities. On the contrary, they have been long respected as fundamental to a well-ordered judicial system." *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 487 (1980). This is especially true in antitrust cases, "where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to customers but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 320a (2023 Supplement). As the Fourth Circuit explained, "[t]here is a place for finality in the law. Defendants are prejudiced when 'memories fade, documents are lost, and witnesses become unavailable.'" *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 180 (4th Cir. 2007) (affirming dismissal of untimely antitrust claim). Moreover, "[b]y encouraging parties to bring suits earlier, the statute of limitations attempts to minimize the public harm that might arise from harmful monopolies, while promoting mergers by preserving repose for merged entities." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 603 (6th Cir. 2014).

Plaintiffs base their claims on supposed anticompetitive acts that occurred either entirely prior to October 2, 2020, or began long before that date and are time-barred. For purposes of this motion, NASCAR focuses on three types of conduct that the undisputed facts and clear law demonstrate are time-barred and non-recoverable: (1) NASCAR's acquisitions of ARCA and ISC;

(2) NASCAR's 2016 Charter Agreement terms, including the limited exclusivity clause that all Charter holders (including Plaintiffs) agreed to and that did not change from 2016 through December 31, 2024; and (3) NASCAR's pre-October 2020 racetrack sanction agreements.[3]

## A. Challenges To The ARCA And ISC Acquisitions Are Time-Barred

"[A] cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith*, 401 U.S. at 338; *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 217 (4th Cir. 1987) ("Accrual of a private antitrust cause of action for purposes of the statute of limitations occurs when defendants commit an act that causes economic harm to a plaintiff."). "[I]n a merger-acquisition case, . . . the cause of harm is the merger itself." *See Z Techs.*, 753 F.3d at 599. Thus, for claims based on acquisitions, the claim accrues and the statute begins to run when the acquisition is completed. *See id.* at 602.

There is no dispute that NASCAR acquired ARCA in 2018 and ISC in 2019. *See, e.g.*, Doc. 178-28 at 10, 11. As the law provides, any harm based on this conduct occurred at the time of the acquisitions. *Z Techs.*, 753 F.3d at 599; *see* Doc. 176 at 10 (arguing the ARCA acquisition "helped to maintain NASCAR's monopoly as it took a nascent competitor under the monopoly firm's control"); Doc. 107 ¶ 14 (arguing the ISC "acquisition substantially foreclosed any potential new competitor from being formed" by restricting access to "high-quality racetracks").

Plaintiffs' claims based on these acquisitions thus accrued in 2018 (ARCA) and 2019

---

[3]     At trial, NASCAR will further demonstrate that Plaintiffs' other theories are also time-barred. For example, Plaintiffs challenge the use restrictions associated with NASCAR's Next Gen car program. But that program was developed in 2018 and endorsed by team owners by late 2019. Doc. 107 ¶ 13; Ex. 21, Probst Tr. 82:16-19, 83:17-25, 84:13-21. By the time the Next Gen car first raced in 2022, team owners had supported the program for years and were aware that the car would be subject to IP-use restrictions. Similarly, Plaintiffs have not and cannot show that the sanction agreement exclusivity clauses changed in any anticompetitive way after October 2, 2020. And track owners' sworn declarations speak about the motorsports ecosystem and the joint product that is the Cup Series, including the need for continued investments in tracks.

(ISC). By the time Plaintiffs filed their Complaint in October 2024, the statute of limitations was long expired. Plaintiffs concede this: "23XI admits that NASCAR's public announcements state that NASCAR acquired Automobile Racing Club of America in April 2018 and closed the acquisition of International Speedway Corporation in October 2019, which are both more than four years prior to 23XI filing th[is] action." Doc. 178-28 at 11; Ex. 11, Snyder Tr. 56:16-20. Plaintiffs' claims based on this conduct are time-barred, and these actions—including their alleged effects— cannot form the basis of any damages calculation.

The continuing violation doctrine cannot save Plaintiffs' claims.[4] As the Fourth Circuit explained, "a continuing-violation claim must be supported by evidence of 'some injurious act actually occurring during the limitations period, *not merely abatable but unabated inertial consequences of some pre-limitations action." CSX*, 114 F.4th at 290; *see also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557-58 (1977) (injury from pre-limitations conduct is "merely an unfortunate event in history which has no present legal consequences"); *Del. State College v. Ricks*, 449 U.S. 250, 258 (1980) ("proper focus is upon the time of the *discriminatory acts*, not upon the time at which the consequences of the acts became most painful").

There is "simply no support" for applying the continuing violation doctrine to acquisition-based claims. *See Z Techs.*, 753 F.3d at 599. As courts have repeatedly held, "[o]nce a merger is completed, there is no continuing violation possible under § 7 that would justify extending the statute of limitations beyond four years." *Id.* at 602; *see also Midwestern Mach. Co., Inc. v. N.W.*

---

[4]    Plaintiffs know this. Plaintiffs' counsel represented to the Court months ago that "[t]o the extent the acquisition happened before" the limitations period, it merely had "evidentiary value going forward" but it was not the basis of any claim for damages. Doc. 103 (Jan. 8, 2025 Hr'g Tr.) at 40:17-25. Dr. Snyder similarly acknowledges that the acquisitions must be excluded from his but-for world. Doc. 230-15 ¶ 173; Ex. 11, Snyder Tr. 37:2-7, 37:14-18, 41:10-18. Despite conceding that the acquisitions are time-barred, Plaintiffs nonetheless seek damages for the alleged harm stemming therefrom. *See infra* Argument § II.

*Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) (applying the continuing violation doctrine to mergers "makes no sense"). A "merger is a discrete act, not an ongoing scheme." *Midwestern Mach. Co.*, 392 F.3d at 271. Thus, "[o]nce the merger is completed, the plan to merge is completed, and no overt acts can be undertaken to further that plan." *Id.* Were the law otherwise, "every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continue[s] to desire to be merged." *Id.*; *see also Complete Ent. Res. LLC v. Live Nation Ent., Inc.*, 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016) ("It cannot be the case that if a merger leads to monopoly power then anything anticompetitive that the newfound monopolist does is a 'continuing violation' that began with the merger, allowing the merger to be challenged indefinitely under section 2 of the Sherman Act. If that were true, the statute of limitations for section 7 of the Clayton Act would be written out of the law."). Because an acquisition is a "discrete act," no later act can be "part of the violation." *Klehr*, 521 U.S. at 189.[5]

## B. Plaintiffs Are Too Late To Challenge The Charter And Sanction Agreement Exclusivity Clauses

Plaintiffs' claims based on the exclusivity provisions of the 2016 Charter Agreements and pre-October 2020 racetrack sanction agreements, and any alleged damages flowing therefrom, fare no better. A cause of action based on exclusivity agreements accrues upon execution of the agreement. *See Z Techs.*, 753 F.3d at 603-04; *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 217-18 (4th Cir. 1987); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174,

---

[5] The caselaw supporting this conclusion is abundant and unrebuttable. *See, e.g.*, *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 995 (N.D. Cal. 2020) ("the continuing violation doctrine does not apply in the context of Section 7 claims under the Clayton Act"); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 299-300 (D.C. Cir. 2023) (laches barred antitrust claim predicated on acquisitions six and eight years before suit); *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 349 (D. Vt. 2010) (continuing violation doctrine "has no independent application" to monopoly claims); *Z Techs.*, 753 F.3d at 599 ("[I]t is clear from the complete absence of supporting case law [applying the doctrine to mergers and acquisitions] that the continuing violations doctrine does not apply to such claims.").

192 (E.D.N.Y. 2023), *aff'd sub nom. Giordano v. Saks & Co.*, 2025 WL 799270 (2d Cir. Mar. 13, 2025) ("The decision to enter the contract—the no-hire agreement—is the overt act that starts the limitations period." (internal quotation marks omitted)).

It is undisputed that the 2016 Charters contained the challenged exclusivity clause, and that those clauses did not change during the life of the 2016 Charters (2016 through December 2024). A claim based on these contracts thus accrued when the contracts were first executed. Similarly, Plaintiffs challenge the exclusivity clauses of multiple 2016 racetrack sanction agreements. *E.g.*, Ex. 22, NASCAR-00343087 at -100 (Daytona International Speedway); Ex. 23, NASCAR-00342753 at -766 (Charlotte Motor Speedway). Claims based on these agreements also accrued when the contracts were executed and were long expired when Plaintiffs filed their Complaint in October 2024. Any harm Plaintiffs attribute to this conduct is time-barred.

The fact that the 2016 Charters continued through 2024 makes no difference whatsoever to the statute of limitations. Mere performance of a contract "during the limitations period is not sufficient to restart the period" and cannot constitute an "overt act" under the continuing violation doctrine. *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004); *In re Mission Health Antitrust Litig.*, 2024 WL 759308, at *7 (W.D.N.C. Feb. 21, 2024) ("[E]xecution or active enforcement of a contract is an overt act, but mere performance under that contract is insufficient to restart the statute of limitations."); *see also Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999). This is because "the performance of a contract [is] a *manifestation* of the 'overt act,' the decision to enter the contract, rather than an independent overt act of its own." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) (emphasis added). Performance of the contract is "merely a reaffirmation of a previous act." *Id.* at 68. Plaintiffs are not entitled to damages based on this time-barred conduct.

### C. Plaintiffs' "Course of Conduct" Theory Does Not Save Their Claims

In an attempt to circumvent the statute of limitations, Plaintiffs call these time-barred acts a "series" or "course of conduct." Doc. 71 at 10; Doc. 107 ¶¶ 139, 154, 155; Doc. 231-13 (Snyder Rep.) ¶¶ 10, 149; Ex. 10, Rascher Tr. 324:5-325:10. This argument fails for multiple reasons:

*First*, the Supreme Court squarely held that "the plaintiff cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190; *CSX*, 114 F.4th at 292 (quoting *Klehr* and rejecting plaintiff's attempt to "'bootstrap[]' *all* the injury CSX suffered since Defendants' initial, pre-limitations violations"). Allowing Plaintiffs to proceed with their claim based on numerous time-barred acts under the guise of a "course of conduct" would effectively eliminate the statute of limitations. Under Plaintiffs' reading, so long as they can identify a purportedly anticompetitive act in the limitations period, the Court can ignore the statute of limitations for all prior conduct and pull it forward. That is flatly contradicted by Supreme Court precedent. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("discrete . . . acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges").

*Second*, while the Fourth Circuit recognizes that an antitrust plaintiff may allege "that a scheme or course of conduct was anticompetitive," such an amalgamated theory of harm is appropriate only where "the individual components of [harm] do not fit neatly within pre-established categories." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024). That is not true here. Plaintiffs' claims are based on multiple typical and well-defined categories under the antitrust laws, including acquisitions and exclusivity clauses. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) ("Exclusive dealing claims are cognizable under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and evaluated under the same rule of reason." (internal quotation marks omitted)); *see* Ex. 10,

Rascher Tr. 297:3-18.  Under binding precedent, this conduct should be analyzed separately.  *Duke Energy*, 111 F.4th at 354; *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (rejecting attempt to "alchemize [different claims] into a new form of antitrust liability"); *Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 402 (D.D.C. 2025).[6]

### D. Plaintiffs Have Released Their Claims

Plaintiffs also voluntarily and repeatedly released their time-barred claims.  Front Row last signed a release on February 6, 2024.  Ex. 26, NASCAR-00531939 at -944.  23XI last signed a release on June 13, 2024.  Ex. 27, 23XI_0027149 at -158.  The Fourth Circuit upheld this "standard" contractual language as having "released all claims based on all sorts of prior conduct," including antitrust claims.  *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 410 (4th Cir. 2025).  Because both Plaintiffs willingly and repeatedly entered releases, their claims for conduct pre-dating those releases are non-recoverable.  *Johnson v. Italian Shoemakers, Inc.*, 2024 WL 2949027, at *3 (W.D.N.C. June 11, 2024).

## II. PLAINTIFFS' FLAWED AGGREGATE DAMAGES ANALYSIS RENDERS THEM INCAPABLE OF PROVING ANY DAMAGES AT TRIAL

The unavoidable conclusion that many of Plaintiffs' challenged acts are non-actionable as time-barred renders Plaintiffs' damages evidence inapplicable.  Plaintiffs have conceded that they

---

[6]     The continuing violation theory can only apply where the independent acts are *not* enough to make out a claim on their own.  *E.g.*, *Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 706 (3d Cir. 2019) ("[N]ot all wrongs are discrete wrongs. . . . These are called continuing violations. No single act may be enough to make out a claim."); *Limestone Dev. Corp. v. Vill. Of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008) (the continuing violation doctrine applies when conduct does not amount to an actionable claim "until a series of wrongful acts blossoms into an injury on which suit can be brought").  There, tolling the statutes of limitations made sense because, if each insufficient act "had to be considered in isolation, there would be no claim even when by virtue of the cumulative effect of the acts it was plain that the plaintiff had suffered actionable injury." *Limestone*, 520 F.3d at 801.  That is not the case here, where Plaintiffs "contend[] that NASCAR already had obtained monopsony power in the relevant market by the time of the negotiation of the 2016 NASCAR Cup Series Charter Member Agreement[.]"  Doc. 178-29 at 14.

cannot recover damages for conduct pre-dating October 2, 2020, but their damages expert puts forward a single measure of aggregated damages that violates that principle.

Dr. Snyder's damages model seeks damages based on conduct that includes time-barred acts. Doc. 231-13 (Snyder Rep.) ¶¶ 10, 31, 147, 149. First, Dr. Snyder concludes that NASCAR's acquisition of ISC gave NASCAR control over multiple "premier" racetracks and strengthened NASCAR's market power because NASCAR could refuse to hold other premier stock car races at those tracks. *Id.* ¶¶ 10, 150. He finds NASCAR's ownership of former ISC tracks "constitutes a significant barrier to entry for potential rivals and is a factor in explaining the lack of entry into PSCR." *Id.* ¶ 52. Second, he concludes that the challenged 2016 Charter provisions prohibited teams from competing in other stock car races, and that sanction agreement restrictions "prevented those venues from hosting competing events." *Id.* ¶¶ 52, 149. After making these two conclusions, he claims that some unidentified new series would have entered at some unidentified point in time if (1) NASCAR does not "control" tracks (including ISC tracks); (2) the 2016 Charter has a "relaxed" "non-compete" provision; and (3) Next Gen was not implemented. *Id.* ¶¶ 171-173; *see id.* ¶ 123.[7] His but-for world thus assumes time-barred conduct is redressable.

Even though it is admitted that Plaintiffs received every penny due under the actual 2016 Charter terms, Dr. Snyder calculates a single damages figure that purports to measure the harm

---

[7] Neither Dr. Snyder nor Dr. Rascher could identify any new entrants over the last 50 years, including the 40 years before the challenged conduct. Neither could identify when this supposed entry would have occurred or when a new series could pay more than the Cup Series so as to attract Teams. *See, e.g.*, Ex. 1, Rascher Tr. 52:25-53:7, 64:19-25, 66:14-21; Doc. 231-13 (Snyder Rep.) ¶ 174; Doc. 231-14 (Rascher Rebuttal Rep.) ¶ 138; Ex. 11, Snyder Tr. 369:5-370:8. Such speculation is insufficient as Defendant's *Daubert* challenges explain. Plaintiffs' assertion also collapses in on itself, as these two things—viable entry and lack of entry—cannot simultaneously be true. Plaintiffs' only remaining "argument" regarding injury is conjecture, as their own experts testified. But mere speculation is insufficient to establish damages. *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015).

14

caused by, *inter alia,* NASCAR's "control" of ISC tracks and the 2016 Charter's non-compete

provision. Dr. Snyder concludes that Plaintiffs' damages total █████████ for 23XI and █████████

█████████ for Front Row. Doc. 231-13 (Snyder Rep.), Table 1. At no point does Dr. Snyder

disaggregate or otherwise distinguish calculations for time-barred conduct.[8]

Plaintiffs intend to present these aggregated damages they supposedly suffered from

NASCAR's alleged "course of conduct," even though Dr. Snyder purports to measure conduct

different than Plaintiffs' allegations (and different than what Dr. Rachser presents). Doc. 231-13

(Snyder Rep.) ¶¶ 10, 171; Ex. 11, Snyder Tr. 41:10-18; Ex. 10, Rascher Tr. 70:19-72:8, 324:5-

325:10. Plaintiffs insist that "Defendants' *course of conduct* monopolized the PSCR input market

in the U.S." and that "[t]his monopoly position has allowed the Defendants to exercise monopsony

power in the input market for PSCR team services, which has caused antitrust injury to Plaintiffs."

Doc. 231-13 (Snyder Rep.) ¶ 11. In other words, Plaintiffs seek damages to recover from the

"harm" caused by multiple time-barred acts regardless of the acts Dr. Snyder purports to measure.

Plaintiffs told the Court months ago that "[t]he damages we are claiming are only within

the four years of when we filed this action." Doc. 103 (Jan. 8, 2025 Hr'g Tr.) at 40:17-25. While

Dr. Snyder only calculates market diminution and lost profits for 2021-2024, he indisputably

purports to measure the effect of pre-limitations acts in his analysis. *E.g.,* Ex. 11, Snyder Tr. 211:9-

---

[8]     To be clear, Dr. Snyder's damages calculation is not connected to *any* particular conduct
and should be excluded on that basis. *See* NASCAR's Motion to Exclude Report and Testimony
of Dr. Edward Snyder. Contrary to what he claims, Dr. Snyder's actual "methodology" is opining
that NASCAR would pay the same percentage of NASCAR's "economic pie" from 2021-2024 as
Formula 1 paid its teams as an average percentage of its "economic pie" from 2017-2024. Doc.
231-13 (Snyder Rep.) ¶ 186. Under that method, Dr. Snyder's calculation is the same regardless
of the claimed conduct included in his analysis. And because the underlying conduct is irrelevant
under that analysis, Plaintiffs have continued to present shifting narratives of harm. Despite his
actual "methodology," this Motion assumes Dr. Snyder did what he says he does, which lumps
together damages for time-barred and other conduct without providing the jury with any means to
distinguish them.

23, 216:5-12. Not only does this theory contradict Plaintiffs' prior representations, it also flouts unequivocal precedent. A "plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190. Even if Plaintiffs could identify a timely overt act, therefore, they still cannot recover for injuries caused by pre-2020 acts. *Id.*; *see also CSX*, 114 F.4th at 292; *Pocahontas Supreme Coal*, 828 F.2d at 218; *Zenith Radio*, 401 U.S. at 338.

The flawed damages analysis is dispositive on damages because Plaintiffs chose to present only aggregated damages numbers that supposedly account for Plaintiffs' purported harm from *all* of NASCAR's alleged anticompetitive conduct. At no point does Dr. Snyder explain the breakdown for what amount of damages are tied to which conduct. At summary judgment, the plaintiff must "provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015); *see also* Areeda & Hovenkamp ¶ 338a (plaintiff must proffer evidence to "allow the jury to estimate the amount of damages without undue speculation in those cases where damages are sought"). If "no reasonable jury could estimate the plaintiff's damages from the reports of the plaintiff's experts," Plaintiffs have failed to meet their burden at summary judgment. *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 594 (7th Cir. 1998). As relevant here, where only some of a defendant's conduct is actionable, the plaintiff must "provide the jury with a reasonable basis upon which to estimate the amount of [plaintiff's] losses" for which the plaintiff can recover, as well as the amount caused by "other factors" for which the plaintiff cannot recover. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988). Plaintiffs fail to do so.

This case mirrors the aggregated damages claim rejected by the Fourth Circuit in *CSX*.

Like here, plaintiff CSX "calculated aggregate harm from *all* the [d]efendants' alleged conduct, including conduct occurring outside the limitations period." *CSX*, 114 F.4th at 292. And "[r]ather than specifying the damages the [d]efendants caused CSX within the limitations period," CSX's "evidence 'bootstrap[ped]' *all* the injury CSX suffered since [d]efendants' initial, pre-limitations violation." *Id.* (internal quotation marks omitted). The Fourth Circuit affirmed the district court's summary judgment order, explaining that "CSX's election to proceed on a unitary theory seeking recovery for all anti-competitive acts, regardless of when they occurred, dooms its ability to present to the jury a non-speculative damages case arising from the 2015 conduct—the only damages for which a timely cause of action had accrued to CSX." *Id.* (internal quotation marks omitted). The same is true here. Plaintiffs' decision to present aggregated damages for Defendants' "course of conduct," regardless of when that conduct occurred, "dooms" Plaintiffs' ability to present the jury with a non-speculative damages case. Plaintiffs leave a jury with no evidence to calculate damages for any timely conduct Plaintiffs challenge.

## III. PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS

Plaintiffs also lack standing to assert their claims based on Charter or sanction agreement exclusionary provisions. First, Plaintiffs did not sign the 2025 Charters. Because they are not bound by the 2025 Charters (and the noncompete provisions therein), Plaintiffs suffer no concrete injury from the inclusion of these provisions in the 2025 Charter. *See Thompson Everett, Inc. v. Nat'l Cable Advert.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (antitrust standing requires establishing an "injury caused by damage to the competitive process").

Second, Plaintiffs have conceded that they are not trying to start their own series such that the Charter or sanction agreement exclusionary provisions could have caused them any harm. *2311 Racing*, Appeal No. 24-2245, Doc. 38 at 59 n.7 (Plaintiffs "are not competitors of the defendants whose antitrust injury lies in being excluded from the market"); Doc. 178-30 at 18;

Doc. 178-28 at 19. As courts have repeatedly recognized, the proper plaintiffs in monopsony cases involving exclusivity clauses are either the *competitors* who lost access to suppliers or *consumers*, but not the suppliers themselves. *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869, 889-90 (N.D. Ohio 2008) (suppliers' alleged harms from exclusive contract were not antitrust injuries, but the results of defendant's "hard bargaining efforts"); *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 850 F. Supp. 470, 476-77 (E.D. Va. 1994); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 107-10 (S.D.N.Y. 2015). Moreover, Plaintiffs' voluntary participation in the 2016 Charter undercuts any claim of coercion and provides no basis to infer an unreasonable restraint of trade under Section 1.[9]

## IV. PLAINTIFFS HAVE NOT PROVEN MARKET POWER

There is a fundamental difference between contract power and market (or monopoly) power. Power that flows from a contract is not cognizable under the antitrust laws. *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("Economic power derived from contractual agreements . . . has nothing to do with market power." (internal quotation marks omitted)); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Conn.*, 108 F. Supp. 2d 549, 583-84 (W.D. Va. 2000). And for good reason. Otherwise, antitrust lawsuits would flow from any restriction in any franchise agreement. The law also recognizes a broader legal principle: a

---

[9]     For similar reasons, Plaintiffs cannot show "injur[y] in [their] business or property" from the exclusionary provisions. 15 U.S.C. § 15(a); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 515-16 (4th Cir. 2002) ("[T]o be recovered as antitrust damages, a competitor's loss of profits must 'stem[] from a competition-reducing aspect or effect of the defendant's behavior,' that is, from 'acts that reduce output or raise prices to consumers.'"); *CSX*, 114 F.5th at 292 (requiring "a causal connection between the Defendants' alleged antitrust violation and [plaintiff's] resulting injury"). As Plaintiffs are not competitors for the allegedly restrained input, they cannot show injury resulting from the exclusivity provisions. Moreover, Dr. Snyder conceded that he does not opine that either acquisition caused damages to Plaintiffs. Ex. 11, Snyder Tr. 41:10-18. Without injury, Plaintiffs have no basis to recover.

plaintiff cannot establish a market by claiming it is "locked in" to selling to a defendant—whether due to a contract or otherwise—when that relationship was "subjected to competition" before the lock-in occurred. *Queen City*, 124 F.3d at 439-40.

Here, 23XI purchased a Charter in October 2020, after the conduct that supposedly restricts competitive entry occurred. 23XI's own words establish that it understood the terms of the Charter, believed that they were not competitive, and decided to go forward anyway. Jordan and Polk concluded that NASCAR had monopsony power and that its "monopoly position gave it the power to dictate the economic terms under which stock car racing teams could compete," yet purchased Charters regardless. Ex. 17, Polk Tr. 180:1-183:8; Doc. 21-3 (Polk Decl.) ¶¶ 7-9. That admission means, as a matter of law, that 23XI entered the Cup Series "eyes wide open, fully able to 'assess the potential costs and economic risks at the time.'" *Virginia Vermiculite*, 108 F. Supp. 2d. at 584. 23XI cannot complain of being "locked in." Nor can it define a market based on its own knowing choice to invest in the very Charter system that it now claims is anticompetitive. *Id.*

Plaintiffs' economist Dr. Rascher commits a similar error. His market is essentially a circle around Charter holders in the Cup Series. Even though he admits that there has been significant entry and exit from the Cup Series, participation in his claimed relevant market starts when a team like 23XI or Trackhouse is formed and buys a Charter. Ex. 10, Rascher Tr. 138:11-15, 139:4-10, 140:18-141:6. Or when a team like Kaulig chooses to make investments so that it can race in the Cup Series in addition to the Xfinity Series or another motorsport. *Id.* at 145:20-146:5. And, a team no longer participates in Dr. Rascher's relevant market when it sells its Charters, even if it is selling its Charters and increasing its investment in another motorsport like IndyCar.[10] In other

---

[10] Chip Ganassi Racing sold two Charters to Trackhouse in 2021. It had been racing two cars in IndyCar, but with the sale of two Charters, Chip Ganassi Racing began racing four cars in IndyCar. Doc. 231-1 (Rascher Rep.) ¶ 89.

words, Dr. Rascher's relevant market is like a fail-safe class definition: it always leads to NASCAR having a 100% market share.

This is wrong as a matter law because, to establish a valid market in a monopsony case, a plaintiff must account for *all* the buyers to which similar sellers may cater "similar services." *See Campfield,* 532 F.3d 1111, 1119 (10th Cir. 2008). If a plaintiff fails to include "reasonably good substitute[]" buyers in their proposed market, they have not established a Section 2 claim. *Id.*; *see It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (rejecting attempt to "gerrymander . . . an antitrust victory without due regard for market realities").

Here, there is clear evidence of cross-elasticity of demand between motorsports—as Dr. Rascher was forced to admit. Ex. 10, Rascher Tr. 141:23-142:16, 143:23-145:1. So, Dr. Rascher's market definition fails as a matter of law. This should not be surprising given the fact that every Court of Appeals case involving motorsports rejects efforts to define a market limited to the particular motorsport. *Brookins v. IMCA*, 219 F.3d 849 (8th Cir. 2000) (rejecting the plaintiffs' single motorsport market for failure to offer proof that "there is no cross-elasticity of demand" between IMCA and "other classes of auto racing"); *Race Tires America, Inc. v. Hoosier Racing Tire Corp.,* 614 F.3d 57, 63 (3d Cir. 2010) ("[S]anctioning bodies (like the track owners and promoters) compete to attract car owners[.]"); *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 912, 917 (6th Cir. 2009) (upholding the exclusion of expert testimony that unreliably asserted a "premium-stock-car race-sanctioning market" despite evidence that NASCAR "competes with various forms of entertainment[,] including other stock-car and open-wheel racing, other professional sports leagues, and recreational sports").

## V.   PLAINTIFFS HAVE FAILED TO PROVE THEIR SECTION 1 CLAIMS

Section 1 of the Sherman Act requires proof of (1) a "contract, combination . . . or conspiracy" that imposed an unreasonable restraint of trade (2) affecting interstate commerce and

(3) causing injury to Plaintiffs' business or property. 15 U.S.C. § 1. Determining whether a restraint is undue for purposes of proving element one calls for a "rule of reason analysis." *NCAA v. Alston*, 594 U.S 69, 81 (2021). Under this framework, Plaintiffs have the initial burden of proving that the challenged restraint has a substantial anticompetitive effect that has caused harm to competition in the relevant market. *Id.* at 96. If they carry that burden, Defendants must identify procompetitive justifications. The burden then shifts back to Plaintiffs to show those benefits could be achieved through less restrictive alternatives. *Id.* at 96-97; *see also id.* at 100 ("[A]nticompetitive restraints of trade may wind up flunking the rule of reason to the extent the evidence shows that substantially less restrictive means exist to achieve any proven procompetitive benefits."). If Plaintiffs have proven elements one and two, they must demonstrate that the restraint caused Plaintiffs to suffer an injury to its business or property. Failure to establish any of the three elements is dispositive to Plaintiffs' Section 1 allegation.

### A. No Genuine Dispute Of Material Fact Regarding Unreasonable Restraint

Plaintiffs cannot show that Defendants' agreements with racetracks or the individual teams harmed competition. In conducting a rule of reason analysis, "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991). This evaluation requires a showing of anticompetitive effect resulting from the agreement in restraint of trade. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) ("To have an anticompetitive effect, conduct must harm the competitive *process* and thereby harm consumers.") (internal citations omitted). Mere "[t]heorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely, or much less is substantial in magnitude." *Id.* at 207 (internal citations omitted). Thus, without a showing of actual adverse effect on competition, one "cannot make out a case under the antitrust laws." *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F.

Supp. 1196, 1217-18 (W.D.N.C. 1989) (*citing Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984)).

## 1. Racetrack Sanction Agreements

Plaintiffs have not demonstrated that NASCAR's sanction agreements with racetracks harmed the competitive *process* and *consumers*. Plaintiffs offer no proof of supracompetitive prices, reduced output, diminished quality, or diminished consumer choice in the alleged market arising from the agreements. This is fatal under the rule of reason. *Dickson*, 309 F.3d at 206-10; *Thompson Everett*, 57 F.3d at 1325-27. Plaintiffs' only assertions about harm to competition resulting from the racetrack sanctions is in Section 5.2 of Dr. Rascher's Report. Doc. 231-1 (Rascher Rep.) ¶¶ 196-211. He asserts that NASCAR's sanctions with racetracks harmed competition in the market for premier stock car racing team services by preventing those tracks from hosting competing premier stock car events, thereby foreclosing access to essential venues and raising barriers to entry for rival series. *Id.* Dr. Rascher's Report, however, is devoid of facts showing anticompetitive effects resulting from these agreements. He does not measure higher consumer prices, higher promoter prices, or higher input prices attributable to NASCAR's agreements with tracks. He also offers no factual showing of fewer races, smaller audiences or suppressed attendance of races attributable to the agreements, lost consumer options or worsened product quality. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Further, Dr. Rascher fails to tie any supposed foreclosure to adverse price or output effects.

Plaintiffs' theory collapses on the facts: their own experts conceded Plaintiffs cannot identify any competing premier stock car series in the past fifty years. Doc. 231-12 (Snyder Rebuttal Rep.) ¶ 18; Doc. 231-14 (Rascher Rebuttal Rep.) ¶ 138 (asserting "it is not my intent to analyze a speculative entry that has been precluded by the challenged conduct in this case"). Where no rivals exist, speculation that entry "might" have occurred is insufficient as a matter of

law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (holding speculative theories of antitrust harm are insufficient); *see Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (holding that courts must ensure that proffered expert opinion is not based on "belief or speculation"); *see also EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee J., concurring) (finding speculation is especially improper when provided by an expert). Plaintiffs' claims flout the law: they merely theorize about conceivable impairments of competition, but offer no claims to support any genuine issue of material fact regarding NASCAR's sanction agreements. *Dickson*, 309 F.3d at 207. Unsupported speculation is not sufficient to defeat a summary judgment motion. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

### 2. Charter Agreement Non-Competes

Plaintiffs' claims related to NASCAR's 2016 and 2025 Charter Agreement non-compete provisions suffer from the same fatal flaw as their claims about the racetrack sanctions. Plaintiffs have not provided facts showing that NASCAR's agreements with Teams harmed competition. Again, Plaintiffs' only assertions about these contracts rest in Dr. Rascher's Report. Dr. Rascher contends in Section 5.4 of his Merits Report that NASCAR's non-compete clauses in team Charter Agreements prevent premier stock car teams from participating in or supporting rival series, further reducing the contestability of the market and reinforcing NASCAR's monopsony power to the detriment of competition. Doc. 231-1 (Rascher Rep.) ¶¶ 220-225. But the opposite is true. When a Cup Series team owner did start a new racing series, he bought cars and hired drivers himself; he did not establish *teams*. Ex. 24, NASCAR-00006583 at -584 (█████████████████

████████████████████████████████████████████████████████████████████

███████). Thus, even in a but-for world with other racing series, there is no "market" for race teams as inputs. This undermines any showing of foreclosure of input supply. Indeed, Dr. Rascher does not and could not quantify how many viable non-charter suppliers exist. Ex. 10, Rascher Tr.

134:2-135:25. On this record, there is no demonstrated harm to the competitive process; a jury would have nothing to evaluate beyond unsupported expert *ipse dixit* and conjecture.

### B. Procompetitive Justifications Are Unrebutted And Dispositive

Even if Plaintiffs had adduced evidence of anticompetitive effects (they have not), Defendants have established legitimate procompetitive rationales that Plaintiffs have not refuted with any less-restrictive alternative that satisfies their burden under Step 3 of the rule of reason, dooming their Section 1 claim. *Am. Express Co.*, 585 U.S. at 541-42; *Alston*, 594 U.S at 100.

Defendants' expert economist, Professor Kevin M. Murphy, has provided a report replete with opinions about procompetitive rationales for both the sanction and Charter agreements. First, the track sanction agreements preserve the unique value proposition of NASCAR's Cup Series product, thereby encouraging racetracks and teams to invest in improvements and marketing that benefit the entire platform rather than dissipating value through duplicative offerings. *See* Doc. 231-4 (Murphy Rebuttal Rep.) ¶¶ 84-85, 114-115. These benefits enhance the quality and appeal of NASCAR events for fans, sponsors, and media partners alike. *See id.* ¶¶ 48-49, 72-73. This in turn improves competition, as it maximizes the overall value of the NASCAR Cup Series as a joint product, which is produced through the collaborative efforts of NASCAR, Teams, racetracks, drivers, and other stakeholders. *See id.* Similarly, the exclusivity provisions in the 2016 and 2025 Charter Agreements prevent freeriding on the goodwill, brand equity, and audience that NASCAR has built over decades of investment and innovation. *See id.* ¶¶ 80, 115. If Teams were permitted to simultaneously participate in stock car series that closely resembled the Cup Series, it would dilute the value of NASCAR's media rights, sponsorships, and fan engagement, undermining the incentives for NASCAR and its partners to invest in the sport, thereby weakening competition. *See id.* And the case law is clear: such justifications are procompetitive. *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 849 (5th Cir. 2015) ("[E]xclusive dealing agreements[]

frequently have procompetitive justifications, such as limiting free riding and increasing specialization."); *see also Indep. Ent. Grp., Inc. v. Nat'l Basketball Ass'n*, 853 F. Supp. 333, 339-40 (C.D. Cal. 1994) (holding that the NBA's exclusive agreements can be found procompetitive because they "prevent . . . free-riding").

Because Defendants provided facts demonstrating the procompetitive benefits of the challenged racetrack sanction agreements and the Charter exclusivity clauses, the burden shifts back to Plaintiffs to prove there are less restrictive means for achieving the same outcome. *Am. Express Co.*, 585 U.S. at 541-42. But Plaintiffs' record is silent on this issue. Dr. Rascher provides a one-paragraph retort in his reply Rebuttal Report that asserts he made allegations about a Section 1 violation in his Report. Doc. 231-14 (Rascher Rebuttal Rep.) ¶ 246. To show there are less restrictive means for achieving the same outcome, a plaintiff must show that "an alternative is substantially less restrictive and is virtually as effective in serving the legitimate objective without significantly increased cost." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1760d (2025). This establishes that the restraint is not reasonably necessary to achieve the stated legitimate objectives. *Id.* Plaintiffs did not offer any opinion whatsoever about an alternative less restrictive restraint to achieve the same legitimate ends, let alone opine on an alternative that would not increase costs. And Dr. Rascher confirmed this. He testified he could not offer any different language providing an alternative for the track exclusivity provision in the sanction agreements. Ex. 10, Rascher Tr. 329:7-11. Plaintiffs' failure to articulate *any* less restrictive means is dispositive on a motion for summary judgment, as there can be no genuine issue of material fact where there is no fact asserted.

## CONCLUSION

The Court should grant summary judgment against Plaintiffs' Section 1 and 2 claims.

Dated:  October 3, 2025                    Respectfully submitted,


                                           By:      /s/ Christopher S. Yates
                                                    Christopher S. Yates*
                                                    Ashley M. Bauer*
                                                    **LATHAM & WATKINS LLP**
                                                    505 Montgomery Street, Suite 2000
                                                    San Francisco, CA 94111
                                                    ashley.bauer@lw.com
                                                    chris.yates@lw.com

                                                    Lawrence E. Buterman*
                                                    **LATHAM & WATKINS LLP**
                                                    1271 Avenue of the Americas
                                                    New York, NY 10020
                                                    lawrence.buterman@lw.com

                                                    Anna M. Rathbun*
                                                    David L. Johnson*
                                                    Christopher J. Brown*
                                                    Christina R. Gay*
                                                    **LATHAM & WATKINS LLP**
                                                    555 Eleventh Street, NW, Suite 1000
                                                    Washington, DC 20004
                                                    anna.rathbun@lw.com
                                                    david.johnson@lw.com
                                                    chris.brown@lw.com
                                                    christina.gay@lw.com

                                                    Tricia Wilson Magee (N.C. Bar No. 31875)
                                                    **SHUMAKER, LOOP, & KENDRICK, LLP**
                                                    101 S Tryon Street, Suite 2200
                                                    Charlotte, NC 28280
                                                    Telephone: (704) 945-2911
                                                    Facsimile: (704) 332-1197
                                                    tmagee@shumaker.com


                                                    *Admitted *pro hac vice*

                                                    *Counsel for NASCAR and James France*

## <u>ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION</u>

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 3rd day of October, 2025.

*/s/ Christopher S. Yates*
Christopher S. Yates
Of Latham & Watkins LLP

# CERTIFICATE OF SERVICE

I certify that on October 3, 2025, a true and correct copy of the foregoing was served via Email on the below counsel of record for Plaintiffs 2311 Racing LLC d/b/a 23XI Racing and Front Row Motorsports, Inc. and Counter-Defendant Curtis Polk.

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

E. Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

Jeanifer E. Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Matthew R. DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com

Eric S. Hochstadt
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 W 52nd Street
New York, New York 10019
Tel: (212) 506-5282
ehochstadt@orrick.com

/s/ *Christopher S. Yates*
Christopher S. Yates