# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. | No. 3:24-cv-886-KDB-SCR <br><br> **PUBLIC FILING** |
| NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. | |

## NASCAR'S MEMORANDUM OF LAW IN OPPOSITION TO COUNTERCLAIM DEFENDANTS' <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Page

COUNTERSTATEMENT OF FACTS ................................................................2

LEGAL STANDARD.........................................................................................16

ARGUMENT .....................................................................................................16

I.      POLK, 23XI, FRM AND OTHERS ENGAGED IN CONCERTED ACTION...............16

        A.      Counterclaim Defendants Colluded In Violation Of Section 1 ............................16

                1.      The Evidence Of Collusion Is Overwhelming...........................................17

                2.      Polk Participated In, And Led, The Conspiracy .......................................22

                3.      Front Row Participated In The Conspiracy ...............................................23

                4.      Counterclaim Defendants' Obstruction Tactics Compel Strong
                        Inferences Of Collusion ..................................................................24

II.     COUNTERCLAIM DEFENDANTS' CONSPIRACY WAS
        ANTICOMPETITIVE ....................................................................................24

        A.      Polk, 23XI, And Front Row Engaged In *Per Se* Illegal Conduct .........................25

        B.      The Conspiracy Is Also Illegal Under A Rule-Of-Reason Analysis ....................26

                1.      The Conspirators Had Market Power .........................................................26

                2.      The Conspiracy Harmed Competition .......................................................29

III.    THE ILLEGAL CONSPIRACY CAUSED NASCAR ANTITRUST INJURY ..............32

# TABLE OF AUTHORITIES

## CASES

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010).............................................................................26

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
  256 F.3d 799 (D.C. Cir. 2001)...............................................................28

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979)...................................................................................19

*Columbia Broad. Sys. v. ASCAP,*
  620 F.2d 930 (2d Cir. 1980)..............................................................19, 21

*Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.,*
  605 F. Supp. 2d 870 (W.D. Ky. 2009)...............................................25, 31

*Cloverleaf Enters., Inc. v. Md. Thoroughbred, Horsemen's Ass'n,*
  730 F. Supp. 2d 451 (D. Md. 2010)..............................................25, 29, 31

*Compact v. Metro. Gov't of Nashville & Davidson Cty.,*
  594 F. Supp. 1567 (M.D. Tenn. 1984).....................................................25

*Cont'l Airlines, Inc. v. United Air Lines,*
  120 F. Supp. 2d 556 (E.D. Va. 2000) ......................................................25

*Duplan Corp. v. Deering Milliken,*
  594 F.2d 979 (4th Cir. 1979) ...................................................................22

*Fears v. Wilhelmina Model Agency,*
  2004 WL 594396 (S.D.N.Y. Mar. 23, 2004) ...........................................17

*Gelboim v. Bank of Am. Corp.,*
  823 F.3d 759 (2d Cir. 2016).....................................................................32

*Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.,*
  386 F.3d 485 (2d Cir. 2004).....................................................................16

*Global Music Rights v. Radio Music Licensing Comm.,*
  No. 16-cv-9051 (C.D. Cal. Dec. 5, 2019) ...........................................21, 26

*In re High Fructose Corn Syrup Antitrust Litig.,*
  295 F.3d 651 (7th Cir. 2002) ...................................................................18

*In re High-Tech. Emp. Antitrust Litig.,*
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................25

*In re Int'l Rate Swaps Antitrust Litig.*,
    351 F. Supp. 3d 698 (S.D.N.Y. 2017) ............................................................18, 23

*In re Loestrin 24 Fe Antitrust Litig.*,
    433 F. Supp. 3d 274 (D.R.I. 2019) .........................................................................29

*In re Multiplan Health Insurance Provider Litig.*,
    MDL No. 3121 (N.D. Ill. Mar. 27, 2025) ...............................................................18

*In re Online DVD Rental Antitrust Litig.*,
    2009 WL 4572070, (N.D. Cal. Dec. 1, 2009) ........................................................35

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    714 F. Supp. 3d 65 (E.D.N.Y. 2024) .....................................................................27

*In re Pork Antitrust Litig.*,
    No. 18-cv-1776 (D. Minn. Oct. 1, 2024), Doc. 2616..............................................17

*In re Southeastern Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ................................................................................32

*In re Titanium Dioxide Antitrust Litig.*,
    959 F. Supp. 2d 799 (D. Md. 2013) ......................................................................28

*Jacobs v. N.C. Admin. Off. of The Courts*,
    780 F.3d 562 (4th Cir. 2015) ...........................................................................16, 28

*JTH Tax, Inc. v. H&R Block Eastern Tax Serv.*,
    28 F. App'x 207 (4th Cir. 2002) ............................................................................33

*Matsushita Elec. Indus. v. Cinram Int'l*,
    299 F. Supp. 2d 370 (D. Del. 2004) ......................................................................20

*Meredith Corp. v. SESAC*,
    1 F. Supp. 3d 180 (S.D.N.Y. 2014) .......................................................................20

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ..............................................................................................16

*Mr. Dee's Inc. v. Inmar, Inc.*,
    2022 WL 825995 (M.D.N.C. Mar. 18, 2022) ..................................................16, 27

*N.C. State Bd. of Dental Examiners v. FTC*,
    717 F.3d 359 (4th Cir. 2013) ...........................................................................16, 17

*Olson Farms, Inc. v. Safeway Stores, Inc.*,
    649 F.2d 1370 (10th Cir. 1979) .......................................................................17, 23

*Plymouth Dealers Ass'n of N. Cal. v. United States*,
  279 F.2d 128 (9th Cir. 1960) ................................................................................18

*Rossi v. Standard Roofing, Inc.*,
  156 F.3d 452 (3d Cir. 1998)...................................................................................17

*Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*,
  2014 WL 407446 (D. Idaho Jan. 24, 2014), aff'd, 778 F.3d 775 (9th Cir. 2015) ...................27

*SD3, LLC v. Black & Decker*,
  801 F.3d 412 (4th Cir. 2015) .........................................................................18, 25

*Sitts v. Dairy Farmers of Am., Inc.*,
  417 F. Supp. 3d 433 (D. Vt. 2019).........................................................................27

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ...............................................................................35

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ...............................................................................27

*Team Cam, LLC v. Reliable Contracting*,
  2025 WL 1019262 (D. Md. Apr. 4, 2025).............................................................25, 32

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) (J., Sotomayor)..........................................................17

*United States v. Socony-Vacuum*,
  310 U.S. 150 (1940).............................................................................................21

*United States v. Charlotte-Mecklenburg Hosp.*,
  248 F. Supp. 3d 720 (W.D.N.C. 2017) ..................................................................26

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973).............................................................................................17

*United States v. Hayter Oil Co.*,
  51 F.3d 1265 (6th Cir. 1995) ...............................................................................22

*United States v. SKW Metals & Alloys, Inc.*,
  195 F.3d 83 (2d Cir. 1999)...................................................................................21

*United States v. Trenton Potteries Co.*,
  273 U.S. 392 (1927).............................................................................................29

*Van Winkle v. Rogers*,
  82 F.4th 370 (5th Cir. 2023) ................................................................................24

*Worley Claims Servs. v. Jefferies*,
    429 F. Supp. 3d 146 (W.D.N.C. 2019) ...................................................................16

*Yeager's Fuel v. Pa. Power & Light Co.*,
    953 F. Supp. 617 (E.D. Pa. 1997) .........................................................................28

**STATUTES**

15 U.S.C. § 1 ...................................................................................................... *passim*

**RULES**

Fed. R. Civ. P. 56(a) ...........................................................................................16

NASCAR's counterclaim easily defeats summary judgment because the evidence shows a coordinated campaign—organized and enforced by Curtis Polk—to fix prices, choke-off individual bargaining, and deploy boycotts, press campaigns and other "action steps" to coerce NASCAR into paying far more than 100% of the increase in its new media contracts. There was not just joint negotiations as Counterclaim Defendants wrongly assert. They agreed to "band together," to "████████████████████," and to "create a shadow committee that creates negotiating leverage." Polk was the driving force behind this effort. He boasted that "WE are united, WE are organized, WE have a plan." He called it a "myth" that the Teams "have no leverage" and preached that "16 Teams together are stronger than NC." He wielded that power against NASCAR, touting that he "████████████████████████████████████," including to "stop bargaining and take action steps." He coordinated a boycott of a major meeting, which his co-owner Denny Hamlin leaked to the press in advance: "████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████" This is classic concerted action to restrain trade: fixing starting terms, policing defections, and executing group refusals to deal until NASCAR paid more.

It worked. Faced with mounting collective pressure, including intentional interference with NASCAR's negotiation of broadcast rights, NASCAR offered larger payments in October 2022, in February 2023, again in November 2023, and ultimately resulting in NASCAR paying ████% of its increased media rights fees in 2025 to Teams—meaning NASCAR and the tracks received less than they did in 2024, despite earning higher broadcast fees. Polk's "████████" was "██████████████████████████████" records show. This evidence establishes genuine disputes of material fact as to a *per se* unlawful conspiracy, and, at the very least, amounts

to a rule-of-reason violation given the coordinated suppression of individual competition, market power wielded through unanimity, and supra-competitive payments extracted from NASCAR. The law condemns the conspiracy that Polk orchestrated and which 23XI and Front Row agreed to. Indeed, Polk's separate counsel has argued that similar practices are "plainly anticompetitive" and "per se illegal under Section 1," elsewhere. Summary judgment must be denied.

## COUNTERSTATEMENT OF FACTS

The 2025 Charter agreements increase NASCAR's payments to Cup Series Teams by $▮ million in 2025. Doc. 216-11, Hansen R. ¶ 48. That increase captures ▮% of the increase in 2025 revenue from NASCAR's most recent broadcast deals. *Id.* ¶ 62. In other words, NASCAR and tracks will make *less* money in 2025 than they made in 2024, while the Teams will make substantially more. *Id.* ¶ 65. NASCAR has projected it will ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮, despite higher broadcast revenues. Doc. 216-11 at ¶ 65. Polk and his collusive efforts were credited for this massive pay increase. *See, e.g.*, Ex. 60, at -670; Ex. 62, at -856; Ex. 85, at -508.

When Polk became a minority owner of a NASCAR Team in 2020, he had no racing experience, he "▮▮▮▮▮▮▮▮▮▮▮▮" at all, Ex. 10, at -972, and he considered NASCAR to be "boring as shit," Ex. 9, at -839; Ex. 5, at -379. But he "like[s] to invest money if it makes economic sense and looks like it has large potential upside." Ex. 10, at -972. 23XI quickly surpassed his profitability projections. Ex. 120, Jordan Tr. 61:6-14; Ex. 121, Lauletta Tr. 153:2-154:16, 156:14-157:18. Halfway through his first season Polk was already disinterested in issues like the Next Gen car; his focus was: "▮▮▮▮▮▮▮▮▮▮" Ex. 16, at -900.

23XI co-owner Denny Hamlin had an idea: ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 15, at -174. 23XI's Steve

Lauletta was concerned that ███████████████████████████████████████████████
and not ██████ as he thought they had in the past. Ex. 14, at -583. He hoped ████████████
████████████████████████████████████████████████ *Id.* Hamlin was
██████████████████ *id.*, and thought Polk could ██████████████████████, Ex. 15, at -174.

They scheduled a call with Race Team Alliance ("RTA") Chairman Rob Kauffman to
strategize. *Id.* Kauffman provided advice to Polk ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ .

Polk and Kauffman quickly expanded their conversation about "████████████" and what
became the Team Negotiating Committee (or "TNC") was formed. Ex. 17, -604. By fall 2021,
the group was making proposals about "████████████████████████████████████
████████████████████████" Ex. 22, at -891. Polk's view at that time was "████████████
████████████████████████████████████████████████████████████
████████" *Id.* at -889. Lauletta proposed they "████████████████████████████████
████████████████████████" *Id.* at -891. Three years later, the 2025 Charter signers
captured ██████% of the increase from the media rights deal. Doc. 216-11 at ¶¶ 29, 62.

The TNC met privately from November 2021 to February 2022 to ████████████████████
████████████████████████████████████████████████████████ " Ex. 24,
at -589; Ex. 25, -620. Their initial plan was to demand that NASCAR "████████████████
████████████████████████████████████████████████████████████
████████████████████████ " Ex. 23, at -192. They did not present this demand to NASCAR,

but they ultimately achieved exactly that:  NASCAR's 2025 payments under the Charter will be $███ million in 2025, growing to ███ million by 2031.  Doc. 216-11, Attach. 7.

Six Teams met ahead of the February 2022 Daytona 500 to discuss their plan.  Polk drafted a speech for Michael Jordan to give, emphasizing that "████████████████████████████ ████████████████ ██████████████████████████████."  Ex. 26, at -484.  Polk gave his own speech that walked through the financial ask and proposed to "[a]gree on the outline of a Plan," "[f]orm a negotiating committee," and "[c]reate a shadow committee that creates negotiating leverage.  THE NEED FOR LEVERAGE (THE STICK)," and if we "all band together we can get positive results."  Ex. 10, at -986 to -987.  Polk "████████████████████████ ████████████████████████████████████████████████."  Ex. 27, at -053.  Polk began referring to this group as ████████████████████████████ ██████████████████████████████."  Ex. 41, at -957.

The TNC met with NASCAR for the first time in March 2022.  At that time, the group's true intentions were not known to NASCAR.  They referred to themselves as the "Rights Group," and told NASCAR that they wanted "████████████████████████████████ ████████████████████████████.  Ex. 30, at -748; Ex. 29, at -080.

But when the TNC reported back at an RTA meeting on April 5, 2022, their message was very different.  Polk said "██████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████," Ex. 31, at -169.

Polk and the TNC returned to the RTA on June 21, 2022, with an updated proposal increasing their demand to $███ million in 2025, "████████" the 2024 payout.  Ex. 33, at -901,

---

[1]    Front Row disputes Polk's role in Jordan's prior business ventures.  Ex. 18, at -805.

-903. That deal would have given Charter holders over ▮% of the media-revenue increase NASCAR achieved in 2025,[2] despite Lauletta believing ▮% would have been reasonable. Ex. 22, at -891. It would have bankrupted NASCAR. Doc. 196-16, Phelps Tr. 130:12-133:2. Polk's emails show that he believed it was critical that "████████████████████" to this demand. Ex. 35, at -619. Polk gave another speech emphasizing unity. One Team representative reported after the meeting that "████████████████████████

████████████████████████████

██████████████." Ex. 36, at -105. Others wrote "████████████████

████████████████████████████

███████████████████████. Ex. 35, at -616.

The TNC presented the $▮ million proposal to NASCAR the next day (June 22, 2022), after editing ██████████████████████████████

█████████████." Ex. 35, at -616. Polk wanted that addition "████████

██████████" *Id.* In case NASCAR called any Teams, the TNC circulated "██████

█████████████████." Ex. 37, at -094.

In response to the Teams' proposal, NASCAR Directors Jim France and Lesa France Kennedy met with the Teams individually to communicate that they "██████████████

██████████████████████" and to encourage the Teams to deal with NASCAR directly, saying, "████████████████████████████." Ex. 43, at -341.

France's attempt to deal directly with Teams enraged Polk, as he viewed it as a challenge to the leverage he was creating. He wrote to the TNC members, RTA Director Jonathan Marshall,



---

2 ████████████████████████████████████

████████████████

and Kauffman, "███████████████████████████████████████████████

███████████████████." Ex. 42, at -960. He and the other TNC members threatened that

"███████████████████████████████████████████████

███████████████████████." Ex. 43, at -340. The TNC then demanded that

NASCAR submit a specific counterproposal by August 29, 2022, or else the TNC would begin

taking "action steps" to harm NASCAR. Ex. 42, at -960; Ex. 49, at -217 to -218.

Right before that arbitrary deadline, Polk convened a meeting ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ Ex. 43, at -341. Polk's texts show that he received agreement.

He texted Michael Jordan that "███████████████████████████████████." Ex.

44, at -899. To align the Teams, he "███████████████████████████████████

███████████████████████████████████████████████

████████████████████" *Id.*

Armed with unanimity from the Teams, Polk threatened NASCAR's negotiators about the

consequences of seeking to go around him and the TNC, saying: "you all asked owners to get us

to stand down. We got the owners to vote 16-0 that it's within the TNC's discretion to stop

bargaining and take action steps without going back to the owners." Ex. 45, at -121. Polk told

NASCAR, "you have days not weeks." *Id.* The TNC then set out on a "██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████." Ex. 46, at -086 to -087.[3] This was the start of what Teams would call Polk's "████████

████" which they lauded as effective at obtaining their negotiation demands. Ex. 62, at -856.

NASCAR submitted its first offer to the Teams in October 2022. At that time, NASCAR was still negotiating its media rights deals and did not know how much media rights revenue it would earn during the 2025 Charter term. So, NASCAR made a contingent offer and proposed the ████████████████████████████████████████████

████████████████████████████ Ex. 50, at Slide 12. If the media deals included ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████. *Id.* at Slide 15.

Many Teams were excited about NASCAR's offer of ████████ per Charter in 2025 and were prepared to move forward at that number, but Polk intervened. Polk texted Jordan that ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

To ensure no Team expressed any statement of acceptance to NASCAR, the TNC repeatedly emphasized the need for unity among the Teams. For example, the TNC met with every Team to "████████████████████████████████████████████

---

[3] 23XI withheld a version of these talking points as "████████████████████████████████████████

████████████████████." Ex. 47, 23XI Priv000680 (Sept. 25, 2022). Thus, according to 23XI, it was already shaping its communications with the expectation of litigation as early as September 2022.

████████████████████████████████████████████.” Ex. 53, at -006 to -007; Ex. 54, at -811 ("████████████████████████████████████████████████████

████████████████████████████"); Ex. 55, at -525; Ex. 56, at -905.

When NASCAR tried to meet with Teams individually, the TNC (led by Polk) sought to harm NASCAR in the press to interfere with NASCAR's media rights negotiations. NASCAR had asked Polk to maintain "harmony" in the press during NASCAR's ongoing media-rights negotiations, but Polk called the request "BS," and wrote: "let me tell you what's going to happen. Action steps that Jim doesn't like," and "then there will be more action steps and more and eventually [Jim France] will realize WE are united, WE are organized, WE have a plan and he will see that without giving us something meaningful the lack of harmony will harm him eventually." Ex. 7, at -970. Polk's series of "action steps" included ████████████████████████

██████████████████. *See* Ex. 69, at -627. Polk called these "████████████" and wrote that ████████████████████████████████████████████████ Ex. 58, at -043. He thought—and told others—that his tactics would cause NASCAR to pay Teams more. Ex. 48, at -145 █████████████████████████████████████████████████████

█████████ Polk told the Teams this approach and their unity ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ Ex. 54, at -812.

In February 2023, faced with additional TNC threats, NASCAR capitulated and offered even more money to the Teams. NASCAR's February 2023 proposal increased 2025 payments from ████████████████████████████████████████████████

████████████████████ Doc. 216-54 at -653; Ex. 61, at -068



).[4]  After seeing the offer, Teams told the TNC they were "███████

████████████████████" Ex. 62, at -856.  Rob Kauffman (RTA) emphasized "████████

████████████████████" Ex. 60, at -670.  But he also encouraged continued

steps by the TNC to "████████████████████

████████████████████

████████████████████." Ex. 61, at -065, 075.

The TNC sent a proposal to NASCAR on February 23, 2023 that stated it would ███████

████████████████████

████████████████████

████████████████████

████████████████████

████████████████.

NASCAR responded in March 2023 agreeing with many of the TNC's demands.  Ex. 64.

Importantly, however, NASCAR said ████████████████████

████████████████████

████████████████████

████████████████████

████████████████." *Id.* at -110.

The TNC's tactics at obtaining higher pool payments emboldened Teams to exercise their

collective muscle for more.  The TNC resolved ████████████████." Ex. 65, at -465.

A Team Owner Council ("TOC") meeting was scheduled with NASCAR for a few days later, and

---

[4]      If this offer was adjusted for the actual broadcast revenue NASCAR later secured, it would

have been ████████ in 2025.

Kauffman recommended that the Teams use the meeting to discuss Charter terms with NASCAR. Ex. 66, at -073. During the meeting, Kauffman then wrote, ██████████████████████████████████ ██████████████" *Id.* at -076. Polk responded, "████████████████████████████████ ████████████████████████████████████" *Id.* at -077. Kauffman remarked this was ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████ *Id.*

That same afternoon, Jerry Freeze of Front Row wrote to another Team that "████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████." Ex. 67, at -893. The next morning, Hamlin leaked to a reporter that "████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████" Ex. 68, at -403.

Polk used this boycott to force NASCAR to deal exclusively with the TNC. In the face of this boycott, NASCAR tried to reach out to Teams individually. But when the TNC heard that NASCAR was "████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████." Ex. 70, at -089 to -090. Kauffman cautioned that NASCAR ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████." Ex. 71, at -973. The TNC knew it did not have to stop individual meetings from happening; it was enough for Jim France to "██████████████████████████████████████████

.” Ex. 74, at -109. ██████████████████████████████████████████████

████████████████████████████ Ex. 78, at -538.

Meanwhile, NASCAR was trying to secure the revenue to pay the Teams from broadcasters. Polk's strategies of projecting disharmony in the press made that more difficult. *See* Doc. 216-12, Desser Report ¶¶ 12-13; Ex. 122, Herbst Tr. 234:1-240:22; Ex. 126, Bazant Tr. 74:12-77:12. But by October 2023, NASCAR was beginning to get a better sense of its potential media rights revenue and so told the Teams that ████████████████████████ ████████████████████████████████████████.” Ex. 82, at -088. But as to "permanent" Charters, NASCAR communicated that "████████████████████ ████████████████████████████████████████████████.” *Id.* The Teams reported that they were "████████████" with that feedback, "████████████████████ ████████████████████████████████████,'" and Jerry Freeze thought "████████████████████████████████████████████████████ ████████████████████████████" *Id.* Marshall circulated feedback that ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████" Ex. 83, at -979.

NASCAR then put that proposal in writing in November 2023. Ex. 84, at -732. NASCAR increased the potential upside for the Teams if the media revenues came in higher, but also presented scenarios of 2025 payments between ████████████████████ if the media rights came in lower. *Id.* at -736. ████████████████████████████████ ████████████████████████ that NASCAR ultimately achieved. Doc. 216-11 at ¶ 29. Marshall reported that ████████████████████████████ ████████████████████████████████████████████████

█████████████████████████████." Ex. 85, at -508.

Believing it had made a substantial offer to the teams on what it had been told mattered the most (more money), NASCAR thought it was close to getting a deal done. But on December 11, 2023, Marshall told NASCAR's Steve O'Donnell to "████████████████████████████ █████████████████████████████" Ex. 86, at -808 (emphasis added). The RTA then reported that the "███████████████████████████████ ███████████████████████████████████ ███████████████████████████████ ████████████████." Ex. 87, at -883. On December 22, 2023, the TNC called NASCAR's Phelps and O'Donnell and described the TNC's "████████████████ ███████████████████████████████████ ███████████████████████████████ █████████████████" Ex. 88, at -965. The TNC told NASCAR that it was "█████████ ██████████████████████████████████" *Id.*

NASCAR sent a draft Charter through the TNC in December 2023. The pool payments in that draft were ████████████████████████████████████ ██████████████████████████████. Ex. 131, Phelps Tr. 137:20-138:8; Doc. 216-11 at ¶ 62. Teams "████████████████████████." Ex. 105, at -962; Ex. 95, at -861.

Polk and the TNC still wanted more. Polk had them fixated on the idea of permanent Charters. Freeze wrote that "████████████████████████████████ █████████████████████████." Ex. 82, at -088. And Polk had made a █████████████████████████████████████████. Ex. 4, at -302. But perhaps "███████████████████████████████████████." Ex. 85, at

-508. So, Polk and the TNC continued to look for opportunities to leverage their unanimity.

The Teams saw their next opportunity to flex collective muscle in January 2024, when NASCAR offered them the opportunity to extend the window during which the Teams and NASCAR would exclusively negotiate with each other. Polk and the TNC saw this as " ███████ ████████████████████████████████████ ," Ex. 91, at -469, and planned to " ████████ ████████████████████████ ." Ex. 89, at -095. The TNC members told all RTA members that they " █████████████████████████████████████████████████████████ ████████ ," Ex. 92, at -146. One Team owner wrote that he " ███████████████ " when he heard that proposal, but Lauletta explained that the act would █████████████████████████████ ████████████████████████████ " Ex. 92, at -146. And ███████████████████████ ████████████████████████ ." Ex. 95, at -860. Polk and others thought this united act " █████████████████████████████████████ ." Ex. 94, at -197; Ex. 90, at -426.

After jointly refusing the extension, the TNC again united the Teams behind a common agenda in any individual meetings with NASCAR. The TNC discouraged Teams from taking meetings that NASCAR requested. Ex. 93, at -865. And the TNC told Teams ████████████████ ███████████████████████████████████ " *Id.* The TNC also told Teams ████████████ ███████████████████████████████████████████ ," Ex. 94, at -195, █████████████ ████████████████████ " and █████████████████████████████████████████████ ████████████████████████████████████████████ ." *Id.* at -198. The Teams reached an " █████████████████████████████████████████████ ." Ex. 96, at -735.

Having achieved the pool payments they wanted, the TNC sought to tackle the next ████████████████████████████ (or how the Team's funding was allocated between fixed payments and race purses). Ex. 85, at -508. ███████████████████████████████████



. Doc. 216-1 at ¶ 72. After collectively discussing a split, and agreeing on it amongst themselves, the TNC proposed to ████ ████████████████████████████████████████████ . Ex. 108, at -663; Ex. 99, at -757.[5] Polk described at the time that ██████████████████████████████████████ ███████████████████████████████." Ex. 102, at -669. 23XI and Front Row joined in the proposal. Ex. 102, at -041; Ex. 107, -041; Ex. 108, at -666. The Charter "████ ████████████████████████████" Ex. 141, at -364; Doc. 216-11 at ¶ 34.

Even after the revenue and allocation were largely resolved, the TNC continued to keep the Teams aligned as they negotiated on other terms. For example, the TNC gave Teams scripts emphasizing four points and language to cut-and-paste to NASCAR when it tried to meet with Teams. Ex. 103, at -197; Ex. 137, at -065. Half the Teams refused to meet, and those that met confirmed they were "████████████████████████████ . Ex. 104, at -871.

Eventually, some Teams began to tire of the TNC's tactics. In April 2024, one Team told Marshall that ████████████████████████████████████████ ████████████████████████████████████." Ex. 105, at -962. After receiving NASCAR's late May 2024 Charter draft, a Team found the offer "seriously fair." Ex. 6, at -410. Even 23XI and Front Row found the December 2023 and May 2024 draft Charter terms attractive enough to sign-up to purchase an *additional Charter* each. Docs. 196-34; 196-35;

---

[5]    Jenkins had previously expressed concern that "████████████████████ ████████ Ex. 12, at -579.

52-10; 178-6, at -885. Polk testified that it was █████████████████████████████

██████████████████████████████████. Ex. 125, Polk Vol. 2 Tr. 68:11-69:13.

After NASCAR sent a draft Charter on August 14, 2024, Freeze sensed some Teams "██

██████" and planning to sign-up for the Charter. Ex. 110, at -197. By August 26, 2024, the TNC

had "█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████."

Ex. 114, at -163. All Teams knew by August 30 when NASCAR sent another draft, that NASCAR

was requesting an executed Charter by September 6. Ex. 121, Lauletta Tr. 140:5-142:22; Doc. 31-

4 ¶ 47. And by September 4, 2024, the "█████████████████████████████████

█████████████████████████" Doc. 178-14 at -200, which happened, Doc. 178-15, at -901.

NASCAR gave 23XI and Front Row two weeks after September 6 to decide whether to

sign. Ex. 142, Lauletta (30(b)(6)) Tr. 11:1-8 ("████████████████████████████

████████████████"); Doc. No. 21-2 ¶ 33 ("██████████████████████████████");

Doc. 31-4 ¶¶ 52-55. But, after 23XI-owner Hamlin and Front Row-owner Jenkins texted to "██

████████████████████, neither did. Ex. 111, at -483; Ex. 112, at -484.

Of course, the Teams did not get everything they wanted in the 2025 Charter. Neither did

NASCAR. But as Jonathan Marshall reflected on the negotiation outcome, ████████████████

█████████████████████████████████████." Ex. 115, at -142.

23XI's paid expert did not identify any higher payment the Teams should have received in 2025.

Ex. 135, Rascher Tr. 335:20-25. And after the 2025 Charter went into effect, one sold for

███ more than 23XI paid only a few months earlier. *Id.* at 249:1-21; Ex. 3, May 2025 Ware Decl.

¶ 27; Ex. 2, Oct.2025 Ware Decl.

## LEGAL STANDARD

Summary judgment is only proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light move favorable to the nonmoving party," *Worley Claims Servs. v. Jefferies*, 429 F. Supp. 3d 146, 152 (W.D.N.C. 2019), and "cannot weigh the evidence or make credibility determinations," *Jacobs v. N.C. Admin. Off. of The Courts*, 780 F.3d 562, 569 (4th Cir. 2015).

## ARGUMENT

The evidence presented here, and far more available for trial, satisfy the Section 1 elements by showing "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade.'" *N.C. State Bd. of Dental Examiners v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013).

## I. POLK, 23XI, FRM AND OTHERS ENGAGED IN CONCERTED ACTION

Counterclaim Defendants' Motion conflates legally distinct concepts of whether an agreement existed, and whether it was an unreasonable "restraint." Doc. 216 at 18. This failure to address the first element may be read as a concession that an agreement is sufficiently shown. *See Mr. Dee's Inc. v. Inmar, Inc.*, 2022 WL 825995, at *4 (M.D.N.C. Mar. 18, 2022). But because Counterclaim Defendants aim their "restraint" arguments at a counterfactual strawman, NASCAR will first discuss the conspiracy and the evidence that fully supports it.

### A. Counterclaim Defendants Colluded In Violation Of Section 1

A Section 1 conspiracy may be established by showing a "common design and understanding," "meeting of the minds," or "conscious commitment to a common scheme" among two or more parties. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). "Specific intent to restrain trade is not required." *Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 507 (2d Cir. 2004). "Acquiescence in an illegal scheme is as much a violation of the Sherman

Act as the creation and promotion of one." *Olson Farms, Inc. v. Safeway Stores, Inc.*, 649 F.2d 1370, 1374 (10th Cir. 1979).

### 1. The Evidence Of Collusion Is Overwhelming

There is direct evidence that Polk facilitated, and 23XI and FRM participated in, a conspiracy on the prices to demand and accept from NASCAR, the allocation of those payments to favor themselves (rather than Open Teams or drivers), not to deviate from fixed terms, and to boycott and take other coercive joint conduct to compel those outcomes. *See supra* pp.2-15.[6]

Counterclaim Defendants' argument that they merely "offer[ed] joint negotiations" as one "option," Doc. 216 at 19-20, is false. From the very outset, Polk and others' plan was not just to present a joint "option," but to get "███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████" Ex. 15, at -174. Polk told Teams to "██████████████ ██████████████████████████████████████████████████████████████." Ex. 4, at -304. Polk initially tried to hide from NASCAR that the TNC was choking off Teams' individual

---

[6] To establish a conspiracy, plaintiffs need not produce proof of a formal, written agreement to restrain trade or even direct evidence of such an agreement. *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998). Indeed, "circumstantial evidence is the lifeblood of antitrust law." *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973). Here, in addition to direct evidence of collusion, there is ample "circumstantial evidence" that the Court may rely on. *N.C. State Bd.*, 717 F.3d at 372-73. And Polk's warning that "████████████ ██████████████████████████████████" Ex. 77, at -144, is exactly what courts rely on to find a conspiracy. *See Fears v. Wilhelmina Model Agency*, 2004 WL 594396, at *10 (S.D.N.Y. Mar. 23, 2004) (finding it "difficult . . . to escape" inference of conspiracy with documents referring to "committing suicide, if we do not stick together" and warning against "not sticking together").

Further, courts and antitrust regulators have observed that information exchange "is an example of a facilitating practice that can help support an inference of a price-fixing agreement *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (J., Sotomayor); Dep't of Justice, Statement of Interest, *In re Pork Antitrust Litig.*, No. 18-cv-1776 (D. Minn. Oct. 1, 2024), Doc. 2616. Here, sensitive information about acceptable prices, costs, driver contracts, and negotiating positions flowed freely and in abundance via the RTA. Ex. 132, Marshall Tr. 115:7-22, 116:15-24, 126:24-127:13.

decision making (as his Motion tries to do) by not "███████████████████████████
████████████████████████████████████████████████████████████████
████████." Ex. 140, at -168. Internally, however, they admitted ████████████████
███████████████████" *Id.* And eventually they demanded, and forced with boycotts, negotiations
through the TNC. *See, e.g.*, Ex. 68, at -403 ("█████████████████████████████
████████████████"); Ex. 45, at -121.

Counterclaim Defendants' argument that some Teams met individually with NASCAR is legally meaningless. "Commercially sophisticated parties like the defendants could well understand the red flags that would be raised from a blanket, total refusal to negotiate." *SD3, LLC v. Black & Decker*, 801 F.3d 412, 427-28 (4th Cir. 2015). And "[c]onspiracies, particularly when alleged among a large group, are not always tidy and symmetric" and each conspirator's "techniques and stratagems" need not be "entirely overlapping." *In re Int'l Rate Swaps Antitrust Litig.*, 351 F. Supp. 3d 698, 706 (S.D.N.Y. 2017) (citation omitted). The Department of Justice has even taken the position that "there can be concerted action subject to Section 1 in setting the starting points of prices even if the conspirators have some discretion in choosing how often to follow them." Dep't of Justice, Statement of Interest at 5, *In re Multiplan Health Insurance Provider Litig.*, MDL No. 3121 (N.D. Ill. Mar. 27, 2025); *see also Plymouth Dealers Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002).

The evidence also heavily disputes whether any individual meetings involved bargaining on material economic terms, or merely repetition of the TNC's fixed messaging. Polk's explicit strategy was to "██████████████████████████████████████████
████████████████████████████████████████████████████████."

Ex. 77, at -144. Polk " ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ " Ex. 72, at -514. Polk and others *also* expressly " █████████████████ " with

NASCAR at times. Ex. 93, at -685; Ex. 132, Marshall Tr. 122:8-15. And Teams, including Front

Row, ████████████████████████████████████████ . *See* Ex. 104, at -871; Ex. 97, at -867.[7]

      This record bears no resemblance to the blanket-music license cases on which

Counterclaim Defendants rely. *See* Doc. 216 at 18-19. The defendants in those cases were sued

by the Department of Justice for repeatedly violating Section 1 and subjected to consent decrees

"that imposed tight restrictions" on their operations, including "guarantee[ing] the legal

availability of direct licensing" and eliminating all "practical impediments preventing direct

dealing." *BMI v. CBS*, 441 U.S. 1, 11-12 (1979) (citation modified). The consent decrees also

established rate courts to prevent music licensors from engaging in pricing abuses and prohibited

any "interfering with the rights" of the individual copyright holders. *CBS v. ASCAP*, 620 F.2d

930, 933 (2d Cir. 1980) (citation modified). Even Polk's separate counsel has argued elsewhere

that, in those exact cases, "arrangements that would otherwise plainly be condemned as naked

restraints of trade amongst horizontal competitors have survived judicial scrutiny in large part

because of the conduct-regulating antitrust consent decrees." Pls.' Opp'n at 1, *Meredith Corp. v.

SESAC, LLC*, 09-cv-9177 (S.D.N.Y. Sept. 27, 2013), Doc. 132. He argued, where those protective

decrees are absent, and the licensor engaged in practices that interfered with "direct licensing," the

---

[7]    There is no evidence any Team bargained on pool payments in defiance of the TNC. That
is noteworthy because ████████████████████████████████████████████

████████████████████████████████ Ex. 57, at -363.

practices are "plainly anticompetitive" and "*per se* illegal." *Id.* at 26. The court denied summary judgment in that case. *See Meredith Corp. v. SESAC*, 1 F. Supp. 3d 180, 213-14 (S.D.N.Y. 2014).

The same result should apply here. There are no government commitments like those in *BMI*, *CBS*, and *Buffalo Broadcasting*.[8] And the conspiracy was aimed directly at interfering with individual dealing that was essential in those cases, including agreeing to "█████████████████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████" Ex. 42, at -960. When Polk perceived NASCAR as seeking to deal with Teams directly, he obtained agreement that "██████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████" Ex. 43, at -341, "got the owners to vote 16-0" that the TNC could "stop bargaining and take action steps," Ex. 45, at -121, convinced the Teams to boycott a negotiation extension to "████████," Ex. 91, at -469; Ex. 92, at -146; Ex. 90, at -425; Ex. 95, at -860 to -861; and convinced all Teams to boycott a contractually required meeting, Ex. 66, at -075 to -078; Ex. 67, at -893; Ex. 68, at -403. Hamlin explained that the TOC boycott, in particular, was intended █████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████." *Id.* Counterclaim Defendants' argument that this record indisputably shows NASCAR was "free to negotiate terms individually" is disingenuous. Doc. 216 at 18.

Counterclaim Defendants' contention that NASCAR "voluntarily engaged in joint negotiations with the TNC," Doc. 216 at 9, is also heavily disputed and irrelevant anyway. NASCAR did not want to be held hostage by the Polk-facilitated collusive conduct, as the record

---

[8]       Government commitments against collusion were also present in the *Matsushita* case Counterclaim Defendants rely on. Doc. 216 at 19 (citing 299 F. Supp. 2d 370, 375 (D. Del. 2004)).

clearly shows. The RTA's Director testified that "███████████████████████████████████████ ██████████████████████████████████████." Ex. 132, Marshall Tr. 68:3-7. Polk's own writings admit that NASCAR "████████████████████████████████." Ex. 45, at - 121. The TNC *knew* NASCAR did not want to deal through the TNC, but the TNC coerced it. Ex. 42, at -961 ("████████████████████████'"); Ex. 43, at -341 ("██████████████████████████ ████████████████████"); Ex. 75, at -379 ("███████████████████████████████████"). Moreover, even the authority that Counterclaim Defendants cite notes that "[i]f competing sellers fix the prices of their products, they violate § 1 no matter how much a buyer may prefer accepting their fixed price to negotiating with each." *CBS*, 620 F.2d at 935.

The fact that 13 teams signed a Charter in September 2024, after years of collusive conduct, does nothing to disprove the fact that a conspiracy existed prior to that date. This only shows that the massive pay increase, which was, ████████████████████████████████████████ was compelling. Ex. 138, at -823. Even if they had not achieved that outcome, the ultimate signing would not eliminate the existence of a prior conspiracy. The Department of Justice has taken the position when faced with similar arguments that "whether the conspiring competitors were successful in convincing customers to make purchases at their agreed price would be irrelevant to the question whether there had been a Section 1 violation," because "a conspiracy to fix price violates § 1 of the Act [] no matter whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other." Dep't of Justice, Statement of Interest at 13, *Global Music Rights v. Radio Music Licensing Comm.*, No. 16-cv-9051 (C.D. Cal. Dec. 5, 2019), Doc. 111 ("GMR Statement of Interest"). Counterclaim Defendants' argument wrongly "conflates the requirement that there be an *agreement* to fix prices with the *successful execution* of that agreement." *Id.* at 12; *United States v. Socony-Vacuum*, 310 U.S. 150, 224 n.59 (1940); *United*

*States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 92 (2d Cir. 1999) ("Entry into an agreement to fix prices—even if the implementation of such an agreement is unsuccessful—is the illegal conduct under the Sherman Act, 15 U.S.C. § 1."); *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1273 (6th Cir. 1995) ("the success of a price-fixing agreement is irrelevant").

### 2.  Polk Participated In, And Led, The Conspiracy

Polk's argument that he did not participate in the conspiracy strains credibility.  The evidence is indisputable that he originated, enforced, and led it.  Polk gave the presentations that united the Daytona Group and then all Charter holders in June 2022.  Ex. 38, at -081 to -085.  He is the one the Teams drew inspiration from and said provided ███████████  Ex. 36, at -104, to -105; Ex. 38, at -081.  He "███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████.  Ex. 39, at -889.  He met with a group of Teams that thought NASCAR's ███████████████████████████████████████████

███████████████████  Ex. 57, at -363.  When the Teams extracted higher payments from NASCAR, they ███████████████████████████."  Ex. 62, at -856.  Hamlin called him

"██████████████████████████████."  Ex. 76, at -014.  The Teams even

███████████████████████████████████████████████████).

And Teams reported that "███████████████████████████████████████████

███████████████████████████."  Ex. 78, at -538.[9]

---

[9]       It is meaningless that Polk was not involved in the 2016 negotiations.  That argument is based on a misrepresentation of NASCAR's claim.  NASCAR's claim is based on the conspiracy Polk *did* facilitate beginning in 2021.  From the outset, that conspiracy relied on Polk's ███████ ███████████████████████  Ex. 14, at -583.  Arguing "adherence to prior practices" is "no defense" in any event.  *Duplan Corp. v. Deering Milliken*, 594 F.2d 979, 982 (4th Cir. 1979).

His contention that some Teams supposedly "departed from the positions that Mr. Polk advocated the teams adopt" confirms he advocated positions, Doc. 216 at 31, but not the lack of conspiracy. Conspirators do not need to act in perfect unison. *See In re Int'l Rate Swaps Antitrust Litig.*, 351 F. Supp. 3d at 706. And the examples of divergence he provides are ambiguous and from well after he had already achieved the substantial pool money increase. *See* Doc. 216 at 13 (citing Doc. 216-50 (Aug. 28, 2024); Doc. 216-66 (Feb. 22, 2024); Doc. 216-77 (Feb. 19, 2024)).

### 3. Front Row Participated In The Conspiracy

Although Front Row was not part of the very first meetings of the conspiracy, it jumped aboard as soon as Polk presented the plan to all Charter holders on June 21, 2022. And "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *Olson Farms*, 649 F.2d at 1374. After hearing Polk's speech, Jenkins reported ███████████████." Ex. 36, at -106. From that point on, Jenkins and Freeze expressed and demonstrated a clear commitment to stick to the TNC's commonly agreed-upon positions, including in the rare instances when Front Row met individually with NASCAR. For example, in May 2023, Freeze ███████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████. Ex. 75, at -379. Jenkins sought to "███████████████████████████," Ex.76, at -014, and communicated that he "███████████████████. Ex. 139, at -201. In February 2024, when NASCAR was seeking to discuss Charter terms directly with Teams, Freeze wrote to Marshall that "███████████████████████████." Ex. 97, at -867. And even when Front Row did meet with NASCAR, it adhered to the Polk/TNC talking points, including during the single example of an individual meeting that Front Row identifies on April 18, 2024. Doc. 216-67; Doc. 216-43; Ex. 104, at -871 ("██████████████████████████████ ████████████████"). Jenkins's declaration confirms that during his meeting he merely

"████████████████████████████████████." Doc. 21-2 ¶ 28.[10]

### 4. Counterclaim Defendants' Obstruction Tactics Compel Strong Inferences Of Collusion

All inferences from the substantial evidence should be drawn particularly strongly in NASCAR's favor because of the co-conspirators' efforts to hide or destroy relevant materials. *See Van Winkle v. Rogers*, 82 F.4th 370, 382 (5th Cir. 2023). For example, Bob Jenkins routinely ████████████████████. Ex. 130, Jenkins Tr. 204:5-205:10. That practice resulted in the destruction of relevant evidence, including the two texts discussed below (Exs. 111, 112) that Jenkins failed to produce.[11] Curtis Polk similarly sought to hide evidence by including a ████████████████████, despite never practicing law. Ex. 124, Polk Vol. 1 Tr. 14:2-16:5. And he strategically moved non-legal conversations to a text thread with his litigation counsel to shield them from discovery. *See, e.g.*, Ex. 116, at -749; Ex. 118, at -750. Multiple conspirators also showed a committed effort to leave no trail in the first place, including Polk who ████████████████," Ex. 73, at -239, ████████████████████ ████████, Ex. 8, at -393; *see also* Ex. 67, at -893 (████████████ ████████████████"). These efforts of obfuscation should factor into the Court's assessments of the inferences it draws from the evidence in NASCAR's favor.

## II. COUNTERCLAIM DEFENDANTS' CONSPIRACY WAS ANTICOMPETITIVE

The record evidence satisfies the second element of NASCAR's Section 1 claim by showing that the conspiracy "imposed an unreasonable restraint of trade" under either a *per se* or

---

[10] Front Row's claim that it "made a unilateral decision not to sign the 2025 Charter Agreement" is disputed. Doc. 216 at 34. In the two weeks leading up to September 6, 2024, Jenkins and Hamlin repeatedly discussed ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████. *Id.*; Ex. 112, at -484.

[11] At an appropriate time, NASCAR will seek a spoliation instruction.

"rule of reason" analysis. *SD3*, 801 F.3d at 422-23; *Team Cam, LLC v. Reliable Contracting*, 2025 WL 1019262, at *11 (D. Md. Apr. 4, 2025).

### A. Polk, 23XI, And Front Row Engaged In *Per Se* Illegal Conduct

Before receiving the evidence, the Court ruled that this counterclaim was subject to the rule of reason. Doc. 162 at 7-9. Many courts, however, have found "that decision is more appropriate on a motion for summary judgment," *In re High-Tech. Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012), after "the development of a factual record on the nature and effects of the restraint," *Cont'l Airlines, Inc. v. United Air Lines*, 120 F. Supp. 2d 556, 565 (E.D. Va. 2000). The factual record now demonstrates that the *per se* rule should apply.

Led by Polk, the Teams furthered their pricing conspiracy by engaging in at least three boycotts, and threatening others. The Teams collectively boycotted negotiations in August 2022, they boycotted the TOC meeting in April 2023,[12] and they boycotted the negotiation extension window in January 2024. All of those actions were in furtherance of their collusion to force NASCAR to accept their commonly fixed terms, including price terms. This evidence brings the collusive conduct within the ambit of *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.*, 605 F. Supp. 2d 870, 873-74, 890 (W.D. Ky. 2009), *Cloverleaf Enters. v. Md. Thoroughbred*, 730 F. Supp. 2d 451, 464 (D. Md. 2010), and others where horizontal competitors used coercive "joint negotiation" tactics, including joint refusals to deal, to obtain larger payments. *See also*, *Team Cam*, 2025 WL 1019262, at *2, 13; *Compact v. Metropolitan Gov't of Nashville & Davidson Cty.*, 594 F. Supp. 1567, 1568-69, 1574-75 (M.D. Tenn. 1984). As the Department of Justice has explained, it "has long been recognized in antitrust law," that a price-fixing agreement "also shares

---

[12] Counterclaim Defendants' argument that TOC meetings are insignificant is a disputed fact. The evidence shows the Teams believed ███████████████████████████ Ex. 69, at -627. And it was significant enough for Hamlin to ████████████████
████████████████████████████ Ex. 68, at -403.

the characteristics of a boycott: that is, a commitment not to sell at other prices or according to other price structures." GMR Statement of Interest at 9. That is exactly what occurred here.

The cases addressing sports leagues on which Counterclaim Defendants rely do not apply. Those cases caution that "[m]embers of any cartel could insist that their cooperation is necessary to produce the 'cartel product,'" *Am. Needle v. NFL*, 560 U.S. 183, 199 n.7 (2010), exactly what Counterclaim Defendants do. Unlike those cases, NASCAR is not a "league" or "joint venture," as Counterclaim Defendants concede. Doc. 107 ¶ 97; Doc. 176-4 ¶¶ 147-48 (contrasting "vertically segregated" NASCAR, with "vertically integrated . . . joint ventures"); Ex. 135, Rascher Tr. 90:14-91:15. 23XI, for example, does not need to communicate with Front Row about which Team will host a race next week and whether it will be a "home" or "away" race. NASCAR, as the sanctioning body handles all of that. For that reason, economic scholars have pointed out specifically that NASCAR races are not subject to the same joint-league or joint-venture construct.[13] Counterclaim Defendants produce no cases from a racing context that hold otherwise. *Churchill Downs* and *Cloverleaf Enterprises*—both racing cases—apply the *per se* rule.

## B. The Conspiracy Is Also Illegal Under A Rule-Of-Reason Analysis

The evidence also shows a "rule of reason" violation based on the collusive conduct's "actual adverse effect on competition," and, independently, through "sufficient market power to cause an adverse effect on competition." *United States v. Charlotte-Mecklenburg Hosp.*, 248 F. Supp. 3d 720, 728 (W.D.N.C. 2017).

### 1. The Conspirators Had Market Power

The record is replete with evidence that the Counterclaim Defendants exercised market

---

[13] Ex. 136, S. Ross & S. Szymanski, *Antitrust & Inefficient Joint Ventures*, 16 Marquette Sports L. Rev. 214, 216 (2006) (disputing that "it is essential to permit collusion among clubs" in NASCAR, where "the competition organizer is . . . a separate, for-profit entity").

power by acting collectively with all Charter-holding Teams. The market power "inquiry is generally rife with questions of fact that must be decided by a jury," and Counterclaim Defendants' arguments confirm that is the case here. *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 478 (D. Vt. 2019); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 97 (E.D.N.Y. 2024) ("market power is a factual finding"). Counterclaim Defendants' arguments merely raise disputed facts. Doc. 216 at 22-25.[14]

Records from the time show that the Teams recognized they had power when acting as a group. They trumpeted that ███████████████████," Ex. 28, 23XI_0224883, at -886, that "██████████████████████████████████████████████ ████████████████████████" Ex. 36, 23XI_0020104, at -105, that a united approach "███████████████████████████," Ex. 54, 23XI_0170809, at -812, and that "████████████████████████████," Ex. 111, 23XI_0251483, at -483. That is proof of market power. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 701 (4th Cir. 2021); *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 2014 WL 407446, at *10-11 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015).

Expert economist Dr. Hubbard also shows that actual or attempted participation in Cup Series races has been substantially limited to the 36 Charter holders.[15] 23XI and Front Row's own

---

[14]     Counterclaim Defendants have not challenged NASCAR's market definition. Thus, that element cannot be a basis for summary judgment. *See Mr. Dee's*, 2022 WL 825995, at *4. In any event, it is irrelevant because Dr. Hubbard presents direct effects of monopoly power by showing "the collective negotiation led to higher prices and less supply to NASCAR." Ex. 13, Hubbard Reply ¶¶ 53-54. Even 23XI's expert, Dr. Rascher, has advocated that this type of conduct is direct evidence of monopoly power in other cases. *See* Expert Report of D. Rascher ¶ 20, *Hubbard v. NCAA*, No. 23-cv-1593 (N.D. Cal. Feb. 2, 2024), Doc. 164-5 ("[E]vidence of the success of that conduct in causing anticompetitive harm proves the existence of market power in a relevant market.").

[15]     Counterclaim Defendants' attacks on Dr. Hubbard are nothing more than an improper request to "weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 568, and

27

Case 3:24-cv-00886-KDB-SCR    Document 241    Filed 10/03/25    Page 33 of 44

power by acting collectively with all Charter-holding Teams. The market power "inquiry is generally rife with questions of fact that must be decided by a jury," and Counterclaim Defendants' arguments confirm that is the case here. *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 478 (D. Vt. 2019); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 97 (E.D.N.Y. 2024) ("market power is a factual finding"). Counterclaim Defendants' arguments merely raise disputed facts. Doc. 216 at 22-25.[14]

Records from the time show that the Teams recognized they had power when acting as a group. They trumpeted that ███████████████████," Ex. 28, 23XI_0224883, at -886, that "██████████████████████████████████████ ████████████████████████" Ex. 36, 23XI_0020104, at -105, that a united approach "███████████████████████████," Ex. 54, 23XI_0170809, at -812, and that "████████████████████████████," Ex. 111, 23XI_0251483, at -483. That is proof of market power. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 701 (4th Cir. 2021); *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 2014 WL 407446, at *10-11 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015).

Expert economist Dr. Hubbard also shows that actual or attempted participation in Cup Series races has been substantially limited to the 36 Charter holders.[15] 23XI and Front Row's own

---

[14]     Counterclaim Defendants have not challenged NASCAR's market definition. Thus, that element cannot be a basis for summary judgment. *See Mr. Dee's*, 2022 WL 825995, at *4. In any event, it is irrelevant because Dr. Hubbard presents direct effects of monopoly power by showing "the collective negotiation led to higher prices and less supply to NASCAR." Ex. 13, Hubbard Reply ¶¶ 53-54. Even 23XI's expert, Dr. Rascher, has advocated that this type of conduct is direct evidence of monopoly power in other cases. *See* Expert Report of D. Rascher ¶ 20, *Hubbard v. NCAA*, No. 23-cv-1593 (N.D. Cal. Feb. 2, 2024), Doc. 164-5 ("[E]vidence of the success of that conduct in causing anticompetitive harm proves the existence of market power in a relevant market.").

[15]     Counterclaim Defendants' attacks on Dr. Hubbard are nothing more than an improper request to "weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 568, and

expert acknowledged that Dr. Hubbard is "███████████████████." Ex. 134, Snyder Tr. 106:19-21. Dr. Hubbard found that the average number of qualifiers in Cup Series races has been below 39 each year since 2020, and lower than 37 in some recent years. Doc. 216-1 at ¶¶ 47, 51, Exhibit 6. The Charter holders represent at least 36 of those entries, which is more than sufficient at this stage to show market power. *See Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617, 658 (E.D. Pa. 1997) (denying summary judgment as to defendant with a 31% market share).

Counterclaim Defendants ignore the above evidence and try to back into a market-share calculation using a single, innocuous line from Dr. Hubbard's report that "[c]urrently there are over 150 licensees." Doc. 216-1 at ¶ 20; Doc. 216 at 23, 24. His point was merely that "obtaining a license is uncomplicated." Doc. 216-1 at ¶ 20. He *did not* describe all those 150 licensees as "potential competitors," Ex. 133, Hubbard Tr. 82:12-83:31, and Counterclaim Defendants present no evidence that they are either.[16] In fact, the NASCAR Rule Book makes clear that a license holder may include a driver, crew member, sponsor, or others, Ex. 119, at ¶ 2.12, and they may relate to any NASCAR series, not just the Cup Series. Doc. 216-1 at ¶ 20.

Counterclaim Defendants' argument that, in response to the Teams' actual and threatened boycotts, NASCAR "discuss[ed]" and "considered" "vertical integration" as a contingency does not help them. Doc. 216 at 23-25. NASCAR took no material steps to implement that plan. Ex. 133, Hubbard Tr. 110:5-113; Ex. 127, O'Donnell Tr. 137:18-138:23 (vertical integration was "████████████████████████████████"); Ex. 129, Prime Tr. 244:3-19 (vertical integration "████████████████"). And it would have taken far too long to implement. *See*

---

"engage in a battle of the experts." *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 817 (D. Md. 2013).

[16] Courts require a showing that a potential competitor has both an "intention to enter the market" and "preparedness to do so." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806-07 (D.C. Cir. 2001).

Ex 133, Hubbard Tr. 110:5-112:3; Doc. 216-76 at -837 ("███████████████████").

Counterclaim Defendants want to argue about who had more power during negotiations, NASCAR or the Teams. Certainly, the Teams believed they had more power together, and said that directly: "16 teams together are stronger than NC." Ex. 4, at -302. The outcome of the negotiations shows that the Teams received ████% of the increase in NASCAR's annual broadcast rights fees, while NASCAR received less money in 2025 than it did in 2024, despite broadcast revenues increasing. Doc. 216-11 at ¶¶ 62-63; Ex. 13, Hubbard Reply ¶¶ 52-53. That dramatic pay increase is direct evidence of market power. *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 299-300 (D.R.I. 2019) ("Direct evidence of market power includes proof such as supracompetitive prices or reduced output" (citation omitted)).[17]

### 2. The Conspiracy Harmed Competition

Counterclaim Defendants' argument that the Teams' collusion caused no harm to competition is both confounding and wrong. Doc. 216 at 26-27. The study of antitrust economics has long recognized that collusion "increases firms' profits by limiting competition." Doc. 216-1 at ¶ 36. And the case law recognizes this harm as well. *See United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927) ("The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition."); *Cloverleaf Enters.*, 730 F. Supp. 2d at 460-61.

The evidence creates a clear picture (and at minimum a disputed fact) that the Teams sought to eliminate competition amongst themselves on Charter terms and to eliminate competition

---

[17]    Witness-after-witness vigorously disputed Counterclaim Defendants' mischaracterization of the document they claim says NASCAR has "all the leverage." *See* Ex. 129; Doc. 196-11; Doc. 196-8. And Counterclaim Defendants excise key portions of other documents to advance their interpretations, including cutting out language saying NASCAR's Directors wanted to "meet in the middle" during negotiations. Doc. 215-3 at -213. The witness who Counterclaim Defendants argue said France was "████████████████████████," Doc. 216 at 15, was not involved in the Charter negotiations at all. *See* Doc. 178-18, Herbst Tr. 198:14-24.

among themselves for a Charter to further their ends. That is the only explanation for Polk and others' repeated urging that "█████████████████████████████████." Ex. 26, at -484; *see also, e.g.*, Ex. 30, at -749; Ex. 61, at -065. Polk and the TNC recognized that some Teams might be interested in accepting lower pool payments than others, or allocating a different mix of fixed and performance payments. That, in fact, happened. But the conscious commitment not to agree to terms unless ███████████████████ eliminated the competition among those Teams. Ex. 57, at -363; *see also* Ex. 55, at -525 (████████████████████████████ ████████"); Ex. 59, at -612; Ex. 86, at -808. If competition between the Teams "did not actually exist," Doc. 217 at 27, it is because they colluded to eliminate it, not because it was impossible.

Counterclaim Defendants' argument that the Charter terms needed to be the same is factually incorrect, but also irrelevant. The record shows that NASCAR desired "███████ █████████████████████████████████" Ex. 113, at -320. Hamlin testified that Jim France was "█████████" about this. Ex. 128, Hamlin Tr. 171:9-173:23; *see also* Ex. 132, Marshall Tr. 61:14-16 ("█████████████████████████████████ ███████████"). █████████ for example, provides special payments to ██████ in recognition of its heritage. Ex. 127, O'Donnell Tr. 150:25-151:2; Ex. 132, Marshall Tr. 61:2-5; Ex. 79, at -889 (████████████████████████████████████████). Polk and the TNC knew this was a possibility and were seeking to prevent that form of competition. *See, e.g.*, Ex. 71, at -973 ("███████████████████████████████ ██████████████████████."); Ex. 98, at -204 ("████████████████████ ████████████████████████████."); *see also* Doc. 216-

1 at ¶ 64.[18]  That is what Hamlin meant when he wrote: "███████████████████████████

███████████████████████████████████."  Ex. 52, at -477.

Even if the ultimate pool payment would be the same for all, the fact that numerous Teams

were willing to accept payments of █████████ in 2025, but instead held out at Polk's urging, *see,*

*e.g.*, Ex. 57, at -363, resulting in their ultimate achievement of █████████ in 2025, shows that

collusive conduct can still drive up prices.  That, of course, was Counterclaim Defendants' intent,

and it is the well-recognized competitive harm from group boycotts and conspiracies of this type

under both economics and the law.  Doc. 216-1 at ¶¶ 37, 62-64; *see Churchill Downs*, 605 F. Supp.

2d at 873-74, 890; *Cloverleaf Enters.*, 730 F. Supp. 2d at 464.

Counterclaim Defendants' challenge to Dr. Hubbard is a strawman argument based on a

mischaracterization of his opinions.  Doc. 216 at 26.  Dr. Hubbard did not limit his assessment to

the effects of the Charter system itself.  He also discussed how the collusive conduct specifically

"helped facilitate an agreement among NASCAR's suppliers regarding what terms to demand,

used collective negotiation to help achieve and preserve higher prices and less supply, limited

firms from negotiating different terms individually with NASCAR, and encouraged firms that

interacted with NASCAR individually not to 'defect' from the collusive outcomes Counterclaim

Defendants were attempting to achieve."  Doc. 216-1 at ¶ 59; *see also id*. ¶¶ 60-75; Ex. 13, Hubbard

Reply ¶¶ 38, 40-47.  Dr. Hubbard addressed Counterclaim Defendants' exact same criticism in his

rebuttal report, where he further described how "the evidence indicated that the outcome of the

2025 Charter Agreement negotiations . . . enhanced the effects of the earlier collective

negotiation."  Ex. 13, Hubbard Reply ¶¶ 38, 40-47.

---

[18]    In their affirmative case, 23XI and Front Row argue that NASCAR may have bid-up Team payments further if it faced a hypothetical stock car series recruiting teams.  That theory must presuppose that NASCAR could offer different payments to different Teams to entice them to stay.

## III. THE ILLEGAL CONSPIRACY CAUSED NASCAR ANTITRUST INJURY

The Teams' conspiracy harmed NASCAR by causing it to pay an artificially high amount in 2025 as a result of the challenged collusive conduct, and a smaller percentage of those payments to performance-based pay.  *See* Doc. 216-1 at ¶¶ 14-16, 36-42, 59-75; Ex. 13, Hubbard Reply ¶¶ 13, 17, 38-45, 51-55; Doc. 216-11 at ¶¶ 50-70; Ex. 34, Hansen Reply ¶¶ 19-24, 43-50.  "[B]eing forced to pay supra-competitive prices as a result of the defendants' anti-competitive conduct is an injury plainly of the type the antitrust laws were intended to prevent."  *Team Cam*, 2025 WL 1019262, at *13 (citation modified); *see also In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 285-86 (6th Cir. 2014).  The fact of paying prices that "no longer reflect ordinary market conditions" due to "a conspiracy" alone is sufficient to assert "injury of the type the antitrust laws were intended to prevent and that flows from which makes defendants' acts unlawful."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).

In 2025, NASCAR increased the Cup Series' payments by ███ million over 2024 to ████████ .  Doc. 216-11 at ¶¶ 33, 48, 62, 65.  The Teams achieved that substantial pay increase, despite NASCAR's broadcast revenue in 2025 increasing by only ██████ .  Doc. 216-11 at ¶ 48.  This means that Teams received ███ % of the increased media rights revenue that NASCAR achieved in 2025.  Doc. 216-11 at ¶¶ 33, 62, 65.  As a result, despite an increase in broadcast fees, NASCAR is now "████████████████████████████████████ ████████████████████ ."  Ex. 34, Hansen Reply ¶ 41.

Damages expert John Hansen concluded that the 2025 Team payments exceeded what the Teams would have achieved absent their conspiracy.  *See* Doc. 216-11 at ¶¶ 53-70; Ex. 34, Hansen Reply at ¶¶ 19-24, 43-50.  Hansen performed two "before-and-after" scenarios and a calculation based on a benchmark that 23XI and Front Row rely on.  Doc. 216-11 at ¶¶ 53-66; Ex. 34, Hansen Reply ¶¶ 19-42, 43-50.  All of these analyses showed that in 2025, absent the Teams' collusive

conduct, NASCAR would have paid no more than ███ million to Cup Series Teams in 2025. Doc. 216-11 at ¶¶ 53-66; Ex. 34, Hansen Reply ¶¶ 19-24, Attach. 12A.1-2.

The contention that the Charter pays less in 2025 than NASCAR's October 2022, February 2023, or November 2023 offers is disputed and false. NASCAR's offers were as follows: ███

████████████████████████████ ████████████

█████████████████████ █████████████████

██████████████████████████████████

████████ [21] NASCAR's media rights came in ███████████████████. Doc. 216-11 at ¶ 29 n.73; Ex. 122, Herbst Tr. 264:9-11. ██████████

███████████████████. Doc. 216-11 at ¶ 29. Counterclaim Defendants misrepresent the offers by omitting the contingencies. For example, before NASCAR's November 2023 offer, the TNC proposed a 2025 payment of ██████████

██████████████. Ex. 80, at -659; Doc. 216-11 at Attach. 10. NASCAR ultimately paid *more* than that ███████ even though the AAV was lower. NASCAR's offers adjusted to the actual media rights were: ████████████████████

██████████████. Doc. 216-11 at ¶¶ 29, 60.

Counterclaim Defendants' argument that it is "myopic" to focus on the 2025 payments is also based on heavily disputed facts and is flawed. Doc. 216 at 14 n.6. This argument fails to account for the essential concept of time value of money, and NASCAR providing the largest pay raises in the earlier years when they are most valuable to Teams. *See JTH Tax, Inc. v. H&R Block Eastern Tax Serv.*, 28 F. App'x 207, 217 (4th Cir. 2002); Ex. 34, Hansen Reply ¶¶ 16-18.

---

[19] Doc. 216-11 at ¶ 56; Ex. 50, at Slides 12, 15.
[20] Doc. 216-54 at -653.
[21] Doc. 216-55 at -781.

Counterclaim Defendants also ignore that each of NASCAR's offers prior to December 2023 was expressly contingent on ████████████████████████████████. *See* Ex. 50, at Slide 14-15; Doc. 216-54 at -653; Doc. 216-55 at -781. It is inexplicable that Counterclaim Defendants' prolonged argument about these offers fails to mention this contingency, because they were keenly aware of it during negotiations.[22]

Including the full term of Charter payments would not change the fact of harm to NASCAR in any event. The Charter payments ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ *See* Ex. 34, Hansen Reply ¶¶ 14, 11-18. This means that, even years into the new Charter, NASCAR has projected EBITDA that will still be ████████████

████████████ even though the broadcast revenues increased. Doc. 216-11 at ¶ 65.[23]

Lastly, Counterclaim Defendants improperly seek an inference in their favor that the increased revenues could not have been a boon to Teams because a draft Charter term tracker from May 2024 reflects, in their view, "no wins" for the Teams. Doc. 216 at 4, 27. That argument is based on a mischaracterization of the document they cite.[24] Doc. 216-5. Even a cursory review of that May 2024 term-change tracker shows that the revenue increase is not included. *See* Doc.

---

[22] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[23] Counterclaim Defendants' suggestion, Doc. 216 at 14 n.5, that NASCAR delayed "agreeing to provide" the higher end of the payout range for 2031 until recently is wrong. The 2031 payout range in the 2025 Charter depended ██████████████████████████████
████████████████████████████████████████████████████████████.

[24] Counterclaim Defendants' argument is one of disputed fact. The May 2024 tracker does reflect "wins" for the Teams, *see, e.g.*, Doc. 216-5, at -687 ("Team Win"); *see also id.* at -681 ("inserted requested language"); *id.* at -678 ("NASCAR proposal built off their feedback").

216-5.  The reason for that exclusion is simple.  The pool payments ███████████████████ ███████████████████████████████.[25]  23XI's paid expert has not identified any higher payment the Teams should have received under the 2025 Charters, Ex. 135, Rascher Tr. 335:20-25, and a 2025 Charter sold in January 2025 for █████ more than 23XI agreed to pay in August 2024.  *Id.* at 249:1-21; Ex. 3, May 2025 Ware Decl. ¶ 27; Ex. 2, Oct. 2025 Ware Decl.

Counterclaim Defendants' cannot prevail by arguing that their █████ million demand was competitive.  Their own expert has not put forward an opinion that the 2025 Charter should have paid that amount.  And NASCAR disputes that figure.  Teams profitability (the supposed basis for that demand) is not relevant to the impact analysis in any event, because NASCAR lacks control over Teams' spending and part of their revenues.  For example, 23XI's records show its costs were ████████████████████████████████████████████████████████████████████ █████████."  Ex. 101, at -607 to -608.  No Team objected to a ████████████████ being implemented in 2025 when discussed during an RTA meeting (not a ████████████).  Ex. 59, at -614.  Plus, parts costs have decreased dramatically due to Next Gen.  Ex. 117, -313 to -314.

23XI and Front Row's characterization of the 2016 Charter economics are also disputed.  In addition to battling expert opinions, it is informative that, Charter holders have attested that the terms "were fair and the value of owning one increased over time," Ex. 1, McLeod, Jr. Decl., and, according to Polk, the 2016 Charter was "████████████████████████████████"  Ex. 125, Polk Vol. 2 Tr. 67:3-11.

\*     \*     \*

The Court should deny Counterclaim Defendants' motion for summary judgment.

---

[25]      *Somers* does not help Counterclaim Defendants because the prices for music downloads never changed at all in that case.  729 F.3d 953, 965 (9th Cir. 2013).  *Online DVD Rental Antitrust Litigation* is also inapposite because plaintiff paid fees to non-party Blockbuster, not to the alleged conspiracy between Netflix and Walmart.  2009 WL 4572070, at \*1-2, 8 (N.D. Cal. Dec. 1, 2009).

Dated: October 3, 2025

Respectfully submitted,

By: *Ashley Bauer*
Ashley M. Bauer*
Christopher S. Yates*
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
ashley.bauer@lw.com
chris.yates@lw.com

Lawrence E. Buterman*
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Anna M. Rathbun*
David L. Johnson*
Christopher J. Brown*
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com

Tricia Wilson Magee (N.C. Bar No. 31875)
**SHUMAKER, LOOP, & KENDRICK, LLP**
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Tel: 704-945-2911
Fax: 704-332-1197
tmagee@shumaker.com

* Admitted *pro hac vice*

*Counsel for Counterclaim Plaintiff NASCAR
Event Management, LLC*

## <u>ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION</u>

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 3rd day of October, 2025.

*/s/ Ashley Bauer\**
Ashley M. Bauer

## CERTIFICATE OF SERVICE

I certify that on October 3, 2025, a true and correct copy of the foregoing was served via Email on the below counsel of record for 2311 Racing LLC d/b/a 23XI Racing, and Front Row Motorsports, Inc., and Curtis Polk.

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

Jeanifer E. Parsigian
Michael Toomey
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Josh Hafenbrack*
**WINSTON & STRAWN LLP**
1901 L Street NW
Washington, DC 20036
Tel: (202) 282-5000
Fax: (202) 282-5100
jhafenbrack@winston.com

E. Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street,16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

Matthew R. DalSanto
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com

Eric S. Hochstadt*
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 W 52nd Street
New York, New York 10019
Tel: (212) 506-5282
ehochstadt@orrick.com

*/s/ Ashley Bauer**
Ashley M. Bauer