# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. | Civil Action No. 3:24-cv-886-KDB-SCR <br><br><br> **JOINT PROPOSED JURY INSTRUCTIONS** |
| NASCAR EVENT MANAGEMENT, LLC, <br><br> Counter-Plaintiff, <br><br> v. <br><br> 2311 RACING LLC d/b/a 23XI RACING, FRONT ROW MOTORSPORTS, INC., and CURTIS POLK, <br><br> Counter-Defendants. |  |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 5

PRELIMINARY JURY INSTRUCTIONS ............................................................ 6

INITIAL INSTRUCTIONS .................................................................................... 7

GENERAL INSTRUCTIONS ................................................................................ 12

    Court's Usual, Non-Substantive Instructions ..................................................... 12

    [Instruction No. 1] Corporate Entities ............................................................... 13

    [Instruction No. 2] Two or More Parties – Different Legal Rights .................... 14

    [Instruction No. 3] Burden of Proof ................................................................... 15

    [Instruction No. 4] The Sherman Act ................................................................. 16

    [Instruction No. 5] Overview of the Claims ...................................................... 18

POTENTIAL INSTRUCTIONS DURING TRIAL ............................................ 23

    [Instruction No. 6] Stipulation of Fact ............................................................... 23

    [Instruction No. 7] Opinion Testimony .............................................................. 24

    [Instruction No. 8] Uncalled Witnesses ............................................................. 25

    Instruction No. 9] Demonstrative Exhibits ........................................................ 26

    [Instruction No. 10] Spoliation ........................................................................... 27

PROPOSED SUBSTANTIVE JURY INSTRUCTIONS .................................... 29

Instructions After The Close Of The Evidence ..................................................... 29

Concluding Instructions After Closing Arguments ............................................... 31

PLAINTIFFS' MONOPOLIZATION / MONOPSONIZATION CLAIM ............... 32

    A.    [Instruction No. 11] Elements of the Monopolization / Monopsonization Claim ........ 32

    B.    [Instruction No. 12] Monopoly Power Defined / Monopsony Power ...................... 36

    C.    [Instruction No. 13] First Element: Relevant Market ........................................ 38

        1.    [Instruction No. 14] Relevant Product Market ........................................ 45

        2.    [Instruction No. 15] Relevant Geographic Market .................................. 51

    D.    [Instruction No. 16] Second Element: Monopoly Power / Monopsony Power ........... 54

        1.    [Instruction No. 17] Direct Evidence of Monopoly / Monopsony Power ............... 57

        2.    [Instruction No. 18] Indirect Evidence of Monopoly / Monopsony Power ............. 62

    E.    [Instruction No. 19] Third Element: Anticompetitive or Exclusionary Conduct / Anticompetitive Conduct ........................................................................ 68

        1.    [Instruction No. 20] Anticompetitive Conduct: Refusal To Deal ............................. 75

        2.    [Instruction No. 21] Anticompetitive Conduct: Motorsports .................................... 78

    F.    [Instruction No. 22] Plaintiffs' Claims Against James France / Individual Liability of James France ........................................................................ 80

2

G.     [Instruction No. 23] Final Element: Injury and Causation ........................................... 82

H.     [Instruction No. 24] Statute of Limitations ................................................................... 86

PLAINTIFFS' CONTRACT, COMBINATION, AND CONSPIRACY IN RESTRAINT OF TRADE CLAIM / PLAINTIFFS' UNREASONABLE RESTRAINT OF TRADE CLAIM ....... 88

A.     [Instruction No. 25] Elements of the Contract, Combination, and Conspiracy in Restraint of Trade Claim / Elements of the Unreasonable Restraint of Trade Claim ............................. 88

B.     [Instruction No. 26] First Element: Existence of a Contract ........................................ 90

      1.     [Instruction No. 27] Existence of a Contract: Exclusive Dealing Arrangements ..... 92

      2. [Instruction No. 28] Individual Liability of James France .......................................... 94

C.     [Instruction No. 29] Second Element: Unreasonable Restraint of Trade (Three-Step Inquiry) ........................................................................................................................... 96

      1.     [Instruction No. 30] Unreasonable Restraint of Trade, Step One: Adverse Effect on Competition in Relevant Market / Substantial Harm to Competition in Relevant Market     100

           a.     [Instruction No. 31] Relevant Market ................................................................ 102

           b.     [Instruction No. 32] Market Power .................................................................... 103

           c.     [Instruction No. 33] Proof of Competitive Harm .............................................. 106

      2.     [Instruction No. 34] Unreasonable Restraint of Trade, Step Two: Evidence of Competitive Benefits ...................................................................................................... 109

      3.     [Instruction No. 35] Unreasonable Restraint of Trade, Step Three: Less Restrictive Means ................................................................................................................................. 113

      4.     [Instruction No. 36] Balancing Anticompetitive Harms and Procompetitive Benefits     115

D.     [Instruction No. 37] Third Element: Injury and Causation ........................................ 117

E.     [Instruction No. 38] Statute of Limitations ................................................................ 119

NASCAR'S COUNTERCLAIM ........................................................................................ 120

A.    [Instruction No. 39] Elements of the Contract, Combination, and Conspiracy in Restraint of Trade Claim / Elements of the Unreasonable Restraint of Trade Claim ........................... 120

B.    [Instruction No. 40] First Element: Existence of a Contract, Combination, or Conspiracy / Existence of A Combination or Conspiracy ...................................................................... 121

      1.     [Instruction No. 41] Restraint of Trade ................................................................. 127

      2.     [Instruction No. 42] Willful Participation by Each Counterclaim-Defendant / Participation and Intent ................................................................................................... 129

      3.     [Instruction No. 43] Individual Liability of Curtis Polk ......................................... 132

C.     [Instruction No. 44] Second Element: Unreasonable Restraint of Trade (Three-Step Inquiry) ......................................................................................................................... 135

      1.     [Instruction No. 45] Unreasonable Restraint of Trade: Trade Associations .......... 138

2.    [Instruction No. 46] Unreasonable Restraint of Trade, Step One: Adverse Effect on Competition in Relevant Market / Relevant Market ................................................ 140

    a.    [Instruction No. 47] Relevant Product Market .................................................... 141

    b.    [Instruction No. 48] Relevant Geographic Market ............................................. 144

    c.    [Instruction No. 49] Market Power ..................................................................... 147

    d.    [Instruction No. 50] Proof of Competitive Harm ................................................ 150

3.    [Instruction No. 51] Unreasonable Restraint of Trade, Step Two: Evidence of Competitive Benefits ........................................................................................................ 152

4.    [Instruction No. 52] Unreasonable Restraint of Trade, Step Three: Less Restrictive Means ............................................................................................................................... 153

5.    [Instruction No. 53] Unreasonable Restraint of Trade: Balancing Anticompetitive Harms and Procompetitive Benefits ............................................................................... 154

D.    [Instruction No. 54] Final Element: Injury and Causation ......................................... 155

DAMAGES ....................................................................................................................................... 158

[Instruction No. 55] Antitrust Damages: Introduction and Purpose ..................................... 158

[Instruction No. 56] Basis for Calculating Damages ............................................................. 160

[Instruction No. 57] Causation and Disaggregation ............................................................... 162

[Instruction No. 58] Lost Profits ............................................................................................ 163

[Instruction No. 59] Buyer Price Fixing ................................................................................ 165

[Instruction No. 60] Mitigation .............................................................................................. 166

[Instruction No. 61] Multiple Plaintiffs ................................................................................. 168

FINAL INSTRUCTIONS ................................................................................................................ 169

## PRELIMINARY STATEMENT

Plaintiffs and Counter-Defendants 2311 Racing LLC d/b/a/ 23XI Racing ("23XI") and Front Row Motorsports, Inc. ("Front Row" and together with 23XI, "Plaintiffs" and "Counterclaim Defendants")), Defendants National Association for Stock Car Auto Racing, LLC and NASCAR Holdings, LLC, Defendant and Counter-Plaintiff NASCAR Event Management, LLC (collectively, with National Association for Stock Car Auto Racing, LLC and NASCAR Holdings, LLC, "NASCAR"), Defendant James France, and Counter-Defendant Curtis Polk, through their undersigned counsel of record, hereby submit these proposed jury instructions.

The parties reserve their rights to amend these proposed instructions or propose additional instructions on the basis of, among other reasons, further exchanges, the parties' meet and confers, further Orders or clarifications by the Court, and the evidence admitted at trial.

The proposed Jury Instructions are presented on a joint basis with the following caveats:

- Language proposed by Plaintiffs to which NASCAR objects is indicated in **bolded and underlined blue text**. Language proposed by NASCAR to which Plaintiffs object is indicated in **bolded and underlined green text**. Objections are presented in footnotes ("**Plaintiffs' Objection**" or "**NASCAR's Objection**").

- At times, the parties have presented the Court with side-by-side alternatives of particular language, in the form of **Plaintiffs' proposed language** / **NASCAR's proposed language**.

- To the extent the parties could not agree on an instruction, each proposed alternative is presented back-to-back with an indication of which side proposed the instruction ("**Plaintiffs' Version**" or "**NASCAR's Version**").

- To the extent that a party has proposed an instruction to which another party objects entirely, the disputed instruction is presented, with an objection.

5

## PRELIMINARY JURY INSTRUCTIONS

The parties respectfully request that the Court charge the jury in its usual manner for instructions at the beginning of the trial, as provided for in Exhibit B of the Court's Standing Order Governing Jury Selection and Instruction. The parties further propose the instructions herein regarding Corporate Entities, Different Entities, The Sherman Act, and Overview of the Claims be provided as part of the Court's preliminary jury instructions. Plaintiffs propose that the Burden of Proof instruction be provided as part of the Court's preliminary jury instructions, while Defendants believe that this instruction is appropriate after the close of the evidence, as provided for in Exhibit C of the Court's Standing Order.

## INITIAL INSTRUCTIONS[1]

Members of the Jury:

Now that you have been sworn, I will give you some preliminary instructions to help you understand what will be presented to you and guide you in your participation in this trial. Please listen carefully and follow my instructions. It is very important that you abide by these rules. Failure to follow these instructions and other instructions that I give you throughout the trial could result in the case having to be retried, which would be a tremendous burden to everyone involved.

First, a few words about your conduct as jurors.

1. I instruct you that during the trial, you are not to discuss the case with anyone or permit anyone to discuss it with you, including your fellow jurors. Until you all retire to the jury room at the end of the case to deliberate on your verdict, you must not talk about this case. You may tell your family, close friends, and other people about your participation in this trial so that you can explain when you are required to be in court. If you do so, you should warn them not to ask you about this case, tell you anything they know or think they know about it, or discuss this case in your presence. Furthermore, you must not post any information on any social media or a social network, or communicate with anyone, about the parties, witnesses, participants, claims, evidence, or anything else related to this case.

2. Do not read or listen to anything touching on this case in any way – that includes newspaper articles, television and radio reports, and social media posts discussing this case, if there are any. If anyone should try to talk to you about the case or influence you in any way, you must bring it to my attention promptly.

---

[1] **Source**: Adapted from *Standing Order Governing Jury Selection and Instruction in Civil Cases Before the Honorable Kenneth D. Bell*, Exhibit B (Nov. 20, 2019). Changes to instructions identified with gray highlighting.

3. Do not look up anything on the internet, try to do any research or make any investigation about the case on your own. It is important that the only evidence that you should consider is what is presented during the trial.

4. Finally, do not form any opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

If you wish, you may take notes. If you do, remember that they should serve only as an aid to your memory; they are not a substitute for your own memory or the memory of any other juror. It is each juror's individual responsibility to listen carefully to and remember the evidence. Also, remember that your notes are not evidence, and your individual recollections must control your deliberations. Those of you who take notes should leave them in the jury room when you leave the courthouse each evening.

Jurors are not permitted to ask questions of witnesses or of the lawyers. Please do not interrupt the lawyers during their examination of witnesses. If you are unable to hear a witness or a lawyer, please raise your hand immediately and I will see that this is corrected.

As members of the jury, you are the sole and exclusive judges of the facts. You determine the credibility of the witnesses and resolve any conflicts as there may be in the testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence. You are to perform the duty of finding the facts without bias, prejudice, or sympathy to any party. I play no part in judging the facts. You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

As judge, my role is to be the judge of the law and make whatever legal decisions have to be made during the course of the trial. I will decide what testimony and evidence is admissible

8

under the law for your consideration and instruct you as to the legal principles governing this case. It is your duty to accept my instructions of law and apply them to the facts as you determine them. You should not single out any instruction as alone stating the law but must consider all my instructions as a whole. You may not substitute or follow any personal or private notion or opinion as to what the law is or ought to be. Nothing that I may say or do during the trial is intended to suggest, or should be taken by you as suggesting, what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the court may instruct you to find.

Certain things are not evidence and must not be considered by you. I will list them for you now:

1. Statements, arguments, and questions by the lawyers or myself are not evidence. It is the witnesses' sworn testimony that is evidence. Thus, if a lawyer makes a statement or propounds a question that assumes certain facts to be true, this must not be taken as evidence unless a witness adopts or agrees to the assumed facts in his answer.

2. Objections to questions are not evidence. When I "sustain" an objection, I am excluding that evidence from this trial for a good reason. When you hear that I have "overruled" an objection, I am permitting that evidence to be admitted. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it. If the objection is overruled, treat the answer like any other. If the objection is sustained, ignore the question. Do not attempt to guess what answer might have been given had I allowed the question to be answered.

3. Testimony that the court has excluded or told you to disregard is not evidence and must not be considered. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

4. Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

There are two types of evidence which you may properly assess in determining whether a party has met its burden of proof – direct evidence and circumstantial evidence. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness to something he knows by virtue of his own senses. Circumstantial evidence is proof of a set of facts from which you may infer or conclude, based on your reason, experience, and common sense, that some other fact exists. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that your verdict must be based on a preponderance of all the evidence presented.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or none of it, or believe part and disbelieve part. In addition, the weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of a fact. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

In considering the testimony of any witness, you should use all the tests for truthfulness that you would use in determining important matters of importance in your daily life. You should consider any bias or hostility the witness displays for or against any party as well as any interest the witness has in the outcome of the case. You should consider the opportunity the witness has

10

had to see, hear, and know the things about which he testifies; the accuracy of his memory; his candor or lack of candor; his intelligence; the reasonableness and probability of his testimony and its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony. Always remember that you should use your common sense and good judgment.

The trial will proceed this way:

First, each side may make an opening statement. An opening statement is neither evidence nor argument; it is an outline of what that party intends to prove, offered to help you follow the evidence. Next, the Plaintiffs will present their witnesses, and the Defendants may cross-examine them. Then the Defendants will present their witnesses, and the Plaintiffs may cross-examine them. Then, the Plaintiffs will have the opportunity to present any additional evidence regarding the counterclaim that was brought by Defendants.

After the evidence is in, I will instruct you on the law, including any legal rulings I have made, and the attorneys will make their closing arguments on the case to you. You will then retire to deliberate on your verdict.

The lawyers are not allowed to speak with you during this case. When you see the lawyers at a recess or pass them in the halls and they do not speak to you, they are not being rude or unfriendly; they are simply following the law.

During the trial, it may be necessary for me to talk with the lawyers out of your hearing about questions of law or procedure. Sometimes, you may be excused from the courtroom during these discussions. I will try to limit these interruptions as much as possible, but you should remember the importance of the matter you are here to determine and should be patient with our process which is designed to protect the fair interests of all the parties.

11

## GENERAL INSTRUCTIONS

### Court's Usual, Non-Substantive Instructions

Consistent with the Court's instructions, the Parties respectfully request that the Court charge the jury in its usual manner as reflected in Exhibit B of its Standing Order. The parties further propose the following additional language for certain preliminary instructions.

**[Instruction No. 1] Corporate Entities[2]**

2311 Racing LLC, doing business as 23XI Racing ("23XI"), Front Row Motorsports, Inc. ("Front Row"), the National Association for Stock Car Auto Racing, LLC, NASCAR Holdings, LLC, and NASCAR Event Management, LLC (collectively, "NASCAR"), are corporate entities. Under the law, a corporate entity is a person, but it acts only through its agents. A corporate entity's agents include its directors, officers, employees, or others acting on its behalf.

A corporation is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment. Acts done within the scope of employment are acts performed on behalf of a corporate entity and directly related to the duties the agent has the authority to perform.

To summarize, for a corporate entity to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his or her employment.

The fact that a corporate entity has instructed its agents not to violate the antitrust laws does not excuse the corporate entity from responsibility for the unlawful acts of its agents done within the scope of their employment.

A corporate entity is entitled to the same fair trial as a private individual. The acts of a corporate entity are to be judged by the same standard as the acts of a private individual, and you may hold a corporate entity liable only if such liability is established by the preponderance of the evidence. All persons, including corporate entities, are equal before the law.

---

[2] **Source**: Adapted from American Bar Association, Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases, (2016) ("ABA Model Instructions (2016)") at Ch. 2, Instr. A.3.

13

**[Instruction No. 2] Two or More Parties – Different Legal Rights**

There are multiple Plaintiffs, Defendants, and Counterclaim-Defendants in this case. You must decide the case as to each Plaintiff, Defendant, and Counterclaim-Defendant separately. Each Plaintiff, Defendant, and Counterclaim-Defendant is entitled to have its case determined from its own conduct and from its specific evidence.

Unless otherwise stated, these instructions apply to all parties.

**[Instruction No. 3] Burden of Proof[3]**

In a civil case, the party with the burden of proof on any given issue ~~has the burden of proving~~ must prove every disputed element of its claim or affirmative defense to you by a preponderance (or the greater weight) of the evidence. To establish a fact by a preponderance (or the greater weight) of the evidence means to prove that the fact is more likely true than not true. It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents. If you conclude that the party bearing the burden of proof has failed to establish any essential part of its claim or affirmative defense by a preponderance of the evidence, you must decide against it on the issue you are considering.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof in a criminal trial. That requirement does not apply to a civil case such as this and you should put it out of your mind.[4]

---

[3] **Source**: Adapted from *Standing Order Governing Jury Selection and Instruction in Civil Cases Before the Honorable Kenneth D. Bell*, Exhibit C (Nov. 20, 2019). Changes to instructions identified with gray highlighting.

**NASCAR's Objection:** NASCAR objects to providing a burden of proof instruction as part of the preliminary instructions before opening statements. NASCAR believes that, as per Exhibit C of the Court's Standing Order, the appropriate time to instruct the jury on the burden of proof is after the close of the evidence.

[4] **Plaintiffs' Statement:** Plaintiffs submit that, in a complex antitrust case, it is appropriate for the Court to instruct the jury on the burden of proof before opening arguments, so that jurors do not mistakenly have in mind the reasonable doubt standard that they may be familiar with from television and media.

**[Instruction No. 4] The Sherman Act[5]**

I am now going to tell you about the law that you will have to apply to the facts as you find them. I will give you more detailed instructions about this at the end of the case. Two **premier stock car racing teams** / **racing teams**[6]—2311 Racing LLC d/b/a/ 23XI Racing ("23XI") and Front Row Motorsports, Inc. ("Front Row")—have brought antitrust claims against NASCAR, **the**

---

[5] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. A.1; Leonard B. Sand, et al., 4 Modern Federal Jury Instructions-Civil P 80.01 (2025); *US Airways, Inc. v. Sabre Holdings Corp., et al.*, No. 1:11-cv-02725-LGS , at ECF 1207-8, Final Jury Instructions, at 9–10 (S.D.N.Y. May 19, 2022); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 1:13-cv-07789-LGS, ECF No. 1998-7, Final Jury Instructions, at 9–10 (S.D.N.Y. Oct. 20, 2022); *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637-TMD, ECF No. 7000, Final Jury Instructions, at 32 (N.D. Ill. Oct. 24, 2023); *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) (internal citations omitted); *Sony Elecs., Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 184 (D. Conn. 2001) (explaining that a buyer-side monopoly is "an arrangement where a buyer uses its market share power to reduce the purchase price of goods" from a seller or sellers); *Kolon Indus., Inc. v. E.I. Du Pont de Nemours & Co.*, No. 3:11-CV-00622, 2012 WL 13047952, at ECF No. 610, Consolidated Jury Instructions, at 41 (E.D. Va. Mar. 26, 2012).

**NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.A (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 22; *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 931 (4th Cir. 1990) ("The Sherman Act is designed to protect competition, not competitors."); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *2311 Racing LLC v. NASCAR*, 139 F.4th 404, 410 (4th Cir. 2025) ("[A]bsent anticompetitive conduct in the service of monopoly power, the law recognizes that parties are 'free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'"); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012) (no claim where defendant "proposed terms for a commercial relationship" but plaintiff "was not satisfied with its terms"); *id.* ("[S]imply because GXS does not offer Loren Data the terms and conditions it desires does not mean that GXS has violated the antitrust laws.")

[6] **NASCAR's Objection:** NASCAR objects to this and numerous other instances referring to "premier" stock-car racing, as it implies that Plaintiffs' proposed relevant market is valid even though their own expert had no definition for "premier." The validity of Plaintiffs' market is one of the key issues in this case, and the jury instructions should not tilt the playing field. NASCAR has proposed appropriately neutral alternatives such as "racing team" here and a number of other places.

**premier stock car racing organization in the United States** / **a motorsports organization that sanctions multiple racing series**, and NASCAR's CEO, James France, who is also one of the co-owners of NASCAR. NASCAR has brought an antitrust counterclaim against 23XI, Front Row, and one of 23XI's co-owners, Curtis Polk.

These antitrust claims are brought under a federal antitrust law known as the Sherman Act. The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources and results in the lowest prices, the highest quality, better choices, and the greatest material progress for society.

**The Sherman Act protects competition, not competitors. As a general matter, the Sherman Act does not restrict the long-recognized right of a business to freely exercise its own judgment as to parties with whom it will deal. And a party does not violate the Sherman Act simply because it does not offer the terms and conditions that a counterparty desires.** [7]

---

[7] **Plaintiffs' Objection:** Plaintiffs object to the final paragraph as unnecessary, confusing, and prejudicial. NASCAR is attempting to selectively highlight one doctrine (which is inapplicable to this case) that is often raised by antitrust defendants; that is improper in the context of an instruction intended to describe the general purposes of the Sherman Act. NASCAR's proposed language is not included in the ABA model instruction. *See* ABA Model Instructions (2016) Ch. 1, Instr. A.1. Further, the "duty to deal" doctrine is not in dispute in this trial, because Plaintiffs have brought no claim based on NASCAR's refusal to deal or assist a rival. Accordingly, this instruction will only serve to confuse the jury and prejudice Plaintiffs—particularly if offered as a preliminary instruction that could shape the jury's expectations as to the relevant issues.

17

## [Instruction No. 5] Overview of the Claims

**Plaintiffs' Version:** Plaintiffs' claims against NASCAR are, as I just noted, brought under the Sherman Act, which is the national antitrust law governing **illegal monopolies** and agreements in restraint of trade. **Plaintiffs have brought a claim under Section 2 of the Sherman Act, in which Congress has determined that certain types of monopolies are anticompetitive and unlawful.** Specifically, Section 2 of the Sherman Act prohibits the willful acquisition or maintenance of a **monopoly in any business through anticompetitive means**. Plaintiffs contend that NASCAR and Mr. France have engaged in anticompetitive conduct to maintain NASCAR's **monopoly** as the sole buyer of the services of premier stock car racing teams. **Defendants deny this claim and contend that NASCAR has achieved its market position solely through lawful competition on the merits.** Plaintiffs also have sued NASCAR and Mr. France for violating Section 1 of the Sherman Act, in which Congress has determined that to protect free and unfettered competition in the marketplace, certain types of contracts, combinations and conspiracies unreasonably restrain trade and are unlawful. Plaintiffs contend that NASCAR and Mr. France have unreasonably restrained trade through contractual restrictions precluding track owners and racing teams from providing needed resources to any competitor to the NASCAR Cup Series, thereby creating a barrier to entry. **Defendants deny that their contractual restrictions unreasonably restrained trade or blocked entry and instead contend that they are procompetitive**.[8]

---

[8] **NASCAR's Objection:** As a general matter, NASCAR objects to Plaintiffs' descriptions of NASCAR's arguments and counterclaim. Here, the language suggests that NASCAR accepts Plaintiffs' proposed market definition and admits that NASCAR has monopsony power, which is not the case.

For its part, NASCAR has brought an antitrust counterclaim against Counterclaim-Defendants 23XI, Front Row, and Mr. Polk under Section 1 of the Sherman Act. **NASCAR contends that the Counterclaim-Defendants have unreasonably restrained trade by agreeing to engage in joint negotiations with NASCAR and other concerted behavior to give them market power which they used against NASCAR in the market for purchasing the services of stock car racing teams for Cup Series races.** The Counterclaim-Defendants deny this claim and contend that the **joint negotiations** they conducted with NASCAR did not give them market power, did not restrain competition, and were procompetitive.[9]

Claims under Section 1 and Section 2 of the Sherman Act have different elements and I will explain these to you in detail, after you receive the evidence in the case, as part of my final instruction to you. You will decide, at the end of the trial, whether Plaintiffs have proven their **monopolization** claim against NASCAR and Mr. France under Section 2 of the Sherman Act and their agreement in restraint of trade claim against NASCAR and Mr. France under Section 1 of the Sherman Act. Additionally, you will determine whether NASCAR has proven its counterclaim against 23XI, Front Row, and Mr. Polk, of an unreasonable restraint of trade under Section 1 of the Sherman Act. Each claim should be considered separately by you based on the evidence that is presented during the trial.

We will now proceed to the opening arguments of the parties.

---

[9] **NASCAR's Objection:** NASCAR objects to the use of the terms "monopoly" and "monopolization" throughout Plaintiffs' proposed instructions. Jurors may be familiar with these terms and may confuse the issues in this case, which is a monopsony claim, not a monopoly claim. *See infra* at n.25. NASCAR also objects to Plaintiffs' characterization of NASCAR's claims as solely relating to "joint negotiations with NASCAR." The evidence shows a coordinated campaign to fix prices, choke off individual bargaining, deploy boycotts, and take other actions to coerce NASCAR into paying the racing teams more than it otherwise would have paid but for the conspiracy. *See* Doc. 249 at 1-2, 16-24. NASCAR also disputes that "market power" is a required element for NASCAR's Section 1 claim. *See infra* at nn.102, 154.

19

**NASCAR's Version:**  As I just explained, the claims and counterclaims in this case are brought under the Sherman Act.

23XI and Front Row challenge NASCAR and James France's conduct under Sections 1 and 2 of the Sherman Act.

NASCAR Event Management challenges 23XI, Front Row, and Curtis Polk's conduct under Section 1 of the Sherman Act.

Section 1 of the Sherman Act prohibits agreements, combinations, and conspiracies that unreasonably restrain trade.

Section 2 of the Sherman Act prohibits the willful acquisition or maintenance of a **monopsony**.[10]

23XI and Front Row allege two claims in this lawsuit:

*First*, 23XI and Front Row allege that NASCAR and James France violated Section 2 of the Sherman Act by engaging in unlawful **monopsonization**.  Specifically, 23XI and Front Row allege the relevant market is the market for **buying the services of stock-car racing teams** in the United States.  They allege that NASCAR had **monopsony power** in that market and **willfully engaged in conduct to maintain its monopsony**.  Further, they claim that they were injured by NASCAR's **monopsony conduct** and that Mr. France actively and knowingly directed, ratified or

---

[10] **Plaintiffs' Objection:** Plaintiffs object to NASCAR's use of the word "monopsony"—as opposed to the far more common term "monopoly"—throughout these instructions. Jury instructions should be written in plain English in a manner that is easily understood by a lay jury. *See* 1 Fed. Jury Prac. & Instr. Ch. 7 Appendix (6th ed.) (jury instructions are easier to understand when "[i]t substitutes plain English for unfamiliar words whenever possible."); Form and Content of Instructions, 9C Fed. Prac. & Proc. Civ. § 2556 (3d ed.) (Wright & Miller) ("It is axiomatic that the trial court should charge the jury in plain language. It should not use technical or obscure legal phrases if the legal rule can be stated in less formal words."). Whereas monopoly is commonly understood, "monopsony" is an unfamiliar legal term that needlessly risks confusing the jury.

controlled NASCAR's **monopsony conduct**.  NASCAR and Mr. France deny this claim and contend that NASCAR **has become a leading motorsport** through lawful means, including because of superior products, business acumen, **and history**—**and that organizations that race in the NASCAR Cup Series also race in other motorsports**.[11]

*Second*, 23XI and Front Row allege that NASCAR and Mr. France violated Section 1 of the Sherman Act by entering into contracts that unreasonably restrain trade.  More specifically, 23XI and Front Row claim that NASCAR and Mr. France entered into agreements with racetrack owners and teams racing in the Cup Series that limit the ability of tracks to host competing **motorsports races** and limit the ability of teams racing in the Cup Series **from racing in other stock car races**.  NASCAR and Mr. France deny that NASCAR's contracts unreasonably restrained trade or blocked entry and instead contend that they allow racing **in many other motorsports**, including other stock car series, and are procompetitive.

NASCAR Event Management alleges one counterclaim against 23XI, Front Row, and Mr. Polk, claiming that they violated Section 1 of the Sherman Act by participating in a conspiracy to unreasonably restrain trade.  More specifically, NASCAR Event Management claims that 23XI, Front Row, and other teams agreed **on the terms that they would offer and agree to when negotiating the 2025 Charter Agreements with NASCAR Event Management, seeking to fix prices, choke off individual bargaining, and coerce NASCAR into paying more**.[12]  NASCAR

---

[11] **Plaintiffs' Objection**: Plaintiffs' object to NASCAR claiming that "history" could somehow justify its monopsony and to its proposed language on Cup Series teams racing in other motorsports. The latter instruction would create the false impression that, if some teams compete in another motorsport alongside the Cup Series, that negates the existence of the relevant input market for premier stock car racing.  That is contrary to the law. *E.g., F.T.C. v. Sysco Corp.*, 113 F. Supp. 3d 1, 30–31 (D.D.C. 2015); *F.T.C. v. Whole Foods Mkt.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008).

[12] **Plaintiffs' Objection:** Plaintiffs object to NASCAR's suggestion that the Court should instruct the jury with inflammatory and prejudicial terms such as "choke off" and "coerce." Moreover, the

Event Management further alleges that Mr. Polk was a knowing and active participant in the conspiracy just described. **23XI, Front Row, and Mr. Polk deny and dispute NASCAR Event Management's allegations**.

       **These claims have different legal elements. After you have heard all of the evidence, I will explain those elements to you in my final instructions.** We will now proceed to the opening arguments of the parties.

---

Court dismissed NASCAR's price fixing claim under Rule 12(b)(6), *see* Dkt. 162, so it is wholly improper for NASCAR to seek an instruction on a claim that has been dismissed and is no longer in the case.

**POTENTIAL INSTRUCTIONS DURING TRIAL**

**[Instruction No. 6] Stipulation of Fact[13]**

The parties have agreed that the following facts are true. You must therefore treat these facts during your deliberations as having been proved for purposes of this case.

[Insert any stipulated facts]

---

[13] **Source**: Model Civ. Jury Instr. 3rd Cir. 2.4 (2025) ("Third Circuit Instructions").

**[Instruction No. 7] Opinion Testimony[14]**

You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such witness has given an opinion does not mean that you are required to accept it. No opinion is binding on your determinations, and you may reach opposite conclusions based on other evidence in the case. If you decide that a witness's opinion is not based on sufficient knowledge, or that the reasons given in support of the opinion are not sound, or that other evidence outweighs the opinion, you may disregard the opinion altogether. Give the opinion testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all the other evidence in the case.

---

[14] **Sources**: Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 11; Third Circuit Instructions 2.13.

**[Instruction No. 8] Uncalled Witnesses[15]**

There are several persons whose names you have heard during the trial, but who did not appear here to testify. I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

---

[15] **Source**: Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 13.

**Instruction No. 9] Demonstrative Exhibits[16]**

      Certain demonstrative exhibits have been shown to you. These exhibits were used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts.

---

[16] **Sources**: Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 16; Federal Civil Jury Instructions of the Seventh Circuit 1.24 (2017).

**[Instruction No. 10] Spoliation**[17]

You have heard testimony that Bob Jenkins deleted text messages that are not recoverable.  Front Row's failure to preserve Mr. Jenkins' text messages is known as "spoliation of evidence."  Spoliation is the destruction or material alteration of evidence or the failure to preserve evidence for another's use in pending or reasonably foreseeable litigation.

You may presume that the lost evidence would have been relevant and helpful to NASCAR's and Mr. France's defenses and NASCAR Event Management's counterclaim and/or would have been harmful to 23XI and Front Row's case.  While it is impossible to know exactly what evidence was lost, you must make these determinations to the best of your ability based on all the facts and circumstances of this case.  You must then decide how much weight and effect to give to your belief about spoliation in reaching your verdict.[18]

---

[17] **NASCAR's Sources:**  Fed. R. Civ. P. 37(e)(1) ("If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court[,] upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice."); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 18; Final Jury Instructions, *GN Netcom Inc. v. Plantronics Inc.*, No. 12-cv-1318-LPS (D. Del. Oct. 18, 2017), ECF No. 532 at 7; *Teague v. Target Corp. d/b/a Target Stores, Inc.*, 2007 WL 1041191 at *2 (W.D.N.C. Apr. 4, 2007) ("[An] available sanction for spoliation is the issuance of jury instructions permitting the jurors to draw an adverse inference from a party's destruction of evidence. Evidence of bad faith or fraudulent intent is not required to obtain this instruction."); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995) (explaining that the "spoliation of evidence rule" is "not an affirmative defense, but a rule of evidence, to be administered at the discretion of the trial court."); *United States v. Johnson*, 996 F.3d 200, 217 (4th Cir. 2021) ("[T]he court abuses its discretion in disallowing an adverse inference instruction where the instruction is 'correct,' is 'not substantially covered by the charge' given to the jury, and 'involve[s] some point so important that the failure to give the instruction seriously impair[s] the defendant's defense.'").

[18] **Plaintiffs' Objection:**  Plaintiffs object to NASCAR's proposed spoliation instruction. A jury instruction on spoliation is only appropriate *after* the Court finds that a party intentionally failed to preserve relevant evidence under Rule 37(e). Fed. Rule Civ. P. 37(e)(2)(B) (providing that, "only upon finding" intentional spoliation, the Court may issue spoliation jury instruction); *e.g., Teague*

*v. Target Corp.*, 2007 WL 1041191, at \*2 (W.D.N.C. Apr. 3, 2007) (explaining that "Courts have held that three elements should be shown to warrant an adverse inference instruction for spoliation"); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 533 (D. Md. 2010). NASCAR never brought any spoliation motion under Rule 37(e), much less obtained a Court order that Mr. Jenkins (or anyone else) intentionally violated any duty to preserve relevant evidence. NASCAR cannot circumvent Rule 37(e) and obtain a spoliation instruction through the back door. In any event, Plaintiffs strongly dispute that Mr. Jenkins committed any act of spoliation. NASCAR has zero evidence that Mr. Jenkins ever deleted relevant evidence that he was under an obligation to preserve, much less that he did so intentionally (indeed, if NASCAR had such evidence, it surely would have brought a Rule 37 motion). This is nothing more than an attempt to smear Mr. Jenkins and Plaintiffs in front of the jury.

28

## PROPOSED SUBSTANTIVE JURY INSTRUCTIONS

## INSTRUCTIONS AFTER THE CLOSE OF THE EVIDENCE[19]

Members of the Jury:

You have now heard the evidence and soon will hear the arguments of counsel. Following those arguments, I will instruct you as to the law that applies in this case. If any difference appears to you between the law as presented by the attorneys in closing arguments and that stated by me in these instructions, you are to be governed by my instructions.

I remind you that it is your duty and responsibility in this trial to judge the facts in accordance with the law as I instruct you. You may find the facts only from the evidence that I have allowed to be admitted during this trial. You must not consider anything that I have instructed you to disregard, and evidence that I have admitted only for a limited purpose you must consider only for that purpose.

In a civil case, the party with the burden of proof on any given issue has the burden of proving every disputed element of his claim or affirmative defense to you by a preponderance (or the greater weight) of the evidence. To establish a fact by a preponderance (or the greater weight) of the evidence means to prove that the fact is more likely true than not true. It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents. If you conclude that the party bearing the burden of proof has failed to establish any essential part of its claim or affirmative defense by a preponderance of the evidence, you must decide against it on the issue you are considering.

---

[19] **Source**: *Standing Order Governing Jury Selection and Instruction in Civil Cases Before the Honorable Kenneth D. Bell*, Exhibit C (Nov. 20, 2019).

29

**As I instructed you at the beginning of trial**, some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof in a criminal trial. That requirement does not apply to a civil case such as this and you should put it out of your mind.

## CONCLUDING INSTRUCTIONS AFTER CLOSING ARGUMENTS[20]

Members of the Jury:

Now you have heard the evidence and the arguments of counsel. It is your duty to remember the evidence whether it has been called to your attention or not, and if your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection of the evidence in your deliberations.

It is your duty not only to consider all the evidence, but also to consider all the arguments, the contentions and positions urged by the attorneys and any other contention that arises from the evidence, and to weigh them all in the light of your common sense, and as best you can, to determine the truth of this matter.

The law, as indeed it should, requires the presiding judge to be impartial. Therefore, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.

I will now give you your instructions on the issues in this case.

---

[20] **Source**: *Standing Order Governing Jury Selection and Instruction in Civil Cases Before the Honorable Kenneth D. Bell*, Exhibit C (Nov. 20, 2019).

**PLAINTIFFS' MONOPOLIZATION / MONOPSONIZATION CLAIM**

A. **[Instruction No. 11] Elements of the Monopolization / Monopsonization Claim[21]**

Plaintiffs 23XI and Front Row allege that Defendants NASCAR and James France have willfully maintained an unlawful monopoly / monopsony in violation of Section 2 of the Sherman Act. More specifically, 23XI and Front Row claim that they were injured by NASCAR's unlawful monopolization / monopsonization of the market for the services of premier stock car racing teams in the United States. As such, 23XI and Front Row allege that NASCAR possesses a "monopsony," which I will explain to you shortly.[22]

To prevail against Defendants on this / a monopsony claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:[23]

---

[21] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3, Instr. A.1; *Banner Pharmacaps Inc. v. Perrigo Co.*, No. 1:04-CV-492, Proposed Final Jury Instructions, at 51–52 (M.D.N.C. Dec. 21, 2005); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007); *Sony Elecs., Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 184 (D. Conn. 2001); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

**NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.1 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 51; *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990) ("To prevail on a monopolization claim, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury."); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (distinguishing between "willful acquisition or maintenance of that power" from "growth or development as a consequence of a superior product, business acumen, or historic accident"); *Brown v. Donco Enters.*, 783 F.2d 644, 646 (6th Cir. 1986) ("Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends.").

[22] **Plaintiffs' Objection:** Plaintiffs incorporate and refer to their earlier objection concerning NASCAR's use of "monopsony" rather than "monopoly." *See supra* n.10. Plaintiffs object to the use of "monopsony" throughout these instructions.

[23] **Joint Statement:** The parties agree that, for each of the claims in this case, there is no dispute that the challenged conduct occurred in or affected interstate commerce. In order to avoid confusing the jury, they have therefore omitted discussion of that element.

32

The **<u>first</u>** element is establishing <u>**a relevant market in which NASCAR is claimed to**</u> <u>**have monopoly power, but a relevant market need not be established if Plaintiffs prove that**</u> <u>**NASCAR possessed monopoly power through direct evidence of that power, as I will explain**</u> <u>**later in my instructions**</u>[24] / <u>**that the alleged relevant market, which Plaintiffs allege is a**</u> <u>**market for buying the services of premier stock car racing teams in the United States, is a**</u> <u>**valid antitrust market**</u>.

The **<u>second</u>** element is establishing that NASCAR possessed <u>**monopoly**</u>[25] / <u>**monopsony**</u> power <u>**in that market**</u>.

---

[24] **NASCAR's Objection:** Plaintiffs' proposal is an incorrect statement of the law and invites reversible error. It has long been settled that "[t]he offense of monopoly under § 2 of the Sherman Act" requires "the possession of monopoly power *in the relevant market*." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (emphasis added); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993) ("[I]t is beyond doubt that [a charge of monopolization] requires proof of market power *in a relevant market*." (emphasis added)). Binding Fourth Circuit law prevents Plaintiffs from arguing that "direct evidence" relieves them of their burden to establish a relevant market. *See, e.g.*, *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986) ("Proof of a relevant market is the threshold for a Sherman Act § 2 claim. The plaintiff *must* establish the geographic and product market that was monopolized. (emphasis added)); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016) (citing *Spectrum Sports* and describing "relevant market as a threshold issue for monopolization claims"). That is because without a "market definition," courts are unable "to discern the nature or extent of any anticompetitive injury that plaintiff and other similarly situated parties may be suffering." *It's My Party*, 811 F.3d at 681. Plaintiffs' only citation here that conceivably supports this move is the out-of-circuit case *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002). But *PepsiCo.* did not decide whether direct evidence in fact allowed the plaintiff to skip market definition (because the plaintiff failed to cite such evidence). *Id.* at 108. And later Second Circuit authority closes that door, clarifying that "a plaintiff claiming monopolization is *obligated* to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market" and so "cannot escape proving [its] claims with reference to a particular market *even if [it] intends to proffer direct evidence*." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) (emphases added). NASCAR therefore requests that the description of the first element follow the ABA Model Instruction verbatim. *See* ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.1 (2016).

[25] **NASCAR's Objection:** *First*, Plaintiffs' complaint pleads a "monopsony" and that NASCAR engaged in "monopsonization" of the relevant market. *See* Doc. 107 ¶¶ 138, 139, 144, 145, 146, 147, 148, 149, 151. A monopsony is a well-established legal category, and bringing a monopsony case comes with particular requirements. For instance, an entity with "monopsony power" seeks

The **third** element is establishing that NASCAR willfully maintained **its monopoly** / **monopsony** power **in that market** by engaging in anticompetitive conduct, **instead of growing because of superior products, business acumen, or history**.

The **fourth** element is establishing that 23XI and Front Row were injured in their business or property because of NASCAR's anticompetitive conduct.

These are the elements of the **monopolization** / **monopsonization** claim. You will have to decide whether Plaintiffs 23XI and Front Row have proven each of these elements.  **If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence, then you must find for Plaintiffs on this claim.  However, if you find that Plaintiffs have failed to prove any of these elements, then you must find for Defendants and against Plaintiffs on this claim.  I will now further explain each of the four elements that are disputed.** [26] / **If you find**

---

to "'restrict its input purchases below the competitive level,' thus 'reduc[ing] the unit price for the remaining input[s] it purchases." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320-21 (2007) (citation omitted) (alterations in original); *see also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices."); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A monopsony occurs when there is 'market power on the buy side of the market' and buyers consequently pay suppliers less than they would in a competitive market." (citation omitted)).

The instructions to the jury should use consistent terminology that squares with Plaintiffs' own allegations and with that established law.  Plaintiffs should not be permitted to conflate a monopoly (with which jurors are likely familiar) with a monopsony, because a monopsony exists only in "unusual" or "exceptional" circumstances. *See Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1135 (10th Cir. 2002) (describing "unusual circumstance of an effective monopsony") (citation omitted); *Dyer v. Conoco, Inc.*, 49 F.3d 727, 1995 WL 103233, at *5 n.9 (5th Cir. 1995) (table) ("exceptional situation" for "monopsony" to "wield substantial power"); *cf. Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (noting "danger in applying [market] factors mechanically in the context of monopsony").

*Second*, Plaintiffs improperly deleted "in that market" from the description of this second element based on their erroneous view that proof of a relevant market is unnecessary in certain circumstances. *Supra* at n.24.

[26] **NASCAR's Objection:** *First*, it is inaccurate to say that the jury will "have to decide" each of these elements.  If, for instance, the jury finds that Plaintiffs have not proven their relevant market,

that 23XI and Front Row have failed to prove any of these elements, then you must find for NASCAR and James France and against 23XI and Front Row on this claim. Only if you find that 23XI and Front Row have proved each and every one of these elements by a preponderance of the evidence as to NASCAR, then you must find for 23XI and Front Row and against NASCAR on this claim. As to Mr. France, 23XI and Front Row must also prove that Mr. France actively and knowingly engaged in conduct designed to achieve anticompetitive ends.

---

that is the end of their Section 2 claim and the jury need not make any further findings on that claim. *Second*, Plaintiffs flip the order of the ABA Model Instruction without explanation. By contrast, NASCAR's proposal precisely tracks the model. *Third*, NASCAR's proposal accurately captures the law with regards to Mr. France, whereas Plaintiffs' proposal does not address the additional requirement for individual liability.

**B. [Instruction No. 12] Monopoly Power Defined / Monopsony Power**

**Plaintiffs' Version**[27]: To prove their **monopolization** claim, 23XI and Front Row must prove that NASCAR has **monopoly** power. **Monopoly** power is the power to control prices or exclude competition.

More precisely, NASCAR is a monopoly buyer (we call such a buyer a monopsonist) if it can **exert control over or** reduce the price that it pays for a good or service **(here, premier stock car racing services)** below competitive levels to the sellers it buys from **(here, racing teams seeking to participate in the NASCAR Cup Series).** [28]

---

[27] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3, Instr. 2; *Sony Elecs., Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 184–85 (D. Conn. 2001) ("[A] monopsony [is] an arrangement where a buyer uses its market power to reduce the purchase price of goods that it will use to produce its own products.); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys, Inc.*, 386 F. 3d 485, 500 (2d Cir. 2004) ("Monopoly power is the power to control prices or exclude competition.") (internal citations omitted); *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (monopoly power is "the power to control prices or exclude competition"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–14 (1984) (market power is the "special ability . . . to force [a contracting partner] to do something he would not do in a competitive market."); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024) ("[A] monopolist violates [Section] 2 when it use[s] [its] monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor."); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320–21 (2007) ("Monopsony power is market power on the buy side of the market.") (citing Blair & Harrison, *Antitrust Policy and Monopsony*, 76 CORNELL L.REV. 297 (1991)).

[28] **NASCAR's Objection:** *First*, NASCAR objects to Plaintiffs' modifications to the ABA Model Instruction in ways transparently designed to lessen their burden. For instance, Plaintiffs delete the requirement to show that monopoly power occurs in a relevant market. They delete the model's statement that the impact on prices should be "substantial[]" and "for a significant period of time." And they delete the model's statement that "possession of monopoly power, in and of itself, is not unlawful." *Second*, NASCAR believes that a full "monopsony power" instruction based on the ABA model should come *after* the relevant-market instructions, *see infra* Instruction 16, such that only a brief definition of a monopsony is appropriate here. *Third*, NASCAR objects to Plaintiffs' repeated use of "monopoly," as it is not accurate for this case. *Supra* at n.25. *Fourth*, NASCAR again objects to Plaintiffs' use of "premier stock car racing" because it suggests the Court believes that market is legitimate. *Supra* at n.6. And *fifth*, Plaintiffs' instruction misstates the law, because a monopsony requires a (1) reduction in the amount purchased in order to (2) lower the price it has to pay for that reduced amount. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007); *infra* at n.29.

36

**NASCAR's Version**[29]:  23XI and Front Row claim that NASCAR possesses a "monopsony" as the only buyer in their alleged market.  **Whereas a monopoly is the control of a market by a single seller, a monopsony is the control of a market by a single buyer.  The mere possession of monopsony power is not unlawful; in fact, it is an important element of the free-market system.**[30]

---

[29] **NASCAR's Sources:**  ABA Model Jury Instrs. in Civ. Antitrust Cases, Nos. 3.A.1, 3.A.8 (2016); *Liggett Grp., Inc. v. Brown & Williamson Tobacco Corp.*, 964 F.2d 335, 336 n.2 (4th Cir. 1992) ("[A] monopoly is the control of a market by one seller…."); *Cable Line, Inc. v. Comcast Cable Commc'ns*, 767 F. App'x 348, 351 (3d Cir. 2019) ("A 'monopsony' exists when a market is controlled by one buyer."); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) ("Monopsony power is market power on the buy side of the market.  As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'"); *id.* at 320-21 (entity with "monopsony power" "seek[s] to 'restrict its input purchases below the competitive level,' thus 'reduc[ing] the unit price for the remaining input[s] it purchases"); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) ("[I]t is clear that merely being a monopolist does not violate Section 2."); *Dyer v. Conoco, Inc.*, 49 F.3d 727, 1995 WL 103233, at *5 (5th Cir. 1995) (in monopsony case, "the seller faces a Hobson's choice:  he can sell into the rigged market and take the depressed price, or he can refuse to sell at all"); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices."); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A monopsony occurs when there is 'market power on the buy side of the market' and buyers consequently pay suppliers less than they would in a competitive market.").

[30] **Plaintiffs' Objection:**  Plaintiffs object to language characterizing monopsony power as "an important element of the free-market system" as legally incorrect, prejudicial, and irrelevant. Plaintiffs challenge NASCAR's maintenance of its monopoly—not how it acquired the monopoly—and thus the principle that firms may lawfully obtain a monopoly through competition on the merits is irrelevant to this case. No case says that a firm ***maintaining monopoly power*** is important to free-market competition or beneficial to consumers; on the contrary, Section 2 is designed to prevent long-term monopolies. *Standard Oil Co. v. Fed. Trade Comm'n*, 340 U.S. 231, 248 (1951) ("The heart of our national economic policy long has been faith in the value of competition."). Further, NASCAR's statement that monopsony is "control of the market by a single buyer" is incorrect—the jury can find a firm is a monopsonist based on direct evidence (ability to control price or exclude competitors) or circumstantial evidence (high market share, barriers to entry, etc.), even if the dominant firm is not the only buyer in the market.  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (monopoly power is "the power to control

37

## C. [Instruction No. 13] First Element: Relevant Market

**Plaintiffs' Version**[31]**:** Plaintiffs 23XI and Front Row must establish the relevant market in which NASCAR is claimed to have **monopoly** power **unless they can prove the existence of such monopoly power through direct evidence. Defining the relevant market may be necessary because you are required to make a judgment about whether NASCAR has monopoly power.** To make this judgment, you must be able to determine what, if any, economic forces restrain NASCAR's freedom to set prices **and defining a relevant market is one way to make that determination**. Plaintiffs contend that the relevant market to assess NASCAR's

---

prices or exclude competition"); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (market share exceeding 70 percent is "strong evidence of monopoly power").

[31] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3, Instr. A.3; *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("reduced output, increased prices, or decreased quality in the relevant market" may serve as "proof of actual detrimental effects [on competition]"); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (explaining that "there is authority to support its claim that a relevant market definition is not a necessary component of a monopolization claim" and that "direct evidence" of market power may suffice); *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022) (plaintiff not required to "define a particular market" where it can show the "actual anticompetitive impact of the challenged practice"); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 608 F. Supp. 3d 298, 314 (W.D.N.C. 2022) ("[A] party may establish monopoly power either through direct evidence of supracompetitive prices and restricted output or by inference from the structure and composition of the relevant market.") (internal citations omitted); *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 99 F. Supp. 3d 610, 624 (D. Md. 2015) (similar); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016) ("[M]onopoly power may be established, not only by proof of a defendant's market share in a relevant market, but alternatively by direct evidence of a defendant's price control or exclusion of competitors from a particular market in a manner indicative of its possession of monopoly power."); *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (emphasis added) (citation omitted) (in the case of a monopsony, the relevant market "is not the market of competing sellers but of competing buyers. This market is comprised of *buyers* who are seen by *sellers* as being reasonably good substitutes"); *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1176 (N.D. Cal. 2017) ("Determination of the relevant market is typically a fact-intensive inquiry, involving 'identification of the field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business. . . . This definitional process is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility.'") (citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)).

**monopoly** power is the market for the purchase of the services of premier stock car racing teams in the United States.[32]

In determining the boundaries of a relevant market, the most likely and most important restraining force on NASCAR's ability to set prices **would be any actual or potential competition from other businesses to purchase the services of premier stock car racing teams**. This includes all businesses that act or likely could act as restraints on NASCAR's power to set prices as it pleases because **premier stock car racing teams** could sell their services to such other businesses if NASCAR offered them too little. **All the businesses or racing organizations, if**

---

[32] **NASCAR's Objection:** *First*, as explained above, Plaintiffs' belief that they can succeed on their monopolization claim without proving a relevant market is wrong. *Supra* at n.24; *see United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993); *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016).

Plaintiffs' authority is not to the contrary. *Ohio v. American Express Company*, involved a *Section 1* claim, and Plaintiffs' incomplete cite is misleading because *Amex* reaffirmed that evidence of "reduced output, increased prices, or decreased quality *in the relevant market*" was required. 585 U.S. 529, 542 (2018) (emphasis added). On appeal, *Duke Energy* reaffirmed that Section 2 requires "monopoly power *in the relevant market*." 111 F.4th 337, 353 (4th Cir. 2024) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966)). So too did *Intellectual Ventures*. *See Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 99 F. Supp. 3d 610, 620-24 (D. Md. 2015) (reaffirming *Grinnell* and relevant-market requirement). Plaintiffs' scattershot references to out-of-circuit cases fare no better. *PepsiCo* (1) does not govern in the Fourth Circuit, (2) did not decide the issue itself, and at any rate (3) is clarified by later precedent in the Second Circuit. *See supra* at n.24. *Shak* reaffirmed proof of "monopoly power *in the relevant market*" and "price control or exclusion of competitors *from a particular market*." *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 480, 482 (S.D.N.Y. 2016) (emphases added). And *PLS.Com* involved a *Section 1* claim (not a Section 2 monopolization claim) and relied on "quick look" case law in *Indiana Federation of Dentists* that is wholly inapplicable here. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022).

*Second*, NASCAR objects to Plaintiffs' use of the word "monopoly" as inaccurately describing Plaintiffs' claims. *Supra* at n.25.

**any, that can reasonably be substituted for NASCAR as purchasers for premier stock car racing team services would be within what is called the relevant market**.[33]

You must consider two parts in determining whether Plaintiffs have met their burden to prove a relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market.

---

[33] **NASCAR's Objection:** Plaintiffs' proposed language improperly assumes the correctness of its relevant market. Describing the teams as "racing teams" is accurate, neutral, and captures the fact that the dispute on this element is whether a market for "premier stock car racing team services" even exists (or is instead gerrymandered for purposes of this case). *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

**NASCAR's Version:**[34]  <u>**23XI and Front Row must prove by a preponderance of the evidence that NASCAR had monopsony power in a relevant market**</u>.[35]  Defining the relevant

---

[34] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.3 (2016); *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986) (it is "practically incontrovertible" that "plaintiff must establish the geographic and product market that was monopolized"); *id.* at 495 ("A market drawn too tightly, either in geographic terms that exclude potential suppliers or in product terms that exclude potential substitutes, creates the illusion of market power where none may exist.  Such a misleading start in antitrust analysis … makes accurate determination of the ultimate question—whether the antitrust laws have been violated—impossible." (internal citations omitted)); *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir. 2021) ("Proof of a relevant market is a threshold for a Sherman Act § 2 claim.  [Plaintiff] bears the burden of proof on the issue of the relevant product and geographic markets." (internal quotations omitted)); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) ("No party can expect to gerrymander its way to an antitrust victory without due regard for market realities."); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320-21 (2007) (entity with "monopsony power" "seek[s] to 'restrict its input purchases below the competitive level,' thus 'reduc[ing] the unit price for the remaining input[s] it purchases"); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices."); *Oksanen v. Page*, 945 F.2d 696, 709 (4th Cir. 1991) (en banc) (plaintiff's "preference alone does not justify excluding other [products] from the relevant market definition"); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 81 (3d Cir. 2010) ("It is well established that the sanctioning bodies compete for racers and drivers, and these racers and drivers are more than able to … 'vote with their trailers.'"); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) (requiring "proof [that] there is no cross-elasticity of demand between this game and other games that modified car racers might choose to play"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997) ("[T]he Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement.  The franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the pre-contract stage."); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 584 (W.D. Va. 2000) ("VVL began doing business in Virginia with its eyes wide open, fully able to 'assess the potential costs and economic risks at the time.'  VVL cannot now claim to be "locked in" to the Louisa County mining rights market." (internal citations omitted)); *Bendfeldt v. Window World, Inc.*, 2017 WL 4274191, *4-5 (W.D.N.C. Sept. 26, 2017) (market definition should not exclude "the broader market in which the franchise operates," particularly when the plaintiffs "knew from the moment they" entered the franchise arrangement that they might become "locked in").

[35] **Plaintiffs' Objection:** NASCAR's instruction misstates the law. Plaintiffs are not required to separately prove a relevant market if they show, through direct evidence, that NASCAR exercised monopoly power. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007); *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016). NASCAR's proposed instruction thus would wrongly instruct the jury that

41

market **is essential** because you are required to make a judgment about whether NASCAR has **monopsony power** in a properly defined economic market. **Monopsony power allows a buyer to reduce the amount it purchases in order to reduce the prices it pays to below-competitive levels. As a result, the options available to sellers (potential substitutes) are important. That is because a market drawn too tightly creates the impression of monopsony power where none may exist. No party can expect to gerrymander its way to an antitrust victory without due regard for market realities.**[36]

To make this judgment, you must be able to determine what, if any, economic forces restrain NASCAR's **freedom to reduce the amount it buys so that it can lower the price it pays for the racing-team services.**

The most likely and most important restraining force will be actual and potential competition **from other motorsports**, or other options available to the owners of the racing teams. This includes all **motorsports** that act or likely could act as restraints on NASCAR's power to set prices as it pleases because teams could choose to begin racing in **other motorsports** instead of

---

Plaintiffs are required to prove a relevant market regardless of whether they provide direct evidence of NASCAR's monopoly power.

[36] **Plaintiffs' Objection**: NASCAR's proposed instruction is wrong under well-established antitrust law because it implies that, in order show NASCAR has monopoly power, Plaintiffs would need to prove that NASCAR restricted output (i.e., "reduce the amount" it purchases or buys). That is not the law. *See, e.g., Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("reduced output, increased prices, *or* decreased quality in the relevant market" may serve as "proof of actual detrimental effects [on competition]") (emphasis added); *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1069 (9th Cir. 2025) ("[A] plaintiff need not allege both output restrictions and supracompetitive pricing to plead direct evidence of monopoly power"); *United States v. Google LLC*, 747 F. Supp. 3d 1, 123 (D.D.C. 2024) (same). Additionally, Plaintiffs object to NASCAR's inflammatory and prejudicial language about "gerrymandering" the market definition.

NASCAR **or leave NASCAR to compete elsewhere** if NASCAR keeps prices too low. **All the other options that exert such restraining force are within what is called the relevant market.**[37]

**The relevant market analysis focuses on competition at the pre-investment rather than the post-investment stage. A party cannot establish a relevant market by claiming to be locked into a market that it entered with eyes wide open, when it was able to assess the potential costs and economic risks at the time.**[38]

---

[37] **Plaintiffs' Objection:** NASCAR attempts to use this instruction to try to imply the existence of a motorsports market, which is prejudicial and likely to confuse the jury. Further, NASCAR's proposed instruction improperly states that if teams leave the market entirely, that can show that NASCAR does not have monopoly power. That is incorrect and misleads the jury. Firms quitting the sport or leaving the market is not evidence of a lack of monopoly power; only substitution to a competitor within the relevant market in response to a price decrease would be. *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 46 (D.D.C. 2024) ("[W]hen a monopoly already exists, any worsening of terms is apt to induce customers to substitute to products that are not, in a competitive market, true substitutes. Including those products in the market based on that substitution therefore risks delineating an erroneously broad product market.") (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 n.7 (9th Cir. 2023)); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 565b (5th ed. 2022) ("[I]t would be improper to group complementary goods into the same relevant market just because they occasionally substitute for one another. Substitution must be effective to hold the primary good to a price near its costs[.]").

[38] **Plaintiffs' Objection**: NASCAR's characterization of the market definition analysis as focusing on the "pre-investment" stage is a plain legal error. NASCAR relies on the *Eastman Kodak* line of cases for this proposition; as Plaintiffs have explained many times, the aftermarket lock-in doctrine has no relevance to this case. Dkt. 71, 265, 279. *Eastman Kodak* applies when a plaintiff purchases a good or service in a competitive foremarket and then claims it is "locked in" with respect to a derivative aftermarket for that good or service (i.e., copy machine repairs). That fact pattern has no application here. Further, NASCAR's suggestion that there is no relevant market because teams could choose not to participate in the monopolized market at all is incorrect; the Sherman Act protects competition in ***every*** market. *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968) (factfinder cannot deny "recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others"); *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 64 (2d Cir. 2019) ("The manner of [plaintiff's] entrance into the . . . agreement notwithstanding, it is entitled to conduct its business in a market that is not infected with an anticompetitive distortion.").

There are two aspects you must consider in determining whether 23XI and Front Row have met their burden to prove **the** relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market.

1. **[Instruction No. 14] Relevant Product Market**

**Plaintiffs' Version[39]:** The basic idea of a relevant product market in an antitrust case like this one, that alleges a **monopoly** by a buyer of products or services, is to identify the market in terms of the competing buyers of the relevant products or services. The relevant product market is comprised of that set of buyers or potential buyers who are seen by sellers as being reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and sellers in the market. **The proper focus is on the commonality and interchangeability of the buyers, and not the commonality or interchangeability of the sellers**.

One way you may be able to tell if products or services are reasonable substitutes—and thus in the same product market—is by considering whether changes in the price of one product

---

[39] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3, Instr. A.4; *F.T.C. v. Surescripts, LLC*, 665 F. Supp. 3d 14, 36 (D.D.C. 2023) ("Markets 'must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn.'") (citing *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017)); *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("When a product is controlled by one interest, without substitutes available in the market, there is monopoly power."); *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."); *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994) (products are included in a single relevant market when they "have the ability—actual or potential—to take significant amounts of business away from each other"); P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 565a (4th & 5th eds. 2024); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) ("The Supreme Court identified several 'practical indicia' that may be used to delineate submarkets, such as 'industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 727 (D. Md. 2002), *aff'd sub nom. Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003) ("Relevant market cannot be proved through generalizations about any given industry, but instead must be based on the economic and commercial realities of the particular market studied."); *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (emphasis added) (citation omitted) (in the case of a monopsony, the relevant market "is not the market of competing sellers but of competing buyers. This market is comprised of *buyers* who are seen by *sellers* as being reasonably good substitutes").

or service have direct and noticeable effects on the prices or sales of the other products or services. If so, the products or services **may** be in the same market.

You may also consider how people in the industry and the public at large view the products or services; whether the products or services have the same or similar characteristics or uses; whether the products or services have similar prices; whether the products or services are sold to similar customers; and whether they are distributed and sold by the same kinds of sellers.

**The relevant market may include not only current buyers, but also potential buyers. Potential buyers are other persons or entities that reasonably could become buyers in competition with NASCAR, even if they are not presently buyers.**

23XI and Front Row allege that the relevant product market in this case is the "market for the services of premier stock car racing teams." The "market for premier stock car racing teams" means the market for purchasing the services of premier stock car racing teams to compete in premier stock car races. **As a result, the relevant product market includes all the buyers to which premier stock car racing teams can reasonably turn to as substitutes for selling their services. A relevant market can include a single brand or buyer where there are no other comparable buyers for the purchase of the product or service.** [40]

---

[40] **NASCAR's Objection:** *First*, though Plaintiffs' proposal purports to be adapted from the ABA Model Instruction, their wholesale and unsupported changes to that model ought to be rejected. Plaintiffs also selectively import portions of the Modern Federal Jury Instructions into their proposal without citing that model. And they modify that model in unjustifiable ways: for example, by saying that products "may" be in the same market instead of that "the products *are* in the same market." *See* Modern Federal Jury Instructions—Civil ¶ 79.05[3], *Instruction 79-51 Relevant Market—Product Market* (Lexis 2025). Or they omit portions that do not suit their purposes: for instance, the statement that "[p]roducts do not have to be identical to be in the same relevant market." *See id.* By contrast, NASCAR's proposal combines both the ABA Model and the Modern Federal Jury Instructions without significant variations from those instructions. In addition, Plaintiffs' paraphrase of *Todd v. Exxon Corp.* (when Plaintiffs say that the "proper focus is on the commonality and interchangeability of the buyers, and not the commonality or interchangeability of the sellers") should be rejected—but if similar language is given, it should

**NASCAR's Version[41]:**   <u>**In a monopsony case, the market is not the market of**</u> <u>**competing sellers, but rather of competing buyers**</u>.  A relevant product market is comprised of

---

come directly from *Todd*:  In a monopsony case, "the market is not the market of competing sellers but of competing buyers.  This market is comprised of buyers who are seen by sellers as being reasonably good substitutes." 275 F.3d 191, 202 (2d Cir. 2001).

    *Second*, Plaintiffs' reliance on a "single brand or buyer" here is inappropriate: they "cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008); *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) ("No party can expect to gerrymander its way to an antitrust victory without due regard for market realities.").  Courts have rejected similar attempts to define a single racing series as its own product market.  *E.g.*, *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) ("[T]he Brookins now argue that IMCA-sanctioned modified car racing is, by itself, a relevant market. But that assertion requires proof there is no cross-elasticity of demand between this game and other games that modified car racers might choose to play."); *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009) ("[D]espite evidence that NASCAR competes with various forms of entertainment—including other stock-car and open-wheel racing, other professional sports leagues, and recreational sports—Zimbalist identified only the Busch series and open-wheel racing series as possible substitutes.  A substitutability analysis that encompasses all the alternative forms of entertainment is necessary in light of the fact that the consumers Zimbalist identifies have a variety of comparable 'products' from which to choose.").  And courts have often found that markets are "too narrowly" defined.  *See, e.g.*, *NHLPA v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472-73 (6th Cir. 2005) (collecting cases); *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 857 (8th Cir. 2020) (finding "alleged product market was too narrowly defined").

    *Third*, Plaintiffs' statement that a product market "includes as the buyers to which premier stock car racing teams can reasonably turn to as substitutes" misses the fact that the relevant market analysis in a case like this focuses on competition at the *pre-investment* stage, not the present circumstances of the racing teams.  *See Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 440-41 (relevant-market analysis must consider whether party "could assess the potential costs and economic risks at the time they signed the franchise agreement"); *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1346-47 (9th Cir. 1987) (an alleged economic lock-in is irrelevant to the determination of a defendant's market power); *Bendfeldt v. Window World, Inc.*, 2017 WL 4274191, *5 (W.D.N.C. Sept. 26, 2017) (market definition should not exclude "the broader market in which the franchise operates," particularly when the plaintiffs "knew from the moment they" entered the franchise arrangement that they might become "locked in").

---

[41] **NASCAR's Sources:**  ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.4 (2016); Modern Federal Jury Instructions—Civil ¶ 79.05[3], *Instruction 79-51 Relevant Market—Product Market* (Lexis 2025); *id.* ¶ 80.01, *Instruction 80-5 Relevant Market Defined*; *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) ("When considering market power in a monopsony situation, 'the market is not the market of competing sellers but of competing buyers.  This market is comprised of buyers who are seen by sellers as being reasonably good

buyers who are seen by sellers as being reasonably good substitutes.  This is a practical test with reference to the actual behavior of buyers and sellers.  Products need not be identical or precisely interchangeable so long as they are reasonable substitutes.

One way to determine whether products are reasonable substitutes for each other is by considering whether changes in the price of one product have fairly direct and noticeable effects on the prices or sales of the other products.  If so, the products **are** in the same market.  **For**

---

substitutes.'  If the market described … fails to include 'reasonably good substitutes' then the plaintiff has not adequately [proven] a relevant market."); *id.* at 1119 ("When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share."); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) ("Whether a product … commands a distinct market depends on whether it is 'reasonably interchangeable' with other products or the 'extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the 'cross-elasticity of demand.'"); *Kentucky Speedway, LLC v. NASCAR*, 588 F.3d 908, 917 (6th Cir. 2009) (noting evidence that "NASCAR competes with other forms of entertainment—including other stock-car and open-wheel racing, other professional sports leagues, and recreational sports"); *id.* ("Appellate courts have also recognized the notion that a professional sport competes with other sports and other forms of entertainment."); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) (rejecting idea that "IMCA-sanctioned modified car racing is, by itself, a relevant market" because "of many other classes of auto racing, and many other auto racing sanctioning bodies"); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 81 (3d Cir. 2010) ("[S]anctioning bodies do not have unfettered discretion in adopting rules, entering exclusive arrangements, or imposing higher equipment costs on the racers and drivers.  It is well established that the sanctioning bodies compete for racers and drivers, and these racers and drivers are more than able to … 'vote with their trailers.'"); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 583 (W.D. Va. 2000) ("A plaintiff cannot establish a relevant [] market by claiming to be 'locked in' a market that it entered knowing in advance that doing so would entail lock-in costs and other economic risks."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient."); *id.* at 440 (noting relevant-market analysis must consider whether party "could assess the potential costs and economic risks at the time they signed the franchise agreement").

48

*example, if racing teams move to other motorsports or shift investments when the terms offered by one motorsport change, then those other motorsports belong in the same market.*[42]

Another consideration is whether a small but significant and non-transitory decrease in the price of one product would result in enough sellers switching from that buyer to another buyer such that the price decrease would not be profitable. If you find that sellers would switch and that the price decrease would not be profitable, then you must conclude that the products are in the same product market. If, on the other hand, you find that sellers would not switch, then you must conclude that the products are not in the same product market.

In sum, to determine the relevant product market, you must decide which products compete with each other. This is a practical determination. Products do not have to be identical to be in the same relevant market, but they must be sufficiently similar in the respects I have just mentioned to compete meaningfully with each other.

*In this case, 23XI and Front Row contend that the relevant product market is the input market for what they call premier stock-car racing teams. By contrast, NASCAR and Mr. France contend that 23XI and Front Row have failed to allege a proper relevant product market. NASCAR and Mr. France contend that NASCAR faces competition from other motorsports and other opportunities available to investors in teams, as shown for example by organizations racing in other motorsports forming teams to race in NASCAR's Cup Series and teams racing in the Cup Series choosing to focus their resources on other motorsports.*[43]

---

[42] **Plaintiffs Objection:** Plaintiffs object to NASCAR's instruction on "investments" for the reasons stated earlier. *See supra* n.38. The question for market definition is whether the teams have any reasonable alternatives to NASCAR for selling their services as premier stock car racing teams, not whether they could abandon the sport entirely and invest in different endeavors.

[43] **Plaintiffs Objection:** Plaintiffs object to this instruction because it is not necessary or appropriate for the Court to instruct the jury, using NASCAR's talking points, as to NASCAR's arguments on market definition.

If you find that 23XI and Front Row have proven a relevant product market, then you should continue to evaluate the remainder of this claim. However, if you find that 23XI and Front Row have failed to prove such a market, then you must find in NASCAR's and Mr. France's favor on this claim and you do not need to review Instructions 15 through 24 (you should move to Instruction 25).

## 2. [Instruction No. 15] Relevant Geographic Market

**Plaintiffs' Version[44]:** The relevant geographic market is the geographic area in which NASCAR faces competition from other **buyers or potential buyers of the services of premier stock car racing teams**. **In other words, it is the geographic area in which premier stock car racing teams, like Plaintiffs 23XI and Front Row, can reasonably turn to other purchasers to sell their services.** The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

In this case, Plaintiffs 23XI and Front Row claim that the relevant geographic market is the United States. In determining whether Plaintiffs met their burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

- The geographic area in which NASCAR and teams **that sell premier stock car racing services** are located;

- The geographic area in which **premier stock car racing teams** sell or have seriously considered selling their services as stock car racing teams;

- The geographic areas that NASCAR views as potential sources of competition for buying the services of **premier stock car racing teams**;

- Whether the **premier stock car racing industry** recognizes a particular geographic area as a distinct market;

---

[44] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3 Instr. A.6; *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 439 (4th Cir. 2011) ("If U.S. consumers can predictably turn to supplies only in the United States, then the United States is the relevant geographic market"); *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1077 (4th Cir. 1982) ("The geographic market should consist of an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies."); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1510 (D.S.C. 1987) ("[T]he relevant market is that area of effective competition within which defendants operate. It must correspond to commercial realities. It is the geographic area in which a purchaser can practically turn for products or services.").

- **Whether there are barriers that prevent other potential buyers from entering or expanding into the area**;

- **And whether governmental licensing requirements, taxes, or other regulations have the effect of limiting competition in certain geographic areas**.[45]

**NASCAR's Version**[46]**:** The relevant geographic market is the area in which NASCAR faces competition **from other entities that compete in the relevant product market. When analyzing the relevant geographic market, you should consider whether changes in prices paid by buyers in one geographic area have substantial effects on prices paid by buyers in another geographic area, which would tend to show that both areas are in the same relevant**

---

[45] **NASCAR's Objection:** *First*, Plaintiffs' proposal improperly and repeatedly assumes the correctness of their market definition, attempting to tilt the field in their favor. *Supra* at n.6; *see also, e.g.*, *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (finding geographic market "too narrow and inherently implausible"). *Second*, Plaintiffs modify the model instruction in ways designed to lessen their burden. For example, they delete a portion of the model stating that "When analyzing the relevant geographic market, you should consider whether changes in prices paid by buyers in one geographic area have substantial effects on prices paid by buyers in another geographic area, which would tend to show that both areas are in the same relevant geographic market." ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.6 (2016). And they omit the portion of the model stating that they have "the burden of proving the relevant geographic market by a preponderance of the evidence"—and providing a place for a defendant's contentions about the scope of the relevant geographic market. *See id.* *Third*, Plaintiffs conflate relevant market with monopsony power by including a "barrier to entry" portion in their proposal. Barriers to entry are part of monopsony power, *not* market definition—which is why the model has no such language. *Finally*, the last bullet regarding government licensing or regulations has no relevance to this case, and NASCAR's proposal therefore omits this factor (as well as other irrelevant factors like "transportation cost differences").

[46] **NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.6 (2016); Modern Federal Jury Instructions—Civil ¶ 79.05[3], *Instruction 79-52 Relevant Market— Geographic Market* (Lexis 2025); *id.* ¶ 80.01, *Instruction 80-5 Relevant Market Defined*; *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986) ("[T]he relevant geographic market is the area in which buyers or sellers of the relevant product effectively compete."); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) ("The relevant geographic market in antitrust cases is defined by the 'area within which the defendant's customers … can practicably turn to alternative supplies if the defendant were to raise its prices.'").

**geographic market**.  The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

23XI and Front Row have the burden of proving the relevant geographic market by a preponderance of the evidence.  In this case, 23XI and Front Row claim that the relevant geographic market is the United States.  **By contrast, NASCAR and Mr. France claim that the market is broader because NASCAR has conducted races outside of the United States; because other motorsports organizations are global; and because teams competing in the NASCAR Cup Series have left NASCAR to focus on global motorsports or have teams that compete in the NASCAR Cup Series and also global motorsports**.

In determining whether 23XI and Front Row met their burden and demonstrated that their proposed geographic market is proper, you may consider several factors, including:

• the geographic area in which NASCAR buys and **where NASCAR's suppliers are located**;

• the geographic area to which teams **have turned** or have seriously **considered turning to sell their services**; and

• the geographic areas that NASCAR views as **potential sources of competition**.[47]

---

[47] **Plaintiffs' Objection:** Plaintiffs object to NASCAR's instruction as it includes superfluous and biased descriptions of the parties' claims, which are unnecessary and prejudicial. Additionally, NASCAR's list of relevant factors for determining the relevant geographic market is incomplete and incorrect. For example, the location of NASCAR's suppliers, or who *NASCAR* views as potential competitors in a general sense, has no relevance to the location of the reasonable substitutes available to *teams* for selling their services as premier stock car racing teams—which is the relevant point for the geographic market. *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 439 (4th Cir. 2011) ("If U.S. consumers can predictably turn to supplies only in the United States, then the United States is the relevant geographic market"); *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1077 (4th Cir. 1982) ("The geographic market should consist of an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies.").

53

D. **[Instruction No. 16] Second Element: Monopoly Power / Monopsony Power**

**Plaintiffs' Version**[48]**:** If you find that Plaintiffs have proven a relevant antitrust market, then you can determine whether NASCAR has **monopoly** power in that relevant market. **Monopoly** power in this context is the power of a buyer to control prices **or** exclude competition in a relevant market. More precisely, an entity is a **monopoly buyer** if it can profitably lower prices or maintain prices below competitive levels **or exclude entry** for a significant period of time.

**In this case, Plaintiffs allege that NASCAR has monopoly power over the market for premier stock car racing teams in the United States, meaning that NASCAR has control over the market to buy the services of premier stock car racing teams in this country.** If you find that NASCAR is the only buyer of the services of premier stock car racing teams in the relevant market, and that 23XI and Front Row are unable to find alternative buyers for these services, then you must conclude that NASCAR is a **monopolist** in this market. **However, monopoly power is not limited to "pure" monopolies where there is only one buyer. Monopoly power can also**

_____

[48] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3 Instr. A.8; *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014) ("Monopoly power is the power to control prices or exclude competition."); *United States v. Google*, 778 F. Supp. 3d 797, 849 (E.D. Va. 2025) (same); *Carefirst of Maryland, Inc. v. Johnson & Johnson*, 745 F. Supp. 3d 288, 304 (E.D. Va. 2024) ("A defendant has market power 'if it can raise price[s] above the competitive without a total loss of sales.'") (citing 14 Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 501 (2024)); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys, Inc.*, 386 F. 3d 485, 500 (2d Cir. 2004) ("Monopoly power is the power to control prices or exclude competition.") (internal citations omitted); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (market share exceeding 70 percent is "strong evidence of monopoly power"); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320–21 (2007) ("Monopsony power is market power on the buy side of the market.") (citing Blair & Harrison, *Antitrust Policy and Monopsony*, 76 CORNELL L.REV. 297 (1991)); *Sony Elecs., Inc. v. Soundview Techs., Inc*., 157 F. Supp. 2d 180, 184–85 (D. Conn. 2001) ("[A] monopsony [is] an arrangement where a buyer uses its market share power to reduce the purchase price of goods that it will use to produce its own products.").

54

**exist where there is a dominant buyer in the relevant market that has the power to either purchase at below competitive market prices or the power to exclude entrants, even if other buyers or potential buyers also exist.**[49]  If you find that NASCAR has the power to control prices **or exclude entry** in the relevant market, then you should conclude that NASCAR has **monopoly** power.

You can consider two kinds of proof to determine whether Plaintiffs have proven that NASCAR has **monopoly** power: (1) direct evidence and (2) indirect evidence.[50]

**NASCAR's Version**[51]:  If you find that 23XI and Front Row have proven a relevant market, then you should determine whether NASCAR has **monopsony** power in that market.

---

[49] **NASCAR's Objection:**  This statement is nowhere to be found in the model instruction or in any of Plaintiffs' cited sources.  It is remarkable that Plaintiffs offer absolutely no authority for this massive deviation, which they appear to have invented.

[50] **NASCAR's Objection:**  *First*, Plaintiffs again modify the model instruction to lessen their burden, removing the requirement that prices must be "substantially" below the competitive level, and giving themselves the alternative of "exclud[ing] entry" where the model does not.  And as NASCAR's sources show, monopsony power has particular requirements that focus on lower prices.  One of Plaintiffs' sources is in accord.  *See Sony Elecs., Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 184–85 (D. Conn. 2001) (focusing on "reduc[ing] the purchase price of goods" in a monopsony setting).  *Second*, Plaintiffs' entire second paragraph is objectionable because it attempts to describe Plaintiffs' claims in a favorable way and to suggest that the Court agrees with those claims.

[51] **NASCAR's Sources:**  ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.8 (2016); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) ("[I]t is clear that merely being a monopolist does not violate Section 2."); *Dyer v. Conoco, Inc.*, 49 F.3d 727, 1995 WL 103233, at *5 (5th Cir. 1995) (in monopsony cases, "the seller faces a Hobson's choice:  he can sell into the rigged market and take the depressed price, or he can refuse to sell at all"); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) ("Monopsony power is market power on the buy side of the market.  As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'"); *id.* at 320-21 (entity with "monopsony power" "seek[s] to 'restrict its input purchases below the competitive level,' thus 'reduc[ing] the unit price for the remaining input[s] it purchases"); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices."); *Boardman v. Pac.*

**Monopsony** power is the power to control prices and exclude competition in a relevant antitrust market. An entity is a monopsonist if it **can reduce the amount it purchases** and thereby lower or maintain prices **substantially** below the competitive level **for a significant period of time**. **The mere possession of monopsony power is not unlawful; in fact, it is an important element of the free-market system.**

You can consider two kinds of proof to determine whether 23XI and Front Row have proven that NASCAR has **monopsony** power: (1) direct evidence and (2) indirect evidence. If you find that NASCAR has **monopsony** power in the relevant market, **then you must consider the remaining elements of this claim. If you find that NASCAR does not have monopsony power, then you must find for NASCAR and Mr. France against 23XI and Front Row on this claim and you do not need to review Instructions 19 through 24 (you should move to Instruction 25)**.[52]

---

*Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A monopsony occurs when there is 'market power on the buy side of the market' and buyers consequently pay suppliers less than they would in a competitive market.").

[52] **Plaintiffs' Objection:** Plaintiffs object to this instruction on the grounds that (1) it would require Plaintiffs to show that NASCAR restricted output in order to prove monopoly power, which is contrary to the law, *see supra* n.36; and (2) it includes incorrect, irrelevant, and prejudicial language about monopsony power being "an important element of the free-market system," *see supra* n.30.

1. **[Instruction No. 17] Direct Evidence of Monopoly / Monopsony Power**

**Plaintiffs' Version[53]:** Plaintiffs can meet their burden of proving NASCAR's **monopoly** power with "direct evidence," which is evidence that shows, without the need for inference, that NASCAR was able to exercise control over the prices or terms at which it purchased the services of **premier stock car racing teams** or that NASCAR was able to exclude entry. This type of evidence may include, but is not limited to, proof that NASCAR suppressed the prices it paid to sellers to be below competitive levels, or that NASCAR was able to dictate the purchase terms to sellers because of its market power as a buyer. It may alternatively include evidence that NASCAR was able to exclude entry.

**With direct evidence, you do not also need to find that Plaintiffs have proven a relevant market. Rather, if Plaintiffs prove by a preponderance of the evidence that NASCAR did suppress prices below competitive market levels or did exclude competition, Plaintiffs have met their burden to prove the existence of monopoly power without having to**

---

[53] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3, Instr. A.8; *Fourqurean v. NCAA*, 143 F.4th 859, 868–69 (7th Cir. Jul. 16, 2025) (citing *NCAA v. Alston,* 594 U.S. 69, 86 (2021)); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (explaining that "there is authority to support its claim that a relevant market definition is not a necessary component of a monopolization claim" and that "direct evidence" of market power may suffice.); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) (definition of relevant market not necessary where monopoly power is proven directly); *Re/Max Int'l v. Realty One*, 173 F.3d 995, 1018–20 (6th Cir. 1999) (same); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'") (internal citation omitted); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016) ("[M]onopoly power may be established, not only by proof of a defendant's market share in a relevant market, but alternatively by direct evidence of a defendant's price control or exclusion of competitors from a particular market in a manner indicative of its possession of monopoly power.").

**prove the precise contours of a relevant market.**[54] To find that NASCAR possessed **monopoly**

power based on direct evidence, you must find that NASCAR: (1) had the ability to drive down

the price it paid for the services of premier stock car racing teams below the level that would exist

in a competitive market, and (2) exercised that power, resulting in lower prices or less favorable

terms for racing teams than would have occurred in a competitive market. Alternatively, you could

---

[54] **NASCAR's Objection:** Plaintiffs' belief that inquiry into the relevant market can be obviated if they provide "direct evidence" is wrong. The Supreme Court has repeatedly held that proof of a relevant market is required for a Section 2 claim. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) ("The offense of monopoly under § 2 of the Sherman Act" requires "the possession of monopoly power *in the relevant market*." (emphasis added)); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993) ("[I]t is beyond doubt that [a charge of monopolization] requires proof of market power *in a relevant market*." (emphasis added)). In *Ohio v. American Express Co.*, the Supreme Court said that it "must first define the relevant market" where plaintiffs relied "exclusively on direct evidence" to prove anticompetitive effects. 585 U.S. 529, 542 (2018). It was only the *dissent* that said "a discussion of market definition was legally unnecessary" where there was "*direct* evidence." *Id.* at 563 (Breyer, J., dissenting). But the Court itself said that "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Id.* at 543; *see id.* at 542-43 & n.7. And it explicitly distinguished *FTC v. Indiana Federation of Dentists* as inapplicable. *Id.* at 543 n.7.

    Similarly, the Fourth Circuit has held that proof of a relevant market is required for a Section 2 claim. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016); *see also, e.g.*, *2311 Racing LLC v. NASCAR*, 139 F.4th 404, 409 (4th Cir. 2025) ("[A] plaintiff must show that the defendant possessed monopoly power *in the relevant market*…" (emphasis added)).

    Plaintiffs offer *no* Fourth Circuit authority holding otherwise. Instead, they point to a few out-of-circuit cases purportedly adopting this approach. But most of these cases do not support Plaintiffs. For instance, one reiterates that "[t]he threshold issues are the relevant market and defendant's market share." *Fourqurean v. NCAA*, 143 F.4th 859, 869 (7th Cir. 2025). Another's statement is dicta because it finds (on a motion to dismiss) that a complaint adequately alleged "monopoly power *in the relevant market*." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir. 2007) (emphasis added). Still another left the question open, where later circuit authority forecloses Plaintiffs' argument. *Compare PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002), *with Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006). And *Shak* reaffirmed the requirement of proof of "monopoly power *in the relevant market*" and "price control or exclusion of competitors *from a particular market*." *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 480, 482 (S.D.N.Y. 2016) (emphases added). Plaintiffs' final case did not address the clear import of *Spectrum Sports* or *Amex*. *Re/Max Int'l v. Realty One*, 173 F.3d 995, 1018–20 (6th Cir. 1999).

find direct evidence of **monopoly** power if NASACAR exercised the power to exclude the entry of competitors to NASCAR for purchasing the services of premier stock car racing teams.

**You may consider evidence such as:**

- **Testimony or documents showing that NASCAR was able to force Plaintiffs and other premier stock car racing teams to accept lower prices or less favorable terms than they could have obtained in a competitive market;**

- **Evidence that Plaintiffs and other premier stock car racing teams had no reasonable alternative buyers to whom they could sell their services at competitive prices and conditions;**

- **Evidence that NASCAR's actions caused a reduction in the prices paid to Plaintiffs and other premier stock car racing teams not because of improved efficiency or lower costs, but because of NASCAR's power; and**

- ** Evidence that NASCAR exercised the power to exclude entrants to compete for the services of premier stock car racing teams.**[55]

---

[55] **NASCAR's Objection:** These bullet points have no support in the ABA Model Instruction and should be rejected. They are also inappropriately argumentative and suggest that such evidence exists. And the first bullet point conflicts with the admissions of Plaintiffs' expert. *See* Doc. 273 at 24 (noting concessions that NASCAR has not lowered payments to teams). While Plaintiffs are entitled to argue that their evidence meets the standard for proving monopsony power, the Court should not put its imprimatur on their theory of the case. Plaintiffs are asking for an instruction that they can use to argue that a verdict in their favor is the only answer, which is not the purpose of jury instructions. *See United States v. Lewis*, 53 F.3d 29, 34 (4th Cir. 1995) ("The purpose of jury instructions is to instruct the jury clearly regarding the law to be applied in the case."); *United States v. Fisher*, 662 F. App'x 200, 202 (4th Cir. 2016) (asking whether instructions "fairly and accurately set forth the controlling law"). NASCAR's version, by contrast, closely tracks the model instruction. In addition, Plaintiffs' bullet points flout the wall of precedent holding that a failure to agree to contract terms is not an antitrust violation. *E.g.*, *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general

If you find, based on direct evidence, that NASCAR had and exercised the power to suppress prices in the relevant market, or to exclude entry, you may conclude that NASCAR possessed **monopoly** power. **Plaintiffs' burden of proof can be met without proof of a relevant market if NASCAR's monopoly power can be proven directly through evidence of NASCAR's control over prices or the exclusion of competition.**

If you do not find such direct evidence, then you may not find that NASCAR possessed **monopoly** power based on direct evidence alone.

**NASCAR's Version**[56]: To directly prove **monopsony** power, 23XI and Front Row have the burden of proving that NASCAR has the ability to lower or maintain the prices that it pays for services in the relevant market below competitive levels. **23XI and Front Row must prove that NASCAR has the power to do so alone—that is, without the assistance of, and despite competition from, any existing or potential competitors**.

**23XI and Front Row must also prove that NASCAR has the power to maintain prices below a competitive level for a significant period of time. If NASCAR attempted to maintain prices below competitive levels, but would lose so much business to other competitors that the price decrease would become unprofitable and would have to be withdrawn, then NASCAR does not have monopsony power**.

---

rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *2311 Racing LLC v. NASCAR*, 139 F.4th 404, 410 (4th Cir. 2025) ("[A]bsent anticompetitive conduct in the service of monopoly power, the law recognizes that parties are 'free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'"); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012) ("[S]imply because GXS does not offer Loren Data the terms and conditions it desires does not mean that GXS has violated the antitrust laws.")

[56] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.8 (2016).

Similarly, 23XI and Front Row must prove that NASCAR has the ability to exclude competition. For example, if NASCAR attempted to maintain prices below competitive levels, but new competitors could enter the relevant market or existing competitors could expand their purchases and take so much business that the price decrease would have to be withdrawn, then NASCAR does not have monopsony power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that a company has monopsony power. Other factors may enable an entity without monopsony power to buy at lower prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior marketing. However, an ability to buy at lower prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopsony power. By contrast, evidence that NASCAR would lose a substantial number of teams if it lowered prices substantially, or that NASCAR's profit margins were low compared to its competitors, or that NASCAR's margins go up and down or are steadily decreasing, might be evidence that NASCAR does not have monopsony power.

If you find that NASCAR has monopsony power in the relevant market, then you must consider the remaining elements of this claim (move to Instruction 25). If you find that NASCAR does not have monopsony power, then you must evaluate whether there is indirect proof of monopsony power (move to the next Instruction).[57]

---

[57] **Plaintiffs' Objection:** Plaintiffs object to this instruction as it misstates the law in numerous respects. First, NASCAR's proposed instruction that Plaintiffs must prove NASCAR has the "power to do so alone" in terms of lowering input prices below the competitive level is confusing, falsely implies that a monopolist must have a 100% market share, and is not part of the model instructions. Second, NASCAR's instruction incorrectly provides that, in order to show direct evidence of monopoly power, Plaintiffs would need to prove that NASCAR had the power to *both* reduce price *and* exclude competitors. That is not correct; either showing suffices. *United States v.*

## 2. [Instruction No. 18] Indirect Evidence of Monopoly / Monopsony Power

**Plaintiffs' Version**[58]: The second way that Plaintiffs can prove that NASCAR had **monopoly** power is through indirect evidence. **Indirect evidence refers to facts and circumstances from which you may infer the existence of monopoly power, even if there is no direct proof that NASCAR actually exercised such power. Indirect evidence of monopoly power involves examining the structure and characteristics of the relevant market, as well as NASCAR's position within that market. This type of evidence does not require proof that NASCAR actually forced sellers to accept lower prices than would exist in a competitive market or actually excluded entry, but instead focuses on whether NASCAR had the ability to do so based on market conditions.**

In evaluating indirect evidence of **monopoly** power, you may consider the following factors:

- Market Share: The percentage of total purchases in the relevant market made by NASCAR. A higher market share suggests a stronger ability to dictate prices or terms. **For example, if you find that NASCAR's share of the relevant markets exceeded 70% of that market, that is strong evidence that NASCAR had monopoly power in that market.**

---

*E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("Monopoly power is the power to control prices or exclude competition."). Third, Plaintiffs object to NASCAR's proposed language on profit margins, which is unnecessary, biased in favor of NASCAR, and unsupported by caselaw.

[58] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3 Instr. A.7; *FTC v. Syngenta Crop Prot. AG,* 711 F. Supp. 3d 545, 583 (M.D.N.C. 2024) (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001)); *Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 129–30 (2d Cir. 1981) ("However the instruction is phrased, it should not deflect the jury's attention from indicia of monopoly power other than market share"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188–89 (3d Cir. 2005) (describing factors for showing indirect evidence of monopoly power); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (market share exceeding 70 percent is "strong evidence of monopoly power").

You may also consider the trend in NASCAR's market share. An increasing market share may strengthen an inference that a company has **monopoly** power, particularly where that company has a high market share. **Monopoly power may also be found when a firm holds its dominant share for a long period.**

- **Concentration of Buyers: Whether there are few buyers in the market, and whether NASCAR is one of the largest or most significant buyers. If you find that NASCAR is the only buyer of services in the relevant market to which Plaintiffs can turn, you should find that NASCAR has monopoly power.**

- Barriers to Entry: Whether it is difficult for new buyers to enter the relevant market in a meaningful and timely way **to compete for the purchase of services from premier stock car racing teams**. Barriers to entry might include large financial investment required to enter the market, limited access to the resources needed to enter the relevant market, and the reputation or brand name recognition of the entity already participating in the relevant market. Evidence of low or no entry barriers may be evidence that NASCAR does not have **monopoly** power, regardless of NASCAR's market share, because new competitors could enter if NASCAR attempted to reduce prices for the services of **premier stock car racing teams** below competitive market levels for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that NASCAR has **monopoly** power.

- Entry into the Market: Similarly, you may consider the history of any entries into and exits from the relevant market. Entry of new buyers or the expansion of existing buyers of services from premier stock car racing teams may be evidence that NASCAR lacks **monopoly** power. On the other hand, a consistent failure of other buyers to enter the

63

market, or repetitive departures from the market, may support an inference that NASCAR has **monopoly** power.

- Market Conditions: The overall competitiveness of the market, including whether prices and terms are consistent with what would be expected in a competitive market.

If you find that the indirect evidence supports an inference that NASCAR possesses **monopoly** power, you may find that Plaintiffs have proven the existence of such power even if there is no direct evidence that NASCAR actually used that power to obtain below competitive market prices or exclude entry.[59]

**NASCAR's Version**[60]: To indirectly prove **monopsony** power, 23XI and Front Row can introduce evidence of the structure of the market, including evidence of NASCAR's market share,

---

[59] **NASCAR's Objection:** *First*, Plaintiffs' substantial deviations from the model instruction should be rejected, and the Court should adopt NASCAR's version, which closely tracks the model instruction. Plaintiffs yet again take the opportunity to modify the model in ways that lessen their burden. For example, relying on out-of-circuit authority, Plaintiffs propose language that 70% market share is "strong evidence" of monopsony power even though the Supreme Court has never found a party with less than 75% to have monopoly power. *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) ("[T]he Supreme Court has never found a party with less than 75% market share to have monopoly power"). Their "concentration of buyers" factor has no basis in the model and appears to be made up. And their extended discourse in the first paragraph is calculated to leave the jury with the misguided impression that proving monopsony power through indirect evidence is easy.

*Second*, Plaintiffs' statement that "monopoly power may also be found when a firm holds its dominant share for a long period" is an inaccurate statement of law. For instance, the Supreme Court has held that "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). And it has distinguished between "the willful acquisition or maintenance of that power" from "growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The mere fact that NASCAR produces the best motorsports series in America does not suffice to find monopsony power.

[60] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.7 (2016); *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) ("[T]he Supreme Court has never found a party with less than 75% market share to have monopoly power.").

barriers to entry, the entry and exit of other entities, and the number and size of other competitors. **If this evidence establishes that NASCAR has the power to control prices and exclude competition in the relevant antitrust market, then you may conclude that NASCAR has monopsony power in the market**.[61]

The first factor that you should consider is NASCAR's share of the relevant market. You should determine NASCAR's market share as a percentage of total purchases in the relevant market. NASCAR must have a significant share of the market in order to possess **monopsony** power.

In evaluating whether the percentage of market share supports a finding of **monopsony** power, you also should consider other aspects of the relevant market, such as the existence of barriers to entry (that is, how difficult is it for other buyers to enter the market and begin competing with NASCAR), the entry and exit by other companies, and the number and size of competitors. Along with NASCAR's market share, these factors should inform you as to whether NASCAR has **monopsony** power. The higher the company's share, the higher the likelihood that a company has **monopsony** power.

**A market share below 75 percent is ordinarily not sufficient to support a conclusion that a defendant has monopsony power. However, if you find that the other evidence**

---

[61] **Plaintiffs' Objection:** Plaintiffs object to this instruction as it purports to incorporate proof of direct evidence of monopoly power into the instruction for finding monopoly power based on indirect evidence. Direct and indirect evidence are alternative routes for establishing NASCAR's monopoly power; the jury does not need to find NASCAR has the power to control prices or exclude competition to conclude it has monopoly power based on indirect evidence. *United States v. Google LLC*, 778 F. Supp. 3d 797, 849 (E.D. Va. 2025) ("Indirect proof is derived from the structure and composition of the relevant market.") (internal quotation marks omitted). Further, NASCAR wrongly says the evidence must establish that NASCAR *both* has the power to "control prices *and* exclude competition" (emphasis added), which is wrong for the reasons described earlier. *See supra* n.57.

**demonstrates that NASCAR does, in fact, have monopsony power despite having a market share below 75 percent, you may conclude that NASCAR has monopsony power**.[62]

The trend in NASCAR's market share is something you may consider. An increasing market share may strengthen an inference that a company has **monopsony** power, particularly where that company has a high market share, **while a decreasing share might show that a company does not have monopsony power**.

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. **Barriers to entry might include the large financial investment required to enter the market, the reputation of the companies already participating in the market, or brand-name recognition.**

Evidence of low or no entry barriers may be evidence that NASCAR does not have **monopsony** power, regardless of market share, because new competitors could enter **easily** if NASCAR attempted to keep prices below competitive levels **for a substantial period of time**. By contrast, evidence of high barriers to entry along with high market share may support an inference that NASCAR has **monopsony** power.

---

[62] **Plaintiffs' Objection:** Plaintiffs object to this instruction because NASCAR misstates the law on monopoly power. NASCAR is wrong that a share below 75% means there is a presumption against finding monopoly power. That has it backwards: a 65-70% or higher share is "strong evidence of monopoly power," *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998), while courts have found firms possess monopoly power with a share lower than 65-70% based on other factors such as high barriers to entry, *Tekion Corp. v. CDK Global, LLC*, 2025 WL 1939870, *3 (N.D. Cal. July 15, 2025) ("Courts generally require a 65% market share to establish a prima facie case of market power but a market share as low as 45-70% may support a finding of monopoly power, if accompanied by other relevant factors.") (cleaned up).

The history of entry and exit in the relevant market may also be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that NASCAR lacks **monopsony** power. On the other hand, departures from the market, or the failure of others to enter the market, **particularly if prices are relatively low and profit margins are relatively high**, may support an inference that NASCAR has **monopsony** power.

**You may consider whether NASCAR's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on NASCAR's ability to lower prices. If NASCAR's competitors are vigorous or have large or increasing market shares this may be evidence that NASCAR lacks monopsony power. On the other hand, if you determine that NASCAR's competitors are weak or have small or declining market shares, this may support an inference that NASCAR has monopsony power.**

**If you find that NASCAR has monopsony power in the relevant market, then you must consider the remaining elements of this claim (move on to Instruction 19). If you find that NASCAR does not have monopsony power, then you must find for NASCAR and James France and against 23XI and Front Row on this claim and you do not need to review Instructions 19 through 24 (you should move to Instruction 25).**[63]

---

[63] **Plaintiffs' Objection:** NASCAR's instructions are incomplete and misleading. First, NASCAR's paragraph on the factors relevant to the barriers to entry analysis is incomplete, as it leaves out access to the resources needed to compete. *Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 108 F.3d 1147, 1154 (9th Cir. 1997) (listing barriers to entry). Second, NASCAR's instruction on a lack of entry applying "particularly if prices are relatively low and profit margins are relatively high" is confusing, has no basis in law, and is not included in the model instructions. Third, NASCAR's reference to whether "competitors are capable of effectively competing" misstates the law. The question is whether competitors constrain NASCAR's ability to pay below-market compensation in the input market, not whether competitors are "capable" of competing. *United States v. Google LLC*, 778 F. Supp. 3d 797, 839 (E.D. Va. 2025) ("a monopolist for open-web display ad exchanges could likely charge

E.  **[Instruction No. 19] Third Element: <span style="color:blue">Anticompetitive or Exclusionary Conduct</span> / <span style="color:green">Anticompetitive Conduct</span>**

**Plaintiffs' Version**[64]**:**  The third element that Plaintiffs must prove is that NASCAR willfully maintained **monopoly** power in a relevant market through anticompetitive **or exclusionary** acts, as distinguished from legitimate competition on the merits.  Anticompetitive **or exclusionary** acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating or foreclosing the efforts of other companies to compete within the relevant market.

**In determining whether NASCAR maintained its monopoly through conduct that was anticompetitive, you should consider whether its challenged conduct, when considered as a whole, had the effect of excluding competition or was instead consistent with competition on**

---

supracompetitive prices without seeing customers switch to rival products in sufficient numbers to constrain the monopolist's prices"); *id.* at 855-56.  Similarly, the size and number of NASCAR's "competitors" in a general sense is meaningless and irrelevant; competitors are only relevant to the monopoly power analysis to the extent they prevent NASCAR from exercising market power over racing teams operating in the input market.

[64] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 3, Instr. A.9; *N. Am. Soccer League, LLC v. USSF*, Case No. 1:17-cv-5495, Final Jury Instructions, ECF No. 540, Instruction No. 41 (E.D.N.Y. Feb. 4, 2025); *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2011) ("To run afoul of Section 2, a defendant must be guilty of illegal conduct 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'…Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist.") (internal citations omitted); *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 315 (4th Cir. 2007) ("[A] firm violates § 2 of the Sherman Act when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident") (internal quotation marks omitted); *Duke Energy Carolinas, LLC v. NTE Carolinas II LLC*, 111 F.4th 337, 354 (4th Cir. 2024) ("It is foundational that alleged anticompetitive conduct must be considered as a whole.") (quoting P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 310c7 (4th & 5th eds. 2024)); *Cont'l Ore. Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he duty of the jury was to look at the whole picture and not merely at the individual figures in it."); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together.").

68

**the merits and providing benefits to sellers. You should not consider each challenged act in isolation from the other challenged acts in determining whether NASCAR maintained monopoly power through anticompetitive acts.**

**If you find that NASCAR willfully maintained monopoly power through anticompetitive acts in a relevant market, and that at least one such act occurred after October 2, 2020, then you must find the third element satisfied and you should consider the remaining elements of this claim. If, however, you find that NASCAR did not willfully maintain monopoly power through anticompetitive acts in a relevant market, or that no such acts occurred after October 2, 2020, then you must find for NASCAR and against Plaintiffs on this claim.**[65]

---

[65] **NASCAR's Objection:** *First*, Plaintiffs cut huge chunks of material from the ABA Model Instruction that they find inconvenient, all in an attempt to reduce their burden of proof on this element. For example, Plaintiffs cut the idea that "[h]arm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition." ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.9 (2016). They cut the sentences stating that "[m]ere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful." *Id.* They cut the idea that "[a] monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws." *Id.* They cut an entire paragraph distinguishing between "anticompetitive conduct" and "conduct that has a legitimate business purpose." *Id.* They cut the idea that "acts or practices that result in the acquisition of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success." *Id.* And they cut an entire paragraph on factors that advise against a finding of monopoly power. Such drastic departures from the model instruction are unwarranted and unjustifiable.

*Second*, Plaintiffs' reliance on *Duke Energy* is misplaced. *Duke Energy* held that "when a court is faced with allegations of a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories, its application of such specific conduct tests would prove too rigid." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024). That approach was confined to the "context of the allegations in th[at] case," which involved interrelated actions taken "simultaneously, and to the same effect" to drive out a competitor. *Id.* at 354, 366 (emphasis omitted).

*Duke Energy* specifically stated that "when anticompetitive conduct is alleged to be typical predatory pricing, *refusing to deal*, price fixing, or dividing markets, as but examples, the case law

**NASCAR's Version**[66]: The next element that 23XI and Front Row must prove is that

NASCAR willfully acquired or maintained **monopsony** power through anticompetitive acts or

---

has developed tests for analyzing such claims." *Id.* at 354 (emphasis added). In those cases, "0 + 0 = 0" is "a proper approach." *Id.* Plaintiffs' Section 2 allegations here fall into precisely that well-defined category: they are challenging refusals to deal in the form of exclusivity clauses in (1) track sanction agreements, (2) Next Gen agreements, and (3) the Goodwill provision (Section 6.6 of the 2016 and 2025 Charter Agreements). That, in fact, is basically all they are actually challenging. *See* Doc. 265 at 2 (listing the overt acts Plaintiffs allege for their Section 2 claim).

Indeed, the Fourth Circuit already recognized that *Duke Energy* is not applicable in this very case: Plaintiffs argued on appeal that the panel should consider a so-called "course of conduct" under *Duke Energy*. Response Brief at 53-58, *2311 Racing LLC v. NASCAR*, 139 F.4th 404 (4th Cir. 2025), ECF No. 38. But the Fourth Circuit—in an opinion by Judge Niemeyer, who also authored *Duke Energy*—rejected that approach and instead focused only on how there is "no prohibition" in the "antitrust laws that prohibits the disclaimer of antitrust claims by a general release." *2311 Racing LLC v. NASCAR*, 139 F.4th 404, 410 (4th Cir. 2025) (quoting *Va. Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262, 266 (4th Cir. 1971)). Plus, it is fundamental that "[t]wo wrong claims do not make one that is right," so Plaintiffs cannot "alchemize" these individual components "into a new form of antitrust liability." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009).

*Third*, Plaintiffs' attempt to bury the statute of limitations in this instruction is inappropriate, as it appears intended to have the jury skip over this crucial safeguard for NASCAR. The Sherman Act provides that "[a]ny action to enforce any cause of action under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b; *see also Klehr v. A.O Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period"); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (2024) ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."); *id.* at 289 ("[M]ere silence or inaction from a defendant—even though the allegedly unlawful conspiracy to exclude a plaintiff remains in effect—isn't enough to restart the limitations period. Instead, an *affirmative* act—like a promise to act in the future—is required."); *id.* at 292 ("[I]n … antitrust cases, [a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."). That is no mere "technicalit[y]"; it is instead "fundamental to a well-ordered judicial system." *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 487 (1980). As NASCAR has explained, much of Plaintiffs' claims are time-barred, and so the jury cannot find liability for this conduct as a matter of law. *See* Doc. 236 at 7-13 (NASCAR Summary Judgment Brief). In addition, the ABA Model Instructions provide a separate instruction entirely for the statute of limitations, and NASCAR has proposed an instruction below to that same effect. There is no basis for Plaintiffs' approach.

[66] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.9 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 56-57; *Kolon Indus. Inc. v. E.I. DuPont de Nemours &*

practices.  Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete **for customers** within the relevant market.  **To find a violation of this element, you must determine that NASCAR engaged in the challenged conduct with the intent to foreclose**

---

*Co.*, 748 F.3d 160, 175 (4th Cir. 2014) ("To violate this prong, a defendant must engage in conduct 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'"); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) ("Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition." (citations omitted)); *Novell v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.) ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect."); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (distinguishing "willful acquisition or maintenance of that power" from "growth or development as a consequence of a superior product, business acumen, or historic accident"); *Cavalier Telephone, LLC v. Verizon Va., Inc.*, 330 F.3d 176, 183 (4th Cir. 2003) ("Conduct that merely has the consequence of shutting out competition does not rise to the level of anticompetitive behavior subject to antitrust liability; the monopolist must have acted with the intent to prevent competitors from entering the market."); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) ("[I]t is clear that merely being a monopolist does not violate Section 2."); *id.* at 398 ("In general, then, even a firm with significant market power has no duty to deal with certain suppliers or distributors, unless it can be shown that its decisions are part of a broader effort to maintain its monopoly power."); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 690 (4th Cir. 2016) ("[B]ig is not invariably bad.  An outsized market position may reflect nothing more than business success achieved through superior effort and sound strategy."); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Major League Baseball Props. v. Salvino, Inc.*, 542 F.3d 290, 304, 311 (2d Cir. 2008) (protection of intellectual property is a legitimate business reason); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295-96 (11th Cir. 2004) ("PGA met its business justification burden by showing that it seeks to prevent Morris from 'free-riding' on PGA's RTSS technology"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440-41 (3d Cir. 1997) (noting importance of "prevent[ing] franchisees from freeriding—offering products of sub-standard quality insufficient to maintain the reputational value of the franchise product while benefitting from the quality control efforts of other actors in the franchise system"); *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417, 1990 WL 12148, at *5 (9th Cir. 1990) ("prevent[ing] free-riding on Haagen-Dazs' goodwill, reputation, and distribution, and to ensure that distributors are wholly committed to marketing Haagen-Dazs products" were "legitimate and lawful" purposes).

71

**competition, to gain a competitive advantage, or to destroy a competitor. Put otherwise, anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition**.[67]

      **Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include depressed prices, decreased production levels, and reduced quality**.[68]

      **The mere possession of monopsony power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopsony power by offering better products or services, putting in greater effort, possessing superior business skills, or because of historic accident, is not unlawful**.

---

[67] **Plaintiffs' Objection:** NASCAR's instruction that Plaintiffs must prove NASCAR "engaged in the conduct with the intent to foreclose competition" flatly misstates Section 2 law. Intent is not an element of a Section 2 monopolization claim, and NASCAR's proposed instruction that Plaintiffs must prove such an intent is a plain error of law. *E.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (in a Section 2 monopolization case, evidence of intent is not required but rather "is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive'"); *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1497 (11th Cir. 1988) ("A distinction between a monopolization claim and an attempt to monopolize claim is that proof of specific intent is required for attempt claims."); *Am. Football League v. Nat'l Football League*, 205 F. Supp. 60, 79 (D. Md. 1962) ("monopolization . . . does not require proof of specific intent").

[68] **Plaintiffs' Objection:** Plaintiffs object to this instruction on harm to competition as misplaced and contrary to law. The issue of harm to competition versus harm to competitors belongs in the instruction on antitrust injury, not the instruction on exclusionary conduct. In any event, NASCAR's instruction misapplies antitrust law and is misleading and prejudicial in this context. Plaintiffs are the direct sellers in the input market; accordingly, if the jury concludes the racing teams were harmed by receiving below-market compensation for their services, that is harm to competition. *NCAA v. Alston*, 594 U.S. 69, 82 (2021) (college athletes had standing where "[defendant] use[d] its monopsony power to 'cap artificially the compensation offered'"); *Le v. Zuffa, LLC*, 2023 WL 5085064, at *15 n.22 (D. Nev. Aug. 9, 2023) ("Plaintiffs have established antitrust injury in the form of suppressed market wages due to [d]efendant's conduct.").

Conduct that merely has the consequence of shutting out competition does not rise to the level of anticompetitive behavior subject to antitrust liability. In general, even an entity with monopsony power has no duty to deal with certain suppliers, unless it can be shown that its decisions are part of a broader effort to maintain its monopsony power.

A monopsonist may compete aggressively without violating the antitrust laws, and a monopsonist may charge monopsony prices without violating the antitrust laws. A monopsonist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals— unlawful, so long as a company does not use anticompetitive means to achieve these goals.

In determining whether NASCAR's conduct was anticompetitive or whether it was business conduct with a legitimate purpose, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to motorsports teams, whether the conduct prevents free-riding on NASCAR's investments and its well-known brand, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the acquisition or maintenance of monopsony power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate

business reason. **You may not find that NASCAR willfully acquired or maintained monopsony power through anticompetitive means if it has acquired or maintained that power through the exercise of superior foresight and skill throughout its history; or because of natural advantages or economic or technological efficiency; or because changes in cost or consumer preference have driven out other competitors. In short, if valid business reasons exist for the alleged conduct, then Section 2 is not violated.**

**If you find that 23XI and Front Row have proven by a preponderance of the evidence that NASCAR willfully acquired or maintained monopsony power through anticompetitive acts, then you must consider whether 23XI and Front Row have proved the remaining elements of this claim. If, however, you find that 23XI and Front Row did not prove this element by a preponderance of the evidence, then you must find for NASCAR and Mr. France and against 23XI and Front Row on this claim and you do not need to review Instructions 22 through 24 (you should move to Instruction 25).**[69]

---

[69] **Plaintiffs' Objection:** Plaintiffs object to the remainder of NASCAR's instruction as contrary to law, misleading, biased, and prejudicial. First, Plaintiffs do not challenge how NASCAR acquired its monopoly. Hence, NASCAR's instructions on how it acquired its monopoly (and its conflating of monopoly acquisition and monopoly maintenance) are prejudicial and confusing. Second, NASCAR's perplexing proposed instruction that conduct that has the "consequence of shutting out competition" is not "anticompetitive behavior subject to antitrust liability" is contrary to the law. The entire purpose of Section 2 of the Sherman Act is to prevent monopolists from engaging in conduct that it not competition on the merits and that has the effect of foreclosing (or "shutting out") competition. *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2011) ("To run afoul of Section 2, a defendant must be guilty of illegal conduct 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor. . . . Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist."). Third, NASCAR is wrong that conduct cannot be exclusionary if it has any legitimate or valid business purpose. Even if a monopolist's acts have some legitimate purpose, a jury can find conduct is exclusionary if the monopolist's conduct, considered on the whole, has the effect of excluding competition and preserving the monopoly. *E.g., Duke Energy*, 111 F.4th at 355 ("A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim.").

74

1. **[Instruction No. 20]** Anticompetitive Conduct: Refusal To Deal[70]

Plaintiffs claim that the anticompetitive-conduct element is satisfied in this case in part because NASCAR unlawfully refused to deal with potential competitors by refusing to let other motorsports race on tracks that it owns.

Ordinarily, a company may deal or refuse to deal with whomever it pleases, and set the prices, terms, and conditions of that dealing. Even a company with monopsony power in a relevant market has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them.

Considering all of the facts and circumstances, you must decide whether NASCAR's alleged refusal to deal was motivated solely by an anticompetitive intent. A refusal to deal with a competitor constitutes anticompetitive conduct only where the refusal is contrary to

---

[70] **NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.B.2 (2016); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) ("[I]t is clear that merely being a monopolist does not violate Section 2."); *id.* at 398 ("In general, then, even a firm with significant market power has no duty to deal with certain suppliers or distributors, unless it can be shown that its decisions are part of a broader effort to maintain its monopoly power."); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *2311 Racing LLC v. NASCAR*, 139 F.4th 404, 410 (4th Cir. 2025) ("[A]bsent anticompetitive conduct in the service of monopoly power, the law recognizes that parties are 'free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'"); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012) (no refusal to deal claim where defendant "proposed terms for a commercial relationship" but plaintiff "was not satisfied with its terms"); *id.* ("[S]imply because GXS does not offer Loren Data the terms and conditions it desires does not mean that GXS has violated the antitrust laws.").

the short-run best interest of the defendant, and where it makes sense for the defendant only because it harms competitors and helps the defendant achieve or maintain monopsony power in the long run.

NASCAR contends that it has allowed many other motorsports to race on its tracks and that any decision not to allow a specific event on its tracks was based on legitimate business purposes. A refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors. In general, the desire to maintain monopsony power or to block entry of competitors is not a legitimate business purpose.

A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, protect its investments or brand, offer a better product or service, or increase short-run profits. In other words, if the refusal to deal results in or is expected to result in short-run or long-run benefits to the defendant—such as more profits, reduction of costs, a higher market share, or avoiding the loss of customers—then it is not anticompetitive and you must find for NASCAR on this element. On the other hand, if the refusal to deal hurts the defendant in the short run and was expected to hurt the defendant in the short run, and is undertaken only because the defendant expects it to harm competitors and enhance its monopsony power in the long run, then you must find for 23XI and Front Row on this element.[71]

---

[71] **Plaintiffs' Objection:** Plaintiffs object to this instruction as it is unnecessary, irrelevant and likely to confuse the jury. This is not a case based on NASCAR's refusal to deal with a competitor. *See* Dkt. 231 at 7-17-18. Accordingly, there is no "alleged" refusal to deal here—this is instead a case based on NASCAR's affirmative restraints on competition. In *Trinko*, the Supreme Court established that "there is no duty to aid competitors." *Verizon Commun. Inc. v. L. Offices of Curtis V. Trinko*, 540 U.S. 398, 411 (2004). The *Trinko* principle does not apply here, however, as Plaintiffs are not alleging any refusal to deal with a competitor. Rather, Plaintiffs challenge

NASCAR's affirmative restraints on competition that have allowed NASCAR to maintain its monopoly. Accordingly, NASCAR's affirmative conduct to foreclose competition is categorically different from a refusal to deal with a competitor. *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ("Again, these 'conditional dealing' schemes are thus categorically different from unilateral conduct that involves only the monopolist's competitors, such as its refusal to deal with them"); *U.S. v. Google LLC*, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ("Courts have declined to 'extend[ ] a refusal-to-deal-with-rivals analysis' to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors"). Further, NASCAR's legitimate business purpose instruction is contrary to law. The question for the jury is whether NASCAR's conduct, considered as a whole, had the effect of excluding competition—not whether the conduct had a legitimate business purpose. *E.g., Duke Energy*, 111 F.4th at 355.

## 2. [Instruction No. 21] Anticompetitive Conduct: Motorsports[72]

In motorsports, some exclusion is an incidental and inevitable byproduct of defining the game, and some restraints on competition are essential if the product is to be available at all. Because the product that is marketed is competition itself, there must be rules created to define that competition. So long as motorsports organizations possess, in good faith,

---

[72] **NASCAR's Sources:** *NCAA v. Bd. of Regents*, 468 U.S. 85, 101 (1984) ("[T]his case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all."); *id.* ("'[S]ome activities can only be carried out jointly. Perhaps the leading example is league sports. When a league of professional lacrosse teams is formed, it would be pointless to declare their cooperation illegal on the ground that there are no other professional lacrosse teams.' What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed."); *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d 32, 43, 45 (2d Cir. 2018) (same for soccer); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80 (3d Cir. 2010) ("Accordingly, sports-related bodies should be given leeway with respect to their adoption of equipment requirements as well as their related decision to enter exclusive contracts with the respective suppliers. As highlighted by the racing case law cited above, it appears that the courts have generally accorded sports organizations a certain degree of deference and freedom to act in similar circumstances."); *id.* at 81 ("[T]he Sherman Act does not forbid sanctioning bodies and other sports-related organizations from freely (i.e., without any coercion or improper interference) adopting exclusive equipment requirements, so long as such organizations otherwise possess, in good faith, sufficient pro-competitive or business justifications for their actions."); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853 (8th Cir. 2000) ("Without question, the way IMCA defines the rules for modified car racing will exclude some types of equipment. But the exclusion is an incidental and inevitable byproduct of defining the game."); *id.* ("[T]he IMCA modified car rules help define a game or sport in which the end product is a form of competition among race care drivers. If the game as defined is exciting for participants and spectators, it will prosper in relation to other games with which it competes in the broad recreational marketplace."); *id.* ("For these reasons, the few courts to consider antitrust challenges to rules defining a sports activity have given the rule-makers considerable discretion to achieve their sporting objectives."); *STP Corp. v. U.S. Auto Club, Inc.*, 286 F. Supp. 146, 151 (S.D. Ind. 1968) ("USAC is a sanctioning organization and has the right to legislate to perpetuate its existence and provide for competitive equivalency among all types of engines and no court has the right to step in and dictate to a sophisticated group of officials, duly elected, in a sanctioning organization which sanctions sports and in particular as in this instance a sport that is attended with grave hazards."); *M&H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 985 (1st Cir. 1984) ("[O]ur general premise [is] that the tracks and drivers have the power to set the parameters within which the racing competition will take place.").

78

**sufficient procompetitive or business justifications for these rules, the Sherman Act does not forbid them.  In particular, motorsports organizations should be given leeway with respect to their adoption of equipment requirements and their related decisions to enter exclusive contracts with suppliers.**[73]

---

[73] **Plaintiffs' Objection:** Plaintiffs object to this instruction as improper, contrary to law, and likely to confuse and mislead the jury. There are no special Section 2 standards for motorsports cases; rather, the normal Section 2 elements of monopoly power, exclusionary conduct, and antitrust injury apply. NASCAR's cited cases have no application here because they addressed challenges to the internal rules governing the sport at issue (i.e., track sizes, tire and engine requirements, rules of the competition). Plaintiffs do not challenge NASCAR's governance rules; rather, this case is about the restraints NASCAR has imposed to prevent an external competitive threat from challenging NASCAR's monopoly. *See NCAA v. Alston*, 594 U.S. 69, 90-91 (2021) ("That *some* restraints are necessary to create or maintain a league sport does not mean *all* aspects of elaborate interleague cooperation are.'"); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 110 (1984).

**F. [Instruction No. 22]** Plaintiffs' Claims[74] Against James France / Individual Liability of James France[75]

To prevail in their Section 2 claim against NASCAR CEO James France as an individual defendant, Plaintiffs must prove, by a preponderance of the evidence, that Mr. France actively and knowingly participated in the anticompetitive conduct by NASCAR that you find violates Section 2 of the Sherman Act.

In order to prevail on their claims against Mr. France, you must first find that Plaintiffs proved their Sherman Act claims against NASCAR. You then must determine whether Plaintiffs

---

[74] **Plaintiffs' Objection:** Plaintiffs object to the order in which this instruction regarding Mr. France's liability appears and to providing this same instruction twice. In Plaintiffs' view, the Court should only instruct the jury with respect to Mr. France's liability one time after reading all the liability instructions relating to Plaintiffs' Section 2 and Section 1 claims against NASCAR.

[75] **Plaintiffs' Sources**: *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986) ("It is undisputed that a corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts."); *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 737 (E.D. Tenn. 2011) ("active and knowing" participation in anticompetitive scheme); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000) ("A corporate officer or director can be held personally liable for damages arising from an antitrust violation where he or she participated in the unlawful acts, or where he or she acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws."); *A & D Supermarkets, Inc., No. 2 v. United Food and Commercial Workers, Local Union 880*, 732 F.Supp. 770, 779 (N.D. Ohio 1989) ("Antitrust decisions addressing issues of individual liability stress that in order for personal liability to attach there must be a showing of the individual's participation in the alleged conduct. Participation may be found in direct action, knowing approval or ratification of the alleged wrongful acts."); *United States v. Atl. Com. Co.*, 45 F. Supp. 187, 195 (E.D.N.C. 1942).

**NASCAR's Sources:** *Brown v. Donco Enters.*, 783 F.2d 644, 646 (6th Cir. 1986) ("Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends."); *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 889 (W.D. Ky. 2009) (similar); *MVConnect, LLC v. Recovery Database Network, Inc.*, 2011 WL 13128799, at *10 (N.D. Tex. May 27, 2011) ("[T]he essential principle of direct, personal participation in the alleged conspiracy is necessary to hold a director or officer personally liable."); *Chandler v. Phoenix Servs.*, 419 F. Supp. 3d 972, 987 (N.D. Tex. 2019) (plaintiffs "must allege that [individual] had a direct role in the attempted monopolization"); *cf. United States v. Wise*, 370 U.S. 405, 416 (1962) (officer liable under Section 1 when officer "knowingly participates in effecting the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime").

have proven that Mr. France participated in NASCAR's Sherman Act violations by actively and knowingly directing, engaging in, authorizing, or ratifying the conduct of NASCAR found to be unlawful. **To find Mr. France liable, you must conclude that he directly and personally participated in such a scheme.**[76]

---

[76] **Plaintiffs' Objection:** NASCAR's proposed final sentence in this instruction is redundant.

## G. [Instruction No. 23] Final Element: Injury and Causation[77]

The final element of the Section 2 claim requires Plaintiffs to prove, by a preponderance of the evidence, that they suffered injury to their business or property as a result of NASCAR's alleged unlawful **monopolization** / **monopsonization**.

---

[77] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 6, Instr. A.1; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *Evergreen Helicopters, Inc. v. Erickson Air-Crane Inc.*, No. 09-3059-PA, Dkt. 93, 2011 Jury Instr. LEXIS 672, Proposed Jury Instructions, at 42–43 (D. Or. Jan. 8, 2011); P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 310c7 (4th & 5th eds. 2024) ("The fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact. Certainly for purposes of measuring damages such aggregation would be in order."); *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311, 315 (4th Cir. 2007) (To determine whether a plaintiff has alleged antitrust injury, courts consider "(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; [and] (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws."); *Am. Football League v. Nat'l Football League*, 205 F. Supp. 60, 79 (D. Md. 1962) ("monopolization…does not require proof of specific intent"); *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 474 (D. Vt. 2019) ("In establishing antitrust injury, a plaintiff may rely on the aggregate effect of the alleged conspiracy."); *Le v. Zuffa, LLC*, 2023 WL 5085064, at *15 n.22 (D. Nev. Aug. 9, 2023) ("Plaintiffs have established antitrust injury in the form of suppressed market wages due to [d]efendant's conduct."); *Team Cam, LLC v. Reliable Contracting Co., Inc.*, 2025 WL 1019262, at *13 (D. Md. Apr. 4, 2025) ("[B]eing forced to pay supra-competitive prices as a result of the defendants' anti-competitive conduct is an injury plainly . . . of the type the antitrust laws were intended to prevent.") (internal citations omitted).

**NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.A.1 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 40-41; Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 43-44; *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 515-16 (4th Cir. 2002) ("[T]o be recovered as antitrust damages, a competitor's loss of profits must 'stem[] from a competition-reducing aspect or effect of the defendant's behavior,' that is, from 'acts that reduce output or raise prices to consumers.'"); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.5th 280, 292 (4th Cir. 2024) (requiring "a causal connection between the [d]efendants' alleged antitrust violation and [the plaintiff's] resulting injury within the limitations period"); *Thompson Everett, Inc. v. National Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) ("Because the antitrust laws are intended to protect competition, and not simply competitors, only injury caused by damage to the competitive process may form the basis of an antitrust claim."); *Host Int'l, Inc, v. MarketPlace PHC*, 32 F.4th 242, 250 (3d Cir. 2022) ("declin[ing] [an] offer" is "not an antitrust injury because competition has not been suppressed"); *CBC Cos. v. Equifax*, 561 F.3d 569, 573 (6th Cir. 2009) ("[E]ven where a business carries a significant portion of the market share, antitrust law is not a negotiating tool for a plaintiff seeking better contract terms.").

**You must assess separately whether 23XI and Front Row have proven injury to their individual business or property. In order for 23XI to recover damages, it must show injury to 23XI's own business or property. In order for Front Row to recover damages, it must show injury to Front Row's own business or property.** A party is entitled to recover for an injury to its business or property if it can establish three elements of injury and causation:

**First,** that it was in fact injured as a result of NASCAR's alleged **monopolization / monopsonization**;

**Second,** that NASCAR's alleged **monopolization** / **monopsonization** was a material cause of its injury; and

**Third,** that its injury is of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For 23XI and Front Row to establish that they are entitled to recover damages, each must prove that it was injured as a result of NASCAR's alleged **monopolization** / **monopsonization**. Proving the fact of damage does not require Plaintiffs to prove the dollar value of their injuries. It requires only that each Plaintiff prove that it was in fact injured by NASCAR's alleged **monopolization**/ **monopsonization**. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Plaintiffs established that they were in fact injured.

Plaintiffs must also each establish by a preponderance of the evidence that NASCAR's alleged **monopolization** / **monopsonization** was a material cause of **each** Plaintiffs' injury. This means that **each** Plaintiff**s** must prove that some damage occurred to **Plaintiffs** / **that Plaintiff** as a result of NASCAR's alleged **monopolization / monopsonization**, and not some other cause. Plaintiffs are not required to prove that NASCAR's alleged **monopolization / monopsonization**

was the sole cause of their injury; nor do Plaintiffs need to eliminate all other possible causes of injury. It is enough that **the Plaintiffs have** / **each Plaintiff has** proved that the alleged **monopolization** / **monopsonization** by NASCAR was at least one material cause of **their** / **its** injury.

Finally, **Plaintiffs must also each** / **each Plaintiff must** establish that **their** / **its** injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, **or acts that would otherwise harm consumers**, then Plaintiffs' injuries are antitrust injuries. On the other hand, if Plaintiffs' injuries were caused by heightened competition, by the normal operation of the competitive process, **or by acts that would benefit consumers**, then Plaintiffs' injuries are not antitrust injuries and Plaintiffs may not recover damages for those injuries under the antitrust laws. **Plaintiffs can rely on the aggregate effect of NASCAR's alleged monopolization in establishing this injury.** **For example, a decision to decline a contract offer is not an antitrust injury because competition has not been suppressed.**

If Plaintiffs can each establish that they were in fact injured by NASCAR's **monopolization** / **monopsonization**, that NASCAR's **monopolization** / **monopsonization** was a material cause of each Plaintiffs' injury, and that **each** Plaintiffs' injuries were the type that the antitrust laws were intended to prevent, then **23XI and Front Row are** / **each injured Plaintiff is** entitled to recover damages for the injury to **their** / **its** business or property if **they** / **it** can prove

84

the amount of such damages **based on conduct occurring within the limitations period**,[78] as I

will discuss later in my instructions.[79]

---

[78] **Plaintiffs' Objection:** Plaintiffs object to NASCAR's proposed instructions as misleading and prejudicial in several respects. First, NASCAR's instruction that Plaintiff must prove "acts that would otherwise harm consumers" is confusing and prejudicial in this context, given that the teams are the direct sellers in the relevant input market and thus are the "consumers" for antitrust injury purposes. *NCAA v. Alston*, 594 U.S. 69, 82 (2021); *Le v. Zuffa*, LLC, 2023 WL 5085064, at *15 n.22 (D. Nev. Aug. 9, 2023). Second, NASCAR's instruction on a "decision to decline a contract offer" not constituting antitrust injury is misleading and prejudicial because Plaintiffs are not claiming antitrust injury from any declined contract offer. Finally, NASCAR's instruction that Plaintiffs must prove damages "based on conduct occurring within the limitations period" misstates the law. Plaintiffs' injury and damages result from the monopoly that NASCAR maintained through exclusionary acts within the limitations period; Plaintiffs are not required to disaggregate their harm based on discrete exclusionary acts. *Cont'l Ore. Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he duty of the jury was to look at the whole picture and not merely at the individual figures in it."); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together.").

[79] **NASCAR's Objection:** NASCAR objects to Plaintiffs' alteration of the ABA Model Instruction. Particularly problematic is deleting several references to "alleged" monopolization and deleting the idea that if Plaintiffs' injuries were caused "by acts that would benefit consumers, then plaintiff's injuries are not antitrust injuries and plaintiff may not recover damages for those injuries under the antitrust laws." ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.A.1 (2016). NASCAR also objects to Plaintiffs' statement regarding the "aggregate effect" of monopolization. The Supreme Court has made clear that a Plaintiff can only recover for damages caused by a specific overt act within the limitations period. *Klehr v. A.O Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period"). And *CSX* makes clear that "antitrust injury" is tied to particular actions—finding that a "claim fail[ed]" because the plaintiff "hasn't shown what antitrust injury *this act*, or any other act committed within the limitations period, caused it." *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 291-92 (4th Cir. 2024) (emphasis added). After all, "care must be taken lest … causation and damages relate predominantly to lawful rather than unlawful conduct. The dominant conduct causing the plaintiff's injuries must still be found to be unlawful." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 310c7 (4th & 5th eds. 2024). And *Duke Energy*'s "course of conduct" idea (though inapplicable for the reasons explained above) deals with anticompetitive conduct, *not* antitrust injury.

## H. [Instruction No. 24] Statute of Limitations[80]

A statute of limitations establishes a time limit for bringing a lawsuit. In doing so, the law seeks to eliminate stale claims, to promote justice by preventing surprises, and to provide security and stability to human affairs.

---

[80] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 7.A.1 (2016); 15 U.S.C. § 15b ("Any action to enforce any cause of action under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued."); *Klehr v. A.O Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period"); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (2024) ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."); *id.* at 289 ("[M]ere silence or inaction from a defendant—even though the allegedly unlawful conspiracy to exclude a plaintiff remains in effect—isn't enough to restart the limitations period. Instead, an *affirmative* act—like a promise to act in the future—is required."); *id.* ("an overt act … must be a new and independent act that is not merely a reaffirmation of a previous act" (quoting *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014)); *id.* at 292 ("[I]n … antitrust cases, [a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."); *CTS Corp. v. Waldburger*, 573 U.S. 1, 7 (2014) ("[A] statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 320a (2025) ("Limitation serves the same functions in antitrust as elsewhere in the law: to put old liabilities to rest, to relieve courts and parties from 'stale' claims where the best evidence may no longer be available, and to create incentives for those who believe themselves wronged to investigate and bring their claims promptly, particularly when they are known or can be determined."); *Rotella v. Wood*, 528 U.S. 549, 555 (2000) (noting "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities"); *Gabelli v. SEC*, 568 U.S. 442, 448-49 (2013) ("Statutes of limitations are intended to 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' They provide 'security and stability to human affairs.' We have deemed them 'vital to the welfare of society,' and concluded that 'even wrongdoers are entitled to assume that their sins may be forgotten.'"); Doc. 265 at 11 ("Plaintiffs are not basing their claims of a Section 2 violation by NASCAR, antitrust injury, or damages, on NASCAR's 2018 acquisition of ARCA or 2019 acquisition of ISC. … [These] are not the overt acts Plaintiffs are relying upon to pursue this action."); Doc. 265 at 13 ("Plaintiffs have brought no claim, and are seeking no damages, based on contractual restraints that NASCAR imposed prior to October 2020.").

86

**The statute of limitations for the Sherman Act does not permit recovery for any conduct prior to October 2, 2020 that caused injuries to 23XI and Front Row. For instance, Plaintiffs cannot base their claims on NASCAR's 2018 acquisition of ARCA, NASCAR's 2019 acquisition of ISC, or any contracts that NASCAR entered into prior to October 2020.**

**23XI and Front Row cannot recover for acts of NASCAR or injuries occurring before October 2, 2020. Instead, the injury that 23XI and Front Row claim must have been caused by a new overt act that occurred on or after October 2, 2020. An overt act must be a new and independent act that is not merely a reaffirmation of a previous act.**

**If you find that conduct that injured 23XI and Front Row spanned both before and after October 2, 2020, then you must apportion the damages between the two periods and you may award damages only for the conduct that occurred after October 2, 2020. When apportioning the damages between the two periods, you should be guided by the same principles that I will explain to you later.**[81]

---

[81] **Plaintiffs' Objection:** NASCAR's proposed instruction on the statute of limitations is contrary to law and prejudicial. First, the statute of limitations is a legal question that has already been teed up for the Court on summary judgment—it is not a fact question for the jury—as there is no dispute over when NASCAR entered into the contractual restraints at issue in this case. *Childers Oil Co. v. Exxon Corp.*, 960 F.2d 1265, 1273 (4th Cir. 1992) ("[I]f resolution of a statute of limitations defense presents a genuine question of material fact, a jury should resolve it. If not, a statute of limitations may be applied as a matter of law."); *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011) ("Whether the statute has run on a claim is usually a question of law for the trial judge, but where the issue involves a factual determination, the determination is for the jury."). The only question for the jury to resolve, with respect to the statute of limitations, is whether NASCAR has taken at least one overt act to maintain its monopoly since October 2, 2020, which Plaintiffs already include in their proposed instruction on exclusionary conduct. *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 780 F. Supp. 322, 328 (M.D.N.C. 1991). Regardless, Plaintiffs are the direct sellers in the input market and are thus "consumers" rather than competitors. Accordingly, Plaintiffs suffer their antitrust injury when they receive the below-market terms— not at the time the exclusionary conduct was first implemented. *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (4th Cir. 2024) ("although the defendant-monopolist had formed a monopoly enabling it to overcharge its customers 'several decades' before the customer-plaintiff

## PLAINTIFFS' CONTRACT, COMBINATION, AND CONSPIRACY IN RESTRAINT OF TRADE CLAIM / PLAINTIFFS' UNREASONABLE RESTRAINT OF TRADE CLAIM

A. **[Instruction No. 25]** Elements of the Contract, Combination, and Conspiracy in Restraint of Trade Claim / Elements of the Unreasonable Restraint of Trade Claim[82]

Plaintiffs' second claim challenges Defendants' conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To prevail on this claim, Plaintiffs must prove the following three elements.

The **first** element is the existence of a contract, **combination, or conspiracy** between or among at least two separate entities. I am instructing you that the parties have agreed that this element is satisfied because NASCAR entered into written agreements with racing teams and

---

filed its action, a claim accrued to the plaintiff each time it paid the inflated price within the limitation period") (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)).

[82] **Plaintiffs' Source**: Adapted from ABA Model Instructions in Civil Antitrust Cases (2016) Ch. 1, Instr. B.2; *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002); *Neotonus, Inc. v. Am. Med. Ass'n.*, 554 F. Supp. 2d 1368, 1375 (N.D. Ga. 2007) ("A party asserting violation of § 1 will rarely be able to show an explicit agreement to restrain trade; thus, it must often resort to inferences drawn from the behavior of the alleged conspirators.") (internal citations omitted); *Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*, 794 F.2d 1359, 1363 (9th Cir. 1986) ("Although restraint may be the "essence" of every contract, *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), under the rule of reason standard only those agreements that unreasonably restrain trade violate the Sherman Act*."); F.T.C. v. Lukens Steel Co.*, 454 F. Supp. 1182, 1189 (D.D.C. 1978) ("Section one of the Sherman Antitrust Act, 15 U.S.C. s 1 (1976), which prohibits contracts, combinations, and conspiracies in restraint of trade, requires proof of concerted action as well. As one commentator has stated, section one presents a single concept about common action, not three separate ones: contract . . . combination or conspiracy' becomes an alliterative noun, roughly translated to mean concerted action.") (citing L. Sullivan, Handbook of the Law of Antitrust 312 (1977)) (internal citations omitted).

**NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.B.2 (2016); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) ("[E]ach licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies."); *see id.* at 202-207 (analyzing each individual license to determine whether plaintiff alleged harm to competition); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 239, 255-56 (3d Cir. 2010) (series of bilateral exclusive contracts with a common hub are not a single agreement under Section 1).

tracks. I will instruct you on which written contract provisions entered into by NASCAR you may consider for the following elements.

The **<u>second</u>** element is that **<u>the</u>** / **<u>each</u>** contract**<u>, combination, or conspiracy</u>** unreasonably restrains trade.

The **<u>third</u>** element is that the **<u>particular</u>** restraint caused **<u>Plaintiffs</u>** / **<u>each Plaintiff</u>** to suffer an injury to **<u>their</u>** / **<u>its</u>** business or property.[83]

**<u>If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for NASCAR and Mr. France and against 23XI and Front Row on their Section 1 claim. If you find that the evidence is sufficient to prove all elements as to NASCAR and/or Mr. France, then you must find for 23XI and Front Row and against NASCAR and/or Mr. France on this claim.</u>**

---

[83] **NASCAR's Objection:** In order to succeed on their Section 1 claim, Plaintiffs must prove that *each* separate agreement violates antitrust law and causes cognizable anticompetitive effects. Governing Fourth Circuit law in *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), makes that clear. In *Dickson*, the Fourth Circuit rejected the idea that a series of agreements between Microsoft and equipment manufacturers was a single conspiracy and that it instead "amount[ed] to multiple conspiracies between the common defendant and each of the other defendants." *Id.* at 203. And the Court found it necessary to evaluate "the likelihood of a substantial anti-competitive harm caused by the two licensing agreements at issue (*considered individually*)." *Id.* at 207 (emphasis added); *see id.* at 207-09 (repeatedly emphasizing agreements should be "considered individually"); *id.* at 211 ("each licensing agreement must be treated as a separate conspiracy"). Other cases are in accord. *See, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc.*, 602 F.3d 239, 255-56 (3d Cir. 2010) (under Section 1, plaintiff must allege that each agreement, by itself, harmed competition); *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1087 (9th Cir. 2025) (stating that "grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade").

Here, *Dickson* requires finding that a series of agreements between NASCAR and independent racetracks—or a series of agreements between NASCAR and racing teams—cannot simply be grouped together or aggregated; instead, the jury must consider each of the challenged agreements individually. Plaintiffs' wholesale failure to offer evidence that any individual contract violates Section 1 is grounds for summary judgment. *See* Doc. 283 at 11-12. But at minimum, Plaintiffs must prove—and the jury must find—that any such contracts individually violated Section 1.

89

**B. [Instruction No. 26] First Element: Existence of a Contract[84]**

**Plaintiffs' Version:** Plaintiffs allege that NASCAR entered into written contracts with track owners and racing teams that contain certain **restrictions**. These written **restrictions** satisfy Plaintiffs' burden for proving a contract **or combination** between NASCAR and another party.

Specifically, Plaintiffs contend that NASCAR entered into **restrictions** contained in a number of written agreements **which violate Section 1**. These are:

(1) The provisions of sanction agreements between NASCAR and the owners of racetracks, that prevented those racetracks from hosting stock car racing events **organized by any competing stock car racing event to the NASCAR Cup Series**; and

(2) The provisions of agreements between NASCAR and the racing teams **that prevented those teams from using Next Gen 7 cars, and their associated car parts and technology, for which the racing teams paid, in any other stock car racing event**.

The existence of these agreements, and the **restrictions** challenged by Plaintiffs, is not disputed and you should consider this first element of proving a contract, **combination or conspiracy** satisfied.[85]

**NASCAR's Version:** As noted, the parties agree that because NASCAR entered into written contracts with track owners and racing teams, the first element is satisfied. **Specifically, Plaintiffs challenge the following provisions in NASCAR's contracts:**

---

[84] **Source**: Adapted from ABA Model Instructions in Civil Antitrust Cases (2016) Ch. 2, Instr. A.1.

[85] **NASCAR's Objection:** Plaintiffs' repeated references to "restrictions," their reference to "agreements which violate Section 1," and their descriptions of the contractual provisions at issue are all improperly slanted in their favor. The Court should instead describe these provisions in a neutral and non-argumentative way or quote the relevant language that Plaintiffs are challenging, rather than putting Plaintiffs' gloss thereon.

(1) **The provisions of sanction agreements between NASCAR and the owners of racetracks that prevented those racetracks hosting NASCAR Cup Series events from hosting certain other racing events, but also allowed many other racing events including races of other stock-car series; and**

(2) **The provisions of agreements between NASCAR and the racing teams that required the teams to obtain a license to use NASCAR's intellectual property embodied in the Next Gen 7 cars and their associated car parts and technology in other racing events.**

**The existence of these agreements, including the contract terms challenged by Plaintiffs, is not disputed. You should consider this element of proving a contract satisfied.**[86]

---

[86] **Plaintiffs' Objection:** NASCAR's characterization of the agreements at issue are biased and unnecessary. NASCAR cites no authority to support the argument that the jury instructions must identify specific provisions of the challenged agreements with the particularity that NASCAR seeks.

1. **[Instruction No. 27]** Existence of a Contract: Exclusive Dealing Arrangements[87]

   The provisions challenged by Plaintiffs are known as exclusive dealing arrangements.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. The arrangement may take the form of an agreement forbidding the buyer from purchasing the product or service from the supplier's competitors or a contract committing the buyer to purchase all of its requirements of specific products or services from the supplier. Some practices may operate as partial exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers. Such arrangements can aim at

---

[87] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 2.D.5 (2016); *Thompson Everett, Inc. v. National Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) ("The exclusive sales rep contracts impose non-price vertical restrictions which are not per se illegal under the antitrust laws, and such restrictions are not disfavored as long as they do not go beyond the legitimate business purposes for which they are used."); *Imaging Ctr., Inc. v. Western Md. Health Sys., Inc.*, 158 F. App'x 413, 420 (4th Cir. 2005) ("The inquiry into exclusive dealing arrangements focuses on whether the arrangement forecloses competition among producers or suppliers in a substantial share of the affected market. That is, 'the plaintiff must show that "the opportunities for other traders to enter into or remain in that market [are] significantly limited" by the exclusive-dealing arrangement.' Courts then evaluate exclusive contracts under the rule of reason."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 774e (2025) ("[C]ourts are loath to interfere when the claim is that the defendant is actually dealing, but only on disadvantageous or onerous terms."); Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 585 (7th Cir. 2002) ("*Kewanee Oil* holds that trade-secret law is compatible with antitrust law; the same can be said for contracts protecting intellectual property that, though not demonstrably a trade secret, is commercially valuable. … Nothing in the antitrust laws gives one producer a right to sponge off another's intellectual property, even when the producer of that knowledge has a market share much larger than IDX's."); *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1211 (C.D. Cal. 2011) (Company "did absolutely nothing anticompetitive by … attempting to protect its intellectual property …."); *Digene Corp. v. Third Wave Techs., Inc.*, 536 F. Supp. 2d 996, 1005 (W.D. Wisc. 2008) (long-term contracts have "valid business justification" of "protecting [an] upfront investment of intellectual property"); *Major League Baseball Props. v. Salvino, Inc.*, 542 F.3d 290, 304, 311 (2d Cir. 2008) (protection of intellectual property is a legitimate business reason).

92

protecting commercially valuable intellectual property.  A business generally has no duty to share its intellectual property with others, and it is not anticompetitive simply to protect intellectual property.

As a result, exclusive dealing arrangements and partial exclusive dealing arrangements, whatever form they may take, are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market.

From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.  I will soon instruct you regarding the rule of reason.[88]

---

[88] **Plaintiffs' Objection:** Plaintiffs object to this instruction as unnecessary and prejudicial. The question under Section 1 is whether the challenged restraints unreasonably restrain trade, not whether they qualify as exclusive dealing. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018) (describing rule of reason analysis). NASCAR's instruction would improperly add an element to the Section 1 analysis, which is contrary to law and would be prejudicial. *See, e.g., In re Google Play Store Antitrust Litig.*, No. 21:md-02981-JD, ECF 592, Final Jury Instructions for Epic Trial, Instrs. 27 – 30 (N.D. Cal. Dec. 6, 2023) (same); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n Inc. et al.*, No. 1:17-cv-05495-HG, Final Jury Instructions, Instrs. 19, 21–29 (E.D.N.Y. 2025) (same).

## 2. [Instruction No. 28] Individual Liability of [89] James France[90]

To prevail in their Section 1 claim against NASCAR CEO James France as an individual defendant, Plaintiffs must prove, by a preponderance of the evidence, that Mr. France actively and knowingly participated in the anticompetitive conduct by NASCAR that you find violates Section 1 of the Sherman Act. For their Section 1 claim, that requires Plaintiffs to prove that Mr. France knowingly participated in effecting the challenged contractual provisions by authorizing,

---

[89] **Plaintiffs' Objection:** Plaintiffs object to the order in which this instruction regarding Mr. France's liability appears and to providing this same instruction twice. The Court should only instruct the jury with respect to Mr. France's liability one time after reading all the liability instructions relating to Plaintiffs' Section 2 and Section 1 claims against NASCAR.

[90] **Plaintiffs' Sources**: *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986) ("It is undisputed that a corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts."); *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 737 (E.D. Tenn. 2011) ("active and knowing" participation in anticompetitive scheme); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000) ("A corporate officer or director can be held personally liable for damages arising from an antitrust violation where he or she participated in the unlawful acts, or where he or she acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws."); *A & D Supermarkets, Inc., No. 2 v. United Food and Commercial Workers, Local Union 880*, 732 F.Supp. 770, 779 (N.D. Ohio 1989) ("Antitrust decisions addressing issues of individual liability stress that in order for personal liability to attach there must be a showing of the individual's participation in the alleged conduct. Participation may be found in direct action, knowing approval or ratification of the alleged wrongful acts."); *United States v. Atl. Com. Co.*, 45 F. Supp. 187, 195 (E.D.N.C. 1942).

**NASCAR's Sources:** *Brown v. Donco Enters.*, 783 F.2d 644, 646 (6th Cir. 1986) ("Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends."); *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 889 (W.D. Ky. 2009) (similar); *MVConnect, LLC v. Recovery Database Network, Inc.*, 2011 WL 13128799, at *10 (N.D. Tex. May 27, 2011) ("[T]he essential principle of direct, personal participation in the alleged conspiracy is necessary to hold a director or officer personally liable."); *Chandler v. Phoenix Servs.*, 419 F. Supp. 3d 972, 987 (N.D. Tex. 2019) (plaintiffs "must allege that [individual] had a direct role in the attempted monopolization"); *cf. United States v. Wise*, 370 U.S. 405, 416 (1962) (officer liable under Section 1 when officer "knowingly participates in effecting the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime").

approving, or ratifying these contracts.  **<u>To find Mr. France liable, you must conclude that he directly and personally participated in these contract provisions.</u>**[91]

---

[91] **Plaintiffs' Objection:** The final sentence added by NASCAR is duplicative and repetitive.

## C. [Instruction No. 29] Second Element: Unreasonable Restraint of Trade (Three-Step Inquiry)[92]

Because the parties have agreed that NASCAR entered into contracts with the exclusivity

provisions that Plaintiffs challenge, Plaintiffs must prove, by a preponderance of the evidence, that

---

[92] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3; *NCAA v. Alston*, 594 U.S. 69, 96–97 (2021); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *Brantmeier v. NCAA*, No. 1:24-CV-238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) ("In evaluating whether there is an unreasonable restraint of trade or commerce in violation of § 1, courts usually apply the three-step burden-shifting framework of the Rule of Reason."); *United States v. Booz Allen Hamilton Inc.*, No. CV CCB-22-1603, 2022 WL 9976035, at *5 (D. Md. Oct. 17, 2022) ("A three-step, burden shifting framework often guides a rule of reason analysis."); *Ohio v. NCAA*, 706 F. Supp. 3d 583, 591 (N.D.W. Va. 2023) ("When analyzing a claim under Section 1 of the Sherman Act to determine whether a restraint violates the rule of reason, courts use a 'three-step, burden shifting framework.'"); *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002); *NCAA v. Alston*, 594 U.S. 69, 96 (2021) ("When describing the rule of reason, this Court has sometimes spoken of 'a three-step, burden-shifting framework' as a means for distinguishing between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.").

**NASCAR's Sources:**  ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.C.1 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 30;  Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 25; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018) ("To determine whether a restraint violates the rule of reason, the parties agree that a three-step, burden-shifting framework applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."); *NCAA v. Alston*, 594 U.S 69, 100 (2021) ("[A]nticompetitive restraints of trade may wind up flunking the rule of reason to the extent the evidence shows that substantially less restrictive means exist to achieve any proven procompetitive benefits."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) ("[E]ach licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies."); *id.* at 202-207 (analyzing each individual license to determine whether plaintiff alleged harm to competition; *id.* at 210 (declining to consider "the potential for anticompetitive effects from resulting from this conduct in the aggregate" and holding that the district court "correctly determined that it could not consider the cumulative harm … but instead was required to consider … *each* agreement's potential for anticompetitive effects" (emphasis added)); *Howard Hess Dental Labs. Inc. v.*

those restrictions unreasonably restrained competition.  **Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable.**

There is a three-step process called the "rule of reason" that you should follow to make this determination:

**First**, you must determine whether Plaintiffs have proven by a preponderance of the evidence that **the** / **each**[93] contract restriction**s** caused an **actual adverse effect on competition** / **substantial harm to competition**[94] in a relevant product and geographic market.  If Plaintiffs do not prove by a preponderance of the evidence an **adverse effect on competition** / **substantial harm to competition**, they will not have proven an unreasonable restraint of trade under this three-step process.

---

*Dentsply Int'l, Inc.*, 602 F.3d 239, 255-56 (3d Cir. 2010) (series of bilateral exclusive contracts with a common hub are not a single agreement under Section 1).

[93] **Plaintiffs' Objection:** NASCAR's proposed instruction that the jury must consider "each" type of agreement in isolation is incorrect.  The question is whether the restraints, considered together, unreasonably restrained trade.  *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 539 (4th Cir. 1998) (considering whether the "*entire* transaction," which consisted of several discrete agreements and acts, constituted an "agreement" in constraint of trade) (emphasis in original); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1153 (9th Cir. 2019) ("Contrary to the defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition."); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("Plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").

[94] **Plaintiffs' Objection:** Plaintiffs object to this instruction because "substantial harm on competition" is not the right standard for evaluating a Section 1 claim.  Instead, Plaintiffs must show an "adverse effect on competition."  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) ("[E]ach licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining ***the adverse effects of the claimed restraints on trade***, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies.") (emphasis added); *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002), *aff'd sub nom.*, 67 F. App'x 810 (4th Cir. 2003) ("Plaintiffs must carry the initial burden of showing that the challenged conduct has 'an actual ***adverse effect*** on competition as a whole in the relevant market.'") (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995)) (emphasis added).

97

If you find that Plaintiffs have proven an **adverse effect on competition** / **substantial harm to competition** in a relevant market, then for the **second** step, you must determine whether Defendants have proved by a preponderance of the evidence that the contract restrictions produced countervailing competitive benefits **to sellers in the relevant market**. If Defendants do not prove such countervailing procompetitive benefits, then you must find that Plaintiffs have proved an unreasonable restraint of trade in this second step of the analysis.

If you find that Defendants have proven countervailing procompetitive benefits, then at the **third** step, you must determine whether Plaintiffs have proven by a preponderance of the evidence that any procompetitive benefits proven by Defendants could be reasonably achieved through **substantially** less restrictive means. If Plaintiffs met their burden of proving such **substantially** less restrictive means, then you **must** / **can** find that Plaintiffs have proven an unreasonable restraint of trade.

Keep in mind that the three steps are not a rigid checklist, and they should not replace careful analysis of whether the contracts at issue unreasonably restrained trade. You must weigh all the evidence and look at the circumstances, details, and logic of the restraints to determine whether, on balance, their anticompetitive harms outweigh any procompetitive benefits **in the same relevant market**.[95]

---

[95] **NASCAR's Objection:** *First*, Plaintiffs have unjustifiably altered the model to lower their burden—by, for instance, deleting the sentence that "[u]nder Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable" and by changing "substantial harm to competition" in the model to "actual adverse effect on competition."

*Second*, Plaintiffs improperly attempt to raise NASCAR's burden by requiring that NASCAR show "countervailing competitive benefits to sellers in the relevant market." Adopting that limitation would invite serious legal error. And *none* of Plaintiffs' sources support that gambit. To start, the Supreme Court has not so limited the rule of reason's second step; instead, defendants need only show "a procompetitive rationale for the restraint." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *see also NCAA v. Alston*, 594 U.S. 69, 96-97 (2021) (same). That can mean looking beyond the alleged relevant market. *See NCAA v. Bd. of Regents*, 468 U.S. 85, 115-20

98

Next, I will review each of these steps in more detail.

---

(1984) (considering NCAA's interest in protecting live attendance at games and "legitimate and important" interest in maintaining competitive balance as justification for restraint operating in different market for telecasting of collegiate football games). Indeed, the student-athletes in *Alston*—represented by Plaintiffs' counsel here—did not "question that the NCAA may permissibly seek to justify its restraints in the labor market by pointing to procompetitive effects they produce in the consumer market." *Alston*, 594 U.S. at 87.

And that is for good reason. The rule of reason requires "the factfinder [to] weigh[] all of the circumstances of a case." *United States v. Brewbaker*, 87 F.4th 563, 573 (4th Cir. 2023). No wonder that the Fourth Circuit has repeatedly considered a range of procompetitive benefits, including those to customers more broadly. *See, e.g.*, *Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*, 158 F. App'x 413, 420 (4th Cir. 2005) (considering that "exclusive arrangements are needed for 'control of quality, control of cost, provision of services, ensuring the availability of services 24/7, 365 days a year, to ensure that the practitioners are highly qualified, and to minimize the disruption of services'"); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 514 (4th Cir. 2002) (considering range of procompetitive benefits, including benefits to "customers"). That makes sense, for even if a case qualifies for quick-look treatment (and therefore does not require "detailed examination of the relevant market"), the factfinder still "must carefully consider a challenged restriction's possible procompetitive justification." *Continental*, 277 F.3d at 510. There is no basis to artificially restrict NASCAR's ability to offer procompetitive justifications for the challenged restrictions.

1. **[Instruction No. 30] Unreasonable Restraint of Trade, Step One:** Adverse Effect on Competition in Relevant Market / Substantial Harm to Competition in Relevant Market[96]

To prove that the challenged contracts are unreasonable, Plaintiffs must first prove that the restraint caused substantial harm to competition. / Plaintiffs must prove that each challenged restraint is unreasonable.   To prove that each challenged restraint is unreasonable, Plaintiffs must prove that the restraint, judged on its own and not aggregated together with other challenged restraints, caused substantial harm to competition.[97]

Although it may be relevant to the inquiry, harm to the individual business of a plaintiff may not be / is not sufficient, by itself, to demonstrate harm to competition generally, although

---

[96] **Plaintiffs' Sources**: Adapted from Leonard B. Sand, et al., 4 Modern Federal Jury Instructions-Civil P 79.01 (2025); *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002), *aff'd sub nom.*, 67 F. App'x 810 (4th Cir. 2003) ("Plaintiffs must carry the initial burden of showing that the challenged conduct has 'an actual adverse effect on competition as a whole in the relevant market.'") (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995)).

**NASCAR's Sources:**  ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.C.2 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 31;  Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 26; *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) ("[E]ach licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies."); *see id.* at 202-207 (analyzing each individual license to determine whether plaintiff alleged harm to competition); *id.* at 210 (declining to consider "the potential for anticompetitive effects from resulting from this conduct in the aggregate" and holding that the district court "correctly determined that it could not consider the cumulative harm … but instead was required to consider … *each* agreement's potential for anticompetitive effects" (emphasis added)); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 239, 255-56 (3d Cir. 2010) (series of bilateral exclusive contracts with a common hub are not a single agreement under Section 1).

[97] **Plaintiffs' Objection:** NASCAR's instruction is wrong in two respects.  First, Plaintiffs are not required to show how "each" type of contractual restraint harmed competition, but rather that NASCAR's agreements, taken together, restrained competition. *See supra* n.93. Second, Plaintiffs must show an "adverse effect on competition," not substantial harm to competition as NASCAR suggests. *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002).

100

**such injury may be sufficient if competition in general is also harmed**.  **That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.**  Further, Plaintiffs must show that the **substantial** harm to competition occurred in **an identified** / **the alleged** relevant market.[98]

If you find that 23XI and Front Row have proven that the challenged restraint resulted in substantial harm to competition in **a** / **the alleged** relevant market, then you must determine whether NASCAR has proven that the restraint produces countervailing competitive benefits based on its procompetitive rationales.  If you find that 23XI and Front Row have not shown that the challenged restraint resulted in a substantial harm to competition in the **alleged** relevant market, then you must find for NASCAR and Mr. France and against 23XI and Front Row on this claim and you do not need to review Instructions 34 through 38 (you should move to Instruction 39).

---

[98] **NASCAR's Objection:**  *First*, Plaintiffs' alteration of the model to read "may not be" and the additional language "although such injury may be found to be sufficient if competition in general is also harmed" is misleading and an incorrect statement of the law.  *NCAA v. Alston* makes clear that showing "significant anticompetitive effects in the relevant market" at the first step of the rule of reason is "no slight burden."  594 U.S. 69, 97 (2021).  Plaintiffs' language is also logically inconsistent, because harm to a competitor cannot be "sufficient" if harm to competition is "*also*" required.  The language from the model instruction should be given here.

*Second*, Plaintiffs must show a "substantial anticompetitive effect that harms consumers *in the relevant market.*"  *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (emphasis added).  That is, Plaintiffs have to prove that (1) the market they alleged is in fact a relevant market and (2) harm to competition occurred in that market.  Courts "usually cannot properly apply the rule of reason without an accurate definition of the market," because "'[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition."  *Id.* at 543 (citation omitted).  Plaintiffs' authority—*R.J. Reynolds*—likewise says as much, requiring harm to competition "in the relevant market."  *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002).

### a. [Instruction No. 31] Relevant Market[99]

**To succeed on their Section 1 claim, 23XI and Front Row must prove by a preponderance of the evidence that the input market for premier stock-car racing teams in the United States is a relevant antitrust market.**[100]

As I instructed you with respect to Plaintiffs' **monopolization** / **monopsonization** claim, there are two parts of a relevant market. The **first part** is known as the relevant *product* market. The **second part** is known as the relevant *geographic* market. You were previously instructed on how to determine whether Plaintiffs have proven a relevant market. Those same relevant market instructions apply to Plaintiffs' Section 1 claim.

---

[99] **Sources**: *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (market power is the "special ability . . . to force [a contracting partner] to do something he would not do in a competitive market."); *In re Google Play Store Antitrust Litig.*, No. 21-md-02981, Final Jury Instructions for *Epic* Trial, ECF No. 850, Instruction No. 18 (N.D. Cal. Dec. 6, 2023).

[100] **Plaintiffs' Objection**: Plaintiffs object to the first paragraph added by NASCAR, which is redundant with the instruction in the agreed-upon following paragraph.

### b. [Instruction No. 32] Market Power[101]

**To succeed on their Section 1 claim, Plaintiffs must prove by a preponderance of the evidence that NASCAR had market power in a relevant market.** Market power is the power to control prices, exclude competition, restrict output, or to force a contracting partner to do something it would not do in a competitive market.

**When instructing you on Plaintiffs' Section 2 claim, I instructed you on monopoly power. Here, you must consider market power—a similar but distinct concept. A company that has monopoly power in a relevant market necessarily has market power in that market. However, a company can have market power in a relevant market even if it does not have monopoly power, because market power requires less than monopoly power. While a single dominant firm can possess monopoly power in a relevant market, a firm can have market power without being the single dominant firm. For example, whereas monopoly power can be inferred by a market share of 70 percent or more, firms can be inferred to have market power with a lower share of the market, such as 30 percent or more.**

In evaluating whether NASCAR has market power, **you may consider direct evidence, such as whether NASCAR has demonstrated the ability to pay racing teams below competitive rates for their services; to force racing teams to accept conditions they would not**

---

[101] **Plaintiffs' Sources**: *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (market power is the "special ability . . . to force [a contracting partner] to do something he would not do in a competitive market."); *In re Google Play Store Antitrust Litig.*, No. 21-md-02981, Final Jury Instructions for *Epic* Trial, ECF No. 850, Instruction No. 28 (N.D. Cal. Dec. 6, 2023) *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) *Carolina Rest. Grp., Inc. v. Pepsico Sales, Inc.*, 2015 WL 4250395, at *7 (W.D.N.C. July 13, 2015) ("[A] plaintiff must allege facts sufficient to show that the defendant has market power."); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (market power required for Section 1 rule of reason claim).

**accept in a competitive market; or to exclude competing or potentially competing premier stock car racing series from the market.** You can also consider indirect evidence of market power, such as NASCAR's market share in the relevant market and barriers to entry. Evidence of low or no entry barriers may be evidence that NASCAR does not have market power, regardless of NASCAR's market share, because new competitors could enter if NASCAR attempted to reduce prices for the services of premier stock car racing teams below competitive market levels for a substantial period of time. **By contrast, evidence of high barriers to entry along with a market share in excess of 30 percent may support an inference that NASCAR had market power.**

If Plaintiffs do not show, by a preponderance of the evidence, that NASCAR had market power, **then Plaintiffs cannot meet their burden of proving an unreasonable restraint of trade and their Section 1 claim fails**.[102]

---

[102] **NASCAR's Objection:** NASCAR objects to breaking out a separate instruction for market power. The one set of jury instructions that Plaintiffs cite supports NASCAR, as it considers market power as *one factor* in determining proof of competitive harm. *See* Final Jury Instructions for *Epic* Trial, *In re Google Play Store Antitrust Litig.* (N.D. Cal. Dec. 6, 2023), No. 21-md-02981, ECF No. 850 at 37-38. Other sets of instructions follow the same approach. *See, e.g.*, Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 35-36; Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 26-27. So too does the ABA Model Instruction. ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.C.2 (2016). And so too does NASCAR's version of the instruction that follows (Instruction 33).

Plaintiffs are wrong that a plaintiff "must prove" market power to "succeed on [a] Section 1 claim." After all, the Supreme Court has said that proving anticompetitive effects can be done directly through "reduced output, increased prices, or decreased quality in the relevant market" *or* indirectly through "market power plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Showing market power is *not* mandatory. Fourth Circuit authority also contradicts Plaintiffs' approach. For example, *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 709 (4th Cir. 1991), holds that "a detailed inquiry into a firm's market power is not essential when the anticompetitive effects of its practices are obvious," and merely says that "[a]bsent … market power," a restraint is "*unlikely*" to succeed—not that it is *impossible* to do so. And that is because the rule of reason requires inquiring into "all of the circumstances to determine whether a practice unreasonably restrains competition." *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 287 (4th Cir. 2009). While that *includes* "market power," it *also* includes "specific information about the relevant business and the

restraint's history, nature, and effect." *Id.* Even Plaintiffs' own out-of-circuit authority supports NASCAR. *MacDermid* does *not* say (contra Plaintiffs) that market power is required; instead, it says that how harm to competition is shown "determines whether proof of market power is *also* required," and that the core requirement is "showing actual harm to consumers in the relevant market." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182-83 (2d Cir. 2016). Plaintiffs' instruction here should be rejected.

### c. [Instruction No. 33] Proof of Competitive Harm

**Plaintiffs' Version**[103]**:** If you determine that Plaintiffs proved a relevant market **and that NASCAR had market power in that market**, then you must determine whether Plaintiffs have proven by a preponderance of the evidence that the challenged contractual restrictions had a substantial harmful effect, **or were likely to have a substantial harmful effect**, on competition in the relevant market.

In this context, a **harmful effect** on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as the loss of higher payments **to racing teams for their services**, the loss of increased output, or the loss of higher product quality. If the challenged contractual restrictions have not resulted in, **or are not likely to result in**, lower payments **or less-favorable terms for racing teams than they would achieve in a competitive market**, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged contract, **combination, or conspiracy** has produced, or is likely to produce, competitive harm, you may look at the following factors:

(1) the effect of the contractual restrictions on prices, output, product quality, and service;

(2) the purpose and nature of the contractual restrictions;

(3) the nature and structure of the relevant market;

---

[103] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3(B); *In re National Football Leagues Sunday Ticket Antitrust Litigation*, Case No. 2:15-ml-02668-PSG-SK (C.D. Cal. 2024), ECF No. 1482, Final Jury Instructions, at 26-27; *NYNEX v. Discon, Inc.*, 525 U.S. 128, 139 (1998); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) (harm to competition "requires a showing of 'anticompetitive effect' resulting from the agreement in restraint of trade. To have 'anticompetitive effect' conduct 'must harm the competitive process and thereby harm consumers. Harm to one or more competitors will not suffice.'").

(4) the number of competitors in the relevant market and the level of competition among them, both before and after the contractual restrictions were imposed; and

(5) whether NASCAR possessed market power **to cause damage to competition in a relevant market**.

If you find that Plaintiffs have proven that Defendants' contracts**, combination, or conspiracy** have caused a substantial adverse competitive effect in the relevant market, you should move on to the second step of the analysis.[104]

**NASCAR's Version**[105]**:** If you find that 23XI and Front Row have proven the existence of a relevant market, then you must determine whether they also have proven that the challenged restraint has a **substantial** harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as **higher prices for sellers**, increased output, or higher product quality. If the challenged conduct has not resulted in **lower prices for buyers**, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors:

---

[104] **NASCAR's Objection**: *First*, Plaintiffs' statement that "market power" is required before reaching proof of competitive harm is incorrect. *Supra* at n.102. *Second*, Plaintiffs' additions to the model instruction are unwarranted—especially when considering that this instruction does not parallel its "proof of competitive harm" instruction for NASCAR's counterclaim below, in ways clearly designed to lower Plaintiffs' burden while raising NASCAR's. *See infra* Instruction 50. This Court should give NASCAR's instruction, which closely tracks the model instruction and other sets of jury instructions, rather than striking out on its own.

[105] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.C.2 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 35-36; Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 26-27.

• the effect of the restraint on prices, output, product quality, and service;

• the purpose and nature of the restraint;

• the nature and structure of the relevant market;

• the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

• **whether NASCAR possesses market power.**

**The last factor mentioned, market power, has been defined as an ability to profitably lower prices, for a sustained period of time, below those that would be charged in a competitive market. A buyer that possesses market power generally can pay lower prices for the same goods or services than a buyer that does not possess market power.**

**An important factor in determining whether NASCAR possesses market power is NASCAR's market share, that is, its percentage of the products or services it buys in the relevant market. Other factors that you may consider in determining whether NASCAR has market power include the existence of barriers to entry or the number of competitors in the relevant market.**

**If NASCAR does not possess a substantial market share, it is less likely that NASCAR possesses market power. If NASCAR does not possess market power, it is less likely that the challenged restraint has resulted in a substantial harmful effect on competition in the market.**[106]

---

[106] **Plaintiffs' Objection:** Plaintiffs object to this instruction because it misstates the law. Under the rule of reason for Section 1 claims, market power is a separate requirement—it is not folded into the harm analysis. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989); *Carolina Rest. Grp., Inc. v. Pepsico Sales, Inc.*, 2015 WL 4250395, at *7 (W.D.N.C. July 13, 2015) ("[A] plaintiff must allege facts sufficient to show that the defendant has market power."); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (market power required for Section 1 rule of reason claim).

## 2. [Instruction No. 34] Unreasonable Restraint of Trade, Step Two: Evidence of Competitive Benefits

**Plaintiffs' Version**[107]:  Under the second step, Defendants have the burden to prove, by a preponderance of the evidence, that NASCAR's challenged contractual restriction had offsetting benefits to competition **within the relevant market**.  A procompetitive benefit is a non-pretextual claim that NASCAR's challenged contractual restrictions produced benefits to competition **within the relevant market**, such as if the challenged contractual restrictions can be shown to increase output, improve product quality, or improve financial and other conditions **for racing teams that sell their services in the relevant market**.

**Evidence of procompetitive benefits can only satisfy Defendants' burden of proof if the benefits occurred in the relevant input market for purchasing the services of premier stock car racing teams.  For instance, any benefits for racing fans of the Cup Series or in the**

---

[107] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3 (2016); *United States v. Topco Assocs.,* 405 U.S. 596, 609–10 (1972) (noting the Court's "inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector"); *Deslandes v. McDonald's U.S., LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (rejecting cross-market balancing that "treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)," because that approach "is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs"); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 596 (N.D. W. Va. 2023) ("As a matter of law, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor." (citing *Deslandes*)); *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994) (finding it "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market"); *United States v. Google LLC*, 778 F. Supp. 3d 797, 868 (E.D. Va. 2025) ("In assessing whether proffered procompetitive justifications are sufficient, courts frequently balance the restriction's anticompetitive harms against its procompetitive benefits"); *see id.* ("A court must assess the validity and sufficiency of each claimed procompetitive justification … [and] pretextual and unsubstantiated justifications are not valid"); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) (when procompetitive benefits are pretextual, they need not be considered).

**market for the sale of NASCAR's broadcast rights do not offset any harm to competition in the relevant *input* market for selling the services of stock car racing teams to NASCAR.**

If you find that Defendants have not met their burden to prove offsetting competitive benefits from the challenged contractual restrictions **within the relevant market for buying the services of racing teams for the Cup Series**, then you must find an unreasonable restraint of trade has been established at step two of the analysis. If you find that NASCAR does meet its burden to show benefits to competition **in the relevant input market**, you should move on to the third step of the analysis.[108]

---

[108] **NASCAR's Objection:** As explained above, Plaintiffs' attempt to raise NASCAR's burden by limiting any procompetitive benefits only to their alleged relevant market would invite serious legal error. *Supra* at n.95. Authority from the Supreme Court and from the Fourth Circuit contradict that approach. *Supra* at n.95; *see Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (requiring only "a procompetitive rationale for the restraint"); *NCAA v. Alston*, 594 U.S. 69, 96-97 (2021) (same); *NCAA v. Bd. of Regents*, 468 U.S. 85, 115-20 (1984) (considering NCAA's interest in protecting live attendance at games and "legitimate and important" interest in maintaining competitive balance as justification for restraint operating in different market for telecasting of collegiate football games); *Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*, 158 F. App'x 413, 420 (4th Cir. 2005) (considering range of procompetitive benefits for "exclusive arrangements" including "'control of quality, control of cost, provision of services, ensuring the availability of services 24/7, 365 days a year, to ensure that the practitioners are highly qualified, and to minimize the disruption of services'"); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 514 (4th Cir. 2002) (considering range of procompetitive benefits, including benefits to "customers"). The baseline principle is that "[f]irms deserve substantial latitude to fashion agreements that serve legitimate business interests." *Alston*, 594 U.S. at 101.

Plaintiffs' authorities do not say otherwise. Plaintiffs incompletely cite *Topco*; its full sentence is that courts' "inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition is another sector *is one important reason we have formulated per se rules*"—which has no application to Plaintiffs' rule-of-reason claim. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609-610 (1972) (emphasis added). *Deslandes* did not "reject cross-market balancing" (contra Plaintiffs) in a rule-of-reason case either: Instead, on a motion to dismiss, it said that the district court incorrectly classified a restraint as "ancillary" and therefore treated an "anti-poach clause" as not subject to *per se* liability. *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703-05 (7th Cir. 2023). And *Sullivan* affirmatively supports NASCAR: It recognizes that the Supreme Court "considered the value of certain procompetitive effects that existed outside of the relevant market in which the restraint operated" and that courts "should generally give a measure of latitude to antitrust defendants in

**NASCAR's Version**[109]:  If you find that 23XI and Front Row have proven that the challenged restraint resulted in **substantial** harm to competition in the alleged relevant market, then you must determine whether NASCAR has proven that the restraint produces **countervailing competitive benefits** based on its procompetitive rationales.

**A procompetitive rationale is a non-pretextual claim that NASCAR's conduct is indeed a form of competition on the merits because it involves competitive benefits such as increased efficiency, enhanced customer appeal, elimination of free-riding, increased specialization, increased output, improved product quality, or because it enables the creation of new products, or reduces prices.** [110]

---

their efforts to explain the procompetitive justifications for their policies and practices." *Sullivan v. NFL*, 34 F.3d 1091, 1111-12 (1st Cir. 1994).

Accepting Plaintiffs' proposal would be reversible error; by contrast, NASCAR's version closely tracks other instructions and governing case law.

[109] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.C.3 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 37;  Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 28; *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 81 (3d Cir. 2010) ("[T]he Sherman Act does *not* forbid sanctioning bodies and other sports-related organizations from freely (i.e., without any coercion or improper interference) adopting exclusive equipment requirements, so long as such organizations otherwise possess, in good faith, sufficient pro-competitive or business justifications for their actions."); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 986 (9th Cir. 2023) ("A procompetitive rationale is 'a [1] nonpretextual claims that [the defendant's] conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.'"); *NCAA v. Alston*, 594 U.S. 69, 98 (2021) ("[A]ntitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes.  To the contrary, courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'"); *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, 883 F.3d 32, 44 (2d Cir. 2018) ("[T]he Standards reduce leagues' incentive to free ride on USSF's efforts and expenditures without making similar investments to generate fan interest in the sport."); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 849 (5th Cir. 2015) ("[E]xclusive dealing arrangements[] frequently have procompetitive justifications, such as limiting free riding and increasing specialization.").

[110] **Plaintiffs' Objection**: NASCAR's proposed instruction misstates the law because it instructs the jury to consider alleged procompetitive benefits in markets other than the input market at issue

111

in this case (i.e., "enhanced consumer appeal"). That is contrary to law—the instruction should direct the jury to only consider asserted procompetitive benefits within the relevant market. *United States v. Topco Assocs.*,405 U.S. 596, 610 (1972) ("Implicit in [the] freedom [to compete] is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy."); *Deslandes v. McDonald's U.S., LLC*, 81 F.4th 699, 703 (7th Cir. 2023); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 596 (N.D.W. Va. 2023) ("As a matter of law, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor.").

### 3. [Instruction No. 35] Unreasonable Restraint of Trade, Step Three: Less Restrictive Means

**Plaintiffs' Version**[111]: If you find that Defendants have proven that the challenged contractual restrictions resulted in competitive benefits **within the relevant market**, then you must determine whether Plaintiffs have proven, by a preponderance of the evidence, that the challenged contracts were not reasonably necessary to achieve those procompetitive benefits.

**If Plaintiffs prove that NASCAR's procompetitive benefits could have been achieved by reasonable alternative, less restrictive means, then the competitive benefits cannot be used to justify the anticompetitive harm. If Plaintiffs have proven the existence of a less restrictive alternative to the challenged contracts, NASCAR's procompetitive rationale cannot justify its conduct.**[112]

---

[111] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3; *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1040 (4th Cir. 1987) ("asserted business justification cannot salvage" anticompetitive conduct "that is otherwise per se unlawful without proof that means less restrictive than the [conduct] were not feasible to achieve the desired protection"); *R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.*, 60 F. Supp. 2d 502, 510 (M.D.N.C. 1999) ("plaintiff can still prevail by showing that the same pro-competitive benefit could be achieved through an alternative means that is less restrictive of competition") (internal quotation marks omitted); *NCAA v. Alston*, 594 U.S. 69, 100, 141 S. Ct. 2141, 2162 (2021) ("'To be sure, [steps two and three] can be collapsed into one,' since a 'legitimate objective that is not promoted by the challenged restraint can be equally served by simply abandoning the restraint, which is surely a less restrictive alternative'") (quoting P. Areeda & H. Hovenkamp, Antitrust Law ¶1505, p. 428 (4th ed. 2019)).

[112] **NASCAR's Objection**: *First*, it is incorrect to say that NASCAR's procompetitive benefits must be "within the relevant market" as defined by Plaintiffs. *Supra* at nn.95, 108. *Second*, it is inaccurate to say that Plaintiffs' Section 1 claim succeeds if they can show only a substantially less restrictive alternative. That would shortcut the ultimate question of whether a restraint "unduly harms competition." *NCAA v. Alston*, 594 U.S. 69, 97 (2021). In addition, Plaintiffs' version downplays the necessity of showing "substantially less restrictive alternative[s]" that "would achieve the same procompetitive effect," *id.* at 100, and not just a "marginally" less restrictive one, *id.* at 103. Courts "may not use antitrust laws to make marginal adjustments to broadly reasonable market restraints." *Id.* at 84; *see also id.* at 98 ("[A]ntitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes. To the contrary, courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'"). In short, Plaintiffs' proposed instruction is a

113

**NASCAR's Version**[113]**:** If you find that NASCAR proved that its conduct had procompetitive benefits or rationales, then you should assess whether 23XI and Front Row have shown that those benefits or rationales could have been achieved through substantially less anticompetitive means.

**Any alternative presented by 23XI and Front Row must be a substantially, not marginally, less restrictive means for achieving the same procompetitive rationales. The alternative must also be virtually as effective in serving NASCAR's procompetitive purposes without significantly increased cost.**[114]

---

"recipe for disaster," as it "risk[s] interfering 'with the legitimate objectives at issue' without 'adding that much to competition.'" *Id.*; *see id.* at 106 ("When it comes to fashioning an antitrust remedy, we acknowledge that caution is key. Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives.").

[113] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 1.C.3 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 38; Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 29; *NCAA v. Alston*, 594 U.S 69, 100 (2021) ("[A]nticompetitive restraints of trade may wind up flunking the rule of reason to the extent the evidence shows that substantially less restrictive means exist to achieve any proven procompetitive benefits."); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1760d (2025, Lexis) ("[O]nce the less restrictive alternative is put in issue to defeat the defendant's prima facie justification, the rule of reason plaintiff bears the burden of persuading the tribunal that an alternative is substantially less restrictive and is virtually as effective in serving the legitimate objective without significantly increased cost. Such persuasion establishes that the restraint is not reasonably necessary to achieve legitimate objectives.").

[114] **Plaintiffs' Objection**: Plaintiffs object to this instruction as misleading and incomplete. First, the "virtually as effective" formulation that NASCAR proposes has not been used in the Fourth Circuit. *See, e.g.*, *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002) (At the third step, "[p]laintiffs can still prevail by showing that the same pro-competitive effect could be achieved through an ***alternative means that is less restrictive of competition***.") (emphasis added). Second, NASCAR's proposed instruction is confusing and prejudicial because it does not instruct the jury that, if the jury concludes the competitive benefits could have been achieved through less-restrictive means, the restriction cannot justify harm to competition. That error undermines the entire purpose of the less-restrictive means instruction.

114

#### 4. [Instruction No. 36] Balancing Anticompetitive Harms and Procompetitive Benefits[115]

If you find that NASCAR's challenged contractual restrictions resulted in procompetitive benefits in the relevant market that could not have been achieved through substantially less restrictive means, then you must balance the competitive harms that you found against the competitive benefits that you found **within the relevant market**.[116]

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraints are unreasonable. If the competitive harm did not **substantially** outweigh the competitive benefits, then the challenged restraints are not unreasonable. **In conducting this analysis, you must consider the benefits and harm to competition and consumers in the market as a whole, not just to a single competitor or group of competitors.** Plaintiffs bear the burden of proving, by a preponderance of the evidence, that the anticompetitive effect of the conduct substantially outweighs its benefits.[117]

---

[115] **Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.4; *North American Soccer League, LLC v. USSF*, Case No. 1:17-cv-5495, Final Jury Instructions, ECF No. 540, Instruction No. 28 (E.D.N.Y. Feb. 4, 2025); *Deutscher Tennis Bund v. ATP Tour Inc.*, Case No. 1:07-cv-1782008, Final Jury Instructions, ECF No. 198, Antitrust Jury Instruction 16 (D. Del. Aug. 11, 2008); Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 30.

[116] **NASCAR's Objection:** *First*, NASCAR again objects to the requirement that the competitive benefits must be "within the relevant market." *Supra* at nn.95, 108. *Second*, Plaintiffs improperly delete material from the model, including the sentence that "you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors."

[117] **Plaintiffs' Objection:** Plaintiffs object to NASCAR's instructions in this paragraph for two reasons. First, the instruction that the jury must find the harm to competition "substantially" outweighs the competitive benefits is contrary to Fourth Circuit law. *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("[P]laintiffs must prove that [defendant's] rules caused anticompetitive harms which *outweighed* any procompetitive justification.") (emphasis added). Second, NASCAR's reference to "consumers in the market as a whole" is confusing and prejudicial given this is an input market where the teams are the direct sellers and the "consumers."

If you find that 23XI and Front Row have proven that the challenged restraint unreasonably restrained trade in a relevant market, then you must determine whether 23XI and Front Row **each** suffered injury to its business or property.  If you find that 23XI and Front Row have not proven an unreasonable restraint of trade, then you must find for NASCAR and Mr. France and against 23XI and Front Row on this claim and you do not need to review Instructions 37 through 38 (you should move to Instruction 39).

**D. [Instruction No. 37] Third Element: Injury and Causation**[118]

**Plaintiffs' Version:** If you find that Plaintiffs have proven that NASCAR entered into **contractual restrictions** that unreasonably restrained trade, then you must determine whether Plaintiffs have proven that they suffered injuries to their businesses and properties due to these challenged restrictions. The injury analysis is the same as what I instructed you for Plaintiffs' **monopolization** claim. In short, Plaintiffs must prove, by a preponderance of the evidence, that: (i) **their business was** in fact injured due to NASCAR's challenged **contractual restrictions**; (ii) those contractual restrictions were a material cause of **Plaintiffs'** injuries; and (iii) the injuries resulted from a reduction in competition rather than from increased competition or the natural competitive process.[119]

I will discuss calculating damages later in these instructions.

**NASCAR's Version:** To succeed on its Section 1 claim, 23XI and Front Row must **each** prove by a preponderance of the evidence that **the provisions involving the intellectual-property protections for the investments made by NASCAR in the Next Gen car, and the efforts in sanction agreements with racetrack owners to protect the look and feel of the Cup Series by limiting copycat series but allowing many other motorsports series to race at tracks used by NASCAR, caused each to suffer an injury to its business or property.**[120] You were previously

---

[118] **Source**: Adapted from ABA Model Instructions (2016) Ch. 6, Instr. A.1.

[119] **NASCAR's Objection:** The use of the shorthand "contractual restrictions" here is neither neutral nor precise. It is not neutral because "restriction" carries a negative connotation. And it is not precise, because Plaintiffs have to connect these particular contractual provisions to their injury.

[120] **Plaintiffs' Objection:** Plaintiffs object to NASCAR's biased description of the contracts that Plaintiffs challenge under Section 1. The jury instructions only need to describe the elements and legal standards the jury must apply, not the parties' characterizations of the contracts at issue (and it is especially improper for a jury instruction to include NASCAR's talking points on those restraints).

instructed on how to determine whether 23XI and Front Row proved injury and causation for their

Section 2 claim.  Those same instructions apply to 23XI and Front Row's Section 1 claim.

**E.  [Instruction No. 38]** Statute of Limitations[121]

The statute of limitations for the Sherman Act does not permit recovery for any conduct prior to October 2, 2020 that caused injuries to 23XI and Front Row.  You were previously instructed on how to determine whether the statute of limitations barred 23XI and Front Row's Section 2 claim.  Those same instructions apply to 23XI and Front Row's Section 1 claim.[122]

---

[121] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 7.A.1 (2016); 15 U.S.C. § 15b ("Any action to enforce any cause of action under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued.").

[122] **Plaintiffs' Objection:**  NASCAR's proposed instruction on the statute of limitations is contrary to law and prejudicial. *See supra* n.81. The application of the statute of limitations is a question of law for the Court, not a factual question for the jury.

# NASCAR'S COUNTERCLAIM

**A.** **[Instruction No. 39]** Elements of the Contract, Combination, and Conspiracy in Restraint of Trade Claim / Elements of the Unreasonable Restraint of Trade Claim[123]

NASCAR Event Management's counterclaim challenges 23XI, Front Row, and Curtis Polk's (Counterclaim-Defendants) conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade.

To prevail on this claim, NASCAR must prove the following three elements:

The **first** element is the existence of a contract, combination, or conspiracy between or among at least two separate entities.

The **second** element is that the contract, combination, or conspiracy unreasonably restrains trade.

The **third** element is that NASCAR Event Management suffered an injury to its business or property.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for 23XI, Front Row, and Mr. Polk and against NASCAR on its Section 1 counterclaim. If you find that the evidence is sufficient to prove all elements as to 23XI, Front Row, and/or Mr. Polk, then you must find for NASCAR and against 23XI, Front Row, and/or Mr. Polk on this claim.[124]

---

[123] **Source**: Adapted from ABA Model Instructions in Civil Antitrust Cases (2016) Ch. 1, Instr. B.

[124] **NASCAR's Objection:** NASCAR continues to believe that its counterclaim is properly adjudicated under a *per se* standard. *See* Doc. 249 at 25-26. To avoid any doubt as to preservation, NASCAR therefore objects to the lack of *per se* instructions to the jury. Yet because the Court has ruled that the counterclaim is subject to the rule of reason, Doc. 162 at 7-9, NASCAR has not proposed jury instructions regarding a *per se* violation. If the Court reconsiders its prior conclusion regarding the counterclaim, NASCAR will submit such instructions.

**B.** **[Instruction No. 40] First Element**: Existence of a Contract, Combination, or Conspiracy / Existence of A Combination or Conspiracy

**Plaintiffs' Version**[125]: NASCAR alleges that 23XI, Front Row, and Curtis Polk agreed "on the prices to demand and accept from NASCAR, the allocation of those payments to favor themselves (rather than Open Teams or drivers), not to deviate from fixed terms, and to boycott and take other coercive joint conduct to compel those outcomes."

To show that Counterclaim-Defendants participated in a **contract**, combination, or conspiracy to restrain trade under Section 1, NASCAR must prove these elements by a preponderance of the evidence:

(1) that the alleged **contract**, combination, or conspiracy existed;

(2) that 23XI, Front Row, and Curtis Polk **each** knowingly became members of the **contract**, combination, or conspiracy. To act knowingly means to participate deliberately, and not because of mistake, accident, or other innocent reason; and

(3) that the alleged contract, combination or conspiracy was a "restraint" on trade.

---

[125] **Plaintiffs' Sources**: Adapted from ABA Model Instructions in Civil Antitrust Cases (2016) Ch. 2, Instr. A.1; *N.C. State Bd. of Dental Examiners v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013) (Under Section 1, "a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade.") (quotations and citation omitted); *Broad. Music, Inc. v. Columbia Broad. Sys. Inc.*, 441 U.S. 1, 23 (1979) ("Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints."); *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 664 (E.D.N.C. 2003) ("[M]ere membership in a trade association [and] attendance at trade association meetings . . . are not, in and of themselves, condemned or even discouraged by the antitrust laws . . . . There must instead be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish an antitrust violation . . . .") (quoting *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987)); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) (a plaintiff must offer "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

121

A **contract**, combination, or conspiracy is an agreement or common understanding between two or more entities. An agreement or understanding between two or more entities exists when they share a commitment to a common scheme.

To establish the existence of a **contract**, combination, or conspiracy, the evidence need not show that its members entered into any formal or written agreement. The agreement itself may have been entirely unspoken. To prove a **contract**, combination, or conspiracy existed, the evidence must show that the alleged members came to an agreement or understanding among themselves to accomplish a common purpose.

A **contract**, combination, or conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors separately accept invitations to participate in an agreement that restrains trade. Similarly, it is not essential that all people act exactly alike, nor is it necessary that they all possess the same motive for entering into the agreement. It is also not necessary that all the means or methods claimed by NASCAR be agreed upon to carry out the alleged **contract**, combination, or conspiracy, nor that all the agreed-upon means or methods actually be used or put into operation, nor that all the entities alleged to be members actually be members. It is the agreement or understanding to restrain trade that constitutes a **contract,** combination, or conspiracy. Thus, you may find a **contract**, combination, or conspiracy existed regardless of its outcome.

NASCAR may prove by a preponderance of the evidence the existence of the alleged contract, combination, or conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the alleged **contract**, combination, or conspiracy. Certain circumstantial evidence allows you to infer a **contract**, combination, or conspiracy exists, when viewed in conjunction with parallel acts by the

alleged members of the contract, combination, or conspiracy. The mere existence of **parallel acts** does not prove the existence of a conspiracy. However, parallel acts that are inconsistent with individual actions and consistent with the claimed conspiracy, may provide circumstantial evidence that such a conspiracy existence. To prove the existence of a conspiracy from circumstantial evidence, NASCAR must come forward with evidence that tends to exclude the possibility of independent actions.

**NASCAR alleges that the Counterclaim-Defendants carried out their alleged conspiracy through the actions of the Race Team Alliance (or RTA), which is a trade association of stock car racing teams, and its four-person Team Negotiating Committee (or TNC). However, participation in the activities of a trade association does not prove participation in a conspiracy to restrain trade.**[126]

---

[126] **NASCAR's Objection:** *First*, Plaintiffs' repeated addition of "contract" neither fits with NASCAR's allegations nor comports with the model instruction. *Second*, Plaintiffs again delete portions of the model instruction that they do not like: for instance, that "[a] person can become a member without full knowledge of all the details of the conspiracy" or that the "members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose." *Third*, Plaintiffs' contention that this conspiracy was not a "restraint" of trade is baseless and relies on irrelevant music licensing cases. *See infra* at n.130 (Instruction 41); Doc. 249 at 19-22. *Fourth*, Plaintiffs' mentions of trade associations more properly belong in the "unreasonable restraint" element, which is where NASCAR's instruction concerning trade associations is proposed (Instruction 45). Plaintiffs are incorrect that NASCAR's conspiracy allegations are limited only to the actions of the RTA and the TNC. And even if trade associations are mentioned in the conspiracy element, Plaintiffs' statement here is too simplistic. The model instruction and case law provide that a trade association *can* take actions that constitute an agreement—so while not every action by a trade association is proof of a conspiracy, some actions are. *See, e.g.*, ABA Model Jury Instrs. in Civ. Antitrust Cases, Nos. 2.C.10 (2016); *Consol. Metal Prods. v. Am. Petroleum Inst.*, 846 F.2d 284, 293 (5th Cir. 1988) ("A trade association by its nature involves collective action by competitors."); *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) ("[T]he nature of trade associations is such that they are frequently the object of antitrust scrutiny …").

**NASCAR'S Version**[127]:  NASCAR must first prove the existence of a **combination or conspiracy** between two or more separate entities.  A **combination or conspiracy** is an agreement or understanding between two or more persons to restrain trade.  NASCAR alleges that 23XI, Front Row, and Mr. Polk **combined or conspired regarding the terms that they would offer and agree to when collectively negotiating the 2025 Charter Agreements with NASCAR**.

NASCAR must prove both of the following elements by a preponderance of the evidence:

(1) that the alleged **combination or conspiracy** existed; and

(2) **that 23XI, Front Row, and/or Mr. Polk knowingly became a member of that combination or conspiracy**.  To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a combination or conspiracy is an agreement or understanding between two or more persons.  An agreement or understanding between two or more persons exists when they share a commitment to a common scheme.  To establish the existence of a combination or conspiracy, the evidence need not show that its members entered into any formal or written agreement.  The agreement itself may have been entirely unspoken.  **A person can become a member without full knowledge of all of the details of the combination or conspiracy, the identity of all of its members, or the parts such members played in the conspiracy.  The members of the combination or conspiracy need not necessarily have met together, directly**

---

[127] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 2.A.1 (2016); *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 284 (4th Cir. 2012) ("Concerted activity is of special concern because it 'inherently is fraught with anticompetitive risk' and 'deprives the marketplace of the independent centers of decision-making that competition assumes and demands.'"); *id.* at 285 (finding concerted action where entity "enabled the individual brokerages to make collective decisions about pricing and services that they otherwise would have made independently"); *id.* at 289-90 ("Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstance evidence to suggest that an agreement took place.").

**stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose.** To prove a combination or conspiracy existed, the evidence must show that the alleged members of the combination or conspiracy came to an agreement or understanding among themselves to accomplish a common purpose.

**A combination or conspiracy may be formed without all parties coming to an agreement at the same time**. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed were agreed upon to carry out the alleged combination or conspiracy, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be members of the conspiracy were actually members. It is the agreement or understanding to restrain trade that constitutes a combination or conspiracy. Therefore, you may find a combination or conspiracy existed regardless of whether it succeeded or failed.

NASCAR may prove the existence of the alleged combination or conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the alleged conspiracy.

**Direct evidence of an agreement may not be available, and therefore a combination or conspiracy also may be shown through circumstantial evidence. You may infer the existence of a combination or conspiracy from the circumstances, including what you find the alleged members actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a**

**combination or conspiracy. If they acted similarly but independently of one another, without any agreement among them, then there would not be a combination or conspiracy**.

**In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.**[128]

---

[128] **Plaintiffs Objection**: Plaintiffs object to this instruction on several grounds. First, NASCAR has omitted "contract" from the standard formulation for describing a Section 1 conspiracy. Second, NASCAR's instruction (in subpart (2)) states that it must prove that "23XI, Front Row and/or Mr. Polk became a member" of the unlawful conspiracy. That is wrong, because NASCAR must separately show that *each* Counter-Defendant joined an unlawful conspiracy (among other things) to hold them liable under Section 1. NASCAR's addition of sentences about conspiracy members not needing to know the identities of other members of the conspiracy, or not needing to have met together, is irrelevant to the case at hand and would be confusing and prejudicial, because NASCAR has alleged a conspiracy between the 15 chartered racing teams that all participate in the Cup Series and met regularly during the course of the 2025 Charter negotiations. Finally, NASCAR's direct evidence instruction is incomplete and misleading.

1. [Instruction No. 41] Restraint of Trade[129]

   In this case, NASCAR alleges that the Counterclaim-Defendants conspired with other racing teams by agreeing to jointly negotiate, through the RTA and TNC, the terms of the 2025 Charter Agreement with NASCAR. Under the law, joint negotiations by teams do not restrain trade if individual negotiations between individual teams and NASCAR were not prohibited by the Counterclaim-Defendants' agreement and instead remained a realistic option for NASCAR. If you find that individual negotiations were not precluded and remained a realistic option for NASCAR, you must find there was no agreement in restraint of trade.[130]

---

[129] **Plaintiffs' Sources:** *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) (holding that composers and authors offering their works through a joint license did not constitute a restraint of trade, where "[t]he individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets"); *Columbia Broad. Sys., Inc. v. Am. Soc. of Composers, Authors & Publishers*, 620 F.2d 930, 936 (2d Cir. 1980) ("We agree with the defendants that if that opportunity is fully available, and if copyright owners retain unimpaired independence to set competitive prices for individual licenses to a licensee willing to deal with them, the blanket license is not a restraint of trade."); *Matsushita Elec. Indust. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370 (D. Del. 2004) (joint licensing did not violate antitrust laws where the record showed that "individual licenses present[ed] a realistic alternative"); *Buffalo Broad. Co. v. ASCAP*, 744 F. 2d 917, 933 (2d Cir. 1984) ("Since the blanket license restrains no one from bargaining over the purchase and sale of music performance rights, it is not a restraint unless it were proven that there are no realistically available alternatives. As we have discussed, the plaintiffs did not present evidence to establish the absence of realistic alternatives. . . . Not having been proven to be a restraint, it cannot be a violation of section 1."); *Five Smiths, Inc. v. NFLPA*, 788 F. Supp. 1042, 1049 (D. Minn. 1992) (joint "negotiating tactics" by NFLPA and player-agents insufficient to state a Section 1 claim).

[130] **NASCAR's Objection:** This instruction misconstrues NASCAR's counterclaim and relies on inapplicable law; it should be rejected in its entirety. *First*, NASCAR's counterclaim is based on a coordinated campaign to fix prices, choke off individual bargaining, deploy boycotts and press campaigns, and take other steps to coerce NASCAR into paying far more to the racing teams. This is not just "joint negotiations," as Plaintiffs incorrectly assert. Doc. 249 at 1-2, 16-24. *Second*, Plaintiffs cite licensing cases which have no applicability here: the defendants there were subjected to consent decrees that "imposed tight restrictions" on operations and required "direct licensing." *BMI v. CBS*, 441 U.S. 1, 11-12 (1979); *see also Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 922-24 (2d Cir. 1984) (discussing consent decrees). The restraints there survived precisely because of those protective decrees—whereas, here, these practices are plainly anticompetitive (as

127

Polk's own counsel has argued).  *See* Doc. 249 at 19-20; Pls.' Opp'n at 1, *Meredith Corp. v. SESAC, LLC*, 09-cv-9177 (S.D.N.Y. Sept. 27, 2013), Doc. 132.  Nor is Plaintiffs' citation to *Five Smiths* persuasive:  that case specifically noted that an "agreement between competitors to restrain price" would be unlawful, *Five Smiths, Inc. v. NFLPA*, 788 F. Supp. 1042, 1052-53 (D. Minn. 1982)— which is exactly what NASCAR alleges here.

## 2. [Instruction No. 42] Willful Participation by Each Counterclaim-Defendant / Participation and Intent[131]

Before you can find that 23XI, Front Row, and Curtis Polk were each members of a conspiracy, NASCAR must prove, by a preponderance of the evidence, that each Counterclaim-Defendant knowingly joined in the unlawful plan at its inception, or at some later time, with the intent to further the purpose of the conspiracy.

**Membership in a trade association, like the RTA, is not by itself enough to establish that there was concerted action in violation of Section 1 of the Sherman Act. Associating with other claimed co-conspirators or knowledge alone of any alleged conspiracy is also not sufficient to establish an active and knowing participation. NASCAR must show that each 23XI, Front Row, and Mr. Polk knowingly conspired with at least one other party acting in that other party's individual capacity to jointly negotiate the 2025 Charter Agreement terms with NASCAR.[132]**

---

[131] **Sources**: Adapted from ABA Model Instructions (2016) Ch. 2, Instr. A.4; *N. Am. Soccer League, LLC v. USSF*, Case No. 1:17-cv-5495, Final Jury Instructions, ECF No. 540, Instruction No. 20 (E.D.N.Y. Feb. 4, 2025); *Okasen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991) (while a group may "have the capacity to conspire among themselves[,] [that] does not mean . . . that every action taken by the [group] satisfies the contract, combination, or conspiracy requirement of section one"); *Hall v. United Airlines, Inc.*, 296 F. Supp. 2d 652, 664 (E.D.N.C. 2003) ("[M]ere membership in a trade association . . . [is] not, in and of [itself], condemned or even discouraged by the antitrust laws."); *United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999) ("[M]ere association with conspirators is not enough to establish participation in a conspiracy."); *United States v. Townsend*, 924 F.2d 1385, 1391 (7th Cir. 1991) (mere knowledge not enough to "tie the conspiracy together").

[132] **NASCAR's Objection:** *First*, Plaintiffs without explanation delete portions of the model instruction that explain important concepts to the jury: for instance, that "[a] person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible" and that "the acts and statements of the conspirators are binding on all of those whom you find were members of the conspiracy." Defendants contend that the model instruction is appropriate here.

*Second*, on the paragraph that Plaintiffs added: The first sentence is incomplete, because members in a trade organization *do* have the capacity to conspire. *See, e.g.*, *Okasen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991). The second sentence is unnecessarily repetitive and

To act knowingly means to participate deliberately and not because of mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

**A person who knowingly joins an existing combination or conspiracy, or who participates only in part of a combination or conspiracy with knowledge of the overall combination or conspiracy, is just as responsible as if he or she had been one of those who formed or began the combination or conspiracy and participated in every part of it.**

In determining whether any of the Counterclaim-Defendants was a member of the alleged conspiracy, you should consider only the evidence about that particular Counterclaim-Defendant's statements and conduct, including any evidence of that Counterclaim-Defendant's knowledge and participation in the events involved and any other evidence of that particular Counterclaim-Defendant's participation in the conspiracy alleged.

You may not find that any of 23XI, Front Row, or Mr. Polk was a member of a conspiracy based only on their association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether a Counterclaim-Defendant was a member of the alleged conspiracy.

**If you find that the alleged combination or conspiracy existed, then the acts and statements of the conspirators are binding on all of those whom you find were members of the combination or conspiracy. Once you have found that a party is a member of a**

---

already covered in other places by the model instructions. And the third sentence is incorrect, because if the jury finds that Front Row and 23XI or Mr. Polk conspired, there is no need to find an additional conspirator—that is enough on its own.

combination or conspiracy, he or it is presumed to remain a member and is responsible for all actions taken by all coconspirators during and in furtherance of the conspiracy until it is shown that the combination or conspiracy has been completed or abandoned.

### 3. [Instruction No. 43] <span style="color:green">Individual Liability of Curtis Polk</span>[133]

**Plaintiffs' Version:** To prevail in its claim against 23XI co-owner Curtis Polk as an individual defendant, NASCAR must prove, by a preponderance of the evidence, that Mr. Polk actively and knowingly participated in the conspiracy that you find violates Section 1 of the Sherman Act. Because Mr. Polk is a co-owner of 23XI, he cannot conspire with

---

[133]**Plaintiffs' Sources**: *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade effected by a 'contract, combination . . . or conspiracy' between separate entities. It does not reach conduct that is wholly unilateral"); *id.* at 469 ("The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals"); *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 194 (2010) ("[A]n internal agreement to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.") (internal citation omitted); *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("[C]orporate employees cannot conspire with each other or with the corporation."); *Brown v. Donco Enters.*, 783 F.2d 644, 646 (6th Cir. 1986) ("Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends."); *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 604 F. Supp. 2d 870, 889 (W.D. Ky. 2009) (similar); *MVConnect, LLC v. Recovery Database Network, Inc.*, 2011 WL 13128799, at *10 (N.D. Tex. May 27, 2011) ("[T]he essential principle of direct, personal participation in the alleged conspiracy is necessary to hold a director or officer personally liable."); *Buffalo Broad. Co. v. Am. Soc. Composers, Authors, & Publishers*, 744 F.2d 917, 925–26 (2d Cir. 1984) (joint negotiations are not a restraint of trade when individual negotiations are not prohibited); *Spectators' Commun. Network, Inc. v. Colonial Country Club*, 231 F.3d 1005, 1010 (5th Cir. 2000) ("To prove conspiracy or "concerted action," the plaintiff must prove that the conspirators had a "conscious commitment to a common scheme designed to achieve an unlawful objective.").

**NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 2.A.1 (2016); *Brown v. Donco Enters.*, 783 F.2d 644, 646 (6th Cir. 1986) ("Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends."); *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 889 (W.D. Ky. 2009) (similar); *MVConnect, LLC v. Recovery Database Network, Inc.*, 2011 WL 13128799, at *10 (N.D. Tex. May 27, 2011) ("[T]he essential principle of direct, personal participation in the alleged conspiracy is necessary to hold a director or officer personally liable."); *Chandler v. Phoenix Servs.*, 419 F. Supp. 3d 972, 987 (N.D. Tex. 2019) (plaintiffs "must allege that [individual] had a direct role in the attempted monopolization"); *cf. United States v. Wise*, 370 U.S. 405, 416 (1962) (officer liable under Section 1 when officer "knowingly participates in effecting the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime—regardless of whether he is acting in a representative capacity.").

132

23XI.  Accordingly, to prove that Mr. Polk knowingly participated in an agreement to restrain trade, you must find that NASCAR proved by a preponderance of the evidence that Mr. Polk knowingly conspired with a team other than 23XI to unlawfully restrain trade.

**As I instructed you earlier (Instruction No. ##), any agreement between Mr. Polk and another team, separate from 23XI, to engage in joint negotiations with NASCAR is not a restraint of trade if the teams remained free to negotiate individually with NASCAR and such individual negotiations were a realistic option. Additionally, and again as I instructed you earlier (Instruction No. ##), Mr. Polk's mere participation in a trade group, such as the RTA or the TNC, is not an agreement in restraint of trade. Businesses, and agents acting on their behalf, may lawfully form industry or professional associations (often called "trade associations") to advance common interests and may communicate and meet with one another in furtherance of lawful trade-association activities.**[134]

**NASCAR's Version**: **If you find that there was a combination or conspiracy between or among two or more racing teams that included 23XI and/or Front Row, then you should determine whether Curtis Polk actively and knowingly participated in that conduct. Individual liability can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To find Mr. Polk liable, you**

---

[134] **NASCAR's Objection:** *First*, NASCAR objects to any imbalance between the individual-liability instructions for James France and Curtis Polk when it comes to the parties' Section 1 claims. Both Mr. France and Mr. Polk are co-owners, and so, if Plaintiffs' desired language about Mr. Polk not being able to conspire with 23XI is given, then the Court should also include similar language for Mr. France and NASCAR. *Second*, NASCAR incorporates its objections to Plaintiffs' "Restraint of Trade" instruction—this is a wholly inaccurate description of the law based on inapposite cases. *Supra* at n.130. And *third*, NASCAR incorporates its objections to Plaintiffs' "trade association statement," as it pulls a selected tidbit from the model that favors Plaintiffs without providing important qualifiers and necessary context. *See supra* at n.132 (Instruction 42); *infra* at Instruction 45.

**must conclude that he directly and personally participated in the combination or conspiracy.**[135]

---

[135] **Plaintiffs' Objection**: NASCAR's instruction is incomplete and misleading because it does not specify that Mr. Polk cannot conspire with 23XI under the *Copperweld* doctrine. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). To hold Mr. Polk personally liable, NASCAR must prove that Mr. Polk knowingly participated in an unlawful agreement to restrain trade with one or more teams other than 23XI, as described in Plaintiffs' proposed instruction.

## C. [Instruction No. 44] Second Element: Unreasonable Restraint of Trade (Three-Step Inquiry)[136]

**Plaintiffs' Version:** If you find that NASCAR has proven that a Counterclaim-Defendant participated in a **contract**, combination or conspiracy in restraint of trade, NASCAR must next prove, by a preponderance of the evidence, that such concerted action in restraint of trade unreasonably restrained competition.

There is a three-step process you should follow to make this determination. This is the same three-step process that I instructed you on for Plaintiffs' Section 1 claim.

**First**, you must determine whether NASCAR has proved by a preponderance of the evidence that the **contract**, combination, or conspiracy in restraint of trade caused an actual adverse effect on competition in a relevant product and geographic market. If NASCAR does not prove by a preponderance of the evidence an adverse effect on competition, it will not have proven an unreasonable restraint of trade.

If you find that NASCAR has proven an adverse effect on competition in a relevant market, then for the **second** step, you must determine whether Counterclaim-Defendants have proven by a preponderance of the evidence, that the **contract**, combination, or conspiracy in restraint of trade produced countervailing competitive benefits **in the relevant market**. If Counterclaim-

---

[136] **Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3.1(A); *NCAA v. Alston*, 594 U.S. 69, 96–97 (2021); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541, 138 S. Ct. 2274, 2284 (2018); *Brantmeier v. NCAA*, No. 1:24-CV-238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) ("In evaluating whether there is an unreasonable restraint of trade or commerce in violation of § 1, courts usually apply the three-step burden-shifting framework of the Rule of Reason."); *United States v. Booz Allen Hamilton Inc.*, No. CV CCB-22-1603, 2022 WL 9976035, at *5 (D. Md. Oct. 17, 2022) ("A three-step, burden shifting framework often guides a rule of reason analysis."); Ohio v. NCAA, 706 F. Supp. 3d 583, 591 (N.D.W. Va. 2023) ("When analyzing a claim under Section 1 of the Sherman Act to determine whether a restraint violates the rule of reason, courts use a 'three-step, burden shifting framework.'").

Defendants do not prove such countervailing procompetitive benefits, then you must find that NASCAR has proved an unreasonable restraint of trade in this second step of the analysis.

If you find that Counterclaim-Defendants have proved countervailing procompetitive benefits, then at the **<u>third</u>** step, you must determine whether NASCAR has proved, by a preponderance of the evidence, that any procompetitive benefits proven by Counterclaim-Defendants could be reasonably achieved through less restrictive means. If NASCAR meets its burden of proving such less restrictive means, then you must find that NASCAR has proven an unreasonable restraint of trade.

Keep in mind that the three steps are not a rigid checklist, and they should not replace careful analysis of whether the contract, combination, or conspiracy unreasonably restrained trade. You must weigh all the evidence and look at the circumstances, details, and logic of a restraint to determine **<u>whether it unreasonably harms competition</u>**.

Next, I will review each of these steps in more detail.[137]

---

[137] **NASCAR's Objection:** *First*, NASCAR repeats its objections to language that also appears in Instruction 29 above. *Supra* at n.95.

*Second*, NASCAR objects to repeating this instruction and the rest of the rule-of-reason instructions that follow (Instructions 49-53) for several reasons. (1) To start, this is already a lengthy and complicated jury charge, and repeating law that has already been explained to the jury at this point is unnecessary. By focusing on the relevant differences (e.g., the defined markets, the fact of a trade-association component), NASCAR's proposals avoid unnecessary repetition. (2) In addition, Plaintiffs have already proposed referring back to earlier instructions in other places—for instance, their relevant-market instructions and their "injury and causation" instructions for their Section 1 claim. And they have also proposed only one set of damages instructions. There is no reason not to follow that logic all the way through here. (3) Moreover, having a streamlined version of instructions for NASCAR's Section 1 counterclaim that refers back up to earlier instructions for Plaintiffs' Section 1 claim ensures that the jury applies *the same standards* to both claims, as it should. That eliminates any inconsistencies in language and does away with Plaintiffs' subtle (or not so subtle) attempts to lower their burden while raising NASCAR's burden.

If the Court believes that repetition is necessary, NASCAR requests both that the instructions above (e.g., Instruction 23) are repeated in full for both Plaintiffs' Section 1 claims and for NASCAR's Section 1 counterclaim. Because each side is making a Section 1 claim, the

**NASCAR's Version**[138]:  NASCAR must next prove by a preponderance of the evidence that the alleged combination or conspiracy was an unreasonable restraint on trade in the relevant market.

In order to determine whether the challenged combination or conspiracy was an unreasonable restraint, you must apply the rule of reason.  You were previously instructed regarding the rule of reason, and those same instructions (Instructions 29 to 36) apply to determining whether NASCAR has proven an unreasonable restraint of trade for its counterclaim.

---

instructions should be substantively identical in order to avoid any inconsistent application of the law.

[138] **NASCAR's Sources:**  ABA Model Jury Instrs. in Civ. Antitrust Cases, Nos. 1.C.1-4 (2016).

1. **[Instruction No. 45]** Unreasonable Restraint of Trade: Trade Associations[139]

In addition to my earlier instructions, consider the following when determining whether the challenged combination or conspiracy unreasonably restrained trade. In its counterclaim, NASCAR claims that 23XI, Front Row, and Mr. Polk combined or conspired to use the Race Team Alliance ("RTA") and the Teams Negotiating Committee ("TNC") in an anticompetitive manner, specifically by agreeing on the terms that they would offer and agree to when collectively negotiating the 2025 Charter Agreements with NASCAR.

Businesses that are actual or potential competitors, such as 23XI and Front Row here, may lawfully form industry or professional associations (often called "trade associations") to advance common interests and may communicate and meet with one another in furtherance of lawful trade-association activities. For example, trade associations may lawfully keep members informed and hold meetings among their members for topics such as new or changed services, technology, standard practices, or legislation and regulations in the industry. But members of such organizations are not permitted to use membership in their organization to restrain competition, such as by agreeing on prices in negotiations with counterparties.

That is, a trade association is capable of committing violations of the antitrust laws. A trade association cannot lawfully act to facilitate the raising of prices in the market in which its members compete with one another. These actions constitute an agreement with its members in violation of the Sherman Act even if the association has not combined or conspired with a nonmember.

---

[139] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, Nos. 2.C.9-10 (2016).

138

**If a trade association exchanges with its members confidential, competitively sensitive information, such as current or future prices, that is evidence which you may consider, along with all the other evidence, in deciding whether the association is in violation of the antitrust laws.**[140]

---

[140] **Plaintiffs' Objection**: This instruction is unnecessary and prejudicial. NASCAR has not sued any trade association, so cases about when trade association activities violate Section 1 are inapposite. NASCAR, instead, has alleged a separate agreement by the teams to jointly negotiate with NASCAR over the 2025 Charter Agreement. The relevant point on trade associations is that mere participation in a trade association does not violate Section 1, which Plaintiffs have incorporated into other instructions. Further, NASCAR's statement that it is unlawful for the members of a trade associate to agree "on prices in negotiations with counterparties" misstates the law. Joint negotiations, including joint negotiations that include price terms, are not unlawful when individual negotiations are available and remain a realistic option. *Broad. Music, Inc. v. Columbia Broad. Sys. Inc.*, 441 U.S. 1, 23 (1979); *Columbia Broad. Sys., Inc. v. Am. Soc. Composers, Authors & Publishers*, 620 F.2d 930, 936 (2d Cir. 1980) ("[I]f that opportunity is fully available, and if copyright owners retain unimpaired independence to set competitive prices for individual licenses to a licensee willing to deal with them, the blanket license is not a restraint of trade."). And in any event, as this Court already held, NASCAR's joint-negotiations claim is subject to the rule of reason, not a *per se* rule of illegality.

## 2. [Instruction No. 46] Unreasonable Restraint of Trade, Step One: Adverse Effect on Competition in Relevant Market / Relevant Market

**Plaintiffs' Version**[141]**:** To prove that the challenged **contract**, combination, or conspiracy is unreasonable, NASCAR must first prove that the restraint caused substantial harm to competition. While it may be relevant to the inquiry, harm to the individual business of Counter-Plaintiff **may not be** sufficient, by itself, to demonstrate harm to competition generally, **although such injury may be sufficient if competition in general is also harmed**.

Further, NASCAR must show that the harm to competition occurred in a relevant market. As I previously instructed you, there are two parts of a relevant market. The **first part** is known as the relevant *product* market. The **second part** is known as the relevant *geographic* market. It is NASCAR's burden to prove by a preponderance of the evidence the existence of a relevant market in which substantial anticompetitive harm occurred.[142]

**NASCAR's Version**[143]**:** In its counterclaim, NASCAR alleges that the relevant market is the market for the entry of cars into NASCAR Cup Series races in the United States and any other location where a Cup Series race is held. **23XI, Front Row, and Mr. Polk contend that NASCAR's alleged market is not a proper antitrust market.**[144]

There are two aspects you must consider in determining whether NASCAR has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market.

---

[141] **Plaintiffs' Source**: Adapted from Leonard B. Sand, et al., 4 Modern Federal Jury Instructions-Civil P 79.05 (2025).

[142] **NASCAR's Objection:** NASCAR incorporates its objections to language that also appears in Instruction 30 above. *Supra* at n.98.

[143] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, Nos. 3.A.3 (2016).

[144] **Plaintiffs' Objection**: It is not necessary to instruct the jury on the parties' positions.

### a. [Instruction No. 47] Relevant Product Market[145]

**Plaintiffs' Version:** **NASCAR alleges that, beginning in 2022, the Counterclaim-Defendants' participation in concerted action with respect to the joint negotiations of the 2025 Charter Agreement constituted an unreasonable restraint of trade in a relevant market for the entry of cars into NASCAR Cup Series races in the United States and any other location where a Cup Series race is held.** NASCAR alleges that it is a purchaser of race car participant services in this market.

As I previously instructed, products or services are in the same relevant market if they are reasonable substitutes for each other from the point of view of the participants in that market; that is, the products or services being purchased compete with one another. Put another way, a relevant product market consists of all products or services that are reasonably interchangeable in the market for the same purposes. **Products or services need not be identical or precisely interchangeable to be considered reasonable substitutes.** This is a practical test that considers the actual behavior of buyers and sellers.

**For this claim, you will need to consider whether other sellers of stock car racing teams were in actual or potential competition with 23XI and Front Row and the other chartered racing teams to sell their services for the Cup Series. If you find that there were**

---

[145] **Plaintiffs' Sources**: Adapted from Leonard B. Sand, et al., 4 Modern Federal Jury Instructions-Civil P 79.05 (2025); *It's My Party, Inc. v. Live Nation, Inc*., 811 F.3d 676, 683 (4th Cir. 2016) ("Whether a product . . . commands a distinct market depends on whether it is 'reasonably interchangeable.'") (quoting *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 395 (1956)); *Fed. Trade Comm'n v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 567 (M.D.N.C. 2024) ("Under this fact-intensive inquiry, the scope of the relevant product market differs on a case-by-case basis.").

**such other actual or potential sellers of stock car racing services for the Cup Series, then they should be included in defining the scope of the relevant market.**[146]

In sum, to determine the relevant product market, you must decide which products or services compete with each other.

**NASCAR's Version**[147]**:** The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. This is a practical test with reference to the actual behavior of buyers and sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.

You were previously instructed on how to determine a relevant product market for Plaintiffs' claims, and the same general principles apply to determining a relevant product market for NASCAR's counterclaim, except that NASCAR's market definition should be assessed from its position as a buyer.

**In its counterclaim, NASCAR contends that the relevant product market is the market for the entry of cars into NASCAR Cup Series races. By contrast, 23XI, Front Row,**

---

[146] **NASCAR's Objection:** *First*, NASCAR incorporates its objections to language that also appears in Instruction 14 above. *Supra* at n.40. *Second*, Plaintiffs' description of NASCAR's counterclaim and relevant market should not be credited. *Third*, Plaintiffs include a portion of the model here ("Products or services need not be identical or precisely interchangeable to be considered reasonable substitutes") that they omitted above, which creates a disparity between the parties' respective burdens on proving relevant market.

[147] **NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.4 (2016); Modern Federal Jury Instructions—Civil ¶ 79.05[3], *Instruction 79-51 Relevant Market—Relevant Product Market* (Lexis 2025); *id.* ¶ 80.01, *Instruction 80-5 Relevant Market Defined*; *supra* at Instruction 14.

**and Mr. Polk contend that NASCAR has failed to allege the proper relevant product market.**[148]

---

[148] **Plaintiffs' Objection**: It is not necessary to instruct the jury on the parties' positions. Moreover, NASCAR misstates Counter Defendants' position with respect to the relevant product market.

### b. [Instruction No. 48] Relevant Geographic Market

**Plaintiffs' Version**[149]**:**  NASCAR alleges the geographic market is the United States and any other location where a Cup Series race is held.

As I previously instructed you, the geographic market is the area in which the products or services compete.  **This area need not be of any particular size.  It may, depending on the facts, be local, regional, national, or international.**

**In determining the geographic market, you may consider if changes in prices at one geographic location have direct or meaningful effects on prices or sales at other geographic locations.  You may consider if people in the industry and the public at large view sellers in different geographic locations as being in competition with each other.  You may also consider how readily a seller can shift from selling in one geographic location to selling in another.  In addition, you may consider where purchasers, as a practical matter, can buy the product— that is, whether buyers residing in one location buy from the same sources as buyers residing in another location, or instead find it more practical to buy from local sources rather than more distant sources.  You may consider whether an increase in prices charged by suppliers in one geographic location—such as in the United States—would cause a substantial number of purchasers to turn to more distant suppliers—such as areas outside of the United States. If so, the geographic market may cover these more distant suppliers.**[150]

---

[149] **Plaintiffs' Source**: Adapted from Leonard B. Sand, et al., 4 Modern Federal Jury Instructions-Civil P 79.05 (2025).

[150] **NASCAR's Objection:**  Plaintiffs make absolutely no attempt to align the instructions for proving a geographic market.  Their instruction here is radically different than their geographic-market instruction above and uses a different source (Modern Federal Jury Instructions rather than the ABA Model Instruction) without justification.  *See* Instruction 15.  That introduces the dangers of jury confusion and inconsistency in application.  By contrast, NASCAR's version here mirrors its proposal above, which in turn closely tracks the model instructions.

144

**NASCAR's Version**[151]:  The relevant geographic market is the area in which racing teams face competition from other entities that compete in the relevant product market.  **When analyzing the relevant geographic market, you should consider whether changes in prices in one geographic area have substantial effects on prices in another geographic area, which would tend to show that both areas are in the same relevant geographic market.**  The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

NASCAR has the burden of proving the relevant geographic market by a preponderance of the evidence.  In this case, NASCAR claims that the relevant geographic market is the United States and any other location where a Cup Series race is held.

In determining whether NASCAR met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

**• the geographic area in which the racing teams sell and where their customers are located;**

**• the geographic area to which NASCAR has turned or has seriously considered turning; and**

**• the geographic areas that racing teams views as potential sources of competition.**

**If you find that NASCAR has proven a relevant market, then you should continue to evaluate the remainder of its counterclaim.**[152]

---

[151] **NASCAR's Sources**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 3.A.6 (2016); Modern Federal Jury Instructions—Civil ¶ 79.05[3], *Instruction 79-52 Relevant Market—Geographic Market* (Lexis 2025); *id.* ¶ 80.01, *Instruction 80-5 Relevant Market Defined*; *supra* at Instruction 15.

[152] **Plaintiffs' Objection:** Plaintiffs object to NASCAR's geographic market instruction on several grounds. NASCAR's list of factors for the jury to consider on geographic market is misleading and prejudicial.  The first factor is vague and confusing, as it references the "customers" (plural) to which the racing teams sell their services even though NASCAR has alleged it is the sole buyer in NASCAR's relevant market. The first factor also does not define what the racing teams are

selling in the relevant market. The second factor is similarly vague and confusing, as the relevant question is the geographic area where NASCAR can reasonably turn ***for entrants into Cup Series races***, which the instruction does not clarify. The third factor is legally irrelevant and thus misleading and prejudicial, because the question for the market definition purposes is the competitive options that ***NASCAR*** has for field Cup Series entrants, not the options the teams have.

### c.  [Instruction No. 49] Market Power[153]

NASCAR **must** prove by a preponderance of the evidence that Counterclaim-Defendants 23XI and Front Row **had market power in a relevant market when acting in combination with the other members of the RTA**.

As I previously instructed you, market power is the power to control prices, exclude competition, restrict output, or to force a contracting partner to do something it would not do in a competitive market.  **A company that has monopoly power in a relevant market necessarily has market power in that market.  However, a company can have market power in a relevant market even if it does not have monopoly power, because market power requires less than monopoly power.  While a single dominant firm can possess monopoly power in a relevant market, a firm can have market power without being the single dominant firm.  For example,**

---

[153] **Plaintiffs' Sources:** *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (market power is the "special ability . . . to force [a contracting partner] to do something he would not do in a competitive market"); *BookLocker.com, Inc. v. Amazon.com, Inc.*, 650 F. Supp. 2d 89, 104 (D. Me. 2009) ("[P]ost-*Jefferson Parish*, there seems to be a consensus building that thirty percent is a threshold."); *Entri, LLC v. GoDaddy.com, LLC*, 2024 WL 4468488, at *7 (E.D. Va. Oct. 10, 2024) (same); *Shafi v. St. Francis Hosp. of Charleston, W. Va.*, 937 F.2d 603, 603 (4th Cir. 1991) (affirming summary judgment, finding 11% market share insufficient to show market power); *HCI Techs., Inc. v. Avaya, Inc.*, 241 F. App'x 115, 124 (4th Cir. 2007) (affirming denial of preliminary injunction in part because it found 24% market share insufficient to show market power); *In re Google Play Store Antitrust Litig.*, No. 21-md-02981, Final Jury Instructions, ECF No. 592, Instruction No. 28 (N.D. Cal. Dec. 6, 2023); *Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) ("In proving a Section 1 violation, the plaintiff must show the market shares of the competitors in the relevant market" as well as the defendant's "market power."); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1096–97(N.D. Cal. 2019), *aff'd, 958 F.3d 1239 (9th Cir. 2020), aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) ("A threshold inquiry in any Rule of Reason case is whether the defendant had market power. . . ."); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) *Carolina Rest. Grp., Inc. v. Pepsico Sales, Inc.*, 2015 WL 4250395, at *7 (W.D.N.C. July 13, 2015) ("[A] plaintiff must allege facts sufficient to show that the defendant has market power."); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (market power required for Section 1 rule of reason claim).

**whereas monopoly power can be inferred by a market share of 70 percent or more, firms can be inferred to have market power with a lower share of the market, such as 30 percent or more.**

In determining **whether 23XI and Front Row, acting in combination with the other members of the RTA, had market power during the negotiations for the 2025 charter agreement**, you may consider direct evidence, such as **whether the RTA members demonstrated the ability to force NASCAR to pay more for their racing services than they would in a competitive market; to force NASCAR to accept conditions it would not accept in a competitive market; or to exclude competitors (such as other racing teams who did not belong to the RTA) from the market**. You can also consider indirect evidence of market power, such as the collective market share of the RTA members in the relevant market and barriers to entry. Evidence of low or no entry barriers may be evidence that RTA members, including 23XI and Front Row, did not have market power, regardless of their market share, because new competitors could enter if the RTA members attempted to force NASCAR to pay above-market prices for their services as premier stock car racing teams. **By contrast, evidence of high barriers to entry along with a substantial market share may support an inference that the RTA members had collective market power.**

If NASCAR does not show, by a preponderance of the evidence, that 23XI and Front Row, acting in combination with the other RTA members, had market power, **then NASCAR cannot meet its burden of proving an unreasonable restraint of trade and its Section 1 counterclaim fails.** [154]

---

[154] **NASCAR's Objection:** NASCAR incorporates its objections to language that also appears in Instruction 32 above. *Supra* at n.102. In brief, there is no justification for a separate market-power

148

requirement either in the model instructions or in governing law, and adopting this approach would be legal error.

Plaintiffs here add sources to those cited above, but none of these cases support this radical approach. *Shafi* involved a tying claim under Section 1 where plaintiff alleged that the defendant "us[ed] its … market power to disrupt the [relevant] market," but the court found "no competent evidence" supporting that allegation. *Shafi v. St. Francis Hosp.*, 937 F.2d 603, 1991 WL 127612, at *3 (4th Cir. 1991) (table). *Jefferson Parish* and *HCI Techs*. likewise involved tying arrangements, where courts are especially concerned with market power. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984); *HCI Techs., Inc. v. Avaya, Inc.*, 241 F. App'x 115, 122 (4th Cir. 2007). *Alston* does not support the idea that market power is always required, either—it instead says that "*[u]sually*, joint ventures enjoying such small market share are incapable of impairing competition." *NCAA v. Alston*, 594 U.S. 69, 89 (2021) (emphasis added). And *Alston* reaffirmed that the rule of reason requires a "'fact-specific assessment of market power and market structure' aimed at assessing the challenged restraint's 'actual effect on competition,'" *id.* at 88—underscoring that market power is a relevant factor for a Section 1 claim, but not an absolutely necessity in every case. In accord with that understanding is *Military Services Realty*, which says that courts must "ascertain the market power of the defendant"—but does not say that a lack of market power automatically dooms a Section 1 claim. *Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987). Similarly, *Murrow* says that "market power" is a "threshold inquiry" which goes into determining harm to competition—which of course is true—but it does not say that market power is absolutely required to find harm to competition. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989).

At a minimum, if the Court disagrees with NASCAR on this point, there is no reason to repeat a separate market power instruction here, because it would be covered in that scenario by the instruction for Plaintiffs' Section 1 claim.

#### d. **[Instruction No. 50]** Proof of Competitive Harm[155]

If you find that NASCAR has proven a relevant market **and that the Counterclaim-Defendants, acting in combination with the other RTA members, had market power in that market**, then you must determine whether NASCAR has proven, by a preponderance of the evidence, that the challenged **contract**, combination, or conspiracy had a substantial harmful effect on competition in the relevant market.

As I instructed you previously, in this context, a harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality in comparison to what would exist in a competitive market. If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

---

[155] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3(B); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. at 429 U.S. 477, 489 (1977) (proof of harm to competition is first required to then show an antitrust injury caused by such a reduction in competition); *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 710 (4th Cir. 2021) ("Antitrust injury encompasses two concepts: (1) the causal connection between the plaintiff's injury and an antitrust violation, and (2) whether the plaintiff's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws."); *Gibson v. Cendyn Grp., LLC*, 2025 WL 2371948, at *6 (9th Cir. Aug. 15, 2025) ("Section 1 requires a causal link between the contested agreement and an anticompetitive restraint of trade in the relevant market."); *Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (finding no causal antitrust injury where plaintiff failed to show the purportedly anticompetitive conduct "affected [] prices"); *Shafi v. St. Francis Hosp. of Charleston*, 937 F.2d 603, 603 (4th Cir. 1991) (affirming summary judgment, finding 11% market share insufficient to show market power); *HCI Techs., Inc. v. Avaya, Inc.*, 241 F. App'x 115, 124 (4th Cir. 2007) (affirming denial of preliminary injunction in part because it found 24% market share insufficient to show market power); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991).

In determining whether the challenged **contract**, combination, or conspiracy has produced competitive harm, you may look at the following factors:

(1) the effect of the restraint on prices, output, product quality, and services;

(2) the purpose and nature of the restraint;

(3) the nature and structure of the relevant market;

(4) the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

(5) whether Counterclaim-Defendants 23XI and Front Row, acting in combination with the other RTA members, possessed market power **to cause damage to competition in a relevant market**.

If you find that NASCAR has proven that Counterclaim-Defendants' **contract,** combination, or conspiracy has caused a substantial adverse competitive effect in the relevant market, you should move on to the second step of the three -step reasonableness analysis.[156]

---

[156] **NASCAR's Objection:** *First*, NASCAR incorporates its objections to language that also appears in Instruction 33 above. *Supra* at n.104. *Second*, Plaintiffs have changed their "proof of competitive harm" instruction compared to what they have above: for example, in Instruction 33 they suggested that "less-favorable terms for racing teams than they would achieve in a competitive market" could show harm for them—but here they provide no corresponding statement for less favorable terms for NASCAR. In Instruction 33, they said that they could show that the contracts "were likely to have a substantial harmful effect"; here, they omit that phrase for NASCAR. *Third*, Plaintiffs' citations to cases regarding antitrust injury and causation (*e.g.*, *Brunswick*, *Steves & Sons*) are inapposite and mix up the elements of the claims: here, we are talking about an unreasonable restraint, not antitrust injury. Unsurprisingly, Plaintiffs did not cite these cases for their "proof of competitive harm" instruction above. *See* Instruction 33. *Fourth*, there is no reason to repeat this instruction here, because it is already covered by the instruction for Plaintiffs' Section 1 claim. *Supra* at n.137. If the Court gives such an instruction, it should exactly parallel NASCAR's version of Instruction 33 above.

### 3. [Instruction No. 51] Unreasonable Restraint of Trade, Step Two: Evidence of Competitive Benefits[157]

Under the second step, the Counterclaim-Defendants have the burden to prove, by a preponderance of the evidence, that their alleged **contract**, combination, or conspiracy has offsetting benefits to competition **within the relevant market**. A procompetitive **rationale** is a non-pretextual claim that Counterclaim-Defendants' conduct produced benefits to competition **within the relevant market**, such as if the challenged agreement can be shown to increase output, improve product quality, or improve financial and other conditions for NASCAR as the purchaser of the services of racing teams **in the relevant market**.

If you find that Counterclaim-Defendants have not met their burden to prove offsetting competitive benefits from the challenged conspiracy, then you must find an unreasonable restraint of trade has been established at step two of the analysis. If you find that they do meet their burden, you should move on to the third step of the analysis. [158]

---

[157] **Plaintiffs' Source**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3(C).

[158] **NASCAR's Objection:** *First*, NASCAR incorporates its objections to language that also appears in Instructions 29 and 34. *Supra* at nn.95, 108. *Second*, Plaintiffs' proposed instruction here significantly differs from its proposed instruction in its Section 1 claim, *see* Instruction 34— such that they have a lower burden than NASCAR. For instance, Plaintiffs drop any language about showing how "[e]vidence of procompetitive benefits can only satisfy [the] burden of proof if the benefits occurred in the relevant market"—suggesting that they don't fully believe their own argument above. And Plaintiffs suggest that they need only show a procompetitive "rationale," while NASCAR needed to show procompetitive "benefits." *Third*, there is at minimum no reason to repeat this instruction here, because it is already covered by the instruction for Plaintiffs' Section 1 claim. If the Court gives such an instruction, it should exactly parallel NASCAR's version of Instruction 34 above.

### 4. [Instruction No. 52] Unreasonable Restraint of Trade, Step Three: Less Restrictive Means[159]

If you find that Counterclaim-Defendants have proven that the challenged **contract,** combination, or conspiracy resulted in competitive benefits, then you must determine whether NASCAR has proven, by a preponderance of the evidence, that the challenged **contract,** combination, or conspiracy was not reasonably necessary to achieve the procompetitive benefits.

As I instructed you earlier with regard to Plaintiffs' Section 1 claim against NASCAR, if NASCAR proves that Counterclaim-Defendants could have achieved their proffered procompetitive rationale through reasonably available less restrictive means, then the competitive benefits cannot be used to justify the anticompetitive harm.

If NASCAR has proven the existence of a less-restrictive alternative to the challenged **contract**, combination, or conspiracy, Counterclaim-Defendants' procompetitive rationale cannot justify their conduct.[160]

---

[159] **Plaintiffs' Source**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.3(C).

[160] **NASCAR's Objection:** *First*, NASCAR incorporates its objections to language that also appears in Instruction 35 above. *Supra* at n.112. *Second*, Plaintiffs' proposed instruction differs from its proposed instruction in its Section 1 claim—such that they have a lower burden than NASCAR. *See* Instruction 35. Plaintiffs remove the requirement that they have to prove procompetitive benefits "within the relevant market" here. NASCAR agrees that such proof is not required at step 2, but if the Court disagrees, then such proof is required for Plaintiffs' claim *and* NASCAR's counterclaim. *Third*, there is no reason to repeat this instruction here, because it is already covered by the instruction for Plaintiffs' Section 1 claim. If the Court gives such an instruction, it should exactly parallel NASCAR's version of Instruction 35 above.

**5. [Instruction No. 53]** Unreasonable Restraint of Trade: Balancing Anticompetitive Harms and Procompetitive Benefits[161]

Finally, if you find that Counterclaim-Defendants' **contract**, combination, or conspiracy resulted in procompetitive benefits in the relevant market that could not have been achieved through substantially less restrictive means, you must then balance the competitive harms that you found against the competitive benefits that you found **within the relevant market**.

If the competitive harm substantially outweighed the competitive benefits, then the challenged restraints are unreasonable. If the competitive harm did not outweigh the competitive benefits, then the challenged restraint is not unreasonable. NASCAR bears the burden of proving, by a preponderance of the evidence, that the anticompetitive effect of the conduct substantially outweighs its benefits.[162]

---

[161] **Plaintiffs' Sources**: Adapted from ABA Model Instructions (2016) Ch. 1, Instr. C.4(D); *N, Am.Soccer League, LLC v. USSF*, Case No. 1:17-cv-5495, Final Jury Instructions, ECF No. 540, Instruction No. 28 (E.D.N.Y. Feb. 4, 2025); *Deutscher Tennis Bund v. ATP Tour Inc.*, Case No. 1:07-cv-1782008, Final Jury Instructions, ECF No. 198, Antitrust Jury Instruction 16 (D. Del. Aug. 8, 2008).

[162] **NASCAR's Objection:** *First*, NASCAR incorporates its objections to language that also appears in Instruction 36 above. *Supra* at n.116. *Second*, there is no reason to repeat this instruction here, because it is already covered by the instruction for Plaintiffs' Section 1 claim. If the Court gives such an instruction, it should exactly parallel NASCAR's proposed language in Instruction 36 above.

154

D.  **[Instruction No. 54] Final Element: Injury and Causation**

**Plaintiffs' Version**[163]:  If you find that NASCAR has proven that Counterclaim-Defendants engaged in a **contract**, combination, or conspiracy that unreasonably restrained trade, then you must determine whether NASCAR has proven that it suffered injuries to its **businesses and properties** due to the **contract**, combination, or conspiracy as the final element of a claim under the Sherman Act.  This is the same injury and causation requirements I instructed you on previously with respect to Plaintiffs' claims against NASCAR.

**NASCAR must prove the following as its final counterclaim element:**

(1) NASCAR was in fact injured in its businesses or properties due to Counterclaim-Defendants' **contract**, combination, or conspiracy;

(2) Counterclaim-Defendants' **contract**, combination, or conspiracy was a cause of NASCAR's injuries **and substantially contributed to it**; and

(3) NASCAR's **injuries resulted from a reduction in competition**.

As I previously instructed you with respect to Plaintiffs' claims, the **first element** is sometimes referred to as "injury in fact" or "fact of damage."  For NASCAR to establish injury in fact, **they** must prove **they** were injured because of Counterclaim-Defendants' violation of the Sherman Act.  Proving injury in fact does not require NASCAR to prove the dollar value of their injuries.

The **second element** is causation. This means NASCAR must prove that some damage occurred to it because of Counterclaim-Defendants' **contract**, combination, or conspiracy.  **NASCAR need not prove that the unlawful activity is the only cause of its injuries; NASCAR**

---

[163] **Plaintiffs' Source**: Adapted from ABA Model Instructions (2016) Ch. 6, Instr. A.1.

**meets its burden if it shows the unlawful activity substantially contributed to NASCAR's injuries, even if other factors also contributed to NASCAR's injuries.**

The **third element** is sometimes referred to as "antitrust injury." If NASCAR's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm competition in a relevant market, then NASCAR's injuries are considered antitrust injuries recoverable under the Sherman Act. On the other hand, if NASCAR's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit competition in a relevant market, then NASCAR's injuries are not antitrust injuries and NASCAR may not recover damages for those injuries under the antitrust laws.

If NASCAR proves each of these elements of injury, and the other elements of its counterclaim**, it may then seek to prove the amount of its damages**.[164]

**NASCAR's Version**[165]**:** To succeed on its counterclaim, NASCAR must prove by a preponderance of the evidence that the challenged **combination or conspiracy** caused it to suffer an injury to its business or property. You were previously instructed on how to determine whether

---

[164] **NASCAR's Objection:** *First*, NASCAR incorporates its objections to language that also appears in Instructions 23 and 37 above. *Supra* at nn. 79, 119. *Second*, Plaintiffs' proposed instruction significantly differs from its proposed instructions for their claims—such that they have a lower burden than NASCAR. For example, in Instruction 23, Plaintiffs say that they are "entitled to recover for an injury to its business or property if [they] can establish three elements of injury and causation;" here, they say that "NASCAR must prove the following as its final counterclaim element." In Instruction 23, Plaintiffs say that they do not "need to eliminate all other possible causes of injury," whereas similar language is missing here. And where they deleted "acts that would otherwise harm consumers" in Instruction 23, they include the concept of "acts that would otherwise harm competition" here. All of this underscores the twin dangers of inconsistency and jury confusion in Plaintiffs' approach. By contrast, NASCAR's version ensures that the jury has a consistent standard to apply and can easily do so. *Third*, there is no reason to repeat this instruction here, because it is already covered by the instruction for Plaintiffs' claims. If the Court gives an instruction, it should exactly parallel NASCAR's proposed language in Instructions 23 and 37 above.

[165] **NASCAR's Source:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.A.1 (2016).

156

a party proves injury and causation under the Sherman Act. Those same instructions apply to NASCAR's counterclaim.

## DAMAGES

### [Instruction No. 55] Antitrust Damages: Introduction and Purpose[166]

If you find that NASCAR and/or Mr. France have violated the Sherman Act in one or both of the Counts alleged by Plaintiffs, then you must determine the amount of damages, if any, that Plaintiffs are entitled to recover.

If you find that the Counterclaim-Defendants (23XI, Front Row, and/or Curtis Polk) have violated Section 1 of the Sherman Act in the Counterclaim alleged by NASCAR, then you must determine the amount of damages, if any, that NASCAR is entitled to recover.

**The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any party should, or should not, prevail in this case. If you find that no party is liable, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.**[167]

I will now turn to the standards for proving damages, which apply in the same manner to both Plaintiffs' claims against the Defendants and NASCAR's counterclaim.

The law provides that the injured party should be fairly compensated for all damages to their business or property that were a direct result, or a likely consequence, of the conduct that you have found to be a Sherman Act violation.

---

[166] **Source**: Adapted from ABA Model Instructions (2016) Ch. 6, Instr. B.1.

[167] **Plaintiffs' Objection**: Plaintiffs object to this language because it is confusing and misleading. Jurors should not be told that they may "disregard" instructions before they are given. The verdict form makes clear that the jury can only find damages if they find for a party on liability with respect to each claim. The verdict form is the appropriate document for jurors to receive this type of instruction.

158

**Also, a defendant (or counterclaim-defendant) is liable for all damages caused by a Sherman Act violation even if those damages occurred after the Sherman Act violation itself, as long as the Sherman Act violation was a substantially contributing cause of those damages.**

**The purpose of any damages that you award 23XI and Front Row and/or NASCAR is compensatory, not punitive. This means that they have the purpose of putting 23XI and Front Row and/or NASCAR as near as possible to the position in which they would have been had the Sherman Act violation not occurred. The law does not permit you to award damages for the purpose of punishing a wrongdoer or to deter wrongful conduct in the future. The purpose of any damages you award must be to make 23XI and Front Row and/or NASCAR whole by placing them in the same economic position they would have been in absent the wrongful conduct that you find**[168] / **Antitrust damages are only compensatory, meaning their purpose is to put an injured party as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award the injured party an amount for attorneys' fees or the costs of maintaining this lawsuit.**

---

[168] **NASCAR's Objection**: Plaintiffs provide no basis for their proposed language in these two paragraphs, which is nowhere to be found in the model instruction. By contrast, NASCAR's proposal precisely mirrors the model instruction.

**[Instruction No. 56] Basis for Calculating Damages**[169]

You are permitted to make just and reasonable estimates in calculating an injured party's damages. You are not required to calculate damages with mathematical certainty or absolute precision.

**Proof of the amount of damages need not conform to a particular theory or model, and exact proof of the amount of damages is not required.** However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. The injured party must prove the reasonableness of **any assumption** / **each of the assumptions** upon which **a damages estimate** / **the damages calculation** is based.

**Damages issues in antitrust cases are rarely proven with the concrete, detailed proof of injury that is available in other contexts. Instead, you may reasonably infer damages from proof of any antitrust violations that have a tendency to harm the other party's businesses and from evidence of any reduced profits, value, or prices that is not shown to be attributable to other causes. If NASCAR and Mr. France and/or the Counterclaim-Defendants by their**

---

[169] **Plaintiffs' Source**s: Adapted from ABA Model Instructions (2016) Ch. 6, Instr. B.3; *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S. Ct. 574, 579, 90 L. Ed. 652 (1946); *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000); *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1377–79 (2d. Cir. 1988); *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1043 (4th Cir. 1987) ("[P]laintiffs generally enjoy a lenient burden of proof in establishing the amount of damages caused by an antitrust violation."); *Int'l Wood Processors v. Power Dry, Inc.*, 593 F. Supp. 710, 724 (D.S.C. 1984), *aff'd*, 792 F.2d 416 (4th Cir. 1986) ("An antitrust plaintiff in a market exclusion case is not precluded from proving damages as lost profits simply because its nascent business has shown no past profits.").

**NASCAR's Sources:** ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.B.3 (2016); Final Jury Instructions, *N. Am. Soccer League, LLC v. U.S. Soccer Federation*, No. 1:17-cv-05495 (E.D.N.Y. Jan. 31, 2025), ECF No. 531 at 65; Jury Instructions, *In re: NFL's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668 (C.D. Cal. June 27, 2024), ECF No. 1482 at 47.

**own wrongdoing have prevented a more precise computation of damages, then you may make a just and reasonable estimate of damages based on relevant data.**

If you find that 23XI and Front Row and/or NASCAR have provided a reasonable basis for **estimating** / **determining** damages, then you may award damages based on a just and reasonable estimate so long as it is supported by the evidence. If you find that a party has failed to carry its burden of providing a reasonable basis for **estimating** / **determining** damages, then you may not award damages (or you may award nominal damages to Plaintiffs and/or NASCAR of one dollar).[170]

---

[170] **NASCAR's Objection:** NASCAR objects to Plaintiffs' deviations from the model instruction and request that the Court give the model instruction (as the courts in *NASL* and *Sunday Ticket* did). Plaintiffs' additions are confusing, repetitive, and unwarranted departures from the model. For instance, Plaintiffs' reference to "any assumption" and "a damages estimate" are attempts by Plaintiffs to lessen their burden on damages and deviate from the model instruction, whereas NASCAR's proposal tracks that language. And Plaintiffs' long proposed third paragraph is repetitive and a transparent attempt to lessen their burden on damages, when the model instruction's language that the jury is "not required to calculate damages with mathematical certainty or precision" is more than sufficient to make this point. Finally, Plaintiffs' attempt to explicitly invite the jury to infer damages if Plaintiffs have failed to prove them should be rejected. But if accepted, the language about "wrongdoing … prevent[ing] a more precise computation of damages" should apply to Plaintiffs too (and not just NASCAR). And this language is especially concerning given that Plaintiffs are objecting in whole to standard "Causation and Disaggregation" and "Mitigation" instructions below.

161

**[Instruction No. 57]** Causation and Disaggregation[171]

If you find that either 23XI, Front Row, and/or Curtis Polk and/or NASCAR and/or James France violated the antitrust laws and the other party was injured by that violation, the injured party is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts. The injured party bears the burden of showing that their injuries were caused by the other party's antitrust violation, as opposed to any other factors. If you find that the alleged injuries were caused in part by an alleged antitrust violation and in part by other factors, then you may award damages only for that portion of alleged injuries that was caused by the alleged antitrust violation.

The injured party bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that either or both parties were injured by the other's alleged antitrust violation, and there is a reasonable basis to apportion alleged injury between lawful and unlawful causes, then you may award damages.

If you find that the injured party's alleged injuries were caused by factors other than an alleged antitrust violation, then you must return a verdict for the other party. If you find that there is no reasonable basis to apportion alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.[172]

---

[171] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.B.4 (2016).

[172] **Plaintiffs' Objection:** Plaintiffs object to this instruction as contrary to law because it misstates Plaintiffs' burden with respect to injury, causation, and damages. First, Plaintiffs do not have to disaggregate damages caused by unlawful versus lawful actions in this action. *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016) ("But calculating damages in antitrust cases is not an exact science. . . . And if a jury were to find [defendant's] actions taken as a whole to be a violation of Section Two of the Sherman Act, disaggregating the monopolist's lawful actions from

**[Instruction No. 58]** Lost Profits[173]

Both sides claim that they were harmed because they lost profits as a result of the other side's alleged antitrust violation.

If you find that NASCAR and/or James France committed an antitrust violation and that this violation caused injury to 23XI and Front Row, you now must calculate the profits, if any, that they lost as a result of NASCAR's and/or Mr. France's antitrust violation. You may calculate the lost profit damages to 23XI and Front Row by subtracting 23XI and Front Row's actual profits from the profits 23XI and Front Row would have earned but for NASCAR's and/or Mr. France's wrongful conduct.

If you find that 23XI, Front Row, and/or Curtis Polk committed an antitrust violation and that this violation caused injury to NASCAR, you now must calculate the profits, if any,

---

its unlawful actions for the purpose of calculating damages may be unnecessary, if not impossible.). Rather, the jury, upon finding unlawful monopolization, is entitled to award damages based on a "just and reasonable inference." *Bigelow v. RKO Pictures, Inc*., 327 U.S. 251, 264 (1946) ("'[T]he jury … is entitled to make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly."); *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1142 (4th Cir. 1980). Indeed, courts have rejected the disaggregation instruction that NASCAR proposes. *Ingevity Corp. v. BASF Corp*., 2024 WL 579667, at *7 (D. Del. Feb. 13, 2024) (holding disaggregation was unnecessary, as reflected by jury instruction that Plaintiff was "entitled to recover damages for an injury to its business or property if it can establish ... that the alleged illegal conduct was a material cause of BASF's injury"); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) ("Similarly, 3M's actions, taken as a whole, were found to violate § 2, thus making the disaggregation that 3M speaks of to be unnecessary, if not impossible."); *In re Pork Antitrust Litig.*, No. 1-1776, 2024 WL 2060386, at *10-11 (D. Minn. May 8, 2024) ("*Comcast* does not impose a requirement to 'disaggregate lawful and unlawful conduct.'"). Further, Plaintiffs are direct sellers in NASCAR's proposed input market, rather than competitors, so they suffer antitrust injury when they receive below-market compensation for their services. *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (4th Cir. 2024) ("[A]lthough the defendant-monopolist had formed a monopoly enabling it to overcharge its customers 'several decades' before the customer-plaintiff filed its action, a claim accrued to the plaintiff each time it paid the inflated price within the limitation period") (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)).

[173] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.B.8 (2016).

163

**that NASCAR lost as a result of 23XI and Front Row's antitrust violation. You may calculate the lost profit damages to NASCAR by subtracting NASCAR's actual profits from the profits NASCAR would have earned but for 23XI, Front Row, and Curtis Polk's wrongful conduct.**[174]

---

[174] **Plaintiffs' Objection**: Plaintiffs object to this instruction as confusing and prejudicial. The legal standard the jury must apply to award damages is a "just and reasonable" inference of damages, not lost profits. *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264 (1946). Regardless, NASCAR's proposed lost profits instruction would be confusing and prejudicial in the context of this case. Plaintiffs allege damages from both lost profits and lost enterprise value, *see* Dkt. 243-1, Snyder Report at ¶¶ 24–27, 183–194, yet NASCAR proposes to only instruct the jury on lost profits. And while NASCAR characterizes the damages for its counterclaim as for "lost profits," their damages in fact stem from alleged overpayment to the teams and not *competitor* lost profits upon which the ABA model instruction that NASCAR cites, No. 6.B.8, is based.

164

**[Instruction No. 59] Buyer Price Fixing[175]**

NASCAR claims that it was harmed because it received less favorable 2025 Charter Agreement terms than it would have received in the absence of 23XI, Front Row, and Mr. Polk's alleged agreement to raise prices paid to the teams. If you have determined that there was an unlawful agreement among 23XI, Front Row, and/or Mr. Polk to threaten, coerce, and extort NASCAR to meet their demands for better Charter terms and that this agreement caused some injury to NASCAR because it gave the teams better terms than it otherwise would have given them absent the team's combination or conspiracy, you must now consider the extent of NASCAR's damages. A proper method of calculating those damages is to award NASCAR the difference between the amount NASCAR will pay to Charter Holders under the 2025 Charter Agreement and the amount of compensation NASCAR would have had to pay in the absence of 23XI, Front Row, and/or Curtis Polk's alleged anticompetitive conduct.[176]

---

[175] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.B.12 (2016).

[176] **Plaintiffs' Objection:** NASCAR's proposed instruction on "buyer price fixing" is contrary to law and this Court's prior rulings. First, the Court dismissed NASCAR's *per se* price fixing claim under Rule 12(b)(6) and it is no longer part of the case, *see* Dkt. 162 at 7, so an instruction on "Buyer Price Fixing" and a purported agreement to "raise prices paid to teams" is improper and disregards this Court's prior ruling, *see* Dkt. 216 at 17-18. Second, NASCAR's variation from the model instruction, including the use of inflammatory language divorced from the legal standard such as "threaten," "coerce," and "extort," is prejudicial and unnecessary. Third, NASCAR is required to show a conspiracy as to each Counter-Defendant, but the instruction allows for agreement in any combination through its use of "and/or."

**[Instruction No. 60]** Mitigation[177]

23XI and Front Row may not recover damages for any portion of their injuries that they could have avoided through the exercise of reasonable care and prudence. 23XI and Front Row are not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If 23XI and Front Row failed to take reasonable steps available to them, and the failure to take those steps resulted in greater harm to 23XI and Front Row than it would have suffered had they taken those steps, then 23XI and Front Row may not recover any damages for that part of the injury they could have avoided.

NASCAR has the burden of proof on this issue. NASCAR must prove by a preponderance of the evidence that 23XI and Front Row:

(1) acted unreasonably in failing to take specific steps to minimize or limit their losses;

(2) that the failure to take those specific steps resulted in their losses being greater than they would have been had they taken such steps; and

(3) the amount by which 23XI and Front Row's loss would have been reduced had they taken those steps.

In determining whether 23XI and Front Row failed to take reasonable measures to limit their damages, you must remember that the law does not require 23XI and Front Row to take every conceivable step that might reduce their damages. The evidence must show that 23XI and Front Row failed to take commercially reasonable measures that were open to them. Commercially reasonable measures mean those measures that a prudent

---

[177] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.B.14 (2016).

166

**businessperson in 23XI and Front Row's position would likely have adopted, given the circumstances as they appeared at that time. 23XI and Front Row should be given wide latitude in deciding how to handle the situation, so long as what they did was not unreasonable in light of the existing circumstances.**[178]

---

[178] **Plaintiffs' Objection:** Plaintiffs object that NASCAR's mitigation instruction is irrelevant and prejudicial. NASCAR has cited no cases saying that an antitrust plaintiff has a duty to mitigate damages in a monopolization case, like this one, where the harm to Plaintiffs results from the exclusion of competition. There is nothing Plaintiffs could have done to mitigate NASCAR's exclusion of rival buyers from the market. To the extent NASCAR suggests that Plaintiffs could have avoided harm by leaving the sport entirely, that is contrary to law because the Sherman Act protects the right of businesses to compete in every market unfettered by anticompetitive restraints. *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968) (factfinder cannot deny "recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others"); *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 64 (2d Cir. 2019) ("The manner of [plaintiff's] entrance into the . . . agreement notwithstanding, it is entitled to conduct its business in a market that is not infected with an anticompetitive distortion.").

167

**[Instruction No. 61] Multiple Plaintiffs**[179]

If you decide to award damages in favor of 23XI and Front Row, you will be asked what sum of money would fairly and reasonably compensate them.  If you find that 23XI and Front Row are both entitled to recover damages, exercise caution to be sure that each of 23XI and Front Row is awarded damages only for its own injuries.[180]

---

[179] **NASCAR's Source**: ABA Model Jury Instrs. in Civ. Antitrust Cases, No. 6.B.15 (2016).

[180] **Plaintiffs' Objection**: Plaintiffs object to this language because it is confusing and misleading. The verdict form makes clear that the jury must find damages independently for each plaintiff. The verdict form is the appropriate document for jurors to receive this type of instruction.

168

## FINAL INSTRUCTIONS[181]

Members of the Jury:

Now you have heard the evidence and the arguments of counsel. It is your duty to remember the evidence whether it has been called to your attention or not, and if your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection of evidence in your deliberations.

It is your duty not only to consider all the evidence, but also to consider all the arguments, the contentions, and the positions presented by the attorneys and the evidence, and to weigh them all in the light of your common sense, to the best of your ability, to determine the truth of this matter.

The law requires the presiding judge to be impartial, as indeed it should. Therefore, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.

I instruct you that a verdict is not a verdict until all eight jurors agree unanimously as to what your decision shall be. Each one of you must decide the case for yourself. However, you should do so only after considering the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it ought to be changed. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

---

[181] **Source**: Adapted from *Standing Order Governing Jury Selection and Instruction in Civil Cases Before the Honorable Kenneth D. Bell*, Exhibit C (Nov. 20, 2019).

I suggest that as soon as you reach the jury room, before beginning deliberations, you select one of your members to serve as the foreperson. This individual has the same vote as the rest of the jurors, but simply serves to preside over the discussions. Once you begin deliberating, if you need to communicate with me, the foreperson should send a written message to me by ringing the buzzer next to the door and handing your note to the Court Security Officer. However, you are not to tell me how you stand numerically as to your verdict—for instance, should you be split in your voting at any time, you would not tell me the specific numbers of division in your note.

We use a verdict sheet. This is the written notice of the decision that you reach in this case. As soon as you have reached a verdict as to the claims alleged in the pleadings, you will return to the courtroom and your foreperson will, on request, hand the verdict sheet to the Clerk. There are places on the verdict sheet for the foreperson to enter the verdict, sign it, and date it.

During the trial, several items were received into evidence as exhibits. You will not be taking the exhibits into the jury room with you at the start. If, after you have begun your discussions of the case, you think it would be helpful to have any of the exhibits with you in the jury room, have the foreperson send me a note asking for them.

If you need a break during deliberations, you may do so in the jury room, or if you need a break outside the jury room, a Court Security Officer will escort you. However, you must not deliberate during a break unless all eight of you are together. If you are not together, then do not talk about the case until all of you are all back together.

You may now take the case and see how you find.

Dated: October 27, 2025            Respectfully submitted,

By:    */s/ Ashley M. Bauer*
Ashley M. Bauer*
Christopher S. Yates*
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
ashley.bauer@lw.com
chris.yates@lw.com

Lawrence E. Buterman*
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Marguerite Sullivan*
Jennifer L. Giordano*
Anna M. Rathbun*
David L. Johnson*
Christopher J. Brown*
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
jennifer.giordano@lw.com
anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com

Tricia Wilson Magee (N.C. Bar No. 31875)
**SHUMAKER, LOOP, & KENDRICK, LLP**
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Telephone: 704-945-2911
Facsimile: 704-332-1197
tmagee@shumaker.com

* Admitted *pro hac vice*

171

*Counsel for Defendants NASCAR and James France*

By: /s/ Jeffrey L. Kessler

Jeffrey L. Kessler*
Neha Vyas*
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
nvyas@winston.com

E. Danielle T. Williams
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

Jeanifer E. Parsigian*
Michael Toomey*
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Matthew R. DalSanto*
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com

Josh Hafenbrack*
Benjamin L. Rudofsky*
**WINSTON & STRAWN LLP**
1901 L Street NW
Washington D.C. 20036
Tel: (202) 282-5000
Fax: (202) 282-5100

173

jhafenbrack@winston.com
brudofsky@winston.com

Benjamin S. Gordon*
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
bgordon@winston.com

*Counsel for 2311 Racing LLC d/b/a 23XI Racing and Front Row Motorsports, Inc*

Eric S. Hochstadt*
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 W 52nd Street
New York, New York 10019
Tel: (212) 506-5282
ehochstadt@orrick.com

*Counsel for Curtis Polk*

*Admitted *pro hac vice*

174

## ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION

I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of NASCAR's instructions, sources, and objections, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in NASCAR's instructions, sources, and objections has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 27th day of October, 2025.

*/s/ Ashley M. Bauer*

I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this Plaintiffs' instructions, sources, and objections, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in Plaintiffs' instructions, sources, and objections has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 27th day of October, 2025.

*/s/ Jeffrey L. Kessler*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **JOINT PROPOSED JURY INSTRUCTIONS** was

electronically filed using the Court's CM/ECF system, which will automatically send notice of filing

to all parties of record as follows:

Danielle T. Williams
dwilliams@winston.com

Jeffrey L. Kessler
jkessler@winston.com

Jeanifer Parsigian
jparsigian@winston.com

Michael Toomey
mtoomey@winston.com

Matthew DalSanto
mdalsanto@winston.com

*Counsel for Plaintiffs 23XI Racing and*
*Front Row Motorsports Inc.*

Eric Shaun Hochstadt
ehochstadt@orrick.com

*Counsel for Counterclaim Defendant Curtis*
*Polk*

This the 27th day of October, 2025.

*/s/ Ashley M. Bauer*

176