# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

2311 RACING LLC d/b/a 23XI RACING, and
FRONT ROW MOTORSPORTS, INC.,

          Plaintiffs,

          v.

NATIONAL ASSOCIATION FOR STOCK
CAR AUTO RACING, LLC, NASCAR
HOLDINGS, LLC, NASCAR EVENT
MANAGEMENT, LLC, and JAMES FRANCE,

          Defendants.

NASCAR EVENT MANAGEMENT, LLC,

          Counter-Plaintiff,

          v.

2311 RACING LLC d/b/a 23XI RACING,
FRONT ROW MOTORSPORTS, INC., and
CURTIS POLK,

          Counter-Defendants.

No. 3:24-cv-886-KDB-SCR

JURY TRIAL DEMANDED

## DEFENDANTS'/COUNTER-PLAINTIFF'S TRIAL BRIEF

# TABLE OF CONTENTS

Page

I. Preliminary Statement ................................................................................................. 1

II. Background ................................................................................................................. 2

III. Applicable Law ........................................................................................................ 6

IV. Substantive Issues For Trial ................................................................................... 10

A.    Section 2 Claim...................................................................................................11

   a.    Plaintiffs' Evidence Will Fail To Establish A Relevant Market Or NASCAR's Market Power ..................................................................................................................11

   b.    Plaintiffs Cannot Prove NASCAR Willfully Obtained Or Maintained Monopsony Power By Engaging In Anticompetitive Conduct ...................................................... 13

B.    Section 1 Claim.................................................................................................. 15

   a.    Plaintiffs Cannot Prove NASCAR Engaged In An Unreasonable Restraint Of Trade ..... 15

C.    Plaintiffs Cannot Satisfy Their Burden To Prove Mr. France Is Individually Liable For Violation Of The Sherman Act........................................................................... 17

D.    For NASCAR's Counterclaim, NASCAR Will Prove By A Preponderance Of The Evidence That 23XI And Front Row's Joint Negotiations And Other Actions Constituted An Unlawful Restraint On Trade ..................................................................................... 17

E.    Remedies Sought by the Parties......................................................................... 20

   a.    At Best, Plaintiffs Rely On Speculative Damages to Support Any Monetary Award ....... 21

   b.    Plaintiffs Cannot Demonstrate A Causal Connection Between Their Claimed Damages And Defendants' Alleged Violations To Support An Award of Damages......................... 23

   c.    Plaintiffs Failed to Mitigate Damages ............................................................... 24

   d.    Injunctive Relief................................................................................................ 25

V. Conclusion.................................................................................................................. 25

ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION............................................. 27

CERTIFICATE OF SERVICE ....................................................................................... 28

**Page(s)**

**Cases**

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014) ................................................................................................. 13

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ................................................................................................. 9

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co., Inc.*,
690 F.2d 411 (4th Cir. 1982) ............................................................................................... 23

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) .............................................................................................................. 14

*Belmora LLC v. Bayer Consumer Care AG*,
987 F.3d 284 (4th Cir. 2021) ............................................................................................... 12

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979) .................................................................................................................. 19

*Brookins v. Int'l Motor Contest Ass'n*,
219 F.3d 849 (8th Cir. 2000) ............................................................................................... 14

*Brown v. Donco Enters., Inc.*,
783 F.2d 644 (6th Cir. 1986) .......................................................................................... 10, 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .............................................................................................................. 10

*Burlington Industries, Inc. v. Milliken & Co.*,
690 F. 2d 380 (4th Cir. 1982) ............................................................................................... 23

*California Dental Ass'n v. FTC*,
526 U.S. 756 (1999) .............................................................................................................. 19

*Campfield v. State Farm Mut. Auto. Ins.*,
532 F.3d 1111 (10th Cir. 2008) ............................................................................................ 12

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993) ................................................................................................. 17

*Chandler v. Phoenix Servs.*,
419 F. Supp. 3d 972 (N.D. Tex. 2019) ................................................................................. 17

*Chicago Bd. Of Trade v. United States*,
  246 U.S. 231 (1918)...................................................................................................15

*Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.*,
  LLC, 605 F. Supp. 2d 870 (W.D. Ky. 2009) ....................................................................17, 18

*Consul Ltd. v. Transco Energy Co.*,
  805 F.2d 490 (4th Cir. 1986) .....................................................................................12

*Continental Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir.2002) ...................................................................................9, 16, 18, 19

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
  114 F.4th 280 (4th Cir. 2024) .................................................................................21, 22

*Dash v. Mayweather*,
  731 F.3d 303 (4th Cir. 2013) ....................................................................................21

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ..................................................................................9, 16

*Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*,
  773 F.2d 1506 (9th Cir. 1985) ..................................................................................23

*Dyer v. Conoco, Inc.*,
  49 F.3d 727, 1995 WL 103233 (5th Cir. 1995) .....................................................................11

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) .................................................................................9, 12, 14

*F.T.C. v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986)...............................................................................................20

*Fashion Originators' Guild of America v. Federal Trade Commission*,
  312 U.S. 457 (1941)..............................................................................................19, 20

*Fishman v. Est. of Wirtz*,
  807 F.2d 520 (7th Cir. 1986) ....................................................................................24

*Howard Hess Dental Laby's Inc. v. Dentsply Int'l Inc.*,
  602 F.3d 239 (3d Cir. 2010)......................................................................................16

*Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*,
  158 F. App'x 413 (4th Cir. 2005) ................................................................................16

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ....................................................................................12

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 ...................................................................................................................21

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) .........................................................................................13

*Lee-Moore Oil Co. v. Union Oil Co. of California*,
    599 F.2d 1299 (4th Cir. 1979) .......................................................................................23

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
    415 F. Supp. 3d 703 (4th Cir. 2019) ..............................................................................18

*M&H Tire Co. v. Hoosier Racing Tire Corp.*,
    733 F.2d 973 (1st Cir. 1984)..........................................................................................15

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) .......................................................................................22

*Major League Baseball Props. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)...........................................................................................17

*MCI Communications Corp. v. American Telephone & Telegraph Co.*,
    708 F.2d 1081 (7th Cir. 1983) .......................................................................................23

*Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*,
    828 F. 2d 1033 (4th Cir. 1987) ......................................................................................23

*Mr. Dee's Inc. v. Inmar, Inc.*,
    No. 1:19CV141, 2021 WL 4224720 (M.D.N.C. Sept. 16, 2021).............................................9

*MVConnect, LLC v. Recovery Database Network, Inc.*,
    2011 WL 13128799 (N.D. Tex. May 27, 2011) ...................................................................17

*NCAA v. Alston*,
    594 U.S. 69 (2021)....................................................................................................15, 16, 17

*NCAA v. Bd. of Regents*,
    468 U.S. 85 (1984)........................................................................................................16

*NCO Financial Systems, Incorporated v. Montgomery Park, LLC*,
    918 F.3d 388 (4th Cir. 2019) .........................................................................................25

*North Carolina State Bd. of Dental Examiners v. F.T.C.*,
    717 F.3d 359 .................................................................................................................18

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*,
    472 U.S. 284 (1985)......................................................................................................19

*Novell v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.)..........................................................................13

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018).................................................................................................15, 17

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)...................................................................................................14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)........................................................................................17

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010)..........................................................................................14

*Reed Properties, LLC v. Concentra Health Services, Inc.*,
  2014 WL 1512997 (W.D.N.C. Apr. 16, 2014) .......................................................................25

*Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*,
  666 F. 2d 1130 (8th Cir. 1981), *cert. denied*, 457 U.S. 1111 (1982).......................................22

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ...........................20

*In re Se. Milk Antitrust Litig.*,
  801 F. Supp. 2d 705 (E.D. Tenn. 2011)...............................................................................10

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
  720 F. Supp. 1196 (W.D.N.C. 1989) .................................................................................16

*Sitts v. Dairy Farmers of Am., Inc.*,
  2020 WL 3467993 (D. Vt. June 24, 2020) ...........................................................................24

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)...................................................................................................12

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F. 3d 690 (4th Cir. 2021) ...................................................................................23, 24

*Steward Health Care Sys., LLC v. Blue Shield of Rhode Island*,
  311 F. Supp. 3d 468 (D.R.I. 2018)...................................................................................24

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
  305 F.3d 1124 (10th Cir. 2002) ....................................................................................11

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006).....................................................................................................18

*TFWS, Inc. v. Schaefer*,
    242 F.3d 198 (4th Cir. 2001) ................................................................................18

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..................................................................................11

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988)................................................................................22

*United States v. Grinnell Corp.*,
    384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).........................................9, 10

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..............................................................................................14

*Westinghouse Elec. Corp. v. Garrett Corp.*,
    601 F.2d 155 (4th Cir. 1979) ................................................................................25

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007)..............................................................................................11

**Statutes**

15 U.S.C. § 15...................................................................................................10, 21

15 U.S.C. § 26...........................................................................................................10

Clayton Act ................................................................................................................21

Sherman Act...................................................................................................... *passim*

Sherman Act Section 1, 15 U.S.C. § 1 ............................................................. *passim*

Sherman Act Sections 1 and 2 .....................................................................................6

Sherman Act Section 2, 15 U.S.C. § 2................................................................ *passim*

**Other Authorities**

Adam Stern, *NASCAR teams dig in as media rights talks approach*, Sports
    Business Journal (Oct. 28, 2022), *available at*
    http://www.sportsbusinessjournal.com/Journal/Issues/2022/02/28/Upfront/NA
    SCAR.aspx (last visited Oct. 27, 2025) ....................................................................6

Nate Ryan, *RTA expands to include 18 full-time Sprint Cup Teams*, USA Today
    Sports (Aug. 13, 2014), *available at*
    https://www.usatoday.com/story/sports/nascar/2014/08/ˆ3/race-team-alliance-
    expands-to-include-18-nascar-sprint-cup-teams/14003447/ (last visited Oct.
    27, 2025) ....................................................................................................................3

Dustin Long, *NASCAR announces charter system for Sprint Cup team owners*,
NBC Sports (Feb. 9, 2016), *available at*
https://www.nbcsports.com/nascar/news/nascar-accounces-charter-system-for-
sprint-cup-team-owners (last visited Oct. 27, 2025)...................................................................3

Greg Engle, *How NASCAR's Sponsorship Ecosystem is Evolving with the Times*,
Forbes Magazine (Apr. 21, 2024), *available at*
https://www.forbes.com/sites/gregengle/2024/04/21/how-nascars-sponsorship-
ecosystem-is-evolving-with-the-times/ (last visited Oct. 27, 2025)..........................................4

# I. PRELIMINARY STATEMENT

For nearly eight decades, NASCAR has worked with drivers, promoters, track owners, racing teams and their owners, original equipment manufacturers, media partners, sponsors, fans, and other stakeholders to deliver a sport enjoyed around the world. NASCAR's entire business is premised on free and fair competition in motorsports, and its success is built on hard work, investments, and innovation, not anticompetitive conduct.

Plaintiffs will ask a jury to find—but will be unable to prove—that NASCAR holds a monopsony over a proposed (yet ill-defined) market for "premier stock car racing teams," which Plaintiffs contend NASCAR willfully maintained through anticompetitive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs will also ask a jury to conclude that track sanction agreements and IP licensing agreements entered with racing teams to use Next Gen Cars constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. For this alleged misconduct, Plaintiffs will ask the jury to award them hundreds of millions of dollars in damages that they intend to keep for themselves. There is no evidence to support such an award, which would require the jury to conclude that Plaintiffs could sign contracts, get paid every penny due under the terms, but then claim—after the contracts ended—that they are entitled to even more.

Plaintiffs' evidence, however, falls far short of carrying their burden to prove essential elements of these claims, fails to establish any actual monetary damages, and does not justify entitlement to equitable relief. The Sherman Act protects competition, not competitors. Indeed, the Sherman Act does not restrict the long-recognized right of a business to freely exercise its own judgment as to parties with whom it will deal. And a party does not violate the Sherman Act simply because it does not offer the terms and conditions that a counterparty desires. At trial,

1

Defendants will ask the Court to rule as a matter of law that Plaintiffs' claims cannot proceed because a reasonable jury would not have a legally sufficient evidentiary basis to find for Plaintiffs on their claims. Defendants will also ask the jury to find in their favor on all of Plaintiffs' claims and if not, then to award—at most—nominal damages of $1.

In addition to presenting evidence to demonstrate the hollowness of Plaintiffs' antitrust claims, Counterclaim Plaintiff NASCAR Event Management, LLC ("NEM") will ask a jury to find that 23XI and Front Row, and self-proclaimed leader Curtis Polk (collectively, "Counter-Defendants") colluded and conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and, as a result, caused NEM antitrust injury.

## II. BACKGROUND

Founded in 1948 by William "Bill" France, Sr., and headquartered in Daytona Beach, Florida, NASCAR is a motorsports sanctioning body known around the world for stock car racing. Despite its modern success, NASCAR had humble roots. Bill France Sr. moved to Florida during the Great Depression with just $100 to his name. Upon arriving in Florida, he worked as a house painter, at a car dealership, and then at a car repair shop. He eventually began promoting stock car races in Daytona Beach and ultimately created NASCAR due not only to his passion for cars and racing but also in response to the then-frequent practice of unscrupulous promoters leaving events without paying drivers.

NASCAR is among the top-ranked motorsports organizations and one of the largest spectator sports leagues in the United States. It sanctions over 1,500 races at more than 100 tracks in forty-eight U.S. states each year, as well as in Europe, Brazil, Mexico, and Canada. James France has served as the company's CEO since August 2018, and much of the current popularity of stock car racing can be directly credited to the France family, who—over 75 years—invested in

the sport along with NASCAR, securing title sponsors and growing the reach of the sport through media-rights deals that brought stock car racing into living rooms across America.

NASCAR sanctions three national racing series: the Cup[1] Series, the Xfinity[2] Series, and the Craftsman Truck[3] Series. Before 2016, teams competed on the track to enter NASCAR Cup Series races. Teams approached NASCAR in 2014 and asked NASCAR to make changes to make it easier for them to sell sponsorships and generate revenues from sponsorships. After extensive negotiations with teams that joined the Race Team Alliance ("RTA") —including Front Row[4]—NASCAR announced a new Charter system in February 2016.[5]

NASCAR offered 36 charters to team owners. Charter holders would be entitled to guaranteed entry in a race (they did not have to compete to have a starting position on the grid) along with guaranteed compensation for racing in those races and, in exchange, they had to agree to race competitively in every Cup Series race. The original teams that received Charters in 2016 from NASCAR did not pay NASCAR any monetary consideration for those Charters. And NASCAR agreed those Charters would be transferable like taxi medallions, providing Charter

---

[1]      The Cup Series races on 28 different tracks, of which NASCAR owns, operates, or is licensed to promote 13. That leaves 15 racetracks that are used in the Cup Series that NASCAR does *not* own—including the Indianapolis Motor Speedway, the Charlotte Motor Speedway, and the Pocono Raceway.

[2]      The NASCAR Xfinity Series generally holds races on the same tracks as the Cup Series, but Xfinity Series races generally run fewer laps.

[3]      The Craftsman Truck Series is comprised of modified pickup truck races.

[4]      In the summer of 2014, nine NASCAR Cup Series racing teams jointly formed the RTA, and by August 2014, nine more teams had joined—including Front Row. *See, e.g.,* Nate Ryan, *RTA expands to include 18 full-time Sprint Cup Teams*, USA Today Sports (Aug. 13, 2014), *available at* https://www.usatoday.com/story/sports/nascar/2014/08/´3/race-team-alliance-expands-to-include-18-nascar-sprint-cup-teams/14003447/ (last visited Oct. 27, 2025).

[5]      *See* Dustin Long, *NASCAR announces charter system for Sprint Cup team owners*, NBC Sports (Feb. 9, 2016), *available at* https://www.nbcsports.com/nascar/news/nascar-accounces-charter-system-for-sprint-cup-team-owners) (last visited Oct. 27, 2025).

3

owners with an immensely valuable asset and revenue source. Since 2016, team owners with Charters have, from time-to-time, sold their Charters to other investors seeking guaranteed entry into Cup Series races and the other benefits of Charters. 23XI is one of the many racing teams that purchased 2016 Charters in late 2020, 2021, and 2024, years after the Charter system was first introduced. Front Row has also sold and purchased Charters since the Charter system started in 2016. Reflecting the value the Charter system provides team owners, the sales prices of Charters have steadily increased over time, reaching over $45 million in 2025.

The Charter system decreased uncertainty for teams and guaranteed they would receive money solely by virtue of participating in NASCAR's Cup Series. Given that Front Row and other RTA teams requested the Charter system in the first place, it is not surprising that team owners were pleased with the negotiations and signed the 2016 Charters. No teams were forced to sign the 2016 Charters if they disapproved of the ultimate terms. Teams remained free to compete "open" in the Cup Series in the same way they did prior to the 2016 Charters. Indeed, since 2016, numerous teams have competed in the Cup Series as "open teams," without the benefits of the Charters, as well as in NASCAR's Xfinity Series and Craftsman Truck series, each of which has no exclusivity requirements—but also no guaranteed starting positions or fixed revenue distributions.

Another important change after 2016 involved the transition to the Next Gen Cars in 2022, which "opened a floodgate of new sponsors"[6] for NASCAR teams and which—due to their

---

[6]       Greg Engle, *How NASCAR's Sponsorship Ecosystem is Evolving with the Times*, Forbes Magazine (Apr. 21, 2024), *available at* https://www.forbes.com/sites/gregengle/2024/04/21/how-nascars-sponsorship-ecosystem-is-evolving-with-the-times/ (last visited Oct. 27, 2025).

4

standardized parts necessitating significantly fewer custom-made parts—lowered costs for Cup Series teams while increasing sponsorship opportunities and making races more competitive.

By their terms, the 2016 Charters expired on December 31, 2024. Their anticipated expiration gave rise to the negotiation of the 2025 Charter Agreements beginning in 2022. The 2025 Charter terms intended to govern the relationship between NASCAR and Cup Series Charter owners for the next seven years (through 2031) with the option to renew them for another seven years (potentially through 2038). As part of approximately two-and-a-half years of negotiations with the teams, NASCAR agreed to the Charter holders' number one demand—significantly increased revenue—and made other concessions. In fact, by mid-2025, the terms of the 2025 Charter were so attractive that both 23XI and Front Row each purchased an additional 2016 Charter from Stewart Haas Racing conditioned upon those Charters being extended into the 2025 term. Although neither NASCAR nor the teams got everything they wanted when negotiating the 2025 Charter Agreements, 13 of the 15 racing team owners, owning 32 of the 36 existing Charters, ultimately agreed on terms for the 2025 Charters. Only 23XI and Front Row rejected the new 2025 Charters.

During the 2025 Charter negotiations, 23XI, Front Row, and 23XI co-owner Curtis Polk worked to create leverage for use in the negotiations. One way they did so was by knowingly orchestrating and participating in an illegal conspiracy that began around February 2022, when 23XI, Front Row, and other teams, coordinated and led by Polk, sent a joint letter to NASCAR notifying the company about the establishment of the Teams Negotiating Committee (hereinafter, the "TNC" or "Committee"). The TNC's aims included limiting competition, increasing payments, and otherwise demanding their preferred terms for Charter teams. Since purchasing a NASCAR Charter in 2021, Polk and 23XI's other owners have openly professed that they want to

5

change NASCAR's economic model by demanding more money for the teams, which would come from NASCAR media revenues rather than from competition between the teams (23XI's horizontal competitors) for sponsorship dollars.[7]

Although the law does not permit horizontal competitors like 23XI and Front Row to agree to eliminate competition by banding together to jointly negotiate the prices they will accept, 23XI, Front Row and others did just that. Polk also led an effort to pressure NASCAR by engaging in media campaigns, interfering with NASCAR's broadcast agreement negotiations, leveraging the threat to boycott NASCAR events, and engaging in a group boycott of a NASCAR Team Owner Council Meeting. NASCAR suffered damages as a result of this scheme to force NASCAR to agree to the teams' demands.

## III. APPLICABLE LAW

### A. The Claims and Counterclaim

Plaintiffs assert federal antitrust claims under Sections 1 and 2 of the Sherman Act, alleging that Defendants have used monopsony power to impose anti-competitive terms and limit competition in an alleged relevant market for "premier stock car racing team" services. (Am. Comp., Doc. 107, ¶¶ 138-160.) Broadly, Plaintiffs accuse NASCAR of acquiring and maintaining a monopsony position over premier stock car racing teams through alleged exclusionary conduct, including: (i) Section 6.6 of the Charters (containing the non-compete and goodwill provisions); (ii) the Next Gen Car's exclusive license; and (iii) sanctioning agreements with independent tracks. Plaintiffs argue that, through these provisions and conduct, NASCAR has blocked the formation

---

[7] Adam Stern, *NASCAR teams dig in as media rights talks* approach, Sports Business Journal (Oct. 28, 2022), *available at* http://www.sportsbusinessjournal.com/Journal/Issues/2022/02/28/Upfront/NASCAR.aspx (last visited Oct. 27, 2025).

6

of any competing premier stock car racing series, forcing teams to "accept take-it-or-leave-it economic conditions in order to compete at the highest level of stock car racing in the United States." (Doc. 107, ¶ 3.)

Plaintiffs further allege that they "have been, and are continuing to be, harmed by any suffered antitrust injury," *id.* ¶ 25, and argue they are entitled to permanent injunctive relief to end NASCAR's allegedly exclusionary practices and to restore competition and trebled monetary damages for harm allegedly suffered over four years as a result of having to compete under the allegedly anti-competitive, "below market terms" of the 2016 Charters (which they agreed to knowing all of the terms, including the payments they would receive and which they could have avoided by selling their Charters for a substantial profit or racing as open teams in Cup Series races).

Defendants did not violate any antitrust laws. NASCAR's conduct was both lawful and procompetitive because the challenged exclusivity clauses in track sanction agreements are not unduly restrictive and led to larger media payments that flow to Charter holders, and the Charter system and Next Gen Car standardization advanced the sport of stock car racing, expanded output, and increased team payout. Defendants assert affirmative defenses, including: (i) Plaintiffs concede they are not challenging the Charter system itself or the payment terms of the 2025 Charters, which limits their case; (ii) a statute-of-limitations defense and doctrine-of-laches defense regarding the claims predating October 2, 2020; (iii) the equitable defense of unclean hands or *in pari delicto*, because Plaintiffs' unlawfully organized through the RTA, negotiated jointly, and boycotted a Team Owner Council meeting to pressure NASCAR, and, having benefited and sought out the Charters, Plaintiffs cannot now claim the system is unlawful; (iv) waiver and release, because the Plaintiffs repeatedly agreed to releases (including in early 2024)

7

that waived asserted claims; and (v) Plaintiffs' claimed injuries are self-inflicted and Plaintiffs failed to mitigate damages.

NEM as Counter-Plaintiff brings a counterclaim under Section 1 of the Sherman Act alleging a horizontal conspiracy (orchestrated by Polk) to collude, collectively negotiate, and extract concessions for the 2025 Charters through anticompetitive means. This price-fixing conspiracy involved an unlawful horizontal agreement, an illegal group boycott (including of meetings and events) and threats of additional boycotts, a coordinated media pressure campaign, and interference with NASCAR's media rights negotiations. NASCAR alleges that these actions reduced competition and harmed the Cup Series, yielding impediments to growth and independent decision-making by teams leading to monetary damages to NASCAR.

Counter-Defendants for their part deny any illegal agreements or boycotts and assert: (i) that NASCAR asked for it (i.e., NASCAR agreed to negotiate jointly) even though it was clear that NASCAR did not consent (or, at the very least, had retracted its consent) because it asked to negotiate individually with the Teams; (ii) that the Teams engaged in good-faith individual negotiations with the NASCAR, and that, accordingly, no concerted refusal to deal with NASCAR occurred (even though 23XI and Front Row have not shown any evidence of withdrawal from their unlawful conspiracy); and (iii) that the agreement on pricing and other terms between the teams was lawful and procompetitive, involving a joint negotiation of common terms to facilitate participation that was legitimate and that improved efficiency, without harming market competition. Counter-Defendants further assert unclean hands or *in pari delicto* because of NASCAR's alleged maintenance of monopsony power, as well as other defenses.

## B. Elements & Damages

To prevail on a Section 1 claim, a "plaintiff must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002) (citing *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (en banc)); 15 U.S.C. § 1. If a plaintiff proves a violation of § 1, it then must prove the existence of "antitrust injury," which involves two "distinct inquiries":

> (1) whether the plaintiff has indeed suffered harm, or "injury-in-fact," and (2) whether any such injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. As to that second prong, to establish an antitrust injury, a plaintiff's losses must stem from anticompetitive acts . . . that reduce output or raise prices to consumers.

*Mr. Dee's Inc. v. Inmar, Inc.*, 2021 WL 4224720, at \*9 (M.D.N.C. Sept. 16, 2021) (cleaned up); *see also Dickson*, 309 F.3d at 202–03 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); citing *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir.2002); *Oksanen*, 945 F.2d at 708; 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶¶ 360–63, at 191–227 (1995)).

To prevail on a Section 2 monopsonization claim, "a plaintiff must show possession of monop[son]y power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Catlin v. Washington Energy Co.,* 791 F.2d 1343, 1347 (9th Cir.1986)); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992); *Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176, 183 (4th Cir. 2003)); 15 U.S.C. § 2. And it is well-settled under Supreme Court precedent that "willful acquisition or maintenance of that [monopsony] power" is

9

"distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell Corp.*, 384 U.S. at 570–71.

For purposes of the individual claims against Mr. France, the law places a significant evidentiary burden to establish individual liability. While Fourth Circuit precedent is sparse on this issue, the Sixth Circuit has explained that to subject a person (in that case, an attorney) to "individual liability under the antitrust laws, the plaintiff must plead and prove that the defendant attorney exerted his power and influence so as to direct the corporation to engage in the complained of acts for an anticompetitive purpose." *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646–47 (6th Cir. 1986). There, the court held, "corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To support a determination of liability under this standard, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions." *Id.* at 646; *see also In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 737 (E.D. Tenn. 2011) (restating and applying Sixth Circuit's holding in *Brown* that "to meet the standard for individual liability, *i.e.* active and knowing participation, the evidence must show that the defendant exerted influence over corporate decisions to the point that his influence shaped corporate intentions.").

If a party violates either section of the Sherman Act, private parties injured by Sherman Act violations may recover treble damages, costs, and reasonable attorney's fees. *See* 15 U.S.C. § 15; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485-86 (1977). Further, both private parties and the government may seek injunctive relief when appropriate. 15 U.S.C. § 26.

10

## IV. SUBSTANTIVE ISSUES FOR TRIAL

Aside from the issues raised in dispositive motions and motions challenging expert testimony, which remain pending, as well as the parties' motions *in limine* filed contemporaneously with this brief, Defendants highlight the following issues remaining for trial:

### A. Section 2 Claim

#### a. Plaintiffs' Evidence Will Fail To Establish A Relevant Market Or NASCAR's Market Power

Plaintiffs contend NASCAR possesses a "monopsony" as the only buyer in their ill-defined market of "premier stock car racing team services." Doc. 107 ¶¶ 138, 139, 144, 145, 146, 147, 148, 149, 151. A *monopoly* is the control of a market by a single *seller*, and a *monopsony* is the control of a market by a single *buyer*. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) ("Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'") (internal citations omitted).

Monopsony claims are rare and proving one comes with certain requirements—for instance, an entity with "monopsony power" seeks to "'restrict its input purchases below the competitive level,' thus 'reduc[ing] the unit price for the remaining input[s] it purchases." *Id.* at 320-21 (internal citations omitted). Plaintiffs should not be permitted to conflate a monopoly (with which jurors are likely familiar) with a monopsony, because a monopsony exists only in "unusual" or "exceptional" circumstances. *See Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1135 (10th Cir. 2002) (describing "unusual circumstance of an effective monopsony"); *Dyer v. Conoco, Inc.*, 1995 WL 103233, at *5 n. 9 (5th Cir. 1995) (table) ("exceptional situation" for "monopsony" to "wield substantial power"); *cf. Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (noting "danger in applying [market] factors mechanically in the context of monopsony").

11

"Proof of a relevant market is a threshold for a Sherman Act § 2 claim. [Plaintiff] bears the burden of proof on the issue of the relevant product and geographic markets." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir. 2021) (internal citations omitted). Inquiry into market definition serves as "a tool to determine the defendant's market power," and has two components that generally must be alleged as a threshold matter: "the relevant product market and the relevant geographic market." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 441 (citing *Consul Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493-95 (4th Cir. 1986); *RCM Supply Co., Inc. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1076 (4th Cir. 1982)). Plaintiffs' contention that they need not prove a relevant market for their Section 2 claim if they provide so-called "direct evidence" is meritless. *See, e.g.*, *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993) ("[I]t is beyond doubt that [a charge of monopsonization] requires proof of market power *in a relevant market*.") (emphasis added); *Consul, Ltd.*, 805 F.2d at 493 ("Proof of a relevant market is the threshold for a Sherman Act § 2 claim. The plaintiff *must* establish the geographic and product market that was monopolized.") (emphasis added).

To establish a valid market in a monopsony case, 23XI and Front Row must account for *all* the buyers to which similar sellers may cater "similar services." *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008). If a plaintiff fails to include "reasonably good substitute[]" buyers in its proposed market, it has not established a Section 2 claim. *Id.*; *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (rejecting attempt to "gerrymander . . . an antitrust victory without due regard for market realities"); *E.I. du Pont de Nemours & Co.*, 637 F.3d at 441-42 (discussing what is required to establish a valid market in a monopsony case).

Here, Plaintiffs' expert testimony fails to prove the relevant product market, which is fatal to its Section 2 claim. Additionally, Defendants' evidence shows that NASCAR faces competition from other motorsports and other opportunities available to investors in teams, as shown for example by organizations racing in other motorsports forming teams to race in NASCAR's Cup Series and teams racing in the Cup Series choosing to focus their resources on other motorsports. And, Plaintiffs' alleged geographic market of the United States is too narrow given the evidence of international motorsports and options available to investors in Cup Series teams. For these reasons, and others to be presented at trial, Plaintiff will be unable to prove monopsony power in a relevant market, foreclosing the jury's ability to find in Plaintiffs' favor at trial.

### b. Plaintiffs Cannot Prove NASCAR Willfully Obtained Or Maintained Monopsony Power By Engaging In Anticompetitive Conduct

Plaintiffs will ask the jury to find that NASCAR engaged in specific anticompetitive conduct in certain exclusivity provisions in track sanction agreements, adoption of Next Gen Car requirements, and the inclusion of the Goodwill provisions (Section 6.6) in the Charter Agreements. To the contrary, NASCAR's evidence will show its conduct is pro-competitive and legitimate, particularly where these decisions benefit motorsports teams and protect NASCAR's intellectual property and investments.

To constitute anticompetitive conduct, "a defendant must engage in conduct to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (internal citation and quotation marks omitted). "Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (cleaned up); *see also Novell v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.) ("Put simply, the monopolist's conduct must be irrational but for its

13

anticompetitive effect.") (internal citation omitted). Additionally, the Supreme Court has made clear, "refusal to deal . . . does not violate Section 2 if valid business reasons exist for that refusal," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597, 605 (1985), and "the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal," *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.") (internal citation omitted).

Here, Plaintiffs cannot prove the identified acts constitute anticompetitive conduct for the purpose of NASCAR maintaining its alleged monopsony power. Plaintiffs also cannot satisfy their burden of proof for their Section 2 claim because they cannot show "willful acquisition or maintenance of that power—as opposed to simply superior products or historic accidents." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 441 (internal citations omitted). Here, the history—indeed, the *legacy*—of NASCAR and the France family's hard work to build NASCAR from humble beginnings to an international sport and brand, explains NASCAR's success. Evidence shows this to be particularly true when considered alongside other motorsports and sports leagues, with which NASCAR competes for media and fans, as well as racers and drivers. *See, e.g.*, *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80 (3d Cir. 2010) ("Accordingly, sports-related bodies should be given leeway with respect to their adoption of equipment requirements as well as their related decision to enter exclusive contracts with the respective suppliers. As highlighted by the racing case law cited above, it appears that the courts have generally accorded sports organizations a certain degree of deference and freedom to act in similar circumstances."); *Brookins*

14

*v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853 (8th Cir. 2000) ("For these reasons, the few courts to consider antitrust challenges to rules defining a sports activity have given the rule-makers considerable discretion to achieve their sporting objectives."); *M&H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 985 (1st Cir. 1984) ("[O]ur general premise [is] that the tracks and drivers have the power to set the parameters within which the racing competition will take place."). Plaintiffs' evidence cannot support a jury verdict in its favor on its monopsonization claim.

## B. Section 1 Claim: Plaintiffs Cannot Prove NASCAR Engaged In An Unreasonable Restraint Of Trade

Plaintiffs cannot demonstrate NASCAR engaged in an unreasonable restraint of trade, and this is particularly true for conduct occurring within the relevant statute of limitations. 15 U.S.C. § 1. For Plaintiffs' claims, the "rule of reason" applies to the alleged restraints on trade here. *See NCAA v. Alston*, 594 U.S. 69, 81 (2021); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018). Under the three-step rule of reason framework, Plaintiffs have the initial burden of proving that the challenged restraint has a substantial anti-competitive effect that has harmed competition in the relevant market;[8] NASCAR must then prove the challenged conduct has a procompetitive rationale, *id.* at 96; and if so, Plaintiffs carry the final burden to demonstrate a "substantially less restrictive alternative" that "would achieve the same procompetitive effect," *id.* at 100, and not just a "marginally" less restrictive one, *id.* at 103; *see also, e.g.*, *Chicago Bd. Of Trade v. United States*, 246 U.S. 231, 238 (1918) (articulating, as part of a seminal opinion by Justice Brandeis, how the rule of reason analysis should be undertaken when a procompetitive rationale exists for a restraint on trade).

---

[8] For the reasons stated above in Section A, Plaintiffs fail to prove a relevant market.

Here, Plaintiffs will be unable to show an anticompetitive effect resulting from an agreement in restraint of trade. *Dickson*, 309 F.3d at 206 ("To have an anticompetitive effect, conduct must harm the competitive *process* and thereby harm consumers.") (internal citations omitted) (emphasis in original). Mere "[t]heorizing about conceivable impairments of competition does not . . . prove that any such impairment has occurred or is likely, or much less is substantial in magnitude." *Id*. at 207 (internal citations omitted). Without a showing of actual adverse effect on competition, one "cannot make out a case under the antitrust laws." *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1217-218 (W.D.N.C. 1989) (citing *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984)). In addition, Plaintiffs must prove that *each* separate agreement, *by itself*, violates antitrust law and causes cognizable anticompetitive effects. *Dickson*, 309 F.3d at 205-07; *see also Howard Hess Dental Laby's Inc. v. Dentsply Int'l Inc.*, 602 F.3d 237, 255-56 (3d Cir. 2010) (under Section 1, plaintiff must allege that each agreement, by itself, harmed competition). Plaintiffs cannot prove a Section 1 violation by relying on supposed aggregate harm from multiple separate contracts. *See Dickson*, 309 F.3d at 205-07.

Here, no evidence will show a restraint on trade. Even if it did, NASCAR will establish legitimate procompetitive rationales that Plaintiffs cannot refute with any less-restrictive alternative that would not impose substantial additional cost. Those procompetitive rationales can include benefits to fans, media partners, and sponsors. *See, e.g.*, *Alston*, 594 U.S. at 96-97; *NCAA v. Bd. of Regents*, 468 U.S. 85, 115-20 (1984); *Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*, 158 F. App'x 413, 420 (4th Cir. 2005) (considering that "exclusive arrangements are needed for control of quality, control of cost, provision of services, ensuring the availability of services 24/7, 365 days a year, to ensure that the practitioners are highly qualified, and to minimize the disruption of services") (internal quotation marks and citation omitted); *Continental Airlines, Inc.*, 277 F.3d at 514

(considering range of procompetitive benefits, including benefits to "customers"); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 304, 311 (2d Cir. 2008) (protection of intellectual property is a legitimate business reason); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440-41 (3d Cir. 1997) (noting importance of "prevent[ing] franchisees from freeriding—offering products of sub-standard quality insufficient to maintain the reputational value of the franchise product while benefitting from the quality control efforts of other actors in the franchise system"). Plaintiffs' failure to satisfy their burden under the rule of reason analysis dooms their Section 1 claim. *See Alston*, 594 U.S. at 100; *see also Ohio*, 585 U.S. at 541-42; *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993).

## C. Plaintiffs Cannot Satisfy Their Burden To Prove Mr. France Is Individually Liable For Violation Of The Sherman Act

No evidence suggests Mr. France "actively and knowingly" engaged in a scheme to achieve anticompetitive ends. *Brown*, 783 F.2d at 646. Plaintiffs cannot prove that he had a direct role and actively and knowingly controlled and/or ratified any of NASCAR's conduct to the extent it may have been anticompetitive. *See Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 889 (W.D. Ky. 2009) (suggesting that an individual's executive-level role in an organization, without more, is insufficient to establish an antitrust claim); *MVConnect, LLC v. Recovery Database Network, Inc.*, 2011 WL 13128799, at *10 (N.D. Tex. May 27, 2011) ("[T]he essential principle of direct, personal participation in the alleged conspiracy is necessary to hold a director or officer personally liable."); *Chandler v. Phoenix Servs.*, 419 F. Supp. 3d 972, 987 (N.D. Tex. 2019) (plaintiffs "must allege that [individual] had a direct role in the attempted monopolization"). A reasonable jury cannot find Mr. France to be personally liable.

## D. NASCAR's Counterclaim: NASCAR Will Prove By A Preponderance Of The Evidence That 23XI And Front Row's Joint Negotiations And Other Actions Constituted An Unlawful Restraint On Trade

17

23XI, Front Row, and Mr. Polk are part of a cartel. As a general matter, horizontal agreements can be unlawful *per se* or under the "rule of reason" analysis. In establishing that a horizontal agreement between competitors is *per se* unlawful under the Sherman Act, a plaintiff such as NASCAR in its role as a Counter-Plaintiff must show that the agreements involve certain categories of restraints that "always or almost always tend to restrict competition and decrease output" and have "such predictable and pernicious anticompetitive effect[s], and such limited potential for procompetitive benefit[s], that they are deemed unlawful *per se*." *See, e.g.*, *Continental Airlines, Inc.*, 277 F.3d at 509.

Certain types of horizontal agreements almost always qualify for *per se* treatment, including price-fixing agreements between competitors, *Texaco Inc. v. Dagher*, 547 U.S. 1, 1 (2006), and market-allocation agreements, *North Carolina State Bd. of Dental Examiners v. F.T.C.*, 717 F.3d 359, 373 at fn. 1 (4th Cir. 2013). *See generally Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703 (4th Cir. 2019) (finding territory allocation agreements between competitors at the same market level made in order to minimize competition to constitute *per se* violations under the Sherman Act); *TFWS, Inc. v. Schaefer*, 242 F.3d 198 (4th Cir. 2001) (discussing *per se* restraints and writing with specific regard to such restraints that they are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"); *see also Am. Express Co.*, 585 U.S. at 540-41 (noting that only horizontal restraints between competitors typically qualify as *per se* unreasonable, as they represent agreements between parties who should be competing rather than coordinating their market behavior); *Churchill Downs Inc.*, 605 F. Supp. 2d at 890 ("Horizontal agreements . . . involve direct competitors at a given level of the market ... and are viewed as especially injurious . . . . Examples include price-fixing and group boycotts. Commercially motivated group boycotts

18

are per se violations because the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote . . . [and] are designed to pressure another party into doing something by withholding, or enlisting others to withhold, patronage or services from the target.") (cleaned up).

When *per se* analysis is inappropriate, then a court will analyze the legality of a horizontal agreement using another method, such as the "rule of reason," which is explained above. *See Continental Airlines, Inc*., 277 F.3d at 509; *see also California Dental Ass'n v. FTC*, 526 U.S. 756, 780-81 (1999). This Court has found that the "rule of reason" analysis is appropriate for NASCAR's claim. (Order on Pls.' Mot. to Dismiss, ECF No. 162, at p. 9.) Because the Court concluded the rule of reason analysis is appropriate, decisions rejecting antitrust claims concerning joint negotiations because they were not *per se* unlawful are inapplicable in analyzing NASCAR's counterclaim. *See, e.g.*, *Broad. Music, Inc. v. Columbia Broad. Sys., Inc*., 441 U.S. 1, 23 (1979) (rejecting an antitrust claim in the context of *per se* illegality).

In other words, although only some horizontal restraints are subject to the *per se* rule, the restraint—vertical or horizontal—may still be unlawful if it fails to survive a rule-of-reason analysis. *See Brewbaker*, 87 F.4th at 571 (discussing the rule of reason generally in the context of a criminal case involving a hybrid restraint with both horizontal and vertical elements); *see also id.* at 573 (writing that although agreements can be analyzed for *per se* illegality, "[t]he rule of reason is the default") (internal citation omitted).

In establishing that a boycott is unlawful, NASCAR can show the boycott's nature was so likely to restrict competition without any offsetting efficiency gains that it should be condemned as a *per se* violation. *See generally Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284 (1985); *Fashion Originators' Guild of America v. Federal Trade*

*Commission*, 312 U.S. 457 (1941) (discussing *per se* treatment where textile and garment manufacturers with a commanding market position used an organized boycott system with red cards for non-cooperators and white cards for cooperators to coerce retail compliance). And if the *per se* approach is not warranted, NASCAR can show under a rule-of-reason analysis that the anti-competitive effects substantially outweigh any pro-competitive justifications. *See generally F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447 (1986); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015); *see also Fashion Originators' Guild of America*, 312 U.S. at 465-68 (discussing how coercive elements combined with market power can constitute an illegal boycott under the Sherman Act).

Plaintiffs' and Polk's concerted action of facilitating a boycott, threatening future boycotts, coordinated group negotiation, and mandated unity among teams to only accept terms agreed upon by the group (alongside sham individual negotiations) resulted in injury to NASCAR (*i.e.*, NASCAR suffered a negative impact from the price-fixing agreement as well as from the boycott). The fact teams may have cheated on the conspiracy does not foreclose NASCAR's claim.

**E. Remedies Sought by the Parties**

If Plaintiffs prevail on the merits, they request that judgment be entered against Defendants for three times the amount of damages sustained by Plaintiffs as a result of any Sherman Act violations together with the costs of suit and reasonable attorneys' fees. They will also ask the Court for injunctive relief, the exact terms of which have not yet been disclosed to Defendants. In addition, Plaintiffs vaguely request the Court order other relief under the circumstances to restore competition.

Counter-Plaintiff NEM seeks a judgment on its counterclaim that 23XI, Front Row, and Curtis Polk violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and an award of treble the actual

damages suffered by NEM under Section 4 of the Clayton Act, 15 U.S.C. § 15.[9] Additionally, NEM will request an order permanently enjoining Counter-Defendants from violating Section 1 of the Sherman Act, and such relief as is necessary to restore competition. Finally, NEM requests its costs and reasonable attorneys' fees in connection with its counterclaim and such further and additional relief as the Court may deem just and proper.

### a.    At Best, Plaintiffs Rely On Speculative Damages to Support Any Monetary Award

The Fourth Circuit has established that uncertainty as to the fact of damages may preclude recovery when the sole evidence supporting the existence of actual damages is overly speculative. *See Dash v. Mayweather*, 731 F.3d 303, 325 (4th Cir. 2013). Plaintiffs' flawed damages analysis reflects speculative damages, and Plaintiffs will present only aggregated damages numbers that supposedly account for Plaintiffs' purported harm from *all* of NASCAR's alleged anticompetitive conduct, which includes harm from time-barred conduct.

The Supreme Court has made clear that a Plaintiff can only recover for damages caused by a specific overt act within the limitations period. *Klehr v. A.O Smith Corp.*, 521 U.S. 179, 190 (1997) ("[a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside of the limitations period."). The Fourth Circuit has emphasized the same. *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 289 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1921 (2025) ("[M]ere silence or inaction from a defendant—even though the allegedly unlawful conspiracy to exclude a plaintiff remains in

---

[9]     The Clayton Act is "designed to remedy economic injury by providing for the recovery of treble damages," bringing to bear the "pressure of 'private attorneys general' on" serious national problems "for which public prosecutorial resources are deemed inadequate." *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 198 at fn. 2 (1997) (Scalia, J., concurring; Thomas, J., concurring) (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987)) (internal quotation marks omitted).

effect—isn't enough to restart the limitations period. Instead, an *affirmative* act—like a promise to act in the future—is required.") (internal citation omitted) (emphasis in original); *id.* at 292 (writing that "in… antitrust cases, [a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period") (internal citation and quotation marks omitted).

The plaintiff must "provide evidence such that a jury is not left to 'speculation or guesswork' in determining the amount of damages to award," and Plaintiffs' failure to do so here—combined with the time-barred nature of large parts of their claims—means that if this case goes to trial it is unlikely that Plaintiffs can recover anything except perhaps nominal damages. *See Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015); *see also* Areeda & Hovenkamp ¶ 338a (noting that a plaintiff must proffer evidence to "allow the jury to estimate the amount of damages without undue speculation in those cases where damages are sought"); *CSX Transp., Inc.*, 114 F.4th at 292 (involving an aggregate damages analysis similar to the one Plaintiffs conducted here, and finding with regard to that analysis that it was speculative such that it doomed the plaintiffs' ability to present the jury with a non-speculative damages case, leaving the jury with no evidence to calculate damages for any timely conduct the plaintiffs alleged). To the extent Plaintiffs argue that an award of only nominal damages would be inappropriate in the antitrust context, that argument should be rejected, as "courts routinely approve the award of such damages" and there seems to be "no authority holding that nominal damages are impermissible in an antitrust case." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1377 (2d Cir. 1988); *see also Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*, 666 F.2d 1130, 1147 (8th Cir. 1981), *cert. denied*, 457 U.S. 1111 (1982).

**b.** **Plaintiffs Cannot Demonstrate A Causal Connection Between Their Claimed Damages And Defendants' Alleged Violations To Support An Award of Damages**

Antitrust damages present complex evidentiary issues requiring proof of both antitrust injury and causation. The Fourth Circuit has held that an antitrust injury encompasses two concepts: (1) the "causal connection" between the plaintiff's injury and an antitrust violation, and (2) whether the plaintiff's injury "was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F. 3d 690, 710 (4th Cir. 2021) (internal citation omitted). Courts require that an antitrust plaintiff demonstrate a causal connection between the defendant's violation and the damages claimed. *See Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F. 2d 1033, 1043-44 (4th Cir. 1987); *see also Burlington Industries, Inc. v. Milliken & Co.*, 690 F. 2d 380, 385 (4th Cir. 1982); *Lee-Moore Oil Co. v. Union Oil Co. of California*, 599 F.2d 1299, 1306 (4th Cir. 1979). "An antitrust plaintiff is entitled to recover only for that portion of . . . [its losses] caused by the defendants' unlawful conduct." *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co., Inc.*, 690 F.2d 411, 415 (4th Cir. 1982); *see also Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1510 (9th Cir. 1985); *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1161, 1187 (7th Cir. 1983).

Plaintiffs have hired an expert to calculate their claimed damages. While it is true that expert testimony plays a crucial role in damages calculations, courts scrutinize the assumptions underlying expert opinions. Here, Dr. Snyder's analysis is unreliable and nonsensical because he assumes NASCAR would have unilaterally decided, in the middle of the 2016 Charter agreement term and in response to hypothetical entry by a competitor racing series, to pay racing teams 45% of its total revenue, amounting to an additional $1.06 billion dollars between 2021 and 2024. But Dr. Snyder

admitted during his deposition that he does not know who would have supposedly entered to compete with NASCAR, nor what form the supposed entry would have taken, nor when the imaginary, unidentified entry would have occurred. He also did not analyze why his imagined entry would suddenly cause NASCAR to pay teams over a billion additional dollars, or how NASCAR could do so with a supposed additional series capturing scarce media dollars and the imagined payments causing violations of loan covenants and threatening insolvency for NASCAR. Nor did Dr. Snyder analyze whether there were cheaper alternatives NASCAR could have availed itself of in his but-for world to address the hypothetical departure of Teams to an unknown entity that, inexplicably, could and would pay Teams more than NASCAR. For example, an obvious response would be for NASCAR to begin working with Xfinity teams, Craftsman Truck teams, and Open teams in the Cup Series, but that obvious alternative was never considered. Finally, Dr. Snyder's 45% total revenue figure was based on a Formula 1 benchmark. But that makes no sense because Formula 1 does not pay its teams a share of its revenues; Formula 1 pays its teams a prize fund based on Formula 1's operating profits. All Dr. Snyder has done is employ (as he did in another case where his opinion was excluded) an improper benchmark and "mathematical and mapping exercise that employs no specialized knowledge or expertise." *Sitts v. Dairy Farmers of Am., Inc.*, 2020 WL 3467993, at *12 (D. Vt. June 24, 2020).

### c. Plaintiffs Failed To Mitigate Damages

Another evidentiary concern focuses on Plaintiffs' failure to mitigate their damages. "'An antitrust plaintiff has a duty to mitigate damages.'" *Steves & Sons, Inc.*, 988 F.3d at 725 (quoting *Golf City, Inc. v. Wilson Sporting Goods, Co.,* 555 F.2d 426, 436 (5th Cir. 1977) (collecting cases)); *see also Fishman v. Est. of Wirtz*, 807 F.2d 520, 556-57 (7th Cir. 1986) (writing that "we agree that the tort rules regarding mitigation of damages can have their places in the law of antitrust"); *Steward*

*Health Care Sys., LLC v. Blue Cross & Shield of Rhode Island*, 311 F. Supp. 3d 468, 511 (D.R.I. 2018). Even if Plaintiffs were able to prove any damages—which they are not—any recovery is substantially limited because they failed to mitigate damages. *See NCO Financial Systems, Incorporated v. Montgomery Park, LLC*, 918 F.3d 388, 393-96 (4th Cir. 2019). Ultimately, a failure to take reasonable action to mitigate damages is a question of fact, and a finding that a plaintiff failed to mitigate damages will result in a substantial reduction in what it can recover. *See generally* ABA Model Jury Instructions in Civil Antitrust Cases (2016), No. 6.B.14; *Westinghouse Elec. Corp. v. Garrett Corp.*, 601 F.2d 155, 158 (4th Cir. 1979) (discussing mitigation with regard to breach of contract); *Reed Properties, LLC v. Concentra Health Services, Inc.*, 2014 WL 1512997, at *1 (W.D.N.C. Apr. 16, 2014) (discussing mitigation and further noting that the reasonableness of mitigation efforts is typically a question of fact).

### d.    Injunctive Relief

If Plaintiffs succeed on their antitrust claims, they intend to ask the Court for injunctive relief. If Plaintiffs obtain a favorable jury verdict, Defendants request an opportunity to present evidence and briefing as to appropriate injunctive relief in line with the jury's findings.

## V. CONCLUSION

What remains to be tried are questions which ultimately are tied to the issues regarding whether NASCAR's actions may have unreasonably restrained and harmed competition under the Sherman Act and whether Counter-Defendants violated Section 1 of the Sherman Act through horizontal agreements or boycotts that are unlawful and that negatively affected competition. The evidence will show that Plaintiffs cannot prevail on their claims, and that NASCAR is entitled to relief for actions taken by the Counter-Defendants that have harmed competition and NASCAR.

25

Dated this 27th day of October, 2025.    Respectfully submitted,

By:    */s/ Tricia Wilson Magee*
Tricia Wilson Magee (N.C. Bar No. 31875)
**SHUMAKER, LOOP, & KENDRICK LLP**
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Tel: 704-945-2911
Fax:704-332-1197
tmagee@shumaker.com

Christopher S. Yates*
Ashley M. Bauer*
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
chris.yates@lw.com
ashley.bauer@lw.com

Lawrence E. Buterman*
**LATHAM & WAKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Anna M. Rathbun*
David L. Johnson*
Christopher J. Brown*
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
anna.rathbun@lw.com
david.johnson@lw.com
chris.brown@lw.com

* Admitted *pro hac vice*
*Counsel for NASCAR and James France*

26

## ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Fast Case, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.


This, the 27th day of October, 2025.

*/s/ Tricia Wilson Magee*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **DEFENDANTS'/COUNTER-PLAINTIFF'S TRIAL BRIEF** was electronically filed using the Court's CM/ECF system, which will automatically send notice of filing to all parties of record as follows:

Danielle T. Williams
dwilliams@winston.com

Jeffrey L. Kessler
jkessler@winston.com

Jeanifer Parsigian
jparsigian@winston.com

Michael Toomey
mtoomey@winston.com

Matthew DalSanto
mdalsanto@winston.com

Benjamin Rudofsky
brudofsky@winston.com

*Counsel for Counterclaim Defendants 23XI
Racing, Front Row Motorsports Inc., and
Curtis Polk*

Eric Shaun Hochstadt
ehochstadt@orrick.com
*Counsel for Counterclaim Defendant Curtis
Polk*

This, the 27th day of October, 2025.

*/s/ Tricia Wilson Magee*

28