# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

2311 RACING LLC d/b/a 23XI RACING, and
FRONT ROW MOTORSPORTS, INC.,

          Plaintiffs,

          v.

NATIONAL ASSOCIATION FOR STOCK
CAR AUTO RACING, LLC, NASCAR
HOLDINGS, LLC, NASCAR EVENT
MANAGEMENT, LLC, and JAMES FRANCE,

          Defendants.

---

NASCAR EVENT MANAGEMENT, LLC,

          Counter-Plaintiff,

          v.

2311 RACING LLC d/b/a 23XI RACING,
FRONT ROW MOTORSPORTS, INC., and
CURTIS POLK,

          Counter-Defendants.

No. 3:24-cv-886-KDB-SCR

**FILED UNDER SEAL**

**PLAINTIFFS AND COUNTER-DEFENDANTS 2311 RACING LLC AND FRONT ROW
MOTORSPORTS, INC. AND COUNTER-DEFENDANT CURTIS POLK'S
<u>TRIAL BRIEF</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

OVERVIEW OF CLAIMS ...................................................................................... 3

    I.     Plaintiffs Will Prove Their Section 2 Antitrust Claim. ........................................ 4

           A.     Defendants Are Unlawful Monopolists in the Input Market for Premier Stock Car Racing Teams in the United States. .............................. 4

           B.     Defendants Willfully Maintained Their Monopoly Power Through Exclusionary Acts. ........................................................................ 6

           C.     Plaintiffs Will Prove Antitrust Injury. ........................................................11

           D.     Plaintiffs Will Prove Damages ................................................................ 13

    II.    Plaintiffs Will Also Prove Their Section 1 Claim. ............................................. 14

    III.   Defendants' Section 1 Claim Will Fail. ........................................................... 17

ISSUES TO BE TRIED ....................................................................................... 20

    I.     Plaintiffs' Section 2 Monopolization Claim ...................................................... 20

    II.    Plaintiffs' Section 1 Claim ........................................................................... 20

    III.   NASCAR's Section 1 Claim ........................................................................ 21

QUESTIONS OF LAW ....................................................................................... 22

ANTICIPATED EVIDENTIARY ISSUES ................................................................. 24

    I.     Motions to Exclude Expert Testimony .............................................................. 24

    II.    Motions in Limine ..................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Health-Care Servs. v. Radford Comm. Hosp.*,
  910 F.2d 139 (4th Cir. 1990) ...................................................................................4

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ...................................................................................12

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) ............................................................................14, 17

*Costar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
  141 F.4th 1075 (9th Cir. 2025) .............................................................................14

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
  114 F.4th 280 (4th Cir. 2024) ...............................................................................12

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ................................................................................17

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) ..........................................................................................4, 14

*In re Google Play Store Antitrust Litig.*,
  147 F.4th 917 (9th Cir. 2025) ...............................................................................23

*Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*,
  No. CV GLR-18-3560, 2024 WL 4123511 (D. Md. Sept. 6, 2024) .......................15

*Great W. Directories, Inc. v. Sw. Bell Tel. Co.*,
  63 F.3d 1378 (5th Cir. 1995) ................................................................................23

*Int'l Boxing Club of N.Y. v. United States*,
  358 U.S 242 (1959) ...............................................................................................23

*NCAA v. Alston*,
  594 U.S. 69 (2021) ................................................................................................15

*Novell, Inc. v. Microsoft Corp*,
  505 F.3d 302 (4th Cir. 2007) ............................................................................3, 11

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) .................................................................................23

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).................................................................15

*Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*,
    633 F.2d 477 (7th Cir. 1980) .............................................................23

*U.S. v. Google LLC*,
    778 F. Supp. 3d 797 (E.D. Va. 2025) ..........................................15, 16

**Statutes**

Sherman Act § 1.................................................................... *passim*

Sherman Act § 2.................................................................... *passim*

# PRELIMINARY STATEMENT

Plaintiffs 23XI and Front Row brought this antitrust lawsuit to hold Defendants NASCAR and Jim France (collectively, "Defendants") accountable for their unlawful monopolization which has deprived the Cup Series racing teams of a competitive market for their services to enrich the France family. Instead of treating the racing teams as valued business partners, NASCAR has exploited its monopoly power to deprive them of a fair opportunity to make a reasonable return on their substantial investments. Rather than collaborating positively with the Cup Series racing teams to build the highest level of stock car racing for the benefit of drivers, sponsors and fans, NASCAR was directed by Jim France to view itself as being "in a competition" with the racing teams, and that it would use its monopoly power to "win." Dkt. No. 216-23, NASCAR-00566485 at -486.

The internal statements of NASCAR's highest ranked executives reveal their understanding that they were being directed by Jim France to use NASCAR's monopoly power to continue to exploit the Cup Series racing teams even though they knew this was not the right path for growing the sport for the benefit of all:

- **Steve Phelps (former NASCAR President, now NASCAR Commissioner)**: The Charter Agreement terms being imposed by NASCAR has "zero wins for the teams." "[The teams] will sign them but we are fucked moving forward."

- **Steve O'Donnell (former NASCAR Chief Operating Officer, now NASCAR President)**: "[The board's strategy] is getting us close . . . to a comfortable 1996, fuck the teams, dictatorship, motorsport, redneck, southern, tiny sport" and "[i]f any big sports person heard this right now. Laughable."

- **Scott Prime (former NASCAR Senior Vice President - Global Strategy, now NASCAR Executive Vice President and Chief Strategy Officer)**: "The approach of 'here's a bit

more money, fuck off everywhere else' is a bold strategy."

Dkt. No. 215-3, NASCAR-00469213 at -213–14.

NASCAR's internal documents reveal, in living color, how NASCAR used anticompetitive and exclusionary acts to raise the barriers to entry to prevent any potential competitor from being formed to challenge NASCAR's monopsony power in the input market for the services of premier stock car racing teams:

- NASCAR sought to (and did) "lock up facilities for Cup-level events" to deprive the racing teams of "options" to organize a competitor series. Dkt. No. 265-15, NASCAR-00026401 at slide 4;

- NASCAR implemented Next Gen 7 car restrictions in 2022 to eliminate the "risk to NASCAR of the creation of a 'copy-cat' series." Dkt. No. 265-20, NASCAR-00138127 at slide 10;

- NASCAR "[s]trategic[ally]" acquired its closest stock car-series competitor because it "operat[ed] in the same bracket of competition." Dkt. No. 176-44, NASCAR-00382753 at -756;

- NASCAR imposed a non-compete provision in its charter agreements to prevent competition, knowing that the "Teams will push back as they view competition against us a leverage." Dkt. No. 231-1, Rascher Rep. ¶ 174 n.244; *see* Dkt. No. 176-7, NASCAR-00169214; and

- NASCAR imposed the 2025 Charter Agreement terms, which had "zero wins for the teams" recognizing that it would be an exercise of NASCAR's monopoly power as a "dictatorship." Dkt. No. 215-3, NASCAR-00469213 at -213.

This sample of the evidence against NASCAR is just the tip of the iceberg. Plaintiffs will present

a small mountain of internal NASCAR documents at trial, along with compelling fact and expert testimony, to support their claims of a Sherman Act violation. Much of this testimony will come from NASCAR's own senior executives.

In retaliation for Plaintiffs challenging Defendants' unlawful monopolization, NASCAR brought a counterclaim under Section 1 of the Sherman Act against Plaintiffs and Curtis Polk (collectively, the "Counterclaim-Defendants"). As discovery confirmed, NASCAR cannot establish any restraint of trade from its voluntary, joint negotiations with the chartered racing teams over the terms of the 2025 Charter Agreement because, among other things, individual negotiations were available and were used by NASCAR to obtain the agreement of 13 of the 15 racing teams. Further, NASCAR cannot show that it suffered any antitrust injury from the teams' joint negotiations, which provided substantial efficiencies because of the undisputed fact that the terms of the Charter Agreement are identical for all of the teams.

## OVERVIEW OF CLAIMS

"The Sherman Act was enacted to protect the freedom to compete by curtailing the destruction of competition through anticompetitive practices." *Novell, Inc. v. Microsoft Corp*, 505 F.3d 302, 315 (4th Cir. 2007). The core issues in this case go to the heart of the antitrust laws: These issues are:

1. Whether Defendants engaged in exclusionary conduct to unlawfully maintain their monopsony over the relevant input market for the services of premier stock car racing teams and then exercised that monopsony power to impose below competitive market terms on Cup Series racing teams (including Plaintiffs) in violation of Section 2 of the Sherman Act;

2. Whether—as part of their monopsonistic scheme—Defendants entered into anticompetitive exclusivity agreements with tracks and for NextGen cars that had

the purpose and effect of unreasonably restraining competition in violation of Section 1 of the Sherman Act ; and

3. Whether Cup Series racing teams' joint negotiations with NASCAR over the identical terms of the 2025 Charter Agreements constituted an unreasonable restraint of trade when it is undisputed that there was no agreement to preclude the individual negotiations that led to the 2025 Charter Agreement being accepted by 13 of the 15 chartered racing teams.

The discovery process unearthed powerful and persuasive evidence to support Plaintiffs' Sherman Act claims against Defendants. By contrast, discovery has confirmed that Defendants cannot show any anticompetitive effects or antitrust injury stemming from its joint negotiations with the racing teams over the terms of the 2025 Charter Agreement.

## I. Plaintiffs Will Prove Their Section 2 Antitrust Claim.

"To prevail on a monopolization claim, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health-Care Servs. v. Radford Comm. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990); *see also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992).

### A. Defendants Are Unlawful Monopolists in the Input Market for Premier Stock Car Racing Teams in the United States.

Plaintiffs will prove by a preponderance of evidence that NASCAR possesses monopoly power in a relevant input market for the services of premier stock car racing teams.

Plaintiffs have submitted a motion for partial summary judgment on the issues of Defendants' monopoly power in the relevant market. Dkt. No. 230. As set forth in detail in Plaintiffs' memorandum (Dkt. No. 231), discovery demonstrates that the Court's preliminary-

injunction conclusion that NASCAR has a 100% market share in the relevant input market for premier stock car racing teams in the United States was correct. If summary judgment is not granted on this issue, Plaintiffs will establish at trial that the input market for premier stock car racing services is a relevant market in which NASCAR exercises monopsony power.

As the Court has already found, premier stock car racing "is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes." Dkt. No. 74 at 12. NASCAR asserted the exact same input market in support of its counterclaim. Dkt. No. 231-2, Hubbard Rep. ¶ 33 ("The relevant market here therefore includes [Cup Series] entrants, and competitors in the relevant market include either all or some subset of firms that can or do supply NASCAR such entrants."). These admissions by NASCAR and its economic expert are backed up by extensive quantitative evidence provided by Plaintiffs' expert, Dr Rascher. Dkt. No. 231-1, Rascher Rep. ¶¶ 66–80 (applying SSNIP to determine Xfinity Series is not a substitute); *id.* ¶¶ 81–92 (applying SSNIP to determine other motorsports are not a substitute). NASCAR's expert, Dr. Hubbard, then confirms Dr. Rascher's analysis by applying the same quantitative methodology to establish the same relevant market. *See* Dkt. No. 231-2, Hubbard Rep. ¶¶ 33-34 (confirming application of SSNIP test).

NASCAR's monopoly power will be established at trial through both direct and indirect evidence, including NASCAR's 100% market share, the absence of any close competitor, the durability of NASCAR's monopoly position for decades, and the undisputed existence of barriers to entry. *E.g.*, Dkt. No. 231-12, Snyder Rebuttal Rep. ¶ 9; Dkt. No. 231-13, Snyder Rep. ¶ 32.b; Dkt. No. 231-10, NASCAR-00116200 at slide 3; Dkt. No. 231-5, Prime Tr. 84:15–85:5; Dkt. No. 231-11, NASCAR-00101820 at -840; Dkt. No. 231-8, L. France Kennedy Tr. 133:8–17; Dkt. No.

231-1, Rascher Rep. ¶¶ 171–211, 226–29, 263–67; Dkt. No. 231-14, Rascher Rebuttal Rep. ¶¶ 105–64.

B. **Defendants Willfully Maintained Their Monopoly Power Through Exclusionary Acts.**

Plaintiffs will prove by a preponderance of evidence at trial the existence of Defendants' series of interrelated exclusionary acts to lock up tracks, race teams, and the expensive, specialized stock cars NASCAR required teams to invest in, with the purpose and effect of blocking any potential competitor from being formed to compete with the Cup Series in the relevant market.

*NASCAR's Exclusivity Agreements With The Race Tracks That A Competitor Would Need Access To In Order to Compete with the Cup Series.* Plaintiffs will prove at trial that NASCAR has deliberately locked up the top-tier racetracks capable of hosting premier stock car races in the United States with exclusivity agreements for the express purpose of preventing the entry of a competitor.

From 2016 through 2025, NASCAR has required all tracks that host Cup Series events, and some tracks that host Xfinity Series or Craftsman Truck Series events, including the tracks that NASCAR owns through its acquisition of International Speedway Corporation ("ISC"),[1] to agree to a "Restrictive Covenant" in its Sanction Agreements that prevents the tracks from hosting a non-NASCAR stock car race that could compete with the Cup Series. *See* Dkt. No. 231-1, Rascher Rep. ¶¶ 14, 203-11; Dkt. No. 238-3, Frost Rep. ¶¶ 85–86, Exs. 1, 2.

The evidence at trial will show that NASCAR entered into these exclusivity agreements for the specific purpose of blocking the formation of a new entrant to compete with the Cup Series. For example, the documentary evidence shows that NASCAR entered into a new Sanction

---

[1] *See, e.g.*, Dkt. No. 176-32, NASCAR-00359432 at -446; Dkt. No. 176-33, NASCAR-00354319 at -332–33.

Agreement with Speedway Motorsports Inc. ("SM") containing these exclusivity restrictions in a strategic effort to block the formation of a new entrant who could partner with Cup Series teams to compete with NASCAR. Specifically, in response to the teams' demand for improved charter agreement terms starting in 2025, NASCAR entered into new sanction agreements with SM with a restrictive covenant lasting through November 2026. *E.g.*, Dkt. No. 265-11, NASCAR-00323698 at -713. These sanction agreements only granted to SM the right to host Cup Series races for 2023 and 2024, but imposed long-term exclusivity provisions through 2026 to ensure that these tracks could not partner with the teams to create a competitor in 2025 when the teams would be free to leave the Cup Series and compete against NASCAR.

SM tried to negotiate a provision allowing for its ability to host events for the nascent stock car series SRX (the Superstar Racing Experience). *See* Dkt. No. 176-22, NASCAR-00117623 at -638. But NASCAR refused because it viewed SRX as a potential competitor. Dkt. No. 176-23, Phelps Tr. at 195:14–196:14; Dkt. No. 176-17, NASCAR-00358203 at -217; Dkt. No. 176-24, NASCAR 30(b)(6) (O'Donnell) Tr. at 129:19–21.

The trial evidence will show that one of the reasons NASCAR imposed its exclusivity restrictions on the tracks was that it was concerned about the possible formation of a new entrant to compete with the Cup Series that would be similar to what the PGA Tour faced from the entry into the market of LIV Golf.[2] The evidence will further show that, as NASCAR executives feared, the Charter teams explored launching a breakaway series, but were deterred from doing so because they were "concerned about the viability, because if you want it to run on tracks in North America,

---

[2] NASCAR's broadcast partners also recognized the potential of a new entrant to be formed to compete with the Cup Series and expressed this concern to NASCAR. Dkt. No. 265-12, Bazant Tr. at 59:23–60:22; Dkt. No. 265-13, Herbst Tr. at 175:11–176:7; Dkt. No. Dkt. No. 231-1, Rascher Rep. ¶ 265.

most of the tracks are bound by . . . [or] controlled directly or indirectly by NASCAR." Dkt. No. 176-14, Kauffman Tr. at 290:4–21.

Plaintiffs will also introduce evidence that in March of 2019, the teams wrote to NASCAR expressing concerns about the sustainability of the team business model under the terms of the 2016 Charter Agreement, indicating that economic improvements needed to be made for the teams. Dkt. No. 216-19, NASCAR-00159497 at -498-01. In response to the teams' letter, NASCAR discussed the fact that "[i]f NASCAR and Tracks were locked into Sanctions, what leverage, if any, would Teams have to negotiate for changes to their business model?" Ex. 1,[3] NASCAR-00015786 at -791. NASCAR thereafter entered into new sanction agreements with the tracks containing exclusivity restrictions that covered the 2021 season, ensuring that the tracks would be locked up and unavailable to any potential competitor when the teams had to decide whether to agree to an extension of their onerous charter agreement terms through 2024. *See, e.g.*, Ex. 2, NASCAR-00387981 (2021 Las Vegas Motor Speedway Sanction Agreement executed October 30, 2019); Ex. 3, NASCAR-00388485 (2021 Phoenix Raceway Sanction Agreement executed October 30, 2019). With the tracks locked up blocking the formation of a competitor, the teams had no choice but to extend their Charters despite no improvements in their economics.

NASCAR's asserted defense that other tracks are available to form a competitor is belied by NASCAR's own internal documents and testimony that recognizes that there is a very limited supply of the quality and type of racetracks necessary to form a premier stock car racing competitor and that "locking up" SM tracks, for example, would block entry. Dkt. No. 265-29, NASCAR-

---

[3] Ex. __ refers to the exhibits to the concurrently filed Declaration of Jeffrey L. Kessler in Support of Plaintiffs And Counter-Defendants 2311 Racing LLC And Front Row Motorsports, Inc. and Counter-Defendant Curtis Polk's Trial Brief.

00317548 at slide 5 ("Existing 'Cup-ready' venues are limited.").[4] A June 2022 NASCAR presentation Mr. Prime drafted explained that teams "[w]ould likely require partnership with SM to secure track inventory for a full-season." Dkt. No. 265-35, NASCAR-00558557 at slide 3. Another said that "in the event some teams explore disruptive models or tactics," NASCAR could "Strengthen Relationship" with SM and "lock up facilities for Cup-level events." Dkt. No. 265-15, NASCAR-00026401 at slide 4. NASCAR's Chief Strategy Officer Scott Prime testified that a rival series would have a hard time finding sufficient and suitable racetracks to be "premier" or "[s]imilar to . . . the Cup Series." Dkt. No. 265-23, Prime Tr. at 84:8–85:5. This evidence will be substantiated by the expert testimony of track expert Timothy Frost showing that the totality of the exclusivity restrictions imposed by NASCAR on the tracks deprived a potential competitor of the tracks it would need to compete with the Cup Series. *See* Dkt. No. 238-3, Frost Rep. ¶ 121.

***Charter Non-Competes.*** Plaintiffs will further establish at trial that NASCAR included non-competes in the 2016 Charters and then broadened them in the 2025 Charters with the specific intent of preventing Cup Series teams or their owners from supporting the creation of a NASCAR competitor. The restrictions in the 2016 Charter Agreement were newly imposed by NASCAR at least 16 different times during the limitations period through the Joinder Agreements that NASCAR required whenever it approved the sale of a charter agreement. *See, e.g.*, Dkt. No. 265-22, 23XI_0005675 (23XI joinder agreement); Dkt. No. 265-23, Prime Tr. 149:13–22.

In the 2016 Charter, NASCAR required that the independent contractor teams and their owners agree not to race in or own any stock car racing series not sanctioned by NASCAR,

---

[4] NASCAR documents and testimony show that to host a premier stock car series event, a track typically needs the capacity to host tens of thousands of spectators, the proper racing surface and track length, and broadcasting and safety infrastructure. Dkt. No. 176-12, Kennedy Tr. at 39:9–40:11; Dkt. No. 176-13, Marshall Tr. at 209:2–210:20; Dkt. No. 176-14, Kauffman Tr. at 257:3–24; Dkt. No. 176-15, NASCAR 30(b)(6) (Probst) Tr. at 299:21–300:23.

including for one year after they surrendered Charter rights. Dkt. No. 216-18, FRM_0005822 § 6.6. A 2015 NASCAR presentation described the non-compete as requiring that "[e]ach owner will commit to exclusivity with NASCAR, i.e., each owner agrees that during [the Charter] term, it will not participate in, or fund/aid, any other stock car races/series." Dkt. No. 216-8, NASCAR-00559140 at slide 11. And NASCAR's internal documents confirm that the non-compete in the Charters served as a "Risk Mitigant" against teams forming a competing racing series. Dkt. No. 176-6, NASCAR-00530959 at -997 ("NASCAR is protected from having current team owners, IP, tracks, etc. participate through Charters and Sanctions."); Dkt. No. 176-7, NASCAR-00169214 at -219 (NASCAR's "[i]ntent" that "if [teams] breach" the exclusivity provision, "there are major consequences").

*NASCAR's Next Gen 7 Restrictions.* Plaintiffs will show at trial that, beginning in 2022, NASCAR required teams to invest in so-called "Next Gen" or "Next Gen 7" cars for all Cup Series races and sign contracts prohibiting them from using the cars or their parts in any other racing event. Dkt. No. 265-20, NASCAR-00138127 at slide 5. NASCAR's internal documents confirm that NASCAR implemented the Next Gen 7 exclusivity requirement because, under the prior generations of Cup Series car models, the *teams* owned their cars (and related IP and parts) and could use them in a rival series. *Id.* at slide 2 (highlighting NASCAR's "[l]imited IP protection on Gen 6 vehicle[s]"). Under NASCAR's new Next Gen 7 exclusivity restrictions, the "copycat" vulnerability from a new entrant to compete with the Cup Series was eliminated: teams were prohibited from using Next Gen 7 cars in any racing series apart from the Cup Series—a restriction that applies even if teams do not renew or sell their Charters. Dkt. No. 265-21, Probst Dep. Tr. at 132:14–133:7.

*ARCA Acquisition.* Plaintiffs will establish at trial that, in 2018, NASCAR acquired a nascent competitor stock car series, the Automobile Racing Club of America ("ARCA") with the express purpose of eliminating direct competition between ARCA and NASCAR's regional touring stock car series. Dkt. No. 176-44, NASCAR-00382753 at -756 ("Strategic [r]ecommendation" to acquire ARCA because "ARCA and [NASCAR's regional touring stock car series] are operating in the same bracket of competition . . . which is dilutive to both Series"). Although ARCA operated at a lower tier than the Cup Series, ARCA was the closest competitor capable of being developed into a premier stock car racing series in the future. NASCAR acquired ARCA shortly after it signed a new television rights deal with Fox that gave it a national spotlight, Dkt. No. 231-1, Rascher Rep. ¶¶ 212–19, effectively subsuming a nascent, emerging competitor into NASCAR's monopoly. Although the ARCA acquisition and the ISC acquisition took place prior to the limitations period, it will give the jury context for how NASCAR was able to maintain its monopsony power, which then caused actionable antitrust injury during the limitations period each time the racing teams were required to accept below competitive market prices for their services as racing teams.

### C. Plaintiffs Will Prove Antitrust Injury.

Plaintiffs will prove by a preponderance of evidence that they suffered antitrust injury as a result of Defendants' unlawful monopoly during the limitations period. In order to prove antitrust injury, Plaintiffs must show: "(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Novell, Inc.*, 505 F.3d at 311. Plaintiffs' antitrust injuries flow from NASCAR's anticompetitive maintenance of its monopsony power that it used to impose below competitive market terms on the Cup Series racing teams during the limitations period commencing in November 2020. *See*

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 290 (4th Cir. 2024) ("Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price.") (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979)).

Plaintiffs will introduce the expert testimony of Dr. Snyder to show that they received lower compensation and other below market terms for their participation in the NASCAR Cup Series than they would have received in a competitive market absent Defendants' unlawful monopolization. As a result, they have suffered lost profits damages in addition to damages from a diminution in their enterprise value. *See* Dkt. No. 231-13, Snyder Rep. ¶¶ 255–258.

NASCAR's documents provide strong evidence that the terms NASCAR was imposing on the teams in the charter agreements were dictated by NASCAR's exercise of its monopsony power. Their senior executives described the 2025 charter agreement terms that Jim France was dictating as "completely unreasonable," (Dkt. No. 176-48, NASCAR-00255771 at -772). As NASCAR executive Scot Prime stated: ***"[W]e (NASCAR) have all the leverage and the Teams will almost have to sign whatever Charter terms we put in front of them."*** Dkt. No. 176-45, NASCAR-00465908 at -908 (emphasis added). NASCAR's now-Commissioner Phelps similarly wrote: "[G]ive them the charters[,] pick a date[,] and they can sign or they can lose their charters – it is that simple." Dkt. No. 216-52, NASCAR-00331199 at -199. The evidence at trial will show that is precisely what happened. In a private chat, NASCAR senior executives (Phelps, Prime, and O'Donnell) recognized that the Charter terms NASCAR were demanding had "zero wins for the teams," with O'Donnell describing NASCAR's position as "fuck the teams," reflecting a

NASCAR "dictatorship" that would limit NASCAR to a "redneck, southern, tiny sport." Dkt. No. 215-3, NASCAR-00469213 at -213.

The trial evidence will further show that on September 6, 2024, after business hours on a Friday evening, Defendants gave the teams seven hours to accept their final offer or lose their Charter rights altogether. Dkt. No. 176-23, Phelps Tr. at 229:20–230:22. There were no changes in the core economic terms of the deal between the May "zero wins for the teams" terms and the take-it-or-leave-it 2025 Charter offered in September. *See* Dkt. No. 231-1, Rascher Rep. ¶¶ 143–45.

The evidence will also show that the terms of the 2016 Charter imposed on the teams during the 2021-2024 period were substantially below those that would have been provided in a competitive market. *Id.* ¶¶ 268–300; Dkt. No. 231-13, Snyder Rep. ¶¶ 177–81. The teams who accepted NASCAR's take-it-or-leave-it offer on September 6, 2024, on average, had lost money every single year since 2021, and 75% of the teams lost money in 2024. *See* Dkt. No. 176-49, 2020-24 Team Financial Information. But they concluded they had to accept the 2025 Charter Agreement terms demanded by NASCAR—with no wins for the teams—because the alternative was to lose their charters and go out of business. *See* Dkt. No. 176-13, Marshall Tr. at 234:14–235:25 ("[T]he teams had to accept the terms that [we]re being proposed" as "there are no substitutes for stock car racing . . . at the top level in North America or in the world.").

D. **Plaintiffs Will Prove Damages**

Plaintiffs will prove by a preponderance of evidence at trial that they are entitled to damages as a result of Defendants' unlawful monopolization. Plaintiffs will present the expert testimony of Dr. Edward Snyder to support a finding that 23XI incurred ***at least*** $205 million in damages and Front Row incurred at least $139.5 million in damages during the statutory period between 2021 to 2024, including diminution in value and lost profits damages. *See* Dkt. No. 231-13, Snyder Rep. ¶¶ 255–258. Dr. Snyder will also present evidence that 23XI incurred at least

$14.9 million and Front Row incurred at least $9.5 million in additional damages in 2025. *See* Dkt. No. 243-3, Snyder Reply Rep. ¶¶ 111–116.

## II. Plaintiffs Will Also Prove Their Section 1 Claim.

To prove their Section 1 claim, Plaintiffs must show that NASCAR (1) had market power in a relevant market; (2) entered into one or more agreements that unreasonably restrained trade in that market; and that the agreements (3) had anticompetitive effects and caused Plaintiffs antitrust injury. *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002).

***Prima Facie Case.*** Plaintiffs will establish by a preponderance of evidence at trial each of the elements of their Section 1 claim challenging NASCAR's post-October 2020, written exclusivity provisions contained in their sanction agreements with the tracks, *see supra* pp. 6–9, and Next Gen 7 car agreements, *see, e.g.*, Dkt. No. 265-19, NASCAR-00478243 at -243; Dkt. No. 265-20, NASCAR-00138127 at slide 5.

Since the evidence shows that NASCAR has monopoly power in a relevant input market, this means that Plaintiffs will also establish that NASCAR has market power, as required under Section 1, as proving market power is a lesser showing than proving monopoly power. *Eastman Kodak*, 504 U.S. at 481 ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

Plaintiffs will establish by a preponderance of the evidence that NASCAR's written restrictions were designed to—and did—foreclose competition from a potential rival series to maintain NASCAR's monopoly, which is also an unreasonable restraint of trade in violation of Section 1. *See supra* pp. 6–9, *Costar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1082 (9th Cir. 2025) ("Using exclusive deals" to maintain a monopoly "is a 'contract . . . in restraint of trade' that violates § 1 of the Sherman Act."). And, for the same reasons discussed with respect to Plaintiffs' Section 2 claim, NASCAR's use of these restrictive agreements to maintain its

14

monopsony injured Plaintiffs, who have received below competitive market prices for their services as premier stock car racing teams. *See supra* pp. 11–13. Plaintiffs will show at trial that the track and Next Gen 7 exclusivity restrictions were designed to and did raise the barriers to entry for a rival series to compete against NASCAR and that, in turn, helped NASCAR to maintain its monopsony and pay Plaintiffs below competitive market rates for their services. *See supra* pp. 6–10.

***Rule of reason balancing***. The rule of reason analysis requires a three-step burden-shifting framework. "[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect. Should the plaintiff carry that burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *NCAA v. Alston*, 594 U.S. 69, 96–97 (2021).

NASCAR will not be able to present any legitimate procompetitive justifications showing that the track and Next Gen agreements were justified. And Plaintiffs will show at trial that NASCAR's proffered procompetitive justifications are pretextual based on NASCAR's own internal documents showing the track and Next Gen restrictions were enacted to prevent competition, not for any reasons articulated by NASCAR's experts after the fact. *See supra* pp. 6–10; *U.S. v. Google LLC*, 778 F. Supp. 3d 797, 868 (E.D. Va. 2025) (pretextual justifications are "not valid" and looking to the "contemporaneous statements contained in the company's internal record" to determine whether the proffered justifications were pretextual).[5]

---

[5] *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) (finding justifications pretextual based on the defendant's internal communications); *Gov't Emps. Health*

Even if a jury finds that Defendants do prove a legitimate procompetitive justification, Plaintiffs will demonstrate that there are obvious less restrictive alternatives. For example, with respect to the track restrictions, NASCAR could have only prohibited competing events that copy the "look and feel" of NASCAR—the purported harm identified by Dr. Murphy (Dkt. No. 240-2, Murphy Rep. ¶¶ 80, 84)—instead of blocking all stock car racing events or all "automobile motorsports racing events"; they also could have reduced the duration of the multi-year track exclusivity restrictions, such as those which NASCAR imposed on SM through 2026 with the express purpose of blocking competitive entry. *See supra* p. 6–7. Similarly, with respect to the Next Gen 7 car exclusivity restrictions, NASCAR could have achieved any alleged cost saving and competitive parity benefits without prohibiting teams from using their cars and their parts in a competitor series, as was the status quo up until 2022 under the Gen 6 program. *See* Dkt. No. 240-3, Rascher Reply Rep. ¶ 243.

And even if the jury does not find a less restrictive alternative, Plaintiffs will still be able to prove that NASCAR violated Section 1 because the harm to competition substantially outweighed any procompetitive benefits in the input market. *Google*, 778 F. Supp. 3d at 868 ("[C]ourts frequently balance the restriction's anticompetitive harms against its procompetitive benefits.") (cleaned up) (collecting cases).

Finally, Plaintiffs will prove by a preponderance of evidence at trial that they are entitled to damages as a result of Defendants' unreasonable restraint of trade, which enabled NASCAR to use its monopsony power to impose below competitive market terms on Plaintiffs. *See supra* pp. 13–14.

---

*Ass'n v. Actelion Pharms. Ltd.*, No. CV GLR-18-3560, 2024 WL 4123511, at *5 (D. Md. Sept. 6, 2024) (same).

**III.    Defendants' Section 1 Claim Will Fail.**

As Plaintiffs established in their motion for summary judgment (Dkt. No. 216), Defendants' counterclaim lacks merit and should be dismissed as a matter of law. But should the claim survive, Defendants will fail to prove any of the required elements of this claim at trial.

In order for Defendants to prove their counterclaim, they must establish by a preponderance of evidence, among other things, that the Counterclaim Defendants and the other chartered racing teams conspired to unreasonably restrain trade and that the conspiracy harmed competition and caused antitrust injury to NASCAR. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202–03 (4th Cir. 2002). As the Court has already determined, the rule-of-reason standard governs Defendants' counterclaim because "here . . . joint negotiation by all or some of the chartered Teams with NASCAR, the sole owner of the Cup Series (as well as most of the racing tracks), is not inherently 'pernicious,' lacking 'any redeeming virtue,' or 'always or almost always tend[ing] to restrict competition.'" Dkt. No. 162 at 7.

Therefore, Defendants must prove that the Cup Series racing teams: (1) had market power in a relevant market; (2) entered into an agreement that unreasonably restrained trade in that market; and (3) that the agreement had anticompetitive effects and caused Plaintiffs antitrust injury. *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002).

The evidence at trial will demonstrate that NASCAR cannot prove that the joint negotiations or other concerted behavior alleged by NASCAR caused any anticompetitive effect in a relevant market. Nor will NASCAR be able to prove that it suffered any antitrust injury from the teams' joint negotiations. Rather, the trial evidence will show that:

- Defendants voluntarily engaged in joint negotiations with the teams, dating back to 2015, without any agreement restricting or making individual negotiations unavailable. Dkt. No. 216-14, Marshall Tr. 219:21–24 (Q: "Did individual meetings between team owners and

NASCAR executives or Mr. France over the charter terms, in fact, occur?" A: "Yes."); Dkt. No. 216-29, Phelps Tr. 40:11–19 (Q: "And NASCAR agreed that it would proceed [to negotiate with the TNC]; correct?" A: "We did proceed." Q: "Right. You didn't – you never said, we don't want to proceed in that way; correct?" A: "Not that I'm aware of."); Dkt. No. 216-25, 23XI_0011095, at -098 (Charter negotiation timeline in letter from Phelps specifying numerous instances of individual negotiations, including "Mid-April 2024 to late May 2024 – Individual Team Meetings").

- NASCAR cannot establish that the chartered racing teams have market power in the relevant input market. NASCAR's expert Dr. Hubbard admitted that there were at least 150 other teams licensed to race in Cup Series events, Dkt. No. 216-1, Hubbard Rep. ¶ 20, and he did no analysis to determine market shares or other accepted measure of market power, *see* Dkt. No. 255-2, Rascher Rebuttal Rep. ¶¶ 45–79. The documentary evidence proves that it was NASCAR, not the teams, that had the power to obtain the terms that it wanted in the 2025 Charter Agreement. *See supra* pp. 4–6.

- Defendants successfully negotiated a record-breaking media deal amidst the Charter negotiations and NASCAR's media expert has not offered any expert testimony claiming that the deal would have been any better in the absence of the claimed concerted behavior by the racing teams. *See* Dkt. No. 216-81, Herbst Tr. 150:24–151:4 (noting that NASCAR's new media rights deal announced in November 2023 "is higher from an [average annual value] perspective than prior deals . . . the actual raw dollars, gross dollars are higher than prior deals").

- The teams did not, in fact, "boycott" NASCAR races, exhibitions, or the Netflix series. *See* Dkt. No. 216-14, Marshall Tr. at 217:8–9 ("The teams never seriously considered

boycotting a race."); Dkt. No. 216-30, France Tr. at 245:18–21 (Q: "Do you recall any boycott of any race that you know – that you knew of?" A: "I'm not aware of . . . any team boycotting that I know of."); Ex. 4, 23XI_0171107 at -112–13 (April 4, 2023 RTA Board and Member Meeting Minutes, noting, "[i]t was [the RTA Chairman's] understanding that the group would request a discussion at the [Team Owner Council (TOC)] meeting or shortly thereafter with the key principals. If that meeting is rejected by a certain time today, then Teams will decide whether they wish to attend tomorrow's [TOC] meeting – noting that the decision is left to each Team as to what they would like to do."); Dkt. No. 216-29, Phelps Tr. 150:19–22.

- 13 of 15 Cup Series teams acquiesced to NASCAR Charter terms that—in NASCAR's words—had "zero wins for the teams" (*supra* pp. 12–13)—the very opposite of NASCAR suffering antitrust injury. *See* Dkt. No. 216-14, Marshall Tr. 234:11–235:25; Ex. 5, Polk (Vol. 2) Tr. at 60:10–18 ("When I negotiated with NASCAR on behalf of 23XI, it had nothing to do with anything about unanimity with the teams. At the end of the day, I tried to advance what I wanted in the Charter Agreement for 23XI, as it got closer to September 6th, and I was continuously rebuffed and was not able to get to a point in a charter agreement that 23XI was comfortable signing.").

- As the Court observed in its motion to dismiss order, "NASCAR and each Charter holder needed to reach the same agreement in all the Charters on many issues, whether or not NASCAR negotiated the Charters individually or collectively," meaning that joint negotiations "would (or at least could) be ***more efficient and procompetitive***." Dkt. No. 162 at 8 (emphasis added). The evidence will show that the joint negotiations generated significant efficiencies, and NASCAR's experts do not dispute this. *See* Dkt. No. 255-2,

19

Rascher Rebuttal Rep. ¶¶ 9(d), 145; Dkt. No. 255-1, Add'l Hubbard Tr. 36:10–13, 37:10–17.

If the Court does not grant summary judgment against the Counterclaim, NASCAR will not be able to prove any of the elements of its claim at trial.

## ISSUES TO BE TRIED

### I. Plaintiffs' Section 2 Monopolization Claim

- Whether NASCAR possesses monopsony power in a relevant United States input market for premier stock car racing teams.

- Whether Defendants willfully engaged in at least one exclusionary act during the limitations period (beginning on October 2, 2020) to unlawfully maintain their monopsony power.

- Whether Defendants' exclusionary acts, considered in the aggregate, had an anticompetitive effect in maintaining NASCAR's monopsony power in the input market for premier stock car racing teams.

- Whether Plaintiffs suffered antitrust injury as a result of Defendants' unlawful monopolization imposing below competitive market terms for the purchase of Plaintiffs' services as premier stock car racing teams.

- What amount of damages Plaintiffs are entitled to recover as a result of Defendants' unlawful monopolization.

### II. Plaintiffs' Section 1 Claim

- Whether Plaintiffs have proven that NASCAR has market power in a relevant United States input market for premier stock car racing teams.

- Whether Plaintiffs have proven that Defendants entered into agreements in restraint of trade that had a substantial anticompetitive effect by foreclosing competitive entry into a relevant input market for premier stock car racing teams.

- Whether Defendants have proven any procompetitive justifications for their challenged conduct in the relevant input market.

- If Defendants have proven any procompetitive justifications in the relevant input market, whether Plaintiffs have proven that any procompetitive justifications proven by Defendants can be reasonably achieved through less restrictive means.

- If Plaintiffs do not prevail at the earlier steps of the rule of reason analysis, whether Plaintiffs have proven that the anticompetitive effects of Defendants' agreements in restraint of trade substantially outweigh any procompetitive justifications proven by Defendants.

- Whether Defendants' agreements in unreasonable restraint of trade inflicted antitrust injury on Plaintiffs.

- What amount of damages Plaintiffs are entitled to recover as a result of Defendants' Section 1 violation.

### III. NASCAR's Section 1 Claim

- Whether NASCAR has proven any restraint of trade through the joint negotiations by the chartered racing teams in the absence of any restriction on individual negotiations.

- Whether NASCAR has proven that 23XI, Front Row and the other chartered racing teams for the Cup Series had market power in the relevant input market.

- Whether NASCAR has proven that Counterclaim-Defendants entered into a conspiracy with the other racing teams that had a substantial anticompetitive effect in the relevant market.

- Whether the Counterclaim-Defendants have proven any procompetitive justification for their challenged conduct in the relevant input market.

- If Counterclaim-Defendants have proven a procompetitive justification for the challenged conduct in the relevant market, whether NASCAR has proven that any procompetitive justifications established by Counterclaim-Defendants can be reasonably achieved through less restrictive means.

- If NASCAR does not prevail at an earlier stage of the rule of reason analysis, whether NASCAR has proven that the anticompetitive effects of Counterclaim-Defendants' restraint of trade substantially outweighs any procompetitive justifications proven by Counterclaim-Defendants.

- Whether Counterclaim-Defendants' agreement in unreasonable restraint of trade caused antitrust injury to NASCAR.

- If NASCAR proves its claim, what amount of damages NASCAR is entitled to recover as a result of. Counterclaim-Defendants' Section 1 violation.

## QUESTIONS OF LAW[6]

The parties have presented a number of questions of law to be resolved by the Court in formulating its instructions to the jury. Plaintiffs refer the Court to that submission (Dkt. No. 299)

---

[6] Plaintiffs have moved for partial summary judgment on market definition and market power (Dkt. No. 230) and summary judgment on Defendants' counterclaim (Dkt. No. 216), requesting this Court to resolve these issues prior to trial as a matter of law. Defendants have also filed a motion for summary judgment, which presents a number of questions of law. Dkt. No. 235.

for a description of these questions of law.

Another question of law to be determined is whether Defendants' arguments that benefits to NASCAR in the output market, which NASCAR claims benefit the Cup Series teams, and arguments that premier stock car racing teams are better off with NASCAR facing no competition, are permissible procompetitive justifications. Plaintiffs filed a motion in limine requesting that this Court exclude these legally improper arguments. *See infra* p. 24.

If the jury finds Defendants liable for violating the Sherman Act, the Court must determine the appropriate equitable remedies for Defendants' antitrust violations. As this Court has already noted, it will have broad remedial powers to restore competition to the market for premier stock car racing teams. Dkt. No. 208 at 3 n.3 ("Where a defendant has been found to violate federal antitrust laws, the available injunctive relief is broad, including to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.") (internal quotations omitted)). Courts regularly order a defendant to deal with parties harmed by anticompetitive conduct following a finding of Section 2 liability. *E.g.*, *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 948 (9th Cir. 2025) ("[A]fter establishing liability, the district court ha[s] within its basket of remedial powers the authority to require [defendant] to deal with parties harmed by its anticompetitive conduct.").[7]

---

[7] *See also, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (affirming injunction ordering defendant "to supply [plaintiff] on non-discriminatory terms" to "remedy[] the harm to [plaintiff] caused by [defendant's] attempted monopolization"); *Int'l Boxing Club of N.Y. v. United States*, 358 U.S 242, 261–62 (1959) (similar); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 485–86 (7th Cir. 1980) (similar); *Great W. Directories, Inc. v. Sw. Bell Tel. Co.*, 63 F.3d 1378, 1390–91 (5th Cir. 1995) (similar).

## ANTICIPATED EVIDENTIARY ISSUES

Plaintiffs have raised the following evidentiary issues in advance of trial.

## I.     Motions to Exclude Expert Testimony

Plaintiffs filed five motions to exclude expert testimony proposed by Defendants. Plaintiffs moved to exclude the testimony of Defendants' experts: Mr. John L. Hansen (Dkt. No. 217), Mr. Edwin S. Desser (Dkt. No. 219), Dr. Thomas N. Hubbard (Dkt. No. 221), and Mr. Paul K. Meyer (Dkt. No. 233), and Plaintiffs filed a motion to exclude the "expert" testimony of NASCAR executive Steve O'Donnell which has not been properly disclosed (Dkt. No. 232). Defendants have also filed various motions to exclude the testimony of three of Plaintiffs' experts: Mr. Timothy Frost (Dkt. No. 237), Dr. Daniel A. Rascher (Dkt. No. 237), and Dr. Edward Snyder (Dkt. No. 239 ).

## II.     Motions in Limine

Plaintiffs concurrently filed ten motions in limine ("MIL") related to evidentiary issues that may arise at trial:

- **MIL 1**: Improper legal arguments that Plaintiffs anticipate Defendants may offer at trial regarding cross-market balancing in the rule of reason analysis and arguments that premier stock car racing teams are better off without competition.

- **MIL 2**: Irrelevant and inflammatory evidence that Plaintiffs anticipate Defendants will offer at trial regarding (i) Plaintiffs' owners' financial condition and net worth; (ii) Plaintiffs' access to outside capital; (iii) the SEC's decade-old investigation and settlement with SFX; (iv) arguments calling into question the accuracy of 23XI's financial statements; and (v) references to Front Row's hypothetical charitable donations.

- **MIL 3**: Inflammatory documents, including such documents shown documents shown at the August 2025 preliminary-injunction hearing.

- **MIL 4**: Irrelevant and untimely historical evidence regarding NASCAR.

- **MIL 5**: Misleading references characterizing NASCAR Cup Series charters as being handed out for "free" from NASCAR to teams.

- **MIL 6**: Argument that Plaintiffs did not allege or adduce proof that Charters were below market rate.

- **MIL 7**: Ad hominem attacks on Plaintiffs and counsel, including references to counsel's prior cases and counsel's prior representations of sports organizations or participants and the subjects discussed in NASCAR's sanctions motion (Dkt. No. 192).

- **MIL 8**: References by Defendants to equitable remedies and treble damages.

- **MIL 9**: Arguments that evidence was inappropriately deleted or inappropriately withheld as privileged by Plaintiffs.

- **MIL 10**: Arguments that Plaintiffs' decision to purchase charters offers Defendants a legal defense to their antitrust violation.

NASCAR is also filing various motions in limine which will present evidentiary issues for the Court to resolve prior to trial.

Dated: October 27, 2025

Respectfully submitted,

WINSTON & STRAWN LLP

By:  /s/ Jeffrey L. Kessler
     Jeffrey L. Kessler (*pro hac vice*)
     Neha Vyas (*pro hac vice*)
     **WINSTON & STRAWN LLP**
     200 Park Avenue
     New York, NY 10166
     Tel: (212) 294-6700
     Fax: (212) 294-4700
     jkessler@winston.com
     nvyas@winston.com

     E. Danielle T. Williams (N.C. Bar No. 23283)
     **WINSTON & STRAWN LLP**
     300 South Tryon Street
     16th Floor
     Charlotte, NC 28202
     Tel: (704) 350-7700
     Fax: (704) 350-7800
     dwilliams@winston.com

     Jeanifer E. Parsigian (*pro hac vice*)
     Michael Toomey (*pro hac vice*)
     **WINSTON & STRAWN LLP**
     101 California Street
     San Francisco, CA 94111
     Tel: (415) 591-1000
     Fax: (415) 591-1400
     jparsigian@winston.com
     mtoomey@winston.com

     Matthew R. DalSanto (*pro hac vice*)
     **WINSTON & STRAWN LLP**
     35 W. Wacker Drive
     Chicago, IL 60601
     Tel: (312) 558-5600
     Fax: (312) 558-5700
     mdalsanto@winston.com

     Josh Hafenbrack (*pro hac vice*)
     Benjamin L. Rudofsky (*pro hac vice*)
     **WINSTON & STRAWN LLP**
     1901 L Street NW

26

Washington, DC 20036
Tel: (202) 282-5000
Fax: (202) 282-5100
jhafenbrack@winston.com
brudofsky@winston.com

Benjamin S. Gordon (*pro hac vice*)
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
bgordon@winston.com

*Counsel for Plaintiffs and Counterclaim
Defendants 2311 Racing LLC d/b/a 23XI
Racing and Front Row Motorsports, Inc. and
Counterclaim Defendant Curtis Polk*

Eric S. Hochstadt (*pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE
LLP**
51 W. 52nd Street
New York, NY 10019
Tel: (212) 506-5282
ehochstadt@orrick.com

*Counsel for Counterclaim Defendant Curtis
Polk*

## <u>CERTIFICATE OF COMPLIANCE</u>

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By:     /s/ Jeffrey L. Kessler

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

*Counsel for Plaintiffs and Counter-Defendants 2311 Racing LLC d/b/a 23XI Racing and Front Row Motorsports, Inc. and Counter-Defendant Curtis Polk*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFFS AND COUNTER-DEFENDANTS 2311 RACING LLC AND FRONT ROW MOTORSPORTS, INC. AND COUNTER-DEFENDANT CURTIS POLK'S TRIAL BRIEF** was electronically filed using the Court's CM/ECF system, and the sealed filings were served by email on the following counsel of record, including:

Tricia Wilson Magee
**SHUMAKER LOOP & KENDRICK, LLP**
101 S. Tryon St., Suite 2200
Charlotte, NC 28280
tmagee@shumaker.com

Christopher S. Yates
Ashley M. Bauer
Natalie W. Kaliss
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
chris.yates@lw.com
ashley.bauer@lw.com
natalie.kaliss@lw.com

Robert B. McNary
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
rob.mcnary@lw.com

Lawrence E. Buterman
Shayan Ahmad
Quinlan Cummings
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com
shayan.ahmad@lw.com
quinlan.cummings@lw.com

Anna M. Rathbun
Christina R. Gay
David L. Johnson
Christopher J. Brown
Margaret E. Cohen
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
anna.rathbun@lw.com
christina.gay@lw.com
david.johnson@lw.com
chris.brown@lw.com
margaret.cohen@lw.com

*Counsel for Defendants and Counterclaim Plaintiff*

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler