IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00886-KDB-SCR

| | |
|---|---|
| 2311 RACING LLC AND FRONT ROW MOTORSPORTS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, ET AL.,<br><br>Defendants. | **MEMORANDUM AND ORDER** |

    The basic facts of this matter are now familiar. Plaintiffs are two teams that participate in defendant NASCAR's Cup Series, stock car racing's highest level series. While a few spots are left in each race for unchartered "open" teams, since 2016 all viable NASCAR Cup Series race teams (the "Teams") have operated under identical, limited duration Charters granted by NASCAR that guarantee entry into each race, a portion of NASCAR's media revenue and other benefits in consideration for various Team obligations (including the core requirement to race so NASCAR can field its events with high quality race teams). The Teams' 2016 Charters were set to expire at the end of 2024. Beginning in 2022, the Teams and NASCAR voluntarily engaged in both joint and individual Team negotiations towards a new 2025 Charter, as they had done in drafting the initial Charters. Ultimately, 13 of the 15 Teams signed NASCAR's final proposed 2025 Charter.

    Plaintiffs did not agree to sign the 2025 Charter and sued NASCAR, James France (NASCAR's Chairman), and the other Defendants (collectively, "NASCAR"), alleging that they unlawfully monopolized premier stock car racing in violation of the Sherman Act, 15 U.S.C. §§ 1,

1

2. NASCAR answered, denied liability, and moved to dismiss the Complaint. It also opposed Plaintiffs' request for a Preliminary Injunction to continue racing, describing the 2025 Charters, in part, as "undeniably fair" and extolling the virtues of its partnership with the Teams to "grow the sport" through the Charters. No counterclaim was asserted.

After the Court partially granted the Plaintiffs' requested Preliminary Injunction and the litigation continued, Defendants filed an Amended Answer and NASCAR filed a Counterclaim and then an Amended Counterclaim.[1] Doc. Nos. 111, 136. The Counterclaim asserts that rather than the 2025 Charters being "fair and balanced,"[2] NASCAR is the alleged victim of an "illegal cartel" made up of all the Cup Series racing teams,[3] who collectively forced NASCAR to pay too much to the Teams through unlawful "joint negotiations." On June 23, 2025, the Court denied Plaintiffs' Motion to Dismiss the Counterclaim, allowing it to proceed through full discovery. Doc. No. 162.

Now before the Court is the Counterclaim Defendants' Motion for Summary Judgment on the Amended Counterclaim, Doc. No. 215. For the reasons discussed briefly here and more fully below, the Court will **GRANT** the motion and dismiss the Counterclaim.

---

[1] Plaintiffs describe the Counterclaim as "retaliatory." While that could be true (it is a common litigation tactic to file a counterclaim in the belief that "the best defense is a good offense"), the Court need not and does not consider NASCAR's "motives" in filing its Counterclaims. Rather, what is before the Court is only whether the Counterclaim survives Plaintiffs' Summary Judgment motion under the applicable legal standards.

[2] This is how NASCAR described the 2025 Charters prior to the lawsuit. On September 11, 2024, after the Charter agreement had been finalized and negotiations concluded, NASCAR wrote to Michael Jordan and Denny Hamlin, saying "We firmly believe that we have come to a document that is fair and balanced based on the interest of all the stakeholders in the industry." Doc. No. 216-25 at 3.

[3] NASCAR only sued the Counterclaim Defendants (Plaintiffs and Curtis Polk) for their roles in the alleged "cartel." The remaining Teams who agreed to NASCAR's final 2025 Charter offer, which contained mutual releases, were not sued.

First, NASCAR has failed to establish an agreement to unreasonably restrain trade, which is necessary to establish liability under Section 1 of the Sherman Act. 15 U.S.C. § 1. As the Court explained in its earlier Order, Doc. No. 162 at 5-9, and confirms here after considering the full record, joint selling (or buying) efforts are not always *per se* antitrust violations. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("BMI") (holding that "not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints").[4] And under *BMI* and the applicable Rule of Reason analysis, the fact that individual negotiations with Teams were more than "realistically available" dooms NASCAR's claim. *See Matsushita Elec. Indust. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 376 (D. Del. 2004) (granting Summary Judgment against Sherman Act claims related to DVD licensing negotiations, explaining, "[T]he opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available."). The evidence here establishes that not only were individual negotiations "available" but NASCAR had such negotiations regularly during the negotiation period. And, those individual negotiations achieved concrete results, including the final 2025 Charter agreement that was signed by 13 teams acting individually (and contrary to the supposed "joint agreement"). Based on these undisputed facts, the Counterclaim Defendants did not engage in an unreasonable restraint of trade.

Second, and independently, NASCAR has failed to sufficiently establish that it suffered the required "antitrust injury" as a result of the allegedly unlawful "joint negotiations" and other

---

[4] Further, allowing "joint negotiations" (with a continuing opportunity for individual negotiations as occurred here) could well be said to *enhance* competition between buyers and sellers where the counterparty NASCAR is the only buyer in the alleged relevant market (defined by NASCAR in the Amended Counterclaim as the "market for entry of cars into NASCAR Cup Series races …") and thus has significant power over any single race team.

3

conduct. It has long and often been said that the Sherman Act was "enacted for 'the protection of competition, not competitors.'" *Atlantic Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 338, (1990) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *United States v. Google LLC*, No. 1:23-CV-108, 2025 WL 1132012, at *18 (E.D. Va. Apr. 17, 2025). NASCAR's allegation that it paid too much to the Teams in the 2025 Charters is not itself an injury to competition; rather, it is only a private economic loss to NASCAR.

More directly, NASCAR's expert economist, Dr. Hubbard, testified that he saw no evidence that the Teams' collective actions caused NASCAR to increase its Charter payments. Doc. No. 255-1 at 108:15–21 (Q. "Have you seen any evidence that the concerted behavior engaged in by the teams after October of 2022 caused NASCAR to increase the amount of money it was willing to pay the teams from what it was willing to offer in October of 2022?" . . . A. "No.");[5] *see also* Doc. No. 255-3 at 76:3–10 (NASCAR damages expert Hansen testifying he is not offering any opinions on harm to competition or what conduct would not have occurred in a competitive market). Simply put, if the supposed increased payments did not harm competition, they could not cause any antitrust injury to NASCAR. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977). Therefore, Summary Judgment is also required because of the absence of proof of an "antitrust injury."

---

[5] Dr. Hubbard did offer an opinion that the Charter system has reduced the number of entrants on the track. Doc. No. 216-1 at ¶¶ 47–51. However, how the Charter system itself affects competition is a different question than whether the "joint negotiations" harmed competition. Indeed, NASCAR has repeatedly argued that the Charter system is good for the sport and not anticompetitive. *See, e.g.,* Doc. No. 206, Aug. 28 PI Hr'g Tr. 27:13–14; 28:21–22 (Mr. Yates: "We think the charter system is good. We think it's good for all teams. . . . I don't believe the charter system harms competition.").

4

## I. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land*, 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely

5

disputed by, inter alia, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (citation modified). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.     FACTS AND PROCEDURAL HISTORY

The Court has fully described the background of this antitrust dispute in several earlier orders. *See, e.g.*, Doc. Nos. 74, 162. Plaintiffs have sued NASCAR alleging that they have unlawfully monopolized premier stock car racing in violation of the Sherman Act, 15 U.S.C. §§ 1, 2. *See* Doc. No. 74 at 5-8. Again, most relevant here, in 2016, NASCAR implemented a Charter Agreement system that defines the relationship between NASCAR and the Teams which typically

field 36 of the 40 spots in each Cup Series race.[6] Plaintiffs acquired their 2016 Charters in 2016 (Front Row Motorsports) and 2020-21 (2311 Racing).

Well in advance of the expiration of the 2016 Charters on December 31, 2024, NASCAR began negotiations towards a 2025 Charter Agreement with the 15 teams that collectively held NASCAR's Charters. NASCAR negotiated with the Teams individually and together (through a Team Negotiating Committee ("TNC")). [7, 8] *See* Doc. No. 58 (Answer) at ¶¶ 17 ("Defendants further admit that NASCAR negotiated with the teams collectively and with individual teams, but denies that it ceased negotiating with the teams collectively."), 107 ("Defendants … admit that NASCAR engaged in individual negotiations with certain teams to address their individual requests regarding the 2025 Charter Agreements while still negotiating with the teams negotiating collectively."). NASCAR agreed to negotiate with the TNC as it had done with the RTA in 2016. Doc. No. 216-29 (Phelps Tr. 40:3–19 (Q: "[Y]ou never said, we don't want to proceed that way; correct?" A: "Not that I am aware of."); Doc. No. 216-31 at 409 ("Obviously, the Teams[] would like us to go thru their group of 4 – which I think we should do initially, but then pivot and get to

---

[6] In addition to "chartered cars," NASCAR races may include a few "open" cars, which are required to qualify for each race separately. Because of the cost of racing in the Cup Series and the uncertainty for teams, drivers and sponsors in not having a guaranteed spot for each race, no non-chartered team has consistently participated as a "open" team since the Charter system was put in place in 2016.

[7] Both "joint" negotiations through the RTA (the Teams' trade group) and with individual teams were used to reach an agreement on Charter terms that applied to all Teams during the 2016 Charter negotiations. Doc. Nos. 216-1 at ¶ 24; 216-11 (NASCAR Expert Rep. of John L. Hansen) at ¶ 22.

[8] In early 2022, the teams nominated a group of team executives to negotiate with NASCAR, known as the TNC. Doc. No. 216-26 (Polk Deposition) at 29:13–19. The TNC consisted of four team representatives: (1) Dave Alpern (President of Joe Gibbs Racing); (2) Marshall Carlson (President of Hendrick Motorsports); (3) Steve Newmark (President of Roush Fenway Keselowski Racing); and (4) Curtis Polk, one of the owners of 23XI. Doc. No. 216-27 at 489. At NASCAR's request, Jeff Gordon (Executive Vice Chairman of Hendrick Motorsports) replaced Mr. Carlson as a TNC member. Doc. No. 216-28 at 243:24 to 247:10..

7

influential owners like Rick Hendrick(s).") [9] In turn, the Teams told NASCAR that individual negotiations could continue, writing in a September 2022 letter that, "[i]t is understood that NASCAR and the individual Race Teams remain free to continue bilateral or multilateral discussions in the customary and normal course of business." Doc. No. 216-27 at 489–90.

According to NASCAR, the first joint Charter negotiation session was held in Talladega on October 2, 2002, with "Individual Team meetings at race shops" occurring immediately thereafter during October 2022. *See* Doc. No. 216-25 (Pre-litigation, NASCAR prepared "Charter Negotiation Timeline") at 4. The Charters were extensively negotiated during the ensuing two years, and NASCAR held meetings with the TNC and with individual teams throughout the negotiations.[10] Doc. No. 216-25 at 4-7 (noting numerous "joint" negotiating sessions and "one on one" and individual team meetings in October 2022, May/June 2023, July 2023, February 2024 and April/May 2024 as well as numerous communications sent to Teams individually); Doc. No. 216 at 12-13 (describing numerous individual team negotiations). NASCAR requested meetings with the TNC to present NASCAR's counterproposals and invited the TNC to present the Teams' counterproposals. Doc. No. 216-34 at 786 (April 17, 2023, talking points prepared for individual team meetings includes note that NASCAR "invited the TNC to make a proposal" and "[t]he ball is in [the TNC's] court"); Doc. No. 216-35 at 975 (NASCAR executives met with TNC members "at NASCAR's request" and "presented NASCAR's 'counter-proposal' to the TNC's/Teams' last proposal").

---

[9] However, as discussed below, the Parties agree that NASCAR's voluntary participation in joint negotiations is not, standing alone, dispositive of its claims – the realistic availability of individual negotiations is also required.
[10] NASCAR also agreed to negotiate directly with the law firm of Covington & Burling, which was jointly representing all teams through the RTA. Doc. No. 216-25 at 6-7; Doc. No. 216-37 at 355.

8

NASCAR and the Teams thus pursued their own agendas, individually and collectively. For example, NASCAR's negotiation timeline notes that on May 10, 2024, it received a "Letter from 3-4 teams with their concept/feedback from the [recent] meeting" but "(23XI said they did not support and would be sending their own comment with TNC.)" *Id*. at 6. Similarly, "June 11, 2024: email to teams acknowledging the request from some teams to extend the window to provide feedback …, so provided that extension to all teams." *Id*. Both the TNC and individual negotiations contributed to the final language of the 2025 Charters. While NASCAR has suggested in argument that the individual negotiations were "meaningless," that assertion is not supported in the record. To the contrary, NASCAR described at oral argument how one particular team had requested a provision that became part of the 2025 Charters (for all teams). Doc. No. 293 at 29-31. And most significantly, all but two of the teams individually agreed to the terms of the 2025 Charters, even though the terms fell well short of the TNC "joint" negotiating position.[11]

The negotiations ended on Friday September 6, 2024, when NASCAR told the Teams in the late afternoon to either sign its final proposal for the 2025 Charters by midnight that same day or lose their Charters. 13 of the 15 teams signed 2025 Charter Agreements later that evening. The 32 signed Charters were identical - the same terms applied to all Teams, even though they vary significantly in size, resources and number of Charters held.

---

[11] NASCAR offered that its Chairman and CEO Jim France would at trial testify as to all his individual meetings with Teams, including that he "went to individual owners and he said, 'what do you need to sign the deal?'" Doc. No. 293 at 29-30. Putting aside that Mr. France's offer of future testimony confirms that NASCAR was able to have individual negotiations with the Teams which led to nearly all the Teams signing NASCAR's final proposed Charter, the Court cannot consider testimony that is not already before the Court at Summary Judgment. With respect to record evidence, NASCAR has failed to present any evidence that any of the Teams that signed the 2025 Charters refused to meaningfully negotiate as an individual team.

9

Plaintiffs – the two racing teams that did not sign a 2025 Charter Agreement – filed this action on October 2, 2024, seeking damages, injunctive relief (such as requiring NASCAR to divest some of the racing tracks that it owns) and a Preliminary Injunction to be allowed to race under the terms of the 2025 Charters. NASCAR opposed the Preliminary Injunction, arguing in part that the terms of the 2025 Charters reflected a fair and beneficial deal for all concerned. *See* Doc. No. 89 at 9. NASCAR also filed an Answer and Motions to Dismiss the Complaint on December 2, 2024. Doc. Nos. 56-58. No Counterclaim was asserted. On December 18, 2024, the Court entered a Preliminary Injunction, allowing the Plaintiffs to race under the terms of the 2025 Charters.[12] Doc. No. 74. NASCAR's Motions to Dismiss were denied by the Court on January 10, 2025. Doc. No. 104. By consent, Plaintiffs filed an Amended Complaint on February 3, 2025, to name the proper NASCAR affiliated entities as Defendants. Doc. No. 106.

In response, on March 5, 2025, NASCAR filed an Answer to the Amended Complaint, adopting its earlier Answer as stipulated among the Parties, but also adding a Counterclaim against Plaintiffs and Curtis Polk (a co-owner of 23XI Racing), alleging that the Teams had formed an "illegal cartel" and violated Section 1 of the Sherman Act by jointly negotiating to "pressure NASCAR to accept their collusive terms" during the 2025 Charter negotiations. Doc. No. 111. Plaintiffs and Mr. Polk moved to dismiss the Counterclaim. The Court denied that motion, Doc. No. 162, and the Parties pursued extensive discovery of the Counterclaim along with Plaintiffs' claims. On September 12, 2025, the Counterclaim Defendants filed a Motion for Summary Judgment on the Counterclaim. The motion has been fully briefed, and the Court held oral argument on the motion on October 23, 2025. It is ripe for the Court's ruling.

---

[12] On June 5, 2025, the Fourth Circuit Court of Appeals issued a ruling vacating the Preliminary Injunction, thereby returning the Plaintiffs to the status of other non-chartered teams (i.e., having to qualify as "open" cars to participate in races). Doc. No. 151.

### III. DISCUSSION

NASCAR's Counterclaim alleges a single count - violation of Section 1 of the Sherman Act. Doc. No. 111 at 24. Section 1 prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade [in interstate or foreign commerce]." 15 U.S.C. § 1. Although the Act, by its terms, prohibits every agreement "in restraint of trade," the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints. *See, e.g., Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342–343 (1982) (citing *United States v. Joint Traffic Assn.*, 171 U.S. 505 (1898)). To establish a violation of Section 1 of the Sherman Act, NASCAR must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202–03 (4th Cir. 2002) (citing *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir.1991)) (en banc). If NASCAR is able to prove a violation of Section 1, it then must also prove the "existence of "*antitrust* injury, which is to say injury of the type the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id*. (emphasis in original) (quoting *Atl. Richfield,* 495 U.S. at 334). NASCAR's evidence fails to establish either an unreasonable restraint of trade or that it suffered antitrust injury.

### A. <u>Unreasonable Restraint of Trade</u>

The Court has previously held that NASCAR's Counterclaim must be analyzed under the "Rule of Reason." *See* Doc. No. 162. In the Rule of Reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 (1977). In these circumstances – where a buyer is faced with a group of sellers acting both collectively and individually – the guiding authority is *BMI* and its progeny. In *BMI*,

the Supreme Court held that composers and authors agreeing to offer their works through a joint license (which, of course involved a joint price agreement) did not commit a *per se* Sherman Act violation or necessarily even an unreasonable restraint of trade, where "[t]he individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets." 441 U.S. at 23–24. Other courts have followed this reasoning to award judgment to defendants in cases where the antitrust plaintiff had a "realistic opportunity" to negotiate individually with the joint sellers and thereby did not suffer an unreasonable antitrust restraint. *See Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir. 1984) ("Since the blanket license restrains no one from bargaining over the purchase and sale of music performance rights, it is not a restraint unless it were proven that there are no realistically available alternatives. [Because the plaintiffs failed to establish the absence of realistic alternatives, there is no restraint and] … it cannot be a violation of section 1."); *Matsushita Elec. Indust. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 376 (D. Del. 2004)[13] ("If the antitrust plaintiff has the opportunity to license independently, then the pool of rights does not restrain trade in violation of Section 1 of the Sherman Act.").

In other words, if a buyer has a "realistically available" choice to deal with the sellers either collectively or individually, then the joint activity of the sellers does not effectively restrain trade because the buyer has a choice of how to pursue its purchase. Again, the goal of the antitrust law is to protect competition and the competitive process. *See Dickson*, 309 F.3d at 206. Where, as here and in the cases cited above, there are pro-competitive reasons to support collective activity

---

[13] In *Matsushita Elec.*, the court granted summary judgment against a Section 1 challenge to an agreement by competitors to offer a joint license to DVD patents, where the record showed that "individual licenses present[ed] a realistic alternative" to the joint licenses being offered. 299 F. Supp. 2d at 379. Because individual bargaining was a realistic alternative for purchasers, the court held that also offering joint terms "does not violate antitrust laws." *Id*.

then prohibiting such conduct harms rather than promotes competition. In its earlier Order, Doc. No. 162 at 7-8, the Court explained that the "NASCAR Cup Series is in all respects a collective, not an individual sport," requiring common rules for a fair competition. Indeed, NASCAR sought to and did reach the same agreement with all the Teams in both the 2016 and 2025 Charters, including the same percentage of media revenue, intellectual property rights and rules related to tires and other elements of racing – all of which would be difficult if not impossible to negotiate differently for each team.[14] And still, as discussed at length above, NASCAR had a choice. It could and did negotiate individually with the Teams, ultimately concluding agreements with the vast majority of the Teams, notwithstanding the significant differences between the joint negotiating offers and the final terms of the 2025 Charters.

In sum, viewing the evidence of record and all reasonable inferences to be drawn therefrom in the light most favorable to NASCAR as the non-moving party, the Court finds that there are no genuine issues of material fact regarding whether individual negotiations were a realistic alternative to joint negotiations. In fact, there is no credible dispute that individual team negotiations were regularly and meaningfully pursued by NASCAR.[15] Therefore, NASCAR has

---

[14] And NASCAR failed to proffer any record evidence that it either desired to negotiate different economic terms for individual teams or that it sought to do so. (In connection with the Motion to Dismiss the Counterclaim, NASCAR's counsel suggested NASCAR was interested in such negotiations, but never offered any actual evidence then or in connection with this motion to support his statement). In the absence of any evidence of negotiations seeking individual team economic terms (either by NASCAR or a team) there is no basis on which the Court could find (as argued by NASCAR) that the Teams were somehow competitors in the context of their negotiations with NASCAR towards a single, identical Charter for all the Teams.

[15] To be clear, the Parties agree that NASCAR's voluntary participation in joint negotiations is not, standing alone, dispositive of its claims. As discussed, the realistic availability of individual negotiations must also be present, which it was here.

13

failed to establish that the Teams' joint negotiation efforts were an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

In addition to its argument that *BMI* is inapplicable authority, which the Court rejects for all the reasons discussed above, NASCAR primarily raises two arguments in support of allowing its claims to proceed to trial. First, it argues at great length that Mr. Polk and others stridently promoted the Teams' joint negotiations and discouraged the Teams from participating in individual negotiations. *See* Doc. No. 249 at 2-15. However, as discussed above, based on NASCAR's documents and testimony there is no genuine dispute that despite Mr. Polk's urgings otherwise, NASCAR had a more than "realistic" opportunity to negotiate with the Teams individually. Mr. Polk and others cheerleading for joint negotiations and the joint negotiating position is insufficient to establish Section 1 liability. Further, NASCAR has produced no evidence that any of the Teams that signed the 2025 Charters (contrary to Polk's advice and much to his and Plaintiffs' disappointment) agreed to solely pursue the joint terms[16] and refused to meaningfully negotiate in the individual team negotiations that indisputably occurred.[17] Thus, that conclusory allegation and NASCAR's attacks on Mr. Polk do not permit NASCAR to avoid Summary Judgment.

---

[16] As in *BMI* and the other cases cited, the fact that the other Teams might have endorsed or even preferred the joint terms offered doesn't aid NASCAR. Those cases didn't turn on whether the antitrust defendants liked their joint offerings more or less than individual licenses, etc. What is important is whether the antitrust plaintiff had a realistic opportunity to negotiate individually. Here, there was plainly such an opportunity and no evidentiary proof of an agreement otherwise.

[17] NASCAR must establish an unlawful agreement with respect to the joint negotiations beyond the Counterclaim Defendants. There is no evidence that Plaintiffs alone have the market power required under the Rule of Reason analysis. *See Carolina Rest. Grp., Inc. v. Pepsico Sales, Inc.*, 2015 WL 4250395, at *7 (W.D.N.C. July 13, 2015) ("[A] plaintiff must allege facts sufficient to show that the defendant has market power.") Indeed, the fact that the Cup Series proceeded without interruption when Plaintiffs did not sign the 2025 Charters like the other Teams strongly suggests otherwise. Relatedly, the Court need not and does not reach the question of whether NASCAR has sufficiently proven that the Teams collectively possessed the requisite market power.

Finally, NASCAR accuses the Teams of participating in an unlawful "boycott" of a Team Owners Council ("TOC") informational meeting in April 2023 that it contends is a *per se* violation of the Sherman Act outside of the *BMI* analysis. The Court disagrees. While "Group boycotts" are "often listed among the classes of economic activity that merit *per se* invalidation under § 1 … [e]xactly what types of activity fall within the forbidden category is, however, far from certain." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co*., 472 U.S. 284, 293–95 (1985). "Some care is therefore necessary in defining the category of concerted refusals to deal that mandate *per se* condemnation. *Id*., citing *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 543 (1978) (concerted refusals to deal "are not a unitary phenomenon"); *BMI*, 441 U.S., at 9.[18] In *Nw Wholesale*, the Supreme Court explained that the cases in which the *per se* approach had been applied "generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Id*. (describing examples that "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete."). Finding that a wholesale purchasing cooperative's boycott of a company seeking membership did not meet these standards or suggest a likelihood of competitive harm, the Court held that *per se* Sherman Act liability did not apply (and that a Rule of Reason analysis should have been used). *Id*. at 298.

*Per se* liability is similarly not appropriate here. The Teams' one time decision not to attend a TOC meeting in April 2023 was, to be sure, a negotiating tactic (which appeared to have little impact as the record reveals that soon after the meeting NASCAR informed the Teams that it wanted to have meetings with individual teams and did so in May and June 2023). *See* Doc. No.

---

[18] The Supreme Court's favorable citation of *BMI* in this context is inconsistent with NASCAR's argument that the "boycott" analysis is somehow an exception to or outside of the authority of *BMI*.

216-25 at 4-5. As such, NASCAR was not denied any "supply, facility, or market" necessary for it to compete (as would, for example, refusing to participate in a racing event). Therefore, the Teams' failure to attend the TOC meeting is not subject to *per se* liability. Rather, the same Rule of Reason / *BMI* analysis discussed above applies. And again, in the absence of a genuine issues of material fact regarding whether individual negotiations were a realistic alternative to joint negotiations (and they occurred soon after the TOC meeting), there is no proof of an unreasonable restraint of trade.

### B. <u>Antitrust Injury</u>

The second independent reason that the Counterclaim Defendants are entitled to Summary Judgment is that NASCAR has failed to show that it suffered an "antitrust injury" as a result of the Teams' joint negotiations or other conduct. To recover under Section 4 of the Clayton Act (the statutory means to enforce Sherman Act liability), an antitrust plaintiff must show an injury to business or property "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful"—i.e., "antitrust injury." *Brunswick,* 429 U.S. at 489. "Antitrust injury encompasses two concepts: (1) the causal connection between the plaintiff's injury and an antitrust violation, and (2) whether the plaintiff's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 710 (4th Cir. 2021) (cleaned up).

Even assuming that the joint negotiations NASCAR challenges caused it economic harm, that does not equate to a harm to competition. Rather, NASCAR getting more or less in contract negotiations is simply that – a hit to its bottom line, not "competition." *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069 (9th Cir. 2025) ("Section 1 requires a causal link between the contested agreement and an anticompetitive restraint of trade in the relevant market."). NASCAR's core

claim is that the Teams' "conspiracy" forced them to pay a higher price for the teams' services in the 2025 Charter Agreements. However, NASCAR has produced no evidence linking the payment increase under the 2025 Charter Agreement to the joint negotiations as opposed to the individual negotiations that resulted in the agreement of the remaining teams (or other market factors). *See Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1044 (4th Cir. 1987) ("[A]n antitrust plaintiff is entitled to recover only for that portion of . . . [its losses] caused by the defendants' unlawful conduct.") (citation omitted).

NASCAR's expert Dr. Hubbard described NASCAR's competitive harm as resulting not from the increased payment to the teams in the 2025 Charter Agreement, but from the charter system itself, which was created in 2016 and was not the subject of the criticized joint negotiations. *See* Hubbard Rep. ¶¶ 47–51 (comparing the number of cars attempting to qualify for Cup Series races in the "pre-Charter" era, i.e., 2011-2015, to the "Charter" era, i.e., 2016-2019). Most significantly, in his deposition, Dr. Hubbard denied that the joint negotiations hurt NASCAR economically. Doc. No. 255-1 at 108:15–21 (Q. "Have you seen any evidence that the concerted behavior engaged in by the teams after October of 2022 caused NASCAR to increase the amount of money it was willing to pay the teams from what it was willing to offer in October of 2022?" . . . A. "No.").

Also, although NASCAR's damages expert, Mr. Hansen, identifies increased payments as the source of NASCAR's injury, that does not connect the payments to the joint negotiations (rather than the individual negotiations or market factors) or to competitive harm. And Mr. Hansen's deposition – in which he testified that he is not offering any opinions on harm to competition or what conduct would not have occurred in a competitive market – is similarly unfavorable to NASCAR. *See* Doc. No. 255-3 at 76:3–10. Again, if the increased payments did

17

not harm competition, they could not cause any antitrust injury to NASCAR. *See Brunswick*, 429 U.S. at 489. Accordingly, the Counterclaim Defendants are entitled to Summary Judgment on NASCAR's Counterclaim because it has failed to establish a sufficient "antitrust injury."

IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Counterclaim Defendants' Motion for Summary Judgment on NASCAR's Counterclaim (Doc. No. 215) is **GRANTED**;

2. Summary Judgment in favor of the Counterclaim Defendants is entered on NASCAR's Counterclaim; and

3. All documents submitted for the Court's consideration in connection with this motion, including Doc. Nos. 216, 249 and 255 (and their accompanying exhibits), are UNSEALED in accordance with *Gray Media Grp., Inc. v. Loveridge*, No. 24-1945, 2025 WL 2679331, at *5 (4th Cir. Sept. 19, 2025) (holding that documents, including exhibits, filed in connection with a summary judgment motion in a civil case are subject to the First Amendment right of access absent "unusual circumstances," (which the Court finds do not apply here)).

**SO ORDERED ADJUDGED AND DECREED**.

Signed: October 28, 2025

Kenneth D. Bell
United States District Judge