UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| 2311 RACING LLC d/b/a 23XI RACING, and FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, NASCAR HOLDINGS, LLC, NASCAR EVENT MANAGEMENT, LLC, and JAMES FRANCE, <br><br> Defendants. | No. 3:24-cv-886-KDB-SCR <br><br> **Public Redacted Version** |

# PLAINTIFFS' OPPOSITION TO NASCAR'S MOTION IN LIMINE TO EXCLUDE EVIDENCE, ARGUMENT, AND TESTIMONY THAT THE PRICE TERMS OF THE 2025 CHARTERS WOULD HAVE BEEN MORE FAVORABLE TO PLAINTIFFS IN THE BUT-FOR WORLD (DKT. NO. 307)

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 2

    I.      Plaintiffs' Experts Opined That The 2025 Charter Price Terms Were Sub-Competitive .................................................................................................................. 2

    II.     NASCAR's Sub-Competitive 2025 Charter Agreement Terms Are Relevant to Liability, Antitrust Injury, and Injunctive Relief .................................................. 7

    III.   All of Dr. Snyder's Damages Opinions Were Disclosed ........................................ 8

CONCLUSION .............................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Garey v. James S. Farrin, P.C.*,
　35 F.4th 917 (4th Cir. 2022) ..................................................................................................8

*Markle v. United States*,
　2015 WL 4477726 (N.D.W. Va. July 22, 2015)....................................................................5

*Moke Am. LLC v. Am. Custom Golf Cars, Inc.*,
　2023 WL 3686963 (E.D. Va. Jan. 11, 2023) .........................................................................5

*U.S. Football League v. Nat'l Football League*,
　644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ...............................8

*United States v. Aramony*,
　88 F.3d 1369 (4th Cir. 1996) .................................................................................................7

*Valassis Commc'ns, Inc. v. News Corp.*,
　2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)...........................................................................8

**INTRODUCTION**

Defendants' Motion to "preclude Plaintiffs from introducing evidence, argument, and/or testimony that the price terms of the 2025 Charter Agreements would have been more favorable to the Plaintiffs in the but-for world" because Plaintiffs supposedly "have not offered any opinion or expert evidence that the price terms of the 2025 Charter Agreement are sub-competitive," Dkt. 307 ("Motion" or "Mot.") at 1, must be rejected. As quoted and described in detail below, the factual premise that Plaintiffs and their experts have not offered or disclosed such evidence is flatly wrong.

Specifically, Dr. Snyder has filed expert reports in which he has opined that in a competitive market, the payment terms to Cup Series teams in both the 2016 and 2025 Charter Agreements would be ▮ of Cup Series league revenues starting at least in 2021 and going forward. *See, e.g.*, Dkt. 231-13, Expert Report of Edward. A Snyder ("Snyder Rep.") ¶¶ 186, 234–35. And Dr. Rascher and Dr. Snyder both opine at length that the terms of the 2025 Charter Agreement, including, but not limited to, its payment terms, are below those that would be provided in a competitive market. Defendants' argument that Plaintiffs have not offered any such expert evidence is thus false.

In addition, Defendants ignore the undisputed fact that Plaintiffs have identified a rash of documentary and testimonial evidence from the history of the 2025 Charter negotiations that demonstrate that NASCAR used its monopsony power to impose a deal on Plaintiffs with "zero wins for the teams" and that the deal being imposed was thus below what would be achieved if a competitive market existed based on NASCAR's own comparisons to other sports. *See, e.g.*, Dkt. 265-4, NASCAR-00465908 at -908 (▮); Dkt. 264-7, NASCAR-00469213 at -213 (2025 Charter contained "zero wins for the teams"); Dkt. 202-3, NASCAR-00394302 (▮); *see also* Dkt. 231-1, Expert Report and Declaration of Daniel A. Rascher ("Rascher Rep.") ¶¶ 143–45.

1

Finally, Defendants' argument that such evidence is irrelevant because Plaintiffs' methodology does not estimate their full lost profit damages through 2025 because of a lack of data ignores its unmistakable relevance to showing Plaintiffs' antitrust injury in 2024 and onward and to Plaintiffs' claim for injunctive relief (among other things). It is clearly relevant and admissible.

## ARGUMENT

**I.   Plaintiffs' Experts Opined That The 2025 Charter Price Terms Were Sub-Competitive**

Contrary to Defendants' claims (and the entire premise of their Motion), Plaintiffs' experts have clearly opined that the price terms in the 2025 Charter Agreement are below those that would have prevailed in a competitive market. For example, Dr. Rascher and Dr. Snyder have opined:

- "In my opinion, this imposition of a take it or leave it 2025 charter agreement by NASCAR, with changes from the 2016 agreement almost all determined by NASCAR's own analysis to be in NASCAR's favor, is direct evidence of NASCAR's exercise of monopsony power to impose below market compensation terms for the purchase of racing team services." Dkt. 231-1, Rascher Rep. ¶ 145.

- "NASCAR's exercise of monopsony market power has led to below competitive market terms in the charter agreements . . . that caused injury to the racing teams[.]" *Id.* ¶ 155.

- "Because of NASCAR's monopsony power, they have imposed on the teams below competitive market terms[.] . . . [T]he terms of the . . . 2025 Charter Agreement were set at levels below that which would occur in [a] competitive market[.]" *Id.* ¶ 156.

- "The restriction on potential competition to protect its monopsony enabled NASCAR to impose below competitive market terms on plaintiffs through the 2016 charter agreements and the 2025 charter agreement terms[.]" *Id.* ¶ 269.

- "If not for the maintenance of its monopsony power through anticompetitive acts, NASCAR would have had to offer more lucrative terms for plaintiffs to supply their premier stock car racing team services in both the 2016 and 2025 charter agreements. The lower compensation and below market terms that plaintiffs were forced to experience . . . caused antitrust injuries to plaintiffs that

2

they would not have incurred in the absence of the monopsony power that NASCAR maintained through anticompetitive acts." *Id.* ¶ 271.

- After noting that "F1 paid approximately ▮▮▮▮▮▮▮▮▮▮ to its race teams" and other "input providers received close to ▮▮▮▮▮▮ of *league-generated revenue*, including national broadcasting and licensing income," Dkt. 231-13, Snyder Rep. ¶ 159 (emphasis added), Dr. Snyder explained that the "teams proposed that they would receive ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.* ¶ 160 (emphasis added). "Ultimately, the pool money offered by NASCAR in the 2025 Charter Agreement . . . . [was] much lower than the team's initial ask[,] . . . and [was] also lower than the other proposals proposed by the teams. *This suggests that in the but-for world, absent NASCAR's anticompetitive conduct which blocked the threat of competitive entry, teams would be expected to be able to negotiate more favorable revenue-sharing terms, increasing their share of NASCAR's economic pie.*" *Id.* ¶ 161 (emphasis added).

Defendants will undoubtedly point out that Plaintiffs' experts' reports do not include the words "price terms," or sometimes do not expressly specify the "2025 Charter Agreements" when describing the anticompetitive harm to Plaintiffs from the exercise of Defendants' monopsony power, but that quibble over word choice ignores the clear substance of their opinions, disclosed in hundreds of pages, that leaves no doubt that they are opining that both the 2016 and the 2025 Charter Agreements imposed below-competitive-market terms on the racing teams.

Even Professor Zmijewski—one of Defendants' own experts—acknowledged that Plaintiffs receiving below-market payments in the future underlies Dr. Snyder's damages estimate for lost enterprise value: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Dkt. 243-6, Expert Rebuttal Report of Prof. Mark E. Zmijewski ("Zmijewski Rep.") ¶ 68 (emphasis added).

This is not the first time Defendants have tried to pretend these expert opinions and analyses do not exist. During a hearing on August 28, 2025, Defendants told this Court that "not one of [P]laintiffs' experts offers an opinion that the 2025 charter payments would have been

3

higher without NASCAR's supposed monopsony and supposed exclusionary conduct." Dkt. 206, Aug. 28, 2025 Hr'g Tr. 56:4–9; *see also* Dkt. 293, Oct. 23, 2025 Summ. J. Hr'g Tr. 96:5–12, 97:3–98:4. That argument was as false at the hearings as it is in the Motion, as Plaintiffs' experts explained in their rebuttal reports:

- "The Rascher Merits Report supports my conclusion that terms for Cup Series teams in the 2025 Charter Agreement were below competitive level from evidence on profitability for teams vs. NASCAR and venues, a comparison of compensation to another motorsport, and the one-sided outcome of the negotiations for the agreement, which resulted in terms other than compensation also being worse for teams." Dkt. 231-14, Expert Rebuttal Report and Declaration of Daniel A. Rascher ¶ 52.

- "Teams continue to experience terms below the competitive level in the 2025 Charter Agreement. The outcome of the 2025 Charter Agreement negotiations was one-sided not just for compensation (as shown by comparison to other major sports in previous paragraphs) but also for other terms." *Id.* ¶ 61.

- "With such modest annual average growth in compensation, the change from the 2025 Charter Agreement is not sufficient to overcome the existing deficit below the competitive level." *Id.* ¶ 62.

- "I also demonstrate that the change in compensation between the 2016 Charter Agreement and the 2025 Charter Agreement was not enough of an increase to alleviate the injury from depressed compensation." *Id.* ¶ 201.

- "NASCAR's anticompetitive conduct . . . has reduced the share of revenues going to [premier stock car racing] teams below competitive level as evidenced by comparison to other major sports associations, . . . and diminished the market values of their teams under both the 2016 and 2025 Charter Agreements." Dkt. 231-12, Expert Rebuttal Report of Edward A. Snyder ("Snyder Rebuttal Rep.") ¶ 8.

- "All we know is that Plaintiffs did not sign the 2025 Charter Agreement in the actual world. In the but-for world, Plaintiffs would have agreed to improved terms from NASCAR or received these terms from a new entrant. In either case, the value of Plaintiffs['] teams would be higher in the but-for world, which means that they suffered damages." *Id.* ¶ 21(iv).

- "At this point, there is still not sufficient data to fully measure the additional lost profits Plaintiffs are suffering in 2025 because *they would have received a larger share of Cup Series revenues in the but-for world than what is stipulated in the 2025 Charter Agreement*." *Id.* ¶ 111 (emphasis added).

4

- "In the but-for world, Plaintiffs would have received a revenue share in 2025 that was higher than that provided for by the 2025 Charter Agreement." *Id.* ¶ 113.

Defendants further ignore the fact that Dr. Snyder's analysis showing that teams would be paid ▮ of Cup Series revenues in a competitive world applies to payments to teams in 2025 just the same as it applies to teams in 2021 through 2024. *See* Dkt. 231-13, Snyder Rep. ¶¶ 186, 234–35. Dr. Snyder explained exactly that at his deposition. *See* Ex. 1,[1] Snyder Tr. 391:23–392:7 ("Q. You haven't disclosed any quantification of how payments would have been different in the 2025 charter agreements because of the anticompetitive conduct, correct? . . . A. . . . That's my damages analysis."). Defendants' claim that Plaintiffs have not presented any expert analysis of what "the 2025 Charter Agreements' pricing terms . . . would be but-for NASCAR's alleged conduct," Mot. at 5, is thus false, and their claim that any expert opinion that the 2025 Charter payment terms were below the competitive level is "untimely" and "would pose a substantial risk of prejudice and must be excluded," *id.* at 6, is without foundation.[2]

To be sure, Dr. Snyder did not calculate full lost profits damages to Plaintiffs for 2025 using the same methodology he applied for 2021 through 2024 because that methodology required knowledge of the total size of NASCAR's economic pie for 2025—a number that was unknown at the time of Dr. Snyder's reports and that remains unknown today. *See* Dkt. 231-12, Snyder Rebuttal Rep. ¶ 22 n.62; *id.* ¶ 111; *see also infra* Section III. But that particular damages

---

[1] Ex. _ refers to the exhibits to the concurrently filed Declaration of Jeffrey L. Kessler in Support of Plaintiffs' Oppositions to Defendants' Motions in Limine.

[2] Because Plaintiffs' experts *did* opine that the 2025 Charter Agreement terms were below those for a competitive market, Defendants' authorities excluding expert testimony that was not properly disclosed are inapposite. *See Markle v. United States*, 2015 WL 4477726, at *3 (N.D.W. Va. July 22, 2015) (excluding expert opinions where there was no dispute that the expert report did not state the opinions at issue); *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 2023 WL 3686963, at *3 (E.D. Va. Jan. 11, 2023) (excluding damages evidence that was never disclosed under Rule 26).

5

methodology is not needed for Plaintiffs' experts to opine that the 2025 Charter payments will be less than ▮ of Cup Series revenue—which Dr. Snyder found to be the competitive yardstick. Dr. Rascher illustrated this quite clearly in his opening report showing that the 2025 payments to teams are projected to be only ▮ of NASCAR total revenue. *See* Dkt. 231-1, Rascher Rep. ¶¶ 292–93 & Ex. 20.

In addition, Defendants just ignore all of the documentary and fact witness testimony that shows that NASCAR imposed the terms of the 2025 Charter Agreement through its monopsony power because the teams had no choice but to accept them or lose their Charters, that the terms contained "zero wins for the teams," and that the terms were dictated by NASCAR using its monopsony power. *See* Dkt. 264-7, NASCAR-00469213 at -213; Dkt. 231-1, Rascher Rep. ¶¶ 143–45. For instance, NASCAR executives discussed how they "▮ ▮," Dkt. 265-4, NASCAR-000465908 at -908, and that NASCAR could "▮ ▮," Dkt. 231-17, NASCAR-00331199 at -199. Plaintiffs' arguments and their experts' conclusions that the terms of the 2025 Charter Agreement—including, but not limited to, the payment terms—were below competitive levels demonstrate that these executives were correct that Defendants could and did inflict antitrust injury on Plaintiffs.[3] This also aligns with Defendants' documents showing that during the 2025 Charter negotiations, NASCAR executives recognized internally that the teams "▮

---

[3] Defendants are also incorrect that it is "undisputed that Plaintiffs do not have any 2025 Charters because they refused to accept the 2025 Charters' terms." Mot. at 5. While Plaintiffs did not sign the 2025 Charter for the two charters that they each possessed for the 2024 Cup Series season, each of 23XI and Front Row purchased (and currently possess) a charter from Stewart-Haas Racing in late 2024. Even one of Defendants' own experts recognized that whether Plaintiffs "▮ ▮" Dkt. 243-6, Zmijewski Rep. ¶ 65.

6

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████." Dkt. 202-3, NASCAR-00394302; *see also* Dkt. 231-12, Snyder Rebuttal Rep. ¶ 20 & n.44. Plaintiffs' experts' opinions confirm the below-market payments that NASCAR executives understood they were making in the 2025 Charter Agreement and will assist the jury in determining whether Defendants exercised their monopsony power to injure Plaintiffs.

## II. NASCAR's Sub-Competitive 2025 Charter Agreement Terms Are Relevant to Liability, Antitrust Injury, and Injunctive Relief

Much of Defendants' Motion is premised on the illogical argument that because Dr. Snyder did not apply the methodology he used to estimate damages through the end of December 2024 to provide a damages estimate for 2025 based on sub-competitive terms in the 2025 Charter Agreement (because the data for doing so did not yet exist), *all* evidence, argument, and/or testimony about this subject is entirely irrelevant and thus inadmissible. *See* Mot. at 1–6. This premise is false.

"To be relevant, evidence need only to have 'any tendency to make the existence of *any fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996) (quoting Fed. R. Evid. 401) (emphasis added). Here, testimony and evidence that the terms of the 2025 Charter Agreement are below those that would prevail in a competitive market is relevant to liability, antirust injury, and injunctive relief, notwithstanding the fact that Dr. Snyder's estimate of past damages through the end of 2024 did not extend to 2025 because of incomplete data.

"In parsing the antitrust injury requirement, courts have distinguished the fact of injury from the amount of damages. Proof of the fact of injury informs the question of the defendant's

7

liability, while proof of amount in damage determines an award." *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *11 (S.D.N.Y. Feb. 21, 2019) (citations omitted); *see also U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1052 (S.D.N.Y. 1986) ("In the law of antitrust, there is a difference between the proof required to establish causation and the proof required to establish damages.") (citations omitted), *aff'd*, 842 F.2d 1335 (2d Cir. 1988). Here, Defendants completely ignore the antirust injury element of antitrust liability to which Plaintiffs' experts' opinions about the below-competitive-market terms of the 2025 Charter Agreement are unquestionably relevant.

Plaintiffs' evidence about the below-competitive-market terms of the 2025 Charter Agreement is also relevant to showing the continuing nature of NASCAR's monopsonization, for which Plaintiffs are seeking injunctive relief. *See* Dkt. 107, Am. Compl. at 42. As the Fourth Circuit has explained, "a plaintiff can satisfy the injury-in-fact requirement for prospective relief either by demonstrating a sufficiently imminent injury in fact or by demonstrating an ongoing injury." *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) (cleaned up). The below-market terms in the 2025 Charter Agreement, including, but not limited to, the payment terms, are thus relevant to Plaintiffs' showing an ongoing antitrust injury for injunctive relief, which provides yet another independent reason for finding that it easily meets the relevance test of Rule 401.

### III. All of Dr. Snyder's Damages Opinions Were Disclosed

Finally, all the damages opinions that Dr. Snyder may offer at trial are disclosed in his expert reports. The past damages analysis has two components, a backwards-looking lost profits analysis measuring Plaintiffs' lost profits from 2021 through 2024, and a forward-looking diminution in value analysis measuring how much less Plaintiffs' businesses were worth due to Defendants' anticompetitive conduct as of December 31, 2024. Dkt. 231-13, Snyder Rep. ¶¶ 183–99. He also disclosed his supplemental partial estimate of 2025 damages in a timely fashion once

8

this information became available. *See* Dkt. 231-12, Snyder Rebuttal Rep. ¶¶ 111–16; Dkt. 271, Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Exclude Expert Report & Test. of Dr. Edward A. Snyder ("Snyder *Daubert* Opp'n") at 22–24.

Defendants make much of the fact that Dr. Snyder did not rely on 2025 Charter payments for his damages analysis through the end of 2024. *See* Mot. at 1–6. But there is a good reason that he did not apply his methodology to prepare a similar damages analysis for 2025: Dr. Snyder did "not have the data available on 2025 year-end financial statements from Plaintiffs and NASCAR to estimate all of Plaintiffs' lost profits." Dkt. 231-12, Snyder Rebuttal Rep. ¶ 22 n.62; *see also id.* ¶ 111. Not only did that data not exist at the time Dr. Snyder performed his damages analysis, it will also still not exist at the time of trial. To suggest that Plaintiffs should be precluded from presenting fully disclosed expert opinions that the 2025 Charter payment terms are below competitive-market levels—opinions that can be supported by the fact that the payments to the teams under the 2025 Charter Agreement will indisputably be less than ▮▮▮ of NASCAR's media revenues, much less its overall Cup Series revenues—merely because the data does not yet exist to fully quantify Plaintiffs' lost profits under Dr. Synder's damages methodology makes no sense. Dr. Snyder is entitled to present his fully disclosed opinions about the below-competitive-market payments in the 2025 Charter Agreements even though he is not using those opinions to estimate lost profits through the end of 2024.

The same conclusion applies to Dr. Snyder's diminution in value damages methodology. The unavailability of complete 2025 NASCAR revenue data required that Dr. Snyder calculate his diminution in value damages as of December 31, 2024—the last date for which such data was available. *See* Dkt. 231-12, Snyder Rebuttal Rep. ¶ 109. But as Dr. Snyder explained, that actually produced *lower diminution in value damages* than if the analysis was based on 2025 Charter

9

payments because Plaintiffs would be getting a share of a larger economic pie in 2025. *See id.* ¶ 99 ("However, even if one were to consider the increase in pool money resulting from 2025 media revenues, the 'economic pie' of the Cup Series would also expand. Because the revenues that Cup Series teams receive in the but-for world are ▮▮▮▮ of this total pie, the but-for world valuation of the teams would also increase."). Again, the fact that Dr. Snyder conducted a damages analysis through the end of 2024 because of the lack of complete data for 2025 in no way means he did not disclose his opinions that the 2025 Charter Agreement also imposed below-market terms. All of Dr. Snyder's opinions about this were disclosed so there is no unfair "surprise" to Defendants.

Similarly, while Defendants again try to exclude Dr. Snyder's separate and partial 2025 damages analysis as "untimely," *see* Mot. at 1 n.1, Defendants do not engage at all with the fact that this analysis could not have been performed until Plaintiffs' motion for a preliminary injunction was denied on September 3, 2025, and it became clear that Plaintiffs would not receive Charter payments for a portion of the 2025 season, *see* Dkt. 271, Snyder *Daubert* Opp'n at 22–24. Dr. Snyder disclosed this analysis five days later on September 8, 2025. *Id.* at 23–24. Accordingly, this was a timely supplement under Rule 26(e), and Defendants' arguments to the contrary must be rejected. Indeed, this Court used the ability of Plaintiffs to seek such damages as one of the reasons for denying the preliminary injunction. *See* Dkt. 208, PI Mem. & Order at 7 (noting that "the loss of the 'fixed' Charter payouts" resulting from Plaintiffs operating as open teams can "be compensated with money damages at trial").

## **CONCLUSION**

For all the foregoing reasons, NASCAR's motion in limine to exclude evidence, argument, and testimony that the terms of the 2025 Charters would have been more favorable to Plaintiffs in the but-for world of a competitive market should be denied.

10

Case 3:24-cv-00886-KDB-SCR   Document 356   Filed 11/03/25   Page 13 of 17

Dated: November 3, 2025	Respectfully submitted,

WINSTON & STRAWN LLP

By:	*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler*
Neha Vyas*
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
nvyas@winston.com

E. Danielle T. Williams (N.C. Bar No. 23283)
**WINSTON & STRAWN LLP**
300 South Tryon Street
16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
dwilliams@winston.com

Jeanifer E. Parsigian*
Michael Toomey*
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com
mtoomey@winston.com

Matthew R. DalSanto*
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
mdalsanto@winston.com

Josh Hafenbrack*
Benjamin L. Rudofsky*
**WINSTON & STRAWN LLP**

11

1901 L Street NW
Washington D.C. 20036
Tel: (202) 282-5000
Fax: (202) 282-5100
jhafenbrack@winston.com
brudofsky@winston.com

Benjamin S. Gordon*
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
bgordon@winston.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs 2311 Racing LLC d/b/a 23XI Racing and Front Row Motorsports, Inc.*

## CERTIFICATE OF COMPLIANCE

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

*Counsel for Plaintiffs 2311 Racing LLC d/b/a 23XI Racing and Front Row Motorsports, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFFS' OPPOSITION TO NASCAR'S MOTION IN LIMINE TO EXCLUDE EVIDENCE, ARGUMENT, AND TESTIMONY THAT THE PRICE TERMS OF THE 2025 CHARTERS WOULD HAVE BEEN MORE FAVORABLE TO PLAINTIFFS IN THE BUT-FOR WORLD (DKT. NO. 307)** was electronically filed using the Court's CM/ECF system, which will automatically send notice of this filing to counsel of record for all parties, including:

Tricia Wilson Magee
**SHUMAKER LOOP & KENDRICK, LLP**
101 S. Tryon St., Suite 2200
Charlotte, NC 28280
tmagee@shumaker.com

Christopher S. Yates
Ashley M. Bauer
Natalie W. Kaliss
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
chris.yates@lw.com
ashley.bauer@lw.com
natalie.kaliss@lw.com

Robert B. McNary
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
rob.mcnary@lw.com

Lawrence E. Buterman
Shayan Ahmad
Quinlan Cummings
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com
shayan.ahmad@lw.com
quinlan.cummings@lw.com

Jennifer Giordano
Marguerite Sullivan
Anna M. Rathbun
Christina R. Gay
David L. Johnson
Christopher J. Brown
Margaret E. Cohen
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
jennifer.giordano@lw.com
marguerite.sullivan@lw.com
anna.rathbun@lw.com
christina.gay@lw.com
david.johnson@lw.com
chris.brown@lw.com
margaret.cohen@lw.com

*Counsel for Defendants*

                                         */s/ Jeffrey L. Kessler*
                                          Jeffrey L. Kessler