IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00886-KDB-SCR

| | |
|---|---|
| 2311 RACING LLC AND FRONT ROW MOTORSPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, ET AL., <br><br> Defendants. | **MEMORANDUM AND ORDER** |

Last week, the Court resolved a Summary Judgment motion related to NASCAR's Counterclaim. With this Order, the Court addresses the Parties' cross-motions for Summary Judgment on Plaintiffs' claims. Defendants move for Summary Judgment in their favor, arguing that the statute of limitations, flaws in Plaintiffs' damages claims, the absence of standing and other reasons support their request. Doc. No. 235. Plaintiffs move for Partial Summary Judgment in their favor on two core elements of their Sherman Act antitrust claims – the definition of the relevant market and whether NASCAR has "Monopsony[1] power" in that market. Doc. No. 230. For the reasons discussed below, the Court will DENY Defendants' motion and GRANT Plaintiffs' motion, allowing this action to proceed to trial on Plaintiffs' claims that NASCAR unlawfully exercised its monopsony power in the market for the purchase of premier stock car racing team services.

---

[1] As previously explained, economists describe the exercise of "monopoly" power by a buyer in an "input" market as "monopsony" power. *See* Doc. No. 74 at 12 n. 8.

1

## I. LEGAL STANDARD

The two summary judgment motions before the Court – one seeking a complete judgment and the other partial judgment – are governed by the same legal standard. *See* Fed. R. Civ. P. 56. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land*, 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir.

2015)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, inter alia, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (citation modified). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

Rule 56 similarly permits a litigant to move for partial summary judgment, and for the Court to resolve certain issues at summary judgment, rather than the entire case. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."); *Lins v. United States*, No. CV ELH-17-2163, 2024 WL 1604494, at *11 (D. Md. Apr. 12, 2024); *see also, e.g.*, *Nguti v.*

3

*Safeco Ins. Co.*, PX-15-742, 2017 WL 2778821, at *2 (D. Md. June 27, 2017) ("A motion for partial summary judgment is recognized as a useful pretrial tool; the Advisory Committee Notes to the 1946 amendment to Rule 56 state: 'The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication ... serves the purpose of speeding up litigation by' narrowing the issues for trial to those over which there is a genuine dispute of material fact.").

## II. FACTS AND PROCEDURAL HISTORY

The general facts and procedural history of this dispute have been fully described by the Court in earlier Orders, *see e.g.*, Doc. Nos. 74, 162, 208, 336, and need not be repeated here. The specific facts relevant to these motions are discussed below in the Court's legal analysis.

## III. DISCUSSION

### A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs have sued NASCAR alleging that it has unlawfully monopolized premier stock car racing in violation of the Sherman Act, 15 U.S.C. §§ 1, 2. The Parties agree that establishing a "relevant market" and "monopoly or monopsony" or "market power" are required elements for both Section 1 and 2 violations. See *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966)) (to establish a violation of Section 2 of the Sherman Act, antitrust plaintiff must establish defendant "possess[ed] . . . monopoly power in the relevant market."); *Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) ("In proving a Section 1 violation, the plaintiff must show the market shares of the competitors in the relevant market" as well as the defendant's "market power."). Plaintiffs seek Partial Summary Judgment on each of the two

elements: 1) the definition of a relevant market and 2) that NASCAR has monopsony power in that market.

### 1. Definition of the Relevant Market

To define a monopsony market is to identify those buyers providing the plaintiff sellers with alternative sources for the sale of their products or services. *See* Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp ("Areeda") ¶530. A properly defined market excludes other potential buyers whose product is too different or too far away. *Id*. Thus, the "relevant market" in this context is the arena within which significant substitution occurs. *Id*; *see Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (for a monopsony claim, the relevant market "is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.").

Plaintiffs allege that the relevant market for their Sherman Act claims is the "input market for premier stock car racing teams," in which "NASCAR's Cup Series is currently the only buyer." Doc. No. 107 ("Amended Compl.") ¶¶ 119, 121). In support of that market, Plaintiffs have offered the expert opinion of Dr. Daniel Rascher, who concludes that "premier stock car racing" is a distinct form of automobile racing, and other types of motorsports like Formula 1 and IndyCar (as well as lower levels of stock car racing) are not substitute purchasers of these specific stock car racing services. Doc. No. 231-1 ¶¶ 29, 52, 58–59. In response, NASCAR asks the Court to deny summary judgment to Plaintiffs based on the opinion of its expert Dr. Kevin Murphy, who criticizes Plaintiffs' proposed market as "flawed" and unduly narrow, arguing that other motorsports are acceptable supply-side substitutes. Doc. 240-2 ¶¶ 14, 71-74.

However, the Court need not decide if Dr. Murphy's opinions create a triable issue of fact as to the relevant market. In asserting its Sherman Act Counterclaim, NASCAR made a judicial admission related to the relevant market that is dispositive with respect to the relevant market for Plaintiffs' claims that NASCAR violated the antitrust laws in purchasing the Teams racing services. "A party is bound by the admissions of his [or her] pleadings." *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 365 (4th Cir. 2022) (quoting *Butts v. Prince William Cnty. Sch. Bd.*, 844 F.3d 424, 432 n.3 (4th Cir. 2016)). To be binding, the admission must be "deliberate, clear, and unambiguous." *Id*. (quoting *Everett v. Pitt Cty. Bd. of Educ.*, 788 F.3d 132, 141 (4th Cir. 2015)); *see also Klein v. Campbell*, No. 22-1497, 2023 WL 3845303, at *15 (4th Cir. June 6, 2023) ("A judicial admission is a representation that is 'conclusive in the case' unless the court allows it to be withdrawn.").

In the Counterclaim, which alleged that the Teams unlawfully conspired in selling their racing services, NASCAR "deliberate[ly], clear[ly] and unambiguous[ly]" alleged that the relevant market is "the market for entry of cars into NASCAR Cup Series races in the United States and any other location where a Cup Series race is held." *Id*.; Doc. 136 ¶ 126.[2] This is effectively the same as the relevant market alleged by Plaintiffs - the "input market for premier stock car racing teams." The same transaction – the sale and purchase of premier stock car racing services – cannot be a different relevant market depending only on which side is complaining. Most simply put, NASCAR made a strategic decision in asserting its Counterclaim and must now live with the

---

[2] NASACAR's expert Dr. Hubbard opined that the relevant Counterclaim input market is the market for racing teams "to supply NASCAR participants ('entrants') in NASCAR Cup Series events." Doc. No. 231-2 ¶ 33. And just like Plaintiffs, NASCAR and Dr. Hubbard asserted that NASCAR is the sole purchaser of those racing team services in the relevant input market. Doc. No. 231-3, Hubbard Tr. 49:22–23 ("NASCAR is the purchaser of team services in the market I define.").

6

consequences.[3] *See Servicetrends, Inc. v. Siemens Med. Sys., Inc.*, 870 F. Supp. 1042, 1069–70 (N.D. Ga. 1994) (granting summary judgment for antitrust plaintiff on defendant's antitrust counterclaims where defendant argued, in its own defense, that relevant geographic market consisted of the entire United States, and therefore could not argue for purpose of its counterclaims that the relevant market consisted of smaller local markets).

NASCAR argues that the relevant market that it alleges for its Counterclaim – in nearly the same words as Plaintiff describes their relevant market – is somehow not the same market. A simple example should suffice to show why NASCAR can't play the same hand twice in different ways. In pursuing its Counterclaim, NASCAR argued that the Plaintiffs had market power in the relevant Cup Series market because it could not reasonably substitute Indy Car or Formula 1 racing teams or even the racing teams participating in its two lower level series. *See* Doc. No. 241 at 27-28 (*e.g.*, "… Dr. Hubbard … shows that actual or attempted participation in Cup Series races has been substantially limited to the 36 Charter holders"). However, in opposing Plaintiffs' relevant market, NASCAR now contends that the same motorsports that could not supply racing teams to the Cup Series are suddenly readily available substitutes for the Cup Series teams like Plaintiffs to sell their services. Not only is it illogical, but there is no record evidence that racing teams in the various motorsports can only move from NASCAR to another motorsport but not vice-versa.

---

[3] To be sure, the different choices available to buyers and sellers need to be considered in determining market, monopoly or monopsony power, but it is still the same relevant market, regardless of whether the claim is being analyzed from a buyer's or a seller's perspective. Specifically, for Plaintiffs' claim, the monopsony power of NASCAR is compared against other reasonably available buyers and for NASCAR's Counterclaim, the monopoly power of the Plaintiffs is viewed against other reasonably available sellers. But the different perspectives of buyers and sellers does not equate to different relevant markets. In other words, one market can spawn two claims. Indeed, every market has both a buyer side and a seller side, each with theoretical antitrust claims.

Again, NASCAR wants to (but cannot) have it differently on each side of the same coin – heads we win, tails you lose.

NASCAR cites *Todd v. Exxon* (a 2001 case from the Second Circuit authored by then Judge Sotomayor) as support for its position, but *Todd* doesn't answer the question presented here. In *Todd*, a group of oil and petrochemical industry employees (with different job functions) alleged a buyer-side conspiracy between fourteen companies in that industry to suppress employee wages. 275 F.3d at 195-96. The Second Circuit reversed the district court, reaching the correct (and unremarkable) conclusion that the *Todd* plaintiffs' "buyer side" claims had been improperly analyzed as seller side claims, explaining that the relevant question was "not the interchangeability of, for example, lawyers with engineers . . . [but] the interchangeability, from the perspective of an [] employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry." *Id*. at 202. However, because *Todd* only addressed a single alleged antitrust claim, it is not analogous to this action.[4] For *Todd* to help NASCAR, the *Todd* defendants would have had to have asserted a pricing conspiracy counterclaim against the *Todd* plaintiffs – alleging that the relevant market was limited to the oil and petrochemical industry – and then have been permitted to turn about (as NASCAR has done here) and claim that plaintiffs' claims limited to that same market are too narrow. *Todd* did not so hold, and neither will this Court. NASCAR's judicial

---

[4] To be clear, the Court is not holding that NASCAR could not have challenged Plaintiffs' relevant market (however it chose to do so) in the absence of a Counterclaim or could have asserted a Counterclaim with a relevant market consistent with its arguments against Plaintiffs' alleged market. Rather, the law does not permit NASCAR to agree with Plaintiffs' relevant market for purposes of its Counterclaim and then argue against that market for Plaintiffs' claims, which arise from the same Charter negotiations.

admission[5] related to the relevant market in its Counterclaim does not permit it to avoid summary judgment in Plaintiffs' favor on the definition of the relevant market for Plaintiffs' claims.

The Court will briefly address two points raised by NASCAR with respect to market definition. First, there is no genuine dispute as to the geographic scope of the relevant market, which is the United States. *See* Doc. No. 231-1 ¶¶ 50, 93. NASCAR has not identified any competitors or potential competitors outside the United States (or within the United States as discussed below). While NASCAR's counsel strains to create an issue based on the Teams merely considering holding an exhibition overseas,[6] references to Formula 1 by one of Plaintiffs' experts and the theoretical possibility of foreign investment in a competing stock car racing league (which of course says nothing about the geographic footprint of such a league), NASCAR cites to no evidence or expert testimony to raise any credible dispute that the United States is a relevant geographic market. Indeed, NASCAR's expert Dr. Murphy did not raise any issue with the geographic scope of the relevant market in his lengthy critique of Plaintiffs' market. (And, to add the icing to the cake, Dr. Hubbard opined in connection with NASCAR's Counterclaim that the United States is the relevant geographic market.) *See* Doc. No. 231-2 ¶ 17.

Second, NASCAR's argument that the Plaintiffs' relevant market is a "fail-safe" or "gerrymandered" market because – according to both Parties – the NASCAR Cup Series is the only buyer of premier stock car racing team services in the United States is incorrect. Just because there is only one racing league *currently* in the market does not mean that there could not be others.

---

[5] Because of the clarity of NASCAR's pleadings and judicial admissions, the Court need not and does not reach Plaintiffs' independent "judicial estoppel" argument based on NASCAR's counsel's argument to the Court in opposing the motion to dismiss the Counterclaim.

[6] The racing teams discussed hosting a potential exhibition in Oman, during the negotiations over the 2025 Charter Agreement, because the 2016 Charter Agreement prevented them from hosting such an event in the United States. Doc. Nos. 279-1, 8 FRM_0005822 §6.6; 279-2 at 265:1–11.

9

The relevant market is defined by the characteristics of the highest level of stock car racing, not NASCAR's brand. *See* Doc. No. 231-1 ¶¶ 27–30, 48–92. In other words, the fact that NASCAR has maintained its position as the sole buyer in the market for many years (which Plaintiffs assert is due to exclusionary conduct that NASCAR disputes) does not make it a self-defining market.

### 2. Monopsony Power

The Court also finds that Plaintiffs are entitled to partial summary judgment on the issue of whether NASCAR possesses monopsony power in the relevant market. Monopsony power can be estimated in the conventional antitrust way by defining a relevant buyers' market and then estimating the defendant's share of it. *See* Areeda, ¶ 575. Having determined that the relevant market is premier stock car racing series in the United States, there is no factual dispute that NASCAR's Cup Series is the only premier stock car racing series.

Neither NASCAR's executives nor its experts identified any other purchaser of premier stock car racing team services in the relevant market. *See* Doc. No. 231-6 (J. France) 61:1–14 (Q. "What other stock car racing series do you view as comparable to the Cup Series in the United States?" . . . A. "I don't know. I don't have any right offhand."); Doc. No. 231-7 (Phelps) 128:23–129:14 (Q. "Can you identify . . . any stock car racing series that is a close competitor to NASCAR in terms of prize money, television ratings, attendance, any economic metric you want to use?" . . . A. "Nothing comes to mind."); Doc. No. 231-3 (Hubbard) 43:10–50:18 (failing to identify any other purchaser of premier stock car racing team services), 49:2023 (Q. "Is there any purchaser of team services in the market you define?" A. "NASCAR is the purchaser of team services in the market I define.")

Therefore, NASCAR effectively has a 100% market share. And NASCAR has maintained its total share of the market for decades, as acknowledged by the experts on both sides. *See* Doc.

No. 231-12 ¶ 9 ("[T]here has been no entry into [the relevant market] in the last 50 years."); Doc. No. 231-4 ("Unlike other top-level professional sports, . . . I understand that there has never been any serious attempt by any stock car series to enter to compete with NASCAR's Cup Series."); 231-13 ¶ 32.b ("While the histories of other U.S. sports include many examples of new organizations, . . . there has been no entry into [premier stock car racing]."). Further, there is no genuine dispute that the relevant market is characterized by high barriers to entry. *See* Doc. No. 231-11 at 840 (estimating $607.3 million cost for NASCAR to self-supply teams); Doc. No. 231-8, 133:8–17 ("[R]acetracks, in general, take a lot of CapEx[.]"); Doc. No. 231-10 at slide 3 (internal NASCAR presentation stating that, in exploring a breakaway series, teams would be "[u]nlikely to find willing tracks that wouldn't require major [capital expenditures]"); Doc. No. 231 ¶¶ 171–211, 226–29, 263–67.

A very high market share, which is durable, along with high barriers to entry is a well-established basis for a finding of monopolization. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (monopolization found where "defendant controlled seventy to one hundred per cent of the relevant market"); *Duke Energy*, 111 F.4th at 353 (monopoly power not at issue "given [defendant's] durably high market share, which stands at or approaching 90%").

In sum, NASCAR plainly exercises monopsony power in the relevant market under the governing analysis. Not only has it operated the only premier stock car racing series in the United States for many years, the barriers for others to enter the market (availability of large racing tracks, highly qualified racing car teams, etc.) are obvious. Therefore, Plaintiffs are entitled to Summary Judgment that NASCAR has monopsony power in the relevant market in partial support of its Section 2 Sherman Act claim. And, establishing monopsony power for a Section 2 claim similarly

leads to a finding that NASCAR has market power for purposes of Plaintiffs' Section 1 claim, which requires a lower relevant market share threshold than is needed to infer monopoly power. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

In the face of these considerable undisputed facts, NASCAR argues that there is still a material factual dispute on the issue of its monopsony power because its payments to the Teams have increased rather than decreased over time. *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices."). First, with full control over the limited duration Charters necessary to be an economically viable Cup Series racing team, NASCAR indisputably had the *power* to decrease demand by denying Charters to any team that did not agree to its final Charter terms. The fact that it only had to use that power against the Plaintiffs doesn't mean that it lacks monopsony power.

Also, the relevant inquiry is whether NASCAR had the power to suppress team payments below competitive levels. *Whaley v. Pac. Seafood Grp.*, No. 1:10-CV-3057-PA, 2012 WL 13047314, at *1 (D. Or. Jan. 31, 2012) ("Monopsony power involves the power to lower input prices below competitive levels."). Evidence that NASCAR "increased" payments, without reference to whether those payments reached the level of a "competitive" market falls short of that proof. *See* Doc. Nos. 216-87 at 50-52, Doc. No. 255-3 at 63-64 (NASCAR's experts stating that they had not evaluated a "competitive market."). Therefore, NASCAR's increased payments to the Teams, standing alone, does not create a triable issue on its monopsony power.[7]

---

[7] NASCAR's final argument that it lacks monopsony power because Plaintiffs and the public have numerous other sports in which to invest or to watch is also unavailing. Of course, Plaintiffs could

## B. Defendants' Motion for Summary Judgment

In support of their Motion for Summary Judgment, Defendants offer a scattershot list of arguments, none of which justify judgment in their favor. Each is discussed briefly below.

### 1. Statute of Limitations / Release

Defendants' first argument is that "elements" of Plaintiffs' claims are time-barred and have been released. The statute of limitations for Sherman Act claims is four years. 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Rsch., Inc*., 401 U.S. 321, 338 (1971). However, "[a] cause of action is not barred by the statute of limitations simply because anticompetitive conduct began outside the statutory period so long as some overt act injuring a plaintiff is committed within the limitations period." *N.C. Elec. Membership Corp. v. Carolina Power & Light Co*., 780 F. Supp. 322, 328 (M.D.N.C. 1991).

*Duke Energy*, 111 F.4th at 353-55, explains the required analysis. First, a firm's exclusionary efforts must be considered in their totality. *Id*. at 355 ("Just as the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole,' … , so too must a firm's exclusionary efforts be considered in their totality."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 310c7 (4th and 5th eds. 2024) ("A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim."); *United States v. Google LLC*, No. 1:23-CV-108 (LMB/JFA), 2025 WL 1132012, at *46 (E.D. Va. Apr. 17, 2025) ("As the Fourth Circuit made clear in *Duke Energy*, courts must avoid unduly divvying up a

---

exit the relevant market and fans could decide to seek entertainment elsewhere, but those options say nothing about NASCAR's monopsony control of the relevant market.

'complex or atypical exclusionary campaign' into 'manufactured subcategories' and justify the actions using 'specific conduct tests.'). Indeed, a court must, when "faced with allegations of a complex or atypical exclusionary campaign," such as we have here, "aggregate" two or more practices which, while lawful individually, are all "part of the same scheme to perpetuate dominance or drive the plaintiff from the market." *Id.* at 354-55 ("This is because 'the means of illicit exclusion, like the means of legitimate competition, are myriad.'").

Plaintiffs have proffered evidence of various alleged instances of anticompetitive conduct individually and collectively within the period of limitations. *See* Doc. No. 265 at 5-8, 10. And, at oral argument Defendants conceded that there was at least one alleged anticompetitive act within the statute of limitations. Doc. No. 293 at 123. Therefore, Defendants are not entitled to judgment on Plaintiffs' claims based on the statute of limitations.[8]

### 2. Damages

Defendants' second summary judgment argument is that "Plaintiffs cannot prove any damages at trial." This argument is a recasting of Defendants' first contention that Plaintiffs' damages calculation is based on conduct that predates the start of the period of limitations. As discussed above, this is not a basis to award summary judgment to Defendants, and the proper scope of Plaintiffs' damages will be addressed in connection with other pending motions.

### 3. Standing

Defendants' third argument is that the Plaintiffs lack standing to assert their claims. The Court disagrees. Plaintiffs have antitrust standing as sellers of premier stock car racing services to

---

[8] In its briefing and at oral argument, Defendants focused their statute of limitations arguments on Plaintiffs' damages calculation, arguing that the bulk of Plaintiffs' damages claim is based on conduct outside the period of limitations (for example, the terms of the 2016 Charters). The Court does not decide the extent of Plaintiffs' permissible damages here. Those important questions are raised and will be decided in connection with the pending Daubert motions and Motions in Limine.

14

NASCAR, who allegedly exercised its monopsony power to pay below competitive compensation to the Cup Series race teams. *See NCAA v. Alston*, 594 U.S. 69, 82 (2021) (college athletes had standing where "[defendant] use[d] its monopsony power to 'cap artificially the compensation offered'"); *Le v. Zuffa, LLC*, No. 215CV01045RFBBNW, 2023 WL 5085064, at *1 (D. Nev. Aug. 9, 2023) ("Plaintiffs have established antitrust injury in the form of suppressed market wages due to [d]efendant's conduct."). This is sufficient for Plaintiffs to pursue their claims, the merits of which will be decided by the jury.

### 4. Market Power

Defendants' fourth argument is that Plaintiffs' proposed relevant market fails as a matter of law. For the reasons discussed at length above, Plaintiffs' proposed market is lawful (and has been judicially admitted as such by Defendants). Therefore, this argument is denied.

### 5. Plaintiffs' Section 1 Claim

Finally, Defendants argue that Plaintiffs' Section 1 claim "fails for lack of proof." To prove their Section 1 claim, Plaintiffs must show that NASCAR (1) had market power in a relevant market; (2) entered into one or more agreements that unreasonably restrained trade in that market; and that the agreements (3) had anticompetitive effects and caused Plaintiffs antitrust injury. *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002). Each of these elements have been met sufficiently to enable Plaintiffs to present their Section 1 claim at trial. As discussed above, there is evidence that NASCAR "had market power in a relevant market." Further, Plaintiffs have provided evidence of NASCAR's track and Next Gen 7 exclusivity restrictions,[9] which a jury

---

[9] There is also evidence in the record from which the jury and/or the Court could conclude that the Charter agreements themselves are anticompetitive restraints on trade with respect to Cup Series aspirants who don't have Charters. *See* Doc. No. 216-1 (Hubbard Expert Report) at ¶¶ 47–51 ("Competition to supply NASCAR Cup Series entrants was lower after the start of the Charter era than before the start of the Charter era.").

could find satisfy the second and third requirements of an agreement that unreasonably restrained trade, anticompetitive effect and resulting antitrust injury to Plaintiffs through NASCAR's alleged payment of below competitive market rates. Therefore, Defendants' Motion for Summary Judgment will be denied.

## IV.  ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. No. 235) is **DENIED**;

2. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 230) is **GRANTED;** and

3. This case shall proceed to trial on the merits on the remaining claims in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: November 4, 2025

Kenneth D. Bell
United States District Judge