# Exhibit 30

# FILED UNDER SEAL

**Pursuant to the Text-Only Order granting Dkt. No. 228 Corrected Motion to Seal entered by U.S. Magistrate Judge Susan C. Rodriguez on 10/1/2025**

**CHARTER MEMBER AGREEMENT NUMBER: 32**
**ASSIGNED CAR NUMBER (AS OF EXECUTION DATE): 23**



**NASCAR CUP SERIES**
**CHARTER MEMBER AGREEMENT**

CONFIDENTIAL

FRM_0005822

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Term | 1 |
| | 2.1 Term | 1 |
| | 2.2 Term Extension | 1 |
| | 2.3 Good Faith Renewal Negotiations | 2 |
| 3. | NEM Commitments | 2 |
| | 3.1 NEM Commitments | 3 |
| | 3.2 Field Size | 4 |
| | 3.3 Anti-Dilution | 5 |
| | 3.4 Charter Member Issuance or Re-Issuance | 6 |
| | 3.5 Governance | 7 |
| | 3.6 Rules Packages and Testing Policy | 11 |
| | 3.7 Single Source Supplier | 12 |
| 4. | Payments and Distributions | 13 |
| | 4.1 Pool Money | 13 |
| | 4.2 Ancillary Rights Distributions | 13 |
| | 4.3 Payment Terms | 15 |
| | 4.4 Payment Obligations | 15 |
| 5. | Intellectual Property | 16 |
| | 5.1 Ownership and Acknowledgment | 16 |
| | 5.2 Advertising and Promotional Activities by NEM | 17 |
| | 5.3 Collective Use | 18 |
| | 5.4 Team Clips | 18 |
| | 5.5 Team Intellectual Property; Works; Ancillary Rights | 18 |
| | 5.6 Advertising and Promotional Activities by Team Owner | 21 |
| 6. | Team Owner Obligations | 21 |
| | 6.1 Operating Obligations | 21 |
| | 6.2 Competition | 21 |
| | 6.3 Designated Sponsor and Competitor Branding | 22 |
| | 6.4 Driver Agreement | 23 |
| | 6.5 NASCAR Rules | 23 |
| | 6.6 Protection Of Goodwill | 23 |
| | 6.7 Injunctive Relief | 24 |
| | 6.8 Sponsor Exclusivity | 24 |

CONFIDENTIAL

| | 6.9 | Series Sponsor Exclusivity. | 25 |
|---|---|---|---|
| | 6.10 | Tire Sponsor Exclusivity | 27 |
| | 6.11 | Fuel Sponsor Exclusivity | 27 |
| | 6.12 | Minimum Performance Standards | 28 |
| | 6.13 | Media/Promotional Obligations | 28 |
| | 6.14 | Team Sponsors | 29 |
| 7. | | Ancillary Rights Financial Records | 29 |
| | 7.1 | Ancillary Rights Statement. | 29 |
| | 7.2 | Financial Records | 30 |
| 8. | | Transferability/Charter Limitation. | 31 |
| | 8.1 | Transfer. | 31 |
| | 8.2 | Limitations On Transfers. | 34 |
| | 8.3 | Charter Member Agreement Limitation | 34 |
| | 8.4 | Transfers by NEM | 34 |
| 9. | | Termination. | 35 |
| | 9.1 | Team Owner Events of Default | 35 |
| | 9.2 | NEM Event of Default | 36 |
| | 9.3 | Consequences of Termination. | 36 |
| | 9.4 | Set-Off. | 37 |
| | 9.5 | Voluntary Forfeiture | 37 |
| 10. | | Representations, Warranties and Covenants. | 37 |
| | 10.1 | Representations, Warranties and Covenants by the Team Owner and the Control Person. | 37 |
| | 10.2 | Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities. | 38 |
| | 10.3 | Release And Waiver by Team Owner and Control Person | 40 |
| | 10.4 | Release And Waiver by NEM | 40 |
| 11. | | Indemnification. | 41 |
| | 11.1 | Team Owner Indemnity | 41 |
| | 11.2 | NEM Indemnity | 41 |
| | 11.3 | Third Party Claims | 41 |
| 12. | | Dispute Resolution. | 42 |
| | 12.1 | Dispute Resolution. | 42 |
| | 12.2 | Arbitration Mechanics | 42 |
| | 12.3 | Arbitration Award | 43 |
| | 12.4 | Equitable Relief | 43 |
| | 12.5 | Limitations on Damages | 43 |

CONFIDENTIAL

FRM_0005824

13.     Miscellaneous. ............................................................................................................ 43

     13.1     Notices ................................................................................................................ 43

     13.2     Complete Agreement ......................................................................................... 44

     13.3     Expenses ............................................................................................................ 44

     13.4     Governing Law .................................................................................................. 44

     13.5     Confidentiality .................................................................................................. 44

     13.6     Relationship Created ......................................................................................... 44

     13.7     No Third-Party Beneficiaries ........................................................................... 44

     13.8     Separability ....................................................................................................... 45

     13.9     Failure to Take Action; Waiver ........................................................................ 45

     13.10     Force Majeure ................................................................................................... 45

     13.11     Publicity ............................................................................................................ 45

     13.12     Amendments. .................................................................................................... 45

     13.13     Further Action ................................................................................................... 46

     13.14     Joint and Several ............................................................................................... 46

     13.15     Reservation of Rights ........................................................................................ 46

     13.16     General Interpretative Provisions ..................................................................... 46

     13.17     Performance ...................................................................................................... 46

     13.18     Survival ............................................................................................................. 46

     13.19     Counterparts ...................................................................................................... 46

     13.20     Guarantees ........................................................................................................ 47

CONFIDENTIAL

# NASCAR CUP SERIES
# CHARTER MEMBER AGREEMENT

The parties to this Charter Member Agreement (this "Agreement") dated as of the Execution Date are (i) NASCAR Event Management, Inc. a Florida corporation ("NEM"), (ii) solely for purposes of Sections 10.2, 10.4, 11.2 and 13.20, NASCAR Broadcasting, LLC, NASCAR Media Group, LLC, NASCAR Media Ventures, LLC, NASCAR Productions, LLC, NASCAR Digital Media, LLC (all of the entities set forth in this clause (ii), the "Specified NASCAR Entities"), (iii) the Team Owner (as defined below), and (iv) the Control Person (as defined below), and is effective as of the Effective Date (as defined below).

## RECITALS

A.    NEM, pursuant to a license agreement with its Affiliate, National Association for Stock Car Auto Racing, Inc., a Florida corporation ("NASCAR"), organizes, operates, sanctions and exploits the Events (each as defined below);

B.    The Team Owner directly owns, controls and operates the Team (as defined below), and the Control Person, directly or indirectly, owns a controlling equity interest in the Team Owner as set forth herein;

C.    NASCAR has historically granted rights to competitors to participate in Events only on an annual basis. The object of this Agreement is NASCAR's grant, through its Affiliate NEM, to the Team Owner of the right to participate in the Cup Series throughout the Term; and

D.    NEM is willing to grant the Team Owner, and the Team Owner is willing to accept, the right and license to participate in the Cup Series during the Term (each as defined below) on the terms and subject to the conditions set forth in this Agreement.

Accordingly, it is agreed as follows:

1.    Definitions. Capitalized terms used but not defined herein shall have the meanings given to them in Exhibit A hereto.

2.    Term.

2.1    Term. Subject to Section 2.2, the term of this Agreement shall commence on the Effective Date and shall continue until the earlier of (x) December 31, 2020 or (y) the termination of this Agreement pursuant to Section 9 hereof (such term, the "Initial Term" and the Initial Term as it may be extended pursuant to Section 2.2, shall be referred to herein as the "Term"). This Agreement shall constitute a valid, binding and enforceable agreement of each of the parties hereto as of the Execution Date.

2.2    Term Extension. NEM and Team Owner acknowledge that the Team Owner's desire to enter into an extension of the Agreement will depend, in part, on the Promoter Fees payable to NEM or its Affiliates during the period from Year 2021 through Year 2024, inclusive, and the portion thereof that would be paid into Pool Money during each such Year, determined in accordance with Exhibit B. Subject to Exhibit B, NEM shall enter into agreements with Promoters setting forth the Promoter Fees to be payable during the period from Year 2021 through Year 2024, inclusive, and, on or prior to November 1,

CONFIDENTIAL    FRM_0005826

2019, provide written notice to Team Owner, certified to be accurate by an authorized officer of NEM, of the amount of such Promoter Fees and the portion thereof payable into Pool Money each such year (or, if such agreements have been entered into with Promoters prior to November 1, 2019, NEM shall provide notice as soon as reasonably practicable once such agreements with Promoters have been entered into). Team Owner may send a written notice (an "Extension Notice") during the period beginning January 1, 2020 and ending March 1, 2020 to NEM stating its desire to extend the Term for an additional four (4) year period. If such Extension Notice is delivered during such period, the Term will be automatically extended until December 31, 2024 without further action by any party (the "Extension Term"), provided that the Term shall not be extended if NEM, following the delivery of such Extension Notice, has the right to terminate this Agreement pursuant to Section 9.1 hereof (and, for any defaults that are subject to cure pursuant to Section 9.1, the applicable cure periods have expired) and NEM provides notice to Team Owner within sixty (60) days following the date of delivery by the Team Owner of such Extension Notice that this Agreement is not being extended as a result of such termination right (the events referenced in this proviso shall be referred to herein as "Nonrenewal Events", it being understood and agreed that in the event that NEM does not deliver such notice, then NEM will not subsequently have the right to terminate this Agreement pursuant to Section 9.1 in respect of any Nonrenewal Event of which it was aware prior to termination of such sixty (60) day period) (provided that, if Team Owner's Designated Vehicle has finished as one of the last three positions in annual owner points of Charter Members during the Years ending December 31, 2018 and December 31, 2019 (but not the Year ending December 31, 2017), and NEM intends to exercise the termination right set forth in Section 9.1(f) or otherwise not extend this Agreement in the event that Team Owner's Designated Vehicle finishes in one of the last three positions in annual owner points of Charter Members in the Year ending December 31, 2020, then NEM must deliver notice setting forth such intention to Team Owner during such 60-day time period specified in this Section 2.2, which notice shall be contingent on (and effective only if) the Team Owner's Designated Vehicle finishing as one of the last three positions in annual owner points of Charter Members in the Year ending December 31, 2020, it being understood that the failure on the part of NEM to timely deliver any such notice under this Section 2.2 shall constitute a waiver of any right on NEM's part to terminate or not extend this Agreement as a result of the events described in Section 9.1(f) in respect of the three-year period ending December 31, 2020). The failure of Team Owner to timely deliver an Extension Notice shall constitute a waiver on the part of Team Owner to extend this Agreement pursuant to this Section 2.2, except in circumstances where NEM has failed to timely deliver to Team Owner the amount of Promoter Fees payable during the period from Year 2021 through Year 2024, inclusive, and the portion thereof to be paid into Pool Money.

2.3    Good Faith Renewal Negotiations. During the period beginning on January 1, 2023 and ending on March 1, 2023, the Team Owner may send a written notice to NEM stating its desire for a renewal of this Agreement beyond December 31, 2024. If the Team Owner sends such notice during such period, NEM will enter into confidential and good faith negotiations with the Team Owner regarding a potential renewal of this Agreement during the period from July 1, 2023 through December 31, 2023 (the "Negotiation Period"). The Negotiation Period shall be exclusive to the Team Owner with respect to a renewal of the rights granted under this Agreement (and neither NEM nor its Affiliates shall solicit offers from, or enter into negotiations with, any third party any time prior to the Negotiation Period regarding any agreement or arrangement that if implemented would prevent or materially impede NEM from extending the Term of or otherwise renewing this Agreement). While NEM and the Team Owner currently desire to renew this Agreement upon expiration of the Term, the final decision regarding whether or not to renew, and the term of any renewal period, shall be subject to mutual agreement of the parties and, for clarity, either party may propose any changes to this Agreement during such Negotiation Period.

3.    NEM Commitments.

CONFIDENTIAL

3.1     NEM Commitments.  During the Term:

(a)     Subject to the terms of this Agreement and the delivery to NEM of a valid executed Driver Agreement, and otherwise in compliance with the NASCAR Rules, the Team Owner shall have the right to (i) enter the Designated Vehicle in, practice, participate in time trials (or whatever reasonable alternate method NEM uses) to determine starting order, race in the Race, and achieve a finishing position for each Event that is held during the Term, (ii) achieve a finishing position in the point standings for the Cup Series for each Season, and (iii) be referred to as a NASCAR Team during the Term.  NEM represents and warrants that (A) it has the exclusive right to grant (or otherwise arrange for) guaranteed starting positions in Events, and that it will not do so through any means other than Charter Member Agreements (and, for clarity, for purposes of the foregoing, participation by open teams shall not be deemed a "guaranteed" starting position in any Event), and (B) the money payable by NEM or its Affiliates to Competitors with respect to Event participation shall be paid to Competitors as provided in Exhibit B and Exhibit F, including the Pool Money and the Contingency Awards and Special Awards monies.  For the avoidance of doubt, all such rights shall include any Invitational Event(s) for which the Team Owner has satisfied all applicable qualification requirements;

(b)     NEM shall, or shall cause its Affiliates to, during each Year of the Term, distribute to the Team Owner, on or prior to when due, the applicable amount (i) of Pool Money as set forth in Exhibit B , (ii) Ancillary Rights Distributions that the Team Owner is entitled to receive pursuant to Section 4.2, and (iii) Contingency Awards and Special Awards monies set forth in Exhibit F, with the amount of such Contingency Awards and Special Awards monies that the Team Owner is eligible for to be determined consistent with past practice (and the applicable contract) based on the achievement of the applicable criteria for such amounts (for clarity, the entire amount of Contingency Awards and Special Awards monies for any Year reflected in Exhibit F shall be paid to Competitors for such Year, subject to the applicable contractual requirements imposed by the counterparties to such contracts with respect to such monies);

(c)     NEM has the right to and shall, or shall cause its Affiliates to, use commercially reasonable efforts to sell one or two (but no more than two) title sponsorships for the Cup Series  pursuant and subject to Sections 6.8 and 6.9,  and one or more sponsorships in the other Reserved Sponsor Categories (which sponsorship may be selected by NASCAR in its reasonable discretion) in an effort to provide necessary competition resources and to have such sponsors engage in commercial activation and promotion of the Cup Series;

(d)     None of NEM or any of its Affiliates, or any direct or indirect owner of any of them, or any Family Relative of any such owner, shall at any time during the Term be a Competitor or acquire a direct or indirect interest in a Competitor; provided, however that (x) NEM and its Affiliates may acquire a Competitor or an interest in a Competitor, or conduct or support the operations of a Competitor, for a period of not more than twelve (12) months if NEM or its Affiliates determines in its reasonable discretion that NASCAR's ownership, conduct or support of such Competitor would be in the best interests of the sport of stock car racing, provided that during such time, NEM shall use commercially reasonable efforts to identify a third party who would acquire such Competitor or such interest therein as soon as reasonably practicable, and (y) nothing in this Agreement shall be deemed to prohibit or restrict any direct or indirect owner of  NASCAR Holdings, Inc., or any Family Relative of any such owner (e.g., any member of the France family), from owning a Competitor or any interest therein or participating in the operations of any Competitor (e.g., as a driver, engineer, crew member, etc.) for any period of time, provided that, with respect to this clause (y), (A) such owner or Family Relative is not an employee involved in racing competition issues, director or officer  of NEM or any of its Affiliates engaged in NASCAR racing competition or management; (B) for so long as such owner or Family

3

CONFIDENTIAL

Relative owns such Competitor or interest or participates in such operations, he or she does not receive any material non-public information from NEM or any of its Affiliates, regarding racing competition that is not available to other Competitors generally; (C) subject to the foregoing clause (x), the direct and indirect owners of NASCAR Holdings, Inc., and the Family Relatives thereof, may not at any time, collectively, own interests in more than four (4) Charters Member Agreements; (D) under no circumstances may NEM or any of its Affiliates, enter into a Charter Member Agreement with any direct or indirect owner of NASCAR Holdings, Inc., or any Family Relative of any such owner (as opposed to such owners or Family Relatives acquiring an interest in an existing Charter Member Agreement). NEM shall provide written notice to Team Owner if any of the foregoing rights are exercised during the Term;

(e)     Other than any ownership by NEM or any Affiliate as of the Execution Date, NEM shall provide written notice under this Agreement to Team Owner if NASCAR or any of its respective Affiliates at any time during the Term becomes a Promoter or acquires a direct or indirect interest in a Promoter;

(f)     NEM shall provide Team Owner with the right to use the Assigned Car Number for the Term of this Agreement. Notwithstanding the foregoing, Team Owner may transfer the Assigned Car Number to any other Team owned and controlled by an Affiliate of such Team Owner, provided that any such transfer shall be subject to prior written notice to NEM and shall only be permitted to be effective prior to the commencement of a (and not during any) Season; and

(g)     All fees required annually for competition as provided in Schedule 3, including without limitation race entry, memberships applications and licenses, credentials and hard cards ("Charter Member Fees") accrued prior to the first Cup Series Points Event of the Season of each Year by Team Owner shall be billed in four (4) equal installments and due on March 1st, June 1st, September 1st and November 1st. All Charter Member Fees accrued after the first Cup Series Points Event of the Season will be billed and due in full on the next payment date of March 1, June 1, September 1st or November 1st as the case may be. Any Charter Member Fees accrued after the November 1st invoice, will be billed within five Business Days following the conclusion of the final Event for such Season and be due and payable on or prior to five Business Days following receipt of such bill. Any Charter Member Fees that remain unpaid 30 days (or in the case of such final bill for the year, five Business Days) after receipt by Team Owner of a written notice from NEM that such payment is past its due date may be set off against future Pool Monies that would otherwise be payable to the Team Owner. All Charter Member Fees shall be paid by ACH or wire transfer. Schedule 3 sets forth the amount of all fees that NEM or any of its Affiliates may charge to Team Owner or Control Person, or their respective Affiliates, during the Term, except that minor fees during the year (e.g., tables at the Cup Banquet, filing an appeal) may be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

3.2     Field Size. For each Cup Series Points Event during the 2016 Year the maximum Field Size is forty (40) Competitors, and the maximum number of Charter Members is thirty-six (36). NEM's current intent is to maintain such Field Size and number of Charter Members for the duration of the Term. However, NEM, if it determines that it is in the best interest of the sport to increase the Field Size or the number of Charter Members during any portion of the remainder of the Term of this Agreement, may increase the Field Size to up to (but not in excess of) forty-three (43) Competitors and the number of Charter Members (with or without any increase in the Field Size) to up to (but not in excess of) forty (40) during any portion of the remainder of the Term (after 2016); provided, however that (i) if the Field Size or number of Charter Members is increased, such increase shall be subject to the anti-dilution provisions set forth in Section 3.3; and (ii) prior to entering into an additional Charter Member Agreement, NEM shall comply with the provisions of Section 3.4(a).

4

CONFIDENTIAL                                                                                      FRM_0005829

3.3　Anti-Dilution.  In the event NEM (or any of its Affiliates) after the Execution Date, either (i) allows for additional open team positions  which, when combined with the number of active Charter Member Agreements, increases the total Field Size above forty (40) Competitors for any Cup Series Points Event(s) or (ii) enters into one or more additional Charter Member Agreements which increases the number of active Charter Member Agreements above thirty-six (36) (which increase shall be effected in accordance with Section 3.2), then the following specific adjustments set forth in Sections 3.3(a)-(d) below shall be made to the Points Pool Money and Ancillary Rights Distributions.

(a)　New Charter Member Agreement Issuance.  If one or more additional Charter Member Agreements are issued which increases the number of active Charter Member Agreements above thirty–six (36) (each such Year in which the number of active Charter Member Agreements is above thirty-six, a "Charter Member Increase"), then for each Year (or portion thereof) during the Term where a Charter Member Increase is in effect (i) the amount of Fixed Owner's Plan (Charter Teams) and Historical Owner's Plan (in each case as specified in Exhibit B)  shall be increased to equal the amount determined by multiplying the amount of Fixed Owner's Plan (Charter Teams) and Historical Owner's Plan that would otherwise be payable in such Year or portion of such Year, as the case may be (as indicated in Exhibit B) by a fraction, the numerator of which is the number of active Charter Member Agreements  for such Year and the denominator of which is 36; (ii) if a Charter Member Increase causes the Field Size to increase above 40 for any Cup Series Points Event, then the amount of the Race Purse and Year-End Point Fund (as specified in Exhibit B) attributable to such Cup Series Points Event(s) shall be increased to equal an amount determined by multiplying the amount of the Race Purse and Year-End Point Fund that would otherwise be payable for such Cup Series Points Event(s) (as indicated in Exhibit B) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40, and (iii) any such Charter Member whose issuance causes such Charter Member Increase shall not be eligible to participate in or receive any Ancillary Rights Distribution during the Term.  If the amount of the Historical Owner's Plan is increased pursuant to clause (i) of the foregoing sentence, then in determining payout per Charter Member Agreement, Historical Owner's Plan points calculation shall be based on the number of active Charter Member Agreements at such time, rather than 36 (e.g., the best average Charter Team Owner Points finisher over the past three years would receive 37 shares if there are 37 active Charter Member Agreements at such time).  If the Race Purse for any Cup Series Points Event(s) is increased pursuant to clause (ii) this Section 3.3(a), then NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field.

(b)　Field Size Increase.  If the Field Size is increased for any Cup Series Points Event(s) above forty (40) by adding one (1) or more open team positions (and not, for clarity, as a result of a Charter Member Increase, which is addressed in Section 3.3(a) above), then the amount of the Race Purse and the Year-End Point Fund (as specified in Exhibit B) attributable to such Cup Series Points Event(s) payable to Competitors shall be increased to equal an amount determined by multiplying the amount of the Race Purse and the Year-End Point Fund that would otherwise be payable for such Cup Series Points Event(s) (as indicated in Exhibit B) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40 (and NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field).

(c)　Expansion of Field due to Increase in Both Charter Member Agreements and Open Teams; Information Requirements.  In the event of an increase in the Field Size for a Cup Series Points Event above 40 due to both a Charter Member Increase and the addition of one or more open team

5

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　FRM_0005830

positions, then the concepts set forth in clauses (a) and (b) above shall be applied by NEM with respect such increases to ensure the full anti-dilution protection contemplated therein, but without any duplication. For purposes of clarification, the concepts set forth in clauses (a) and (b) above shall only be applied for Cup Series Points Event(s) where the number of active Charter Member Agreements exceeds thirty-six (36) and/or the Field Size exceeds forty (40) Competitors. In the event NEM or any of its Affiliates elects to grant to any Person the right to compete in the Cup Series in any Year of the Term and if as a result of such grant there is a Charter Member Increase or the Field Size would be increased above forty (40), then in addition to compliance with the other provisions of this Agreement and NASCAR Rules, NEM shall deliver to Team Owner prior written notice of its intention to expand and documentation sufficient to evidence its compliance with the requirements of this Section 3.3. In no event will NEM issue a new Charter Member Agreement in accordance with this Section 3.3 and 3.4 that permits such new Charter Member to commence racing in any Event after the first Cup Series Points Event of such Season has commenced

(d) Subsequent Reduction of the Field Size. If, in any Year or portion of any Year following any increase in the Field Size above 40 or a Charter Member Increase as a result of which anti-dilution payments are made pursuant to the foregoing subsections (a)-(c), either the Field Size is decreased or the number of active Charter Member Agreement is decreased, then, effective following the time of such decrease, the foregoing requirements in respect of anti-dilution payments shall cease to apply in respect of the applicable increase that gave rise thereto (it being understood that any anti-dilution payments required to be made pursuant to such subsections (a)-(c) prior to such date shall be made as so required), provided, however, that, if such reduction results in a Charter Shortfall or a Field Shortfall, Section 4.1 shall apply.

3.4 Charter Member Issuance or Re-Issuance.

(a) Neither NEM nor its Affiliates shall enter into a new Charter Member Agreement that causes a Charter Member Increase, unless (i) NEM gives written notice to Team Owner and each other Charter Member of its desire to enter into the new Charter Member Agreement and specifying the identity of the proposed new Charter Member, following which Team Owner and each other Charter Member shall have the right to negotiate (to the exclusion of NEM and its Affiliates) with such proposed new Charter Member for a period of one hundred twenty (120) days following receipt of such notice regarding the terms on which Team Owner or any such other Charter Member might Transfer an existing Charter Member Agreement to such proposed new Charter Member, and (ii) if neither Team Owner nor any other Charter Members reach agreement with the proposed new Charter Member for the Transfer of an existing Charter Member Agreement within such 120-day period, then NEM will be free to negotiate with such proposed new Charter Member regarding the terms on which NEM is willing to issue a new Charter Member Agreement to such proposed new Charter Member. In the event that NEM reaches agreement with any such proposed new Charter Member, then at least 10 Business Days before issuing a new Charter Member Agreement to such prospective new Charter Member, NEM shall give written notice to Team Owner and each other existing Charter Member, specifying the economics (which such economics shall exclude the anti-dilutive amount that would be due and owing, and necessary to eliminate any anti-dilution payments, by such prospective new Charter Member pursuant to Section 3.3(a)-(c) of this Agreement (the "Dilutive Amount"), but such notice shall include, solely for information purposes, the amount of such Dilutive Amount and the basis for the calculation of such Dilutive Amount) to be paid by the new Charter Member and the rights being granted under the Charter Member Agreement and enclosing a firm offer by such proposed new Charter Member to purchase a Charter Member Agreement from any existing Charter Member on such terms (which, for clarity, shall exclude the payment by such prospective new Charter Member of any Dilutive Amount). If neither Team Owner nor any other Charter Member expresses an interest in transferring its Charter Member Agreement to the proposed new Charter

6

CONFIDENTIAL                                                                     FRM_0005831

Member in return for the consideration specified in the notice delivered by NEM within 10 Business Days following receipt of such notice from NEM, then NEM shall be free to issue a new Charter Member Agreement to such proposed Charter Member on such terms within 30 days following the expiration of such 10 Business Day period. Team Owner or any other Charter Member timely expressing such an interest in transferring a Charter Member Agreement to such proposed new Charter Member shall be permitted to assign its Charter Member Agreement to such new Charter Member in exchange for the economics set forth in the notice delivered by NEM (pursuant to an assignment agreement containing terms acceptable to the transferring Charter Member, acting reasonably) rather than NEM entering into a new Charter Member Agreement with such prospective new Charter Member (and NEM agrees to enter into any amendments to such Charter Member Agreement reasonably necessary to make the rights granted therein consistent with the applicable terms negotiated by NEM with the new Charter Member, other than the payment of the Dilutive Amount). If more than one Charter Member expresses an interest in assigning its Charter Member Agreement to the new prospective Charter Member in return for the consideration specified in the notice delivered by NEM, then the interested Charter Member that finished lowest in owner points (relative to other Charter Members) in the most recently completed Season shall have the right to assign a Charter Member Agreement that it currently holds to the new prospective Charter Member.

(b)      In the event any Charter Member Agreement is forfeited or terminated for any reason, NEM may re-issue such Charter Member Agreement during the Term of this Agreement pursuant to the procedures set forth in this Section 3.4(b) (and, for clarity, without subject to the provisions of Section 3.3 or 3.4(a)). Upon reissuance of such Charter Member Agreement, NEM shall be entitled to retain no more than Five Hundred Thousand ($500,000.00) US Dollars as NEM's re-issuance fee, with the remaining excess amount charged for such Charter Member Agreement to be distributed to (and to increase) the Fixed Owner's Plan - Charter Teams as shown in Exhibit B in the following Season (or, in the event that such Charter Member Agreement is re-issued in the final Year of the Term, then during such final Year's racing season). If NEM desires to reissue any forfeited or terminated Charter Member Agreement, NEM shall provide written notice (the "Invitation to Bid") to the then existing Competitors (including the Team Owner) and negotiate in good faith with any Competitors expressing an interest in acquiring such Charter Member Agreement (and the Competitors will be given a period of thirty (30) days following receipt of the Invitation to Bid during which to express such an interest) before reissuing such Charter Member Agreement to any third party. NEM's Invitation to Bid shall have as a condition that the Charter is granted to the eligible Competitor who submitted the highest bid, as reasonably determined by NEM. In the event that no bids are received in the applicable period then NEM shall be free to reissue such Charter Member Agreement to an eligible third party with whom NEM reaches a binding agreement.

3.5      Governance. NEM is committed to a robust and inclusive governance model which will allow for NEM to provide information to and obtain significant and meaningful input from the Competitors to ensure decisions are made in the best interests of the sport. In furtherance of this goal, NEM shall form and maintain throughout the Term a Team Owner Council as described in further detail herein.

(a)      Formation of Team Owner Council. NEM shall form and maintain throughout the Term a Team Owner Council, which will be comprised of (i) the controlling owner that controls, and together with its Affiliates is a party to, one or more Charter Member Agreements and the Cup Series teams granted such rights thereto (each, a "Charter Member Group"), and the controlling owner of each other Charter Member that is not part of a Charter Member Group, and in each case an alternate member designated by each such controlling owner who shall be a director, owner, CEO, President or CFO within the applicable Charter Member Group or of the Charter Member, as applicable, or another senior

7

CONFIDENTIAL                                                                                                                      FRM_0005832

executive within such Charter Member Group or such Charter Member, as applicable, who has been approved by NEM (which approval will not be unreasonably withheld or delayed) and who may attend meetings of the Team Owner Council together with the controlling owner of such Charter Member Group or Charter Member, as applicable, (ii) the controlling owner of each open participant that attempted to qualify for at least 75% of the Cup Series races in the prior Year (a "Qualifying Open Participant") (any designated representative in the foregoing clauses (i) and (ii) shall be referred to herein as a "Team Owner Council Representative"); and (iii) NASCAR designees. Subject to the NEM approval rights set forth above, if applicable, Team Owner shall notify NEM of its alternate Team Owner Council Representative and of any change to such alternate Team Owner Council Representative. The Team Owner Council will be co-chaired by one NASCAR designee and one Competitor-appointed designee (the "Team Co-Chair"). The Team Co-Chair will be a current member of the Team Owner Council and will be selected (and may at any time be removed and replaced) by majority vote of the Team Owner Council, and in any such vote (whether for selection, removal or replacement) the Team Owner Council Representative from each Charter Member Group will have one vote for each Charter Member Agreement held by such Charter Member Group and the other Team Owner Council Representatives will have a single vote (for clarity, the alternate representatives shall vote only in the event that the applicable controlling owner is not present) (and, for clarity, the NASCAR designees shall not have a vote). The Team Co-Chair will serve a one-year term as co-chair, and the Team Owner Council must use good faith efforts to rotate the Team Co-Chair based on BMG affiliation.

(b)     Operation of Team Owner Council.

(i)     Through the mechanism of the Team Owner Council, NEM will present to the Team Owner Council and will consult meaningfully with the Competitors on all material matters of interest to the Competitors (e.g. safety and competition, proposed rule changes, industry economics, broadcast and sponsorship issues, single supplier arrangements, digital media issues and the development of fan-centric racing.) NEM's meaningful consultation obligation will include the obligation of NEM to share information with the Team Owner Council reasonably requested by any member of the Team Owner Council, but subject to the obligations of the members of the Team Owner Council to maintain the confidentiality of such information. Nothing herein shall require NEM or its Affiliates to breach bona fide confidentiality obligations imposed on them pursuant to existing agreements.

(ii)     Before implementing any Material Change, NEM shall cause such Material Changes to be individually brought forward and presented to the Team Owner Council. No later than three (3) Business Days from the date of such presentation to the Team Owner Council, the Team Co-Chair shall send a writing to NEM that includes (or copies) notice to all other Team Owner Council Representatives and either (i) endorses such Material Change for implementation by NEM (the "Endorsement"), (ii) does not endorse such Material Change for implementation by NEM (the "Non-Endorsement") or (iii) takes no position with respect to an Endorsement or Non-Endorsement of such Material Change (the "No-Position") (and, for clarity, if no Endorsement, Non-Endorsement or No Position is sent to NEM during such three (3) Business Day period, the five (5) Business Day period described in the subsequent sentence shall not apply and such Material Change shall not be deemed subject to a Non-Endorsement). Any Endorsement, Non-Endorsement or No Position shall go into full force and effect on the date that is five (5) Business Days after receipt thereof by NEM unless superseded by a written revocation of any such Non-Endorsement delivered to NEM by the Team Co-Chair during such five (5) Business Day period, which revocation, if any, will include (or copy) notice to all other Team Owner Council Representatives. NEM may then rely on the revocation of the Team Owner Co-Chair as the final position of the Team Owner Council Representatives. "Material Change" as used herein means as follows: (i) major rule package changes; (ii) increasing the number of testing dates or otherwise changing the testing policies in a manner that would materially increase costs for Competitors;

8

CONFIDENTIAL                                                                                       FRM_0005833

(iii) without in any way limiting the advance notice requirements set forth in Section 3.6(d) below, major equipment or engine changes; (iv) new single source supplier arrangements (whether created pursuant to agreements or implemented via NASCAR Rules or via specifications intended to create a single source supplier); (v) material Race format changes; (vi) material Chase eligibility or format changes; or (vii) material expansion to the length of the Event weekend.

(iii)    Unendorsed Material Changes during the Initial Term. If during the Initial Term, NEM adopts or imposes three (3) Material Changes that are subject to an effective Non-Endorsement as set forth in subsection (ii) above, then the Team Owner may elect to terminate the Protection of Goodwill provision outlined in Section 6.6 upon written notice to NEM (following which such Section 6.6 shall be of no further force or effect, including during the Extension Term).

(iv)    Unendorsed Material Changes during the Extension Term. If during the Extension Term, NEM adopts or imposes three (3) Material Changes that are subject to an effective Non-Endorsement as set forth in subsection (ii) above (and, for clarity, not otherwise counted pursuant to subjection (iii) above), then the Team Owner may elect to terminate the Protection of Goodwill provision outlined in Section 6.6 upon written notice to NEM (following which such Section 6.6 shall be of no further force or effect).

(c)    Regular and Special Meetings of Team Owner Council. NEM will schedule and conduct, no less than four (4) times a Year, regular Team Owner Council meetings. Meetings will be held with the specific dates and locations to be determined by NEM in its reasonable discretion. In 2016, NEM shall notify the member of the Team Owner Council of the dates and locations for such regular meetings as soon as practicable after execution of this Agreement. After 2016, NEM shall be obligated to notify the members of the Team Owner Council, by January 1 of such Year, of the dates and locations for such regular meetings in such Year. All such regular meetings must be attended in person NEM will collaborate with Teams in developing the agenda for each such meeting, and the Chair of the Team Owner Council that is an NEM executive shall distribute the agenda for any regular meeting to each Team Owner Council member at least five (5) Business Days prior to the meeting. Special meetings of the Team Owner Council may be convened by either Co-Chair of the Team Owner Council, upon reasonable notice to the other members of the Team Owner Council, in which event the agenda shall include emergency matters raised by such members. Members shall be entitled to participate in any Special meeting by means of conference telephone. The Chairs shall ensure that a full and accurate summary of each meeting is prepared and distributed to each member of the Team Owner Council promptly following conclusion of any meeting of the Team Owner Council, and NEM shall be responsible for compiling and retaining such summaries and other materials from Team Owner Council meetings.

(d)    Committee Formation. The Team Owner Council shall form and maintain throughout the Term the committees of the Team Owner Council referenced in subsections (i) and (ii) below (and such committees may form subcommittees as deemed reasonably necessary or appropriate). Ideas will be generated at the committee level and where applicable project work groups will be formed by the applicable committee to further research, and to develop and make recommendations to the committees and/or sub-committees. Project work groups shall entail joint participation and leadership from Competitor representatives and NEM designees. Committees will, where applicable, make recommendations for implementation and discussion at the Team Owner Council. However, NEM as the sanctioning body shall have the final decision making authority, subject to the terms of this Agreement.

(i)    Competition Committee. The objective of the Competition Committee shall be to collaborate to enhance safety and drive efficiencies and to produce a fan-centric racing product on the track. Each Charter Member Group and each other Charter Member that is not part of an a Charter

9

CONFIDENTIAL                                                                                      FRM_0005834

Member Group shall have the right to designate one (1) representative on the Competition Committee (who shall be its competition director or senior technical lead), provided that the controlling owner and president of such Charter Member Group or Charter Member, as applicable, shall also have an open invitation to participate in Competition Committee meetings. Each Qualifying Open Participant shall have the right to designate one representative on the Competition Committee. The Competition Committee shall be chaired by two (2) NEM senior executives and by one (1) additional chairperson (e.g., three (3) additional chairpersons in total if there are three (3) BMG's) who will represent each active branded manufacturers' group (e.g., Chevrolet, Ford and Toyota hereafter, each a "BMG") and who will be selected from among the existing Competition Committee Team representatives. Each such BMG chairperson will be selected annually by the Teams associated with such BMG, provided that such chairperson shall rotate among the applicable Charter Member Groups annually. The Competition Committee shall have the discretion to invite to such meetings any third party who will be able to provide relevant input to the meetings (e.g., OEMs, engine builders, tire manufacturers and other suppliers, vendors, etc.) such participation shall be subject to a non-disclosure agreement if the Competition Committee so requests. Regular Competition Committee meetings will be held monthly during the racing season (i.e., nine (9) times per Year), with dates and locations to be determined by NEM in its reasonable discretion. NEM will notify the members of the Competition Committee, by January 1 of each Year, of the dates and locations for such regular meetings in such Year (except that, in 2016, such notification shall be made as soon as reasonably practicable following execution of this Agreement). The Chairpersons of the Competition Committee will develop the agenda for each such meeting after seeking input from other members of the Competition Committee, and a Chair who is an NEM executive shall distribute the agenda for any regular meeting to each Competition Committee member at least five (5) Business Days prior to the meeting. Members shall be entitled to participate in any meeting by means of conference telephone. The Chairpersons shall ensure that a full and accurate summary of each meeting is prepared and distributed to each member of the Competition Committee and Team Owner Council promptly following conclusion of any meeting of the Competition Committee, and NEM shall be responsible for compiling and retaining such summaries and other materials from Competition Committee meetings.

        (ii)    Marketing Committee. The objective of the Marketing Committee shall be to provide information to and obtain significant and meaningful input from the Competitors with respect to marketing-related issues, including, without limitation, as pertaining to sponsorships, broadcast, event marketing, digital media, ancillary programs, fan engagement and promotions. Each Charter Member Group that holds one or more Charter Member Agreement(s) and each other Charter Member that is not part of an Charter Member Group shall have the right to designate one (1) representative on the Marketing Committee. Each Qualifying Open Participant shall have the right to designate one representative on the Marketing Committee, and NEM shall have the right to, and shall, designate NASCAR's Chief Marketing Officer to the Marketing Committee. The Marketing Committee shall be co-chaired by a NASCAR designee and one (1) additional chairperson representing each BMG and selected by the Team Owners affiliated with such BMG. Regular Marketing Committee meetings will be held no less than four (4) times per year, with dates and locations to be determined by NEM in its reasonable discretion. NEM will notify the members of the Marketing Committee, by January 1 of a Year, of the dates and locations for such regular meetings in such Year (except that, in 2016, such notification shall be made as soon as reasonably practicable following execution of this Agreement). The Chairpersons of the Marketing Committee will develop the agenda for each such meeting after seeking input from other members of the Marketing Committee, and the Co-Chair who is NEM's designee shall distribute the agenda for any regular meeting to each Marketing Committee member at least five (5) Business Days prior to the meeting. Members shall be entitled to participate in any meeting by means of conference telephone. The Chairpersons shall ensure that a full and accurate summary of each meeting is prepared and distributed to each member of the Marketing Committee and Team Owner Council promptly

CONFIDENTIAL    FRM_0005835

following conclusion of any meeting of the Marketing Committee, and NEM shall be responsible for compiling and retaining such summaries and other materials from Marketing Committee meetings.

(e)     _Conduct of Meetings_.  Any and all meetings conducted are intended to be open forums for productive dialogue for Competitors and NEM to raise issues, present positions, maintain a dialogue, provide meaningful input and make recommendations for review, all with the goal of reaching consensus based decisions.

(f)     _Consensus Building_.  It is NEM's desire to build consensus amongst the Teams, BMGs, NEM and other relevant supporting stakeholders in the sport through the Team Owner Council and its committees, and the above referenced meeting processes. NEM recognizes the value of diversity of input and the desire to have a cooperative and constructive collaboration in the sport, and both Team Owner by and through its representatives on the Team Owner Council and related committees and NEM commit to use their good faith efforts to reach consensus on all issues reviewed by the Team Owner Council.  However, NEM as the sanctioning body shall have the final decision making authority regarding issues related to governance of the sport, except as otherwise set forth in other provisions of this Agreement (including, without limitation, Section 3.5(g) and Section 6.5).

(g)     _Comprehensive Policy Changes_.  Notwithstanding the foregoing, NEM shall not implement a significant and comprehensive policy change, outside of its past practices, that is designed to, or would otherwise reasonably be expected to, materially improve the competitive balance amongst Competitors unless such policy change is effectuated by an amendment to this Agreement pursuant to Section 13.12 (and, for clarity, NEM shall not under any circumstances implement a significant and comprehensive policy change, outside of its past practices, that is designed to, or would otherwise reasonably be expected to, otherwise materially alter the competitive balance amongst Competitors), provided that the foregoing shall not in any way limit, impede or effect the parties' rights with respect to Material Changes set forth in this Section 3.5 which do not come within the foregoing restrictions.

3.6     _Rules Packages and Testing Policy_.

(a)     _Annual Rule Package and Unified Testing Master Schedule Issuance_.  Beginning with respect to the Rules Package that will be applicable in 2017 and without limiting the commitments set forth in Section 3.5, NEM shall (i) provide an update to the Team Owner Council and obtain the Team Owner Council's input on the annual Rules Package that will be applicable in a race Season at the May Team Owner Council meeting preceding the race season, (ii) provide the annual Rules Package to the Team Owner Council for review no later than August 1 preceding any race Season and identifying any changes from the 2016 Rules Package and, if a later year, the preceding Year's final Rules Package, and (iii) discuss and obtain meaningful input on the Rules Package from the Team Owner Council at its September meeting, prior to the issuance of such annual Rules Package. NEM shall issue the final annual Rules Package by October 1 and after considering in good faith Team Owner Council input, and provided that such annual Rules Package shall not be in violation of the terms of this Agreement.

(b)     _In Season Changes to Rules Package_.  NEM covenants that no changes shall be made to the Rules Package that apply to any race season after the Rules Package for such race Season has been set in accordance with Section 3.6(a), unless, (i) such change is necessary for urgent safety reasons threatening life, limb or well-being or in order to comply with applicable law; or (ii) a Force Majeure Event or material and unanticipated supply chain issues or any other circumstances that would prevent or materially impede NEM's ability to conduct an Event without making such change, NEM shall be able to make such change (provided that any such change made pursuant to clause (ii) shall be effective only for so long as the applicable issue or circumstance necessitating such change remains in effect). For clarity, any such changes made in accordance with the foregoing subsections (i) or (ii) shall not be subject to an

11

CONFIDENTIAL

Endorsement or Non-Endorsement. NEM shall provide to the members of the Team Owner Council written notice, delivered as far in advance as is reasonably possible, of any proposed change to the Rules Package to be implemented pursuant to the previous sentence, and shall consult with and obtain views from the Team Owner Council in advance of such change to the extent practicable. Notwithstanding anything above, the foregoing shall not impede NEM's ability to conduct, officiate the competition and enforce the NASCAR Rulebook subject to Section 6.5.

(c) Advance Notice. Notwithstanding any provision of this Agreement to the contrary, NEM will communicate race Event related specifications to the Cup Series teams no less than four (4) months in advance of the Event unless such change (i) is described in Sections 3.6(b)(i), or (ii) relates to gear ratio (which may only be changed to any ratio set forth in the set of gear ratios most recently published by NEM) or tires, in each case, to the extent a shorter notice is necessary based on changes to track conditions.

(d) Bill of Materials. Without limiting the commitments set forth in Section 3.5, NEM will provide the periods of notification and timelines for implementation as outlined in Exhibit G for any bills of materials changes with respect to the vehicle systems described in Exhibit G unless such change is described in Section 3.6(b)(i). NEM shall not make any change to items set forth in Exhibit G unless (i) such change is necessary for urgent safety reasons or in order to comply with applicable law, or (ii) such change is in the ordinary course and does not create a material expense for Team Owner.

(e) Race Schedule. Notwithstanding this Section 3.6, NEM shall not modify the Cup Series Points Event schedule or the Invitational Event schedule to add any Cup Series Points Events or Invitational Events in any Year unless the aggregate amount of Pool Money payable to Competitors in such Year is increased proportionally (i.e., the Pool Money shall be multiplied by a fraction, the numerator of which is of total number of Cup Series Points Events and Invitational Events for such Year (inclusive of such additional Cup Series Points Event(s) and/or Invitational Event(s)) and the denominator of which is 38 (i.e., the total number of Cup Series Points Events and Invitational Events on the Effective Date). For clarity, the Daytona 500 and the Duels at Daytona are included as one Cup Series Points Event for purposes of the foregoing calculation of the denominator.

3.7 Single Source Supplier. In the event that NEM determines that it will pursue a single source supplier for any part used by Competitors (whether created pursuant to agreements or implemented via NASCAR Rules or specifications intended to create a single source supplier), then (i) if the single source supplier will supply anything other than a single engine or vehicle chassis sanctioned for use by all Competitors, any such supplier selection process shall be subject to the process set forth in Section 3.5, meaning that NEM shall identify and discuss potential single source opportunities with the Team Owner Council, and obtain the Team Owner Council's feedback thereon, prior to pursuing such opportunities and (ii) if the single source supplier will supply a single engine or vehicle chassis sanctioned for use by all Competitors, such supplier selection process shall only be effectuated by an amendment to this Agreement pursuant to Section 13.12. In addition, NEM will disclose the RFP for any applicable single source arrangement and the responses to the RFP to the Team Owner Council promptly following issuance or receipt of each such document. NEM will collect cost benchmarks and evaluate RFP responses against such benchmarks with the Team Owner Council, and NEM will present the proposed preferred vendor and rationale for its selection to the Team Owner Council prior to signing an agreement with such vendor. Subject to the foregoing and the other applicable terms of this Agreement, NEM will have the discretion to make the final selection of the supplier if the single source supplier will supply anything other than a single engine or vehicle chassis sanctioned for use by all Competitors; provided that no single source supplier shall charge Competitors in excess of arms-length reasonable commercial rates for the single sourced product. NEM and the Team Owner commit that they shall not receive financial

12

CONFIDENTIAL

consideration for exploiting their intellectual property or other assets as part of the agreement with the selected supplier. NEM and the Competitors, and their respective Affiliates, may exploit their intellectual property or other marketing assets for value and consideration to a single source supplier, provided that (i) such arrangement is not discussed or negotiated in any manner, or entered into, until after the single source supply arrangement is finalized and executed; (ii) the single source supply arrangement may not be conditioned in any manner on, including having economic incentives or termination rights tied to, entering into or failing to enter into any such arrangement, and (iii) if any such arrangement with a single source supplier is entered into in accordance with the foregoing, NEM (or its Affiliates) or the Team Owner (as applicable) shall provide written notice to the other party regarding the effective date, term and general subject matter of (including whether consideration will be received, but not otherwise detailing the consideration to be paid under) such arrangement. In the event that a single supplier agreement already exists on the date of this Agreement which includes intellectual property or marketing assets, this Section 3.7 shall not disqualify the single source supplier from participating in the RFP process in connection with any future single source supplier arrangement or renewal. Any (i) single source supply agreements existing as of the Execution Date and renewals thereof or (ii) replacement of any single source supply agreement in the Tire Category or Fuel Category, shall not be subject to the foregoing process (provided that (x) the prices charged Competitors in any of the foregoing single supply agreements (including extensions, renewals or replacements entered into after the Execution Date) shall not be artificially increased or, in the case of any replacement entered into after the Execution Date, pricing shall be determined consistent with the methodology from the previous contract, it being understood and agreed by the Team Owner that such prices may be subject to increases (including historical price escalations under existing single source agreements) and fluctuation based on market conditions, including, without limitation, the pricing or availability of raw materials, labor, transportation or conversion costs, and (y) the Team Owner and Control Person agree that the pricing under any single source supply agreement existing as of the Execution Date satisfies the foregoing requirements).

4.     Payments and Distributions. Subject to any adjustments made pursuant to Section 3.3 or Section 3.6(e):

4.1     Pool Money. In addition to any Ancillary Rights Distribution and any Contingency Awards and Special Awards distribution, for each Year, the amount to which the Team Owner is entitled to under this Agreement shall be determined in accordance with the terms set forth in Exhibit B hereto (the "Pool Money"). For avoidance of doubt, Exhibit B includes total Pool Money posted for Competitors. However, if any monies remain unpaid because the field for any Event is not filled ("Field Shortfall") or because fewer than 36 Charter Member Agreements are issued and active for any given Year ("Charter Shortfall"), then NEM shall pay any and all Pool Money attributable to the Field Shortfall or the Charter Shortfall, as the case may be, by increasing payouts to Competitors who competed in the Event within each category of Pool Money in such Year (as such categories are set forth in more detail on Exhibit B) by the amounts that would otherwise be unpaid within such categories as a result of such Field Shortfall and/or Charter Shortfall.

4.2     Ancillary Rights Distributions.

(a)     On or before April 30 following the conclusion of each Year, NEM shall, or shall cause its Affiliate(s) to, determine the amount of Ancillary Rights Total Net Income, if any, earned during such Year. As soon as practicable thereafter, but in no event later than five (5) Business Days thereafter, NEM shall, or shall cause its Affiliate(s) to, distribute such Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes and/or Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes (if any) to the Team Owner pursuant to this Section 4.2 (each, an "Ancillary Rights Distribution"). In making any such determination and distribution for any Year during

13

CONFIDENTIAL     FRM_0005838

the Term, any losses attributable to Primary Ancillary Rights or Secondary Ancillary Rights, as applicable, from the immediately preceding Year only may be applied against the Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes or Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, as applicable, in such Year (losses carried over into a Year shall not include losses from the immediately preceding Year that were attributable to losses carried over into the immediately preceding Year from the Year preceding the immediately preceding Year). NEM or its Affiliate(s) may at its option make a single payment for Ancillary Rights Distributions. NEM shall calculate Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes and Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes in good faith and in accordance with United States generally accepted accounting principles (GAAP), consistently applied, and, without limiting the foregoing, NEM shall (i) account for all intercompany transactions between any Ancillary Rights Entity, on the one hand, and any Affiliate of any Ancillary Rights Entity, on the other hand, on arms' length basis and at fair market value and (ii) undertake the categorization of revenues and expenses to Primary Ancillary Rights and Secondary Ancillary Rights in good faith and on a reasonable basis (for clarity, and without limitation, if any Ancillary Rights Entity provides services in relation to the creation or production (as further set forth in Section 5.5(e)) of content that is distributed through non-television platforms, then the revenues from such distribution shall be included for purposes of calculating Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, and the applicable Ancillary Rights Entity will be paid an arms-length fee for such services, which shall be included for purposes of calculating Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes or Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, as applicable).

(b) With respect to each Year, NEM shall, or shall cause its Affiliate(s) to, distribute twenty-five percent (25%) of the Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, if any, for such Year attributable to the NASCAR Cup Series to the Charter Members in the aggregate, and the Team Owner's allocation of such distribution shall be equal to the aggregate amount of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes to be distributed multiplied by the percentage obtained by dividing (i) such Team Owner's total share of Charter Team Points Pool Money for such Year by (ii) the aggregate amount of Charter Team Points Pool Money distributions payable to all Charter Members for such Year. During each Year of the Term where the applicable Ancillary Rights Income is divided among three NASCAR national Series, ninety percent (90%) of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes will be attributable to the Cup Series, provided that if during any Year there are fewer than three NASCAR national series, the parties will in good faith attempt to agree on the applicable Cup Series allocation and failure to agree on such allocation will be subject to the dispute resolution procedures set forth in Section 12.

(c) With respect to each Year, NEM shall, or shall cause its Affiliate(s) to, distribute sixty percent (60%) of the Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, if any, for such Year attributable to the NASCAR Cup Series to the Charter Members in the aggregate, and the Team Owner's allocation of such distribution shall be equal to the aggregate amount of Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes to be distributed multiplied by the percentage obtained by dividing (i) such Team Owner's total share of Charter Team Points Pool Money for such Year by (ii) the aggregate amount of Charter Team Points Pool Money distributions payable to all Charter Members for such Year. During each Year of the Term where the applicable Ancillary Rights Income is divided among three NASCAR national Series ninety percent (90%) of Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes will be attributable to the NASCAR Cup Series, provided that if during any Year of the Term there are fewer than three NASCAR national series, the parties will in good faith attempt to agree on the applicable Cup

14

CONFIDENTIAL                                                                                      FRM_0005839

Series allocation and failure to agree on such allocation will be subject to the dispute resolution procedures set forth in Section 12.

4.3     Payment Terms.     All Pool Money and each Ancillary Rights Distribution and Contingency Awards and Special Awards distribution shall be payable solely and directly to the Team Owner and not to any Driver, Control Person, Owner or other employee, agent or contractor of the Team Owner. The Team Owner (and not NEM or any of its Affiliates) shall be solely responsible for the determination of and distribution of any and all Pool Money and each Ancillary Rights Distribution and Contingency Awards and Special Awards distribution that may have been earned by a Driver or any employee, agent or contractor of the Team Owner with respect to the finishing position of the Designated Vehicle in any Event and the standings of the Cup Series and, provided that NEM has timely made or has caused its Affiliates to timely make all payments of Pool Money and each Ancillary Rights Distribution and Contingency Awards and Special Awards distribution to the Team Owner, the sole recourse of such Driver or any such employee, agent or contractor for any failure to properly distribute any Pool Money and each Ancillary Rights Distribution and Contingency Awards and Special Awards distribution shall be against the Team Owner and not against NEM or any of its Affiliates. Neither NEM nor any of its Affiliates shall be responsible for the filing or payment of any Taxes associated with any Pool Money, each Ancillary Rights Distribution or each Contingency Awards and Special Awards distribution paid to Team Owner, which Taxes shall remain the sole responsibility of the Team Owner and the Driver (as applicable), except solely to the extent required by applicable law to be, and which are, withheld by NEM or its Affiliate(s) from the Pool Money or each Ancillary Rights Distribution or Contingency Awards and Special Awards distribution, as applicable.

4.4     Payment Obligations.

(a)     Team Owner has no right to Pool Money specific to an Event if the Event is not commenced and officially completed (as determined in accordance with the Rule Book) due to a Force Majeure Event. If the Live Transmission Income or the Promoter Fee to be received by NEM or the applicable NASCAR Rights Affiliate(s) is delayed or reduced in whole or in part due to either (a) a Bankruptcy of a counterparty to a Live Transmission Contract or to the applicable Promoter's Sanction Agreement, as the case may be, (b) a breach or violation of any such agreement by the counterparty thereto (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)) or (c) a breach or violation of any such agreement by NEM or the applicable NASCAR Rights Affiliate solely to the extent that such breach or violation is caused by one or more Competitors other than due to a Force Majeure Event (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)), then, in any such case, the portion of the total Pool Money that would have been funded by the Live Transmission Income and/or by the applicable Promoter Fee which is not received by NEM or the NASCAR Rights Affiliate may be correspondingly delayed or reduced upon prior written notice to Team Owner, but only to the extent of the original delay or reduction in receipt (e.g., if a portion of the Live Transmission Income which is owed to the applicable NASCAR Rights Affiliate is not received under the circumstances described in clauses (a) - (c) above, then 25% of 90% of the shortfall would not be paid into the Pool Money until it is received); provided, that if any such delay shall occur which delays timely payment of any portion of Pool Money to Team Owner for more than sixty (60) days, then, notwithstanding anything to the contrary herein, Team Owner and Control Person have the right to terminate this Agreement effective upon

15

CONFIDENTIAL                                                                                                FRM_0005840

written notice to NEM, and upon such termination shall have no further obligations to NEM, NASCAR or their respective Affiliates; and provided, further, that for the avoidance of doubt, any monies recovered by NEM or a NASCAR Rights Affiliate in connection with the exercise of remedies against a counterparty or a Competitor (or any of their respective Affiliates) will be paid into the Pool Money (up to the amount of the proportionate Charter Members' percentage of such underpayment, and net of the Charter Members' proportionate percentage of actual out-of-pocket costs and expenses incurred by NEM or a NASCAR Rights Affiliate in connection with such recovery).

(b) Upon Team Owner's request, NEM will provide Team Owner with a statement of all revenues received by NEM or its Affiliates under Live Transmission Contracts and Promoter Fees during any Year, which will be certified to be accurate by an authorized officer of NEM and an independent third party accounting firm of national standing. NEM represents and warrants that, as of the Execution Date, Exhibit B sets forth (i) 25% of 90% of the Live Transmission Income payable during each Year of the Term, and (ii) the Promoter Fees payable to Pool Money during each Year of the Initial Term.

5.    Intellectual Property.

5.1    Ownership and Acknowledgment.    The Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, acknowledge and agree that NASCAR exclusively and in perpetuity owns any and all rights to broadcast, transmit live, film, tape, capture, overhear, photograph, collect or record all Works by any means, process, medium or device (including television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmission over the Internet, and public and private online services authorized by NASCAR), whether or not currently in existence, and that, as between NASCAR, on the one hand, and Team Owner, the Control Person and their respective Team Affiliates, on the other hand, NASCAR is and shall be the sole owner of any and all intellectual property rights (including patents, copyrights, trademarks, design rights, and other ancillary and proprietary rights) worldwide in and to these Works, copyrightable or otherwise, created from the images, sounds and Event Data arising from and during any Event (excluding, for clarity, any Team Intellectual Property and any trademarks, service marks, copyrights, name image or likeness, of any other third party that are embodied in any Work). To the extent not already owned by NASCAR, the Team Owner and the Control Person hereby assign, and shall cause their respective controlled Affiliates to assign (and shall use reasonable efforts to cause other Team Affiliates to execute and deliver such further instruments to assign), to NEM, as the designated representative of NASCAR for the collection of such rights, any and all rights set forth above, exclusively and in perpetuity. In addition, Team Owner hereby grants NEM a worldwide, perpetual, irrevocable, non-exclusive, transferable, assignable and royalty-free license, without further compensation (which license shall survive termination of this Agreement) to use by any means worldwide any Team Intellectual Property included or incorporated in any Work to the extent that such license is necessary to enable NEM to exercise the rights expressly reserved, exclusively or non-exclusively, to NEM pursuant to this Agreement. The Team Owner and the Control Person each represent and warrant that, as of the Execution Date, such Person has not granted to any third Person the rights described in the first two sentences of this Section 5.1. The Team Owner agrees to take all steps reasonably necessary and that are reasonably requested by NEM, including good faith efforts to implement a system that requires all of its Team Affiliates that may be visible at-track to sign documentation that grants or assigns the applicable rights set forth in this Section 5.1 exclusively and in perpetuity as set forth herein, to protect, perfect or effectuate NASCAR's ownership or other interest in these rights described in this Section 5.1 (all at NASCAR's cost, other than costs related to obtaining the clearances of such Team Affiliates pursuant to forms reflecting reasonable terms (consistent with this Section 5.1) provided by NEM). The Team Owner and the Control Person agree not to take any action, nor cause others to take any action, nor enter

16

CONFIDENTIAL                                                                              FRM_0005841

into any third party agreement, which would contravene, encroach or infringe upon these NASCAR rights described in this Section 5.1. Team Owner agrees to allow any and all equipment relating to audio and video transmissions, as well as timing and scoring information, including, size, location, and weight, and use thereof as determined by NEM, in or on the Designated Vehicle for each Event, or a weighted device equal to the size, weight, and location of part or all of such equipment if such Designated Vehicle is not selected to run part or all of such equipment, as determined by NEM.

5.2    Advertising and Promotional Activities by NEM. The Team Owner and the Control Person, for themselves and on behalf of each of the their controlled Affiliates, acknowledge and agree that NASCAR, the then current Series Sponsor (subject to the immediately subsequent sentence), each then-current Promoter, each then-current Broadcast Partner, each then-current Person that has entered into an agreement with any Ancillary Rights Entity to exploit any Ancillary Rights, and the duly authorized Affiliates of each of them (collectively, "NASCAR Recipients"), may use and exploit, on a non-exclusive basis, the name, likeness and performance, in or out of uniform, including photographs, images and sounds of the Team Owner, the Control Person, the Driver(s), in or out of uniform, each of the crew members, in uniform, and other controlled Affiliates of the Team Owner and the Control Person, and/or the Designated Vehicle, in each case taken in connection with an Event during the Term, in any medium (including print, broadcasts by and through television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmissions over the Internet, and public and private online services authorized by NASCAR) solely for (a) promoting or advertising any Event or the Cup Series, (b) news reporting in respect of an Event or the Cup Series, or (c) any telecast or programming that constitutes Live Transmission Activity (or shoulder programming with respect to such Live Transmission Activity), a Primary Ancillary Activity or a Secondary Ancillary Activity, and the Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, hereby grant (and shall use reasonable efforts to cause each other Team Affiliate to grant in accordance with the fourth sentence of Section 5.1) to each NASCAR Recipient, in perpetuity, all rights thereto for such purposes. Upon request of the Team Owner, which will be made solely during the period beginning on January 1 and ending on January 31 of any Year, NEM will provide to Team Owner a list of all NASCAR Recipients that have been granted rights hereunder during the Year immediately preceding the Year of such request. During any Year, the rights granted above with respect to the Driver (provided, however, following the 2016 Season, such rights with respect to the Driver shall be limited to the Driver in fire suit or any other branded apparel of a Team sponsor) may be sublicensed to any then-current Series Sponsor for such Year on an exclusive basis solely for endorsement of any or all products and services of such Series Sponsor in such Series Sponsor's Series Sponsor Category (as defined in Exhibit C), provided that, if a Series Sponsor Change has been effectuated during the Term, then (i) off-track activation rights of the Series Sponsor shall be subject to any applicable limitations set forth in the last sentences of Sections 6.9(b) and (c) and (ii) no such endorsement rights may be used in any manner that would be in conflict with a Qualifying Sponsor written agreement of Team Owner or Driver existing prior to such change (as such Team Owner or Driver sponsorship agreement may be extended from time to time on similar terms). Moreover, the Team Owner shall make good faith efforts to enter into agreements with the Fuel Sponsor and Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of such sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement). With the exception of any Series Sponsor's exclusive rights as set forth above with respect to endorsements within such Series Sponsor Category, this Section 5.2 does not grant to any NASCAR Recipient (or to any other Person) any right for (or to authorize) the use or endorsement of a third party brand, product or service utilizing the name, image or likeness of the Team Owner, the Control Person, the Driver(s), each of the crew members, any other Team Affiliate or the Designated Vehicle without such party's express consent (or, in the case of the Designated Vehicle, the express consent of the Team Owner).

17

CONFIDENTIAL

FRM_0005842

5.3     Collective Use. Any Event still image that depict(s) ten (10) or more race vehicles and/or ten (10) or more drivers in uniform and/or ten (10) or more crew members in uniform at an Event may be used in any medium by the Team Owner, Team Affiliates, Other Teams and their Team Affiliates, sponsors of Competitors, Promoters, Broadcast Partners, and NASCAR and its Affiliates and its sponsors and licensees for advertising, marketing and promotional purposes supporting the parties' involvement in the sport even though it may include the likeness of the Team Owner, the Control Person, the Driver or any of their respective Team Affiliates, provided that no personal endorsement of any brand, product or service is created or implied by any such use.

5.4     Team Clips. Upon Team Owner's request, NEM shall (or shall cause the appropriate NASCAR Affiliate to) provide up to five (5) minutes of audio-visual Works per Event that are readily accessible by NEM (or such Affiliate) for licensing (without regard to any restrictions on licensing which exist only among NEM and/or other NASCAR Affiliates) and that include Team Intellectual Property (the "Team Clips") for a royalty-free use by the Team Owner or a Team Owner primary or other major associate sponsor (each, a "Material Sponsor") in accordance with the following: (i) in connection with such request, the Team Owner shall provide NEM (or its Affiliate) with information reasonably requested with respect to the usage of such Team Clips, (ii) the Team Clips shall only be exhibited via a freely distributed medium (including, without limitation, television, cable television, satellite television, and transmission over the Internet or broadband (including subscription based services)) that is intended solely to promote and/or market such Team, Material Sponsor, or Driver's (as applicable) relationship with the sport, NASCAR or each other and not to create any product, application, site or platform that is intended to predominately exploit the Team Clips or the Team Clips in connection with other NASCAR-related audio-visual footage related to the Team or the Driver, (iii) the Team Owner shall be responsible for all reasonable and customary search and editing costs (but not a license fee) associated with such Team Clips in the event that editing is necessary to satisfy the Team Owner's request, (iv) all Team Owner Material Sponsors utilizing such clips will be required to enter into a royalty free form license agreement with NEM (or its Affiliate) with reasonable and customary terms, including with respect to indemnification and referencing the usage restrictions in accordance with this Section 5.4, and (v) such use will comply with NASCAR's brand guidelines and other guidelines to ensure such usage does not conflict with any Live Transmission Contract or any third party agreement that exploits Ancillary Rights. The Team Owner shall use good faith efforts to ensure that all requests to NEM for the use of Team Clips by any Material Sponsor is coordinated by and conducted through the Team Owner. The Team Owner acknowledges and agrees that NEM and its Affiliates will exploit portions of the Works (and other NASCAR-related content) for non-sponsored promotional uses and such Ancillary Rights Entity will not charge NEM (or such Affiliate) a license fee for the exploitation of such footage in such cases.

5.5     Team Intellectual Property; Works; Ancillary Rights.

(a)     This Agreement grants no rights to use Team Intellectual Property in any manner (on in connection with any activities) except as referenced in this Section 5. Without limiting the foregoing, this Agreement grants no rights to NEM or its Affiliates to utilize Team Intellectual Property for any activity involving physical goods that are produced or distributed, whether freely or not. The parties agree to work in good faith together to identify relevant cross-licensing opportunities inclusive of the Team, Driver and NASCAR marks in a manner consistent with past practices of the parties as of the Execution Date. Notwithstanding any existing agreements, it is also agreed and understood that the parties shall have the option to utilize the NASCAR Team Properties Trust structure and/or enter into separate agreements for purposes of establishing new licensing agreements, as determined at each individual party's sole discretion. To the extent that Team or Driver merchandise is sold through NASCAR.com or through the industry trackside merchandise program at Events (but not through track-specific owned stores and/or concessions at Events), the parties agree to distribute royalties in a manner

18

CONFIDENTIAL

consistent with existing NASCAR Team Properties Trust (which, for clarity, distributes a 9% royalty to Team Owner and a 1% royalty to NASCAR). In addition, for any product approvals administered through the Trademarx online approval system, other than for "lifestyle" products as generally recognized in the industry, all parties shall mandate the use of the official "NASCAR" hangtag with integrated hologram or "NASCAR" hologram only (where applicable); provided that the Trademarx system continues to be funded through the sale of holograms/hangtags to third party licensees. As means of clarity, give-aways of sponsor premium and promotional products, including those distributed at trackside venues, are not subject to the foregoing terms.

(b)     Pursuant to and in accordance with the terms expressly set forth in <u>Sections 5.2</u> and <u>5.4</u> of this this Agreement, NASCAR Recipients may utilize Team Intellectual Property for the promotional and other similar purposes as set forth in this Agreement.

(c)     Subject to the terms of this Agreement (including, without limitation, the requirement that NEM pay to Team Owner the applicable portion of monies received with respect to Live Transmission Contracts) Team Intellectual Property may be distributed within Live Transmissions of Events ("<u>Live Transmission Activity</u>").

(d)     Subject to the terms of the Agreement (including, without limitation, the requirement that NEM pay a portion of Secondary Ancillary Rights Income to Team Owner), NEM and its Affiliates may utilize and distribute Works (inclusive of Team Intellectual Property visible within the Works) in conducting Secondary Ancillary Activity. For purposes hereof, "<u>Secondary Ancillary Activity</u>" means (i) operation of the NASCAR.com business and any other NASCAR owned, operated or branded digital offerings via any platform now known or hereafter developed (e.g. NASCAR on YouTube), but in each case excluding Live Transmissions made pursuant to Live Transmission Contracts; (ii) with the exception of satellite radio, the exploitation or license of any audio only content (including live audio telecasts of Events) to third parties; (iii) the licensing or distribution, other than through Live Transmissions (including pursuant to <u>Section 5.5(e)(iv)</u>), of content accessed predominantly through the internet (other than delivery via closed-system internet protocol delivery of multi-channel linear programming services for in-home television signal reception (e.g., telephone MVPD service using internet protocol packet delivery)), mobile telephone/mobile data technology protocols, WAP, SAP, EVDO, VCAST, UMTS, WiMax, LTE and/or any other non-television protocol/platform (i.e., any protocol or platform other than traditional linear standard or cable television or any multi-channel programming services provider (whether or not currently in existence) that provides a service substantially equivalent to linear cable television services as in effect on the Execution Date); and (iv) any other licensing or other exploitation of content that does not constitute either a Live Transmission or a Primary Ancillary Activity. For illustration and not limitation, Secondary Ancillary Activities include (v) the licensing or other exploitation of Event Data (excluding only Event Data rights granted pursuant to a Live Transmission Contract), (w) e-commerce activities, (x) licensing or other exploitation of content (other than Live Transmissions (including pursuant to <u>Section 5.5(e)(iv)</u>)) on third party digital platforms (<u>e.g.</u>, NASCAR highlight packages on Yahoo or in Apple TV archives), (y) the license of content as part of fantasy games, video games or similar content offered on NASCAR platforms and/or third party platforms; and (z) simulated virtual reality versions of content and data feeds of content (e.g., Digital Dash content and NASCAR Race View), whether live or otherwise (excluding any rights granted pursuant to a Live Transmission Contract). Notwithstanding any of the foregoing references to Live Transmission or Live Transmission Contracts, in each Year, the applicable Secondary Ancillary Activity Ancillary Amount shall be attributable to Secondary Ancillary Activities and shall be included in the calculation of Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes.

19

CONFIDENTIAL

FRM_0005844

(e)     Subject to the terms of the Agreement (including, without limitation, the requirement that NEM pay a portion of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes to Team Owner), NEM and its Affiliates may utilize Works (inclusive of Team Intellectual Property visible within the Works) with respect to the conduct of Primary Ancillary Activity. For purposes hereof, "Primary Ancillary Activity" means:

(i)     Production services offered in connection with the live performance of an Event including without limitation:

(A)     Operation and provision of broadcast compound services at the facility such Event is held.

(B)     Capture and collection of audio-visual footage and other content.

(C)     Production of Event related programming for Broadcast Partners and others.

(D)     Any other production services (e.g., Race Hub program, studio leasing, off-site production not an Event)

(ii)     Production of non-national series and other events

(iii)     Other programming production services (e.g., Nickelodeon, documentaries, etc.)

(iv)     Production, distribution, sale or license of feeds of, or rights to, the Events for Live Transmission (or, for geographies in different time zones, first run delayed transmission) outside of the United States, its territories, possessions and commonwealths, plus Bermuda

(v)     Maintenance of audio-visual footage and photographs generated during Events, and licensing to Live Transmission Contract partners and others for distribution via television platforms (if licensing is to non-television platforms, revenues for customary tape stock and transfer fees may be allocated to Primary Ancillary Rights Net Income Before Industry Expenses and After Income Taxes with respect to such licensing, but any other revenues from such licensing shall apply to Secondary Ancillary Rights Net Income Before Industry Expenses and After Income Taxes);

(vi)     Licensing of audio content for satellite radio transmission;

(vii)     Non-production services or activities provided by a NASCAR Rights Affiliate(s) for third-party entertainment projects (e.g., consulting or producer fees), none of which shall include the licensing or distribution of content  (but, for clarity, content may be licensed in accordance with subsection (d) above).

Notwithstanding that Primary Ancillary Activities may include elements of or derived directly or indirectly from the Live Transmission of an Event, "Primary Ancillary Activities" do not include "Live Transmission Rights" but the applicable Primary Ancillary Activity Designated Amount shall be attributable to Primary Ancillary Activities and shall be included in the calculation of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes.  For purposes of the definition of "Primary Ancillary Activities", it is agreed and understood that neither the term "production" nor "production services" as used above are deemed to include the right to license, distribute or otherwise exploit any content.

20

CONFIDENTIAL

FRM_0005845

5.6     Advertising and Promotional Activities by Team Owner.  NEM, for itself and on behalf of each of its Affiliates, hereby grants to Team Owner a limited, non-exclusive, sub licensable license to use the "NASCAR" name and mark and the names and marks of the sponsors of NASCAR, NEM or their Affiliates (such as Goodyear and Sunoco) that are visible on the Designated Vehicle or uniforms of Team Owner, Control Person, Driver, crew or the Team Affiliates as seen at track during any Event solely in connection with the display of images of the Designated Vehicle or such uniforms, (including still photography captured by Event-credentialed photographers in connection with the Event that features the Team and Designated Vehicle) in any freely distributed medium (including print, broadcasts by and through television, cable television, radio, satellite signal, digital signal, transmissions over the Internet, and public online services) for sponsorship, endorsement, promotions or advertising activities of Team Owner, Control Person, Driver or their Affiliates, and to promote the Events and other news reporting, provided that (x) no such use shall enhance, enlarge, or otherwise alter the "NASCAR" name or mark, (y) the foregoing does not grant to any Person any right for (or to authorize) the use or endorsement of the "NASCAR" name or mark in such a way as to create or imply NASCAR's endorsement of any third party brand, product or service without NEM's express consent, and (z) all photographers shall be subject to NEM or its Affiliate's standard photographer and media licensing/credentialing process.

6.      Team Owner Obligations.

6.1     Operating Obligations.  At all times during the Term, the Team Owner shall, subject to Force Majeure Events, use commercially reasonable efforts to conduct all of the day-to-day operating and administrative functions reasonably necessary for the first-class operation of a stock car racing team and such team's participation in the Cup Series, while using commercially reasonable efforts to maintain continuity of race vehicle, assets, equipment, personnel, crew chief, crew members and shop address/location, and shall disclose Team members and other information as required in Schedule 1, and shall update as necessary to make accurate or up to date upon the written request by NEM. In addition, Team Owner and the Control Person shall, subject to Section 6.5, execute all other documents and forms reasonably required by NEM or its Affiliates for participation in the Cup Series, including a Competition Membership and License Application form for the Cup Series, in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules, provided, that in the event of any conflict or inconsistency with such documents or forms entered into by the Team Owner, Control Person or any Team Affiliate with the subject matter set forth in Section 3.1(a), 3.1(b), 3.1(f), 3.1(g), 4, 5, or 6 of this Agreement, such applicable Section(s) of this Agreement shall control, and the Team Owner, Control Person and NEM acknowledge that the 2016 Competition Membership and License Application form for the Cup Series is substantially similar to the 2015 Competition Membership and License Application form for the Cup Series and accordingly may have inconsistencies or conflicts with respect to such subject matter set forth in such Section(s) of this Agreement.

6.2     Competition.  The Team Owner shall, subject to Force Majeure Events:

(a)     use best efforts to provide and deliver the Designated Vehicle, with Driver, crew chief and pit crew to compete in each Event and any practice, Qualifying or testing events or sessions as and when scheduled by NEM or its Affiliates;

(b)     use its best efforts to start, race, and finish at the highest possible level in each Event, including up to two Invitational Events per Year, with winnings for such Invitational Events not less than historic levels as set forth in Exhibit B hereto, including using commercially reasonable efforts to race for the entire advertised Event distance as outlined in the official entry blank, unless (i) NASCAR, in its discretion, has determined that such Event is complete pursuant to the NASCAR Rule Book; or (ii) the Designated Vehicle is involved in an accident or incident during such Event that renders the Designated Vehicle unable to race further in such Event, provided that such inability to race further in

21

CONFIDENTIAL                                                                        FRM_0005846

such Event is validated by the Senior Vice President of Competition or NASCAR Managing Director, Cup Series, or his/her designee, officiating at such Event, whose decision in this respect will be final. In the event that Team Owner fails to start in any Event in accordance with this Section 6.2(b) for any reason or no reason (e.g. logistics, economics, safety etc.) NEM shall have the right to replace such Team Owner's vehicle in the starting field for that particular Event with a vehicle and racing team that is party to an open team agreement (even if such open team is maintained by a Charter Member or otherwise Affiliated with a Person that is party to a Charter Member Agreement) selected by NEM. If such circumstances shall arise, the Control Person and the Team Owner waive all rights and remedies they may have arising from such replacement of NEM's selection including injunctive relief.

6.3    Designated Sponsor and Competitor Branding.  Team Owner shall cause the Driver, crew members and the Designated Vehicle, at all times for every Event in which Team Owner participates, to adhere to and display the designated branding requirements as shown in the attached Exhibit D, as such requirements may be reasonably modified or supplemented by NEM from time to time during the Term upon reasonable advance written notice to Team Owner, and subject to the terms hereof in the case of the designation by NEM of sponsors in Reserved Sponsor Categories and provided that such modification or supplementation does not diminish the space or location of branding available to Team Owner for its sponsors available as of the Execution Date.  Notwithstanding the foregoing, NEM agrees that the space currently allocated on the Designated Vehicle to each sponsor as outlined in Exhibit F under the program commonly referred to as the "contingency program" as of the Execution Date shall be allocated to the Team Owner, and available for Team Owner exploitation, at the time that NEM's (or its Affiliate's) current agreements with such contingency sponsor terminate or expire, which agreements shall not be extended or renewed (and NEM shall provide reasonable notice prior to the termination or expiration of each such contingency sponsor agreement); provided that, throughout the Term, (i) NEM may continue to include, for any of its Fuel Sponsors (including the corner panel and fuel port decal), Tire Sponsors and Series Sponsors in the Reserved Sponsor Categories, space decals on the Designated Vehicle of the same size and placement that exist as of the Execution Date under the contingency program (provided that in the event of a bi-furcated Series Sponsor pursuant to Section 6.9(c), the Series Sponsor may only display such space decal during its respective exclusive portion of the Season), and (ii) NEM and the Team Owner shall work in good faith to continue the contingency program (or a successor program) that does not utilize any space decals on the Designated Vehicle and the Team Owner acknowledges and agrees that any such continuation (or successor program) will include the exploitation of other mutually agreed upon Team and/or Driver marketing or sponsorship assets.  Subject to the terms of this Agreement, the Team Owner shall and shall cause its controlled Affiliates to abide by the provisions in the NASCAR Rule Book regarding advertising and related promotional restrictions as set forth in Section 20.4.19 relating to "Decals and Advertising" as in effect on the Execution Date and amended or supplemented in accordance with the terms of this Agreement.  The Team Owner understands and agrees that NEM may refuse to permit, or it may restrict or assign the size or placement of decals, identification, and advertising of any kind on the Designated Vehicle, or the Driver's uniform ("Car/Driver Sponsor Advertising"), that is reasonably in the best collective interests of NEM and all of the Team Owner and other Charter Members, provided that, nothing herein shall limit the Control Person, Team Owner or any Team Affiliate from maintaining and complying with an agreement with a sponsor for Car/Driver Sponsor Advertising that was permitted by NEM at any time during the previous three (3) racing seasons; provided further, that, notwithstanding the foregoing, if NEM raises reasonable concerns that a sponsor's brand has become tarnished by controversy, crisis or circumstance such that its association with Team or NEM would damage the NASCAR brand or image of the sport, or violate the broadcast standards of partners under Live Transmission Contracts or damage their ability to sell advertising within Event telecasts, then NEM and Team Owner will discuss such concerns and cooperate in good faith to reach a mutually agreeable solution.

22

CONFIDENTIAL    FRM_0005847

6.4     Driver Agreement.  For each Year of the Term, the Team Owner shall (or shall cause an Affiliate to) be responsible for retaining the services of an eligible Driver(s) to race in each Event using the Designated Vehicle.  The Team Owner shall cause any Driver providing services to the Team Owner during the Term to execute (including upon execution of this Agreement) and deliver a Driver Agreement in the form attached hereto as Exhibit I, and will use commercially reasonable efforts to cause the Driver to enter into such amendments thereto as NEM may reasonably require from time to time and which are not in conflict with this Agreement (the "Driver Agreement"), it being understood that no amendments or modifications will be made by NEM to the Exhibits of the Driver Agreement if such amendments or modifications would be in conflict with, or otherwise inconsistent with, the corresponding terms and provisions of this Agreement, provided however, that upon reasonable request by the Team Owner as a result of such Driver's failure to sign the attached Driver Agreement, NEM will accept, solely for the 2016 Season, a Driver Agreement in substantially similar form to the 2015 Driver Agreement and the Team Owner acknowledges and agrees that NEM shall not be deemed in breach of this Agreement if any terms of such 2016 Season Driver Agreement are not consistent with this Agreement.  In addition, Team Owner shall cause Driver to execute all other documents and forms reasonably required by NEM or its Affiliates for participation in the Cup Series including a Competition Membership and License Application form for the Cup Series in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules.  Upon expiration or termination of the Driver Agreement or upon injury or approved absence of Driver requiring substitution of an alternate eligible Driver, the Team Owner shall deliver to NEM an executed Driver Agreement as outlined above for such Driver such that at all times during the Term the Team Owner's Driver has executed and delivered a Driver Agreement.  In the event of any conflict or inconsistency between the Driver Agreement and the agreement for driver services between Team Owner and Driver, the Driver Agreement shall control.

6.5     NASCAR Rules.  Subject to the terms of this Agreement, including Sections 3.5 and 3.6 hereof, the Team Owner and the Control Person acknowledge and agree that NASCAR and its Affiliates shall have the sole and exclusive right to amend and supplement the NASCAR Rules from time to time in their sole and absolute discretion, provided that (i) no such amendment or supplement shall abrogate or modify the terms of this Agreement or the rights granted to Team Owner or Control Person hereunder; (ii) in the event of any conflict or inconsistency between this Agreement and NASCAR Rules, this Agreement shall govern; and (iii) NASCAR and its Affiliates shall at all times implement and administer such NASCAR Rules in good faith and not out of self-interest, and in seeking to further the best interests of the sport.  Subject to the immediately preceding sentence, the Team Owner and the Control Person acknowledge and agree that they shall be bound by, and shall comply with, each NASCAR Rule.   NEM is the sanctioning body of the Cup Series and shall (subject to the preceding clause (iii) and to any rights of appeal set forth in the NASCAR Rules) have sole authority to enforce the NASCAR Rules, implemented in accordance with the terms hereof, for purposes of exercising its sanctioning authority over all aspects of on track-racing activity during the competition of any Events, including with respect to qualifications and eligibility to race in any Event, inspection process (pre and post-Race), race procedures and on track competition, it being understood and agreed that the implementation and enforcement by NEM of NASCAR Rules in accordance with the terms of this Agreement may have an adverse impact (including an adverse economic impact) on the Team Owner.

6.6     Protection Of Goodwill.  Subject to Sections 3.5(b)(iii)-(iv), in recognition of (a) the substantial goodwill and expertise developed, and the significant investment, by NEM and its Affiliates with respect to the sport of stock car racing, (b) the confidential information that will be shared by NEM with Team Owner and the Control Person pursuant to this Agreement and otherwise, (c) the harm that would result, including potential confusion in the marketplace, dilution of the rights granted to any Broadcast Partner, to NEM, its Affiliates and the Other Teams if the Team Owner or the Control Person were to use any of such goodwill, expertise or confidential information, or any of the benefits obtained by

23

CONFIDENTIAL                                                                    FRM_0005848

Team Owner or the Control Person under this Agreement or otherwise through their association with NASCAR, and (d) the need to ensure that all Charter Members use their reasonable best efforts, and devote all reasonable resources necessary, to start, race, and finish at the highest possible level in each Event to maintain and enhance the quality of Cup Series racing, at all times during the Term, each of the Team Owner, the Control Person shall not, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations shall not, race in or directly or indirectly own an equity ownership interest (or profits participation interest with attributes similar to equity) in any stock car racing series that is held in the Territory except (i) any such stock car racing series that is sanctioned by NEM, NASCAR or any of their respective Affiliates, (ii) any participation in any event or any series in which NASCAR teams or their Affiliates have previously participated (such as ARCA), similar or successor series, private events, or other similar exceptions, all at their current scope, (iii) any other racing series that is approved by NEM, NASCAR or any of their respective Affiliates, and (iv) with respect to any 10% or more owner of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations (but, for clarity, not the Control Person or any Person under his or her direct or indirect control), if such 10% or more owner owns an equity ownership (or profits participation interest with attributes similar to equity) in any stock car racing series that is held in the Territory through an entity in which the 10% or more owner is a limited investor and does not receive material non-public information regarding racing competition in respect of such series or provide such series any material non-public information relating to NASCAR, the Team Owner, the Team or their respective operations (any such 10% owner described in this clause (iv) an "Exempt 10% Owner"). For avoidance of doubt, this Section 6.6 applies only to professional stock car racing series in the Territory, and not to any other motorsports or non-stock car series (such as V8 Supercars, Indy Car, IMSA or Global Rally Cross), nor to any amateur/semi-pro series, nor to any activities outside of the Territory. If NEM presents Team Owner with opportunities to participate in NASCAR sanctioned racing series outside of North America Team Owner agrees to consider in good faith participating in any such series. If Team Owner presents NEM with opportunities to sanction a stock car racing series or event outside of North America, then NEM agrees to consider in good faith sanctioning any such series.

6.7     Injunctive Relief. If, despite the harm that would be incurred by NASCAR, NEM, NASCAR Rights Affiliates and others, any Arbitration Panel construes any of the covenants in Section 6.6 to be too broad, the Arbitration Panel shall have the authority to reduce the duration, Territory or scope of prohibited activities to the extent necessary so that the provision is enforceable (and the provision, as reduced, shall then be enforced).

6.8     Sponsor Exclusivity. NEM has agreed, pursuant to Section 3.1(c), to use commercially reasonable efforts to sell certain exclusive sponsorship rights in the Reserved Sponsor Categories. At all times during the Term, Team Owner shall comply with, and shall cause its controlled Affiliates to comply with any,  exclusivity reasonably required by the agreements relating to such Reserved Sponsor Categories, including any reasonable promotional requirements relating to the Designated Vehicle or any uniform, and any other reasonable restrictions necessary to protect the exclusivity granted in such Reserved Sponsor Categories (but subject, in the event of a change in the Series Sponsor Category or the appointment of multiple Series Sponsors in any Year, to the provisions in Section 6.9). The Series Sponsor Category may change from time to time during the Term, and NEM will notify the Team Owner in writing of any change in the exclusivity, promotional requirements or other restrictions relating to the Series Sponsor Category prior to January 1 of the applicable Year (or such later date if, in NEM's good faith judgment, January 1 is not practicable). The other Reserved Sponsor Categories may not expand in nature or scope during the Term (but, for clarity, are permitted to contract or be further limited). The Reserved Sponsor Categories as of the Execution Date are described in Exhibit C.

24

CONFIDENTIAL                                                                              FRM_0005849

6.9    Series Sponsor Exclusivity.

(a)    Series Sponsor Exclusivity.  At all times during the Term when an agreement relating to a Series Sponsor is in effect, but subject to this Section 6.9 and subject to written agreements Team Owner may have with NEM or its Affiliates in existence on the Effective Date, the Team Owner and the Control Person shall not, and Team Owner shall cause each Team Affiliate not to, when participating in any Event or in any advertising or promotion that uses the name, image or likeness of Team Owner, Control Person, or any Team Affiliate, or that is based on such Team Owner's, Control Person's or any Team Affiliate's participation in the Cup Series (unless otherwise expressly authorized in writing by NEM), use or display in any commercialized or sponsored manner any product, brand, logo, trademark or service identification of any Person in any Series Sponsor Category anywhere by such Person, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, the Team's equipment or haulers or anywhere in Victory Lane; provided that, if, following the date of this Agreement, NEM modifies the Series Sponsor Category or enters into an agreement with a new Series Sponsor(s) (each, a "Series Sponsor Change") and the Team Owner, Control Person or any Team Affiliate is then a party to a written contract with a sponsor with respect to any branding and related rights that have been granted to such sponsor via such written contract prior to the Series Sponsor Change (each, together with any permitted successors thereto (as such permission is determined pursuant to the applicable agreement with such sponsor), a "Qualifying Sponsor") that would breach the exclusivities granted by NEM within such new Series Sponsor Category (or Series Sponsor Categories) (each, an "Exclusivity Breach"), the Team Owner, Control Person or any Team Affiliate shall have the right to maintain and comply with such Qualifying Sponsor's agreement (or agreements) in accordance with Sections 6.9(b)-(c) below (and, for clarity, only the exceptions set forth in Sections 6.9(b)-(c) are permitted).  Subject to compliance with this Section 6.9, the Team Owner acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of any product, brand, logo, trademark or service identification of a Person in any Series Sponsor Category, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers.

(b)    Single Series Sponsor.  During any Year in which NEM effectuated a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, any Team Owner, Control Person or any Team Affiliate that would be in an Exclusivity Breach with respect to any branding that has been granted to a Qualifying Sponsor on the Designated Vehicle, Driver, crew members, Cup Series uniforms, hauler, or other similar assets that are visible to the general public at any Event (the "At Event Assets"), such Qualifying Sponsor branding for the At Event Assets shall be permitted during the Term solely at the visibility or participation level pursuant to and set forth in the then-current agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for At Event Assets shall not be increased, other the any increases already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to such levels (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would be limited to the deck lid without any other increases; if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events, or if such Qualifying Sponsor branding was permitted on crash carts and haulers but was not on the Designated Vehicle then such branding would be restricted to such crash carts or haulers etc.), provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any At-Event Asset, the exclusivity exceptions set forth in this Section 6.9(b) shall be permitted at the highest level of branding that was granted at any time pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in

25

CONFIDENTIAL                                                                                      FRM_0005850

accordance with the terms hereof), (ii) if, at any point during the Term, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this Section 6.9(b) shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination and shall otherwise comply with Section 6.9(a) without exception except for exceptions applicable to the non-terminated contract, if any (e.g., if a Driver has a personal services agreement with a Qualifying Sponsor of Team Owner, the termination of the personal services agreement will not require the Team Owner, Control Person or any Team Affiliate (as applicable) to comply with Section 6.9(a) without exception in the event that they have non-terminated contracts which are permitted hereunder and remain in effect), and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding for the At Event Assets, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions for any At Event Assets set forth in this Section 6.9(b). During any Year in which NEM effectuated a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, such exclusivity granted to any Series Sponsor shall extend to off-track activation in accordance with Section 6.9(a), provided that if any Team Owner, Control Person or any Team Affiliate would be in an Exclusivity Breach with respect to any off-track activation that has been granted to a Qualifying Sponsor via such written contract, then such Qualifying Sponsor may continue marketing off-track throughout the Year, in accordance with the restrictions set forth in the foregoing sentence, even though such marketing may conflict with the current conflicting Series Sponsor Category.

(c) Bi-Furcated Series Sponsors. During any Year in which NEM effectuated a Series Sponsor Change such that agreements with two (2) Series Sponsors are then in effect (i.e., each Series Sponsor has rights to a different continuous portion of the Season), each Series Sponsor shall only be afforded exclusivity in such applicable Series Sponsor Category as provided in Section 6.9(a) with respect to the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row (and, for clarity, not with respect to other equipment or haulers) and solely during the portion of the Season that NEM or its Affiliates have granted such Series Sponsor exclusivity, which must correspond with a portion of the Season for which one of NASCAR's then principal Live Transmission Broadcast Partners has Event live telecast rights (e.g., as of the Execution Date, a Series Sponsor that corresponds to FOX for the first portion of the Season and another Series Sponsor that corresponds to NBC for the second portion of the Season). In addition to the foregoing sentence, if any Team Owner, Control Person or Team Affiliate would be in an Exclusivity Breach with any Qualifying Sponsor during the applicable portion of the Season, such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row shall be permitted solely at the visibility or participation level pursuant to and set forth in the then-current written agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season shall not be increased, other than any increases during such portion of the Season already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to increase such levels of such agreement with such Qualifying Sponsor (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would limited to the deck lid during such portion of the Season without any other increases or if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events during such portion of the Season) provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season, the exclusivity exceptions set forth in this Section

26

CONFIDENTIAL

FRM_0005851

<u>6.9(c)</u> shall be permitted at the highest level of branding that was granted pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the then-current term of such agreement, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this <u>Section 6.9(c)</u> shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination, and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions set forth in this <u>Section 6.9(c)</u>. For clarity, any exclusivity granted to any bi-furcated Series Sponsor in accordance with this <u>Section 6.9(c)</u> shall not extend to off-track activation (<u>e.g.</u>, any Team sponsor may continue marketing not at the track throughout the Term even though such marketing may conflict with the current conflicting Series Sponsor Category) and the Series Sponsor's off-track activation shall be limited to collective uses made pursuant to Section 5.3.

6.10    <u>Tire Sponsor Exclusivity</u>. The Team Owner, on behalf of the Team Affiliates, agrees that when participating in any Event, unless otherwise expressly authorized in writing by NEM, no product, brand, logo, trademark or service identification of any Person in the Tire Category (other than the Tire Sponsor) as defined in <u>Exhibit C</u>, will be used or displayed anywhere by such Team Affiliate during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers. The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate, including the Driver, may advertise or promote a product, brand, logo, trademark or service identification of any Person in the Tire Category as defined in <u>Exhibit C</u>, whether in conjunction with an Event or not, if such advertising or promotion includes a NASCAR racing (e.g., Driver, crew member) suit, whether worn by such Team Affiliate or not, and/or a NASCAR racing vehicle. The Team Owner, on behalf of the Team Affiliates, acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of a product, brand, logo, trademark or service identification of any Person in the Tire Category by any Team Owner Party during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers. Notwithstanding the foregoing, actual use of tires other than those made by the Tire Sponsor on Team equipment other than the Designated Vehicle (e.g., pit carts and haulers) shall not be considered a breach of the provisions set forth in this paragraph. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Tire Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to tires, on the same financial terms, as other Competitors by Tire Sponsor.

6.11    <u>Fuel Sponsor Exclusivity</u>. The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate will participate in any sponsorship, licensing, or personal appearances with a company in the Fuel Category (other than the Fuel Sponsor) as it relates to Cup Series racing either in or out of uniform other than as provided herein. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Fuel Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Fuel

CONFIDENTIAL    FRM_0005852

Sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Fuel Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to fuel, on the same financial terms, as other Competitors by Fuel Sponsor.

6.12    Minimum Performance Standards.  The Events represent the highest caliber of racing in motorsports.  NEM may temporarily waive compliance with the Minimum Performance Standards if the Team Owner presents evidence to NEM that as a result of events or circumstances outside the Team Owner's control, it is impossible, unreasonable or impractical for the Team Owner to enter and/or participate in Events.  If NEM determines that Team Owner is at risk of not complying with Minimum Performance Standards, after two years of finishing in the bottom three (3) positions, NEM will issue Team Owner a Performance Improvement Notice (PIN) outlining the steps and/or timing in which Team Owner must take to improve its performance (provided that, other than the termination rights set forth in Section 9.1(f) if Team Owner fails to meet the Minimum Performance Standard, there shall be no other consequences to Team Owner for failing to comply with a PIN or the Minimum Performance Standards).  The termination right for failure to satisfy the Minimum Performance Standards is set forth in Section 9.1(f), and, subject to NEM's rights pursuant to Section 6.5, no other in-season minimum performance standards shall be established which, if not satisfied, would result in the termination of the rights provided to Team Owner hereunder.

6.13    Media/Promotional Obligations.  Team Owner and Control Person shall perform and Team Owner shall cause the Driver to perform, as applicable, the following media and promotional obligations:

(a)    Victory Lane Media Obligations of Team Owner//Control Person:  Immediately following the race conclusion of each Event, as reasonably required by NEM, the winning Team Owner and Control Person if present at the particular Event shall proceed to victory lane for post-race interviews.  Subject to the last sentence of this Section 6.13(a), the Team Owner and Control Person of each Event won during the Term agree to permit a display of one item from Series Sponsor, one item from the applicable Event entitlement sponsor so long as such Event entitlement sponsor does not conflict with a Team sponsor, and items from the Team's sponsors on the Designated Vehicle in victory lane so long as such Team sponsors do not conflict with the Series Sponsor Category.  Subject to the last sentence of this Section 6.13(a), the size, location and weight of such item(s) shall be approved by NEM and all items shall be subject to the exclusivity of the Reserved Sponsor Categories.  Team Owner and Control Person understand that members of the winning team will be required to take photographs with the Event entitlement sponsor and its guests.  Post-race ceremonies will conclude once all reasonable sponsor photos, individual photos and media requirements in victory lane have been completed.  Notwithstanding the foregoing, if following the date of this Agreement NEM modifies the Series Sponsor Category and the Team Owner, Control Person or any Team Affiliate is a party to a written agreement with a Qualifying Sponsor that is a primary sponsor as of the date of such modification (subject to the applicable extensions solely in accordance with Sections 6.9(b)-(c))) that would be in an Exclusivity Breach with respect to the display of products of such Series Sponsor within the Series Sponsor Category in victory lane, the Team Owner shall not, during the period of exclusivity of the Series Sponsor within the Series Sponsor Category, (i) display the products of such Qualifying Sponsor and (ii) be required to display the products of such new Series Sponsor, in each of (i) and (ii), in victory lane (and none of the foregoing shall be deemed a breach of this Agreement or NASCAR Rules).

(b)    Promotional Appearances.  As designated by NASCAR or NEM, Team Owner and Control Person agree to make commercially reasonable good faith efforts to participate in promotional activities and events surrounding the NASCAR Sprint Cup Series and NASCAR

28

CONFIDENTIAL                                                                                   FRM_0005853

events. These events include but are not limited to, NASCAR Sprint Cup Series Champions Week, promotional events for the NASCAR Hall of Fame and/or NASCAR's Season launch activities leading up to the Daytona 500 Event. If the Team Owner qualifies for the Chase for the NASCAR Sprint Cup, Team Owner agrees to make commercially reasonable good faith efforts to attend the NASCAR Sprint Cup Series Awards banquet including all season-ending special awards ceremonies and events at times and locations designated by NASCAR. NASCAR will provide reasonable notice of the ceremony and event schedules Team Owner, and Team Owner will take reasonable steps to coordinate his or her availability in accordance with such event schedules, and will provide reasonable advance notice to NASCAR of any potential schedule conflicts.

(c) _Victory Tour Media Obligations of Team Owner/Driver_. Team Owner shall cause the Driver to appear and attend the Victory Tour media obligations as outlined in the Driver Agreement, but in no event will NEM require more than thirty-six (36) Victory Tour media obligations in a Season in total among all drivers of Competitors having Victory Tour media obligations or more than two (2) victory tour media obligation from any individual driver in a Season. Team Owner shall work in good faith with NASCAR, NEM and the applicable race Promoter to coordinate scheduling of such appearances. Any and all actual, reasonable, and documented travel costs associated with the Driver's Victory Tour obligations shall be at the expense of Team Owner. All other actual, reasonable, and documented travel costs associated with all other appearances requested by NEM shall be at NEM's expense.

6.14 _Team Sponsors_. Prior to the first Event of each Year, Team Owner shall provide all Team sponsors with access to a copy of the NASCAR Rule Book and use good faith efforts to make all Team sponsors aware of all of the applicable provisions therein.

7. _Ancillary Rights Financial Records_. The Team Owner acknowledges that it has no direct control or management responsibility for NEM or the Ancillary Rights Entities. However, NEM agrees and acknowledges that it is in the mutual best interest of both parties to seek to improve the results of the Ancillary Rights Entities over the Term, and timely, accurate and clear information should be communicated between the parties to assist in that regard. As such, Sections 7.1 and 7.2 of this Agreement should be considered the minimum amount of information required regarding the Ancillary Rights Entities and their associated revenues and expenses, and may be supplemented or modified, by written agreement of the parties, to better reflect the business as it evolves. Accordingly, NEM agrees to use reasonable efforts to supply such supplemental information, should it mutually and reasonably be agreed to by the parties to be desirable and in the best interest of advancing the Ancillary Rights Entities' business and/or the parties' ability to work cooperatively together.

7.1 _Ancillary Rights Statement_.

(a) NEM will (i) provide the Team Owner with annual audited consolidated financial statements that include all and only the Ancillary Rights Entities, (ii) cause the appropriate Ancillary Rights Entity to provide the Team Owner with an income statement for Primary Ancillary Activities and Secondary Ancillary Activities for the recently completed Year (the "Annual Ancillary Rights Statement"), certified to be accurate by an authorized officer of the appropriate Ancillary Rights Entity, no later than May 1 of the following Year (e.g., May 1, 2017 for the 2016 Year), and which will be consistent with the sample Annual Ancillary Rights Statement attached hereto as Exhibit H and (iii) a description of all material transactions and allocations between any Ancillary Rights Entity, on one hand, and any Affiliate of any Ancillary Rights Entity, on the other hand, including the terms on which such transactions were based. The Annual Ancillary Rights Statement shall show in reasonable detail revenues and expenses included in Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes and Secondary Ancillary Rights Net Income before Industry Expenses and after Income

29

CONFIDENTIAL                                                                 FRM_0005854

Taxes, which when added together reconciles to the annual audited consolidated financial statements described in the foregoing clause (i). NEM shall also provide such additional information as Team Owner shall reasonably request in connection with the foregoing. In the event there is a dispute between NEM and Team Owner about the calculation of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes or Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, then NEM and Team Owner shall submit such dispute to Arbitration in accordance with <u>Section 12.2</u>.

(b) Within forty-five (45) days after the end of the each calendar quarter during each Year during the Term, NEM will cause the appropriate Ancillary Rights Entity to provide the Team Owner with (i) an interim income statement for Primary Ancillary Rights Activities and Secondary Ancillary Rights Activities for the Year to date period ending on such calendar quarter, certified to be accurate by an authorized officer of the appropriate Ancillary Rights Entity (the "<u>Interim Ancillary Rights Statement</u>") and (ii) a description of all material transactions and allocations between any Ancillary Rights Entity, on one hand, and any Affiliate of any Ancillary Rights Entity, on the other hand, including the terms on which such transactions were based. Each Interim Ancillary Rights Statement shall be reported on the same basis and in the same format as the Annual Ancillary Rights Statement, subject to reasonable estimates and year-end adjustments.

7.2 <u>Financial Records</u>. NEM shall maintain, and shall cause its Affiliates to maintain, in accordance with GAAP, consistently applied, accurate and complete books, records and other documents to determine the amount and document the calculations of Ancillary Rights Total Net Income, Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes and Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes and shall retain such books, records and other documents for a period of one (1) year following the end of the applicable Audit Period. Without limiting the foregoing, any transactions between any Ancillary Rights Entity, on one hand, and any Affiliate of any Ancillary Rights Entity, on the other hand shall be based on arms-length terms at fair market value rates. Team Owner or an authorized representative may, once a year upon reasonable notice, inspect or audit the books, records and other documents pertaining to Ancillary Rights, at NASCAR's principal place of business in Daytona Beach, Florida, or at any other mutually agreeable location during regular business hours and subject at all times to <u>Section 13.5</u>. NEM will, and will cause each applicable Ancillary Rights Entity to, cooperate with Team Owner and its authorized representatives in conducting such audit. Each Charter Member Group shall only be permitted such right to audit once per calendar year (including once in the calendar year following the Term) and such audit shall not include (i) any Year previously audited by Team Owner or its authorized representative or (ii) any Year that is three or more Years preceding the conclusion of the most recently completed Year (each such three-year period, an "<u>Audit Period</u>"). NEM may reasonably coordinate the dates and times of any audit by Team Owner with a substantially concurrent audit by any other Charter Member. In addition, such audit must be completed within 60 days following the date on which substantially all of the materials are made available for inspection pursuant to this <u>Section 7.2</u>, unless an extension is reasonably required to complete the audit due to NEM or its Affiliate's delay. If any audit under this <u>Section 7.2</u> reveals a past under- or overpayment of any amount of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes or Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes due under this Agreement, then the party owing such amount must correct the under- or overpayment by paying the other party all sums due in full within ten (10 ) Business Days after receiving a substantiation of the inaccuracy, subject to NEM right to in good faith contest such results prior to the expiration of such ten (10) Business Day period (in which case the parties will submit the matter to Arbitration in the event that they are unable to resolve any such dispute within 10 Business Days, and the payments will be due within 10 Business Days following resolution of such dispute). If a Team Owner's audit reveals a shortfall greater than the greater of (a) five percent (5%) of the Primary Ancillary Rights

30

CONFIDENTIAL FRM_0005855

Net Income before Industry Expenses and after Income Taxes or Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, or (b) Two Hundred Thousand ($200,000) Dollars in any Year, then NEM shall reimburse the out-of-pocket costs of the accountants engaged by Team Owner to perform such audit; otherwise the costs of such audit shall be borne by Team Owner.

8.    Transferability/Charter Limitation.

8.1    Transfer.

(a)    Team Owner represents and warrants that, as of the date of this Agreement, Schedule 2 sets forth (i) each direct owner of 10% or more of the equity in Team Owner and (ii) each direct owner of an equity interest in any entity whose primary asset is a direct or indirect interest in Team Owner if such equity interest represents an indirect ownership interest in Team Owner of 10% or more (each of (i) and (ii), a "Substantial Owner"). In the event that, following the date of this Agreement, there is a change in the identity of one or more Substantial Owners (whether because of a Transfer of ownership, the issuance of additional equity interests or otherwise), then Team Owner shall provide written notice of such event to NEM within thirty (30) days following such change (provided that an inadvertent failure to timely provide such notice shall not constitute a breach hereunder if such failure is timely cured), which notice shall include the identity of the new Substantial Owners and/or the identity of any Person who is no longer a Substantial Owner, as the case may be. In addition, Team Owner represents and warrants that Schedule 1 sets forth the identity of the Control Person and the Designated Team Representative as of the date of this Agreement, and Team Owner agrees that it shall inform NEM promptly upon any change in the identity of such Control Person (subject to the terms of this Section 8.1) or Designated Team Representative.

(b)    Subject to the terms hereof, neither the Team Owner nor any the Control Person may at any time:

(i)    in the case of the Team Owner, Transfer any of its rights or delegate any of its duties under this Agreement (either by outright Transfer, license, management contract or otherwise); or

(ii)    in the case of the Control Person, Transfer any direct or indirect equity interest in the Team Owner if doing so would result in the Control Person no longer owning a Controlling Interest in, and at least 30% of the direct or indirect equity of, the Team Owner;

unless each of the following conditions has been satisfied (or waived by NEM in its sole discretion): (1) the Team Owner or Control Person, as applicable, provides advance written notice to NEM of such Transfer (a "Transfer Notice"), which notice shall include the identity of the successor Team Owner or transferee, as the case may be, a brief description of the transaction, and certification from such successor owner or transferee that he, she or it is not a Prohibited Person and which shall include as an annex thereto the Transfer Approval Form attached hereto as Exhibit I (the "Transfer Approval Form"), (2) NEM shall have approved such Transfer in accordance with the process described in Section 8.1(c) below, it being understood and agreed that if NEM does not object in writing to such Transfer within 15 Business Days following its receipt of the Transfer Notice from Team Owner, then NEM shall be deemed to have approved such Transfer, (3) at the closing of the Transfer, the successor Team Owner and/or Control Person, as applicable, executes and delivers to NEM a joinder to this Agreement agreeing to be bound by the terms hereof applicable to Team Owner or Control Person, as applicable, and to assume all of the transferor Team Owner's or Control Person's (as applicable) obligations under this Agreement (in which case, upon execution and delivery of such joinder, Team Owner or Control Person or both, as applicable, shall be relieved of its obligations under this Agreement), (4) (x) the successor Team Owner

31

CONFIDENTIAL                                                                FRM_0005856

or Control Person pays to NEM a transfer fee in the amount of $50,000 (the "Transfer Fee") and (y) the Team Owner or Control Person pays or causes the successor Team Owner or Control Person to pay to NEM an amount equal to all unpaid amounts then due and owing by Team Owner (in the case of a Transfer under clause (i) above) or Control Person (in the case of a Transfer under clause (ii) above) under this Agreement or NASCAR Rules at the time of such Transfer (provided that the Transfer Fee shall not be payable in connection with a Transfer described in Sections 8.1(d) or 8.1(e)), and (5) the Transfer would not result in the Team Owner or the Control Person being in breach of Section 8.2 or Section 8.3 upon the consummation of such Transfer, and (6) any successor Control Person must own, directly or indirectly, at least a 30% equity interest in the Team Owner.

(c)    Upon its receipt of a Transfer Notice, NEM shall (subject to the deemed approval provisions of Section 8.1(b) above) evaluate the Transfer as expeditiously as possible to determine whether or not to approve the Transfer. NEM shall provide its approval hereunder unless NEM reasonably and in good faith believes that the applicable transferee (or person directly or indirectly controlling such transferee) is a Prohibited Person. In the event that NEM timely notifies the Team Owner that NEM reasonably and in good faith believes that the applicable transferee (or any person directly or indirectly controlling such transferee) is a Prohibited Person, and the Team Owner disagrees with NASCAR's determination, then the parties shall discuss in good faith whether it is possible to address NEM's concerns. In the event that the parties are unable to resolve such disagreement within ten (10) business days of NEM's delivery of such notice, then either party may refer such dispute to Arbitration pursuant to Section 12.2, with the sole issue to be resolved in any such Arbitration being whether or not the applicable transferee is (or is directly or indirectly controlled by) a Prohibited Person. In the event of such a dispute, if (i) the parties mutually agree in writing the applicable transferee (or any person directly or indirectly controlling such transferee) is not a Prohibited Person or (ii) the arbitrator makes a final and binding determination that the applicable transferee (or any person directly or indirectly controlling such transferee) is not a Prohibited Person, then the proposed Transfer shall be deemed approved and may be consummated in accordance with the terms hereof and, so long as NEM made such determination in good faith that the applicable transferee was a Prohibited Person, such arbitration shall be the Team Owner and the Control Person's sole recourse against NEM or its Affiliates with respect to such determination, regardless of whether such transaction with such transferee is consummated; in the absence of such mutual agreement or such a final and binding determination in respect of an objection that has been timely raised by NEM in accordance with the terms hereof, the proposed Transfer may not be consummated. For the avoidance of doubt, other than the restrictions on Transfers set forth in Section 8.1(b) above with respect to the Team Owner and Control Person, no other Transfers of a direct or indirect interest in the Team Owner shall be subject to NEM's approval rights hereunder. The parties agree that the placing of a lien or encumbrance on the Team Owner's rights in respect of the Team and this Agreement shall not constitute a Transfer for purposes of this Agreement; provided, that (i) the Team Owner shall notify NEM promptly following the granting of any such lien or encumbrance and shall inform its lenders of the restrictions placed on Transfers of the Team Owner to Prohibited Persons (or persons directly or indirectly controlled by Prohibited Persons) hereunder and (ii) the Team Owner shall (or shall cause the applicable grantee of such lien or encumbrance to) notify NEM of any foreclosure (or attempted foreclosure) under any such loan documents.

(d)    Notwithstanding Section 8.1(b), but subject to Section 8.1(c), the Transfer Fee shall not apply to any Transfer effected pursuant to Section 3.4 or to any Transfer by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, to a successor Control Person that, as of the date of this Agreement, already owns (directly or indirectly) at least 10% of Team Owner, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's

32

CONFIDENTIAL

obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement.

(e)     Notwithstanding Section 8.1(b), the Transfer Fee shall not apply to any Transfer (whether directly or indirectly) by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, (i) to a Family Relative, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement, or (ii) upon the death of such Control Person, to the estate of such Control Person, it being understood that the fees contemplated in Section 8.1(b)(4)(y) shall also not apply in such case (provided that a Transfer of the Controlling Interest by such estate (except to a Family Relative of the Control Person, who, for clarity, shall remain subject to Section 8.1(h)) shall be subject to the provisions of Section 8.1(b) and this 8.1(e), as applicable).

(f)     Notwithstanding Section 8.1(b), the Team Owner and the Control Person may lease, license or otherwise temporarily Transfer their respective rights under this Agreement to any third party, provided that such third party is not a Prohibited Person, on an interim, temporary basis for one full race season during the Initial Term and/or for one full race season during the four-year extension of the Term, provided that (x) NEM shall be provided with advance notice of such transfer and (y) in such event, as between NEM and Team Owner and the Control Person, the transferor Team Owner and its Control Person shall remain responsible to NEM for their respective obligations under this Agreement. Neither the Transfer Fee nor the fees described in Section 8.1(b)(4)(y) shall apply to any such Transfer described in this Section 8.1(f).

(g)     For clarity, any Transfer of the Team Owner's interest in this Agreement shall also effectively Transfer to the same transferee the car number, historical or championship points and any performance-related standards history outlined in Section 6.12 associated with this Agreement.

(h)     If any time during the Term, NEM reasonably and in good faith believes that the Control Person has become a Prohibited Person, NEM shall notify the Team Owner and the Control Person that NEM reasonably and in good faith believes that the Control Person has become Prohibited Person. If the Control Person disagrees with NEM's determination, then the parties shall discuss in good faith whether it is possible to address NEM's concerns. In the event that the parties are unable to resolve such disagreement within ten (10) Business Days of NEM's delivery of such notice, then either party may refer such dispute to Arbitration pursuant to Section 12.2, with the sole issue to be resolved in any such Arbitration being whether or not the Control Person has become a Prohibited Person. In the event that (i) the parties mutually agree in writing the Control Person has become a Prohibited Person or (ii) the arbitrator makes a final and binding determination that the Control Person has become Prohibited Person, then (x) the Control Person shall no longer be designated the Control Person hereunder or have the authority with respect to NASCAR Core Matters set forth in Section 10.1(c) (but, for clarity, shall not be required to sell or divest any of its direct or indirect ownership interest in the Team Owner) and (y) the Team Owner shall designate a new Control Person in accordance with this Agreement, provided that NEM shall waive the requirement that such new Control Person own at least 30% of the direct or indirect equity of the Team Owner.

(i)     During the Term, NEM shall (i) maintain the Transfer Approval Form(s) (set forth in Exhibit I) in respect of Transfers which have been approved (or deemed approved) hereunder in its principal office in Daytona Beach, Florida and (ii) make such Transfer Approval Form(s) available for inspection by the Control Person (or by any other Control Person of a then-current Charter Member) upon written request. In the event of such request by any Charter Member that was not a party to the Transfer

CONFIDENTIAL    FRM_0005858

that was subject to such Transfer Approval Form, notification of such request shall be provided to Team Owner who was a party to such Transfer.

8.2     Limitations On Transfers.

(a)     Following any Transfer by the Team Owner or the Control Person made in accordance with Section 8.1, neither the Team Owner transferor nor the Control Person transferor, as applicable (nor any of their respective controlled Affiliates, as applicable), shall purchase or otherwise acquire any direct or indirect equity interest in any other Charter Member or any assignment or delegation of rights under any Competitor for the period of twelve (12) months following such Transfer.

(b)     The following limitations and conditions apply to all Transfers, as applicable:

(i)     Unless NEM shall have provided (or shall be deemed to have provided in accordance with Section 8.1) its prior approval, neither the Team Owner nor the Control Person shall consummate any Transfer described in Section 8.1(b) if either (i) NEM reasonably and in good faith believes that the applicable transferee (or any direct or indirect owner thereof) is a Prohibited Person or (ii) the applicable transferee (or any direct or indirect owner thereof) is a BMG or an Original Equipment Manufacturer ("OEM").

(ii)     The Team Owner and the Control Person may not Transfer, or permit to be Transferred, any direct or indirect equity interest in the Team Owner if such Transfer would result in the Control Person (or any successor Control Person) being in breach of Section 10.1(b).

8.3     Charter Member Agreement Limitation.  At all times, neither the Team Owner nor any other Person shall own or otherwise acquire any direct or indirect interest in any Charter Member Agreement (including owning any direct or indirect ownership interest in, or exercising any control over, any other Competitor) if, after giving effect to such interest, the Team Owner or such other Person (as applicable), together with all of his, her or its Affiliates (including Family Relatives), would collectively have direct or indirect interest in more than four (4) Charter Member Agreements (including this Agreement).  Notwithstanding the foregoing, nothing in this Section 8.3 shall in any way limit, modify, amend or supersede Section 3.11.2.4 of the NASCAR Rulebook ("Multi Vehicle Teams / Affiliate Groups) as in effect on the Execution Date (but without regard to the provisions thereof to the applicable shared services, which, for clarity, shall not be applied to the sharing of information or equipment so long as such sharing of information or equipment is done at arm's length fair market value and without affecting any team's ability or desire to compete in NASCAR to the fullest extent of such team's capabilities) and, for clarity, NEM shall maintain all rights of inspection, investigation, enforcement or otherwise as set forth in such Section 3.11.2.4.

8.4     Transfers by NEM.  NEM may Transfer its interest in this Agreement in a transaction in which the transferee is acquiring all or substantially all of NEM's assets (an "NEM Permitted Transferee"), whether by way of merger, consolidation, sale of assets, acquisition of equity or otherwise, provided that (x) after giving effect to such Transfer, such NEM Permitted Transferee is an Affiliate of the entity or entities that own all or substantially all of the other NASCAR-related Cup Series assets  and (y) Team Owner is provided with prior written notice of such Transfer.  Except as set forth in the preceding sentence, NEM shall not Transfer any of its rights or obligations under this Agreement to any Person without the prior written consent of Team Owner.  For clarity the parties agree that placing a lien or other encumbrance on NEM or any of its Affiliates or any of their respective rights under this Agreement shall not constitute a Transfer for purpose of this Section 8.4, provided that NEM shall (or shall cause the applicable grantee of such lien or encumbrance to) notify Team Owner of any foreclosure (or attempted foreclosure) under any such loan documents.

34

CONFIDENTIAL                                                                                     FRM_0005859

9. <u>Termination</u>.

9.1 <u>Team Owner Events of Default</u>. In addition to any other rights or remedies NEM may have, this Agreement may be terminated by NEM, by written notice to the Team Owner, upon the occurrence of one or more of the following (each, a "<u>Team Owner Event of Default</u>"):

(a) subject to <u>Sections 9.1(b)</u>, <u>9.1(c)</u> and <u>13.10</u>, (i) the Team Owner or Control Person breaches or fails to perform in any material respect any of its obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, or (ii) any of Team Owner or the Control Person's representations and warranties in this Agreement were materially untrue or incorrect when made on the Execution Date and which untruth or inaccuracy materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non-compliance or untruth that is curable, the Team Owner effects a cure within thirty (30) days after receiving written notice of breach or default from NEM;

(b) the Team Owner or the Control Person violates in any material respect <u>Sections 6.2</u>, <u>6.3</u>, <u>6.8</u>, <u>6.9</u>, <u>6.10</u>, or <u>6.11</u> of this Agreement unless the Team Owner effects a cure within the earlier of the following time periods after receiving written notice of breach or default from NEM (i) forty-eight (48) hours and (ii) the start of the next Event;

(c) the Team Owner dissolves the Team Owner's or the business of the Team that is the subject of this Agreement or substantially ceases operations or the performance of the Team Owner's operating obligations set forth in <u>Section 6.1</u>, and in each case such business, operations or performance is not continued by a successor to whom the Team Owner's business has been transferred in compliance with the terms of this Agreement;

(d) the Control Person commits any act of fraud or embezzlement in connection with the operation of the Team Owner or the Team, as finally determined by a court of last resort, or is convicted by a trial court of, or pleads guilty or no contest to, a felony (other than a traffic violation) which involves moral turpitude;

(e) the Team Owner becomes subject to a Bankruptcy;

(f) Team Owner's Designated Vehicle finishes in the bottom three positions in annual owner points of then Charter Members during three (3) consecutive Years (the "<u>Minimum Performance Standard</u>") and NEM provides notice to Team Owner of its intent to terminate this Agreement as a result of such poor performance on or prior to December 31 of the third consecutive Year of such poor performance; or

(g) unless NEM has exercised it set-off rights as provided herein, the Team Owner or the Control Person fails to make any payments due and validly owing pursuant to <u>Section 3.1(g)</u> within (30) days from the date of receipt by Team Owner of a written notice from NEM that such payment is past due.

In the event of either (x) a Team Owner Event of Default by Team Owner that results in the termination of this Agreement by NEM in accordance with the terms and provisions of this <u>Section 9.1</u> or (y) a voluntary forfeiture by Team Owner to NEM of its rights under this Agreement pursuant to <u>Section 9.5</u>, and in each case <u>provided</u> that the terms and restrictions of <u>Section 6.6</u> hereof are in effect at such time, the Team Owner and Control Person shall, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise

35

CONFIDENTIAL                                                                    FRM_0005860

materially involved in Team Owner operations and is not otherwise an Exempt 10% Owner shall, be subject to the terms and restrictions set forth in Section 6.6 (Protection Of Goodwill) for a period of twelve (12) months following the date of such termination or forfeiture, as the case may be. For purposes of clarity, the restrictions set forth in Section 6.6 shall not apply following a termination effected by Team Owner pursuant to Section 4.4(a) or Section 9.2.

For the avoidance of doubt, in no event shall NEM have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by Team Owner, Control Person or any of their Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by Team Owner, Control Person or any of their Affiliates to pay any amount due under any such agreement or arrangement.

9.2     NEM Event of Default.  In addition to any other rights or remedies the Team Owner may have, but subject to Section 13.10, this Agreement may be terminated by the Team Owner by delivering written notice to NEM if (i) NEM or any of its Affiliates breaches or fails to perform in any material respect any of its material obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, or (ii) any representation or warranty in this Agreement of NEM, NASCAR or any of their respective Affiliates was materially untrue or incorrect when made on the Execution Date and, which untruth or inaccuracy materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non-compliance or untruth that is curable, NEM (or its applicable Affiliate) effects a cure within thirty (30) days after receiving written notice of breach or default from Team Owner.  For the avoidance of doubt, in no event shall the Team Owner or the Control Person have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by NEM or any of its Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by NEM or any of its Affiliates to pay any amount due under any such agreement or arrangement.

9.3     Consequences of Termination.  Upon the termination of this Agreement, (a) all rights granted by NEM to the Team Owner and Control Person under this Agreement shall revert to NEM and all rights granted by the Team Owner and Control Person to NEM or its Affiliates under this Agreement shall revert to the Team Owner and Control Person, as applicable; (b) subject to Section 13.18 none of NEM (or its Affiliates) or Team Owner or Control Person (or their respective Affiliates) shall have any further obligations under this Agreement; (c) the Team Owner shall take all actions that may be necessary to return all rights with respect to the Assigned Car Number to NEM or its designee; (d) the Team Owner shall immediately pay to NEM all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages NEM may incur as a result of any breach of this Agreement by the Team Owner, and (e) NEM and its Affiliates shall immediately pay to Team Owner all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages the Team Owner, Control Person or their Affiliates may incur as a result of any breach of this Agreement by NEM or any of its Affiliates. For clarity, nothing in this Section 9.3 shall be construed to limit any other rights or remedies that the Team Owner, Control Person, NEM or any of their respective Affiliates may have, or to preclude the Team Owner, Control Person or NEM from enforcing such rights or pursuing such remedies to the fullest extent possible, including under NASCAR Rules. For clarity, in the event of termination by either party, the sole and exclusive process for resolution of any Disputes between the parties (and their respective Affiliates) shall be set forth in Section 12.

36

CONFIDENTIAL                                                                    FRM_0005861

9.4     Set-Off.

(a)     In the event of a Team Owner Event of Default pursuant to Section 9.1(h), in addition to NEM's termination rights with respect to non-payment, NEM shall have the set-off rights set forth in Section 3.1(g) above.

(b)     In the event that the Arbitration Panel issues a decision (with respect to a Dispute) with respect to an amount payable to NEM or any of its Affiliates in accordance with this Agreement, NEM shall have the right to withhold from the Team Owner any amounts that would have been payable to Team Owner under this Agreement in an amount equal to the amount determined by the Arbitration Panel to be so payable to NEM or any of its Affiliates.

9.5     Voluntary Forfeiture.  Notwithstanding anything herein to the contrary (but subject to the penultimate paragraph of Section 9.1), NEM acknowledges and agrees that the Team Owner may, in its sole discretion, elect to voluntarily forfeit its rights under this Agreement (provided that no such forfeiture shall be effective during a Cup Series Season) by delivering written notice of such forfeiture to NEM (which notice shall specify the effective date of such forfeiture).  In the event that Team Owner exercises such forfeiture right, then the parties will treat the Agreement as having been terminated on the applicable date for purposes of Section 9.3, and, subject to any separate rights or remedies NEM may have in respect of any Team Owner Event of Default that is otherwise (and independently) occurring without regard to such forfeiture as of such date of such forfeiture, such forfeiture will not be deemed a breach or violation of any of the terms or provisions hereof.

10.     Representations, Warranties and Covenants.

10.1     Representations, Warranties and Covenants by the Team Owner and the Control Person.

(a)     Each of the Team Owner and Control Person severally represent and warrant as to itself to NEM that:

(i)     The Team Owner is either a corporation, limited liability company, limited partnership duly organized, validly existing and in good standing under the law of its jurisdiction of formation.

(ii)     Each of the Team Owner and the Control Person has the full power and authority to enter into and perform its, his or her obligations under this Agreement in accordance with its terms.

(iii)     The execution, delivery and performance of this Agreement by the Team Owner and the Control Person have been duly authorized by all necessary action of the Team Owner and this Agreement constitutes a valid and binding obligation of the Team Owner and the Control Person, enforceable against each in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(iv)     The execution, delivery and performance of this Agreement by the Team Owner and the Control Person do not and will not (i) conflict with any of the Team Owner's Governing Documents and do not and will not conflict with or result in the breach or termination of, or constitute a default under, any material lease, agreement, commitment or other instrument, or any order, judgment or decree, to which the Team Owner or the Control Person is a party or by which the Team Owner or the

37

CONFIDENTIAL                                                                                        FRM_0005862

Control Person is bound, or (ii) constitute a violation by the Team Owner or the Control Person of any law or regulation applicable to the Team Owner or the Control Person. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority is required on the part of the Team Owner or the Control Person in connection with the execution, delivery or performance of its, his or her obligations under this Agreement.

(b) The Team Owner and Control Person severally covenant as to itself that the Control Person, as designated in Schedule 1, and/or trusts for the benefit of the Control Person and his or her lineal descendants for which the Control Person is the trustee, shall own (so long as he or she is designated as the Control Person), a direct or indirect equity interest in the Team Owner of no less than thirty percent (30%).

(c) At all times during the Term a single person (who is as of the Execution Date, the Control Person) shall have full authority to act on behalf of the Team Owner and to bind the Team Owner with respect to all NASCAR and NEM matters relating to the Team, the Cup Series, NASCAR and the stock car business operations of the Team Owner (the "NASCAR Core Matters"). In addition, beginning on the Execution Date and throughout the Term, all actions taken by the Control Person or his or her Designated Team Representative shall be binding on the Team Owner and may be relied upon by NEM (and its Affiliates) and the Other Teams without further inquiry and without notice to or consent of any other Owners or any shareholder, partner or member vote, or through a board of directors, board of managers, or similar body

(d) In entering into this Agreement, neither the Team Owner, the Control Person, any Owner, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) NEM, except as expressly contained in this Agreement or in a writing provided by an officer of NASCAR or NEM. Without limiting the generality of the preceding sentence, NEM and its representatives and advisors have not made any representations or warranties assuring the Team Owner or the Control Person that it will be able to earn a profit or that NEM otherwise will provide any financial assistance to the Team Owner or the Control Person (other than the payments due hereunder) or offer to repurchase any rights granted to the Team Owner under this Agreement

(e) The Team Owner shall comply, in all material respects with all laws, regulations and ordinances applicable to the Team Owner, the Team, and the Designated Vehicle with respect to the performance of their respective obligations under this Agreement

(f) The Team Owner, together with its wholly-owned and controlled subsidiaries, is as of the Execution Date, and subject to Section 8, shall remain during the Term, the (i) owner, licensee or lessee, as applicable, and is the operator of all (or substantially all) assets, properties and rights associated with the operation of the Team and the Designated Vehicle (e.g., race shop, haulers, race cars) or otherwise necessary for the performance of Team Owner's obligations under this Agreement and (ii) the sole owner and operator of the Team.

10.2    Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities.

(a) Each of NEM and the Specified NASCAR Entities severally represent and warrant as to itself to the Team Owner and the Control Person that:

38

CONFIDENTIAL

(i)     Such Person is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the law of the State of Florida or Delaware (as applicable) and has the full power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

(ii)     The execution, delivery and performance of this Agreement by it have been duly authorized by all necessary actions of and this Agreement constitutes the valid and binding obligation of such party enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(iii)     The execution, delivery and performance of this Agreement by it does not and will not (i) conflict with the certificate of incorporation, certificate of formation, bylaws, operating agreement or other governing documents or agreements of such party, as applicable, and does not and will not conflict with or result in the breach or termination of, or constitute a default under, any lease, agreement, commitment or other instrument, or any order, judgment or decree to which it is a party or by which it is bound, or (ii) constitute a violation by such party of any law or regulation applicable to it.  No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority or any direct or indirect owner of such party is required on the part of such party in connection with the execution, delivery and performance of this Agreement by it.

(b)     In entering into this Agreement, neither such party, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) Team Owner or Control Person, except as expressly contained in this Agreement.

(c)     NEM and each Specified NASCAR Entity has and shall retain throughout the Term the power and authority to perform, and to cause their Affiliates to perform, all of their respective obligations and the obligations of their Affiliates set forth herein.  Without limitation of the foregoing, NEM and each Specified NASCAR Entity severally represents, warrants, covenants and agrees for the benefit of Team Owner and the Control Person that subject to <u>Section 8.4</u>, (i), NASCAR Holdings, Inc. is and shall remain throughout the Term the direct or indirect owner of 100% of the issued and outstanding capital stock or other applicable equity interests of each of NASCAR, NEM, NASCAR Broadcasting, LLC and NASCAR Media Group, LLC (which in turn, with respect to NASCAR Media Group, LLC, is and shall remain throughout the Term the direct or indirect owner of 100% of the issued and outstanding capital stock or other applicable equity interests of each of NASCAR Media Ventures, LLC, NASCAR Productions, LLC and NASCAR Digital Media, LLC), (ii) NEM (or its NEM Permitted Transferee) is and shall remain throughout the Term the sole Person with rights to sanction Events and all Promoter Fees shall be paid to NEM (or its NEM Permitted Transferee) (or Awards and Achievement Bureau, Inc., a wholly-owned subsidiary of NEM) throughout the Term, (iii) the only NEM Affiliate that is party to any Live Transmission Contracts is and shall remain throughout the Term NASCAR Broadcasting, LLC, and all Live Transmission Income is and shall remain payable directly to NASCAR Broadcasting, LLC pursuant to such Live Transmission Contracts, (iv) all revenues relating to Primary Ancillary Activities and Secondary Ancillary Activities will be paid in full to the applicable Ancillary Rights Entities, (v) only Ancillary Rights Entities will conduct Primary Ancillary Activities and Secondary Ancillary Activities, and (vi) without limitation of the foregoing, NEM shall not, and shall not permit any Affiliates to, take any action intended or designed to artificially (x) reduce the Pool Money or the Ancillary Rights Total Net Income, (y) reduce Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes via allocations to Secondary  Ancillary Rights Net Income before Industry Expenses and after

39

CONFIDENTIAL                                                                                                FRM_0005864

Income Taxes, or (z) reduce Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes via allocations to Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes, in each of (x), (y) and (z), whether by changing the ownership and/or licensing structure of NASCAR and its Affiliates or otherwise.

(d)    Each of NEM and each Specified NASCAR Entity shall comply (and NEM shall cause NASCAR to comply), in all material respects, with all laws, regulations and ordinances applicable to such party with respect to the performance of their respective obligations under this Agreement.

(e)    NEM represents and warrants that during the Term ninety percent (90%) of all Live Transmission Income received by NEM and any other NASCAR Rights Affiliate will be attributed to the Live Transmission of the Cup Series during the Year in which an Event is held, provided that if during any Year there are fewer than three NASCAR national series, the parties will in good faith attempt to agree on the applicable Cup Series allocation and the failure to agree on such allocation will be subject to the dispute resolution procedures set forth in Section 12.

(f)    NEM represents and warrants that NEM and Promoters, to NEM's knowledge, use best practices in organizing, operating, sanctioning and exploiting Events.

10.3    Release And Waiver by Team Owner and Control Person.  Each of the Team Owner and the Control Person, on their own behalf and on behalf of their controlled Affiliates, hereby releases and forever discharges each of the NEM Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all actions, causes of action, suits, debts, losses, costs, controversies, damages, liabilities, judgments, claims, and demands whatsoever, in law, admiralty or equity (collectively, "Claims"), known or unknown and arising out of or relating to  the criteria used by NEM to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner or any other Person; provided, however that (x) nothing in this Section 10.3 shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by NEM or any of its Affiliates and (y) in the event any third party brings any Claim against the Team Owner, the Control Person or any of their respective Affiliates, nothing in this Section 10.3 shall prevent or restrict the Team Owner, the Control Person or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the NEM Indemnified Parties that is related to the subject matter of such third party Claim.  Each of the Team Owner and the Control Person jointly and severally represent and warrant to the NEM Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person.  The release and discharge set forth in Section 10.3 shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any controlled Affiliate, on the one hand, and any of NEM or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

10.4    Release And Waiver by NEM.  Each of NEM and the Specified NASCAR Entities on their own behalf and on behalf of their respective Affiliates (including NASCAR Holdings, Inc. and NASCAR), hereby releases and forever discharges each of the Team Owner Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all Claims, known or unknown and arising out of or relating to the criteria used by the Team Owner to determine whether or

40

CONFIDENTIAL

FRM_0005865

not to enter into, or to offer to enter into, a Charter Member Agreement with NEM; provided, however that (x) nothing in this Section 10.4 shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by the Team Owner or the Control Person and (y) in the event any third party brings any Claim against NEM or any of its Affiliates, nothing in this Section 10.4 shall prevent or restrict NEM or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the Team Owner Indemnified Parties that is related to the subject matter of such third party Claim. Each of NEM and the Specified NASCAR Entities jointly and severally represents and warrants to the Team Owner Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person. The release and discharge set forth in Section 10.4 shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any Team Affiliate, on the one hand, and any of NEM, or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Team Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

11. Indemnification.

11.1 Team Owner Indemnity. The Team Owner shall indemnify, defend and hold harmless each of the NEM Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to (i) Team Owner's or Control Person's breach of any representation, warranty, covenant or other obligations pursuant to this Agreement or (ii) NEM or any of its authorized Affiliates' permitted use or license of any Team Intellectual Property pursuant to and in accordance with the terms and conditions of this Agreement.

11.2 NEM Indemnity. NEM (and, as to their own representations, warranties, covenants and agreements set forth herein, each Specified NASCAR Entity) severally as to itself shall indemnify, defend and hold harmless each of the Team Owner Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to the breach by them of any their respective representations, warranties, covenants or other obligations pursuant to this Agreement or (ii) the Team Owner's permitted use or license of any of the Works pursuant and in accordance with the terms and conditions of to this Agreement.

11.3 Third Party Claims. The obligations and liabilities of the parties under this Agreement for indemnification with respect to, relating to, caused (in whole or in part) by or arising out of claims of third parties (each, a "Third Party Claim"), shall be subject to the terms and conditions set forth in this Section 11.3. The party entitled to be indemnified hereunder (the "Indemnified Party") shall give the party obligated to provide the indemnity (the "Indemnifying Party") prompt notice of any Third Party Claim; provided, that the failure to give such notice shall not affect the liability of the Indemnifying Party under this Agreement unless the failure materially and adversely affects the ability of the Indemnifying Party to defend the Third Party Claim. The Indemnifying Party shall have the right, exercisable by notice to the Indemnified Party, to control the defense of any Third Party Claim, with counsel of its choosing, provided that the Indemnifying Party as a condition to controlling such defense, shall confirm in writing its obligation to indemnify the Indemnified Party with respect to such claim (including for payment of reasonable fees and expenses of counsel) under this Section 11. Any notice of a Third Party Claim shall identify, to the extent known to the Indemnified Party, the basis for the Third Party Claim, the facts giving rise to such Third Party Claim, and the amount of such Third Party Claim. The Indemnified Party shall make available to the Indemnifying Party copies of all relevant documents and records in its possession.

41

CONFIDENTIAL

12. <u>Dispute Resolution</u>.

12.1 <u>Dispute Resolution</u>. Subject to <u>Section 12.4</u>, and the second sentence of this <u>Section 12.1</u>, the exclusive method of resolving any Dispute shall be the procedures set forth in this <u>Section 12</u>. Notwithstanding the foregoing, but subject to the proviso of this sentence, if there is a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of any NASCAR Rule, such disagreements and disputes will be resolved by NEM or its applicable Affiliates, in its reasonable discretion as the sanctioning body of NASCAR stock car auto racing, in accordance with the provisions set forth in NASCAR Rules and, for clarity shall not be subject to any Arbitration and the Arbitration Panel shall have no authority with respect to such matters; <u>provided</u>, that if the dispute, controversy or claim is with respect to whether there is a conflict or inconsistency between this Agreement and NASCAR Rules as set forth in <u>Section 6.5</u> or as to whether NASCAR or its Affiliates have complied with the requirements of <u>Section 6.5</u>, then such dispute, controversy or claim shall be resolved pursuant to the procedures set forth in this <u>Section 12</u>.

12.2 <u>Arbitration Mechanics</u>. Each party shall have the right to commence an arbitration (the "<u>Arbitration</u>") with respect to any Dispute by giving a notice to the other party that sets forth in reasonable detail the nature of the Dispute and reasonable support for its claim. Except as set in this <u>Section 12.2</u>, the Arbitration shall be administered by the American Arbitration Association (the "<u>AAA</u>") under its Commercial Arbitration Rules and conducted pursuant to such rules, as such rules are in effect as of the time the Dispute is submitted to the AAA for Arbitration (the "<u>Submission Date</u>"). The panel of arbitrators who shall be responsible for resolving the Dispute (the "<u>Arbitration Panel</u>") will consist of three persons (each an "<u>Arbitrator</u>"), who shall be selected in accordance with the AAA's Commercial Arbitration Rules. In proposing a list of candidates for Arbitrators, the parties will request that the AAA take into account the Parties' desire that each Arbitrator be an individual who is a lawyer and/or former judge that has not been employed by, retained by, or otherwise associated with, and has not served as a consultant, contractor, advisor, agent or in any similar capacity to or for any party, or any of their respective Affiliates or predecessors-in-interest, within ten (10) years prior to the Submission Date. The parties shall instruct the Arbitration Panel to convene an initial conference with the parties within fifteen (15) Business Days after the appointment of the Arbitration Panel to establish the timing of any discovery that the Arbitration Panel deems appropriate, to set the date for a hearing and any other matters as may be deemed appropriate by the Arbitration Panel. Unless the Parties otherwise agree with respect to any Arbitration, (a) all disputed issues regarding discovery shall be decided by the Arbitration Panel, (b) if any Arbitration hearing takes more than one day, it will proceed on the next following Business Day until it is completed (<u>provided</u>, that the Arbitration Panel may elect not to hear the Dispute on one (1) Business Day of each week), (c) barring extraordinary circumstances, the Arbitration Panel will render a written decision not later than fifteen (15) Business Days from the date of the conclusion of the Arbitration hearing, (d) the Arbitration hearing shall take place in Charlotte, North Carolina, and (e) subject to the second sentence of <u>Section 12.1</u>, the Arbitration Panel shall have the authority to award damages, equitable relief (including specific performance) and such other remedies the Arbitration Panel deems appropriate (<u>provided</u>, <u>however</u>, the Arbitration Panel shall not have the authority to alter, change, amend, modify, waive, add to or delete from any provision of this Agreement) , and (f) if the parties initiate multiple Arbitration proceedings (including with respect to any Team Owner and other members of its Charter Member Group), the subject matters of which are related by common questions of law or fact and which could result in conflicting awards or obligations, such proceedings shall be consolidated, at NEM's election into a single Arbitration proceeding. Each Party irrevocably consents to the delivery of service of process with respect to any Arbitration in any manner permitted for the giving of notices under <u>Section 13.1</u>. Notwithstanding anything contained in the AAA Commercial Arbitration Rules to the contrary, the non-prevailing party shall bear all costs associated with any Arbitration under this Agreement, including the costs and expenses of the Arbitration, and the cost of its own and the prevailing

42

CONFIDENTIAL

FRM_0005867

party's legal representation and expert witness fees (including any related charges and disbursements). The parties hereto agree to keep confidential in accordance with Section 13.5, and to require that the Arbitration Panel keep confidential, the existence of any Arbitration, the arbitral proceedings, the submissions made by the parties (including any discovery) and any decisions made by the Arbitration Panel, including any award, except, in addition to the exceptions set forth in Section 13.5, to the limited extent necessary in connection with any proceeding to confirm or vacate such award in accordance with this Section 12.

12.3    Arbitration Award.  Any award rendered by the Arbitration Panel shall be (a) in writing, state the basis of the award and include both findings of fact and conclusions of law and (b) final, binding and non-appealable upon the parties and any court having jurisdiction may enter a judgment on any such award.

12.4    Equitable Relief.  Each of the parties hereto acknowledge that the rights granted by and to NEM, Team Owner and Control Person under this Agreement possess a special, unique, and extraordinary character that make difficult the assessment of monetary damage that would be sustained by NEM, Team Owner or Control Person as a result of any breach of this Agreement by the other parties hereto or any unauthorized use of the rights granted by or to NEM under this Agreement and any such breach of unauthorized use will immediately cause irreparable harm to the Cup Series, NASCAR, NEM, NASCAR Rights Affiliates, Team Owner, Control Person and others and that any remedy at law for such breach will be inadequate.  Notwithstanding anything to the contrary in this Agreement, before the Arbitration Panel is convened in accordance with this Section 12 any party may seek temporary or preliminary injunctive relief in aid of the Arbitration, at any time exclusively from the U.S. District Court or, if it does not have jurisdiction, the North Carolina state courts, in each case located in Charlotte, North Carolina (collectively, the "Designated Courts") with respect to any Dispute (collectively, "Interim Equitable Relief"); provided that neither the Team Owner nor the Control Person, nor any other Person acting on their behalf or for their benefit, shall seek Interim Equitable Relief or any other equitable relief of any kind to enjoin or otherwise restrain or limit NEM (or any of its Affiliates) from conducting any of the Events.  If a Dispute requires Interim Equitable Relief before the Arbitration Panel is convened in accordance with this Section 12, the procedures set forth in this Section 12 will still govern the ultimate resolution of the Dispute notwithstanding the fact that a Designated Court may have entered an order providing for injunctive or another form of Interim Equitable Relief.  Each of the parties to this Agreement submits to the exclusive jurisdiction of the Designated Courts with respect to the Interim Equitable Relief, including, the in personam and subject matter jurisdiction of the Designated Courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail (in accordance with Section 13.1) or any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered thereby in connection with such Interim Equitable Relief subject to all applicable appeal rights from such Designated Courts.

12.5    Limitations on Damages.  Other than with respect to claims for indemnification in respect of third party claims pursuant to Section 11, no claim may be made under any legal theory (including contract or tort) by any party against the other party, any Affiliate of the other party, or the directors, officers, employees, shareholders, members, partners, attorneys, or agents of such other party or its Affiliates, for any special, indirect, consequential, incidental or punitive damages in connection with a cause of action arising out of or relating to the transactions contemplated by this Agreement.

13.    Miscellaneous.

13.1    Notices.  Any notice or other communication under this Agreement shall be in writing and shall be considered to have been given and received when delivered personally or sent by electronic

43

CONFIDENTIAL                                                                                          FRM_0005868

mail (with a copy by any other means for providing notices under this Agreement), or one Business Day after being sent by a reputable overnight courier to the applicable party (with a copy by any other means for providing notices under this Agreement) at the address set forth below its name on the signature page to this Agreement (or at such other address as that party may specify by notice to the other).

13.2    Complete Agreement.  This Agreement, including all Schedules and Exhibits contained herein, contains a complete statement of the arrangements between NEM, and its Affiliates, on the one hand, and the Team Owner and the Control Person, on the other hand, with respect to the subject matter hereof and supersedes all prior agreements and understandings between them with respect to that subject matter.

13.3    Expenses.  Each party shall bear its own expenses (including the fees and disbursements of its attorneys and accountants) incurred in connection with the negotiation and preparation of this Agreement and, except as expressly set forth in this Agreement, in connection with all obligations required to be performed by it under this Agreement.

13.4    Governing Law.  This Agreement shall be governed by and construed in accordance with the law of the State of Florida applicable to agreements made and to be performed entirely in Florida.

13.5    Confidentiality.  During the Term, each of NEM, the Team Owner and the Control Person shall, and shall cause their respective controlled Affiliates (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates) to, treat and hold as confidential (and not disclose or provide access to any third party to) all of the Confidential Information, except that disclosure is permitted to NEM, NASCAR and their Affiliates, the Team Owner's and the Control Person's Affiliates and their legal and professional advisors and representatives, to current or prospective, lenders, investors or Transferees, and to other Competitors and their Affiliates and legal and professional advisors and representatives and any association of Competitors and their legal and professional advisors, provided that (i) such Persons are made aware of the confidential nature of such Confidential Information and (ii) such Persons are instructed to maintain the confidential nature of such Confidential Information pursuant to this Section 13.5.  In the event that NEM, Team Owner, the Control Person, any of their controlled Affiliate (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates or such advisors or representatives becomes legally compelled to disclose any Confidential Information, the Team Owner or NEM, as applicable, shall, to the extent practicable, provide the other with prompt written notice of such requirement so that Team Owner or NEM, as applicable, may seek a protective order or other remedy or waive compliance with this Section 13.5.  In the event that such protective order or other remedy is not obtained, or Team Owner or NEM, as applicable, waives compliance with this Section 13.5, NEM or the Team Owner, as applicable, shall furnish only that portion of such Confidential Information which is legally required to be provided and exercise its reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information; provided, however, that this Section 13.5 shall not apply to any information that, at the time of disclosure, is available publicly and was not disclosed in breach of this Agreement  or becomes available on a nonconfidential basis from a source other than a party to this Agreement.

13.6    Relationship Created.  NEM is not a partner, joint venturer or principal and agent with the Team Owner or the Control Person, and nothing in this Agreement shall be construed so as to create any of those relationships or to impose any liability as such on any of them, or to grant any party the right to bind the other without the other's prior written consent.

13.7    No Third-Party Beneficiaries.  Except for the rights of those Persons who are entitled to indemnification under Section 11, this Agreement is solely for the benefit of the parties hereto, and

44

CONFIDENTIAL                                                                                    FRM_0005869

nothing in this Agreement shall be deemed to create any third-party beneficiary rights in any person or entity not a party to this Agreement.

13.8    Separability.    If any provision of this Agreement shall be deemed invalid or unenforceable by any court having jurisdiction, the court shall have the discretion to modify the provision to the extent necessary to make it valid or enforceable and the provision (as so modified), and the balance of this Agreement, shall remain in effect and shall be enforced to the maximum extent permitted by law.

13.9    Failure to Take Action; Waiver.    The failure by any party to seek redress for violation of, or to insist upon the strict performance of, any provisions of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.  All waivers must be in writing, subject to Section 13.12(b).

13.10    Force Majeure.    If a Force Majeure Event prohibits, prevents or delays any party from performing any of its obligations under this Agreement (other than any payment obligation), then such party shall be excused from such performance to the extent, but only to the extent, made necessary by the Force Majeure Event and only until such time as the Force Majeure Event terminates or is revoked or resolved.  If a Force Majeure Event shall last longer than one (1) year, the party to whom performance would otherwise be owed shall have the right to terminate this Agreement to the same extent (if any) as it would have if the occurrence of a Force Majeure Event did not excuse the other party's performance under this Agreement.

13.11    Publicity.    Following the Execution Date, NEM, the Team Owner, the Control Person and their respective Affiliates shall mutually cooperate in good faith regarding issuing a press release, written public statement or press conference regarding the entering into this Agreement and any other details regarding transactions contemplated by entering into this Agreement (other than Confidential Information).

13.12    Amendments.

(a)    This Agreement may not be amended or modified other than by a writing duly signed by the Team Owner, the Control Person and NEM.

(b)    Notwithstanding the foregoing clause (a), in the event that NEM enters into substantively identical amendments or waivers to Charter Member Agreements with the applicable Charter Members and control persons thereof representing (x) at least sixty six and two-thirds percent (66 2/3%) of the then-total number of Charter Members and (y) no less than fifty percent (50%) of the then-total number of Charter Members representing one BMG group and no less than fifty percent (50%) of the then-total number of Charter Members representing at least one other BMG group, then upon delivery by NEM to Team Owner of a copy of such amendment or waiver (together with the signatures from the requisite Charter Members), this Agreement shall thereafter be deemed to have been amended to the same extent as the Charter Member Agreements of the Charter Members who have executed such amendment or waiver and such amendment or waiver will be effective and enforceable against NEM, the Team Owner and the Control Person regardless of whether the Team Owner or Control Person has signed, approved or consented to such amendment; provided, that in no event shall any such amendment or waiver proposed to be effected pursuant to this  subsection (b): (i) extend the Initial Term or the Term or otherwise cause an extension or renewal of this Agreement, (ii) shorten the Term or (iii) treat Team Owner or the Control Person in a manner that materially differs from the treatment of other Charter Members' and control persons, as applicable, it being understood and agreed that the written consent of Team Owner and the Control Person shall be necessary for any such amendment or waiver described in this proviso.

45

CONFIDENTIAL                                                                                     FRM_0005870

13.13    Further Action.  Each party shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as NEM, the Team Owner or the Control Person may reasonably request to effectuate the terms and intent of this Agreement or as may be necessary or appropriate to carry out the terms of this Agreement.

13.14    Joint and Several.  All representations, warranties, covenants and obligations of the Team Owner or the Control Person set forth in this Agreement are several representations, warranties, covenants and obligations of the Team Owner and the Control Person, respectively, regardless of whether or not the applicable provision explicitly provides for joint, several or joint and several liability.  The Control Person shall have no liability in respect of any of the representations, warranties, covenants or obligations of the Team Owner hereunder, it being understood and agreed that the sole obligations of the Control Person are in respect of the representations, warranties, covenants and obligations expressly undertaken by the Control Person herein..

13.15    Reservation of Rights.  All rights not specifically granted to the Team Owner, the Control Person or NEM by this Agreement are reserved by the Team Owner, the Control Person, or NEM as applicable, provided that, nothing in this Agreement shall restrict the Team Owner, the Control Person, NEM or their respective Affiliate thereof from exercising any legal rights that are otherwise available to such Person as a non-NASCAR rights holders or the public at large.

13.16    General Interpretative Provisions.  Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine and feminine forms.  The term "including", whenever used in any provision of this Agreement, means including, but without limiting the generality of, any description preceding or succeeding such term.  Each reference to a person or entity shall include a reference to the successors and assigns of such person or entity.  All references to "Sections", "schedules", "Exhibits" or "exhibits" shall be references to the Sections, schedules and Exhibits to this Agreement, as amended, modified, supplemented or restated from time to time.  The Section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.  This Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied that would result in the resolution of an ambiguity contained herein against the drafting party.  The word "or" shall not be exclusive.  In the computation of any period of time expressed in day(s) in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, except that if it is not a Business Day such period shall end on the next succeeding Business Day.

13.17    Performance.  NEM may perform any of its obligations or exercise any of its rights under this Agreement through any one or more of its Affiliates, provided that NEM shall remain primarily responsible for all of its obligations under this Agreement.

13.18    Survival.  The provisions of Article VII (for the periods set forth therein with respect to delivery of financial statements and audit rights for any periods on or prior to the termination date), Sections 8.2(a) (for the period set forth therein), the penultimate paragraph of 9.1 (including, Section 6.6, if applicable with respect to such termination or forfeiture under Sections 9.1 or 9.5), 9.3, 11 (for any claims relating to periods on or prior to the termination date), 12, 13.1-13.10, 13.14, 13.16-13.20 shall survive termination, expiration or forfeiture of this Agreement.

13.19    Counterparts.  This Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument.  Any counterpart or other signature delivered by facsimile, PDF

46

CONFIDENTIAL                                                                                    FRM_0005871

or other electronic transmission shall be deemed for all purposes as being good and valid execution of this Agreement by the applicable party.

13.20 <u>Guarantees</u>. NASCAR Broadcasting, LLC hereby guarantees all of NEM's financial obligations under this Agreement, <u>provided</u> that, in any Year the aggregate liability of NASCAR Broadcasting, LLC in accordance with the foregoing shall not exceed 25% of 90% of Live Transmission Income for such Year. Each of NASCAR Media Ventures, LLC and NASCAR Productions, LLC hereby guarantees all of NEM's financial obligations under this Agreement, <u>provided</u> that, in any Year the aggregate liability of NASCAR Media Ventures, LLC and NASCAR Productions, LLC in accordance with the foregoing shall not exceed 25% of 90% of the amount of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes for such Year. NASCAR Digital Media, LLC hereby guarantees all of NEM's financial obligations under this Agreement, <u>provided</u> that, in any Year the aggregate liability of NASCAR Digital Media, LLC in accordance with the foregoing shall not exceed the 60% of 90% of the amount of Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes for such Year.

[*Signature page follows.*]

CONFIDENTIAL    FRM_0005872

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Execution Date.

NASCAR EVENT MANAGEMENT, INC.

By: _[signature]_
Name: Brent Dewar
Title: Chief Operating Officer

Address for Notices:
NASCAR Event Management, Inc.
Attn: General Counsel
One Daytona Boulevard
Daytona Beach, Florida 32114

Electronic Mail Address for Notices:
legalnotice@nascar.com

NASCAR BROADCASTING, LLC (solely for purposes of Sections 10.2, 10.4, 11.2 and 13.20 hereof)

By: _[signature]_
Name: Brent Dewar
Title: Chief Operating Officer

Address for Notices:
NASCAR Broadcasting, LLC
Attn: General Counsel
One Daytona Boulevard
Daytona Beach, Florida 32114

Electronic Mail Address for Notices:
legalnotice@nascar.com

NASCAR MEDIA GROUP, LLC (solely for purposes of Sections 10.2, 10.4, 11.2 and 13.20 hereof)

By: _[signature]_
Name: Brent Dewar
Title: Chief Operating Officer

Address for Notices:
NASCAR Media Group, LLC
Attn: General Counsel
One Daytona Boulevard
Daytona Beach, Florida 32114

Electronic Mail Address for Notices:
legalnotice@nascar.com

[*Signature Page to Charter Member Agreement*]

CONFIDENTIAL

**NASCAR PRODUCTIONS, LLC** (solely for purposes
of Sections 10.2, 10.4, 11.2 and 13.20 hereof)

By: _[signature]_
Name: Brent Dewar
Title:  Chief Operating Officer

Address for Notices:
NASCAR Productions, LLC
Attn: General Counsel
One Daytona Boulevard
Daytona Beach, Florida 32114

Electronic Mail Address for Notices:
legalnotice@nascar.com

**NASCAR DIGITAL MEDIA, LLC** (solely for
purposes of Sections 10.2, 10.4, 11.2 and 13.20 hereof)

By: _[signature]_
Name: Brent Dewar
Title:  Chief Operating Officer

Address for Notices:
NASCAR Digital Media, LLC
Attn: General Counsel
One Daytona Boulevard
Daytona Beach, Florida 32114

Electronic Mail Address for Notices:
legalnotice@nascar.com

**NASCAR MEDIA VENTURES, LLC** (solely for
purposes of Sections 10.2, 10.4, 11.2 and 13.20 hereof)

By: _[signature]_
Name: Brent Dewar
Title:  Chief Operating Officer

Address for Notices:
NASCAR Media Ventures, LLC
Attn: General Counsel
One Daytona Boulevard
Daytona Beach, Florida 32114

Electronic Mail Address for Notices:
legalnotice@nascar.com

[*Signature Page to Charter Member Agreement*]

CONFIDENTIAL

[TEAM OWNER]

By: _____

Name: **Ronald C. Devine**

Title: **President, BK Racing, LLC**

Address for Notices:

**6320 Augusta Dr., Suite 1400**

**Springfield, VA 22150**

Electronic Mail Address for Notices:

**rdevine@arfoods.com**


[CONTROL PERSON]

By: _____

Name: **Ronald C. Devine**

Title: **President, BK Racing, LLC**

Address for Notices:

**6320 Augusta Dr., Suite 1400**

**Springfield, VA 22150**

Electronic Mail Address for Notices:

**rdevine@arfoods.com**

CONFIDENTIAL

FRM_0005875

## Exhibit A

## Definitions

"AAA" has the meaning set forth in Section 12.2.

"Affiliate" means (i) with respect to any Person, any other Person, which directly or indirectly controls, is controlled by, or is under common control with such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract, or otherwise, and (ii) with respect to any Person who is an individual, each parent, spouse or domestic partner, sibling, or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such Persons in the capacity as such custodian or guardian; provided, however, for purposes of this Agreement, neither International Speedway Corporation nor any of its direct or indirect subsidiaries shall be deemed an Affiliate of NEM; and further provided, that any Person or team not engaged in professional stock car racing in the United States, Canada or Mexico which is otherwise an Affiliate of Team Owner or Control Person shall not be deemed an Affiliate of Team Owner, except for the purposes of being a beneficiary of an indemnity, release, or damages limitation, or Section 6.6(ii).

"Agreement" has the meaning set forth in the Preamble.

"Ancillary Rights" means those rights related to activities categorized as Primary Ancillary Activities and Secondary Ancillary Activities in accordance with the terms hereof.

"Ancillary Rights Total Net Income" means the sum of (i) the Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes and (ii) the Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes.

"Ancillary Rights Distribution" has the meaning set forth Section 4.2(a).

"Ancillary Rights Entity" means (A) each Specified NASCAR Entity and (B) any other entity that (i) has joined this Agreement as an applicable guarantor pursuant to Section 13.20 and otherwise consistent with the Sections applicable to the then-current Ancillary Rights Entities and (ii) is controlled by NASCAR Media Group, LLC or another Affiliate of NEM.

"Annual Ancillary Rights Statement" has the meaning set forth in Section 7.1.

"Arbitration" has the meaning set forth in Section 12.2.

"Arbitration Panel" has the meaning set forth in Section 12.2.

"Arbitrator" has the meaning set forth in Section 12.2.

"Assigned Car Number" means the vehicle number that is assigned by NASCAR for use by the Team Owner, pursuant to NASCAR Rules. As of the Execution Date, the Assigned Car Number that is assigned for use by the Team Owner, pursuant to NASCAR Rules, and subject to the rights of the Team Owner set forth in this Agreement is set forth on Schedule 1.

"At Event Assets" has the meaning set forth in Section 6.9(b).

"Audit Period" has the meaning set forth in Section 7.2.

51

CONFIDENTIAL

"Bankruptcy" means, with respect to a Person, (i) a general assignment for the benefit of the creditors of such Person, (ii) a voluntary petition in bankruptcy by such Person, (iii) the adjudication of such Person as bankrupt or insolvent, (iv) the entering against such Person of an order for relief in any bankruptcy or insolvency proceeding, (v) the filing by such Person of a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any bankruptcy statute, law or regulation, (vi) such Person's seeking, consenting to or acquiescing in, in each case in writing, to the appointment of a trustee, receiver or liquidator of the Person or all or any substantial part of such Person's properties, (vii) such Person's failure to obtain the dismissal, within sixty (60) days after the commencement thereof, of any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, foreclosure or similar relief under any statute, law or regulation, (viii) such Person's failure to cause to be vacated or stayed, within sixty (60) days after the appointment without such Person's consent or acquiescence, of a trustee, receiver or liquidator of the Person or of all or any substantial part of such Person's properties or (ix) such Person's failure to vacate an appointment described in clause (viii) of this sentence within sixty (60 days of the expiration of any such stay.

"BMG" has the meaning set forth in Section 3.5(d)(i).

"Broadcast Partner" means any Person other than NEM or any of its Affiliates to whom NEM (or any of its Affiliates) has granted Live Transmission Rights in respect of any Event pursuant to a Live Transmission Contract.

"Business Day" means any day (other than a Saturday, Sunday or legal holiday) on which banks are open for business in New York, New York.

"Car/Driver Sponsor Advertising" has the meaning set forth in Section 6.3.

"Charter Members" means, collectively, the Team Owner and other teams who are currently or hereafter may be a party to a then-current Charter Member Agreement.

"Charter Member Agreement" means any agreement that grants (i) guaranteed entry in an Event and (ii) the right to be eligible for the Charter Team Points Pool Money.

"Charter Member Fees" has the meaning set forth in Section 3.1(g).

"Charter Member Group" has the meaning set forth Section 3.5(a).

"Charter Member Increase" has the meaning set forth in Section 3.3(a).

"Charter Shortfall" has the meaning set forth in Section 4.1.

"Charter Team Points Pool Money" means all Points Pool Money other than the money attributable to the Fixed Owner's Plan-Open Teams as specified in Exhibit B.

"Claims" has the meaning set forth in Section 10.3.

"Competitors" means, as of the date of any such determination, the Team and the Other Teams that are licensed to and competing in the Cup Series season.

"Competitor Tire Shop" has the meaning set forth in Exhibit C.

52

CONFIDENTIAL

"Confidential Information" means, collectively, this Agreement, the terms hereof, any all proprietary information or materials provided by NEM, Team Owner, Control Person or any of their respective Affiliates in connection herewith or in furtherance of their respective rights or obligations hereunder, including the Annual Ancillary Rights Statements, Interim Ancillary Right Statements, any financial statements delivered in accordance with Section 7, any Transfer Approval Forms, and any proprietary information or materials disseminated at, prior to or in connection with any Team Owner Council meeting, in each case (other than the Annual Ancillary Rights Statements, Interim Ancillary Right Statements, and any financial statements delivered in accordance with Section 7) that are clearly marked at the time of delivery as confidential.

"Contingency Awards" mean certain monies awarded to Competitors for meeting, completing or exceeding certain award criteria or performance goals as specified in each such contract that awards such amounts. The Team Owner acknowledges and agrees that eligibility for any Contingency Awards shall be based on or require the Competitors use or display sponsors product and/or decal to be eligible for such award.

"Control Person" means the individual person identified by the Team Owner from time to time who (i) directly or indirectly owns at least a 30% equity interest in the Team Owner, (ii) has the authority with respect to NASCAR Core Matters that is set forth in Section 10.1(c) and (iii) has executed and delivered this Agreement or a joinder hereto.

"Controlling Interest" means any direct or indirect equity interest in the Team Owner that, if Transferred, would Transfer the Control Person's effective authority to bind the Team Owner for purposes of this Agreement and NASCAR Core Matters.

"Cup Series" means the NASCAR racing series known, as of the Execution Date, as the NASCAR Sprint Cup Series, and any successor thereto, regardless of its name or sponsor, so long as such successor series is identified by NEM and NASCAR as the highest and most premium NASCAR racing series, and publically held up and promoted by NEM and NASCAR as such.

"Cup Series Points Event" means each Event that is included in the Cup Series where championship points are awarded.

"Designated Courts" has the meaning set forth in Section 12.4.

"Designated Team Representative" means a then-current director or officer of the Team Owner to whom the Control Person has granted the authority with respect to NASCAR Core Matters that is set forth in Section 10.1(c).

"Designated Vehicle" means any stock car that (i) complies with NASCAR Rules, (ii) is owned (or leased) and operated by the Team Owner, (iii) is assigned the Assigned Car Number, and (iv) is authorized to compete in Events pursuant to this Agreement, the Driver Agreement and applicable NASCAR Rules.

"Dilutive Amount" has the meaning set forth in Section 3.4(a).

"Dispute" means any dispute, disagreement, controversy or claim between the parties hereunder (including any of their respective officers, directors, shareholders, partners, members, agents, representatives and attorneys) that arises under or in connection with this Agreement and except as otherwise provided in Section 12.1, is not a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of NASCAR Rules.

53

CONFIDENTIAL

"Driver" means any driver that has executed and delivered (i) a binding agreement with the Team Owner to compete in the Events driving the Designated Vehicle and (ii) the Driver Agreement with NEM with respect to the Designated Vehicle. Notwithstanding that a Driver may have executed a Driver Agreement for one or more other Team Owner vehicle(s), the Driver must execute and deliver a current Driver Agreement specifically for the Designated Vehicle before being allowed to compete in the Designated Vehicle. At the time that the Team Owner intends to have the Driver drive the Designated Vehicle, the Driver must be a Member in good standing; hold a current, valid Cup Series driver license.

"Driver Agreement" has the meaning set forth in Section 6.4.

"Effective Date" means January 1, 2016

"Endorsement" has the meaning set forth in Section 3.5(b)(ii).

"Event" means the time period of activities during a competitive stock car racing Cup Series racing event sanctioned by NEM in accordance with the NASCAR Rules which includes all periods for registration (including without limitation review and approval), inspections, all Practices, Qualifying and Qualifying Races, as provided in Section 9 of the NASCAR Rules position determination, the Race, Post-Race and rain or postponed dates related thereto (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date).

"Event Data" means all data and other information arising from and during one or more Events that is collected (i) by or on behalf of NEM or its Affiliates or (ii) by the Team Owner, its Affiliates or any other Person (other than, in the case of clauses (i) and (ii), Trade Secrets), it being understood the Team Owner will have no obligation to collect any such Event Data that is not currently collected as of the Execution Date unless the expenses attributable thereto are satisfied by NEM or its Affiliates in accordance with the immediately following sentence. To the extent Event Data is collected by or on behalf of NEM or its Affiliates, it shall be collected at the expense of (a) a Broadcast Partner, in the case of certain Event Data exploited via the Live Transmission Activities, (b) an Ancillary Rights Entity (or a third party) in the case of certain Event Data exploited via the Secondary Ancillary Activities, or (c) NEM or any of its Affiliates. NEM (on its own behalf and on behalf of its Affiliates) and the Team Owner agree that any Event Data that is commercially exploited (which, for clarity, shall not include any use by NEM of its Affiliates for competition or officiating purposes in which Event Data is not disseminated to the general public) shall be exploited only via Live Transmission Activities or Secondary Ancillary Activities.

"Exclusivity Breach" has the meaning set forth in Section 6.9(a).

"Execution Date" means February 8, 2016.

"Extension Notice" has the meaning set forth in Section 2.2.

"Extension Term" has the meaning set forth in Section 2.2.

"Family Relatives" means, with respect to any Person, such Person's spouse, mother, father, brothers, sisters and lineal descendants (including those related by adoption and spouses of lineal descendants) and trusts for the benefit of any of the foregoing.

"Field Shortfall" has the meaning set forth in Section 4.1.

54

CONFIDENTIAL

FRM_0005879

"Field Size" means the total number of Competitors authorized by NEM to start any Race.

"Force Majeure Event" means any act, event or condition (except, in each case, for the payment of money), which is beyond the reasonable control of the party asserting the Force Majeure (as defined below), which wholly or partially prevents or delays the performance of any of the duties, responsibilities or obligations of the party asserting the Force Majeure. The term "Force Majeure" shall include, but not be limited to, an act of God; an act of the public enemy; civil disturbance or unrest;; injunctions; lightning; fire, explosion or other serious casualty; terrorist attack (or threats thereof); epidemics; strike, lock-out or labor dispute (without regard to the reasonableness of any party's demands or any party's ability to satisfy such demands); accident or sabotage; unusually severe weather (including hurricane, earthquake, tornado, landslide or flood); war (whether declared or not or threats thereof); blockades; embargoes; condemnation or other taking by the action of any governmental body on behalf of any public, quasi-governmental or private entity; provided, however, for purposes of this Agreement, any crash, accident or other damage to the Designated Vehicle resulting from competition at an Event shall not be deemed a Force Majeure Event.

"Fuel Category" has the meaning set forth in Exhibit C.

"Fuel Sponsor" means any sponsor, that at any time, with which NEM or any of its Affiliates enters into a sponsorship (or similar) agreement that sells products or services in Fuel Category.

"Governing Documents" means all agreements and documents affecting the ownership, control, financing or management of a Person (including, as applicable, its certificate of limited partnership and agreement of limited partnership, formation and limited liability company agreement, certificate of incorporation, bylaws and other governing documents).

"Income Taxes" means all foreign, federal, state and local taxes imposed on Primary Ancillary Rights or Secondary Ancillary Rights, as the case may be and reported in accordance with GAAP. Income Taxes will be allocated under a tax sharing agreement between (and solely among) the applicable Ancillary Rights Entities and under no circumstances will Income Taxes include taxes other than those taxes attributable to the applicable Ancillary Rights Entities.

"Indemnified Party" has the meaning set forth in Section 11.3.

"Indemnifying Party" has the meaning set forth in Section 11.3.

"Initial Term" has the meaning set forth in Section 2.1.

"Interim Ancillary Rights Statement" has the meaning set forth in Section 7.1(b).

"Interim Equitable Relief" has the meaning set forth in Section 12.4.

"Industry Expenses" means the sum of the license fees paid to Promoters, Competitors and NASCAR for Primary Ancillary Rights or Secondary Ancillary Rights, as the case may be. For purposes of clarification, Industry Expenses for Primary Ancillary Rights only includes the 65% license fee to Promoters, the 25% license fee to Competitors and the 10% license fee to NASCAR, and Industry Expenses for Secondary Ancillary Rights only includes the 30% license fee to Promoters, the 60% license fee to Competitors and the 10% license fee to NASCAR.

"Invitation to Bid" has the meaning set forth in Section 3.4(b).

55

CONFIDENTIAL

"Invitational Events" are those non-points Events that are included in the Cup Series schedule to which certain qualifying Charter Member Teams are invited to participate. And so long as they meet the qualifications as determined by NASCAR, Other Teams may also be invited to participate. Invitational Events include, as of the Execution Date, the NASCAR All Star Series Event and the Sprint Unlimited.

"Invitational Pool Money" means, in any given Year, the Race Purse for each Invitational Event.

"Live Transmission" means the live transmission, distribution or exhibition of audio-visual signals of the performance of a NASCAR national series event (including the Events), and any replay(s) thereof if granted as part and parcel of a grant of Live Transmission Rights, by any means, process, medium, distribution platform, method or device, whether now known or hereafter developed, including, without limitation, by broadcast television signal, cable television signal, Direct Broadcast Satellite, the Internet, and/or could be offered to consumers on a Pay Per View or subscription basis etc. within the United States, its territories, possessions and commonwealths, plus Bermuda.

"Live Transmission Activity" has the meaning specified in Section 5.5.

"Live Transmission Contract" means any contract, agreement or other enforceable obligation, whether oral or written, entered into between a NASCAR Rights Affiliate and any Broadcast Partner, for the license, assignment or other transfer of any Live Transmission Rights. As of the Execution Date, NBC Universal Media LLC and Fox Broadcasting Company/Fox Cable Networks, Inc. are both parties to Live Transmission Contracts and thus are both currently deemed Broadcast Partners.

"Live Transmission Income" means all monies, other than the Primary Ancillary Activity Designated Amount and the Secondary Ancillary Activity Designated Amount, actually received, subject to Section 4.4(a), by NEM or a NASCAR Rights Affiliate pursuant to all Live Transmission Contracts that relate to Live Transmission of a NASCAR national Series..

"Live Transmission Rights" means any and all rights to engage in a Live Transmission and directly related activity (for example, delayed transmissions, single re-transmissions, and support shoulder programming.) For clarity, and without limiting the foregoing, Live Transmission Rights include the right to offer the Live Transmission Rights of an Event to mobile devices, tablets, computers, connected TVs, virtual reality viewing devices, hologram viewing devices, etc. For further clarity, without limiting the foregoing, the Live Transmission Rights of an Event could be included as part of what is commonly known as a "TV Everywhere offering," and/or could be offered directly to consumers or delivered as part of any other type of offering now known or hereafter developed. Live Transmission Rights will only be granted through Live Transmission Contracts.

"Material Change" has the meaning set forth in Section 3.5(b)(ii).

"Material Sponsor" has the meaning set forth in Section 5.4.

"Member" has the meaning given to it in the NASCAR Rule Book.

"Minimum Performance Standard" has the meaning set forth in Section 9.1(f).

"NASCAR" has the meaning given to it in the Recitals.

CONFIDENTIAL

"NASCAR Contribution" means, in any given Year, the amount paid by NASCAR to NEM or its designated Affiliate to be included in Year-End Point Fund and/or an Invitational Event Race Purse.

"NASCAR Core Matters" has the meaning set forth in Section 10.1(c).

"NASCAR Recipients" has the meaning set forth in Section 5.2.

"NASCAR Rights Affiliate" means any Person that is (i) an Affiliate or an assignee of NEM and (ii) engaged in the business of exploiting Live Transmission Rights or Ancillary Rights for purposes of generating Live Transmission Income or Ancillary Rights Income or performing any necessary activities incident thereto. NEM may arrange for, coordinate, supervise, determine, or control certain Event-related activity related to the immediately preceding, or act in other capacities relative to the Live Transmission Rights or Ancillary Rights; however, NEM is not engaged in the business of exploiting Live Transmission Rights or Ancillary Rights for purposes of generating Live Transmission Income or Ancillary Rights Income and, accordingly, is not a NASCAR Rights Affiliate.

"NASCAR Rule Book" means the NASCAR Sprint Cup Series Rule Book, as it may be amended, supplemented or otherwise modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NASCAR Rules" means the NASCAR Rule Book and all other rules, regulations, guidelines, directives, memoranda, resolutions, bulletins and agreements (including all agreements and other documents with respect to Drivers, sponsorship or media rights) of NASCAR, or any of its Affiliates, in each case as they may be amended or modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NEM" has the meaning set forth in the Preamble.

"NEM Indemnified Parties" means, collectively, NEM, its Affiliates and each of their respective agents, representatives, Affiliates, employees, shareholders, managers, members, officers and directors.

"NEM Permitted Transferee" has the meaning set forth in Section 8.4.

"Negotiation Period" has the meaning set forth in Section 2.3.

"No Position" has the meaning set forth in Section 3.5(b)(ii).

"Non-Endorsement" has the meaning set forth in Section 3.5(b)(ii).

"Non-Fuel Products" has the meaning set forth in Exhibit C.

"Nonrenewal Events" has the meaning set forth in Section 2.2.

"OEM" has the meaning set forth in Section 8.2(b)(i).

"Other Teams" means each of the stock car racing teams authorized by NEM to participate in the Cup Series from time to time, other than the Team.

CONFIDENTIAL                                                                                                    FRM_0005882

"Owner" means any Person who, directly or through any intermediate corporations, partnerships, limited liability companies or other Persons, owns of record or beneficially an equity interest in the Team Owner.

"Person" means any individual, corporation, association partnership (general or limited), joint venture, trust, estate, limited liability company or other legal entity or organization.

"PIN" has the meaning set forth in Section 6.12.

"Points Pool Money" means, in any given Year, the sum of Race Purse for all Cup Series Points Events (which includes the Qualifying Races for the Daytona 500), Fixed Owner's Plan – Charter Teams, Fixed Owner's Plan – Open Teams, Historical Owner's Plan, and Year-End Point Fund in such Year, in each case as set forth in Exhibit B.

"Pool Money" means in any given Year the sum of Invitational Pool Money and Points Pool Money.

"Primary Ancillary Activity" has the meaning specified in Section 5.5(b).

"Primary Ancillary Activity Designated Amount" means the amounts set forth in further detail on Schedule 4 that (i) represents 1.25% of the monies received by NEM or a NASCAR Rights Affiliate pursuant to the currently effective Live Transmission Contracts with each of NBC Universal Media LLC and Fox Broadcasting Company/Fox Cable Networks, Inc., (ii) is attributable to Primary Ancillary Activities, and (iii) will be included in the calculation of Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes.

"Primary Ancillary Rights" means those rights related to activities categorized as Primary Ancillary Activities in accordance with the terms hereof.

"Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes" means net income related to Primary Ancillary Rights (as determined in accordance with GAAP) plus the sum of (a) Income Taxes attributable to Primary Ancillary Rights, and (b) Industry Expenses attributable to Primary Ancillary Rights each accounted for in accordance with GAAP. For clarity, Primary Ancillary Rights Net Income before Industry Expenses and after Income Taxes will be calculated consistent with the Annual Ancillary Rights Statement attached hereto as Exhibit H.

"Prohibited Person" is a Person whose association with NEM or NASCAR would materially and adversely affect the NASCAR brand or the image of the sport of stock car racing. For example and without limitation, a Person may be determined to be a Prohibited Person if such Person is involved in a material way with a business or activity that is illegal or immoral (such as pornography, illegal gambling or illegal performance-enhancing substances).

"Promoter" means any track promoter hosting an Event at its facility.

"Promoter Fees" means all amounts due and payable by Promoter by Promoters to NEM or its Affiliates in respect of Events, whether pursuant to the Sanction Agreements between Promoters and NEM or otherwise, provided that Promoter Fees will only include the fees related to conducting and officiating the NASCAR Cup Series and shall not include non-competition fees (e.g., Event transfer fees, FIA listing fees, and fees for memberships, credentials, banquet tables and similar fees that have not been included in past practice).

58

CONFIDENTIAL

"Promotional Activities" has the meaning set forth in Section 5.5.

"Qualifying Open Participant" has the meaning set forth in Section 3.5(a).

"Qualifying Sponsor" has the meaning set forth in Section 6.9(b).

"Race" means the portion of the Event that does not include Practice or Qualifying (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date). For clarity, the Duels at Daytona and other similar race qualifying formats adopted after the Effective Date, if any, shall each individually be considered a "Race" for all purposes of this Agreement.

"Reserved Sponsor Categories" means, collectively, each Series Sponsor Category, the Tire Category and the Fuel Category.

"Rules Package" means the annual rules package and testing policy of the Cup Series, including the NASCAR Rules, for any Year.

"Sanction Agreement" means the agreements between each of the Promoters and NEM, whereby NEM agrees to conduct and officiate an Event at a Facility operated by the applicable Promoter.

"Season" means the NASCAR Cup Series race season that occurs in a Year.

"Secondary Ancillary Activity" has the meaning specified in Section 5.5(b).

"Secondary Ancillary Activity Designated Amount" means the amounts set forth in further detail on Schedule 4 that (i) represents 2% of the monies received by NEM or a NASCAR Rights Affiliate pursuant to the currently effective Live Transmission Contracts with each of NBC Universal Media LLC and Fox Broadcasting Company/Fox Cable Networks, Inc., (ii) is attributable to Secondary Ancillary Activities and, (iii) will be included in the calculation of Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes.

"Secondary Ancillary Rights" means those rights related to activities categorized as Secondary Ancillary Activities in accordance with the terms hereof.

"Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes" means net income related to Secondary Ancillary Rights (determined in accordance with GAAP) plus the sum of (a) Income Taxes attributable to Secondary Ancillary Rights, and (b) Industry Expenses attributable to Secondary Ancillary Rights each accounted for in accordance with GAAP. For clarity, Secondary Ancillary Rights Net Income before Industry Expenses and after Income Taxes will be calculated consistent with the Annual Ancillary Rights Statement attached hereto as Exhibit H

"Series Sponsor" means any title and presenting sponsor of the Cup Series. At any given time there may be only one Series Sponsor and only one Series Sponsor Category. As of the Execution Date, the sole Series Sponsor is Sprint, and the Series Sponsor Category has the meaning set forth in Exhibit C.

"Series Sponsor Category" has the meaning set forth in Exhibit C as amended from time to time in accordance with the terms hereof.

"Series Sponsor Change" has the meaning set forth in Section 6.9(a).

CONFIDENTIAL                                                                          FRM_0005884

"Special Awards" means those awards given to Competitors by the Reserved Category Sponsors.

"Specified NASCAR Entities" has the meaning set forth in the Preamble.

"Submission Date" has the meaning set forth in Section 12.2.

"Substantial Owner" has the meaning set forth in Section 8.1(a).

"Substitute Control Person" means an alternate individual person set forth and designated on Schedule 1 who is authorized to act on behalf of or bind the Team Owner in the absence, incapacity or death of the Control Person.

"Taxes" means all taxes, duties, levies and other similar charges, including related interest, additions to tax and penalties.

"Team" means the NASCAR racing team set forth on Schedule 1.

"Team Affiliates" means, with respect to each Team Owner, collectively, (a) all Affiliates of such Team Owner whose business pertains to competing in the Cup Series, (b) each Driver or crew member who is employed, engaged or otherwise controlled by such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, and (c) the officers, employees, agents, and representatives of such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, but with respect to (a) through (c) above, only if such Person is directly responsible for the participation of the Team's Designated Vehicle in the Events for Team Owner.

"Team Clips" has the meaning set forth in Section 5.4.

"Team Co-Chair" has the meaning set forth in Section 3.5(a).

"Team Intellectual Property" means the image, likeness, name, performance, and voice of Team Owner, Team or Team Affiliates or the Designated Vehicle; all names, words, symbols, emblems, logos, slogans, depictions, trade dress, trademarks, service marks, trade names, patents, copyrights, domain names, and other intellectual property owned or controlled by Team Owner or Team or Team Affiliates; and the Assigned Car Number.

"Team Owner" means the domestic U.S. entity set forth on Schedule 1 that directly and wholly owns, controls and operates the Team as provided herein.

"Team Owner Council" means the body of NEM representatives and designees of Charter Members and Open Team Members who meet and confer as provided in Section 3.5. As of the Execution Date, the Team Owner Council members for the Team Owner are set forth on Schedule 1. The Control Person shall have the right to remove or replace any Team Owner Council member at any time upon written notice to NEM, provided that such Person meets the requirements set forth in Section 6.5(a).

"Team Owner Council Representative" has the meaning set forth in Section 3.5(a).

"Team Owner Event of Default" has the meaning set forth in Section 9.1.

60

CONFIDENTIAL

FRM_0005885

"Team Owner Indemnified Parties" means, collectively, the Team Owner, the Control Person and each of their respective Affiliates, and each of their respective agents, representatives, Affiliates, employees, shareholders (or equivalent), managers, members, officers and directors.

"Team Owner Parties" means, collectively, the Team Owner and the Control Person.

"Term" has the meaning set forth in Section 2.1.

"Territory" shall be the United States and its territories, Canada and Mexico.

"Third Party Claim" has the meaning set forth in Section 11.3.

"Tire Category" has the meaning set forth in Exhibit C.

"Tire Sponsor" means the single sponsor with which NEM or any of its Affiliates enters into a sponsorship and supply (or similar) agreement with respect to, and that sells products or services in, the Tire Category.

"Trade Secret" means all data and other information collected by the Team Owner or one of its Affiliates or NEM or one of its Affiliates (i) pertaining to Team Owner or its operations (and not otherwise available to other Competitors), (ii) that provides the Team Owner (or one of its Affiliates) with an actual and independent competitive advantage from not being generally known to or readily ascertainable through appropriate means by other Competitors who would obtain a competitive advantage (or would materially negate Team Owners (or one of its Affiliates) competitive advantage) from its disclosure or use, and (iii) (to the extent controlled by Team Owner) is the subject of efforts by the Team Owner or such Affiliate that are reasonable under the circumstances to maintain its secrecy, provided that, (A) once any such data or other information is disseminated and known to the general public it shall no longer be deemed a Trade Secret and (B) notwithstanding the foregoing, any data or other information arising from and during one or more Events that was commercially exploited during the 2015 Cup Series season via any Live Transmission Activity, Primary Ancillary Activity or Secondary Ancillary Activity shall not be deemed a Trade Secret. For clarity, neither the Team Owner nor any of its Affiliates nor NEM nor any of its Affiliates may commercially exploit (or authorize or license any Person the rights to commercially exploit) any Trade Secret, provided that the foregoing shall not preclude the use of any Trade Secret by (x) Team Owner or its Affiliates for non-public competition purposes or the use by Team Owner or its Affiliates or Team Owner's BMG or applicable vendor, as the case may be, pursuant to requirements of agreements under which such Trade Secret was invented or developed, or (y) NEM or its Affiliates for non-public (and, for clarity, not disclosed to any other Competitor) competition or officiating purposes. NEM and its Affiliates shall maintain the confidentiality of Trade Secrets known to NEM, unless Team Owner agrees otherwise in writing.

"Transfer" means (i) when used as a noun: any direct or indirect transfer, sale, assignment, or other disposition (including the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law) and (ii) when used as a verb: to directly or indirectly transfer, sell, assign, or otherwise dispose of (including through the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law).

"Transfer Approval Form" has the meaning set forth in Section 8.1(b)(ii).

"Transfer Fee" has the meaning set forth in Section 8.1(b)(ii).

61

CONFIDENTIAL

FRM_0005886

"Transfer Notice" has the meaning set forth in Section 8.1(b)(ii).

"Works" means all film, audio only, video only, audio-visual, photographic images, sounds and Event Data (including in-car audio, in-car video, in-car radio, other electronic transmissions between cars and crews, and timing and scoring information) arising from and during any Event.

"Year" means (i) the period commencing as of January 1, 2016 and ending on December 31, 2016, and (ii) each subsequent twelve-month period beginning on January 1 and ending on December 31 of any year of the Term.

CONFIDENTIAL    FRM_0005887

## Exhibit B

Timing of Payments of Pool Money

Race Purse, Fixed Owner's Plan (Charter Teams), Fixed Owner's Plan (Open Teams), and Historical Owner's Plan monies will be paid within 5 Business Days subsequent to final race results for each Event (with the exception of the Qualifying Races for Daytona (1) and the Sprint Unlimited, which will be paid within 5 Business Days subsequent to final race results of the Daytona (1)).

Year-End Point Fund monies will be paid within 30 calendar days subsequent to final race results for each Year.

Timely remittance of all monies is subject to submission of all banking, tax and other administrative information reasonably requested by NEM, including information required to comply with federal, state and local tax laws.

Sources & Uses of Pool Money

| | | | | | $000's | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| **Sources of Funds** | | | | | | | | | |
| Live Transmission Income | $152,403 | $157,954 | $163,570 | $170,340 | $177,198 | $184,120 | $191,130 | $201,470 | $209,938 |
| Promoter Fees | 73,822 | 77,944 | 82,253 | 86,763 | 91,474 | *TBD* | *TBD* | *TBD* | *TBD* |
| NASCAR Contribution | 6,422 | 6,517 | 6,613 | 6,711 | 6,812 | 7,011 | 7,214 | 7,512 | 7,756 |
| **Total Pool Money** | **$232,647** | **$242,415** | **$252,436** | **$263,815** | **$275,483** | | | | |
| **Uses of Funds** | | | | | | | | | |
| **Points Events** | | | | | | | | | |
| Race Purse | 76,920 | 80,328 | 83,810 | 87,788 | 91,846 | | | | |
| Fixed Owner's Plan (Charter Teams) | 68,340 | 71,250 | 74,250 | 77,640 | 81,130 | | | | |
| Fixed Owner's Plan (Open Teams) | 2,808 | 2,808 | 2,808 | 2,808 | 2,808 | | | | |
| Historical Owner's Plan | 56,950 | 59,380 | 61,870 | 64,700 | 67,610 | | | | |
| Year-End Point Fund | 22,780 | 23,750 | 24,750 | 25,880 | 27,040 | | | | |
| **Points Pool Money** | **227,798** | **237,516** | **247,488** | **258,816** | **270,434** | | | | |
| **Invitational Events** | | | | | | | | | |
| Sprint Unlimited | 983 | 1,008 | 1,033 | 1,058 | 1,083 | | | | |
| Sprint All-Star | 3,866 | 3,891 | 3,916 | 3,941 | 3,966 | | | | |
| **Invitational Pool Money** | **4,849** | **4,899** | **4,949** | **4,999** | **5,049** | | | | |
| **Total Pool Money** | **$232,647** | **$242,415** | **$252,436** | **$263,815** | **$275,483** | | | | |

Team Owner acknowledges that Promoter Fees are not contracted beyond 2020. NEM covenants and agrees that it will use commercially reasonable efforts to (i) maximize Promoter Fees paid during the period from Year 2021 through Year 2024, (ii) increase annual Promoter Fees attributable to Cup Series Points Events during such period at a rate such that the annual percentage increase in Promoter Fees for each such Year attributable to Cup Series Points Events (measured against the Promoter Fees for the immediately preceding Year attributable to Cup Series Points Events) is equal to the annual percentage increase in Live Transmission Income and (iii) increase annual Promoter Fees attributable to Invitational Events consistent with past practice (measured against the Promoter Fees for the immediately preceding Year attributable to Invitational Events). In addition, NEM covenants and agrees that it will not take any actions with the purpose or intent of causing amounts payable by or on behalf of Promoters and that would otherwise constitute Promoter Fees hereunder based on past practices to be paid in such a way in the future such that those amounts do not constitute Promoter Fees for purposes hereof.

63

CONFIDENTIAL

FRM_0005888

Without limitation of the foregoing, but subject to <u>Section 4.4</u> hereof, NEM covenants and agrees that the percentage of Promoter Fees contracted to be paid into the Pool Money in each Year 2021, 2022, 2023 and 2024, relative to the aggregate amount of Promoter Fees for such Year, will be 65%, which NEM represents and warrants is equal to the percentage of such Promoter Fees contracted to be paid into the Pool Money on average during the Initial Term (e.g., as of the Execution Date, on average during the Initial Term 65% of all Promoter Fees are contracted to be paid into the Pool Money, so during each Year 2021, 2022, 2023 and 2024 at least 65% of the Promoter Fees will be contracted to be paid into the Pool Money for such Year).

A third party auditor acting at the direction of Team Owner may, once during the Extension Term, upon reasonable notice, inspect or audit the portions of the documents pertaining to the amount of Promoter Fees payable pursuant to Sanction Agreements (which an appropriate officer of NEM shall represent and warrant to such auditors and the Team Owner is all of such documentation necessary to verify such Promoter Fees) in NEM's offices in Daytona Beach, Florida, or at any other mutually agreeable location, during regular business hours for purposes of determining compliance with the foregoing provisions in respect of the Promoter Fees. The auditor shall only be permitted to disclose to the Team Owner whether such amount of Promoter Fees contracted to be paid is consistent with the amount of Promoter Fees previously disclosed to the Team Owner pursuant to this Agreement and no other information relating to such Promoter Fees or Sanction Agreement. NEM will, and will cause each of its applicable Affiliates to, cooperate with such third party auditor in conducting such audit (including by making available such information as is necessary to confirm the percentage of Promoter Fees contracted to be paid into the Pool Money on average during the Initial Term as of the Execution Date). Any disagreement amongst the parties with respect to such auditor's findings shall be subject to the dispute resolution procedures in <u>Section 12.1</u>.

Subject to <u>Section 3.3</u> of the Agreement, total Points Pool Money for each Year 2021, 2022, 2023, and 2024 shall be allocated as follows: 25% to Historical Owner's Plan, 30% to the Fixed Owner's Plan (Charter Teams), 10% to Year-End Point Fund, and 35% to Fixed Owner's Plan (Open Teams) and Race Purse. The 35% allocated to Fixed Owner's Plan (Open Teams) and Race Purse will further be allocated as follows: 1% of Pool Money to Fixed Owner's Plan (Open Teams) and the remainder to Race Purse.

64

CONFIDENTIAL

**Race Purses For Cup Series Events**

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| | | | ($000's) | | |
| Atlanta (1) | 2,230 | 2,306 | 2,384 | 2,477 | 2,573 |
| Auto Club (1) | 1,944 | 2,053 | 2,164 | 2,289 | 2,417 |
| Bristol (1) | 1,575 | 1,624 | 1,676 | 1,736 | 1,799 |
| Bristol (2) | 2,290 | 2,365 | 2,443 | 2,535 | 2,630 |
| Charlotte (1) | 2,594 | 2,710 | 2,828 | 2,961 | 3,096 |
| Charlotte (2) | 1,327 | 1,423 | 1,522 | 1,630 | 1,741 |
| Chicago (1) | 2,131 | 2,253 | 2,376 | 2,515 | 2,657 |
| Darlington (1) | 1,776 | 1,886 | 1,999 | 2,127 | 2,257 |
| Daytona (1) | 15,210 | 15,709 | 16,215 | 16,816 | 17,425 |
| *Daytona Qualifying Race #1* | *675* | *675* | *675* | *675* | *675* |
| *Daytona Qualifying Race #2* | *675* | *675* | *675* | *675* | *675* |
| *Daytona 500* | *13,860* | *14,359* | *14,865* | *15,466* | *16,075* |
| Daytona (2) | 2,270 | 2,345 | 2,423 | 2,515 | 2,610 |
| Dover (1) | 1,968 | 2,076 | 2,187 | 2,312 | 2,440 |
| Dover (2) | 1,281 | 1,378 | 1,477 | 1,586 | 1,698 |
| Homestead (1) | 1,391 | 1,487 | 1,585 | 1,692 | 1,802 |
| Indianapolis (1) | 5,065 | 5,188 | 5,313 | 5,456 | 5,601 |
| Kansas (1) | 1,371 | 1,422 | 1,476 | 1,539 | 1,605 |
| Kansas (2) | 2,131 | 2,253 | 2,376 | 2,515 | 2,657 |
| Kentucky (1) | 1,146 | 1,244 | 1,345 | 1,456 | 1,569 |
| Las Vegas (1) | 2,406 | 2,480 | 2,556 | 2,647 | 2,740 |
| Martinsville (1) | 1,107 | 1,191 | 1,277 | 1,373 | 1,470 |
| Martinsville (2) | 1,233 | 1,331 | 1,431 | 1,540 | 1,652 |
| Michigan (1) | 1,275 | 1,357 | 1,441 | 1,535 | 1,630 |
| Michigan (2) | 1,273 | 1,355 | 1,439 | 1,532 | 1,628 |
| New Hampshire (1) | 1,359 | 1,410 | 1,464 | 1,527 | 1,593 |
| New Hampshire (2) | 1,398 | 1,494 | 1,592 | 1,699 | 1,809 |
| Phoenix (1) | 1,149 | 1,247 | 1,348 | 1,459 | 1,572 |
| Phoenix (2) | 1,233 | 1,331 | 1,431 | 1,540 | 1,652 |
| Pocono (1) | 1,128 | 1,227 | 1,328 | 1,439 | 1,552 |
| Pocono (2) | 1,128 | 1,227 | 1,328 | 1,439 | 1,552 |
| Richmond (1) | 1,206 | 1,304 | 1,404 | 1,514 | 1,626 |
| Richmond (2) | 1,233 | 1,331 | 1,431 | 1,540 | 1,652 |
| Sonoma (1) | 1,726 | 1,807 | 1,891 | 1,990 | 2,093 |
| Talladega (1) | 2,126 | 2,203 | 2,283 | 2,377 | 2,474 |
| Talladega (2) | 1,452 | 1,548 | 1,645 | 1,752 | 1,861 |
| Texas (1) | 3,015 | 2,991 | 2,963 | 2,944 | 2,921 |
| Texas (2) | 2,794 | 2,739 | 2,679 | 2,622 | 2,560 |
| Watkins Glen (1) | 977 | 1,033 | 1,091 | 1,160 | 1,230 |
| **Total Points Events** | **$ 76,920** | **$ 80,328** | **$ 83,810** | **$ 87,788** | **$ 91,846** |
| | | | | | |
| Sprint Unlimited | 983 | 1,008 | 1,033 | 1,058 | 1,083 |
| Sprint All-Star | 3,866 | 3,891 | 3,916 | 3,941 | 3,966 |
| **Total Invitational Events** | **$ 4,849** | **$ 4,899** | **$ 4,949** | **$ 4,999** | **$ 5,049** |
| | | | | | |
| **Total Race Purse** | **$ 81,769** | **$ 85,227** | **$ 88,758** | **$ 92,787** | **$ 96,895** |

Case 3:24-cv-00886-KDB-SCR    Document 449    Filed 11/21/25    Page 70 of 114

CONFIDENTIAL

FRM_0005890

**Race Purse Payout Curve For Cup Series Points Events (a)**

| Finish Position | Payout Percentage | Finish Position | Payout Percentage |
|---|---|---|---|
| 1 | 5.160% | 21 | 2.399% |
| 2 | 4.067% | 22 | 2.318% |
| 3 | 3.976% | 23 | 2.237% |
| 4 | 3.885% | 24 | 2.157% |
| 5 | 3.794% | 25 | 2.076% |
| 6 | 3.704% | 26 | 1.995% |
| 7 | 3.613% | 27 | 1.915% |
| 8 | 3.522% | 28 | 1.834% |
| 9 | 3.432% | 29 | 1.753% |
| 10 | 3.341% | 30 | 1.672% |
| 11 | 3.250% | 31 | 1.597% |
| 12 | 3.165% | 32 | 1.521% |
| 13 | 3.079% | 33 | 1.445% |
| 14 | 2.993% | 34 | 1.370% |
| 15 | 2.908% | 35 | 1.294% |
| 16 | 2.822% | 36 | 1.218% |
| 17 | 2.736% | 37 | 1.143% |
| 18 | 2.651% | 38 | 1.057% |
| 19 | 2.565% | 39 | 0.971% |
| 20 | 2.479% | 40 | 0.886% |

(a) The Race Purse Payout Curve for the Daytona (1) Qualifying Races will be determined annually based on past practices and the number of entrants

CONFIDENTIAL

FRM_0005891

**Fixed Owner's Plan (Charter Team) payouts**

| | 2016 | | 2017 | | $000's 2018 | | 2019 | | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Fixed Owner's Plan (Charter Teams) | $ | 68,340 | $ | 71,250 | $ | 74,250 | $ | 77,640 | $ | 81,130 |
| Fixed Amount Per Points Event | $ | 1,898 | $ | 1,979 | $ | 2,063 | $ | 2,157 | $ | 2,254 |
| Fixed Amount Per Charter / Per Event | $ | 53 | $ | 55 | $ | 57 | $ | 60 | $ | 63 |

67

CONFIDENTIAL

**Historical Owner's Plan Payout Methodology**

Historical Owner's Plan is a share-based model, calculated annually using a combination of rolling 3-year Owner Points finishes plus bonus shares for past Championships

**Rolling 3-year Owner Points Shares**
- 36 shares given to the best average Charter Team Owner Points finish over the past 3 years, declining to 1 share for 36th best average Charter Team Owner Points finish
- Most recent year weighted at 100%, 2nd most recent year at 75%, 3rd most recent year at 50%
- In the event of a tie in Charter Team Owner Points in a given season, teams that are tied will both receive credit for their tied position (e.g., if two teams tied for 10th, then both teams would receive credit for a 10th place finish in that season)
- In the event of a tie in average Charter Team Owner Points finish over the past 3 years, then the shares would be split across the tied Teams (e.g., if two Teams tied for 5th in average Charter Team Owner Points finish over the past 3 years, then each of those two Teams would split the shares for 5th and 6th place, resulting in 31.5 shares for each Team – 32 shares for 5th, 31 shares for 6th, average of 31.5 shares)

**Past Owner Points Championships Shares**
- Bonus shares to be given for past Owner Points Championships, with no depreciation on bonus share value during the period of the agreement
  - 1-3 Owner Points Championships = 1 bonus share
  - 4-6 Owner Points Championships = 2 bonus shares
  - 7+ Owner Points Championships = 3 bonus shares
- For example, a car with 5 total Owner Points Championships at the end of the most recently completed Season would be entitled to 2 bonus shares; a car with 8 Championships would be entitled to 3 bonus shares

A Charter's rolling 3-year Owner Points shares and Past Owner Points Championship shares are added together, and divided by the total number of outstanding shares to determine the percentage of total Historical Owner's Plan money to be paid out to the Charter in the following season.

Given the rolling nature of the calculation, NEM will notify all Charter Teams of their Historical Owner's Plan payout for the following season within 30 calendar days subsequent to the final race results for each Season.

68

CONFIDENTIAL

FRM_0005893

# Year-End Point Fund Payout

$000's

| Finish Position | Shares [1] | Payout Percentage | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| 1 | 28 | 8.537% | $ 1,945 | $ 2,027 | $ 2,113 | $ 2,209 | $ 2,308 |
| 2 | 24 | 7.317% | 1,667 | 1,738 | 1,811 | 1,894 | 1,979 |
| 3 | 23 | 7.012% | 1,597 | 1,665 | 1,736 | 1,815 | 1,896 |
| 4 | 22 | 6.707% | 1,528 | 1,593 | 1,660 | 1,736 | 1,814 |
| 5 | 21 | 6.402% | 1,458 | 1,521 | 1,585 | 1,657 | 1,731 |
| 6 | 20 | 6.098% | 1,389 | 1,448 | 1,509 | 1,578 | 1,649 |
| 7 | 19 | 5.793% | 1,320 | 1,376 | 1,434 | 1,499 | 1,566 |
| 8 | 18 | 5.488% | 1,250 | 1,303 | 1,358 | 1,420 | 1,484 |
| 9 | 17 | 5.183% | 1,181 | 1,231 | 1,283 | 1,341 | 1,401 |
| 10 | 16 | 4.878% | 1,111 | 1,159 | 1,207 | 1,262 | 1,319 |
| 11 | 15 | 4.573% | 1,042 | 1,086 | 1,132 | 1,184 | 1,237 |
| 12 | 14 | 4.268% | 972 | 1,014 | 1,056 | 1,105 | 1,154 |
| 13 | 13 | 3.963% | 903 | 941 | 981 | 1,026 | 1,072 |
| 14 | 12 | 3.659% | 833 | 869 | 905 | 947 | 989 |
| 15 | 11 | 3.354% | 764 | 796 | 830 | 868 | 907 |
| 16 | 10 | 3.049% | 695 | 724 | 755 | 789 | 824 |
| 17 | 9 | 2.744% | 625 | 652 | 679 | 710 | 742 |
| 18 | 8 | 2.439% | 556 | 579 | 604 | 631 | 660 |
| 19 | 7 | 2.134% | 486 | 507 | 528 | 552 | 577 |
| 20 | 6 | 1.829% | 417 | 434 | 453 | 473 | 495 |
| 21 | 5 | 1.524% | 347 | 362 | 377 | 395 | 412 |
| 22 | 4 | 1.220% | 278 | 290 | 302 | 316 | 330 |
| 23 | 3 | 0.915% | 208 | 217 | 226 | 237 | 247 |
| 24 | 2 | 0.610% | 139 | 145 | 151 | 158 | 165 |
| 25 | 1 | 0.305% | 69 | 72 | 75 | 79 | 82 |
| **Total Year-End Point Fund** | | | **$ 22,780** | **$ 23,750** | **$ 24,750** | **$ 25,880** | **$ 27,040** |

(1) 25 shares given to top Owner's Points finisher, declining to 1 share for 25th place. 3 additional bonus shares given to Owner's Points Champion

Case 3:24-cv-00886-KDB-SCR    Document 449    Filed 11/21/25    Page 74 of 114

CONFIDENTIAL

FRM_0005894

## Exhibit C

### Reserved Sponsor Categories

1. <u>Series Sponsor Category</u>. means (i) the operation or provision of, whether directly (e.g., wireless communications carrier) or indirectly (e.g., MVNO), a wireless telecommunications network; (ii) the provision of wireless voice and data (i.e., anything other than voice) services over a wireless telecommunications network; (iii) the provision of Internet access and related online connectivity services delivered via a wireless telecommunications network, where such services are primarily marketed as and intended to be a wireless mobile solution and for use with wireless telecommunication devices; (iv) in-vehicle communication systems (e.g., OnStar); (v) the provision of local and long distance wireline telecommunications services (and also including VOIP (Voice-Over-Internet) telephone services such as Skype); and (vi) wireless telecommunications devices/hardware (including, without limitation wireless phones, tablets, e-readers, mobile hotspot devices, and broadband cards), and related wireless device accessories (e.g., skins, covers, belt clips, faceplate, headsets, ear buds, cases, straps, chargers, etc.).

2. <u>Tire Category</u>. means tires for any type of vehicle, including passenger cars, vans, sport utility vehicles (SUVs), light trucks, commercial trucks, trailers, motorcycles, aircraft, mopeds, scooters and recreational vehicles (RVs), including racing tires for any of the foregoing vehicles. "<u>Competitor Tire Shop</u>" means a tire retailer, installer or repair facility that: (i) includes the name of a single competitor tire brand (e.g., with respect to Goodyear (the Tire Sponsor as of the Execution Date), Firestone Complete Auto Care); or (ii) is owned or operated by any Person that owns a third-party competitor tire brand and gives preferential treatment to a single competitor brand or affiliate brands. The Team Owner or Control Person shall be permitted to include on the Designated Vehicle the branding of a retail tire company and/or repair facility which features the word "tire" in conjunction with the company name (<u>e.g.</u>, Discount Tire), <u>provided</u> that such third party retailer/repair facility is not a Competitor Tire Shop.

3. <u>Fuel Category</u>. means combustion-based fuel and fuel blends for automotive vehicles, including hydro carbon-based, diesel, biodiesel, denatured, domestically-produced ethanol as a component of fuel (e.g., E15), or other alternative fuels and fuel blends. Notwithstanding the foregoing, a company in the Fuel Category may also manufacture lubricants (i.e., motor oil, etc.) and other products or offer other services (i.e., convenience stores) other than automotive fuel (collectively "<u>Non-Fuel Products</u>"). Such Non Fuel Products sponsorships are permitted subject to NEM approval and the conditions outlined below. Companies in the Fuel Category may sponsor a Team Owner Party or the Team for Non-Fuel Products, <u>provided</u> that the Designated Vehicle and the Team's uniforms, hauler and at-track equipment, etc., cannot feature the brand, logo, trademark, product or service identification of a (i) fuel, (ii) fuel retailer, or (iii) a corporate name of a company in the Fuel Category. Further, no Team Owner Party may advertise or promote a product or service which includes a brand, logo, or trademark of, or where the advertisement or promotion features a brand, logo, or trademark of a (i) fuel, (ii) fuel retailer, or (iii) the corporate name of a company in the Fuel Category, whether, in or out of uniform. For example, the Driver or Team Owner may enter into agreements with convenience stores as long as such convenience stores are not branded by a company in the Fuel Category (e.g. 7-Eleven, Circle K, Sheetz, WaWa). Companies in the Fuel Category may sponsor the Designated Vehicle, the Driver or the Team for a lubricant or other similar product as long as they are not branded by a company in the Fuel Category. It is agreed and understood that the Team Owner Parties may not use their NASCAR themed property to promote and/or advertise foreign produced ethanol and/or non-corn based ethanol or advocate for any specific ethanol based consumer fuel blend. (e.g. E15, E30). Team Owner may promote American ethanol and American

CONFIDENTIAL

FRM_0005895

ethanol related services <u>provided</u> that such advertising and promotions is approved in writing by NEM.

71

# Exhibit D

## Display of NASCAR and Designated Sponsor and Competitor Branding.

1. **The NASCAR Logo**: the 2015 NASCAR Bar logo, having minimum dimensions of .75" tall x 3.5" wide, to be displayed on the uppermost and outer left sleeve of the Driver's and crew members uniforms and on the Designated Vehicle immediately above each door top on the "A" post as shown in Exhibit E or as otherwise directed by NEM;

2. **The NASCAR Cup Series Logo**: the designated NASCAR Cup Series logo, having minimum dimensions of 1.75" tall x 3.50" wide, to be displayed on the uppermost right hand chest of the Driver and all crew members uniforms. The NASCAR Cup Series logo to be centered between the right underarm and the center zipper line, and be at least 2" below the shoulder epaulet. The vertical placement of all other logos should not be equal to or partially equal to the NASCAR Cup Series logo, and full color schematics are required. In addition, other requirements include Series Sponsor branding in a visible location on all crew member 2-way radio headsets and helmets, and the NASCAR Cup Series decal to be displayed on the Designated Vehicle immediately below each door window, as shown in Exhibit E or as otherwise directed by NEM;

3. **The Tire Sponsor Logo**: the Tire Sponsor logo having minimum dimensions of 1" x 4", to be displayed on the top half front-facing torso on the Driver's and all crew members uniforms, and the Tire Sponsor logo having minimum dimensions of 1" x 15", as supplied by the Tire Sponsor to be displayed on each front fender of the Designated Vehicle, as shown in Exhibit E or as otherwise directed by NEM;

4. **The Fuel Sponsor Logo**: the Fuel Sponsor logo having minimum dimensions of 2.25" x 3.50", to be displayed on the upper chest or outer sleeve above the elbow of the Driver's and all crew members uniforms, and a Fuel Sponsor decal(s) to be displayed on each side of the front bumper of the Designated Vehicle adjacent to the front wheel well, and on all fuel filler cans of the team, as shown in Exhibit E or as otherwise directed by NEM;

5. **American Ethanol Branding**: the branding of the fuel port on the Designated Vehicle shall be a green band, PMS 362 color, displayed both around the fuel port and on the inner portion of the fuel port, as shown in Exhibit E or as otherwise directed by NEM. The words "American Ethanol" are printed in Avenir black font style over the band with white lettering height equal to 15/16". The green band width is equal to 1.25" from the outside of the fuel port opening. The American Ethanol branding should not be obscured or covered by any other logo. Any branding issues pertaining to the color band or placement of the wording "American Ethanol" will be decided by NEM, in its reasonable discretion.

6. **Driver's Name:** the Driver's last name in Berthold Akzidenz Grotesk Extra Bold Condensed Italic font with white letters 3.5 inches in height, as shown in Exhibit E or as otherwise directed by NEM, to be displayed across the top center of the windshield of the Designated Vehicle as specified by NEM. NEM may permit a driver to include his/her first name or initial(s) in order to avoid duplication.

7. **Manufacturer's Logo**: the manufacturer's logo having minimum dimensions of 2.18" x 5.50", to be displayed across the extreme top left side and extreme top right side of the windshield of the Designated Vehicle as shown in Exhibit E or as otherwise directed by NEM.

72

CONFIDENTIAL

FRM_0005897

8. **<u>Chase Branding</u>**: In the event that Team Owner qualifies for the Chase for the NASCAR Cup, or any subsequent elimination round thereof, in any year of the Term, then Team Owner shall cause the display of any and all Chase branding elements mandated by NEM on the Drivers and all crew members uniforms and on the Designated Vehicle, as specified by NEM, <u>provided</u> that Team Owner shall not be obligated to comply if compliance would cause any material negative impact or any breach of Team Owner or Driver sponsorship branding obligations. Furthermore, any Drivers and/or Team Owners that did not qualify for the Chase for the NASCAR Cup, or that are otherwise eliminated from championship contention at any stage during the Chase, shall not be permitted to display branding elements similar to those mandated by NEM to identify current Chase contenders.

CONFIDENTIAL

FRM_0005898

**Exhibit E**

**Logos**

The NASCAR logo and the NASCAR Sprint Series logo will only be used as follows:





74

CONFIDENTIAL

FRM_0005899

## EXHIBIT E
## 2016 LOGO PLACEMENT GUIDELINES



CONFIDENTIAL                                                                 FRM_0005900

# EXHIBIT E
## FUEL PORT SPECIFICATIONS – AMERICAN ETHANOL BRANDING

**NASCAR FUEL PORT SPECS**



<u>PRINT SPECIFICATIONS</u>
Fuel Port band: 1.25 inches high
American Ethanol text: 15/16 inches high

<u>COLORS</u>
Fuel Port band: Green, Pantone 362
American Ethanol text: White

<u>FONT USED IN AMERICAN ETHANOL TEXT</u>
Font: Avenir Black



**GREEN**
Pantone 362
c.70 m.0 y.100 k.9



**WHITE**
c.0 m.0 y.0 k.0



IMAGES SHOWN ARE FOR REFERENCE PURPOSES ONLY AND ARE NOT TO SCALE.
The green stripe in the space are for representation in the NASCAR color standards. All the NASCAR color standards must firstly derive within of the Pantone Inc. publications. PANTONE® is a registered trademark of Pantone, Inc.

76



Font: Berthold Akzidenz Grotesk Extra Bold Condensed Italic Height: 3.5 Inches
Color: White                                       Chevrolet Logo: 2.18" x 6.71"
Ford Logo: 2.75" x 7.34"                                 Toyota Logo: 3.5" x 5.5"

Case 3:24-cv-00886-KDB-SCR    Document 449    Filed 11/21/25    Page 82 of 114

CONFIDENTIAL                                                                FRM_0005902

**Exhibit F**

**Contingency**

**Expiration date of Contingency Award contracts which require on-car decals**

| Sponsor | Final Year |
|---|---|
| FDP Virginia, Inc. | 2016 |
| MillerCoors LLC | 2017 |
| ExxonMobil Oil Corporation | 2017 |
| The Sherwin Williams Company | 2017 |
| Competition Cams, Inc. | 2018 |
| Flowmaster, Inc. | 2018 |
| MAHLE Clevite Inc. | 2018 |
| Edelbrock, LLC | 2019 |
| Ingersoll-Rand Company | 2019 |
| Mechanix Wear, Inc. | 2019 |
| Federal-Mogul Motorsports Corporation | 2019 |
| 3M Company | 2020 |
| Lincoln Electric Company, Inc. | 2020 |
| K&N Engineering, Inc. | 2021 |

**Amount of existing Awards by year**

| Year | Contingency Awards | Special Awards | Overall Total |
|---|---|---|---|
| 2016 | $3,595,600 | $536,000 | $4,131,600 |
| 2017 | $3,312,000 | $536,500 | $3,848,500 |
| 2018 | $2,428,800 | $484,000 | $2,912,800 |
| 2019 | $1,734,800 | $484,000 | $2,218,800 |
| 2020 | $608,400 | TBD | $608,400 |
| 2021 | $201,600 | TBD | $201,600 |
| 2022 | $0 | TBD | TBD |
| 2023 | $0 | TBD | TBD |
| 2024 | $0 | TBD | TBD |

Note: Does not include the potential value of a renewal / new sponsor in Special Awards.

78

CONFIDENTIAL

## Exhibit G

## NEW CONCEPTS BILL OF MATERIAL RUNWAYS

| Vehicle System | Initial Notification for Inventory Management (Months Prior To On Track) | Specification Available (Months Prior To On Track) | Preferred On Track Month |
|---|---|---|---|
| Body Exterior | BMG Dependent | 5 Months | February |
| Body Exterior – Material Change | 7 Months | 5 Months | February |
| Body Exterior Aerodynamic Devices | 6 Months | 5 Months | February |
| Chassis/Roll Cage – New | 24 Months | 18 Months | February |
| Chassis/Roll Cage - Minor | 12 Months | 5 Months | February |
| Broadcast Camera Locations | 6 Months 6 Months | 5 Months 5 Months | February July |
| Engine - New | 36 Months | 30 Months | February |
| Engine - Major | 18 Months | 12 Months | February |
| Engine - Minor | 12 Months | 8 Months | February |
| Engine Cooling | 18 Months | 5 Months | February |
| Engine Oiling | 18 Months | 5 Months | February |
| Fuel System | 18 Months | 5 Months | February |
| Wheel Hubs | 12 Months | 5 Months | February |
| Suspension | 14 Months | 12 Months | February |
| Steering | 14 Months | 12 Months | February |
| Brakes | 12 Months | 8 Months | February |
| Rear Axle | 14 Months | 12 Months | February |
| Wheels | 18 Months | 12 Months | February |
| Tires | 18 Months | 12 Months | February |
| Transmission | 14 Months | 12 Months | February |
| Bellhousing / Clutch / Pressure Plate | 14 Months | 12 Months | February |
| Shifter | 14 Months | 12 Months | February |
| Driveshaft | 12 Months | 8 Months | February |
| Electrical / Instrumentation / Battery | 14 Months | 12 Months | February |
| Seats | 12 Months | 12 Months | February |
| Seat Belt Restraints | 12 Months | 12 Months | February |
| Fire Suppression | 12 Months | 8 Months | February |

79

CONFIDENTIAL

## Exhibit H

## Sample Ancillary Rights Statements

**NASCAR Media Group, LLC**
**Primary Ancillary Rights Income Statement**

**Revenues**
Broadcast Services
Broadcast Programming
Library and Other Media Production
International Television Rights
Satellite Radio Rights
Other
    Total Revenues

**Direct Expenses**
Broadcast Services
Broadcast Programming
Library and Other Media Production
Content Licensing
    Total Direct Expenses

Gross Margin

**Operating Expenses**
Equipment and Facility Costs
General and Administrative
    Total Operating Expenses

Operating Income

Interest Expense
Interest Income
    Net Income Before Industry Expenses and Taxes(1)

**Industry Expenses**
Promoters
Competitors
NASCAR
    Total Industry Expenses

Income Before Taxes
Income Tax Provision (2)
    Net Income

Informational: Primary Ancillary Rights Net Income before Industry Expenses and After Income Taxes equal the sum of (1) & (2), or $[X], for the period.

80

CONFIDENTIAL

FRM_0005905

**NASCAR Media Group, LLC**
**Secondary Ancillary Rights Income Statement**

**Revenues**
Advertising
Streaming Rights
Subscriptions
Turner Fixed Fee
E-Commerce
Other
   Total Revenues

**Direct Expenses**
Profit Sharing
Revenue Sharing
Commissions
License Fees
Ad Sales-External
   Total Direct Expenses

Gross Margin

**Operating Expenses**
Technology and Content
General and Administrative
   Total Operating Expenses

Operating Income

Interest Expense
Interest Income
   Net Income Before Industry Expenses and Taxes(1)

**Industry Expenses**
Promoters
Competitors
NASCAR
   Total Industry Expenses

Income Before Taxes
Income Tax Provision (2)
   Net Income

Informational: Secondary Ancillary Rights Net Income before Industry Expenses and After Income Taxes equal the sum of (1) & (2), or $[X], for the period.

81

CONFIDENTIAL

FRM_0005906

**Exhibit I**
**Sample Transfer Approval Form**

[Date]

**Charter Agreement No**  [Number]       [Effective Date]

**Transferor:**
**Charter Team Owner**  [Name]
          [Contact Information]

**Control Person**    [Name]
          [Contact Information]

**Transferee:**
**Team Owner**     [Name]
          [Contact Information]

**Control Person**    [Name]
          [Contact Information]

*[Please attach Team Ownership Disclosure Document]*

**Charter Transfer Value**
        **Total Consideration:**   [Amount]

**Requested Competition Number**     [Number]

**Does the Transferor Retain any interest in the above Charter?**  [Y/N]

    If yes, please describe:

*\*Please note that neither NEM nor its Affiliates represent, warrant, or in any way certify or confirm the accuracy of the above information. NEM and its Affiliates have not participated, nor assisted in the gathering or reporting of the above information and is provided solely for information purposes only. No liability, reliance or other claim shall be made against NEM of its Affiliates for providing the information contained in this document*

82

CONFIDENTIAL               FRM_0005907

## Schedule 1

### Certain Designations and Disclosures

| | | |
|---|---|---|
| **Team Name:** | (e.g. commonly used name of team) | **BK Racing, LLC** |
| **Assigned Car Number:** | | **23** |
| **Team Owner:** | (e.g. name of official corporate entity that owns the team) | **BK Racing, LLC** |
| **Control Person:** | (e.g. team principal) | **Ronald C. Devine** |
| **Substitute Control Person:** | (e.g. President, COO, etc. to act in absence, incapacity or death of Control Person) | **Ryan Du Bois** |
| **Designated Team Representative:** | (e.g. competition director) | **Ryan DuBois** |
| **Team Owner Council Representative:** | (e.g. director, owner, CEO, President, CFO or other senior executive appointed by Team Owner) | **Ronald C. Devine** |
| **Initial Driver:** | | **David Ragan** |
| **Crew Chief:** | | **Patrick Donahue** |
| **Manufacturer:** | | **Toyota** |

CONFIDENTIAL

FRM_0005908

Schedule 2

### Ownership of Team Owner - # 23

(A)   *Each direct owner of 10% or more of the equity in Team Owner:*

   (1)   Entity Name:     **Virginia Racers Group, LLC**

          Contact Address:     **6320 August Sr. Suite 1400**

                            **Springfield, VA 22150**

          % Equity in Team Owner:     **76%**

          Ultimate Beneficial Owner:  **Devine Family**

          Contact Number:

   (2)   Entity Name:     **Iowa City Partners**

          Contact Address:     **2310 Lake Ridge Pl NE**

                            **North Liberty, IA 52317**

          % Equity in Team Owner:     **10%**

          Ultimate Beneficial Owner:  **Anthony Marlowe**

          Contact Number:

   (3)   Entity Name:     **L.A.M.Z. Enterprises, LLC**

          Contact Address:     **15243 Medici Way**

                            **Naples, FL 34110**

          % Equity in Team Owner:     **10%**

          Ultimate Beneficial Owner:  **Wayne Press**

          Contact Number:



CONFIDENTIAL

FRM_0005909

(B)   *Each direct owner of an equity interest in any entity whose primary asset is a direct or indirect interest in Team Owner if such equity interest represents an indirect ownership interest in Team Owner of 10% or more:*

(1)   Entity Name:  _____

Contact Address:  _____

_____

% Equity in Team Owner:  _____

Ultimate Beneficial Owner:  _____

Contact Number:  _____

(2)   Entity Name:  _____

Contact Address:  _____

_____

% Equity in Team Owner:  _____

Ultimate Beneficial Owner:  _____

Contact Number:  _____

(3)   Entity Name:  _____

Contact Address:  _____

_____

% Equity in Team Owner:  _____

Ultimate Beneficial Owner:  _____

Contact Number:  _____

CONFIDENTIAL

FRM_0005910

## Schedule 3

## NEM FEE SCHEDULE*

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| **Memberships** | | | | | | | | | |
| **Gold Driver** | $8,400 | $8,400 | $8,568 | $8,739 | $8,914 | $9,092 | $9,274 | $9,460 | $9,649 |
| **Cup** | | | | | | | | | |
| - Team Owner | $4,200 | $4,200 | $4,284 | $4,370 | $4,457 | $4,546 | $4,637 | $4,730 | $4,824 |
| - Driver | $5,250 | $5,250 | $5,355 | $5,462 | $5,571 | $5,683 | $5,796 | $5,912 | $6,031 |
| - Crew | $1,575 | $1,575 | $1,607 | $1,639 | $1,671 | $1,705 | $1,739 | $1,774 | $1,809 |
| - Team Sponsor | $2,425 | $2,425 | $2,474 | $2,523 | $2,573 | $2,625 | $2,677 | $2,731 | $2,786 |
| | | | | | | | | | |
| **Credentials** | | | | | | | | | |
| **- Annual** | | | | | | | | | |
| - Cup | $1,155 | $1,155 | $1,178 | $1,202 | $1,226 | $1,250 | $1,275 | $1,301 | $1,327 |
| - Cup - Replacement | $330 | $330 | $337 | $343 | $350 | $357 | $364 | $372 | $379 |
| **- SEL** | | | | | | | | | |
| - Cup | $335 | $335 | $342 | $349 | $356 | $363 | $370 | $377 | $385 |
| - Cup Late Add | $385 | $385 | $393 | $401 | $409 | $417 | $425 | $434 | $442 |
| | | | | | | | | | |
| **Entry Fees** | | | | | | | | | |
| - Cup (Single race) | $4,730 | $4,730 | $4,825 | $4,921 | $5,020 | $5,120 | $5,222 | $5,327 | $5,433 |
| - Cup (Yearly bundle) | $114,088 | $114,088 | $116,369 | $118,697 | $121,071 | $123,492 | $125,962 | $128,481 | $131,051 |
| *- Implied single race cost* | *$3,169* | *$3,169* | *$3,232* | *$3,297* | *$3,363* | *$3,430* | *$3,499* | *$3,569* | *$3,640* |

\* This chart reflects major team-related fees for participating in racing events. Other fees during the year (e.g., tables at the Cup Banquet, filing an appeal) to be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

86

CONFIDENTIAL

## Schedule 4

### Primary Ancillary Activity and Secondary Ancillary Activity Designated Amount

$000s

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Consolidated amounts due under NBC and FOX Live Transmission Contracts | 700,100 | 725,600 | 751,400 | 782,500 | 814,000 | 845,800 | 878,000 | 925,500 | 964,400 |
| Secondary Ancillary Activity Designated Amount | 14,002 | 14,512 | 15,028 | 15,650 | 16,280 | 16,916 | 17,560 | 18,510 | 19,288 |
| Primary Ancillary Activity Designated Amount | 8,751 | 9,070 | 9,393 | 9,781 | 10,175 | 10,573 | 10,975 | 11,569 | 12,055 |

DC: 5956610-4

1

CONFIDENTIAL

FRM_0005912

**Exhibit I**

**FORM OF DRIVER AGREEMENT**



CAR NUMBER: _____
TEAM OWNER: _____

**NASCAR CUP SERIES
DRIVER AGREEMENT**

In order to participate in the NASCAR Cup Series (the "Cup Series") and become eligible to share in applicable contest, prize or point fund earnings contributed by the Series Sponsor (as defined below) and NASCAR Event Management Inc. ("NEM") as licensee for the National Association for Stock Car Auto Racing, Inc. ("NASCAR") (collectively, the "NASCAR Cup Series Contest Awards"), the undersigned driver (the "Driver") hereby agrees to the following, effective upon full execution below and expiring upon the earlier to occur of (a) the later of December 31st, 2020 and the expiration date of any extension of the Charter Member Agreement (as amended from time to time, the "Charter Member Agreement") entered into by Driver's Team Owner (as identified above, and together with any permitted successors, the "Team Owner") and (b) the termination of this Agreement pursuant to Section 9 hereof (the "Term"). For purposes of this NASCAR Cup Series Driver Agreement (as amended or supplemented from time to time in accordance with the terms hereof, this "Agreement"), all NASCAR Cup Series Events and other related activities for each Year of the Term shall be referred to herein as a "Season". "Year" means (i) the period commencing as of January 1, 2016 and ending on December 31, 2016, and (ii) each subsequent twelve-month period beginning on January 1 and ending on December 31 of any year of the Term.

1.  **NASCAR MEMBERSHIP AND ENTRY BLANK FORMS.** Driver agrees to annually submit a NASCAR Competition Membership and License Application form for each Season of the Term, a fully-executed Official Entry Blank coupon for each NASCAR Cup Series Event that Driver decides to enter or the Season and any other documents or forms reasonably required by NASCAR or its affiliate NEM for participation in any NASCAR Cup Series Events or related activities during the Term, in each case in accordance with NASCAR Rules and this Agreement and to abide by the NASCAR Rules for each Season as they may be amended from time to time, subject to Section 16 hereof, provided, that in the event of any conflict or inconsistency with such documents or forms entered into by the Driver with the subject matter set forth in Sections 3, 4, 7, or 8, or Exhibits A, B or C of this Agreement, such applicable Section(s) or Exhibit(s) of this Agreement shall control, and the Driver acknowledges and agrees that the 2016 Competition Membership and License Application form for the Cup Series is substantially similar to the 2015 Competition Membership and License Application form for the Cup Series and accordingly may have inconsistencies or conflicts with respect to such subject matter set forth in such Section(s) or Exhibit(s) of this Agreement. Driver agrees that he or she is not an employee of NASCAR or its affiliates. For purposes of this Agreement, "Event" means the time period of activities during a competitive stock car racing Cup Series racing event sanctioned by NEM in accordance with the NASCAR Rules which includes all periods for registration (including without limitation review and approval), inspections, all Practices, Qualifying and Qualifying Races, as provided in Section

CONFIDENTIAL

FRM_0005913

9 of the NASCAR Rules position determination, the Race, Post-Race and rain or postponed dates related thereto (as such terms are defined in the NASCAR Rule Book).

2. **DRIVER POINTS ELIGIBILITY.** By signing this Agreement, Driver hereby acknowledges and agrees that he or she may compete in and be awarded prize monies and Driver championship points (where applicable) for the Events. However, Driver agrees that he or she will only be permitted to accumulate Driver championship points for one (1) of the following Series currently known as: NASCAR Sprint Cup Series, NASCAR Xfinity Series, or NASCAR Camping World Truck Series, as selected annually on Driver's NASCAR Competition Membership and License Application. For more information concerning Driver Points, see the NASCAR Rule Book.

3. **BROADCAST AND OTHER RIGHTS**. Driver acknowledges and agrees that, as between Driver and NASCAR, NASCAR exclusively and in perpetuity owns any and all rights to broadcast, transmit, film, tape, capture, overhear, photograph, collect or record all Works (as defined below) by any means, process, medium or device (including television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmission over the Internet, and public and private online services authorized by NASCAR, whether or not currently in existence, and that, as between NASCAR, on the one hand, and Driver, on the other hand, NASCAR is and shall be the sole owner of any and all intellectual property rights (including patents, copyrights, trademarks, design rights, and other proprietary rights) worldwide in and to the Works, copyrightable or otherwise, created from the images, sounds and event data) arising from and during any Event (excluding, for clarity, any Driver Intellectual Property (as defined below), and any trademarks, service marks, copyrights, name image or likeness, of any other third party that are embodied in any Work). In addition, to the extent not already owned by NASCAR, Driver hereby assigns to NEM, as the designated representative of NASCAR for the collection of such rights, exclusively and in perpetuity any and all rights set forth above (excluding, for clarity, any Driver Intellectual Property and any trademarks, service marks, copyrights, name image or likeness, of any other third party that are embodied in any Work) and Driver hereby grants NEM a worldwide, perpetual, irrevocable, non-exclusive, transferable, assignable and royalty-free license, without further compensation (which license shall survive termination of this Agreement) to use by any means worldwide any Driver Intellectual Property which is included or incorporated in any Work to the extent that such license is necessary to enable NEM to exercise the rights expressly reserved, exclusively or non-exclusively, to NEM pursuant to this Agreement. The Driver represents and warrants that, as of the effective date of this Agreement, Driver has not granted to any third person the rights described in this Section 3. The Driver agrees to take all steps reasonably necessary, and that are reasonably requested by NEM, to protect, perfect or effectuate NASCAR's ownership or other interest in these rights described in this Section (all at NASCAR's cost). The Driver agrees not to take any action, nor cause others to take any action, nor enter into any third party agreement, which would contravene, encroach or infringe upon these NEM or NASCAR's rights described in this Section 3. Driver agrees to allow any and all equipment relating to audio and video transmissions, as well as timing and scoring information, including, size, location and weight, and use thereof as determined by NEM, in or on the Designated Vehicle for each Event, or a weighted device equal to the size, weight, and location of part or all of such equipment if such Designated Vehicle is not selected to run part or all of such equipment, as determined by NEM. Notwithstanding the foregoing, NEM agrees that nothing in this Agreement shall restrict Driver from exercising any legal right that is otherwise available to non-NASCAR rights holders or the public at large and not derived from any benefits or rights obtained by Driver under this Agreement. For purposes of this Agreement, "Works" means all film, audio only, video only, audio-visual, photographic images, sounds and event data (including in-car audio, in-car video,

CONFIDENTIAL                                                                                      FRM_0005914

in-car radio, other electronic transmissions between cars and crews, and timing and scoring information) arising from and during any Event. "Driver Intellectual Property" means the image, likeness, name, performance, and voice of the Driver; all names, words, symbols, emblems, logos, slogans, depictions, trade dress, trademarks, service marks, trade names, patents, copyrights, domain names, and other intellectual property owned or controlled by the Driver related to his or her NASCAR activities. "Designated Vehicle" means any stock car that (i) complies with NASCAR Rules, (ii) is owned (or leased) and operated by the Team Owner, (iii) is assigned the vehicle number that is assigned by NASCAR for use by the Team Owner, pursuant to NASCAR Rules, and (iv) is authorized to compete in Events pursuant to this Agreement, the Charter Member Agreement and applicable NASCAR Rules.

**4.     ADVERTISING AND PROMOTIONAL ACTIVITIES**. Driver acknowledges and agrees that NEM, the then-current title and presenting sponsor of the Cup Series (a "Series Sponsor"), each then-current track promoter hosting an Event at its facility ("Promoter"), each then-current television broadcast partner with rights to broadcast a NASCAR Cup Series Event or any portion thereof during the Term ("Broadcast Partner"), each then-current person or entity that has entered into an agreement with NEM or any affiliate of NEM to exploit any NASCAR related content, and the duly authorized affiliates of each of them (collectively, "NEM Recipients"), may use and exploit, on a non-exclusive basis, the name, likeness and performance, in or out of uniform, including photographs, images and sounds of the Driver, in each case taken in connection with an Event during the Term, in any medium (including print, broadcasts by and through television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmissions over the Internet and public and private online services authorized by NEM) solely for (a) promoting or advertising any Event or the Cup Series, (b) news reporting in respect of an Event or the Cup Series, or (c) any telecast or programming that constitutes a telecast of an Event or shoulder programming with respect to such telecast, or other distribution of NASCAR related content, and the Driver hereby grants to each NEM Recipient, in perpetuity, all rights thereto for such purposes.  With the exception of any Series Sponsor's exclusive rights as set forth in Section 1 of Exhibit A with respect to endorsements within such Series Sponsor Category, this Section 4 does not grant to NEM or its Affiliates (or to any other Person) any right for (or to authorize) the use or endorsement of a third party brand, product or service utilizing the name, image or likeness of the Driver without Driver's express consent

**5.     ADVERTISING, PROMOTIONAL, SPONSORSHIP ACTIVITIES AND BRANDING REQUIREMENTS.** Subject to Section 16, at all times during the Term, Driver hereby agrees to comply with the requirements as set forth on Exhibits A, B, and C, as such exhibits may be amended, supplemented or modified from time to time during the Term by NEM with reasonable prior notice to the Driver.

**6.     CERTAIN VICTORY LANE OBLIGATIONS**. Driver understands that if Driver is the winning driver of any Event, Driver will be required to take a photograph with the Event sponsor(s) and their guests.  Driver also understands that Driver is required to participate in interviews in victory lane and the media center, as described further below.  Victory lane ceremonies will conclude once all customary sponsor photos, individual photos and media requirements in victory lane have been completed.

**7.     PROMOTIONAL/MEDIA APPEARANCES.**  The Driver shall have the following promotional and media obligations, it being understood and agreed that any and all actual, reasonable, and documented travel costs and subsistence expenses (including hotels, etc.) associated with such obligations that involve travel on Driver's part, other than the Victory Tour,

CONFIDENTIAL                                                                                     FRM_0005915

shall be, unless otherwise set forth in this <u>Section 7</u> (and subject to any separate agreement which the Driver may have with the Team Owner), at the cost and expense of the Driver. The time, date and location of each appearance required below shall, unless otherwise specified below, be mutually agreed upon by NEM and Driver and shall be subject to Driver's individual schedule and other bona fide professional commitments (other than in the case of <u>Section 7(b)</u> below). NEM shall use commercially reasonable efforts to provide Driver with sufficient advance written notice of such appearances. Appearances will be rescheduled in the case of Driver's injury or illness or in the event of a force majeure event which prevents Driver from making such appearance.

a) As reasonably designated by NEM, Driver agrees to make commercially reasonable good faith efforts, to participate in promotional activities, production days and events surrounding the NASCAR Cup Series. These events include but are not limited to NASCAR's Season launch activities leading up to the Daytona 500 (including, without limitation, the Daytona 500 Media Day), promotional events for the NASCAR Hall of Fame, NASCAR Chase for the Sprint Cup activities and NASCAR Cup Series Champions Week and/or other NASCAR marketing programs.

b) In the event Driver qualifies for the Chase for the NASCAR Cup or is Rookie of the Year in any Season during the Term, Driver agrees to attend for up to two days (subject to the last sentence below) the NASCAR Cup Series Awards banquet and all season-ending special awards ceremonies and events at times and locations designated by NEM. NEM will provide reasonable advance notice of the ceremony and event schedules to Driver, and Driver will take reasonable steps to coordinate his or her availability in accordance with such event schedules, and will provide reasonable advance notice to NEM of any potential schedule conflicts. However, in no event shall Driver be required to be in attendance at such season ending events and award ceremonies for more than two (2) full days (but the Driver will arrive with ample time to participate in all events during such days, including arrival by 9am local time on the first day), <u>provided</u> that if the Driver is the NASCAR Cup Series Champion for any Season during the Term, Driver shall attend such season ending award ceremonies for no more than five (5) full days.

c) In addition, In each Year during the Term, Driver agrees to (i) participate in a minimum of one (1) media tour to promote the NASCAR Cup Series, (ii) attend a minimum of one (1) four-hour still-photo or production shoot to promote the NASCAR Cup Series, and (iii) attend one (1) two-hour Series Sponsor event during the NASCAR Cup Series Season. Schedule of such appearances will be mutually agreed upon between NEM and Driver.

d) If Driver is the NASCAR Cup Series Champion for any Season during the Term, Driver agrees to participate in up to three (3) mutually-agreed-upon commemorative projects developed by the Series Sponsor and NEM and their licensing agents, on the understanding that mutually-agreed-upon royalties will be paid to the Driver and/or Team Owner.

e) Driver agrees to use commercially reasonable good faith efforts, to make himself or herself available to NEM for one (1) additional media or promotional appearance per

CONFIDENTIAL

Season upon NEM's request, to assist with the promotion of the Daytona 500 and/or the respective NASCAR Cup Series Season Launch activities. NEM will make good faith efforts to coordinate Driver's appearance with Driver's existing travel schedule, with the understanding that such coordination may not be possible to achieve the primary goal of this provision, namely to ensure appropriate national media coverage for the Daytona 500 and the commencement of the NASCAR Season.

f)  Immediately following the race conclusion of each Event, the winning driver shall proceed to victory lane for post-race interviews. When victory lane ceremonies are concluded, the winning driver must report to the media center for post-race interviews unless otherwise directed by NEM Officials. Drivers of the 2nd through 5th place cars shall stop on pit road or other area designated by NEM for media interviews. Furthermore, any driver finishing outside the top five, shall comply with any reasonable request by NEM for post-race interviews. After the completion of the pit road interviews, drivers of the 2nd and 3rd place cars shall proceed to the media center.

g)  The top sixteen (16) drivers in current championship points standings, shall make reasonable good faith efforts to provide at least fifteen (15) minutes of availability at their team hauler or in the media center on Thursday or Friday of the Event weekend as determined by NEM. NEM will make good faith efforts to provide notice of the Event schedule to Driver and Driver will take reasonable steps to coordinate his or her availability in accordance with the Event schedule and provide notice to NEM of any potential schedule conflicts.

h)  The top three (3) qualifiers and top qualifying Rookie of the Year candidate shall go to the media center immediately following the conclusion of qualifying. Drivers participating in the final round of qualifying at the 2nd through 36th championship points Events shall be available on pit road or other area designated by NEM for media interviews immediately following qualifying. Furthermore, any driver finishing outside the top 12 in qualifying, shall comply with any reasonable request by NEM for post-race interviews. At the request of NEM, drivers qualified for the final segment of qualifying at the 2nd through 36th championship points Events shall comply with reasonable requests for media interviews between the penultimate and final segment of qualifying.

i)  The highest finishing Rookie of the Year candidate shall go to the media center following the race.

In addition, following the 26th championship points event or the commencement of the "Chase for the NASCAR Cup" as determined by NEM:

(1)  Those drivers that have qualified for the Chase for the NASCAR Cup will participate in a production shoot supporting the Chase (consistent with past practice) and a special post-race media requirements, in each case, as reasonably directed by NEM.

(2)  Those drivers that have qualified for the Chase for the NASCAR Cup will participate in media events to promote their participation in the Chase for the

CONFIDENTIAL     FRM_0005917

NASCAR Cup prior to the first (e.g., 27th) Chase for the NASCAR Cup Event as reasonably directed by NEM.

(3)     Each of those drivers that have qualified for the Chase for the NASCAR Cup will participate, as reasonably directed by NEM, in Chase-related media events including but not limited to NASCAR's "Chase Across North America" national media tour and at least one national media teleconference, satellite media tour and radio tour during the final (e.g., 10) Events of each respective Season. NEM agrees to reimburse such drivers for reasonable travel and subsistence expenses, provided that such expenses are pre-approved by NEM in writing. Driver's reimbursement by NEM for any such promotional appearance in conjunction with an already scheduled Event (i.e. media appearance at the same track or city hosting the upcoming Event weekend) will be limited to the extent of such Driver's incremental expenses beyond such standard travel costs for the Event.

In addition, following the 29th championship points Event as determined by NEM:

(i)     Those drivers that remain eligible for the Chase for the NASCAR Cup championship will participate in special post-race media requirements as reasonably directed by NEM.

(ii)    Those drivers that remain eligible for the Chase for the NASCAR Cup championship will participate in media events to promote the remaining Events in the Chase for the NASCAR Cup prior to the 30th or 31st championship points Event at days, times and locations to be determined. NEM agrees to reimburse such drivers for reasonable travel and subsistence expenses, provided that such expenses are pre-approved by NEM in writing. Driver's reimbursement by NEM for any such promotional appearance in conjunction with an already scheduled Event (i.e. media appearance at the same track or city hosting the upcoming Event weekend) will be limited to the extent of such Driver's incremental expenses beyond such standard travel costs for the Event.

In addition, following the 32nd championship points Event as determined by NEM:

(x)     Those drivers that remain eligible for the Chase for the NASCAR Cup championship will participate in special post-race media requirements as reasonably directed by NEM.

(y)     Those drivers that remain eligible for the Chase for the NASCAR Cup championship will participate in media events to promote the remaining Events in the Chase for the NASCAR Cup prior to the 33rd or 34th championship points Event at days, times and locations to be determined. NEM agrees to reimburse such drivers for reasonable travel and subsistence expenses, provided that such expenses are pre-approved by NEM in writing. Driver's reimbursement by NEM for any such promotional appearance in conjunction with an already scheduled Event (i.e. media appearance at the same track or city hosting the upcoming Event weekend) will be limited to the extent of such Driver's incremental expenses beyond such standard travel costs for the Event.

In addition, following the 35th championship points Event as determined by NEM:

CONFIDENTIAL                                                                    FRM_0005918

<ol type="A">
<li>(A)    All drivers in contention for the NASCAR Cup Series championship following the penultimate (e.g., 35th) Event of each Season will participate, as reasonably directed by NEM, in a NEM scheduled news conference prior to the final Event.</li>
<li>(B)    The NASCAR Cup Series Champion of each respective Season will participate, as directed by NEM, in a national media tour including a visit to New York City following the final championship Event. Driver's reimbursement by NEM for any such promotional appearance in conjunction with an already scheduled Event (i.e. media appearance at the same track or city hosting the upcoming Event weekend) will be limited to the extent of such Driver's incremental expenses beyond such standard travel costs for the Event.</li>
</ol>

In addition, Driver shall participate in the NASCAR Victory Tour as follows:

> Driver acknowledges that he/she may be required to participate in the NASCAR Cup Series Victory Tour media obligations. Driver will use good faith efforts to work with NEM and take reasonable steps to coordinate his or her availability. Such media obligations will be limited to two (2) Cup Series track appearances per Year and shall be at the cost and expense of the Team Owner. Each track media obligation will consist of a four (4) hour in event market appearance prior to the Event and one fifteen (15) minute at track appearance at the same Event.

**8.    AMOUNT AND DISTRIBUTION OF AWARDS.** All decisions regarding the eligibility of drivers to compete for the NASCAR Cup Series Contest Awards and the awards distributed in connection with the NASCAR Cup Series for each Season, and the persons to whom such awards shall be distributed shall be made solely by NEM in accordance with this Agreement, NEM's agreement with each respective team owner in the Series, and the NASCAR Rules. Any NASCAR Cup Series Contest Awards, prizes, point funds or other winnings won by the Driver shall be paid by NEM to the Team Owner. The Team Owner, and not NEM, shall be solely responsible for the distribution of such NASCAR Cup Series Contest Awards, prizes, point funds and other winnings to the Driver following payment of such amounts by NEM to the Team Owner, and the sole recourse of the Driver following such payments by NEM to Team Owner shall be against Team Owner. Neither NEM nor its affiliates shall be responsible for the filing and/or payment of any federal, state, local or foreign taxes associated with any NASCAR Cup Series Contest Awards, prize, point fund, special awards and contingency winnings paid to Driver, which taxes shall remain the sole responsibility of the Driver. Driver agrees to abide by all decisions of NEM made in accordance with this Agreement and the NASCAR Rules with respect to the distribution of these awards. The NASCAR Cup Series Contest Awards are subject to all restrictions, terms and conditions set forth in this Agreement, NEM's agreement with each respective team owner in the Series, and NASCAR Rules (subject to Section 16 hereof). Failure to abide by any such restrictions, terms or conditions herein may result in such race team and/or driver being declared ineligible for such awards.

**9.    TERMINATION.** In addition to any other rights or remedies NEM may have, this Agreement may be terminated by NEM, by written notice to the Driver (and, in the case of clauses (a) and (e) below, by Driver upon written notice to NEM), upon occurrence of one or more of the following:

<ol type="a">
<li>(a)    Driver's agreement with the Team Owner for the Driver's right to drive the Designated Vehicle in Events on behalf of the Team has expired or has otherwise been terminated;</li>
</ol>

CONFIDENTIAL    FRM_0005919

(b) Driver breaches or fails to perform in any material respect any of its obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement;

(c) Driver's NASCAR membership or license is terminated;

(d) The Team Owner's Charter Member Agreement with NEM has expired or has otherwise terminated for any reason; or

(e) upon Driver's written notice to NEM electing to no longer participate in the Cup Series.

**10.     SUBSTANCE ABUSE POLICY.**   Driver understands and agrees to abide by the NASCAR Substance Abuse Policy (the "Policy") as set forth in Section 19 of the NASCAR Rule Book.  The Driver further acknowledges that under the Policy, the NEM designated Medical Review Officer ("MRO") serves as an independent and impartial physician who investigates whether a non-negative result from a testing laboratory was due to a legitimate medical explanation. Driver agrees to provide any and all authorizations and releases of MRO requested information, such as protected health information as defined by the Health Insurance Portability and Accountability Act of 1996, as amended from time to time ("HIPAA"), for NEM's designated MRO's investigation.

**11.     TESTING LIMITATIONS.**   Driver understands and agrees to abide by the NASCAR Testing Policy as set forth in NASCAR Rules in each Season of the Term, including, but not limited to, the requirement that all tires distributed in conjunction with the NASCAR Testing Policy and the Tire Leasing Policy are for track use only, and laboratory testing (e.g., Calspan, etc.) of any such tires is strictly prohibited.

**12.     ROOKIE SEMINAR.** Unless otherwise authorized by NEM, any driver that will be competing in the NASCAR Rookie of the Year program, any driver 22 years of age or younger, or any driver without substantial experience driving NASCAR Cup Series stock cars, as determined by NEM, will be required to attend (and the if the Driver meets any of the foregoing criteria hereby agrees to attend) the NASCAR Rookie Seminar at Daytona International Speedway prior to the start of each respective Season. Dates and times of the Rookie Seminar will be published by NEM and communicated upon request prior to each Season.

**13.     INDEMNIFICATION AND ATTORNEY'S FEES**.  Driver agrees that he or she is solely responsible for, and will defend, indemnify and hold harmless, NEM its subsidiaries and affiliates, and each of the respective shareholders, directors, officers, agents, and employees of NEM and its affiliates, from any third party causes of action or damages, reasonable attorney's fees, reasonable costs, losses, expenses, claims, demands, or liabilities, as a result of or in connection with Driver's breach of any of its obligations pursuant to this Agreement.

NEM agrees that it is solely responsible for, and will defend, indemnify and hold harmless, Driver, together with his or her heirs and successors, from any third party causes of action or damages, reasonable attorney's fees, reasonable costs, losses, expenses, claims, demands, or liabilities, as a result of or in connection with NEM's or NASCAR's breach of any of its obligations pursuant to this Agreement.   Notwithstanding the foregoing, the above indemnity

CONFIDENTIAL

provisions shall not apply to NEM's final decision-making authority with respect to its application and enforcement of the NASCAR Rule Book to administer competition at Events in accordance with <u>Section 16</u> below. As such, NEM shall not be obligated to indemnify Driver and Driver's indemnitees as set forth above, if applicable, for any claims for loss or damages to any party resulting therefrom.

14.    **LIMITATION ON DAMAGES**.  Other than with respect to claims for indemnification in respect of third party claims, no claim may be made under any legal theory (including contract or tort) by any party against the other party, any affiliate of the other party, or the directors, officers, employees, shareholders, members, partners, attorneys, or agents of such other party or its affiliates, for any special, indirect, consequential, incidental or punitive damages in connection with a cause of action arising out of or relating to the transactions contemplated by this Agreement.

15.    **GOVERNING LAW.**  This Agreement shall be governed by and construed in accordance with the law of the State of Florida applicable to agreements made and to be performed entirely in Florida.

16.    **NASCAR RULES.** Subject to the terms of this Agreement, the Driver acknowledges and agrees that NEM and its affiliates shall have the sole and exclusive right to amend and supplement the NASCAR Rules from time to time in their sole and absolute discretion, <u>provided</u> that (i) no such amendment or supplement shall abrogate or modify the terms of this Agreement or the rights granted to Driver hereunder; (ii) in the event of any conflict or inconsistency between this Agreement and NASCAR Rules, this Agreement shall govern; and (iii) NEM and its Affiliates shall at all times implement and administer such NASCAR Rules in good faith and not out of self-interest, and in seeking to further the best interests of the sport.  Subject to the immediately preceding sentence, the Driver acknowledges and agrees that Driver shall be bound by, and shall comply with, each NASCAR Rule.  NEM is the sanctioning body of the Cup Series and shall (subject to the preceding clause (iii) and to any rights of appeal set forth in the NASCAR Rules) have sole authority to enforce the NASCAR Rules, implemented in accordance with the terms hereof, for purposes of exercising its sanctioning authority over all aspects of on track-racing activity during the competition of any Events, including with respect to qualifications and eligibility to race in any Event, inspection process (pre and post-Race), race procedures and on track competition, it being understood and agreed that the implementation and enforcement by NEM of NASCAR Rules in accordance with the terms of this Agreement may have an adverse impact (including an adverse economic impact) on the Driver.  As used herein, "<u>NASCAR Rules</u>" means the NASCAR Rule Book and all other rules, regulations, guidelines, directives, memoranda, resolutions, bulletins and agreements (including all agreements and other documents with respect to Drivers, sponsorship or media rights) of NASCAR, or any of its affiliates, in each case as they may be amended or modified from time to time by NASCAR or any of its affiliates.

17.    **DISPUTE RESOLUTION.**

      (a)    <u>Exhaustion of Remedies</u>. Subject to <u>Section 17(d)</u>, and the second sentence of this <u>Section 17(a)</u>, the exclusive method of resolving any Dispute shall be the procedures set forth in this <u>Section 17</u>. Notwithstanding the foregoing, but subject to the proviso of this sentence, if there is a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of any NASCAR Rule, such disagreements and disputes will be resolved by NEM or its applicable affiliates, in their reasonable discretion as the sanctioning body of NASCAR stock car auto racing, in accordance with the provisions set forth in NASCAR Rules and, for clarity

CONFIDENTIAL

shall not be subject to any Arbitration and the Arbitration Panel shall have no authority with respect to such matters; provided, that if the dispute, controversy or claim is with respect to whether there is a conflict or inconsistency between this Agreement and NASCAR Rules as set forth in Section 16 or as to whether NEM or its affiliates have complied with the requirements of Section 16, then such dispute, controversy or claim shall be resolved pursuant to the procedures set forth in this Section 17. As used in this Agreement, "Dispute" means any dispute, disagreement, controversy or claim between the parties hereunder that arises under or in connection with this Agreement and except as otherwise provided in Section 17(a), is not a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of NASCAR Rules

(b)     Arbitration Mechanics.     Each party shall have the right to commence an arbitration (the "Arbitration") with respect to any Dispute by giving a notice to the other party that sets forth in reasonable detail the nature of the Dispute and reasonable support for its claim. Except as set in this Section 17(c), the Arbitration shall be administered by the American Arbitration Association (the "AAA") under its Commercial Arbitration Rules and conducted pursuant to such rules, as such rules are in effect as of the time the Dispute is submitted to the AAA for Arbitration (the "Submission Date"). The panel of arbitrators who shall be responsible for resolving the Dispute (the "Arbitration Panel") will consist of three persons (each an "Arbitrator"), who shall be selected in accordance with the AAA's Commercial Arbitration Rules. In proposing a list of candidates for Arbitrators, the parties will request that the AAA take into account the Parties' desire that each Arbitrator be an individual who is a lawyer and/or former judge that has not been employed by, retained by, or otherwise associated with, and has not served as a consultant, contractor, advisor, agent or in any similar capacity to or for any party, or any of their respective affiliates or predecessors-in-interest, within ten (10) years prior to the Submission Date. The parties shall instruct the Arbitration Panel to convene an initial conference with the parties within fifteen (15) Business Days after the appointment of the Arbitration Panel to establish the timing of any discovery that the Arbitration Panel deems appropriate, to set the date for a hearing and any other matters as may be deemed appropriate by the Arbitration Panel. Unless the parties otherwise agree with respect to any Arbitration, (a) all disputed issues regarding discovery shall be decided by the Arbitration Panel, (b) if any Arbitration hearing takes more than one day, it will proceed on the next following business day until it is completed (provided, that the Arbitration Panel may elect not to hear the Dispute on one (1) business day of each week), (c) barring extraordinary circumstances, the Arbitration Panel will render a written decision not later than fifteen (15) business days from the date of the conclusion of the Arbitration hearing, (d) the Arbitration hearing shall take place in Charlotte, North Carolina, (e) subject to the second sentence of Section 17(a), the Arbitration Panel shall have the authority to award damages, equitable relief (including specific performance) and such other remedies the Arbitration Panel deems appropriate (provided, however, the Arbitration Panel shall not have the authority to alter, change, amend, modify, waive, add to or delete from any provision of this Agreement), and (f) if the parties initiate multiple Arbitration proceedings, the subject matters of which are related by common questions of law or fact and which could result in conflicting awards or obligations, such proceedings shall be consolidated, at NEM's election into a single Arbitration proceeding (and in the event that Driver and Team Owner initiate multiple Arbitration proceedings, the subject matters of which are related by common questions of law or fact and which could result in conflicting awards or obligations, such proceedings shall be consolidated into a single Arbitration proceeding at the election of NEM and Team Owner). Each Party irrevocably consents to the delivery of service of process with respect to any Arbitration in any manner permitted for the giving of notices under Section 19. Notwithstanding anything contained in the AAA Commercial Arbitration Rules to the contrary, the non-prevailing party shall bear all

CONFIDENTIAL

costs associated with any Arbitration under this Agreement, including the costs and expenses of the Arbitration, and the cost of its own and the prevailing party's legal representation and expert witness fees (including any related charges and disbursements). The parties hereto agree to keep confidential, and to require that the Arbitration Panel keep confidential, the existence of any Arbitration, the arbitral proceedings, the submissions made by the parties (including any discovery) and any decisions made by the Arbitration Panel, including any award, except to the extent necessary to Driver's legal and professional advisors (provided that such individuals will be made aware of the confidential nature of such information), and to the limited extent necessary in connection with any proceeding to confirm or vacate such award in accordance with this Section 17(b).

(c)     Arbitration Award.  Any award rendered by the Arbitration Panel shall be (a) in writing, state the basis of the award and include both findings of fact and conclusions of law and (b) final, binding and non-appealable upon the parties and any court having jurisdiction may enter a judgment on any such award.

(d)     Equitable Relief.  Each of the parties hereto acknowledges that the rights granted by and to NEM and Driver under this Agreement possess a special, unique, and extraordinary character that make difficult the assessment of monetary damage that would be sustained by NEM or Driver as a result of any breach of this Agreement by the other party or any unauthorized use of the rights granted by NEM or Driver under this Agreement and any such breach of unauthorized use will immediately cause irreparable harm to the Cup Series, NASCAR, NEM, NEM and NASCAR affiliates, Driver and others and that any remedy at law for such breach will be inadequate.   Notwithstanding anything to the contrary in this Agreement, before the Arbitration Panel is convened in accordance with this Section 17 any party may seek temporary or preliminary injunctive relief in aid of the Arbitration, at any time exclusively from the  U.S. District Court or, if it does not have jurisdiction, the North Carolina state courts, in each case located in Charlotte, North Carolina (collectively, the "Designated Courts") with respect to any Dispute (collectively, "Interim Equitable Relief"); provided that Driver shall not seek Interim Equitable Relief or any other equitable relief of any kind to enjoin or otherwise restrain or limit NEM, NASCAR (or any of their affiliates) from conducting any of the Events.  If a Dispute requires Interim Equitable Relief before the Arbitration Panel is convened in accordance with this Section 17, the procedures set forth in this Section 17 will still govern the ultimate resolution of the Dispute notwithstanding the fact that a Designated Court may have entered an order providing for injunctive or another form of Interim Equitable Relief.  Each of the parties to this Agreement submits to the exclusive jurisdiction of the Designated Courts with respect to the Interim Equitable Relief, including, the in personam and subject matter jurisdiction of the Designated Courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail or any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered thereby in connection with such Interim Equitable Relief subject to all applicable appeal rights from such Designated Courts.

**18.     NO THIRD PARTY BENEFICIARY.**  The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto, and it is not the intention of the parties to confer third-party beneficiary rights upon any other person or entity other than any person or entity entitled to indemnification under Section 13 above.

CONFIDENTIAL

**19.** **NOTICES**. Any notice or other communication under this Agreement shall be in writing and shall be considered to have been given and received when delivered personally or sent by facsimile or electronic mail (with a copy by any other means for providing notices under this Agreement), or one business day after being sent by a reputable overnight courier to the applicable party at the address, facsimile number or electronic mail address set forth below its name on the signature page to this Agreement (or at such other address or facsimile number as that party may specify by notice to the other).

**20.** **PERSONAL INJURY AND PROPERTY DAMAGE RELEASE.** I hereby release and waive any and all claims pursuant to the RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT in my NASCAR Competition Membership and License Application.

**21.** **AMENDMENT**. Other than as set forth herein, this Agreement may not be amended other than by a writing duly signed by the Driver and NEM.

(Signature page attached)

CONFIDENTIAL

## NASCAR CUP SERIES
## DRIVER AGREEMENT

The undersigned each hereby acknowledge to have read, understand, and agree to fully comply with the foregoing terms.

Driver's Name (Print) _____ NASCAR License Number _____

Address _____
        Street                       City               State             Zip

Driver's Phone No(s). _____

_____

**Signature of Driver**

Signed this _____ day of _____, _____.

In the Presence of:

_____

**Signature of Witness as to Driver**

Please complete and sign in the spaces designated above and have your signatures witnessed. Then mail the Agreement with original signatures to Steve O'Donnell, Executive Vice President and Chief Racing Development Officer, NASCAR Event Management, Inc. PO Box 2875, Daytona Beach, FL 32120-2875. **Please make a copy for your files**.

## NASCAR EVENT MANAGEMENT, INC.

By: _____

Name: _____

Title: _____

Date: _____

Address for Notices:__

CONFIDENTIAL

FRM_0005925

# Exhibit A

## Additional Advertising, Promotional, Sponsorship Activities and Branding Requirements

1. **ADVERTISING AND PROMOTIONAL ACTIVITIES.** During any Year, the rights granted in Section 4 of the Agreement with respect to the Driver (provided, however, that following the 2016 Season such rights with respect to the Driver shall be limited to the Driver in fire suit or any other branded apparel of a Team sponsor) may be sublicensed to any then-current Series Sponsor for such Year on an exclusive basis solely for endorsement of any or all products and services of such Series Sponsor in such Series Sponsor's Series Sponsor Category (as defined in Exhibit C), provided that, if a Series Sponsor Change (as defined below) has been effectuated during the Term, off-track activation rights of the Series Sponsor shall be subject to the limitations set forth in Sections 4(c) and (d) below and no such endorsement rights may be used in any manner that would be in conflict with a sponsorship agreement of Driver existing prior to such change (as such sponsorship agreement may be extended from time to time on similar terms).

2. **COLLECTIVE USE.** Any Event still image that depict(s) ten (10) or more race vehicles and/or ten (10) or more drivers in uniform and/or ten (10) or more crew members in uniform at an Event may be used in any medium by the car owner(s), team(s), driver(s), sponsor(s), licensee(s), track(s), and NEM and its affiliates and its sponsors and licensees for advertising, marketing and promotional purposes supporting the parties' involvement in the sport even though it may include the likeness of the Driver, provided that no personal endorsement of any brand, product or service is created or implied by any such use

3. **DISPLAY OF NASCAR AND DESIGNATED SPONSOR AND COMPETITOR BRANDING.** Driver acknowledges and agrees that, at all times for every Event in which Driver competes in the Cup Series, Driver will adhere to the sponsor and competitor branding requirements on Driver's uniform and race vehicle as mandated by NEM in Exhibit B. Furthermore, if a Driver endorses any product(s) or service(s) utilizing his or her Cup Series uniform, such use must be as seen in competition, and cannot conflict with the provisions of Section 4 with respect to the Reserved Sponsor Category exclusivity. Subject to the terms of this Agreement, the Driver shall abide by the provisions in the NASCAR Rule Book regarding advertising and related promotional restrictions as set forth in Section 20.4.19 relating to "Decals and Advertising" as in effect on the date hereof and amended or supplemented in accordance with the terms of this Agreement. The Driver understands and agrees that NEM may refuse to permit, or it may restrict or assign the size or placement of decals, identification, and advertising of any kind on the Designated Vehicle or the Driver's uniform ("Car/Driver Sponsor Advertising"), that is reasonably in the best collective interests of NEM and all of the competitors in the Cup Series, provided that, nothing herein shall limit the Driver from maintaining and complying with an agreement with a sponsor for Car/Driver Sponsor Advertising that was permitted by NEM at any time during the previous three (3) racing seasons; provided further, that, notwithstanding the foregoing, if NEM raises reasonable concerns that a sponsor's brand has become tarnished by controversy, crisis or circumstance such that its association with Driver, his or her team or NEM would damage the NASCAR brand or image of the sport, or violate the broadcast standards of partners under NASCAR telecast contracts or damage their ability to sell advertising within Event telecasts, then NEM and the Team Owner will discuss such concerns and cooperate in good faith to reach a mutually agreeable solution.

4. **RESERVED SPONSOR EXCLUSIVITY.**

CONFIDENTIAL

(a)  **GENERAL.**  NEM has agreed, pursuant to its agreement with each respective Team Owner in the Cup Series, to use commercially reasonable efforts to sell certain sponsorships in the Series Sponsor Category, the Tire Category and the Fuel Category (Series Sponsor Category, Tire Category and Fuel Category shall have the meanings set forth on Exhibit C hereto, provided the Series Sponsor Category is subject to change in accordance with the terms hereof; Series Sponsor Category, Tire Category and Fuel Category shall be collectively referred to herein as "Reserved Sponsor Categories").  Subject to terms set forth below, the Series Sponsor Category may change from time to time during the Term and NEM may sell up to two Series Sponsor Categories for any Year (and in either such event NEM shall notify Driver in writing of any change in the exclusivity, promotional requirements or other restrictions relating to the Series Sponsor Category(ies) prior to January 1 for the applicable Year (or such later date if, in NEM's good faith judgment, January 1 is not practicable).  The other Reserved Sponsor Categories may not expand in nature or scope during the Term (but, for clarity, are permitted to contract or be further limited).  In the event of such sponsor changes to the Series Sponsor Category, Driver agrees to acknowledge such changes which affect Driver's rights and obligations under this Agreement, to the extent that such changes are in accordance with the terms of this Agreement, prior to the start of the subsequent Season as a prerequisite for Driver to compete in such Season(s).  At all times during the Term, Driver shall comply with exclusivity reasonably required by the agreements relating to such Reserved Sponsor Categories, including any reasonable promotional requirements relating to Driver's uniform, and any other reasonable restrictions necessary to protect the exclusivity granted in such Reserved Sponsor Categories (but subject the remaining provisions set forth in this Section 4). The Reserved Sponsor Categories and all applicable restrictions or limitation are attached hereto and incorporated herein as Exhibit C.

(b)  **SERIES SPONSOR EXCLUSIVITY.**  At all times during the Term when an agreement relating to a Series Sponsor is in effect, but subject to this Section 4 and subject to written agreements Team Owner may have with NEM or its Affiliates in existence on the date hereof, Driver shall not, when participating in any Event or in any advertising or promotion that uses the name, image or likeness of Driver, or that is based on Driver's participation in the Cup Series (unless otherwise expressly authorized in writing by NEM), use or display in any commercialized or sponsored manner any product, brand, logo, trademark or service identification of any person or entity in any Series Sponsor Category anywhere by such Person, including on the Driver's Cup Series uniform; provided that, if, following the date of this Agreement, NEM modifies the Series Sponsor Category or enters into an agreement with a new Series Sponsor(s) (each, a "Series Sponsor Change") and Team Owner or Driver is then a party to a written contract with a sponsor with respect to any branding that has been granted to such sponsor via such written contract prior to the Series Sponsor Change (each, together with any permitted successors thereto (as such permission is determined pursuant to the applicable agreement with such sponsor), a "Qualifying Sponsor") that would breach the exclusivities granted by NEM within such new Series Sponsor Category (or Series Sponsor Categories) (each, an "Exclusivity Breach"), the Driver shall have the right to maintain and comply with such Qualifying Sponsor's agreement (or agreements) in accordance with Sections 4(c)-(d) below (and, for clarity, only the exceptions set forth in Sections (c)-(d) are permitted). Subject to compliance with this Section 4, Driver acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of any product, brand, logo, trademark or service identification of a person or entity in any Series Sponsor Category, including on the Driver's Cup Series uniforms.

(c)  **SINGLE SERIES SPONSOR.**  During any Year in which NEM effectuated a Series Sponsor Change such that only one Series Sponsor is then-current for such

CONFIDENTIAL                                                                       FRM_0005927

Year, if Driver would be in an Exclusivity Breach with respect to any branding that Team Owner or Driver has granted to a Qualifying Sponsor on the Designated Vehicle, Driver or Driver's uniform and would be visible to the general public at any Event (the "At Event Assets"), such Qualifying Sponsor branding for the At Event Assets shall be permitted during the Term solely at the visibility or participation level pursuant to and set forth in the then-current agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for At Event Assets shall not be increased, other the any increases already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to such levels, provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any At-Event Asset, the exclusivity exceptions set forth in this Section 4(c) shall be permitted at the highest level of branding that was granted pursuant to such written contract, regardless of whether the Team Owner or Driver, as applicable, enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the Term, such Qualifying Sponsor's relationship with Driver is terminated, the exclusivity exceptions set forth in this Section 4(c) shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is otherwise permitted that is then in effect, and (in the case of an agreement entered into with Driver) the Driver shall provide prompt written notice to NEM of such termination and shall otherwise comply with Section 4(b) without exception except for exceptions applicable to the non-terminated contract, if any (e.g., if Driver has a personal services agreement with a Qualifying Sponsor of Team Owner, the termination of the personal services agreement will not require Team Owner to comply with Section 6.9(a) without exception in the event that it has non-terminated contracts which are otherwise permitted and remain in effect), and (iii) if any agreement entered into with the Driver with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding for the At-Event Assets, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions for any At-Event Assets set forth in this Section 4(c). During any Year in which NEM effectuated a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, such exclusivity granted to any Series Sponsor shall extend to off-track activation in accordance with Section 4(b), provided that if Team Owner or Driver would be in an Exclusivity Breach with respect to any off-track activation that has been granted to a Qualifying Sponsor via such written contract, then such Qualifying Sponsor may continue marketing off-track throughout the Year, in accordance with the restrictions set forth in the foregoing sentence, even though such marketing may conflict with the current conflicting Series Sponsor Category.

      **(d)**    **BIFURCATED SERIES SPONSORS.**  During any Year in which NEM effectuated a Series Sponsor Change such that agreements with two (2) Series Sponsors are then in effect (i.e., each Series Sponsor has rights to a different continuous portion of the Season), each Series Sponsor shall only be afforded exclusivity in such applicable Series Sponsor Category as provided in Section 4(b) with respect to the Driver's Cup Series uniform (it being understood that other applicable At-Event Assets are addressed in the Charter Member Agreement with Team Owner) and solely during the portion of the Season that NEM or its Affiliates have granted such Series Sponsor exclusivity, which must correspond with a portion of the Season for which one of NASCAR's then principal U.S. television broadcast partners has Event live telecast rights (e.g., as of the date hereof, a Series Sponsor that corresponds to FOX for the first portion of the Season and another Series Sponsor that corresponds to NBC for the second portion of the Season). In addition to the foregoing sentence, if Driver would be in an Exclusivity Breach with any Qualifying Sponsor during the applicable portion of the Season, such Qualifying Sponsor branding for the Driver's Cup Series uniform shall be permitted solely at the visibility or participation level pursuant to and set forth in the then-current written agreement with such

CONFIDENTIAL

Qualifying Sponsor and the level of such Qualifying Sponsor branding for the Driver's uniform during such portion of the Season shall not be increased, other than any increases during such portion of the Season already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to increase such levels of such agreement with such Qualifying Sponsor; provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for the Driver's uniform during such portion of the Season, the exclusivity exceptions set forth in this Section 4(d) shall be permitted at the highest level of branding that was granted pursuant to such written contract, regardless of whether the Driver enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner and Driver, as applicable, shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the then-current term of such agreement, such Qualifying Sponsor's relationship with Team Owner or Driver is terminated, the exclusivity exceptions set forth in this Section 4(d) shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is otherwise permitted that is then in effect and (in the case of an agreement entered into with Driver) the Driver shall provide prompt written notice to NEM of such termination, and (iii) if any agreement entered into with the Driver with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding of the Driver's uniform, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions set forth in this Section 4(d). For clarity, any exclusivity granted to any Series Sponsor in accordance with this Section 4(d) shall not extend to off-track activation (e.g., any Team sponsor may continue marketing not at the track throughout the Term even though such marketing may conflict with the current conflicting Series Sponsor Category).

(e) **TIRE SPONSOR EXCLUSIVITY.** Driver agrees that when participating in any Event, unless otherwise expressly authorized in writing by NEM, no product, brand, logo, trademark or service identification of any person or entity in the Tire Category (other than the Tire Sponsor) as defined in Exhibit C, will be used or displayed anywhere by Driver during any Event, including on the Driver's Cup Series uniform. Driver agrees that Driver may not advertise or promote a product, brand, logo, trademark or service identification of any person or entity in the Tire Category as defined in Exhibit C, whether in conjunction with an Event or not, if such advertising or promotion includes a NASCAR racing (e.g., Driver, crew member) suit, whether worn by Driver or not, and/or a NASCAR racing vehicle. Driver acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of a product, brand, logo, trademark or service identification of any person or entity in the Tire Category by Driver during any Event, including on the Driver's Cup Series uniform. Notwithstanding the foregoing, actual use of tires other than those made by the Tire Sponsor on Team equipment other than the Designated Vehicle (e.g., pit carts and haulers) shall not be considered a breach of the provisions set forth in this paragraph.

(f) **FUEL SPONSOR EXCLUSIVITY.** Driver agrees that Driver will not participate in any sponsorship, licensing, or personal appearances with a company in the Fuel Category (other than the Fuel Sponsor) as it relates to Cup Series racing either in or out of uniform other than as provided herein.

(g) **Team Owner Agreements.** For clarity, the rights afforded to Driver in respect of agreements entered into between Driver and any Qualifying Sponsor pursuant to the preceding provisions of this Section 4 apply only as between Driver and NEM and, accordingly, such rights may be subject to further limitations as provided in agreements between Driver and Team Owner.

CONFIDENTIAL

FRM_0005929

**5.     ADDITIONAL VICTORY LANE OBLIGATIONS.** Subject to the last sentence of this Section 5, for each Event won during the Term, the Driver agrees to permit a display of one item from Series Sponsor, one item from the applicable Event entitlement sponsor so long as such Event entitlement sponsor does not conflict with a Team sponsor, and items from the Team's sponsors on the Designated Vehicle in victory lane so long as such Team sponsors do not conflict with the Series Sponsor Category. Subject to the last sentence of this Section 5, the size, location and weight of such item(s) shall be approved by NEM and all items shall be subject to the exclusivity of the Reserved Sponsor Categories. Notwithstanding the foregoing, if following the date of this Agreement NEM modifies the Series Sponsor Category and the Team Owner or Driver is a party to a written agreement with a Qualifying Sponsor that is a primary sponsor as of the date of such modification (subject to the applicable extensions solely in accordance with Sections 4(b)-(c) above) that would be in an Exclusivity Breach with respect to the display of products of such Series Sponsor within the Series Sponsor Category in victory lane, the Driver shall not (i) display the products of such Qualifying Sponsor and (ii) be required to display the products of such new Series Sponsor, in each of (i) and (ii), in victory lane (and none of the foregoing shall be deemed a breach of this Agreement or NASCAR Rules).

CONFIDENTIAL                                                                                    FRM_0005930

## EXHIBIT B

### Logo Placement Requirements

(a)     **The NASCAR Logo**: the designated NASCAR Bar logo, having minimum dimensions of .75" tall x 3.5" wide, to be displayed on the uppermost and outer left sleeve of the Driver's fire suit, as directed by NASCAR;

(b)     **The NASCAR Cup Series Logo**: the designated NASCAR Cup Series logo, having minimum dimensions of 1.75" tall x 3.50" wide, to be displayed on the uppermost right hand chest of the Driver's fire suit. The NASCAR Cup Series logo to be centered between the right underarm and the center zipper line, and be at least 2" below the shoulder epaulet. The vertical placement of all other logos should not be equal to or partially equal to the NASCAR Cup Series logo, and full color schematics are required, all as directed by NASCAR or NEM;

(c)     **The Tire Sponsor Logo**: the Tire Sponsor logo having minimum dimensions of 1" x 4", to be displayed on the top half front-facing torso on Driver's fire suit, as directed by NASCAR or NEM;

(d)     **The Fuel Sponsor Logo**: the Fuel Sponsor logo having minimum dimensions of 2.25" x 3.50", to be displayed on the upper chest or outer sleeve above the elbow of the Driver's fire suit, as directed by NASCAR or NEM;

(e)     **Chase Branding:** Any Drivers that have qualified for the Chase for the NASCAR Cup, or any subsequent elimination round thereof, must display any and all Chase branding elements mandated by NASCAR or NEM on the Driver's uniform or race car, as specified by NASCAR or NEM, provided NEM agrees to work in good faith with the Driver and the Team Owner in good faith to mitigate any material negative impact or to avoid any breach of team or Driver sponsorship branding obligations but, reserves the right to make all final decisions related to Chase branding for purposes of uniformity amongst Chase contenders. Furthermore, any Drivers that did not qualify for the Chase for the NASCAR Cup, or that are otherwise eliminated from championship contention at any stage during the Chase, shall not be permitted to display branding elements similar to those mandated by NASCAR or NEM to identify current Chase contenders.

1

CONFIDENTIAL

# 2016 LOGO PLACEMENT GUIDELINES



CONFIDENTIAL

Case 3:24-cv-00886-KDB-SCR     Document 449     Filed 11/21/25     Page 112 of 114

FRM_0005932

## EXHIBIT C

### Reserved Sponsor Categories

**Series Sponsor Category**. means (i) the operation or provision of, whether directly (e.g., wireless communications carrier) or indirectly (e.g., MVNO), a wireless telecommunications network; (ii) the provision of wireless voice and data (i.e., anything other than voice) services over a wireless telecommunications network; (iii) the provision of Internet access and related online connectivity services delivered via a wireless telecommunications network, where such services are primarily marketed as and intended to be a wireless mobile solution and for use with wireless telecommunication devices; (iv) in-vehicle communication systems (e.g., OnStar); (v) the provision of local and long distance wireline telecommunications services (and also including VOIP (Voice-Over-Internet) telephone services such as Skype); and (vi) wireless telecommunications devices/hardware (including, without limitation wireless phones, tablets, e-readers, mobile hotspot devices, and broadband cards), and related wireless device accessories (e.g., skins, covers, belt clips, faceplate, headsets, ear buds, cases, straps, chargers, etc.).

**Tire Category**. means tires for any type of vehicle, including passenger cars, vans, sport utility vehicles (SUVs), light trucks, commercial trucks, trailers, motorcycles, aircraft, mopeds, scooters and recreational vehicles (RVs), including racing tires for any of the foregoing vehicles. "Competitor Tire Shop" means a tire retailer, installer or repair facility that: (i) includes the name of a single competitor tire brand (e.g., with respect to Goodyear (the Tire Sponsor as of the effective date of this Agreement), Firestone Complete Auto Care); or (ii) is owned or operated by any Person that owns a third-party competitor tire brand and gives preferential treatment to a single competitor brand or affiliate brands. The Driver shall be permitted to include on the Designated Vehicle the branding of a retail tire company and/or repair facility which features the word "tire" in conjunction with the company name (e.g., Discount Tire), provided that such third party retailer/repair facility is not a Competitor Tire Shop.

**Fuel Category**. means combustion-based fuel and fuel blends for automotive vehicles, including hydro carbon-based, diesel, biodiesel, denatured, domestically-produced ethanol as a component of fuel (e.g., E15), or other alternative fuels and fuel blends. Notwithstanding the foregoing, a company in the Fuel Category may also manufacture lubricants (i.e., motor oil, etc.) and other products or offer other services (i.e., convenience stores) other than automotive fuel (collectively "Non-Fuel Products"). Such Non Fuel Products sponsorships are permitted subject to NEM approval and the conditions outlined below. Companies in the Fuel Category may sponsor a Driver and race team for Non-Fuel Products, provided that the Designated Vehicle and the Driver and team's uniforms, hauler and at-track equipment, etc., cannot feature the brand, logo, trademark, product or service identification of a (i) fuel, (ii) fuel retailer, or (iii) a corporate name of a company in the Fuel Category. Further, no Driver may advertise or promote a product or service which includes a brand, logo, or trademark of, or where the advertisement or promotion features a brand, logo, or trademark of a (i) fuel, (ii) fuel retailer, or (iii) the corporate name of a company in the Fuel Category, whether, in or out of uniform. For example, the Driver may enter into agreements with convenience stores as long as such convenience stores are not branded by a company in the Fuel Category (e.g. 7-Eleven, Circle K, Sheetz, WaWa). Companies in the Fuel Category may sponsor the Designated Vehicle, the

1

CONFIDENTIAL

FRM_0005933

Driver or Driver's team for a lubricant or other similar product as long as they are not branded by a company in the Fuel Category. Driver may promote American ethanol and American ethanol related services provided that such advertising and promotions is approved in writing by NEM. Driver may advocate, advertise or promote generic ethanol based consumer fuel blends (e.g. E15, E30) in or out of uniform, provided that i) the blend is not branded or advertised with a company in the Fuel Category, and ii) such promotions or advertisements do not reference fuels used in NASCAR racing, unless the reference is to "Sunoco Green E15". Notwithstanding the foregoing, it is agreed and understood that the Driver may not promote and/or advertise foreign produced ethanol and/or non-corn based ethanol.

1

CONFIDENTIAL                                                                                                           FRM_0005934