# Exhibit 113

# FILED UNDER SEAL

**Pursuant to the Text-Only Order granting Dkt. 229 Defendants' Motion to Seal, entered on 10/2/2025 at 8:14 a.m. and filed on 10/2/2025**

| | |
|---|---|
| **From:** | Phelps, Steve [sphelps@nascar.com] |
| **Sent:** | 8/30/2024 2:12:53 PM |
| **To:** | Denny Hamlin [denny@23xiracing.com] |
| **CC:** | Steve Lauletta steve.lauletta@23xiracing.com [steve.lauletta@23xiracing.com]; Curtis Polk |
| **Subject:** | Charter Agreement |
| **Attachments:** | Charter Summary 8.29.24.docx; 2025 Charter Redline 8.29.24.docx; 2025 Charter #04 - 23XI (execution version)(1026193.2).pdf; 2025 Charter #30 - 23XI (execution version)(1026216.2).pdf |

Dear Mr. Hamlin and Mr. Jordan:

We thank you for your continued engagement in our discussions regarding the Charter Agreement and appreciate your continued patience as we have taken input from many of the Charter Member holders during this process, including the most recent input from Jeff Gordon on behalf of the Team Owner Council.

We believe we've made meaningful movement around the term extension and the tie to a floor of the current aggregate Pool Money amount if the next media rights agreement is greater to or equal to the current media rights. We also believe the more consistent communication between NASCAR and the Teams through the Team Advisory Committee will provide input from the Teams earlier on in decisions that may affect the Teams and the Competition Committee will continue to work diligently to find efficiencies wherever possible.

The two areas we cannot agree to are (i) a most favored nation clause; and (ii) running the Driver Ambassador Program through the Teams. This Agreement is between the Team and NASCAR and NASCAR needs flexibility to allow variance based on a case-by-case analysis with each of its Teams. Whether it's a sponsor right that can't be extended to all or an exception, like the 4-car rule, NASCAR needs to be able to work with Teams to permit things that an MFN would restrict. What we can say is that today the Pool Money on Exhibit B is the same for all the Teams. However, NASCAR may need to modify Exhibit B based on the number of executed Charter Member Agreements that we receive.

We have heard from you that the Driver Ambassador Program is not popular with the owners, but we truly believe that through developing Driver star power and Driver brands, it's the best way to connect to new audiences and grow the business for all of us. We are willing to keep you in the loop and coordinate with you regarding scheduling, sponsorship issues, and any other conflicts, but we need the ability to directly incentivize the drivers in order to help grow the sport, which has been a challenge in the past.

As you've heard we've announced our exciting upcoming 2025 schedule, which encapsulates the return to our roots at Bowman Gray and the international expansion into Mexico. With the announcement of the schedule and welcoming back both our old and new broadcast partners, NASCAR needs to solidify all aspects of the 2025 season. To that end, we would like to close the loop on the Charter Negotiations and shift the focus to planning for all the great things ahead. In order to do that, we need to receive your executed Charter Member Agreement(s) no later than close of business on September 6, 2024.

Sincerely,

Steve Phelps

Please find attached:
- Chart setting forth a summary of the new edits
- Redline from the August 14, 2024 draft from NEM
- Executable Charter Member Agreement(s)

HIGHLY CONFIDENTIAL - OCO

Summary:

| Section | |
|---|---|
| 2.2 and 2.3 | NEM agrees that if Team is in "Good Standing" then if our next Live Transmission Contract is a Traditional Broadcast Agreement and the AAV is equal to or greater than the Initial Term Media Revenues AAV then the aggregate Pool Money will be no less than the current amount on Exhibit B.<br><br>We have deleted the mandatory non-compete language if the Charter is not renewed. However, if a Team chooses to compete against NASCAR after the negotiation periods have concluded then NASCAR reserves the right to award or sell that Charter without any restrictions. |
| 4.2 | Given the concerns regarding direct payment to drivers, we added language that NEM would use good faith efforts to provide transparency to Team Owner regarding any such payments. |
| Definitions | "Good Standing" means Team Owner is not in material breach of this Agreement and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-compliance being waived by NEM in its sole discretion), and in NEM's reasonable discretion, is working cooperatively to enhance the growth of the sport, which shall include, but is not limited to, assistance with the Driver Ambassador Program and non-disparagement of the sport as a business.<br><br>"Traditional Broadcast Deal" means NEM or its Affiliates contract with third party(ies) paying a fixed license fee for the Live Transmission (i.e., not an earn out, or ad- or subscription-based, or any other performance-based fee structure, etc.) of the Events. |

HIGHLY CONFIDENTIAL - OCO

23XI_0004321

**CHARTER MEMBER AGREEMENT NUMBER: [●]**

**ASSIGNED CAR NUMBER (AS OF EXECUTION DATE): [●]**

**NASCAR CUP SERIES
CHARTER MEMBER AGREEMENT**

1

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 4 of 241

HIGHLY CONFIDENTIAL - OCO                                    23XI_0004322

# TABLE OF CONTENTS

Page

1.  Definitions .......................................................................................................... 5

2.  Term ................................................................................................................... 5

    2.1  Term ......................................................................................................... 5
    2.2  Term Extension ......................................................................................... 5
    2.3  Good Faith Renewal Negotiations ............................................................. 6

3.  NEM Commitments .............................................................................................. 7

    3.1  NEM Commitments ................................................................................... 7
    3.2  Field Size .................................................................................................. 8
    3.3  Anti-Dilution ............................................................................................. 9
    3.4  Charter Member Issuance or Re-Issuance ................................................ 10
    3.5  Governance .............................................................................................. 11
    3.6  Rules Packages and Testing Policy ........................................................... 15
    3.7  Single Source Supplier ............................................................................. 16

4.  Payments and Distributions .................................................................................. 17

    4.1  Pool Money .............................................................................................. 17
    4.2  Payment Terms ......................................................................................... 17
    4.3  Payment Obligations ................................................................................. 17

5.  Intellectual Property ............................................................................................. 18

    5.1   Ownership and Acknowledgment ............................................................. 18
    5.2   Advertising and Promotional Activities by NEM ...................................... 19
    5.3   Collective Use .......................................................................................... 20
    5.4   Team Clips ............................................................................................... 20
    5.5   Team Intellectual Property; Works; Ancillary Rights ............................... 21
    5.6   Advertising and Promotional Activities by Team Owner ........................... 22
    5.7   Team Websites ......................................................................................... 22
    5.8   Entertainment Program ............................................................................. 23
    5.9   NASCAR Fan Rewards Support ................................................................ 23
    5.10  Motorsports Consumer Data Platform ...................................................... 23
    5.11  Driver Ambassador Program ..................................................................... 23
    5.12  Industry Support ....................................................................................... 23
    5.13  Retained Revenue ..................................................................................... 23
    5.14  New Business ........................................................................................... 24

6.  Team Owner Obligations ...................................................................................... 24

    6.1  Operating Obligations ............................................................................... 24
    6.2  Competition .............................................................................................. 25
    6.3  Designated Sponsor and Competitor Branding ......................................... 25
    6.4  Driver Agreement ..................................................................................... 26

2

| 6.5 | NASCAR Rules | 26 |
| 6.6 | Protection Of Goodwill | 27 |
| 6.7 | Injunctive Relief | 27 |
| 6.8 | Sponsor Exclusivity | 27 |
| 6.9 | Series Sponsor Exclusivity | 28 |
| 6.10 | Tire Sponsor Exclusivity | 30 |
| 6.11 | Fuel Sponsor Exclusivity | 31 |
| 6.12 | Minimum Performance Standards | 31 |
| 6.13 | Media/Promotional Obligations | 31 |
| 6.14 | Team Sponsors | 32 |

| 7. | Cost Cap Model | 33 |
| 7.1 | Development | 33 |
| 7.2 | Soft Launch | 33 |
| 7.3 | Implementation | 33 |

| 8. | Transferability/Charter Limitation | 33 |
| 8.1 | Transfer | 33 |
| 8.2 | Limitations On Transfers | 36 |
| 8.3 | Charter Member Agreement Limitation | 36 |
| 8.4 | Transfers by NEM | 36 |
| 8.5 | Publicly Traded Entities | 36 |
| 8.6 | Institutional Investors Policy | 37 |

| 9. | Termination | 37 |
| 9.1 | Team Owner Events of Default | 37 |
| 9.2 | NEM Event of Default | 38 |
| 9.3 | Consequences of Termination | 38 |
| 9.4 | Set-Off | 39 |
| 9.5 | Voluntary Forfeiture | 39 |

| 10. | Representations, Warranties and Covenants | 39 |
| 10.1 | Representations, Warranties and Covenants by the Team Owner and the Control Person | 39 |
| 10.2 | Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities | 40 |
| 10.3 | Release And Waiver by Team Owner and Control Person | 42 |
| 10.4 | Release And Waiver by NEM | 42 |

| 11. | Indemnification | 42 |
| 11.1 | Team Owner Indemnity | 42 |
| 11.2 | NEM Indemnity | 43 |
| 11.3 | Third Party Claims | 43 |

| 12. | Dispute Resolution | 43 |

3

| | | |
|---|---|---|
| 12.1 | Dispute Resolution | 43 |
| 12.2 | Arbitration Mechanics | 43 |
| 12.3 | Arbitration Award | 44 |
| 12.4 | Equitable Relief | 44 |
| 12.5 | Limitations on Damages | 45 |
| **13.** | **Miscellaneous** | **45** |
| 13.1 | Notices | 45 |
| 13.2 | Complete Agreement | 45 |
| 13.3 | Expenses | 45 |
| 13.4 | Governing Law | 46 |
| 13.5 | Confidentiality | 46 |
| 13.6 | Relationship Created | 46 |
| 13.7 | No Third-Party Beneficiaries | 46 |
| 13.8 | Separability | 46 |
| 13.9 | Failure to Take Action; Waiver | 46 |
| 13.10 | Force Majeure | 46 |
| 13.11 | Publicity | 47 |
| 13.12 | Amendments | 47 |
| 13.13 | Further Action | 47 |
| 13.14 | Joint and Several | 47 |
| 13.15 | Reservation of Rights | 47 |
| 13.16 | General Interpretative Provisions | 48 |
| 13.17 | Performance | 48 |
| 13.18 | Survival | 48 |
| 13.19 | Counterparts | 48 |
| **Exhibit A** | | **51** |
| **Exhibit B** | | **60** |
| **Exhibit C** | | **65** |
| **Exhibit D** | | **66** |
| **Exhibit E** | | **67** |
| **Exhibit F** | | **68** |
| **Exhibit G** | | **69** |
| **Exhibit H** | | **70** |
| **Schedule 1** | | **71** |
| **Schedule 2** | | **72** |
| **Schedule 3** | | **74** |
| **Exhibit I** | | **75** |

4

# NASCAR CUP SERIES
# CHARTER MEMBER AGREEMENT

The parties to this Charter Member Agreement (this "Agreement") dated as of the Execution Date are (i) NASCAR Event Management, LLC a Florida limited liability company ("NEM"), (ii) solely for purposes of Sections 10.2, 10.4, 11.2,, NASCAR Broadcasting, LLC ("Specified NASCAR Entities"), (iii) the Team Owner (as defined below), and (iii) the Control Person (as defined below), and is effective as of the Effective Date (as defined below).

## RECITALS

A.    NEM, pursuant to a license agreement with its Affiliate, National Association for Stock Car Auto Racing, LLC, a Florida limited liability company ("NASCAR"), organizes, operates, sanctions and exploits the Events (each as defined below);

B.    The Team Owner directly owns, controls and operates the Team (as defined below), and the Control Person, directly or indirectly, owns a controlling equity interest in the Team Owner as set forth herein;

C.    The object of this Agreement is NASCAR's grant, through its Affiliate NEM, to the Team Owner of the right to participate in the Cup Series throughout the Term; and

D.    NEM is willing to grant the Team Owner, and the Team Owner is willing to accept, the right and license to participate in the Cup Series during the Term (each as defined below) on the terms and subject to the conditions set forth in this Agreement.

Accordingly, it is agreed as follows:

1.    Definitions.  Capitalized terms used but not defined herein shall have the meanings given to them in Exhibit A hereto.

2.    Term.

2.1    Term.  Subject to Section 2.2, the term of this Agreement shall commence on the Effective Date and shall continue until the earlier of (x) December 31, 2031 or (y) the termination of this Agreement pursuant to Section 9 hereof (such term, the "Initial Term" and the Initial Term as it may be extended by the Extension Term (as defined below) pursuant to Section 2.2, shall be referred to herein as the "Term"). This Agreement shall constitute a valid, binding and enforceable agreement of each of the parties hereto as of the Execution Date and it is acknowledged that the rights granted under this entire Section 2 apply specifically to this Agreement (Charter No. [CHARTER NUMBER]).  This Section does not limit or affect NEM's rights regarding other Charter Member Agreements.

2.2    Term Extension.  NEM and Team Owner acknowledge that the Team Owner's desire to enter into an extension of the Agreement will depend, in part, on the Pool Money payable to Team Owner during the period from Year 2032 through Year 2038.  Subject to Team Owner not being in ~~Good Standing~~material breach of this Agreement at such time and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-compliance being waived by NEM in its sole discretion), then on or prior to November 1, 2030 (or as soon as reasonably practicable ), NEM will provide written notice to Team Owner of the amount of Pool Money and the allocations thereof for each year during the period from Year 2032 through Year 2038 (the "Pool Money

5

HIGHLY CONFIDENTIAL - OCO

23XI_0004326

Notice"). Subject to 4.3(a), if NEM or its Affiliates enter into a Traditional Broadcast Deal for a term of at least seven (7) years (commencing January 1, 2032) and the gross annual average value ("AAV") during the period from Year 2032 through Year 2038 is no less than gross AAV of the current Media Revenues for the Initial Term then the aggregate Pool Money across the Extension Term offered by NEM shall be no less than the aggregate set forth on Exhibit B. Team Owner may send a written notice (an "Extension Notice") during the period beginning January 1, 2031 and ending March 1, 2031 to NEM stating its desire to extend the Term for an additional seven (7) year period through Year 2038. If such Extension Notice is delivered during such period, the Term will be automatically extended until December 31, 2038 without further action by any party (the "Extension Term"), provided that the Term shall not be extended if NEM, following the delivery of such Extension Notice, has the right to terminate this Agreement pursuant to Section 9.1 hereof (and, for any defaults that are subject to cure pursuant to Section 9.1, the applicable cure periods have expired) and NEM provides notice to Team Owner within sixty (60) days following the date of delivery by the Team Owner of such Extension Notice that this Agreement is not being extended as a result of such termination right (the events referenced in this proviso shall be referred to herein as "Nonrenewal Events", it being understood and agreed that in the event that NEM does not deliver such notice, then NEM will not subsequently have the right to terminate this Agreement pursuant to Section 9.1 in respect of any Nonrenewal Event of which it was aware prior to termination of such sixty (60) day period) (provided that, if Team Owner has complied with the Minimum Performance Standards as provided under Section 6.12 in all material respects and is otherwise not in material breach of this Agreement at such time). The failure of Team Owner to timely deliver an Extension Notice shall constitute a waiver on the part of Team Owner to extend this Agreement pursuant to this Section 2.2, except in circumstances where NEM has failed to timely deliver to Team Owner the amount of Pool Money payable during the period from Year 2032 through Year 2038 and the allocations thereof. If Team Owner does not issue the Extension Notice, then any issuance of this Agreement will be governed by the provisions set forth in this Section 2.2 and Section 3.4 shall not apply. Except as provided below, NEM may not reissue this Agreement to any third party on terms more favorable than those offered to Team Owner for the remainder of the Initial Term following delivery of the Pool Money. If NEM intends to reissue this Agreement during the Initial Term to a third party on terms that are more favorable to the third party than the then-Current terms of this agreement, NEM must promptly inform Team Owner of such more favorable terms. Team Owner will then have thirty (30) days from receiving such notice to accept the extension of this Agreement for the duration of the Extension Term on such more favorable terms. Should Team Owner exercise this right and extend this Agreement, NEM must extend this Agreement on such more favorable terms. If this Agreement is not extended pursuant to this Section 2.2 and ~~NEM elects not to reissue this Agreement for the racing season commencing January 1, 2032 through December 31, 2032, then~~ Team Owner ~~agrees to adhere to limitations set forth~~participates in a competitive motorsports as defined in Section 6.6 ~~for the twelve (12) months commencing January 1, 2032~~then NEM shall be free to offer or sell this Agreement without any restrictions.

2.3    Good Faith Renewal Negotiations.  Subject to Team Owner not being in material breach of this Agreement at such time and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-compliance being waived by NEM in its sole discretion), the parties agree that during the period beginning on from July 1, 2037 through December 31, 2037 (the "Negotiation Period"), the parties will discuss the economic and non-economic terms related to the extension of the Term and, if there is mutual agreement, will enter into an amendment for a renewal of this Agreement beyond December 31, 2038. All renewal discussions shall be confidential and done in good faith, and NEM shall deliver to Team Owner a written proposal on or before the start of such Negotiation Period outlining the terms and conditions (including economic terms) on which it would then be willing to enter into a renewal. The Negotiation Period shall be exclusive to the Team Owner with respect to a renewal

6

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

23XI_0004327

of the rights granted under this Agreement (and neither NEM nor its Affiliates shall solicit offers from, or enter into negotiations with, any third party any time prior to the Negotiation Period regarding any agreement or arrangement that if implemented would prevent or materially impede NEM from extending the Term of or otherwise renewing this Agreement).  While NEM and the Team Owner currently desire to renew this Agreement upon expiration of the Term, the final decision regarding whether or not to renew, and the term of any renewal period, shall be subject to mutual agreement of the parties and, for clarity, either party may propose any changes to this Agreement during such Negotiation Period.  If the parties have not agreed to renew this agreement prior to December 1, 2037, then no later than December 15, 2037, NEM shall submit its final offer to Team Owner with respect to such renewal in writing (the "Final Offer") and Team Owner shall accept or decline the Final Offer in writing no later than December 31, 2037 (it being agreed if Team Owner does not accept or decline the Final Offer prior to December 31, 2037, then Team Owner shall automatically decline such Final Offer).   If the parties fail to come to terms on an extension of this Agreement prior to the end of the Negotiation Period, then any issuance of this Agreement will be governed by the provisions set forth in this Section 2.3 and Section 3.4 shall not apply.   Except as provided below, NEM may not reissue this Agreement to any third party on terms more favorable than those included in the Final Offer for the remainder of the Extension Term following the end of the Negotiation Period. If NEM intends to reissue this Agreement during the Extension Term to a third party on terms more favorable to the third party than those included in the Final Offer, it must promptly inform Team Owner of such terms. Team Owner will then have thirty (30) days from receiving such notice to either accept or reject such more favorable terms. Should Team Owner exercise this right and match a third-party offer, NEM must renew the Agreement on the matched terms. After good faith negotiations as prescribed herein~~, if NEM elects not to reissue and~~ the ~~Agreement for the racing season commencing January 1, 2039 through December 31, 2039~~parties fail to reach an agreement then if Team Owner ~~agrees to adhere to limitations set forth~~participates in a competitive motorsports as defined in Section 6.6 ~~for the twelve (12) months commencing January 1, 2039~~then NEM shall be free to offer or sell this Agreement without any restrictions. For avoidance of doubt, NEM may determine to issue or not re-issue such Agreement under Section 2.2 or under this Section at its discretion.


3.    NEM Commitments.

    3.1    NEM Commitments.  During the Term:

        (a)    Subject to the terms of this Agreement and the delivery to NEM of a valid executed Driver Agreement, and otherwise in compliance with the NASCAR Rules, the Team Owner shall have the right to (i) enter the Designated Vehicle in, practice, participate in qualifying (or whatever reasonable alternate method NEM uses) to determine starting order, race in the Race, and achieve a finishing position for each Event that is held during the Term, (ii) achieve a finishing position in the point standings for the Cup Series for each Season, and (iii) be referred to as a NASCAR Team during the Term.  NEM represents, warrants and covenants that (A) it has and will retain the exclusive right to grant (or otherwise arrange for) guaranteed starting positions in Events, and that, except as otherwise provided in this Agreement, it will not do so through any means other than Charter Member Agreements (and, for clarity, for purposes of the foregoing, participation by open teams shall not be deemed a "guaranteed" starting position in any Event), and (B) the money payable by NEM or its Affiliates to Competitors with respect to Event participation shall be paid to Competitors as provided in Exhibit B.  Special Awards monies, if any, will be determined on an annual basis in addition to money payable pursuant to Exhibit B.  For the avoidance of doubt, all such rights

7

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

23XI_0004328

shall include any Invitational Event(s) for which the Team Owner has satisfied all applicable qualification requirements;

(b)     NEM shall, or shall cause its Affiliates to, during each Year of the Term, distribute to the Team Owner, on or prior to when due, the applicable amount (i) of Pool Money as set forth in Exhibit B, and (ii) Special Awards monies, if any, with the amount of such Special Awards monies, if any, that the Team Owner is eligible for to be determined based on the applicable contract and achievement of the applicable criteria for such amounts (for clarity, any Special Awards monies for any Year shall be paid to Competitors for such Year, after receipt of such funds and subject to the applicable contractual requirements imposed by the counterparties to such contracts with respect to such monies);

(c)     NEM, either directly or through an Affiliate, has the right to sell one or more (but not more than two) title sponsorships for the Cup Series in any year pursuant and subject to Sections 6.8 and 6.9, and one or more sponsorships in the other Reserved Sponsor Categories (which sponsorship may be selected by NASCAR in its reasonable discretion) in an effort to provide necessary competition resources and to have such sponsors engage in commercial activation and promotion of the Cup Series;

(d)     None of NEM or any parent, subsidiary or affiliate companies, shall at any time during the Term be a Competitor or acquire a direct or indirect interest in a Competitor; provided, however that (x) NEM and its Affiliates may acquire a Competitor or an interest in a Competitor, or conduct or support the operations of a Competitor, for a period of not more than twelve (12) months if NEM or its Affiliates determines in its reasonable discretion that NASCAR's ownership, conduct or support of such Competitor would be in the best interests of the sport of stock car racing, provided that during such time, NEM shall use commercially reasonable efforts to identify a third party who would acquire such Competitor or such interest therein as soon as reasonably practicable, and (y) nothing in this Agreement shall be deemed to prohibit or restrict any direct or indirect owner of NASCAR Holdings, Inc., or any Family Relative of any such owner (e.g., any member of the France family), from starting a Team and acquiring a Charter in accordance with the terms of this Agreement or owning a Competitor or any interest therein or participating in the operations of any Competitor (e.g., as a driver, engineer, crew member, etc.) for any period of time subject to Section 8.3 of this Agreement. NEM shall provide written notice to Team Owner if any of the foregoing rights are exercised during the Term;

(e)     Other than any ownership by NEM or any Affiliate as of the Execution Date, NEM shall provide written notice under this Agreement to Team Owner if NASCAR or any of its respective Affiliates at any time during the Term becomes a Promoter or acquires a direct or indirect interest in a Promoter;

(f)     NEM shall provide Team Owner with the right to use the Assigned Car Number for the Term of this Agreement. Notwithstanding the foregoing, Team Owner may transfer the Assigned Car Number to any other Team owned and controlled by an Affiliate of such Team Owner, provided that any such transfer shall be subject to prior written notice to NEM and shall only be permitted to be effective prior to the commencement of a (and not during any) Season; and

(g)     All fees required annually for competition as provided in Schedule 3, including without limitation race entry, memberships applications and licenses, credentials and hard cards ("Charter Member Fees") accrued prior to the first Cup Series Points Event of the Season of each Year by Team Owner shall be billed in four (4) equal installments and due on March 1st, June 1st, September 1st and November 1st. All Charter Member Fees accrued after the first Cup Series Points Event of the Season will be billed and due in full on the next payment date of March 1, June 1, September 1st or November 1st as the case may be. Any Charter Member Fees accrued after the November 1st invoice, will be billed within

8

HIGHLY CONFIDENTIAL - OCO

23XI_0004329

five Business Days following the conclusion of the final Event for such Season and be due and payable on or prior to five Business Days following receipt of such bill. Any Charter Member Fees or other penalties as prescribed in this Agreement that remain unpaid 30 days (or in the case of such final bill for the year, five Business Days) after receipt by Team Owner of a written notice from NEM that such payment is past its due date may be set off against future Pool Monies that would otherwise be payable to the Team Owner. All Charter Member Fees shall be paid by ACH or wire transfer. <u>Schedule 3</u> sets forth the amount of all fees that NEM or any of its Affiliates may charge to Team Owner or Control Person, or their respective Affiliates, during the Term, except that minor fees during the year (e.g., tables at the Cup Banquet, filing an appeal) may be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

3.2     <u>Field Size.</u>  For each Cup Series Points Event during the 2025 Year the maximum Field Size is forty (40) Competitors, and the maximum number of Charter Members is thirty-six (36). NEM's current intent is to maintain such Field Size and number of Charter Members for the duration of the Term. However, NEM, if it determines that it is in the best interest of the sport to increase the Field Size or the number of Charter Members during any portion of the remainder of the Term of this Agreement, may increase the Field Size to up to (but not in excess of) forty-three (43) Competitors and the number of Charter Members (with or without any increase in the Field Size) to up to (but not in excess of) forty (40) during any portion of the remainder of the Term; provided, however that (i) if the Field Size or number of Charter Members is increased, such increase shall be subject to the anti-dilution provisions set forth in <u>Section 3.3</u>; and (ii) prior to entering into an additional Charter Member Agreement, NEM shall comply with the provisions of <u>Section 3.4(a)</u>.

3.3     <u>Anti-Dilution.</u>  In the event NEM (or any of its Affiliates) after the Execution Date, either (i) allows for additional open team positions which, when combined with the number of active Charter Member Agreements, increases the total Field Size above forty (40) Competitors for any Cup Series Points Event(s) or (ii) enters into one or more additional Charter Member Agreements which increases the number of active Charter Member Agreements above thirty-six (36) (which increase shall be effected in accordance with <u>Section 3.2</u>), then the following specific adjustments set forth in <u>Sections 3.3(a)-(d)</u> below shall be made to the Points Pool Money.

(a)     <u>New Charter Member Agreement Issuance.</u>  If one or more additional Charter Member Agreements are issued which increases the number of active Charter Member Agreements above thirty–six (36) (each such Year in which the number of active Charter Member Agreements is above thirty six, a "<u>Charter Member Increase</u>"), then for each Year (or portion thereof) during the Term where a Charter Member Increase is in effect (i) the amount of Fixed Owner's Plan (Charter Teams) shall be increased to equal the amount determined by multiplying the amount of Fixed Owner's Plan (Charter Teams) that would otherwise be payable in such Year or portion of such Year, as the case may be (as indicated in <u>Exhibit B</u>) by a fraction, the numerator of which is the number of active Charter Member Agreements for such Year and the denominator of which is 36 ; (ii) if a Charter Member Increase causes the Field Size to increase above 40 for any Cup Series Points Event, then the amount of the Race Purse, Performance Plan and Year-End Point Fund (as specified in <u>Exhibit B</u>) attributable to such Cup Series Points Event(s) shall be increased to equal an amount determined by multiplying the amount of the Race Purse, Year-End Point Fund and Performance Plan that would otherwise be payable for such Cup Series Points Event(s) (as indicated in <u>Exhibit B</u>) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40. If the Race Purse for any Cup Series Points Event(s) is increased pursuant to clause (ii)  this <u>Section 3.3(a)</u>, then NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased

9

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field. Notwithstanding the foregoing, provided that a new BMG wishing to enter the sport is not able to secure a Team affiliate, then NEM may issue a new Charter Member Agreement(s) to a team owner affiliated with a new BMG entering the sport that does not include or fund the Fixed Owner's Plan in those particular Charter Member Agreement(s).

(b)     Field Size Increase. If the Field Size is increased for any Cup Series Points Event(s) above forty (40) by adding one (1) or more open team positions (and not, for clarity, as a result of a Charter Member Increase, which is addressed in Section 3.3(a) above), then the amount of the Race Purse and Year-End Point Fund (as specified in Exhibit B) attributable to such Cup Series Points Event(s) payable to Competitors shall be increased to equal an amount determined by multiplying the amount of the Race Purse and Year-End Point Fund that would otherwise be payable for such Cup Series Points Event(s) (as indicated in Exhibit B) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40 (and NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field). Notwithstanding the foregoing, NEM may create an additional open category on an Event-by-Event basis for defined criteria as determined by NEM (e.g., F1 driver, former NASCAR Champion, etc.) that will have a reserved open position for that specific Event (the "Open Exemption"), provided however that such Open Exemption shall not be eligible for Race Purse or any other Pool Money and shall not require an increase to Race Purse and will not cause a Field Size increase under this Section and is not subject to anti-dilution. The "Open Exemption" position is intended for a driver who will significantly impact the promotion of the event and grow the prominence of the sport. Competitors must submit their request for the "Open Exemption" to NEM at least ninety (90) days prior to the Event. NEM will evaluate all submissions for the Event and have the sole discretion to determine which (if any) driver is approved for the Open Exemption.

(c)     Expansion of Field due to Increase in Both Charter Member Agreements and Open Teams; Information Requirements. In the event of an increase in the Field Size for a Cup Series Points Event above 40 due to both a Charter Member Increase and the addition of one or more open team positions, then the concepts set forth in clauses (a) and (b) above shall be applied by NEM with respect such increases to ensure the full anti-dilution protection contemplated therein, but without any duplication. For purposes of clarification, the concepts set forth in clauses (a) and (b) above shall only be applied for Cup Series Points Event(s) where the number of active Charter Member Agreements exceeds thirty-six (36) and/or the Field Size exceeds forty (40) Competitors. In the event NEM or any of its Affiliates elects to grant to any Person the right to compete in the Cup Series in any Year of the Term and if as a result of such grant there is a Charter Member Increase or the Field Size would be increased above forty (40), then in addition to compliance with the other provisions of this Agreement and NASCAR Rules, NEM shall deliver to Team Owner prior written notice of its intention to expand and documentation sufficient to evidence its compliance with the requirements of this Section 3.3. In no event will NEM issue a new Charter Member Agreement in accordance with this Section 3.3 and 3.4 that permits such new Charter Member to commence racing in any Event after the first Cup Series Points Event of such Season has commenced.

(d)     Subsequent Reduction of the Field Size. If, in any Year or portion of any Year following any increase in the Field Size above 40 or a Charter Member Increase as a result of which anti-dilution payments are made pursuant to the foregoing subsections (a)-(c), either the Field Size is decreased or the number of active Charter Member Agreement is decreased, then, effective following the time of such decrease, the foregoing requirements in respect of anti-dilution payments shall cease to apply in respect of

10

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                                 23XI_0004331

the applicable increase that gave rise thereto (it being understood that any anti-dilution payments required to be made pursuant to such subsections (a)-(c) prior to such date shall be made as so required), provided, however, that, if such reduction results in a Charter Shortfall or a Field Shortfall, Section 4.1 shall apply.

3.4     <u>Charter Member Issuance or Re-Issuance.</u>

(i)     Neither NEM nor its Affiliates shall enter into a new Charter Member Agreement that causes a Charter Member Increase, unless (i) NEM gives written notice to Team Owner and each other Charter Member of its desire to enter into the new Charter Member Agreement and specifying the identity of the proposed new Charter Member, following which Team Owner and each other Charter Member shall have the right to negotiate (to the exclusion of NEM and its Affiliates) with such proposed new Charter Member for a period of one hundred twenty (120) days following receipt of such notice regarding the terms on which Team Owner or any such other Charter Member might Transfer an existing Charter Member Agreement to such proposed new Charter Member, and (ii) if neither Team Owner nor any other Charter Members reach agreement with the proposed new Charter Member for the Transfer of an existing Charter Member Agreement within such 120-day period, then NEM will be free to negotiate with such proposed new Charter Member regarding the terms on which NEM is willing to issue a new Charter Member Agreement to such proposed new Charter Member. In the event that NEM reaches agreement with any such proposed new Charter Member, then at least 10 Business Days before issuing a new Charter Member Agreement to such prospective new Charter Member, NEM shall give written notice to Team Owner and each other existing Charter Member, specifying the economics (which such economics shall exclude the anti-dilutive amount that would be due and owing, and necessary to eliminate any anti-dilution payments, by such prospective new Charter Member pursuant to <u>Section 3.3(a)-(c)</u> of this Agreement (the "<u>Dilutive Amount</u>"), but such notice shall include, solely for information purposes, the amount of such Dilutive Amount and the basis for the calculation of such Dilutive Amount) to be paid by the new Charter Member and the rights being granted under the Charter Member Agreement and enclosing a firm offer by such proposed new Charter Member to purchase a Charter Member Agreement from any existing Charter Member on such terms (which, for clarity, shall exclude the payment by such prospective new Charter Member of any Dilutive Amount). If neither Team Owner nor any other Charter Member expresses an interest in transferring its Charter Member Agreement to the proposed new Charter Member in return for the consideration specified in the notice delivered by NEM within 10 Business Days following receipt of such notice from NEM, then NEM shall be free to issue a new Charter Member Agreement to such proposed Charter Member on such terms within 30 days following the expiration of such 10 Business Day period. Team Owner or any other Charter Member timely expressing such an interest in transferring a Charter Member Agreement to such proposed new Charter Member shall be permitted to assign its Charter Member Agreement to such new Charter Member in exchange for the economics set forth in the notice delivered by NEM (pursuant to an assignment agreement containing terms acceptable to the transferring Charter Member, acting reasonably) rather than NEM entering into a new Charter Member Agreement with such prospective new Charter Member (and NEM agrees to enter into any amendments to such Charter Member Agreement reasonably necessary to make the rights granted therein consistent with the applicable terms negotiated by NEM with the new Charter Member, other than the payment of the Dilutive Amount). If more than one Charter Member expresses an interest in assigning its Charter Member Agreement to the new prospective Charter Member in return for the consideration specified in the notice delivered by NEM, then the interested Charter Member that finished lowest in owner points (relative to other Charter Members) in the most recently completed Season shall have the right to assign a Charter Member Agreement that it currently holds to the new prospective Charter Member.

11

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004332

(ii)     In the event any Charter Member Agreement is forfeited or terminated for any reason except as set forth in Section 2.2 and 2.3, NEM may re-issue such Charter Member Agreement during the Term of this Agreement pursuant to the procedures set forth in this Section 3.4(ii) (and, for clarity, without subject to the provisions of Section 3.3 or 3.3(a)).  Upon reissuance of such Charter Member Agreement, NEM shall be entitled to retain no more than Five Hundred Thousand ($500,000.00) US Dollars as NEM's re-issuance fee, with the remaining excess amount charged for such Charter Member Agreement to be distributed to (and to increase) the Fixed Owner's Plan - Charter Teams as shown in Exhibit B in the following Season (or, in the event that such Charter Member Agreement is re-issued in the final Year of the Term, then during such final Year's racing season).  If NEM desires to reissue any forfeited or terminated Charter Member Agreement, NEM shall provide written notice (the "Invitation to Bid") to the then existing Competitors (including the Team Owner) and negotiate in good faith with any Competitors expressing an interest in acquiring such Charter Member Agreement (and the Competitors will be given a period of thirty (30) days following receipt of the Invitation to Bid during which to express such an interest) before reissuing such Charter Member Agreement to any third party.  NEM's Invitation to Bid shall have as a condition that the Charter is granted to the eligible Competitor who submitted the highest bid, as reasonably determined by NEM. In the event that no bids are received in the applicable period then NEM shall be free to reissue such Charter Member Agreement to an eligible third party with whom NEM reaches a binding agreement.

3.5     Governance.  NEM is committed to a robust and inclusive governance model which will allow for NEM to provide information to and obtain significant and meaningful input from the Competitors to ensure decisions are made in the best interests of the sport.  In furtherance of this goal, NEM shall form and maintain throughout the Term a Team Owner Council as described in further detail herein.

(a)     Formation of Team Owner Council.  NEM shall form and maintain throughout the Term a Team Owner Council, which will be comprised of (i) the controlling owner that controls, and together with its Affiliates is a party to, one or more Charter Member Agreements and the Cup Series teams granted such rights thereto (each, a "Charter Member Group"), and the controlling owner of each other Charter Member that is not part of a Charter Member Group, and in each case an alternate member designated by each such controlling owner who shall be a director, owner, CEO, President or CFO within the applicable Charter Member Group or of the Charter Member, as applicable, or another senior executive within such Charter Member Group or such Charter Member, as applicable, who has been approved by NEM (which approval will not be unreasonably withheld or delayed) and who may attend meetings of the Team Owner Council together with the controlling owner of such Charter Member Group or Charter Member, as applicable, (ii) the controlling owner of each open participant that attempted to qualify for at least 75% of the Cup Series races in the prior Year (a "Qualifying Open Participant") (any designated representative in the foregoing clauses (i) and (ii) shall be referred to herein as a "Team Owner Council Representative"); and (iii) NASCAR designees.  Subject to the NEM approval rights set forth above, if applicable, Team Owner shall notify NEM of its alternate Team Owner Council Representative and of any change to such alternate Team Owner Council Representative.  The Team Owner Council will be co-chaired by one NASCAR designee and one Competitor-appointed designee (each a "Team Co-Chair" and collectively the "Team Co-Chairs").  The Team Co-Chairs will be a current member of the Team Owner Council and will be selected (and may at any time be removed and replaced) by majority vote of the Team Owner Council, and in any such vote (whether for selection, removal or replacement) the Team Owner Council Representative from each Charter Member Group will have one vote for each Charter Member Agreement held by such Charter Member Group and the other Team Owner Council Representatives will have a single vote (for clarity, the alternate representatives shall vote only in the event that the applicable controlling owner is not present) (and, for clarity, the NASCAR designees shall not have a vote).  The Team

12

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004333

Co-Chairs will serve a two-year term as co-chair (subject to earlier resignation), and the Team Owner Council must use good faith efforts to rotate the Team Co-Chairs based on BMG affiliation.

(b)     Operation of Team Owner Council. Through the mechanism of the Team Owner Council, NEM will present to the Team Owner Council and will consult meaningfully with the Competitors on all material matters of interest to the Competitors (e.g. safety and competition, proposed rule changes, industry economics, broadcast and sponsorship issues, single supplier arrangements, digital media issues and the development of fan-centric racing.) NEM's meaningful consultation obligation will include the obligation of NEM to share information with the Team Owner Council reasonably requested by any member of the Team Owner Council, but subject to the obligations of the members of the Team Owner Council to maintain the confidentiality of such information.  However, NEM as the sanctioning body shall have the final decision making authority, subject to the terms of this Agreement.  Nothing herein shall require NEM or its Affiliates to breach bona fide confidentiality obligations imposed on them pursuant to existing agreements.

(i)     Before implementing any General Change, NEM shall cause such General Changes to be individually brought forward and presented to the Team Owner Council.   The Team Owner Council may provide feedback and will be meaningfully consulted on all General Changes; however, NASCAR will have final say regarding any General Change  "General Change" as used herein means as follows: (i) major rule package changes; (ii) increasing the number of testing dates or otherwise changing the testing policies in a manner that would materially increase costs for Competitors; (iii)  without in any way limiting the advance notice requirements set forth in Section 3.6(d) below, major equipment or engine changes; (iv) new single source supplier arrangements (whether created pursuant to agreements or implemented via NASCAR Rules or via specifications intended to create a single source supplier); (v) material Race format changes; (vi) material playoff eligibility or format changes; or (vii) material expansion to the length of the Event weekend.

(c)     Regular and Special Meetings of Team Owner Council. NEM will schedule and conduct, no less than two (2) times a Year, regular Team Owner Council meetings. Meetings will be held with the specific dates and locations to be determined by NEM in its reasonable discretion. NEM shall be obligated to notify the members of the Team Owner Council, by January 15th of such Year, of the dates and locations for such regular meetings in such Year.  All such regular meetings must be attended in person. NEM will collaborate with Teams in developing the agenda for each such meeting, and the Chair of the Team Owner Council that is an NEM executive shall distribute the agenda for any regular meeting to each Team Owner Council member at least five (5) Business Days prior to the meeting.  Special meetings of the Team Owner Council may be convened by either Co-Chair of the Team Owner Council, upon reasonable notice to the other members of the Team Owner Council, in which event the agenda shall include emergency matters raised by such members.  Members shall be entitled to participate in any special meeting (i.e., any Team Owner Council meetings other than the twice-annual regular Team Owner Council meetings) by means of conference telephone.  The Team Co-Chairs shall ensure that the meeting materials are distributed to each member of the Team Owner..

(d)     Committee Formation.

(i)     General. The Team Owner Council shall form and maintain throughout the Term the committees of the Team Owner Council referenced below (and such committees may form subcommittees as deemed reasonably necessary or appropriate).  Ideas will be generated at the committee level and where applicable project work groups will be formed by the applicable committee to further research, and to develop and make recommendations to the committees and/or sub-committees.  Project

13

work groups shall entail joint participation and leadership from Competitor representatives and NEM designees. The committees will, where applicable, make recommendations for implementation and discussion at the Team Owner Council. However, NEM as the sanctioning body shall have the final decision making authority, subject to the terms of this Agreement. Team Owner and NEM agree to work in good faith to find ways to continue improving communication on a regular basis.

(ii) <u>Team Advisory Committee</u>. The objective of the Team Advisory Committee shall be to review General Changes at an early stage of those processes and provide opportunities for feedback, input and collaboration. The Team Advisory Committee shall be chaired by an NEM executive(s). The Team Advisory Committee shall be comprised of four NEM designated members (including the chair person) and one (1) additional representative for each active BMG (as defined below). Each such BMG representative will be selected every two (2) years by the Teams associated with such BMG, provided that such representative shall rotate among the applicable Charter Member Groups every two (2) years. Information presented to the Team Advisory Committee shall be treated as confidential by all such representatives and shall not be shared with other Competitors until approved by NEM. The Team Advisory Committee shall have the discretion to invite to such meetings any third party who will be able to provide relevant input to the meetings (e.g., OEMs, engine builders, tire manufacturers, and other suppliers, vendors, promoters, etc.), such participation shall be subject to a non-disclosure agreement if the Team Advisory Committee so requests. Team Advisory Committee meetings will be held on dates and at locations to be determined by NEM in its reasonable discretion. NEM will notify the members of the Team Advisory Committee of the dates and locations for such regular meetings no later than fifteen (15) Business Days prior to such meeting. NEM shall distribute the agenda for any regular meeting to each Team Advisory Committee member at least five (5) Business Days prior to the meeting.

(iii) <u>Competition Committee</u>. The objective of the Competition Committee shall be to collaborate to enhance safety and drive efficiencies and to produce a fan-centric racing product on the track. Each Charter Member Group and each other Charter Member that is not part of a Charter Member Group shall have the right to designate one (1) representative on the Competition Committee (who shall be its competition director or senior technical lead), provided that the controlling owner and president of such Charter Member Group or Charter Member, as applicable, shall also have an open invitation to participate in Competition Committee meetings. Each Qualifying Open Participant shall have the right to designate one representative on the Competition Committee. The Competition Committee shall be chaired by two (2) NEM senior executives and by one (1) additional chairperson (e.g., three (3) additional chairpersons in total if there are three (3) BMG's) (each a "<u>Chairperson</u>") who will represent each BMG and who will be selected from among the existing Team representatives on the Competition Committee . Each such BMG Chairperson will be selected annually by the Teams associated with such BMG, provided that such Chairperson shall rotate among the applicable Charter Member Groups annually. The Competition Committee shall have the discretion to invite to such meetings any third party who will be able to provide relevant input to the meetings (e.g., OEMs, engine builders, tire manufacturers and other suppliers, vendors, etc.) such participation shall be subject to a non-disclosure agreement if the Competition Committee so requests. Competition Committee meetings will be held on dates and at locations to be determined by NEM in its reasonable discretion. NEM will notify the members of the Competition Committee of the dates and locations for such regular meetings no later than fifteen (15) Business Days prior to such meeting. The Chairpersons of the Competition Committee will develop the agenda for each such meeting after seeking input from other members of the Competition Committee, and a Chairperson who is an NEM executive shall distribute the agenda for any regular meeting to each Competition Committee member at least five (5) Business Days prior to the meeting. Members shall be entitled to participate in any meeting by means of conference telephone.

14

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO                                                                                                        23XI_0004335

(e)    Conduct of Meetings.  Any and all meetings conducted are intended to be open forums for productive dialogue for Competitors and NEM to raise issues, present positions, maintain a dialogue, provide meaningful input and make recommendations for review, all with the goal of reaching consensus based decisions.

(f)    Consensus Building.  It is NEM's desire to build consensus amongst the Teams, BMGs, NEM and other relevant supporting stakeholders in the sport through the Team Owner Council and its committees, and the above referenced meeting processes.  NEM recognizes the value of diversity of input and the desire to have a cooperative and constructive collaboration in the sport, and both Team Owner by and through its representatives on the Team Owner Council and related committees and NEM commit to use their good faith efforts to reach consensus on all issues reviewed by the Team Owner Council.  However, NEM as the sanctioning body shall have the final decision making authority regarding issues related to governance of the sport, except as otherwise set forth in other provisions of this Agreement (including, without limitation, Section 6.5).

3.6    Rules Packages and Testing Policy.

(a)    Annual Rule Package and Unified Testing Master Schedule Issuance.  Beginning with respect to the Rules Package that will be applicable in 2025 and without limiting the commitments set forth in Section 3.5, NEM shall (i) provide an update to the Team Owner Council and obtain the Team Owner Council's input on the annual Rules Package that will be applicable in a race Season at a Team Owner Council meeting preceding the race season, (ii) provide the annual Rules Package to the Team Owner for review no later than August 1 preceding any race Season and identifying any changes from the preceding Year's final Rules Package, and (iii) discuss and obtain meaningful input on the Rules Package from the Team Owner Council at its subsequent meeting, prior to the issuance of such annual Rules Package.  NEM shall issue the final annual Rules Package by November 15 (or within two weeks of the end of the Season, whichever is later) and after considering in good faith Team Owner Council input, and provided that such annual Rules Package shall not be in violation of the terms of this Agreement.  NEM will not schedule more than three (3) organizational tests (excluding Goodyear or other Tire partner testing) under the Unified Testing schedule for any year during the Term and NEM will collaborate and coordinate with the Teams on the scheduling of such test dates.

(b)    In Season Changes to Rules Package.  NEM covenants that no changes shall be made to the Rules Package that apply to any race season after the Rules Package for such race Season has been set in accordance with Section 3.6(a), unless (i) such change is a normal in-season administrative change, including tire allocations per event and gear ratios or other sporting regulations (not related to the car specifications), (ii) such changes are intended to drive efficiencies, (iii) such changes are intended to preserve parity or improve race quality, (iv)  such change is necessary for urgent safety reasons threatening life, limb or well-being, (v) such change is necessary in order to comply with applicable law; or (vi) a Force Majeure Event or material and unanticipated supply chain issues or any other circumstances that would prevent or materially impede NEM's ability to conduct an Event without making such change.  NEM shall be able to make such Force Majeure changes, provided that any such change made pursuant to clause (vi) shall be effective only for so long as the applicable issue or circumstance necessitating such change remains in effect.  Changes intended to preserve parity or improve race quality which cost teams more than $150,000 on average across the Competitors per season must be shared with the Team Advisory Committee to allow input prior to implementation.  NEM shall provide to the members of the Team Owner Council written notice, delivered as far in advance as is reasonably possible, of any proposed change to the Rules Package

15

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004336

to be implemented pursuant to the previous sentence, and shall consult with and obtain views from the Team Owner Council in advance of such change to the extent practicable. Notwithstanding anything above, the foregoing shall not impede NEM's ability to conduct, officiate the competition and enforce the NASCAR Rulebook subject to Section 6.5.

(c) <u>Bill of Materials.</u> Without limiting the commitments set forth in Section 3.5 and subject to changes described in Section 3.6, to minimize parts obsolescence a material change to single source parts will require a minimum notice period of twelve (12) months and any major engine changes would require an twenty-four (24) month notice period. NEM shall not make any material change outside of the foregoing notice periods unless (i) such change is necessary for urgent safety reasons or in order to comply with applicable law (including without limitation any applicable federal or state law limiting carbon emissions), (ii) such change is in the ordinary course and does not create a material expense for Team Owner, (iii) a new BMG enters into or leaves the Cup Series, or (iv) due to any supply chain disruptions, raw materials shortages, labor or strike issues or other Force Majeure Events.

(d) <u>Race Schedule.</u> Notwithstanding this Section 3.6, NEM shall not modify the Cup Series Points Event schedule or the Invitational Event schedule to add any Cup Series Points Events or Invitational Events in any Year unless the aggregate amount of Pool Money payable to Competitors in such Year is increased proportionally (i.e., the Pool Money shall be multiplied by a fraction, the numerator of which is of total number of Cup Series Points Events and Invitational Events for such Year (inclusive of such additional Cup Series Points Event(s) and/or Invitational Event(s)) and the denominator of which is 38)(i.e., the total number of Cup Series Points Events and Invitational Events on the Effective Date). For clarity, the Daytona 500 and the Duels at Daytona are included as one Cup Series Points Event for purposes of the foregoing calculation of the denominator.

3.7 <u>Single Source Supplier.</u> In the event that NEM determines that it will pursue a single source supplier for any part used by Competitors (whether created pursuant to agreements or implemented via NASCAR Rules or specifications intended to create a single source supplier), then if the single source supplier will supply anything sanctioned for use by all Competitors, NEM shall identify and discuss potential single source opportunities with the Competition Committee, and obtain the Competitor's feedback thereon, prior to pursuing such opportunities. In addition, NEM will disclose the RFP for any applicable single source arrangement and the responses to the RFP to the Competition Committee promptly following issuance or receipt of each such document. NEM will collect cost benchmarks and evaluate RFP responses against such benchmarks with the Competition Committee, and NEM will present the proposed preferred vendor and rationale for its selection to the Competition Committee prior to signing an agreement with such vendor. Subject to the foregoing and the other applicable terms of this Agreement, NEM will have the discretion to make the final selection of the supplier; provided that no single source supplier shall charge Competitors in excess of arms-length reasonable commercial rates for the single sourced product. NEM and the Team Owner commit that they shall not receive financial consideration for exploiting their intellectual property or other assets as part of the agreement with the selected supplier. NEM and the Competitors, and their respective Affiliates, may exploit their intellectual property or other marketing assets for value and consideration to a single source supplier, provided that (i) such arrangement is not discussed or negotiated in any manner, or entered into, until after the single source supply arrangement is finalized and executed; (ii) the single source supply arrangement may not be conditioned in any manner on, including having economic incentives or termination rights tied to, entering into or failing to enter into any such arrangement, and (iii) if any such arrangement with a single source supplier is entered into in accordance with the foregoing, NEM (or its Affiliates) or the Team Owner (as applicable) shall provide written notice

16

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

23XI_0004337

to the other party regarding the effective date, term and general subject matter of (including whether consideration will be received, but not otherwise detailing the consideration to be paid under) such arrangement. In the event that a single supplier agreement already exists on the date of this Agreement which includes intellectual property or marketing assets, this <u>Section 3.7</u> shall not disqualify the single source supplier from participating in the RFP process in connection with any future single source supplier arrangement or renewal. Any (i) single source supply agreements existing as of the Execution Date and renewals thereof or (ii) single source supply agreements with a Part that will cost a team less than $2,500 a season in the aggregate or (iii) replacement of any single source supply agreement in the Tire Category or Fuel Category, shall not be subject to the foregoing process (provided that (x) the prices charged Competitors in any of the foregoing single supply agreements (including extensions, renewals or replacements entered into after the Execution Date) shall not be artificially increased or, in the case of any replacement entered into after the Execution Date, pricing shall be determined consistent with the methodology from the previous contract, it being understood and agreed by the Team Owner that such prices may be subject to increases (including historical price escalations under existing single source agreements) and fluctuation based on market conditions, including, without limitation, the pricing or availability of raw materials, labor, transportation or conversion costs, and (y) the Team Owner and Control Person agree that the pricing under any single source supply agreement existing as of the Execution Date satisfies the foregoing requirements).

4.     <u>Payments and Distributions.</u>  Subject to any adjustments made pursuant to <u>Section 3.3</u> or <u>Section 3.6</u>:

4.1     <u>Pool Money.</u>  In addition to any Special Awards distribution, for each Year, the amount to which the Team Owner is entitled to under this Agreement shall be determined in accordance with the terms set forth in <u>Exhibit B</u> hereto (the "<u>Pool Money</u>").  For avoidance of doubt, <u>Exhibit B</u> includes total Pool Money posted for Competitors if all team positions are paid for all Events.  However, if any monies remain unpaid because the field for any Event is not filled ("<u>Field Shortfall</u>") or because fewer than 36 Charter Member Agreements are issued and active for any given Year ("<u>Charter Shortfall</u>"), then NEM shall pay any and all Race Purse attributable to the Field Shortfall or the Charter Shortfall, as the case may be, by increasing payouts in the Race Purse to Competitors who competed in the Event. The remaining amounts attributable to the Field Shortfall or Charter Shortfall (Fixed Owners Plan and Performance Plan) shall be retained by NEM to use during the then current Season at its reasonable discretion for the mitigation of the loss of Competitors and the growth or promotional opportunities for the sport.

4.2     <u>Payment Terms.</u>  All Pool Money and any Special Awards distribution shall be payable solely and directly to the Team Owner and not to any Driver, Control Person, Owner or other employee, agent or contractor of the Team Owner.  The Team Owner (and not NEM or any of its Affiliates) shall be solely responsible for the determination of and distribution of any and all Pool Money and any Special Awards distribution that may have been earned by a Driver or any employee, agent or contractor of the Team Owner with respect to the finishing position of the Designated Vehicle in any Event and the standings of the Cup Series and, provided that NEM has timely made or has caused its Affiliates to timely make all payments of Pool Money and any Special Awards distribution to the Team Owner, the sole recourse of such Driver or any such employee, agent or contractor for any failure to properly distribute any Pool Money and any Special Awards distribution shall be against the Team Owner and not against NEM or any of its Affiliates.  Neither NEM nor any of its Affiliates shall be responsible for the filing or payment of any Taxes associated with any Pool Money or any Special Awards distribution paid to Team Owner, which Taxes shall remain the sole responsibility of the Team Owner and the Driver (as applicable), except solely to the extent

17

HIGHLY CONFIDENTIAL - OCO                                                                                   23XI_0004338

required by applicable law to be, and which are, withheld by NEM or its Affiliate(s) from the Pool Money or any Special Awards distribution, as applicable. Notwithstanding the foregoing, NEM reserves the right to pay out additional awards, bonuses or any other consideration to Competitors or Drivers as NEM determines in its sole discretion, including without limitation Other Awards; provided NASCAR shall use good faith efforts to provide transparency to Team Owner for any payments made to Team's Driver(s) under this Section.

4.3     Payment Obligations.

(a)     Team Owner has no right to Pool Money specific to an Event if the Event is not commenced and officially completed (as determined in accordance with the Rule Book) due to a Force Majeure Event. If Media Revenue to be received by NEM or the applicable NASCAR Rights Affiliate(s) is delayed or reduced in whole or in part due to either (a) a Bankruptcy of a counterparty to a Live Transmission Contract, (b) a breach or violation of any such agreement by the counterparty thereto (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)), (c) a breach or violation of any such agreement by NEM or the applicable NASCAR Rights Affiliate solely to the extent that such breach or violation is caused by one or more Competitors other than due to a Force Majeure Event (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)), or (d) a Force Majeure event, or (e) a contractual reduction permitted in a Live Transmission Contract as the same has previously been described by NEM to Team Owner and which amount is not  a material reduction to the overall Media Revenues or (f) any costs, expenses, settlements, legal fees, damages or other losses or liabilities arising out of or in connection with any and all claims, actions, demands, suits, investigations or any other legal or governmental proceedings in connection with any the Live Transmission Contract or the Live Transmission of Events  ("Permitted Contractual Reduction"), then, in any such case, the portion of the total Pool Money that would have been indirectly funded by the Media Revenue which is not received by NEM or the NASCAR Rights Affiliate may be correspondingly delayed or reduced upon prior written notice to Team Owner, but only to the extent of the original delay or reduction in receipt (e.g., if a portion of the Media Revenue which is owed to the applicable NASCAR Rights Affiliate is not received under the circumstances described in clauses (a) – (f) above, then the pro rata portion of the shortfall would not be paid into the Pool Money until it is received. For example, if five percent (5%) of the Media Revenue is not paid when contractually required under the circumstances described in clauses (a)-(f), the Pool Money for the remaining Events shall be reduced proportionately so that total Pool Money is reduced by five percent (5%). If any such delay shall occur which delays timely payment of any portion of Pool Money to Team Owner for more than sixty (60) days, then, notwithstanding anything to the contrary herein, Team Owner and Control Person have the right to terminate this Agreement effective upon written notice to NEM, and upon such termination shall have no further obligations to NEM, NASCAR or their respective Affiliates; and provided, further, that for the avoidance of doubt, any monies subsequently received by NEM or a NASCAR Rights Affiliate, including moneys received by NEM or a NASCAR Rights Affiliate in connection with the exercise of remedies against a counterparty or a Competitor (or any of their respective Affiliates) in excess of actual out-of-pocket costs and expenses incurred by NEM or a NASCAR Rights Affiliate in connection with such recovery ("Net Recovery") as well as any moneys so received via insurance recoveries on the part of NEM or a NASCAR Rights Affiliate, will be paid into the Pool Money and distributed to the then current Charter

18

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 21 of 241

HIGHLY CONFIDENTIAL - OCO                                                    23XI_0004339

Members in good standing ("Remaining Charter Members") (up to the amount of the Remaining Charter Members' proportionate percentage of such underpayment).

(b)   On an annual basis, NEM will represent and warrant the amount of Media Revenues actually received by NASCAR Broadcasting for the applicable year. Upon Team Owner's request, NEM will provide Team Owner with a statement of all revenues received by NEM or its Affiliates under Live Transmission Contracts during any Year, which will be certified to be accurate by an authorized officer of NEM and an independent third-party accounting firm of national standing.

5.   Intellectual Property.

5.1   Ownership and Acknowledgment.   The Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, acknowledge and agree that NASCAR exclusively and in perpetuity owns any and all rights to broadcast, transmit live, film, tape, capture, overhear, photograph, collect or record all Works by any means, process, medium or device (including television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmission over the Internet, and public and private online services authorized by NASCAR), whether or not currently in existence, and that, as between NASCAR, on the one hand, and Team Owner, the Control Person and their respective Team Affiliates, on the other hand, NASCAR is and shall be the sole owner of any and all intellectual property rights (including patents, copyrights, trademarks, design rights, and other ancillary and proprietary rights) worldwide in and to these Works, copyrightable or otherwise, created from the images, sounds and Event Data arising from and during any Event (excluding, for clarity, any Team Intellectual Property and any trademarks, service marks, copyrights, name image or likeness, of any other third party that are embodied in any Work). To the extent not already owned by NASCAR, the Team Owner and the Control Person hereby assign, and shall cause their respective controlled Affiliates to assign (and shall use reasonable efforts to cause other Team Affiliates to execute and deliver such further instruments to assign), to NEM, as the designated representative of NASCAR for the collection of such rights, any and all rights set forth above, exclusively and in perpetuity. In addition, Team Owner hereby grants NEM a worldwide, perpetual, irrevocable, non-exclusive, transferable, assignable and royalty-free license, without further compensation (which license shall survive termination of this Agreement) to use by any means worldwide any Team Intellectual Property included or incorporated in any Work to the extent that such license is necessary to enable NEM to exercise the rights expressly reserved, exclusively or non-exclusively, to NEM pursuant to this Agreement. The Team Owner and the Control Person each represent and warrant that, as of the Execution Date, such Person has not granted to any third Person the rights described in the first two sentences of this Section 5.1. The Team Owner agrees to take all steps reasonably necessary and that that are reasonably requested by NEM, including good faith efforts to implement a system that requires all of its Team Affiliates that may be visible at-track to sign documentation that grants or assigns the applicable rights set forth in this Section 5.1 exclusivity and in perpetuity as set forth herein, to protect, perfect or effectuate NASCAR's ownership or other interest in these rights described in this Section 5.1 (all at NASCAR's cost, other than costs related to obtaining the clearances of such Team Affiliates pursuant to forms reflecting reasonable terms (consistent with this Section 5.1) provided by NEM). The Team Owner and the Control Person agree not to take any action, nor cause others to take any action, nor enter into any third-party agreement, which would contravene, encroach or infringe upon these NASCAR rights described in this Section 5.1. Team Owner agrees to allow: (i) audio, audio-visual or video equipment for use on the Driver during Event weekends, including, without limitation, a microphone or camera, etc., provided that use of such audio shall be subject to Team approval, not to be unreasonably withheld; and (ii) any and all equipment relating to audio and video transmissions, as well as timing and scoring information, including, size, location, and weight, and

19

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                                                    23XI_0004340

use thereof as determined by NEM, in or on the Designated Vehicle for each Event, or a weighted device equal to the size, weight, and location of part or all of such equipment if such Designated Vehicle is not selected to run part or all of such equipment, as determined by NEM.

5.2     Advertising and Promotional Activities by NEM.     The Team Owner and the Control Person, for themselves and on behalf of each of the their controlled Affiliates, acknowledge and agree that NASCAR, the then current Series Sponsor (subject to the immediately subsequent sentence), each then current Promoter, each then-current Broadcast Partner, each then-current Person that has entered into an agreement with NEM or its Affiliates to exploit any Ancillary Rights, and the duly authorized Affiliates of each of them (collectively, "NASCAR Recipients"), may use and exploit, on a non-exclusive basis, the name, likeness and performance, in or out of uniform, including photographs, images and sounds of the Team Owner, the Control Person, the Driver(s), in or out of uniform, each of the crew members, in uniform, and other controlled Affiliates of the Team Owner and the Control Person, and/or the Designated Vehicle, in each case taken in connection with an Event during the Term, in any medium (including print, broadcasts by and through television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmissions over the Internet, and public and private online services authorized by NASCAR) solely for (a) promoting or advertising any Event or the Cup Series, (b) news reporting in respect of an Event or the Cup Series, or (c) any telecast or programming that constitutes Live Transmission Activity (or shoulder programming with respect to such Live Transmission Activity) or an Ancillary Right, and the Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, hereby grant (and shall use reasonable efforts to cause each other Team Affiliate to grant in accordance with the fourth sentence of Section 5.1) to each NASCAR Recipient, in perpetuity, all rights thereto for such purposes.  Upon request of the Team Owner, which will be made solely during the period beginning on January 1 and ending on January 31 of any Year, NEM will provide to Team Owner a list of all NASCAR Recipients that have been granted rights hereunder during the Year immediately preceding the Year of such request.  During any Year, the rights granted above with respect to the Driver (provided, however,  such rights with respect to the Driver shall be limited to the Driver in fire suit or any other branded apparel of a Team sponsor) may be sublicensed to any then-current Series Sponsor for such Year on an exclusive basis solely for endorsement of any or all products and services of such Series Sponsor in such Series Sponsor's Series Sponsor Category (as defined in Exhibit C), provided that, if a Series Sponsor Change has been effectuated during the Term, then (i) off-track activation rights of the Series Sponsor shall be subject to any applicable limitations set forth in the last sentences of Section 6.9.2 and (ii) no such endorsement rights may be used in any manner that would be in conflict with a Qualifying Sponsor written agreement of Team Owner or Driver existing prior to such change (as such Team Owner or Driver sponsorship agreement may be extended from time to time on similar terms).  Moreover, the Team Owner shall make good faith efforts to enter into agreements with the Fuel Sponsor and Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of such sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement).  With the exception of any Series Sponsor's exclusive rights as set forth above with respect to endorsements within such Series Sponsor Category, this Section 5.2 does not grant to any NASCAR Recipient (or to any other Person) any right for (or to authorize) the use or endorsement of a third party brand, product or service utilizing the name, image or likeness of the Team Owner, the Control Person, the Driver(s), each of the crew members, any other Team Affiliate or the Designated Vehicle without such party's express consent (or, in the case of the Designated Vehicle, the express consent of the Team Owner).

5.3     Collective Use.  Any Event image in photography or audio-visual footage that depict(s) five (5) or more race vehicles and/or five (5) or more drivers in uniform and/or five (5) or more crew

||US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004341

members in uniform at an Event may be used in any medium by the Team Owner, Team Affiliates, Other Teams and their Team Affiliates, sponsors of Competitors, Promoters, Broadcast Partners, and NASCAR and its Affiliates and its sponsors and licensees for advertising, marketing and promotional purposes supporting the parties' involvement in the sport even though it may include the likeness of the Team Owner, the Control Person, the Driver or any of their respective Team Affiliates, provided that no personal endorsement of any brand, product or service is created or implied by any such use.

5.4     Team Clips.     Upon Team Owner's request, NEM shall (or shall cause the appropriate NASCAR Affiliate to) provide up to five (5) minutes of audio-visual Works per Event that are readily accessible by NEM (or such Affiliate) for licensing (without regard to any restrictions on licensing which exist only among NEM and/or other NASCAR Affiliates) and that include Team Intellectual Property (the "Team Clips") for a royalty-free use by the Team Owner or a Team Owner primary or other major associate sponsor (each, a "Material Sponsor") in accordance with the following: (i) in connection with such request, the Team Owner shall provide NEM (or its Affiliate) with information reasonably requested with respect to the usage of such Team Clips, (ii) the Team Clips shall only be exhibited via a freely distributed medium (including, without limitation, television, cable television, satellite television, and transmission over the Internet or broadband (including subscription based services)) that is intended solely to promote and/or market such Team, Material Sponsor, or Driver's (as applicable) relationship with the sport, NASCAR or each other and not to create any product, application, site or platform that is intended to predominately exploit the Team Clips or the Team Clips in connection with other NASCAR-related audio-visual footage related to the Team or the Driver, (iii) the Team Owner shall be responsible for all reasonable and customary search and editing costs (but not a license fee) associated with such Team Clips in the event that editing is necessary to satisfy the Team Owner's request, (iv) all Team Owner or Material Sponsors utilizing such clips will be required to enter into a royalty free form license agreement with NEM (or its Affiliate) with reasonable and customary terms, including with respect to indemnification and referencing the usage restrictions in accordance with this Section 5.4, (v) notwithstanding the foregoing, if the use of Team Clips is otherwise in accordance with this section and is for use on Team Owner-branded social media channels or Team Owner-branded website then no additional license agreement is needed for the non-exclusive, non transferable use by Team Owner and any search and search and editing costs (if any) will be approved via e-mail; and (vi) such use will comply with NASCAR's brand guidelines and other guidelines to ensure such usage does not conflict with any Live Transmission Contract or any third party agreement that exploits Ancillary Rights. The Team Owner shall use good faith efforts to ensure that all requests to NEM for the use of Team Clips by any Material Sponsor is coordinated by and conducted through the Team Owner. The Team Owner acknowledges and agrees that NEM and its Affiliates will, on a non-exclusive basis, exploit portions of the Works (and other NASCAR-related content) for non-sponsored promotional uses and NEM (or such Affiliate) will not be charged a license fee for the exploitation of such footage in such cases.

5.5     Team Intellectual Property; Works; Ancillary Rights.

(a)     This Agreement grants no rights to use Team Intellectual Property in any manner (on in connection with any activities) except as referenced in this Section 5. Without limiting the foregoing, this Agreement grants no rights to NEM or its Affiliates to utilize Team Intellectual Property for any activity involving physical goods that are produced or distributed, whether freely or not. The parties agree to work in good faith together to identify relevant cross-licensing opportunities inclusive of the Team, Driver and NASCAR marks in a manner consistent with past practices of the parties as of the Execution Date. Notwithstanding any existing agreements, it is also agreed and understood that the parties shall have the option to utilize the NASCAR Team Properties Trust structure, using the structure set forth below in Section 5.14 and/or enter into separate agreements for purposes of establishing new licensing agreements, as

21

HIGHLY CONFIDENTIAL - OCO                                                                         23XI_0004342

determined at each individual party's sole discretion. To the extent that Team or Driver merchandise is sold through NASCAR.com or through the industry trackside merchandise program at Events (but not through track-specific owned stores and/or concessions at Events), the parties agree to distribute royalties in a manner consistent with existing NASCAR Team Properties Trust (which, for clarity, distributes a 9% royalty to Team Owner and a 1% royalty to NASCAR). In addition, for any product approvals administered through the Trademarx online approval system, other than for "lifestyle" products as generally recognized in the industry, all parties shall mandate the use of the official "NASCAR" hangtag with integrated hologram or "NASCAR" hologram only (where applicable); provided that the Trademarx system continues to be funded through the sale of holograms/hangtags to third party licensees. As means of clarity, give aways of sponsor premium and promotional products, including those distributed at trackside venues, are not subject to the foregoing terms.

(b)    Pursuant to and in accordance with the terms expressly set forth in Sections 5.2 and 5.4 of this Agreement, NASCAR Recipients may utilize Team Intellectual Property for the promotional and other similar purposes as set forth in this Agreement.

(c)    Subject to the terms of this Agreement (including, without limitation, the requirement that NEM pay to Team Owner the monies set forth on Exhibit B), Team Intellectual Property may be distributed within Live Transmissions of Events ("Live Transmission Activity").

(d)    Subject to the terms of the Agreement, NEM and its Affiliates may utilize and distribute Works (inclusive of Team Intellectual Property visible within the Works) in conducting Ancillary Activity. For purposes hereof, "Ancillary Activity" means (i) operation of the NASCAR.com business and any other NASCAR owned, operated or branded digital offerings via any platform now known or hereafter developed (e.g. NASCAR on YouTube), but in each case excluding Live Transmissions made pursuant to Live Transmission Contracts; (ii) the exploitation or license of any audio only content (including live audio telecasts of Events) to third parties; (iii) the licensing or distribution of Event content in any and all media, other than through Live Transmissions, including, without limitation, via the internet (other than delivery via closed-system internet protocol delivery of multi-channel linear programming services for in-home television signal reception (e.g., telephone MVPD service using internet protocol packet delivery)), mobile telephone/mobile data technology protocols, WAP, SAP, EVDO, VCAST, UMTS, WiMax, LTE and/or any other non television protocol/platform (i.e., any protocol or platform other than traditional linear standard or cable television or any multi-channel programming services provider (whether or not currently in existence) that provides a service substantially equivalent to linear cable television services as in effect on the Execution Date); (iv) non-fungible tokens (NFTs); (v) any other licensing or other exploitation of content that does not constitute a Live Transmission; (vi) production, distribution, sale or license of feeds of, or rights to, the Events for Live Transmission (or, for geographies in different time zones, first run delayed transmission) outside of the United States, its territories, possessions and commonwealths, plus Bermuda (for clarity, revenues from the Live Transmission rights within the United States, its territories, possessions, and commonwealths and Bermuda constitute Media Revenues); and (vii) maintenance of audio-visual footage and photographs generated during Events; and (viii) any other use or exploitation of the Works by NEM, affiliates or third parties other than Live Transmissions made pursuant to Live Transmission Contracts. For illustration and not limitation, Ancillary Activities include (v) the licensing or other exploitation of Event Data (excluding only Event Data rights granted pursuant to a Live Transmission Contract), (w) e-commerce activities, (x) licensing or other exploitation of content (other than Live Transmissions) on third party digital platforms (e.g., NASCAR highlight packages on Yahoo or in Apple TV archives), (y) the license of Works as part of fantasy games, video games or similar content offered on NASCAR platforms and/or third party platforms; and (z) simulated virtual reality versions of content and

22

[US-DOCS\147133351.4]]

HIGHLY CONFIDENTIAL - OCO

23XI_0004343

data feeds of content (e.g., Digital Dash content and NASCAR Race View), whether live or otherwise (excluding any rights granted pursuant to a Live Transmission Contract).

5.6    Retained Revenue.  NEM or its Affiliates shall be solely responsible for all costs associated with the production, creation, storage and/or exploitation of the Ancillary Rights and Works.  Therefore, NEM or its Affiliates shall be entitled to retain all revenues generated from the exploitation, license and/or use of the Ancillary Rights and/or Works.  If there is an opportunity that requires Team Intellectual Property in addition to the Team Intellectual Property that is present in the Works then such use of the Team Intellectual Property shall be governed by the New Business process in Section 5.14;

5.7    Advertising and Promotional Activities by Team Owner.  NEM, for itself and on behalf of each of its Affiliates, hereby grants to Team Owner a limited, non-exclusive, sub licensable license to use the "NASCAR" name and mark and the names and marks of the sponsors of NASCAR, NEM or their Affiliates (such as Goodyear and Sunoco) that are visible on the Designated Vehicle or uniforms of Team Owner, Control Person, Driver, crew or the Team Affiliates as seen at track during any Event solely in connection with the display of images of the Designated Vehicle or such uniforms, (including still photography captured by Event-credentialed photographers in connection with the Event that features the Team and Designated Vehicle) in any freely distributed medium (including print, broadcasts by and through television, cable television, radio, satellite signal, digital signal, transmissions over the Internet, and public online services) for sponsorship, endorsement, promotions or advertising activities of Team Owner, Control Person, Driver or their Affiliates, and to promote the Events and other news reporting, provided that (x) no such use shall enhance, enlarge, or otherwise alter the "NASCAR" name or mark, (y) the foregoing does not grant to any Person any right for (or to authorize) the use or endorsement of the "NASCAR" name or mark in such a way as to create or imply NASCAR's endorsement of any third party brand, product or service without NEM's express consent, and (z) all photographers shall be subject to NEM or its Affiliate's standard photographer and media licensing/credentialing process.

5.8    Team Websites.  Subject to a separate agreement with NEM's Affiliate to be mutually agreed by Team Owner and such Affiliate in good faith, Team Owner agrees to exclusively host the Team-specific website on the official NASCAR website and app platform, which services shall be provided at no cost to Team Owner.  Team Owner or its designee shall be solely responsible for (at its sole cost), and have sole control of, the daily operation of and content publishing on such Team-specific website located on NEM's Affiliate's platform.  Team Owner and NEM or NEM's Affiliate shall mutually and in good faith agree upon minimum content standards, minimum content posting and engagement minimums for the season for the Team-specific website.  Such Team-specific website engagement and content can be produced, programmed at captured through Team or NEM's Affiliate, with access facilitated by Team, the specific terms of which shall be mutually agreed upon in the separate agreement referenced herein.  NEM's Affiliate and Team shall coordinate sponsorship opportunities appearing on the NASCAR-hosted Team-specific website to, among other things, avoid sponsor conflicts and remain in compliance with Team contracts. Team Owner shall cooperate in bringing Driver websites onto the NEM official website and app platform at no additional fee to Team.   If however, the Team Owner does not have the authority to provide such Driver rights and there is a required fee payable to Driver , then NEM will be solely responsible for such fee.

5.9    Entertainment Program.  Team Owner agrees that NEM or its designated Affiliate shall have the right to produce, sell or license (or engage in any action in connection with the foregoing) any program or series that includes more than four (4) NASCAR Cup Series Competitors.  If NEM is trying to sell or license a program or series about the sport in general (e.g., playoff show or Race For the Championship) then Team Owner grants NEM or its designated Affiliate the non-exclusive, transferable

23

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO                                                    23XI_0004344

right to: (i) use the Team Intellectual Property as seen in-context in footage at the Event, Team race shop or otherwise; and (ii) reasonable access to Team race shop and employees of Team Owner and Owners for filming for the program, including, without limitation, the right to mic and collect audio footage from Driver and team members at Events. NEM (or its applicable Affiliate) shall use commercially reasonable efforts to obtain customary liability releases for Team Owner with respect to any such program or series. NEM and Team Owner shall coordinate in good faith to mitigate the risks of Team sponsor conflicts. Any exclusivity around the foregoing rights shall be subject to Team Owner's prior written (e-mail shall suffice) approval, not to be unreasonably withheld, conditioned or delayed. Each of the parties hereto shall regularly communicate with the other party (or its designee) regarding entertainment programming or content opportunities being pitched or pursued by such party.

5.10    NASCAR Fan Rewards Support.    Team Owner agrees to use commercially reasonable efforts to cooperate with the NEM Affiliate that licenses and operates the NASCAR Fan Rewards to determine a plan to better integrate Team into the NASCAR Fan Rewards program and collaborate to create custom exposure and engagement opportunities. Additionally, to the extent permitted by the NASCAR Fan Rewards terms and conditions, the NEM Affiliate will use commercially reasonable efforts to share non-identifiable first party data as set forth in Section 5.11 below.

5.11    Motorsports Consumer Data Platform.    Subject to applicable law and contractual obligations, Team agrees to add existing Team database information and any future Team consumer data capture into the Motorsports Consumer Data Platform (MCDP). For purposes of clarity, no consumer personally identifiable information is shared across MCDP participants but helpful trends and habits can be aggregated based on the information, and this aggregated de-identified information can be shared across MCDP participants. Team will have the same access to the MCDP as all MCDP participants other than the MCDP administrator.

5.12    Driver Ambassador Program.    Team Owner agrees to cooperate in good faith with NEM regarding the Driver Ambassador Program and to cooperate in good faith on a reasonable basis to make the best use of the Driver's time to maximize exposure for the sport. NEM acknowledges and agrees that Driver shall not be obligated to participate if there is a Team Owner category conflict associated with the opportunity. NEM will work with Team Owner regarding the scheduling of such opportunities. NEM represents and warrants that all monies deducted from Media Revenues for the Driver Ambassador Program shall be used solely for the program. NEM acknowledges and agrees that if the Driver Ambassador Program amount is reduced or if the Driver Ambassador Program is discontinued at any time during the Term by NEM, in its sole discretion, and such discontinuation is not as a result of the Team not supporting the program, then the amount of the reduction of monies or the monies previously allocated to the Driver Ambassador Program, as applicable, shall be added back on a pro rata basis between NEM and Team Owner(s) and NEM will distribute an amended Exhibit B.

5.13    Industry Support.    Team will cooperate in good faith with NEM and NEM Affiliates to provide commercially reasonable support to promote event, engagement and growth in interest among new fan audiences, including without limitation, non-revenue generating activities to grow the sport.

5.14    New Business.    "New Business" shall mean new revenue opportunities that include both a license to (A) collective (i.e., 4 or more Competitors) Team Intellectual Property or Other Team intellectual property; and (B) NASCAR name and/or mark and/or Promoter name and/or mark. Notwithstanding the foregoing, New Business does not include Ancillary Rights, Driver Ambassador Program(s), Other Awards, Live Transmission, Events or any Event promotional rights already granted to NASCAR and/or promoter consistent with current practices. A committee will be formed jointly by three (3) Competitors selected by

24

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                    23XI_0004345

Charter Members and NEM to explore the sourcing of New Business. Both Team and NASCAR commit to use commercially reasonable efforts (at no cost to Team or Competitor) to: (i) generate and source viable New Business opportunities; and (ii) bring appropriate New Business opportunities to the committee and/or Team early in the opportunity development phase to ensure collaboration and alignment, subject, in each case of clauses (i) and (ii), to existing contractual obligations to sponsors and other third parties that may limit these efforts which must be disclosed to NEM early in the process. Examples of New Business may include use of both NASCAR and Team Intellectual Property together in connection with gaming, content projects, new technologies and other new ventures related to the NASCAR Cup Series.

(a)     Any new business opportunity, including (i) the definitive terms governing such new business opportunity, (ii) the allocation of net revenue with respect to Team Owners and NEM, respectively, resulting from such New Business opportunity and (iii) the method of calculating (and ultimate definition and calculation of) net revenue thereunder, requires the approval of both (x) NEM and (y) a majority of the Competitors on the New Business committee. Allocation of any such net revenue among the Competitors shall also be determined through the vote of a majority of the Competitors on the New Business committee.

(b)     In the event that Driver(s) rights are required to pursue the opportunity which includes Team Intellectual Property, Team shall grant any necessary rights to Driver in uniform and Team will use commercially reasonable efforts to deliver any other necessary rights of the Driver(s) for the applicable agreement, subject in each case to existing contractual obligations and applicable law.  In the event that the Team Owner is unable to grant the necessary rights of the Driver for such opportunity, then NEM or its Affiliates shall be permitted to obtain such rights directly from the Driver.

(c)     Team (if Team is participating in the New Business opportunity) will have transparency into the underlying structure of the agreement, and calculations of net revenue.

(d)     Team Owner shall not have a right to opt out of the New Business and accordingly shall participate in such New Business if it has been approved pursuant to clause (a) above unless: (i) there is a direct conflict with a current Team Owner partner or sponsor who Team Owner has a contractual relationship at the time such New Business was presented; (ii) Team Owner has signed a term sheet for an upcoming partnership or can show evidence of current conversations which would put the Team Owner in direct conflict if the agreement was completed; or (iii) the New Business opportunity includes a product, service or counterparty that is associated with entities or causes inconsistent with the image and integrity of the Team, its Drivers or its sponsors, as determined in Team's reasonable and good faith discretion.  The parties will execute a statement of work specific to the New Business which would allow NEM or its Affiliates the right to sublicense the Team Intellectual Property for purposes of the New Business.  Nothing herein shall prevent Team Owner or NEM or its Affiliates from pursuing any individual sponsorship, licensing or other commercial agreements which do not use the other party's intellectual property.

6     Team Owner Obligations.

6.1     Operating Obligations.  At all times during the Term, the Team Owner shall, subject to Force Majeure Events, use commercially reasonable efforts to conduct all of the day-to-day operating and administrative functions reasonably necessary for the first-class operation of a stock car racing team and such team's participation in the Cup Series, while using commercially reasonable efforts to maintain continuity of race vehicle, assets, equipment, personnel, crew chief, crew members and shop address/location, and shall disclose Team members and other information as required in Schedule 1, and shall update as necessary to make accurate or up to date upon the written request by NEM.  In addition, Team Owner and the Control Person shall, subject to Section 6.5, execute all other documents and forms

25

reasonably required by NEM or its Affiliates for participation in the Cup Series, including a Competition Membership and License Application form for the Cup Series, in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules, provided, that in the event of any conflict or inconsistency with such documents or forms entered into by the Team Owner, Control Person or any Team Affiliate with the subject matter set forth in Section 3.1(a), 3.1(b), 4, 5, or 6 of this Agreement, such applicable Section(s) of this Agreement shall control.

6.2    Competition.  The Team Owner shall, subject to Force Majeure Events:

6.2.1    use best efforts to provide and deliver the Designated Vehicle, with Driver, crew chief and pit crew to compete in each Event and any practice, qualifying or testing events or sessions as and when scheduled by NEM or its Affiliates;

6.2.2    use its best efforts to start, race, and finish at the highest possible level in each Event, including up to two Invitational Events per Year, with winnings for such Invitational Events not less than historic levels as set forth in Exhibit B hereto, including using commercially reasonable efforts to race for the entire advertised Event distance as outlined in the official entry blank, unless (i) NASCAR, in its discretion, has determined that such Event is complete pursuant to the NASCAR Rule Book; or (ii) the Designated Vehicle is involved in an accident or incident during such Event that renders the Designated Vehicle unable to race further in such Event, provided that such inability to race further in such Event is validated by the Senior Vice President of Competition or NASCAR Managing Director, Cup Series, or his/her designee, officiating at such Event, whose decision in this respect will be final.  In the event that Team Owner fails to start in any Event in accordance with this Section 6.2.2 for any reason or no reason (e.g. logistics, economics, safety etc.) NEM shall have the right to replace such Team Owner's vehicle in the starting field for that particular Event with a vehicle and racing team that is party to an open team agreement (even if such open team is maintained by a Charter Member or otherwise Affiliated with a Person that is party to a Charter Member Agreement) selected by NEM.  If such circumstances shall arise, the Control Person and the Team Owner waive all rights and remedies they may have arising from such replacement of NEM's selection including injunctive relief.

6.3    Designated Sponsor and Competitor Branding.  Team Owner shall cause the Driver, crew members and the Designated Vehicle, at all times for every Event in which Team Owner participates, to adhere to and display the designated branding requirements as shown in the attached Exhibit D, as such requirements may be reasonably modified or supplemented by NEM from time to time during the Term upon reasonable advance written notice to Team Owner, and subject to the terms hereof in the case of the designation by NEM of sponsors in Reserved Sponsor Categories and provided that such modification or supplementation does not diminish the space or location of branding available to Team Owner for its sponsors available as of the Execution Date.  NEM may continue to include, for any of its Fuel Sponsors (including the corner panel and fuel port decal), Tire Sponsors and Series Sponsors in the Reserved Sponsor Categories, space decals on the Designated Vehicle of the same size and placement that exist as of the Execution Date (provided that in the event of a bi-furcated Series Sponsor pursuant to Section 6.9.3, the Series Sponsor may only display such space decal during its respective exclusive portion of the Season).  Subject to the terms of this Agreement, the Team Owner shall and shall cause its controlled Affiliates to abide by the provisions in the NASCAR Rule Book regarding advertising and related promotional restrictions as set forth in Section 20.4.19 relating to "Decals and Advertising" as in effect on the Execution Date and amended or supplemented in accordance with the terms of this Agreement.  The Team Owner understands and agrees that NEM may refuse to permit, or it may restrict or assign the size or placement of decals, identification, and advertising of any kind on the Designated Vehicle, or the Driver's uniform ("Car/Driver Sponsor Advertising"), that is reasonably in the best collective interests of NEM and

26

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

23XI_0004347

all of the Team Owner and other Charter Members, provided that, nothing herein shall limit the Control Person, Team Owner or any Team Affiliate from maintaining and complying with an agreement with a sponsor for Car/Driver Sponsor Advertising that was permitted by NEM at any time during the previous three (3) racing seasons; provided further, that, notwithstanding the foregoing, if NEM raises reasonable concerns that a sponsor's brand has become tarnished by controversy, crisis or circumstance such that its association with Team or NEM would damage the NASCAR brand or image of the sport, or violate the broadcast standards of partners under Live Transmission Contracts or damage their ability to sell advertising within Event telecasts, or if the category in question has been disallowed as a sponsor by NEM acting in good faith, then NEM and Team Owner will discuss such concerns and cooperate in good faith to reach a mutually agreeable solution.

6.4     Driver Agreement.  For each Year of the Term, the Team Owner shall (or shall cause an Affiliate to) be responsible for retaining the services of an eligible Driver(s) to race in each Event using the Designated Vehicle.  The Team Owner shall cause any Driver providing services to the Team Owner during the Term to execute (including upon execution of this Agreement) and deliver a Driver Agreement in the form attached hereto as Exhibit I, and will use commercially reasonable efforts to cause the Driver to enter into such amendments thereto as NEM may reasonably require from time to time and which are not in conflict with this Agreement (the "Driver Agreement"), it being understood that no amendments or modifications will be made by NEM to the Exhibits of the Driver Agreement if such amendments or modifications would be in conflict with, or otherwise inconsistent with, the corresponding terms and provisions of this Agreement.  In addition, Team Owner shall cause Driver to execute all other documents and forms reasonably required by NEM or its Affiliates for participation in the Cup Series including a Competition Membership and License Application form for the Cup Series in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules.  Upon expiration or termination of the Driver Agreement or upon injury or approved absence of Driver requiring substitution of an alternate eligible Driver, the Team Owner shall deliver to NEM an executed Driver Agreement as outlined above for such Driver such that at all times during the Term the Team Owner's Driver has executed and delivered a Driver Agreement.  In the event of any conflict or inconsistency between the Driver Agreement and the agreement for driver services between Team Owner and Driver, the Driver Agreement shall control.

6.5     NASCAR Rules.  Subject to the terms of this Agreement, including Sections 3.5 and 3.6 hereof, the Team Owner and the Control Person acknowledge and agree that NASCAR and its Affiliates shall have the sole and exclusive right to amend and supplement the NASCAR Rules from time to time in their sole and absolute discretion, provided that (i) no such amendment or supplement shall abrogate or modify the terms of this Agreement or the rights granted to Team Owner or Control Person hereunder; (ii) in the event of any conflict or inconsistency between this Agreement and NASCAR Rules, this Agreement shall govern; and (iii) NASCAR and its Affiliates shall at all times implement and administer such NASCAR Rules in good faith and not out of self-interest, and in seeking to further the best interests of the sport.   Subject to the immediately preceding sentence, the Team Owner and the Control Person acknowledge and agree that they shall be bound by, and shall comply with, each NASCAR Rule.  NEM is the sanctioning body of the Cup Series and shall (subject to the preceding clause (iii) and to any rights of appeal set forth in the NASCAR Rules) have sole authority to enforce the NASCAR Rules, implemented in accordance with the terms hereof, for purposes of exercising its sanctioning authority over all aspects of on-track-racing activity during the competition of any Events, including with respect to qualifications and eligibility to race in any Event, inspection process (pre and post-Race), race procedures and on track competition, it being understood and agreed that the implementation and enforcement by NEM of NASCAR Rules in accordance with the terms of this Agreement may have an adverse impact (including an adverse economic impact) on the Team Owner.

27

[US-DOCS\147133351.4]]

HIGHLY CONFIDENTIAL - OCO

23XI_0004348

6.6 <u>Protection Of Goodwill.</u> In recognition of (a) the substantial goodwill and expertise developed, and the significant investment, by NEM and its Affiliates with respect to automobile or truck motorsports racing, (b) the Confidential Information that will be shared by NEM with Team Owner and the Control Person pursuant to this Agreement and otherwise, (c) the harm that would result, including potential confusion in the marketplace, dilution of the rights granted to any Broadcast Partner, to NEM, its Affiliates and the Other Teams if the Team Owner or the Control Person were to use any of such goodwill, expertise or Confidential Information, or any of the benefits obtained by Team Owner or the Control Person under this Agreement or otherwise through their association with NASCAR, and (d) the need to ensure that all Charter Members use their reasonable best efforts, and devote all reasonable resources necessary, to start, race, and finish at the highest possible level in each Event to maintain and enhance the quality of Cup Series racing, at all times during the Term, each of the Team Owner, the Control Person shall not, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations shall not, race in or directly or indirectly own an equity ownership interest (or profits participation interest with attributes similar to equity) in any automobile or truck motorsports racing series that is held throughout the Territory except (i) any motorsports racing series that is sanctioned by NEM, NASCAR or any of their respective Affiliates (including without limitation IMSA, ARCA and the Whelen Modified Tour), (ii) Open Wheel Racing: any motorsport series currently configured as an open wheel racing series, including without limitation IndyCar, Indy Lights, F1, World of Outlaws or any open wheel series or similar and successor series, provided such series continue to operate primarily as an open wheel racing series in their current form and fashion; (iii) any participation in NHRA, Bandoleros, XR Racing, CARS Tour, Legends Series, Supercars, Global Rally Cross and or similar or successor series, provided such series continue to operate primarily in the same fashion or form, (iv) Private Events, (v) any other racing series that is created or formed after the Effective Date and approved by NEM, NASCAR or any of their respective Affiliates, and (vi) an "Exempt 10% Owner" which is defined as any 10% or more owner of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations (but, for clarity, not the Control Person or any Person under his or her direct or indirect control), if such 10% or more owner owns an equity ownership (or profits participation interest with attributes similar to equity) in any motorsports racing series throughout the Territory through an entity in which the 10% or more owner is a limited investor and does not receive material non-public information regarding racing competition in respect of such series or provide such series any material non-public information relating to NASCAR, the Team Owner, the Team or their respective operations (any such 10% owner described in this clause (vi) an Exempt 10% Owner). If NEM presents Team Owner with opportunities to participate in NASCAR sanctioned stock-car racing series or exhibition events outside of North America, Team Owner agrees to consider in good faith participating in any such series, which shall be separate from the New Business opportunities under <u>Section 5.15</u>. If Team Owner presents NEM with opportunities to sanction a stock car racing series outside of the Territory, then NEM agrees to consider in good faith sanctioning any such series.

This <u>Section 6.6</u> is a material part of the consideration for NEM.

6.7 <u>Injunctive Relief.</u> If, despite the harm that would be incurred by NASCAR, NEM, NASCAR Rights Affiliates and others, any Arbitration Panel construes any of the covenants in <u>Section 6.6</u> to be too broad, the Arbitration Panel shall have the authority to reduce the duration, Territory or scope of prohibited activities to the extent necessary so that the provision is enforceable (and the provision, as reduced, shall then be enforced).

28

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004349

6.8     Sponsor Exclusivity.  NEM has agreed, pursuant to Section 3.1(c), to use commercially reasonable efforts to sell certain exclusive sponsorship rights in the Reserved Sponsor Categories.  At all times during the Term, Team Owner shall comply with, and shall cause its controlled Affiliates to comply with any, exclusivity reasonably required by the agreements relating to such Reserved Sponsor Categories, including any reasonable promotional requirements relating to the Designated Vehicle or any uniform, and any other reasonable restrictions necessary to protect the exclusivity granted in such Reserved Sponsor Categories (but subject, in the event of a change in the Series Sponsor Category or the appointment of multiple Series Sponsors in any Year, to the provisions in Section 6.9).  The Series Sponsor Category may change from time to time during the Term, and NEM will notify the Team Owner in writing of any change in the exclusivity, promotional requirements or other restrictions relating to the Series Sponsor Category prior to January 1 of the applicable Year (or such later date if, in NEM's good faith judgment, January 1 is not practicable).  The other Reserved Sponsor Categories may not expand in nature or scope during the Term (but, for clarity, are permitted to contract or be further limited).  The Reserved Sponsor Categories as of the Execution Date are described in Exhibit C.

6.9     Series Sponsor Exclusivity.

6.9.1     Series Sponsor Exclusivity.  At all times during the Term when an agreement relating to a Series Sponsor is in effect, but subject to this Section 6.9 and subject to written agreements Team Owner may have with NEM or its Affiliates in existence on the Effective Date, the Team Owner and the Control Person shall not, and Team Owner shall cause each Team Affiliate not to, when participating in any Event or in any advertising or promotion that uses the name, image or likeness of Team Owner, Control Person, or any Team Affiliate, or that is based on such Team Owner's, Control Person's or any Team Affiliate's participation in the Cup Series (unless otherwise expressly authorized in writing by NEM), use or display in any commercialized or sponsored manner any product, brand, logo, trademark or service identification of any Person in any Series Sponsor Category anywhere by such Person, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, the Team's equipment or haulers or anywhere in Victory Lane; provided that, if, following the date of this Agreement, NEM modifies the Series Sponsor Category or enters into an agreement with a new Series Sponsor(s) (each, a "Series Sponsor Change") and the Team Owner, Control Person or any Team Affiliate is then a party to a written contract with a sponsor with respect to any branding and related rights that have been granted to such sponsor via such written contract prior to the Series Sponsor Change (each, together with any permitted successors thereto (as such permission is determined pursuant to the applicable agreement with such sponsor), a "Qualifying Sponsor") that would breach the exclusivities granted by NEM within such new Series Sponsor Category (or Series Sponsor Categories) (each, an "Exclusivity Breach"), the Team Owner, Control Person or any Team Affiliate shall have the right to maintain and comply with such Qualifying Sponsor's agreement (or agreements) in accordance with Section 6.9.2 below (and, for clarity, only the exceptions set forth in Section 6.9.2 are permitted).  Subject to compliance with this Section 6.9, the Team Owner acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of any product, brand, logo, trademark or service identification of a Person in any Series Sponsor Category, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers.

6.9.2     Single Series Sponsor.  As of the Execution Date, NEM has a number of premier partner sponsors and does not have a Series Sponsor.  However, NEM may, in its sole discretion, elect to enter into an Agreement for a Series Sponsor at any time during the Term.  In any Year in which NEM elects to enter into an Agreement for a Series Sponsor and effectuates a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, any Team Owner, Control Person or any Team Affiliate that

29

||US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004350

would be in an Exclusivity Breach with respect to any branding that has been granted to a Qualifying Sponsor on the Designated Vehicle, Driver, crew members, Cup Series uniforms, hauler, or other similar assets that are visible to the general public at any Event (the "At Event Assets"), such Qualifying Sponsor branding for the At Event Assets shall be permitted during the Term solely at the visibility or participation level pursuant to and set forth in the then-current agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for At Event Assets shall not be increased, other the any increases already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to such levels (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would be limited to the deck lid without any other increases; if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events, or if such Qualifying Sponsor branding was permitted on crash carts and haulers but was not on the Designated Vehicle then such branding would be restricted to such crash carts or haulers etc.), provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any At Event Asset, the exclusivity exceptions set forth in this Section 6.9(b) shall be permitted at the highest level of branding that was granted at any time pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the Term, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this Section 6.9.2 shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination and shall otherwise comply with Section 6.9.1 without exception except for exceptions applicable to the non-terminated contract, if any (e.g., if a Driver has a personal services agreement with a Qualifying Sponsor of Team Owner, the termination of the personal services agreement will not require the Team Owner, Control Person or any Team Affiliate (as applicable) to comply with Section 6.9.1 without exception in the event that they have non-terminated contracts which are permitted hereunder and remain in effect), and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding for the At Event Assets, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions for any At Event Assets set forth in this Section 6.9.2. During any Year in which NEM effectuated a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, such exclusivity granted to any Series Sponsor shall extend to off-track activation in accordance with Section 6.9.1 provided that if any Team Owner, Control Person or any Team Affiliate would be in an Exclusivity Breach with respect to any off-track activation that has been granted to a Qualifying Sponsor via such written contract, then such Qualifying Sponsor may continue marketing off-track throughout the Year, in accordance with the restrictions set forth in the foregoing sentence, even though such marketing may conflict with the current conflicting Series Sponsor Category.

6.9.3 <u>Bi-Furcated Series Sponsors.</u> During any Year in which NEM effectuated a Series Sponsor Change such that agreements with two (2) Series Sponsors are then in effect (i.e., each Series Sponsor has rights to a different continuous portion of the Season), each Series Sponsor shall only be afforded exclusivity in such applicable Series Sponsor Category as provided in Section 6.9.1 with respect to the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row (and, for clarity, not with respect to other equipment or haulers) and solely during the portion of the Season that NEM or its Affiliates have granted such Series Sponsor

30

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                                    23XI_0004351

exclusivity, which must correspond with a portion of the Season for which one of NASCAR's then principal Live Transmission Broadcast Partners has Event live telecast rights (e.g., as of the Execution Date, a Series Sponsor that corresponds to FOX for the first portion of the Season and another Series Sponsor that corresponds to NBC for the second portion of the Season). In addition to the foregoing sentence, if any Team Owner, Control Person or Team Affiliate would be in an Exclusivity Breach with any Qualifying Sponsor during the applicable portion of the Season, such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row shall be permitted solely at the visibility or participation level pursuant to and set forth in the then-current written agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season shall not be increased, other than any increases during such portion of the Season already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to increase such levels of such agreement with such Qualifying Sponsor (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would limited to the deck lid during such portion of the Season without any other increases or if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events during such portion of the Season) provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season, the exclusivity exceptions set forth in this Section 6.9.3 shall be permitted at the highest level of branding that was granted pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the then-current term of such agreement, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this Section 6.9.3 shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination, and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions set forth in this Section 6.9.3. For clarity, any exclusivity granted to any bi-furcated Series Sponsor in accordance with this Section 6.9.3 shall not extend to off-track activation (e.g., any Team sponsor may continue marketing not at the track throughout the Term even though such marketing may conflict with the current conflicting Series Sponsor Category) and the Series Sponsor's off-track activation shall be limited to collective uses made pursuant to Section 5.3.

      6.10    <u>Tire Sponsor Exclusivity.</u> The Team Owner, on behalf of the Team Affiliates, agrees that when participating in any Event, unless otherwise expressly authorized in writing by NEM, no product, brand, logo, trademark or service identification of any Person in the Tire Category (other than the Tire Sponsor) as defined in <u>Exhibit C</u>, will be used or displayed anywhere by such Team Affiliate during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers. The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate, including the Driver, may advertise or promote a product, brand, logo, trademark or service

31

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

identification of any Person in the Tire Category as defined in Exhibit C, whether in conjunction with an Event or not, if such advertising or promotion includes a NASCAR racing (e.g., Driver, crew member) suit, whether worn by such Team Affiliate or not, and/or a NASCAR racing vehicle. The Team Owner, on behalf of the Team Affiliates, acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of a product, brand, logo, trademark or service identification of any Person in the Tire Category by any Team Owner Party during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers. Notwithstanding the foregoing, actual use of tires other than those made by the Tire Sponsor on Team equipment other than the Designated Vehicle (e.g., pit carts and haulers) shall not be considered a breach of the provisions set forth in this paragraph. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Tire Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to tires, on the same financial terms, as other Competitors by Tire Sponsor.

6.11    Fuel Sponsor Exclusivity. The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate will participate in any sponsorship, licensing, or personal appearances with a company in the Fuel Category (other than the Fuel Sponsor) as it relates to Cup Series racing either in or out of uniform other than as provided herein. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Fuel Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Fuel Sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Fuel Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to fuel, on the same financial terms, as other Competitors by Fuel Sponsor.

6.12    Minimum Performance Standards. The Events represent the highest caliber of racing in motorsports. The "Minimum Performance Standards" require that Team Owner comply with the following standards each Season during the Term of the Agreement: 1) purchase the lesser of either ninety percent (90%) of tire allotments or the equivalent percent of the Event tire allotment minus one set for each race; 2) Fill at least ninety percent (90%) of the road and pit crew roster allocations for each Race; 3) Use three (3) or less drivers during each Season unless approved by NASCAR in advance (i.e. playoff waiver granted, medical, suspension, etc.) and 4) qualify within at least one hundred and seven percent (107%) of the fastest time in each Event session of practice on average on a rolling basis across the previous three (3) Races in which Team Owner participates (crashes, other on-track incidents, adverse weather or track conditions and disqualifications during qualifying would be excluded). Upon any failure by Team Owner to meet the Minimum Performance Standards, NEM will issue a notice of the failure to meet the Minimum Performance Standard (a "MPS Notice") to Team Owner, specifying the specific standard(s) which Team Owner has failed to satisfy and the material facts of such failure. Upon the second MPS Notice, NEM may elect to retain up to Twenty-Five Thousand ($25,000.00) US Dollars from Team Owner's Pool Money. Upon the third MPS Notice and for each MPS Notice thereafter, NEM may elect to retain up to Fifty Thousand ($50,000.00) US Dollars from Team Owner's Pool Money. Upon the fourth MPS Notice and for each MPS Notice thereafter, NEM may elect to retain up to One Hundred Thousand ($100,000.00) US Dollars from Team Owner's Pool Money or such remedies as set forth in Section 9.1.6. For avoidance of doubt, nothing in this Section 6.12 is intended to affect or relieve other Team Owner obligations as set forth in this

32

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004353

Agreement. NEM may temporarily waive compliance with the Minimum Performance Standards in its sole discretion.

6.13 <u>Media/Promotional Obligations.</u> Team Owner and Control Person shall perform and Team Owner shall cause the Driver to perform, as applicable, the following media and promotional obligations:

6.13.1 <u>Victory Lane Media Obligations of Team Owner//Control Person:</u> Immediately following the race conclusion of each Event, as reasonably required by NEM, the winning Team Owner and Control Person if present at the particular Event shall proceed to victory lane for post-race interviews. Subject to the last sentence of this <u>Section 6.13.1</u>, the Team Owner and Control Person of each Event won during the Term agree to permit a display of one item from Series Sponsor, one item from the applicable Event entitlement sponsor so long as such Event entitlement sponsor does not conflict with a Team sponsor, and items from the Team's sponsors on the Designated Vehicle in victory lane so long as such Team sponsors do not conflict with the Series Sponsor Category. Subject to the last sentence of this Section <u>6.13.1</u>, the size, location and weight of such item(s) shall be approved by NEM and all items shall be subject to the exclusivity of the Reserved Sponsor Categories. Team Owner and Control Person understand that members of the winning team will be required to take photographs with the Event entitlement sponsor and its guests. Post-race ceremonies will conclude once all reasonable sponsor photos, individual photos and media requirements in victory lane have been completed. Notwithstanding the foregoing, if following the date of this Agreement NEM modifies the Series Sponsor Category and the Team Owner, Control Person or any Team Affiliate is a party to a written agreement with a Qualifying Sponsor that is a primary sponsor as of the date of such modification (subject to the applicable extensions solely in accordance with <u>Section 6.9.2</u>) that would be in an Exclusivity Breach with respect to the display of products of such Series Sponsor within the Series Sponsor Category in victory lane, the Team Owner shall not, during the period of exclusivity of the Series Sponsor within the Series Sponsor Category, (i) display the products of such Qualifying Sponsor and (ii) be required to display the products of such new Series Sponsor, in each of (i) and (ii), in victory lane (and none of the foregoing shall be deemed a breach of this Agreement or NASCAR Rules).

6.13.2 <u>Promotional Appearances.</u> As designated by NASCAR or NEM, Team Owner and Control Person agree to make commercially reasonable good faith efforts to participate in promotional activities and events surrounding the NASCAR Cup Series and NASCAR events. These events include but are not limited to, NASCAR Cup Series Champions Week, promotional events for the NASCAR Hall of Fame and/or NASCAR's Season launch activities leading up to the Daytona 500 Event. If the Team Owner qualifies for the playoffs for the NASCAR Cup, Team Owner agrees to make commercially reasonable good faith efforts to attend the NASCAR Cup Series Awards banquet including all season-ending special awards ceremonies and events at times and locations designated by NASCAR. NASCAR will provide reasonable notice of the ceremony and event schedules Team Owner, and Team Owner will take reasonable steps to coordinate his or her availability in accordance with such event schedules, and will provide reasonable advance notice to NASCAR of any potential schedule conflicts.

6.13.3 <u>Victory Tour Media Obligations of Team Owner/Driver.</u> Team Owner shall cause the Driver to appear and attend the Victory Tour media obligations as outlined in the Driver Agreement, but in no event will NEM require more than thirty-six (36) Victory Tour media obligations in a Season in total among all drivers of Competitors having Victory Tour media obligations or more than two (2) victory tour media obligation from any individual driver in a Season. Team Owner shall work in good faith with NASCAR, NEM and the applicable race Promoter to coordinate scheduling of such appearances. Any and all actual, reasonable, and documented travel costs associated with the Driver's Victory Tour obligations

33

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

23XI_0004354

shall be at the expense of Team Owner. All other actual, reasonable, and documented travel costs associated with all other appearances requested by NEM shall be at NEM's expense.

6.14    Team Sponsors. Prior to the first Event of each Year, Team Owner shall provide all Team sponsors with access to a copy of the NASCAR Rule Book and use good faith efforts to make all Team sponsors aware of all of the applicable provisions therein.

7    Cost Cap Model.

7.1    Feasibility. NASCAR and Team Owners commit to collectively explore the feasibility of a cost cap structure and solicit feedback from all NASCAR Cup Series teams, with the intent of developing a complete framework. Once a framework is finalized, in NASCAR's sole discretion, NASCAR will implement the cost cap structure.

7.2    Soft Launch. Recognizing the complexity and significance of introducing a cost cap model, following the feasibility assessment set forth above, NASCAR will outline the period for the soft launch of the cost cap. During this soft launch, the parties shall collaboratively implement the proposed cost cap model in a trial setting to facilitate accurate accounting practices and assess potential impacts on Team operations. This period shall serve as a foundational phase for adjustments before formal enforcement.

7.3    Implementation. Following the soft launch period, and subject to a review of its outcomes by NEM and after consultation with the Team Owners, NEM will determine whether to implement a cost cap model. If instituted, the Cost cap shall commence at the start of the year following the conclusion of the soft launch. Any documented and incurred costs for implementing a cost cap (currently estimated at $5 million per year) shall be deducted from the Media Revenues prior to payment to the Teams and NEM will provide an amended Exhibit B to account for such costs at the time of implementation.

8    Transferability/Charter Limitation.

8.1    Transfer.

8.1.1    Team Owner represents and warrants that, as of the date of this Agreement, Schedule 2 sets forth each Owner and that Team Owner shall cause all such Owners (including future Owners) to comply with the Terms of this Agreement, including without limitation this Section 8. Team Owner shall submit an updated Schedule 2 at least annually. Additionally, each direct or indirect owner of 10% or more of the equity in Team Owner (each, a "Substantial Owner"). In the event that there is a change in the identity of one or more Owners (whether because of a Transfer of ownership, the issuance of additional equity interests or otherwise), then Team Owner shall provide written notice of such event to NEM within thirty (30) days following such change (provided that an inadvertent failure to timely provide such notice shall not constitute a breach hereunder if such failure is timely cured), which notice shall include the identity of all Owners (including the new Substantial Owners) in an updated Schedule 2. In addition, Team Owner represents and warrants that Schedule 1 sets forth the identity of the Control Person and the Designated Team Representative as of the date of this Agreement, and Team Owner agrees that it shall inform NEM promptly upon any change in the identity of such Control Person (subject to the terms of this Section 8.1) or Designated Team Representative.

8.1.2    Subject to the terms hereof, neither the Team Owner nor any Substantial Owner may at any time:

34

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

23XI_0004355

8.1.2.1 in the case of the Team Owner, Transfer any of its rights or delegate any of its duties under this Agreement (either by outright Transfer, license, management contract or otherwise); or

8.1.2.2 Transfer any direct or indirect equity interest in the Team Owner that would result in (a) the Control Person no longer owning a Controlling Interest in, and at least 30% of the direct or indirect equity of, the Team Owner or (b) any person that was not previously a Substantial Owner of the Team Owner becoming a Substantial Owner; unless, with respect to each of Sections 8.1.2.1 and 8.1.2.2, as applicable, each of the following conditions has been satisfied (or waived by NEM in its sole discretion): (1) the Team Owner provides advance written notice to NEM of such Transfer (a "Transfer Notice"), which notice shall include the identity of the successor Team Owner, transferee Control Person or transferee Substantial Owner, as the case may be, a brief description of the transaction, a copy of a completed ownership application in a form customary for major U.S. sports leagues (including all supplementary information requests, financial disclosures including the incurrence of any debt secured by the Team, Team Owner or by Team or Team Owner interests, and authorization to complete background checks), a copy of the transfer/sale documents effectuating such Transfer which includes the sources and comprehensive details of all consideration exchanged for such interest, and certification from such successor Team Owner, transferee Control Person or transferee Substantial Owner that he, she or it is not a Prohibited Person and which shall include as an annex thereto the Transfer Approval Form attached hereto as Exhibit H (the "Transfer Approval Form"), and Team Owner and its applicable Control Person and/or Substantial Owners shall fully comply with all reasonable information and due diligence requests of NEM in connection with any of the foregoing (2) NEM shall have approved such Transfer in accordance with the process described in Section 8.1.3 below, it being understood and agreed that if NEM does not object in writing to such Transfer within fifteen (15) Business Days following its receipt of the Transfer Notice from Team Owner, then NEM shall be deemed to have approved such Transfer, (3) the Transfer does not require the successor Team Owner or transferee (or its affiliated Owners) to incur an amount of debt financing that is greater than forty percent (40%) of the consideration exchanged for such interest and (4) the Transfer would not result in the Team Owner, Control Person or any Owner being in breach of Section 8.2 or Section 8.3 upon the consummation of such Transfer, and (5) if such Transfer results in the Control Person no longer owning a Controlling Interest in, and at least 30% of the direct or indirect equity of, the Team Owner, the successor Control Person must own, directly or indirectly (and together with such Control Person's family and estate planning vehicles that are controlled by Control Person), at least a 30% equity interest in the Team Owner and must execute and deliver to NEM a joinder to this Agreement agreeing to be bound by the terms hereof applicable to Control Person and to assume all of the transferor Control Person's obligations under this Agreement (in which case, upon execution and delivery of such joinder, Control Person shall be relieved of its obligations under this Agreement), (6) in the case of a Transfer under clause (i) above, the successor Team Owner must execute and deliver to NEM a joinder to this Agreement agreeing to be bound by the terms hereof applicable to Team Owner and to assume all of the transferor Team Owner's obligations under this Agreement (in which case, upon execution and delivery of such joinder and a customary release and indemnity for the benefit of NEM with respect to the applicable Transfer, Team Owner shall be relieved of its obligations under this Agreement) and (7) after giving effect to such Transfer, Team Owner shall have no more than twenty (20) Owners (provided, that for purposes of such determination, NEM may, at its sole discretion, attribute to an Owner the interests held by such Owner's Family Relatives). In addition to the foregoing requirements, if a transfer by a Control Person would result in the Control Person no longer owning a Controlling Interest in, or at least 30% of the direct or indirect equity of, the Team Owner (a "Qualifying Transfer"), then upon (or prior to) consummation of such Qualifying Transfer, (x) the transferee Control Person will pay to NEM a transfer fee in the amount equal

35

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004356

to the greater of two percent (2%) of the gross consideration paid for such interest or Two Hundred and Fifty Thousand ($250,000.00) US Dollars (the "Transfer Fee") and (y) the Team Owner or Owner pays or causes the successor Team Owner or Owner to pay to NEM an amount equal to all unpaid amounts then due and owing by Team Owner (in the case of a Transfer under clause (i) above) or Control Person (in the case of a Transfer under clause (ii) above) under this Agreement or NASCAR Rules at the time of such Transfer (provided that the Transfer Fee shall not be payable in connection with a Transfer described in Sections 8.1.4 or 8.1.5).

        8.1.3    Upon its receipt of a Transfer Notice, NEM shall (subject to the deemed approval provisions of Section 8.1.2 above) evaluate the Transfer as expeditiously as possible to determine whether or not to approve the Transfer. NEM shall provide its approval hereunder unless NEM reasonably and in good faith believes that the applicable transferee (or person directly or indirectly controlling such transferee) is (i) a Prohibited Person, (ii) a BMG or an Original Equipment Manufacturer ("OEM") or (iii) such Transfer would result in the Control Person (or any successor Control Person) being in breach of Section 8.3 or Section 9.1.2. The parties agree that the placing of a lien or encumbrance on the Team Owner's rights in respect of the Team and this Agreement shall not constitute a Transfer for purposes of this Agreement; provided, that (i) the Team Owner shall notify NEM promptly (no later than ten business days) following the granting of any such lien or encumbrance and shall inform its lenders of the restrictions placed on Transfers by Team Owner hereunder and (ii) the Team Owner shall (or shall cause the applicable grantee of such lien or encumbrance to) notify NEM of any foreclosure (or attempted foreclosure) under any such loan documents.

        8.1.4    Notwithstanding Section 8.1.2, but subject to Section 8.1.3, the Transfer Fee shall not apply to any Transfer effected pursuant to Section 3.4 or to any Transfer by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, to a successor Control Person that, as of the date of this Agreement, already owns (directly or indirectly) at least 10% of Team Owner, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement.

        8.1.5    Notwithstanding Section 8.1.2, the Transfer Fee shall not apply to any Transfer (whether directly or indirectly) by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, (i) to a Family Relative, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement, or (ii) upon the death of such Control Person, to the estate of such Control Person, it being understood that the fees contemplated in Section 8.1.2.2(y) shall also not apply in such case (provided that a Transfer of the Controlling Interest by such estate (except to a Family Relative of the Control Person, who, for clarity, shall remain subject to Section 8.1.8 shall be subject to the provisions of Section 8.1.2 and this Section 8.1.5 as applicable).

        8.1.6    Notwithstanding Section 8.1.2, the Team Owner and the Control Person may, subject to the prior written approval of NEM , lease, license or otherwise temporarily Transfer their respective rights under this Agreement to any third party, provided that such third party is not a Prohibited Person, on an interim, temporary basis for one (but no more than one) full race season during the Initial Term and/or for one (but no more than one) full race season during the Extension Term, provided that (x) NEM shall be provided with advance notice of such transfer and shall only provide its prior written approval

36

[US-DOCS\147133351.4]]

HIGHLY CONFIDENTIAL - OCO

23XI_0004357

if it determines, in its reasonable discretion, that such temporary Transfer is in the best interest of the sport and (y) in such event, as between NEM and Team Owner and the Control Person, the transferor Team Owner and its Control Person shall remain responsible to NEM for their respective obligations under this Agreement. Neither the Transfer Fee nor the fees described in Section 8.1.2.2 shall apply to such Transfer as described in this Section.

8.1.7    For clarity, any Transfer of the Team Owner's interest in this Agreement shall also effectively Transfer to the same transferee the car number, historical or championship points and any performance-related standards history outlined in <u>Section 6.12</u> associated with this Agreement.

8.1.8    If any time during the Term, NEM reasonably and in good faith believes that an Owner has become a Prohibited Person, NEM shall notify the Team Owner and the Control Person that NEM reasonably and in good faith believes that such Owner has become a Prohibited Person. If the Control Person disagrees with NEM's determination, then the parties shall discuss in good faith whether it is possible to address NEM's concerns. In the event that the parties are unable to resolve such disagreement within ten (10) Business Days of NEM's delivery of such notice, then either party may refer such dispute to Arbitration pursuant to <u>Section 11.2</u>, with the sole issue to be resolved in any such Arbitration being whether or not the Owner has become a Prohibited Person. In the event that (i) the parties mutually agree in writing the Owner has become a Prohibited Person or (ii) the Arbitrator makes a final and binding determination that the Owner has become Prohibited Person, then (x) in instances where such Owner is also the Control Person, the Owner may no longer be designated the Control Person hereunder or have the authority with respect to NASCAR Core Matters set forth in <u>Section 10.1.3</u> and Team Owner must designate a new Control Person (in which case such successor Control Person will have one hundred and eighty (180) days to come into compliance with the requirements of being a Control Person set forth in the definition thereof, including the 30% minimum equity requirement) and (y) such Owner shall be required to sell or divest any of its direct or indirect ownership interest in the Team Owner within 120 days and failure to divest of such interest shall be a breach of this Agreement.

8.1.9    During the Term, NEM shall (i) maintain the Transfer Approval Form(s) (set forth in <u>Exhibit I</u>) in respect of Transfers which have been approved (or deemed approved) hereunder in its principal office in Daytona Beach, Florida and (ii) make such Transfer Approval Form(s) available for inspection by the Control Person (or by any other Control Person of a then-current Charter Member) upon written request. In the event of such request by any Charter Member that was not a party to the Transfer that was subject to such Transfer Approval Form, notification of such request shall be provided to the Team Owner who was a party to such Transfer.

8.2    <u>Limitations On Transfers.</u>

8.2.1    Following any Transfer by the Team Owner or the Control Person made in accordance with <u>Section 8.1</u>, neither the Team Owner transferor nor the Control Person transferor, as applicable (nor any of their respective controlled Affiliates, as applicable), shall purchase or otherwise acquire any direct or indirect equity interest in any other Charter Member or any assignment or delegation of rights under any Competitor for the period of thirty-six (36) months following such Transfer.

8.2.1.1  The Team Owner and the Control Person may not Transfer, or permit to be Transferred, any direct or indirect equity interest in the Team Owner if such Transfer would result in the Control Person (or any successor Control Person) being in breach of <u>Section 9.1.2</u>.

8.3    <u>Charter Member Agreement Limitation.</u>  At all times and unless waived by NEM, neither the Team Owner nor any other Person shall own or otherwise acquire any direct or indirect interest in any

37

||US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                                23XI_0004358

Charter Member Agreement (including owning any direct or indirect ownership interest in, or exercising any control over, any other Competitor) if, after giving effect to such interest, the Team Owner or such other Person (as applicable), together with all of his, her or its Affiliates (including Family Relatives), would collectively have direct or indirect interest in more than three (3) Charter Member Agreements (including this Agreement). Notwithstanding the foregoing, nothing in this Section 8.3 shall in any way limit, modify, amend or supersede the affiliate group rule as set forth in the NASCAR Rulebook ("Multi Vehicle Teams" / "Affiliate Groups") as in effect on the Execution Date (but without regard to the provisions thereof to the applicable shared services, which, for clarity, shall not be applied to the sharing of information or equipment so long as such sharing of information or equipment is done at arm's length fair market value and without affecting any team's ability or desire to compete in NASCAR to the fullest extent of such team's capabilities) and, for clarity, NEM shall maintain all rights of inspection, investigation, enforcement or otherwise as set forth in such affiliate group rule set forth in the NASCAR Rulebook.

8.4    Transfers by NEM.  NEM may Transfer its interest in this Agreement in a transaction in which the transferee is acquiring all or substantially all of NEM's assets (an "NEM Permitted Transferee"), whether by way of merger, consolidation, sale of assets, acquisition of equity or otherwise, provided that (x) after giving effect to such Transfer, such NEM Permitted Transferee is an Affiliate of the entity or entities that own all or substantially all of the other NASCAR-related Cup Series assets and (y) Team Owner is provided with prior written notice of such Transfer.  Except as set forth in the preceding sentence, NEM shall not Transfer any of its rights or obligations under this Agreement to any Person without the prior written consent of Team Owner.  For clarity the parties agree that placing a lien or other encumbrance on NEM or any of its Affiliates or any of their respective rights under this Agreement shall not constitute a Transfer for purpose of this Section 8.4, provided that NEM shall (or shall cause the applicable grantee of such lien or encumbrance to) notify Team Owner of any foreclosure (or attempted foreclosure) under any such loan documents.

8.5    Publicly Traded Entities.  No Charter Member shall be an entity whose stock or other equity interest is listed, designated or quoted on a securities exchange or trading market.

8.6    Institutional Investors Policy.  At all times, Team Owner, the Control Person and the Owners must abide by the Institutional Investors Policy set forth on Exhibit G and shall not take any action or consummate any Transfer that would result in a breach of such Institutional Investors Policy.

9    Termination.

9.1    Team Owner Events of Default.  In addition to any other rights or remedies NEM may have, this Agreement may be terminated by NEM, by written notice to the Team Owner, upon the occurrence of one or more of the following (each, a "Team Owner Event of Default"):

9.1.1    subject to Sections 8.1.2, 8.1.3 and 13.10, (i) the Team Owner or Control Person breaches or fails to perform in any material respect any of its obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, or (ii) any of Team Owner or the Control Person's representations and warranties in this Agreement were materially untrue or incorrect when made on the Execution Date and which untruth or inaccuracy materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non compliance or untruth that is curable, the Team Owner effects a cure within thirty (30) days after receiving written notice of breach or default from NEM;

38

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004359

9.1.2    the Team Owner or the Control Person violates in any material respect <u>Sections 6.2, 6.3, 6.8, 6.9, 6.10, or 6.11</u> of this Agreement unless the Team Owner effects a cure within the earlier of the following time periods after receiving written notice of breach or default from NEM (i) forty eight (48) hours and (ii) the start of the next Event;

9.1.3    the Team Owner dissolves the Team Owner's or the business of the Team that is the subject of this Agreement or substantially ceases operations or the performance of the Team Owner's operating obligations set forth in <u>Section 6.1</u>, and in each case such business, operations or performance is not continued by a successor to whom the Team Owner's business has been transferred in compliance with the terms of this Agreement;

9.1.4    the Control Person commits any act of fraud or embezzlement in connection with the operation of the Team Owner or the Team, as finally determined by a court of last resort, or is convicted by a trial court of, or pleads guilty or no contest to, a felony (other than a traffic violation) which involves moral turpitude;

9.1.5    the Team Owner becomes subject to a Bankruptcy;

9.1.6    Team Owner receives five (5) or more MPS Notices during any Season and NEM provides notice to Team Owner of its intent to terminate this Agreement as a result of such poor performance on or prior to December 31 of the third consecutive Year of such poor performance;

9.1.7    If there is an uncured or unwaived Team Owner Event of Default by Team Owner under the prior Charter Member Agreement bearing the same number and which had the Execution Date of January 1, 2016 (the "Predecessor Charter Agreement") for which written notice has been provided to the Team Owner as of the Effective Date;

9.1.8    unless NEM has exercised it set-off rights as provided herein, the Team Owner or the Control Person fails to make any payments due and validly owing pursuant to <u>Section 3.1(e)</u> within (30) days from the date of receipt by Team Owner of a written notice from NEM that such payment is past due.

In the event of either (x) a Team Owner Event of Default by Team Owner that results in the termination of this Agreement by NEM in accordance with the terms and provisions of this <u>Section 9.1</u> or (y) a voluntary forfeiture by Team Owner to NEM of its rights under this Agreement pursuant to Section 9.5, and in each case provided that the terms and restrictions of Section 6.6 hereof are in effect at such time, the Team Owner and Control Person shall, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations and is not otherwise an Exempt 10% Owner shall, be subject to the terms and restrictions set forth in <u>Section 6.6</u> (Protection Of Goodwill) for a period of twelve (12) months following the date of such termination or forfeiture, as the case may be.  For purposes of clarity, the restrictions set forth in <u>Section 6.6</u> shall not apply following a termination effected by Team Owner pursuant to <u>Section 4.3(a)</u> or <u>Section 9.2.</u>

For the avoidance of doubt, in no event shall NEM have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by Team Owner, Control Person or any of their Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by Team Owner, Control Person or any of their Affiliates to pay any amount due under any such agreement or arrangement.

9.2    <u>NEM Event of Default</u>.  In addition to any other rights or remedies the Team Owner may have, but subject to <u>Section 13.10</u>, this Agreement may be terminated by the Team Owner by delivering

39

‖US-DOCS‖147133351.4‖

HIGHLY CONFIDENTIAL - OCO

23XI_0004360

written notice to NEM if (i) NEM or any of its Affiliates breaches or fails to perform in any material respect any of its material obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, or (ii) any representation or warranty in this Agreement of NEM (or in any certification delivered hereunder), NASCAR or any of their respective Affiliates was materially untrue or incorrect when made on the Execution Date and, which untruth or inaccuracy materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non-compliance or untruth that is curable, NEM (or its applicable Affiliate) effects a cure within thirty (30) days after receiving written notice of breach or default from Team Owner. For the avoidance of doubt, in no event shall the Team Owner or the Control Person have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by NEM or any of its Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by NEM or any of its Affiliates to pay any amount due under any such agreement or arrangement.

9.3　　Consequences of Termination. Upon the termination of this Agreement, (a) all rights granted by NEM to the Team Owner and Control Person under this Agreement shall revert to NEM and all rights granted by the Team Owner and Control Person to NEM or its Affiliates under this Agreement shall revert to the Team Owner and Control Person, as applicable; (b) subject to Section 13.18 none of NEM (or its Affiliates) or Team Owner or Control Person (or their respective Affiliates) shall have any further obligations under this Agreement; (c) the Team Owner shall take all actions that may be necessary to return all rights with respect to the Assigned Car Number to NEM or its designee; (d) the Team Owner shall immediately pay to NEM all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages NEM may incur as a result of any breach of this Agreement by the Team Owner, and (e) NEM and its Affiliates shall immediately pay to Team Owner all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages the Team Owner, Control Person or their Affiliates may incur as a result of any breach of this Agreement by NEM or any of its Affiliates. For clarity, nothing in this Section 9.3 shall be construed to limit any other rights or remedies that the Team Owner, Control Person, NEM or any of their respective Affiliates may have, or to preclude the Team Owner, Control Person or NEM from enforcing such rights or pursuing such remedies to the fullest extent possible, including under NASCAR Rules. For clarity, in the event of termination by either party, the sole and exclusive process for resolution of any Disputes between the parties (and their respective Affiliates) shall be set forth in Section 12.

9.4　　Set-Off.

9.4.1　　In the event of a Team Owner Event of Default pursuant to Section 9.1.8, in addition to NEM's termination rights with respect to non-payment, NEM shall have the set-off rights set forth in Section 3.1(g) and 6.12 above.

9.4.2　　In the event that the Arbitration Panel issues a decision (with respect to a Dispute) with respect to an amount payable to NEM or any of its Affiliates in accordance with this Agreement, NEM shall have the right to withhold from the Team Owner any amounts that would have been payable to Team Owner under this Agreement in an amount equal to the amount determined by the Arbitration Panel to be so payable to NEM or any of its Affiliates.

9.5　　Voluntary Forfeiture. Notwithstanding anything herein to the contrary (but subject to the penultimate paragraph of Section 8.1), NEM acknowledges and agrees that the Team Owner may, in its sole discretion, elect to voluntarily forfeit its rights under this Agreement (provided that no such forfeiture shall be effective during a Cup Series Season) by delivering written notice of such forfeiture to NEM (which

40

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004361

notice shall specify the effective date of such forfeiture. In the event that Team Owner exercises such forfeiture right, then the parties will treat the Agreement as having been terminated on the applicable date for purposes of Section 8.3, and, subject to any separate rights or remedies NEM may have in respect of any Team Owner Event of Default that is otherwise (and independently) occurring without regard to such forfeiture as of such date of such forfeiture, such forfeiture will not be deemed a breach or violation of any of the terms or provisions hereof.

10    Representations, Warranties and Covenants.

    10.1    Representations, Warranties and Covenants by the Team Owner and the Control Person.

        10.1.1    Each of the Team Owner and Control Person severally represent and warrant as to itself to NEM that:

        10.1.1.1    The Team Owner is either a corporation, limited liability company, limited partnership duly organized, validly existing and in good standing under the law of its jurisdiction of formation.

        10.1.1.2    Each of the Team Owner and the Control Person has the full power and authority to enter into and perform its, his or her obligations under this Agreement in accordance with its terms and neither Team Owner nor Control Person have entered into any alliance, agreement or other governing body that would in any way inhibit, effect or limit the authority of Team Owner or Control Person in exercising all rights and obligations under this Agreement.

        10.1.1.3    The execution, delivery and performance of this Agreement by the Team Owner and the Control Person have been duly authorized by all necessary action of the Team Owner and this Agreement constitutes a valid and binding obligation of the Team Owner and the Control Person, enforceable against each in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

        10.1.1.4    The execution, delivery and performance of this Agreement by the Team Owner and the Control Person do not and will not (i) conflict with any of the Team Owner's Governing Documents and do not and will not conflict with or result in the breach or termination of, or constitute a default under, any material lease, agreement, commitment or other instrument, or any order, judgment or decree, to which the Team Owner or the Control Person is a party or by which the Team Owner or the Control Person is bound, or (ii) constitute a violation by the Team Owner or the Control Person of any law or regulation applicable to the Team Owner or the Control Person. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority is required on the part of the Team Owner or the Control Person in connection with the execution, delivery or performance of its, his or her obligations under this Agreement.

        10.1.2    The Team Owner and Control Person severally covenant as to itself that the Control Person, as designated in Schedule 1, and/or trusts for the benefit of the Control Person and his or her lineal descendants for which the Control Person is the trustee, shall own (so long as he or she is designated as the Control Person), a direct or indirect equity interest in the Team Owner of no less than thirty percent (30%).

        10.1.3    At all times during the Term a single person (who is as of the Execution Date, the Control Person) shall have full authority to act on behalf of the Team Owner and to bind the Team Owner

‖US-DOCS\147133351.4‖

HIGHLY CONFIDENTIAL - OCO

with respect to all NASCAR and NEM matters relating to the Team, the Cup Series, NASCAR and the stock car business operations of the Team Owner (the "NASCAR Core Matters"). In addition, beginning on the Execution Date and throughout the Term, all actions taken by the Control Person or his or her Designated Team Representative shall be binding on the Team Owner and may be relied upon by NEM (and its Affiliates) and the Other Teams without further inquiry and without notice to or consent of any other Owners or any shareholder, partner or member vote, or through a board of directors, board of managers, or similar body.

10.1.4   In entering into this Agreement, neither the Team Owner, the Control Person, any Owner, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) NEM, except as expressly contained in this Agreement or in a writing provided by an officer of NASCAR or NEM. Without limiting the generality of the preceding sentence, NEM and its representatives and advisors have not made any representations or warranties assuring the Team Owner or the Control Person that it will be able to earn a profit or that NEM otherwise will provide any financial assistance to the Team Owner or the Control Person (other than the payments due hereunder) or offer to repurchase any rights granted to the Team Owner under this Agreement.

10.1.5   The Team Owner shall comply, in all material respects with all laws, regulations and ordinances applicable to the Team Owner, the Team, and the Designated Vehicle with respect to the performance of their respective obligations under this Agreement.

10.1.6   The Team Owner, together with its wholly-owned and controlled subsidiaries, is as of the Execution Date, and subject to <u>Section 8</u>, shall remain during the Term, the (i) owner, licensee or lessee, as applicable, and is the operator of all (or substantially all) assets, properties and rights associated with the operation of the Team and the Designated Vehicle (e.g., race shop, haulers, race cars) or otherwise necessary for the performance of Team Owner's obligations under this Agreement and (ii) the sole owner and operator of the Team.

10.2   <u>Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities.</u>

10.2.1   Each of NEM and the Specified NASCAR Entities severally represent and warrant as to itself to the Team Owner and the Control Person that:

10.2.1.1 Such Person is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the law of the State of Florida or Delaware (as applicable) and has the full power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

10.2.1.2 The execution, delivery and performance of this Agreement by it have been duly authorized by all necessary actions of and this Agreement constitutes the valid and binding obligation of such party enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

10.2.1.3 The execution, delivery and performance of this Agreement by it does not and will not (i) conflict with the certificate of incorporation, certificate of formation, bylaws, operating agreement or other governing documents or agreements of such party, as applicable, and does not and will not conflict with or result in the breach or termination of, or constitute a default under, any lease, agreement,

42

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                                                23XI_0004363

commitment or other instrument, or any order, judgment or decree to which it is a party or by which it is bound, or (ii) constitute a violation by such party of any law or regulation applicable to it. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority or any direct or indirect owner of such party is required on the part of such party in connection with the execution, delivery and performance of this Agreement by it.

10.2.1.4    In entering into this Agreement, neither such party, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) Team Owner or Control Person, except as expressly contained in this Agreement.

10.2.1.5    NEM and each Specified NASCAR Entity has and shall retain throughout the Term the power and authority to perform, and to cause their Affiliates to perform, all of their respective obligations and the obligations of their Affiliates set forth herein. Without limitation of the foregoing, NEM and each Specified NASCAR Entity severally represents, warrants, covenants and agrees for the benefit of Team Owner and the Control Person that subject to Section 8.4, (i), NASCAR Holdings, LLC is and shall remain throughout the Term the direct or indirect owner of 100% of the issued and outstanding capital stock or other applicable equity interests of each of NASCAR, NEM, NASCAR Broadcasting, LLC is and shall remain throughout the Term the sole Person with rights to sanction Events and all promoter fees shall be paid to NEM (or its NEM Permitted Transferee) (or Awards and Achievement Bureau, Inc., a wholly-owned subsidiary of NEM) throughout the Term, (iii) the only NEM Affiliate that is party to any Live Transmission Contracts is and shall remain throughout the Term NASCAR Broadcasting, LLC, and all Media Revenue is and shall remain payable directly to NASCAR Broadcasting, LLC pursuant to such Live Transmission Contracts (iv) without limitation of the foregoing, NEM shall not, and shall not permit any Affiliates to, take any action intended or designed to artificially reduce the Pool Money, whether by changing the ownership and/or licensing structure of NASCAR and its Affiliates or otherwise.

10.2.2    Each of NEM and each Specified NASCAR Entity shall comply (and NEM shall cause NASCAR to comply), in all material respects, with all laws, regulations and ordinances applicable to such party with respect to the performance of their respective obligations under this Agreement.

10.2.3    NEM represents and warrants that NEM and Promoters, to NEM's knowledge, use best practices in organizing, operating, sanctioning and exploiting Events.

10.3    Release And Waiver by Team Owner and Control Person.    Each of the Team Owner and the Control Person, on their own behalf and on behalf of their controlled Affiliates, hereby releases and forever discharges each of the NEM Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all actions, causes of action, suits, debts, losses, costs, controversies, damages, liabilities, judgments, claims, and demands whatsoever, in law, admiralty or equity (collectively, "Claims"), known or unknown and arising out of or relating to the criteria used by NEM to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner or any other Person; provided, however that (x) nothing in this Section 10.3 shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by NEM or any of its Affiliates and (y) in the event any third party brings any Claim against the Team Owner, the Control Person or any of their respective Affiliates, nothing in this Section 10.3 shall prevent or restrict the Team Owner, the Control Person or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the NEM Indemnified Parties that

43

HIGHLY CONFIDENTIAL - OCO    23XI_0004364

is related to the subject matter of such third party Claim. Each of the Team Owner and the Control Person jointly and severally represent and warrant to the NEM Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person. The release and discharge set forth in Section 10.3 shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any controlled Affiliate, on the one hand, and any of NEM or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

10.4    Release And Waiver by NEM. Each of NEM and the Specified NASCAR Entities on their own behalf and on behalf of their respective Affiliates (including NASCAR Holdings, LLC and NASCAR), hereby releases and forever discharges each of the Team Owner Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all Claims, known or unknown and arising out of or relating to the criteria used by the Team Owner to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with NEM; provided, however that (x) nothing in this Section 10.4 shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by the Team Owner or the Control Person and (y) in the event any third party brings any Claim against NEM or any of its Affiliates, nothing in this Section 10.4 shall prevent or restrict NEM or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the Team Owner Indemnified Parties that is related to the subject matter of such third party Claim. Each of NEM and the Specified NASCAR Entities jointly and severally represents and warrants to the Team Owner Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person. The release and discharge set forth in Section 10.4 shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any Team Affiliate, on the one hand, and any of NEM, or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Team Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

11    Indemnification.

11.1    Team Owner Indemnity. The Team Owner shall indemnify, defend and hold harmless each of the NEM Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to (i) Team Owner's or Control Person's breach of any representation, warranty, covenant or other obligations pursuant to this Agreement, (ii) use of Team Clips as permitted in Section 5.4, or (iii) NEM or any of its authorized Affiliates' permitted use or license of any Team Intellectual Property pursuant to and in accordance with the terms and conditions of this Agreement.

11.2    NEM Indemnity. NEM (and, as to their own representations, warranties, covenants and agreements set forth herein, each Specified NASCAR Entity) severally as to itself shall indemnify, defend and hold harmless each of the Team Owner Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to (i) the breach by them of any their respective representations, warranties, covenants or other obligations pursuant to this Agreement or (ii) the Team Owner's permitted use or license of any of the Works pursuant and in accordance with the terms and conditions of to this Agreement.

11.3    Third Party Claims. The obligations and liabilities of the parties under this Agreement for indemnification with respect to, relating to, caused (in whole or in part) by or arising out of claims of third

44

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                                          23XI_0004365

parties (each, a "Third Party Claim"), shall be subject to the terms and conditions set forth in this Section 11.3. The party entitled to be indemnified hereunder (the "Indemnified Party") shall give the party obligated to provide the indemnity (the "Indemnifying Party") prompt notice of any Third Party Claim; provided, that the failure to give such notice shall not affect the liability of the Indemnifying Party under this Agreement unless the failure materially and adversely affects the ability of the Indemnifying Party to defend the Third Party Claim. The Indemnifying Party shall have the right, exercisable by notice to the Indemnified Party, to control the defense of any Third Party Claim, with counsel of its choosing, provided that the Indemnifying Party as a condition to controlling such defense, shall confirm in writing its obligation to indemnify the Indemnified Party with respect to such claim (including for payment of reasonable fees and expenses of counsel) under this Section 11. Any notice of a Third Party Claim shall identify, to the extent known to the Indemnified Party, the basis for the Third Party Claim, the facts giving rise to such Third Party Claim, and the amount of such Third Party Claim. The Indemnified Party shall make available to the Indemnifying Party copies of all relevant documents and records in its possession.

12    Dispute Resolution.

12.1    Dispute Resolution. Subject to Section 12.4, and the second sentence of this Section 12.1, the exclusive method of resolving any Dispute shall be the procedures set forth in this Section 12. Notwithstanding the foregoing, but subject to the proviso of this sentence, if there is a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of any NASCAR Rule, such disagreements and disputes will be resolved by NEM or its applicable Affiliates, in their reasonable discretion as the sanctioning body of NASCAR stock car auto racing, in accordance with the provisions set forth in NASCAR Rules and, for clarity shall not be subject to any Arbitration and the Arbitration Panel shall have no authority with respect to such matters; provided, that if the dispute, controversy or claim is with respect to whether there is a conflict or inconsistency between this Agreement and NASCAR Rules as set forth in Section 6.5 or as to whether NASCAR or its Affiliates have complied with the requirements of Section 6.5, then such dispute, controversy or claim shall be resolved pursuant to the procedures set forth in this Section 12.

12.2    Arbitration Mechanics. Each party shall have the right to commence an arbitration (the "Arbitration") with respect to any Dispute by giving a notice to the other party that sets forth in reasonable detail the nature of the Dispute and reasonable support for its claim. Except as set in this Section 12.2, the Arbitration shall be administered by the American Arbitration Association (the "AAA") under its Commercial Arbitration Rules and conducted pursuant to such rules, as such rules are in effect as of the time the Dispute is submitted to the AAA for Arbitration (the "Submission Date"). The panel of arbitrators who shall be responsible for resolving the Dispute (the "Arbitration Panel") will consist of three persons (each an "Arbitrator"), who shall be selected in accordance with the AAA's Commercial Arbitration Rules. In proposing a list of candidates for Arbitrators, the parties will request that the AAA take into account the parties' desire that each Arbitrator be an individual who is a lawyer and/or former judge that has not been employed by, retained by, or otherwise associated with, and has not served as a consultant, contractor, advisor, agent or in any similar capacity to or for any party, or any of their respective Affiliates or predecessors-in-interest, within ten (10) years prior to the Submission Date. The parties shall instruct the Arbitration Panel to convene an initial conference with the parties within fifteen (15) Business Days after the appointment of the Arbitration Panel to establish the timing of any discovery that the Arbitration Panel deems appropriate, to set the date for a hearing and any other matters as may be deemed appropriate by the Arbitration Panel. Unless the Parties otherwise agree with respect to any Arbitration, (a) all disputed issues regarding discovery shall be decided by the Arbitration Panel, (b) if any Arbitration hearing takes more than one day, it will proceed on the next following Business Day until it is completed (provided, that the

45

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO                                                                23XI_0004366

Arbitration Panel may elect not to hear the Dispute on one (1) Business Day of each week), (c) barring extraordinary circumstances, the Arbitration Panel will render a written decision not later than fifteen (15) Business Days from the date of the conclusion of the Arbitration hearing, (d) the Arbitration hearing shall take place in Charlotte, North Carolina, and (e) subject to the second sentence of Section 11.1, the Arbitration Panel shall have the authority to award damages, equitable relief (including specific performance) and such other remedies the Arbitration Panel deems appropriate (provided, however, the Arbitration Panel shall not have the authority to alter, change, amend, modify, waive, add to or delete from any provision of this Agreement), and (f) if the parties initiate multiple Arbitration proceedings (including with respect to any Team Owner and other members of its Charter Member Group), the subject matters of which are related by common questions of law or fact and which could result in conflicting awards or obligations, such proceedings shall be consolidated, at NEM's election into a single Arbitration proceeding. Each party irrevocably consents to the delivery of service of process with respect to any Arbitration in any manner permitted for the giving of notices under Section 13.1. Notwithstanding anything contained in the AAA Commercial Arbitration Rules to the contrary, the non-prevailing party shall bear all costs associated with any Arbitration under this Agreement, including the costs and expenses of the Arbitration, and the cost of its own and the prevailing party's legal representation and expert witness fees (including any related charges and disbursements). The parties hereto agree to keep confidential in accordance with Section 13.5, and to require that the Arbitration Panel keep confidential, the existence of any Arbitration, the arbitral proceedings, the submissions made by the parties (including any discovery) and any decisions made by the Arbitration Panel, including any award, except, in addition to the exceptions set forth in Section 13.5, to the limited extent necessary in connection with any proceeding to confirm or vacate such award in accordance with this Section 12.

12.3    Arbitration Award.  Any award rendered by the Arbitration Panel shall be (a) in writing, state the basis of the award and include both findings of fact and conclusions of law and (b) final, binding and non-appealable upon the parties and any court having jurisdiction may enter a judgment on any such award.

12.4    Equitable Relief.  Each of the parties hereto acknowledge that the rights granted by and to NEM, Team Owner and Control Person under this Agreement possess a special, unique, and extraordinary character that make difficult the assessment of monetary damage that would be sustained by NEM, Team Owner or Control Person as a result of any breach of this Agreement by the other parties hereto or any unauthorized use of the rights granted by or to NEM under this Agreement and any such breach of unauthorized use will immediately cause irreparable harm to the Cup Series, NASCAR, NEM, NASCAR Rights Affiliates, Team Owner, Control Person and others and that any remedy at law for such breach will be inadequate. Notwithstanding anything to the contrary in this Agreement, before the Arbitration Panel is convened in accordance with this Section 12 any party may seek temporary or preliminary injunctive relief in aid of the Arbitration, at any time exclusively from the U.S. District Court or, if it does not have jurisdiction, the North Carolina state courts, in each case located in Charlotte, North Carolina (collectively, the "Designated Courts") with respect to any Dispute (collectively, "Interim Equitable Relief"); provided that neither the Team Owner nor the Control Person, nor any other Person acting on their behalf or for their benefit, shall seek Interim Equitable Relief or any other equitable relief of any kind to enjoin or otherwise restrain or limit NEM (or any of its Affiliates) from conducting any of the Events.  If a Dispute requires Interim Equitable Relief before the Arbitration Panel is convened in accordance with this Section 12, the procedures set forth in this Section 12 will still govern the ultimate resolution of the Dispute notwithstanding the fact that a Designated Court may have entered an order providing for injunctive or another form of Interim Equitable Relief.  Each of the parties to this Agreement submits to the exclusive jurisdiction of the Designated Courts with respect to the Interim Equitable Relief, including, the in

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

personam and subject matter jurisdiction of the Designated Courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail (in accordance with <u>Section 13.1</u>) or any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered thereby in connection with such Interim Equitable Relief subject to all applicable appeal rights from such Designated Courts.

12.5    <u>Limitations on Damages.</u>  Other than with respect to claims for indemnification in respect of third party claims pursuant to <u>Section 11</u>, no claim may be made under any legal theory (including contract or tort) by any party against the other party, any Affiliate of the other party, or the directors, officers, employees, shareholders, members, partners, attorneys, or agents of such other party or its Affiliates, for any special, indirect, consequential, incidental or punitive damages in connection with a cause of action arising out of or relating to the transactions contemplated by this Agreement.

13    <u>Miscellaneous.</u>

13.1    <u>Notices.</u>  Any notice or other communication under this Agreement shall be in writing and shall be considered to have been given and received when delivered personally or sent by electronic mail (with a copy by any other means for providing notices under this Agreement), or one Business Day after being sent by a reputable overnight courier to the applicable party (with a copy by any other means for providing notices under this Agreement) at the address set forth below its name on the signature page to this Agreement (or at such other address as that party may specify by notice to the other).

13.2    <u>Complete Agreement.</u>  This Agreement, including all Schedules and Exhibits contained herein, contains a complete statement of the arrangements between NEM, and its Affiliates, on the one hand, and the Team Owner and the Control Person, on the other hand, with respect to the subject matter hereof and supersedes all prior agreements and understandings between them with respect to that subject matter.

13.3    <u>Expenses.</u>  Each party shall bear its own expenses (including the fees and disbursements of its attorneys and accountants) incurred in connection with the negotiation and preparation of this Agreement and, except as expressly set forth in this Agreement, in connection with all obligations required to be performed by it under this Agreement.

13.4    <u>Governing Law.</u>  This Agreement shall be governed by and construed in accordance with the law of the State of Florida applicable to agreements made and to be performed entirely in Florida.

13.5    <u>Confidentiality.</u>  During the Term, each of NEM, the Team Owner and the Control Person shall, and shall cause their respective controlled Affiliates (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates) to, treat and hold as confidential (and not disclose or provide access to any third party to) all of the Confidential Information, except that disclosure is permitted to NEM, NASCAR and their Affiliates, the Team Owner's and the Control Person's Affiliates and their legal and professional advisors and representatives, to current or prospective, lenders, investors or Transferees, and to other Competitors and their Affiliates and legal and professional advisors and representatives and any association of Competitors and their legal and professional advisors, provided that (i) such Persons are made aware of the confidential nature of such Confidential Information and (ii) such Persons are instructed to maintain the confidential nature of such Confidential Information pursuant to this <u>Section 13.5</u>.  In the event that NEM, Team Owner, the Control Person, any of their controlled Affiliates (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates) or such advisors or representatives become legally compelled to disclose any Confidential Information, the Team Owner or NEM, as applicable, shall, to the extent

||US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO    23XI_0004368

practicable, provide the other with prompt written notice of such requirement so that Team Owner or NEM, as applicable, may seek a protective order or other remedy or waive compliance with this <u>Section 13.5</u>. In the event that such protective order or other remedy is not obtained, or Team Owner or NEM, as applicable, waives compliance with this <u>Section 13.5</u>, NEM or the Team Owner, as applicable, shall furnish only that portion of such Confidential Information which is legally required to be provided and exercise its reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information; provided, however, that this <u>Section 13.5</u> shall not apply to any information that, at the time of disclosure, is available publicly and was not disclosed in breach of this Agreement or becomes available on a nonconfidential basis from a source other than a party to this Agreement.

13.6     <u>Relationship Created.</u>  NEM is not a partner, joint venturer or principal and agent with the Team Owner or the Control Person, and nothing in this Agreement shall be construed so as to create any of those relationships or to impose any liability as such on any of them, or to grant any party the right to bind the other without the other's prior written consent.

13.7     <u>No Third-Party Beneficiaries.</u>  Except for the rights of those Persons who are entitled to indemnification under <u>Section 11</u>, this Agreement is solely for the benefit of the parties hereto, and nothing in this Agreement shall be deemed to create any third-party beneficiary rights in any person or entity not a party to this Agreement.

13.8     <u>Separability.</u>  If any provision of this Agreement shall be deemed invalid or unenforceable by any court having jurisdiction, the court shall have the discretion to modify the provision to the extent necessary to make it valid or enforceable and the provision (as so modified), and the balance of this Agreement, shall remain in effect and shall be enforced to the maximum extent permitted by law.

13.9     <u>Failure to Take Action; Waiver.</u>  The failure by any party to seek redress for violation of, or to insist upon the strict performance of, any provisions of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.  All waivers must be in writing, subject to <u>Section 13.2.</u>

13.10     <u>Force Majeure.</u>  If a Force Majeure Event prohibits, prevents or delays any party from performing any of its obligations under this Agreement (other than any payment obligation), then such party shall be excused from such performance to the extent, but only to the extent, made necessary by the Force Majeure Event and only until such time as the Force Majeure Event terminates or is revoked or resolved. If a Force Majeure Event shall last longer than one (1) year, the party to whom performance would otherwise be owed shall have the right to terminate this Agreement to the same extent (if any) as it would have if the occurrence of a Force Majeure Event did not excuse the other party's performance under this Agreement.

13.11     <u>Publicity.</u>  Following the Execution Date, NEM, the Team Owner, the Control Person and their respective Affiliates shall mutually cooperate in good faith regarding issuing a press release, written public statement or press conference regarding the entering into this Agreement and any other details regarding transactions contemplated by entering into this Agreement (other than Confidential Information).

13.12     <u>Amendments.</u>

13.12.1          This Agreement may not be amended or modified other than by a writing duly signed by the Team Owner, the Control Person and NEM.

13.12.2          Notwithstanding the foregoing clause (a), in the event that NEM enters into substantively identical amendments or waivers to Charter Member Agreements with the applicable Charter Members and control persons thereof representing (x) at least sixty six and two-thirds percent (66

48

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004369

2/3%) of the then-total number of Charter Members and (y) no less than fifty percent (50%) of the then-total number of Charter Members representing one BMG group and no less than fifty percent (50%) of the then-total number of Charter Members representing at least one other BMG group, then upon delivery by NEM to Team Owner of a copy of such amendment or waiver (together with the signatures from the requisite Charter Members), this Agreement shall thereafter be deemed to have been amended to the same extent as the Charter Member Agreements of the Charter Members who have executed such amendment or waiver and such amendment or waiver will be effective and enforceable against NEM, the Team Owner and the Control Person regardless of whether the Team Owner or Control Person has signed, approved or consented to such amendment; provided, that in no event shall any such amendment or waiver proposed to be effected pursuant to this subsection (b): (i) extend the Initial Term or the Term or otherwise cause an extension or renewal of this Agreement, (ii) shorten the Term or (iii) treat Team Owner or the Control Person in a manner that materially differs from the treatment of other Charter Members' and control persons, as applicable, it being understood and agreed that the written consent of Team Owner and the Control Person shall be necessary for any such amendment or waiver described in this proviso.

13.13    Further Action.    Each party shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as NEM, the Team Owner or the Control Person may reasonably request to effectuate the terms and intent of this Agreement or as may be necessary or appropriate to carry out the terms of this Agreement.

13.14    Joint and Several.    All representations, warranties, covenants and obligations of the Team Owner or the Control Person set forth in this Agreement are several representations, warranties, covenants and obligations of the Team Owner and the Control Person, respectively, regardless of whether or not the applicable provision explicitly provides for joint, several or joint and several liability.  The Control Person shall have no liability in respect of any of the representations, warranties, covenants or obligations of the Team Owner hereunder, it being understood and agreed that the sole obligations of the Control Person are in respect of the representations, warranties, covenants and obligations expressly undertaken by the Control Person herein.

13.15    Reservation of Rights.    All rights not specifically granted to the Team Owner, the Control Person or NEM by this Agreement are reserved by the Team Owner, the Control Person, or NEM as applicable, provided that, nothing in this Agreement shall restrict the Team Owner, the Control Person, NEM or their respective Affiliate thereof from exercising any legal rights that are otherwise available to such Person as a non-NASCAR rights holders or the public at large.

13.16    General Interpretative Provisions.    Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine and feminine forms.  The term "including", whenever used in any provision of this Agreement, means including, but without limiting the generality of, any description preceding or succeeding such term.  Each reference to a person or entity shall include a reference to the successors and assigns of such person or entity.  All references to "Sections", "schedules", "Exhibits" or "exhibits" shall be references to the Sections, schedules and Exhibits to this Agreement, as amended, modified, supplemented or restated from time to time.  The Section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.  This Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied that would result in the resolution of an ambiguity contained herein against the drafting party.  The word "or" shall not be exclusive. In the computation of any period of time expressed in day(s) in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the

49

HIGHLY CONFIDENTIAL - OCO                                                                    23XI_0004370

period so computed shall be included, except that if it is not a Business Day such period shall end on the next succeeding Business Day.

13.17   <u>Performance.</u>  NEM may perform any of its obligations or exercise any of its rights under this Agreement through any one or more of its Affiliates, provided that NEM shall remain primarily responsible for all of its obligations under this Agreement.

13.18   <u>Survival.</u>  The provisions of Sections 2.2, 2.3 <u>Sections 8.2.1</u> (for the period set forth therein), the penultimate paragraph of 9.1 (including, <u>Section 6.6</u>, if applicable with respect to Sections 2.2 or 2.3 or such termination or forfeiture under <u>Sections 9.1 or 9.5</u>), <u>10.3, 11</u> (for any claims relating to periods on or prior to the termination date), <u>11, 13.1-13.10, 13.14, 13.16-13.19</u> shall survive termination, expiration or forfeiture of this Agreement.  For avoidance of doubt, the Predecessor Charter Agreement shall survive the execution of this Agreement in accordance with its terms.

13.19   <u>Counterparts.</u>  This Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument.  Any counterpart or other signature delivered by facsimile, PDF or other electronic transmission shall be deemed for all purposes as being good and valid execution of this Agreement by the applicable party.

13.20   <u>Guarantee.</u>  NASCAR Broadcasting, LLC hereby irrevocably guarantees all of NEM's financial obligations under this Agreement.

[Signature page follows.]

50

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004371

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Execution Date.

NASCAR EVENT MANAGEMENT, LLC


By:

Name:

Title:


Address for Notices:

NASCAR Event Management, LLC

Attn: General Counsel

One Daytona Boulevard

Daytona Beach, Florida 32114


Electronic Mail Address for Notices: [ HYPERLINK "mailto:legalnotice@nascar.com" ] NASCAR BROADCASTING, LLC (solely for purposes of Sections 10.2, 10.4, 11.2 and 13.20 hereof)

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004372

*[Signature Page to Charter Member Agreement]*

[TEAM OWNER]

By:

Name:

Title:

Address for Notices:

Electronic Mail Address for Notices:

[CONTROL PERSON]

Address for Notices:

Electronic Mail Address for Notices:

*[Signature Page to Charter Member Agreement]*

52

HIGHLY CONFIDENTIAL - OCO

23XI_0004373

## Exhibit A

## Definitions

"AAA" has the meaning set forth in Section 12.2.

"Affiliate" means (i) with respect to any Person, any other Person, which directly or indirectly controls, is controlled by, or is under common control with such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract, or otherwise, and (ii) with respect to any Person who is an individual, each parent, spouse or domestic partner, sibling, or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such Persons in the capacity as such custodian or guardian; provided, however, for purposes of this Agreement, neither International Speedway Corporation nor any of its direct or indirect subsidiaries shall be deemed an Affiliate of NEM; and further provided, that any Person or team not engaged in professional stock car racing in the United States, Canada or Mexico which is otherwise an Affiliate of Team Owner or Control Person shall not be deemed an Affiliate of Team Owner, except for the purposes of being a beneficiary of an indemnity, release, or damages limitation, or Section 6.6(ii).

"Agreement" has the meaning set forth in the Preamble.

"Ancillary Activity" has the meaning set forth in Section 5.5(d)

"Ancillary Rights" means those rights related to any activity categorized as an Ancillary Activity in accordance with the terms hereof.

"Arbitration" has the meaning set forth in Section 12.2.

"Arbitration Panel" has the meaning set forth in Section 12.2.

"Arbitrator" has the meaning set forth in Section 12.2.

"Assigned Car Number" means the vehicle number that is assigned by NASCAR for use by the Team Owner, pursuant to NASCAR Rules. As of the Execution Date, the Assigned Car Number that is assigned for use by the Team Owner, pursuant to NASCAR Rules, and subject to the rights of the Team Owner set forth in this Agreement is set forth on Schedule 1.

"At Event Assets" has the meaning set forth in Section 6.9.2

"Bankruptcy" means, with respect to a Person, (i) a general assignment for the benefit of the creditors of such Person, (ii) a voluntary petition in bankruptcy by such Person, (iii) the adjudication of such Person as bankrupt or insolvent, (iv) the entering against such Person of an order for relief in any bankruptcy or insolvency proceeding, (v) the filing by such Person of a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any bankruptcy statute, law or regulation, (vi) such Person's seeking, consenting to or acquiescing in, in each case in writing, to the appointment of a trustee, receiver or liquidator of the Person or all or any substantial part of such Person's properties, (vii) such Person's failure to obtain the dismissal, within sixty (60) days after the commencement thereof, of any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, foreclosure or similar relief under any statute, law or regulation, (viii) such Person's failure to cause to be vacated or stayed, within sixty (60) days after the appointment without

such Person's consent or acquiescence, of a trustee, receiver or liquidator of the Person or of all or any substantial part of such Person's properties or (ix) such Person's failure to vacate an appointment described in clause (viii) of this sentence within sixty (60 days of the expiration of any such stay).

"BMG" means each active branded manufacturer group (e.g., Chevrolet, Ford, and Toyota).

"Broadcast Partner" means any Person other than NEM or any of its Affiliates to whom NEM (or any of its Affiliates) has granted Live Transmission Rights in respect of any Event pursuant to a Live Transmission Contract.

"Business Day" means any day (other than a Saturday, Sunday or legal holiday) on which banks are open for business in New York, New York.

"Car/Driver Sponsor Advertising" has the meaning set forth in Section 6.3.

"Chairperson" has the meaning set forth in Section 3.5(d)(ii)

"Charter Member Agreement" means any agreement that grants (i) guaranteed entry in an Event and (ii) the right to be eligible for the Charter Team Points Pool Money.

"Charter Member Fees" has the meaning set forth in Section 3.1(g).

"Charter Member Group" has the meaning set forth Section 3.5(a).

"Charter Member Increase" has the meaning set forth in Section 3.3(a).

"Charter Members" means, collectively, the Team Owner and other teams who are currently or hereafter may be a party to a then-current Charter Member Agreement.

"Charter Shortfall" has the meaning set forth in Section 4.1.

"Charter Team Points Pool Money" means all Points Pool Money other than the money attributable to the Fixed Owner's Plan-Open Teams as specified in Exhibit B.

"Claims" has the meaning set forth in Section 10.3.

"Competitors" means, as of the date of any such determination, the Team and the Other Teams that are licensed to and competing in the Cup Series season.

"Competitor Tire Shop" has the meaning set forth in Exhibit C.

"Confidential Information" means, collectively, this Agreement, the terms hereof, any all proprietary information or materials provided by NEM, Team Owner, Control Person or any of their respective Affiliates in connection herewith or in furtherance of their respective rights or obligations hereunder, including any Transfer Approval Forms, and any proprietary information or materials disseminated at, prior to or in connection with any Team Owner Council meeting, in each case that are clearly marked at the time of delivery as confidential.

"Contingency Awards" mean certain monies awarded to Competitors for meeting, completing or exceeding certain award criteria or performance goals as specified in each such contract that awards such amounts. The Team Owner acknowledges and agrees that eligibility for any Contingency Awards shall be based on or require the Competitors use or display sponsors product and/or decal to be eligible for such award.

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004375

"Control Person" means the individual person identified by the Team Owner from time to time who (i) directly or indirectly owns a Controlling Interest and at least a 30% equity interest in the Team Owner, (ii) has the authority with respect to NASCAR Core Matters that is set forth in Section 9.1(c) and (iii) has executed and delivered this Agreement or a joinder hereto.

"Controlling Interest" means any direct or indirect equity interest in the Team Owner that, if Transferred, would Transfer the Control Person's effective authority to bind the Team Owner for purposes of this Agreement and NASCAR Core Matters.

"Cup Series" means the NASCAR racing series known, as of the Execution Date, as the NASCAR Cup Series, and any successor thereto, regardless of its name or sponsor, so long as such successor series is identified by NEM and NASCAR as the highest and most premium NASCAR stock car racing series, and publicly held up and promoted by NEM and NASCAR as such.

"Cup Series Points Event" means each Event that is included in the Cup Series where championship points are awarded.

"Designated Courts" has the meaning set forth in Section 12.4.

"Designated Team Representative" means a then-current director or officer of the Team Owner to whom the Control Person has granted the authority with respect to NASCAR Core Matters that is set forth in Section 10.1.3.

"Designated Vehicle" means any stock car that (i) complies with NASCAR Rules, (ii) is owned (or leased) and operated by the Team Owner, (iii) is assigned the Assigned Car Number, and (iv) is authorized to compete in Events pursuant to this Agreement, the Driver Agreement and applicable NASCAR Rules.

"Dilutive Amount" has the meaning set forth in Section 3.4(i).

"Dispute" means any dispute, disagreement, controversy or claim between the parties hereunder (including any of their respective officers, directors, shareholders, partners, members, agents, representatives and attorneys) that arises under or in connection with this Agreement and except as otherwise provided in Section 11.1, is not a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of NASCAR Rules.

"Driver" means any driver that has executed and delivered (i) a binding agreement with the Team Owner to compete in the Events driving the Designated Vehicle and (ii) the Driver Agreement with NEM with respect to the Designated Vehicle. Notwithstanding that a Driver may have executed a Driver Agreement for one or more other Team Owner vehicle(s), the Driver must execute and deliver a current Driver Agreement specifically for the Designated Vehicle before being allowed to compete in the Designated Vehicle. At the time that the Team Owner intends to have the Driver drive the Designated Vehicle, the Driver must be a Member in good standing; hold a current, valid Cup Series driver license.

"Driver Agreement" has the meaning set forth in Section 6.4.

"Effective Date" means January 1, 2025, except as otherwise provided herein.

"Event" means the time period of activities during a competitive stock car racing Cup Series racing event sanctioned by NEM in accordance with the NASCAR Rules which includes all periods for registration (including without limitation review and approval), inspections, all Practices, Qualifying and Qualifying Races, as provided in Section 9 of the NASCAR Rules position determination, the Race, Post-Race and

55

[US-DOCS\147133351.4]

HIGHLY CONFIDENTIAL - OCO

23XI_0004376

rain or postponed dates related thereto (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date).

"Event Data" means all data and other information arising from and during one or more Events that is collected (i) by or on behalf of NEM or its Affiliates or (ii) by the Team Owner, its Affiliates or any other Person (other than, in the case of clauses (i) and (ii), Trade Secrets), it being understood the Team Owner will have no obligation to collect any such Event Data that is not currently collected as of the Execution Date unless the expenses attributable thereto are satisfied by NEM or its Affiliates in accordance with the immediately following sentence. To the extent Event Data is collected by or on behalf of NEM or its Affiliates, it shall be collected at the expense of (a) a Broadcast Partner, in the case of certain Event Data exploited via the Live Transmission Activities or (b) NEM or any of its Affiliates. NEM (on its own behalf and on behalf of its Affiliates) and the Team Owner agree that any Event Data that is commercially exploited (which, for clarity, shall not include any use by NEM of its Affiliates for competition or officiating purposes in which Event Data is not disseminated to the general public) shall be exploited only via Live Transmission Activities.

"Exclusivity Breach" has the meaning set forth in Section 6.9.1.

"Execution Date" means[            ].

"Exempt 10% Owner" has the meaning set forth in Section 6.6.

"Extension Notice" has the meaning set forth in Section 2.2.

"Extension Term" has the meaning set forth in Section 2.2.

"Family Relatives" means, with respect to any Person, such Person's spouse, mother, father, brothers, sisters and lineal descendants (including those related by adoption and spouses of lineal descendants) and trusts for the benefit of any of the foregoing.

"Field Shortfall" has the meaning set forth in Section 4.1.

"Field Size" means the total number of Competitors authorized by NEM to start any Race.

"Force Majeure Event" means any act, event or condition (except, in each case, for the payment of money), which is beyond the reasonable control of the party asserting the Force Majeure (as defined below), which wholly or partially prevents or delays the performance of any of the duties, responsibilities or obligations of the party asserting the Force Majeure. The term "Force Majeure" shall include, but not be limited to, an act of God; an act of the public enemy; civil disturbance or unrest;; injunctions; lightning; fire, explosion or other serious casualty; terrorist attack (or threats thereof); epidemics; strike, lock-out or labor dispute (without regard to the reasonableness of any party's demands or any party's ability to satisfy such demands); accident or sabotage; unusually severe weather (including hurricane, earthquake, tornado, landslide or flood); war (whether declared or not or threats thereof); blockades; embargoes; condemnation or other taking by the action of any governmental body on behalf of any public, quasi-governmental or private entity; provided, however, for purposes of this Agreement, any crash, accident or other damage to the Designated Vehicle resulting from competition at an Event shall not be deemed a Force Majeure Event.

"Fuel Sponsor" means any sponsor, that at any time, with which NEM or any of its Affiliates enters into a sponsorship (or similar) agreement that sells products or services in Fuel Category.

"Good Standing" means Team Owner is not in material breach of this Agreement and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-

56

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004377

compliance being waived by NEM in its sole discretion), and in NEM's reasonable discretion, is working cooperatively to enhance the growth of the sport, which shall include, but is not limited to, assistance with the Driver Ambassador Program and non-disparagement of the sport as a business.

"Governing Documents" means all agreements and documents affecting the ownership, control, financing or management of a Person (including, as applicable, its certificate of limited partnership and agreement of limited partnership, formation and limited liability company agreement, certificate of incorporation, bylaws and other governing documents).

"Indemnified Party" has the meaning set forth in Section 11.3.

"Indemnifying Party" has the meaning set forth in Section 11.3.

"Initial Term" has the meaning set forth in Section 2.1.

"Interim Equitable Relief" has the meaning set forth in Section 12.4.

"Invitational Events" are those non-points Events that are included in the Cup Series schedule to which certain qualifying Charter Member Teams are invited to participate. And so long as they meet the qualifications as determined by NASCAR, Other Teams may also be invited to participate. Invitational Events include, as of the Execution Date, the NASCAR All Star Series Event and the Clash.

"Invitational Pool Money" means, in any given Year, the Race Purse for each Invitational Event.

"Live Transmission" means the live transmission, distribution or exhibition of audio-visual signals of the performance of a NASCAR national series event (including the Events), and any replay(s) thereof if granted as part and parcel of a grant of Live Transmission Rights, by any means, process, medium, distribution platform, method or device, whether now known or hereafter developed, including, without limitation, by broadcast television signal, cable television signal, Direct Broadcast Satellite, the Internet, and/or could be offered to consumers on a Pay Per View or subscription basis etc. within the United States, its territories, possessions and commonwealths, plus Bermuda.

"Live Transmission Activity" has the meaning specified in Section 5.5(c).

"Live Transmission Contract" means any contract, agreement or other enforceable obligation, whether oral or written, entered into between a NASCAR Rights Affiliate and any Broadcast Partner, for the license, assignment or other transfer of any Live Transmission Rights. The current Live Transmission Contract is for years 2025-2031 (inclusive).

"Live Transmission Rights" means any and all rights to engage in a Live Transmission and directly related activity (for example, delayed transmissions, single re-transmissions, and support shoulder programming.) For clarity, and without limiting the foregoing, Live Transmission Rights include the right to offer the Live Transmission Rights of an Event to mobile devices, tablets, computers, connected TVs, virtual reality viewing devices, hologram viewing devices, etc. For further clarity, without limiting the foregoing, the Live Transmission Rights of an Event could be included as part of what is commonly known as a "TV Everywhere offering," and/or could be offered directly to consumers or delivered as part of any other type of offering now known or hereafter developed.

"Material Sponsor" has the meaning set forth in Section 5.4.

"Media Revenues" means all monies, other than Other Awards, actually received, subject to Section 4.3(a), by NEM or a NASCAR Rights Affiliate pursuant to a Live Transmission Contract that relates to Live

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

Transmission of the NASCAR Cup Series (and, if aggregated with the NASCAR Cup Series, of the NASCAR Xfinity Series) and NASCAR Craftsman Truck Series (or their successors).

"Member" has the meaning given to it in the NASCAR Rule Book.

"Minimum Performance Standard" has the meaning set forth in Section 6.12.

"MPS Notice" has the meaning set forth in Section 6.12.

"NASCAR" has the meaning given to it in the Recitals.

"NASCAR Core Matters" has the meaning set forth in Section 10.1.3

"NASCAR Recipients" has the meaning set forth in Section 5.2.

"NASCAR Rights Affiliate" means any Person that is (i) an Affiliate or an assignee of NEM and (ii) engaged in the business of exploiting Live Transmission Rights or Ancillary Rights for purposes of performing any necessary activities incident thereto. NEM may arrange for, coordinate, supervise, determine, or control certain Event-related activity related to the immediately preceding, or act in other capacities relative to the Live Transmission Rights or Ancillary Rights; however, NEM is not engaged in the business of exploiting Live Transmission Rights or Ancillary Rights and, accordingly, is not a NASCAR Rights Affiliate.

"NASCAR Rule Book" means the NASCAR Cup Series Rule Book, as it may be amended, supplemented or otherwise modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NASCAR Rules" means the NASCAR Rule Book and all other rules, regulations, guidelines, directives, memoranda, resolutions, bulletins and agreements (including all agreements and other documents with respect to Drivers, sponsorship or media rights) of NASCAR, or any of its Affiliates, in each case as they may be amended or modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NEM" has the meaning set forth in the Preamble.

"NEM Indemnified Parties" means, collectively, NEM, its Affiliates and each of their respective agents, representatives, Affiliates, employees, shareholders, managers, members, officers and directors.

"NEM Permitted Transferee" has the meaning set forth in Section 8.4.

"Negotiation Period" has the meaning set forth in Section 2.3.

"Net Recovery" has the meaning set forth in Section 4.3(a).

"Non-Fuel Products" has the meaning set forth in Exhibit C.

"Nonrenewal Events" has the meaning set forth in Section 2.2.

"OEM" has the meaning set forth in Section 8.1.3

"Other Awards" shall mean awards paid to a NASCAR Rights Affiliate and awarded to the Driver (which may be waived by Driver in writing to be paid to Team) for the mid-season tournament from Warner Brothers Discovery and any successor promotion by a Broadcast Partner.

58

HIGHLY CONFIDENTIAL - OCO

"Other Teams" means each of the stock car racing teams authorized by NEM to participate in the Cup Series from time to time, other than the Team.

"Owner" means any Person who, directly or through any intermediate corporations, partnerships, limited liability companies or other Persons, owns of record or beneficially an equity interest in the Team Owner.

"Permitted Contractual Reduction" has the meaning set forth in Section 4.3(a).

"Person" means any individual, corporation, association partnership (general or limited), joint venture, trust, estate, limited liability company or other legal entity or organization.

"Points Pool Money" means, in any given Year, the sum of Race Purse for all Cup Series Points Events (which includes the Qualifying Races for the Daytona 500), Fixed Owner's Plan – Charter Teams, Fixed Owner's Plan – Open Teams, and Year-End Point Fund in such Year, in each case as set forth in Exhibit B.

"Pool Money" means in any given Year the sum of Invitational Pool Money and Points Pool Money.

"Practices" has the meaning set forth in the NASCAR Rule Book.

"Private Event" means an automobile or truck motorsports event which is non-commercial (i.e., track rental or automobile club). Non-commercial under this definition shall mean that Team Owner(s) does not receive consideration for the Private Event, including without limitation payment for i) any broadcast or exhibition in any media, ii) ticket sales, and/or iii) sponsorships.

"Prohibited Person" is a Person whose association with NEM or NASCAR would in NASCAR's reasonable opinion adversely affect the NASCAR brand or the image of the sport of stock car racing. For example and without limitation, a Person may be determined to be a Prohibited Person if such Person is involved in a material way with a business or activity that is illegal or immoral (such as pornography, illegal gambling or illegal performance-enhancing substances).

"Promoter" means any track promoter hosting an Event at its facility.

"Qualifying" has the meaning set forth in the NASCAR Rule Book.

"Qualifying Open Participant" has the meaning set forth in Section 3.5(a).

"Qualifying Race" has the meaning set forth in the NASCAR Rule Book.

"Qualifying Sponsor" has the meaning set forth in Section 6.9.1

"Race" means the portion of the Event that does not include Practice or Qualifying (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date). For clarity, the Duels at Daytona and other similar race qualifying formats adopted after the Effective Date, if any, shall each individually be considered a "Race" for all purposes of this Agreement.

"Remaining Charter Members" has the meaning set forth in Section 4.3(a).

"Reserved Sponsor Categories" means, collectively, each Series Sponsor Category, the Tire Category and the Fuel Category.

"Rules Package" means the annual rules package and testing policy of the Cup Series, including the NASCAR Rules, for any Year.

59

‖US-DOCS‖147133351.4‖

HIGHLY CONFIDENTIAL - OCO

23XI_0004380

"Sanction Agreement" means the agreements between each of the Promoters and NEM, whereby NEM agrees to conduct and officiate an Event at a facility operated by the applicable Promoter.

"Season" means the NASCAR Cup Series race season that occurs in a Year.

"Series Sponsor" means any title and presenting sponsor of the Cup Series. At any given time there may be only one Series Sponsor and only one Series Sponsor Category.

"Series Sponsor Category" has the meaning set forth in Exhibit C as amended from time to time in accordance with the terms hereof.

"Series Sponsor Change" has the meaning set forth in Section 6.9.1

"Special Awards" means those awards given to Competitors by the Reserved Category Sponsors.

"Specified NASCAR Entities" has the meaning set forth in the Preamble.

"Submission Date" has the meaning set forth in Section 12.2.

"Substitute Control Person" means an alternate individual person set forth and designated on Schedule 1 who is authorized to act on behalf of or bind the Team Owner in the absence, incapacity or death of the Control Person.

"Taxes" means all taxes, duties, levies and other similar charges, including related interest, additions to tax and penalties.

"Team" means the NASCAR racing team set forth on Schedule 1.

"Team Affiliates" means, with respect to each Team Owner, collectively, (a) all Affiliates of such Team Owner whose business pertains to competing in the Cup Series, (b) each Driver or crew member who is employed, engaged or otherwise controlled by such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, and (c) the officers, employees, agents, and representatives of such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, but with respect to (a) through (c) above, only if such Person is directly responsible for the participation of the Team's Designated Vehicle in the Events for Team Owner.

"Team Clips" has the meaning set forth in Section 5.4.

"Team Co-Chair" has the meaning set forth in Section 3.5(a).

"Team Intellectual Property" means the image, likeness, name, performance, and voice of Team Owner, Team or Team Affiliates or the Designated Vehicle; all names, words, symbols, emblems, logos, slogans, depictions, trade dress, trademarks, service marks, trade names, patents, copyrights, domain names, and other intellectual property owned or controlled by Team Owner or Team or Team Affiliates; and the Assigned Car Number.

"Team Owner" means the domestic U.S. entity set forth on Schedule 1 that directly and wholly owns, controls and operates the Team as provided herein.

"Team Owner Council" means the body of NEM representatives and designees of Charter Members and Open Team Members who meet and confer as provided in Section 3.5. As of the Execution Date, the Team Owner Council members for the Team Owner are set forth on Schedule 1. The Control Person shall have the right to remove or replace any Team Owner Council member at any time upon written notice to NEM, provided that such Person meets the requirements set forth in Section 6.5.

60

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO                                                                 23XI_0004381

"Team Owner Council Representative" has the meaning set forth in Section 3.5(a).

"Team Owner Event of Default" has the meaning set forth in Section 9.1.

"Team Owner Indemnified Parties" means, collectively, the Team Owner, the Control Person and each of their respective Affiliates, and each of their respective agents, representatives, Affiliates, employees, shareholders (or equivalent), managers, members, officers and directors.

"Team Owner Parties" means, collectively, the Team Owner and the Control Person.

"Term" has the meaning set forth in Section 2.1.

"Territory" shall be the United States and its territories, Canada and Mexico.

"Third Party Claim" has the meaning set forth in Section 11.3.

"Tire Category" has the meaning set forth in Exhibit C.

"Tire Sponsor" means the single sponsor with which NEM or any of its Affiliates enters into a sponsorship and supply (or similar) agreement with respect to, and that sells products or services in, the Tire Category.

"Trade Secret" means all data and other information collected by the Team Owner or one of its Affiliates or NEM or one of its Affiliates (i) pertaining to Team Owner or its operations (and not otherwise available to other Competitors), (ii) that provides the Team Owner (or one of its Affiliates) with an actual and independent competitive advantage from not being generally known to or readily ascertainable through appropriate means by other Competitors who would obtain a competitive advantage (or would materially negate Team Owners (or one of its Affiliates) competitive advantage) from its disclosure or use, and (iii) (to the extent controlled by Team Owner) is the subject of efforts by the Team Owner or such Affiliate that are reasonable under the circumstances to maintain its secrecy, provided that, (A) once any such data or other information is disseminated and known to the general public it shall no longer be deemed a Trade Secret and (B) notwithstanding the foregoing, any data or other information arising from and during one or more Events that was commercially exploited during the 2015 Cup Series season via any Live Transmission Activity shall not be deemed a Trade Secret. For clarity, neither the Team Owner nor any of its Affiliates nor NEM nor any of its Affiliates may commercially exploit (or authorize or license any Person the rights to commercially exploit) any Trade Secret, provided that the foregoing shall not preclude the use of any Trade Secret by (x) Team Owner or its Affiliates for non-public competition purposes or the use by Team Owner or its Affiliates or Team Owner's BMG or applicable vendor, as the case may be, pursuant to requirements of agreements under which such Trade Secret was invented or developed, or (y) NEM or its Affiliates for non-public (and, for clarity, not disclosed to any other Competitor) competition or officiating purposes. NEM and its Affiliates shall maintain the confidentiality of Trade Secrets known to NEM, unless Team Owner agrees otherwise in writing.

"Traditional Broadcast Deal" means NEM or its Affiliates contract with third party(ies) paying a fixed license fee for the Live Transmission (i.e., not an earn out, or ad- or subscription-based, or any other performance-based fee structure, etc.) of the Events.

"Transfer" means (i) when used as a noun: any direct or indirect transfer, sale, assignment, or other disposition (including the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law) and (ii) when used as a verb: to directly or indirectly transfer, sell, assign, or otherwise dispose of (including through the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law).

61

HIGHLY CONFIDENTIAL - OCO

"Transfer Approval Form" has the meaning set forth in Section 8.1.2.2

"Transfer Fee" has the meaning set forth in Section 8.1.2.2

"Transfer Notice" has the meaning set forth in Section 8.1.2.2

"Victory Tour" has the meaning set forth in the Driver Agreement.

"Works" means all film, audio only, video only, audio-visual, photographic images, sounds and Event Data (including in-car audio, in-car video, in-car radio, other electronic transmissions between cars and crews, and timing and scoring information) arising from and during any Event.

"Year" means (i) the period commencing as of January 1, 2025 and ending on December 31, 2025, and (ii) each subsequent twelve-month period beginning on January 1 and ending on December 31 of any year of the Term.


## **Exhibit B**

Timing of Payments of Pool Money

Race Purse and Fixed Owner's Plan monies will be paid within 5 Business Days subsequent to final race results for each Event (with the exception of the Qualifying Races for Daytona 500 and the Clash, which will be paid within 5 Business Days subsequent to final race results of the Daytona 500).

Year-End Point Fund monies will be paid within 30 calendar days subsequent to final race results for each Year.

Timely remittance of all monies is subject to submission of all banking, tax and other administrative information reasonably requested by NEM, including information required to comply with federal, state and local tax laws.


Pool Money

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 (a) |
|---|---|---|---|---|---|---|---|
| | | | | $000's | | | |
| **Total Pool Money** | $431,373 | $437,043 | $447,055 | $450,662 | $458,614 | $462,312 | $444,558 - 468,209 |
| **Uses of Funds** | | | | | | | |
| Race Purse (Points events) | 118,014 | 121,555 | 125,201 | 128,957 | 132,826 | 136,811 | 133,797 - 140,915 |
| Race Purse (Invitational events) | 6,005 | 6,186 | 6,371 | 6,562 | 6,759 | 6,962 | 6,809 - 7,171 |
| Fixed Owner's Plan | 182,136 | 180,329 | 182,640 | 178,314 | 178,096 | 173,378 | 161,989 - 170,607 |
| *Per Charter* | *5,059* | *5,009* | *5,073* | *4,953* | *4,947* | *4,816* | |
| Performance Plan | 91,505 | 94,250 | 97,078 | 99,990 | 102,990 | 106,080 | 103,743 - 109,262 |
| Year-End Point Fund | 33,712 | 34,723 | 35,765 | 36,838 | 37,943 | 39,081 | 38,220 - 40,254 |
| **Pool Money** | **431,373** | **437,043** | **447,055** | **450,662** | **458,614** | **462,312** | **444,558 - 468,209** |
| *Per Charter* | *11,983* | *12,140* | *12,418* | *12,518* | *12,739* | *12,842* | *12,349 - 13,006* |

Race-specific purses to be communicated to Teams by November 1st of the prior year

(a) Final number to be delivered to Teams by September 1, 2029

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004383

**Race Purse Payout Curve For Cup Series Points Events (a)**

| Finish Position | Payout Percentage | Finish Position | Payout Percentage |
|:---:|:---:|:---:|:---:|
| 1 | 5.160% | 21 | 2.399% |
| 2 | 4.067% | 22 | 2.318% |
| 3 | 3.976% | 23 | 2.237% |
| 4 | 3.885% | 24 | 2.157% |
| 5 | 3.794% | 25 | 2.076% |
| 6 | 3.704% | 26 | 1.995% |
| 7 | 3.613% | 27 | 1.915% |
| 8 | 3.522% | 28 | 1.834% |
| 9 | 3.432% | 29 | 1.753% |
| 10 | 3.341% | 30 | 1.672% |
| 11 | 3.250% | 31 | 1.597% |
| 12 | 3.165% | 32 | 1.521% |
| 13 | 3.079% | 33 | 1.445% |
| 14 | 2.993% | 34 | 1.370% |
| 15 | 2.908% | 35 | 1.294% |
| 16 | 2.822% | 36 | 1.218% |
| 17 | 2.736% | 37 | 1.143% |
| 18 | 2.651% | 38 | 1.057% |
| 19 | 2.565% | 39 | 0.971% |
| 20 | 2.479% | 40 | 0.886% |

(a) The Race Purse Payout Curve for the Daytona 500 Qualifying Races will be determined annually based on past practices and the number of entrants

63

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004384

64

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004385

**Fixed Owner's Plan payouts**

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 (a) |
|---|---|---|---|---|---|---|---|
| | | | | $000's | | | |
| Fixed Owner's Plan | $182,136 | $180,329 | $182,640 | $178,314 | $178,096 | $173,378 | 161,989 - 170,607 |
| Fixed Amount Per Points Event | $5,059 | $5,009 | $5,073 | $4,953 | $4,947 | $4,816 | *$4500 - $4739* |
| Fixed Amount Per Charter / Per Event | $141 | $139 | $141 | $138 | $137 | $134 | $125 - 132 |

65

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004386

**Performance Plan Payout Methodology**

Performance Plan is a share-based model, calculated annually using a combination of rolling 2-year Owner Points finishes

**<u>Rolling 2-year Owner Points Shares</u>**

- 36 shares given to the best average Charter Team Owner Points finish over the past 2 years, declining to 1 share for 36th best average Charter Team Owner Points finish
- Most recent year weighted at 100%, 2nd most recent year at 50%
- In the event of a tie in Charter Team Owner Points in a given season, teams that are tied will both receive credit for their tied position (e.g., if two teams tied for 10th, then both teams would receive credit for a 10th place finish in that season)
- In the event of a tie in average Charter Team Owner Points finish over the past 2 years, then the shares would be split across the tied Teams (e.g., if two Teams tied for 5th in average Charter Team Owner Points finish over the past 2 years, then each of those two Teams would split the shares for 5th and 6th place, resulting in 31.5 shares for each Team – 32 shares for 5th, 31 shares for 6th, average of 31.5 shares)

A Charter's rolling 2-year Owner Points shares are divided by the total number of outstanding shares to determine the percentage of total Performance Plan money to be paid out to the Charter in the following season.

Given the rolling nature of the calculation, NEM will notify all Charter Teams of their Performance Plan payout for the following season within 30 calendar days subsequent to the final race results for each Season.

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004387

# Year-End Point Fund Payout

| Finish Position | Payout Percentage | $000's | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
| 1 | 8.423% | $2,840 | $2,925 | $3,013 | $3,103 | $3,196 | $3,292 | $3219 - $3391 |
| 2 | 7.138% | $2,406 | $2,479 | $2,553 | $2,630 | $2,708 | $2,790 | $2728 - $2873 |
| 3 | 6.853% | $2,310 | $2,379 | $2,451 | $2,524 | $2,600 | $2,678 | $2619 - $2759 |
| 4 | 6.567% | $2,214 | $2,280 | $2,349 | $2,419 | $2,492 | $2,567 | $2510 - $2644 |
| 5 | 6.282% | $2,118 | $2,181 | $2,247 | $2,314 | $2,383 | $2,455 | $2401 - $2529 |
| 6 | 5.996% | $2,021 | $2,082 | $2,145 | $2,209 | $2,275 | $2,343 | $2292 - $2414 |
| 7 | 5.711% | $1,925 | $1,983 | $2,042 | $2,104 | $2,167 | $2,232 | $2183 - $2299 |
| 8 | 5.425% | $1,829 | $1,884 | $1,940 | $1,998 | $2,058 | $2,120 | $2073 - $2184 |
| 9 | 5.068% | $1,709 | $1,760 | $1,813 | $1,867 | $1,923 | $1,981 | $1937 - $2040 |
| 10 | 4.783% | $1,612 | $1,661 | $1,711 | $1,762 | $1,815 | $1,869 | $1828 - $1925 |
| 11 | 4.497% | $1,516 | $1,562 | $1,608 | $1,657 | $1,706 | $1,758 | $1719 - $1810 |
| 12 | 4.212% | $1,420 | $1,462 | $1,506 | $1,551 | $1,598 | $1,646 | $1610 - $1695 |
| 13 | 3.926% | $1,324 | $1,363 | $1,404 | $1,446 | $1,490 | $1,534 | $1501 - $1580 |
| 14 | 3.569% | $1,203 | $1,239 | $1,276 | $1,315 | $1,354 | $1,395 | $1364 - $1437 |
| 15 | 3.284% | $1,107 | $1,140 | $1,174 | $1,210 | $1,246 | $1,283 | $1255 - $1322 |
| 16 | 2.998% | $1,011 | $1,041 | $1,072 | $1,104 | $1,138 | $1,172 | $1146 - $1207 |
| 17 | 2.698% | $910 | $937 | $965 | $994 | $1,024 | $1,055 | $1031 - $1086 |
| 18 | 2.384% | $804 | $828 | $853 | $878 | $905 | $932 | $911 - $960 |
| 19 | 2.099% | $707 | $729 | $751 | $773 | $796 | $820 | $802 - $845 |
| 20 | 1.799% | $606 | $625 | $643 | $663 | $683 | $703 | $688 - $724 |
| 21 | 1.499% | $505 | $521 | $536 | $552 | $569 | $586 | $573 - $603 |
| 22 | 1.199% | $404 | $416 | $429 | $442 | $455 | $469 | $458 - $483 |
| 23 | 0.899% | $303 | $312 | $322 | $331 | $341 | $352 | $344 - $362 |
| 24 | 0.571% | $193 | $198 | $204 | $210 | $217 | $223 | $218 - $230 |
| 25 | 0.286% | $96 | $99 | $102 | $105 | $108 | $112 | $109 - $115 |
| 26 | 0.214% | $72 | $74 | $77 | $79 | $81 | $84 | $82 - $86 |
| 27 | 0.200% | $67 | $69 | $71 | $74 | $76 | $78 | $76 - $80 |
| 28 | 0.186% | $63 | $64 | $66 | $68 | $70 | $73 | $71 - $75 |
| 29 | 0.171% | $58 | $59 | $61 | $63 | $65 | $67 | $65 - $69 |
| 30 | 0.164% | $55 | $57 | $59 | $60 | $62 | $64 | $63 - $66 |
| 31 | 0.157% | $53 | $55 | $56 | $58 | $60 | $61 | $60 - $63 |
| 32 | 0.154% | $52 | $54 | $55 | $57 | $59 | $60 | $59 - $62 |
| 33 | 0.151% | $51 | $53 | $54 | $56 | $57 | $59 | $58 - $61 |
| 34 | 0.148% | $50 | $52 | $53 | $55 | $56 | $58 | $57 - $60 |
| 35 | 0.146% | $49 | $51 | $52 | $54 | $55 | $57 | $56 - $59 |
| 36 | 0.143% | $48 | $50 | $51 | $53 | $54 | $56 | $55 - $57 |
| **Total Year-End Point Fund** | | **$33,712** | **$34,723** | **$35,765** | **$36,838** | **$37,943** | **$39,081** | **$38,220 - 40,254** |

||US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004388

**Exhibit C**

**Reserved Sponsor Categories**

1.      Series Sponsor Category.

2.      Tire Category. means tires for any type of vehicle, including passenger cars, vans, sport utility vehicles (SUVs), light trucks, commercial trucks, trailers, motorcycles, aircraft, mopeds, scooters and recreational vehicles (RVs), including racing tires for any of the foregoing vehicles. "Competitor Tire Shop" means a tire retailer, wholesaler, retreader installer or repair facility that: (i) includes the name of a single competitor tire brand (e.g., with respect to Goodyear (the Tire Sponsor as of the Execution Date), Firestone Complete Auto Care); or (ii) is owned or operated by any Person that owns a third-party competitor tire brand and gives preferential treatment to a single competitor brand or affiliate brands. The Team Owner or Control Person shall be permitted to include on the Designated Vehicle the branding of a retail tire company and/or repair facility which features the word "tire" in conjunction with the company name (e.g., Discount Tire), provided that such third party retailer/repair facility is not a Competitor Tire Shop.

3.      Fuel Category. means combustion-based fuel and fuel blends for automotive vehicles, including hydro carbon-based, diesel, biodiesel, hydrogen, ethanol, or other alternative fuels and fuel blends. Notwithstanding the foregoing, a company in the Fuel Category may also manufacture lubricants (i.e., motor oil, etc.) and other products or offer other services (i.e., convenience stores) other than automotive fuel (collectively "Non-Fuel Products"). Such Non Fuel Products sponsorships are permitted subject to NEM approval and the conditions outlined below. Companies in the Fuel Category may sponsor a Team Owner Party or the Team for Non-Fuel Products, provided that the Designated Vehicle and the Team's uniforms, hauler and at-track equipment, etc., cannot feature the brand, logo, trademark, product or service identification of a (i) fuel, (ii) fuel retailer, or (iii) a corporate name of a company in the Fuel Category. Further, no Team Owner Party may advertise or promote a product or service which includes a brand, logo, or trademark of, or where the advertisement or promotion features a brand, logo, or trademark of a (i) fuel, (ii) fuel retailer, or (iii) the corporate name of a company in the Fuel Category, whether, in or out of uniform. For example, the Driver or Team Owner may enter into agreements with convenience stores as long as such convenience stores are not branded by a company in the Fuel Category (e.g. 7-Eleven, Circle K, Sheetz, WaWa). Companies in the Fuel Category may sponsor the Designated Vehicle, the Driver or the Team for a lubricant or other similar product as long as they are not branded by a company in the Fuel Category. It is agreed and understood that the Team Owner Parties may not use their NASCAR themed property to promote and/or advertise foreign produced ethanol and/or non-corn based ethanol or advocate for any specific ethanol based consumer fuel blend (e.g. E15, E30). Team Owner may promote American ethanol and American ethanol related services provided that such advertising and promotions is approved in writing by NEM.

68

‖US-DOCS\147133351.4‖

HIGHLY CONFIDENTIAL - OCO

23XI_0004389

**Exhibit D**

**Logos**

The NASCAR logo and the NASCAR Series logo will only be used as follows:

69

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004390

## Exhibit E

## 2025 LOGO PLACEMENT GUIDELINES





70

||US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004391

**<u>Exhibit F</u>**

**WINDSHIELD SPECIFICATIONS**

**DRIVER'S NAME AND MANUFACTURER'S LOGO**

71

HIGHLY CONFIDENTIAL - OCO                                                                23XI_0004392



Font: Berthold Akzidenz Grotesk Extra Bold Condensed Italic     Height: 3.5 Inches

Color: White                                                                           Chevrolet Logo: 2.18" x 6.71"

|US-DOCS\147133351.4||

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 75 of 241

HIGHLY CONFIDENTIAL - OCO                                                    23XI_0004393

## Exhibit G

## Institutional Investors Policy

The following restrictions and regulations apply to the ownership and acquisition of passive, minority interests in one or more Charter Members by private investment funds ("Funds").

1.      A Fund, together with its related Funds, shall not own a direct or indirect equity interest in a Charter Member that is greater than or equal to 49%.

2.      No Charter Member shall have more than 49% of its equity interests owned directly or indirectly by Funds .

3.      No Fund nor its representatives, managers or affiliates shall be permitted to serve as a Control Person, Designated Team Representative or in any management or governance role of a Charter Member or NASCAR team. Prior to the acquisition of any equity interest in a Charter Member that would make a Fund a Substantial Owner, NEM must approve such fund in its sole and absolute discretion.

4.      No Fund, together with its affiliates, shall own a direct or indirect equity interest in more than two (2) Charter Member ownership groups (groups owning one or more Charter Member).

5.      Any equity interest in a Charter Member that is directly or indirectly owned by a Fund shall be passive interest and the Fund shall not have any form of voting, management or consent rights with respect to such Charter Member or the applicable NASCAR team, other than customary fundamental consent rights such as with respect to (i) fundamental changes in the Charter Member's capital structure; (ii) affiliated party transactions with the Charter Member's Control Person and (iii) amendments to the governing documents of the Charter Member that are specifically intended to adversely and disproportionately affect the Fund in a material manner as compared to other equity owners.

6.      Funds [that are Owners of more than one (1) Charter Member] shall not have access to non-public competitive data (e.g., data related to race strategy or analytics) or any team personnel (e.g., driver, team manager, crew chief) or participate in or have access to any competitive decisions or decision making process.

7.      Notwithstanding anything to the contrary contained herein, no sovereign wealth fund shall be an Owner (other than as a limited partner in a Fund).  NEM acknowledges and agrees that no Fund that is a sovereign wealth fund is or will be a direct equity owner of NEM.

NEM agrees in good faith that the foregoing limitations shall not apply with respect to the ownership of Charter Members by sports holding conglomerates (e.g., Fenway Sports Group, Harris Blitzer Sports Entertainment and similar entities) and such conglomerates shall not constitute "Funds" for the purposes of this Exhibit G.

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004394

## Exhibit H

### Sample Transfer Approval Form

[Date]

**Charter Agreement No**       [Number]             [Effective Date]

**Transferor:**
**Charter Team Owner**       [Name]
       [Contact Information]

**Control Person**       [Name]
       [Contact Information]

**Transferee:**
**Team Owner**       [Name]
       [Contact Information]

**Control Person**       [Name]
       [Contact Information]

***[Please attach Team Ownership Disclosure Document]***

**Charter Transfer Value**

       **Total Consideration:**       [Amount]

**Requested Competition Number**       [Number]

**Does the Transferor Retain any interest in the above Charter?**       [Y/N]

       If yes, please describe:

*\*Please note that neither NEM nor its Affiliates represent, warrant, or in any way certify or confirm the accuracy of the above information. NEM and its Affiliates have not participated, nor assisted in the gathering or reporting of the above information and is provided solely for information purposes only. No liability, reliance or other claim shall be made against NEM of its Affiliates for providing the information contained in this document*

74

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO       23XI_0004395

## Schedule 1

### Certain Designations and Disclosures

**Team Name:**      **(e.g. commonly used name of team)**                _____

**Assigned Car Number:**                                _____

**Team Owner:**      (e.g. name of official corporate entity that owns the team)      _____

**Control Person:**      (e.g. team principal)      _____

**Substitute Control Person:**      (e.g. President, COO, etc. to act in absence, incapacity or death of Control Person)      _____

**Designated Team Representative:**      (e.g. competition director)      _____

**Team Owner Council Representative:**      (e.g. director, owner, CEO, President, CFO or other senior executive appointed by Team Owner)      _____

**Initial Driver:**                                  _____

**Crew Chief:**                                   _____

**Manufacturer:**                                _____

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004396

## Schedule 2

## Ownership of Team Owner

*[TEAM OWNER TO PROVIDE INFORMATION]*

(A)    *Each direct owner of Team Owner*:

(1)    Entity Name: _____

Contact Address: _____

_____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

(2)    Entity Name: _____

Contact Address: _____

_____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

(3)    Entity Name: _____

Contact Address: _____

_____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

*[ADD MORE ENTRIES IF NECESSARY]*

76

||US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

(B) *Each direct owner of an equity interest in any entity whose primary asset is a direct or indirect interest in Team Owner:*

(1) Entity Name: _____

Contact Address: _____

_____

% Equity in Team Owner: _____

Ultimate Beneficial Owner: _____

Contact Number: _____

(2) Entity Name: _____

Contact Address: _____

_____

% Equity in Team Owner: _____

Ultimate Beneficial Owner: _____

Contact Number: _____

(3) Entity Name: _____

Contact Address: _____

_____

% Equity in Team Owner: _____

Ultimate Beneficial Owner: _____

Contact Number: _____

*[ADD MORE ENTRIES IF NECESSARY]*

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004398

**Schedule 3**

**NEM FEE SCHEDULE\***

| | |
|---|---|
| | |
| | |
| | |
| | |

* This chart reflects major team-related fees for participating in racing events. Other fees during the year (e.g., tables at the Cup Banquet, filing an appeal) to be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

78

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004399

**Exhibit I**

**FORM OF DRIVER AGREEMENT**

79

|US-DOCS\147133351.4||

HIGHLY CONFIDENTIAL - OCO

23XI_0004400

HIGHLY CONFIDENTIAL - OCO

23XI_0004401

**CHARTER MEMBER AGREEMENT NUMBER: 04**

**ASSIGNED CAR NUMBER (AS OF EXECUTION DATE): 45**

# NASCAR CUP SERIES
# CHARTER MEMBER AGREEMENT

1

US-DOCS\147133351.4

HIGHLY CONFIDENTIAL - OCO

23XI_0004402

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Definitions | 5 |
| 2. | Term | 5 |
| | 2.1 Term | 5 |
| | 2.2 Term Extension | 5 |
| | 2.3 Good Faith Renewal Negotiations | 6 |
| 3. | NEM Commitments | 7 |
| | 3.1 NEM Commitments | 7 |
| | 3.2 Field Size | 8 |
| | 3.3 Anti-Dilution | 9 |
| | 3.4 Charter Member Issuance or Re-Issuance | 10 |
| | 3.5 Governance | 11 |
| | 3.6 Rules Packages and Testing Policy | 15 |
| | 3.7 Single Source Supplier | 16 |
| 4. | Payments and Distributions | 17 |
| | 4.1 Pool Money | 17 |
| | 4.2 Payment Terms | 17 |
| | 4.3 Payment Obligations | 17 |
| 5. | Intellectual Property | 18 |
| | 5.1 Ownership and Acknowledgment | 18 |
| | 5.2 Advertising and Promotional Activities by NEM | 19 |
| | 5.3 Collective Use | 20 |
| | 5.4 Team Clips | 20 |
| | 5.5 Team Intellectual Property; Works; Ancillary Rights | 21 |
| | 5.6 Advertising and Promotional Activities by Team Owner | 22 |
| | 5.7 Team Websites | 22 |
| | 5.8 Entertainment Program | 23 |
| | 5.9 NASCAR Fan Rewards Support | 23 |
| | 5.10 Motorsports Consumer Data Platform | 23 |
| | 5.11 Driver Ambassador Program | 23 |
| | 5.12 Industry Support | 23 |
| | 5.13 Retained Revenue | 23 |
| | 5.14 New Business | 24 |
| 6. | Team Owner Obligations | 24 |
| | 6.1 Operating Obligations | 24 |
| | 6.2 Competition | 25 |
| | 6.3 Designated Sponsor and Competitor Branding | 25 |
| | 6.4 Driver Agreement | 26 |

2

|       |       |                                                                          |       |
|-------|-------|--------------------------------------------------------------------------|-------|
|       | 6.5   | NASCAR Rules ............................................................ | 26    |
|       | 6.6   | Protection Of Goodwill ................................................... | 27    |
|       | 6.7   | Injunctive Relief .......................................................... | 27    |
|       | 6.8   | Sponsor Exclusivity ...................................................... | 27    |
|       | 6.9   | Series Sponsor Exclusivity .............................................. | 28    |
|       | 6.10  | Tire Sponsor Exclusivity ................................................. | 30    |
|       | 6.11  | Fuel Sponsor Exclusivity ................................................. | 31    |
|       | 6.12  | Minimum Performance Standards ...................................... | 31    |
|       | 6.13  | Media/Promotional Obligations ........................................ | 31    |
|       | 6.14  | Team Sponsors ............................................................. | 32    |
| 7.    | Cost Cap Model ..................................................................... | | 33 |
|       | 7.1   | Development ............................................................... | 33    |
|       | 7.2   | Soft Launch ................................................................ | 33    |
|       | 7.3   | Implementation ........................................................... | 33    |
| 8.    | Transferability/Charter Limitation ............................................ | | 33 |
|       | 8.1   | Transfer .................................................................... | 33    |
|       | 8.2   | Limitations On Transfers ................................................ | 36    |
|       | 8.3   | Charter Member Agreement Limitation .............................. | 36    |
|       | 8.4   | Transfers by NEM ........................................................ | 36    |
|       | 8.5   | Publicly Traded Entities ................................................ | 36    |
|       | 8.6   | Institutional Investors Policy .......................................... | 37    |
| 9.    | Termination ........................................................................... | | 37 |
|       | 9.1   | Team Owner Events of Default ......................................... | 37    |
|       | 9.2   | NEM Event of Default ................................................... | 38    |
|       | 9.3   | Consequences of Termination .......................................... | 38    |
|       | 9.4   | Set-Off ..................................................................... | 39    |
|       | 9.5   | Voluntary Forfeiture ..................................................... | 39    |
| 10.   | Representations, Warranties and Covenants ................................ | | 39 |
|       | 10.1  | Representations, Warranties and Covenants by the Team Owner and the Control Person ............................................... | 39    |
|       | 10.2  | Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities ................................................ | 40    |
|       | 10.3  | Release And Waiver by Team Owner and Control Person ............ | 42    |
|       | 10.4  | Release And Waiver by NEM ............................................ | 42    |
| 11.   | Indemnification ..................................................................... | | 42 |
|       | 11.1  | Team Owner Indemnity .................................................. | 42    |
|       | 11.2  | NEM Indemnity ........................................................... | 43    |
|       | 11.3  | Third Party Claims ....................................................... | 43    |
| 12.   | Dispute Resolution ................................................................. | | 43 |

3

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 86 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004404

|  | 12.1 | Dispute Resolution | 43 |
|  | 12.2 | Arbitration Mechanics | 43 |
|  | 12.3 | Arbitration Award | 44 |
|  | 12.4 | Equitable Relief | 44 |
|  | 12.5 | Limitations on Damages | 45 |

13. Miscellaneous ................................................................. 45

|  | 13.1 | Notices | 45 |
|  | 13.2 | Complete Agreement | 45 |
|  | 13.3 | Expenses | 45 |
|  | 13.4 | Governing Law | 46 |
|  | 13.5 | Confidentiality | 46 |
|  | 13.6 | Relationship Created | 46 |
|  | 13.7 | No Third-Party Beneficiaries | 46 |
|  | 13.8 | Separability | 46 |
|  | 13.9 | Failure to Take Action; Waiver | 46 |
|  | 13.10 | Force Majeure | 46 |
|  | 13.11 | Publicity | 47 |
|  | 13.12 | Amendments | 47 |
|  | 13.13 | Further Action | 47 |
|  | 13.14 | Joint and Several | 47 |
|  | 13.15 | Reservation of Rights | 47 |
|  | 13.16 | General Interpretative Provisions | 48 |
|  | 13.17 | Performance | 48 |
|  | 13.18 | Survival | 48 |
|  | 13.19 | Counterparts | 48 |

**Exhibit A** ................................................................. 51

**Exhibit B** ................................................................. 60

**Exhibit C** ................................................................. 65

**Exhibit D** ................................................................. 66

**Exhibit E** ................................................................. 67

**Exhibit F** ................................................................. 68

**Exhibit G** ................................................................. 69

**Exhibit H** ................................................................. 70

**Schedule 1** ................................................................. 71

**Schedule 2** ................................................................. 72

**Schedule 3** ................................................................. 74

**Exhibit I** ................................................................. 75

4

US-DOCS\147133351.4

HIGHLY CONFIDENTIAL - OCO

23XI_0004405

# NASCAR CUP SERIES
# CHARTER MEMBER AGREEMENT

The parties to this Charter Member Agreement (this "Agreement") dated as of the Execution Date are (i) NASCAR Event Management, LLC a Florida limited liability company ("NEM"), (ii) solely for purposes of Sections 10.2, 10.4, 11.2,, NASCAR Broadcasting, LLC ("Specified NASCAR Entities"), (iii) the Team Owner (as defined below), and (iii) the Control Person (as defined below), and is effective as of the Effective Date (as defined below).

## RECITALS

A.     NEM, pursuant to a license agreement with its Affiliate, National Association for Stock Car Auto Racing, LLC, a Florida limited liability company ("NASCAR"), organizes, operates, sanctions and exploits the Events (each as defined below);

B.     The Team Owner directly owns, controls and operates the Team (as defined below), and the Control Person, directly or indirectly, owns a controlling equity interest in the Team Owner as set forth herein;

C.     The object of this Agreement is NASCAR's grant, through its Affiliate NEM, to the Team Owner of the right to participate in the Cup Series throughout the Term; and

D.     NEM is willing to grant the Team Owner, and the Team Owner is willing to accept, the right and license to participate in the Cup Series during the Term (each as defined below) on the terms and subject to the conditions set forth in this Agreement.

Accordingly, it is agreed as follows:

1.     Definitions.  Capitalized terms used but not defined herein shall have the meanings given to them in Exhibit A hereto.

2.     Term.

2.1     Term.  Subject to Section 2.2, the term of this Agreement shall commence on the Effective Date and shall continue until the earlier of (x) December 31, 2031 or (y) the termination of this Agreement pursuant to Section 9 hereof (such term, the "Initial Term" and the Initial Term as it may be extended by the Extension Term (as defined below) pursuant to Section 2.2, shall be referred to herein as the "Term"). This Agreement shall constitute a valid, binding and enforceable agreement of each of the parties hereto as of the Execution Date and it is acknowledged that the rights granted under this entire Section 2 apply specifically to this Agreement (Charter No. [CHARTER NUMBER]).  This Section does not limit or affect NEM's rights regarding other Charter Member Agreements.

2.2     Term Extension.  NEM and Team Owner acknowledge that the Team Owner's desire to enter into an extension of the Agreement will depend, in part, on the Pool Money payable to Team Owner during the period from Year 2032 through Year 2038.  Subject to Team Owner not being in Good Standing, then on or prior to November 1, 2030 (or as soon as reasonably practicable ), NEM will provide written notice to Team Owner of the amount of Pool Money and the allocations thereof for each year during the period from Year 2032 through Year 2038 (the "Pool Money Notice").  Subject to 4.3(a), if NEM or its Affiliates enter into a Traditional Broadcast Deal for a term of at least seven (7) years (commencing January 1, 2032) and the gross annual average value ("AAV") during the period from Year 2032 through Year 2038

5

HIGHLY CONFIDENTIAL - OCO

23XI_0004406

is no less than gross AAV of the current Media Revenues for the Initial Term then the aggregate Pool Money across the Extension Term offered by NEM shall be no less than the aggregate set forth on Exhibit B. Team Owner may send a written notice (an "Extension Notice") during the period beginning January 1, 2031 and ending March 1, 2031 to NEM stating its desire to extend the Term for an additional seven (7) year period through Year 2038. If such Extension Notice is delivered during such period, the Term will be automatically extended until December 31, 2038 without further action by any party (the "Extension Term"), provided that the Term shall not be extended if NEM, following the delivery of such Extension Notice, has the right to terminate this Agreement pursuant to Section 9.1 hereof (and, for any defaults that are subject to cure pursuant to Section 9.1, the applicable cure periods have expired) and NEM provides notice to Team Owner within sixty (60) days following the date of delivery by the Team Owner of such Extension Notice that this Agreement is not being extended as a result of such termination right (the events referenced in this proviso shall be referred to herein as "Nonrenewal Events", it being understood and agreed that in the event that NEM does not deliver such notice, then NEM will not subsequently have the right to terminate this Agreement pursuant to Section 9.1 in respect of any Nonrenewal Event of which it was aware prior to termination of such sixty (60) day period) (provided that, if Team Owner has complied with the Minimum Performance Standards as provided under Section 6.12 in all material respects and is otherwise not in material breach of this Agreement at such time). The failure of Team Owner to timely deliver an Extension Notice shall constitute a waiver on the part of Team Owner to extend this Agreement pursuant to this Section 2.2, except in circumstances where NEM has failed to timely deliver to Team Owner the amount of Pool Money payable during the period from Year 2032 through Year 2038 and the allocations thereof. If Team Owner does not issue the Extension Notice, then any issuance of this Agreement will be governed by the provisions set forth in this Section 2.2 and Section 3.4 shall not apply. Except as provided below, NEM may not reissue this Agreement to any third party on terms more favorable than those offered to Team Owner for the remainder of the Initial Term following delivery of the Pool Money. If NEM intends to reissue this Agreement during the Initial Term to a third party on terms that are more favorable to the third party than the then-Current terms of this agreement, NEM must promptly inform Team Owner of such more favorable terms. Team Owner will then have thirty (30) days from receiving such notice to accept the extension of this Agreement for the duration of the Extension Term on such more favorable terms. Should Team Owner exercise this right and extend this Agreement, NEM must extend this Agreement on such more favorable terms. If this Agreement is not extended pursuant to this Section 2.2 and Team Owner participates in a competitive motorsports as defined in Section 6.6 then NEM shall be free to offer or sell this Agreement without any restrictions.

2.3     Good Faith Renewal Negotiations.  Subject to Team Owner not being in material breach of this Agreement at such time and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-compliance being waived by NEM in its sole discretion), the parties agree that during the period beginning on from July 1, 2037 through December 31, 2037 (the "Negotiation Period"), the parties will discuss the economic and non-economic terms related to the extension of the Term and, if there is mutual agreement, will enter into an amendment for a renewal of this Agreement beyond December 31, 2038. All renewal discussions shall be confidential and done in good faith, and NEM shall deliver to Team Owner a written proposal on or before the start of such Negotiation Period outlining the terms and conditions (including economic terms) on which it would then be willing to enter into a renewal. The Negotiation Period shall be exclusive to the Team Owner with respect to a renewal of the rights granted under this Agreement (and neither NEM nor its Affiliates shall solicit offers from, or enter into negotiations with, any third party any time prior to the Negotiation Period regarding any agreement or arrangement that if implemented would prevent or materially impede NEM from extending the Term of or otherwise renewing this Agreement). While NEM and the Team Owner currently desire to

6

HIGHLY CONFIDENTIAL - OCO

renew this Agreement upon expiration of the Term, the final decision regarding whether or not to renew, and the term of any renewal period, shall be subject to mutual agreement of the parties and, for clarity, either party may propose any changes to this Agreement during such Negotiation Period. If the parties have not agreed to renew this agreement prior to December 1, 2037, then no later than December 15, 2037, NEM shall submit its final offer to Team Owner with respect to such renewal in writing (the "Final Offer") and Team Owner shall accept or decline the Final Offer in writing no later than December 31, 2037 (it being agreed if Team Owner does not accept or decline the Final Offer prior to December 31, 2037, then Team Owner shall automatically decline such Final Offer). If the parties fail to come to terms on an extension of this Agreement prior to the end of the Negotiation Period, then any issuance of this Agreement will be governed by the provisions set forth in this Section 2.3 and Section 3.4 shall not apply. Except as provided below, NEM may not reissue this Agreement to any third party on terms more favorable than those included in the Final Offer for the remainder of the Extension Term following the end of the Negotiation Period. If NEM intends to reissue this Agreement during the Extension Term to a third party on terms more favorable to the third party than those included in the Final Offer, it must promptly inform Team Owner of such terms. Team Owner will then have thirty (30) days from receiving such notice to either accept or reject such more favorable terms. Should Team Owner exercise this right and match a third-party offer, NEM must renew the Agreement on the matched terms. After good faith negotiations as prescribed herein and the parties fail to reach an agreement then if Team Owner participates in a competitive motorsports as defined in Section 6.6 then NEM shall be free to offer or sell this Agreement without any restrictions. For avoidance of doubt, NEM may determine to issue or not re-issue such Agreement under Section 2.2 or under this Section at its discretion.

3.  <u>NEM Commitments.</u>

   3.1  <u>NEM Commitments.</u>  During the Term:

      (a)  Subject to the terms of this Agreement and the delivery to NEM of a valid executed Driver Agreement, and otherwise in compliance with the NASCAR Rules, the Team Owner shall have the right to (i) enter the Designated Vehicle in, practice, participate in qualifying (or whatever reasonable alternate method NEM uses) to determine starting order, race in the Race, and achieve a finishing position for each Event that is held during the Term, (ii) achieve a finishing position in the point standings for the Cup Series for each Season, and (iii) be referred to as a NASCAR Team during the Term. NEM represents, warrants and covenants that (A) it has and will retain the exclusive right to grant (or otherwise arrange for) guaranteed starting positions in Events, and that, except as otherwise provided in this Agreement, it will not do so through any means other than Charter Member Agreements (and, for clarity, for purposes of the foregoing, participation by open teams shall not be deemed a "guaranteed" starting position in any Event), and (B) the money payable by NEM or its Affiliates to Competitors with respect to Event participation shall be paid to Competitors as provided in <u>Exhibit B</u>. Special Awards monies, if any, will be determined on an annual basis in addition to money payable pursuant to <u>Exhibit B</u>. For the avoidance of doubt, all such rights shall include any Invitational Event(s) for which the Team Owner has satisfied all applicable qualification requirements;

      (b)  NEM shall, or shall cause its Affiliates to, during each Year of the Term, distribute to the Team Owner, on or prior to when due, the applicable amount (i) of Pool Money as set forth in Exhibit B, and (ii) Special Awards monies, if any, with the amount of such Special Awards monies, if any, that the

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 90 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004408

Team Owner is eligible for to be determined based on the applicable contract and achievement of the applicable criteria for such amounts (for clarity, any Special Awards monies for any Year shall be paid to Competitors for such Year, after receipt of such funds and subject to the applicable contractual requirements imposed by the counterparties to such contracts with respect to such monies);

(c)     NEM, either directly or through an Affiliate, has the right to sell one or more (but not more than two) title sponsorships for the Cup Series in any year pursuant and subject to Sections 6.8 and 6.9, and one or more sponsorships in the other Reserved Sponsor Categories (which sponsorship may be selected by NASCAR in its reasonable discretion) in an effort to provide necessary competition resources and to have such sponsors engage in commercial activation and promotion of the Cup Series;

(d)     None of NEM or any parent, subsidiary or affiliate companies, shall at any time during the Term be a Competitor or acquire a direct or indirect interest in a Competitor; provided, however that (x) NEM and its Affiliates may acquire a Competitor or an interest in a Competitor, or conduct or support the operations of a Competitor, for a period of not more than twelve (12) months if NEM or its Affiliates determines in its reasonable discretion that NASCAR's ownership, conduct or support of such Competitor would be in the best interests of the sport of stock car racing, provided that during such time, NEM shall use commercially reasonable efforts to identify a third party who would acquire such Competitor or such interest therein as soon as reasonably practicable, and (y) nothing in this Agreement shall be deemed to prohibit or restrict any direct or indirect owner of NASCAR Holdings, Inc., or any Family Relative of any such owner (e.g., any member of the France family), from starting a Team and acquiring a Charter in accordance with the terms of this Agreement or owning a Competitor or any interest therein or participating in the operations of any Competitor (e.g., as a driver, engineer, crew member, etc.) for any period of time subject to Section 8.3 of this Agreement. NEM shall provide written notice to Team Owner if any of the foregoing rights are exercised during the Term;

(e)     Other than any ownership by NEM or any Affiliate as of the Execution Date, NEM shall provide written notice under this Agreement to Team Owner if NASCAR or any of its respective Affiliates at any time during the Term becomes a Promoter or acquires a direct or indirect interest in a Promoter;

(f)     NEM shall provide Team Owner with the right to use the Assigned Car Number for the Term of this Agreement. Notwithstanding the foregoing, Team Owner may transfer the Assigned Car Number to any other Team owned and controlled by an Affiliate of such Team Owner, provided that any such transfer shall be subject to prior written notice to NEM and shall only be permitted to be effective prior to the commencement of a (and not during any) Season; and

(g)     All fees required annually for competition as provided in Schedule 3, including without limitation race entry, memberships applications and licenses, credentials and hard cards ("Charter Member Fees") accrued prior to the first Cup Series Points Event of the Season of each Year by Team Owner shall be billed in four (4) equal installments and due on March 1st, June 1st, September 1st and November 1st. All Charter Member Fees accrued after the first Cup Series Points Event of the Season will be billed and due in full on the next payment date of March 1, June 1, September 1st or November 1st as the case may be. Any Charter Member Fees accrued after the November 1st invoice, will be billed within five Business Days following the conclusion of the final Event for such Season and be due and payable on or prior to five Business Days following receipt of such bill. Any Charter Member Fees or other penalties as prescribed in this Agreement that remain unpaid 30 days (or in the case of such final bill for the year, five Business Days) after receipt by Team Owner of a written notice from NEM that such payment is past its due date may be set off against future Pool Monies that would otherwise be payable to the Team Owner.

8

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 91 of 241

HIGHLY CONFIDENTIAL - OCO                                        23XI_0004409

All Charter Member Fees shall be paid by ACH or wire transfer. Schedule 3 sets forth the amount of all fees that NEM or any of its Affiliates may charge to Team Owner or Control Person, or their respective Affiliates, during the Term, except that minor fees during the year (e.g., tables at the Cup Banquet, filing an appeal) may be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

3.2     Field Size.  For each Cup Series Points Event during the 2025 Year the maximum Field Size is forty (40) Competitors, and the maximum number of Charter Members is thirty-six (36). NEM's current intent is to maintain such Field Size and number of Charter Members for the duration of the Term. However, NEM, if it determines that it is in the best interest of the sport to increase the Field Size or the number of Charter Members during any portion of the remainder of the Term of this Agreement, may increase the Field Size to up to (but not in excess of) forty-three (43) Competitors and the number of Charter Members (with or without any increase in the Field Size) to up to (but not in excess of) forty (40) during any portion of the remainder of the Term; provided, however that (i) if the Field Size or number of Charter Members is increased, such increase shall be subject to the anti-dilution provisions set forth in Section 3.3; and (ii) prior to entering into an additional Charter Member Agreement, NEM shall comply with the provisions of Section 3.4(a).

3.3     Anti-Dilution.  In the event NEM (or any of its Affiliates) after the Execution Date, either (i) allows for additional open team positions which, when combined with the number of active Charter Member Agreements, increases the total Field Size above forty (40) Competitors for any Cup Series Points Event(s) or (ii) enters into one or more additional Charter Member Agreements which increases the number of active Charter Member Agreements above thirty-six (36) (which increase shall be effected in accordance with Section 3.2), then the following specific adjustments set forth in Sections 3.3(a)-(d) below shall be made to the Points Pool Money.

(a)     New Charter Member Agreement Issuance.  If one or more additional Charter Member Agreements are issued which increases the number of active Charter Member Agreements above thirty–six (36) (each such Year in which the number of active Charter Member Agreements is above thirty six, a "Charter Member Increase"), then for each Year (or portion thereof) during the Term where a Charter Member Increase is in effect (i) the amount of Fixed Owner's Plan (Charter Teams) shall be increased to equal the amount determined by multiplying the amount of Fixed Owner's Plan (Charter Teams) that would otherwise be payable in such Year or portion of such Year, as the case may be (as indicated in Exhibit B) by a fraction, the numerator of which is the number of active Charter Member Agreements for such Year and the denominator of which is 36 ; (ii) if a Charter Member Increase causes the Field Size to increase above 40 for any Cup Series Points Event, then the amount of the Race Purse, Performance Plan and Year-End Point Fund (as specified in Exhibit B) attributable to such Cup Series Points Event(s) shall be increased to equal an amount determined by multiplying the amount of the Race Purse, Year-End Point Fund and Performance Plan that would otherwise be payable for such Cup Series Points Event(s) (as indicated in Exhibit B) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40. If the Race Purse for any Cup Series Points Event(s) is increased pursuant to clause (ii) this Section 3.3(a), then NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field. Notwithstanding the foregoing, provided that a new BMG wishing to enter the sport is not able to secure a Team affiliate, then NEM may issue a new Charter Member Agreement(s) to a team owner affiliated with a new BMG entering the sport that does not include or fund the Fixed Owner's Plan in those particular Charter Member Agreement(s).

9

HIGHLY CONFIDENTIAL - OCO

23XI_0004410

(b)     Field Size Increase. If the Field Size is increased for any Cup Series Points Event(s) above forty (40) by adding one (1) or more open team positions (and not, for clarity, as a result of a Charter Member Increase, which is addressed in Section 3.3(a) above), then the amount of the Race Purse and Year-End Point Fund (as specified in Exhibit B) attributable to such Cup Series Points Event(s) payable to Competitors shall be increased to equal an amount determined by multiplying the amount of the Race Purse and Year-End Point Fund that would otherwise be payable for such Cup Series Points Event(s) (as indicated in Exhibit B) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40 (and NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field). Notwithstanding the foregoing, NEM may create an additional open category on an Event-by-Event basis for defined criteria as determined by NEM (e.g., F1 driver, former NASCAR Champion, etc.) that will have a reserved open position for that specific Event (the "Open Exemption"), provided however that such Open Exemption shall not be eligible for Race Purse or any other Pool Money and shall not require an increase to Race Purse and will not cause a Field Size increase under this Section and is not subject to anti-dilution. The "Open Exemption" position is intended for a driver who will significantly impact the promotion of the event and grow the prominence of the sport. Competitors must submit their request for the "Open Exemption" to NEM at least ninety (90) days prior to the Event. NEM will evaluate all submissions for the Event and have the sole discretion to determine which (if any) driver is approved for the Open Exemption.

(c)     Expansion of Field due to Increase in Both Charter Member Agreements and Open Teams; Information Requirements. In the event of an increase in the Field Size for a Cup Series Points Event above 40 due to both a Charter Member Increase and the addition of one or more open team positions, then the concepts set forth in clauses (a) and (b) above shall be applied by NEM with respect such increases to ensure the full anti-dilution protection contemplated therein, but without any duplication. For purposes of clarification, the concepts set forth in clauses (a) and (b) above shall only be applied for Cup Series Points Event(s) where the number of active Charter Member Agreements exceeds thirty-six (36) and/or the Field Size exceeds forty (40) Competitors. In the event NEM or any of its Affiliates elects to grant to any Person the right to compete in the Cup Series in any Year of the Term and if as a result of such grant there is a Charter Member Increase or the Field Size would be increased above forty (40), then in addition to compliance with the other provisions of this Agreement and NASCAR Rules, NEM shall deliver to Team Owner prior written notice of its intention to expand and documentation sufficient to evidence its compliance with the requirements of this Section 3.3. In no event will NEM issue a new Charter Member Agreement in accordance with this Section 3.3 and 3.4 that permits such new Charter Member to commence racing in any Event after the first Cup Series Points Event of such Season has commenced.

(d)     Subsequent Reduction of the Field Size. If, in any Year or portion of any Year following any increase in the Field Size above 40 or a Charter Member Increase as a result of which anti-dilution payments are made pursuant to the foregoing subsections (a)-(c), either the Field Size is decreased or the number of active Charter Member Agreement is decreased, then, effective following the time of such decrease, the foregoing requirements in respect of anti-dilution payments shall cease to apply in respect of the applicable increase that gave rise thereto (it being understood that any anti-dilution payments required to be made pursuant to such subsections (a)-(c) prior to such date shall be made as so required), provided, however, that, if such reduction results in a Charter Shortfall or a Field Shortfall, Section 4.1 shall apply.

3.4     Charter Member Issuance or Re-Issuance.

10

HIGHLY CONFIDENTIAL - OCO

23XI_0004411

(i)     Neither NEM nor its Affiliates shall enter into a new Charter Member Agreement that causes a Charter Member Increase, unless (i) NEM gives written notice to Team Owner and each other Charter Member of its desire to enter into the new Charter Member Agreement and specifying the identity of the proposed new Charter Member, following which Team Owner and each other Charter Member shall have the right to negotiate (to the exclusion of NEM and its Affiliates) with such proposed new Charter Member for a period of one hundred twenty (120) days following receipt of such notice regarding the terms on which Team Owner or any such other Charter Member might Transfer an existing Charter Member Agreement to such proposed new Charter Member, and (ii) if neither Team Owner nor any other Charter Members reach agreement with the proposed new Charter Member for the Transfer of an existing Charter Member Agreement within such 120-day period, then NEM will be free to negotiate with such proposed new Charter Member regarding the terms on which NEM is willing to issue a new Charter Member Agreement to such proposed new Charter Member. In the event that NEM reaches agreement with any such proposed new Charter Member, then at least 10 Business Days before issuing a new Charter Member Agreement to such prospective new Charter Member, NEM shall give written notice to Team Owner and each other existing Charter Member, specifying the economics (which such economics shall exclude the anti-dilutive amount that would be due and owing, and necessary to eliminate any anti-dilution payments, by such prospective new Charter Member pursuant to <u>Section 3.3(a)-(c)</u> of this Agreement (the "<u>Dilutive Amount</u>"), but such notice shall include, solely for information purposes, the amount of such Dilutive Amount and the basis for the calculation of such Dilutive Amount) to be paid by the new Charter Member and the rights being granted under the Charter Member Agreement and enclosing a firm offer by such proposed new Charter Member to purchase a Charter Member Agreement from any existing Charter Member on such terms (which, for clarity, shall exclude the payment by such prospective new Charter Member of any Dilutive Amount). If neither Team Owner nor any other Charter Member expresses an interest in transferring its Charter Member Agreement to the proposed new Charter Member in return for the consideration specified in the notice delivered by NEM within 10 Business Days following receipt of such notice from NEM, then NEM shall be free to issue a new Charter Member Agreement to such proposed Charter Member on such terms within 30 days following the expiration of such 10 Business Day period. Team Owner or any other Charter Member timely expressing such an interest in transferring a Charter Member Agreement to such proposed new Charter Member shall be permitted to assign its Charter Member Agreement to such new Charter Member in exchange for the economics set forth in the notice delivered by NEM (pursuant to an assignment agreement containing terms acceptable to the transferring Charter Member, acting reasonably) rather than NEM entering into a new Charter Member Agreement with such prospective new Charter Member (and NEM agrees to enter into any amendments to such Charter Member Agreement reasonably necessary to make the rights granted therein consistent with the applicable terms negotiated by NEM with the new Charter Member, other than the payment of the Dilutive Amount). If more than one Charter Member expresses an interest in assigning its Charter Member Agreement to the new prospective Charter Member in return for the consideration specified in the notice delivered by NEM, then the interested Charter Member that finished lowest in owner points (relative to other Charter Members) in the most recently completed Season shall have the right to assign a Charter Member Agreement that it currently holds to the new prospective Charter Member.

(ii)     In the event any Charter Member Agreement is forfeited or terminated for any reason except as set forth in <u>Section 2.2 and 2.3</u>, NEM may re-issue such Charter Member Agreement during the Term of this Agreement pursuant to the procedures set forth in this <u>Section 3.4(ii)</u> (and, for clarity, without subject to the provisions of <u>Section 3.3 or 3.3(a)</u>). Upon reissuance of such Charter Member Agreement, NEM shall be entitled to retain no more than Five Hundred Thousand ($500,000.00) US Dollars as NEM's re-issuance fee, with the remaining excess amount charged for such Charter Member Agreement

11

HIGHLY CONFIDENTIAL - OCO

23XI_0004412

to be distributed to (and to increase) the Fixed Owner's Plan - Charter Teams as shown in Exhibit B in the following Season (or, in the event that such Charter Member Agreement is re-issued in the final Year of the Term, then during such final Year's racing season). If NEM desires to reissue any forfeited or terminated Charter Member Agreement, NEM shall provide written notice (the "Invitation to Bid") to the then existing Competitors (including the Team Owner) and negotiate in good faith with any Competitors expressing an interest in acquiring such Charter Member Agreement (and the Competitors will be given a period of thirty (30) days following receipt of the Invitation to Bid during which to express such an interest) before reissuing such Charter Member Agreement to any third party. NEM's Invitation to Bid shall have as a condition that the Charter is granted to the eligible Competitor who submitted the highest bid, as reasonably determined by NEM. In the event that no bids are received in the applicable period then NEM shall be free to reissue such Charter Member Agreement to an eligible third party with whom NEM reaches a binding agreement.

      3.5   <u>Governance.</u> NEM is committed to a robust and inclusive governance model which will allow for NEM to provide information to and obtain significant and meaningful input from the Competitors to ensure decisions are made in the best interests of the sport. In furtherance of this goal, NEM shall form and maintain throughout the Term a Team Owner Council as described in further detail herein.

      (a)   <u>Formation of Team Owner Council.</u> NEM shall form and maintain throughout the Term a Team Owner Council, which will be comprised of (i) the controlling owner that controls, and together with its Affiliates is a party to, one or more Charter Member Agreements and the Cup Series teams granted such rights thereto (each, a "Charter Member Group"), and the controlling owner of each other Charter Member that is not part of a Charter Member Group, and in each case an alternate member designated by each such controlling owner who shall be a director, owner, CEO, President or CFO within the applicable Charter Member Group or of the Charter Member, as applicable, or another senior executive within such Charter Member Group or such Charter Member, as applicable, who has been approved by NEM (which approval will not be unreasonably withheld or delayed) and who may attend meetings of the Team Owner Council together with the controlling owner of such Charter Member Group or Charter Member, as applicable, (ii) the controlling owner of each open participant that attempted to qualify for at least 75% of the Cup Series races in the prior Year (a "Qualifying Open Participant") (any designated representative in the foregoing clauses (i) and (ii) shall be referred to herein as a "Team Owner Council Representative"); and (iii) NASCAR designees. Subject to the NEM approval rights set forth above, if applicable, Team Owner shall notify NEM of its alternate Team Owner Council Representative and of any change to such alternate Team Owner Council Representative. The Team Owner Council will be co-chaired by one NASCAR designee and one Competitor-appointed designee (each a "Team Co-Chair" and collectively the "Team Co-Chairs"). The Team Co-Chairs will be a current member of the Team Owner Council and will be selected (and may at any time be removed and replaced) by majority vote of the Team Owner Council, and in any such vote (whether for selection, removal or replacement) the Team Owner Council Representative from each Charter Member Group will have one vote for each Charter Member Agreement held by such Charter Member Group and the other Team Owner Council Representatives will have a single vote (for clarity, the alternate representatives shall vote only in the event that the applicable controlling owner is not present) (and, for clarity, the NASCAR designees shall not have a vote). The Team Co-Chairs will serve a two-year term as co-chair (subject to earlier resignation), and the Team Owner Council must use good faith efforts to rotate the Team Co-Chairs based on BMG affiliation.

      (b)   <u>Operation of Team Owner Council.</u> Through the mechanism of the Team Owner Council, NEM will present to the Team Owner Council and will consult meaningfully with the Competitors on all material matters of interest to the Competitors (e.g. safety and competition, proposed rule changes, industry economics, broadcast and sponsorship issues, single supplier arrangements, digital media issues

12

HIGHLY CONFIDENTIAL - OCO

23XI_0004413

and the development of fan-centric racing.) NEM's meaningful consultation obligation will include the obligation of NEM to share information with the Team Owner Council reasonably requested by any member of the Team Owner Council, but subject to the obligations of the members of the Team Owner Council to maintain the confidentiality of such information. However, NEM as the sanctioning body shall have the final decision making authority, subject to the terms of this Agreement. Nothing herein shall require NEM or its Affiliates to breach bona fide confidentiality obligations imposed on them pursuant to existing agreements.

(i)     Before implementing any General Change, NEM shall cause such General Changes to be individually brought forward and presented to the Team Owner Council. The Team Owner Council may provide feedback and will be meaningfully consulted on all General Changes; however, NASCAR will have final say regarding any General Change  "General Change" as used herein means as follows: (i) major rule package changes; (ii) increasing the number of testing dates or otherwise changing the testing policies in a manner that would materially increase costs for Competitors; (iii)  without in any way limiting the advance notice requirements set forth in Section 3.6(d) below, major equipment or engine changes; (iv) new single source supplier arrangements (whether created pursuant to agreements or implemented via NASCAR Rules or via specifications intended to create a single source supplier); (v) material Race format changes; (vi) material playoff eligibility or format changes; or (vii) material expansion to the length of the Event weekend.

(c)     Regular and Special Meetings of Team Owner Council. NEM will schedule and conduct, no less than two (2) times a Year, regular Team Owner Council meetings. Meetings will be held with the specific dates and locations to be determined by NEM in its reasonable discretion. NEM shall be obligated to notify the members of the Team Owner Council, by January 15th of such Year, of the dates and locations for such regular meetings in such Year. All such regular meetings must be attended in person. NEM will collaborate with Teams in developing the agenda for each such meeting, and the Chair of the Team Owner Council that is an NEM executive shall distribute the agenda for any regular meeting to each Team Owner Council member at least five (5) Business Days prior to the meeting. Special meetings of the Team Owner Council may be convened by either Co-Chair of the Team Owner Council, upon reasonable notice to the other members of the Team Owner Council, in which event the agenda shall include emergency matters raised by such members. Members shall be entitled to participate in any special meeting (i.e., any Team Owner Council meetings other than the twice-annual regular Team Owner Council meetings) by means of conference telephone. The Team Co-Chairs shall ensure that the meeting materials are distributed to each member of the Team Owner..

(d)     Committee Formation.

(i)     General. The Team Owner Council shall form and maintain throughout the Term the committees of the Team Owner Council referenced below (and such committees may form subcommittees as deemed reasonably necessary or appropriate). Ideas will be generated at the committee level and where applicable project work groups will be formed by the applicable committee to further research, and to develop and make recommendations to the committees and/or sub-committees. Project work groups shall entail joint participation and leadership from Competitor representatives and NEM designees. The committees will, where applicable, make recommendations for implementation and discussion at the Team Owner Council. However, NEM as the sanctioning body shall have the final decision making authority, subject to the terms of this Agreement. Team Owner and NEM agree to work in good faith to find ways to continue improving communication on a regular basis.

13

HIGHLY CONFIDENTIAL - OCO

23XI_0004414

(ii)     <u>Team Advisory Committee</u>.   The objective of the Team Advisory Committee shall be to review General Changes at an early stage of those processes and provide opportunities for feedback, input and collaboration.   The Team Advisory Committee shall be chaired by an NEM executive(s).  The Team Advisory Committee shall be comprised of four NEM designated members (including the chair person) and one (1) additional representative for each active BMG (as defined below). Each such BMG representative will be selected every two (2) years by the Teams associated with such BMG, provided that such representative shall rotate among the applicable Charter Member Groups every two (2) years. Information presented to the Team Advisory Committee shall be treated as confidential by all such representatives and shall not be shared with other Competitors until approved by NEM.  The Team Advisory Committee shall have the discretion to invite to such meetings any third party who will be able to provide relevant input to the meetings (e.g., OEMs, engine builders, tire manufacturers, and other suppliers, vendors, promoters, etc.), such participation shall be subject to a non-disclosure agreement if the Team Advisory Committee so requests. Team Advisory Committee meetings will be held on dates and at locations to be determined by NEM in its reasonable discretion. NEM will notify the members of the Team Advisory Committee of the dates and locations for such regular meetings no later than fifteen (15) Business Days prior to such meeting. NEM shall distribute the agenda for any regular meeting to each Team Advisory Committee member at least five (5) Business Days prior to the meeting.

(iii)     <u>Competition Committee.</u>  The objective of the Competition Committee shall be to collaborate to enhance safety and drive efficiencies and to produce a fan-centric racing product on the track.  Each Charter Member Group and each other Charter Member that is not part of a Charter Member Group shall have the right to designate one (1) representative on the Competition Committee (who shall be its competition director or senior technical lead), provided that the controlling owner and president of such Charter Member Group or Charter Member, as applicable, shall also have an open invitation to participate in Competition Committee meetings.  Each Qualifying Open Participant shall have the right to designate one representative on the Competition Committee.  The Competition Committee shall be chaired by two (2) NEM senior executives and by one (1) additional chairperson (e.g., three (3) additional chairpersons in total if there are three (3) BMG's) (each a "<u>Chairperson</u>") who will represent each BMG and who will be selected from among the existing Team representatives on the Competition Committee . Each such BMG Chairperson will be selected annually by the Teams associated with such BMG, provided that such Chairperson shall rotate among the applicable Charter Member Groups annually.   The Competition Committee shall have the discretion to invite to such meetings any third party who will be able to provide relevant input to the meetings (e.g., OEMs, engine builders, tire manufacturers and other suppliers, vendors, etc.) such participation shall be subject to a non-disclosure agreement if the Competition Committee so requests.  Competition Committee meetings will be held on dates and at locations to be determined by NEM in its reasonable discretion.  NEM will notify the members of the Competition Committee of the dates and locations for such regular meetings no later than fifteen (15) Business Days prior to such meeting.  The Chairpersons of the Competition Committee will develop the agenda for each such meeting after seeking input from other members of the Competition Committee, and a Chairperson who is an NEM executive shall distribute the agenda for any regular meeting to each Competition Committee member at least five (5) Business Days prior to the meeting.  Members shall be entitled to participate in any meeting by means of conference telephone.

(e)     <u>Conduct of Meetings.</u>  Any and all meetings conducted are intended to be open forums for productive dialogue for Competitors and NEM to raise issues, present positions, maintain a dialogue, provide meaningful input and make recommendations for review, all with the goal of reaching consensus based decisions.

14

HIGHLY CONFIDENTIAL - OCO

23XI_0004415

(f)     Consensus Building.  It is NEM's desire to build consensus amongst the Teams, BMGs, NEM and other relevant supporting stakeholders in the sport through the Team Owner Council and its committees, and the above referenced meeting processes.  NEM recognizes the value of diversity of input and the desire to have a cooperative and constructive collaboration in the sport, and both Team Owner by and through its representatives on the Team Owner Council and related committees and NEM commit to use their good faith efforts to reach consensus on all issues reviewed by the Team Owner Council. However, NEM as the sanctioning body shall have the final decision making authority regarding issues related to governance of the sport, except as otherwise set forth in other provisions of this Agreement (including, without limitation, Section 6.5).

3.6     Rules Packages and Testing Policy.

(a)     Annual Rule Package and Unified Testing Master Schedule Issuance.  Beginning with respect to the Rules Package that will be applicable in 2025 and without limiting the commitments set forth in Section 3.5, NEM shall (i) provide an update to the Team Owner Council and obtain the Team Owner Council's input on the annual Rules Package that will be applicable in a race Season at a Team Owner Council meeting preceding the race season, (ii) provide the annual Rules Package to the Team Owner for review no later than August 1 preceding any race Season and identifying any changes from the preceding Year's final Rules Package, and (iii) discuss and obtain meaningful input on the Rules Package from the Team Owner Council at its subsequent meeting, prior to the issuance of such annual Rules Package.  NEM shall issue the final annual Rules Package by November 15 (or within two weeks of the end of the Season, whichever is later) and after considering in good faith Team Owner Council input, and provided that such annual Rules Package shall not be in violation of the terms of this Agreement.  NEM will not schedule more than three (3) organizational tests (excluding Goodyear or other Tire partner testing) under the Unified Testing schedule for any year during the Term and NEM will collaborate and coordinate with the Teams on the scheduling of such test dates.

(b)     In Season Changes to Rules Package.  NEM covenants that no changes shall be made to the Rules Package that apply to any race season after the Rules Package for such race Season has been set in accordance with Section 3.6(a), unless (i) such change is a normal in-season administrative change, including tire allocations per event and gear ratios or other sporting regulations (not related to the car specifications), (ii) such changes are intended to drive efficiencies, (iii) such changes are intended to preserve parity or improve race quality, (iv)  such change is necessary for urgent safety reasons threatening life, limb or well-being, (v) such change is necessary in order to comply with applicable law; or (vi) a Force Majeure Event or material and unanticipated supply chain issues or any other circumstances that would prevent or materially impede NEM's ability to conduct an Event without making such change.  NEM shall be able to make such Force Majeure changes, provided that any such change made pursuant to clause (vi) shall be effective only for so long as the applicable issue or circumstance necessitating such change remains in effect.  Changes intended to preserve parity or improve race quality which cost teams more than $150,000 on average across the Competitors per season must be shared with the Team Advisory Committee to allow input prior to implementation.  NEM shall provide to the members of the Team Owner Council written notice, delivered as far in advance as is reasonably possible, of any proposed change to the Rules Package to be implemented pursuant to the previous sentence, and shall consult with and obtain views from the Team Owner Council in advance of such change to the extent practicable.  Notwithstanding anything above, the foregoing shall not impede NEM's ability to conduct, officiate the competition and enforce the NASCAR Rulebook subject to Section 6.5.

15

HIGHLY CONFIDENTIAL - OCO

23XI_0004416

(c)  <u>Bill of Materials.</u>  Without limiting the commitments set forth in <u>Section 3.5</u> and subject to changes described in <u>Section 3.6</u>, to minimize parts obsolescence a material change to single source parts will require a minimum notice period of twelve (12) months and any major engine changes would require an twenty-four (24) month notice period.  NEM shall not make any material change outside of the foregoing notice periods unless (i) such change is necessary for urgent safety reasons or in order to comply with applicable law (including without limitation any applicable federal or state law limiting carbon emissions), (ii) such change is in the ordinary course and does not create a material expense for Team Owner, (iii) a new BMG enters into or leaves the Cup Series, or (iv) due to any supply chain disruptions, raw materials shortages, labor or strike issues or other Force Majeure Events.

(d)  <u>Race Schedule.</u> Notwithstanding this <u>Section 3.6</u>, NEM shall not modify the Cup Series Points Event schedule or the Invitational Event schedule to add any Cup Series Points Events or Invitational Events in any Year unless the aggregate amount of Pool Money payable to Competitors in such Year is increased proportionally (i.e., the Pool Money shall be multiplied by a fraction, the numerator of which is of total number of Cup Series Points Events and Invitational Events for such Year (inclusive of such additional Cup Series Points Event(s) and/or Invitational Event(s)) and the denominator of which is 38)(i.e., the total number of Cup Series Points Events and Invitational Events on the Effective Date).  For clarity, the Daytona 500 and the Duels at Daytona are included as one Cup Series Points Event for purposes of the foregoing calculation of the denominator.

3.7  <u>Single Source Supplier.</u>  In the event that NEM determines that it will pursue a single source supplier for any part used by Competitors (whether created pursuant to agreements or implemented via NASCAR Rules or specifications intended to create a single source supplier), then if the single source supplier will supply anything  sanctioned for use by all Competitors,  NEM shall identify and discuss potential single source opportunities with the Competition Committee, and obtain the Competitor's feedback thereon, prior to pursuing such opportunities.  In addition, NEM will disclose the RFP for any applicable single source arrangement and the responses to the RFP to the Competition Committee promptly following issuance or receipt of each such document.  NEM will collect cost benchmarks and evaluate RFP responses against such benchmarks with the Competition Committee, and NEM will present the proposed preferred vendor and rationale for its selection to the Competition Committee prior to signing an agreement with such vendor.  Subject to the foregoing and the other applicable terms of this Agreement, NEM will have the discretion to make the final selection of the supplier; provided that no single source supplier shall charge Competitors in excess of arms-length reasonable commercial rates for the single sourced product. NEM and the Team Owner commit that they shall not receive financial consideration for exploiting their intellectual property or other assets as part of the agreement with the selected supplier. NEM and the Competitors, and their respective Affiliates, may exploit their intellectual property or other marketing assets for value and consideration to a single source supplier, provided that (i) such arrangement is not discussed or negotiated in any manner, or entered into, until after the single source supply arrangement is finalized and executed; (ii) the single source supply arrangement may not be conditioned in any manner on, including having economic incentives or termination rights tied to, entering into or failing to enter into any such arrangement, and (iii) if any such arrangement with a single source supplier is entered into in accordance with the foregoing, NEM (or its Affiliates) or the Team Owner (as applicable) shall provide written notice to the other party regarding the effective date, term and general subject matter of (including whether consideration will be received, but not otherwise detailing the consideration to be paid under) such arrangement.  In the event that a single supplier agreement already exists on the date of this Agreement which includes intellectual property or marketing assets, this <u>Section 3.7 </u>shall not disqualify the single

16

HIGHLY CONFIDENTIAL - OCO

23XI_0004417

source supplier from participating in the RFP process in connection with any future single source supplier arrangement or renewal. Any (i) single source supply agreements existing as of the Execution Date and renewals thereof or (ii) single source supply agreements with a Part that will cost a team less than $2,500 a season in the aggregate or (iii) replacement of any single source supply agreement in the Tire Category or Fuel Category, shall not be subject to the foregoing process (provided that (x) the prices charged Competitors in any of the foregoing single supply agreements (including extensions, renewals or replacements entered into after the Execution Date) shall not be artificially increased or, in the case of any replacement entered into after the Execution Date, pricing shall be determined consistent with the methodology from the previous contract, it being understood and agreed by the Team Owner that such prices may be subject to increases (including historical price escalations under existing single source agreements) and fluctuation based on market conditions, including, without limitation, the pricing or availability of raw materials, labor, transportation or conversion costs, and (y) the Team Owner and Control Person agree that the pricing under any single source supply agreement existing as of the Execution Date satisfies the foregoing requirements).

4. <u>Payments and Distributions.</u> Subject to any adjustments made pursuant to <u>Section 3.3</u> or <u>Section 3.6</u>:

4.1 <u>Pool Money.</u> In addition to any Special Awards distribution, for each Year, the amount to which the Team Owner is entitled to under this Agreement shall be determined in accordance with the terms set forth in <u>Exhibit B</u> hereto (the "<u>Pool Money</u>"). For avoidance of doubt, <u>Exhibit B</u> includes total Pool Money posted for Competitors if all team positions are paid for all Events. However, if any monies remain unpaid because the field for any Event is not filled ("<u>Field Shortfall</u>") or because fewer than 36 Charter Member Agreements are issued and active for any given Year ("<u>Charter Shortfall</u>"), then NEM shall pay any and all Race Purse attributable to the Field Shortfall or the Charter Shortfall, as the case may be, by increasing payouts in the Race Purse to Competitors who competed in the Event. The remaining amounts attributable to the Field Shortfall or Charter Shortfall (Fixed Owners Plan and Performance Plan) shall be retained by NEM to use during the then current Season at its reasonable discretion for the mitigation of the loss of Competitors and the growth or promotional opportunities for the sport.

4.2 <u>Payment Terms.</u> All Pool Money and any Special Awards distribution shall be payable solely and directly to the Team Owner and not to any Driver, Control Person, Owner or other employee, agent or contractor of the Team Owner. The Team Owner (and not NEM or any of its Affiliates) shall be solely responsible for the determination of and distribution of any and all Pool Money and any Special Awards distribution that may have been earned by a Driver or any employee, agent or contractor of the Team Owner with respect to the finishing position of the Designated Vehicle in any Event and the standings of the Cup Series and, provided that NEM has timely made or has caused its Affiliates to timely make all payments of Pool Money and any Special Awards distribution to the Team Owner, the sole recourse of such Driver or any such employee, agent or contractor for any failure to properly distribute any Pool Money and any Special Awards distribution shall be against the Team Owner and not against NEM or any of its Affiliates. Neither NEM nor any of its Affiliates shall be responsible for the filing or payment of any Taxes associated with any Pool Money or any Special Awards distribution paid to Team Owner, which Taxes shall remain the sole responsibility of the Team Owner and the Driver (as applicable), except solely to the extent required by applicable law to be, and which are, withheld by NEM or its Affiliate(s) from the Pool Money or any Special Awards distribution, as applicable. Notwithstanding the foregoing, NEM reserves the right to pay out additional awards, bonuses or any other consideration to Competitors or Drivers as NEM determines in its sole discretion, including without limitation Other Awards; provided NASCAR shall use

17

HIGHLY CONFIDENTIAL - OCO

23XI_0004418

good faith efforts to provide transparency to Team Owner for any payments made to Team's Driver(s) under this Section.

    4.3    <u>Payment Obligations.</u>

    (a)    Team Owner has no right to Pool Money specific to an Event if the Event is not commenced and officially completed (as determined in accordance with the Rule Book) due to a Force Majeure Event. If Media Revenue to be received by NEM or the applicable NASCAR Rights Affiliate(s) is delayed or reduced in whole or in part due to either (a) a Bankruptcy of a counterparty to a Live Transmission Contract, (b) a breach or violation of any such agreement by the counterparty thereto (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)), (c) a breach or violation of any such agreement by NEM or the applicable NASCAR Rights Affiliate solely to the extent that such breach or violation is caused by one or more Competitors other than due to a Force Majeure Event (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)), or (d) a Force Majeure event, or (e) a contractual reduction permitted in a Live Transmission Contract as the same has previously been described by NEM to Team Owner and which amount is not a material reduction to the overall Media Revenues or (f) any costs, expenses, settlements, legal fees, damages or other losses or liabilities arising out of or in connection with any and all claims, actions, demands, suits, investigations or any other legal or governmental proceedings in connection with any the Live Transmission Contract or the Live Transmission of Events ("<u>Permitted Contractual Reduction</u>"), then, in any such case, the portion of the total Pool Money that would have been indirectly funded by the Media Revenue which is not received by NEM or the NASCAR Rights Affiliate may be correspondingly delayed or reduced upon prior written notice to Team Owner, but only to the extent of the original delay or reduction in receipt (e.g., if a portion of the Media Revenue which is owed to the applicable NASCAR Rights Affiliate is not received under the circumstances described in clauses (a) – (f) above, then the pro rata portion of the shortfall would not be paid into the Pool Money until it is received). For example, if five percent (5%) of the Media Revenue is not paid when contractually required under the circumstances described in clauses (a)-(f), the Pool Money for the remaining Events shall be reduced proportionately so that total Pool Money is reduced by five percent (5%). If any such delay shall occur which delays timely payment of any portion of Pool Money to Team Owner for more than sixty (60) days, then, notwithstanding anything to the contrary herein, Team Owner and Control Person have the right to terminate this Agreement effective upon written notice to NEM, and upon such termination shall have no further obligations to NEM, NASCAR or their respective Affiliates; and provided, further, that for the avoidance of doubt, any monies subsequently received by NEM or a NASCAR Rights Affiliate, including moneys received by NEM or a NASCAR Rights Affiliate in connection with the exercise of remedies against a counterparty or a Competitor (or any of their respective Affiliates) in excess of actual out-of-pocket costs and expenses incurred by NEM or a NASCAR Rights Affiliate in connection with such recovery ("<u>Net Recovery</u>") as well as any moneys so received via insurance recoveries on the part of NEM or a NASCAR Rights Affiliate, will be paid into the Pool Money and distributed to the then current Charter Members in good standing ("<u>Remaining Charter Members</u>") (up to the amount of the Remaining Charter Members' proportionate percentage of such underpayment).

18

HIGHLY CONFIDENTIAL - OCO

23XI_0004419

(b)     On an annual basis, NEM will represent and warrant the amount of Media Revenues actually received by NASCAR Broadcasting for the applicable year.  Upon Team Owner's request, NEM will provide Team Owner with a statement of all revenues received by NEM or its Affiliates under Live Transmission Contracts during any Year, which will be certified to be accurate by an authorized officer of NEM and an independent third-party accounting firm of national standing.

5.     <u>Intellectual Property.</u>

5.1     <u>Ownership and Acknowledgment.</u>     The Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, acknowledge and agree that NASCAR exclusively and in perpetuity owns any and all rights to broadcast, transmit live, film, tape, capture, overhear, photograph, collect or record all Works by any means, process, medium or device (including television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmission over the Internet, and public and private online services authorized by NASCAR), whether or not currently in existence, and that, as between NASCAR, on the one hand, and Team Owner, the Control Person and their respective Team Affiliates, on the other hand, NASCAR is and shall be the sole owner of any and all intellectual property rights (including patents, copyrights, trademarks, design rights, and other ancillary and proprietary rights) worldwide in and to these Works, copyrightable or otherwise, created from the images, sounds and Event Data arising from and during any Event (excluding, for clarity, any Team Intellectual Property and any trademarks, service marks, copyrights, name image or likeness, of any other third party that are embodied in any Work).  To the extent not already owned by NASCAR, the Team Owner and the Control Person hereby assign, and shall cause their respective controlled Affiliates to assign (and shall use reasonable efforts to cause other Team Affiliates to execute and deliver such further instruments to assign), to NEM, as the designated representative of NASCAR for the collection of such rights, any and all rights set forth above, exclusively and in perpetuity.  In addition, Team Owner hereby grants NEM a worldwide, perpetual, irrevocable, non-exclusive, transferable, assignable and royalty-free license, without further compensation (which license shall survive termination of this Agreement) to use by any means worldwide any Team Intellectual Property included or incorporated in any Work to the extent that such license is necessary to enable NEM to exercise the rights expressly reserved, exclusively or non-exclusively, to NEM pursuant to this Agreement.  The Team Owner and the Control Person each represent and warrant that, as of the Execution Date, such Person has not granted to any third Person the rights described in the first two sentences of this <u>Section 5.1</u>.  The Team Owner agrees to take all steps reasonably necessary and that that are reasonably requested by NEM, including good faith efforts to implement a system that requires all of its Team Affiliates that may be visible at-track to sign documentation that grants or assigns the applicable rights set forth in this <u>Section 5.1</u> exclusivity and in perpetuity as set forth herein, to protect, perfect or effectuate NASCAR's ownership or other interest in these rights described in this <u>Section 5.1</u> (all at NASCAR's cost, other than costs related to obtaining the clearances of such Team Affiliates pursuant to forms reflecting reasonable terms (consistent with this <u>Section 5.1</u>) provided by NEM).  The Team Owner and the Control Person agree not to take any action, nor cause others to take any action, nor enter into any third-party agreement, which would contravene, encroach or infringe upon these NASCAR rights described in this <u>Section 5.1</u>.  Team Owner agrees to allow: (i) audio, audio-visual or video equipment for use on the Driver during Event weekends, including, without limitation, a microphone or camera, etc., provided that use of such audio shall be subject to Team approval, not to be unreasonably withheld; and (ii) any and all equipment relating to audio and video transmissions, as well as timing and scoring information, including, size, location, and weight, and use thereof as determined by NEM, in or on the Designated Vehicle for each Event, or a weighted device equal to the size, weight, and location of part or all of such equipment if such Designated Vehicle is not selected to run part or all of such equipment, as determined by NEM.

19

HIGHLY CONFIDENTIAL - OCO

5.2     <u>Advertising and Promotional Activities by NEM.</u>  The Team Owner and the Control Person, for themselves and on behalf of each of the their controlled Affiliates, acknowledge and agree that NASCAR, the then current Series Sponsor (subject to the immediately subsequent sentence), each then current Promoter, each then-current Broadcast Partner, each then-current Person that has entered into an agreement with NEM or its Affiliates to exploit any Ancillary Rights, and the duly authorized Affiliates of each of them (collectively, "<u>NASCAR Recipients</u>"), may use and exploit, on a non-exclusive basis, the name, likeness and performance, in or out of uniform, including photographs, images and sounds of the Team Owner, the Control Person, the Driver(s), in or out of uniform, each of the crew members, in uniform, and other controlled Affiliates of the Team Owner and the Control Person, and/or the Designated Vehicle, in each case taken in connection with an Event during the Term, in any medium (including print, broadcasts by and through television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmissions over the Internet, and public and private online services authorized by NASCAR) solely for (a) promoting or advertising any Event or the Cup Series, (b) news reporting in respect of an Event or the Cup Series, or (c) any telecast or programming that constitutes Live Transmission Activity (or shoulder programming with respect to such Live Transmission Activity) or an Ancillary Right, and the Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, hereby grant (and shall use reasonable efforts to cause each other Team Affiliate to grant in accordance with the fourth sentence of <u>Section 5.1</u>) to each NASCAR Recipient, in perpetuity, all rights thereto for such purposes.  Upon request of the Team Owner, which will be made solely during the period beginning on January 1 and ending on January 31 of any Year, NEM will provide to Team Owner a list of all NASCAR Recipients that have been granted rights hereunder during the Year immediately preceding the Year of such request.  During any Year, the rights granted above with respect to the Driver (provided, however,  such rights with respect to the Driver shall be limited to the Driver in fire suit or any other branded apparel of a Team sponsor) may be sublicensed to any then-current Series Sponsor for such Year on an exclusive basis solely for endorsement of any or all products and services of such Series Sponsor in such Series Sponsor's Series Sponsor Category (as defined in <u>Exhibit C</u>), provided that, if a Series Sponsor Change has been effectuated during the Term, then (i) off-track activation rights of the Series Sponsor shall be subject to any applicable limitations set forth in the last sentences of <u>Section 6.9.2</u> and (ii) no such endorsement rights may be used in any manner that would be in conflict with a Qualifying Sponsor written agreement of Team Owner or Driver existing prior to such change (as such Team Owner or Driver sponsorship agreement may be extended from time to time on similar terms). Moreover, the Team Owner shall make good faith efforts to enter into agreements with the Fuel Sponsor and Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of such sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement).  With the exception of any Series Sponsor's exclusive rights as set forth above with respect to endorsements within such Series Sponsor Category, this <u>Section 5.2</u> does not grant to any NASCAR Recipient (or to any other Person) any right for (or to authorize) the use or endorsement of a third party brand, product or service utilizing the name, image or likeness of the Team Owner, the Control Person, the Driver(s), each of the crew members, any other Team Affiliate or the Designated Vehicle without such party's express consent (or, in the case of the Designated Vehicle, the express consent of the Team Owner).

5.3     <u>Collective Use.</u>  Any Event image in photography or audio-visual footage that depict(s) five (5) or more race vehicles and/or five (5) or more drivers in uniform and/or five (5) or more crew members in uniform at an Event may be used in any medium by the Team Owner, Team Affiliates, Other Teams and their Team Affiliates, sponsors of Competitors, Promoters, Broadcast Partners, and NASCAR and its Affiliates and its sponsors and licensees for advertising, marketing and promotional purposes

20

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 103 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004421

supporting the parties' involvement in the sport even though it may include the likeness of the Team Owner, the Control Person, the Driver or any of their respective Team Affiliates, provided that no personal endorsement of any brand, product or service is created or implied by any such use.

5.4　Team Clips.　Upon Team Owner's request, NEM shall (or shall cause the appropriate NASCAR Affiliate to) provide up to five (5) minutes of audio-visual Works per Event that are readily accessible by NEM (or such Affiliate) for licensing (without regard to any restrictions on licensing which exist only among NEM and/or other NASCAR Affiliates) and that include Team Intellectual Property (the "Team Clips") for a royalty-free use by the Team Owner or a Team Owner primary or other major associate sponsor (each, a "Material Sponsor") in accordance with the following: (i) in connection with such request, the Team Owner shall provide NEM (or its Affiliate) with information reasonably requested with respect to the usage of such Team Clips, (ii) the Team Clips shall only be exhibited via a freely distributed medium (including, without limitation, television, cable television, satellite television, and transmission over the Internet or broadband (including subscription based services)) that is intended solely to promote and/or market such Team, Material Sponsor, or Driver's (as applicable) relationship with the sport, NASCAR or each other and not to create any product, application, site or platform that is intended to predominately exploit the Team Clips or the Team Clips in connection with other NASCAR-related audio-visual footage related to the Team or the Driver, (iii) the Team Owner shall be responsible for all reasonable and customary search and editing costs (but not a license fee) associated with such Team Clips in the event that editing is necessary to satisfy the Team Owner's request, (iv) all Team Owner or Material Sponsors utilizing such clips will be required to enter into a royalty free form license agreement with NEM (or its Affiliate) with reasonable and customary terms, including with respect to indemnification and referencing the usage restrictions in accordance with this Section 5.4, (v) notwithstanding the foregoing, if the use of Team Clips is otherwise in accordance with this section and is for use on Team Owner-branded social media channels or Team Owner-branded website then no additional license agreement is needed for the non-exclusive, non transferable use by Team Owner and any search and search and editing costs (if any) will be approved via e-mail; and (vi) such use will comply with NASCAR's brand guidelines and other guidelines to ensure such usage does not conflict with any Live Transmission Contract or any third party agreement that exploits Ancillary Rights.　The Team Owner shall use good faith efforts to ensure that all requests to NEM for the use of Team Clips by any Material Sponsor is coordinated by and conducted through the Team Owner.　The Team Owner acknowledges and agrees that NEM and its Affiliates will, on a non-exclusive basis, exploit portions of the Works (and other NASCAR-related content) for non-sponsored promotional uses and NEM (or such Affiliate) will not be charged a license fee for the exploitation of such footage in such cases.

5.5　Team Intellectual Property; Works; Ancillary Rights.

(a)　This Agreement grants no rights to use Team Intellectual Property in any manner (on in connection with any activities) except as referenced in this Section 5. Without limiting the foregoing, this Agreement grants no rights to NEM or its Affiliates to utilize Team Intellectual Property for any activity involving physical goods that are produced or distributed, whether freely or not.　The parties agree to work in good faith together to identify relevant cross-licensing opportunities inclusive of the Team, Driver and NASCAR marks in a manner consistent with past practices of the parties as of the Execution Date. Notwithstanding any existing agreements, it is also agreed and understood that the parties shall have the option to utilize the NASCAR Team Properties Trust structure, using the structure set forth below in Section 5.14 and/or enter into separate agreements for purposes of establishing new licensing agreements, as determined at each individual party's sole discretion.　To the extent that Team or Driver merchandise is sold through NASCAR.com or through the industry trackside merchandise program at Events (but not through track-specific owned stores and/or concessions at Events), the parties agree to distribute royalties in a

21

HIGHLY CONFIDENTIAL - OCO

23XI_0004422

manner consistent with existing NASCAR Team Properties Trust (which, for clarity, distributes a 9% royalty to Team Owner and a 1% royalty to NASCAR). In addition, for any product approvals administered through the Trademarx online approval system, other than for "lifestyle" products as generally recognized in the industry, all parties shall mandate the use of the official "NASCAR" hangtag with integrated hologram or "NASCAR" hologram only (where applicable); provided that the Trademarx system continues to be funded through the sale of holograms/hangtags to third party licensees. As means of clarity, give aways of sponsor premium and promotional products, including those distributed at trackside venues, are not subject to the foregoing terms.

(b)     Pursuant to and in accordance with the terms expressly set forth in Sections 5.2 and 5.4 of this Agreement, NASCAR Recipients may utilize Team Intellectual Property for the promotional and other similar purposes as set forth in this Agreement.

(c)     Subject to the terms of this Agreement (including, without limitation, the requirement that NEM pay to Team Owner the monies set forth on Exhibit B), Team Intellectual Property may be distributed within Live Transmissions of Events ("Live Transmission Activity").

(d)     Subject to the terms of the Agreement, NEM and its Affiliates may utilize and distribute Works (inclusive of Team Intellectual Property visible within the Works) in conducting Ancillary Activity. For purposes hereof, "Ancillary Activity" means (i) operation of the NASCAR.com business and any other NASCAR owned, operated or branded digital offerings via any platform now known or hereafter developed (e.g. NASCAR on YouTube), but in each case excluding Live Transmissions made pursuant to Live Transmission Contracts; (ii) the exploitation or license of any audio only content (including live audio telecasts of Events) to third parties; (iii) the licensing or distribution of Event content in any and all media, other than through Live Transmissions, including, without limitation, via the internet (other than delivery via closed-system internet protocol delivery of multi-channel linear programming services for in-home television signal reception (e.g., telephone MVPD service using internet protocol packet delivery)), mobile telephone/mobile data technology protocols, WAP, SAP, EVDO, VCAST, UMTS, WiMax, LTE and/or any other non television protocol/platform (i.e., any protocol or platform other than traditional linear standard or cable television or any multi-channel programming services provider (whether or not currently in existence) that provides a service substantially equivalent to linear cable television services as in effect on the Execution Date); (iv) non-fungible tokens (NFTs); (v) any other licensing or other exploitation of content that does not constitute a Live Transmission; (vi) production, distribution, sale or license of feeds of, or rights to, the Events for Live Transmission (or, for geographies in different time zones, first run delayed transmission) outside of the United States, its territories, possessions and commonwealths, plus Bermuda (for clarity, revenues from the Live Transmission rights within the United States, its territories, possessions, and commonwealths and Bermuda constitute Media Revenues); and (vii) maintenance of audio-visual footage and photographs generated during Events; and (viii) any other use or exploitation of the Works by NEM, affiliates or third parties other than Live Transmissions made pursuant to Live Transmission Contracts. For illustration and not limitation, Ancillary Activities include (v) the licensing or other exploitation of Event Data (excluding only Event Data rights granted pursuant to a Live Transmission Contract), (w) e-commerce activities, (x) licensing or other exploitation of content (other than Live Transmissions) on third party digital platforms (e.g., NASCAR highlight packages on Yahoo or in Apple TV archives), (y) the license of Works as part of fantasy games, video games or similar content offered on NASCAR platforms and/or third party platforms; and (z) simulated virtual reality versions of content and data feeds of content (e.g., Digital Dash content and NASCAR Race View), whether live or otherwise (excluding any rights granted pursuant to a Live Transmission Contract).

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 105 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004423

5.6    Retained Revenue.  NEM or its Affiliates shall be solely responsible for all costs associated with the production, creation, storage and/or exploitation of the Ancillary Rights and Works.  Therefore, NEM or its Affiliates shall be entitled to retain all revenues generated from the exploitation, license and/or use of the Ancillary Rights and/or Works.  If there is an opportunity that requires Team Intellectual Property in addition to the Team Intellectual Property that is present in the Works then such use of the Team Intellectual Property shall be governed by the New Business process in Section 5.14;

5.7    Advertising and Promotional Activities by Team Owner.  NEM, for itself and on behalf of each of its Affiliates, hereby grants to Team Owner a limited, non-exclusive, sub licensable license to use the "NASCAR" name and mark and the names and marks of the sponsors of NASCAR, NEM or their Affiliates (such as Goodyear and Sunoco) that are visible on the Designated Vehicle or uniforms of Team Owner, Control Person, Driver, crew or the Team Affiliates as seen at track during any Event solely in connection with the display of images of the Designated Vehicle or such uniforms, (including still photography captured by Event-credentialed photographers in connection with the Event that features the Team and Designated Vehicle) in any freely distributed medium (including print, broadcasts by and through television, cable television, radio, satellite signal, digital signal, transmissions over the Internet, and public online services) for sponsorship, endorsement, promotions or advertising activities of Team Owner, Control Person, Driver or their Affiliates, and to promote the Events and other news reporting, provided that (x) no such use shall enhance, enlarge, or otherwise alter the "NASCAR" name or mark, (y) the foregoing does not grant to any Person any right for (or to authorize) the use or endorsement of the "NASCAR" name or mark in such a way as to create or imply NASCAR's endorsement of any third party brand, product or service without NEM's express consent, and (z) all photographers shall be subject to NEM or its Affiliate's standard photographer and media licensing/credentialing process.

5.8    Team Websites.  Subject to a separate agreement with NEM's Affiliate to be mutually agreed by Team Owner and such Affiliate in good faith, Team Owner agrees to exclusively host the Team-specific website on the official NASCAR website and app platform, which services shall be provided at no cost to Team Owner.  Team Owner or its designee shall be solely responsible for (at its sole cost), and have sole control of, the daily operation of and content publishing on such Team-specific website located on NEM's Affiliate's platform.  Team Owner and NEM or NEM's Affiliate shall mutually and in good faith agree upon minimum content standards, minimum content posting and engagement minimums for the season for the Team-specific website.  Such Team-specific website engagement and content can be produced, programmed at captured through Team or NEM's Affiliate, with access facilitated by Team, the specific terms of which shall be mutually agreed upon in the separate agreement referenced herein.  NEM's Affiliate and Team shall coordinate sponsorship opportunities appearing on the NASCAR-hosted Team-specific website to, among other things, avoid sponsor conflicts and remain in compliance with Team contracts.  Team Owner shall cooperate in bringing Driver websites onto the NEM official website and app platform at no additional fee to Team.   If however, the Team Owner does not have the authority to provide such Driver rights and there is a required fee payable to Driver , then NEM will be solely responsible for such fee.

5.9    Entertainment Program.  Team Owner agrees that NEM or its designated Affiliate shall have the right to produce, sell or license (or engage in any action in connection with the foregoing) any program or series that includes more than four (4) NASCAR Cup Series Competitors. If NEM is trying to sell or license a program or series about the sport in general (e.g., playoff show or Race For the Championship) then Team Owner grants NEM or its designated Affiliate the non-exclusive, transferable right to: (i) use the Team Intellectual Property as seen in-context in footage at the Event, Team race shop or otherwise; and (ii) reasonable access to Team race shop and employees of Team Owner and Owners for

23

HIGHLY CONFIDENTIAL - OCO

23XI_0004424

filming for the program, including, without limitation, the right to mic and collect audio footage from Driver and team members at Events. NEM (or its applicable Affiliate) shall use commercially reasonable efforts to obtain customary liability releases for Team Owner with respect to any such program or series. NEM and Team Owner shall coordinate in good faith to mitigate the risks of Team sponsor conflicts. Any exclusivity around the foregoing rights shall be subject to Team Owner's prior written (e-mail shall suffice) approval, not to be unreasonably withheld, conditioned or delayed. Each of the parties hereto shall regularly communicate with the other party (or its designee) regarding entertainment programming or content opportunities being pitched or pursued by such party.

5.10    NASCAR Fan Rewards Support. Team Owner agrees to use commercially reasonable efforts to cooperate with the NEM Affiliate that licenses and operates the NASCAR Fan Rewards to determine a plan to better integrate Team into the NASCAR Fan Rewards program and collaborate to create custom exposure and engagement opportunities. Additionally, to the extent permitted by the NASCAR Fan Rewards terms and conditions, the NEM Affiliate will use commercially reasonable efforts to share non-identifiable first party data as set forth in Section 5.11 below.

5.11    Motorsports Consumer Data Platform. Subject to applicable law and contractual obligations, Team agrees to add existing Team database information and any future Team consumer data capture into the Motorsports Consumer Data Platform (MCDP). For purposes of clarity, no consumer personally identifiable information is shared across MCDP participants but helpful trends and habits can be aggregated based on the information, and this aggregated de-identified information can be shared across MCDP participants. Team will have the same access to the MCDP as all MCDP participants other than the MCDP administrator.

5.12    Driver Ambassador Program. Team Owner agrees to cooperate in good faith with NEM regarding the Driver Ambassador Program and to cooperate in good faith on a reasonable basis to make the best use of the Driver's time to maximize exposure for the sport. NEM acknowledges and agrees that Driver shall not be obligated to participate if there is a Team Owner category conflict associated with the opportunity. NEM will work with Team Owner regarding the scheduling of such opportunities. NEM represents and warrants that all monies deducted from Media Revenues for the Driver Ambassador Program shall be used solely for the program. NEM acknowledges and agrees that if the Driver Ambassador Program amount is reduced or if the Driver Ambassador Program is discontinued at any time during the Term by NEM, in its sole discretion, and such discontinuation is not as a result of the Team not supporting the program, then the amount of the reduction of monies or the monies previously allocated to the Driver Ambassador Program, as applicable, shall be added back on a pro rata basis between NEM and Team Owner(s) and NEM will distribute an amended Exhibit B.

5.13    Industry Support. Team will cooperate in good faith with NEM and NEM Affiliates to provide commercially reasonable support to promote event, engagement and growth in interest among new fan audiences, including without limitation, non-revenue generating activities to grow the sport.

5.14    New Business. "New Business" shall mean new revenue opportunities that include both a license to (A) collective (i.e., 4 or more Competitors) Team Intellectual Property or Other Team intellectual property; and (B) NASCAR name and/or mark and/or Promoter name and/or mark. Notwithstanding the foregoing, New Business does not include Ancillary Rights, Driver Ambassador Program(s), Other Awards, Live Transmission, Events or any Event promotional rights already granted to NASCAR and/or promoter consistent with current practices. A committee will be formed jointly by three (3) Competitors selected by Charter Members and NEM to explore the sourcing of New Business. Both Team and NASCAR commit to use commercially reasonable efforts (at no cost to Team or Competitor) to: (i) generate and source viable

24

HIGHLY CONFIDENTIAL - OCO

New Business opportunities; and (ii) bring appropriate New Business opportunities to the committee and/or Team early in the opportunity development phase to ensure collaboration and alignment, subject, in each case of clauses (i) and (ii), to existing contractual obligations to sponsors and other third parties that may limit these efforts which must be disclosed to NEM early in the process. Examples of New Business may include use of both NASCAR and Team Intellectual Property together in connection with gaming, content projects, new technologies and other new ventures related to the NASCAR Cup Series.

(a) Any new business opportunity, including (i) the definitive terms governing such new business opportunity, (ii) the allocation of net revenue with respect to Team Owners and NEM, respectively, resulting from such New Business opportunity and (iii) the method of calculating (and ultimate definition and calculation of) net revenue thereunder, requires the approval of both (x) NEM and (y) a majority of the Competitors on the New Business committee. Allocation of any such net revenue among the Competitors shall also be determined through the vote of a majority of the Competitors on the New Business committee.

(b) In the event that Driver(s) rights are required to pursue the opportunity which includes Team Intellectual Property, Team shall grant any necessary rights to Driver in uniform and Team will use commercially reasonable efforts to deliver any other necessary rights of the Driver(s) for the applicable agreement, subject in each case to existing contractual obligations and applicable law. In the event that the Team Owner is unable to grant the necessary rights of the Driver for such opportunity, then NEM or its Affiliates shall be permitted to obtain such rights directly from the Driver.

(c) Team (if Team is participating in the New Business opportunity) will have transparency into the underlying structure of the agreement, and calculations of net revenue.

(d) Team Owner shall not have a right to opt out of the New Business and accordingly shall participate in such New Business if it has been approved pursuant to clause (a) above unless: (i) there is a direct conflict with a current Team Owner partner or sponsor who Team Owner has a contractual relationship at the time such New Business was presented; (ii) Team Owner has signed a term sheet for an upcoming partnership or can show evidence of current conversations which would put the Team Owner in direct conflict if the agreement was completed; or (iii) the New Business opportunity includes a product, service or counterparty that is associated with entities or causes inconsistent with the image and integrity of the Team, its Drivers or its sponsors, as determined in Team's reasonable and good faith discretion. The parties will execute a statement of work specific to the New Business which would allow NEM or its Affiliates the right to sublicense the Team Intellectual Property for purposes of the New Business. Nothing herein shall prevent Team Owner or NEM or its Affiliates from pursuing any individual sponsorship, licensing or other commercial agreements which do not use the other party's intellectual property.

6       Team Owner Obligations.

6.1     Operating Obligations. At all times during the Term, the Team Owner shall, subject to Force Majeure Events, use commercially reasonable efforts to conduct all of the day-to-day operating and administrative functions reasonably necessary for the first-class operation of a stock car racing team and such team's participation in the Cup Series, while using commercially reasonable efforts to maintain continuity of race vehicle, assets, equipment, personnel, crew chief, crew members and shop address/location, and shall disclose Team members and other information as required in Schedule 1, and shall update as necessary to make accurate or up to date upon the written request by NEM. In addition, Team Owner and the Control Person shall, subject to Section 6.5, execute all other documents and forms reasonably required by NEM or its Affiliates for participation in the Cup Series, including a Competition

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 108 of 241

HIGHLY CONFIDENTIAL - OCO                                                          23XI_0004426

Membership and License Application form for the Cup Series, in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules, provided, that in the event of any conflict or inconsistency with such documents or forms entered into by the Team Owner, Control Person or any Team Affiliate with the subject matter set forth in Section 3.1(a), 3.1(b), 4, 5, or 6 of this Agreement, such applicable Section(s) of this Agreement shall control.

6.2     Competition.  The Team Owner shall, subject to Force Majeure Events:

6.2.1     use best efforts to provide and deliver the Designated Vehicle, with Driver, crew chief and pit crew to compete in each Event and any practice, qualifying or testing events or sessions as and when scheduled by NEM or its Affiliates;

6.2.2     use its best efforts to start, race, and finish at the highest possible level in each Event, including up to two Invitational Events per Year, with winnings for such Invitational Events not less than historic levels as set forth in Exhibit B hereto, including using commercially reasonable efforts to race for the entire advertised Event distance as outlined in the official entry blank, unless (i) NASCAR, in its discretion, has determined that such Event is complete pursuant to the NASCAR Rule Book; or (ii) the Designated Vehicle is involved in an accident or incident during such Event that renders the Designated Vehicle unable to race further in such Event, provided that such inability to race further in such Event is validated by the Senior Vice President of Competition or NASCAR Managing Director, Cup Series, or his/her designee, officiating at such Event, whose decision in this respect will be final.  In the event that Team Owner fails to start in any Event in accordance with this Section 6.2.2 for any reason or no reason (e.g. logistics, economics, safety etc.) NEM shall have the right to replace such Team Owner's vehicle in the starting field for that particular Event with a vehicle and racing team that is party to an open team agreement (even if such open team is maintained by a Charter Member or otherwise Affiliated with a Person that is party to a Charter Member Agreement) selected by NEM.  If such circumstances shall arise, the Control Person and the Team Owner waive all rights and remedies they may have arising from such replacement of NEM's selection including injunctive relief.

6.3     Designated Sponsor and Competitor Branding.  Team Owner shall cause the Driver, crew members and the Designated Vehicle, at all times for every Event in which Team Owner participates, to adhere to and display the designated branding requirements as shown in the attached Exhibit D, as such requirements may be reasonably modified or supplemented by NEM from time to time during the Term upon reasonable advance written notice to Team Owner, and subject to the terms hereof in the case of the designation by NEM of sponsors in Reserved Sponsor Categories and provided that such modification or supplementation does not diminish the space or location of branding available to Team Owner for its sponsors available as of the Execution Date.  NEM may continue to include, for any of its Fuel Sponsors (including the corner panel and fuel port decal), Tire Sponsors and Series Sponsors in the Reserved Sponsor Categories, space decals on the Designated Vehicle of the same size and placement that exist as of the Execution Date (provided that in the event of a bi-furcated Series Sponsor pursuant to Section 6.9.3, the Series Sponsor may only display such space decal during its respective exclusive portion of the Season).  Subject to the terms of this Agreement, the Team Owner shall and shall cause its controlled Affiliates to abide by the provisions in the NASCAR Rule Book regarding advertising and related promotional restrictions as set forth in Section 20.4.19 relating to "Decals and Advertising" as in effect on the Execution Date and amended or supplemented in accordance with the terms of this Agreement.  The Team Owner understands and agrees that NEM may refuse to permit, or it may restrict or assign the size or placement of decals, identification, and advertising of any kind on the Designated Vehicle, or the Driver's uniform ("Car/Driver Sponsor Advertising"), that is reasonably in the best collective interests of NEM and all of the Team Owner and other Charter Members, provided that, nothing herein shall limit the Control

26

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 109 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004427

Person, Team Owner or any Team Affiliate from maintaining and complying with an agreement with a sponsor for Car/Driver Sponsor Advertising that was permitted by NEM at any time during the previous three (3) racing seasons; provided further, that, notwithstanding the foregoing, if NEM raises reasonable concerns that a sponsor's brand has become tarnished by controversy, crisis or circumstance such that its association with Team or NEM would damage the NASCAR brand or image of the sport, or violate the broadcast standards of partners under Live Transmission Contracts or damage their ability to sell advertising within Event telecasts, or if the category in question has been disallowed as a sponsor by NEM acting in good faith, then NEM and Team Owner will discuss such concerns and cooperate in good faith to reach a mutually agreeable solution.

6.4 <u>Driver Agreement.</u> For each Year of the Term, the Team Owner shall (or shall cause an Affiliate to) be responsible for retaining the services of an eligible Driver(s) to race in each Event using the Designated Vehicle. The Team Owner shall cause any Driver providing services to the Team Owner during the Term to execute (including upon execution of this Agreement) and deliver a Driver Agreement in the form attached hereto as <u>Exhibit I</u>, and will use commercially reasonable efforts to cause the Driver to enter into such amendments thereto as NEM may reasonably require from time to time and which are not in conflict with this Agreement (the "<u>Driver Agreement</u>"), it being understood that no amendments or modifications will be made by NEM to the Exhibits of the Driver Agreement if such amendments or modifications would be in conflict with, or otherwise inconsistent with, the corresponding terms and provisions of this Agreement. In addition, Team Owner shall cause Driver to execute all other documents and forms reasonably required by NEM or its Affiliates for participation in the Cup Series including a Competition Membership and License Application form for the Cup Series in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules. Upon expiration or termination of the Driver Agreement or upon injury or approved absence of Driver requiring substitution of an alternate eligible Driver, the Team Owner shall deliver to NEM an executed Driver Agreement as outlined above for such Driver such that at all times during the Term the Team Owner's Driver has executed and delivered a Driver Agreement. In the event of any conflict or inconsistency between the Driver Agreement and the agreement for driver services between Team Owner and Driver, the Driver Agreement shall control.

6.5 <u>NASCAR Rules.</u> Subject to the terms of this Agreement, including <u>Sections 3.5 and 3.6</u> hereof, the Team Owner and the Control Person acknowledge and agree that NASCAR and its Affiliates shall have the sole and exclusive right to amend and supplement the NASCAR Rules from time to time in their sole and absolute discretion, provided that (i) no such amendment or supplement shall abrogate or modify the terms of this Agreement or the rights granted to Team Owner or Control Person hereunder; (ii) in the event of any conflict or inconsistency between this Agreement and NASCAR Rules, this Agreement shall govern; and (iii) NASCAR and its Affiliates shall at all times implement and administer such NASCAR Rules in good faith and not out of self-interest, and in seeking to further the best interests of the sport. Subject to the immediately preceding sentence, the Team Owner and the Control Person acknowledge and agree that they shall be bound by, and shall comply with, each NASCAR Rule. NEM is the sanctioning body of the Cup Series and shall (subject to the preceding clause (iii) and to any rights of appeal set forth in the NASCAR Rules) have sole authority to enforce the NASCAR Rules, implemented in accordance with the terms hereof, for purposes of exercising its sanctioning authority over all aspects of on-track-racing activity during the competition of any Events, including with respect to qualifications and eligibility to race in any Event, inspection process (pre and post-Race), race procedures and on track competition, it being understood and agreed that the implementation and enforcement by NEM of NASCAR Rules in accordance with the terms of this Agreement may have an adverse impact (including an adverse economic impact) on the Team Owner.

27

Case 3:24-cv-00886-KDB-SCR    Document 454-61    Filed 11/21/25    Page 110 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004428

6.6    Protection Of Goodwill.  In recognition of (a) the substantial goodwill and expertise developed, and the significant investment, by NEM and its Affiliates with respect to automobile or truck motorsports racing, (b) the Confidential Information that will be shared by NEM with Team Owner and the Control Person pursuant to this Agreement and otherwise, (c) the harm that would result, including potential confusion in the marketplace, dilution of the rights granted to any Broadcast Partner, to NEM, its Affiliates and the Other Teams if the Team Owner or the Control Person were to use any of such goodwill, expertise or Confidential Information, or any of the benefits obtained by Team Owner or the Control Person under this Agreement or otherwise through their association with NASCAR, and (d) the need to ensure that all Charter Members use their reasonable best efforts, and devote all reasonable resources necessary, to start, race, and finish at the highest possible level in each Event to maintain and enhance the quality of Cup Series racing, at all times during the Term, each of the Team Owner, the Control Person shall not, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations shall not, race in or directly or indirectly own an equity ownership interest (or profits participation interest with attributes similar to equity) in any automobile or truck motorsports racing series that is held throughout the Territory except (i) any motorsports racing series that is sanctioned by NEM, NASCAR or any of their respective Affiliates (including without limitation IMSA, ARCA and the Whelen Modified Tour), (ii) Open Wheel Racing: any motorsport series currently configured as an open wheel racing series, including without limitation  IndyCar, Indy Lights, F1,  World of Outlaws or any open wheel series or similar and successor series, provided such series continue to operate primarily as an open wheel racing series in their current form and fashion; (iii) any participation in NHRA, Bandoleros, XR Racing, CARS Tour, Legends Series, Supercars, Global Rally Cross and or similar or successor series, provided such series continue to operate primarily in the same fashion or form, (iv) Private Events, (v) any other racing series that is created or formed after the Effective Date and approved by NEM, NASCAR or any of their respective Affiliates, and (vi) an "Exempt 10% Owner" which is defined as any 10% or more owner of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations (but, for clarity, not the Control Person or any Person under his or her direct or indirect control), if such 10% or more owner owns an equity ownership (or profits participation interest with attributes similar to equity) in any motorsports racing series throughout the Territory through an entity in which the 10% or more owner is a limited investor and does not receive material non-public information regarding racing competition in respect of such series or provide such series any material non-public information relating to NASCAR, the Team Owner, the Team or their respective operations (any such 10% owner described in this clause (vi) an Exempt 10% Owner).  If NEM presents Team Owner with opportunities to participate in NASCAR sanctioned stock-car racing series or exhibition events outside of North America, Team Owner agrees to consider in good faith participating in any such series, which shall be separate from the New Business opportunities under Section 5.15.  If Team Owner presents NEM with opportunities to sanction a stock car racing series outside of the Territory, then NEM agrees to consider in good faith sanctioning any such series.

This Section 6.6 is a material part of the consideration for NEM.

6.7    Injunctive Relief.  If, despite the harm that would be incurred by NASCAR, NEM, NASCAR Rights Affiliates and others, any Arbitration Panel construes any of the covenants in Section 6.6 to be too broad, the Arbitration Panel shall have the authority to reduce the duration, Territory or scope of prohibited activities to the extent necessary so that the provision is enforceable (and the provision, as reduced, shall then be enforced).

28

HIGHLY CONFIDENTIAL - OCO

23XI_0004429

6.8     Sponsor Exclusivity.  NEM has agreed, pursuant to Section 3.1(c), to use commercially reasonable efforts to sell certain exclusive sponsorship rights in the Reserved Sponsor Categories.  At all times during the Term, Team Owner shall comply with, and shall cause its controlled Affiliates to comply with any, exclusivity reasonably required by the agreements relating to such Reserved Sponsor Categories, including any reasonable promotional requirements relating to the Designated Vehicle or any uniform, and any other reasonable restrictions necessary to protect the exclusivity granted in such Reserved Sponsor Categories (but subject, in the event of a change in the Series Sponsor Category or the appointment of multiple Series Sponsors in any Year, to the provisions in Section 6.9).  The Series Sponsor Category may change from time to time during the Term, and NEM will notify the Team Owner in writing of any change in the exclusivity, promotional requirements or other restrictions relating to the Series Sponsor Category prior to January 1 of the applicable Year (or such later date if, in NEM's good faith judgment, January 1 is not practicable).  The other Reserved Sponsor Categories may not expand in nature or scope during the Term (but, for clarity, are permitted to contract or be further limited).  The Reserved Sponsor Categories as of the Execution Date are described in Exhibit C.

6.9     Series Sponsor Exclusivity.

6.9.1     Series Sponsor Exclusivity.  At all times during the Term when an agreement relating to a Series Sponsor is in effect, but subject to this Section 6.9 and subject to written agreements Team Owner may have with NEM or its Affiliates in existence on the Effective Date, the Team Owner and the Control Person shall not, and Team Owner shall cause each Team Affiliate not to, when participating in any Event or in any advertising or promotion that uses the name, image or likeness of Team Owner, Control Person, or any Team Affiliate, or that is based on such Team Owner's, Control Person's or any Team Affiliate's participation in the Cup Series (unless otherwise expressly authorized in writing by NEM), use or display in any commercialized or sponsored manner any product, brand, logo, trademark or service identification of any Person in any Series Sponsor Category anywhere by such Person, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, the Team's equipment or haulers or anywhere in Victory Lane; provided that, if, following the date of this Agreement, NEM modifies the Series Sponsor Category or enters into an agreement with a new Series Sponsor(s) (each, a "Series Sponsor Change") and the Team Owner, Control Person or any Team Affiliate is then a party to a written contract with a sponsor with respect to any branding and related rights that have been granted to such sponsor via such written contract prior to the Series Sponsor Change (each, together with any permitted successors thereto (as such permission is determined pursuant to the applicable agreement with such sponsor), a "Qualifying Sponsor") that would breach the exclusivities granted by NEM within such new Series Sponsor Category (or Series Sponsor Categories) (each, an "Exclusivity Breach"), the Team Owner, Control Person or any Team Affiliate shall have the right to maintain and comply with such Qualifying Sponsor's agreement (or agreements) in accordance with Section 6.9.2 below (and, for clarity, only the exceptions set forth in Section 6.9.2 are permitted).  Subject to compliance with this Section 6.9, the Team Owner acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of any product, brand, logo, trademark or service identification of a Person in any Series Sponsor Category, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers.

6.9.2     Single Series Sponsor.  As of the Execution Date, NEM has a number of premier partner sponsors and does not have a Series Sponsor.  However, NEM may, in its sole discretion, elect to enter into an Agreement for a Series Sponsor at any time during the Term.  In any Year in which NEM elects to enter into an Agreement for a Series Sponsor and effectuates a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, any Team Owner, Control Person or any Team Affiliate that

29

HIGHLY CONFIDENTIAL - OCO

would be in an Exclusivity Breach with respect to any branding that has been granted to a Qualifying Sponsor on the Designated Vehicle, Driver, crew members, Cup Series uniforms, hauler, or other similar assets that are visible to the general public at any Event (the "At Event Assets"), such Qualifying Sponsor branding for the At Event Assets shall be permitted during the Term solely at the visibility or participation level pursuant to and set forth in the then-current agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for At Event Assets shall not be increased, other the any increases already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to such levels (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would be limited to the deck lid without any other increases; if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events, or if such Qualifying Sponsor branding was permitted on crash carts and haulers but was not on the Designated Vehicle then such branding would be restricted to such crash carts or haulers etc.), provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any At Event Asset, the exclusivity exceptions set forth in this Section 6.9(b) shall be permitted at the highest level of branding that was granted at any time pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the Term, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this Section 6.9.2 shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination and shall otherwise comply with Section 6.9.1 without exception except for exceptions applicable to the non-terminated contract, if any (e.g., if a Driver has a personal services agreement with a Qualifying Sponsor of Team Owner, the termination of the personal services agreement will not require the Team Owner, Control Person or any Team Affiliate (as applicable) to comply with Section 6.9.1 without exception in the event that they have non-terminated contracts which are permitted hereunder and remain in effect), and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding for the At Event Assets, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions for any At Event Assets set forth in this Section 6.9.2. During any Year in which NEM effectuated a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, such exclusivity granted to any Series Sponsor shall extend to off-track activation in accordance with Section 6.9.1 provided that if any Team Owner, Control Person or any Team Affiliate would be in an Exclusivity Breach with respect to any off-track activation that has been granted to a Qualifying Sponsor via such written contract, then such Qualifying Sponsor may continue marketing off-track throughout the Year, in accordance with the restrictions set forth in the foregoing sentence, even though such marketing may conflict with the current conflicting Series Sponsor Category.

6.9.3    Bi-Furcated Series Sponsors.  During any Year in which NEM effectuated a Series Sponsor Change such that agreements with two (2) Series Sponsors are then in effect (i.e., each Series Sponsor has rights to a different continuous portion of the Season), each Series Sponsor shall only be afforded exclusivity in such applicable Series Sponsor Category as provided in Section 6.9.1 with respect to the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row (and, for clarity, not with respect to other equipment or haulers) and solely during the portion of the Season that NEM or its Affiliates have granted such Series Sponsor

30

HIGHLY CONFIDENTIAL - OCO

23XI_0004431

exclusivity, which must correspond with a portion of the Season for which one of NASCAR's then principal Live Transmission Broadcast Partners has Event live telecast rights (e.g., as of the Execution Date, a Series Sponsor that corresponds to FOX for the first portion of the Season and another Series Sponsor that corresponds to NBC for the second portion of the Season). In addition to the foregoing sentence, if any Team Owner, Control Person or Team Affiliate would be in an Exclusivity Breach with any Qualifying Sponsor during the applicable portion of the Season, such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row shall be permitted solely at the visibility or participation level pursuant to and set forth in the then-current written agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season shall not be increased, other than any increases during such portion of the Season already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to increase such levels of such agreement with such Qualifying Sponsor (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would limited to the deck lid during such portion of the Season without any other increases or if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events during such portion of the Season) provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season, the exclusivity exceptions set forth in this Section 6.9.3 shall be permitted at the highest level of branding that was granted pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the then-current term of such agreement, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this Section 6.9.3 shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination, and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions set forth in this Section 6.9.3. For clarity, any exclusivity granted to any bi-furcated Series Sponsor in accordance with this Section 6.9.3 shall not extend to off-track activation (e.g., any Team sponsor may continue marketing not at the track throughout the Term even though such marketing may conflict with the current conflicting Series Sponsor Category) and the Series Sponsor's off-track activation shall be limited to collective uses made pursuant to Section 5.3.

6.10    Tire Sponsor Exclusivity.  The Team Owner, on behalf of the Team Affiliates, agrees that when participating in any Event, unless otherwise expressly authorized in writing by NEM, no product, brand, logo, trademark or service identification of any Person in the Tire Category (other than the Tire Sponsor) as defined in Exhibit C, will be used or displayed anywhere by such Team Affiliate during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers.  The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate, including the Driver, may advertise or promote a product, brand, logo, trademark or service

31

HIGHLY CONFIDENTIAL - OCO

23XI_0004432

identification of any Person in the Tire Category as defined in <u>Exhibit C</u>, whether in conjunction with an Event or not, if such advertising or promotion includes a NASCAR racing (e.g., Driver, crew member) suit, whether worn by such Team Affiliate or not, and/or a NASCAR racing vehicle. The Team Owner, on behalf of the Team Affiliates, acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of a product, brand, logo, trademark or service identification of any Person in the Tire Category by any Team Owner Party during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers. Notwithstanding the foregoing, actual use of tires other than those made by the Tire Sponsor on Team equipment other than the Designated Vehicle (e.g., pit carts and haulers) shall not be considered a breach of the provisions set forth in this paragraph. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Tire Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to tires, on the same financial terms, as other Competitors by Tire Sponsor.

6.11    <u>Fuel Sponsor Exclusivity.</u> The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate will participate in any sponsorship, licensing, or personal appearances with a company in the Fuel Category (other than the Fuel Sponsor) as it relates to Cup Series racing either in or out of uniform other than as provided herein. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Fuel Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Fuel Sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Fuel Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to fuel, on the same financial terms, as other Competitors by Fuel Sponsor.

6.12    <u>Minimum Performance Standards.</u> The Events represent the highest caliber of racing in motorsports. The "<u>Minimum Performance Standards</u>" require that Team Owner comply with the following standards each Season during the Term of the Agreement: 1) purchase the lesser of either ninety percent (90%) of tire allotments or the equivalent percent of the Event tire allotment minus one set for each race; 2) Fill at least ninety percent (90%) of the road and pit crew roster allocations for each Race; 3) Use three (3) or less drivers during each Season unless approved by NASCAR in advance (i.e. playoff waiver granted, medical, suspension, etc.) and 4) qualify within at least one hundred and seven percent (107%) of the fastest time in each Event session of practice on average on a rolling basis across the previous three (3) Races in which Team Owner participates (crashes, other on-track incidents, adverse weather or track conditions and disqualifications during qualifying would be excluded). Upon any failure by Team Owner to meet the Minimum Performance Standards, NEM will issue a notice of the failure to meet the Minimum Performance Standard (a "<u>MPS Notice</u>") to Team Owner, specifying the specific standard(s) which Team Owner has failed to satisfy and the material facts of such failure. Upon the second MPS Notice, NEM may elect to retain up to Twenty-Five Thousand ($25,000.00) US Dollars from Team Owner's Pool Money. Upon the third MPS Notice and for each MPS Notice thereafter, NEM may elect to retain up to Fifty Thousand ($50,000.00) US Dollars from Team Owner's Pool Money. Upon the fourth MPS Notice and for each MPS Notice thereafter, NEM may elect to retain up to One Hundred Thousand ($100,000.00) US Dollars from Team Owner's Pool Money or such remedies as set forth in Section 9.1.6. For avoidance of doubt, nothing in this Section 6.12 is intended to affect or relieve other Team Owner obligations as set forth in this

32

HIGHLY CONFIDENTIAL - OCO

23XI_0004433

Agreement.  NEM may temporarily waive compliance with the Minimum Performance Standards in its sole discretion.

6.13    Media/Promotional Obligations.  Team Owner and Control Person shall perform and Team Owner shall cause the Driver to perform, as applicable, the following media and promotional obligations:

6.13.1    Victory Lane Media Obligations of Team Owner//Control Person:  Immediately following the race conclusion of each Event, as reasonably required by NEM, the winning Team Owner and Control Person if present at the particular Event shall proceed to victory lane for post-race interviews. Subject to the last sentence of this Section 6.13.1, the Team Owner and Control Person of each Event won during the Term agree to permit a display of one item from Series Sponsor, one item from the applicable Event entitlement sponsor so long as such Event entitlement sponsor does not conflict with a Team sponsor, and items from the Team's sponsors on the Designated Vehicle in victory lane so long as such Team sponsors do not conflict with the Series Sponsor Category.  Subject to the last sentence of this Section 6.13.1, the size, location and weight of such item(s) shall be approved by NEM and all items shall be subject to the exclusivity of the Reserved Sponsor Categories.  Team Owner and Control Person understand that members of the winning team will be required to take photographs with the Event entitlement sponsor and its guests. Post-race ceremonies will conclude once all reasonable sponsor photos, individual photos and media requirements in victory lane have been completed.  Notwithstanding the foregoing, if following the date of this Agreement NEM modifies the Series Sponsor Category and the Team Owner, Control Person or any Team Affiliate is a party to a written agreement with a Qualifying Sponsor that is a primary sponsor as of the date of such modification (subject to the applicable extensions solely in accordance with Section 6.9.2) that would be in an Exclusivity Breach with respect to the display of products of such Series Sponsor within the Series Sponsor Category in victory lane, the Team Owner shall not, during the period of exclusivity of the Series Sponsor within the Series Sponsor Category, (i) display the products of such Qualifying Sponsor and (ii) be required to display the products of such new Series Sponsor, in each of (i) and (ii), in victory lane (and none of the foregoing shall be deemed a breach of this Agreement or NASCAR Rules).

6.13.2    Promotional Appearances.  As designated by NASCAR or NEM, Team Owner and Control Person agree to make commercially reasonable good faith efforts to participate in promotional activities and events surrounding the NASCAR Cup Series and NASCAR events.  These events include but are not limited to, NASCAR Cup Series Champions Week, promotional events for the NASCAR Hall of Fame and/or NASCAR's Season launch activities leading up to the Daytona 500 Event.  If the Team Owner qualifies for the playoffs for the NASCAR Cup, Team Owner agrees to make commercially reasonable good faith efforts to attend the NASCAR Cup Series Awards banquet including all season-ending special awards ceremonies and events at times and locations designated by NASCAR.  NASCAR will provide reasonable notice of the ceremony and event schedules Team Owner, and Team Owner will take reasonable steps to coordinate his or her availability in accordance with such event schedules, and will provide reasonable advance notice to NASCAR of any potential schedule conflicts.

6.13.3    Victory Tour Media Obligations of Team Owner/Driver.  Team Owner shall cause the Driver to appear and attend the Victory Tour media obligations as outlined in the Driver Agreement, but in no event will NEM require more than thirty-six (36) Victory Tour media obligations in a Season in total among all drivers of Competitors having Victory Tour media obligations or more than two (2) victory tour media obligation from any individual driver in a Season.  Team Owner shall work in good faith with NASCAR, NEM and the applicable race Promoter to coordinate scheduling of such appearances.  Any and all actual, reasonable, and documented travel costs associated with the Driver's Victory Tour obligations shall be at the expense of Team Owner.  All other actual, reasonable, and documented travel costs associated with all other appearances requested by NEM shall be at NEM's expense.

33

HIGHLY CONFIDENTIAL - OCO

23XI_0004434

6.14    Team Sponsors.  Prior to the first Event of each Year, Team Owner shall provide all Team sponsors with access to a copy of the NASCAR Rule Book and use good faith efforts to make all Team sponsors aware of all of the applicable provisions therein.

7    Cost Cap Model.

7.1    Feasibility.    NASCAR and Team Owners commit to collectively explore the feasibility of a cost cap structure and solicit feedback from all NASCAR Cup Series teams, with the intent of developing a complete framework.  Once a framework is finalized, in NASCAR's sole discretion, NASCAR will implement the cost cap structure.

7.2    Soft Launch.    Recognizing the complexity and significance of introducing a cost cap model, following the feasibility assessment set forth above, NASCAR will outline the period for the soft launch of the cost cap. During this soft launch, the parties shall collaboratively implement the proposed cost cap model in a trial setting to facilitate accurate accounting practices and assess potential impacts on Team operations. This period shall serve as a foundational phase for adjustments before formal enforcement.

7.3    Implementation.    Following the soft launch period, and subject to a review of its outcomes by NEM and after consultation with the Team Owners, NEM will determine whether to implement a cost cap model. If instituted, the Cost cap shall commence at the start of the year following the conclusion of the soft launch. Any documented and incurred costs for implementing a cost cap (currently estimated at $5 million per year) shall be deducted from the Media Revenues prior to payment to the Teams and NEM will provide an amended Exhibit B to account for such costs at the time of implementation.

8    Transferability/Charter Limitation.

8.1    Transfer.

8.1.1    Team Owner represents and warrants that, as of the date of this Agreement, Schedule 2 sets forth each Owner and that Team Owner shall cause all such Owners (including future Owners) to comply with the Terms of this Agreement, including without limitation this Section 8.  Team Owner shall submit an updated Schedule 2 at least annually.  Additionally, each direct or indirect owner of 10% or more of the equity in Team Owner (each, a "Substantial Owner").  In the event that there is a change in the identity of one or more  Owners (whether because of a Transfer of ownership, the issuance of additional equity interests or otherwise), then Team Owner shall provide written notice of such event to NEM within thirty (30) days following such change (provided that an inadvertent failure to timely provide such notice shall not constitute a breach hereunder if such failure is timely cured), which notice shall include the identity of all Owners (including the new Substantial Owners)  in an updated Schedule 2.  In addition, Team Owner represents and warrants that Schedule 1 sets forth the identity of the Control Person and the Designated Team Representative as of the date of this Agreement, and Team Owner agrees that it shall inform NEM promptly upon any change in the identity of such Control Person (subject to the terms of this Section 8.1) or Designated Team Representative.

8.1.2    Subject to the terms hereof, neither the Team Owner nor any Substantial Owner may at any time:

34

HIGHLY CONFIDENTIAL - OCO

23XI_0004435

8.1.2.1 in the case of the Team Owner, Transfer any of its rights or delegate any of its duties under this Agreement (either by outright Transfer, license, management contract or otherwise); or

8.1.2.2 Transfer any direct or indirect equity interest in the Team Owner that would result in (a) the Control Person no longer owning a Controlling Interest in, and at least 30% of the direct or indirect equity of, the Team Owner or (b) any person that was not previously a Substantial Owner of the Team Owner becoming a Substantial Owner; unless, with respect to each of Sections 8.1.2.1 and 8.1.2.2, as applicable, each of the following conditions has been satisfied (or waived by NEM in its sole discretion): (1) the Team Owner provides advance written notice to NEM of such Transfer (a "Transfer Notice"), which notice shall include the identity of the successor Team Owner, transferee Control Person or transferee Substantial Owner, as the case may be, a brief description of the transaction, a copy of a completed ownership application in a form customary for major U.S. sports leagues (including all supplementary information requests, financial disclosures including the incurrence of any debt secured by the Team, Team Owner or by Team or Team Owner interests, and authorization to complete background checks), a copy of the transfer/sale documents effectuating such Transfer which includes the sources and comprehensive details of all consideration exchanged for such interest, and certification from such successor Team Owner, transferee Control Person or transferee Substantial Owner that he, she or it is not a Prohibited Person and which shall include as an annex thereto the Transfer Approval Form attached hereto as Exhibit H (the "Transfer Approval Form"), and Team Owner and its applicable Control Person and/or Substantial Owners shall fully comply with all reasonable information and due diligence requests of NEM in connection with any of the foregoing (2) NEM shall have approved such Transfer in accordance with the process described in Section 8.1.3 below, it being understood and agreed that if NEM does not object in writing to such Transfer within fifteen (15) Business Days following its receipt of the Transfer Notice from Team Owner, then NEM shall be deemed to have approved such Transfer, (3) the Transfer does not require the successor Team Owner or transferee (or its affiliated Owners) to incur an amount of debt financing that is greater than forty percent (40%) of the consideration exchanged for such interest and (4) the Transfer would not result in the Team Owner, Control Person or any Owner being in breach of Section 8.2 or Section 8.3 upon the consummation of such Transfer, and (5) if such Transfer results in the Control Person no longer owning a Controlling Interest in, and at least 30% of the direct or indirect equity of, the Team Owner, the successor Control Person must own, directly or indirectly (and together with such Control Person's family and estate planning vehicles that are controlled by Control Person), at least a 30% equity interest in the Team Owner and must execute and deliver to NEM a joinder to this Agreement agreeing to be bound by the terms hereof applicable to Control Person and to assume all of the transferor Control Person's obligations under this Agreement (in which case, upon execution and delivery of such joinder, Control Person shall be relieved of its obligations under this Agreement), (6) in the case of a Transfer under clause (i) above, the successor Team Owner must execute and deliver to NEM a joinder to this Agreement agreeing to be bound by the terms hereof applicable to Team Owner and to assume all of the transferor Team Owner's obligations under this Agreement (in which case, upon execution and delivery of such joinder and a customary release and indemnity for the benefit of NEM with respect to the applicable Transfer, Team Owner shall be relieved of its obligations under this Agreement) and (7) after giving effect to such Transfer, Team Owner shall have no more than twenty (20) Owners (provided, that for purposes of such determination, NEM may, at its sole discretion, attribute to an Owner the interests held by such Owner's Family Relatives). In addition to the foregoing requirements, if a transfer by a Control Person would result in the Control Person no longer owning a Controlling Interest in, or at least 30% of the direct or indirect equity of, the Team Owner (a "Qualifying Transfer"), then upon (or prior to) consummation of such Qualifying Transfer, (x) the transferee Control Person will pay to NEM a transfer fee in the amount equal

35

HIGHLY CONFIDENTIAL - OCO

23XI_0004436

to the greater of two percent (2%) of the gross consideration paid for such interest or Two Hundred and Fifty Thousand ($250,000.00) US Dollars (the "Transfer Fee") and (y) the Team Owner or Owner pays or causes the successor Team Owner or Owner to pay to NEM an amount equal to all unpaid amounts then due and owing by Team Owner (in the case of a Transfer under clause (i) above) or Control Person (in the case of a Transfer under clause (ii) above) under this Agreement or NASCAR Rules at the time of such Transfer (provided that the Transfer Fee shall not be payable in connection with a Transfer described in Sections 8.1.4 or 8.1.5).

        8.1.3    Upon its receipt of a Transfer Notice, NEM shall (subject to the deemed approval provisions of Section 8.1.2 above) evaluate the Transfer as expeditiously as possible to determine whether or not to approve the Transfer. NEM shall provide its approval hereunder unless NEM reasonably and in good faith believes that the applicable transferee (or person directly or indirectly controlling such transferee) is (i) a Prohibited Person, (ii) a BMG or an Original Equipment Manufacturer ("OEM") or (iii) such Transfer would result in the Control Person (or any successor Control Person) being in breach of Section 8.3 or Section 9.1.2. The parties agree that the placing of a lien or encumbrance on the Team Owner's rights in respect of the Team and this Agreement shall not constitute a Transfer for purposes of this Agreement; provided, that (i) the Team Owner shall notify NEM promptly (no later than ten business days) following the granting of any such lien or encumbrance and shall inform its lenders of the restrictions placed on Transfers by Team Owner hereunder and (ii) the Team Owner shall (or shall cause the applicable grantee of such lien or encumbrance to) notify NEM of any foreclosure (or attempted foreclosure) under any such loan documents.

        8.1.4    Notwithstanding Section 8.1.2, but subject to Section 8.1.3, the Transfer Fee shall not apply to any Transfer effected pursuant to Section 3.4 or to any Transfer by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, to a successor Control Person that, as of the date of this Agreement, already owns (directly or indirectly) at least 10% of Team Owner, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement.

        8.1.5    Notwithstanding Section 8.1.2, the Transfer Fee shall not apply to any Transfer (whether directly or indirectly) by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, (i) to a Family Relative, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement, or (ii) upon the death of such Control Person, to the estate of such Control Person, it being understood that the fees contemplated in Section 8.1.2.2(y) shall also not apply in such case (provided that a Transfer of the Controlling Interest by such estate (except to a Family Relative of the Control Person, who, for clarity, shall remain subject to Section 8.1.8 shall be subject to the provisions of Section 8.1.2 and this Section 8.1.5 as applicable).

        8.1.6    Notwithstanding Section 8.1.2, the Team Owner and the Control Person may, subject to the prior written approval of NEM , lease, license or otherwise temporarily Transfer their respective rights under this Agreement to any third party, provided that such third party is not a Prohibited Person, on an interim, temporary basis for one (but no more than one) full race season during the Initial Term and/or for one (but no more than one) full race season during the Extension Term, provided that (x) NEM shall be provided with advance notice of such transfer and shall only provide its prior written approval

HIGHLY CONFIDENTIAL - OCO

23XI_0004437

if it determines, in its reasonable discretion, that such temporary Transfer is in the best interest of the sport and (y) in such event, as between NEM and Team Owner and the Control Person, the transferor Team Owner and its Control Person shall remain responsible to NEM for their respective obligations under this Agreement. Neither the Transfer Fee nor the fees described in Section 8.1.2.2 shall apply to such Transfer as described in this Section.

8.1.7    For clarity, any Transfer of the Team Owner's interest in this Agreement shall also effectively Transfer to the same transferee the car number, historical or championship points and any performance-related standards history outlined in <u>Section 6.12</u> associated with this Agreement.

8.1.8    If any time during the Term, NEM reasonably and in good faith believes that an Owner has become a Prohibited Person, NEM shall notify the Team Owner and the Control Person that NEM reasonably and in good faith believes that such Owner has become a Prohibited Person. If the Control Person disagrees with NEM's determination, then the parties shall discuss in good faith whether it is possible to address NEM's concerns. In the event that the parties are unable to resolve such disagreement within ten (10) Business Days of NEM's delivery of such notice, then either party may refer such dispute to Arbitration pursuant to <u>Section 11.2</u>, with the sole issue to be resolved in any such Arbitration being whether or not the Owner has become a Prohibited Person. In the event that (i) the parties mutually agree in writing the Owner has become a Prohibited Person or (ii) the Arbitrator makes a final and binding determination that the Owner has become Prohibited Person, then (x) in instances where such Owner is also the Control Person, the Owner may no longer be designated the Control Person hereunder or have the authority with respect to NASCAR Core Matters set forth in <u>Section 10.1.3</u> and Team Owner must designate a new Control Person (in which case such successor Control Person will have one hundred and eighty (180) days to come into compliance with the requirements of being a Control Person set forth in the definition thereof, including the 30% minimum equity requirement) and (y) such Owner shall be required to sell or divest any of its direct or indirect ownership interest in the Team Owner within 120 days and failure to divest of such interest shall be a breach of this Agreement.

8.1.9    During the Term, NEM shall (i) maintain the Transfer Approval Form(s) (set forth in <u>Exhibit I</u>) in respect of Transfers which have been approved (or deemed approved) hereunder in its principal office in Daytona Beach, Florida and (ii) make such Transfer Approval Form(s) available for inspection by the Control Person (or by any other Control Person of a then-current Charter Member) upon written request. In the event of such request by any Charter Member that was not a party to the Transfer that was subject to such Transfer Approval Form, notification of such request shall be provided to the Team Owner who was a party to such Transfer.

8.2    <u>Limitations On Transfers.</u>

8.2.1    Following any Transfer by the Team Owner or the Control Person made in accordance with <u>Section 8.1</u>, neither the Team Owner transferor nor the Control Person transferor, as applicable (nor any of their respective controlled Affiliates, as applicable), shall purchase or otherwise acquire any direct or indirect equity interest in any other Charter Member or any assignment or delegation of rights under any Competitor for the period of thirty-six (36) months following such Transfer.

8.2.1.1    The Team Owner and the Control Person may not Transfer, or permit to be Transferred, any direct or indirect equity interest in the Team Owner if such Transfer would result in the Control Person (or any successor Control Person) being in breach of <u>Section 9.1.2.</u>

8.3    <u>Charter Member Agreement Limitation.</u>    At all times and unless waived by NEM, neither the Team Owner nor any other Person shall own or otherwise acquire any direct or indirect interest in any

37

HIGHLY CONFIDENTIAL - OCO

23XI_0004438

Charter Member Agreement (including owning any direct or indirect ownership interest in, or exercising any control over, any other Competitor) if, after giving effect to such interest, the Team Owner or such other Person (as applicable), together with all of his, her or its Affiliates (including Family Relatives), would collectively have direct or indirect interest in more than three (3) Charter Member Agreements (including this Agreement).   Notwithstanding the foregoing, nothing in this Section 8.3 shall in any way limit, modify, amend or supersede the affiliate group rule as set forth in the NASCAR Rulebook ("Multi Vehicle Teams" / "Affiliate Groups") as in effect on the Execution Date (but without regard to the provisions thereof to the applicable shared services, which, for clarity, shall not be applied to the sharing of information or equipment so long as such sharing of information or equipment is done at arm's length fair market value and without affecting any team's ability or desire to compete in NASCAR to the fullest extent of such team's capabilities) and, for clarity, NEM shall maintain all rights of inspection, investigation, enforcement or otherwise as set forth in such affiliate group rule set forth in the NASCAR Rulebook.

8.4     Transfers by NEM.   NEM may Transfer its interest in this Agreement in a transaction in which the transferee is acquiring all or substantially all of NEM's assets (an "NEM Permitted Transferee"), whether by way of merger, consolidation, sale of assets, acquisition of equity or otherwise, provided that (x) after giving effect to such Transfer, such NEM Permitted Transferee is an Affiliate of the entity or entities that own all or substantially all of the other NASCAR-related Cup Series assets and (y) Team Owner is provided with prior written notice of such Transfer.   Except as set forth in the preceding sentence, NEM shall not Transfer any of its rights or obligations under this Agreement to any Person without the prior written consent of Team Owner.   For clarity the parties agree that placing a lien or other encumbrance on NEM or any of its Affiliates or any of their respective rights under this Agreement shall not constitute a Transfer for purpose of this Section 8.4, provided that NEM shall (or shall cause the applicable grantee of such lien or encumbrance to) notify Team Owner of any foreclosure (or attempted foreclosure) under any such loan documents.

8.5     Publicly Traded Entities.   No Charter Member shall be an entity whose stock or other equity interest is listed, designated or quoted on a securities exchange or trading market.

8.6     Institutional Investors Policy.   At all times, Team Owner, the Control Person and the Owners must abide by the Institutional Investors Policy set forth on Exhibit G and shall not take any action or consummate any Transfer that would result in a breach of such Institutional Investors Policy.

9     Termination.

9.1     Team Owner Events of Default.   In addition to any other rights or remedies NEM may have, this Agreement may be terminated by NEM, by written notice to the Team Owner, upon the occurrence of one or more of the following (each, a "Team Owner Event of Default"):

9.1.1     subject to Sections 8.1.2, 8.1.3 and 13.10, (i) the Team Owner or Control Person breaches or fails to perform in any material respect any of its obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, or (ii) any of Team Owner or the Control Person's representations and warranties in this Agreement were materially untrue or incorrect when made on the Execution Date and which untruth or inaccuracy materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non compliance or untruth that is curable, the Team Owner effects a cure within thirty (30) days after receiving written notice of breach or default from NEM;

38

HIGHLY CONFIDENTIAL - OCO

9.1.2    the Team Owner or the Control Person violates in any material respect Sections 6.2, 6.3, 6.8, 6.9, 6.10, or 6.11 of this Agreement unless the Team Owner effects a cure within the earlier of the following time periods after receiving written notice of breach or default from NEM (i) forty eight (48) hours and (ii) the start of the next Event;

9.1.3    the Team Owner dissolves the Team Owner's or the business of the Team that is the subject of this Agreement or substantially ceases operations or the performance of the Team Owner's operating obligations set forth in Section 6.1, and in each case such business, operations or performance is not continued by a successor to whom the Team Owner's business has been transferred in compliance with the terms of this Agreement;

9.1.4    the Control Person commits any act of fraud or embezzlement in connection with the operation of the Team Owner or the Team, as finally determined by a court of last resort, or is convicted by a trial court of, or pleads guilty or no contest to, a felony (other than a traffic violation) which involves moral turpitude;

9.1.5    the Team Owner becomes subject to a Bankruptcy;

9.1.6    Team Owner receives five (5) or more MPS Notices during any Season and NEM provides notice to Team Owner of its intent to terminate this Agreement as a result of such poor performance on or prior to December 31 of the third consecutive Year of such poor performance;

9.1.7    If there is an uncured or unwaived Team Owner Event of Default by Team Owner under the prior Charter Member Agreement bearing the same number and which had the Execution Date of January 1, 2016 (the "Predecessor Charter Agreement") for which written notice has been provided to the Team Owner as of the Effective Date;

9.1.8    unless NEM has exercised it set-off rights as provided herein, the Team Owner or the Control Person fails to make any payments due and validly owing pursuant to Section 3.1(e) within (30) days from the date of receipt by Team Owner of a written notice from NEM that such payment is past due.

In the event of either (x) a Team Owner Event of Default by Team Owner that results in the termination of this Agreement by NEM in accordance with the terms and provisions of this Section 9.1 or (y) a voluntary forfeiture by Team Owner to NEM of its rights under this Agreement pursuant to Section 9.5, and in each case provided that the terms and restrictions of Section 6.6 hereof are in effect at such time, the Team Owner and Control Person shall, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations and is not otherwise an Exempt 10% Owner shall, be subject to the terms and restrictions set forth in Section 6.6 (Protection Of Goodwill) for a period of twelve (12) months following the date of such termination or forfeiture, as the case may be.  For purposes of clarity, the restrictions set forth in Section 6.6 shall not apply following a termination effected by Team Owner pursuant to Section 4.3(a) or Section 9.2.

For the avoidance of doubt, in no event shall NEM have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by Team Owner, Control Person or any of their Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by Team Owner, Control Person or any of their Affiliates to pay any amount due under any such agreement or arrangement.

9.2    NEM Event of Default.  In addition to any other rights or remedies the Team Owner may have, but subject to Section 13.10, this Agreement may be terminated by the Team Owner by delivering

39

HIGHLY CONFIDENTIAL - OCO

23XI_0004440

written notice to NEM if (i) NEM or any of its Affiliates breaches or fails to perform in any material respect any of its material obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, or (ii) any representation or warranty in this Agreement of NEM (or in any certification delivered hereunder), NASCAR or any of their respective Affiliates was materially untrue or incorrect when made on the Execution Date and, which untruth or inaccuracy materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non-compliance or untruth that is curable, NEM (or its applicable Affiliate) effects a cure within thirty (30) days after receiving written notice of breach or default from Team Owner. For the avoidance of doubt, in no event shall the Team Owner or the Control Person have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by NEM or any of its Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by NEM or any of its Affiliates to pay any amount due under any such agreement or arrangement.

9.3     <u>Consequences of Termination.</u>  Upon the termination of this Agreement, (a) all rights granted by NEM to the Team Owner and Control Person under this Agreement shall revert to NEM and all rights granted by the Team Owner and Control Person to NEM or its Affiliates under this Agreement shall revert to the Team Owner and Control Person, as applicable; (b) subject to <u>Section 13.18</u> none of NEM (or its Affiliates) or Team Owner or Control Person (or their respective Affiliates) shall have any further obligations under this Agreement; (c) the Team Owner shall take all actions that may be necessary to return all rights with respect to the Assigned Car Number to NEM or its designee; (d) the Team Owner shall immediately pay to NEM all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages NEM may incur as a result of any breach of this Agreement by the Team Owner, and (e) NEM and its Affiliates shall immediately pay to Team Owner all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages the Team Owner, Control Person or their Affiliates may incur as a result of any breach of this Agreement by NEM or any of its Affiliates. For clarity, nothing in this <u>Section 9.3</u> shall be construed to limit any other rights or remedies that the Team Owner, Control Person, NEM or any of their respective Affiliates may have, or to preclude the Team Owner, Control Person or NEM from enforcing such rights or pursuing such remedies to the fullest extent possible, including under NASCAR Rules. For clarity, in the event of termination by either party, the sole and exclusive process for resolution of any Disputes between the parties (and their respective Affiliates) shall be set forth in <u>Section 12</u>.

9.4     <u>Set-Off.</u>

9.4.1     In the event of a Team Owner Event of Default pursuant to <u>Section 9.1.8</u>, in addition to NEM's termination rights with respect to non-payment, NEM shall have the set-off rights set forth in <u>Section 3.1(g) and 6.12</u> above.

9.4.2     In the event that the Arbitration Panel issues a decision (with respect to a Dispute) with respect to an amount payable to NEM or any of its Affiliates in accordance with this Agreement, NEM shall have the right to withhold from the Team Owner any amounts that would have been payable to Team Owner under this Agreement in an amount equal to the amount determined by the Arbitration Panel to be so payable to NEM or any of its Affiliates.

9.5     <u>Voluntary Forfeiture.</u>  Notwithstanding anything herein to the contrary (but subject to the penultimate paragraph of <u>Section 8.1</u>), NEM acknowledges and agrees that the Team Owner may, in its sole discretion, elect to voluntarily forfeit its rights under this Agreement (provided that no such forfeiture shall be effective during a Cup Series Season) by delivering written notice of such forfeiture to NEM (which

40

HIGHLY CONFIDENTIAL - OCO

23XI_0004441

notice shall specify the effective date of such forfeiture). In the event that Team Owner exercises such forfeiture right, then the parties will treat the Agreement as having been terminated on the applicable date for purposes of Section 8.3, and, subject to any separate rights or remedies NEM may have in respect of any Team Owner Event of Default that is otherwise (and independently) occurring without regard to such forfeiture as of such date of such forfeiture, such forfeiture will not be deemed a breach or violation of any of the terms or provisions hereof.

10      Representations, Warranties and Covenants.

    10.1      Representations, Warranties and Covenants by the Team Owner and the Control Person.

        10.1.1      Each of the Team Owner and Control Person severally represent and warrant as to itself to NEM that:

            10.1.1.1 The Team Owner is either a corporation, limited liability company, limited partnership duly organized, validly existing and in good standing under the law of its jurisdiction of formation.

            10.1.1.2      Each of the Team Owner and the Control Person has the full power and authority to enter into and perform its, his or her obligations under this Agreement in accordance with its terms and neither Team Owner nor Control Person have entered into any alliance, agreement or other governing body that would in any way inhibit, effect or limit the authority of Team Owner or Control Person in exercising all rights and obligations under this Agreement.

            10.1.1.3      The execution, delivery and performance of this Agreement by the Team Owner and the Control Person have been duly authorized by all necessary action of the Team Owner and this Agreement constitutes a valid and binding obligation of the Team Owner and the Control Person, enforceable against each in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

            10.1.1.4      The execution, delivery and performance of this Agreement by the Team Owner and the Control Person do not and will not (i) conflict with any of the Team Owner's Governing Documents and do not and will not conflict with or result in the breach or termination of, or constitute a default under, any material lease, agreement, commitment or other instrument, or any order, judgment or decree, to which the Team Owner or the Control Person is a party or by which the Team Owner or the Control Person is bound, or (ii) constitute a violation by the Team Owner or the Control Person of any law or regulation applicable to the Team Owner or the Control Person. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority is required on the part of the Team Owner or the Control Person in connection with the execution, delivery or performance of its, his or her obligations under this Agreement.

        10.1.2      The Team Owner and Control Person severally covenant as to itself that the Control Person, as designated in Schedule 1, and/or trusts for the benefit of the Control Person and his or her lineal descendants for which the Control Person is the trustee, shall own (so long as he or she is designated as the Control Person), a direct or indirect equity interest in the Team Owner of no less than thirty percent (30%).

        10.1.3      At all times during the Term a single person (who is as of the Execution Date, the Control Person) shall have full authority to act on behalf of the Team Owner and to bind the Team Owner

41

HIGHLY CONFIDENTIAL - OCO

23XI_0004442

with respect to all NASCAR and NEM matters relating to the Team, the Cup Series, NASCAR and the stock car business operations of the Team Owner (the "NASCAR Core Matters"). In addition, beginning on the Execution Date and throughout the Term, all actions taken by the Control Person or his or her Designated Team Representative shall be binding on the Team Owner and may be relied upon by NEM (and its Affiliates) and the Other Teams without further inquiry and without notice to or consent of any other Owners or any shareholder, partner or member vote, or through a board of directors, board of managers, or similar body.

10.1.4   In entering into this Agreement, neither the Team Owner, the Control Person, any Owner, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) NEM, except as expressly contained in this Agreement or in a writing provided by an officer of NASCAR or NEM. Without limiting the generality of the preceding sentence, NEM and its representatives and advisors have not made any representations or warranties assuring the Team Owner or the Control Person that it will be able to earn a profit or that NEM otherwise will provide any financial assistance to the Team Owner or the Control Person (other than the payments due hereunder) or offer to repurchase any rights granted to the Team Owner under this Agreement.

10.1.5   The Team Owner shall comply, in all material respects with all laws, regulations and ordinances applicable to the Team Owner, the Team, and the Designated Vehicle with respect to the performance of their respective obligations under this Agreement.

10.1.6   The Team Owner, together with its wholly-owned and controlled subsidiaries, is as of the Execution Date, and subject to Section 8, shall remain during the Term, the (i) owner, licensee or lessee, as applicable, and is the operator of all (or substantially all) assets, properties and rights associated with the operation of the Team and the Designated Vehicle (e.g., race shop, haulers, race cars) or otherwise necessary for the performance of Team Owner's obligations under this Agreement and (ii) the sole owner and operator of the Team.

10.2     Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities.

10.2.1   Each of NEM and the Specified NASCAR Entities severally represent and warrant as to itself to the Team Owner and the Control Person that:

10.2.1.1 Such Person is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the law of the State of Florida or Delaware (as applicable) and has the full power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

10.2.1.2 The execution, delivery and performance of this Agreement by it have been duly authorized by all necessary actions of and this Agreement constitutes the valid and binding obligation of such party enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

10.2.1.3 The execution, delivery and performance of this Agreement by it does not and will not (i) conflict with the certificate of incorporation, certificate of formation, bylaws, operating agreement or other governing documents or agreements of such party, as applicable, and does not and will not conflict with or result in the breach or termination of, or constitute a default under, any lease, agreement,

42

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 125 of 241

HIGHLY CONFIDENTIAL - OCO                                                                23XI_0004443

commitment or other instrument, or any order, judgment or decree to which it is a party or by which it is bound, or (ii) constitute a violation by such party of any law or regulation applicable to it. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority or any direct or indirect owner of such party is required on the part of such party in connection with the execution, delivery and performance of this Agreement by it.

10.2.1.4 In entering into this Agreement, neither such party, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) Team Owner or Control Person, except as expressly contained in this Agreement.

10.2.1.5 NEM and each Specified NASCAR Entity has and shall retain throughout the Term the power and authority to perform, and to cause their Affiliates to perform, all of their respective obligations and the obligations of their Affiliates set forth herein. Without limitation of the foregoing, NEM and each Specified NASCAR Entity severally represents, warrants, covenants and agrees for the benefit of Team Owner and the Control Person that subject to Section 8.4, (i), NASCAR Holdings, LLC is and shall remain throughout the Term the direct or indirect owner of 100% of the issued and outstanding capital stock or other applicable equity interests of each of NASCAR, NEM, NASCAR Broadcasting, LLC is and shall remain throughout the Term the sole Person with rights to sanction Events and all promoter fees shall be paid to NEM (or its NEM Permitted Transferee) (or Awards and Achievement Bureau, Inc., a wholly-owned subsidiary of NEM) throughout the Term, (iii) the only NEM Affiliate that is party to any Live Transmission Contracts is and shall remain throughout the Term NASCAR Broadcasting, LLC, and all Media Revenue is and shall remain payable directly to NASCAR Broadcasting, LLC pursuant to such Live Transmission Contracts (iv) without limitation of the foregoing, NEM shall not, and shall not permit any Affiliates to, take any action intended or designed to artificially reduce the Pool Money, whether by changing the ownership and/or licensing structure of NASCAR and its Affiliates or otherwise.

10.2.2 Each of NEM and each Specified NASCAR Entity shall comply (and NEM shall cause NASCAR to comply), in all material respects, with all laws, regulations and ordinances applicable to such party with respect to the performance of their respective obligations under this Agreement.

10.2.3 NEM represents and warrants that NEM and Promoters, to NEM's knowledge, use best practices in organizing, operating, sanctioning and exploiting Events.

10.3    Release And Waiver by Team Owner and Control Person. Each of the Team Owner and the Control Person, on their own behalf and on behalf of their controlled Affiliates, hereby releases and forever discharges each of the NEM Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all actions, causes of action, suits, debts, losses, costs, controversies, damages, liabilities, judgments, claims, and demands whatsoever, in law, admiralty or equity (collectively, "Claims"), known or unknown and arising out of or relating to the criteria used by NEM to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner or any other Person; provided, however that (x) nothing in this Section 10.3 shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by NEM or any of its Affiliates and (y) in the event any third party brings any Claim against the Team Owner, the Control Person or any of their respective Affiliates, nothing in this Section 10.3 shall prevent or restrict the Team Owner, the Control Person or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the NEM Indemnified Parties that

43

HIGHLY CONFIDENTIAL - OCO

23XI_0004444

is related to the subject matter of such third party Claim. Each of the Team Owner and the Control Person jointly and severally represent and warrant to the NEM Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person. The release and discharge set forth in Section 10.3 shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any controlled Affiliate, on the one hand, and any of NEM or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

10.4    Release And Waiver by NEM. Each of NEM and the Specified NASCAR Entities on their own behalf and on behalf of their respective Affiliates (including NASCAR Holdings, LLC and NASCAR), hereby releases and forever discharges each of the Team Owner Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all Claims, known or unknown and arising out of or relating to the criteria used by the Team Owner to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with NEM; provided, however that (x) nothing in this Section 10.4 shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by the Team Owner or the Control Person and (y) in the event any third party brings any Claim against NEM or any of its Affiliates, nothing in this Section 10.4 shall prevent or restrict NEM or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the Team Owner Indemnified Parties that is related to the subject matter of such third party Claim. Each of NEM and the Specified NASCAR Entities jointly and severally represents and warrants to the Team Owner Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person. The release and discharge set forth in Section 10.4 shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any Team Affiliate, on the one hand, and any of NEM, or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Team Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

11    Indemnification.

11.1    Team Owner Indemnity. The Team Owner shall indemnify, defend and hold harmless each of the NEM Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to (i) Team Owner's or Control Person's breach of any representation, warranty, covenant or other obligations pursuant to this Agreement, (ii) use of Team Clips as permitted in Section 5.4, or (iii) NEM or any of its authorized Affiliates' permitted use or license of any Team Intellectual Property pursuant to and in accordance with the terms and conditions of this Agreement.

11.2    NEM Indemnity. NEM (and, as to their own representations, warranties, covenants and agreements set forth herein, each Specified NASCAR Entity) severally as to itself shall indemnify, defend and hold harmless each of the Team Owner Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to (i) the breach by them of any their respective representations, warranties, covenants or other obligations pursuant to this Agreement or (ii) the Team Owner's permitted use or license of any of the Works pursuant and in accordance with the terms and conditions of to this Agreement.

11.3    Third Party Claims. The obligations and liabilities of the parties under this Agreement for indemnification with respect to, relating to, caused (in whole or in part) by or arising out of claims of third

44

HIGHLY CONFIDENTIAL - OCO                                                                23XI_0004445

parties (each, a "Third Party Claim"), shall be subject to the terms and conditions set forth in this Section 11.3. The party entitled to be indemnified hereunder (the "Indemnified Party") shall give the party obligated to provide the indemnity (the "Indemnifying Party") prompt notice of any Third Party Claim; provided, that the failure to give such notice shall not affect the liability of the Indemnifying Party under this Agreement unless the failure materially and adversely affects the ability of the Indemnifying Party to defend the Third Party Claim. The Indemnifying Party shall have the right, exercisable by notice to the Indemnified Party, to control the defense of any Third Party Claim, with counsel of its choosing, provided that the Indemnifying Party as a condition to controlling such defense, shall confirm in writing its obligation to indemnify the Indemnified Party with respect to such claim (including for payment of reasonable fees and expenses of counsel) under this Section 11. Any notice of a Third Party Claim shall identify, to the extent known to the Indemnified Party, the basis for the Third Party Claim, the facts giving rise to such Third Party Claim, and the amount of such Third Party Claim. The Indemnified Party shall make available to the Indemnifying Party copies of all relevant documents and records in its possession.

12    Dispute Resolution.

12.1    Dispute Resolution. Subject to Section 12.4, and the second sentence of this Section 12.1, the exclusive method of resolving any Dispute shall be the procedures set forth in this Section 12. Notwithstanding the foregoing, but subject to the proviso of this sentence, if there is a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of any NASCAR Rule, such disagreements and disputes will be resolved by NEM or its applicable Affiliates, in their reasonable discretion as the sanctioning body of NASCAR stock car auto racing, in accordance with the provisions set forth in NASCAR Rules and, for clarity shall not be subject to any Arbitration and the Arbitration Panel shall have no authority with respect to such matters; provided, that if the dispute, controversy or claim is with respect to whether there is a conflict or inconsistency between this Agreement and NASCAR Rules as set forth in Section 6.5 or as to whether NASCAR or its Affiliates have complied with the requirements of Section 6.5, then such dispute, controversy or claim shall be resolved pursuant to the procedures set forth in this Section 12.

12.2    Arbitration Mechanics. Each party shall have the right to commence an arbitration (the "Arbitration") with respect to any Dispute by giving a notice to the other party that sets forth in reasonable detail the nature of the Dispute and reasonable support for its claim. Except as set in this Section 12.2, the Arbitration shall be administered by the American Arbitration Association (the "AAA") under its Commercial Arbitration Rules and conducted pursuant to such rules, as such rules are in effect as of the time the Dispute is submitted to the AAA for Arbitration (the "Submission Date"). The panel of arbitrators who shall be responsible for resolving the Dispute (the "Arbitration Panel") will consist of three persons (each an "Arbitrator"), who shall be selected in accordance with the AAA's Commercial Arbitration Rules. In proposing a list of candidates for Arbitrators, the parties will request that the AAA take into account the parties' desire that each Arbitrator be an individual who is a lawyer and/or former judge that has not been employed by, retained by, or otherwise associated with, and has not served as a consultant, contractor, advisor, agent or in any similar capacity to or for any party, or any of their respective Affiliates or predecessors-in-interest, within ten (10) years prior to the Submission Date. The parties shall instruct the Arbitration Panel to convene an initial conference with the parties within fifteen (15) Business Days after the appointment of the Arbitration Panel to establish the timing of any discovery that the Arbitration Panel deems appropriate, to set the date for a hearing and any other matters as may be deemed appropriate by the Arbitration Panel. Unless the Parties otherwise agree with respect to any Arbitration, (a) all disputed issues regarding discovery shall be decided by the Arbitration Panel, (b) if any Arbitration hearing takes more than one day, it will proceed on the next following Business Day until it is completed (provided, that the

45

HIGHLY CONFIDENTIAL - OCO

23XI_0004446

Arbitration Panel may elect not to hear the Dispute on one (1) Business Day of each week), (c) barring extraordinary circumstances, the Arbitration Panel will render a written decision not later than fifteen (15) Business Days from the date of the conclusion of the Arbitration hearing, (d) the Arbitration hearing shall take place in Charlotte, North Carolina, and (e) subject to the second sentence of Section 11.1, the Arbitration Panel shall have the authority to award damages, equitable relief (including specific performance) and such other remedies the Arbitration Panel deems appropriate (provided, however, the Arbitration Panel shall not have the authority to alter, change, amend, modify, waive, add to or delete from any provision of this Agreement), and (f) if the parties initiate multiple Arbitration proceedings (including with respect to any Team Owner and other members of its Charter Member Group), the subject matters of which are related by common questions of law or fact and which could result in conflicting awards or obligations, such proceedings shall be consolidated, at NEM's election into a single Arbitration proceeding. Each party irrevocably consents to the delivery of service of process with respect to any Arbitration in any manner permitted for the giving of notices under Section 13.1. Notwithstanding anything contained in the AAA Commercial Arbitration Rules to the contrary, the non-prevailing party shall bear all costs associated with any Arbitration under this Agreement, including the costs and expenses of the Arbitration, and the cost of its own and the prevailing party's legal representation and expert witness fees (including any related charges and disbursements). The parties hereto agree to keep confidential in accordance with Section 13.5, and to require that the Arbitration Panel keep confidential, the existence of any Arbitration, the arbitral proceedings, the submissions made by the parties (including any discovery) and any decisions made by the Arbitration Panel, including any award, except, in addition to the exceptions set forth in Section 13.5, to the limited extent necessary in connection with any proceeding to confirm or vacate such award in accordance with this Section 12.

12.3     Arbitration Award.  Any award rendered by the Arbitration Panel shall be (a) in writing, state the basis of the award and include both findings of fact and conclusions of law and (b) final, binding and non-appealable upon the parties and any court having jurisdiction may enter a judgment on any such award.

12.4     Equitable Relief.  Each of the parties hereto acknowledge that the rights granted by and to NEM, Team Owner and Control Person under this Agreement possess a special, unique, and extraordinary character that make difficult the assessment of monetary damage that would be sustained by NEM, Team Owner or Control Person as a result of any breach of this Agreement by the other parties hereto or any unauthorized use of the rights granted by or to NEM under this Agreement and any such breach of unauthorized use will immediately cause irreparable harm to the Cup Series, NASCAR, NEM, NASCAR Rights Affiliates, Team Owner, Control Person and others and that any remedy at law for such breach will be inadequate.  Notwithstanding anything to the contrary in this Agreement, before the Arbitration Panel is convened in accordance with this Section 12 any party may seek temporary or preliminary injunctive relief in aid of the Arbitration, at any time exclusively from the U.S. District Court or, if it does not have jurisdiction, the North Carolina state courts, in each case located in Charlotte, North Carolina (collectively, the "Designated Courts") with respect to any Dispute (collectively, "Interim Equitable Relief"); provided that neither the Team Owner nor the Control Person, nor any other Person acting on their behalf or for their benefit, shall seek Interim Equitable Relief or any other equitable relief of any kind to enjoin or otherwise restrain or limit NEM (or any of its Affiliates) from conducting any of the Events.  If a Dispute requires Interim Equitable Relief before the Arbitration Panel is convened in accordance with this Section 12, the procedures set forth in this Section 12 will still govern the ultimate resolution of the Dispute notwithstanding the fact that a Designated Court may have entered an order providing for injunctive or another form of Interim Equitable Relief.  Each of the parties to this Agreement submits to the exclusive jurisdiction of the Designated Courts with respect to the Interim Equitable Relief, including, the in

46

HIGHLY CONFIDENTIAL - OCO

23XI_0004447

personam and subject matter jurisdiction of the Designated Courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail (in accordance with <u>Section 13.1</u>) or any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered thereby in connection with such Interim Equitable Relief subject to all applicable appeal rights from such Designated Courts.

      12.5   <u>Limitations on Damages.</u>  Other than with respect to claims for indemnification in respect of third party claims pursuant to <u>Section 11</u>, no claim may be made under any legal theory (including contract or tort) by any party against the other party, any Affiliate of the other party, or the directors, officers, employees, shareholders, members, partners, attorneys, or agents of such other party or its Affiliates, for any special, indirect, consequential, incidental or punitive damages in connection with a cause of action arising out of or relating to the transactions contemplated by this Agreement.

13    <u>Miscellaneous.</u>

      13.1   <u>Notices.</u>  Any notice or other communication under this Agreement shall be in writing and shall be considered to have been given and received when delivered personally or sent by electronic mail (with a copy by any other means for providing notices under this Agreement), or one Business Day after being sent by a reputable overnight courier to the applicable party (with a copy by any other means for providing notices under this Agreement) at the address set forth below its name on the signature page to this Agreement (or at such other address as that party may specify by notice to the other).

      13.2   <u>Complete Agreement.</u>  This Agreement, including all Schedules and Exhibits contained herein, contains a complete statement of the arrangements between NEM, and its Affiliates, on the one hand, and the Team Owner and the Control Person, on the other hand, with respect to the subject matter hereof and supersedes all prior agreements and understandings between them with respect to that subject matter.

      13.3   <u>Expenses.</u>  Each party shall bear its own expenses (including the fees and disbursements of its attorneys and accountants) incurred in connection with the negotiation and preparation of this Agreement and, except as expressly set forth in this Agreement, in connection with all obligations required to be performed by it under this Agreement.

      13.4   <u>Governing Law.</u>  This Agreement shall be governed by and construed in accordance with the law of the State of Florida applicable to agreements made and to be performed entirely in Florida.

      13.5   <u>Confidentiality.</u>  During the Term, each of NEM, the Team Owner and the Control Person shall, and shall cause their respective controlled Affiliates (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates) to, treat and hold as confidential (and not disclose or provide access to any third party to) all of the Confidential Information, except that disclosure is permitted to NEM, NASCAR and their Affiliates, the Team Owner's and the Control Person's Affiliates and their legal and professional advisors and representatives, to current or prospective, lenders, investors or Transferees, and to other Competitors and their Affiliates and legal and professional advisors and representatives and any association of Competitors and their legal and professional advisors, provided that (i) such Persons are made aware of the confidential nature of such Confidential Information and (ii) such Persons are instructed to maintain the confidential nature of such Confidential Information pursuant to this <u>Section 13.5</u>.  In the event that NEM, Team Owner, the Control Person, any of their controlled Affiliates (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates) or such advisors or representatives become legally compelled to disclose any Confidential Information, the Team Owner or NEM, as applicable, shall, to the extent

47

HIGHLY CONFIDENTIAL - OCO          23XI_0004448

practicable, provide the other with prompt written notice of such requirement so that Team Owner or NEM, as applicable, may seek a protective order or other remedy or waive compliance with this Section 13.5. In the event that such protective order or other remedy is not obtained, or Team Owner or NEM, as applicable, waives compliance with this Section 13.5, NEM or the Team Owner, as applicable, shall furnish only that portion of such Confidential Information which is legally required to be provided and exercise its reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information; provided, however, that this Section 13.5 shall not apply to any information that, at the time of disclosure, is available publicly and was not disclosed in breach of this Agreement or becomes available on a nonconfidential basis from a source other than a party to this Agreement.

13.6     Relationship Created.  NEM is not a partner, joint venturer or principal and agent with the Team Owner or the Control Person, and nothing in this Agreement shall be construed so as to create any of those relationships or to impose any liability as such on any of them, or to grant any party the right to bind the other without the other's prior written consent.

13.7     No Third-Party Beneficiaries.  Except for the rights of those Persons who are entitled to indemnification under Section 11, this Agreement is solely for the benefit of the parties hereto, and nothing in this Agreement shall be deemed to create any third-party beneficiary rights in any person or entity not a party to this Agreement.

13.8     Separability.  If any provision of this Agreement shall be deemed invalid or unenforceable by any court having jurisdiction, the court shall have the discretion to modify the provision to the extent necessary to make it valid or enforceable and the provision (as so modified), and the balance of this Agreement, shall remain in effect and shall be enforced to the maximum extent permitted by law.

13.9     Failure to Take Action; Waiver.  The failure by any party to seek redress for violation of, or to insist upon the strict performance of, any provisions of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.  All waivers must be in writing, subject to Section 13.2.

13.10    Force Majeure.  If a Force Majeure Event prohibits, prevents or delays any party from performing any of its obligations under this Agreement (other than any payment obligation), then such party shall be excused from such performance to the extent, but only to the extent, made necessary by the Force Majeure Event and only until such time as the Force Majeure Event terminates or is revoked or resolved. If a Force Majeure Event shall last longer than one (1) year, the party to whom performance would otherwise be owed shall have the right to terminate this Agreement to the same extent (if any) as it would have if the occurrence of a Force Majeure Event did not excuse the other party's performance under this Agreement.

13.11    Publicity.  Following the Execution Date, NEM, the Team Owner, the Control Person and their respective Affiliates shall mutually cooperate in good faith regarding issuing a press release, written public statement or press conference regarding the entering into this Agreement and any other details regarding transactions contemplated by entering into this Agreement (other than Confidential Information).

13.12    Amendments.

13.12.1     This Agreement may not be amended or modified other than by a writing duly signed by the Team Owner, the Control Person and NEM.

13.12.2     Notwithstanding the foregoing clause (a), in the event that NEM enters into substantively identical amendments or waivers to Charter Member Agreements with the applicable Charter Members and control persons thereof representing (x) at least sixty six and two-thirds percent (66

48

HIGHLY CONFIDENTIAL - OCO

23XI_0004449

2/3%) of the then-total number of Charter Members and (y) no less than fifty percent (50%) of the then-total number of Charter Members representing one BMG group and no less than fifty percent (50%) of the then-total number of Charter Members representing at least one other BMG group, then upon delivery by NEM to Team Owner of a copy of such amendment or waiver (together with the signatures from the requisite Charter Members), this Agreement shall thereafter be deemed to have been amended to the same extent as the Charter Member Agreements of the Charter Members who have executed such amendment or waiver and such amendment or waiver will be effective and enforceable against NEM, the Team Owner and the Control Person regardless of whether the Team Owner or Control Person has signed, approved or consented to such amendment; provided, that in no event shall any such amendment or waiver proposed to be effected pursuant to this subsection (b): (i) extend the Initial Term or the Term or otherwise cause an extension or renewal of this Agreement, (ii) shorten the Term or (iii) treat Team Owner or the Control Person in a manner that materially differs from the treatment of other Charter Members' and control persons, as applicable, it being understood and agreed that the written consent of Team Owner and the Control Person shall be necessary for any such amendment or waiver described in this proviso.

13.13    Further Action.    Each party shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as NEM, the Team Owner or the Control Person may reasonably request to effectuate the terms and intent of this Agreement or as may be necessary or appropriate to carry out the terms of this Agreement.

13.14    Joint and Several.    All representations, warranties, covenants and obligations of the Team Owner or the Control Person set forth in this Agreement are several representations, warranties, covenants and obligations of the Team Owner and the Control Person, respectively, regardless of whether or not the applicable provision explicitly provides for joint, several or joint and several liability.  The Control Person shall have no liability in respect of any of the representations, warranties, covenants or obligations of the Team Owner hereunder, it being understood and agreed that the sole obligations of the Control Person are in respect of the representations, warranties, covenants and obligations expressly undertaken by the Control Person herein.

13.15    Reservation of Rights.    All rights not specifically granted to the Team Owner, the Control Person or NEM by this Agreement are reserved by the Team Owner, the Control Person, or NEM as applicable, provided that, nothing in this Agreement shall restrict the Team Owner, the Control Person, NEM or their respective Affiliate thereof from exercising any legal rights that are otherwise available to such Person as a non-NASCAR rights holders or the public at large.

13.16    General Interpretative Provisions.    Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine and feminine forms.  The term "including", whenever used in any provision of this Agreement, means including, but without limiting the generality of, any description preceding or succeeding such term.  Each reference to a person or entity shall include a reference to the successors and assigns of such person or entity.  All references to "Sections", "schedules", "Exhibits" or "exhibits" shall be references to the Sections, schedules and Exhibits to this Agreement, as amended, modified, supplemented or restated from time to time.  The Section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.  This Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied that would result in the resolution of an ambiguity contained herein against the drafting party.  The word "or" shall not be exclusive. In the computation of any period of time expressed in day(s) in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the

HIGHLY CONFIDENTIAL - OCO                    23XI_0004450

period so computed shall be included, except that if it is not a Business Day such period shall end on the next succeeding Business Day.

13.17    <u>Performance.</u>  NEM may perform any of its obligations or exercise any of its rights under this Agreement through any one or more of its Affiliates, provided that NEM shall remain primarily responsible for all of its obligations under this Agreement.

13.18    <u>Survival.</u>  The provisions of Sections 2.2, 2.3 <u>Sections 8.2.1</u> (for the period set forth therein), the penultimate paragraph of 9.1 (including, <u>Section 6.6</u>, if applicable with respect to Sections 2.2 or 2.3 or such termination or forfeiture under <u>Sections 9.1 or 9.5</u>), <u>10.3, 11</u> (for any claims relating to periods on or prior to the termination date), <u>11, 13.1-13.10, 13.14, 13.16-13.19</u> shall survive termination, expiration or forfeiture of this Agreement.  For avoidance of doubt, the Predecessor Charter Agreement shall survive the execution of this Agreement in accordance with its terms.

13.19    <u>Counterparts.</u>  This Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument.  Any counterpart or other signature delivered by facsimile, PDF or other electronic transmission shall be deemed for all purposes as being good and valid execution of this Agreement by the applicable party.

13.20    <u>Guarantee.</u>  NASCAR Broadcasting, LLC hereby irrevocably guarantees all of NEM's financial obligations under this Agreement.

[Signature page follows.]

50

HIGHLY CONFIDENTIAL - OCO

23XI_0004451

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Execution Date.

NASCAR EVENT MANAGEMENT, LLC


By:

Name:

Title:


Address for Notices:

NASCAR Event Management, LLC

Attn: General Counsel

One Daytona Boulevard

Daytona Beach, Florida 32114


Electronic Mail Address for Notices: legalnotice@nascar.com
NASCAR BROADCASTING, LLC (solely for purposes of Sections 10.2, 10.4, 11.2 and 13.20 hereof)

*[Signature Page to Charter Member Agreement]*
51

HIGHLY CONFIDENTIAL - OCO

23XI_0004452

2311 RACING, LLC d/b/a 23XI Racing

By:

Name:

Title:


Address for Notices:

218 Raceway Drive

Mooresville, NC 28117

Electronic Mail Address for Notices:

denny@23xiracing.com


_____

DENNY HAMLIN


Address for Notices:

218 Raceway Drive

Mooresville, NC 28117

Electronic Mail Address for Notices:

denny@23xiracing.com


*[Signature Page to Charter Member Agreement]*

52

HIGHLY CONFIDENTIAL - OCO

23XI_0004453

**Exhibit A**

**Definitions**

"AAA" has the meaning set forth in Section 12.2.

"Affiliate" means (i) with respect to any Person, any other Person, which directly or indirectly controls, is controlled by, or is under common control with such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract, or otherwise, and (ii) with respect to any Person who is an individual, each parent, spouse or domestic partner, sibling, or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such Persons in the capacity as such custodian or guardian; provided, however, for purposes of this Agreement, neither International Speedway Corporation nor any of its direct or indirect subsidiaries shall be deemed an Affiliate of NEM; and further provided, that any Person or team not engaged in professional stock car racing in the United States, Canada or Mexico which is otherwise an Affiliate of Team Owner or Control Person shall not be deemed an Affiliate of Team Owner, except for the purposes of being a beneficiary of an indemnity, release, or damages limitation, or Section 6.6(ii).

"Agreement" has the meaning set forth in the Preamble.

"Ancillary Activity" has the meaning set forth in Section 5.5(d)

"Ancillary Rights" means those rights related to any activity categorized as an Ancillary Activity in accordance with the terms hereof.

"Arbitration" has the meaning set forth in Section 12.2.

"Arbitration Panel" has the meaning set forth in Section 12.2.

"Arbitrator" has the meaning set forth in Section 12.2.

"Assigned Car Number" means the vehicle number that is assigned by NASCAR for use by the Team Owner, pursuant to NASCAR Rules. As of the Execution Date, the Assigned Car Number that is assigned for use by the Team Owner, pursuant to NASCAR Rules, and subject to the rights of the Team Owner set forth in this Agreement is set forth on Schedule 1.

"At Event Assets" has the meaning set forth in Section 6.9.2

"Bankruptcy" means, with respect to a Person, (i) a general assignment for the benefit of the creditors of such Person, (ii) a voluntary petition in bankruptcy by such Person, (iii) the adjudication of such Person as bankrupt or insolvent, (iv) the entering against such Person of an order for relief in any bankruptcy or insolvency proceeding, (v) the filing by such Person of a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any bankruptcy statute, law or regulation, (vi) such Person's seeking, consenting to or acquiescing in, in each case in writing, to the appointment of a trustee, receiver or liquidator of the Person or all or any substantial part of such Person's properties, (vii) such Person's failure to obtain the dismissal, within sixty (60) days after the commencement thereof, of any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, foreclosure or similar relief under any statute, law or regulation, (viii) such Person's failure to cause to be vacated or stayed, within sixty (60) days after the appointment without

53

HIGHLY CONFIDENTIAL - OCO

23XI_0004454

such Person's consent or acquiescence, of a trustee, receiver or liquidator of the Person or of all or any substantial part of such Person's properties or (ix) such Person's failure to vacate an appointment described in clause (viii) of this sentence within sixty (60 days of the expiration of any such stay).

"BMG" means each active branded manufacturer group (e.g., Chevrolet, Ford, and Toyota.

"Broadcast Partner" means any Person other than NEM or any of its Affiliates to whom NEM (or any of its Affiliates) has granted Live Transmission Rights in respect of any Event pursuant to a Live Transmission Contract.

"Business Day" means any day (other than a Saturday, Sunday or legal holiday) on which banks are open for business in New York, New York.

"Car/Driver Sponsor Advertising" has the meaning set forth in Section 6.3.

"Chairperson" has the meaning set forth in Section 3.5(d)(ii)

"Charter Member Agreement" means any agreement that grants (i) guaranteed entry in an Event and (ii) the right to be eligible for the Charter Team Points Pool Money.

"Charter Member Fees" has the meaning set forth in Section 3.1(g).

"Charter Member Group" has the meaning set forth Section 3.5(a).

"Charter Member Increase" has the meaning set forth in Section 3.3(a).

"Charter Members" means, collectively, the Team Owner and other teams who are currently or hereafter may be a party to a then-current Charter Member Agreement.

"Charter Shortfall" has the meaning set forth in Section 4.1.

"Charter Team Points Pool Money" means all Points Pool Money other than the money attributable to the Fixed Owner's Plan-Open Teams as specified in Exhibit B.

"Claims" has the meaning set forth in Section 10.3.

"Competitors" means, as of the date of any such determination, the Team and the Other Teams that are licensed to and competing in the Cup Series season.

"Competitor Tire Shop" has the meaning set forth in Exhibit C.

"Confidential Information" means, collectively, this Agreement, the terms hereof, any all proprietary information or materials provided by NEM, Team Owner, Control Person or any of their respective Affiliates in connection herewith or in furtherance of their respective rights or obligations hereunder, including any Transfer Approval Forms, and any proprietary information or materials disseminated at, prior to or in connection with any Team Owner Council meeting, in each case that are clearly marked at the time of delivery as confidential.

"Contingency Awards" mean certain monies awarded to Competitors for meeting, completing or exceeding certain award criteria or performance goals as specified in each such contract that awards such amounts. The Team Owner acknowledges and agrees that eligibility for any Contingency Awards shall be based on or require the Competitors use or display sponsors product and/or decal to be eligible for such award.

54

HIGHLY CONFIDENTIAL - OCO

23XI_0004455

"Control Person" means the individual person identified by the Team Owner from time to time who (i) directly or indirectly owns a Controlling Interest and at least a 30% equity interest in the Team Owner, (ii) has the authority with respect to NASCAR Core Matters that is set forth in Section 9.1(c) and (iii) has executed and delivered this Agreement or a joinder hereto.

"Controlling Interest" means any direct or indirect equity interest in the Team Owner that, if Transferred, would Transfer the Control Person's effective authority to bind the Team Owner for purposes of this Agreement and NASCAR Core Matters.

"Cup Series" means the NASCAR racing series known, as of the Execution Date, as the NASCAR Cup Series, and any successor thereto, regardless of its name or sponsor, so long as such successor series is identified by NEM and NASCAR as the highest and most premium NASCAR stock car racing series, and publicly held up and promoted by NEM and NASCAR as such.

"Cup Series Points Event" means each Event that is included in the Cup Series where championship points are awarded.

"Designated Courts" has the meaning set forth in Section 12.4.

"Designated Team Representative" means a then-current director or officer of the Team Owner to whom the Control Person has granted the authority with respect to NASCAR Core Matters that is set forth in Section 10.1.3.

"Designated Vehicle" means any stock car that (i) complies with NASCAR Rules, (ii) is owned (or leased) and operated by the Team Owner, (iii) is assigned the Assigned Car Number, and (iv) is authorized to compete in Events pursuant to this Agreement, the Driver Agreement and applicable NASCAR Rules.

"Dilutive Amount" has the meaning set forth in Section 3.4(i).

"Dispute" means any dispute, disagreement, controversy or claim between the parties hereunder (including any of their respective officers, directors, shareholders, partners, members, agents, representatives and attorneys) that arises under or in connection with this Agreement and except as otherwise provided in Section 11.1, is not a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of NASCAR Rules.

"Driver" means any driver that has executed and delivered (i) a binding agreement with the Team Owner to compete in the Events driving the Designated Vehicle and (ii) the Driver Agreement with NEM with respect to the Designated Vehicle. Notwithstanding that a Driver may have executed a Driver Agreement for one or more other Team Owner vehicle(s), the Driver must execute and deliver a current Driver Agreement specifically for the Designated Vehicle before being allowed to compete in the Designated Vehicle. At the time that the Team Owner intends to have the Driver drive the Designated Vehicle, the Driver must be a Member in good standing; hold a current, valid Cup Series driver license.

"Driver Agreement" has the meaning set forth in Section 6.4.

"Effective Date" means January 1, 2025, except as otherwise provided herein.

"Event" means the time period of activities during a competitive stock car racing Cup Series racing event sanctioned by NEM in accordance with the NASCAR Rules which includes all periods for registration (including without limitation review and approval), inspections, all Practices, Qualifying and Qualifying Races, as provided in Section 9 of the NASCAR Rules position determination, the Race, Post-Race and

55

HIGHLY CONFIDENTIAL - OCO

23XI_0004456

rain or postponed dates related thereto (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date).

"Event Data" means all data and other information arising from and during one or more Events that is collected (i) by or on behalf of NEM or its Affiliates or (ii) by the Team Owner, its Affiliates or any other Person (other than, in the case of clauses (i) and (ii), Trade Secrets), it being understood the Team Owner will have no obligation to collect any such Event Data that is not currently collected as of the Execution Date unless the expenses attributable thereto are satisfied by NEM or its Affiliates in accordance with the immediately following sentence. To the extent Event Data is collected by or on behalf of NEM or its Affiliates, it shall be collected at the expense of (a) a Broadcast Partner, in the case of certain Event Data exploited via the Live Transmission Activities or (b) NEM or any of its Affiliates. NEM (on its own behalf and on behalf of its Affiliates) and the Team Owner agree that any Event Data that is commercially exploited (which, for clarity, shall not include any use by NEM of its Affiliates for competition or officiating purposes in which Event Data is not disseminated to the general public) shall be exploited only via Live Transmission Activities.

"Exclusivity Breach" has the meaning set forth in Section 6.9.1.

"Execution Date" means[          ].

"Exempt 10% Owner" has the meaning set forth in Section 6.6.

"Extension Notice" has the meaning set forth in Section 2.2.

"Extension Term" has the meaning set forth in Section 2.2.

"Family Relatives" means, with respect to any Person, such Person's spouse, mother, father, brothers, sisters and lineal descendants (including those related by adoption and spouses of lineal descendants) and trusts for the benefit of any of the foregoing.

"Field Shortfall" has the meaning set forth in Section 4.1.

"Field Size" means the total number of Competitors authorized by NEM to start any Race.

"Force Majeure Event" means any act, event or condition (except, in each case, for the payment of money), which is beyond the reasonable control of the party asserting the Force Majeure (as defined below), which wholly or partially prevents or delays the performance of any of the duties, responsibilities or obligations of the party asserting the Force Majeure. The term "Force Majeure" shall include, but not be limited to, an act of God; an act of the public enemy; civil disturbance or unrest;; injunctions; lightning; fire, explosion or other serious casualty; terrorist attack (or threats thereof); epidemics; strike, lock-out or labor dispute (without regard to the reasonableness of any party's demands or any party's ability to satisfy such demands); accident or sabotage; unusually severe weather (including hurricane, earthquake, tornado, landslide or flood); war (whether declared or not or threats thereof); blockades; embargoes; condemnation or other taking by the action of any governmental body on behalf of any public, quasi-governmental or private entity; provided, however, for purposes of this Agreement, any crash, accident or other damage to the Designated Vehicle resulting from competition at an Event shall not be deemed a Force Majeure Event.

"Fuel Sponsor" means any sponsor, that at any time, with which NEM or any of its Affiliates enters into a sponsorship (or similar) agreement that sells products or services in Fuel Category.

"Good Standing" means Team Owner is not in material breach of this Agreement and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-

56

HIGHLY CONFIDENTIAL - OCO

23XI_0004457

compliance being waived by NEM in its sole discretion), and in NEM's reasonable discretion, is working cooperatively to enhance the growth of the sport, which shall include, but is not limited to, assistance with the Driver Ambassador Program and non-disparagement of the sport as a business.

"Governing Documents" means all agreements and documents affecting the ownership, control, financing or management of a Person (including, as applicable, its certificate of limited partnership and agreement of limited partnership, formation and limited liability company agreement, certificate of incorporation, bylaws and other governing documents).

"Indemnified Party" has the meaning set forth in Section 11.3.

"Indemnifying Party" has the meaning set forth in Section 11.3.

"Initial Term" has the meaning set forth in Section 2.1.

"Interim Equitable Relief" has the meaning set forth in Section 12.4.

"Invitational Events" are those non-points Events that are included in the Cup Series schedule to which certain qualifying Charter Member Teams are invited to participate.  And so long as they meet the qualifications as determined by NASCAR, Other Teams may also be invited to participate.  Invitational Events include, as of the Execution Date, the NASCAR All Star Series Event and the Clash.

"Invitational Pool Money" means, in any given Year, the Race Purse for each Invitational Event.

"Live Transmission" means the live transmission, distribution or exhibition of audio-visual signals of the performance of a NASCAR national series event (including the Events), and any replay(s) thereof if granted as part and parcel of a grant of Live Transmission Rights, by any means, process, medium, distribution platform, method or device, whether now known or hereafter developed, including, without limitation, by broadcast television signal, cable television signal, Direct Broadcast Satellite, the Internet, and/or could be offered to consumers on a Pay Per View or subscription basis etc. within the United States, its territories, possessions and commonwealths, plus Bermuda.

"Live Transmission Activity" has the meaning specified in Section 5.5(c).

"Live Transmission Contract" means any contract, agreement or other enforceable obligation, whether oral or written, entered into between a NASCAR Rights Affiliate and any Broadcast Partner, for the license, assignment or other transfer of any Live Transmission Rights.  The current Live Transmission Contract is for years 2025-2031 (inclusive).

"Live Transmission Rights" means any and all rights to engage in a Live Transmission and directly related activity (for example, delayed transmissions, single re-transmissions, and support shoulder programming.)  For clarity, and without limiting the foregoing, Live Transmission Rights include the right to offer the Live Transmission Rights of an Event to mobile devices, tablets, computers, connected TVs, virtual reality viewing devices, hologram viewing devices, etc.  For further clarity, without limiting the foregoing, the Live Transmission Rights of an Event could be included as part of what is commonly known as a "TV Everywhere offering," and/or could be offered directly to consumers or delivered as part of any other type of offering now known or hereafter developed.

"Material Sponsor" has the meaning set forth in Section 5.4.

"Media Revenues" means all monies, other than Other Awards, actually received, subject to Section 4.3(a), by NEM or a NASCAR Rights Affiliate pursuant to a Live Transmission Contract that relates to Live

HIGHLY CONFIDENTIAL - OCO

23XI_0004458

Transmission of the NASCAR Cup Series (and, if aggregated with the NASCAR Cup Series, of the NASCAR Xfinity Series) and NASCAR Craftsman Truck Series (or their successors).

"Member" has the meaning given to it in the NASCAR Rule Book.

"Minimum Performance Standard" has the meaning set forth in Section 6.12.

"MPS Notice" has the meaning set forth in Section 6.12.

"NASCAR" has the meaning given to it in the Recitals.

"NASCAR Core Matters" has the meaning set forth in Section 10.1.3

"NASCAR Recipients" has the meaning set forth in Section 5.2.

"NASCAR Rights Affiliate" means any Person that is (i) an Affiliate or an assignee of NEM and (ii) engaged in the business of exploiting Live Transmission Rights or Ancillary Rights for purposes of performing any necessary activities incident thereto. NEM may arrange for, coordinate, supervise, determine, or control certain Event-related activity related to the immediately preceding, or act in other capacities relative to the Live Transmission Rights or Ancillary Rights; however, NEM is not engaged in the business of exploiting Live Transmission Rights or Ancillary Rights and, accordingly, is not a NASCAR Rights Affiliate.

"NASCAR Rule Book" means the NASCAR Cup Series Rule Book, as it may be amended, supplemented or otherwise modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NASCAR Rules" means the NASCAR Rule Book and all other rules, regulations, guidelines, directives, memoranda, resolutions, bulletins and agreements (including all agreements and other documents with respect to Drivers, sponsorship or media rights) of NASCAR, or any of its Affiliates, in each case as they may be amended or modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NEM" has the meaning set forth in the Preamble.

"NEM Indemnified Parties" means, collectively, NEM, its Affiliates and each of their respective agents, representatives, Affiliates, employees, shareholders, managers, members, officers and directors.

"NEM Permitted Transferee" has the meaning set forth in Section 8.4.

"Negotiation Period" has the meaning set forth in Section 2.3.

"Net Recovery" has the meaning set forth in Section 4.3(a).

"Non-Fuel Products" has the meaning set forth in Exhibit C.

"Nonrenewal Events" has the meaning set forth in Section 2.2.

"OEM" has the meaning set forth in Section 8.1.3

"Other Awards" shall mean awards paid to a NASCAR Rights Affiliate and awarded to the Driver (which may be waived by Driver in writing to be paid to Team) for the mid-season tournament from Warner Brothers Discovery and any successor promotion by a Broadcast Partner.

HIGHLY CONFIDENTIAL - OCO

23XI_0004459

"Other Teams" means each of the stock car racing teams authorized by NEM to participate in the Cup Series from time to time, other than the Team.

"Owner" means any Person who, directly or through any intermediate corporations, partnerships, limited liability companies or other Persons, owns of record or beneficially an equity interest in the Team Owner.

"Permitted Contractual Reduction" has the meaning set forth in Section 4.3(a).

"Person" means any individual, corporation, association partnership (general or limited), joint venture, trust, estate, limited liability company or other legal entity or organization.

"Points Pool Money" means, in any given Year, the sum of Race Purse for all Cup Series Points Events (which includes the Qualifying Races for the Daytona 500), Fixed Owner's Plan – Charter Teams, Fixed Owner's Plan – Open Teams, and Year-End Point Fund in such Year, in each case as set forth in Exhibit B.

"Pool Money" means in any given Year the sum of Invitational Pool Money and Points Pool Money.

"Practices" has the meaning set forth in the NASCAR Rule Book.

"Private Event" means an automobile or truck motorsports event which is non-commercial (i.e., track rental or automobile club).  Non-commercial under this definition shall mean that Team Owner(s) does not receive consideration for the Private Event, including without limitation payment for i) any broadcast or exhibition in any media, ii) ticket sales, and/or iii) sponsorships.

"Prohibited Person" is a Person whose association with NEM or NASCAR would in NASCAR's reasonable opinion adversely affect the NASCAR brand or the image of the sport of stock car racing.  For example and without limitation, a Person may be determined to be a Prohibited Person if such Person is involved in a material way with a business or activity that is illegal or immoral (such as pornography, illegal gambling or illegal performance-enhancing substances).

"Promoter" means any track promoter hosting an Event at its facility.

"Qualifying" has the meaning set forth in the NASCAR Rule Book.

"Qualifying Open Participant" has the meaning set forth in Section 3.5(a).

"Qualifying Race" has the meaning set forth in the NASCAR Rule Book.

"Qualifying Sponsor" has the meaning set forth in Section 6.9.1

"Race" means the portion of the Event that does not include Practice or Qualifying (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date).  For clarity, the Duels at Daytona and other similar race qualifying formats adopted after the Effective Date, if any, shall each individually be considered a "Race" for all purposes of this Agreement.

"Remaining Charter Members" has the meaning set forth in Section 4.3(a).

"Reserved Sponsor Categories" means, collectively, each Series Sponsor Category, the Tire Category and the Fuel Category.

"Rules Package" means the annual rules package and testing policy of the Cup Series, including the NASCAR Rules, for any Year.

59

HIGHLY CONFIDENTIAL - OCO

"Sanction Agreement" means the agreements between each of the Promoters and NEM, whereby NEM agrees to conduct and officiate an Event at a facility operated by the applicable Promoter.

"Season" means the NASCAR Cup Series race season that occurs in a Year.

"Series Sponsor" means any title and presenting sponsor of the Cup Series. At any given time there may be only one Series Sponsor and only one Series Sponsor Category.

"Series Sponsor Category" has the meaning set forth in Exhibit C as amended from time to time in accordance with the terms hereof.

"Series Sponsor Change" has the meaning set forth in Section 6.9.1

"Special Awards" means those awards given to Competitors by the Reserved Category Sponsors.

"Specified NASCAR Entities" has the meaning set forth in the Preamble.

"Submission Date" has the meaning set forth in Section 12.2.

"Substitute Control Person" means an alternate individual person set forth and designated on Schedule 1 who is authorized to act on behalf of or bind the Team Owner in the absence, incapacity or death of the Control Person.

"Taxes" means all taxes, duties, levies and other similar charges, including related interest, additions to tax and penalties.

"Team" means the NASCAR racing team set forth on Schedule 1.

"Team Affiliates" means, with respect to each Team Owner, collectively, (a) all Affiliates of such Team Owner whose business pertains to competing in the Cup Series, (b) each Driver or crew member who is employed, engaged or otherwise controlled by such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, and (c) the officers, employees, agents, and representatives of such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, but with respect to (a) through (c) above, only if such Person is directly responsible for the participation of the Team's Designated Vehicle in the Events for Team Owner.

"Team Clips" has the meaning set forth in Section 5.4.

"Team Co-Chair" has the meaning set forth in Section 3.5(a).

"Team Intellectual Property" means the image, likeness, name, performance, and voice of Team Owner, Team or Team Affiliates or the Designated Vehicle; all names, words, symbols, emblems, logos, slogans, depictions, trade dress, trademarks, service marks, trade names, patents, copyrights, domain names, and other intellectual property owned or controlled by Team Owner or Team or Team Affiliates; and the Assigned Car Number.

"Team Owner" means the domestic U.S. entity set forth on Schedule 1 that directly and wholly owns, controls and operates the Team as provided herein.

"Team Owner Council" means the body of NEM representatives and designees of Charter Members and Open Team Members who meet and confer as provided in Section 3.5. As of the Execution Date, the Team Owner Council members for the Team Owner are set forth on Schedule 1. The Control Person shall have the right to remove or replace any Team Owner Council member at any time upon written notice to NEM, provided that such Person meets the requirements set forth in Section 6.5.

60

HIGHLY CONFIDENTIAL - OCO

23XI_0004461

"Team Owner Council Representative" has the meaning set forth in Section 3.5(a).

"Team Owner Event of Default" has the meaning set forth in Section 9.1.

"Team Owner Indemnified Parties" means, collectively, the Team Owner, the Control Person and each of their respective Affiliates, and each of their respective agents, representatives, Affiliates, employees, shareholders (or equivalent), managers, members, officers and directors.

"Team Owner Parties" means, collectively, the Team Owner and the Control Person.

"Term" has the meaning set forth in Section 2.1.

"Territory" shall be the United States and its territories, Canada and Mexico.

"Third Party Claim" has the meaning set forth in Section 11.3.

"Tire Category" has the meaning set forth in Exhibit C.

"Tire Sponsor" means the single sponsor with which NEM or any of its Affiliates enters into a sponsorship and supply (or similar) agreement with respect to, and that sells products or services in, the Tire Category.

"Trade Secret" means all data and other information collected by the Team Owner or one of its Affiliates or NEM or one of its Affiliates (i) pertaining to Team Owner or its operations (and not otherwise available to other Competitors), (ii) that provides the Team Owner (or one of its Affiliates) with an actual and independent competitive advantage from not being generally known to or readily ascertainable through appropriate means by other Competitors who would obtain a competitive advantage (or would materially negate Team Owners (or one of its Affiliates) competitive advantage) from its disclosure or use, and (iii) (to the extent controlled by Team Owner) is the subject of efforts by the Team Owner or such Affiliate that are reasonable under the circumstances to maintain its secrecy, provided that, (A) once any such data or other information is disseminated and known to the general public it shall no longer be deemed a Trade Secret and (B) notwithstanding the foregoing, any data or other information arising from and during one or more Events that was commercially exploited during the 2015 Cup Series season via any Live Transmission Activity shall not be deemed a Trade Secret. For clarity, neither the Team Owner nor any of its Affiliates nor NEM nor any of its Affiliates may commercially exploit (or authorize or license any Person the rights to commercially exploit) any Trade Secret, provided that the foregoing shall not preclude the use of any Trade Secret by (x) Team Owner or its Affiliates for non-public competition purposes or the use by Team Owner or its Affiliates or Team Owner's BMG or applicable vendor, as the case may be, pursuant to requirements of agreements under which such Trade Secret was invented or developed, or (y) NEM or its Affiliates for non-public (and, for clarity, not disclosed to any other Competitor) competition or officiating purposes. NEM and its Affiliates shall maintain the confidentiality of Trade Secrets known to NEM, unless Team Owner agrees otherwise in writing.

"Traditional Broadcast Deal" means NEM or its Affiliates contract with third party(ies) paying a fixed license fee for the Live Transmission (i.e., not an earn out, or ad- or subscription-based, or any other performance-based fee structure, etc.) of the Events.

"Transfer" means (i) when used as a noun: any direct or indirect transfer, sale, assignment, or other disposition (including the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law) and (ii) when used as a verb: to directly or indirectly transfer, sell, assign, or otherwise dispose of (including through the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law).

61

HIGHLY CONFIDENTIAL - OCO

23XI_0004462

"Transfer Approval Form" has the meaning set forth in Section 8.1.2.2

"Transfer Fee" has the meaning set forth in Section 8.1.2.2

"Transfer Notice" has the meaning set forth in Section 8.1.2.2

"Victory Tour" has the meaning set forth in the Driver Agreement.

"Works" means all film, audio only, video only, audio-visual, photographic images, sounds and Event Data (including in-car audio, in-car video, in-car radio, other electronic transmissions between cars and crews, and timing and scoring information) arising from and during any Event.

"Year" means (i) the period commencing as of January 1, 2025 and ending on December 31, 2025, and (ii) each subsequent twelve-month period beginning on January 1 and ending on December 31 of any year of the Term.

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 145 of 241

HIGHLY CONFIDENTIAL - OCO                                                                23XI_0004463

## Exhibit B

<u>Timing of Payments of Pool Money</u>

Race Purse and Fixed Owner's Plan monies will be paid within 5 Business Days subsequent to final race results for each Event (with the exception of the Qualifying Races for Daytona 500 and the Clash, which will be paid within 5 Business Days subsequent to final race results of the Daytona 500).

Year-End Point Fund monies will be paid within 30 calendar days subsequent to final race results for each Year.

Timely remittance of all monies is subject to submission of all banking, tax and other administrative information reasonably requested by NEM, including information required to comply with federal, state and local tax laws.

<u>Pool Money</u>

| | | | | $000's | | | |
|---|---|---|---|---|---|---|---|
| | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031 (a)** |
| **Total Pool Money** | $431,373 | $437,043 | $447,055 | $450,662 | $458,614 | $462,312 | $444,558 - 468,209 |
| **Uses of Funds** | | | | | | | |
| Race Purse (Points events) | 118,014 | 121,555 | 125,201 | 128,957 | 132,826 | 136,811 | 133,797 - 140,915 |
| Race Purse (Invitational events) | 6,005 | 6,186 | 6,371 | 6,562 | 6,759 | 6,962 | 6,809 - 7,171 |
| Fixed Owner's Plan | 182,136 | 180,329 | 182,640 | 178,314 | 178,096 | 173,378 | 161,989 - 170,607 |
| *Per Charter* | *5,059* | *5,009* | *5,073* | *4,953* | *4,947* | *4,816* | |
| Performance Plan | 91,505 | 94,250 | 97,078 | 99,990 | 102,990 | 106,080 | 103,743 - 109,262 |
| Year-End Point Fund | 33,712 | 34,723 | 35,765 | 36,838 | 37,943 | 39,081 | 38,220 - 40,254 |
| **Pool Money** | **431,373** | **437,043** | **447,055** | **450,662** | **458,614** | **462,312** | **444,558 - 468,209** |
| *Per Charter* | *11,983* | *12,140* | *12,418* | *12,518* | *12,739* | *12,842* | *12,349 - 13,006* |

Race-specific purses to be communicated to Teams by November 1st of the prior year

(a) Final number to be delivered to Teams by September 1, 2029

Case 3:24-cv-00886-KDB-SCR    Document 454-61    Filed 11/21/25    Page 146 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004464

**Race Purse Payout Curve For Cup Series Points Events (a)**

| Finish Position | Payout Percentage | Finish Position | Payout Percentage |
|:---:|:---:|:---:|:---:|
| 1 | 5.160% | 21 | 2.399% |
| 2 | 4.067% | 22 | 2.318% |
| 3 | 3.976% | 23 | 2.237% |
| 4 | 3.885% | 24 | 2.157% |
| 5 | 3.794% | 25 | 2.076% |
| 6 | 3.704% | 26 | 1.995% |
| 7 | 3.613% | 27 | 1.915% |
| 8 | 3.522% | 28 | 1.834% |
| 9 | 3.432% | 29 | 1.753% |
| 10 | 3.341% | 30 | 1.672% |
| 11 | 3.250% | 31 | 1.597% |
| 12 | 3.165% | 32 | 1.521% |
| 13 | 3.079% | 33 | 1.445% |
| 14 | 2.993% | 34 | 1.370% |
| 15 | 2.908% | 35 | 1.294% |
| 16 | 2.822% | 36 | 1.218% |
| 17 | 2.736% | 37 | 1.143% |
| 18 | 2.651% | 38 | 1.057% |
| 19 | 2.565% | 39 | 0.971% |
| 20 | 2.479% | 40 | 0.886% |

(a) The Race Purse Payout Curve for the Daytona 500 Qualifying Races will be determined annually based on past practices and the number of entrants

64

HIGHLY CONFIDENTIAL - OCO

23XI_0004465

## Fixed Owner's Plan payouts

| | | | | $000's | | | |
|---|---|---|---|---|---|---|---|
| | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031 (a)** |
| Fixed Owner's Plan | $182,136 | $180,329 | $182,640 | $178,314 | $178,096 | $173,378 | 161,989 - 170,607 |
| Fixed Amount Per Points Event | $5,059 | $5,009 | $5,073 | $4,953 | $4,947 | $4,816 | *$4500 - $4739* |
| Fixed Amount Per Charter / Per Event | $141 | $139 | $141 | $138 | $137 | $134 | $125 - 132 |

65

HIGHLY CONFIDENTIAL - OCO

23XI_0004466

**Performance Plan Payout Methodology**

Performance Plan is a share-based model, calculated annually using a combination of rolling 2-year Owner Points finishes

## Rolling 2-year Owner Points Shares

- 36 shares given to the best average Charter Team Owner Points finish over the past 2 years, declining to 1 share for 36th best average Charter Team Owner Points finish
- Most recent year weighted at 100%, 2nd most recent year at 50%
- In the event of a tie in Charter Team Owner Points in a given season, teams that are tied will both receive credit for their tied position (e.g., if two teams tied for 10th, then both teams would receive credit for a 10th place finish in that season)
- In the event of a tie in average Charter Team Owner Points finish over the past 2 years, then the shares would be split across the tied Teams (e.g., if two Teams tied for 5th in average Charter Team Owner Points finish over the past 2 years, then each of those two Teams would split the shares for 5th and 6th place, resulting in 31.5 shares for each Team – 32 shares for 5th, 31 shares for 6th, average of 31.5 shares)

A Charter's rolling 2-year Owner Points shares are divided by the total number of outstanding shares to determine the percentage of total Performance Plan money to be paid out to the Charter in the following season.

Given the rolling nature of the calculation, NEM will notify all Charter Teams of their Performance Plan payout for the following season within 30 calendar days subsequent to the final race results for each Season.

66

HIGHLY CONFIDENTIAL - OCO

23XI_0004467

# Year-End Point Fund Payout

$000's

| Finish Position | Payout Percentage | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
|---|---|---|---|---|---|---|---|---|
| 1 | 8.423% | $2,840 | $2,925 | $3,013 | $3,103 | $3,196 | $3,292 | $3219 - $3391 |
| 2 | 7.138% | $2,406 | $2,479 | $2,553 | $2,630 | $2,708 | $2,790 | $2728 - $2873 |
| 3 | 6.853% | $2,310 | $2,379 | $2,451 | $2,524 | $2,600 | $2,678 | $2619 - $2759 |
| 4 | 6.567% | $2,214 | $2,280 | $2,349 | $2,419 | $2,492 | $2,567 | $2510 - $2644 |
| 5 | 6.282% | $2,118 | $2,181 | $2,247 | $2,314 | $2,383 | $2,455 | $2401 - $2529 |
| 6 | 5.996% | $2,021 | $2,082 | $2,145 | $2,209 | $2,275 | $2,343 | $2292 - $2414 |
| 7 | 5.711% | $1,925 | $1,983 | $2,042 | $2,104 | $2,167 | $2,232 | $2183 - $2299 |
| 8 | 5.425% | $1,829 | $1,884 | $1,940 | $1,998 | $2,058 | $2,120 | $2073 - $2184 |
| 9 | 5.068% | $1,709 | $1,760 | $1,813 | $1,867 | $1,923 | $1,981 | $1937 - $2040 |
| 10 | 4.783% | $1,612 | $1,661 | $1,711 | $1,762 | $1,815 | $1,869 | $1828 - $1925 |
| 11 | 4.497% | $1,516 | $1,562 | $1,608 | $1,657 | $1,706 | $1,758 | $1719 - $1810 |
| 12 | 4.212% | $1,420 | $1,462 | $1,506 | $1,551 | $1,598 | $1,646 | $1610 - $1695 |
| 13 | 3.926% | $1,324 | $1,363 | $1,404 | $1,446 | $1,490 | $1,534 | $1501 - $1580 |
| 14 | 3.569% | $1,203 | $1,239 | $1,276 | $1,315 | $1,354 | $1,395 | $1364 - $1437 |
| 15 | 3.284% | $1,107 | $1,140 | $1,174 | $1,210 | $1,246 | $1,283 | $1255 - $1322 |
| 16 | 2.998% | $1,011 | $1,041 | $1,072 | $1,104 | $1,138 | $1,172 | $1146 - $1207 |
| 17 | 2.698% | $910 | $937 | $965 | $994 | $1,024 | $1,055 | $1031 - $1086 |
| 18 | 2.384% | $804 | $828 | $853 | $878 | $905 | $932 | $911 - $960 |
| 19 | 2.099% | $707 | $729 | $751 | $773 | $796 | $820 | $802 - $845 |
| 20 | 1.799% | $606 | $625 | $643 | $663 | $683 | $703 | $688 - $724 |
| 21 | 1.499% | $505 | $521 | $536 | $552 | $569 | $586 | $573 - $603 |
| 22 | 1.199% | $404 | $416 | $429 | $442 | $455 | $469 | $458 - $483 |
| 23 | 0.899% | $303 | $312 | $322 | $331 | $341 | $352 | $344 - $362 |
| 24 | 0.571% | $193 | $198 | $204 | $210 | $217 | $223 | $218 - $230 |
| 25 | 0.286% | $96 | $99 | $102 | $105 | $108 | $112 | $109 - $115 |
| 26 | 0.214% | $72 | $74 | $77 | $79 | $81 | $84 | $82 - $86 |
| 27 | 0.200% | $67 | $69 | $71 | $74 | $76 | $78 | $76 - $80 |
| 28 | 0.186% | $63 | $64 | $66 | $68 | $70 | $73 | $71 - $75 |
| 29 | 0.171% | $58 | $59 | $61 | $63 | $65 | $67 | $65 - $69 |
| 30 | 0.164% | $55 | $57 | $59 | $60 | $62 | $64 | $63 - $66 |
| 31 | 0.157% | $53 | $55 | $56 | $58 | $60 | $61 | $60 - $63 |
| 32 | 0.154% | $52 | $54 | $55 | $57 | $59 | $60 | $59 - $62 |
| 33 | 0.151% | $51 | $53 | $54 | $56 | $57 | $59 | $58 - $61 |
| 34 | 0.148% | $50 | $52 | $53 | $55 | $56 | $58 | $57 - $60 |
| 35 | 0.146% | $49 | $51 | $52 | $54 | $55 | $57 | $56 - $59 |
| 36 | 0.143% | $48 | $50 | $51 | $53 | $54 | $56 | $55 - $57 |
| **Total Year-End Point Fund** | | $33,712 | $34,723 | $35,765 | $36,838 | $37,943 | $39,081 | $38,220 - 40,254 |

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 150 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004468

**Exhibit C**

**Reserved Sponsor Categories**

1.      Series Sponsor Category.

2.      Tire Category. means tires for any type of vehicle, including passenger cars, vans, sport utility vehicles (SUVs), light trucks, commercial trucks, trailers, motorcycles, aircraft, mopeds, scooters and recreational vehicles (RVs), including racing tires for any of the foregoing vehicles. "Competitor Tire Shop" means a tire retailer, wholesaler, retreader installer or repair facility that: (i) includes the name of a single competitor tire brand (e.g., with respect to Goodyear (the Tire Sponsor as of the Execution Date), Firestone Complete Auto Care); or (ii) is owned or operated by any Person that owns a third-party competitor tire brand and gives preferential treatment to a single competitor brand or affiliate brands. The Team Owner or Control Person shall be permitted to include on the Designated Vehicle the branding of a retail tire company and/or repair facility which features the word "tire" in conjunction with the company name (e.g., Discount Tire), provided that such third party retailer/repair facility is not a Competitor Tire Shop.

3.      Fuel Category. means combustion-based fuel and fuel blends for automotive vehicles, including hydro carbon-based, diesel, biodiesel, hydrogen, ethanol, or other alternative fuels and fuel blends. Notwithstanding the foregoing, a company in the Fuel Category may also manufacture lubricants (i.e., motor oil, etc.) and other products or offer other services (i.e., convenience stores) other than automotive fuel (collectively "Non-Fuel Products"). Such Non Fuel Products sponsorships are permitted subject to NEM approval and the conditions outlined below. Companies in the Fuel Category may sponsor a Team Owner Party or the Team for Non-Fuel Products, provided that the Designated Vehicle and the Team's uniforms, hauler and at-track equipment, etc., cannot feature the brand, logo, trademark, product or service identification of a (i) fuel, (ii) fuel retailer, or (iii) a corporate name of a company in the Fuel Category. Further, no Team Owner Party may advertise or promote a product or service which includes a brand, logo, or trademark of, or where the advertisement or promotion features a brand, logo, or trademark of a (i) fuel, (ii) fuel retailer, or (iii) the corporate name of a company in the Fuel Category, whether, in or out of uniform. For example, the Driver or Team Owner may enter into agreements with convenience stores as long as such convenience stores are not branded by a company in the Fuel Category (e.g. 7-Eleven, Circle K, Sheetz, WaWa). Companies in the Fuel Category may sponsor the Designated Vehicle, the Driver or the Team for a lubricant or other similar product as long as they are not branded by a company in the Fuel Category. It is agreed and understood that the Team Owner Parties may not use their NASCAR themed property to promote and/or advertise foreign produced ethanol and/or non-corn based ethanol or advocate for any specific ethanol based consumer fuel blend (e.g. E15, E30). Team Owner may promote American ethanol and American ethanol related services provided that such advertising and promotions is approved in writing by NEM.

68

HIGHLY CONFIDENTIAL - OCO                23XI_0004469

**Exhibit D**

**Logos**

The NASCAR logo and the NASCAR Series logo will only be used as follows:

HIGHLY CONFIDENTIAL - OCO

23XI_0004470

## 2025 LOGO PLACEMENT GUIDELINES





HIGHLY CONFIDENTIAL - OCO

23XI_0004471

FUEL PORT SPECIFICATIONS – AMERICAN ETHANOL BRANDING

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 154 of 241

HIGHLY CONFIDENTIAL - OCO                                      23XI_0004472

**Exhibit F**

**WINDSHIELD SPECIFICATIONS**

**DRIVER'S NAME AND MANUFACTURER'S LOGO**







Font: Berthold Akzidenz Grotesk Extra Bold Condensed Italic    Height: 3.5 Inches

Color: White    Chevrolet Logo: 2.18" x 6.71"

72

HIGHLY CONFIDENTIAL - OCO    23XI_0004473

## Exhibit G

## Institutional Investors Policy

The following restrictions and regulations apply to the ownership and acquisition of passive, minority interests in one or more Charter Members by private investment funds ("Funds").

1.      A Fund, together with its related Funds, shall not own a direct or indirect equity interest in a Charter Member that is greater than or equal to 49%.

2.      No Charter Member shall have more than 49% of its equity interests owned directly or indirectly by Funds .

3.      No Fund nor its representatives, managers or affiliates shall be permitted to serve as a Control Person, Designated Team Representative or in any management or governance role of a Charter Member or NASCAR team. Prior to the acquisition of any equity interest in a Charter Member that would make a Fund a Substantial Owner, NEM must approve such fund in its sole and absolute discretion.

4.      No Fund, together with its affiliates, shall own a direct or indirect equity interest in more than two (2) Charter Member ownership groups (groups owning one or more Charter Member).

5.      Any equity interest in a Charter Member that is directly or indirectly owned by a Fund shall be passive interest and the Fund shall not have any form of voting, management or consent rights with respect to such Charter Member or the applicable NASCAR team, other than customary fundamental consent rights such as with respect to (i) fundamental changes in the Charter Member's capital structure; (ii) affiliated party transactions with the Charter Member's Control Person and (iii) amendments to the governing documents of the Charter Member that are specifically intended to adversely and disproportionately affect the Fund in a material manner as compared to other equity owners.

6.      Funds [that are Owners of more than one (1) Charter Member] shall not have access to non-public competitive data (e.g., data related to race strategy or analytics) or any team personnel (e.g., driver, team manager, crew chief) or participate in or have access to any competitive decisions or decision making process.

7.      Notwithstanding anything to the contrary contained herein, no sovereign wealth fund shall be an Owner (other than as a limited partner in a Fund).  NEM acknowledges and agrees that no Fund that is a sovereign wealth fund is or will be a direct equity owner of NEM.

NEM agrees in good faith that the foregoing limitations shall not apply with respect to the ownership of Charter Members by sports holding conglomerates (e.g., Fenway Sports Group, Harris Blitzer Sports Entertainment and similar entities) and such conglomerates shall not constitute "Funds" for the purposes of this Exhibit G.

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 156 of 241

HIGHLY CONFIDENTIAL - OCO                                                                                      23XI_0004474

**Exhibit H**

**Sample Transfer Approval Form**

[Date]

| | | |
|---|---|---|
| **Charter Agreement No** | [Number] | [Effective Date] |

**Transferor:**

**Charter Team Owner**  [Name]
[Contact Information]

**Control Person**  [Name]
[Contact Information]

**Transferee:**

**Team Owner**  [Name]
[Contact Information]

**Control Person**  [Name]
[Contact Information]

***[Please attach Team Ownership Disclosure Document]***

**Charter Transfer Value**

**Total Consideration:**  [Amount]

**Requested Competition Number**  [Number]

**Does the Transferor Retain any interest in the above Charter?**  [Y/N]

If yes, please describe:

*\*Please note that neither NEM nor its Affiliates represent, warrant, or in any way certify or confirm the accuracy of the above information. NEM and its Affiliates have not participated, nor assisted in the gathering or reporting of the above information and is provided solely for information purposes only. No liability, reliance or other claim shall be made against NEM of its Affiliates for providing the information contained in this document*

74

HIGHLY CONFIDENTIAL - OCO

23XI_0004475

## Schedule 1

### Certain Designations and Disclosures

**Team Name:**     **(e.g. commonly used name of team)**      _____

**Assigned Car Number:**      _____

**Team Owner:**      (e.g. name of official corporate entity that owns the team)      _____

**Control Person:**      (e.g. team principal)      _____

**Substitute Control Person:**      (e.g. President, COO, etc. to act in absence, incapacity or death of Control Person)      _____

**Designated Team Representative:**      (e.g. competition director)      _____

**Team Owner Council Representative:**      (e.g. director, owner, CEO, President, CFO or other senior executive appointed by Team Owner)      _____

**Initial Driver:**      _____

**Crew Chief:**      _____

**Manufacturer:**      _____

75

HIGHLY CONFIDENTIAL - OCO

23XI_0004476

**Ownership of Team Owner**

*[TEAM OWNER TO PROVIDE INFORMATION]*


(A)     *Each direct owner of Team Owner*:

(1)     Entity Name: _____

        Contact Address: _____

        _____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

(2)     Entity Name: _____

        Contact Address: _____

        _____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

(3)     Entity Name: _____

        Contact Address: _____

        _____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

*[ADD MORE ENTRIES IF NECESSARY]*

HIGHLY CONFIDENTIAL - OCO

23XI_0004477

(B)   *Each direct owner of an equity interest in any entity whose primary asset is a direct or indirect interest in Team Owner:*

(1)   Entity Name:                    _____

      Contact Address:                _____

                                        _____

      % Equity in Team Owner:      _____

      Ultimate Beneficial Owner:   _____

      Contact Number:              _____

(2)   Entity Name:                    _____

      Contact Address:                _____

                                            _____

      % Equity in Team Owner:      _____

      Ultimate Beneficial Owner:   _____

      Contact Number:              _____

(3)   Entity Name:                    _____

      Contact Address:                _____

                                            _____

      % Equity in Team Owner:      _____

      Ultimate Beneficial Owner:   _____

      Contact Number:              _____

*[ADD MORE ENTRIES IF NECESSARY]*

HIGHLY CONFIDENTIAL - OCO

23XI_0004478

**Schedule 3**

**NEM FEE SCHEDULE\***

| | |
|---|---|
| | |
| | |
| | |
| | |

  \* This chart reflects major team-related fees for participating in racing events.  Other fees during the year (e.g., tables at the Cup Banquet, filing an appeal) to be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

HIGHLY CONFIDENTIAL - OCO

23XI_0004479

**Exhibit I**

**FORM OF DRIVER AGREEMENT**

HIGHLY CONFIDENTIAL - OCO

23XI_0004480

**CHARTER MEMBER AGREEMENT NUMBER: 30**

**ASSIGNED CAR NUMBER (AS OF EXECUTION DATE):  23**

**NASCAR CUP SERIES
CHARTER MEMBER AGREEMENT**

1

US-DOCS\147133351.4

HIGHLY CONFIDENTIAL - OCO

23XI_0004481

# TABLE OF CONTENTS

                                                                                                    **Page**

1.   Definitions ................................................................................................................. 5

2.   Term ......................................................................................................................... 5

    2.1   Term ............................................................................................................... 5
    2.2   Term Extension .............................................................................................. 5
    2.3   Good Faith Renewal Negotiations .................................................................. 6

3.   NEM Commitments .................................................................................................. 7

    3.1   NEM Commitments ........................................................................................ 7
    3.2   Field Size ....................................................................................................... 8
    3.3   Anti-Dilution .................................................................................................. 9
    3.4   Charter Member Issuance or Re-Issuance ..................................................... 10
    3.5   Governance ..................................................................................................... 11
    3.6   Rules Packages and Testing Policy ................................................................ 15
    3.7   Single Source Supplier ................................................................................... 16

4.   Payments and Distributions ...................................................................................... 17

    4.1   Pool Money ..................................................................................................... 17
    4.2   Payment Terms ............................................................................................... 17
    4.3   Payment Obligations ...................................................................................... 17

5.   Intellectual Property ................................................................................................. 18

    5.1   Ownership and Acknowledgment .................................................................. 18
    5.2   Advertising and Promotional Activities by NEM .......................................... 19
    5.3   Collective Use ................................................................................................. 20
    5.4   Team Clips ...................................................................................................... 20
    5.5   Team Intellectual Property; Works; Ancillary Rights .................................... 21
    5.6   Advertising and Promotional Activities by Team Owner ............................... 22
    5.7   Team Websites ................................................................................................ 22
    5.8   Entertainment Program ................................................................................... 23
    5.9   NASCAR Fan Rewards Support ..................................................................... 23
    5.10  Motorsports Consumer Data Platform ........................................................... 23
    5.11  Driver Ambassador Program .......................................................................... 23
    5.12  Industry Support ............................................................................................. 23
    5.13  Retained Revenue ........................................................................................... 23
    5.14  New Business .................................................................................................. 24

6.   Team Owner Obligations .......................................................................................... 24

    6.1   Operating Obligations ..................................................................................... 24
    6.2   Competition ..................................................................................................... 25
    6.3   Designated Sponsor and Competitor Branding ............................................... 25
    6.4   Driver Agreement ........................................................................................... 26

US-DOCS\147133351.4

HIGHLY CONFIDENTIAL - OCO

23XI_0004482

|      | 6.5   | NASCAR Rules | 26 |
|      | 6.6   | Protection Of Goodwill | 27 |
|      | 6.7   | Injunctive Relief | 27 |
|      | 6.8   | Sponsor Exclusivity | 27 |
|      | 6.9   | Series Sponsor Exclusivity | 28 |
|      | 6.10  | Tire Sponsor Exclusivity | 30 |
|      | 6.11  | Fuel Sponsor Exclusivity | 31 |
|      | 6.12  | Minimum Performance Standards | 31 |
|      | 6.13  | Media/Promotional Obligations | 31 |
|      | 6.14  | Team Sponsors | 32 |

7.    Cost Cap Model .......................................................................................... 33

|      | 7.1   | Development | 33 |
|      | 7.2   | Soft Launch | 33 |
|      | 7.3   | Implementation | 33 |

8.    Transferability/Charter Limitation ............................................................ 33

|      | 8.1   | Transfer | 33 |
|      | 8.2   | Limitations On Transfers | 36 |
|      | 8.3   | Charter Member Agreement Limitation | 36 |
|      | 8.4   | Transfers by NEM | 36 |
|      | 8.5   | Publicly Traded Entities | 36 |
|      | 8.6   | Institutional Investors Policy | 37 |

9.    Termination ................................................................................................ 37

|      | 9.1   | Team Owner Events of Default | 37 |
|      | 9.2   | NEM Event of Default | 38 |
|      | 9.3   | Consequences of Termination | 38 |
|      | 9.4   | Set-Off | 39 |
|      | 9.5   | Voluntary Forfeiture | 39 |

10.   Representations, Warranties and Covenants ............................................... 39

|      | 10.1  | Representations, Warranties and Covenants by the Team Owner and the Control Person | 39 |
|      | 10.2  | Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities | 40 |
|      | 10.3  | Release And Waiver by Team Owner and Control Person | 42 |
|      | 10.4  | Release And Waiver by NEM | 42 |

11.   Indemnification .......................................................................................... 42

|      | 11.1  | Team Owner Indemnity | 42 |
|      | 11.2  | NEM Indemnity | 43 |
|      | 11.3  | Third Party Claims | 43 |

12.   Dispute Resolution ..................................................................................... 43

3

HIGHLY CONFIDENTIAL - OCO

23XI_0004483

| | 12.1 | Dispute Resolution | 43 |
| | 12.2 | Arbitration Mechanics | 43 |
| | 12.3 | Arbitration Award | 44 |
| | 12.4 | Equitable Relief | 44 |
| | 12.5 | Limitations on Damages | 45 |

13. Miscellaneous ........................................................................................... 45

| | 13.1 | Notices | 45 |
| | 13.2 | Complete Agreement | 45 |
| | 13.3 | Expenses | 45 |
| | 13.4 | Governing Law | 46 |
| | 13.5 | Confidentiality | 46 |
| | 13.6 | Relationship Created | 46 |
| | 13.7 | No Third-Party Beneficiaries | 46 |
| | 13.8 | Separability | 46 |
| | 13.9 | Failure to Take Action; Waiver | 46 |
| | 13.10 | Force Majeure | 46 |
| | 13.11 | Publicity | 47 |
| | 13.12 | Amendments | 47 |
| | 13.13 | Further Action | 47 |
| | 13.14 | Joint and Several | 47 |
| | 13.15 | Reservation of Rights | 47 |
| | 13.16 | General Interpretative Provisions | 48 |
| | 13.17 | Performance | 48 |
| | 13.18 | Survival | 48 |
| | 13.19 | Counterparts | 48 |

**Exhibit A** ..................................................................................................... 51

**Exhibit B** ..................................................................................................... 60

**Exhibit C** ..................................................................................................... 65

**Exhibit D** ..................................................................................................... 66

**Exhibit E** ..................................................................................................... 67

**Exhibit F** ..................................................................................................... 68

**Exhibit G** ..................................................................................................... 69

**Exhibit H** ..................................................................................................... 70

**Schedule 1** ................................................................................................... 71

**Schedule 2** ................................................................................................... 72

**Schedule 3** ................................................................................................... 74

**Exhibit I** ..................................................................................................... 75

4

# NASCAR CUP SERIES
# CHARTER MEMBER AGREEMENT

The parties to this Charter Member Agreement (this "Agreement") dated as of the Execution Date are (i) NASCAR Event Management, LLC a Florida limited liability company ("NEM"), (ii) solely for purposes of Sections 10.2, 10.4, 11.2,, NASCAR Broadcasting, LLC ("Specified NASCAR Entities"), (iii) the Team Owner (as defined below), and (iii) the Control Person (as defined below), and is effective as of the Effective Date (as defined below).

## RECITALS

A.     NEM, pursuant to a license agreement with its Affiliate, National Association for Stock Car Auto Racing, LLC, a Florida limited liability company ("NASCAR"), organizes, operates, sanctions and exploits the Events (each as defined below);

B.     The Team Owner directly owns, controls and operates the Team (as defined below), and the Control Person, directly or indirectly, owns a controlling equity interest in the Team Owner as set forth herein;

C.     The object of this Agreement is NASCAR's grant, through its Affiliate NEM, to the Team Owner of the right to participate in the Cup Series throughout the Term; and

D.     NEM is willing to grant the Team Owner, and the Team Owner is willing to accept, the right and license to participate in the Cup Series during the Term (each as defined below) on the terms and subject to the conditions set forth in this Agreement.

Accordingly, it is agreed as follows:

1.     Definitions.  Capitalized terms used but not defined herein shall have the meanings given to them in Exhibit A hereto.

2.     Term.

2.1     Term.  Subject to Section 2.2, the term of this Agreement shall commence on the Effective Date and shall continue until the earlier of (x) December 31, 2031 or (y) the termination of this Agreement pursuant to Section 9 hereof (such term, the "Initial Term" and the Initial Term as it may be extended by the Extension Term (as defined below) pursuant to Section 2.2, shall be referred to herein as the "Term"). This Agreement shall constitute a valid, binding and enforceable agreement of each of the parties hereto as of the Execution Date and it is acknowledged that the rights granted under this entire Section 2 apply specifically to this Agreement (Charter No. [CHARTER NUMBER]).  This Section does not limit or affect NEM's rights regarding other Charter Member Agreements.

2.2     Term Extension.  NEM and Team Owner acknowledge that the Team Owner's desire to enter into an extension of the Agreement will depend, in part, on the Pool Money payable to Team Owner during the period from Year 2032 through Year 2038.  Subject to Team Owner not being in Good Standing, then on or prior to November 1, 2030 (or as soon as reasonably practicable ), NEM will provide written notice to Team Owner of the amount of Pool Money and the allocations thereof for each year during the period from Year 2032 through Year 2038 (the "Pool Money Notice").  Subject to 4.3(a), if NEM or its Affiliates enter into a Traditional Broadcast Deal for a term of at least seven (7) years (commencing January 1, 2032) and the gross annual average value ("AAV") during the period from Year 2032 through Year 2038

5

HIGHLY CONFIDENTIAL - OCO

23XI_0004485

is no less than gross AAV of the current Media Revenues for the Initial Term then the aggregate Pool Money across the Extension Term offered by NEM shall be no less than the aggregate set forth on Exhibit B. Team Owner may send a written notice (an "Extension Notice") during the period beginning January 1, 2031 and ending March 1, 2031 to NEM stating its desire to extend the Term for an additional seven (7) year period through Year 2038. If such Extension Notice is delivered during such period, the Term will be automatically extended until December 31, 2038 without further action by any party (the "Extension Term"), provided that the Term shall not be extended if NEM, following the delivery of such Extension Notice, has the right to terminate this Agreement pursuant to Section 9.1 hereof (and, for any defaults that are subject to cure pursuant to Section 9.1, the applicable cure periods have expired) and NEM provides notice to Team Owner within sixty (60) days following the date of delivery by the Team Owner of such Extension Notice that this Agreement is not being extended as a result of such termination right (the events referenced in this proviso shall be referred to herein as "Nonrenewal Events", it being understood and agreed that in the event that NEM does not deliver such notice, then NEM will not subsequently have the right to terminate this Agreement pursuant to Section 9.1 in respect of any Nonrenewal Event of which it was aware prior to termination of such sixty (60) day period) (provided that, if Team Owner has complied with the Minimum Performance Standards as provided under Section 6.12 in all material respects and is otherwise not in material breach of this Agreement at such time). The failure of Team Owner to timely deliver an Extension Notice shall constitute a waiver on the part of Team Owner to extend this Agreement pursuant to this Section 2.2, except in circumstances where NEM has failed to timely deliver to Team Owner the amount of Pool Money payable during the period from Year 2032 through Year 2038 and the allocations thereof. If Team Owner does not issue the Extension Notice, then any issuance of this Agreement will be governed by the provisions set forth in this Section 2.2 and Section 3.4 shall not apply. Except as provided below, NEM may not reissue this Agreement to any third party on terms more favorable than those offered to Team Owner for the remainder of the Initial Term following delivery of the Pool Money. If NEM intends to reissue this Agreement during the Initial Term to a third party on terms that are more favorable to the third party than the then-Current terms of this agreement, NEM must promptly inform Team Owner of such more favorable terms. Team Owner will then have thirty (30) days from receiving such notice to accept the extension of this Agreement for the duration of the Extension Term on such more favorable terms. Should Team Owner exercise this right and extend this Agreement, NEM must extend this Agreement on such more favorable terms. If this Agreement is not extended pursuant to this Section 2.2 and Team Owner participates in a competitive motorsports as defined in Section 6.6 then NEM shall be free to offer or sell this Agreement without any restrictions.

     2.3    Good Faith Renewal Negotiations. Subject to Team Owner not being in material breach of this Agreement at such time and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-compliance being waived by NEM in its sole discretion), the parties agree that during the period beginning on from July 1, 2037 through December 31, 2037 (the "Negotiation Period"), the parties will discuss the economic and non-economic terms related to the extension of the Term and, if there is mutual agreement, will enter into an amendment for a renewal of this Agreement beyond December 31, 2038. All renewal discussions shall be confidential and done in good faith, and NEM shall deliver to Team Owner a written proposal on or before the start of such Negotiation Period outlining the terms and conditions (including economic terms) on which it would then be willing to enter into a renewal. The Negotiation Period shall be exclusive to the Team Owner with respect to a renewal of the rights granted under this Agreement (and neither NEM nor its Affiliates shall solicit offers from, or enter into negotiations with, any third party any time prior to the Negotiation Period regarding any agreement or arrangement that if implemented would prevent or materially impede NEM from extending the Term of or otherwise renewing this Agreement). While NEM and the Team Owner currently desire to

6

HIGHLY CONFIDENTIAL - OCO    23XI_0004486

renew this Agreement upon expiration of the Term, the final decision regarding whether or not to renew, and the term of any renewal period, shall be subject to mutual agreement of the parties and, for clarity, either party may propose any changes to this Agreement during such Negotiation Period. If the parties have not agreed to renew this agreement prior to December 1, 2037, then no later than December 15, 2037, NEM shall submit its final offer to Team Owner with respect to such renewal in writing (the "Final Offer") and Team Owner shall accept or decline the Final Offer in writing no later than December 31, 2037 (it being agreed if Team Owner does not accept or decline the Final Offer prior to December 31, 2037, then Team Owner shall automatically decline such Final Offer). If the parties fail to come to terms on an extension of this Agreement prior to the end of the Negotiation Period, then any issuance of this Agreement will be governed by the provisions set forth in this Section 2.3 and Section 3.4 shall not apply. Except as provided below, NEM may not reissue this Agreement to any third party on terms more favorable than those included in the Final Offer for the remainder of the Extension Term following the end of the Negotiation Period. If NEM intends to reissue this Agreement during the Extension Term to a third party on terms more favorable to the third party than those included in the Final Offer, it must promptly inform Team Owner of such terms. Team Owner will then have thirty (30) days from receiving such notice to either accept or reject such more favorable terms. Should Team Owner exercise this right and match a third-party offer, NEM must renew the Agreement on the matched terms. After good faith negotiations as prescribed herein and the parties fail to reach an agreement then if Team Owner participates in a competitive motorsports as defined in Section 6.6 then NEM shall be free to offer or sell this Agreement without any restrictions. For avoidance of doubt, NEM may determine to issue or not re-issue such Agreement under Section 2.2 or under this Section at its discretion.

3.  <u>NEM Commitments.</u>

　　3.1　<u>NEM Commitments.</u> During the Term:

　　　　(a)　Subject to the terms of this Agreement and the delivery to NEM of a valid executed Driver Agreement, and otherwise in compliance with the NASCAR Rules, the Team Owner shall have the right to (i) enter the Designated Vehicle in, practice, participate in qualifying (or whatever reasonable alternate method NEM uses) to determine starting order, race in the Race, and achieve a finishing position for each Event that is held during the Term, (ii) achieve a finishing position in the point standings for the Cup Series for each Season, and (iii) be referred to as a NASCAR Team during the Term. NEM represents, warrants and covenants that (A) it has and will retain the exclusive right to grant (or otherwise arrange for) guaranteed starting positions in Events, and that, except as otherwise provided in this Agreement, it will not do so through any means other than Charter Member Agreements (and, for clarity, for purposes of the foregoing, participation by open teams shall not be deemed a "guaranteed" starting position in any Event), and (B) the money payable by NEM or its Affiliates to Competitors with respect to Event participation shall be paid to Competitors as provided in <u>Exhibit B</u>. Special Awards monies, if any, will be determined on an annual basis in addition to money payable pursuant to <u>Exhibit B</u>. For the avoidance of doubt, all such rights shall include any Invitational Event(s) for which the Team Owner has satisfied all applicable qualification requirements;

　　　　(b)　NEM shall, or shall cause its Affiliates to, during each Year of the Term, distribute to the Team Owner, on or prior to when due, the applicable amount (i) of Pool Money as set forth in Exhibit B, and (ii) Special Awards monies, if any, with the amount of such Special Awards monies, if any, that the

7

HIGHLY CONFIDENTIAL - OCO

23XI_0004487

Team Owner is eligible for to be determined based on the applicable contract and achievement of the applicable criteria for such amounts (for clarity, any Special Awards monies for any Year shall be paid to Competitors for such Year, after receipt of such funds and subject to the applicable contractual requirements imposed by the counterparties to such contracts with respect to such monies);

(c)       NEM, either directly or through an Affiliate, has the right to sell one or more (but not more than two) title sponsorships for the Cup Series in any year pursuant and subject to Sections 6.8 and 6.9, and one or more sponsorships in the other Reserved Sponsor Categories (which sponsorship may be selected by NASCAR in its reasonable discretion) in an effort to provide necessary competition resources and to have such sponsors engage in commercial activation and promotion of the Cup Series;

(d)       None of NEM or any parent, subsidiary or affiliate companies, shall at any time during the Term be a Competitor or acquire a direct or indirect interest in a Competitor; provided, however that (x) NEM and its Affiliates may acquire a Competitor or an interest in a Competitor, or conduct or support the operations of a Competitor, for a period of not more than twelve (12) months if NEM or its Affiliates determines in its reasonable discretion that NASCAR's ownership, conduct or support of such Competitor would be in the best interests of the sport of stock car racing, provided that during such time, NEM shall use commercially reasonable efforts to identify a third party who would acquire such Competitor or such interest therein as soon as reasonably practicable, and (y) nothing in this Agreement shall be deemed to prohibit or restrict any direct or indirect owner of NASCAR Holdings, Inc., or any Family Relative of any such owner (e.g., any member of the France family), from starting a Team and acquiring a Charter in accordance with the terms of this Agreement or owning a Competitor or any interest therein or participating in the operations of any Competitor (e.g., as a driver, engineer, crew member, etc.) for any period of time subject to Section 8.3 of this Agreement.  NEM shall provide written notice to Team Owner if any of the foregoing rights are exercised during the Term;

(e)       Other than any ownership by NEM or any Affiliate as of the Execution Date, NEM shall provide written notice under this Agreement to Team Owner if NASCAR or any of its respective Affiliates at any time during the Term becomes a Promoter or acquires a direct or indirect interest in a Promoter;

(f)       NEM shall provide Team Owner with the right to use the Assigned Car Number for the Term of this Agreement.  Notwithstanding the foregoing, Team Owner may transfer the Assigned Car Number to any other Team owned and controlled by an Affiliate of such Team Owner, provided that any such transfer shall be subject to prior written notice to NEM and shall only be permitted to be effective prior to the commencement of a (and not during any) Season; and

(g)       All fees required annually for competition as provided in Schedule 3, including without limitation race entry, memberships applications and licenses, credentials and hard cards ("Charter Member Fees") accrued prior to the first Cup Series Points Event of the Season of each Year by Team Owner shall be billed in four (4) equal installments and due on March 1st, June 1st, September 1st and November 1st. All Charter Member Fees accrued after the first Cup Series Points Event of the Season will be billed and due in full on the next payment date of March 1, June 1, September 1st or November 1st as the case may be. Any Charter Member Fees accrued after the November 1st invoice, will be billed within five Business Days following the conclusion of the final Event for such Season and be due and payable on or prior to five Business Days following receipt of such bill. Any Charter Member Fees or other penalties as prescribed in this Agreement that remain unpaid 30 days (or in the case of such final bill for the year, five Business Days) after receipt by Team Owner of a written notice from NEM that such payment is past its due date may be set off against future Pool Monies that would otherwise be payable to the Team Owner.

8

HIGHLY CONFIDENTIAL - OCO

23XI_0004488

All Charter Member Fees shall be paid by ACH or wire transfer. Schedule 3 sets forth the amount of all fees that NEM or any of its Affiliates may charge to Team Owner or Control Person, or their respective Affiliates, during the Term, except that minor fees during the year (e.g., tables at the Cup Banquet, filing an appeal) may be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

      3.2    Field Size.  For each Cup Series Points Event during the 2025 Year the maximum Field Size is forty (40) Competitors, and the maximum number of Charter Members is thirty-six (36). NEM's current intent is to maintain such Field Size and number of Charter Members for the duration of the Term. However, NEM, if it determines that it is in the best interest of the sport to increase the Field Size or the number of Charter Members during any portion of the remainder of the Term of this Agreement, may increase the Field Size to up to (but not in excess of) forty-three (43) Competitors and the number of Charter Members (with or without any increase in the Field Size) to up to (but not in excess of) forty (40) during any portion of the remainder of the Term; provided, however that (i) if the Field Size or number of Charter Members is increased, such increase shall be subject to the anti-dilution provisions set forth in Section 3.3; and (ii) prior to entering into an additional Charter Member Agreement, NEM shall comply with the provisions of Section 3.4(a).

      3.3    Anti-Dilution.  In the event NEM (or any of its Affiliates) after the Execution Date, either (i) allows for additional open team positions which, when combined with the number of active Charter Member Agreements, increases the total Field Size above forty (40) Competitors for any Cup Series Points Event(s) or (ii) enters into one or more additional Charter Member Agreements which increases the number of active Charter Member Agreements above thirty-six (36) (which increase shall be effected in accordance with Section 3.2), then the following specific adjustments set forth in Sections 3.3(a)-(d) below shall be made to the Points Pool Money.

            (a)    New Charter Member Agreement Issuance.  If one or more additional Charter Member Agreements are issued which increases the number of active Charter Member Agreements above thirty–six (36) (each such Year in which the number of active Charter Member Agreements is above thirty six, a "Charter Member Increase"), then for each Year (or portion thereof) during the Term where a Charter Member Increase is in effect (i) the amount of Fixed Owner's Plan (Charter Teams) shall be increased to equal the amount determined by multiplying the amount of Fixed Owner's Plan (Charter Teams) that would otherwise be payable in such Year or portion of such Year, as the case may be (as indicated in Exhibit B) by a fraction, the numerator of which is the number of active Charter Member Agreements for such Year and the denominator of which is 36 ; (ii) if a Charter Member Increase causes the Field Size to increase above 40 for any Cup Series Points Event, then the amount of the Race Purse, Performance Plan and Year-End Point Fund (as specified in Exhibit B) attributable to such Cup Series Points Event(s) shall be increased to equal an amount determined by multiplying the amount of the Race Purse, Year-End Point Fund and Performance Plan that would otherwise be payable for such Cup Series Points Event(s) (as indicated in Exhibit B) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40. If the Race Purse for any Cup Series Points Event(s) is increased pursuant to clause (ii) this Section 3.3(a), then NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field. Notwithstanding the foregoing, provided that a new BMG wishing to enter the sport is not able to secure a Team affiliate, then NEM may issue a new Charter Member Agreement(s) to a team owner affiliated with a new BMG entering the sport that does not include or fund the Fixed Owner's Plan in those particular Charter Member Agreement(s).

9

HIGHLY CONFIDENTIAL - OCO

23XI_0004489

(b)     Field Size Increase. If the Field Size is increased for any Cup Series Points Event(s) above forty (40) by adding one (1) or more open team positions (and not, for clarity, as a result of a Charter Member Increase, which is addressed in Section 3.3(a) above), then the amount of the Race Purse and Year-End Point Fund (as specified in Exhibit B) attributable to such Cup Series Points Event(s) payable to Competitors shall be increased to equal an amount determined by multiplying the amount of the Race Purse and Year-End Point Fund that would otherwise be payable for such Cup Series Points Event(s) (as indicated in Exhibit B) by a fraction, the numerator of which is the number of Competitors in the field for such Cup Series Points Event(s) and the denominator of which is 40 (and NEM shall in its reasonable discretion reset the Points Event Race Purse Payout Curve for such Cup Series Points Event(s) among such increased field in a manner that is substantially consistent with the Points Event Race Purse Payout Curve set forth in Exhibit B for a 40 car field).  Notwithstanding the foregoing, NEM may create an additional open category on an Event-by-Event basis for defined criteria as determined by NEM (e.g., F1 driver, former NASCAR Champion, etc.) that will have a reserved open position for that specific Event (the "Open Exemption"), provided however that such Open Exemption shall not be eligible for Race Purse or any other Pool Money and shall not require an increase to Race Purse and will not cause a Field Size increase under this Section and is not subject to anti-dilution.  The "Open Exemption" position is intended for a driver who will significantly impact the promotion of the event and grow the prominence of the sport. Competitors must submit their request for the "Open Exemption" to NEM at least ninety (90) days prior to the Event. NEM will evaluate all submissions for the Event and have the sole discretion to determine which (if any) driver is approved for the Open Exemption.

(c)     Expansion of Field due to Increase in Both Charter Member Agreements and Open Teams; Information Requirements. In the event of an increase in the Field Size for a Cup Series Points Event above 40 due to both a Charter Member Increase and the addition of one or more open team positions, then the concepts set forth in clauses (a) and (b) above shall be applied by NEM with respect such increases to ensure the full anti-dilution protection contemplated therein, but without any duplication.  For purposes of clarification, the concepts set forth in clauses (a) and (b) above shall only be applied for Cup Series Points Event(s) where the number of active Charter Member Agreements exceeds thirty-six (36) and/or the Field Size exceeds forty (40) Competitors.  In the event NEM or any of its Affiliates elects to grant to any Person the right to compete in the Cup Series in any Year of the Term and if as a result of such grant there is a Charter Member Increase or the Field Size would be increased above forty (40), then in addition to compliance with the other provisions of this Agreement and NASCAR Rules, NEM shall deliver to Team Owner prior written notice of its intention to expand and documentation sufficient to evidence its compliance with the requirements of this Section 3.3.  In no event will NEM issue a new Charter Member Agreement in accordance with this Section 3.3 and 3.4 that permits such new Charter Member to commence racing in any Event after the first Cup Series Points Event of such Season has commenced.

(d)     Subsequent Reduction of the Field Size.  If, in any Year or portion of any Year following any increase in the Field Size above 40 or a Charter Member Increase as a result of which anti-dilution payments are made pursuant to the foregoing subsections (a)-(c), either the Field Size is decreased or the number of active Charter Member Agreement is decreased, then, effective following the time of such decrease, the foregoing requirements in respect of anti-dilution payments shall cease to apply in respect of the applicable increase that gave rise thereto (it being understood that any anti-dilution payments required to be made pursuant to such subsections (a)-(c) prior to such date shall be made as so required), provided, however, that, if such reduction results in a Charter Shortfall or a Field Shortfall, Section 4.1 shall apply.

3.4     Charter Member Issuance or Re-Issuance.

10

HIGHLY CONFIDENTIAL - OCO                                                                                    23XI_0004490

(i)     Neither NEM nor its Affiliates shall enter into a new Charter Member Agreement that causes a Charter Member Increase, unless  (i) NEM gives written notice to Team Owner and each other Charter Member of its desire to enter into the new Charter Member Agreement and specifying the identity of the proposed new Charter Member, following which Team Owner and each other Charter Member shall have the right to negotiate (to the exclusion of NEM and its Affiliates) with such proposed new Charter Member for a period of one hundred twenty (120) days following receipt of such notice regarding the terms on which Team Owner or any such other Charter Member might Transfer an existing Charter Member Agreement to such proposed new Charter Member, and (ii) if neither Team Owner nor any other Charter Members reach agreement with the proposed new Charter Member for the Transfer of an existing Charter Member Agreement within such 120-day period, then NEM will be free to negotiate with such proposed new Charter Member regarding the terms on which NEM is willing to issue a new Charter Member Agreement to such proposed new Charter Member.  In the event that NEM reaches agreement with any such proposed new Charter Member, then at least 10 Business Days before issuing a new Charter Member Agreement to such prospective new Charter Member, NEM shall give written notice to Team Owner and each other existing Charter Member, specifying the economics (which such economics shall exclude the anti-dilutive amount that would be due and owing, and necessary to eliminate any anti-dilution payments, by such prospective new Charter Member pursuant to <u>Section 3.3(a)-(c)</u> of this Agreement (the "<u>Dilutive Amount</u>"), but such notice shall include, solely for information purposes, the amount of such Dilutive Amount and the basis for the calculation of such Dilutive Amount) to be paid by the new Charter Member and the rights being granted under the Charter Member Agreement and enclosing a firm offer by such proposed new Charter Member to purchase a Charter Member Agreement from any existing Charter Member on such terms (which, for clarity, shall exclude the payment by such prospective new Charter Member of any Dilutive Amount).  If neither Team Owner nor any other Charter Member expresses an interest in transferring its Charter Member Agreement to the proposed new Charter Member in return for the consideration specified in the notice delivered by NEM within 10 Business Days following receipt of such notice from NEM, then NEM shall be free to issue a new Charter Member Agreement to such proposed Charter Member on such terms within 30 days following the expiration of such 10 Business Day period. Team Owner or any other Charter Member timely expressing such an interest in transferring a Charter Member Agreement to such proposed new Charter Member shall be permitted to assign its Charter Member Agreement to such new Charter Member in exchange for the economics set forth in the notice delivered by NEM (pursuant to an assignment agreement containing terms acceptable to the transferring Charter Member, acting reasonably) rather than NEM entering into a new Charter Member Agreement with such prospective new Charter Member (and NEM agrees to enter into any amendments to such Charter Member Agreement reasonably necessary to make the rights granted therein consistent with the applicable terms negotiated by NEM with the new Charter Member, other than the payment of the Dilutive Amount).   If more than one Charter Member expresses an interest in assigning its Charter Member Agreement to the new prospective Charter Member in return for the consideration specified in the notice delivered by NEM, then the interested Charter Member that finished lowest in owner points (relative to other Charter Members) in the most recently completed Season shall have the right to assign a Charter Member Agreement that it currently holds to the new prospective Charter Member.

(ii)     In the event any Charter Member Agreement is forfeited or terminated for any reason except as set forth in <u>Section 2.2 and 2.3</u>, NEM may re-issue such Charter Member Agreement during the Term of this Agreement pursuant to the procedures set forth in this <u>Section 3.4(ii)</u> (and, for clarity, without subject to the provisions of <u>Section 3.3 or 3.3(a)</u>).  Upon reissuance of such Charter Member Agreement, NEM shall be entitled to retain no more than Five Hundred Thousand ($500,000.00) US Dollars as NEM's re-issuance fee, with the remaining excess amount charged for such Charter Member Agreement

11

HIGHLY CONFIDENTIAL - OCO

to be distributed to (and to increase) the Fixed Owner's Plan - Charter Teams as shown in Exhibit B in the following Season (or, in the event that such Charter Member Agreement is re-issued in the final Year of the Term, then during such final Year's racing season). If NEM desires to reissue any forfeited or terminated Charter Member Agreement, NEM shall provide written notice (the "Invitation to Bid") to the then existing Competitors (including the Team Owner) and negotiate in good faith with any Competitors expressing an interest in acquiring such Charter Member Agreement (and the Competitors will be given a period of thirty (30) days following receipt of the Invitation to Bid during which to express such an interest) before reissuing such Charter Member Agreement to any third party. NEM's Invitation to Bid shall have as a condition that the Charter is granted to the eligible Competitor who submitted the highest bid, as reasonably determined by NEM. In the event that no bids are received in the applicable period then NEM shall be free to reissue such Charter Member Agreement to an eligible third party with whom NEM reaches a binding agreement.

3.5     Governance. NEM is committed to a robust and inclusive governance model which will allow for NEM to provide information to and obtain significant and meaningful input from the Competitors to ensure decisions are made in the best interests of the sport. In furtherance of this goal, NEM shall form and maintain throughout the Term a Team Owner Council as described in further detail herein.

(a)     Formation of Team Owner Council. NEM shall form and maintain throughout the Term a Team Owner Council, which will be comprised of (i) the controlling owner that controls, and together with its Affiliates is a party to, one or more Charter Member Agreements and the Cup Series teams granted such rights thereto (each, a "Charter Member Group"), and the controlling owner of each other Charter Member that is not part of a Charter Member Group, and in each case an alternate member designated by each such controlling owner who shall be a director, owner, CEO, President or CFO within the applicable Charter Member Group or of the Charter Member, as applicable, or another senior executive within such Charter Member Group or such Charter Member, as applicable, who has been approved by NEM (which approval will not be unreasonably withheld or delayed) and who may attend meetings of the Team Owner Council together with the controlling owner of such Charter Member Group or Charter Member, as applicable, (ii) the controlling owner of each open participant that attempted to qualify for at least 75% of the Cup Series races in the prior Year (a "Qualifying Open Participant") (any designated representative in the foregoing clauses (i) and (ii) shall be referred to herein as a "Team Owner Council Representative"); and (iii) NASCAR designees. Subject to the NEM approval rights set forth above, if applicable, Team Owner shall notify NEM of its alternate Team Owner Council Representative and of any change to such alternate Team Owner Council Representative. The Team Owner Council will be co-chaired by one NASCAR designee and one Competitor-appointed designee (each a "Team Co-Chair" and collectively the "Team Co-Chairs"). The Team Co-Chairs will be a current member of the Team Owner Council and will be selected (and may at any time be removed and replaced) by majority vote of the Team Owner Council, and in any such vote (whether for selection, removal or replacement) the Team Owner Council Representative from each Charter Member Group will have one vote for each Charter Member Agreement held by such Charter Member Group and the other Team Owner Council Representatives will have a single vote (for clarity, the alternate representatives shall vote only in the event that the applicable controlling owner is not present) (and, for clarity, the NASCAR designees shall not have a vote). The Team Co-Chairs will serve a two-year term as co-chair (subject to earlier resignation), and the Team Owner Council must use good faith efforts to rotate the Team Co-Chairs based on BMG affiliation.

(b)     Operation of Team Owner Council. Through the mechanism of the Team Owner Council, NEM will present to the Team Owner Council and will consult meaningfully with the Competitors on all material matters of interest to the Competitors (e.g. safety and competition, proposed rule changes, industry economics, broadcast and sponsorship issues, single supplier arrangements, digital media issues

12

HIGHLY CONFIDENTIAL - OCO

and the development of fan-centric racing.) NEM's meaningful consultation obligation will include the obligation of NEM to share information with the Team Owner Council reasonably requested by any member of the Team Owner Council, but subject to the obligations of the members of the Team Owner Council to maintain the confidentiality of such information. However, NEM as the sanctioning body shall have the final decision making authority, subject to the terms of this Agreement. Nothing herein shall require NEM or its Affiliates to breach bona fide confidentiality obligations imposed on them pursuant to existing agreements.

(i)      Before implementing any General Change, NEM shall cause such General Changes to be individually brought forward and presented to the Team Owner Council. The Team Owner Council may provide feedback and will be meaningfully consulted on all General Changes; however, NASCAR will have final say regarding any General Change  "General Change" as used herein means as follows: (i) major rule package changes; (ii) increasing the number of testing dates or otherwise changing the testing policies in a manner that would materially increase costs for Competitors; (iii) without in any way limiting the advance notice requirements set forth in Section 3.6(d) below, major equipment or engine changes; (iv) new single source supplier arrangements (whether created pursuant to agreements or implemented via NASCAR Rules or via specifications intended to create a single source supplier); (v) material Race format changes; (vi) material playoff eligibility or format changes; or (vii) material expansion to the length of the Event weekend.

(c)      Regular and Special Meetings of Team Owner Council. NEM will schedule and conduct, no less than two (2) times a Year, regular Team Owner Council meetings. Meetings will be held with the specific dates and locations to be determined by NEM in its reasonable discretion. NEM shall be obligated to notify the members of the Team Owner Council, by January 15th of such Year, of the dates and locations for such regular meetings in such Year. All such regular meetings must be attended in person. NEM will collaborate with Teams in developing the agenda for each such meeting, and the Chair of the Team Owner Council that is an NEM executive shall distribute the agenda for any regular meeting to each Team Owner Council member at least five (5) Business Days prior to the meeting. Special meetings of the Team Owner Council may be convened by either Co-Chair of the Team Owner Council, upon reasonable notice to the other members of the Team Owner Council, in which event the agenda shall include emergency matters raised by such members. Members shall be entitled to participate in any special meeting (i.e., any Team Owner Council meetings other than the twice-annual regular Team Owner Council meetings) by means of conference telephone. The Team Co-Chairs shall ensure that the meeting materials are distributed to each member of the Team Owner..

(d)      Committee Formation.

(i)      General. The Team Owner Council shall form and maintain throughout the Term the committees of the Team Owner Council referenced below (and such committees may form subcommittees as deemed reasonably necessary or appropriate). Ideas will be generated at the committee level and where applicable project work groups will be formed by the applicable committee to further research, and to develop and make recommendations to the committees and/or sub-committees. Project work groups shall entail joint participation and leadership from Competitor representatives and NEM designees. The committees will, where applicable, make recommendations for implementation and discussion at the Team Owner Council. However, NEM as the sanctioning body shall have the final decision making authority, subject to the terms of this Agreement. Team Owner and NEM agree to work in good faith to find ways to continue improving communication on a regular basis.

13

HIGHLY CONFIDENTIAL - OCO

23XI_0004493

(ii) <u>Team Advisory Committee</u>. The objective of the Team Advisory Committee shall be to review General Changes at an early stage of those processes and provide opportunities for feedback, input and collaboration. The Team Advisory Committee shall be chaired by an NEM executive(s). The Team Advisory Committee shall be comprised of four NEM designated members (including the chair person) and one (1) additional representative for each active BMG (as defined below). Each such BMG representative will be selected every two (2) years by the Teams associated with such BMG, provided that such representative shall rotate among the applicable Charter Member Groups every two (2) years. Information presented to the Team Advisory Committee shall be treated as confidential by all such representatives and shall not be shared with other Competitors until approved by NEM. The Team Advisory Committee shall have the discretion to invite to such meetings any third party who will be able to provide relevant input to the meetings (e.g., OEMs, engine builders, tire manufacturers, and other suppliers, vendors, promoters, etc.), such participation shall be subject to a non-disclosure agreement if the Team Advisory Committee so requests. Team Advisory Committee meetings will be held on dates and at locations to be determined by NEM in its reasonable discretion. NEM will notify the members of the Team Advisory Committee of the dates and locations for such regular meetings no later than fifteen (15) Business Days prior to such meeting. NEM shall distribute the agenda for any regular meeting to each Team Advisory Committee member at least five (5) Business Days prior to the meeting.

(iii) <u>Competition Committee</u>. The objective of the Competition Committee shall be to collaborate to enhance safety and drive efficiencies and to produce a fan-centric racing product on the track. Each Charter Member Group and each other Charter Member that is not part of a Charter Member Group shall have the right to designate one (1) representative on the Competition Committee (who shall be its competition director or senior technical lead), provided that the controlling owner and president of such Charter Member Group or Charter Member, as applicable, shall also have an open invitation to participate in Competition Committee meetings. Each Qualifying Open Participant shall have the right to designate one representative on the Competition Committee. The Competition Committee shall be chaired by two (2) NEM senior executives and by one (1) additional chairperson (e.g., three (3) additional chairpersons in total if there are three (3) BMG's) (each a "<u>Chairperson</u>") who will represent each BMG and who will be selected from among the existing Team representatives on the Competition Committee . Each such BMG Chairperson will be selected annually by the Teams associated with such BMG, provided that such Chairperson shall rotate among the applicable Charter Member Groups annually. The Competition Committee shall have the discretion to invite to such meetings any third party who will be able to provide relevant input to the meetings (e.g., OEMs, engine builders, tire manufacturers and other suppliers, vendors, etc.) such participation shall be subject to a non-disclosure agreement if the Competition Committee so requests. Competition Committee meetings will be held on dates and at locations to be determined by NEM in its reasonable discretion. NEM will notify the members of the Competition Committee of the dates and locations for such regular meetings no later than fifteen (15) Business Days prior to such meeting. The Chairpersons of the Competition Committee will develop the agenda for each such meeting after seeking input from other members of the Competition Committee, and a Chairperson who is an NEM executive shall distribute the agenda for any regular meeting to each Competition Committee member at least five (5) Business Days prior to the meeting. Members shall be entitled to participate in any meeting by means of conference telephone.

(e) <u>Conduct of Meetings.</u> Any and all meetings conducted are intended to be open forums for productive dialogue for Competitors and NEM to raise issues, present positions, maintain a dialogue, provide meaningful input and make recommendations for review, all with the goal of reaching consensus based decisions.

14

HIGHLY CONFIDENTIAL - OCO

23XI_0004494

(f)    Consensus Building.  It is NEM's desire to build consensus amongst the Teams, BMGs, NEM and other relevant supporting stakeholders in the sport through the Team Owner Council and its committees, and the above referenced meeting processes.  NEM recognizes the value of diversity of input and the desire to have a cooperative and constructive collaboration in the sport, and both Team Owner by and through its representatives on the Team Owner Council and related committees and NEM commit to use their good faith efforts to reach consensus on all issues reviewed by the Team Owner Council. However, NEM as the sanctioning body shall have the final decision making authority regarding issues related to governance of the sport, except as otherwise set forth in other provisions of this Agreement (including, without limitation, Section 6.5).

3.6    Rules Packages and Testing Policy.

(a)    Annual Rule Package and Unified Testing Master Schedule Issuance.  Beginning with respect to the Rules Package that will be applicable in 2025 and without limiting the commitments set forth in Section 3.5, NEM shall (i) provide an update to the Team Owner Council and obtain the Team Owner Council's input on the annual Rules Package that will be applicable in a race Season at a Team Owner Council meeting preceding the race season, (ii) provide the annual Rules Package to the Team Owner for review no later than August 1 preceding any race Season and identifying any changes from the preceding Year's final Rules Package, and (iii) discuss and obtain meaningful input on the Rules Package from the Team Owner Council at its subsequent meeting, prior to the issuance of such annual Rules Package.  NEM shall issue the final annual Rules Package by November 15 (or within two weeks of the end of the Season, whichever is later) and after considering in good faith Team Owner Council input, and provided that such annual Rules Package shall not be in violation of the terms of this Agreement.  NEM will not schedule more than three (3) organizational tests (excluding Goodyear or other Tire partner testing) under the Unified Testing schedule for any year during the Term and NEM will collaborate and coordinate with the Teams on the scheduling of such test dates.

(b)    In Season Changes to Rules Package. NEM covenants that no changes shall be made to the Rules Package that apply to any race season after the Rules Package for such race Season has been set in accordance with Section 3.6(a), unless (i) such change is a normal in-season administrative change, including tire allocations per event and gear ratios or other sporting regulations (not related to the car specifications), (ii) such changes are intended to drive efficiencies, (iii) such changes are intended to preserve parity or improve race quality, (iv)  such change is necessary for urgent safety reasons threatening life, limb or well-being, (v) such change is necessary in order to comply with applicable law; or (vi) a Force Majeure Event or material and unanticipated supply chain issues or any other circumstances that would prevent or materially impede NEM's ability to conduct an Event without making such change.  NEM shall be able to make such Force Majeure changes, provided that any such change made pursuant to clause (vi) shall be effective only for so long as the applicable issue or circumstance necessitating such change remains in effect.  Changes intended to preserve parity or improve race quality which cost teams more than $150,000 on average across the Competitors per season must be shared with the Team Advisory Committee to allow input prior to implementation.  NEM shall provide to the members of the Team Owner Council written notice, delivered as far in advance as is reasonably possible, of any proposed change to the Rules Package to be implemented pursuant to the previous sentence, and shall consult with and obtain views from the Team Owner Council in advance of such change to the extent practicable.  Notwithstanding anything above, the foregoing shall not impede NEM's ability to conduct, officiate the competition and enforce the NASCAR Rulebook subject to Section 6.5.

15

HIGHLY CONFIDENTIAL - OCO                                          23XI_0004495

(c)    <u>Bill of Materials.</u>  Without limiting the commitments set forth in <u>Section 3.5</u> and subject to changes described in <u>Section 3.6</u>, to minimize parts obsolescence a material change to single source parts will require a minimum notice period of twelve (12) months and any major engine changes would require an twenty-four (24) month notice period. NEM shall not make any material change outside of the foregoing notice periods unless (i) such change is necessary for urgent safety reasons or in order to comply with applicable law (including without limitation any applicable federal or state law limiting carbon emissions), (ii) such change is in the ordinary course and does not create a material expense for Team Owner, (iii) a new BMG enters into or leaves the Cup Series, or (iv) due to any supply chain disruptions, raw materials shortages, labor or strike issues or other Force Majeure Events.

(d)    <u>Race Schedule.</u> Notwithstanding this <u>Section 3.6</u>, NEM shall not modify the Cup Series Points Event schedule or the Invitational Event schedule to add any Cup Series Points Events or Invitational Events in any Year unless the aggregate amount of Pool Money payable to Competitors in such Year is increased proportionally (i.e., the Pool Money shall be multiplied by a fraction, the numerator of which is of total number of Cup Series Points Events and Invitational Events for such Year (inclusive of such additional Cup Series Points Event(s) and/or Invitational Event(s)) and the denominator of which is 38)(i.e., the total number of Cup Series Points Events and Invitational Events on the Effective Date). For clarity, the Daytona 500 and the Duels at Daytona are included as one Cup Series Points Event for purposes of the foregoing calculation of the denominator.

3.7    <u>Single Source Supplier.</u> In the event that NEM determines that it will pursue a single source supplier for any part used by Competitors (whether created pursuant to agreements or implemented via NASCAR Rules or specifications intended to create a single source supplier), then if the single source supplier will supply anything  sanctioned for use by all Competitors,  NEM shall identify and discuss potential single source opportunities with the Competition Committee, and obtain the Competitor's feedback thereon, prior to pursuing such opportunities.  In addition, NEM will disclose the RFP for any applicable single source arrangement and the responses to the RFP to the Competition Committee promptly following issuance or receipt of each such document.  NEM will collect cost benchmarks and evaluate RFP responses against such benchmarks with the Competition Committee, and NEM will present the proposed preferred vendor and rationale for its selection to the Competition Committee prior to signing an agreement with such vendor.  Subject to the foregoing and the other applicable terms of this Agreement, NEM will have the discretion to make the final selection of the supplier; provided that no single source supplier shall charge Competitors in excess of arms-length reasonable commercial rates for the single sourced product. NEM and the Team Owner commit that they shall not receive financial consideration for exploiting their intellectual property or other assets as part of the agreement with the selected supplier. NEM and the Competitors, and their respective Affiliates, may exploit their intellectual property or other marketing assets for value and consideration to a single source supplier, provided that (i) such arrangement is not discussed or negotiated in any manner, or entered into, until after the single source supply arrangement is finalized and executed; (ii) the single source supply arrangement may not be conditioned in any manner on, including having economic incentives or termination rights tied to, entering into or failing to enter into any such arrangement, and (iii) if any such arrangement with a single source supplier is entered into in accordance with the foregoing, NEM (or its Affiliates) or the Team Owner (as applicable) shall provide written notice to the other party regarding the effective date, term and general subject matter of (including whether consideration will be received, but not otherwise detailing the consideration to be paid under) such arrangement.  In the event that a single supplier agreement already exists on the date of this Agreement which includes intellectual property or marketing assets, this <u>Section 3.7</u> shall not disqualify the single

16

HIGHLY CONFIDENTIAL - OCO

23XI_0004496

source supplier from participating in the RFP process in connection with any future single source supplier arrangement or renewal. Any (i) single source supply agreements existing as of the Execution Date and renewals thereof or (ii) single source supply agreements with a Part that will cost a team less than $2,500 a season in the aggregate or (iii) replacement of any single source supply agreement in the Tire Category or Fuel Category, shall not be subject to the foregoing process (provided that (x) the prices charged Competitors in any of the foregoing single supply agreements (including extensions, renewals or replacements entered into after the Execution Date) shall not be artificially increased or, in the case of any replacement entered into after the Execution Date, pricing shall be determined consistent with the methodology from the previous contract, it being understood and agreed by the Team Owner that such prices may be subject to increases (including historical price escalations under existing single source agreements) and fluctuation based on market conditions, including, without limitation, the pricing or availability of raw materials, labor, transportation or conversion costs, and (y) the Team Owner and Control Person agree that the pricing under any single source supply agreement existing as of the Execution Date satisfies the foregoing requirements).

4. <u>Payments and Distributions.</u> Subject to any adjustments made pursuant to <u>Section 3.3</u> or <u>Section 3.6</u>:

4.1 <u>Pool Money.</u> In addition to any Special Awards distribution, for each Year, the amount to which the Team Owner is entitled to under this Agreement shall be determined in accordance with the terms set forth in <u>Exhibit B</u> hereto (the "<u>Pool Money</u>"). For avoidance of doubt, <u>Exhibit B</u> includes total Pool Money posted for Competitors if all team positions are paid for all Events. However, if any monies remain unpaid because the field for any Event is not filled ("<u>Field Shortfall</u>") or because fewer than 36 Charter Member Agreements are issued and active for any given Year ("<u>Charter Shortfall</u>"), then NEM shall pay any and all Race Purse attributable to the Field Shortfall or the Charter Shortfall, as the case may be, by increasing payouts in the Race Purse to Competitors who competed in the Event. The remaining amounts attributable to the Field Shortfall or Charter Shortfall (Fixed Owners Plan and Performance Plan) shall be retained by NEM to use during the then current Season at its reasonable discretion for the mitigation of the loss of Competitors and the growth or promotional opportunities for the sport.

4.2 <u>Payment Terms.</u> All Pool Money and any Special Awards distribution shall be payable solely and directly to the Team Owner and not to any Driver, Control Person, Owner or other employee, agent or contractor of the Team Owner. The Team Owner (and not NEM or any of its Affiliates) shall be solely responsible for the determination of and distribution of any and all Pool Money and any Special Awards distribution that may have been earned by a Driver or any employee, agent or contractor of the Team Owner with respect to the finishing position of the Designated Vehicle in any Event and the standings of the Cup Series and, provided that NEM has timely made or has caused its Affiliates to timely make all payments of Pool Money and any Special Awards distribution to the Team Owner, the sole recourse of such Driver or any such employee, agent or contractor for any failure to properly distribute any Pool Money and any Special Awards distribution shall be against the Team Owner and not against NEM or any of its Affiliates. Neither NEM nor any of its Affiliates shall be responsible for the filing or payment of any Taxes associated with any Pool Money or any Special Awards distribution paid to Team Owner, which Taxes shall remain the sole responsibility of the Team Owner and the Driver (as applicable), except solely to the extent required by applicable law to be, and which are, withheld by NEM or its Affiliate(s) from the Pool Money or any Special Awards distribution, as applicable. Notwithstanding the foregoing, NEM reserves the right to pay out additional awards, bonuses or any other consideration to Competitors or Drivers as NEM determines in its sole discretion, including without limitation Other Awards; provided NASCAR shall use

17

HIGHLY CONFIDENTIAL - OCO

23XI_0004497

good faith efforts to provide transparency to Team Owner for any payments made to Team's Driver(s) under this Section.

4.3     Payment Obligations.

(a)     Team Owner has no right to Pool Money specific to an Event if the Event is not commenced and officially completed (as determined in accordance with the Rule Book) due to a Force Majeure Event.  If Media Revenue to be received by NEM or the applicable NASCAR Rights Affiliate(s) is delayed or reduced in whole or in part due to either (a) a Bankruptcy of a counterparty to a Live Transmission Contract, (b) a breach or violation of any such agreement by the counterparty thereto (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)), (c) a breach or violation of any such agreement by NEM or the applicable NASCAR Rights Affiliate solely to the extent that such breach or violation is caused by one or more Competitors other than due to a Force Majeure Event (provided that payment will be excused pursuant to this clause only so long as NEM or the applicable NASCAR Rights Affiliate is using commercially reasonable efforts to pursue remedies which may be available to NEM or such NASCAR Rights Affiliate in respect of such breach (which remedies may include, without limitation, institution of litigation or similar proceedings)), or (d) a Force Majeure event, or (e) a contractual reduction permitted in a Live Transmission Contract as the same has previously been described by NEM to Team Owner and which amount is not  a material reduction to the overall Media Revenues or (f) any costs, expenses, settlements, legal fees, damages or other losses or liabilities arising out of or in connection with any and all claims, actions, demands, suits, investigations or any other legal or governmental proceedings in connection with any the Live Transmission Contract or the Live Transmission of Events  ("Permitted Contractual Reduction"), then, in any such case, the portion of the total Pool Money that would have been indirectly funded by the Media Revenue which is not received by NEM or the NASCAR Rights Affiliate may be correspondingly delayed or reduced upon prior written notice to Team Owner, but only to the extent of the original delay or reduction in receipt (e.g., if a portion of the Media Revenue which is owed to the applicable NASCAR Rights Affiliate is not received under the circumstances described in clauses (a) – (f) above, then the pro rata portion of the shortfall would not be paid into the Pool Money until it is received). For example, if five percent (5%) of the Media Revenue is not paid when contractually required under the circumstances described in clauses (a)-(f), the Pool Money for the remaining Events shall be reduced proportionately so that total Pool Money is reduced by five percent (5%).  If any such delay shall occur which delays timely payment of any portion of Pool Money to Team Owner for more than sixty (60) days, then, notwithstanding anything to the contrary herein, Team Owner and Control Person have the right to terminate this Agreement effective upon written notice to NEM, and upon such termination shall have no further obligations to NEM, NASCAR or their respective Affiliates; and provided, further, that for the avoidance of doubt, any monies subsequently received by NEM or a NASCAR Rights Affiliate, including moneys received by NEM or a NASCAR Rights Affiliate in connection with the exercise of remedies against a counterparty or a Competitor (or any of their respective Affiliates) in excess of actual out-of-pocket costs and expenses incurred by NEM or a NASCAR Rights Affiliate in connection with such recovery ("Net Recovery") as well as any moneys so received via insurance recoveries on the part of NEM or a NASCAR Rights Affiliate, will be paid into the Pool Money and distributed to the then current Charter Members in good standing ("Remaining Charter Members") (up to the amount of the Remaining Charter Members' proportionate percentage of such underpayment).

18

HIGHLY CONFIDENTIAL - OCO

23XI_0004498

(b)     On an annual basis, NEM will represent and warrant the amount of Media Revenues actually received by NASCAR Broadcasting for the applicable year.  Upon Team Owner's request, NEM will provide Team Owner with a statement of all revenues received by NEM or its Affiliates under Live Transmission Contracts during any Year, which will be certified to be accurate by an authorized officer of NEM and an independent third-party accounting firm of national standing.

5.     Intellectual Property.

5.1     Ownership and Acknowledgment.     The Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, acknowledge and agree that NASCAR exclusively and in perpetuity owns any and all rights to broadcast, transmit live, film, tape, capture, overhear, photograph, collect or record all Works by any means, process, medium or device (including television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmission over the Internet, and public and private online services authorized by NASCAR), whether or not currently in existence, and that, as between NASCAR, on the one hand, and Team Owner, the Control Person and their respective Team Affiliates, on the other hand, NASCAR is and shall be the sole owner of any and all intellectual property rights (including patents, copyrights, trademarks, design rights, and other ancillary and proprietary rights) worldwide in and to these Works, copyrightable or otherwise, created from the images, sounds and Event Data arising from and during any Event (excluding, for clarity, any Team Intellectual Property and any trademarks, service marks, copyrights, name image or likeness, of any other third party that are embodied in any Work).  To the extent not already owned by NASCAR, the Team Owner and the Control Person hereby assign, and shall cause their respective controlled Affiliates to assign (and shall use reasonable efforts to cause other Team Affiliates to execute and deliver such further instruments to assign), to NEM, as the designated representative of NASCAR for the collection of such rights, any and all rights set forth above, exclusively and in perpetuity.  In addition, Team Owner hereby grants NEM a worldwide, perpetual, irrevocable, non-exclusive, transferable, assignable and royalty-free license, without further compensation (which license shall survive termination of this Agreement) to use by any means worldwide any Team Intellectual Property included or incorporated in any Work to the extent that such license is necessary to enable NEM to exercise the rights expressly reserved, exclusively or non-exclusively, to NEM pursuant to this Agreement.  The Team Owner and the Control Person each represent and warrant that, as of the Execution Date, such Person has not granted to any third Person the rights described in the first two sentences of this Section 5.1.  The Team Owner agrees to take all steps reasonably necessary and that that are reasonably requested by NEM, including good faith efforts to implement a system that requires all of its Team Affiliates that may be visible at-track to sign documentation that grants or assigns the applicable rights set forth in this Section 5.1 exclusivity and in perpetuity as set forth herein, to protect, perfect or effectuate NASCAR's ownership or other interest in these rights described in this Section 5.1 (all at NASCAR's cost, other than costs related to obtaining the clearances of such Team Affiliates pursuant to forms reflecting reasonable terms (consistent with this Section 5.1) provided by NEM).  The Team Owner and the Control Person agree not to take any action, nor cause others to take any action, nor enter into any third-party agreement, which would contravene, encroach or infringe upon these NASCAR rights described in this Section 5.1.  Team Owner agrees to allow: (i) audio, audio-visual or video equipment for use on the Driver during Event weekends, including, without limitation, a microphone or camera, etc., provided that use of such audio shall be subject to Team approval, not to be unreasonably withheld; and (ii) any and all equipment relating to audio and video transmissions, as well as timing and scoring information, including, size, location, and weight, and use thereof as determined by NEM, in or on the Designated Vehicle for each Event, or a weighted device equal to the size, weight, and location of part or all of such equipment if such Designated Vehicle is not selected to run part or all of such equipment, as determined by NEM.

19

HIGHLY CONFIDENTIAL - OCO

5.2    <u>Advertising and Promotional Activities by NEM.</u>    The Team Owner and the Control Person, for themselves and on behalf of each of the their controlled Affiliates, acknowledge and agree that NASCAR, the then current Series Sponsor (subject to the immediately subsequent sentence), each then current Promoter, each then-current Broadcast Partner, each then-current Person that has entered into an agreement with NEM or its Affiliates to exploit any Ancillary Rights, and the duly authorized Affiliates of each of them (collectively, "<u>NASCAR Recipients</u>"), may use and exploit, on a non-exclusive basis, the name, likeness and performance, in or out of uniform, including photographs, images and sounds of the Team Owner, the Control Person, the Driver(s), in or out of uniform, each of the crew members, in uniform, and other controlled Affiliates of the Team Owner and the Control Person, and/or the Designated Vehicle, in each case taken in connection with an Event during the Term, in any medium (including print, broadcasts by and through television, cable television, radio, pay-per-view, closed-circuit television, satellite signal, digital signal, film productions, audiotape productions, transmissions over the Internet, and public and private online services authorized by NASCAR) solely for (a) promoting or advertising any Event or the Cup Series, (b) news reporting in respect of an Event or the Cup Series, or (c) any telecast or programming that constitutes Live Transmission Activity (or shoulder programming with respect to such Live Transmission Activity) or an Ancillary Right, and the Team Owner and the Control Person, for themselves and on behalf of each of their controlled Affiliates, hereby grant (and shall use reasonable efforts to cause each other Team Affiliate to grant in accordance with the fourth sentence of <u>Section 5.1</u>) to each NASCAR Recipient, in perpetuity, all rights thereto for such purposes.  Upon request of the Team Owner, which will be made solely during the period beginning on January 1 and ending on January 31 of any Year, NEM will provide to Team Owner a list of all NASCAR Recipients that have been granted rights hereunder during the Year immediately preceding the Year of such request.  During any Year, the rights granted above with respect to the Driver (provided, however,  such rights with respect to the Driver shall be limited to the Driver in fire suit or any other branded apparel of a Team sponsor) may be sublicensed to any then-current Series Sponsor for such Year on an exclusive basis solely for endorsement of any or all products and services of such Series Sponsor in such Series Sponsor's Series Sponsor Category (as defined in <u>Exhibit C</u>), provided that, if a Series Sponsor Change has been effectuated during the Term, then (i) off-track activation rights of the Series Sponsor shall be subject to any applicable limitations set forth in the last sentences of <u>Section 6.9.2</u> and (ii) no such endorsement rights may be used in any manner that would be in conflict with a Qualifying Sponsor written agreement of Team Owner or Driver existing prior to such change (as such Team Owner or Driver sponsorship agreement may be extended from time to time on similar terms). Moreover, the Team Owner shall make good faith efforts to enter into agreements with the Fuel Sponsor and Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of such sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement).  With the exception of any Series Sponsor's exclusive rights as set forth above with respect to endorsements within such Series Sponsor Category, this <u>Section 5.2</u> does not grant to any NASCAR Recipient (or to any other Person) any right for (or to authorize) the use or endorsement of a third party brand, product or service utilizing the name, image or likeness of the Team Owner, the Control Person, the Driver(s), each of the crew members, any other Team Affiliate or the Designated Vehicle without such party's express consent (or, in the case of the Designated Vehicle, the express consent of the Team Owner).

5.3    <u>Collective Use.</u>  Any Event image in photography or audio-visual footage that depict(s) five (5) or more race vehicles and/or five (5) or more drivers in uniform and/or five (5) or more crew members in uniform at an Event may be used in any medium by the Team Owner, Team Affiliates, Other Teams and their Team Affiliates, sponsors of Competitors, Promoters, Broadcast Partners, and NASCAR and its Affiliates and its sponsors and licensees for advertising, marketing and promotional purposes

20

HIGHLY CONFIDENTIAL - OCO

23XI_0004500

supporting the parties' involvement in the sport even though it may include the likeness of the Team Owner, the Control Person, the Driver or any of their respective Team Affiliates, provided that no personal endorsement of any brand, product or service is created or implied by any such use.

5.4    Team Clips.  Upon Team Owner's request, NEM shall (or shall cause the appropriate NASCAR Affiliate to) provide up to five (5) minutes of audio-visual Works per Event that are readily accessible by NEM (or such Affiliate) for licensing (without regard to any restrictions on licensing which exist only among NEM and/or other NASCAR Affiliates) and that include Team Intellectual Property (the "Team Clips") for a royalty-free use by the Team Owner or a Team Owner primary or other major associate sponsor (each, a "Material Sponsor") in accordance with the following: (i) in connection with such request, the Team Owner shall provide NEM (or its Affiliate) with information reasonably requested with respect to the usage of such Team Clips, (ii) the Team Clips shall only be exhibited via a freely distributed medium (including, without limitation, television, cable television, satellite television, and transmission over the Internet or broadband (including subscription based services)) that is intended solely to promote and/or market such Team, Material Sponsor, or Driver's (as applicable) relationship with the sport, NASCAR or each other and not to create any product, application, site or platform that is intended to predominately exploit the Team Clips or the Team Clips in connection with other NASCAR-related audio-visual footage related to the Team or the Driver, (iii) the Team Owner shall be responsible for all reasonable and customary search and editing costs (but not a license fee) associated with such Team Clips in the event that editing is necessary to satisfy the Team Owner's request, (iv) all Team Owner or Material Sponsors utilizing such clips will be required to enter into a royalty free form license agreement with NEM (or its Affiliate) with reasonable and customary terms, including with respect to indemnification and referencing the usage restrictions in accordance with this Section 5.4, (v) notwithstanding the foregoing, if the use of Team Clips is otherwise in accordance with this section and is for use on Team Owner-branded social media channels or Team Owner-branded website then no additional license agreement is needed for the non-exclusive, non transferable use by Team Owner and any search and search and editing costs (if any) will be approved via e-mail; and (vi) such use will comply with NASCAR's brand guidelines and other guidelines to ensure such usage does not conflict with any Live Transmission Contract or any third party agreement that exploits Ancillary Rights.  The Team Owner shall use good faith efforts to ensure that all requests to NEM for the use of Team Clips by any Material Sponsor is coordinated by and conducted through the Team Owner.  The Team Owner acknowledges and agrees that NEM and its Affiliates will, on a non-exclusive basis, exploit portions of the Works (and other NASCAR-related content) for non-sponsored promotional uses and NEM (or such Affiliate) will not be charged a license fee for the exploitation of such footage in such cases.

5.5    Team Intellectual Property; Works; Ancillary Rights.

(a)    This Agreement grants no rights to use Team Intellectual Property in any manner (on in connection with any activities) except as referenced in this Section 5. Without limiting the foregoing, this Agreement grants no rights to NEM or its Affiliates to utilize Team Intellectual Property for any activity involving physical goods that are produced or distributed, whether freely or not.  The parties agree to work in good faith together to identify relevant cross-licensing opportunities inclusive of the Team, Driver and NASCAR marks in a manner consistent with past practices of the parties as of the Execution Date. Notwithstanding any existing agreements, it is also agreed and understood that the parties shall have the option to utilize the NASCAR Team Properties Trust structure, using the structure set forth below in Section 5.14 and/or enter into separate agreements for purposes of establishing new licensing agreements, as determined at each individual party's sole discretion.  To the extent that Team or Driver merchandise is sold through NASCAR.com or through the industry trackside merchandise program at Events (but not through track-specific owned stores and/or concessions at Events), the parties agree to distribute royalties in a

21

HIGHLY CONFIDENTIAL - OCO

23XI_0004501

manner consistent with existing NASCAR Team Properties Trust (which, for clarity, distributes a 9% royalty to Team Owner and a 1% royalty to NASCAR). In addition, for any product approvals administered through the Trademarx online approval system, other than for "lifestyle" products as generally recognized in the industry, all parties shall mandate the use of the official "NASCAR" hangtag with integrated hologram or "NASCAR" hologram only (where applicable); provided that the Trademarx system continues to be funded through the sale of holograms/hangtags to third party licensees. As means of clarity, give aways of sponsor premium and promotional products, including those distributed at trackside venues, are not subject to the foregoing terms.

(b)     Pursuant to and in accordance with the terms expressly set forth in Sections 5.2 and 5.4 of this Agreement, NASCAR Recipients may utilize Team Intellectual Property for the promotional and other similar purposes as set forth in this Agreement.

(c)     Subject to the terms of this Agreement (including, without limitation, the requirement that NEM pay to Team Owner the monies set forth on Exhibit B), Team Intellectual Property may be distributed within Live Transmissions of Events ("Live Transmission Activity").

(d)     Subject to the terms of the Agreement, NEM and its Affiliates may utilize and distribute Works (inclusive of Team Intellectual Property visible within the Works) in conducting Ancillary Activity. For purposes hereof, "Ancillary Activity" means (i) operation of the NASCAR.com business and any other NASCAR owned, operated or branded digital offerings via any platform now known or hereafter developed (e.g. NASCAR on YouTube), but in each case excluding Live Transmissions made pursuant to Live Transmission Contracts; (ii) the exploitation or license of any audio only content (including live audio telecasts of Events) to third parties; (iii) the licensing or distribution of Event content in any and all media, other than through Live Transmissions, including, without limitation, via the internet (other than delivery via closed-system internet protocol delivery of multi-channel linear programming services for in-home television signal reception (e.g., telephone MVPD service using internet protocol packet delivery)), mobile telephone/mobile data technology protocols, WAP, SAP, EVDO, VCAST, UMTS, WiMax, LTE and/or any other non television signal protocol/platform (i.e., any protocol or platform other than traditional linear standard or cable television or any multi-channel programming services provider (whether or not currently in existence) that provides a service substantially equivalent to linear cable television services as in effect on the Execution Date); (iv) non-fungible tokens (NFTs); (v) any other licensing or other exploitation of content that does not constitute a Live Transmission; (vi) production, distribution, sale or license of feeds of, or rights to, the Events for Live Transmission (or, for geographies in different time zones, first run delayed transmission) outside of the United States, its territories, possessions and commonwealths, plus Bermuda (for clarity, revenues from the Live Transmission rights within the United States, its territories, possessions, and commonwealths and Bermuda constitute Media Revenues); and (vii) maintenance of audio-visual footage and photographs generated during Events; and (viii) any other use or exploitation of the Works by NEM, affiliates or third parties other than Live Transmissions made pursuant to Live Transmission Contracts. For illustration and not limitation, Ancillary Activities include (v) the licensing or other exploitation of Event Data (excluding only Event Data rights granted pursuant to a Live Transmission Contract), (w) e-commerce activities, (x) licensing or other exploitation of content (other than Live Transmissions) on third party digital platforms (e.g., NASCAR highlight packages on Yahoo or in Apple TV archives), (y) the license of Works as part of fantasy games, video games or similar content offered on NASCAR platforms and/or third party platforms; and (z) simulated virtual reality versions of content and data feeds of content (e.g., Digital Dash content and NASCAR Race View), whether live or otherwise (excluding any rights granted pursuant to a Live Transmission Contract).

22

HIGHLY CONFIDENTIAL - OCO

23XI_0004502

5.6     Retained Revenue.  NEM or its Affiliates shall be solely responsible for all costs associated with the production, creation, storage and/or exploitation of the Ancillary Rights and Works.  Therefore, NEM or its Affiliates shall be entitled to retain all revenues generated from the exploitation, license and/or use of the Ancillary Rights and/or Works.  If there is an opportunity that requires Team Intellectual Property in addition to the Team Intellectual Property that is present in the Works then such use of the Team Intellectual Property shall be governed by the New Business process in Section 5.14;

5.7     Advertising and Promotional Activities by Team Owner.  NEM, for itself and on behalf of each of its Affiliates, hereby grants to Team Owner a limited, non-exclusive, sub licensable license to use the "NASCAR" name and mark and the names and marks of the sponsors of NASCAR, NEM or their Affiliates (such as Goodyear and Sunoco) that are visible on the Designated Vehicle or uniforms of Team Owner, Control Person, Driver, crew or the Team Affiliates as seen at track during any Event solely in connection with the display of images of the Designated Vehicle or such uniforms, (including still photography captured by Event-credentialed photographers in connection with the Event that features the Team and Designated Vehicle) in any freely distributed medium (including print, broadcasts by and through television, cable television, radio, satellite signal, digital signal, transmissions over the Internet, and public online services) for sponsorship, endorsement, promotions or advertising activities of Team Owner, Control Person, Driver or their Affiliates, and to promote the Events and other news reporting, provided that (x) no such use shall enhance, enlarge, or otherwise alter the "NASCAR" name or mark, (y) the foregoing does not grant to any Person any right for (or to authorize) the use or endorsement of the "NASCAR" name or mark in such a way as to create or imply NASCAR's endorsement of any third party brand, product or service without NEM's express consent, and (z) all photographers shall be subject to NEM or its Affiliate's standard photographer and media licensing/credentialing process.

5.8     Team Websites.  Subject to a separate agreement with NEM's Affiliate to be mutually agreed by Team Owner and such Affiliate in good faith, Team Owner agrees to exclusively host the Team-specific website on the official NASCAR website and app platform, which services shall be provided at no cost to Team Owner.  Team Owner or its designee shall be solely responsible for (at its sole cost), and have sole control of, the daily operation of and content publishing on such Team-specific website located on NEM's Affiliate's platform.  Team Owner and NEM or NEM's Affiliate shall mutually and in good faith agree upon minimum content standards, minimum content posting and engagement minimums for the season for the Team-specific website.  Such Team-specific website engagement and content can be produced, programmed at captured through Team or NEM's Affiliate, with access facilitated by Team, the specific terms of which shall be mutually agreed upon in the separate agreement referenced herein.  NEM's Affiliate and Team shall coordinate sponsorship opportunities appearing on the NASCAR-hosted Team-specific website to, among other things, avoid sponsor conflicts and remain in compliance with Team contracts.  Team Owner shall cooperate in bringing Driver websites onto the NEM official website and app platform at no additional fee to Team.   If however, the Team Owner does not have the authority to provide such Driver rights and there is a required fee payable to Driver , then NEM will be solely responsible for such fee.

5.9     Entertainment Program.  Team Owner agrees that NEM or its designated Affiliate shall have the right to produce, sell or license (or engage in any action in connection with the foregoing) any program or series that includes more than four (4) NASCAR Cup Series Competitors.  If NEM is trying to sell or license a program or series about the sport in general (e.g., playoff show or Race For the Championship) then Team Owner grants NEM or its designated Affiliate the non-exclusive, transferable right to: (i) use the Team Intellectual Property as seen in-context in footage at the Event, Team race shop or otherwise; and (ii) reasonable access to Team race shop and employees of Team Owner and Owners for

23

HIGHLY CONFIDENTIAL - OCO

23XI_0004503

filming for the program, including, without limitation, the right to mic and collect audio footage from Driver and team members at Events. NEM (or its applicable Affiliate) shall use commercially reasonable efforts to obtain customary liability releases for Team Owner with respect to any such program or series. NEM and Team Owner shall coordinate in good faith to mitigate the risks of Team sponsor conflicts. Any exclusivity around the foregoing rights shall be subject to Team Owner's prior written (e-mail shall suffice) approval, not to be unreasonably withheld, conditioned or delayed. Each of the parties hereto shall regularly communicate with the other party (or its designee) regarding entertainment programming or content opportunities being pitched or pursued by such party.

5.10    NASCAR Fan Rewards Support.    Team Owner agrees to use commercially reasonable efforts to cooperate with the NEM Affiliate that licenses and operates the NASCAR Fan Rewards to determine a plan to better integrate Team into the NASCAR Fan Rewards program and collaborate to create custom exposure and engagement opportunities. Additionally, to the extent permitted by the NASCAR Fan Rewards terms and conditions, the NEM Affiliate will use commercially reasonable efforts to share non-identifiable first party data as set forth in Section 5.11 below.

5.11    Motorsports Consumer Data Platform.    Subject to applicable law and contractual obligations, Team agrees to add existing Team database information and any future Team consumer data capture into the Motorsports Consumer Data Platform (MCDP). For purposes of clarity, no consumer personally identifiable information is shared across MCDP participants but helpful trends and habits can be aggregated based on the information, and this aggregated de-identified information can be shared across MCDP participants. Team will have the same access to the MCDP as all MCDP participants other than the MCDP administrator.

5.12    Driver Ambassador Program.    Team Owner agrees to cooperate in good faith with NEM regarding the Driver Ambassador Program and to cooperate in good faith on a reasonable basis to make the best use of the Driver's time to maximize exposure for the sport. NEM acknowledges and agrees that Driver shall not be obligated to participate if there is a Team Owner category conflict associated with the opportunity. NEM will work with Team Owner regarding the scheduling of such opportunities. NEM represents and warrants that all monies deducted from Media Revenues for the Driver Ambassador Program shall be used solely for the program. NEM acknowledges and agrees that if the Driver Ambassador Program amount is reduced or if the Driver Ambassador Program is discontinued at any time during the Term by NEM, in its sole discretion, and such discontinuation is not as a result of the Team not supporting the program, then the amount of the reduction of monies or the monies previously allocated to the Driver Ambassador Program, as applicable, shall be added back on a pro rata basis between NEM and Team Owner(s) and NEM will distribute an amended Exhibit B.

5.13    Industry Support.    Team will cooperate in good faith with NEM and NEM Affiliates to provide commercially reasonable support to promote event, engagement and growth in interest among new fan audiences, including without limitation, non-revenue generating activities to grow the sport.

5.14    New Business.    "New Business" shall mean new revenue opportunities that include both a license to (A) collective (i.e., 4 or more Competitors) Team Intellectual Property or Other Team intellectual property; and (B) NASCAR name and/or mark and/or Promoter name and/or mark. Notwithstanding the foregoing, New Business does not include Ancillary Rights, Driver Ambassador Program(s), Other Awards, Live Transmission, Events or any Event promotional rights already granted to NASCAR and/or promoter consistent with current practices. A committee will be formed jointly by three (3) Competitors selected by Charter Members and NEM to explore the sourcing of New Business. Both Team and NASCAR commit to use commercially reasonable efforts (at no cost to Team or Competitor) to: (i) generate and source viable

24

HIGHLY CONFIDENTIAL - OCO

23XI_0004504

New Business opportunities; and (ii) bring appropriate New Business opportunities to the committee and/or Team early in the opportunity development phase to ensure collaboration and alignment, subject, in each case of clauses (i) and (ii), to existing contractual obligations to sponsors and other third parties that may limit these efforts which must be disclosed to NEM early in the process. Examples of New Business may include use of both NASCAR and Team Intellectual Property together in connection with gaming, content projects, new technologies and other new ventures related to the NASCAR Cup Series.

(a) Any new business opportunity, including (i) the definitive terms governing such new business opportunity, (ii) the allocation of net revenue with respect to Team Owners and NEM, respectively, resulting from such New Business opportunity and (iii) the method of calculating (and ultimate definition and calculation of) net revenue thereunder, requires the approval of both (x) NEM and (y) a majority of the Competitors on the New Business committee. Allocation of any such net revenue among the Competitors shall also be determined through the vote of a majority of the Competitors on the New Business committee.

(b) In the event that Driver(s) rights are required to pursue the opportunity which includes Team Intellectual Property, Team shall grant any necessary rights to Driver in uniform and Team will use commercially reasonable efforts to deliver any other necessary rights of the Driver(s) for the applicable agreement, subject in each case to existing contractual obligations and applicable law. In the event that the Team Owner is unable to grant the necessary rights of the Driver for such opportunity, then NEM or its Affiliates shall be permitted to obtain such rights directly from the Driver.

(c) Team (if Team is participating in the New Business opportunity) will have transparency into the underlying structure of the agreement, and calculations of net revenue.

(d) Team Owner shall not have a right to opt out of the New Business and accordingly shall participate in such New Business if it has been approved pursuant to clause (a) above unless: (i) there is a direct conflict with a current Team Owner partner or sponsor who Team Owner has a contractual relationship at the time such New Business was presented; (ii) Team Owner has signed a term sheet for an upcoming partnership or can show evidence of current conversations which would put the Team Owner in direct conflict if the agreement was completed; or (iii) the New Business opportunity includes a product, service or counterparty that is associated with entities or causes inconsistent with the image and integrity of the Team, its Drivers or its sponsors, as determined in Team's reasonable and good faith discretion. The parties will execute a statement of work specific to the New Business which would allow NEM or its Affiliates the right to sublicense the Team Intellectual Property for purposes of the New Business. Nothing herein shall prevent Team Owner or NEM or its Affiliates from pursuing any individual sponsorship, licensing or other commercial agreements which do not use the other party's intellectual property.

6       Team Owner Obligations.

6.1     Operating Obligations. At all times during the Term, the Team Owner shall, subject to Force Majeure Events, use commercially reasonable efforts to conduct all of the day-to-day operating and administrative functions reasonably necessary for the first-class operation of a stock car racing team and such team's participation in the Cup Series, while using commercially reasonable efforts to maintain continuity of race vehicle, assets, equipment, personnel, crew chief, crew members and shop address/location, and shall disclose Team members and other information as required in Schedule 1, and shall update as necessary to make accurate or up to date upon the written request by NEM. In addition, Team Owner and the Control Person shall, subject to Section 6.5, execute all other documents and forms reasonably required by NEM or its Affiliates for participation in the Cup Series, including a Competition

25

HIGHLY CONFIDENTIAL - OCO

Membership and License Application form for the Cup Series, in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules, provided, that in the event of any conflict or inconsistency with such documents or forms entered into by the Team Owner, Control Person or any Team Affiliate with the subject matter set forth in Section 3.1(a), 3.1(b), 4, 5, or 6 of this Agreement, such applicable Section(s) of this Agreement shall control.

6.2     Competition.  The Team Owner shall, subject to Force Majeure Events:

6.2.1     use best efforts to provide and deliver the Designated Vehicle, with Driver, crew chief and pit crew to compete in each Event and any practice, qualifying or testing events or sessions as and when scheduled by NEM or its Affiliates;

6.2.2     use its best efforts to start, race, and finish at the highest possible level in each Event, including up to two Invitational Events per Year, with winnings for such Invitational Events not less than historic levels as set forth in Exhibit B hereto, including using commercially reasonable efforts to race for the entire advertised Event distance as outlined in the official entry blank, unless (i) NASCAR, in its discretion, has determined that such Event is complete pursuant to the NASCAR Rule Book; or (ii) the Designated Vehicle is involved in an accident or incident during such Event that renders the Designated Vehicle unable to race further in such Event, provided that such inability to race further in such Event is validated by the Senior Vice President of Competition or NASCAR Managing Director, Cup Series, or his/her designee, officiating at such Event, whose decision in this respect will be final.  In the event that Team Owner fails to start in any Event in accordance with this Section 6.2.2 for any reason or no reason (e.g. logistics, economics, safety etc.) NEM shall have the right to replace such Team Owner's vehicle in the starting field for that particular Event with a vehicle and racing team that is party to an open team agreement (even if such open team is maintained by a Charter Member or otherwise Affiliated with a Person that is party to a Charter Member Agreement) selected by NEM.  If such circumstances shall arise, the Control Person and the Team Owner waive all rights and remedies they may have arising from such replacement of NEM's selection including injunctive relief.

6.3     Designated Sponsor and Competitor Branding.  Team Owner shall cause the Driver, crew members and the Designated Vehicle, at all times for every Event in which Team Owner participates, to adhere to and display the designated branding requirements as shown in the attached Exhibit D, as such requirements may be reasonably modified or supplemented by NEM from time to time during the Term upon reasonable advance written notice to Team Owner, and subject to the terms hereof in the case of the designation by NEM of sponsors in Reserved Sponsor Categories and provided that such modification or supplementation does not diminish the space or location of branding available to Team Owner for its sponsors available as of the Execution Date.  NEM may continue to include, for any of its Fuel Sponsors (including the corner panel and fuel port decal), Tire Sponsors and Series Sponsors in the Reserved Sponsor Categories, space decals on the Designated Vehicle of the same size and placement that exist as of the Execution Date (provided that in the event of a bi-furcated Series Sponsor pursuant to Section 6.9.3, the Series Sponsor may only display such space decal during its respective exclusive portion of the Season).  Subject to the terms of this Agreement, the Team Owner shall and shall cause its controlled Affiliates to abide by the provisions in the NASCAR Rule Book regarding advertising and related promotional restrictions as set forth in Section 20.4.19 relating to "Decals and Advertising" as in effect on the Execution Date and amended or supplemented in accordance with the terms of this Agreement.  The Team Owner understands and agrees that NEM may refuse to permit, or it may restrict or assign the size or placement of decals, identification, and advertising of any kind on the Designated Vehicle, or the Driver's uniform ("Car/Driver Sponsor Advertising"), that is reasonably in the best collective interests of NEM and all of the Team Owner and other Charter Members, provided that, nothing herein shall limit the Control

26

HIGHLY CONFIDENTIAL - OCO

Person, Team Owner or any Team Affiliate from maintaining and complying with an agreement with a sponsor for Car/Driver Sponsor Advertising that was permitted by NEM at any time during the previous three (3) racing seasons; provided further, that, notwithstanding the foregoing, if NEM raises reasonable concerns that a sponsor's brand has become tarnished by controversy, crisis or circumstance such that its association with Team or NEM would damage the NASCAR brand or image of the sport, or violate the broadcast standards of partners under Live Transmission Contracts or damage their ability to sell advertising within Event telecasts, or if the category in question has been disallowed as a sponsor by NEM acting in good faith, then NEM and Team Owner will discuss such concerns and cooperate in good faith to reach a mutually agreeable solution.

6.4     <u>Driver Agreement.</u>  For each Year of the Term, the Team Owner shall (or shall cause an Affiliate to) be responsible for retaining the services of an eligible Driver(s) to race in each Event using the Designated Vehicle.  The Team Owner shall cause any Driver providing services to the Team Owner during the Term to execute (including upon execution of this Agreement) and deliver a Driver Agreement in the form attached hereto as <u>Exhibit I</u>, and will use commercially reasonable efforts to cause the Driver to enter into such amendments thereto as NEM may reasonably require from time to time and which are not in conflict with this Agreement (the "<u>Driver Agreement</u>"), it being understood that no amendments or modifications will be made by NEM to the Exhibits of the Driver Agreement if such amendments or modifications would be in conflict with, or otherwise inconsistent with, the corresponding terms and provisions of this Agreement.  In addition, Team Owner shall cause Driver to execute all other documents and forms reasonably required by NEM or its Affiliates for participation in the Cup Series including a Competition Membership and License Application form for the Cup Series in the form then prescribed by NEM, in each case consistent with this Agreement and NASCAR Rules.  Upon expiration or termination of the Driver Agreement or upon injury or approved absence of Driver requiring substitution of an alternate eligible Driver, the Team Owner shall deliver to NEM an executed Driver Agreement as outlined above for such Driver such that at all times during the Term the Team Owner's Driver has executed and delivered a Driver Agreement.  In the event of any conflict or inconsistency between the Driver Agreement and the agreement for driver services between Team Owner and Driver, the Driver Agreement shall control.

6.5     <u>NASCAR Rules.</u>  Subject to the terms of this Agreement, including <u>Sections 3.5 and 3.6</u> hereof, the Team Owner and the Control Person acknowledge and agree that NASCAR and its Affiliates shall have the sole and exclusive right to amend and supplement the NASCAR Rules from time to time in their sole and absolute discretion, provided that (i) no such amendment or supplement shall abrogate or modify the terms of this Agreement or the rights granted to Team Owner or Control Person hereunder; (ii) in the event of any conflict or inconsistency between this Agreement and NASCAR Rules, this Agreement shall govern; and (iii) NASCAR and its Affiliates shall at all times implement and administer such NASCAR Rules in good faith and not out of self-interest, and in seeking to further the best interests of the sport.   Subject to the immediately preceding sentence, the Team Owner and the Control Person acknowledge and agree that they shall be bound by, and shall comply with, each NASCAR Rule.  NEM is the sanctioning body of the Cup Series and shall (subject to the preceding clause (iii) and to any rights of appeal set forth in the NASCAR Rules) have sole authority to enforce the NASCAR Rules, implemented in accordance with the terms hereof, for purposes of exercising its sanctioning authority over all aspects of on track-racing activity during the competition of any Events, including with respect to qualifications and eligibility to race in any Event, inspection process (pre and post-Race), race procedures and on track competition, it being understood and agreed that the implementation and enforcement by NEM of NASCAR Rules in accordance with the terms of this Agreement may have an adverse impact (including an adverse economic impact) on the Team Owner.

27

HIGHLY CONFIDENTIAL - OCO

23XI_0004507

6.6 <u>Protection Of Goodwill.</u> In recognition of (a) the substantial goodwill and expertise developed, and the significant investment, by NEM and its Affiliates with respect to automobile or truck motorsports racing, (b) the Confidential Information that will be shared by NEM with Team Owner and the Control Person pursuant to this Agreement and otherwise, (c) the harm that would result, including potential confusion in the marketplace, dilution of the rights granted to any Broadcast Partner, to NEM, its Affiliates and the Other Teams if the Team Owner or the Control Person were to use any of such goodwill, expertise or Confidential Information, or any of the benefits obtained by Team Owner or the Control Person under this Agreement or otherwise through their association with NASCAR, and (d) the need to ensure that all Charter Members use their reasonable best efforts, and devote all reasonable resources necessary, to start, race, and finish at the highest possible level in each Event to maintain and enhance the quality of Cup Series racing, at all times during the Term, each of the Team Owner, the Control Person shall not, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations shall not, race in or directly or indirectly own an equity ownership interest (or profits participation interest with attributes similar to equity) in any automobile or truck motorsports racing series that is held throughout the Territory except (i) any motorsports racing series that is sanctioned by NEM, NASCAR or any of their respective Affiliates (including without limitation IMSA, ARCA and the Whelen Modified Tour), (ii) Open Wheel Racing: any motorsport series currently configured as an open wheel racing series, including without limitation IndyCar, Indy Lights, F1, World of Outlaws or any open wheel series or similar and successor series, provided such series continue to operate primarily as an open wheel racing series in their current form and fashion; (iii) any participation in NHRA, Bandoleros, XR Racing, CARS Tour, Legends Series, Supercars, Global Rally Cross and or similar or successor series, provided such series continue to operate primarily in the same fashion or form, (iv) Private Events, (v) any other racing series that is created or formed after the Effective Date and approved by NEM, NASCAR or any of their respective Affiliates, and (vi) an "Exempt 10% Owner" which is defined as any 10% or more owner of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations (but, for clarity, not the Control Person or any Person under his or her direct or indirect control), if such 10% or more owner owns an equity ownership (or profits participation interest with attributes similar to equity) in any motorsports racing series throughout the Territory through an entity in which the 10% or more owner is a limited investor and does not receive material non-public information regarding racing competition in respect of such series or provide such series any material non-public information relating to NASCAR, the Team Owner, the Team or their respective operations (any such 10% owner described in this clause (vi) an Exempt 10% Owner). If NEM presents Team Owner with opportunities to participate in NASCAR sanctioned stock-car racing series or exhibition events outside of North America, Team Owner agrees to consider in good faith participating in any such series, which shall be separate from the New Business opportunities under <u>Section 5.15</u>. If Team Owner presents NEM with opportunities to sanction a stock car racing series outside of the Territory, then NEM agrees to consider in good faith sanctioning any such series.

This <u>Section 6.6</u> is a material part of the consideration for NEM.

6.7 <u>Injunctive Relief.</u> If, despite the harm that would be incurred by NASCAR, NEM, NASCAR Rights Affiliates and others, any Arbitration Panel construes any of the covenants in <u>Section 6.6</u> to be too broad, the Arbitration Panel shall have the authority to reduce the duration, Territory or scope of prohibited activities to the extent necessary so that the provision is enforceable (and the provision, as reduced, shall then be enforced).

HIGHLY CONFIDENTIAL - OCO

23XI_0004508

6.8    Sponsor Exclusivity.  NEM has agreed, pursuant to Section 3.1(c), to use commercially reasonable efforts to sell certain exclusive sponsorship rights in the Reserved Sponsor Categories.  At all times during the Term, Team Owner shall comply with, and shall cause its controlled Affiliates to comply with any, exclusivity reasonably required by the agreements relating to such Reserved Sponsor Categories, including any reasonable promotional requirements relating to the Designated Vehicle or any uniform, and any other reasonable restrictions necessary to protect the exclusivity granted in such Reserved Sponsor Categories (but subject, in the event of a change in the Series Sponsor Category or the appointment of multiple Series Sponsors in any Year, to the provisions in Section 6.9).  The Series Sponsor Category may change from time to time during the Term, and NEM will notify the Team Owner in writing of any change in the exclusivity, promotional requirements or other restrictions relating to the Series Sponsor Category prior to January 1 of the applicable Year (or such later date if, in NEM's good faith judgment, January 1 is not practicable).  The other Reserved Sponsor Categories may not expand in nature or scope during the Term (but, for clarity, are permitted to contract or be further limited).  The Reserved Sponsor Categories as of the Execution Date are described in Exhibit C.

6.9    Series Sponsor Exclusivity.

6.9.1    Series Sponsor Exclusivity.  At all times during the Term when an agreement relating to a Series Sponsor is in effect, but subject to this Section 6.9 and subject to written agreements Team Owner may have with NEM or its Affiliates in existence on the Effective Date, the Team Owner and the Control Person shall not, and Team Owner shall cause each Team Affiliate not to, when participating in any Event or in any advertising or promotion that uses the name, image or likeness of Team Owner, Control Person, or any Team Affiliate, or that is based on such Team Owner's, Control Person's or any Team Affiliate's participation in the Cup Series (unless otherwise expressly authorized in writing by NEM), use or display in any commercialized or sponsored manner any product, brand, logo, trademark or service identification of any Person in any Series Sponsor Category anywhere by such Person, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, the Team's equipment or haulers or anywhere in Victory Lane; provided that, if, following the date of this Agreement, NEM modifies the Series Sponsor Category or enters into an agreement with a new Series Sponsor(s) (each, a "Series Sponsor Change") and the Team Owner, Control Person or any Team Affiliate is then a party to a written contract with a sponsor with respect to any branding and related rights that have been granted to such sponsor via such written contract prior to the Series Sponsor Change (each, together with any permitted successors thereto (as such permission is determined pursuant to the applicable agreement with such sponsor), a "Qualifying Sponsor") that would breach the exclusivities granted by NEM within such new Series Sponsor Category (or Series Sponsor Categories) (each, an "Exclusivity Breach"), the Team Owner, Control Person or any Team Affiliate shall have the right to maintain and comply with such Qualifying Sponsor's agreement (or agreements) in accordance with Section 6.9.2 below (and, for clarity, only the exceptions set forth in Section 6.9.2 are permitted).  Subject to compliance with this Section 6.9, the Team Owner acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of any product, brand, logo, trademark or service identification of a Person in any Series Sponsor Category, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers.

6.9.2    Single Series Sponsor.  As of the Execution Date, NEM has a number of premier partner sponsors and does not have a Series Sponsor.  However, NEM may, in its sole discretion, elect to enter into an Agreement for a Series Sponsor at any time during the Term.  In any Year in which NEM elects to enter into an Agreement for a Series Sponsor and effectuates a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, any Team Owner, Control Person or any Team Affiliate that

29

HIGHLY CONFIDENTIAL - OCO

23XI_0004509

would be in an Exclusivity Breach with respect to any branding that has been granted to a Qualifying Sponsor on the Designated Vehicle, Driver, crew members, Cup Series uniforms, hauler, or other similar assets that are visible to the general public at any Event (the "At Event Assets"), such Qualifying Sponsor branding for the At Event Assets shall be permitted during the Term solely at the visibility or participation level pursuant to and set forth in the then-current agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for At Event Assets shall not be increased, other the any increases already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to such levels (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would be limited to the deck lid without any other increases; if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events, or if such Qualifying Sponsor branding was permitted on crash carts and haulers but was not on the Designated Vehicle then such branding would be restricted to such crash carts or haulers etc.), provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any At Event Asset, the exclusivity exceptions set forth in this Section 6.9(b) shall be permitted at the highest level of branding that was granted at any time pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the Term, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this Section 6.9.2 shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination and shall otherwise comply with Section 6.9.1 without exception except for exceptions applicable to the non-terminated contract, if any (e.g., if a Driver has a personal services agreement with a Qualifying Sponsor of Team Owner, the termination of the personal services agreement will not require the Team Owner, Control Person or any Team Affiliate (as applicable) to comply with Section 6.9.1 without exception in the event that they have non-terminated contracts which are permitted hereunder and remain in effect), and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding for the At Event Assets, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions for any At Event Assets set forth in this Section 6.9.2. During any Year in which NEM effectuated a Series Sponsor Change such that only one Series Sponsor is then-current for such Year, such exclusivity granted to any Series Sponsor shall extend to off-track activation in accordance with Section 6.9.1 provided that if any Team Owner, Control Person or any Team Affiliate would be in an Exclusivity Breach with respect to any off-track activation that has been granted to a Qualifying Sponsor via such written contract, then such Qualifying Sponsor may continue marketing off-track throughout the Year, in accordance with the restrictions set forth in the foregoing sentence, even though such marketing may conflict with the current conflicting Series Sponsor Category.

6.9.3  Bi-Furcated Series Sponsors.  During any Year in which NEM effectuated a Series Sponsor Change such that agreements with two (2) Series Sponsors are then in effect (i.e., each Series Sponsor has rights to a different continuous portion of the Season), each Series Sponsor shall only be afforded exclusivity in such applicable Series Sponsor Category as provided in Section 6.9.1 with respect to the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row (and, for clarity, not with respect to other equipment or haulers) and solely during the portion of the Season that NEM or its Affiliates have granted such Series Sponsor

30

HIGHLY CONFIDENTIAL - OCO

23XI_0004510

exclusivity, which must correspond with a portion of the Season for which one of NASCAR's then principal Live Transmission Broadcast Partners has Event live telecast rights (e.g., as of the Execution Date, a Series Sponsor that corresponds to FOX for the first portion of the Season and another Series Sponsor that corresponds to NBC for the second portion of the Season). In addition to the foregoing sentence, if any Team Owner, Control Person or Team Affiliate would be in an Exclusivity Breach with any Qualifying Sponsor during the applicable portion of the Season, such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row shall be permitted solely at the visibility or participation level pursuant to and set forth in the then-current written agreement with such Qualifying Sponsor and the level of such Qualifying Sponsor branding for the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season shall not be increased, other than any increases during such portion of the Season already set forth in the then-current contract with such Qualifying Sponsor without any modifications or amendments to increase such levels of such agreement with such Qualifying Sponsor (e.g., if such Qualifying Sponsor branding was limited to the deck lid on the Designated Vehicle then such branding would limited to the deck lid during such portion of the Season without any other increases or if such Qualifying Sponsor branding was permitted for five (5) Events then such branding would be limited to no more than five (5) Events during such portion of the Season) provided that (i) if, at any point during the Term, such Qualifying Sponsor reduces its level of branding for any of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row during such portion of the Season, the exclusivity exceptions set forth in this Section 6.9.3 shall be permitted at the highest level of branding that was granted pursuant to such written contract, regardless of whether the Team Owner, Control Person or any Team Affiliate enters into any amendment, renewal or different agreement with such Qualifying Sponsor (for clarity, Team Owner, Control Person and Team Affiliates shall have the right to enter into such amendments, renewals or different agreement with such Qualifying Sponsor in accordance with the terms hereof), (ii) if, at any point during the then-current term of such agreement, such Qualifying Sponsor's relationship with such Team Owner, Control Person or any Team Affiliate (as applicable) is terminated, the exclusivity exceptions set forth in this Section 6.9.3 shall no longer apply with respect to such Series Sponsor, but only as to the terminated contract and not to any other contract which is permitted hereunder that is then in effect, and the Team Owner shall provide prompt written notice to NEM of such termination, and (iii) if any agreement entered into with the Team Owner, the Control Person or any Team Affiliate with any Qualifying Sponsor would be in an Exclusivity Breach but such agreement does not specifically identify the level of branding of the Driver's and crew members' Cup Series uniforms, the Designated Vehicle, war wagon and other major equipment and personnel in pit row, then such Qualifying Sponsor shall not be afforded the exclusivity exceptions set forth in this Section 6.9.3. For clarity, any exclusivity granted to any bi-furcated Series Sponsor in accordance with this Section 6.9.3 shall not extend to off-track activation (e.g., any Team sponsor may continue marketing not at the track throughout the Term even though such marketing may conflict with the current conflicting Series Sponsor Category) and the Series Sponsor's off-track activation shall be limited to collective uses made pursuant to Section 5.3.

      6.10    Tire Sponsor Exclusivity. The Team Owner, on behalf of the Team Affiliates, agrees that when participating in any Event, unless otherwise expressly authorized in writing by NEM, no product, brand, logo, trademark or service identification of any Person in the Tire Category (other than the Tire Sponsor) as defined in Exhibit C, will be used or displayed anywhere by such Team Affiliate during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers. The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate, including the Driver, may advertise or promote a product, brand, logo, trademark or service

HIGHLY CONFIDENTIAL - OCO

identification of any Person in the Tire Category as defined in <u>Exhibit C</u>, whether in conjunction with an Event or not, if such advertising or promotion includes a NASCAR racing (e.g., Driver, crew member) suit, whether worn by such Team Affiliate or not, and/or a NASCAR racing vehicle. The Team Owner, on behalf of the Team Affiliates, acknowledges and agrees that NEM may, in its reasonable discretion, refuse to permit or limit the use or display of a product, brand, logo, trademark or service identification of any Person in the Tire Category by any Team Owner Party during any Event, including on the Driver's or crew members' Cup Series uniforms, the Designated Vehicle, and the Team's equipment and haulers. Notwithstanding the foregoing, actual use of tires other than those made by the Tire Sponsor on Team equipment other than the Designated Vehicle (e.g., pit carts and haulers) shall not be considered a breach of the provisions set forth in this paragraph. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Tire Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Tire Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to tires, on the same financial terms, as other Competitors by Tire Sponsor.

6.11    <u>Fuel Sponsor Exclusivity.</u> The Team Owner, on behalf of the Team Affiliates, agrees that no Team Affiliate will participate in any sponsorship, licensing, or personal appearances with a company in the Fuel Category (other than the Fuel Sponsor) as it relates to Cup Series racing either in or out of uniform other than as provided herein. The Team Owner shall use good faith efforts for the duration of the Term to enter into annual agreements with the Fuel Sponsor which have fair and equitable terms for each of the respective parties for advertising and promotional rights in support of the Fuel Sponsor's participation in the Cup Series (but, for clarity, the Team Owner shall have sole discretion over whether to enter into any such agreement), and if Team Owner and Fuel Sponsor have not entered into an agreement at any time during the Term, NEM shall ensure that Team Owner shall be afforded the same access to fuel, on the same financial terms, as other Competitors by Fuel Sponsor.

6.12    <u>Minimum Performance Standards.</u> The Events represent the highest caliber of racing in motorsports. The "<u>Minimum Performance Standards</u>" require that Team Owner comply with the following standards each Season during the Term of the Agreement: 1) purchase the lesser of either ninety percent (90%) of tire allotments or the equivalent percent of the Event tire allotment minus one set for each race; 2) Fill at least ninety percent (90%) of the road and pit crew roster allocations for each Race; 3) Use three (3) or less drivers during each Season unless approved by NASCAR in advance (i.e. playoff waiver granted, medical, suspension, etc.) and 4) qualify within at least one hundred and seven percent (107%) of the fastest time in each Event session of practice on average on a rolling basis across the previous three (3) Races in which Team Owner participates (crashes, other on-track incidents, adverse weather or track conditions and disqualifications during qualifying would be excluded). Upon any failure by Team Owner to meet the Minimum Performance Standards, NEM will issue a notice of the failure to meet the Minimum Performance Standard (a "<u>MPS Notice</u>") to Team Owner, specifying the specific standard(s) which Team Owner has failed to satisfy and the material facts of such failure. Upon the second MPS Notice, NEM may elect to retain up to Twenty-Five Thousand ($25,000.00) US Dollars from Team Owner's Pool Money. Upon the third MPS Notice and for each MPS Notice thereafter, NEM may elect to retain up to Fifty Thousand ($50,000.00) US Dollars from Team Owner's Pool Money. Upon the fourth MPS Notice and for each MPS Notice thereafter, NEM may elect to retain up to One Hundred Thousand ($100,000.00) US Dollars from Team Owner's Pool Money or such remedies as set forth in Section 9.1.6. For avoidance of doubt, nothing in this Section 6.12 is intended to affect or relieve other Team Owner obligations as set forth in this

32

HIGHLY CONFIDENTIAL - OCO

Agreement. NEM may temporarily waive compliance with the Minimum Performance Standards in its sole discretion.

6.13    Media/Promotional Obligations. Team Owner and Control Person shall perform and Team Owner shall cause the Driver to perform, as applicable, the following media and promotional obligations:

6.13.1    Victory Lane Media Obligations of Team Owner//Control Person: Immediately following the race conclusion of each Event, as reasonably required by NEM, the winning Team Owner and Control Person if present at the particular Event shall proceed to victory lane for post-race interviews. Subject to the last sentence of this Section 6.13.1, the Team Owner and Control Person of each Event won during the Term agree to permit a display of one item from Series Sponsor, one item from the applicable Event entitlement sponsor so long as such Event entitlement sponsor does not conflict with a Team sponsor, and items from the Team's sponsors on the Designated Vehicle in victory lane so long as such Team sponsors do not conflict with the Series Sponsor Category. Subject to the last sentence of this Section 6.13.1, the size, location and weight of such item(s) shall be approved by NEM and all items shall be subject to the exclusivity of the Reserved Sponsor Categories. Team Owner and Control Person understand that members of the winning team will be required to take photographs with the Event entitlement sponsor and its guests. Post-race ceremonies will conclude once all reasonable sponsor photos, individual photos and media requirements in victory lane have been completed. Notwithstanding the foregoing, if following the date of this Agreement NEM modifies the Series Sponsor Category and the Team Owner, Control Person or any Team Affiliate is a party to a written agreement with a Qualifying Sponsor that is a primary sponsor as of the date of such modification (subject to the applicable extensions solely in accordance with Section 6.9.2) that would be in an Exclusivity Breach with respect to the display of products of such Series Sponsor within the Series Sponsor Category in victory lane, the Team Owner shall not, during the period of exclusivity of the Series Sponsor within the Series Sponsor Category, (i) display the products of such Qualifying Sponsor and (ii) be required to display the products of such new Series Sponsor, in each of (i) and (ii), in victory lane (and none of the foregoing shall be deemed a breach of this Agreement or NASCAR Rules).

6.13.2    Promotional Appearances. As designated by NASCAR or NEM, Team Owner and Control Person agree to make commercially reasonable good faith efforts to participate in promotional activities and events surrounding the NASCAR Cup Series and NASCAR events. These events include but are not limited to, NASCAR Cup Series Champions Week, promotional events for the NASCAR Hall of Fame and/or NASCAR's Season launch activities leading up to the Daytona 500 Event. If the Team Owner qualifies for the playoffs for the NASCAR Cup, Team Owner agrees to make commercially reasonable good faith efforts to attend the NASCAR Cup Series Awards banquet including all season-ending special awards ceremonies and events at times and locations designated by NASCAR. NASCAR will provide reasonable notice of the ceremony and event schedules Team Owner, and Team Owner will take reasonable steps to coordinate his or her availability in accordance with such event schedules, and will provide reasonable advance notice to NASCAR of any potential schedule conflicts.

6.13.3    Victory Tour Media Obligations of Team Owner/Driver. Team Owner shall cause the Driver to appear and attend the Victory Tour media obligations as outlined in the Driver Agreement, but in no event will NEM require more than thirty-six (36) Victory Tour media obligations in a Season in total among all drivers of Competitors having Victory Tour media obligations or more than two (2) victory tour media obligation from any individual driver in a Season. Team Owner shall work in good faith with NASCAR, NEM and the applicable race Promoter to coordinate scheduling of such appearances. Any and all actual, reasonable, and documented travel costs associated with the Driver's Victory Tour obligations shall be at the expense of Team Owner. All other actual, reasonable, and documented travel costs associated with all other appearances requested by NEM shall be at NEM's expense.

Case 3:24-cv-00886-KDB-SCR    Document 454-61    Filed 11/21/25    Page 195 of 241

HIGHLY CONFIDENTIAL - OCO                                                          23XI_0004513

6.14    Team Sponsors.  Prior to the first Event of each Year, Team Owner shall provide all Team sponsors with access to a copy of the NASCAR Rule Book and use good faith efforts to make all Team sponsors aware of all of the applicable provisions therein.


7    Cost Cap Model.

7.1    Feasibility.    NASCAR and Team Owners commit to collectively explore the feasibility of a cost cap structure and solicit feedback from all NASCAR Cup Series teams, with the intent of developing a complete framework.  Once a framework is finalized, in NASCAR's sole discretion, NASCAR will implement the cost cap structure.

7.2    Soft Launch.    Recognizing the complexity and significance of introducing a cost cap model, following the feasibility assessment set forth above, NASCAR will outline the period for the soft launch of the cost cap. During this soft launch, the parties shall collaboratively implement the proposed cost cap model in a trial setting to facilitate accurate accounting practices and assess potential impacts on Team operations. This period shall serve as a foundational phase for adjustments before formal enforcement.

7.3    Implementation.    Following the soft launch period, and subject to a review of its outcomes by NEM and after consultation with the Team Owners, NEM will determine whether to implement a cost cap model. If instituted, the Cost cap shall commence at the start of the year following the conclusion of the soft launch. Any documented and incurred costs for implementing a cost cap (currently estimated at $5 million per year) shall be deducted from the Media Revenues prior to payment to the Teams and NEM will provide an amended Exhibit B to account for such costs at the time of implementation.

8    Transferability/Charter Limitation.

8.1    Transfer.

8.1.1    Team Owner represents and warrants that, as of the date of this Agreement, Schedule 2 sets forth each Owner and that Team Owner shall cause all such Owners (including future Owners) to comply with the Terms of this Agreement, including without limitation this Section 8.  Team Owner shall submit an updated Schedule 2 at least annually.  Additionally, each direct or indirect owner of 10% or more of the equity in Team Owner (each, a "Substantial Owner").  In the event that there is a change in the identity of one or more  Owners (whether because of a Transfer of ownership, the issuance of additional equity interests or otherwise), then Team Owner shall provide written notice of such event to NEM within thirty (30) days following such change (provided that an inadvertent failure to timely provide such notice shall not constitute a breach hereunder if such failure is timely cured), which notice shall include the identity of all Owners (including the new Substantial Owners)  in an updated Schedule 2.  In addition, Team Owner represents and warrants that Schedule 1 sets forth the identity of the Control Person and the Designated Team Representative as of the date of this Agreement, and Team Owner agrees that it shall inform NEM promptly upon any change in the identity of such Control Person (subject to the terms of this Section 8.1) or Designated Team Representative.

8.1.2    Subject to the terms hereof, neither the Team Owner nor any Substantial Owner may at any time:

34

HIGHLY CONFIDENTIAL - OCO

8.1.2.1 in the case of the Team Owner, Transfer any of its rights or delegate any of its duties under this Agreement (either by outright Transfer, license, management contract or otherwise); or

8.1.2.2 Transfer any direct or indirect equity interest in the Team Owner that would result in (a) the Control Person no longer owning a Controlling Interest in, and at least 30% of the direct or indirect equity of, the Team Owner or (b) any person that was not previously a Substantial Owner of the Team Owner becoming a Substantial Owner; unless, with respect to each of Sections 8.1.2.1 and 8.1.2.2, as applicable, each of the following conditions has been satisfied (or waived by NEM in its sole discretion): (1) the Team Owner provides advance written notice to NEM of such Transfer (a "Transfer Notice"), which notice shall include the identity of the successor Team Owner, transferee Control Person or transferee Substantial Owner, as the case may be, a brief description of the transaction, a copy of a completed ownership application in a form customary for major U.S. sports leagues (including all supplementary information requests, financial disclosures including the incurrence of any debt secured by the Team, Team Owner or by Team or Team Owner interests, and authorization to complete background checks), a copy of the transfer/sale documents effectuating such Transfer which includes the sources and comprehensive details of all consideration exchanged for such interest, and certification from such successor Team Owner, transferee Control Person or transferee Substantial Owner that he, she or it is not a Prohibited Person and which shall include as an annex thereto the Transfer Approval Form attached hereto as Exhibit H (the "Transfer Approval Form"), and Team Owner and its applicable Control Person and/or Substantial Owners shall fully comply with all reasonable information and due diligence requests of NEM in connection with any of the foregoing (2) NEM shall have approved such Transfer in accordance with the process described in Section 8.1.3 below, it being understood and agreed that if NEM does not object in writing to such Transfer within fifteen (15) Business Days following its receipt of the Transfer Notice from Team Owner, then NEM shall be deemed to have approved such Transfer, (3) the Transfer does not require the successor Team Owner or transferee (or its affiliated Owners) to incur an amount of debt financing that is greater than forty percent (40%) of the consideration exchanged for such interest and (4) the Transfer would not result in the Team Owner, Control Person or any Owner being in breach of Section 8.2 or Section 8.3 upon the consummation of such Transfer, and (5) if such Transfer results in the Control Person no longer owning a Controlling Interest in, and at least 30% of the direct or indirect equity of, the Team Owner, the successor Control Person must own, directly or indirectly (and together with such Control Person's family and estate planning vehicles that are controlled by Control Person), at least a 30% equity interest in the Team Owner and must execute and deliver to NEM a joinder to this Agreement agreeing to be bound by the terms hereof applicable to Control Person and to assume all of the transferor Control Person's obligations under this Agreement (in which case, upon execution and delivery of such joinder, Control Person shall be relieved of its obligations under this Agreement), (6) in the case of a Transfer under clause (i) above, the successor Team Owner must execute and deliver to NEM a joinder to this Agreement agreeing to be bound by the terms hereof applicable to Team Owner and to assume all of the transferor Team Owner's obligations under this Agreement (in which case, upon execution and delivery of such joinder and a customary release and indemnity for the benefit of NEM with respect to the applicable Transfer, Team Owner shall be relieved of its obligations under this Agreement) and (7) after giving effect to such Transfer, Team Owner shall have no more than twenty (20) Owners (provided, that for purposes of such determination, NEM may, at its sole discretion, attribute to an Owner the interests held by such Owner's Family Relatives). In addition to the foregoing requirements, if a transfer by a Control Person would result in the Control Person no longer owning a Controlling Interest in, or at least 30% of the direct or indirect equity of, the Team Owner (a "Qualifying Transfer"), then upon (or prior to) consummation of such Qualifying Transfer, (x) the transferee Control Person will pay to NEM a transfer fee in the amount equal

35

HIGHLY CONFIDENTIAL - OCO

to the greater of two percent (2%) of the gross consideration paid for such interest or Two Hundred and Fifty Thousand ($250,000.00) US Dollars (the "Transfer Fee") and (y) the Team Owner or Owner pays or causes the successor Team Owner or Owner to pay to NEM an amount equal to all unpaid amounts then due and owing by Team Owner (in the case of a Transfer under clause (i) above) or Control Person (in the case of a Transfer under clause (ii) above) under this Agreement or NASCAR Rules at the time of such Transfer (provided that the Transfer Fee shall not be payable in connection with a Transfer described in Sections 8.1.4 or 8.1.5).

        8.1.3    Upon its receipt of a Transfer Notice, NEM shall (subject to the deemed approval provisions of Section 8.1.2 above) evaluate the Transfer as expeditiously as possible to determine whether or not to approve the Transfer. NEM shall provide its approval hereunder unless NEM reasonably and in good faith believes that the applicable transferee (or person directly or indirectly controlling such transferee) is (i) a Prohibited Person, (ii) a BMG or an Original Equipment Manufacturer ("OEM") or (iii) such Transfer would result in the Control Person (or any successor Control Person) being in breach of Section 8.3 or Section 9.1.2. The parties agree that the placing of a lien or encumbrance on the Team Owner's rights in respect of the Team and this Agreement shall not constitute a Transfer for purposes of this Agreement; provided, that (i) the Team Owner shall notify NEM promptly (no later than ten business days) following the granting of any such lien or encumbrance and shall inform its lenders of the restrictions placed on Transfers by Team Owner hereunder and (ii) the Team Owner shall (or shall cause the applicable grantee of such lien or encumbrance to) notify NEM of any foreclosure (or attempted foreclosure) under any such loan documents.

        8.1.4    Notwithstanding Section 8.1.2, but subject to Section 8.1.3, the Transfer Fee shall not apply to any Transfer effected pursuant to Section 3.4 or to any Transfer by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, to a successor Control Person that, as of the date of this Agreement, already owns (directly or indirectly) at least 10% of Team Owner, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement.

        8.1.5    Notwithstanding Section 8.1.2, the Transfer Fee shall not apply to any Transfer (whether directly or indirectly) by the Control Person of a Controlling Interest, and the Control Person's rights and duties under this Agreement, (i) to a Family Relative, provided that upon any such transfer, the transferee shall execute and deliver to NEM a joinder to this Agreement pursuant to which such transferee assumes all of the transferor Control Person's obligations under this Agreement, and upon such execution and delivery the transferor Control Person shall be relieved of its obligations under this Agreement, or (ii) upon the death of such Control Person, to the estate of such Control Person, it being understood that the fees contemplated in Section 8.1.2.2(y) shall also not apply in such case (provided that a Transfer of the Controlling Interest by such estate (except to a Family Relative of the Control Person, who, for clarity, shall remain subject to Section 8.1.8 shall be subject to the provisions of Section 8.1.2 and this Section 8.1.5 as applicable).

        8.1.6    Notwithstanding Section 8.1.2, the Team Owner and the Control Person may, subject to the prior written approval of NEM , lease, license or otherwise temporarily Transfer their respective rights under this Agreement to any third party, provided that such third party is not a Prohibited Person, on an interim, temporary basis for one (but no more than one) full race season during the Initial Term and/or for one (but no more than one) full race season during the Extension Term, provided that (x) NEM shall be provided with advance notice of such transfer and shall only provide its prior written approval

36

HIGHLY CONFIDENTIAL - OCO

if it determines, in its reasonable discretion, that such temporary Transfer is in the best interest of the sport and (y) in such event, as between NEM and Team Owner and the Control Person, the transferor Team Owner and its Control Person shall remain responsible to NEM for their respective obligations under this Agreement. Neither the Transfer Fee nor the fees described in Section 8.1.2.2 shall apply to such Transfer as described in this Section.

8.1.7 For clarity, any Transfer of the Team Owner's interest in this Agreement shall also effectively Transfer to the same transferee the car number, historical or championship points and any performance-related standards history outlined in Section 6.12 associated with this Agreement.

8.1.8 If any time during the Term, NEM reasonably and in good faith believes that an Owner has become a Prohibited Person, NEM shall notify the Team Owner and the Control Person that NEM reasonably and in good faith believes that such Owner has become a Prohibited Person. If the Control Person disagrees with NEM's determination, then the parties shall discuss in good faith whether it is possible to address NEM's concerns. In the event that the parties are unable to resolve such disagreement within ten (10) Business Days of NEM's delivery of such notice, then either party may refer such dispute to Arbitration pursuant to Section 11.2, with the sole issue to be resolved in any such Arbitration being whether or not the Owner has become a Prohibited Person. In the event that (i) the parties mutually agree in writing the Owner has become a Prohibited Person or (ii) the Arbitrator makes a final and binding determination that the Owner has become Prohibited Person, then (x) in instances where such Owner is also the Control Person, the Owner may no longer be designated the Control Person hereunder or have the authority with respect to NASCAR Core Matters set forth in Section 10.1.3 and Team Owner must designate a new Control Person (in which case such successor Control Person will have one hundred and eighty (180) days to come into compliance with the requirements of being a Control Person set forth in the definition thereof, including the 30% minimum equity requirement) and (y) such Owner shall be required to sell or divest any of its direct or indirect ownership interest in the Team Owner within 120 days and failure to divest of such interest shall be a breach of this Agreement.

8.1.9 During the Term, NEM shall (i) maintain the Transfer Approval Form(s) (set forth in Exhibit I) in respect of Transfers which have been approved (or deemed approved) hereunder in its principal office in Daytona Beach, Florida and (ii) make such Transfer Approval Form(s) available for inspection by the Control Person (or by any other Control Person of a then-current Charter Member) upon written request. In the event of such request by any Charter Member that was not a party to the Transfer that was subject to such Transfer Approval Form, notification of such request shall be provided to the Team Owner who was a party to such Transfer.

8.2     Limitations On Transfers.

8.2.1 Following any Transfer by the Team Owner or the Control Person made in accordance with Section 8.1, neither the Team Owner transferor nor the Control Person transferor, as applicable (nor any of their respective controlled Affiliates, as applicable), shall purchase or otherwise acquire any direct or indirect equity interest in any other Charter Member or any assignment or delegation of rights under any Competitor for the period of thirty-six (36) months following such Transfer.

8.2.1.1 The Team Owner and the Control Person may not Transfer, or permit to be Transferred, any direct or indirect equity interest in the Team Owner if such Transfer would result in the Control Person (or any successor Control Person) being in breach of Section 9.1.2.

8.3     Charter Member Agreement Limitation. At all times and unless waived by NEM, neither the Team Owner nor any other Person shall own or otherwise acquire any direct or indirect interest in any

37

HIGHLY CONFIDENTIAL - OCO

23XI_0004517

Charter Member Agreement (including owning any direct or indirect ownership interest in, or exercising any control over, any other Competitor) if, after giving effect to such interest, the Team Owner or such other Person (as applicable), together with all of his, her or its Affiliates (including Family Relatives), would collectively have direct or indirect interest in more than three (3) Charter Member Agreements (including this Agreement). Notwithstanding the foregoing, nothing in this Section 8.3 shall in any way limit, modify, amend or supersede the affiliate group rule as set forth in the NASCAR Rulebook ("Multi Vehicle Teams" / "Affiliate Groups") as in effect on the Execution Date (but without regard to the provisions thereof to the applicable shared services, which, for clarity, shall not be applied to the sharing of information or equipment so long as such sharing of information or equipment is done at arm's length fair market value and without affecting any team's ability or desire to compete in NASCAR to the fullest extent of such team's capabilities) and, for clarity, NEM shall maintain all rights of inspection, investigation, enforcement or otherwise as set forth in such affiliate group rule set forth in the NASCAR Rulebook.

8.4    Transfers by NEM.  NEM may Transfer its interest in this Agreement in a transaction in which the transferee is acquiring all or substantially all of NEM's assets (an "NEM Permitted Transferee"), whether by way of merger, consolidation, sale of assets, acquisition of equity or otherwise, provided that (x) after giving effect to such Transfer, such NEM Permitted Transferee is an Affiliate of the entity or entities that own all or substantially all of the other NASCAR-related Cup Series assets and (y) Team Owner is provided with prior written notice of such Transfer.  Except as set forth in the preceding sentence, NEM shall not Transfer any of its rights or obligations under this Agreement to any Person without the prior written consent of Team Owner.  For clarity the parties agree that placing a lien or other encumbrance on NEM or any of its Affiliates or any of their respective rights under this Agreement shall not constitute a Transfer for purpose of this Section 8.4, provided that NEM shall (or shall cause the applicable grantee of such lien or encumbrance to) notify Team Owner of any foreclosure (or attempted foreclosure) under any such loan documents.

8.5    Publicly Traded Entities.  No Charter Member shall be an entity whose stock or other equity interest is listed, designated or quoted on a securities exchange or trading market.

8.6    Institutional Investors Policy.  At all times, Team Owner, the Control Person and the Owners must abide by the Institutional Investors Policy set forth on Exhibit G and shall not take any action or consummate any Transfer that would result in a breach of such Institutional Investors Policy.

9    Termination.

9.1    Team Owner Events of Default.  In addition to any other rights or remedies NEM may have, this Agreement may be terminated by NEM, by written notice to the Team Owner, upon the occurrence of one or more of the following (each, a "Team Owner Event of Default"):

9.1.1    subject to Sections 8.1.2, 8.1.3 and 13.10, (i) the Team Owner or Control Person breaches or fails to perform in any material respect any of its obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, or (ii) any of Team Owner or the Control Person's representations and warranties in this Agreement were materially untrue or incorrect when made on the Execution Date and which untruth or inaccuracy materially adversely affects or denies a material right or benefit of NEM (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non compliance or untruth that is curable, the Team Owner effects a cure within thirty (30) days after receiving written notice of breach or default from NEM;

38

HIGHLY CONFIDENTIAL - OCO

9.1.2    the Team Owner or the Control Person violates in any material respect Sections 6.2, 6.3, 6.8, 6.9, 6.10, or 6.11 of this Agreement unless the Team Owner effects a cure within the earlier of the following time periods after receiving written notice of breach or default from NEM (i) forty eight (48) hours and (ii) the start of the next Event;

9.1.3    the Team Owner dissolves the Team Owner's or the business of the Team that is the subject of this Agreement or substantially ceases operations or the performance of the Team Owner's operating obligations set forth in Section 6.1, and in each case such business, operations or performance is not continued by a successor to whom the Team Owner's business has been transferred in compliance with the terms of this Agreement;

9.1.4    the Control Person commits any act of fraud or embezzlement in connection with the operation of the Team Owner or the Team, as finally determined by a court of last resort, or is convicted by a trial court of, or pleads guilty or no contest to, a felony (other than a traffic violation) which involves moral turpitude;

9.1.5    the Team Owner becomes subject to a Bankruptcy;

9.1.6    Team Owner receives five (5) or more MPS Notices during any Season and NEM provides notice to Team Owner of its intent to terminate this Agreement as a result of such poor performance on or prior to December 31 of the third consecutive Year of such poor performance;

9.1.7    If there is an uncured or unwaived Team Owner Event of Default by Team Owner under the prior Charter Member Agreement bearing the same number and which had the Execution Date of January 1, 2016 (the "Predecessor Charter Agreement") for which written notice has been provided to the Team Owner as of the Effective Date;

9.1.8    unless NEM has exercised it set-off rights as provided herein, the Team Owner or the Control Person fails to make any payments due and validly owing pursuant to Section 3.1(e) within (30) days from the date of receipt by Team Owner of a written notice from NEM that such payment is past due.

In the event of either (x) a Team Owner Event of Default by Team Owner that results in the termination of this Agreement by NEM in accordance with the terms and provisions of this Section 9.1 or (y) a voluntary forfeiture by Team Owner to NEM of its rights under this Agreement pursuant to Section 9.5, and in each case provided that the terms and restrictions of Section 6.6 hereof are in effect at such time, the Team Owner and Control Person shall, and the Team Owner agrees that each direct or indirect owner of 10% or more of Team Owner who is an employee, director or officer of Team Owner or otherwise materially involved in Team Owner operations and is not otherwise an Exempt 10% Owner shall, be subject to the terms and restrictions set forth in Section 6.6 (Protection Of Goodwill) for a period of twelve (12) months following the date of such termination or forfeiture, as the case may be.  For purposes of clarity, the restrictions set forth in Section 6.6 shall not apply following a termination effected by Team Owner pursuant to Section 4.3(a) or Section 9.2.

For the avoidance of doubt, in no event shall NEM have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by Team Owner, Control Person or any of their Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by Team Owner, Control Person or any of their Affiliates to pay any amount due under any such agreement or arrangement.

9.2    NEM Event of Default.  In addition to any other rights or remedies the Team Owner may have, but subject to Section 13.10, this Agreement may be terminated by the Team Owner by delivering

39

HIGHLY CONFIDENTIAL - OCO

23XI_0004519

written notice to NEM if (i) NEM or any of its Affiliates breaches or fails to perform in any material respect any of its material obligations under this Agreement and such breach or failure materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, or (ii) any representation or warranty in this Agreement of NEM (or in any certification delivered hereunder), NASCAR or any of their respective Affiliates was materially untrue or incorrect when made on the Execution Date and, which untruth or inaccuracy materially adversely affects or denies a material right or benefit of Team Owner (or any of its Affiliates) under this Agreement, unless in the case of any breach, failure to perform, non-compliance or untruth that is curable, NEM (or its applicable Affiliate) effects a cure within thirty (30) days after receiving written notice of breach or default from Team Owner. For the avoidance of doubt, in no event shall the Team Owner or the Control Person have any right to rescind, invalidate or otherwise terminate this Agreement as a result of any actual or alleged violation by NEM or any of its Affiliates under any agreement or other arrangement other than this Agreement itself, including any failure by NEM or any of its Affiliates to pay any amount due under any such agreement or arrangement.

9.3    <u>Consequences of Termination.</u>  Upon the termination of this Agreement, (a) all rights granted by NEM to the Team Owner and Control Person under this Agreement shall revert to NEM and all rights granted by the Team Owner and Control Person to NEM or its Affiliates under this Agreement shall revert to the Team Owner and Control Person, as applicable; (b) subject to <u>Section 13.18</u> none of NEM (or its Affiliates) or Team Owner or Control Person (or their respective Affiliates) shall have any further obligations under this Agreement; (c) the Team Owner shall take all actions that may be necessary to return all rights with respect to the Assigned Car Number to NEM or its designee; (d) the Team Owner shall immediately pay to NEM all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages NEM may incur as a result of any breach of this Agreement by the Team Owner, and (e) NEM and its Affiliates shall immediately pay to Team Owner all unpaid amounts due under this Agreement as of the date of termination, and shall remain liable for all other damages the Team Owner, Control Person or their Affiliates may incur as a result of any breach of this Agreement by NEM or any of its Affiliates.  For clarity, nothing in this <u>Section 9.3</u> shall be construed to limit any other rights or remedies that the Team Owner, Control Person, NEM or any of their respective Affiliates may have, or to preclude the Team Owner, Control Person or NEM from enforcing such rights or pursuing such remedies to the fullest extent possible, including under NASCAR Rules.  For clarity, in the event of termination by either party, the sole and exclusive process for resolution of any Disputes between the parties (and their respective Affiliates) shall be set forth in <u>Section 12</u>.

9.4    <u>Set-Off.</u>

9.4.1    In the event of a Team Owner Event of Default pursuant to <u>Section 9.1.8</u>, in addition to NEM's termination rights with respect to non-payment, NEM shall have the set-off rights set forth in <u>Section 3.1(g) and 6.12</u> above.

9.4.2    In the event that the Arbitration Panel issues a decision (with respect to a Dispute) with respect to an amount payable to NEM or any of its Affiliates in accordance with this Agreement, NEM shall have the right to withhold from the Team Owner any amounts that would have been payable to Team Owner under this Agreement in an amount equal to the amount determined by the Arbitration Panel to be so payable to NEM or any of its Affiliates.

9.5    <u>Voluntary Forfeiture.</u>  Notwithstanding anything herein to the contrary (but subject to the penultimate paragraph of <u>Section 8.1</u>), NEM acknowledges and agrees that the Team Owner may, in its sole discretion, elect to voluntarily forfeit its rights under this Agreement (provided that no such forfeiture shall be effective during a Cup Series Season) by delivering written notice of such forfeiture to NEM (which

40

HIGHLY CONFIDENTIAL - OCO

23XI_0004520

notice shall specify the effective date of such forfeiture). In the event that Team Owner exercises such forfeiture right, then the parties will treat the Agreement as having been terminated on the applicable date for purposes of Section 8.3, and, subject to any separate rights or remedies NEM may have in respect of any Team Owner Event of Default that is otherwise (and independently) occurring without regard to such forfeiture as of such date of such forfeiture, such forfeiture will not be deemed a breach or violation of any of the terms or provisions hereof.

10     Representations, Warranties and Covenants.

    10.1     Representations, Warranties and Covenants by the Team Owner and the Control Person.

        10.1.1    Each of the Team Owner and Control Person severally represent and warrant as to itself to NEM that:

           10.1.1.1 The Team Owner is either a corporation, limited liability company, limited partnership duly organized, validly existing and in good standing under the law of its jurisdiction of formation.

           10.1.1.2 Each of the Team Owner and the Control Person has the full power and authority to enter into and perform its, his or her obligations under this Agreement in accordance with its terms and neither Team Owner nor Control Person have entered into any alliance, agreement or other governing body that would in any way inhibit, effect or limit the authority of Team Owner or Control Person in exercising all rights and obligations under this Agreement.

           10.1.1.3 The execution, delivery and performance of this Agreement by the Team Owner and the Control Person have been duly authorized by all necessary action of the Team Owner and this Agreement constitutes a valid and binding obligation of the Team Owner and the Control Person, enforceable against each in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

           10.1.1.4 The execution, delivery and performance of this Agreement by the Team Owner and the Control Person do not and will not (i) conflict with any of the Team Owner's Governing Documents and do not and will not conflict with or result in the breach or termination of, or constitute a default under, any material lease, agreement, commitment or other instrument, or any order, judgment or decree, to which the Team Owner or the Control Person is a party or by which the Team Owner or the Control Person is bound, or (ii) constitute a violation by the Team Owner or the Control Person of any law or regulation applicable to the Team Owner or the Control Person. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority is required on the part of the Team Owner or the Control Person in connection with the execution, delivery or performance of its, his or her obligations under this Agreement.

        10.1.2    The Team Owner and Control Person severally covenant as to itself that the Control Person, as designated in Schedule 1, and/or trusts for the benefit of the Control Person and his or her lineal descendants for which the Control Person is the trustee, shall own (so long as he or she is designated as the Control Person), a direct or indirect equity interest in the Team Owner of no less than thirty percent (30%).

        10.1.3    At all times during the Term a single person (who is as of the Execution Date, the Control Person) shall have full authority to act on behalf of the Team Owner and to bind the Team Owner

41

HIGHLY CONFIDENTIAL - OCO

with respect to all NASCAR and NEM matters relating to the Team, the Cup Series, NASCAR and the stock car business operations of the Team Owner (the "NASCAR Core Matters"). In addition, beginning on the Execution Date and throughout the Term, all actions taken by the Control Person or his or her Designated Team Representative shall be binding on the Team Owner and may be relied upon by NEM (and its Affiliates) and the Other Teams without further inquiry and without notice to or consent of any other Owners or any shareholder, partner or member vote, or through a board of directors, board of managers, or similar body.

10.1.4   In entering into this Agreement, neither the Team Owner, the Control Person, any Owner, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) NEM, except as expressly contained in this Agreement or in a writing provided by an officer of NASCAR or NEM. Without limiting the generality of the preceding sentence, NEM and its representatives and advisors have not made any representations or warranties assuring the Team Owner or the Control Person that it will be able to earn a profit or that NEM otherwise will provide any financial assistance to the Team Owner or the Control Person (other than the payments due hereunder) or offer to repurchase any rights granted to the Team Owner under this Agreement.

10.1.5   The Team Owner shall comply, in all material respects with all laws, regulations and ordinances applicable to the Team Owner, the Team, and the Designated Vehicle with respect to the performance of their respective obligations under this Agreement.

10.1.6   The Team Owner, together with its wholly-owned and controlled subsidiaries, is as of the Execution Date, and subject to Section 8, shall remain during the Term, the (i) owner, licensee or lessee, as applicable, and is the operator of all (or substantially all) assets, properties and rights associated with the operation of the Team and the Designated Vehicle (e.g., race shop, haulers, race cars) or otherwise necessary for the performance of Team Owner's obligations under this Agreement and (ii) the sole owner and operator of the Team.

10.2   Representations, Warranties and Covenants by NEM and the Specified NASCAR Entities.

10.2.1   Each of NEM and the Specified NASCAR Entities severally represent and warrant as to itself to the Team Owner and the Control Person that:

10.2.1.1 Such Person is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the law of the State of Florida or Delaware (as applicable) and has the full power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

10.2.1.2 The execution, delivery and performance of this Agreement by it have been duly authorized by all necessary actions of and this Agreement constitutes the valid and binding obligation of such party enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

10.2.1.3 The execution, delivery and performance of this Agreement by it does not and will not (i) conflict with the certificate of incorporation, certificate of formation, bylaws, operating agreement or other governing documents or agreements of such party, as applicable, and does not and will not conflict with or result in the breach or termination of, or constitute a default under, any lease, agreement,

42

HIGHLY CONFIDENTIAL - OCO

23XI_0004522

commitment or other instrument, or any order, judgment or decree to which it is a party or by which it is bound, or (ii) constitute a violation by such party of any law or regulation applicable to it. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority or any direct or indirect owner of such party is required on the part of such party in connection with the execution, delivery and performance of this Agreement by it.

10.2.1.4 In entering into this Agreement, neither such party, nor any person or entity acting as a representative of any of them, has relied upon any representation or statement by, or the work product of, any person employed by, representing or advising (or purporting to be employed by, represent or advise) Team Owner or Control Person, except as expressly contained in this Agreement.

10.2.1.5 NEM and each Specified NASCAR Entity has and shall retain throughout the Term the power and authority to perform, and to cause their Affiliates to perform, all of their respective obligations and the obligations of their Affiliates set forth herein. Without limitation of the foregoing, NEM and each Specified NASCAR Entity severally represents, warrants, covenants and agrees for the benefit of Team Owner and the Control Person that subject to Section 8.4, (i), NASCAR Holdings, LLC is and shall remain throughout the Term the direct or indirect owner of 100% of the issued and outstanding capital stock or other applicable equity interests of each of NASCAR, NEM, NASCAR Broadcasting, LLC is and shall remain throughout the Term the sole Person with rights to sanction Events and all promoter fees shall be paid to NEM (or its NEM Permitted Transferee) (or Awards and Achievement Bureau, Inc., a wholly-owned subsidiary of NEM) throughout the Term, (iii) the only NEM Affiliate that is party to any Live Transmission Contracts is and shall remain throughout the Term NASCAR Broadcasting, LLC, and all Media Revenue is and shall remain payable directly to NASCAR Broadcasting, LLC pursuant to such Live Transmission Contracts (iv) without limitation of the foregoing, NEM shall not, and shall not permit any Affiliates to, take any action intended or designed to artificially reduce the Pool Money, whether by changing the ownership and/or licensing structure of NASCAR and its Affiliates or otherwise.

10.2.2 Each of NEM and each Specified NASCAR Entity shall comply (and NEM shall cause NASCAR to comply), in all material respects, with all laws, regulations and ordinances applicable to such party with respect to the performance of their respective obligations under this Agreement.

10.2.3 NEM represents and warrants that NEM and Promoters, to NEM's knowledge, use best practices in organizing, operating, sanctioning and exploiting Events.

10.3    Release And Waiver by Team Owner and Control Person. Each of the Team Owner and the Control Person, on their own behalf and on behalf of their controlled Affiliates, hereby releases and forever discharges each of the NEM Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all actions, causes of action, suits, debts, losses, costs, controversies, damages, liabilities, judgments, claims, and demands whatsoever, in law, admiralty or equity (collectively, "Claims"), known or unknown and arising out of or relating to the criteria used by NEM to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner or any other Person; provided, however that (x) nothing in this Section 10.3 shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by NEM or any of its Affiliates and (y) in the event any third party brings any Claim against the Team Owner, the Control Person or any of their respective Affiliates, nothing in this Section 10.3 shall prevent or restrict the Team Owner, the Control Person or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the NEM Indemnified Parties that

43

HIGHLY CONFIDENTIAL - OCO

23XI_0004523

is related to the subject matter of such third party Claim. Each of the Team Owner and the Control Person jointly and severally represent and warrant to the NEM Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person. The release and discharge set forth in <u>Section 10.3</u> shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any controlled Affiliate, on the one hand, and any of NEM or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

      10.4   <u>Release And Waiver by NEM.</u> Each of NEM and the Specified NASCAR Entities on their own behalf and on behalf of their respective Affiliates (including NASCAR Holdings, LLC and NASCAR), hereby releases and forever discharges each of the Team Owner Indemnified Parties, and each of their respective predecessors, successors, assigns and Affiliates, and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, Affiliates and subsidiaries of each of the foregoing from all Claims, known or unknown and arising out of or relating to the criteria used by the Team Owner to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with NEM; provided, however that (x) nothing in this <u>Section 10.4</u> shall be deemed to release or discharge any Claims arising from any breach or misrepresentation under this Agreement by the Team Owner or the Control Person and (y) in the event any third party brings any Claim against NEM or any of its Affiliates, nothing in this <u>Section 10.4</u> shall prevent or restrict NEM or such Affiliate from bringing any counterclaim, cross-claim, claim for contribution or indemnification or other similar claim against any of the Team Owner Indemnified Parties that is related to the subject matter of such third party Claim. Each of NEM and the Specified NASCAR Entities jointly and severally represents and warrants to the Team Owner Indemnified Parties that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other Person. The release and discharge set forth in <u>Section 10.4</u> shall not apply to terminate, modify or amend any contracts or agreements between or among the Team, the Team Owner and any Team Affiliate, on the one hand, and any of NEM, or its Affiliates, on the other hand, that were entered into by the Team, the Team Owner or such Team Affiliate in the ordinary course of its business of operating the Team, including this Agreement.

11   <u>Indemnification.</u>

      11.1   <u>Team Owner Indemnity.</u> The Team Owner shall indemnify, defend and hold harmless each of the NEM Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to (i) Team Owner's or Control Person's breach of any representation, warranty, covenant or other obligations pursuant to this Agreement, (ii) use of Team Clips as permitted in <u>Section 5.4</u>, or (iii) NEM or any of its authorized Affiliates' permitted use or license of any Team Intellectual Property pursuant to and in accordance with the terms and conditions of this Agreement.

      11.2   <u>NEM Indemnity.</u> NEM (and, as to their own representations, warranties, covenants and agreements set forth herein, each Specified NASCAR Entity) severally as to itself shall indemnify, defend and hold harmless each of the Team Owner Indemnified Parties from any third party causes of action or damages, attorney's fees, costs, losses, expenses, claims, demands, or liabilities, arising out of or in any way related to (i) the breach by them of any their respective representations, warranties, covenants or other obligations pursuant to this Agreement or (ii) the Team Owner's permitted use or license of any of the Works pursuant and in accordance with the terms and conditions of to this Agreement.

      11.3   <u>Third Party Claims.</u> The obligations and liabilities of the parties under this Agreement for indemnification with respect to, relating to, caused (in whole or in part) by or arising out of claims of third

44

HIGHLY CONFIDENTIAL - OCO

parties (each, a "Third Party Claim"), shall be subject to the terms and conditions set forth in this Section 11.3. The party entitled to be indemnified hereunder (the "Indemnified Party") shall give the party obligated to provide the indemnity (the "Indemnifying Party") prompt notice of any Third Party Claim; provided, that the failure to give such notice shall not affect the liability of the Indemnifying Party under this Agreement unless the failure materially and adversely affects the ability of the Indemnifying Party to defend the Third Party Claim. The Indemnifying Party shall have the right, exercisable by notice to the Indemnified Party, to control the defense of any Third Party Claim, with counsel of its choosing, provided that the Indemnifying Party as a condition to controlling such defense, shall confirm in writing its obligation to indemnify the Indemnified Party with respect to such claim (including for payment of reasonable fees and expenses of counsel) under this Section 11. Any notice of a Third Party Claim shall identify, to the extent known to the Indemnified Party, the basis for the Third Party Claim, the facts giving rise to such Third Party Claim, and the amount of such Third Party Claim. The Indemnified Party shall make available to the Indemnifying Party copies of all relevant documents and records in its possession.

12      Dispute Resolution.

12.1      Dispute Resolution. Subject to Section 12.4, and the second sentence of this Section 12.1, the exclusive method of resolving any Dispute shall be the procedures set forth in this Section 12. Notwithstanding the foregoing, but subject to the proviso of this sentence, if there is a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of any NASCAR Rule, such disagreements and disputes will be resolved by NEM or its applicable Affiliates, in their reasonable discretion as the sanctioning body of NASCAR stock car auto racing, in accordance with the provisions set forth in NASCAR Rules and, for clarity shall not be subject to any Arbitration and the Arbitration Panel shall have no authority with respect to such matters; provided, that if the dispute, controversy or claim is with respect to whether there is a conflict or inconsistency between this Agreement and NASCAR Rules as set forth in Section 6.5 or as to whether NASCAR or its Affiliates have complied with the requirements of Section 6.5, then such dispute, controversy or claim shall be resolved pursuant to the procedures set forth in this Section 12.

12.2      Arbitration Mechanics. Each party shall have the right to commence an arbitration (the "Arbitration") with respect to any Dispute by giving a notice to the other party that sets forth in reasonable detail the nature of the Dispute and reasonable support for its claim. Except as set in this Section 12.2, the Arbitration shall be administered by the American Arbitration Association (the "AAA") under its Commercial Arbitration Rules and conducted pursuant to such rules, as such rules are in effect as of the time the Dispute is submitted to the AAA for Arbitration (the "Submission Date"). The panel of arbitrators who shall be responsible for resolving the Dispute (the "Arbitration Panel") will consist of three persons (each an "Arbitrator"), who shall be selected in accordance with the AAA's Commercial Arbitration Rules. In proposing a list of candidates for Arbitrators, the parties will request that the AAA take into account the parties' desire that each Arbitrator be an individual who is a lawyer and/or former judge that has not been employed by, retained by, or otherwise associated with, and has not served as a consultant, contractor, advisor, agent or in any similar capacity to or for any party, or any of their respective Affiliates or predecessors-in-interest, within ten (10) years prior to the Submission Date. The parties shall instruct the Arbitration Panel to convene an initial conference with the parties within fifteen (15) Business Days after the appointment of the Arbitration Panel to establish the timing of any discovery that the Arbitration Panel deems appropriate, to set the date for a hearing and any other matters as may be deemed appropriate by the Arbitration Panel. Unless the Parties otherwise agree with respect to any Arbitration, (a) all disputed issues regarding discovery shall be decided by the Arbitration Panel, (b) if any Arbitration hearing takes more than one day, it will proceed on the next following Business Day until it is completed (provided, that the

45

HIGHLY CONFIDENTIAL - OCO

23XI_0004525

Arbitration Panel may elect not to hear the Dispute on one (1) Business Day of each week), (c) barring extraordinary circumstances, the Arbitration Panel will render a written decision not later than fifteen (15) Business Days from the date of the conclusion of the Arbitration hearing, (d) the Arbitration hearing shall take place in Charlotte, North Carolina, and (e) subject to the second sentence of Section 11.1, the Arbitration Panel shall have the authority to award damages, equitable relief (including specific performance) and such other remedies the Arbitration Panel deems appropriate (provided, however, the Arbitration Panel shall not have the authority to alter, change, amend, modify, waive, add to or delete from any provision of this Agreement), and (f) if the parties initiate multiple Arbitration proceedings (including with respect to any Team Owner and other members of its Charter Member Group), the subject matters of which are related by common questions of law or fact and which could result in conflicting awards or obligations, such proceedings shall be consolidated, at NEM's election into a single Arbitration proceeding. Each party irrevocably consents to the delivery of service of process with respect to any Arbitration in any manner permitted for the giving of notices under Section 13.1. Notwithstanding anything contained in the AAA Commercial Arbitration Rules to the contrary, the non-prevailing party shall bear all costs associated with any Arbitration under this Agreement, including the costs and expenses of the Arbitration, and the cost of its own and the prevailing party's legal representation and expert witness fees (including any related charges and disbursements). The parties hereto agree to keep confidential in accordance with Section 13.5, and to require that the Arbitration Panel keep confidential, the existence of any Arbitration, the arbitral proceedings, the submissions made by the parties (including any discovery) and any decisions made by the Arbitration Panel, including any award, except, in addition to the exceptions set forth in Section 13.5, to the limited extent necessary in connection with any proceeding to confirm or vacate such award in accordance with this Section 12.

12.3    Arbitration Award.  Any award rendered by the Arbitration Panel shall be (a) in writing, state the basis of the award and include both findings of fact and conclusions of law and (b) final, binding and non-appealable upon the parties and any court having jurisdiction may enter a judgment on any such award.

12.4    Equitable Relief.  Each of the parties hereto acknowledge that the rights granted by and to NEM, Team Owner and Control Person under this Agreement possess a special, unique, and extraordinary character that make difficult the assessment of monetary damage that would be sustained by NEM, Team Owner or Control Person as a result of any breach of this Agreement by the other parties hereto or any unauthorized use of the rights granted by or to NEM under this Agreement and any such breach of unauthorized use will immediately cause irreparable harm to the Cup Series, NASCAR, NEM, NASCAR Rights Affiliates, Team Owner, Control Person and others and that any remedy at law for such breach will be inadequate.  Notwithstanding anything to the contrary in this Agreement, before the Arbitration Panel is convened in accordance with this Section 12 any party may seek temporary or preliminary injunctive relief in aid of the Arbitration, at any time exclusively from the U.S. District Court or, if it does not have jurisdiction, the North Carolina state courts, in each case located in Charlotte, North Carolina (collectively, the "Designated Courts") with respect to any Dispute (collectively, "Interim Equitable Relief"); provided that neither the Team Owner nor the Control Person, nor any other Person acting on their behalf or for their benefit, shall seek Interim Equitable Relief or any other equitable relief of any kind to enjoin or otherwise restrain or limit NEM (or any of its Affiliates) from conducting any of the Events.  If a Dispute requires Interim Equitable Relief before the Arbitration Panel is convened in accordance with this Section 12, the procedures set forth in this Section 12 will still govern the ultimate resolution of the Dispute notwithstanding the fact that a Designated Court may have entered an order providing for injunctive or another form of Interim Equitable Relief.  Each of the parties to this Agreement submits to the exclusive jurisdiction of the Designated Courts with respect to the Interim Equitable Relief, including, the in

46

HIGHLY CONFIDENTIAL - OCO

23XI_0004526

personam and subject matter jurisdiction of the Designated Courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail (in accordance with <u>Section 13.1</u>) or any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered thereby in connection with such Interim Equitable Relief subject to all applicable appeal rights from such Designated Courts.

  12.5 <u>Limitations on Damages.</u> Other than with respect to claims for indemnification in respect of third party claims pursuant to <u>Section 11</u>, no claim may be made under any legal theory (including contract or tort) by any party against the other party, any Affiliate of the other party, or the directors, officers, employees, shareholders, members, partners, attorneys, or agents of such other party or its Affiliates, for any special, indirect, consequential, incidental or punitive damages in connection with a cause of action arising out of or relating to the transactions contemplated by this Agreement.

13 <u>Miscellaneous.</u>

  13.1 <u>Notices.</u> Any notice or other communication under this Agreement shall be in writing and shall be considered to have been given and received when delivered personally or sent by electronic mail (with a copy by any other means for providing notices under this Agreement), or one Business Day after being sent by a reputable overnight courier to the applicable party (with a copy by any other means for providing notices under this Agreement) at the address set forth below its name on the signature page to this Agreement (or at such other address as that party may specify by notice to the other).

  13.2 <u>Complete Agreement.</u> This Agreement, including all Schedules and Exhibits contained herein, contains a complete statement of the arrangements between NEM, and its Affiliates, on the one hand, and the Team Owner and the Control Person, on the other hand, with respect to the subject matter hereof and supersedes all prior agreements and understandings between them with respect to that subject matter.

  13.3 <u>Expenses.</u> Each party shall bear its own expenses (including the fees and disbursements of its attorneys and accountants) incurred in connection with the negotiation and preparation of this Agreement and, except as expressly set forth in this Agreement, in connection with all obligations required to be performed by it under this Agreement.

  13.4 <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the law of the State of Florida applicable to agreements made and to be performed entirely in Florida.

  13.5 <u>Confidentiality.</u> During the Term, each of NEM, the Team Owner and the Control Person shall, and shall cause their respective controlled Affiliates (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates) to, treat and hold as confidential (and not disclose or provide access to any third party to) all of the Confidential Information, except that disclosure is permitted to NEM, NASCAR and their Affiliates, the Team Owner's and the Control Person's Affiliates and their legal and professional advisors and representatives, to current or prospective, lenders, investors or Transferees, and to other Competitors and their Affiliates and legal and professional advisors and representatives and any association of Competitors and their legal and professional advisors, provided that (i) such Persons are made aware of the confidential nature of such Confidential Information and (ii) such Persons are instructed to maintain the confidential nature of such Confidential Information pursuant to this <u>Section 13.5</u>.  In the event that NEM, Team Owner, the Control Person, any of their controlled Affiliates (and, in the case of NEM, NASCAR Holdings, Inc. and its controlled Affiliates) or such advisors or representatives become legally compelled to disclose any Confidential Information, the Team Owner or NEM, as applicable, shall, to the extent

HIGHLY CONFIDENTIAL - OCO

23XI_0004527

practicable, provide the other with prompt written notice of such requirement so that Team Owner or NEM, as applicable, may seek a protective order or other remedy or waive compliance with this <u>Section 13.5</u>. In the event that such protective order or other remedy is not obtained, or Team Owner or NEM, as applicable, waives compliance with this <u>Section 13.5</u>, NEM or the Team Owner, as applicable, shall furnish only that portion of such Confidential Information which is legally required to be provided and exercise its reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information; provided, however, that this <u>Section 13.5</u> shall not apply to any information that, at the time of disclosure, is available publicly and was not disclosed in breach of this Agreement or becomes available on a nonconfidential basis from a source other than a party to this Agreement.

13.6 <u>Relationship Created.</u> NEM is not a partner, joint venturer or principal and agent with the Team Owner or the Control Person, and nothing in this Agreement shall be construed so as to create any of those relationships or to impose any liability as such on any of them, or to grant any party the right to bind the other without the other's prior written consent.

13.7 <u>No Third-Party Beneficiaries.</u> Except for the rights of those Persons who are entitled to indemnification under <u>Section 11</u>, this Agreement is solely for the benefit of the parties hereto, and nothing in this Agreement shall be deemed to create any third-party beneficiary rights in any person or entity not a party to this Agreement.

13.8 <u>Separability.</u> If any provision of this Agreement shall be deemed invalid or unenforceable by any court having jurisdiction, the court shall have the discretion to modify the provision to the extent necessary to make it valid or enforceable and the provision (as so modified), and the balance of this Agreement, shall remain in effect and shall be enforced to the maximum extent permitted by law.

13.9 <u>Failure to Take Action; Waiver.</u> The failure by any party to seek redress for violation of, or to insist upon the strict performance of, any provisions of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation. All waivers must be in writing, subject to <u>Section 13.2.</u>

13.10 <u>Force Majeure.</u> If a Force Majeure Event prohibits, prevents or delays any party from performing any of its obligations under this Agreement (other than any payment obligation), then such party shall be excused from such performance to the extent, but only to the extent, made necessary by the Force Majeure Event and only until such time as the Force Majeure Event terminates or is revoked or resolved. If a Force Majeure Event shall last longer than one (1) year, the party to whom performance would otherwise be owed shall have the right to terminate this Agreement to the same extent (if any) as it would have if the occurrence of a Force Majeure Event did not excuse the other party's performance under this Agreement.

13.11 <u>Publicity.</u> Following the Execution Date, NEM, the Team Owner, the Control Person and their respective Affiliates shall mutually cooperate in good faith regarding issuing a press release, written public statement or press conference regarding the entering into this Agreement and any other details regarding transactions contemplated by entering into this Agreement (other than Confidential Information).

13.12 <u>Amendments.</u>

13.12.1 This Agreement may not be amended or modified other than by a writing duly signed by the Team Owner, the Control Person and NEM.

13.12.2 Notwithstanding the foregoing clause (a), in the event that NEM enters into substantively identical amendments or waivers to Charter Member Agreements with the applicable Charter Members and control persons thereof representing (x) at least sixty six and two-thirds percent (66

48

HIGHLY CONFIDENTIAL - OCO

2/3%) of the then-total number of Charter Members and (y) no less than fifty percent (50%) of the then-total number of Charter Members representing one BMG group and no less than fifty percent (50%) of the then-total number of Charter Members representing at least one other BMG group, then upon delivery by NEM to Team Owner of a copy of such amendment or waiver (together with the signatures from the requisite Charter Members), this Agreement shall thereafter be deemed to have been amended to the same extent as the Charter Member Agreements of the Charter Members who have executed such amendment or waiver and such amendment or waiver will be effective and enforceable against NEM, the Team Owner and the Control Person regardless of whether the Team Owner or Control Person has signed, approved or consented to such amendment; provided, that in no event shall any such amendment or waiver proposed to be effected pursuant to this subsection (b): (i) extend the Initial Term or the Term or otherwise cause an extension or renewal of this Agreement, (ii) shorten the Term or (iii) treat Team Owner or the Control Person in a manner that materially differs from the treatment of other Charter Members' and control persons, as applicable, it being understood and agreed that the written consent of Team Owner and the Control Person shall be necessary for any such amendment or waiver described in this proviso.

13.13    Further Action.    Each party shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as NEM, the Team Owner or the Control Person may reasonably request to effectuate the terms and intent of this Agreement or as may be necessary or appropriate to carry out the terms of this Agreement.

13.14    Joint and Several.    All representations, warranties, covenants and obligations of the Team Owner or the Control Person set forth in this Agreement are several representations, warranties, covenants and obligations of the Team Owner and the Control Person, respectively, regardless of whether or not the applicable provision explicitly provides for joint, several or joint and several liability.  The Control Person shall have no liability in respect of any of the representations, warranties, covenants or obligations of the Team Owner hereunder, it being understood and agreed that the sole obligations of the Control Person are in respect of the representations, warranties, covenants and obligations expressly undertaken by the Control Person herein.

13.15    Reservation of Rights.    All rights not specifically granted to the Team Owner, the Control Person or NEM by this Agreement are reserved by the Team Owner, the Control Person, or NEM as applicable, provided that, nothing in this Agreement shall restrict the Team Owner, the Control Person, NEM or their respective Affiliate thereof from exercising any legal rights that are otherwise available to such Person as a non-NASCAR rights holders or the public at large.

13.16    General Interpretative Provisions.    Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine and feminine forms.  The term "including", whenever used in any provision of this Agreement, means including, but without limiting the generality of, any description preceding or succeeding such term.  Each reference to a person or entity shall include a reference to the successors and assigns of such person or entity.  All references to "Sections", "schedules", "Exhibits" or "exhibits" shall be references to the Sections, schedules and Exhibits to this Agreement, as amended, modified, supplemented or restated from time to time.  The Section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.  This Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied that would result in the resolution of an ambiguity contained herein against the drafting party.  The word "or" shall not be exclusive.  In the computation of any period of time expressed in day(s) in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the

49

HIGHLY CONFIDENTIAL - OCO

period so computed shall be included, except that if it is not a Business Day such period shall end on the next succeeding Business Day.

13.17    Performance.  NEM may perform any of its obligations or exercise any of its rights under this Agreement through any one or more of its Affiliates, provided that NEM shall remain primarily responsible for all of its obligations under this Agreement.

13.18    Survival.  The provisions of Sections 2.2, 2.3 Sections 8.2.1 (for the period set forth therein), the penultimate paragraph of 9.1 (including, Section 6.6, if applicable with respect to Sections 2.2 or 2.3 or such termination or forfeiture under Sections 9.1 or 9.5), 10.3, 11 (for any claims relating to periods on or prior to the termination date), 11, 13.1-13.10, 13.14, 13.16-13.19 shall survive termination, expiration or forfeiture of this Agreement.  For avoidance of doubt, the Predecessor Charter Agreement shall survive the execution of this Agreement in accordance with its terms.

13.19    Counterparts.  This Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument.  Any counterpart or other signature delivered by facsimile, PDF or other electronic transmission shall be deemed for all purposes as being good and valid execution of this Agreement by the applicable party.

13.20    Guarantee.  NASCAR Broadcasting, LLC hereby irrevocably guarantees all of NEM's financial obligations under this Agreement.

[Signature page follows.]

50

HIGHLY CONFIDENTIAL - OCO

23XI_0004530

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Execution Date.

NASCAR EVENT MANAGEMENT, LLC


By:

Name:

Title:


Address for Notices:

NASCAR Event Management, LLC

Attn: General Counsel

One Daytona Boulevard

Daytona Beach, Florida 32114


Electronic Mail Address for Notices: legalnotice@nascar.com
NASCAR BROADCASTING, LLC (solely for purposes of
Sections 10.2, 10.4, 11.2 and 13.20 hereof)

HIGHLY CONFIDENTIAL - OCO      23XI_0004531

2311 RACING, LLC d/b/a 23XI Racing

By:

Name:

Title:

Address for Notices:

218 Raceway Drive

Mooresville, NC 28117

Electronic Mail Address for Notices:

denny@23xiracing.com

_____

DENNY HAMLIN

Address for Notices:

218 Raceway Drive

Mooresville, NC 28117

Electronic Mail Address for Notices:

denny@23xiracing.com

*[Signature Page to Charter Member Agreement]*

52

HIGHLY CONFIDENTIAL - OCO                                          23XI_0004532

<u>**Exhibit A**</u>

<u>**Definitions**</u>

"AAA" has the meaning set forth in Section 12.2.

"Affiliate" means (i) with respect to any Person, any other Person, which directly or indirectly controls, is controlled by, or is under common control with such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract, or otherwise, and (ii) with respect to any Person who is an individual, each parent, spouse or domestic partner, sibling, or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such Persons in the capacity as such custodian or guardian; provided, however, for purposes of this Agreement, neither International Speedway Corporation nor any of its direct or indirect subsidiaries shall be deemed an Affiliate of NEM; and further provided, that any Person or team not engaged in professional stock car racing in the United States, Canada or Mexico which is otherwise an Affiliate of Team Owner or Control Person shall not be deemed an Affiliate of Team Owner, except for the purposes of being a beneficiary of an indemnity, release, or damages limitation, or Section 6.6(ii).

"Agreement" has the meaning set forth in the Preamble.

"Ancillary Activity" has the meaning set forth in Section 5.5(d)

"Ancillary Rights" means those rights related to any activity categorized as an Ancillary Activity in accordance with the terms hereof.

"Arbitration" has the meaning set forth in Section 12.2.

"Arbitration Panel" has the meaning set forth in Section 12.2.

"Arbitrator" has the meaning set forth in Section 12.2.

"Assigned Car Number" means the vehicle number that is assigned by NASCAR for use by the Team Owner, pursuant to NASCAR Rules. As of the Execution Date, the Assigned Car Number that is assigned for use by the Team Owner, pursuant to NASCAR Rules, and subject to the rights of the Team Owner set forth in this Agreement is set forth on Schedule 1.

"At Event Assets" has the meaning set forth in Section 6.9.2

"Bankruptcy" means, with respect to a Person, (i) a general assignment for the benefit of the creditors of such Person, (ii) a voluntary petition in bankruptcy by such Person, (iii) the adjudication of such Person as bankrupt or insolvent, (iv) the entering against such Person of an order for relief in any bankruptcy or insolvency proceeding, (v) the filing by such Person of a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any bankruptcy statute, law or regulation, (vi) such Person's seeking, consenting to or acquiescing in, in each case in writing, to the appointment of a trustee, receiver or liquidator of the Person or all or any substantial part of such Person's properties, (vii) such Person's failure to obtain the dismissal, within sixty (60) days after the commencement thereof, of any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, foreclosure or similar relief under any statute, law or regulation, (viii) such Person's failure to cause to be vacated or stayed, within sixty (60) days after the appointment without

53

HIGHLY CONFIDENTIAL - OCO

23XI_0004533

such Person's consent or acquiescence, of a trustee, receiver or liquidator of the Person or of all or any substantial part of such Person's properties or (ix) such Person's failure to vacate an appointment described in clause (viii) of this sentence within sixty (60 days of the expiration of any such stay).

"BMG" means each active branded manufacturer group (e.g., Chevrolet, Ford, and Toyota.

"Broadcast Partner" means any Person other than NEM or any of its Affiliates to whom NEM (or any of its Affiliates) has granted Live Transmission Rights in respect of any Event pursuant to a Live Transmission Contract.

"Business Day" means any day (other than a Saturday, Sunday or legal holiday) on which banks are open for business in New York, New York.

"Car/Driver Sponsor Advertising" has the meaning set forth in Section 6.3.

"Chairperson" has the meaning set forth in Section 3.5(d)(ii)

"Charter Member Agreement" means any agreement that grants (i) guaranteed entry in an Event and (ii) the right to be eligible for the Charter Team Points Pool Money.

"Charter Member Fees" has the meaning set forth in Section 3.1(g).

"Charter Member Group" has the meaning set forth Section 3.5(a).

"Charter Member Increase" has the meaning set forth in Section 3.3(a).

"Charter Members" means, collectively, the Team Owner and other teams who are currently or hereafter may be a party to a then-current Charter Member Agreement.

"Charter Shortfall" has the meaning set forth in Section 4.1.

"Charter Team Points Pool Money" means all Points Pool Money other than the money attributable to the Fixed Owner's Plan-Open Teams as specified in Exhibit B.

"Claims" has the meaning set forth in Section 10.3.

"Competitors" means, as of the date of any such determination, the Team and the Other Teams that are licensed to and competing in the Cup Series season.

"Competitor Tire Shop" has the meaning set forth in Exhibit C.

"Confidential Information" means, collectively, this Agreement, the terms hereof, any all proprietary information or materials provided by NEM, Team Owner, Control Person or any of their respective Affiliates in connection herewith or in furtherance of their respective rights or obligations hereunder, including any Transfer Approval Forms, and any proprietary information or materials disseminated at, prior to or in connection with any Team Owner Council meeting, in each case that are clearly marked at the time of delivery as confidential.

"Contingency Awards" mean certain monies awarded to Competitors for meeting, completing or exceeding certain award criteria or performance goals as specified in each such contract that awards such amounts. The Team Owner acknowledges and agrees that eligibility for any Contingency Awards shall be based on or require the Competitors use or display sponsors product and/or decal to be eligible for such award.

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 216 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004534

"Control Person" means the individual person identified by the Team Owner from time to time who (i) directly or indirectly owns a Controlling Interest and at least a 30% equity interest in the Team Owner, (ii) has the authority with respect to NASCAR Core Matters that is set forth in Section 9.1(c) and (iii) has executed and delivered this Agreement or a joinder hereto.

"Controlling Interest" means any direct or indirect equity interest in the Team Owner that, if Transferred, would Transfer the Control Person's effective authority to bind the Team Owner for purposes of this Agreement and NASCAR Core Matters.

"Cup Series" means the NASCAR racing series known, as of the Execution Date, as the NASCAR Cup Series, and any successor thereto, regardless of its name or sponsor, so long as such successor series is identified by NEM and NASCAR as the highest and most premium NASCAR stock car racing series, and publicly held up and promoted by NEM and NASCAR as such.

"Cup Series Points Event" means each Event that is included in the Cup Series where championship points are awarded.

"Designated Courts" has the meaning set forth in Section 12.4.

"Designated Team Representative" means a then-current director or officer of the Team Owner to whom the Control Person has granted the authority with respect to NASCAR Core Matters that is set forth in Section 10.1.3.

"Designated Vehicle" means any stock car that (i) complies with NASCAR Rules, (ii) is owned (or leased) and operated by the Team Owner, (iii) is assigned the Assigned Car Number, and (iv) is authorized to compete in Events pursuant to this Agreement, the Driver Agreement and applicable NASCAR Rules.

"Dilutive Amount" has the meaning set forth in Section 3.4(i).

"Dispute" means any dispute, disagreement, controversy or claim between the parties hereunder (including any of their respective officers, directors, shareholders, partners, members, agents, representatives and attorneys) that arises under or in connection with this Agreement and except as otherwise provided in Section 11.1, is not a dispute, disagreement, controversy or claim regarding the application, interpretation or enforcement of NASCAR Rules.

"Driver" means any driver that has executed and delivered (i) a binding agreement with the Team Owner to compete in the Events driving the Designated Vehicle and (ii) the Driver Agreement with NEM with respect to the Designated Vehicle. Notwithstanding that a Driver may have executed a Driver Agreement for one or more other Team Owner vehicle(s), the Driver must execute and deliver a current Driver Agreement specifically for the Designated Vehicle before being allowed to compete in the Designated Vehicle. At the time that the Team Owner intends to have the Driver drive the Designated Vehicle, the Driver must be a Member in good standing; hold a current, valid Cup Series driver license.

"Driver Agreement" has the meaning set forth in Section 6.4.

"Effective Date" means January 1, 2025, except as otherwise provided herein.

"Event" means the time period of activities during a competitive stock car racing Cup Series racing event sanctioned by NEM in accordance with the NASCAR Rules which includes all periods for registration (including without limitation review and approval), inspections, all Practices, Qualifying and Qualifying Races, as provided in Section 9 of the NASCAR Rules position determination, the Race, Post-Race and

HIGHLY CONFIDENTIAL - OCO

23XI_0004535

rain or postponed dates related thereto (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date).

"Event Data" means all data and other information arising from and during one or more Events that is collected (i) by or on behalf of NEM or its Affiliates or (ii) by the Team Owner, its Affiliates or any other Person (other than, in the case of clauses (i) and (ii), Trade Secrets), it being understood the Team Owner will have no obligation to collect any such Event Data that is not currently collected as of the Execution Date unless the expenses attributable thereto are satisfied by NEM or its Affiliates in accordance with the immediately following sentence. To the extent Event Data is collected by or on behalf of NEM or its Affiliates, it shall be collected at the expense of (a) a Broadcast Partner, in the case of certain Event Data exploited via the Live Transmission Activities or (b) NEM or any of its Affiliates. NEM (on its own behalf and on behalf of its Affiliates) and the Team Owner agree that any Event Data that is commercially exploited (which, for clarity, shall not include any use by NEM of its Affiliates for competition or officiating purposes in which Event Data is not disseminated to the general public) shall be exploited only via Live Transmission Activities.

"Exclusivity Breach" has the meaning set forth in Section 6.9.1.

"Execution Date" means[            ].

"Exempt 10% Owner" has the meaning set forth in Section 6.6.

"Extension Notice" has the meaning set forth in Section 2.2.

"Extension Term" has the meaning set forth in Section 2.2.

"Family Relatives" means, with respect to any Person, such Person's spouse, mother, father, brothers, sisters and lineal descendants (including those related by adoption and spouses of lineal descendants) and trusts for the benefit of any of the foregoing.

"Field Shortfall" has the meaning set forth in Section 4.1.

"Field Size" means the total number of Competitors authorized by NEM to start any Race.

"Force Majeure Event" means any act, event or condition (except, in each case, for the payment of money), which is beyond the reasonable control of the party asserting the Force Majeure (as defined below), which wholly or partially prevents or delays the performance of any of the duties, responsibilities or obligations of the party asserting the Force Majeure. The term "Force Majeure" shall include, but not be limited to, an act of God; an act of the public enemy; civil disturbance or unrest;; injunctions; lightning; fire, explosion or other serious casualty; terrorist attack (or threats thereof); epidemics; strike, lock-out or labor dispute (without regard to the reasonableness of any party's demands or any party's ability to satisfy such demands); accident or sabotage; unusually severe weather (including hurricane, earthquake, tornado, landslide or flood); war (whether declared or not or threats thereof); blockades; embargoes; condemnation or other taking by the action of any governmental body on behalf of any public, quasi-governmental or private entity; provided, however, for purposes of this Agreement, any crash, accident or other damage to the Designated Vehicle resulting from competition at an Event shall not be deemed a Force Majeure Event.

"Fuel Sponsor" means any sponsor, that at any time, with which NEM or any of its Affiliates enters into a sponsorship (or similar) agreement that sells products or services in Fuel Category.

"Good Standing" means Team Owner is not in material breach of this Agreement and otherwise complying with the Minimum Performance Standards in all material respects (or, in each case, such breach or non-

56

HIGHLY CONFIDENTIAL - OCO

23XI_0004536

compliance being waived by NEM in its sole discretion), and in NEM's reasonable discretion, is working cooperatively to enhance the growth of the sport, which shall include, but is not limited to, assistance with the Driver Ambassador Program and non-disparagement of the sport as a business.

"Governing Documents" means all agreements and documents affecting the ownership, control, financing or management of a Person (including, as applicable, its certificate of limited partnership and agreement of limited partnership, formation and limited liability company agreement, certificate of incorporation, bylaws and other governing documents).

"Indemnified Party" has the meaning set forth in Section 11.3.

"Indemnifying Party" has the meaning set forth in Section 11.3.

"Initial Term" has the meaning set forth in Section 2.1.

"Interim Equitable Relief" has the meaning set forth in Section 12.4.

"Invitational Events" are those non-points Events that are included in the Cup Series schedule to which certain qualifying Charter Member Teams are invited to participate. And so long as they meet the qualifications as determined by NASCAR, Other Teams may also be invited to participate. Invitational Events include, as of the Execution Date, the NASCAR All Star Series Event and the Clash.

"Invitational Pool Money" means, in any given Year, the Race Purse for each Invitational Event.

"Live Transmission" means the live transmission, distribution or exhibition of audio-visual signals of the performance of a NASCAR national series event (including the Events), and any replay(s) thereof if granted as part and parcel of a grant of Live Transmission Rights, by any means, process, medium, distribution platform, method or device, whether now known or hereafter developed, including, without limitation, by broadcast television signal, cable television signal, Direct Broadcast Satellite, the Internet, and/or could be offered to consumers on a Pay Per View or subscription basis etc. within the United States, its territories, possessions and commonwealths, plus Bermuda.

"Live Transmission Activity" has the meaning specified in Section 5.5(c).

"Live Transmission Contract" means any contract, agreement or other enforceable obligation, whether oral or written, entered into between a NASCAR Rights Affiliate and any Broadcast Partner, for the license, assignment or other transfer of any Live Transmission Rights. The current Live Transmission Contract is for years 2025-2031 (inclusive).

"Live Transmission Rights" means any and all rights to engage in a Live Transmission and directly related activity (for example, delayed transmissions, single re-transmissions, and support shoulder programming.) For clarity, and without limiting the foregoing, Live Transmission Rights include the right to offer the Live Transmission Rights of an Event to mobile devices, tablets, computers, connected TVs, virtual reality viewing devices, hologram viewing devices, etc. For further clarity, without limiting the foregoing, the Live Transmission Rights of an Event could be included as part of what is commonly known as a "TV Everywhere offering," and/or could be offered directly to consumers or delivered as part of any other type of offering now known or hereafter developed.

"Material Sponsor" has the meaning set forth in Section 5.4.

"Media Revenues" means all monies, other than Other Awards, actually received, subject to Section 4.3(a), by NEM or a NASCAR Rights Affiliate pursuant to a Live Transmission Contract that relates to Live

57

HIGHLY CONFIDENTIAL - OCO

23XI_0004537

Transmission of the NASCAR Cup Series (and, if aggregated with the NASCAR Cup Series, of the NASCAR Xfinity Series) and NASCAR Craftsman Truck Series (or their successors).

"Member" has the meaning given to it in the NASCAR Rule Book.

"Minimum Performance Standard" has the meaning set forth in Section 6.12.

"MPS Notice" has the meaning set forth in Section 6.12.

"NASCAR" has the meaning given to it in the Recitals.

"NASCAR Core Matters" has the meaning set forth in Section 10.1.3

"NASCAR Recipients" has the meaning set forth in Section 5.2.

"NASCAR Rights Affiliate" means any Person that is (i) an Affiliate or an assignee of NEM and (ii) engaged in the business of exploiting Live Transmission Rights or Ancillary Rights for purposes of performing any necessary activities incident thereto. NEM may arrange for, coordinate, supervise, determine, or control certain Event-related activity related to the immediately preceding, or act in other capacities relative to the Live Transmission Rights or Ancillary Rights; however, NEM is not engaged in the business of exploiting Live Transmission Rights or Ancillary Rights and, accordingly, is not a NASCAR Rights Affiliate.

"NASCAR Rule Book" means the NASCAR Cup Series Rule Book, as it may be amended, supplemented or otherwise modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NASCAR Rules" means the NASCAR Rule Book and all other rules, regulations, guidelines, directives, memoranda, resolutions, bulletins and agreements (including all agreements and other documents with respect to Drivers, sponsorship or media rights) of NASCAR, or any of its Affiliates, in each case as they may be amended or modified from time to time by NASCAR or any of its Affiliates in accordance with this Agreement.

"NEM" has the meaning set forth in the Preamble.

"NEM Indemnified Parties" means, collectively, NEM, its Affiliates and each of their respective agents, representatives, Affiliates, employees, shareholders, managers, members, officers and directors.

"NEM Permitted Transferee" has the meaning set forth in Section 8.4.

"Negotiation Period" has the meaning set forth in Section 2.3.

"Net Recovery" has the meaning set forth in Section 4.3(a).

"Non-Fuel Products" has the meaning set forth in Exhibit C.

"Nonrenewal Events" has the meaning set forth in Section 2.2.

"OEM" has the meaning set forth in Section 8.1.3

"Other Awards" shall mean awards paid to a NASCAR Rights Affiliate and awarded to the Driver (which may be waived by Driver in writing to be paid to Team) for the mid-season tournament from Warner Brothers Discovery and any successor promotion by a Broadcast Partner.

58

HIGHLY CONFIDENTIAL - OCO

"Other Teams" means each of the stock car racing teams authorized by NEM to participate in the Cup Series from time to time, other than the Team.

"Owner" means any Person who, directly or through any intermediate corporations, partnerships, limited liability companies or other Persons, owns of record or beneficially an equity interest in the Team Owner.

"Permitted Contractual Reduction" has the meaning set forth in Section 4.3(a).

"Person" means any individual, corporation, association partnership (general or limited), joint venture, trust, estate, limited liability company or other legal entity or organization.

"Points Pool Money" means, in any given Year, the sum of Race Purse for all Cup Series Points Events (which includes the Qualifying Races for the Daytona 500), Fixed Owner's Plan – Charter Teams, Fixed Owner's Plan – Open Teams, and Year-End Point Fund in such Year, in each case as set forth in Exhibit B.

"Pool Money" means in any given Year the sum of Invitational Pool Money and Points Pool Money.

"Practices" has the meaning set forth in the NASCAR Rule Book.

"Private Event" means an automobile or truck motorsports event which is non-commercial (i.e., track rental or automobile club). Non-commercial under this definition shall mean that Team Owner(s) does not receive consideration for the Private Event, including without limitation payment for i) any broadcast or exhibition in any media, ii) ticket sales, and/or iii) sponsorships.

"Prohibited Person" is a Person whose association with NEM or NASCAR would in NASCAR's reasonable opinion adversely affect the NASCAR brand or the image of the sport of stock car racing. For example and without limitation, a Person may be determined to be a Prohibited Person if such Person is involved in a material way with a business or activity that is illegal or immoral (such as pornography, illegal gambling or illegal performance-enhancing substances).

"Promoter" means any track promoter hosting an Event at its facility.

"Qualifying" has the meaning set forth in the NASCAR Rule Book.

"Qualifying Open Participant" has the meaning set forth in Section 3.5(a).

"Qualifying Race" has the meaning set forth in the NASCAR Rule Book.

"Qualifying Sponsor" has the meaning set forth in Section 6.9.1

"Race" means the portion of the Event that does not include Practice or Qualifying (as such terms are defined in the NASCAR Rule Book as in effect on the Execution Date). For clarity, the Duels at Daytona and other similar race qualifying formats adopted after the Effective Date, if any, shall each individually be considered a "Race" for all purposes of this Agreement.

"Remaining Charter Members" has the meaning set forth in Section 4.3(a).

"Reserved Sponsor Categories" means, collectively, each Series Sponsor Category, the Tire Category and the Fuel Category.

"Rules Package" means the annual rules package and testing policy of the Cup Series, including the NASCAR Rules, for any Year.

59

HIGHLY CONFIDENTIAL - OCO

"Sanction Agreement" means the agreements between each of the Promoters and NEM, whereby NEM agrees to conduct and officiate an Event at a facility operated by the applicable Promoter.

"Season" means the NASCAR Cup Series race season that occurs in a Year.

"Series Sponsor" means any title and presenting sponsor of the Cup Series. At any given time there may be only one Series Sponsor and only one Series Sponsor Category.

"Series Sponsor Category" has the meaning set forth in Exhibit C as amended from time to time in accordance with the terms hereof.

"Series Sponsor Change" has the meaning set forth in Section 6.9.1

"Special Awards" means those awards given to Competitors by the Reserved Category Sponsors.

"Specified NASCAR Entities" has the meaning set forth in the Preamble.

"Submission Date" has the meaning set forth in Section 12.2.

"Substitute Control Person" means an alternate individual person set forth and designated on Schedule 1 who is authorized to act on behalf of or bind the Team Owner in the absence, incapacity or death of the Control Person.

"Taxes" means all taxes, duties, levies and other similar charges, including related interest, additions to tax and penalties.

"Team" means the NASCAR racing team set forth on Schedule 1.

"Team Affiliates" means, with respect to each Team Owner, collectively, (a) all Affiliates of such Team Owner whose business pertains to competing in the Cup Series, (b) each Driver or crew member who is employed, engaged or otherwise controlled by such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, and (c) the officers, employees, agents, and representatives of such Team Owner or any of its Affiliates whose business pertains to competing in the Cup Series, but with respect to (a) through (c) above, only if such Person is directly responsible for the participation of the Team's Designated Vehicle in the Events for Team Owner.

"Team Clips" has the meaning set forth in Section 5.4.

"Team Co-Chair" has the meaning set forth in Section 3.5(a).

"Team Intellectual Property" means the image, likeness, name, performance, and voice of Team Owner, Team or Team Affiliates or the Designated Vehicle; all names, words, symbols, emblems, logos, slogans, depictions, trade dress, trademarks, service marks, trade names, patents, copyrights, domain names, and other intellectual property owned or controlled by Team Owner or Team or Team Affiliates; and the Assigned Car Number.

"Team Owner" means the domestic U.S. entity set forth on Schedule 1 that directly and wholly owns, controls and operates the Team as provided herein.

"Team Owner Council" means the body of NEM representatives and designees of Charter Members and Open Team Members who meet and confer as provided in Section 3.5. As of the Execution Date, the Team Owner Council members for the Team Owner are set forth on Schedule 1. The Control Person shall have the right to remove or replace any Team Owner Council member at any time upon written notice to NEM, provided that such Person meets the requirements set forth in Section 6.5.

60

HIGHLY CONFIDENTIAL - OCO

23XI_0004540

"Team Owner Council Representative" has the meaning set forth in Section 3.5(a).

"Team Owner Event of Default" has the meaning set forth in Section 9.1.

"Team Owner Indemnified Parties" means, collectively, the Team Owner, the Control Person and each of their respective Affiliates, and each of their respective agents, representatives, Affiliates, employees, shareholders (or equivalent), managers, members, officers and directors.

"Team Owner Parties" means, collectively, the Team Owner and the Control Person.

"Term" has the meaning set forth in Section 2.1.

"Territory" shall be the United States and its territories, Canada and Mexico.

"Third Party Claim" has the meaning set forth in Section 11.3.

"Tire Category" has the meaning set forth in Exhibit C.

"Tire Sponsor" means the single sponsor with which NEM or any of its Affiliates enters into a sponsorship and supply (or similar) agreement with respect to, and that sells products or services in, the Tire Category.

"Trade Secret" means all data and other information collected by the Team Owner or one of its Affiliates or NEM or one of its Affiliates (i) pertaining to Team Owner or its operations (and not otherwise available to other Competitors), (ii) that provides the Team Owner (or one of its Affiliates) with an actual and independent competitive advantage from not being generally known to or readily ascertainable through appropriate means by other Competitors who would obtain a competitive advantage (or would materially negate Team Owners (or one of its Affiliates) competitive advantage) from its disclosure or use, and (iii) (to the extent controlled by Team Owner) is the subject of efforts by the Team Owner or such Affiliate that are reasonable under the circumstances to maintain its secrecy, provided that, (A) once any such data or other information is disseminated and known to the general public it shall no longer be deemed a Trade Secret and (B) notwithstanding the foregoing, any data or other information arising from and during one or more Events that was commercially exploited during the 2015 Cup Series season via any Live Transmission Activity shall not be deemed a Trade Secret. For clarity, neither the Team Owner nor any of its Affiliates nor NEM nor any of its Affiliates may commercially exploit (or authorize or license any Person the rights to commercially exploit) any Trade Secret, provided that the foregoing shall not preclude the use of any Trade Secret by (x) Team Owner or its Affiliates for non-public competition purposes or the use by Team Owner or its Affiliates or Team Owner's BMG or applicable vendor, as the case may be, pursuant to requirements of agreements under which such Trade Secret was invented or developed, or (y) NEM or its Affiliates for non-public (and, for clarity, not disclosed to any other Competitor) competition or officiating purposes. NEM and its Affiliates shall maintain the confidentiality of Trade Secrets known to NEM, unless Team Owner agrees otherwise in writing.

"Traditional Broadcast Deal" means NEM or its Affiliates contract with third party(ies) paying a fixed license fee for the Live Transmission (i.e., not an earn out, or ad- or subscription-based, or any other performance-based fee structure, etc.) of the Events.

"Transfer" means (i) when used as a noun: any direct or indirect transfer, sale, assignment, or other disposition (including the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law) and (ii) when used as a verb: to directly or indirectly transfer, sell, assign, or otherwise dispose of (including through the issuance of equity in a Person), whether for value or no value and whether voluntary or involuntary (including by operation of law).

61

HIGHLY CONFIDENTIAL - OCO

"Transfer Approval Form" has the meaning set forth in Section 8.1.2.2

"Transfer Fee" has the meaning set forth in Section 8.1.2.2

"Transfer Notice" has the meaning set forth in Section 8.1.2.2

"Victory Tour" has the meaning set forth in the Driver Agreement.

"Works" means all film, audio only, video only, audio-visual, photographic images, sounds and Event Data (including in-car audio, in-car video, in-car radio, other electronic transmissions between cars and crews, and timing and scoring information) arising from and during any Event.

"Year" means (i) the period commencing as of January 1, 2025 and ending on December 31, 2025, and (ii) each subsequent twelve-month period beginning on January 1 and ending on December 31 of any year of the Term.

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 224 of 241

HIGHLY CONFIDENTIAL - OCO                                                              23XI_0004542

# **Exhibit B**

## Timing of Payments of Pool Money

Race Purse and Fixed Owner's Plan monies will be paid within 5 Business Days subsequent to final race results for each Event (with the exception of the Qualifying Races for Daytona 500 and the Clash, which will be paid within 5 Business Days subsequent to final race results of the Daytona 500).

Year-End Point Fund monies will be paid within 30 calendar days subsequent to final race results for each Year.

Timely remittance of all monies is subject to submission of all banking, tax and other administrative information reasonably requested by NEM, including information required to comply with federal, state and local tax laws.

## Pool Money

| | | | | | $000's | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031 (a)** |
| **Total Pool Money** | $431,373 | $437,043 | $447,055 | $450,662 | $458,614 | $462,312 | $444,558 - 468,209 |
| | | | | | | | |
| **Uses of Funds** | | | | | | | |
| Race Purse (Points events) | 118,014 | 121,555 | 125,201 | 128,957 | 132,826 | 136,811 | 133,797 - 140,915 |
| Race Purse (Invitational events) | 6,005 | 6,186 | 6,371 | 6,562 | 6,759 | 6,962 | 6,809 - 7,171 |
| Fixed Owner's Plan | 182,136 | 180,329 | 182,640 | 178,314 | 178,096 | 173,378 | 161,989 - 170,607 |
| *Per Charter* | *5,059* | *5,009* | *5,073* | *4,953* | *4,947* | *4,816* | |
| Performance Plan | 91,505 | 94,250 | 97,078 | 99,990 | 102,990 | 106,080 | 103,743 - 109,262 |
| Year-End Point Fund | 33,712 | 34,723 | 35,765 | 36,838 | 37,943 | 39,081 | 38,220 - 40,254 |
| **Pool Money** | **431,373** | **437,043** | **447,055** | **450,662** | **458,614** | **462,312** | **444,558 - 468,209** |
| *Per Charter* | *11,983* | *12,140* | *12,418* | *12,518* | *12,739* | *12,842* | *12,349 - 13,006* |

Race-specific purses to be communicated to Teams by November 1st of the prior year

(a) Final number to be delivered to Teams by September 1, 2029

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 225 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004543

**Race Purse Payout Curve For Cup Series Points Events (a)**

| Finish Position | Payout Percentage | Finish Position | Payout Percentage |
|:---:|:---:|:---:|:---:|
| 1 | 5.160% | 21 | 2.399% |
| 2 | 4.067% | 22 | 2.318% |
| 3 | 3.976% | 23 | 2.237% |
| 4 | 3.885% | 24 | 2.157% |
| 5 | 3.794% | 25 | 2.076% |
| 6 | 3.704% | 26 | 1.995% |
| 7 | 3.613% | 27 | 1.915% |
| 8 | 3.522% | 28 | 1.834% |
| 9 | 3.432% | 29 | 1.753% |
| 10 | 3.341% | 30 | 1.672% |
| 11 | 3.250% | 31 | 1.597% |
| 12 | 3.165% | 32 | 1.521% |
| 13 | 3.079% | 33 | 1.445% |
| 14 | 2.993% | 34 | 1.370% |
| 15 | 2.908% | 35 | 1.294% |
| 16 | 2.822% | 36 | 1.218% |
| 17 | 2.736% | 37 | 1.143% |
| 18 | 2.651% | 38 | 1.057% |
| 19 | 2.565% | 39 | 0.971% |
| 20 | 2.479% | 40 | 0.886% |

(a) The Race Purse Payout Curve for the Daytona 500 Qualifying Races will be determined annually based on past practices and the number of entrants

HIGHLY CONFIDENTIAL - OCO

23XI_0004544

**Fixed Owner's Plan payouts**

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 (a) |
|---|---|---|---|---|---|---|---|
| | | | | $000's | | | |
| Fixed Owner's Plan | $182,136 | $180,329 | $182,640 | $178,314 | $178,096 | $173,378 | 161,989 - 170,607 |
| Fixed Amount Per Points Event | $5,059 | $5,009 | $5,073 | $4,953 | $4,947 | $4,816 | *$4500 - $4739* |
| Fixed Amount Per Charter / Per Event | $141 | $139 | $141 | $138 | $137 | $134 | $125 - 132 |

Case 3:24-cv-00886-KDB-SCR    Document 454-61    Filed 11/21/25    Page 227 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004545

**Performance Plan Payout Methodology**

Performance Plan is a share-based model, calculated annually using a combination of rolling 2-year Owner Points finishes

**Rolling 2-year Owner Points Shares**

- 36 shares given to the best average Charter Team Owner Points finish over the past 2 years, declining to 1 share for 36th best average Charter Team Owner Points finish
- Most recent year weighted at 100%, 2nd most recent year at 50%
- In the event of a tie in Charter Team Owner Points in a given season, teams that are tied will both receive credit for their tied position (e.g., if two teams tied for 10th, then both teams would receive credit for a 10th place finish in that season)
- In the event of a tie in average Charter Team Owner Points finish over the past 2 years, then the shares would be split across the tied Teams (e.g., if two Teams tied for 5th in average Charter Team Owner Points finish over the past 2 years, then each of those two Teams would split the shares for 5th and 6th place, resulting in 31.5 shares for each Team – 32 shares for 5th, 31 shares for 6th, average of 31.5 shares)

A Charter's rolling 2-year Owner Points shares are divided by the total number of outstanding shares to determine the percentage of total Performance Plan money to be paid out to the Charter in the following season.

Given the rolling nature of the calculation, NEM will notify all Charter Teams of their Performance Plan payout for the following season within 30 calendar days subsequent to the final race results for each Season.

Case 3:24-cv-00886-KDB-SCR    Document 454-61    Filed 11/21/25    Page 228 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004546

## Year-End Point Fund Payout

| Finish Position | Payout Percentage | $000's | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
| 1 | 8.423% | $2,840 | $2,925 | $3,013 | $3,103 | $3,196 | $3,292 | $3219 - $3391 |
| 2 | 7.138% | $2,406 | $2,479 | $2,553 | $2,630 | $2,708 | $2,790 | $2728 - $2873 |
| 3 | 6.853% | $2,310 | $2,379 | $2,451 | $2,524 | $2,600 | $2,678 | $2619 - $2759 |
| 4 | 6.567% | $2,214 | $2,280 | $2,349 | $2,419 | $2,492 | $2,567 | $2510 - $2644 |
| 5 | 6.282% | $2,118 | $2,181 | $2,247 | $2,314 | $2,383 | $2,455 | $2401 - $2529 |
| 6 | 5.996% | $2,021 | $2,082 | $2,145 | $2,209 | $2,275 | $2,343 | $2292 - $2414 |
| 7 | 5.711% | $1,925 | $1,983 | $2,042 | $2,104 | $2,167 | $2,232 | $2183 - $2299 |
| 8 | 5.425% | $1,829 | $1,884 | $1,940 | $1,998 | $2,058 | $2,120 | $2073 - $2184 |
| 9 | 5.068% | $1,709 | $1,760 | $1,813 | $1,867 | $1,923 | $1,981 | $1937 - $2040 |
| 10 | 4.783% | $1,612 | $1,661 | $1,711 | $1,762 | $1,815 | $1,869 | $1828 - $1925 |
| 11 | 4.497% | $1,516 | $1,562 | $1,608 | $1,657 | $1,706 | $1,758 | $1719 - $1810 |
| 12 | 4.212% | $1,420 | $1,462 | $1,506 | $1,551 | $1,598 | $1,646 | $1610 - $1695 |
| 13 | 3.926% | $1,324 | $1,363 | $1,404 | $1,446 | $1,490 | $1,534 | $1501 - $1580 |
| 14 | 3.569% | $1,203 | $1,239 | $1,276 | $1,315 | $1,354 | $1,395 | $1364 - $1437 |
| 15 | 3.284% | $1,107 | $1,140 | $1,174 | $1,210 | $1,246 | $1,283 | $1255 - $1322 |
| 16 | 2.998% | $1,011 | $1,041 | $1,072 | $1,104 | $1,138 | $1,172 | $1146 - $1207 |
| 17 | 2.698% | $910 | $937 | $965 | $994 | $1,024 | $1,055 | $1031 - $1086 |
| 18 | 2.384% | $804 | $828 | $853 | $878 | $905 | $932 | $911 - $960 |
| 19 | 2.099% | $707 | $729 | $751 | $773 | $796 | $820 | $802 - $845 |
| 20 | 1.799% | $606 | $625 | $643 | $663 | $683 | $703 | $688 - $724 |
| 21 | 1.499% | $505 | $521 | $536 | $552 | $569 | $586 | $573 - $603 |
| 22 | 1.199% | $404 | $416 | $429 | $442 | $455 | $469 | $458 - $483 |
| 23 | 0.899% | $303 | $312 | $322 | $331 | $341 | $352 | $344 - $362 |
| 24 | 0.571% | $193 | $198 | $204 | $210 | $217 | $223 | $218 - $230 |
| 25 | 0.286% | $96 | $99 | $102 | $105 | $108 | $112 | $109 - $115 |
| 26 | 0.214% | $72 | $74 | $77 | $79 | $81 | $84 | $82 - $86 |
| 27 | 0.200% | $67 | $69 | $71 | $74 | $76 | $78 | $76 - $80 |
| 28 | 0.186% | $63 | $64 | $66 | $68 | $70 | $73 | $71 - $75 |
| 29 | 0.171% | $58 | $59 | $61 | $63 | $65 | $67 | $65 - $69 |
| 30 | 0.164% | $55 | $57 | $59 | $60 | $62 | $64 | $63 - $66 |
| 31 | 0.157% | $53 | $55 | $56 | $58 | $60 | $61 | $60 - $63 |
| 32 | 0.154% | $52 | $54 | $55 | $57 | $59 | $60 | $59 - $62 |
| 33 | 0.151% | $51 | $53 | $54 | $56 | $57 | $59 | $58 - $61 |
| 34 | 0.148% | $50 | $52 | $53 | $55 | $56 | $58 | $57 - $60 |
| 35 | 0.146% | $49 | $51 | $52 | $54 | $55 | $57 | $56 - $59 |
| 36 | 0.143% | $48 | $50 | $51 | $53 | $54 | $56 | $55 - $57 |
| **Total Year-End Point Fund** | | $33,712 | $34,723 | $35,765 | $36,838 | $37,943 | $39,081 | $38,220 - 40,254 |

Case 3:24-cv-00886-KDB-SCR    Document 454-61    Filed 11/21/25    Page 229 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004547

**Exhibit C**

**Reserved Sponsor Categories**

1.      Series Sponsor Category.

2.      Tire Category. means tires for any type of vehicle, including passenger cars, vans, sport utility vehicles (SUVs), light trucks, commercial trucks, trailers, motorcycles, aircraft, mopeds, scooters and recreational vehicles (RVs), including racing tires for any of the foregoing vehicles. "Competitor Tire Shop" means a tire retailer, wholesaler, retreader installer or repair facility that: (i) includes the name of a single competitor tire brand (e.g., with respect to Goodyear (the Tire Sponsor as of the Execution Date), Firestone Complete Auto Care); or (ii) is owned or operated by any Person that owns a third-party competitor tire brand and gives preferential treatment to a single competitor brand or affiliate brands.  The Team Owner or Control Person shall be permitted to include on the Designated Vehicle the branding of a retail tire company and/or repair facility which features the word "tire" in conjunction with the company name (e.g., Discount Tire), provided that such third party retailer/repair facility is not a Competitor Tire Shop.

3.      Fuel Category. means combustion-based fuel and fuel blends for automotive vehicles, including hydro carbon-based, diesel, biodiesel, hydrogen, ethanol, or other alternative fuels and fuel blends.  Notwithstanding the foregoing, a company in the Fuel Category may also manufacture lubricants (i.e., motor oil, etc.) and other products or offer other services (i.e., convenience stores) other than automotive fuel (collectively "Non-Fuel Products").  Such Non Fuel Products sponsorships are permitted subject to NEM approval and the conditions outlined below.  Companies in the Fuel Category may sponsor a Team Owner Party or the Team for Non-Fuel Products, provided that the Designated Vehicle and the Team's uniforms, hauler and at-track equipment, etc., cannot feature the brand, logo, trademark, product or service identification of a (i) fuel, (ii) fuel retailer, or (iii) a corporate name of a company in the Fuel Category.  Further, no Team Owner Party may advertise or promote a product or service which includes a brand, logo, or trademark of, or where the advertisement or promotion features a brand, logo, or trademark of a (i) fuel, (ii) fuel retailer, or (iii) the corporate name of a company in the Fuel Category, whether, in or out of uniform.  For example, the Driver or Team Owner may enter into agreements with convenience stores as long as such convenience stores are not branded by a company in the Fuel Category (e.g. 7-Eleven, Circle K, Sheetz, WaWa).  Companies in the Fuel Category may sponsor the Designated Vehicle, the Driver or the Team for a lubricant or other similar product as long as they are not branded by a company in the Fuel Category.  It is agreed and understood that the Team Owner Parties may not use their NASCAR themed property to promote and/or advertise foreign produced ethanol and/or non-corn based ethanol or advocate for any specific ethanol based consumer fuel blend (e.g. E15, E30).  Team Owner may promote American ethanol and American ethanol related services provided that such advertising and promotions is approved in writing by NEM.

68

HIGHLY CONFIDENTIAL - OCO

23XI_0004548

**Exhibit D**

**Logos**

The NASCAR logo and the NASCAR Series logo will only be used as follows:

HIGHLY CONFIDENTIAL - OCO    23XI_0004549

## Exhibit E

## 2025 LOGO PLACEMENT GUIDELINES





70

HIGHLY CONFIDENTIAL - OCO

23XI_0004550

FUEL PORT SPECIFICATIONS – AMERICAN ETHANOL BRANDING

Case 3:24-cv-00886-KDB-SCR     Document 454-61     Filed 11/21/25     Page 233 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004551

**Exhibit F**

**WINDSHIELD SPECIFICATIONS**

**DRIVER'S NAME AND MANUFACTURER'S LOGO**







Font: Berthold Akzidenz Grotesk Extra Bold Condensed Italic        Height: 3.5 Inches

Color: White        Chevrolet Logo: 2.18" x 6.71"

72

HIGHLY CONFIDENTIAL - OCO        23XI_0004552

**Exhibit G**

**Institutional Investors Policy**

The following restrictions and regulations apply to the ownership and acquisition of passive, minority interests in one or more Charter Members by private investment funds ("Funds").

1.      A Fund, together with its related Funds, shall not own a direct or indirect equity interest in a Charter Member that is greater than or equal to 49%.

2.      No Charter Member shall have more than 49% of its equity interests owned directly or indirectly by Funds .

3.      No Fund nor its representatives, managers or affiliates shall be permitted to serve as a Control Person, Designated Team Representative or in any management or governance role of a Charter Member or NASCAR team. Prior to the acquisition of any equity interest in a Charter Member that would make a Fund a Substantial Owner, NEM must approve such fund in its sole and absolute discretion.

4.      No Fund, together with its affiliates, shall own a direct or indirect equity interest in more than two (2) Charter Member ownership groups (groups owning one or more Charter Member).

5.      Any equity interest in a Charter Member that is directly or indirectly owned by a Fund shall be passive interest and the Fund shall not have any form of voting, management or consent rights with respect to such Charter Member or the applicable NASCAR team, other than customary fundamental consent rights such as with respect to (i) fundamental changes in the Charter Member's capital structure; (ii) affiliated party transactions with the Charter Member's Control Person and (iii) amendments to the governing documents of the Charter Member that are specifically intended to adversely and disproportionately affect the Fund in a material manner as compared to other equity owners.

6.      Funds [that are Owners of more than one (1) Charter Member] shall not have access to non-public competitive data (e.g., data related to race strategy or analytics) or any team personnel (e.g., driver, team manager, crew chief) or participate in or have access to any competitive decisions or decision making process.

7.      Notwithstanding anything to the contrary contained herein, no sovereign wealth fund shall be an Owner (other than as a limited partner in a Fund).  NEM acknowledges and agrees that no Fund that is a sovereign wealth fund is or will be a direct equity owner of NEM.

NEM agrees in good faith that the foregoing limitations shall not apply with respect to the ownership of Charter Members by sports holding conglomerates (e.g., Fenway Sports Group, Harris Blitzer Sports Entertainment and similar entities) and such conglomerates shall not constitute "Funds" for the purposes of this Exhibit G.

HIGHLY CONFIDENTIAL - OCO

23XI_0004553

## Exhibit H

## Sample Transfer Approval Form

[Date]

**Charter Agreement No**      [Number]                  [Effective Date]

**Transferor:**
**Charter Team Owner**     [Name]
                               [Contact Information]

**Control Person**         [Name]
                               [Contact Information]

**Transferee:**
**Team Owner**          [Name]
                                 [Contact Information]

**Control Person**         [Name]
                               [Contact Information]

***[Please attach Team Ownership Disclosure Document]***

**Charter Transfer Value**
                        **Total Consideration:**       [Amount]

**Requested Competition Number**               [Number]

**Does the Transferor Retain any interest in the above Charter?**     [Y/N]

        If yes, please describe:

*\*Please note that neither NEM nor its Affiliates represent, warrant, or in any way certify or confirm the accuracy of the above information. NEM and its Affiliates have not participated, nor assisted in the gathering or reporting of the above information and is provided solely for information purposes only. No liability, reliance or other claim shall be made against NEM of its Affiliates for providing the information contained in this document*

74

Case 3:24-cv-00886-KDB-SCR    Document 454-61    Filed 11/21/25    Page 236 of 241

HIGHLY CONFIDENTIAL - OCO

23XI_0004554

## Schedule 1

### Certain Designations and Disclosures

**Team Name:**        (**e.g. commonly used name of team**)         _____

**Assigned Car Number:**         _____

**Team Owner:**        (e.g. name of official corporate entity that owns the team)      _____

**Control Person:**        (e.g. team principal)      _____

**Substitute Control Person:**        (e.g.  President, COO, etc. to act in absence, incapacity or death of Control Person)      _____

**Designated Team Representative:**        (e.g. competition director)      _____

**Team Owner Council Representative:**        (e.g. director, owner, CEO, President, CFO or other senior executive appointed by Team Owner)      _____

**Initial Driver:**         _____

**Crew Chief:**         _____

**Manufacturer:**         _____

75

HIGHLY CONFIDENTIAL - OCO

23XI_0004555

**Ownership of Team Owner**

*[TEAM OWNER TO PROVIDE INFORMATION]*

(A)  *Each direct owner of Team Owner*:

(1)  Entity Name: _____

Contact Address: _____

_____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

(2)  Entity Name: _____

Contact Address: _____

_____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

(3)  Entity Name: _____

Contact Address: _____

_____

Please list below all Persons holding an ownership interest, whether direct or indirect, in such direct owner of Team Owner (including, with respect to any trust, all trustees and beneficiaries and a narrative description of beneficiaries' rights), including any applicable ownership percentages. The ownership percentages must sum to 100% and Team Owner may provide additional information, as needed, to clearly detail the ownership structure. This supplemental information should capture all owners of any entity that holds an ownership interest, ensuring that all layers of ownership, down to the ultimate beneficial owners, are fully disclosed.

*[ADD MORE ENTRIES IF NECESSARY]*

HIGHLY CONFIDENTIAL - OCO

23XI_0004556

(B)   *Each direct owner of an equity interest in any entity whose primary asset is a direct or indirect interest in Team Owner:*

    (1)    Entity Name: _____

             Contact Address: _____

             _____

             % Equity in Team Owner: _____

             Ultimate Beneficial Owner: _____

             Contact Number: _____

    (2)    Entity Name: _____

             Contact Address: _____

             _____

             % Equity in Team Owner: _____

             Ultimate Beneficial Owner: _____

             Contact Number: _____

    (3)    Entity Name: _____

             Contact Address: _____

             _____

             % Equity in Team Owner: _____

             Ultimate Beneficial Owner: _____

             Contact Number: _____

*[ADD MORE ENTRIES IF NECESSARY]*

HIGHLY CONFIDENTIAL - OCO

23XI_0004557

**Schedule 3**

**NEM FEE SCHEDULE\***

|  |  |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

    \* This chart reflects major team-related fees for participating in racing events.  Other fees during the year (e.g., tables at the Cup Banquet, filing an appeal) to be determined on an annual basis, with NEM acting reasonably and in a manner consistent with past practices.

HIGHLY CONFIDENTIAL - OCO

23XI_0004558

**Exhibit I**

**FORM OF DRIVER AGREEMENT**

HIGHLY CONFIDENTIAL - OCO    23XI_0004559